**Nos. 26-1141 & 26-1195**

# In the United States Court of Appeals
# for the First Circuit

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS - HARVARD FACULTY CHAPTER; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY; RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN FEDERATION OF TEACHERS; MIDDLE EAST STUDIES ASSOCIATION,

Plaintiffs–Appellees/Cross–Appellants,

v.

MARCO RUBIO, in the official capacity as Secretary of State; U.S. DEPARTMENT OF STATE; MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, in the official capacity as Acting Director of U.S. Immigration and Customs Enforcement; DONALD J. TRUMP, in the official capacity as President of the United States; UNITED STATES,

Defendants–Appellants/Cross–Appellees.

*On Appeal from the U.S. District Court*
*for the District of Massachusetts*
*Docket Number 1:25-cv-10685-WGY*

## DEFENDANTS–APPELLANTS'/CROSS–APPELLEES' PRINCIPAL BRIEF

BRETT A. SHUMATE
  *Assistant Attorney General*
  *Civil Division*
DREW C. ENSIGN
  *Deputy Assistant Attorney General*
PAUL F. STONE
  *Acting Chief,*
  *National Security Unit*
  *Office of Immigration Litigation*
LINDSAY M. MURPHY
  *Deputy Chief*

June 17, 2026

VICTORIA SANTORA
  *Senior Counsel for National Security*
JESSE BUSEN
  *Counsel for National Security*
  *Office of Immigration Litigation*
  *U.S. Department of Justice*
  *P.O. Box 878, Ben Franklin Station*
  *Washington, DC  20044-0878*
  *(202) 305-9647*

ATTORNEYS FOR DEFENDANTS-APPELLANTS/CROSS-APPELLEES

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

STATEMENT OF JURISDICTION ......................................................................5

STATEMENT OF THE ISSUES ...........................................................................5

STATEMENT OF THE CASE ...............................................................................6

I.    The United States Responds to an Increase in Antisemitic
      Violence and National Security Threats Since October 7, 2023 ..............6

II.   Complaint ......................................................................................................7

III.  Motion for a Preliminary Injunction..........................................................8

IV.   The District Court Sets Parameters for Discovery ...................................9

V.    The Bench Trial ..........................................................................................10

      A.    AAUP and MESA's Member Witnesses .........................................10

      B.    AAUP and MESA's Organizational Witness .................................15

      C.    The Government's Witnesses...........................................................15

VI.   Post-Trial Findings of Fact and Rulings of Law......................................17

VII.  January 22, 2026, Remedies Order ...........................................................19

SUMMARY OF THE ARGUMENT......................................................................20

STANDARD OF REVIEW ...................................................................................23

ARGUMENT .........................................................................................................24

I.    AAUP AND MESA LACKED STANDING...............................................24

      A.    AAUP and MESA Lacked Associational Standing.........................24

      B.    MESA Lacked Organizational Standing .......................................33

II.    JURISDICTION WAS BARRED BY 8 U.S.C. §§1252(b)(9) AND (g) ........................................................................38

      A.    8 U.S.C. §1252(b)(9)........................................................40

      B.    8 U.S.C. §1252(g) ............................................................46

      C.    None of The District Court's Reasons for Ignoring §§1252(b)(9) and (g) Have Merit.........................................49

III.   THE DISTRICT COURT ERRED IN FINDING A FIRST AMENDMENT VIOLATION ......................................................51

      A.    Aliens' First Amendment Rights are not Coextensive with Citizens' ..........................................................................51

      B.    The District Court Should Have Applied the Facially Legitimate and Bona Fide Standard ...........................................55

      C.    The District Court Erred in Finding an APA Violation ...................58

IV.    THE DISTRICT COURT ERRED IN ENTERING ITS SANCTION REMEDY................................................................59

CONCLUSION...............................................................................65

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

## CASES

Page(s)

*AAUP v. Rubio,*
No. 25-10685-WGY, 2026 WL 686418 (D. Mass. Mar. 11, 2026)...................49

*Aguilar v. ICE,*
510 F.3d 1 (1st Cir. 2007) ...............................................................1, *passim*

*Alexander v. Sandoval,*
532 U.S. 275 (2001).....................................................................................64

*Alvidres-Reyes v. Reno,*
180 F.3d 199 (5th Cir. 1999).......................................................................45

*Bivens v. Six Unknown Fed. Narcotics Agents,*
403 U.S. 388 (1971).....................................................................................64

*Blum v. Holder,*
744 F.3d 790 (1st Cir. 2014) .......................................................................29

*California v. Texas,*
593 U.S. 659 (2021).....................................................................................32

*Carlson v. Landon,*
342 U.S. 524 (1952).....................................................................................55

*Chapinski v. Ziglar,*
278 F.3d 718 (7th Cir. 2002)........................................................................45

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)...........................................................................24, *passim*

*Harisiades v. Shaughnessy,*
342 U.S. 580 (1952)) ...................................................................................52

*Costa v. de Lima,*
  94 F.4th 174 (1st Cir. 2024)................................................................23

*DHS v. D.V.D.,*
  145 S. Ct. 2153 (2025)......................................................................63

*Deep S. Ctr. for Env't Just. v. EPA,*
  138 F.4th 310 (5th Cir. 2025)...........................................................34

*Demore v. Kim,*
  538 U.S. 510 (2003)..................................................................... 53-54

*Department of State v. Muñoz,*
  602 U.S. 899 (2024)................................................................ 54-55, 57

*Doc Soc'y v. Rubio,*
  141 F.4th 1273 (D.C. Cir. 2025) .......................................................32

*Donahue v. City of Boston,*
  304 F.3d 110 (1st Cir. 2002) ...........................................................31

*E.F.L. v. Prim,*
  986 F.3d 959 (7th Cir. 2021)...........................................................47

*Elend v. Basham,*
  471 F.3d 1199 (11th Cir. 2006).......................................................33

*Elgharib v. Napolitano,*
  600 F.3d 597 (6th Cir. 2010)...........................................................48

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024).............................................................31, *passim*

*Garland v. Aleman Gonzalez,*
  596 U.S. 543 (2022)........................................................................60

*Gasperini v. Ctr. For Humanities, Inc.,*
  518 U.S. 415 (1996)........................................................................62

iv

*Graham v. Richardson,*
  403 U.S. 365 (1971)....................................................................................52

*Grupo Mexicano De Desarrollo v. All. Bond Fund,*
  527 U.S. 308 (1999)....................................................................................63

*Haig v. Agee,*
  453 U.S. 280 (1981)....................................................................................54

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982)....................................................................................35

*Hernandez v. Mesa,*
  593 U.S. 93 (2020)......................................................................................64

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010)........................................................................................53

*Humphries v. Various Fed. USINS Emps.,*
  164 F.3d 936 (5th Cir. 1999).......................................................................48

*J.E.F.M. v. Lynch,*
  837 F.3d 1026 (9th Cir. 2016).....................................................................41

*Jimenez-Angeles v. Ashcroft,*
  291 F.3d 594 (9th Cir. 2002)................................................................. 47-48

*Johnson v. Eisentrager,*
  339 U.S. 763 (1950).............................................................................53, 54

*Jones-El v. Berge,*
  374 F.3d 541 (7th Cir. 2004).......................................................................60

*Khalil v. President, United States,*
  164 F.4th 259 (3d Cir. 2026).........................................................40, *passim*

v

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972)..............................................................18, *passim*

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994)........................................................................38

*Kontrick v. Ryan*,
  540 U.S. 443 (2004).........................................................................1

*Kwong Hai Chew v. Colding*,
  344 U.S. 590 (1953).......................................................................53

*Labrador v. Poe*,
  144 S. Ct. 921 (2024).....................................................................63

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)..............................................................24, 36, 38

*M.M.V. v. Garland*,
  1 F.4th 1100 (D.C. Cir. 2021) .......................................................45

*Mathews v. Diaz*,
  426 U.S. 67 (1976)..................................................................... 53-55

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010).......................................................................24

*Nieves v. Bartlett*,
  587 U.S. 391 (2019).................................................................. 64-65

*Nken v. Holder*,
  556 U.S. 418 (2009).......................................................................63

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008) ...................................................... 55-56

*Rauda v. Jennings*,
  55 F.4th 773 (9th Cir. 2022) .........................................................47

vi

*Reddy v. Foster*,
  845 F.3d 493 (1st Cir. 2017) ...............................................................24, 25, 26

*Reno v. AADC*,
  525 U.S. 471 (1999)...............................................................................2, *passim*

*Riley v. Bondi*,
  606 U.S. 259 (2025).........................................................................................1

*Simon v. E. Kentucky Welfare Rts. Org.*,
  426 U.S. 26 (1976).................................................................................36, 38

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)......................................................................................24

*Steel Co. v. Citizens for Better Environment*,
  523 U.S. 83 (1998...................................................................................31, 39

*Susan B. Anthony Lisa v. Driehaus*,
  573 U.S. 149 (2014).......................................................................24, 25, 26, 30

*Tazu v. Att'y Gen. of the United States*,
  975 F.3d 292 (3d Cir. 2020) .........................................................................46

*Texas State LULAC v. Elfant*,
  52 F.4th 248 (5th Cir. 2022) ........................................................................34

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025)......................................................................................63

*Trump v. Hawaii*,
  585 U.S. 667 (2018).................................................................................54, 56

*Turner v. Williams*,
  194 U.S. 279 (1904)......................................................................................52

vii

*United States v. Texas,*
  173 F.4th 659 (5th Cir. 2026).................................................................35

*United States v. Verdugo-Urquidez,*
  494 U.S. 259 (1990)..............................................................................53

*Warth v. Seldin,*
  422 U.S. 490 (1975)..............................................................................36

*Ziglar v. Abbasi,*
  582 U.S. 120 (2017)..............................................................................64

## STATUTES

### Immigration and Nationality Act of 1952, as amended:

8 U.S.C. § 1182(a)(2) ..............................................................................61

8 U.S.C. § 1201(i)...............................................................10, 39, 40, 57

8 U.S.C. § 1227(a)(2) ..............................................................................61

8 U.S.C. § 1227(a)(4)(C)............................................................. 9, passim

8 U.S.C. § 1227(a)(4)(C)(i) .....................................................................32

8 U.S.C. § 1227(a)(4)(C)(ii) ....................................................................32

8 U.S.C. § 1229a .................................................................................39, 60

8 U.S.C. § 1231 .........................................................................................60

8 U.S.C. § 1252(a)(5) ...........................................................21, 40, 41, 65

8 U.S.C. § 1252(b)(9)...................................................................1, *passim*

8 U.S.C. § 1252(f)(1)....................................................................2, *passim*

8 U.S.C. § 1252(g)........................................................................2, *passim*

viii

28 U.S.C. § 1331 ...............................................................................................5

28 U.S.C. § 1291 ...............................................................................................5

28 U.S.C. § 1292(a)(1) ......................................................................................5

## FEDERAL RULES OF APPELLATE PROCEDURE

Fed. R. Civ. P. 52(a)(6) ...................................................................................23

Fed. R. Civ. P. 65(d)(2) ...................................................................................62

Federal Rule of Civil Procedure 65 ..........................................................22, 62

## OTHER AUTHORITIES

Executive Order 14188, Additional Measures to Combat Anti-Semitism, 90
    Fed. Reg. 8847 (Jan. 29, 2025)................................................................6, 7

Executive Order 14161, Protecting the United States from Foreign
    Terrorists and Other National Security and Public Safety Threats, 90 Fed.
    Reg. 8451..................................................................................................6, 7

Nos. 26-1141 & 26-1195

# In the United States Court of Appeals for the First Circuit

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,

*Plaintiffs – Appellees,*

v.

MARCO RUBIO, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE, ET AL.,
*Defendants – Appellants.*

*On Appeal from the U.S. District Court
for the District of Massachusetts
Docket No. 1:25-cv-10685-WGY*

## BRIEF FOR DEFENDANTS – APPELLANTS

## INTRODUCTION

"A federal court must always satisfy itself that it has jurisdiction." *Riley v. Bondi*, 606 U.S. 259, 273 (2025). And "[o]nly Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004). Congress did just that when it enacted the Immigration and Nationality Act ("INA"), and it knew what it was doing. Because removal proceedings were mired in a "scattershot and piecemeal" review process, Congress enacted the "zipper clause," 8 U.S.C. § 1252(b)(9), to make judicial review "available only" from a final order of removal. *Aguilar v. ICE*, 510 F.3d

1, 9 (1st Cir. 2007). Because of the "particular evil" of "attempts to impose judicial constraints upon prosecutorial discretion," *Reno v. AADC*, 525 U.S. 471, 485 n.9 (1999), Congress decided that "no court shall have jurisdiction" to challenge the decision "to commence proceedings, adjudicate cases, or execute removal orders against any alien" outside of a petition for review, 8 U.S.C. § 1252(g). And to further limit judicial interference with the execution of the immigration laws, Congress generally provided that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain" removal proceedings as to non-named parties.  8 U.S.C. § 1252(f)(1).

Under those principles, this case should have been an easy dismissal. Two academic organizations, the American Association of University Professors ("AAUP") and the Middle East Studies Association ("MESA") initiated this lawsuit to challenge a  so-called "ideological deportation policy,"  which they say is a "large-scale" policy of "arresting, detaining, and deporting" noncitizen students and faculty engaged in "pro-Palestinian protests" and related "expression and association." But their sensationalist labeling cannot hide their suit's fatal defects. AAUP and MESA could not identify any of their own members at who triggered such a policy. The only pieces of evidence they could conjure up that their putative ideological deportation policy even exists

are cherry-picked public statements and the removal or visa revocation non-party and non-member aliens, for whom each action was independently justified. And even if they had plausibly alleged such a policy, the proper route to challenge it is the one Congress provided—through a petition for review from a final order of removal, not a broad programmatic challenge. Indeed, many of the non-party aliens at issue are now pursuing just such review now.

Nonetheless, the district court plowed ahead in a rush to the merits. In an order that begins with a postcard and ends with political commentary in the literary guise of a fictional dialogue with the district judge's spouse, the district court held that AAUP and MESA have associational standing because the alleged policy chilled their members' speech, and that MESA has organizational standing because the alleged policy "harm[s] its core activity of facilitating academic discourse." Add.181. It then proceeded to hold that the alleged policy violates the First Amendment because, in its view, "non-citizens lawfully present here in [sic] United States actually have the same free speech rights as the rest of us." *Id.* at 131. The district court was no less inventive at the remedial hearing, where—at the request of no one—it purported to grant every AAUP and MESA member the ability to file an action in any court to automatically stay their removal.

All of that is quintessential judicial overreach. There is no Article III case or controversy when there is only *unreasonable* fear of enforcement. Nor can Congress's limitations on judicial review of removal orders be evaded simply by conjuring some deportation "policy" out of cherry-picked examples. And there is no escaping the fact that, in the immigration context, the Government need only provide a "facially legitimate and bona fide" (i.e., good faith) reason for the challenged action, and that standard is easily satisfied here. In any event, the district court's unprecedented stay-upon-demand remedial regime is indefensible—which is presumably why AAUP and MESA did not oppose the Government's motion to stay the remedy pending appeal (which this Court granted).

This Court should vacate the decision below and order the dismissal of this action.

## STATEMENT OF JURISDICTION

AAUP and MESA invoked jurisdiction under 28 U.S.C. §1331, Joint Appendix ("JA") at 291, which the Government disputes. *See infra* at pp.39-51.

The district court entered partial final judgment under Rule 54(b) on January 22, 2026. Add.230. The Government timely appealed on February 9. JA.81. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether AAUP and MESA lacked standing to bring this action.

2.      Whether 8 U.S.C. §§1252(b)(9) & (g) divested the district court of jurisdiction over AAUP and MESA's claims.

3.      Whether the district court erred in finding a First Amendment violation.

4.      Whether the district court's remedy is unlawful.

## STATEMENT OF THE CASE

**I.    The United States Responds to an Increase in Antisemitic Violence and National Security Threats**

Upon taking office, President Trump issued two Executive Orders to address antisemitism and national security. Executive Order 14188, *Additional Measures to Combat Anti-Semitism*, responds to "an unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence … especially in" schools, that arose from the Israeli-Hamas conflict. 90 Fed. Reg. 8847 (Jan. 29, 2025). It directs executive agencies to use "all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.* §2.

Executive Order 14161, *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed. Reg. 8451, declares the United States' policy to "protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." EO 14161, § 1(a). It seeks to ensure aliens "do not advocate for, aid, or support designated foreign terrorists and other threats to our national security." *Id.*

Both EOs require their implementation to be consistent with applicable law. EO 14161, § 4(a)(i)-(ii); EO 14188, § 4(b).

## II.    Complaint

On March 23, 2025, AAUP and MESA[1] filed a complaint in the District of Massachusetts alleging that in implementing EOs 14161 and 14188, the Department of Homeland Security ("DHS") and the Department of State ("State") were carrying out an "ideological-deportation policy" ("IDP"), JA.289, which they described as a "large-scale" policy of "arrest[ing], detain[ing], and deport[ing]" noncitizen students and faculty engaged in "pro-Palestinian protests" and related "expression and association." JA.299. To prove the alleged IDP's existence, AAUP and MESA relied on public officials' statements and high-profile immigration enforcement actions taken against individuals who were not members of either organization.  *See* JA.296-305.

AAUP and MESA alleged four causes of action—two First Amendment claims (Counts I-II), one Fifth Amendment claim (Count III), and an APA claim (Count IV). Relevant here, Count I alleged that the IDP violated the First Amendment because it directs the arrest, detention, and deportation of

---

[1] Several chapters of AAUP also filed suit but were found to lack standing. Add.9-10.

aliens based on their political viewpoints. Count II alleged that the IDP violated the First Amendment because it involved coercive threats that unconstitutionally chilled speech. JA.333-34. And Count IV alleged the IDP violates the APA. JA.334.

## III. Motion for a Preliminary Injunction

On April 1, 2025, AAUP and MESA asked the Court to preliminarily enjoin "Defendants from threatening to arrest, detain, and deport noncitizen students and faculty based on their lawful political expression," and to stay the IDP under the APA. Dkt. ##13 & 14. The Government opposed on standing and statutory jurisdiction grounds. Dkt. #65 at 4-18. The district court "collapsed the motion into a trial on the merits pursuant to Rule 65(a)." Add.4 n.3. And it "construed [the Government's] opposition … as a motion to dismiss." *Id.*

On April 29, 2025, the district court denied the motion to dismiss. Add.1-68. It rejected the Government's jurisdictional arguments, found AAUP and MESA sufficiently alleged associational standing, and found MESA sufficiently alleged organizational standing. Add.22-38, 44, 52. The First Amendment and APA claims survived, Add.55-67, but the district court dismissed the Fifth Amendment claim. Add.61-63.

## IV.    The District Court Sets Parameters for Discovery

Over the Government's objections, the district court ordered it to produce discovery relating to five non-party aliens, whom AAUP and MESA alleged illustrated the IDP:  Mahmoud Khalil, Moshen Mahdawi, Yunseo Chung, Badar Khan Suri, and Rumeysa Öztürk. Dkt #102 at 9-10.  None of these individuals is a party to this litigation or a member of AAUP or MESA.

The documents produced showed that the Secretary of State determined that the activities and presence in the United States of Khalil, Mahdawi, and Chung, all of whom were lawful permanent residents ("LPR"), and Suri, who was in valid nonimmigrant status as a research scholar, "would have potentially serious adverse foreign policy consequences and compromise a compelling U.S. foreign policy interest," and that they were therefore removable under 8 U.S.C. §1227(a)(4)(C). JA.1564, 1572, 1589, 1592.

- The Secretary's determination regarding Khalil was based on his leadership role "in antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States," and on his unlawful activity during those protests. JA1565; *see* JA.2161-65, 2197-98, 2207-11.

- The Secretary's determination regarding Mahdawi was based on his "anti-Semitic conduct," specifically, his leadership of and involvement in disruptive protests, where he was "identified … as having engaged in threatening rhetoric and intimidation of pro-Israeli bystanders," and "calling for Israel's destruction." JA.1573; *see* JA.2173-78, 2101-02, 2212-16.

- The Secretary's determination regarding Chung was based on her "role … in antisemitic protests and disruptive activities, which foster[ed] a hostile environment for Jewish students in the United States," as well as on her "citations for unlawful activity during these protests." JA.1590; *see* JA.2179-81, 2199-2200, 2207-11.

- The Secretary's determination regarding Suri was based on an assessment that "Suri's direct connection to Hamas leadership and involvement in antisemitic activities … [creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization." JA.1593. In addition, Suri was "actively supporting Hamas terrorism" and "actively spread[ing Hamas] propaganda and promot[ing] antisemitism on social media." JA.1593; *see* JA.2166-72, 2205-06, 2217-21.

Öztürk was not an LPR and had an unexpired visa. State revoked her visa under 8 U.S.C. §1201(i), which allows the Secretary of State and consular officers to revoke visas as a matter of discretion, finding that she "had been involved in associations that may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." JA.1582.

## V.    The Bench Trial

The district court held a nine-day bench trial between July 7 and 18, 2026, taking testimony from several witnesses for AAUP and MESA and the Government. JA.337-1519.

### A.    AAUP and MESA's Member Witnesses

AAUP and MESA proffered several members to testify about the supposed chill resulting from the alleged IDP. Although these members testified

- 10 -

that they refrained from certain activities due to immigration actions taken against the five individuals discussed above, none testified about (1) any adverse immigration action taken against them personally; (2) being contacted by the Government about their speech; or (3) any specific government policy they could identify chilling their speech.

1.     Megan Hyska, an LPR and AAUP member, testified that she feared arrest and deportation for engaging in political activity, and so chose to self-censor, based on the arrests of Khalil and Öztürk. JA.379-80, 390, 395. She testified that she changed her mind about becoming more active with the Democratic Socialists of America, an organization aligned with pro-Palestinian causes, and decided not to publish an op-ed critical of the Trump Administration. JA. 379-80, 395.

Hyska did not identify any immigration enforcement actions directed at her; rather, her fears were based solely on reviewing internet reports about others. JA.420 ("I just know what I see in reporting"); JA.425 (referencing "clusters of social media posts around the detention of Mr. Khalil"); JA.426 (admitting she was never personally contacted by the Government about her speech).

2. Nadia Al-Ali, an LPR and AAUP and MESA member, testified that she altered international travel plans following Khalil's arrest, feeling that her pro-Palestinian speech put her at risk of being "flagged" upon return to the United States, JA.470-71, and halted separate work-related plans to travel to Beirut and Baghdad. JA.467-68, 476. She further testified that she abandoned plans to write an article providing a "feminist critique of Hamas" because it would have included "a feminist critique of the Israeli government policies." JA.468-69; 478. She also (1) declined to sign letters or facilitate meetings regarding the situation in Israel and Palestine, despite having done these things prior to her arrest, JA.529-30; (2) did not attend MESA's 2025 annual meeting, JA.479-80; (3) declined chairing the human rights committee of the Women's Association of Middle East Studies, believing it would be "too risky," JA.480-81; and (4) refrained from protesting after March 2025, fearing that as a noncitizen she "would be … vulnerable." JA.546.

Nonetheless, Al-Ali admitted that her ample scholarship includes only two works touching upon Palestine, JA.461, and she has no social media postings on the subject. JA.482-83. She was one of many signatories on three letters to Brown's president relating to the Israeli–Palestinian conflict. JA.522, 525-26, 527.

3.      Bernhard Nickel, an LPR and AAUP member, testified that Khalil's arrest, which he read about, "scared [him]," and made him fear "political reprisal." JA.593-94. He testified that Öztürk's arrest caused him to refrain from traveling internationally based on fear of "being detained at the border when [trying] to re-enter" the United States. JA.598-600. Nickel feared that his past political speech, such as his signature on a 2019 open letter to the Director of the U.S. Holocaust Museum and his signature on a 2021 Harvard faculty statement in support of Palestinian liberation, created a "heightened risk" that the Government would target him for deportation. JA.607-611 (discussing JA.1883-1914). Nickel stated that following Khalil's arrest he attempted not to "draw attention to [himself]," fearing that he "might potentially be the target of something." JA.597. He "stopped going to protests," "stopped signing on to public letters," and "cancelled international travel." JA.565.

Nickel admitted that he has never been contacted by the Government about his political views or received any indication that it has been monitoring his speech. JA.625. Prior to President Trump's election, the only public acts he was associated with were his signatures on two letters where he was among hundreds of signatories. JA.608-11.  Ultimately, Nickel acknowledged that he

- 13 -

did not believe that any enforcement action was imminent: "[Do I believe] that it would definitely happen? No." JA.611.

4.     Brian Shuve, an AAUP member, testified that he belonged to Claremont Colleges' Faculty for Justice in Palestine ("FJP"), JA.1520-21, an organization which publicly supports Palestine and criticizes Israel. JA.1524. Shuve said he was the member representative for Harvey Mudd College's AAUP chapter, through which he published a statement about "the ability of scholars to speak on contentious issues specifically with respect to Israel and Palestine." JA.1521-22. During AAUP's April 2025 National Day of Action, his AAUP chapter hosted a meeting and participated in a webinar discussing issues including Palestine. JA.1523-24. Shuve was also involved in drafting multiple statements for FJP relating to Palestine and Gaza, JA.1525-26, and participated in an FJP public demonstration in the spring of 2025. JA.1526-28.

Shuve testified that his history of public, pro-Palestinian speech, JA.1521-22, 1524-27, 1529-30, left him fearful of being arrested at his April 23, 2025, naturalization interview. JA.1535-36. However, rather than being penalized for his pro-Palestinian views, following a 20-minute interview, he was granted citizenship. JA.1530.

5. Finally, Nadia Abu El Haj, a U.S. citizen, professor at Barnard College and Columbia University, and AAUP and MESA member, testified that Khalil's arrest created "a sort of anxiety and panic about what might happen next," JA.667, and Mahdawi's arrest "escalated a sense of anxiety and panic at Columbia." JA.683-84.

## B. AAUP and MESA's Organizational Witness

Veena Dubal, the General Counsel of AAUP and a MESA member, JA.1415-1449, testified that AAUP has approximately 50,000 members. JA.1418. She explained that following Khalil's arrest, AAUP and MESA expended resources and co-hosted town-halls to assist noncitizen members in avoiding similar enforcement actions. JA.1421, 1424, 1427-29, 1436-38. She acknowledged that since the 2024 election, AAUP had expanded its number of chapters, which "help[ed] the organization" and "increased [its] ability" to carry out its mission. JA.1440-41.

## C. The Government's Witnesses

The Government's witnesses testified about the processes for evaluating and referring individuals for immigration enforcement actions, and for making removability and visa revocation determinations. The Government

also presented testimony showing the political activity of AAUP and MESA had *increased* since the beginning of 2025.

1. Andre Watson, the then-Assistant Director of the National Security Division ("NSD") within ICE's Homeland Security Investigations ("HSI") unit, and Peter Hatch, the Assistant Director of the Office of Intelligence ("OI") within HSI, testified about the process for evaluating referrals for potential enforcement actions and the mechanism for implementing EOs 14161 and 14188. JA.876-77, 884, 1277, 1279. In short, concerning 2025 protestor referrals, OI forwarded about 200 referrals, called Reports of Analysis ("ROA"), out of 5,000 leads to NSD, which forwarded only between 20 and 30 to State, JA.1286-87—less than 1% of the total number of leads.

2. John Armstrong, the Senior Official at the State Department's Bureau of Consular Affairs, testified that if NSD refers a nonimmigrant visa holder, the information is sent to the Visa Office within the Bureau of Consular Affairs, which "examines the information" to determine whether it warrants "enact[ing] a revocation" of the visa, and if so, revokes. JA.1000-01, 1003 (discussing JA.2226).

In the case of an LPR, State cannot "revoke [the individual's] status," instead, "the Secretary of State can [make] a finding that th[e] person is removable" under 8 U.S.C. §1227(a)(4)(C). JA.1002 (discussing JA.2226).

3.      Mohamed Maklad, an HSI supervisory analyst, testified as a summary witness about the publications and public events of AAUP and MESA since January 2025. JA.1237. Specifically, the number of events at AAUP's National Day of Action in 2025, which MESA co-sponsored, and which was intended to promote "engage[ment] in free speech activities across college campuses," was a *2000 percent increase*—from 9 events in 2024 to 191 events in 2025. JA.1247-1248 (discussing JA.2193-96). The exhibits he discussed further show that AAUP's website promoted a significantly greater number of political events in the first six months of 2025 than in all of 2024. JA.1240-44 (discussing JA.2193-96).

## VI.    Post-Trial Findings of Fact and Rulings of Law

On September 30, 2025, the district court found the Government violated the First Amendment and APA. Add.69-229. It reiterated its prior determination that both AAUP and MESA "had associational standing … and that at least MESA had organizational standing," Add.170, because it had demon-

- 17 -

strated harm to "its core activity of facilitating academic discourse and scholarship about issues impacting the Middle East." Add.181-82. And while the district court concluded "[t]here was no ideological deportation policy," Add.163, it found there was a "mode of enforcement" Add.191, where the "Secretaries initiated removal proceedings against a few … for speaking out … with the goal of tamping down pro-Palestinian student protests and terrorizing similarly situated non-citizen (and other) pro-Palestinians into silence because their views were unwelcome." Add.163; *see also* Add.176-180, 191.

On the merits, the district court found in favor of AAUP and MESA on viewpoint discrimination (Count I). It held that noncitizens' free speech rights were equal to those of citizens but declined to decide what legal standard governed. Add.193. Instead, the court found liability "even under the 'facially legitimate and bona fide' standard'" from *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972). Add.193. It also found in favor of AAUP and MESA on their APA claim (Count IV) because the so-called mode of enforcement was contrary to the First Amendment and reversed prior policy without reasonable explanation. Add.169.

## VII.  January 22, 2026, Remedies Order

The district court issued an annotated judgment and remedies order, Add.230-39, entering judgment for AAUP and MESA on Counts I and IV, Add.231, and declaring that Secretaries Noem and Rubio implemented EOs 14161 and 14188 in a "viewpoint discriminatory way to chill protected speech," thereby "violat[ing] the First Amendment." Add.231 (internal quotations omitted). It ordered the "Public Officials' enforcement policy and the implementation thereof ... [to be] of no effect, void, illegal, set aside, and vacated" under the APA. Add.232 (emphasis omitted).

Additionally, it issued a sanction that AAUP and MESA never requested, permitting any current member of AAUP or MESA who was a member on or after the filing of the complaint on March 25, 2025—a "Sanction Plaintiff"— to institute a "Sanction Action" in the U.S. District Court where he or she resides. Add.233. The Sanction Action may challenge any "adverse immigration action changing [the] Sanction Plaintiff's immigration status from what it was on January 20, 2025." Add.233-34. A Sanction Plaintiff's removal is automatically stayed during the pendency of the action, and the Government bears the burden of determining whether a Sanction Action has been filed.

Add.235-36. In such an action, it is "presumed that the alteration in immigration status is in retribution for the exercise … of First Amendment rights." Add.234. The Sanction Action "voids the alteration in immigration status" unless the Government rebuts the presumption of retribution with clear and convincing evidence that (1) a Sanction Plaintiff's immigration status expired by its own terms; (2) a Sanction Plaintiff was convicted of a crime to which a jury-trial right attached; or (3) there is an appropriate reason for the action. Add.234-35.

The Government moved for a stay pending appeal below. Dkt. #317. Even though it was largely unopposed, the district court denied it almost entirely. Dkt. #330. The Government then renewed that request in this Court, which was also unopposed and then granted. Order, Apr. 7, 2026, Dkt. Nos. 26-1141 & 26-1195.

## SUMMARY OF THE ARGUMENT

I.    AAUP and MESA brought this case challenging a so-called ideological deportation policy, but they identified no members who had been subject to it or even directly threatened by it. AAUP and MESA thus lack standing. Their third-party challenges to immigration enforcement choices fail because third parties cannot challenge the Executive's enforcement discretion.

Additionally, AAUP's and MESA's members established no injury beyond a subjective chill prompted by their anxiety and speculation. In fact, one AAUP member who continued pro-Palestinian speech successfully naturalized after a twenty-minute interview. Even if AAUP's and MESA's members suffered an injury, it is too attenuated because it is based on speculative fear stemming from others' injuries. MESA lacks organizational standing because it has no specific legal right that the Government allegedly violated and it has not otherwise established a redressable injury-in-fact traceable to the challenged policy.

II.    The district court's decision exceeded its jurisdiction. Federal courts have limited jurisdiction, and Congress specifically withdrew jurisdiction to review decisions and actions to place aliens in removal proceedings. 8 U.S.C. §§1252(b)(9) & (g). Instead, it channeled those claims into removal proceedings reviewable in the courts of appeals. 8 U.S.C. §1252(a)(5). MESA and AAUP's claims rest on two premises, neither of which the district court had jurisdiction to consider . First, the Government violated the rights of non-party aliens by placing them in removal proceedings on account of their protected speech. Second, that AAUP and MESA's members reasonably feared being similarly placed in removal proceedings.

- 21 -

But Congress directed that both types of claims be channeled into removal proceedings. Otherwise, it would set up a race to the courthouse where aliens can get pre-enforcement review of their claims so long as they file before immigration proceedings are commenced. This they cannot do.

III.    Even assuming jurisdiction, under 8 U.S.C. §1252(f)(1) the district court lacked authority to enter injunctive relief restraining the implementation of removal proceedings as to non-named parties. The court likewise lacked authority to create a new cause of action in other courts because they, too, lack jurisdiction under §§1252(b)(9) & (g). In creating this new cause of action, the district court exceeded its equitable authority and its authority under Federal Rule of Civil Procedure 65.

IV.    On the merits, the district court also erred in finding a First Amendment violation. The Supreme Court has already held that the First Amendment does not prohibit the United States from deporting aliens for their political beliefs and associations. At most, AAUP and MESA's claims are reviewed under the highly deferential "facially legitimate and bona fide" standard. Under that standard, courts only look to the legal justification proffered by the agency and, if facially valid, the review ends. The district court did not just look behind the agency decisions here, it permitted extensive and

burdensome discovery into, and review of, every action taken to remove five aliens who were not even parties to the litigation. At most, the district court should have looked at the face of the agencies' justifications, which are facially legitimate and bona fide, and ended its inquiry there. These errors, too, infected the district court's APA violation finding.

## STANDARD OF REVIEW

This Court reviews the district court's legal conclusions *de novo*. *See da Costa v. de Lima*, 94 F.4th 174, 180 (1st Cir. 2024) (citations omitted). "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous." *Id.* (quoting Fed. R. Civ. P. 52(a)(6)). The appropriate standard of review for mixed questions of law and fact depends on whether it "entails primarily legal or factual work." *Id.* (citations and quotations omitted).

## ARGUMENT

## I.    AAUP AND MESA LACKED STANDING

### A.    AAUP and MESA Lacked Associational Standing

1.    An association may have standing if, among other requirements, at least one member has Article III standing to sue in the member's own right. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343

(1977). Article III standing, in turn, "requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). To establish an injury in fact, a plaintiff must show he "has sustained or is immediately in danger of sustaining a direct injury" because of the challenged action. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 346 (2016) (Thomas, J., concurring) (citations omitted). The injury must be "concrete and particularized," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted), and not merely "conjectural or hypothetical." *Susan B. Anthony Lisa v. Driehaus* ("*SBA List*"), 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 560).

In pre-enforcement First Amendment challenges, the Supreme Court has "repeatedly reiterated that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). But a claim of future injury may also suffice if "there is a 'substantial risk' that the harm will occur." *SBA List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 415, n.5); *see also Reddy*, 845 F.3d at 500 ("injury is imminent if it is certainly impending *or* if there is a substantial risk that harm will occur"). A plaintiff satisfies the

"substantial risk of harm" standard where he has alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *SBA List*, 573 U.S. at 159. Under either framework, mere "allegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409; *see also SBA List*, 573 U.S. at 158.

Both AAUP and MESA lacked associational standing because none of their members established an injury-in-fact. Their members' claimed injury was *self*-censorship based purely on their subjective assessments of the Government's reasons for taking immigration enforcement actions against other individuals. *See* JA.379-80, 390, 395 (Hyska on self-censoring after learning of Khalil's and Öztürk's arrests); JA.467-68, 470-71, 476, 478 (Al-Ali on choice to abandon plans to write an article, or comment publicly on the situation in Israel and Palestine following Khalil's and Öztürk's arrests); JA.593-94, 598-600 (Nickel regarding how his fear of "political reprisal" caused him to self-censor following Khalil's arrest). But to constitute an injury-in-fact, the chilling effect must stem from something more than "merely … the individual's knowledge that a governmental agency was engaged in certain activities." *Clapper*, 568 U.S. at 418; *see also id.* at 418-20 (rejecting notion that "plaintiffs can establish

standing simply by claiming that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part"); *SBA List*, 573 U.S. at 159. The threat of injury must be certainly impending, or there must be a substantial risk of that harm, i.e., a credible threat of prosecution under the challenged law. *Reddy*, 845 F.3d at 500. AAUP and MESA established neither.

*First*, their members merely speculated they might come within the universe of people the Government was interested in investigating. JA.1530, 1535-36 (Shuve generally fearful of arrest and detention, but actually obtained citizenship on April 23, 2025); JA.667, 683-84 (El-Haj felt "anxiety and panic" after Mahdawi's and Khalil's arrests); JA.420, 425-26 (Hyska had general fears based on internet reporting); JA.468-69, 470-71, 478 (Al-Ali's fears stemmed from hearing about Khalil's arrest); JA.593-94, 597, 625 (Nickel feared "political reprisal" after reading about Khalil's arrest).

*Second*, even assuming a future investigation, AAUP and MESA provided no evidence that it would reveal information supporting immigration enforcement. *Compare* JA.2197-98 (report that Khalil *led* disruptive protests, including the occupation of university buildings), *with* JA.1520-21, 1525-28 (membership in organization that publicly supports Palestine, drafting public

statements, and participating in demonstrations), *and* JA.522, 525-27, 607-11 (signing onto letters supporting Palestine), *and* JA.468-69, 478 (writing scholarly articles critiquing Hamas).

*Third*, AAUP and MESA offered nothing to show that such future, hypothetical action would be based on protected speech rather than general noncompliance with visa terms or some other unrelated basis for removal. *See* JA.1569 (Khalil NTA charging removability for willfully misrepresenting material facts on his LPR application).

*Finally*, even if they showed that certain Government actors might pursue enforcement action based on protected speech, AAUP and MESA offered no concrete evidence that such action would be approved, especially when so few campus protester leads (less than 1%) were even forwarded for *potential* enforcement action, JA.1286. *See Clapper*, 568 U.S. at 413 (expressing reluctance to find standing where it "require[s] guesswork as to how independent decisionmakers will exercise their judgment").

Notably, the record shows that none of the consequences AAUP's and MESA's members claim to fear—arrest, detention, and deportation—have come to fruition. They never identified a member targeted for enforcement under the challenged policy despite their members' continued engagement in

behaviors that they characterized as "risky." *See* JA.399, 402, 432-33 (Hyska describing continue attendance at political protests); JA.551-52 (Al-Ali testifying she followed through with plans to give talks abroad and was permitted to reenter the U.S.); JA.607-611 (Nickel testifying he still sent large group emails to colleagues and students in March and April 2025).

In fact, evidence AAUP and MESA provided showed that their members' fears were *unreasonable*. For example, Brian Shuve claimed that his public, pro-Palestinian speech between late-2023 and mid-2025, JA.1521-22, 1524-26, 1529-30, left him fearful of arrest and detention when he attended his April 23, 2025, naturalization interview. JA.1534. Indeed, the volume of his public speech in support of Palestine, including drafting website statements about Palestine and Gaza, his membership in FJP, his participation in an FJP public demonstration in the spring of 2025, and his leadership role at Harvey-Mudd-AAUP, far exceeded the public political profile of the other testifying witnesses. JA.1520-21, 1523-34. Nonetheless, Shuve was naturalized after an uneventful twenty-minute interview. JA.1530.

Even the district court found that there "was no ideological deportation policy. It was never the Secretaries' immediate intention to deport all pro-Palestinian non-citizens." Add.163. Rather, enforcement action "target[ed] a few"

- 28 -

noncitizens, *id.* at 173, none of whom are witnesses or parties in this case. Add.203-04 (district court finding that AAUP and MESA "have not produced evidence of threats targeted specifically at their members" and therefore have "not proved a campaign of coercion" to be able to prevail on Count II).

Because the facts showed that enforcement actions relating to pro-Palestinian speech are rare and no enforcement threat has been identified as to any of their members, MESA and AAUP failed to establish the injury-in-fact required for standing. *See Blum v Holder*, 744 F.3d 790, 799 (1st Cir. 2014) (upholding no standing in a chill case where enforcement "has been rare and has addressed actions taken that are different from those plaintiffs propose to undertake"). AAUP and MESA's members' fears boil down to "a subjective chill based on speculation about potential governmental action," which has yet to occur to any of their members, and thus falls far short of the "concrete evidence to substantiate their [members'] fears" that they were required to present to establish associational standing. *Clapper*, 568 U.S. at 420 (citation omitted); *accord SBA List*, 573 U.S. at 158.

2.    AAUP's and MESA's claimed injuries also are not traceable to the challenged putative policy but rather arise from the fear and self-chilling be-

havior of certain of their members, based on hypothetical potential immigration enforcement. *See, e.g.,* JA.390, 470; JA.598-600; JA.1534-35. There is no concrete evidence directly linking the challenged putative policy and any harm or even threat of harm to AAUP and MESA's members. Rather, the crux of their case is that other non-similarly-situated individuals who are not implicated in this litigation (e.g., Khalil and the other four so-called "targeted" individuals) suffered injuries (immigration enforcement actions), which caused AAUP and MESA's members to restrict their speech out of fear that a similar (though not-yet-threatened) action may befall them. *See, e.g.,* JA.395, 479-80; JA.529-30, 598-600.

But absent a "certainly impending" harm, plaintiffs "cannot manufacture standing merely by inflicting harms on themselves based on their fears of hypothetical future harm." *Clapper*, 568 U.S. at 416. Any injury AAUP and MESA's members incurred is traceable not to any so-called IDP, but rather to their subjective fears. This sequence of events illustrates the "overly attenuated" connections that the traceability requirement seeks to bar. *Donahue v. City of Boston*, 304 F.3d 110, 115 (1st Cir. 2002); *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("The causation requirement also rules out attenuated links.).

3.     Even if AAUP's and MESA's members' self-inflicted injuries could establish an injury in fact, they have failed to show such an injury is re-dressable. *See Steel Co.*, 523 U.S. at 103. AAUP and MESA failed to identify a nonspeculative likelihood that an injunction against the policy or a declaration that it is unlawful would redress their injury. JA.334-35. The challenged puta-tive policy does not vest the Government with any new or additional authority not already conveyed by statute.  Thus, while their members maintain that they would discontinue their self-censorship if the putative policy were not in force, they fail to explain why that would ease their fears given that any future adverse action would be based on enforcement of valid immigration statutes that have been in effect for decades.

For example, for years, Congress has allowed deportation where the Secretary of State has reasonable ground to believe an alien's "presence or activities" in the United States "would have potentially serious adverse foreign policy consequences." 8 U.S.C. §1227(a)(4)(C)(i). These consequences could at-tach to otherwise lawful "past, current, or expected beliefs, statements, or as-sociations" if the Secretary determines that the alien's presence in the United States "would compromise a compelling United States foreign policy interest."

8 U.S.C. §1227(a)(4)(C)(ii); *see also* JA.346 (district court recognizing 8 U.S.C. §1227(a)(4)(C) has "been on the books for quite some time").

Thus, even without the challenged enforcement policy, AAUP and MESA's noncitizen members had reason to restrict their speech, which defeats a causal link between their self-censoring and the challenged policy. *See, e.g.*, JA.2163 (Khalil restricted his protest activity during the prior administration); *see also Clapper*, 568 U.S. at 417; *California v. Texas*, 593 U.S. 659, 679 (2021) (holding that plaintiffs could not trace their asserted injury "to enforcement of [an] 'allegedly unlawful' provision of [an Act]" where "other provisions of [the] Act, impose[d]" the requirements about which plaintiffs complained). Because enjoining the alleged mode of enforcement policy would leave in place all immigration statutes, which is what provides the Government with the authority to take immigration enforcement actions—AAUP and MESA's claimed injuries are not redressable here. *See Doc Soc'y v. Rubio*, 141 F.4th 1273, 1279 (D.C. Cir. 2025) (no redressability where plaintiffs' members failed to explain why they would feel comfortable returning to the actions they ceased "if the social media policy were vacated").

Finally, the lack of any injury-in-fact creates a serious obstacle to the district court's ability to redress AAUP and MESA's alleged harms "beyond

abstractly commanding the [defendants] to obey the First Amendment." *Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006). Given the attenuated, speculative, and prospective nature of AAUP and MESA's alleged harm, the district court lacked the details necessary to resolve the hypothetical constitutional infirmity that their members subjectively fear. "Such a claim is not fit for adjudication." *Id.* at 1212.

### B.    MESA Lacks Organizational Standing

The district court erred in finding that MESA had organizational standing. Organizations may "sue on their own behalf for injuries they have sustained," *All. for Hippocratic Med.*, 602 U.S. at 393 (quotation omitted), by "satisfy[ing] the usual standards for injury in fact, causation, and redressability." *Id.* at 393-94. The district court acknowledged that MESA's organizational standing claim was based on an "arguably novel theory" that its members' chilled speech sufficiently harms the organization itself—a claim that it recognized has been rejected elsewhere. Add.183 (citing *Texas State LULAC v. Elfant*, 52 F.4th 248, 256-57 (5th Cir. 2022)). Yet it nonetheless concluded that the alleged IDP "significantly harmed [MESA's] core activity of facilitating academic discourse and scholarship about issues impacting the Middle East,"

such that MESA established this "relatively unusual form of standing." Add.181-183.

That is error. An organization, like any plaintiff, "must show far more than simply a setback to the organization's abstract social interests" to establish standing. *Alliance*, 602 U.S. at 394. And the alleged policy's effect on MESA is nothing if not abstract. The challenged policy does not require MESA to do, or refrain from doing, anything. Nor does it "directly affect" or "interfere with" the organizations' activities, *Alliance*, 602 U.S. at 395; "prevent[]" them "from engaging in [their] advocacy, education, and training activities,"; or "compel[] [them] to take any action," *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 319 (5th Cir. 2025). If standing were conferred on MESA on that basis alone, "any enterprising legal-advocacy organization could repackage a generalized grievance as an 'injury' to its 'core business activities' and manufacture Article III standing every time a new law or regulation goes into effect." *United States v. Texas*, 173 F.4th 659, 666 (5th Cir. 2026) (en banc) (citation omitted).

The district court attempted to frame MESA as a "unique case" like the one in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Add.183 n.37. But the Supreme Court cautioned that *Havens* is "an unusual case" which courts

should "be[] careful not to extend … beyond its context." *Alliance*, 602 U.S. at 396. And what made *Havens* the "unusual" instance of successful organizational standing is that, there, the organization had a specific statutory right to truthful, nondiscriminatory housing information *and* "operated a housing counseling service." *Id.* at 395. Misinformation thus "directly affected and interfered with" the organization's "core business activities" in the same way that a manufacturer "selling defective goods" interferes with the business activities of a retailer. *Id.* That is not the case with MESA. Any interference with MESA's core activity of facilitating discourse can be traced only to speculative fears. *See, supra*, at 26-30.

Here, MESA's circumstances are different. MESA has no legal right that the Government violated. Without that legal right, MESA must satisfy the traditional requirements for standing:  a concrete injury that is actual or imminent, that is "fairly traceable" to the action being challenged, and that can be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. It established none of these.

MESA also speculated that the challenged putative policy could lead to unlawful enforcement action against non-parties (its members), who will let their memberships lapse and not attend the organization's annual meeting,

which will in turn reduce the organization's revenue. Dkt. #179 (Plaintiffs' Pre-Trial Brief) at 32-33. But the Supreme Court has "decline[d] to abandon [its] usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414; *see also Lujan*, 504 U.S. at 561-62. Rather, "Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976); *Warth v. Seldin*, 422 U.S. 490, 506 (1975) (finding standing lacking where alleged injury resulted from outside forces "rather than … respondents' assertedly illegal acts").

The district court's organizational standing analysis fails even on the facts. It relied primarily on one email describing a decrease in the number of abstracts submitted for proposed publication and pre-organized panels in early 2025 to conclude that the challenged policy "significantly harmed" MESA's core activities. Add.181; *see* JA.2011-12. But the district court made no mention of the Government's evidence showing a *2000 percent increase* in the number of events sponsored by AAUP and MESA from 2024 to 2025. JA.1248. And MESA provided no evidence of harm in the form of reduced

membership or revenue more than a year after this alleged policy came into effect. The only testimony MESA provided to show harm was that of a single member, who claimed to have not attended the organization's 2025 annual meeting or chair the group's human rights committee for fear of government retaliation. J.A.479-80. But one member's testimony about how her subjective fear caused her not to attend one meeting or chair one committee is hardly sufficient to show any injury-in-fact to MESA's core activity of facilitating academic discourse about issues concerning the Middle East. Nor is it indicative of how other MESA members might act such that any injury would be fairly traceable to the government. *Alliance*, 602 U.S. at 385 (to establish causation in cases where unregulated parties are suing the government, the plaintiff must show "a predictable chain of events leading from the government action to the asserted injury"). Indeed, none of the evidence in this case indicates that current MESA members would let their membership lapse, especially when no member has been harmed under the challenged policy.

The speculative fear that immigration enforcement under an alleged policy will cause MESA to cancel events or have reduced attendance at events is too attenuated to show traceability. *See Lujan*, 504 U.S. at 561-62. A plaintiff

who "is not himself the object of the governmental action or inaction he challenges" should find it "'substantially more difficult' to establish" standing, not less. *Id.* (citations omitted); *Eastern Ky. Welfare Rights Org.*, 426 U.S. at 44-45 ("indirectness of injury" generally "'make[s] it substantially more difficult'" to establish standing) (citation omitted). Given MESA's failure to establish a redressable injury in fact that is fairly traceable to the challenged putative policy, the district court erred in finding that MESA had organizational standing.

## II.    JURISDICTION WAS BARRED BY 8 U.S.C. §§1252(b)(9) AND (g).

Even if AAUP and MESA had standing, the district court lacked jurisdiction to hear their claims under §1252(b)(9) and §1252(g). "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). This includes jurisdiction to review constitutional issues, which Congress can channel into other forums. *See AADC*, 525 U.S. at 490-91. So, where federal courts lack jurisdiction, they "cannot proceed at all in any cause," and instead "the only function remaining … is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 93-102 (1998). 8 U.S.C. §§

1252(b)(9) and (g) limit district courts' jurisdiction to hear challenges to decisions and actions to place aliens in removal proceedings, and channel review of such claims through the petition-for-review process, with ultimate review in a federal court of appeals. Because AAUP and MESA's challenge turns on potential decisions to place aliens in removal proceedings, the district court lacked jurisdiction over this case from the beginning.

While the district court pledged not to "retry immigration proceedings or judicial proceedings in another district," Dkt. #87 at 20-21, it did just that by adjudicating the propriety of those proceedings central to its decisions. The five non-party aliens were placed in removal proceedings under 8 U.S.C. §1229a, because the Government acted to revoke their visas under 8 U.S.C. §1201(i), or the Secretary of State certified them as removable under 8 U.S.C. §1227(a)(4)(C). The district court plainly would have lacked jurisdiction to hear challenges to those decisions under 1252(b)(9) and (g). *See AADC*, 525 U.S. at 945 (holding challenge to decision to commence proceedings "falls squarely within §1252(g)"); *Khalil v. President, United States*, 164 F.4th 259, 273, 265-66 (3d Cir. 2026) (holding §1252(b)(9) bars collateral challenge to removal proceedings); *see also* 8 U.S.C. § 1201(i) (barring all judicial review of visa revocations outside of removal proceedings. AAUP and MESA's attempt to

"lump[] together" the cases, "each of which would be jurisdictionally barred if brought alone" cannot "skirt the statutory channel markers." *Aguilar v. ICE*, 510 F.3d 1, 9-10 (1st Cir. 2007).

## A.    8 U.S.C. §1252(b)(9)

1.    Congress provided, in the Immigration and Nationality Act ("INA"), a comprehensive and exclusive remedial scheme over challenges to decisions, actions, and proceedings related to the removal of aliens, that channels all such challenges through the immigration courts and subsequent review into the courts of appeals. *See* 8 U.S.C. §§1252(a)(5), (b)(9), & (g). Section 1252(b)(9) directs that judicial review "of **all questions of law and fact** … arising from **any action taken** or proceeding brought **to remove an alien from the United States** under this subchapter shall be available only in judicial review of a final order under this section." 8 U.S.C. §1252(b)(9) (emphasis added).

Congress thus prescribed a single path for judicial review—"a petition for review filed with an appropriate court of appeals." §1252(a)(5). These provisions create "an unmistakable 'zipper' clause" whose "expanse is breathtaking." *Aguilar*, 510 F.3d at 9 (citation omitted). The statute, thus, deprives the

- 40 -

courts of jurisdiction except in reviewing a final order of removal. *See id.* (holding the provision is a "general jurisdictional limitation"). "Taken together, §1252(a)(5) and §1252(b)(9) means that *any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed only through the [petition-for-review] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016).

The recent decision in *Khalil* is illustrative. There, the Secretary of State issued an order under the foreign-policy provision at 8 U.S.C. §1227(a)(4)(C), and DHS charged Khalil with removability for that reason and because he made a material misrepresentation. *Khalil*, 164 F.4th at 266-67. Before the completion of removal proceedings, Khalil filed a petition for writ of habeas corpus arguing, among other things, that he was placed in proceedings in retaliation for his pro-Palestinian and anti-Israeli speech. *See id.* at 276. The Third Circuit held that, irrespective of any chill, Khalil had to wait until he files a petition for review of a final removal order to obtain judicial review of his constitutional claims. *See id.* at 273, 279. And indeed Khalil is now pursuing just such review. *See Khalil v. Blanche*, No. 26-60344 (5th Cir.).

Neither AAUP nor MESA has shown that the Government has taken any action to remove any of their members. Those organizations nonetheless

- 41 -

seek to bring the same collateral challenge that Khalil brought and lost. It would be paradoxical to require Khalil to bring his constitutional claims in removal proceedings, while permitting someone against whom no proceedings have been brought to challenge imagined future enforcement actions based on *his* removal. And it would be doubly bizarre to allow an organization—without even a credibly threatened member—to bring such a challenge.

That is the case here. Counts I and IV of the Complaint depend on the existence of a so-called unconstitutional ideological-deportation policy. JA.333-34. In the district court's own telling, it is "a mode of enforcement policy" that consists of "detaining, deporting, and revoking noncitizens' visas solely on the basis of political speech, and with the intent of chilling such speech and that of others similarly situated." Add.191. So, like the complaint, the district court's findings relied on determining the validity of past and future (speculative) actions taken to remove aliens from the United States.

These are precisely the types of issues that must be raised in removal proceedings. If a member of AAUP or MESA is placed in a proceeding, that person can challenge it on First Amendment grounds. *See Khalil*, 164 F.4th at 280 (noting that aliens can raise constitutional issues in immigration court and then in circuit courts); *AADC*, 525 U.S. at 496 n.2 (Ginsburg, J., concurring in

part and in the judgment) (describing this mechanism). But they cannot short circuit this process by bringing a preemptive and premature claim in district court before the Government acts.

2.      That AAUP and MESA's members have not been placed in removal proceedings gives no excuse to circumvent §1252(b)(9)'s strictures. *Cf.* Add.27-37. This Court in *Aguilar* explicitly rejected the argument that §1252(b)(9) does not apply where "the challenged actions occurred prior to the institution of any formal removal proceedings," because "[r]eading the statute" to be limited "to claims that arise from ongoing removal proceedings" would create a rush-to-the-courthouse dynamic that would unlawfully circumvent Congress's carefully reticulated review process. 510 F.3d at 10. This is what AAUP and MESA's complaint does—it supposes that the Government will take actions to place their members in removal proceedings and that they will be placed in those proceedings in violation of their constitutional rights, therefore, they will self-censor their speech out of fear. So, AAUP and MESA rushed to the courthouse and demanded the Judiciary preemptively prohibit actions the Government *might* take. Accepting this would render 1252(b)(9) a dead letter so long as aliens can imagine a hypothetical government policy that could in theory apply to them.

3.    The district court determined that "the general principals underlying *Bantam Books*" and other similar cases (though applicable to Count II on which the court denied relief) were still informative as to its findings on Count I. *See* Add.203-04; JA.344. Yet here, too, the court should have never come that far. This attempt to transform Count I into a chilling claim does not bring the case outside of §1252(b)(9)'s strictures. AAUP and MESA claimed that the Government took illegal *actions* to institute and maintain removal proceedings, which caused AAUP and MESA's alien members to fear speaking out else similar *actions* be taken against them. Constitutional claim or not, it must be heard in a petition for review. 8 U.S.C. §1252(b)(9); *see also AADC*, 525 U.S. at 490-91; *Khalil*, 164 F.4th at 279-80.

4.    Likewise, attempts to skirt the jurisdictional bars by banding together claims by *organizations*, not aliens, are at odds with the district court's determination that AAUP and MESA have associational standing *because of* their alien members' fears of being placed in removal proceedings. *Cf.* Add.27-37. Throughout trial, AAUP and MESA presented testimony of their members' fears of agency decisions and actions to remove them because of their constitutionally protected speech. Likewise, MESA's organizational standing was based on harm to its core activities *because of* their alien members' and

- 44 -

potential members' fears of being placed in removal proceedings. Thus, all of AAUP and MESA's claims rest on a challenge to the legality of actions taken to place aliens in removal proceedings. Grouping plaintiffs together does not avoid the strictures of (b)(9) and (g). *See Alvidres-Reyes v. Reno*, 180 F.3d 199, 205 (5th Cir. 1999) (holding that Section 1252(g) barred jurisdiction over a challenge to the INS's refusal to initiate removal proceedings against a class of individuals); *Chapinski v. Ziglar*, 278 F.3d 718, 721 (7th Cir. 2002) (same).

5.      Finally, the district court's attempt to avoid the jurisdictional limitations by characterizing AAUP and MESA's claims as challenging the Government's *enforcement policy*, not individual decisions to initiate removal proceedings, also fails. Add.27, 33-34, 168-69. The language of §1252(b)(9) referring to *any action* "is keyed to the nature of the challenged agency action, not the basis for" AAUP and MESA's challenge. *M.M.V. v. Garland*, 1 F.4th 1100, 1108 (D.C. Cir. 2021). AAUP and MESA cannot plead their way out of the channeling provision by basing their challenge on a supposed *policy* to chill speech when the "nature of the challenged agency actions" are *actions* to institute removal proceedings.

Indeed, it would be especially perverse to reframe AAUP and MESA's claims as solely targeting a *policy* as opposed to a removal proceeding given

the district court's standing theory. Under *Clapper*, to support standing based on a "chilling effect" theory, the threat must be "certainly impending." 568 U.S. at 417. In other words, if AAUP and MESA have standing at all, it is because there is more than an abstract enforcement policy—there must be a concrete, "certainly impending" removal proceeding. And if there is such a proceeding, section 1252(b)(9) directs where any challenge must be heard.

**B.    8 U.S.C. §1252(g)**

Section 1252(g) provides that "notwithstanding any other provision of law (statutory or nonstatutory) … no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to [1] commence proceedings, [2] adjudicate cases, or [3] execute removal orders against any alien," except through a petition for review from a final order of removal. Courts "cannot entertain challenges to the enumerated executive branch decisions or actions" outside a petition for review. *E.F.L.*, 986 F.3d at 964. As with §1252(b)(9), this provision barred the district court's jurisdiction to hear AAUP and MESA's claims.

Section 1252(g) was "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion" and "similar discretionary decisions." *AADC*, 525 U.S. at 485 & 485 n.9. Through §1252(g) and

- 46 -

other provisions of the INA, Congress aimed to prevent removal proceedings from becoming "fragment[ed], and hence prolong[ed]." *Id.* at 487; *see Rauda v. Jennings*, 55 F.4th 773, 777-78 (9th Cir. 2022) (Congress' intent was to "streamline immigration proceedings by limiting judicial review to final orders, litigated in the context of petitions for review"). To achieve these ends, §1252(g) prohibits district courts from adjudicating any challenge related to the commencement of removal proceedings—not only *whether* to commence proceedings, but also *when* to commence a proceeding. *See Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002).

In *AADC*, a group of aliens—members of the Popular Front for the Liberation of Palestine—brought a suit challenging their deportations. *Id.* at 473-75. The aliens claimed they were targeted for their beliefs and expression and even pointed to a specific statement by the "INS regional counsel" indicating as much. *Id.* at 474. They alleged that being deported "because of their affiliation with a politically unpopular group" was unlawful, in violation of the First and Fifth Amendments. *Id.* The Supreme Court held such suit jurisdictionally barred. The Court reasoned that the "decision to 'commence proceedings'" against an alien (or group of aliens) fit exactly within the plain text of

§1252(g)—in fact, a "challenge" to such an action was "precisely" what Congress had "in mind" when enacting that provision. *Id.* at 487. Such a challenge to one's removal (be it on constitutional grounds, or any other) must be channeled into a petition for review. *See Elgharib v. Napolitano*, 600 F.3d 597, 599, 601-03 (6th Cir. 2010) (holding 1252(g) barred constitutional claims even if another avenue of relief was unavailable); *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 945 (5th Cir. 1999) (holding 1252(g) barred claim that alien was excluded from the United States on account of his exercise of First Amendment rights).

This case follows *a fortiori*. If aliens *themselves* cannot bring this sort of suit against the Government "for allegedly targeting them for deportation because of their affiliation with a politically unpopular group," *AADC*, 525 U.S. at 472-73, then third parties (*e.g.*, professors, AAUP, or MESA) cannot bring such a collateral suit on the ground that they wish to listen to or associate with these aliens. Otherwise, the INA's jurisdictional bars would be meaningless, circumvented in every case by a family member, colleague, or friend who wishes to readily hear from the person being deported. No court has ever indulged such a theory.

So as with §1252(b)(9), §1252(g) deprived the district court of jurisdiction to hear AAUP and MESA's challenge to the actions and possible actions taken to remove aliens from the United States.

### C.    None of The District Court's Reasons for Ignoring §§1252(b)(9) and (g) Has Merit

The district court did not address §1252(b)(9) in the post-trial findings and fact and conclusions of law. Instead, it attempted to distinguish §1252(b)(9) in its denial of the Government's motion to stay the Sanctions Order. *See AAUP v. Rubio*, No. CV 25-10685-WGY, 2026 WL 686418, *5-8 (D. Mass. Mar. 11, 2026). The district court argued that AAUP and MESA's alien members would be deprived of their constitutional rights if they were forced to wait until removal proceedings to vindicate them. *See id.* Meaning, the injury would be irreparable because their speech would already have been chilled. *See id.*

The Supreme Court already rejected the idea that constitutional claims are exempt from the INA's jurisdictional bars. In *AADC*, the Court indicated that whatever First Amendment rights noncitizens have could wait until their removal proceedings had been completed and the courts of appeals could review them. *See* 525 U.S. at 487-89. The concurrence agreed with the general proposition that immediate judicial consideration of selective enforcement claims is unnecessary. *See id.* (Ginsburg, J, concurring in part and concurring

- 49 -

in the judgment). Indeed, section 1252(b)(9) expressly contemplates that "[j]udicial review of all questions of law and fact, *including interpretation and application of constitutional and statutory provisions*" are "available *only* in judicial review of a final order." 8 U.S.C. §1252(b)(9). There are no exceptions at all, let alone an exception for constitutional claims asserting chilled speech.

The district court, in denying the Government's motion to dismiss, held that §1252(g) did not apply because AAUP and MESA were not bringing their claims on behalf of any aliens in removal proceedings. Rather they were challenging a claimed enforcement policy, which they believed caused harm to their members. Add.35-36. This attempt to distinguish §1252(g) fails as well. AAUP and MESA plainly brought their action on behalf of their alien-members who feared the Government's immigration enforcement actions, and the complaint seeks to bar such actions. JA.334-35. As the Supreme Court explained, §1252(g) is "clearly designed to give some measure of protection to 'no deferred action' decisions and *similar discretionary determinations*." *AADC*, 525 U.S. at 485. This includes initiating proceedings. So AAUP and MESA bring their challenge on behalf of their members who might be placed in removal proceedings and seek to prevent that eventuality. This runs headlong

into §1252(g) as it preemptively challenges a discretionary prosecutorial deci-sion. Section 1252(g), like §1252(b)(9), was not designed to set up a race to the courthouse where so long as aliens file first, they can avoid 1252(g)'s strictures. *See Aguilar*, 510 F.3d at 10.

## III.   THE DISTRICT COURT ERRED IN FINDING A FIRST AMEND-MENT AND APA VIOLATION

The district court held that the purported policy violates the First Amendment and the APA because it constitutes viewpoint discrimination and chills speech. *See*, s*upra*, at 17-19. Neither theory has merit. The First Amend-ment does not prohibit the Government from removing aliens based on their political activity, as long as the Government has a facially legitimate and bona fide basis for the challenged action. And it does here. The APA claim fails for essentially the same reasons. And the district court's additional theory that the IDP constitutes an unexplained change of position is both forfeited and meritless.

### A.    The First Amendment Does Not Bar The Government From Re-moving Aliens Based On Their Political Activity

Supreme Court precedent squarely forecloses AAUP and MESA's claims that the alleged IDP violates the First Amendment. AAUP and MESA's theory is that the government has a policy of deporting aliens based

on their pro-Palestine political views. Even if such a policy existed, it would comport with Supreme Court precedent.

In *Harisiades v. Shaughnessy*, the Supreme Court ruled that the First Amendment was no "barrier" to the deportation of aliens based on their membership or association with the Communist Party. 342 U.S. 580, 592 (1952). Similarly, in *Turner v. Williams*, the Court held that there was no First Amendment impediment to the Government deporting an alien because of his anarchist beliefs and advocacy. *See Turner v. Williams*, 194 U.S. 279, 293 (1904); *see also Graham v. Richardson*, 403 U.S. 365, 377 (1971) ("[t]he national government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, [and the] regulation of their conduct").

The district court provided no sound basis for distinguishing *Harisiades*. The court first questioned the continuing validity of the case on the basis that it arose during the "Red Scare." Add.57. But that is not a legitimate reason for lower courts to disregard Supreme Court precedent.

The district court also disregarded *Harisiades* on the basis that aliens have the same First Amendment rights as citizens. Add.57-58. In fact, the rel-

evant cases stand only for the proposition that LPRs have *some* First Amendment rights—not that those rights are completely coterminous with citizens'. *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (noting the petitioner was a LPR); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (holding that only as a noncitizen "increases his identity with our society" do the "generous and ascending scale of rights" spring into action) (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)); *cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 25-26, 31-32 (2010) (affirming constitutionality of speech restrictions that could include citizens where the only exemption was for "independent advocacy that might be viewed as promoting the [terrorist] group's legitimacy"); *AADC*, 525 U.S. at 488 ("an alien unlawfully in this country has no constitutional right to assert selective enforcement [based on the First Amendment]"). In fact, the relevant cases stand only for the proposition that LPRs have *some* First Amendment rights—not that those rights are coterminous with citizens.

These limits on aliens' constitutional rights are consistent with the notion that "'[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.'" *Demore v. Kim*, 538 U.S. 510, 521 (2003) (quoting *Mathews v.*

*Diaz*, 426 U.S. 67, 79-80 (1976) and affirming it is not dictum); *accord Trump v. Hawaii*, 585 U.S. 667, 702 (2018). This is grounded in the principle that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Kim*, 538 U.S. at 522 (cleaned up). Indeed, in the foreign relations context, the Government can burden even citizens' First Amendment rights. *See Haig v. Agee*, 453 U.S. 280, 287 (1981) (upholding executive's authority to revoke passport on national security and foreign policy grounds).

## B. The Government's Actions Were Facially Legitimate and Bona Fide

1.      To the extent that AAUP and MESA assert that the government has burdened the First Amendment rights of their *citizen* members, those claims should be reviewed under the highly deferential "facially legitimate and bona fide standard"—*i.e.*, solely whether the legal justification proffered by the agency is facially valid, without further inquiry into the justifications behind the government's actions. *See Department of State v. Muñoz*, 602 U.S. 899, 908 (2024); *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972).  That standard is plainly met here. Under the facially legitimate and bona fide standard, the court looks to the legal justification proffered by the agency and, if facially

- 54 -

valid, "the inquiry is at an end." *Muñoz*, 602 U.S. at 908 (reviewing a citizen's constitutional challenge to a noncitizen's visa denial for whether the agency provided a "facially legitimate and bona fide reason"). This is because Congress has plenary authority over immigration matters, which are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Mathews*, 426 U.S. at 81 n.17 (citations and quotations omitted); *see also Carlson v. Landon*, 342 U.S. 524, 534 (1952) (as long as a noncitizen "fail[s] to obtain and maintain citizenship by naturalization, they remain subject to the plenary power of Congress to expel them under the sovereign right to determine what noncitizens shall be permitted to remain within our borders").

The Second Circuit's decision in *Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008), is instructive. There, the Second Circuit recognized that while noncitizens present in the United States have a constitutional right to equal protection, a claim that an executive-created registration and removal program violates equal protection based on religion, ethnicity, gender, or race, is reviewed no more stringently than under a facially legitimate and bona fide standard, or for rational basis. *Id.* at 427, 432, 438 (2d Cir. 2008) (reviewing equal protection claim challenging executive-created NSEERS program under facially

legitimate and bona fide standard). The Supreme Court relied on this decision in discussing review of executive action involving aliens. *See Hawaii*, 585 U.S. at 704 (citing *Rajah*).

The Government's challenged actions in this case plainly satisfy the facially-legitimate-and-bona-fide standard. The Secretary of State determined that Khalil, Mahdawi, Chung, and Suri were removable under 8 U.S.C. §1227(a)(4)(C), because they "would have potentially serious adverse foreign policy consequences and compromise a compelling U.S. foreign policy interest." JA.1564, 1572, 1589, 1592. This was based on their participation in anti-semitic protests and disruptive activities which created a hostile environment for Jewish students, engaging in threatening rhetoric and intimidation of pro-Israel bystanders, and support for designated terrorist organizations, among other reasons. *See supra* pp.9-10.  Öztürk, meanwhile, had her visa revoked as a matter of discretion under 8 U.S.C. §1201(i) based on the Secretary of State's finding that she "had been involved in associations that may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." *See, supra*, p.10. These were facially legitimate and bona fide justifications for the enforcement actions against these individuals, supported by statute, and based on the aliens'

- 56 -

conduct the district court's inquiry should have ended there. *Kleindienst*, 408 U.S. at 754, 769-70; *see Muñoz*, 602 U.S. at 908.

Although the district court purported to apply the facially-legitimate-and-bone-fide standard, it in fact proceeded to look behind the individual removal decisions. *See* Add.198-99. Despite AAUP and MESA's allegation of "an ideological deportation policy" targeting pro-Palestinian speech, the district court concluded that "[t]here was no ideological deportation policy." *See* Add.163. Indeed, the only way the district court was able to mount any assertion that the Government was attempting to chill speech was by looking to statements made by executive branch officials as evidence of an ulterior motive. *See* Add.198-99. This is precisely the action that the Supreme Court admonished against when applying the facially legitimate and bona fide standard. *See Kleindienst*, 408 U.S. at 758, 766) (declining to balance the First Amendment interests of those bringing the suit against Congress's plenary power because Congress had placed that responsibility "in the hands of the executive"). The same should apply here where Congress placed plenary power in the hands of the executive in 8 U.S.C. §§1201(i) & 1227(a)(4)(C). The district court should have followed *Kleindienst* and deferred to the agency's

facially legitimate and bona fide reasons for placing aliens in removal proceedings. *See* JA.1564-65, 1572-73, 1582, 1589-90, 1592-93.

## C.    The District Court Erred in Finding an APA Violation

The district court's APA holding rested not only on its erroneous finding of a constitutional violation, but also on a determination that the Government changed prior policy without reasonable explanation. The district court contended that the Government had reversed the September 3, 2021, Memorandum by Secretary of Homeland Security Mayorkas. www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf; Add.81-82, 210-211. That argument, like AAUP and MESA's constitutional claim, lacks merit. The first time this memorandum was raised was in AAUP and MESA's post-trial brief. Dkt# 254 at 6, 137. So, the Government did not have an opportunity to present evidence on or rebut AAUP and MESA's interpretation of the memorandum as there were no replies to the post-trial briefs. If it had, at the very least the Government would have pointed out that although the Mayorkas Memo instructs that "[a] noncitizen's exercise of their First Amendment rights … should never be a factor in deciding to take enforcement action," Add.81, Mayorkas Memo at 4, it caveats this instruction with the following: "This guidance does not prohibit consideration of one or more of the above-mentioned

- 58 -

factors if they are directly relevant to status under immigration law or eligibility for an immigration benefit." Mayorkas Memo at 4. In any event, that claim, too, fails because it hinges on a non-existent First Amendment violation.

## IV. The District Court Erred in Entering its Sanction Remedy

The district court's Sanctions Order violates fundamental limitations on its jurisdiction by creating a newly minted cause of action for AAUP and MESA's members who experience "an adverse immigration action." It provides that (1) "[u]pon commencement" of such action, "the Sanction Plaintiff's removal from the United States is automatically **STAYED** during the pendency of the Sanction Action"; and (2) in such action, the adverse immigration action is automatically "void[ed]," unless the government can rebut the presumption that the action was in retaliation for First Amendment conduct. AAUP and MESA did not request this remedy, have not defended it, and this Court has stayed it pending appeal.

1. Because §1252(b)(9) and (g) deprive the district court of jurisdiction over the action in toto, it necessarily had no jurisdiction to enter *any* relief. Also, the Sanctions Order conflicts with the commands of §§1252(b)(9) and (g) limiting challenges to actions to bring proceedings to judicial review of removal orders by setting up novel parallel proceedings in other district courts.

*See AADC*, 525 U.S. at 487 ("challenge to the Attorney General's decision to 'commence proceedings' … falls squarely within §1252(g)"); *Aguilar*, 510 F.3d at 9-14 (noting the "breathtaking scope" of §1252(b)(9)).

2.     Even absent those bars, §1252(f)(1) deprives the district court of jurisdiction to create its novel judicial procedure. It provides: "[N]o court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter" as to non-named parties. 8 U.S.C. §1252(f)(1); *see Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022); ("[§1252(f)(1)] generally prohibits … injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the … provisions").

The district court's order unquestionably enjoins or restrains the operation of covered provisions found in Part IV of the statute. It restrains removal proceedings under 8 U.S.C. §1229a and detention of aliens under 8 U.S.C. §1231. And, notwithstanding the district court's characterization of the order as a "sanction," it is "properly characterized as an 'injunction'" as "it substantially and obviously alters the parties' pre-existing legal relationship." *See Jones-El v. Berge*, 374 F.3d 541 (7th Cir. 2004). It does so by placing burdens on the Government vis-à-vis the "Sanction Action" and "Sanction Plaintiffs"

that otherwise do not exist. The Court's order also puts the "burden" on the Government to "affirmatively ascertain and determine whether [a qualified "Sanction Plaintiff"] has filed a Sanction Action in the United States District Courts." Add.247. The order then requires the Government to prove by clear and convincing evidence that it has an "appropriate" basis to remove a "Sanction Plaintiff." *Id.* Lastly, "[u]pon the moment of commencement of any Sanction Action … the Sanction Plaintiff's removal from the United States is automatically [stayed] during the pendency of the Sanction Action." *Id.* at 3. Because the Court's "Sanction" is clearly injunctive in nature, it is barred by §1252(f)(1).

The most egregious example of judicial overreach is the district court's prohibition on removing an alien because of the conviction of a crime before September 30, 2025. *See* Add.235 & n.5. This effectively nullifies a broad swath of the INA where Congress requires aliens who committed or were convicted of certain crimes to be removed. *See, e.g.*, 8 U.S.C. §§1182(a)(2), 1227(a)(2).

Section 1252(f)(1), thus, bars the Sanctions Action and §1252(f)(1), in combination with §1252(b)(9) and (g) would bar most of the other relief AAUP and MESA sought below.

- 61 -

3.      The Sanction Order also violates Rule 65, which provides that an injunction "binds only" "the parties" "who receive *actual notice* of it by personal service or otherwise." Fed. R. Civ. P. 65(d)(2) (emphasis added). It provides for a prospective and "automatic[] **STAY**[]" of any removal proceedings upon "commencement" of an action by a "Sanction Plaintiff" and places "the burden" on the United States "affirmatively to ascertain and determine whether such person has filed a Sanction Action in the United States District Courts." Add.235-36. That burden-flipping mandate cannot be squared with Rule 65(d)(2), not to mention basic principles of fairness, particularly because the Sanctions Order purports to impose binding obligations on federal officials in the absence of notice to such effect.

The Sanction Order purports not to control proceedings in *other district courts* over which it has no power, and over which the district court conceded it has no jurisdiction. Add.236., But it plainly operates to direct how proceedings in other district courts should proceed. That is far outside the district court's authority. *See Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 430 n.10 (1996) ("If there is a federal district court standard, it must come from the Court of Appeals, not from … district court judges.").

The Sanction Order exceeds the scope of the district court's equitable authority. A stay is an "equitable remedy." *See Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring in the grant of stay); *DHS v. D.V.D.*, 145 S. Ct. 2153, 2158 (2025) (Sotomayor, J., dissenting). Thus, the "substantive prerequisites for obtaining" a stay "depend on traditional principles of equity jurisdiction." *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 318-19 (1999); *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025). And "the traditional stay factors contemplate individualized judgments in each case," where "[t]he party requesting [the] stay bears the burden." *Nken v. Holder*, 556 U.S. 418, 433-34 (2009) (citation omitted). The two "most critical" factors are "whether the stay applicant has made a strong showing that he is likely to succeed on the merits," and "whether the applicant will be irreparably injured absent a stay." *Id.* at 434.

The Sanction Order transgresses these principles. It purports to "automatically **STAY**[]" the removal of a given alien upon filing and places the burden on the *non-moving* party to remove the stay. *But see Nken*, 556 U.S. at 434. It grants a stay without a meaningful showing that the applicant has *any* likelihood of success on the merits. And it does so when the only harm proven is removal, even though the Supreme Court has made clear that removal "is

not categorically irreparable." *Id.* at 435. This chutes-and-ladders system of relief is irreconcilable with traditional equity.

There is a word for what the district court did here: legislation. Creating federal causes of action—including for constitutional violations—is for Congress, not the courts: "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). This is true "[i]n both statutory and constitutional cases." *Hernandez v. Mesa*, 593 U.S. 93, 101 (2020).

At bottom, the Sanction order invades the province of Congress, which did not authorize the new "Sanction Action." The Supreme Court has rejected such free-floating power of federal courts to "adjust their remedies so as to grant the necessary relief when federally protected rights have been invaded." *Ziglar v. Abbasi*, 582 U.S. 120, 132 (2017) (quoting *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 392 (1971)); *see also Hernandez*, 593 U.S. at 99-101 (same). The presumption of unconstitutionality also amounts to a preclearance regime for removal proceedings contrary to §§1252(b)(9), (g), and (f)(1). And to make matters worse, the order upends the presumption of *regularity* that generally attaches to official acts. *See Nieves v. Bartlett*, 587

U.S. 391, 399-400 (2019) (explaining that when presumption of regularity is suspended, the plaintiff has the burden to prove lack of probable cause).

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court and direct that the case be dismissed for lack of jurisdiction. Alternatively, the Court should reverse the district court's judgment on the merits. At a minimum, the Court should vacate the Sanction portion of the district court's remedy order.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
  *Civil Division, U.S. Department of Justice*

DREW C. ENSIGN
  *Deputy Assistant Attorney General*


  /s/ Paul F. Stone
PAUL F. STONE
  *Acting Chief*
LINDSAY M. MURPHY
  *Deputy Chief*
VICTORIA SANTORA
  *Senior Counsel for National Security*
JESSE BUSEN
  *Counsel for National Security*
  *National Security Unit*

- 65 -

*Office of Immigration Litigation*
*Civil Division, U.S. Department of Justice*
*Post Office Box 878, Ben Franklin Station*
*Washington, D.C.  20044*
*Telephone: (202) 305-9647*
*Facsimile: (202) 307-8698*

JUNE 17, 2026                    ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I certify that this Brief for Defendants – Appellants complies with the word limit of Rule 31(a)(7)(B)(i), of the Federal Rules of Appellate Procedure, because, excluding the parts of the documents exempted by Rule 32(f), the brief contains 12,883 words. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it is prepared in a proportionally spaced typeface using MS Word in 14-point Century Expanded BT.

 /s/ Paul F. Stone
PAUL F. STONE
*United States Department of Justice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2026, I electronically filed the foregoing Brief for Respondent with the Clerk for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

      /s/ Paul F. Stone
PAUL F. STONE
  *United States Department of Justice*

Addendum to Defendants–Appellants' Principal Brief,
*AAUP v. Rubio*, Nos. 26-1141 & 26-1195 (1st Cir.)

Docket #73, April 29, 2025: Memorandum and Order,
  Denying, in part, Defendants' Motion to Dismiss...................................... Add.1

Docket #261, September 30, 2025:
  Findings of Fact and Rulings of Law.................................................... Add.69

Docket #313, January 22, 2026: Annotated Judgment.......................... Add.230

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                              )
AMERICAN ASSOCIATION OF                       )
UNIVERSITY PROFESSORS,                        )
                                              )
AMERICAN ASSOCIATION OF                       )
UNIVERSITY PROFESSORS -- HARVARD              )
FACULTY CHAPTER,                              )
                                              )
AMERICAN ASSOCIATION OF                       )
UNIVERSITY PROFESSORS AT NEW                  )
YORK UNIVERSITY,                              )
                                              )       CIVIL ACTION NO.
RUTGERS AMERICAN ASSOCIATION OF               )       25-10685-WGY
UNIVERSITY PROFESSORS-AMERICAN                )
FEDERATION OF TEACHERS, and                   )
                                              )
MIDDLE EAST STUDIES ASSOCIATION,              )
                                              )
                    Plaintiffs,               )
            v.                                )
                                              )
MARCO RUBIO, in his official                  )
capacity as Secretary of State,               )
and the DEPARTMENT OF STATE,                  )
                                              )
KRISTI NOEM, in her official                  )
capacity as Secretary of Homeland             )
Security, and the                             )
DEPARTMENT OF HOMELAND SECURITY,              )
                                              )
TODD LYONS, in his official                   )
capacity as Acting Director of                )
U.S. Immigration and                          )
Customs Enforcement,                          )
                                              )
DONALD J. TRUMP, in his official              )
Capacity as President of                      )
the United States, and                        )
                                              )
UNITED STATES OF AMERICA,                     )
                                              )
                    Defendants.               )
_____)

Add.1

YOUNG, D.J.                                  April 29, 2025

**MEMORANDUM AND ORDER**

The right of free speech enshrined in the Bill of Rights in the First Amendment to the Constitution "[a]s a general matter, . . . means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  United States v. Stevens, 559 U.S. 460, 468 (2010). It "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, . . . in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests," and "safeguards an individual's right to participate in the public debate through political expression and political association."  McCutcheon v. Federal Election Comm'n, 572 U.S. 185, 203 (2014) (quoting Cohen v. California, 403 U.S. 15, 24 (1971)).  Indeed, "[p]olitical speech is the primary object of First Amendment protection and the lifeblood of a self-governing people."  Id. at 228 (Thomas, J., dissenting).  This case raises the issue of whether certain Public Officials can enforce a policy of arresting, detaining and deporting non-citizens who are otherwise here legally based

[2]

Add.2

solely upon their pro-Palestine or anti-Israel political speech.

Here, the American Association of University Professors (the

"AAUP"), the AAUP-Harvard Faculty Chapter, the AAUP at New York

University, the Rutgers AAUP-American Federation of Teachers,

and the Middle East Studies Association (collectively, "the

Plaintiffs") sue Secretary of State Marco Rubio in his official

capacity, the Department of State, Secretary of Homeland

Security Kristi Noem in her official capacity, the Department of

Homeland Security, Acting Director of U.S. Immigration and

Customs Enforcement Todd Lyons in his official capacity,

President Donald J. Trump in his official capacity,[1]

(collectively, "the Public Officials"), and the United States of

America[2] based on the Public Officials' alleged policy of

targeting noncitizens who engage in pro-Palestinian or anti-

Israel speech and association for arrest, detainment, and

deportation (the so-called "ideological-deportation policy").

Compl., ECF No. 1.

---

[1] The President, who is sued in his official capacity, is not a proper party to this suit at least as to injunctive relief, and is dismissed to the extent that such relief is sought against him. See State of Miss. v. Johnson, 71 U.S. 475, 501 (1866); Franklin v. Massachusetts, 505 U.S. 788, 802-03 (1992); Trump v. United States, 603 U.S. 593, 639-40 (2024).

[2] The United States of America is dismissed as a party from this action inasmuch as it is, in the context of this action, the living embodiment of the Constitution, and the claims for declaratory and injunctive relief against the Public Officials are in their official capacities.

[3]

Add.3

The Plaintiffs bring four counts: (1) a claim based upon the First Amendment to the Constitution, challenging the ideological-deportation policy itself; (2) a claim based upon the First Amendment to the Constitution, challenging the Public Officials' threats to punish noncitizens' constitutionally protected speech;, (3) a claim based upon the Fifth Amendment to the Constitution, alleging that the ideological-deportation policy invites arbitrary and discriminatory enforcement; and (4) a violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(C), also based on the ideological-deportation policy. Compl. ¶¶ 134-39.  The Plaintiffs seek declaratory and injunctive relief, and an award of costs and attorneys' fees. Id. 47-48.

The Public Officials move to dismiss[3] on the grounds that: (1) this Court lacks jurisdiction because the Plaintiffs seek class-wide relief against immigration enforcement actions, which

---

[3] At the April 23, 2025, hearing on the Plaintiffs' Motion for Preliminary Injunction, ECF No. 13, the Court collapsed the motion into a trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, which is this Court's usual practice.  The Court construed the Public Officials' opposition to the Motion for a Preliminary Injunction as a motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and the Plaintiffs' Reply, ECF No. 69, as the opposition to the motion. The parties were offered an opportunity to adjourn until a later date to argue the motion to dismiss, but were content with having their motion to dismiss arguments heard forthwith.  The Court heard argument and took the matter under advisement. Elec. Clerk's Notes, ECF No. 72.

[4]

Add.4

is barred by two provisions of the federal immigration laws; (2) the Plaintiffs lack standing because they allege only incidental harms based on the possible choices of third parties in response to a vaguely defined policy, rather than the concrete and imminent harm that constitutional standing requires; (3) the Plaintiffs' First Amendment claims fail because this Amendment applies differently in the immigration context, and the Plaintiffs challenge an ill-defined policy that is really a generic political initiative, which challenge is foreclosed by the rule against selective deportation claims and in any case must be dealt with on an individual basis; (4) the Plaintiffs' Fifth Amendment claim fails because only statutes can be challenged as unconstitutionally vague; and (5) the Plaintiffs' APA claim fails because, given the ill-defined nature of the policy and the exclusive administrative scheme through which removal challenges must be channeled, the Plaintiffs point to no final agency action for which there is no other adequate remedy.

For the reasons stated below, the motion to dismiss is ALLOWED in part as to count three, and DENIED in part, as to counts one, two, and four. A case management conference is set for Tuesday, May 6, 2025 at 10 a.m.

[5]

Add.5

## I. INTRODUCTION

### A. Procedural History

The Plaintiffs filed suit against the Public Officials on March 25, 2025. See Compl. On April 1, 2025, the Plaintiffs moved for a preliminary injunction to enjoin the Public Officials and their agents from implementing or enforcing the ideological-deportation policy, and from threatening to arrest, detain, or deport noncitizen students and faculty based on political expression, and requested that this Court stay the policy under the Administrative Procedure Act, 5 U.S.C. § 705. Pls.' Mot. Prelim. Inj. & Expedited Briefing Sched., ECF No. 13. This motion was fully briefed. Mem. Law. Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Mem."), ECF No. 14; Defs.' Opp'n Pls.' Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 65; Pls.' Reply Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Reply"), ECF No. 69.[4]

This Court promptly scheduled a hearing on the preliminary injunction motion. As set forth above, see supra n.2, the motion for preliminary injunction was collapsed into a trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, the opposition to the motion was construed as a motion to dismiss, and the Plaintiffs' reply was construed as an

---

[4] The Court also received submissions from amici. The Court is grateful for these helpful, educational submissions.

opposition.  The Court heard argument on the motion to dismiss and took the matter under advisement.

**B.  Facts Alleged**

The Court takes the following facts alleged in the Complaint as true for purposes of the motion to dismiss.

The Plaintiffs allege that the Public Officials have announced and begun to carry out an "ideological-deportation policy" entailing "large-scale arrests, detentions, and deportations of noncitizen students and faculty who participate in pro-Palestinian protests and other related expression and association."  Compl. ¶ 1.  Pursuant to this policy, the agents of these Public Officials have arrested recent Columbia University graduate and lawful permanent resident Mahmoud Khalil ("Khalil") and revoked the visas of at least four others, supplied universities with the names of other students they intend to target, and launched new social media surveillance programs to identify other targets.  Id.  While occasionally referring to "pro-Hamas" speech, officials have in fact "stretched that label beyond the breaking point to encompass any speech supportive of Palestinian human rights or critical of Israel's military actions in Gaza," thus squarely targeting "constitutionally protected speech and association."  Id. ¶ 2.

The Plaintiffs allege that this policy "has created a climate of repression and fear on university campuses," such

[7]

Add.7

that some noncitizen students and faculty have stopped attending protests, resigned from politically-oriented groups, declined opportunities to publish commentary and scholarship, stopped contributing to classroom discussions, deleted past work from the internet, and in general now hesitate to speak on political issues in public or even in private text messages.  Id. ¶ 3. The Plaintiffs allege that this shows the policy "is accomplishing its purpose: it is terrorizing students and faculty for their exercise of First Amendment rights in the past, intimidating them from exercising those rights now, and silencing political viewpoints that the government disfavors." Id.  The Plaintiffs' counsel confirmed at oral argument that the ideological-deportation policy here is limited to speech related to Palestine and Israel.

### 1. The Plaintiffs

The Plaintiffs are associations whose members include thousands of faculty and students at universities across the country.  Id. ¶ 4.  They allege that the ideological-deportation policy prevents their citizen members from hearing from and associating with their noncitizen students and colleagues, to organize with them or engage in political speech with them, to benefit from their insights and scholarship, and to collaborate with them on academic projects.  Id.  The organizations themselves have also been harmed because they cannot learn from

[8]

Add.8

and engage with noncitizen members like they once did, and must divert resources to address the possibility that their noncitizen members will be arrested, imprisoned, and deported for exercising their First Amendment rights.  <u>Id.</u>

The AAUP is a nonprofit membership association and labor union of faculty, graduate students, and other academic professionals with chapters at universities across the country. <u>Id.</u> ¶ 9.  Its mission is to advance academic freedom and shared governance and to help the academic community organize to accomplish its goals, among other things.  <u>Id.</u>

The AAUP-Harvard Faculty Chapter is the AAUP chapter for Harvard faculty, headquartered in Cambridge, Massachusetts, the AAUP at New York University is the AAUP chapter for NYU faculty, headquartered in New York City, New York, and the Rutgers AAUP-American Federation of Teachers is the Rutgers AAUP chapter for at Rutgers University, headquartered in New Brunswick, New Jersey.  <u>Id.</u> ¶ 10-12.

The Middle East Studies Association ("MESA") is a nonprofit membership association of scholars, educators, and those interested in the study of the Middle East, whose mission is "to foster the study of the Middle East; to promote high standards of scholarship and teaching; and to encourage public understanding of the region and its peoples" through programs, publications, and services.  <u>Id.</u> ¶ 13.

[9]

Add.9

## 2. The Ideological-Deportation Policy

The Plaintiffs trace the origins of the policy to the wave of pro-Palestinian protests that occurred across campuses in the wake of the October 7, 2023 Hamas-led attacks on Israel and Israel's subsequent bombing of Gaza, including the widely publicized encampment at Columbia University in mid-April 2024. Id. ¶¶ 21-23.  They point out that, during his 2024 presidential campaign, President Trump characterized these protests as "pro-Hamas," "pro-terrorist," "antisemitic" and "anti-American," and promised to deport noncitizen students and faculty who participated, including a statement to donors in May 2024 that, "any student that protests, I throw them out of the country." Id. ¶ 24.

The Plaintiffs allege that "[t]he defendant agencies adopted the ideological-deportation policy . . . to implement two executive orders" issued by President Trump shortly after he took office: Executive Order No. 14,161, issued on January 20, 2025 and titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," which states that it is the policy of the United States to protect citizens from noncitizens who "espouse hateful ideology" and to ensure that noncitizens "do not bear hostile attitudes towards its citizens, culture, government, institutions, or founding principles" and "do not advocate for,

[10]

Add.10

aid, or support designated foreign terrorists and other threats to national security," and which directs the Secretary of State promptly to "vet and screen" all noncitizens "to the maximum degree possible," id. ¶¶ 25-26; and Executive Order 14,188, which states that it is the policy of the United States "to combat anti-Semitism vigorously" and "to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence," and directs each agency or executive department head to identify all authorities or actions that might be used "to curb and combat anti-Semitism," including "recommendations for familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3)" so that universities and colleges "may monitor for and report activities by alien students and staff relevant to those grounds" and ensure "that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens," id. ¶ 27. This second Order also reaffirms Executive Order 13,899, issued during the first Trump administration, which adopted a definition of antisemitism that includes constitutionally protected speech, such as claiming that Israel is "a racist endeavor," holding Israel to standards "not expected or demanded of any other democratic nation," or "comparing Israeli policies to those of the Nazis." Id.

[11]

Add.11

The "grounds for inadmissibility" referred to in Executive Order 14,188 are the security and related grounds, including terrorism-related provisions rendering noncitizens who engage in or incite terrorist activity, or endorse or espouse or persuade others to endorse or espouse the same, or represent "a political, social, or other group" that endorses or espouses such activity, inadmissible under 8 U.S.C. § 1182(a)(3)(B); and a foreign policy provision rendering inadmissible any noncitizen "whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States"; provided that, if such belief is grounded on beliefs, statements, or associations that are otherwise lawful, the Secretary of State must "personally determine[] that the [noncitizen]'s admission would compromise a compelling United States foreign policy interest" and provide timely notice of this determination to Congress, id. § 1182(a)(3)(C). Compl. ¶ 28.

The Plaintiffs also cite a White House fact sheet about Executive Order 14,188, which "promise[s]" to "Deport Hamas Sympathizers and Revoke Students Visas," and which included a warning from the President that resident aliens who "joined in the pro-jihadist protests" would be found and deported "come 2025," and that "student visas of all Hamas sympathizers on

[12]

Add.12

college campuses, which have been infested with radicalism like never before," would be canceled.  Id. ¶ 29.

As an example of the direct impact of the alleged policy, Plaintiffs cite the arrest of Mahmoud Khalil, a lawful permanent resident and recent Columbia graduate who was arrested at his Columbia student housing and had his green card revoked, whose deportation notice cites the foreign policy provision, and whom officials have stated was leading activities "aligned to" Hamas or that were "pro-Palestinian" but was not breaking the law; the revocation of at least four other student or faculty visas; the government's supplying universities with the names of other students to be targeted; and the launch of a new social media surveillance campaign to identify new targets.  Id. ¶¶ 30, 32-34, 36.  The Plaintiffs allege that the subsequent justification for revoking Khalil's green card, namely that he failed to disclose he was a member of the United Nations Relief and Works Agency for Palestine Refugees and Columbia University Apartheid Divest, and that he had continued to work for the British government, was pretextual.  Id. ¶ 35.

The Plaintiffs also recount the stories of four other students and faculty whose visas have been revoked on ideological grounds: Columbia doctoral student and NYU adjunct professor Ranjani Srinivasan, who fled the United States when threatened with arrest, including ICE agents' showing up at her

[13]

Add.13

apartment after her student visa was revoked, and who was later accused (without evidence, as alleged) of being a terrorist sympathizer who advocated violence, but who is active in protesting human rights violations in Gaza and signed an open letter in support of Palestinian liberation, id. ¶ 37; Columbia student and lawful permanent resident Yunseo Chung, who engaged in a pro-Palestinian protest and sit-in where she was arrested by police and given a ticket for obstructing governmental administration, and whose lawful permanent resident status was subsequently revoked after ICE issued a warrant for her arrest, id. ¶ 38; Georgetown University postdoctoral fellow Badar Khan Suri, who was arrested and whose student visa was revoked pursuant to the foreign policy provision, based on spreading "Hamas propaganda" and promoting antisemitism on social media and for having connections to a senior advisor to Hamas, despite those connections' being greatly attenuated, id. ¶ 39; and Cornell University doctoral candidate Momodou Taal, who is a prominent pro-Palestinian advocate, and whose student visa was revoked after he refused a request to "surrender to ICE custody," id. ¶ 40.[5]

---

[5] In their subsequent briefs, the Plaintiffs also refer to Rümeysa Öztürk, a doctoral student at Tufts University who was detained and whose visa was revoked, allegedly for writing an op-ed critical of Israel, Pls.' Mem. 3, and to Mohsen Mahdwani, a Columbia student and lawful permanent resident who led pro-

[14]

Add.14

The Plaintiffs also cite a number of statements from executive officials, including Secretary of State Rubio's statement on X (formerly Twitter) referring to a "zero tolerance" policy for foreign students who "support terrorists," notice of a new social media surveillance program called "Catch and Revoke," which uses Artificial Intelligence to find relevant evidence to support visa revocations, and statements expressing a clear intent to target more foreign students and faculty, including Vice President J.D. Vance's statement that Khalil's arrest was not about free speech or even fundamentally about national security, but about the American people's deciding who "gets to join our national community" and Secretary Rubio and the President's deciding "this person shouldn't be in America," and Secretary Rubio's statement that "every day now" the government is approving more visa revocations, id. ¶¶ 31, 41-47.

As a result of this policy, the Plaintiffs allege, many noncitizen students and faculty no longer participate in public protests, some have stepped back from leadership roles or participation in advocacy groups related to Palestine, some abstain from public writing or scholarship and have purged past writing and online posts, some skip class or classroom discussion, and some faculty have fled their home cities in the

---

Palestinian demonstrations at Columbia and whom DHS has now detained and seeks to deport, Pls.' Reply 2; id., Ex. H.

[15]

United States.  Id. ¶ 48.  "This chill," the Plaintiffs allege,
"flows directly from the policy challenged here," and from the
Public Officials' "threats" to arrest, detain, and deport
noncitizen students and faculties based on their lawful
expression and association.  Id. ¶ 49.  "Plaintiffs all have
noncitizen faculty and student members who have been compelled
to curtail their exercise of expressive and associational
rights" in these ways.  Id. ¶ 50.

In support of these allegations, the Plaintiffs describe
the chill experienced by five anonymous members of the AAUP, two
anonymous members of MESA, and one anonymous student who has
worked closely with their AAUP chapter.  Id. ¶¶ 51-76.  AAUP
Members A-E are lawful permanent resident professors or
lecturers who have, variously, taken down social media posts and
previously published writing and scholarship, stopped assigning
material about Palestine in class, withdrawn from a conference
presentation, ceased traveling abroad for conferences, ceased
engaging in political protest and assembly in which they
previously participated, ceased teaching a course they
previously taught, and foregone opportunities to write and speak
at public events, to continue planning a national organization
addressing issues related to Palestine, and to take on
leadership opportunities within their AAUP chapter.  Id. ¶¶ 51-
66.  MESA Members A-B are lawful permanent resident professors

[16]

Add.16

who have, variously, reduced their engagement on social media and self-censored on issues related to Palestine, refrained from traveling internationally for key research including on a new book project that requires it, canceled travel plans for conferences and thus foregone associating with colleagues including other MESA members, ceased protesting activity in which they formerly engaged, declined opportunities to chair academic committees and publish work, and foregone research grants and scholarship opportunities that would have required travel -- all of which harms their scholarship, which depends on travel for interviews and attendance at cultural events that they study. Id. ¶¶ 67-73. Noncitizen Student A is a graduate student and student visa holder who has worked closely with local AAUP chapter members, and who recently deleted their social media account, which they used for academic and networking purposes, and removed information about their work from university websites due to concern about material related to Palestine, and who has been chilled from associating publicly with colleagues, including AAUP members, and has declined to give speeches at protests or to appear at rallies and a previously planned film screening and panel discussion and a conference at which they had planned to speak. Id. ¶¶ 74-76.

In addition to the harms to these anonymous noncitizen teachers and students, the Plaintiffs allege direct harms to

[17]

Add.17

their organizations, which all advocate for academic freedom and related causes, and to their citizen members: deterred noncitizen participation in AAUP events and leadership roles, and diverted resources to counsel noncitizen members on immigration issues, id. ¶¶ 78-81; similar harms, including reduced noncitizen membership joining, to Harvard-AAUP, id. ¶¶ 82-84; similar harms, including a member-prepared petition related to pro-Palestine protesting that the NYU administration discounted in part because members felt compelled to remove their names out of fear, to the NYU-AAUP, id. ¶¶ 85-87; similar harms to Rutgers AAUP-AFT, id. ¶¶ 88-90; and similar harms to MESA, including the reduced participation of noncitizen scholars whose expertise is uniquely vital to MESA due to their "personal connections, heritage, and language skills," significantly reduced anticipated participation in MESA's landmark annual meeting in Washington, DC in November 2025 due to fear, and leadership and staff's specifically spending "more time and energy responding to crises stemming from the policy than on scholarship," id. ¶¶ 91-94.

The Plaintiffs also recount the experiences of several citizen member professors, including the President of MESA Asli Bâli, a professor at Yale Law School, who have been contacted by noncitizen students who are scrubbing the internet of any evidence of Palestine-related speech or scholarship, avoiding

[18]

Add.18

traveling abroad for critical research or speaking at academic events, or changing research topics and syllabi, and who themselves now hesitate to or are unable to coordinate or organize with, work with, or otherwise communicate with noncitizen members and other faculty and students as they once did, and who have canceled events, had online communities shut down, and witnessed noncitizens' ceasing participating in class, refraining from teaching or speaking on political topics, or even going into hiding, and who in some cases have significantly curtailed their own speech with noncitizens.  Id. ¶¶ 95-133. The citizen member professors argue that these fear-based restraints have significantly harmed their research and teaching and negatively impacted their rights to hear from and to associate with the threatened noncitizens.  Id.

## II.  ANALYSIS

### A. Standard of Review

Pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint "that states a claim for relief must contain . . .  a short and plain statement of the claim showing that the pleader is entitled to relief."  To test the sufficiency of the pleading, a defendant can file a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and to test the subject matter jurisdiction of the Court, a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1). "When faced with motions

[19]

Add.19

to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." Katz v. Pershing, LLC, 806 F. Supp. 2d 452, 456 (D. Mass. 2011) (Stearns, J.), aff'd, 672 F.3d 64 (1st Cir. 2012). Whether a motion is brought under Rule 12(b)(1) or 12(b)(6), "the reviewing court must take all of plaintiff's allegations as true and must view them, along with all reasonable inferences therefrom, in the light most favorable to plaintiff." Verlus v. Experian Info. Sols., Inc., No. 23-CV-11426-DJC, 2025 WL 836588, at *1 (D. Mass. Mar. 17, 2025) (Casper, J.). The complaint must include sufficient factual allegations that, accepted as true, "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Courts "draw every reasonable inference" in favor of the plaintiff, Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000), but they disregard statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (cleaned up). Accordingly, the Court addresses the jurisdictional issues first, and then proceeds to the merits arguments.

**B. This Court Has Subject Matter Jurisdiction**

"For much of U.S. history, the federal courts have not laid down clear principles governing the relationship between the

[20]

Add.20

First Amendment's commitment to freedom of speech and the immigration laws." Jennifer Lee Koh, Executive Discretion and First Amendment Constraints on the Deportation State, 56 Ga. L. Rev. 1473, 1482 (2022). Part of the reason may be jurisdictional. Here, the Public Officials argue the Court has no jurisdiction to test the merits for two reasons: first, 8 U.S.C. § 1252(f) ("Section 1252(f)") provides that no court other than the Supreme Court has jurisdiction "to enjoin or restrain the operation" of the federal laws governing deportation except as pertains to an individual alien against whom proceedings have been initiated, and the Supreme Court has interpreted this to mean that courts such as this one may not grant injunctive relief ordering federal officials "to take or to refrain from taking actions to enforce, implement, or otherwise carry out" the deportation provisions, whether or not those officials have properly interpreted the laws, Garland v. Aleman Gonzalez, 596 U.S. 543, 549-52 (2022); Defs.' Opp'n 4-6; and, second, 8 U.S.C. § 1252(g) ("Section 1252(g)") provides that no court has jurisdiction to hear a claim "by or on behalf of any alien arising from" the Attorney General's decision to commence proceedings, adjudicate cases, or execute removal orders, except through a petition for review from a final order of removal filed in a court of appeals, and the Supreme Court has interpreted this to mean that selective prosecution claims

[21]

Add.21

are jurisdictionally barred once an order of removal has been issued, see Reno v. American-Arab Anti-Discrim. Comm., 525 U.S. 471 (1999) ("AADC")[6] -- which rule, the Public Officials argue, applies a fortiori to third party claims, or else associates could always make an end run around the jurisdictional bar, Defs.' Opp'n 6-7.

### 1. Section 1252(f) Bars Only Injunctive Relief as to Certain Claims

The Public Officials first argue that to the extent that the "Plaintiffs ask this Court to 'enjoin' [the] Defendants from taking any action to 'arrest, detain, and deport' **any** 'noncitizen students and faculty' pursuant to the alleged 'ideological deportation policy,'" they ask for an injunction of "certain [immigration] enforcement actions against a class of people -- all noncitizen students and faculty across the country." Defs.' Opp'n 4. Such injunctive relief, say the Public Officials, has been jurisdictionally stripped by Congress from imposition by lower federal courts (though not the Supreme Court) by 8 U.S.C. § 1252(f)(1) ("Section 1252"), which provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this

---

[6] Most courts and commentators use AADC, or some acronym variation, as a short form, so it is adopted here.

[22]

Add.22

subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).

The Supreme Court recently reviewed the contours of Section 1252(f) in Aleman Gonzalez, 596 U.S. at 543. In that case, the lower courts certified and entered class-wide relief to provide aliens detained under 8 U.S.C. § 1231(a)(6) with bond hearings. Id. at 546. The government appealed, and the Ninth Circuit affirmed. Id.

The Supreme Court granted certiorari and ordered the parties to address whether Section 1252(f)(1) "deprived the District Courts of jurisdiction to entertain respondents' requests." Id. The Supreme Court held that Section 1252(f)(1) "deprived" the district court "of jurisdiction to entertain . . . requests for class-wide injunctive relief." Id.

The Supreme Court explained that Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions," except "with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." Id. at 550 (quoting Section 1252(f)(1)).

[23]

Add.23

As Justice Sotomayor observed in her partial concurrence, the Court's "holding risks depriving many vulnerable noncitizens of any meaningful opportunity to protect their rights." Id. at 569 (Sotomayor, J., concurring in part). That being said, Aleman Gonzalez "does not purport to hold that § 1252(f)(1) affects courts' ability to 'hold unlawful and set aside agency action, findings, and conclusions' under the Administrative Procedure Act, 5 U.S.C. § 706(2)," nor does it "bar[] even classwide declaratory relief." Id. at 571; see National TPS All. v. Noem, No. 25-CV-01766-EMC, 2025 WL 957677, at *11 (N.D. Cal. Mar. 31, 2025) ("The Court also bears in mind that the Supreme Court has, to date, declined to address the issue of whether § 1252(f)(1) is a bar to a court issuing relief pursuant to the APA.").

The Supreme Court subsequently read the provision as not brushing up against subject matter jurisdiction over an action at all, but rather merely "depriv[ing] courts [other than the Supreme Court] of the power to issue a specific category of remedies: those that 'enjoin or restrain the operation of' the relevant sections of the statute." Biden v. Texas, 597 U.S. 785, 798 (2022) (citation omitted). Indeed, the limitation is only on the authority of an inferior federal court to enter injunctive remedies. Id. at 799. Said differently, and more to the point, "the question whether a court has jurisdiction to

[24]

Add.24

grant a particular remedy is different from the question whether it has subject matter jurisdiction over a particular class of claims." Id. at 801. While the dissenting Justices in Biden v. Texas questioned the jurisdiction-versus-remedy holding with respect to injunctive relief, the only present bar is on injunctive relief. Id. at 821, 838-839. Indeed, Justice Barrett questions:

> Does [Section 1252(f)(1)] mean that the restriction on remedial authority is subject to waiver or forfeiture, so that a lower court can sometimes properly enter non-individual injunctive relief that this Court can then review? That a district court has the authority to enter some kinds of non-individual relief (for example, a classwide declaratory judgment) and that this Court can enter different relief (for example, a classwide injunction) on review of that judgment? Or that this Court can enter an injunction on appeal if the district court could have entered at least one form of relief, even if it actually entered only relief that exceeded its authority? Or perhaps the parenthetical serves the very different purpose of clarifying that § 1252(f)(1) does not disturb any pre-existing authority this Court has under the All Writs Act or other sources. These are difficult questions, yet the Court does not address any of them.

Id. at 838-39. The First Circuit presciently concluded, pre-Aleman Gonzalez, "that declaratory relief remains available under section 1252(f)(1)" and "[i]n so holding . . . reach[ed] the unremarkable conclusion that Congress meant only what it said -- and not what it did not say." Brito v. Garland, 22 F. 4th 240, 252 (1st Cir. 2021).

[25]

Add.25

The Public Officials argue that the requested relief falls squarely within the injunction-bar as interpreted by the Supreme Court in Aleman Gonzales. Defs.' Opp'n 5. The Public Officials incorrectly assert, however, that Section 1252(f)(1) is a "jurisdictional" bar. It is not.

The Plaintiffs argue that: (1) the provision does not bar injunctive relief vis-à-vis the ideological-deportation policy as opposed to specific immigration law provisions; (2) an injunction would only be barred as to "Part IV" of the Immigration and Nationality Act as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"); and (3) the remaining relief would not be injunctive relief (i.e. a stay under the APA or an injunction against threats). Pls.' Reply 8-10. All three of these arguments are problematic.

Nevertheless, at the motion to dismiss stage, this Court need not rule on this issue since the contours of the relief requested remain unclear. See Immigrant Defs. L. Ctr. v. United States Dept. of Homeland Sec., No. CV 21-0395, 2021 WL 4295139, at *7 (C.D. Cal. July 27, 2021) ("Because the precise form of plaintiffs' requested injunctive relief is not clearly defined at this stage of the case, it is premature to rule on whether § 1252(f) applies at this time.").

[26]

Add.26

Accordingly, the motion to dismiss based on this Court's subject matter jurisdiction is DENIED without prejudice, subject to renewal as to the issue of authorized remedies if -- and only if -- liability is first established.

### 2. Section 1252(g) Does Not Divest This Court of Jurisdiction Over the Plaintiffs' Ideological-Deportation Policy Claims

The Public Officials argue that even to entertain consideration of the alleged ideological-deportation policy is an end-around of Section 1252(g).  The Plaintiffs respond that their claims are brought neither by nor on behalf of an alien, nor do they arise from any deportation proceeding subject to the narrow jurisdictional bar; rather, the Plaintiffs attack an allegedly unconstitutional, overarching policy.  Pls.' Reply 4.

Section 1252(g) is a jurisdiction-stripping clause applicable to aliens or those bringing claims on their behalf in three distinct phases of the removal process:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim **by or on behalf of any alien** arising from the **decision or action** by the Attorney General **to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.**

8 U.S.C. § 1252(g) (emphasis added).

[27]

Add.27

As an initial matter, the statutory bar applies to "any cause or claim **by or on behalf of any alien**." Id. (emphasis added). The parties agree that Section 1252(g) is not all-encompassing, but rather is "narrow[]" in scope; it does not "cover[] the universe of deportation claims." AADC, 525 U.S. at 482; see Defs.' Opp'n 6; Pls.' Reply 4. Rather, the Supreme Court is clear that Section 1252(g) "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '[(1)] commence proceedings, [(2)] adjudicate cases, or [(3)] execute removal orders.'" Id. (brackets added).

A quarter century ago, in AADC, eight members of the Popular Front for the Liberation of Palestine, "a group characterized by the government as an international and terrorist organization," were charged under the now-repealed (and repealed at the time of the AADC decision) McCarran-Walter Act, which permitted the deportation of aliens who 'advocat[ed] . . . world communism.'" AADC, 525 U.S. at 473. Six of the eight were also charged with overstaying their visas and failing to maintain their student status. Id.

The aliens filed suit against the government to prevent their deportation, "challenging the anticommunism provisions of the McCarran-Walter Act and seeking declaratory and injunctive relief against the Attorney General, the INS, and various

[28]

Add.28

immigration officials in their personal and official capacities." Id.

The advocacy-of-communism charges were dropped. Id. The "technical violation charges against the six temporary residents [were retained] and [] Hamide and Shehadeh, who were permanent residents, [were charged] under a different section of the McCarran-Walter Act, which authorized the deportation of aliens who were members of an organization advocating 'the duty, necessity, or propriety of the unlawful assaulting or killing of any [government] officer or officers' and 'the unlawful damage, injury, or destruction of property.'" Id. at 474 (quoting 8 U.S.C. §§ 1251(a)(6)(F)(ii)-(iii)). Furthermore, the "INS regional counsel William Odencrantz said at a press conference that the charges had been changed for tactical reasons but the INS was still seeking respondents' deportation because of their affiliation with the PFLP." Id. The aliens "amended their complaint to include an allegation that the INS was selectively enforcing immigration laws against them in violation of their First and Fifth Amendment rights." Id.

The case wound its way through the courts, and eventually the district court preliminarily enjoined the aliens' deportation. Id. at 475. The district court held "that [the six temporary aliens] were likely to prove that the INS did not enforce routine status requirements against immigrants who were

[29]

Add.29

not members of disfavored terrorist groups and that the possibility of deportation, combined with the chill to their First Amendment rights while the proceedings were pending, constituted irreparable injury."  Id.  The two permanent residents lost at summary judgment.  The Ninth Circuit affirmed the injunction as to the six and reversed as to the two permanent residents.  Id.  The matter was remanded to the district court.  Id.

At that point, IIRIRA was passed by Congress, which enacted, among other things, Section 1252(g). Id.  The Attorney General appealed, claiming this new section stripped the courts of jurisdiction.  Id.  The Ninth Circuit disagreed, the Attorney General appealed again, and the Supreme Court granted certiorari.  Id. at 476.

The Supreme Court rejected the parties' competing arguments, and held that Section 1252(g) "applies only to three discrete actions that the Attorney General may take:" her "decision or action" to "**commence** proceedings, **adjudicate** cases, or **execute** removal orders."  Id. at 482.  As the Supreme Court explained, Congress' precision decidedly omitted "many other decisions or actions that may be part of the deportation process -- such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the

[30]

Add.30

product of the adjudication, and to refuse reconsideration of that order." Id. As the Supreme Court reasoned, "it is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings. Not because Congress is too unpoetic to use synecdoche, but because that literary device is incompatible with the need for precision in legislative drafting." Id. at 482.

To be sure, as argued by the Public Officials, "**many** provisions of IIRIRA are aimed at protecting the Executive's discretion from the courts -- indeed, that can fairly be said to be the theme of the legislation," such as inspections of aliens, denials of discretionary relief, and limiting review of asylum determinations. Id. at 486. Section 1252(g) is limited, however, to the discrete "subset of deportation claims" of three specific claims outline above. Id. at 487. Turning to the aliens' challenge to the commencement of deportation proceedings, the Supreme Court held that Section 1252(g) squarely applied. Id.

The aliens argued that the doctrine of constitutional doubt required the Supreme Court "to interpret § 1252(g) in such fashion as to permit immediate review of their selective-enforcement claims." Id. at 488. The Supreme Court stated that it did "not believe that the doctrine of constitutional doubt

[31]

Add.31

has any application here" and held that "[a]s a general matter -
- and assuredly in the context of claims such as those put
forward in the present case -- **an alien unlawfully in this
country has no constitutional right to assert selective
enforcement as a defense against his deportation**."  Id. at 488
(emphasis added).

The Supreme Court was sensitive, in the context of
perceived selective enforcement, to the independence of the
Executive Branch:

> What will be involved in deportation cases is not
> merely the disclosure of normal domestic law
> enforcement priorities and techniques, but often the
> disclosure of foreign-policy objectives and (as in
> this case) foreign-intelligence products and
> techniques.  The Executive should not have to disclose
> its "real" reasons for deeming nationals of a
> particular country a special threat -- or indeed for
> simply wishing to antagonize a particular foreign
> country by focusing on that country's nationals -- and
> even if it did disclose them a court would be ill
> equipped to determine their authenticity and utterly
> unable to assess their adequacy.

Id. at 490-91.  The Supreme Court was clear that a continued
violation of the law need not be countenanced because an alien
is improperly selected for deportation:

> In many cases (for six of the eight aliens here)
> deportation is sought simply because the time of
> permitted residence in this country has expired, or
> the activity for which residence was permitted has
> been completed.  Even when deportation is sought
> because of some act the alien has committed, in
> principle the alien is not being punished for that act
> (criminal charges may be available for that separate
> purpose) but is merely being held to the terms under

[32]

Add.32

which he was admitted.  And in all cases, deportation is necessary in order to bring to an end an ongoing violation of United States law.  **The contention that a violation must be allowed to continue because it has been improperly selected is not powerfully appealing.**

To resolve the present controversy, **we need not rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome.  Whether or not there be such exceptions,** the general rule certainly applies here.  **When an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity.**

AADC, 525 U.S. at 491–92 (emphasis added).  In sum, it does not

violate the Constitution for the government to commence removal

proceedings against an alien that is in the United States in

violation of the law for the **additional** reason that the alien is

a member of an organization that supports terrorist activity.

Here the Plaintiffs challenge the applicability of the

statute to them inasmuch as they are not bringing their claims

on behalf of an alien or in relation to a deportation

proceeding, and argue that the narrow grounds of Section 1252(g)

are not applicable.  The Plaintiffs' reliance on NWDC Resistance

v. Immigration & Customs Enf't, 493 F. Supp. 3d 1003, 1006 (W.D.

Wash. 2020) is persuasive authority that the Plaintiffs can

pursue their own rights and do not fall within the narrow

jurisdictional bar of Section 1252(g).  Pls.' Reply 4.

[33]

Add.33

In NWDC Resources, two immigration activist organizations sued ICE, its then-acting-director, and the then acting-Secretary of the Department of Homeland Security, claiming that "ICE ha[d] a policy and practice of targeting undocumented immigration activists in retaliation for their protected speech" but clarifying that they did "not seek to intervene in any particular removal proceeding, or to reverse any specific removal decision, but instead ask[ed] the Court to enjoin ICE's 'selective enforcement' policy as unconstitutional." Id. at 1006. Specifically, the plaintiffs plausibly pled the following facts that echo the allegations in the instant complaint:

> ICE has engaged in a policy and practice of targeting outspoken activists who publicly criticize U.S. immigration law, policy and enforcement. [The plaintiffs'] operative First Amended Complaint includes numerous examples of such targeting. Maru Mora-Villalpando is the president of La Resistencia. The FAC and Mora-Villalpando's Declaration establish that she was issued a Notice to Appear because of her "anti-ICE protests." La Resistencia and Maru Mora-Villalpando claim that such tactics are discriminatory and unconstitutional, and that they have had the perhaps intended effect of disrupting and discouraging member activists and their speech. Plaintiffs plausibly claim that they rely on family members for information about detainees, and that as the result of ICE's practice, those family members are afraid to speak. Plaintiffs argue that the fear caused by selective enforcement has forced them to cancel events, limit interactions with the media, and required them to divert resources from activism to defending members facing removal proceedings.

Id. at 1007. ICE's primary argument was that Section 1252(g) barred the action because the claim was really a selective

[34]

Add.34

enforcement claim against the immigrants, relying on the Supreme court's decision in AADC. Id. at 1008-09. For their part, the plaintiffs in that case argued that Section 1252(g) did not apply to their claims, which did not "challenge any specific removal decision, but rather the constitutionality of a policy of selectively enforcing immigration laws against aliens who speak about immigration issues." Id. at 1010.

The district court agreed with the plaintiffs that Section 1252(g) did not bar the claim:

> The Plaintiff organizations challenge the constitutionality of ICE's "policy choice" to target outspoken aliens. They do not seek to stop, delay, reverse or otherwise interfere with any of the three discrete actions described in Section 1252(g), as to any specific alien or any particular proceeding. None of the authorities upon which ICE relies supports its claim that such actions are barred by that statute's "limited scope;" every case it cites involved a claim by an individual challenging the motives behind removal proceedings commenced against him or her.
>
> Unlike the plaintiffs in those cases, the organizational Plaintiffs here are not aliens seeking to undo or prevent removal proceedings commenced against them. A narrow reading of Section 1252(g) does not apply to constitutional challenges brought by one who is not the alien subject to the three discrete decisions articulated in that statute, or one who is not bringing a challenge to such actions on the alien's behalf.

Id. at 1011.

So it is here. The NWDC Resistance decision, while somewhat a lone voice in the wilderness, is virtually indistinguishable from the larger picture in this case: the

[35]

Add.35

Plaintiffs plausibly allege harm from a policy driven purely by the Public Officials' displeasure with pro-Palestinian speech -- not even membership in an organization or espousing violence.

Whether the Plaintiffs will be successful on the merits is, of course, another matter entirely, but the Plaintiffs in the instant action are not barred by Section 1252(g), at least to the extent the relief is construed consistent with attacking the ideological-deportation policy.[7]  This Court agrees that the Plaintiffs' claims based upon the ideological-deportation policy are not brought "by or on behalf of any alien arising from" an enumerated deportation decision, and therefore this Court is not stripped of jurisdiction.  See Section 1252(g).

Though the Court rules that Section 1252(g) does not apply to the Plaintiffs' claims, it nevertheless addresses the applicability of the so-called "outrageousness" exception under AADC, being fully cognizant that "[t]his argument is based on dicta in [AADC] where the Supreme Court commented that a rare case might present a constitutional violation that is so outrageous that the doctrine of constitutional doubt might be employed to overcome the jurisdictional prohibitions of Section

---

[7] In fact, the plaintiffs in NWDC Resistance ultimately lost at summary judgment in January 2024.  See Jan. 4, 2024 Order Granting Summary Judgment and Vacating the Trial Date, ECF No. 191, NWDC Resistance v. Immigration & Customs Enforcement, Civ. No. 3:18-cv-05860-JLR.  There was no hearing, and the Order is unclear as to the reasoning; a written opinion is pending.  Id.

[36]

Add.36

1252(g)." Oldaker v. Giles, 724 F. Supp. 3d 1315, 1338 (M.D. Ga. 2024). While at least one court has viewed the exception as a possible avenue for relief in an appropriate case, see Ragbir v. Homan, 923 F.3d 53, 69–73 (2d Cir. 2019) (reversing jurisdiction-based dismissal of habeas claim, on basis that outrageousness exception to Section 1252(g) had been pleaded), **cert. granted, judgment vacated on other grounds sub nom**. Pham v. Ragbir, 141 S. Ct. 227 (2020), it is unclear whether it is applicable here. The Plaintiffs seem to recognize the tenuous nature of its applicability, devoting only a single sentence in a footnote:

> Even if § 1252(g) applied, [the] Defendants' policy is so egregious a violation of the First Amendment that it would come within the exception recognized in AADC for outrageous government conduct.

Pls.' Reply 5 n. 3 (citations omitted). As the Court views it, the Plaintiffs have successfully argued the inapplicability of Section 1252(g), and thus this Court has no basis for ruling on the applicability of the outrageousness exception. Put another way, Section 1252(g)'s jurisdictional bar applies narrowly to claims by aliens or brought on their behalf in relation to the deportation decisions enumerated in the statute, but the Supreme Court has left the door ajar to an even narrower exception even as to **those** claims.

[37]

Add.37

In any event, Section 1252(g) does not bar the Plaintiffs' claims, and its claims as to the ideological-deportation policy as pleaded plausibly will proceed as to most of the counts here. The Public Officials' motion to dismiss on this ground is DENIED.

### C. Standing

"As Justice Scalia memorably said, Article III requires a plaintiff to first answer a basic question: '"What's it to you?"'" Food and Drug Admin. v. Alliance for Hippocratic Med., 602 U.S. 367, 379 (2024) (quoting Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983)). As the Supreme Court recently explained, "[f]or a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute," and "courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" Id. (first quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021); and then quoting Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 487 (1982)). "In particular, the standing requirement means that the federal courts decide some contested legal questions later rather than sooner, thereby allowing issues to

[38]

Add.38

percolate and potentially be resolved by the political branches in the democratic process," and as to some "the standing requirement means that the federal courts may never need to decide some contested legal questions." Id. at 380. Indeed, "'[o]ur system of government leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed.'" Id. (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 227 (1974)).

Here, the Public Officials argue that the Plaintiffs lack standing under both of the theories that they advance: associational and organizational standing. Defs.' Opp'n 7-11.

In order to establish standing, plaintiffs must show that they have suffered an "injury in fact" that is "concrete and particularized," and, if based on future action, "actual or imminent" rather than "conjectural" or "hypothetical"; (2) "fairly traceable" to the alleged conduct of the defendant; and (3) "likely" redressable by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). "The plaintiff 'bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter," and "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" Murthy v. Missouri, 603 U.S. 43, 57 (2024)

[39]

Add.39

(alterations in original) (first quoting <u>Carney</u> v. <u>Adams</u>, 592 U.S. 53, 59 (2020); and then quoting <u>Lujan</u>, 504 U.S. at 561). "'[P]laintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" <u>Id.</u> at 61 (quoting <u>TransUnion LLC</u>, 594 U.S. at 431). "At the pleading stage, [the Court] 'appl[ies] [to questions of standing] the same plausibility standard used to evaluate a motion under Rule 12(b)(6)"; the Plaintiffs "'need not definitively prove [their] injury or disprove . . . defenses' but need only 'plausibly plead on the face of [their] complaint' facts supporting standing." <u>In re Fin. Oversight & Mgmt. Bd. for Puerto Rico</u>, 110 F.4th 295, 307 (1st Cir. 2024) (first quoting <u>Gustavsen</u> v. <u>Alcon Lab'ys, Inc.</u>, 903 F.3d 1, 7 (1st Cir. 2018); and then quoting <u>Tyler</u> v. <u>Hennepin Cnty.</u>, 598 U.S. 631, 637 (2023)).

### 1. Associational Standing

Associational standing allows an organization to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." <u>Hunt</u> v. <u>Washington State Apple Advert. Comm'n</u>, 432 U.S. 333, 343 (1977); <u>see also In re Fin. Oversight & Mgmt. Bd. for P.R.</u>, 110 F. 4th

[40]

Add.40

at 308.  The first prong, which is the only one that has been

challenged here, requires only "that at least **one** of the group's

members have standing as an individual."  Draper v. Healey, 827

F.3d 1, 3 (1st Cir. 2016).

"Where a litigant seeks to challenge governmental action as

violative of the First Amendment, two types of injuries may

confer Article III standing without necessitating that the

challenger have been subjected to [penalty]."  Thayer v. City of

Worcester, 979 F. Supp. 2d 143, 151 (D. Mass. 2013) (Hillman,

J.).  The first, which the Plaintiffs have not alleged, arises

when "the plaintiff has alleged an intention to engage in a

course of conduct arguably affected with a constitutional

interest, but proscribed by statute, and there exists a credible

threat of prosecution."  Id. (quoting Babbitt v. United Farm

Workers Nat'l Union, 442 U.S. 289, 298 (1979)).  The second

occurs when "the plaintiff is chilled from exercising her right

to free expression or forgoes expression in order to avoid

enforcement consequences.  In such situations the vice of the

statute is its pull toward self-censorship."  Id. (quoting New

Hampshire Right to Life PAC v. Gardner, 99 F.3d 8, 13-14 (1st

Cir. 1996)).[8]  Both injuries "depend on 'the existence of a

---

[8] Similarly, "[w]hen it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals.  The risk of a chilling effect

[41]

Add.41

credible threat that the challenged law will be enforced,'" or, put differently, require that "the fear of prosecution must be 'objectively reasonable.'" Mangual v. Rotger-Sabat, 317 F.3d 45, 57 (1st Cir. 2003) (first quoting N.H. Right to Life, 99 F.3d at 14; and then quoting Rhode Island Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 30 (1st Cir. 1999)).  At least in the criminal context, the evidentiary bar to show a credible threat of enforcement is "extremely low," and will be assumed "in the absence of compelling contrary evidence."  Id. (quoting N.H. Right to Life, 99 F.3d at 15).

The problem of evaluating allegedly objective chills on First Amendment rights has been analyzed recently in a number of campus speech code cases.  See Speech First, Inc. v. Cartwright, 32 F. 4th 1110, 1120 (11th Cir. 2022) (collecting cases).  In a recent dissent from a denial of certiorari in one such case, Justice Thomas described the state of the law on this issue:

> It is well settled that plaintiffs may establish standing based on "the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights."  And, in assessing whether an "objective chill" exists in a particular case, courts must "look through forms to the substance" of the government's "informal sanctions," . . . .

---

on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'" Americans for Prosperity Found. v. Bonta, 594 U.S. 595, 618-19 (2021) (quoting National Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 433 (1963)).

[42]

Add.42

> Common features of [campus] bias response
> policies suggest that they may cause "'students [to]
> self-censor, fearing the consequences of a report to
> [the bias response team] and **thinking that speech is
> no longer worth the trouble**.'" . . . . [T]he
> challenged bias response program combines a definition
> of bias that "appears limitless in scope" with a
> "threshold for reporting [that] is intentionally low."
> . . . . And, the threat that the bias response team
> may refer a report to other university officers for
> further action is **a "weighty consequenc[e]" that
> "'lurks in the background.'"**

Speech First, Inc. v. Whitten, 145 S. Ct. 701, 703 (2025)

(Thomas, J., dissenting from denial of certiorari) (emphasis

added) (citations omitted).  As the Eleventh Circuit has framed

its version of the objective chill test, "to determine whether a

First Amendment plaintiff has standing, we simply ask whether

the 'operation or enforcement,' of the government policy would

cause a reasonable would-be speaker to 'self censor[],' -- even

where the policy 'fall[s] short of a direct prohibition against

the exercise of First Amendment rights.'"  Cartwright, 32 F. 4th

at 1120 (alterations in original) (citations omitted).

The Public Officials argue that the alleged policy has not

been enforced against any of the Plaintiffs' members or even

anyone their members know, so the Plaintiffs cannot show that

their members face an immediate threat of harm that a judicial

remedy could alleviate, or, put differently, that any particular

speech of a particular speaker will invite deportation.  Id. at

7-8.  Were the Plaintiffs' associational standing theory to pass

[43]

Add.43

muster, the Public Officials warn, any group of professors could challenge any federal enforcement initiative that might impact students.  Id. at 9.  They also point to a more general bar against challenging the Executive Branch's exercise of enforcement discretion, premised on the principle that courts lack meaningful standards to assess enforcement choices, and argues that Plaintiffs cannot show causation because both the policy and the class of persons impacted are ambiguously defined.  Id. at 9-10.  Finally, the Public Officials argue that the Plaintiffs have not shown that any incidental injuries to the Plaintiffs and their members are redressable, because the alleged chill depends on the actions of others (that is, noncitizens) who feel threatened, and even the requested injunction would in no way reduce the authority of the government to exercise its immigration authority or prevent governmental authorities from commenting on issues related to Israel and Palestine.  Id.

On balance, drawing all factual inferences in their favor, at least the AAUP and MESA have associational standing to challenge the allegedly objective chill on their noncitizen members' speech.  Although they have downplayed this standing argument in their supporting briefs, the Plaintiffs have alleged facts supporting a plausible inference that reasonable noncitizen members of the Plaintiff organizations would self-

[44]

Add.44

censor in response to the challenged policy based on a credible threat of enforcement, which amounts to an objective chill. Compl. ¶¶ 51-76; see Cartwright, 32 F. 4th at 1120; see Laird v. Tatum, 408 U.S. 1, 11 (distinguishing between cases where chill "arise[s] merely from the individual's knowledge that a governmental agency was engaged in certain activities," such as the army surveillance program challenged there, and, based on those activities, "might in the future take some other and additional action," and cases where the governmental power exercised "was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to" it); Susan B. Anthony List v. Driehaus, 573 U.S. 149, 164-66 (2014) (finding risk of future enforcement sufficiently substantial where there was history of past enforcement, broad authority to file complaints triggering enforcement, enforcement proceedings were not rare, and proceedings could trigger criminal prosecution).

The experiences of five anonymous AAUP members and two anonymous MESA members, all lawful permanent residents and professors or lecturers, are described in the complaint, with particularized allegations that these members have stopped assigning materials or teaching formerly-offered classes touching on Israel and Palestine, turned down opportunities to write and speak on related matters, canceled conference and

[45]

Add.45

other plans, removed related previously published writing and scholarship from the internet, declined leadership and event opportunities within their organizations, ceased traveling abroad or departed the country, and stopped associating or protesting, all out of fear of potential retaliatory deportation if they engage in political speech. Compl. ¶¶ 51-73. The complaint alleges, moreover, that "Plaintiffs all have noncitizen faculty and student members who have been compelled to curtail the exercise of expressive and associational rights," that only "some" of these members have described their experiences in detail, and that they are "anonymized because they fear that their connection to this lawsuit could lead to them being targeted," and that some noncitizen members who were interviewed by counsel "were too fearful even to have their experiences described anonymously." Compl. ¶ 50. Contrary to the Public Officials' assertions, this alleged chill bears a close connection to the Plaintiffs' allegations that the Public Officials have announced an intent to carry out large-scale arrests and deportations of noncitizen students and faculty who participate in pro-Palestinian protests and related speech, have made good on this promise by initiating arrests and revoking student visas, have supplied the names of other students to be targeted to universities, and have launched a social media surveillance program to identify more targets. Compl. ¶ 30.

[46]

Add.46

Although the Plaintiffs may be required to name at least one of these would-be speakers, see Summers v. Earth Island Inst., 555 U.S. 488, 498-99 (2009); Draper v. Healey, 827 F.3d 1, 3 (1st Cir. 2016), these chilled noncitizen members of the Plaintiffs' organizations would have standing to assert their First Amendment rights on their own behalf, so the associations of which they are members also have standing to sue.

Instead of emphasizing the chill on their noncitizen members' speech, the Plaintiffs have stressed their citizen members' right to hear from and associate with noncitizens, citing Kleindenst v. Mandel, 408 U.S. 753, 762-65 (1972) for the proposition that the right to hear and to receive information and ideas is protected by the First Amendment. The Plaintiffs are not wrong to invoke their citizen members' right to hear and to receive information, particularly given that the First Amendment is "nowhere more vital than in our schools and universities," Mandel, 408 U.S. at 763, nor of course their right to associate, see Bonta, 594 U.S., but they point to no authority for the extension of what amounts to a kind of right-to-consortium claim to the right to hear from and associate with potential deportees. Mandel involved an individual would-be speaker who was invited to speak by particular would-be hearers and refused entry, 408 U.S. at 756-60, lending support to the Public Officials' argument that the harm to the citizen members'

[47]

Add.47

rights is too attenuated because no specific member is alleged to have been deprived by the government of the opportunity to hear from or associate with a specific noncitizen, Defs.' Opp'n 9. The Plaintiffs' "right to hear" argument, therefore, while non-frivolous, asks this Court to take an apparently unprecedented creative leap: to rule that one may sue for being deprived of the right to hear from another, due to an objective chill on another's speech. Without ruling that such a theory, or a similar theory based on freedom of association, could not properly be advanced, this Court instead rests its ruling that the AAUP and MESA have associational standing on the Plaintiffs' own noncitizen members' objectively chilled speech.

The Public Officials' redressability argument likewise fails at this stage. Although "Article III requires some minimum likelihood that the relief sought actually does or could matter," at the same time, "declaratory relief alone may be sought where it may have some meaningful effect." Neely v. Benefits Review Bd., 139 F.3d 276, 279 (1st Cir. 1998). This Court may grant the Plaintiffs declaratory relief, or a stay under the Administrative Procedure Act, even if injunctive relief is barred. See Brito, 22 F. 4th at 252. The Supreme Court has found the redressability requirement satisfied where, for instance, "it would seem . . . 'substantially likely that the President and other executive and congressional officials

[48]

Add.48

would abide by an authoritative interpretation of the census statute and constitutional provision,'" even in circumstances where it was not entirely clear how an agency would or must respond to a court's determination on a given issue.  Utah v. Evans, 536 U.S. 452, 463-64 (2002) (quoting Franklin v. Massachusetts, 505 U.S. 788, 803 (1992) (opinion of O'Connor, J.)); see also Antilles Cement Corp. v. Fortuno, 670 F.3d 310, 318 (1st Cir. 2012) ("To carry its burden of establishing redressability, [plaintiff] need only show that a favorable ruling could potentially lessen its injury . . . .").  The Public Officials are incorrect, moreover, in asserting that the Plaintiffs' claims necessarily depend on the actions or inaction of others; rather, the Plaintiffs allege that their members' own speech is being chilled.

### 2. Organizational Standing

Because the Plaintiffs' standing theories may affect the relief this Court can offer, this Court proceeds to analyze organizational standing as well.

Organizational standing allows an organization to sue when, like an individual, it has "alleged . . . a personal stake in the outcome of the controversy," because the challenged actions have caused "concrete and demonstrable injury to the organization's activities," with a "consequent drain on the organization's resources" that is "more than simply a setback to

[49]

Add.49

the organization's abstract social interests." Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) (quoting Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 261 (1977)). Although "only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact," Louis v. Saferent Solutions, LLC, 685 F. Supp. 3d 19, 32 (D. Mass. 2023) (Kelley, J.), the Supreme Court has cautioned that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action," and thus "has been careful not to extend the Havens [organizational standing] holding beyond its context," Food & Drug Admin. v. Alliance for Hippocratic Med., 602 U.S. 367, 370 (2024); see also Equal Means Equal v. Ferriero, 3 F. 4th 24, 29-31 (1st Cir. 2021) (collecting cases); African Cmtys. Together v. Trump, No. 19-10432, 2019 WL 5537231, at *4 (D. Mass. Oct. 25, 2019) (Hillman, J.) (injury-in-fact requirement satisfied where plaintiff organization alleged it had diverted resources to protect particular African immigrants facing imminent removal); Massachusetts v. United States Dept. of Health & Hum. Servs., 923 F.3d 209, 222 (1st Cir. 2019) (noting that, "[i]n this circuit, '[i]t is a bedrock proposition that "a relatively small economic loss -- even an identifiable trifle -- is enough to

[50]

Add.50

confer standing"'" (quoting Katz v. Pershing, LLC, 672 F.3d 64, 76 (1st Cir. 2012))).

The Public Officials argue that the Plaintiffs do not have organizational standing because they do not claim that they are being regulated directly, but rather focus on downstream harms from others' actions, such as noncitizens' declining to become members of their organizations. Defs.' Opp'n 11. It is entirely speculative, the Public Officials contend, whether associating with the Plaintiff organizations would lead to deportation, and the Plaintiffs have not alleged that it has; they have only alleged "ipse dixit anxiety." Id. Likewise, because organizations may not spend their way into standing, these organizations' decisions to divert resources toward addressing fears of deportation is not a cognizable Article III injury. Id.

The Plaintiffs argue that they have organizational standing because the policy has caused concrete injury to their activities, such as by deterring noncitizen faculty and students from joining their organizations and participating in their events, including members' stepping back from AAUP leadership positions and skipping AAUP and MESA events and projects, including MESA's flagship annual meeting, which has significantly lower-than-usual registration numbers at this time of year. Pls.' Mem. 9-10. The Plaintiffs also argue that they

[51]

Add.51

have diverted resources from other projects, spending significant portions of their time counseling noncitizen members on deportation risks and connecting them with legal help.  Id.

This Court rules that at least MESA has organizational standing to sue based on its own injuries.  The Middle East Studies Association, after all, exists to "foster the study of the Middle East," Compl. ¶ 91, and the Plaintiffs allege that the Public Officials are intentionally targeting noncitizens who speak about an important controversy affecting the Middle East and chilling speech related to it, see Compl. ¶¶ 13, 91-94.  This is a far cry from Alliance for Hippocratic Med., where the plaintiff medical associations alleged only that they were incurring costs to oppose the FDA's actions with respect to mifepristone, such as sponsoring studies to inform citizens of the drug's risk.  602 U.S. at 394.  The case at bar seems closer to Havens, where, as described in Alliance for Hippocratic Med., "[c]ritically, [the plaintiff] not only was an issue-advocacy organization, but also  operated a . . . service [that was] . . . . 'perceptibly impaired'" by the defendant's actions, that is, where the plaintiff's core service of providing accurate housing information were harmed by the defendant's giving its employees false information.  Id. at 395 (quoting Havens, 455 U.S. at 379).  With the caution that the Supreme Court has deemed Havens to be "an unusual case," id. at 396, then, MESA at least

[52]

Add.52

plausibly alleges that the Public Officials' "actions directly affect[] and interfere[]" with its "core . . . activities," id. at 395, such as by deterring noncitizen members -- whom MESA alleges are among its most valuable members due to their backgrounds and linguistic capacities, Compl. ¶ 92 -- from participating in core organization activities, and by perceptibly impairing its core mission of fostering the study of and dialogue about the Middle East.

Given the AAUP's core mission of advancing "academic freedom" in higher education, at least some of this reasoning applies to the AAUP and its chapters as well.  Compl. ¶ 78.  Considering the broader sweep of this mission, however, the AAUP's organizational standing argument is somewhat less particularized than MESA's.  But see The Presbyterian Church (U.S.A.) v. United States, 870 F.2d 518, 521-22 (9th Cir. 1989) (organizational standing to sue based on plaintiff church's allegation that Immigration and Naturalization Service surveillance caused members to "withdraw from active participation in the churches" and led to cancellation of a bible study group, to clergy time being diverted from regular duties, and to a general decline in support and congregant engagement and speech); NWDC Resistance, 493 F. Supp. 3d at 1015-16 (collecting First Amendment cases supporting capacious view of organizational standing).

[53]

Add.53

"So long as one plaintiff has standing to seek a particular form of global relief, the court need not address the standing of other plaintiffs seeking the same relief." Comfort v. Lynn Sch. Comm., 418 F.3d 1, 11 (1st Cir. 2005) (en banc). This Court therefore declines to rule on whether the AAUP and its chapters have organizational standing to sue at this stage. The motion to dismiss on standing is DENIED, and the Court proceeds to the merits.

## D. The First Amendment (Counts One and Two)

As to the Plaintiffs' First Amendment claims, the Public Officials argue: (1) that a "policy" cobbled together from news articles and social media posts is not amenable to First Amendment challenge, but is protected by the Public Officials' own rights to speech and to coordinate political initiatives, Defs.' Opp'n 12; (2) a facial challenge to the Executive Orders themselves is foreclosed because they have a plainly legitimate sweep, and these orders address unlawful conduct such as supporting terrorist groups, not protected speech, id. at 12-13; (3) under the federal immigration laws and Supreme Court precedent, the President and the Secretary of State may take action against noncitizens based on expression, such as speech that would compromise a compelling United States foreign policy interest or that endorses or espouses terrorist activity or persuades others to do so, or Communist party membership,

[54]

Add.54

because First Amendment protections are less robust for noncitizens, id. at 13-14; (4) aliens unlawfully in the United States cannot raise a selective enforcement defense against their deportations, so their would-be hearers cannot raise what is in essence one either and, to the extent that noncitizens can bring such claims, they must do so individually, id. at 14-15; and (5) the Plaintiffs cannot bring a claim based on National Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 191 (2024), because they do not allege that the Public Officials are suppressing their or their members' speech by coercing a third party to censor them, but rather that the Public Officials are acting directly against the would-be speakers, id. at 15.

Although this case raises novel First Amendment issues and the precise scope of the ideological-deportation policy challenged by the Plaintiffs is not yet clear, at the motion to dismiss stage the Plaintiffs' First Amendment claims survive. It is well established that noncitizens have at least some First Amendment rights, see Bridges v. Wixon, 326 U.S. 135, 148 (1945), and political speech is "at the core of what the First Amendment is designed to protect," Virginia v. Black, 538 U.S. 343, 365 (2003). Although case law defining the scope of noncitizens' First Amendment rights is notably sparse, the Plaintiffs have at least plausibly alleged that noncitizens, including lawful permanent residents, are being targeted

[55]

Add.55

specifically for exercising their right to political speech. See American-Arab Anti-Discrim. Comm. v. Reno, 70 F.3d 1045, 1063-64 (9th Cir. 1995), rev'd on other grounds, 525 U.S. 471 ("The Supreme Court . . . has accorded to aliens living in the United States those protections of the Bill of Rights that are not, by the text of the Constitution, restricted to citizens."); OPAWL – Building AAPI Feminist Leadership v. Yost, 118 F. 4th 770, 776 (6th Cir. 2024) ("Lawful permanent residents have First Amendment rights. . . . [T]hey have developed sufficient connections with the United States to be considered part of the national community: They live and work here lawfully, and they can serve in the military."); United States v. Verdugo-Urquidez, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); but see Price v. United States Immigr. & Naturalization Serv., 962 F.2d 836, 841-42 (9th Cir. 1991).  The Plaintiffs have also clarified that they do not mean to bring a selective prosecution challenge, but rather contend "that Defendants are deporting people on the basis of their viewpoints alone."  Pls.' Reply 6.

Contrary to what the Public Officials contend, this Court cannot agree that this alleged conduct would be constitutional. See Abourezk v. Reagan, 592 F. Supp. 880 (D.D.C. 1984) ("[Public

[56]

Add.56

Officials] may not, consistent with the First Amendment, deny [noncitizens] entry solely on account of the content of their speech."), vacated on other grounds, 785 F.2d 1043 (D.C. Cir. 1986). The Public Officials' reliance on case law from the height of the second Red Scare era, such as Harisiades v. Shaughnessy, 342 U.S. 580 (1952), is misplaced, and this Court assumes instead that noncitizens lawfully present in the United States have at least the core rights protected by the First Amendment, chief among them the right to speak on political subjects at least where such speech poses no immediate threat to others. See American Arab Anti-Discrim. Comm. v. Meese, 714 F. Supp. 1060, 1074-82 (C.D. Cal. 1989) (collecting cases holding that noncitizens have First Amendment rights, holding that noncitizens retain these rights in the deportation setting, and observing that in Harisiades, "the Supreme Court applied to aliens the same First Amendment test then applicable to citizens," which has since changed), aff'd in part, rev'd in part sub nom. American-Arab Anti-Discrim. Comm. v. Thornburgh, 970 F.2d 501 (9th Cir. 1991); see also Erwin Chemerinsky, The First Amendment 137-39 (3rd ed. 2024) (observing that, following the era in which Harisiades was decided, "by the mid-1960s, the Court appeared to be much more protective of speech," and describing the since-developed "incitement test" requiring "a likelihood of imminent harm"); Keyishian v. Board of Regents,

[57]

Add.57

385 U.S. 589 (1967) (holding a state law denying employment to members of subversive organizations, without requiring proof of knowledge and intent respecting the organizations' illegal objectives, unconstitutional); Holder v. Humanitarian L. Project, 561 U.S. 1, 39 (2010) (upholding application of statute criminalizing material support of terrorism to groups providing any material support to designated terrorist groups, including legal training and political advocacy done in coordination with them, but noting that the Court "in no way suggest[s] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations").

Although there is some superficial appeal to the Public Officials' argument that the Plaintiffs have raised no more than "generalized complaints about agency behavior," Greater Boston Legal Servs. v. United States Dept. of Homeland Sec., No. 21-cv-10083, 2022 WL 138629, at *6 (D. Mass. Jan. 14, 2022) (Casper, J.) (quoting Cobell v. Kempthorne, 455 F.3d 301, 307 (D.C. Cir. 2006)), First Amendment challenges may be brought against unwritten policies, and at this stage the existence of the policy the Plaintiffs allege is a factual issue on which this Court must draw all reasonable inferences in their favor, see, e.g., Hoye v. City of Oakland, 653 F.3d 835, 855 (9th Cir. 2011) (noting that "[a]n unwritten policy . . . is usually harder to

[58]

Add.58

establish," but less so when "the [Public Officials'] own pronouncements definitively articulate a content-discriminatory enforcement policy")[9]; see also Schmitt v. Murphy, No. 05-11348, 2010 WL 3813648, at *7 n.13 (D. Mass. 2010) (Gertner, J.) ("The existence of an oral, rather than written, policy does not

---

[9] In Hoye, the Ninth Circuit describes the First Circuit's identification of a "second kind of as-applied challenge," which challenges a neutral law that is being "enforced selectively in a viewpoint-discriminatory way," and which the Ninth Circuit characterizes instead as a "selective enforcement equal protection claim[]" rather than an as-applied challenge. 653 F.3d 835, 854-55 (9th Cir. 2011) (quoting McGuire v. Reilly, 386 F.3d 45, 62 (1st Cir. 2004)). The Public Officials construe the Plaintiffs' claims as a facial challenge to the relevant Executive Orders, but the Plaintiffs consistently state that they instead challenge a discriminatory policy implementing these orders. See Compl. ¶ 1. To make a selective enforcement claim of the kind described in McGuire, "some showing of intent on the part of government officials probably is necessary." 386 F.3d 45, 63 (1st Cir. 2004). Insofar as this can be construed as a facial challenge, the Public Officials are wrong to suggest that Plaintiffs must show that the challenged law or policy lacks any "plainly legitimate sweep," Moody v. NetChoice, 603 U.S. 707, 744 (2024); Defs.' Opp'n 12. Rather, "[t]o 'provide[] breathing room for free expression,'" a facial challenge under the First Amendment requires plaintiffs to show that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" Moody, 603 U.S. at 723 (first quoting United States v. Hansen, 599 U.S. 762, 769 (2023); and then quoting Bonta, 594 U.S. at 615)). Since the Plaintiffs allege intent, this Court need not decide the exact scope of their First Amendment challenge at this stage. See also Tipton v. University of Haw., 15 F.3d 922, 927 (9th Cir. 1994) (describing attack on "unwritten policy as manifested in the [defendant's] application of its written policy," which may be described as either facial or as-applied, and which focuses on "the **systematically unconstitutional operation** of a [written policy]" (quoting Bowen v. Kendrick, 487 U.S. 589, 608 (1988) (Blackmun, J., dissenting))).

[59]

appear to implicate the Constitution.  The Supreme Court discusses regulations or 'practice.'" (quoting <u>Procunier</u> v. <u>Martinez</u>, 416 U.S. 396, 413 (1974)).  This makes intuitive sense, because a speech code that is unwritten or vague but enforced with harsh penalties would seem more likely to chill broad swaths of speech than one that clearly defines what is forbidden.  <u>See</u> <u>Speech First, Inc.</u> v. <u>Sands</u>, 69 F. 4th 184, 207 (4th Cir. 2023) (Wilkinson, J., dissenting) ("With a definition this loose and rambling, almost anything could be framed as a [bias violation].").  This is what the Plaintiffs have alleged: a not-clearly-articulated policy against speech that could be construed as pro-Palestinian or anti-Israel, and that may be enforced by arrest, detainment, and deportation, including arrests at one's home or on the street by masked officers.  It is hard to imagine a policy more focused on intimidating its targets from practicing protected political speech.

Given the broadness of these allegations, this Court declines to analyze counts one and two separately at this stage. The law against speech-chilling governmental pressure, which more clearly applies to count two's alleged campaign of "threats to punish constitutionally protected speech," Compl. ¶ 136, is in some ways clearer than the law regarding rules or policies that work an objective chill, because there is on-point Supreme Court precedent establishing that the government may not exert

[60]

Add.60

undue pressure against First Amendment rights through a regime of "thinly veiled threats" and "informal censorship," Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 66-67 (1963), but the former may ultimately collapse into the latter, see Whitten, 145 S. Ct. at 703 (Thomas, J., dissenting), and the more recent case law regarding the former is more obviously applicable to the ideological-deportation policy that is challenged in count one, Compl. ¶¶ 134-35; see Cartwright, 32 F. 4th.[10]

This Court rules that the Plaintiffs have plausibly alleged the existence of both an ideological-deportation policy targeting protected political speech and a more informal campaign of censorship through threats. The motion to dismiss counts one and two is therefore DENIED.

**E. The Fifth Amendment (Count Three)**

As to the Plaintiffs' Fifth Amendment claim, the Public Officials argue that the Plaintiffs cannot challenge a cobbled-together unwritten "policy" as unconstitutionally vague; that, even if the Plaintiffs challenge the relevant Executive Orders,

---

[10] Count two also faces unique challenges because it implicates government speech, see Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."), and must also reckon with the free speech rights of the individual government actors whose speech the Plaintiffs view as threatening, see Goldstein v. Galvin, 719 F.3d 16, 30 (1st Cir. 2016) ("Not only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern.").

[61]

Add.61

this challenge is foreclosed, because these Orders do not regulate private conduct; that there is no precedent for extending Fifth Amendment vagueness doctrine beyond the statutory context; and, in any case, the Orders track well-established concepts of unlawful conduct such as harassment and aiding terrorism, so they are not vague. Defs.' Opp'n 15-16.

The Plaintiffs' counterargument is confined to a footnote, stating the general proposition that policies such as this one may be challenged on vagueness grounds, and that the Plaintiffs are not, as the Public Officials contend, challenging the Executive Orders themselves. Pls.' Reply 7 n.5. The cases cited for this proposition address written rules and regulations, not unwritten policies. See, e.g., Wagner v. City of Holyoke, 100 F. Supp. 2d 78, 86 (D. Mass. 2000) (Ponsor, J.) ("Even if **the rule** might be vague as applied . . . , it belies common sense to suppose that this plaintiff was not aware that his conduct fell within the purview of **the regulation.**" (emphasis added)). The Plaintiffs draw this Court's attention to a Due Process challenge to the foreign policy provision of the INA that the government has invoked to argue that it may take adverse immigration action based on expression, see Massieu v. Reno, 915 F. Supp. 681, 698-703 (D.N.J. 1996) (Barry, J.) (holding INA foreign policy provision void for vagueness), rev'd

[62]

Add.62

on other grounds, 91 F.3d 416 (3d Cir.); Defs.' Opp'n 13, but do not challenge this provision themselves.

Because Due Process-based vagueness challenges have not been extended beyond the statutory sphere or, at most, to written rules and regulations, the motion to dismiss count three is ALLOWED.

**F. The APA (Count Four)**

As to the Plaintiffs' APA claim, the Public Officials argue that the Plaintiffs have not challenged a final agency action or one for which there is no other adequate remedy, because (1) the alleged policy has not determined rights and obligations or triggered legal consequences, but is instead at most a general executive program not captured in any order or regulation, Defs.' Opp'n 16-17, and (2) challenges to removal decisions must be channeled through the exclusive administrative scheme established for immigration review, so there is another adequate remedy, id. at 17-18. In addition, the Public Officials argue that Executive Orders may not be challenged under the APA because the President is not an agency, and that the Plaintiffs' APA challenge would fail on the merits in any case because the "substantive policy decisions captured in the EOs (and reflected in practice)" are not arbitrary or capricious, but rather represent a rational response to a surge of antisemitic harassment after the October 7 attack that benefited terrorist

[63]

Add.63

organizations such as Hamas to the detriment of the United States' national security. Id. at 18.

In response, the Plaintiffs argue that there is a strong presumption in favor of judicial review of agency action, that agency action may be final even if it not reduced to writing, and that the Plaintiffs do lack any other adequate remedy because their claims are not reviewable through removal proceedings and their harms would not be relieved by future review of potential deportees' claims. Pls.' Reply 7-8.

For an agency action to be reviewable under the APA, it must be "final" action, Lujan, 497 U.S. at 882, and there must be "no other adequate remedy" for the alleged harm, Bennett v. Spear, 520 U.S. 154, 157 (1997). To be final, agency action must be "one by which rights and obligations have been determined" or from which "legal consequences will flow." Bennett, 520 U.S. at 177-78.

Particularly given that this Court must draw all reasonable inferences in the Plaintiffs' favor at this stage, including "inferences that support the existence of an official policy," Amadei v. Nielsen, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018), the Plaintiffs have plausibly alleged final agency action. Agency action "need not be in writing to be judicially reviewable as a final action," as "[a] contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to

[64]

Add.64

put those decisions in writing.'" Aracely, R. v. Nielsen, 319

F. Supp. 3d 110, 139 (D.D.C. 2018) (quoting Grand Canyon Tr. v.

Public Serv. Co. of N.M., 283 F. Supp. 2d 1249, 1252 (D.N.M.

2003)). This rule has been applied, for instance, where

plaintiffs challenged an unwritten Department of Homeland

Security policy that "direct[ed] ICE officers to consider

deterrence of mass migration as a factor in their custody

determinations," leading to the increased detention of Central

American mothers and children. R.I.L-R. v. Johnson, 80 F. Supp.

3d 164, 174 (D.D.C. 2015). Where "Defendants have repeatedly

stated that there is a policy," moreover, they "cannot, now,

have their cake and eat it too," and the Plaintiffs have pointed

to several examples of high-level agency officials at least

arguably "saying that they were following a policy" of targeting

those who have engaged in pro-Palestinian advocacy for

deportation. Amadei, 348 F. Supp. 3d at 165; see, e.g., Compl.

¶ 29.

As the Plaintiffs argue, the Public Officials' analogy to

Lujan, where the plaintiffs challenged a constellation of Bureau

of Land Management actions announcing its intent to grant

permission to certain activities, to decline to interfere with

others, and to take other action if requested, is inapposite,

because the Plaintiffs allege a specific "policy of revoking the

visas and green cards of faculty and students engaged in pro-

[65]

Add.65

Palestinian advocacy," not a constellation of independent decisions or a general drift in agency priorities. Pls.' Reply 7-8; Lujan, 497 U.S. at 892. This case is closer to Johnson than Lujan: here the Plaintiffs allege that the Public Officials are targeting noncitizens who engage in pro-Palestinian advocacy for visa revocation and deportation, not that they have become anti-Palestinian or suppressive of speech in some general way.

The Plaintiffs have also plausibly argued that their harms are not otherwise redressable than through the APA. If, as discussed supra, the Plaintiffs may be unable to obtain an injunction based on their freestanding First Amendment claims, then it is unclear how their harms may otherwise be redressed than by the stay they request under the APA. Likewise, "even if an individual noncitizen challenges the Agencies' [action], that review does not address the broader injury alleged by Plaintiffs here," Greater Boston Legal Servs. 2022 WL 138629, at *5 -- that is, the chill on noncitizen members' speech, the harm to citizen members' ability to hear from and associate with noncitizen colleagues and students, and the direct harm to the organizations' core missions of supporting academic freedom and to their core activities and spending. The Public Officials argue that the INA broadly precludes APA review of decisions affecting immigration, Defs.' Opp'n 17-18, but, as Justice Sotomayor noted in her Aleman Gonzalez concurrence, the Supreme

[66]

Add.66

Court has not addressed whether the INA restrains courts from setting aside agency action under the APA, 596 U.S. at 571 (Sotomayor, J., concurring in part), and the Plaintiffs point to instances where courts have held or assumed that it does not, Pls.' Reply 10; see National TPS All. v. Noem, No. 25-cv-01766, 2025 WL 957677, at *11-14 (N.D. Cal. Mar. 31, 2025).

Therefore, this Court DENIES the motion to dismiss count four.[11]

---

[11] The Plaintiffs argued the prudential standing requirement that their claims must be within the "zone of interests" of the statute governing the challenged actions for them to bring a claim regarding implementations of the statute under the APA, pointing to cases where employers benefiting from visa programs and organizations inviting noncitizens to speak were held to fall within the zone of interests of the INA.  Pls.' Mem. 17-18. The Public Officials do not challenge this characterization. This issue is underdeveloped now.  "As long as the constitutional standing requirements are satisfied, the court may evaluate the case's merits before resolving thorny prudential standing questions," and so this Court does here. Labor Rels. Div. of Constr. Indus. of Mass. v. Healey, No. 15-10116, 2015 WL 4508646, at *5 (July 9, 2015) (Zobel, J.).

## III. CONCLUSION

For the reasons stated above, the Motion to Dismiss is ALLOWED in part as to count three and DENIED in part as to counts one, two, and four. A case management conference is set for Tuesday, May 6, 2025 at 10 a.m.


**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[12]

---

[12] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.

[68]

Add.68

Post card dated June 19, 2025
(On file in Chambers)

19/JUNE 2025

TRUMP HAS PARDONS
AND TANKS....
WHAT DO YOU
HAVE ?

Dear Mr. or Ms. Anonymous,

Alone, I have nothing but my sense of duty.

Together, We the People of the United States -- you and me -- have our magnificent Constitution.

Here's how that works out in a specific case --

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                        )
AMERICAN ASSOCIATION OF                 )
UNIVERSITY PROFESSORS,                  )
AMERICAN ASSOCIATION OF                 )
UNIVERSITY PROFESSORS -- HARVARD        )
FACULTY CHAPTER,                        )
AMERICAN ASSOCIATION OF                 )
UNIVERSITY PROFESSORS AT NEW            )
YORK UNIVERSITY,                        )
RUTGERS AMERICAN ASSOCIATION OF         )
UNIVERSITY PROFESSORS-AMERICAN          )
FEDERATION OF TEACHERS, and             )        CIVIL ACTION NO.
MIDDLE EAST STUDIES ASSOCIATION,        )        25-10685-WGY
                                        )
              Plaintiffs,               )
        v.                              )
                                        )
MARCO RUBIO, in his official            )
capacity as Secretary of State,         )
and the DEPARTMENT OF STATE,            )
KRISTI NOEM, in her official            )
```

[1]

Add.69

capacity as Secretary of Homeland )
Security, and the )
DEPARTMENT OF HOMELAND SECURITY, )
TODD LYONS, in his official )
capacity as Acting Director of )
U.S. Immigration and )
Customs Enforcement, )
DONALD J. TRUMP, in his official )
Capacity as President of )
the United States, and )
UNITED STATES OF AMERICA, )
                                   )
                    Defendants.    )
_____)

YOUNG, D.J.                                        September 30, 2025


## FINDINGS OF FACT AND RULINGS OF LAW, PURSUANT TO FED. R. CIV. P. 52(A)


Proposed by Congress in 1789, and ratified in 1791, the First Amendment to the Constitution of the United States -- its words carved in New Hampshire granite on the exterior of the very courthouse in which this Court sits -- provides:

> **Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.**

U.S. Const. amend. I.

## I.    INTRODUCTION

On January 20, 2025, the first day of President Donald Trump's second term in office, he promulgated 26 Executive Orders. Executive Order 14149, entitled "Restoring Freedom of

[2]

Add.70

Speech and Ending Federal Censorship",[1] ostensibly issued to reverse conduct of his predecessor, barred federal officials from "any conduct that would unconstitutionally abridge the free speech of any American citizen." Id. at § 2(b). President Trump here makes clear that, in his view, the First Amendment's protection of freedom of speech applies to American citizens alone, and to an unconstitutionally narrow view of citizenship at that.

This case -- perhaps the most important ever to fall within the jurisdiction of this district court -- squarely presents the issue whether non-citizens lawfully present here in United States actually have the same free speech rights as the rest of us.  The Court answers this Constitutional question unequivocally "yes, they do."  "No law" means "no law."  The First Amendment does not draw President Trump's invidious distinction and it is not to be found in our history or

---

[1] See Executive Order 14160, entitled "Protecting the Meaning and Value of American Citizenship", Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025),  unconstitutionally attempting -- by executive fiat -- to extinguish birthright citizenship.  Doe v. Trump, 766 F. Supp. 3d 266, 289 (D. Mass. 2025), aff'd sub nom. New Jersey v. Trump, No. 25-1200, 2025 WL 2495232 (1st Cir. Apr. 23, 2025) ("[T]he Constitution confers birthright citizenship broadly, including to persons within the categories described in the EO.  Under the plain language of the Citizenship Clause and the INA provision that later borrowed its wording, and pursuant to binding Supreme Court precedent, the Court concludes that the plaintiffs' constitutional and statutory challenges to [Executive Order 14160] are likely to prevail.") (Sorokin, J.).

[3]

Add.71

jurisprudence.  See Section III.A infra.  No one's freedom of speech is unlimited, of course, but these limits are the same for both citizens and non-citizens alike.

With this constitution ruling firmly undergirding its approach, the Court here held a full hearing and a nine-day bench trial on the issue of whether the rights of these plaintiffs to constitutional freedom of speech have been unconstitutionally chilled by the deliberate conduct of any or all of these Public Official defendants.  The Court heard 15 witnesses and admitted 250 exhibits consisting of documents, photographs, and video clips.[2]

Having carefully considered the entirety of the record, this Court finds by clear and convincing evidence[3] that the Secretary of Homeland Security Kristi Noem and the Secretary of State Marco Rubio, together with the subordinate officials and

---

[2] All of the agreed-to Exhibits 1 – 231 were admitted as matter of course.  As for the balance of the numbered exhibits, those were admitted during the trial.

[3] As applicable here, "[t]he usual standard of proof in civil litigation is preponderance of the evidence." E.M.D. Sales, Inc. v. Carrera, 604 U.S. 45, 47 (2025).  "A more demanding standard, such as clear and convincing evidence, applies only when a statute or the Constitution requires a heightened standard or in certain other rare cases, such as 'when the government seeks to take unusual coercive action— action more dramatic than entering an award of money damages or other conventional relief—against an individual.'" Id. (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 253 (1989) (plurality opinion)).  Nevertheless, the Court considers the facts here so compelling as to meet and exceed the higher standard.

[4]

Add.72

agents of each of them, deliberately and with purposeful aforethought, did so concert their actions and those of their two departments intentionally to chill the rights to freedom of speech and peacefully to assemble of the non-citizen plaintiff members of the plaintiff associations.  What remains after issuing this opinion is to consider what, if anything, may be done to remedy these constitutional violations.

## II.  FINDINGS OF FACT[4]

Actually, there is but little dispute over the facts. Here they are:

### A. The Plaintiff Associations –- AAUP and MESA.

AAUP is a nonprofit membership association and labor union of faculty, graduate students, and other academic professionals with chapters at universities across the country.  As AAUP's general counsel, Veena Dubal ("Professor Dubal"), testified, "AAUP is one of the nation's oldest professional organizations" that represents faculty and graduate student workers at universities and colleges in the United States, Trial Tr. vol. I, 67:23-25-68:1 Jul. 18, 2025.  AAUP's goal is to "define and

---

[4] As this Court has reiterated during trial, we live in the real world.  There are facts that exist outside those presented at trial of which the Court can take judicial notice and other facts of general knowledge which while not dispositive of any issue here, provide context.  Those facts are presented mostly in the footnotes to these Findings of Fact and have citation references outside of the record.

Add.73

protect academic freedom and shared-governance principles." Id. 68:1-3. Central to its mission, since 1915, is to protect its members' right to engage extramural speech. Id. 68:4-9; 69:1-5. That is, speech made purely as a citizen, not as a researcher or scholar. Id. 68:11-15.

AAUP is a national organization, and also has chapters at various universities and colleges, which include both advocacy and collective bargaining functions. Trial Tr. vol. I, 70:1-11, Jul. 18, 2025. AAUP--Harvard Faculty Chapter is the AAUP chapter for Harvard faculty, AAUP at New York University is the AAUP chapter for NYU faculty, and Rutgers AAUP--American Federation of Teachers is the Rutgers AAUP chapter for Rutgers University.

The Middle East Studies Association ("MESA") is "the largest international organization that focuses on Middle East studies." Trial Tr. vol. II 129:24-130:1, Jul. 7, 2025. According to its website, its mission is "to foster[] the study of the Middle East; to promote high standards of scholarship and teaching; and encourage public understanding of the region and its peoples through programs, publications, and services." MESA Strategic Plan, 2021-2025, MESA Mission Statement, Ex. 133.

**B. The Relevant Immigration and Nationality Act Statutes – INA 212 and INA 237 Foreign Policy Non-Citizen Exclusions, and INA 221(i) Visa Revocations**

Congress passed the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., ("INA") in 1952. As set forth below, Congress delegated to the Secretary of State significant authority to exclude or classify as deportable non-citizens from the United States, and to revoke visas.

**1. Foreign Policy Reasons Making a Non-Citizen Excludable (INA 212(a)(3)(C))**

For non-citizens attempting to gain entry to the United States, pursuant to 8 U.S.C. § 1182(a)(3)(C)(i) ("INA 212(a)(3)(C)" or "Section 3C"), a non-citizen "whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is inadmissible." Id. Congress has clarified that a non-citizen is generally not "excludable or subject to restrictions or conditions on entry into the United States" on account of the non-citizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States, unless the Secretary of State personally determines that the [non-citizen's] admission would compromise a compelling United States foreign policy interest." Id. § 1182(a)(3)(C)(iii).

[7]

Add.75

### 2. Foreign Policy Reasons Making a Non-Citizen Deportable (INA 237(a)(4)(C))

For non-citizens already present in the United States, pursuant to 8 U.S.C. § 1227(a)(4)(C)(i) ("INA 237(a)(4)(C)" or "Section 4C"), a non-citizen "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." Id.

INA 237(a)(4)(C) incorporates the same exception from Section 3C. That is, while a non-citizen present in the United States is generally not deportable on account of the non-citizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States" that non-citizen may be removed if "the Secretary of State personally determines that the [non-citizen's] admission would compromise a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii), as incorporated by 8 U.S.C. § 1227(a)(4)(C)(ii). Essentially, INA 212(a)(3)(C) and INA 237(a)(4)(C)'s exceptions place profound -- but narrow -- exclusion and deportability classification power solely with the Secretary of State.[5]

---

[5] Since the implementation of INA 237(a)(4)(C), it has only been applied in a handful of instances prior to 2025, and there

[8]

Add.76

### 3. Visa Revocations under INA 221(i)

With respect to a non-citizen visa holder, pursuant to 8 U.S.C. § 1201(i) ("INA 221(i)"), "[a]fter the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation." Discretion is guided by Chapter 9 of the Foreign Affairs Manual ("FAM"), consular guidance through cables, emails and webinars distributed by the State Department. Trial Tr. vol. I, 21:1-23, Jul. 11, 2025. INA 221(i) does not contain a provision with respect to revocations of visas based upon past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States, such as appears in INA 237(a)(3)(C) and INA 237(a)(4)(C)'s exceptions.

### C. The United States Government's Relevant Organizational Structure Concerning Immigration and Removal

#### 1. The Department of State

The Department of State is charged with, among other things, determining whether and on what conditions non-citizens are admitted to, and permitted to retain status to remain in, the United States. See 8 U.S.C. § 1104. The Department of

---

is no evidence of it ever having been employed in the context of domestic speech. See note 19, infra.

[9]

Add.77

State is headed by the Defendant Secretary Marco Rubio ("Secretary Rubio"), a Presidential-appointed and Senate-confirmed Cabinet member.  As pertinent to this action, Senior Bureau Official of the Bureau of Consular Affairs John Armstrong ("SBO Armstrong") is the highest ranking consular official at the Department of State's Bureau of Consular Affairs, holding that position since February 27, 2025.  Trial Tr. vol. II, 78:7-14, 81:2-4, Jul. 11, 2025.

### 2. The Department of Homeland Security

The Department of Homeland Security ("DHS") is responsible for, among other things, the protection of the United States from internal threats just as the Department of Defense protects the nation from external threats.  The Department of Homeland Security is headed by the Defendant Secretary Kristi Noem ("Secretary Noem"), a Presidential-appointed and Senate-confirmed Cabinet member.  DHS oversees Immigration and Customs Enforcement ("ICE") (and its Enforcement and Removal Operations branch ("ICE-ERO" or "ERO")), which oversees the Department of Homeland Security Investigations ("HSI").  Trial Tr. vol. I, 43:7-8; 42:25-43:4, Jul. 9, 2025.  "HSI's mission is to dismantle transnational criminal organizations." Id. 54:18-19.

Assistant Director of the National Security Division of ICE, Andre Watson ("AD Watson"), is the "senior-most" ranking

[10]

Add.78

official at the National Security Division.  Trial Tr., vol. I, 60:16-23, Jul. 17, 2025.

Assistant Director Peter Hatch ("AD Hatch") is the most senior official at the Office of Intelligence, which operates under the umbrella of HSI.  Trial Tr. vol. I, 42:25-43:12, 55: 16-21, Jul. 9, 2025.  The Office of Intelligence supports investigations by producing research and analysis, traditionally on "criminal networks, criminal conspiracies, [and] those engaged in criminal conduct." Id. 56:2-5.  AD Hatch oversees the compilation of intelligence reports known as Reports of Analysis ("ROAs").  Id. 56:18-21.  ROAs are compiled by approximately 1,000 analysts who conduct investigations and review a variety of non-public and publicly available sources, otherwise known as "open source,"  Trial Tr. vol. I, 54:18-55:19, Jul. 10 2025, to inform, among other things, on possible violations of the INA and criminal laws to DHS and other agencies.  Trial Tr. vol. I, 55:25-56:1, Jul. 9. 2025.  Hatch reviews approximately 1,000 ROAs per year, and his office produces about 25,000 – 30,000 ROAs in total in any given year.  Id. 49:1-4, 50:1-4.  With respect to the student protests, Hatch reviewed approximately 100 ROAs.  Id. 53: 12-16.  There were approximately 100-200 ROAs total generated with respect to student protests.  Id. 54:5-11.

[11]

Add.79

While there is an internal review process, AD Hatch does not "sign off" on ROAs.  Id. 64:10-25.[6]

### 3. The Process of Initiation of Removal of Non-citizens under INA 237(a)(4)(C) or the Revocation of Visas under INA 221(i).

Since March 2025, the process for initiating the removal of a non-citizen under INA 237(a)(4)(C) is straight-forward.  Under the process at issue in this action, HSI issues an ROA which is then presented to the National Security Division.  Trial Tr. vol. II, 100:12-17, Jul. 9, 2025.  Upon review, if AD Watson and his team determines that it is appropriate, he sends a letter to the Department of State, id. 100:9-11, sometimes referred to as a "DHS Referral Letter."  That DHS Referral Letter is reviewed, and a recommendation is made directly to SBO Armstrong if it concerns revocation of a visa under INA 221(i), Trial Tr. vol. I, 54:14-55:9,  65:10-23, Jul. 18, 2025, or, if it concerns a lawful permanent resident or a foreign policy reason, a recommendation is made by SBO Armstrong to Secretary Rubio, so he may then make the statutorily required personal determination

---

[6] These agencies' public servants' contributions and sacrifices made in protecting the Nation are not lost on this Court.  SBO Armstrong summed it up on the last day of trial: "This is not a mundane thing.  If we get this wrong, we get the Molotov cocktail attack in Colorado.  If we get these sort of things wrong, you get the Boston Bomber.  If we get this stuff wrong, you get 9/11."  Trial Tr. vol. I, 33: 1-5, Jul. 18, 2025. While their efforts are oft times necessarily carried out in secret, the enormous responsibilities and pressures these public servants bear is acknowledged and appreciated.

[12]

Add.80

as to whether the non-citizen ought be removed, under INA 237(a)(4)(C). Id.  45:7-14, 50:11-23, Jul. 18, 2025.  If the recommendation is approved, SBO Armstrong or Secretary Rubio informs Secretary Noem, ICE, and HSI of the change in status of the non-citizen.  Trial Tr. vol. II 91:23-92:4, Jul. 11, 2025. If detention is sought, an administrative Form I-200 (HHS calls it a "warrant") is then issued.[7]

### D. Timeline of Relevant Events

**1. Former President Biden's Secretary of Homeland Security Mayorkas Implements Written Policy Banning Consideration of Exercise of First Amendment Rights in Enforcement of INA.**

On September 30, 2021, Secretary of Homeland Security Alejandro Mayorkas issued a memorandum stating, in pertinent part:

> We must exercise our discretionary authority in a way that protects civil rights and civil liberties. The integrity of our work and our Department depend on it.  A noncitizen's race, religion, gender, sexual orientation or gender identity, national origin, or political associations shall never be factors in deciding to take enforcement action.  A noncitizen's exercise of their First Amendment rights also should never be a factor in deciding to take enforcement action.  We must ensure that enforcement actions are not discriminatory and do not lead to inequitable outcomes.

---

[7] See note 20, infra.

[13]

Memorandum from Alejandro N. Mayorkas, Sec'y, U.S. Dept. of Homeland Sec., to Tae D. Johnson, Acting Director, U.S. Immigr. & Customs Enf't 5 (Sept. 30, 2021).

### 2. October 7, 2023 Terror Attack in Israel

According to a 2023 State Department Report, "[o]n October 7, [2023] Hamas, Palestinian Islamic Jihad, and other Palestinian terrorists launched a large-scale attack on Israel from the Gaza Strip, killing an estimated 1,200 individuals, injuring more than 5,400, and abducting 253 hostages. Israel responded with a sustained, wide-scale military operation in Gaza, which had killed more than 21,000 Palestinians and injured more than 56,000 by the end of the year, displaced the vast majority of Palestinians in Gaza, and resulted in a severe humanitarian crisis." 2023 Country Reports on Human Rights Practices: Israel, West Bank and Gaza, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/israel-west-bank-and-gaza/.[8]

Demonstrations on college campuses across the United States ensued, many of which were pro-Palestine/anti-Israel. Many protesters were non-citizens, many here on non-immigrant visas, see 8 U.S.C. §1101, 1184, or lawful permanent resident status

---

[8] At trial, the Court in effect took judicial notice of this event. Trial Tr. vol. II, 112:14-16, Jul. 17, 2025, and the parties do not dispute the occurrence of the October 7 attack.

[14]

Add.82

("Lawful Permanent Resident"), see 8 U.S.C. § 1151(a), so-called Green Card holders, of the United States.

In the wake of the October 2023 Hamas terror attack, the foreign policy of the United States under the Biden Administration was staunchly pro-Israel. This foreign policy has continued under the Trump administration. If anything, it has become even more strongly pro-Israel, following in virtual lock-step the foreign policy of the State of Israel.

### 3. January 2025 – Executive Orders Issued that Blend Legally Protected Speech and Unprotected Speech

#### a. Executive Order 14161

On January 20, 2025, upon President Trump's inauguration for his second term, he issued Executive Order 14161, entitled "Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats." Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 30, 2025), Ex. 70. The President declared that "[i]t is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, **espouse hateful ideology**, or otherwise exploit the immigration laws for malevolent purposes." Id. at § 1(a) (emphasis added). That Executive Order further states that "the United States must ensure that admitted aliens and aliens otherwise already present in the United States **do not bear hostile attitudes toward its**

[15]

Add.83

**citizens, culture, government, institutions, or founding**

**principles,** and do not advocate for, aid, or support designated

foreign terrorists and other threats to our national security."

Id. at § 1(b) (emphasis added).[9]

### b.  Executive Order 14188

On January 29, 2025, the President issued Executive Order

No. 14188, entitled "Additional Measures To Combat Anti-

Semitism."  Exec. Order No. 14188, 90 Fed. Reg. 8847 (Jan. 29,

2025).  The President declared in that Executive Order that

**"[i]t shall be the policy of the United States to combat anti-**

**Semitism vigorously, using all available and appropriate legal**

**tools, to prosecute, remove, or otherwise hold to account the**

**perpetrators of unlawful anti-Semitic harassment and violence."**

Id. at § 2.  That Executive Order reaffirmed an earlier

Executive Order,[10] "and directs additional measures to advance

---

[9] Another court has questioned the undefined "hostile attitudes" language. Aditya W. H. v. Trump, No. 25-CV-1976 (KMM/JFD), 2025 WL 1420131, at *11 (D. Minn. May 14, 2025)(Menendez, J.) ("Executive Order 14161 demonstrates the government's intent to focus on the vaguely defined category of noncitizens within the United States who purportedly bear "hostile attitudes" toward Americans or U.S. culture and institutions.").

[10] Executive Order 13899, "Combating Anti-Semitism," was issued during the President's first term.  Exec. Order No. 13899, 84 Fed. Reg. 68779 (2019).  In that Executive Order, the President directed that in considering evidence of discrimination under Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. 2000d et seq., as relating to anti-Semitism, "agencies shall not diminish or infringe upon any

[16]

Add.84

the policy thereof in the wake of the Hamas terrorist attacks of October 7, 2023, against the people of Israel." Id. at § 1. According to the President, the "attacks unleashed an unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence against our citizens, especially in our schools and on our campuses," and as a result "Jewish students have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; and intimidation, harassment, and physical threats and assault." Id.

The President ordered that within 60 days "the head of each executive department or agency [was to] submit a report to the President, . . . identifying all civil and criminal authorities or actions within the jurisdiction of that agency, beyond those already implemented under Executive Order 13899, that might be used to curb or combat anti-Semitism, and containing an inventory and analysis of all pending administrative complaints, as of the date of the report, against or involving institutions of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism." Id. at § 3.

---

right protected under Federal law or under the First Amendment." Id. at § 2(b).

[17]

Add.85

Additionally, the President ordered that "the Secretary of State, . . . and the Secretary of Homeland Security, in consultation with each other, shall include in their reports recommendations for familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. 1182(a)(3)[11] so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens." Id. at § 3(e).

The President issued a fact sheet along with Executive Order 14188, explaining that the Department of Justice would take "immediate action" to, among other things, "investigate **and punish** anti-Jewish racism in leftist, anti-American colleges and universities." Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism (emphasis added), Ex. 45; Stipulation and Order ("Stipulation No. __"), Stipulation No. 22, ECF No. 130; see also Ex. 23. He also made the following statement in that fact sheet:

> **To all the resident aliens who joined in the pro-jihadist protests,** we put you on notice: **come 2025, we will find you, and we will deport you. I will also**

---

[11] Section 1182(a)(3) of Title 8 of the United Sates Code enumerates security and related grounds that make aliens inadmissible to the United States, including INA 212(a)(3)(C).

[18]

Add.86

> **quickly cancel the student visas of all Hamas sympathizers on college campuses,** which have been infested with radicalism like never before.

Id. at 2 (emphasis added).

### 4. February 2025

#### a. The Department of Justice Forms the Federal Government Task Force To Combat Anti-Semitism

On **February 3, 2025,** the Department of Justice announced the creation of the Task Force to Combat Anti-Semitism ("Task Force"), coordinated through its Civil Rights Division.[12] "The Task Force's first priority will be to root out anti-Semitic harassment in schools and on college campuses." Id.

#### b. Diplomatic Cables Issued To Ensure Maximum Vetting of Visas

On **February 28, 2025,** Secretary Rubio issued a diplomatic cable entitled "Catch and Revoke: National Security Through Timely Processing of Visa Systems Messages" ("Catch and Revoke Cable"). 25 STATE 17178, Ex. 51; see Trial Tr. vol II, 99:12 – 100:2, Jul. 11, 2025. That cable implements Executive Order 14161, explaining in its summary that because "the Department is directed to ensure **maximum screening and vetting** throughout the visa process," consular officers must "use the whole-of-government law enforcement systems to vigilantly monitor the activities of aliens -- whether they are inside the United

---

[12] See https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-combat-anti-semitism.

[19]

Add.87

States or not." Catch and Revoke Cable 1. Furthermore, if a consular officer "catches an alien misusing a visa, the officer should generally revoke it" under INA 221(i). Catch and Revoke Cable at 1 The cable anticipates domestic consumption, providing that "[r]equests for revocation of visas where the individual is in the United States must be sent to the Revocation Team[.]" Id. at 5.

SBO Armstrong testified that the Catch and Revoke Cable, known as an "all back," and sent to over 200 diplomatic posts abroad. Trial Tr. Vol. II, 100:18-25, Jul. 11, 2025. According to SBO Armstrong, the Catch and Revoke Cable did not provide new legal authority for revoking visas, but rather relied on existing legal authority under INA 221(i). Id. 101:14-18. Indeed, according to SBO Armstrong, the Catch and Revoke Cable increased vigilance of using this authority. Id. 101:6-10. According to SBO Armstrong, the Department of State also performed a partial review of its Section 3(C) policies for visa denials. Id. 105:7-15.

The Catch and Revoke guidance was apparently successful, as a cable was later updated in May 2025, with guidance that relayed the doubling of visa revocations, and a 150% increase in visa revocations over the same time period of March 1 through April 15, 2024. "Caught and Revoked: Update Guidance on Systems Messages", 25 STATE 45612, Ex. 50.

[20]

Add.88

### 5. March 2025

#### a. The Homeland Security Council Held Multiple Meetings with Agencies to Align with the Executive Orders on Anti-Semitism

The Homeland Security Council is an executive branch council under the Executive Office of the President. Although the Council is not "secret," the Public Officials claimed privilege as to its membership, Trial Tr. vol. I, 45:6-16, and of course much of what it does is necessarily concealed from the public. At least with respect to certain members, membership is a matter of public record based upon their positions in the government.[13] Notably, White House Deputy Chief of Staff Stephen Miller ("Deputy Chief of Staff Miller"), is also the Homeland Security Advisor to the Homeland Security Council. Trial Tr. vol. I 47:5-6, Jul. 11, 2025; Trial Tr. vol. II, 114:22-24, July 17, 2025.

Throughout March 2025, the Homeland Security Council held interagency meetings to discuss, among other things, student visa revocations. Trial Tr., vol. I, 42:3-6, Jul. 11, 2025;

---

[13] The Administration has set out the contours of the Homeland Security Council and its membership on the public record, and therefore any privilege asserted by Public Officials as to the Council's composition -- at least as to those officials that fill the titles described in the January 20, 2025 National Security Presidential Memorandum -- is inapplicable or is waived. See https://www.whitehouse.gov/presidential-actions/2025/01/organization-of-the-national-security-council-and-subcommittees/

[21]

Add.89

Trial Tr. vol. I, 13:23-14:8, 19:12-20:2, Jul. 18, 2025. These meetings included "DHS, [the] State Department, [the Department of Defense] . . . the White House . . . [and] the Homeland Security [C]ouncil." Armstrong Dep. Tr. 207:21-24. Deputy Chief of Staff Miller, at times his deputy Adam Leason, SBO Armstrong, State Department's Office of Counsel Senior Advisor Andrew Veprek, and Senior Advisor Maureen Smith ("SA Smith") were attendees. Trial Tr. vol. I, 16:11-16, Jul. 18, 2025; Trial Tr. vol. I, 42:17-19, July 11, 2025. Approximately 12-20 meetings took place, mostly during March 2025. Trial Tr. vol. 1, 16:23-24, Jul. 18, 2025; Armstrong Depo. Tr. 201:1-21, 204:15-19.

As for the content of the communications, particularly from Deputy Chief of Staff Miller, the Public Officials assert the presidential communications privilege. For purposes of this action, the limited content of the communications disclosed from Deputy Chief of Staff Miller is unnecessary, and therefore the Court need not rule on the assertions of privilege with respect to those communications. The Court nevertheless infers from the timing and number of these meetings, that these weekly meetings logically were intended to implement the Administration's policies with respect to the executive orders, that the White House did not provide any guidance that contradicted the Public Officials' interpretations of the Executive Orders, and their

[22]

Add.90

actions related thereto as set forth below.  To be sure, there is no evidence in the record that the President had any participation other than the Executive Orders and public statements attributed to him.

### b.   DHS Investigates Campus Protestors

In early March, AD Hatch attended a meeting with HSI senior leadership.  Trial Tr. vol. I, 71:15-20, Jul. 9, 2025.  The Office of Intelligence focused on non-citizens, being charged "[t]o look at the protesters, to develop reports of analysis on the protesters, specifically looking for violations of U.S. laws, including and specific to **immigration and customs laws**." Trial Tr. vol. I, 74:14-17, Jul. 9, 2025 (emphasis added).  As Hatch related:

> Thinking in general terms, it was anything that may relate to national security or public safety issues, things like were any of the protesters violent or inciting violence? I think that's a clear obvious one.  Were any of them supporting terrorist organizations?  Were any of them involved in obstruction or unlawful activity in the protest . . . .  Like blocking normal citizens from going about their business . . . .  And that we would use the normal report of analysis process and our normal trade craft for this.

Id. 74:20-75:7-7.  Notably, no direction or definition as to what "supporting terrorist organizations" was provided.  Trial Tr. vol. II 93:4-8, Jul. 9, 2025.  AD Hatch stated, however, that his office performed their analysis in the usual manner. Id. 93: 9-13.  As Hatch testified:

[23]

Add.91

Q.  What does "supporting a terrorist organization" mean when you say it?

A.  (Pause.) Again the analyst looks for indicators, does not make the judgment on whether the activity actually supports or doesn't support terrorism.  So we look for activities, um, such as, um, support for a terrorist -- statements in support of a terrorist leader, um, everything from that to material support, which would be providing money to a terrorist organization or making, um, donations to an organization that's affiliated with a terrorist organization.  But I really don't want to say any more detail than that.

Id. 93:21-25, 94:1-7.

AD Hatch was told by DHS leadership (Hatch could not recall who) to review the names of student protestors on the Canary Mission website, which contains a database of over 5,000 individuals.  Id., 109-111.  Canary Mission's website purports to "document[] individuals and organizations that promote hatred of the USA, Israel and Jews on North American college campuses and beyond."  See "Our Mission", Canary Mission, Ex. 229.[14] Prior to March 2025, AD Hatch was unaware of the Canary Mission website.  Id. 112:18-22.

Within about a week of the early March meeting, a so-called "Tiger Team" was assembled to expedite the preparation of ROAs.

---

[14] The Public Officials are correct that Court did not admit the exhibit with respect to the Canary Mission website, Ex. 229, for its truth.  It makes no findings as to the truth of Canary Mission, its website, its contents, or its portrayal those individuals listed therein.  It is admitted as evidence of what the Public Officials viewed as Canary Mission's website as a primary source to investigate non-citizen student protesters.

[24]

Add.92

Id. 98:8-25-99:3.  Hatch confirmed that the Tiger Team's process was that: (1) the Office of Intelligence would fact find; (2) the National Security Division of Homeland Security Investigations would compile the information and provide it to the State Department; and (3) the State Department would decide on what action to take, if any.  Id. 98:20-99:3.  The use of the term "Tiger Team" is not pejorative.  It is a common internal practice referring to the speed and intensity of the work to be completed.  The phrase was not intended to intimidate or, indeed, to be publicly known.  Trial Tr. vol. II, 95:17-97:8, Jul. 10, 2025.

Due to the workload, the requirement to review all 5,000 individuals on the Canary Mission Website, the assembly of the Tiger Team required analysts be taken off of the "Counterintelligence Unit, the Counterterrorism Intelligence Unit, from the Cyber Intelligence Unit, from the Global Trade Intelligence Unit, from all different parts of HSI intelligence."  Trial Tr. vol. II, 106:16-21, Jul. 9, 2025.[15]

---

[15] According to AD Hatch, the Tiger Team was needed because "the normal unit or section or group of analysts . . . operating in [the] normal organizational construct couldn't handle that workload."  Id. 111:3-5.  When asked about deadlines, AD Hatch responded, "We are an organization or an agency that, um, in a world where . . . taking months to do things is not acceptable. So, yeah, it -- we were not -- I was not  going to be allowed to say we've got 5 -- well you know a small number of analysts on this, it's going to take them 6 months to get through 5,000 names. I was not given a deadline.  But I knew from how we were

[25]

Add.93

Canary Mission's list made up the bulk of the sources for HSI's investigations.  Trial Tr. vol. I, 15:10-13, Jul. 10, 2025.  There were others.  For example, Hatch also related that the team relied on Betar U.S.'s website for additional names.  Trial Tr. vol. I, 19: 7-16, Jul. 10, 2025.  He was also provided lists of names from HSI "top leadership".  Trial Tr. vol. II, 79:13-25, 80:25-81:5, July 10, 2025.  Some of these leads apparently came the Office of the Border Czar, Tom Homan.  Id. 79:10-19, 81:18-20.

Review of protest activity was new for AD Hatch, who had been in his position since 2019, and had not been requested to undertake such activity prior to 2025.  Trial Tr. vol. I,  66:9-10, Jul. 9, 2025.  AD Hatch understood that his department's ROAs were to focus only those engaged in protests because of the volume of names on the lists, which was a deviation from their normal practice of doing an ROA on all of those reviewed.  Trial Tr. vol. II, 97:25-98:12, 109:24-110:4, Jul. 10, 2025.  Thus, of the approximately 5,000 individuals investigated by the Office of Investigations, ROAs were prepared for less than 5%.  Id. 105:15-106:11.

---

organized and how we worked that we needed to work through this expeditiously." Id. 111:10-18.  The Court takes no position as to the Public Officials' prioritization of HSI's resources in this manner.

[26]

### c. The Public Officials Pursue Student Protestors Using an Elastic Definition of Anti-Semitism

On **March 3, 2025,** the Joint Task Force, including the Department of Health and Human Services, Department of Education, and General Services Administration announced a comprehensive review of higher education contracts and grants "for dereliction of duties to curb or combat Ant-Semitism violence and harassment."[16] HHS Secretary Robert F. Kennedy, Jr. is quoted as stating, "Anti-Semitism -- like racism -- is a spiritual and moral malady that sickens societies and kills people with lethalities comparable to history's most deadly plagues." Id. Further, he stated, "[i]n recent years, the censorship and false narratives of woke cancel culture have transformed our great universities into greenhouses for this deadly and virulent pestilence." Id.

On **March 4, 2025,** the President posted on social media:

> All Federal Funding will STOP for any College, School, or University that allows illegal protests. **Agitators will be imprisoned/or permanently sent back to the country from which they came.** American students will be permanently expelled or, depending on the crime, arrested. NO MASKS! Thank you for your attention to this matter.

https://truthsocial.com/@realDonaldTrump/posts/114104167452 161158 (emphasis added).

---

[16] See https://www.ed.gov/about/news/press-release/ed-hhs-and-gsa-announce-additional-measures-end-anti-semitic-harassment-college-campuses.

[27]

Add.95

On **March 6, 2025,** Secretary Rubio posted the following

on social media:

> Those who support designated terrorist
> organizations, including Hamas, threaten our
> national security.  The United States has zero
> tolerance for foreign visitors who support
> terrorists.  Violators of U.S. law —- including
> international students —- face visa denial or
> revocation, and deportation.

March 6, 2025, Secretary Rubio post on X; Stipulation No.

1.

### d.    HSI Investigates and Issues DHS Referral Letters as to Chung and Khalil

On **March 6, 2025,** HSI issued an ROA for Yunseo Chung

("Chung"), a Legal Permanent Resident.  Chung ROA, Ex. 236.

According to the report, Chung's criminal history included

charges for obstruction of governmental administration,

disorderly conduct, and trespass relating to a demonstration at

Barnard College that occurred on the previous day.  Id.

That evening, AD Watson signed, but did not compose, a

referral letter to Andrea Toll Whiting, Director of Field

Operations ("DFO Whiting") at the State Department.  Chung DHS

Referral Letter, Ex. 243; Trial Tr. vol. I, 79:16-23, Jul 17,

2025.  The purpose of the letter was "to provide a summary of

the actions by Yunseo Chung that violate President Trump's

executive orders on anti-Semitism and may be sufficient for the

Secretary of State to determine there are compelling adverse

[28]

Add.96

foreign policy consequences for the United States from" her "presence or activities consistent with" INA 237(a)(4)(C).  Id.

AD Watson stated Chung's Lawful Permanent Resident status, and related that "Chung's involvement in the March 5, 2025, protest at Barnard College, where Hamas fliers were distributed, aligns with the executive order's focus on deporting 'Hamas sympathizers.'"  Id.  He further stated social media posts, "indicate she was a figure in the Barnard College library occupation, where protesters distributed Hamas-authored flyers." Id.

Though there was neither an allegation nor evidence of Chung distributing flyers herself, Watson asserted that "HSI is concerned that the distribution of Hamas-authored flyers, leadership in disruptive protests, [and] involvement in antisemitic activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." Id.  AD Watson concluded by requesting that "the Secretary of State determine whether there are compelling adverse foreign policy consequences for the United States from" Chung's "presence or activities consistent with" INA 237(a)(4)(C) and stated that if it did make that determination, "HSI would initiate removal charges against" Chung.  Id.  The letter

[29]

Add.97

apparently attached a copy of the ROA.  Id.; Trial Tr. vol. I, 78:16-20, July 17, 2025.

On **March 6, 2025,** HSI issued an ROA for Mahmoud Khalil ("Khalil"), a Legal Permanent Resident and spouse of a United States citizen.  Khalil ROA, Ex. 233.  No criminal history was noted in the report.  According to the report, attached news articles and social media posts indicated that Khalil had been critical of Israel and participated in demonstrations at Columbia University, including an article from Canary Mission characterizing him as having "participated in the pro-Hamas encampment at Columbia in April 2024 as a lead negotiator on behalf of Columbia University Apartheid Divest (CUAD), an anti-Israel student coalition."  Id.

On **March 7, 2025,** AD Watson signed, but did not compose, a referral letter to DFO Whiting.  Trial Tr. vol. I, 79: 21-30, Jul. 17, 2025; Khalil DHS Referral Letter, Ex. 242.  That letter -- similar to the Chung DHS Referral letter -- was intended "to provide a summary of the actions by Mahmoud Khalil that violate President Trump's executive orders on anti-Semitism and may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences for the United States from" Khalil's "presence or activities consistent with" INA 237(a)(4)(C).  Id.

[30]

Add.98

AD Watson confirmed Khalil's Lawful Permanent Resident status, and related that "Khalil's involvement in the March 6, 2025, protest at Barnard College, where Hamas fliers were distributed, aligns with the executive order's focus on deporting 'Hamas sympathizers.'" Id. He further stated that "[h]is leadership in these disruptive protests **creates a hostile environment for Jewish students**" and that "Khalil is identified as a . . . **prominent pro-Palestinian activist involved in antisemitic activities**." Id. (emphasis added). AD Watson continued, stating that the social media posts and news articles attached to the ROA "document his leadership roles, including the occupation of Columbia University's Hamilton Hall in April 2024." Id. Further, then-"recent social media posts from March 6, 2025, indicate [Khalil] was a key figure in the Barnard College library occupation, where protestors distributed Hamas-authored flyers." Id.

Again, though there is neither an allegation nor evidence of Khalil actually distributing flyers (though, as set forth below, the Public Officials allege this anyway), AD Watson asserted that "HSI is concerned that **the** distribution of Hamas-authored flyers, **leadership roles** in antisemitic activities, and **leadership in disruptive protests** may undermine U.S. foreign policy **by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization**."

[31]

Add.99

Id. (emphasis added).  AD Watson concluded by requesting that "the Secretary of State determine whether there are compelling adverse foreign policy consequences for the United States from [Khalil's] presence or activities consistent with" INA 237(a)(4)(C), and that if it did make that determination, "HSI would initiate removal charges against" Khalil.  Id. at 1-2. The letter attached a copy of the ROA.

On **March 8, 2025,** SBO Armstrong authored an "Action Memo for the Secretary" as to both Chung and Khalil.  Mar. 8, 2025 Action Memo for the Secretary ("Chung/Khalil Action Memo"), Ex. 247.  As to Recommendations Nos. 1 and 2, Armstrong recommended that Secretary Rubio "determine the presence and activities of" Chung and Khalil "have potentially serious adverse foreign policy consequences for the United States and would compromise a compelling U.S. foreign policy interest, rendering" them "deportable under" INA 237(a)(4)(C).  Id.  Armstrong relied solely on the DHS Referral Letter from HSI and the ROAs in making his recommendation to Secretary Rubio.  Id.

Notably, Armtrong has never received guidance on what constitutes antisemitism.  Trial Tr. vol. I 25:15-25-28:4, Jul. 18, 2025.  Rather, he believes that "there's a common understanding in our culture in our society of what antisemitism is."  Id. 28:3-4.  Armstrong elaborated as to what he viewed anti-Semitism as definitionally in the absence of guidance:

[32]

Add.100

THE COURT: I'd like to now ask, would you state that, so I understand it? What do you think is the common understanding of what "antisemitism" is?

THE WITNESS: In my opinion, **antisemitism is unjustified views, biases, or prejudices, or actions against Jewish people, or Israel,** that are the result of hatred towards them.

THE COURT: Thank you.

Q [(by counsel)]. In other words, in your understanding **antisemitism includes hatred or prejudice against Israel and the Israeli people, right?**

A. Yes. In my understanding **antisemites will sometimes try to hide their views and say they're not against Jews, they're just against Israel, which is a farcical argument in my mind. It's just a dodge.**

Q. It's a dodge. It's a way of obscuring a person's antisemitic views?

A. In my opinion, yes, Counselor.

Id. 28:5-23 (emphasis added). Armstrong is informed by the public statements by Secretary Rubio that the United States has a strong policy against anti-Semitism, particularly on college campuses. Id. 21:2-8. According to Armstrong, this includes "anyone organizing antisemitic activity in the United States." Id. 21:21-22:5.

Guidance exists within the Department of State, however, which has an entire web page dedicated to the definition of anti-Semitism, in which it acknowledges, among other things, that "[m]anifestations [of Anti-Semitism] might include the targeting of the state of Israel, conceived as a Jewish

[33]

Add.101

collectivity. However, **criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic."** Ex. 210; https://www.state.gov/defining-antisemitism/ (emphasis added).[17]

As for Chung and Khalil, SBO Armstrong forwarded the information provide by AD Watson to Secretary Rubio. He concluded:

> The activities of Chung and Khalil in the United States have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest, because their participation and roles in antisemitic protests and disruptive activities fosters a hostile environment for Jewish students in the United States, and the public actions undermine U.S. policy to combat anti-Semitism around the world. Under E.O. 14188, *Additional Measures to Combat Anti-Semitism*, it is the policy of the United States to combat anti-Semitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and

---

[17] As the Court indicated during trial, and discusses further in its rulings of law, infra, "[c]riticisms of the State of Israel are not anti-Semitism, they're political speech, protected speech. Even strong, . . . vile criticisms of the State of Israel and its policies are protected speech . . . . [T]he [hypothetical or alleged] conduct of the State of Israel [as] -- involve[ing] war crimes, as involve[ing] genocide,. . . those matters are protected speech. . . . under the First Amendment to our Constitution." Trial Tr. vol. I, 113:4-15, Jul. 17, 2025. Additionally, "[c]riticism of the State of Israel, the use of the words that I mentioned, does not -- it's political speech, it does not constitute pro-Hamas, um, support. Pro-Hamas support has to be something more than, um, that." Id. 114:7-10. See e.g. Mohammed H. v. Trump, 781 F. Supp. 3d 886, 894 (D. Minn. 2025) (Blackwell, J.) ("[Speech] opposing violence in Palestine[] falls within the core of protected expression, which extends to noncitizens."). To be clear, while that type of speech is protected, the Court itself expresses no opinion as to the conduct of the State of Israel.

[34]

violence.  Allowing Chung and Khalil to remain in the
United States undermines the U.S. policy to combat
anti-Semitism and efforts to protect Jewish students
from harassment and violence in the United States.
Consistent with E.O. 14150, *America First Policy
Directive to the Secretary of State*, the foreign
policy of the United States champions core American
interests and U.S. citizens, and condoning anti-
Semitic conduct and disruptive protests in the United
States would severely undermine that significant
foreign policy objective.

Chung/Khalil Action Memo 3.  Nevertheless, Armstrong alerted

Secretary Rubio about the lack of alternative grounds for

removing Chung or Khalil, the unprecedented nature of the

reliance on INA 237(a)(4)(C), and probable legal challenge:

> DHS has not identified any alternative grounds of
> removability that would be applicable to Chung and
> Khlail, including the ground of removability for aliens
> who have provided material support to a foreign
> terrorist organization  or terrorist activity.  We are
> not aware of any prior exercises of the Secretary's
> removal authority under . . . [INA 237(a)(4)(C)], and
> given their LPR status, Chung and Khalil are likely to
> challenge their removal under this authority, and
> courts may scrutinize the basis for these
> determinations.

Id. (emphasis added).[18]  When questioned about prior usage of INA

237(a)(4)(C), Armstrong clarified that he believed INA

---

[18] Indeed, Chung challenged her INA 237(a)(4)(C)
determination, and a federal district judge issued a preliminary
injunction ruling that the Public Officials were "enjoined from
detaining and/or arresting" her and "[s]hould defendants-
respondents seek to detain [Chung] on any asserted basis other
than pursuing her removal under 8 U.S. C. § 1227 (a)(4)(C) are
ordered to provide seventy-two hours' advance notice to the
Court and counsel, in order to enable plaintiff-petitioner an
opportunity to be heard regarding whether any such asserted
basis for detention constitutes a pretext for First Amendment

[35]

Add.103

237(a)(4)(C) "was used at other times" and "was used at some time earlier as a matter of fact in this century," but could not recall when.[19]  Trial Tr. vol. I, 49: 4-5, 16-19, Jul 18, 2025.

### e.   Khalil is Arrested in New York, New York.

On **March 8, 2025,** Secretary Rubio adopted SBO Armstrong's recommendations.  March 8, 2025, Memorandum from Secretary Rubio to Secretary Noem, Khalil, Exs. 8 and 19. In that memorandum, Secretary Rubio explains that he has exercised his authority to classify Khalil and Chung as deportable under the foreign policy

---

retaliation."  Chung v. Trump, Civ. No. 1:25-02412-NRB, Order, ECF No. 57 (Buchwald, J.).  That case remains pending, and this Court takes no position as to that court's findings or rulings.

Khalil challenged his INA 237(a)(4)(C) determination, and a federal district judge entered a preliminary injunction against the Public Officials here, first ruling that Khalil "is likely to succeed on the merits of his claim that [INA 237(a)(4)(C)], as applied to him here through the Secretary of State's determination, is vague in violation of the Due Process Clause of the Constitution." Khalil v. Trump, 784 F. Supp. 3d 705, 767 (D.N.J. 2025) (Farbiarz, J.), and thereafter a preliminary injunction was issued. Khalil v. Trump, No. 25-CV-01963 (MEF)(MAH), 2025 WL 1649197, at *6 (D.N.J. June 11, 2025), opinion clarified, No. 25-CV-01963 (MEF)(MAH), 2025 WL 1981392 (D.N.J. July 16, 2025), and opinion clarified, No. 25-CV-01963 (MEF)(MAH), 2025 WL 1983755 (D.N.J. July 17, 2025).  That case, too, remains pending, and this Court takes no position as to that court's findings or rulings.

[19]  SBO Armstrong's recollection appears to be accurate. INA 237(a)(4)(C)'s language was incorporated into the statute 35 years ago, in 1990.  See Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978 (1990).  In Khalil, that court requested INA 237(a)(4)(C) enforcement information from, among others, the same defendants here, and was provided only **four** instances of the Secretary of State's exercising this extraordinary authority before 2025: twice in 1995, once in 1997, and once in 1999 -- none of which concerned domestic speech.  2025 WL 1514713, at *33-37.

[36]

Add.104

exception, INA 237(a)(4)(C).  Id.  He explained the reasoning,

incorporating much of SBO Armstrong's recommendation:

> These determinations are based on information
> DHS/ICE/HSI regarding the participation and roles of
> Chung and Khalil in antisemitic protests and
> disruptive activities, which fosters a hostile
> environment for Jewish students in the United States.
> My determination for Yunseo [Chung] is also based on
> her citations for unlawful activity during these
> protests.  The public actions and continued presence
> of Chung and Khalil in the United States undermines
> U.S. policy to combat anti-Semitism around the world
> and in the United States, in addition to efforts to
> protect Jewish students from harassment and violence
> in the United States.  Consistent with E.O. 14150,
> America First Policy Directive to the Secretary of
> State, the foreign policy of the United States
> champions core American interests and American
> citizens and condoning anti-Semitic conduct and
> disruptive protests in the United States would
> severely undermine that significant foreign policy
> objective.

Id.

Administrative Form I-200 arrest warrants for Chung and

Khalil were issued.  Form I-200 Arrest Warrant, Khalil, Ex. 11;

Form I- 200 Warrant, Chung Ex. 20; March 9, 2025 Homeland

Security Social Media Post, Ex. 25 (indicating Khalil

arrested).[20]

---

[20]  The warrants referenced here are all Form I-200
administrative arrest warrants issued by the Executive Branch.
See Exs. 11, 14, 18, and 20.  The Form I-200 administrative
warrants here are reviewed by "ICE, [and] the office of
principal Legal Advisor." Trial Tr. vol 1, 21:1-22:6, July 15,
2025.  "The I-200 [administrative] warrant is a fascinating tool
that is all but self-executing, issued to ICE agents by ICE
agents without a neutral third-party to review its integrity."
Rodrigues De Oliveira v. Joyce, No. 2:25-CV-00291-LEW, 2025 WL

[37]

Add.105

Khalil was arrested in the lobby of his apartment building in New York City in the early evening of March 8, 2025. Trial Tr. vol. II, 119:9-10, Jul. 10, 2025; Tr. vol. II, 91:24-92:2, Jul. 15, 2025. Four HSI officers participated; they identified themselves, with neck badges visible. Id. 94:2-16; see also Khalil Arrest Video 00:24, Ex. 237. The agents did not wear masks, though again, there was no mask policy. Trial Tr. vol. I, 96:1-2, Jul. 15, 2025.

The HSI Special Agent in Charge of Khalil's arrest was informed that the "the Secretary of State and/or White House had an interest in Mr. Khalil." Trial Tr. vol. 2, 103:14-15, July 15, 2025. Because HSI agents have not in recent history enforced the INA, he contacted ERO "to confirm there was a legal basis for [the] arrest." Id. 106:2-14.

As for Chung, she obtained a temporary restraining order prior to any arrest. See Chung v. Trump, Civ. No. 1:25-cv-02412 (S.D.N.Y. March 25, 2025) Temporary Restraining Order, ECF No. 19. There is currently a preliminary injunction in place. See n. 18, supra.

---

1826118, at *4 (D. Me. July 2, 2025)(Walker,J.). It is "different from a judicial arrest warrant." Aditya W. H. v. Trump, 782 F. Supp. 3d 691, 699 n. 3 (D. Minn. 2025) (Menendez, J.).

[38]

Add.106

> **f.   The Public Officials Publicize the Arrest of Khalil and Speech of the Plaintiffs and their Members are Chilled**

On **March 9, 2025,** Secretary Rubio posted on social media that "[w]e will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."  Ex. 26; Stipulation No. 3.  Attached to the post, is a photograph of Khalil attached to a news story.  Id.  Three hours later, DHS posted on social media:

> On March 9, **in support of President Trump's executive orders prohibiting anti-Semitism**, and in coordination with the Department of State, U.S. Immigration and Customs Enforcement arrested Mahmoud Khahlil, a former Columbia University graduate student.  **Khalil led activities aligned to Hamas**, a designated terrorist organization.

March 9, 2025 post on X (emphasis added), Ex. 25, Stipulation No. 2.

Professor of International Studies at Brown University Nadje Al-Ali ("Professor Al-Ali") is a member of MESA and AAUP, and an Lawful Permanent Resident.  Trial Tr. vol. II, 127:3-4; 129:13-15, Jul. 7, 2025.  When she learned of Khalil's arrest on March 9, 2025, she became afraid of being harassed upon reentry to the United States or possibly deported.  Id. 134:13-20; 135:3-8; 140:2-21; 142:14-17.  She has canceled overseas trips, shied away from writing on certain topics critical of Israeli policies, including ceasing development of a specific article that was to discuss Hamas and Israel, stopped engaging in

[39]

Add.107

protests as she previously did, and generally kept a low profile.  Id. 140-46.  If the alleged ideological deportation policy were ended, Professor Ali testified, she would resume activities such as research, travel to the Middle East, attending meetings (including MESA's annual meeting), and speaking out and writing on Israel and Palestine.  Trial Tr. vol. I, 21:5-20; 22:3-5, Jul. 8, 2025.

Harvard University Professor of Philosophy Bernhard Nickel ("Professor Nickel"), is a member of AAUP, a German citizen, and an Lawful Permanent Resident.  Trial Tr. vol. I, 53: 18-25, 54:7-14, July 8, 2025.  He believes the arrest of Khalil was a manifestation of an ideological deportation policy because "[n]othing in the [media] coverage of this case indicated that he had done anything other than exercising his political speech."  Id. 82:24-25.  This arrest scared Professor Nickel because he "didn't think that those kinds of . . . arrests would happen in America, but they did."  Trial Tr. vol. II, 83: 17-19, Jul. 8, 2025.

> On **March 10, 2025,** the President posted on social media:
>
> Following my previously signed Executive Orders, ICE proudly apprehended and **detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the campus of Columbia University.  This is the first arrest of many to come.  We know there are more students at Columbia and other Universities across the County who have engaged in pro-terrorist anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it . . . We will find, apprehend, and deport**

[40]

Add.108

**these terrorist sympathizers from our country -- never to return again.** If you support terrorism, including the slaughtering of innocent men, women, and children, your presence is contrary to our national and foreign policy interests, and you are not welcome here. We expect every one of America's Colleges and Universities to comply. Thank you!

Social Media Post (emphasis added), Ex. 27; Stipulation No. 4.

AAUP member and Northwestern University Professor Megan Hyska ("Professor Hyska"), a Canadian citizen and Legal Permanent Resident, testified that around this time she saw the video of Khalil's arrest and that she was "shocked and distressed" because his "status as a green card holder" did not protect him from what she understood as retaliation for political speech. Trial Tr. vol. I, 35:7-8, 36:1-3, 44:6-13, 44:23-45:10, Jul. 7, 2025. Seeing the President's social media post in particular caused her to feel "extremely stressed out, scared, maybe even trapped." Id. 48: 1-25; 51:2-4.

AAUP General Counsel Veena Dubal ("Professor Dubal") testified that it was about this time that AAUP became aware of what it considers to be the ideological deportation policy, which it believes is ongoing. Trial Tr. vol. 1, 72:12-25, Jul. 18, 2025. She testified about her conversations with "noncitizens, members who were extremely afraid, who expressed fear about how the ideological deportation policy was going to affect their economic livelihood and personal lives, and, . . . most of [her] attention became . . . focused in on . . . the

[41]

Add.109

academic freedom and shared governance rights of our noncitizens." Id. 73:8-14.

Barnard College and Columbia University Professor of Anthropology Nadia Abu El-Haj ("Professor El-Haj"), a MESA and AAUP member, testified that everything changed after Khalil's arrest. Trial Tr. vol. II, 131:14-132: 6, 135:12-14, 139:4-18; 146:9-21, Jul. 8, 2025.

### g. The Public Officials' Investigations of Non-Citizens Continue and the Public Officials Concomitant Statements Publicizing Khalil's Arrest

On **March 10, 2025**, HSI issued an ROA for Badar Khan Suri ("Khan Suri"). Khan Suri ROA, Ex. 234. No criminal history or associated HSI investigations were noted in the ROA. Id. at 1. According to the ROA, Khan Suri is married to the U.S.-citizen daughter of Ahmed Yousef, a senior Hamas figure. Id. at 1. HSI wrote that "according to open source reporting, Khan Suri actively spreads Hamas propaganda and promotes anti-Semitism on social media." Id. Those open sources were meforum.org, an Instagram posting by a person who claimed to be affiliated with meforum.org, articles posted by Khan Suri to Middle East Monitor, and postings to Instagram by Khan Suri that "appear" to be "Pro-Palestinian content." Id.

On **March 11, 2025**, White House Press Secretary Karoline Leavitt ("Leavitt") claimed that Khalil "sid[ed] with

[42]

Add.110

terrorists… who organized group protests that . . . distributed pro Hamas propaganda." Leavitt Press Conference, Mar. 11, 2025, Ex. 28; Stipulation 5, Ex 28; <u>see also</u> https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-mar-11-2025/10:45 – 11:32. Even though HSI reported that there was no evidence of Khalil distributing pro-Hamas materials, Leavitt nonetheless claimed that Khalil "distributed" pro-Hamas fliers on the campus of Columbia University. <u>Id.</u> at 11:38-11:44.

Leavitt further echoed the President's comments when asked about how many arrests were expected. She responded that she did not have an estimate, but that "anti-American, anti-Semitic, pro-Hamas protests will not be tolerated." <u>Id.</u> at 30:43-31:14.

On **March 12, 2025**, Secretary Rubio discussed revocation of visas:

> QUESTION: . . . President Trump appealed to a lot of Americans during his campaign on free speech arguments and not suppressing speech, especially from the government, but your revocation of the green card to many is seen as one of the most anti-speech actions a secretary can take with his powers. How do you respond?
>
> * * *
>
> Secretary Rubio: . . . . On your first point, when you enter the -- this is an important point, and I'm glad you asked this question. When you come to the United States as a visitor -- which is what a visa is, which is how this individual entered this country, on a visitor's visa, **okay -- you are here as a visitor. We can deny you that visa. We can deny you**

[43]

Add.111

that -- if you tell us when you apply, "Hi, I'm trying
to get into the United States on a student visa, I am
a big supporter of Hamas, a murderous, barbaric group
that kidnaps children, that rapes teenage girls, that
takes hostages, that allows them to die in captivity,
that returns more bodies than live hostages" -- if you
tell us that you are in favor of a group like this,
and if you tell us when you apply for your visa, "And
by the way, I intend to come to your country as a
student and rile up all kinds of anti-Jewish student,
anti-Semitic activities, I intend to shut down your
universities" -- if you told us all these things when
you applied for a visa, we would deny your visa.  I
hope we would.  If you actually end up doing that once
you're in this country on such a visa, we will revoke
it.  And if you end up having a green card -- not
citizenship but a green card -- as a result of that
visa while you're here and those activities, we're
going to kick you out.  It's as simple as that.

       This is not about free speech.  This is about
people that don't have a right to be in the United
States to begin with.  No one has a right to a student
visa.  No one has a right to a green card, by the way.
So when you apply for a student visa or any visa to
enter the United States, we have a right to deny you
for virtually any reason, but I think being a
supporter of Hamas and coming into our universities
and turning them upside down and being complicit in
what are clearly crimes of vandalization, complicit in
shutting down learning institutions -- there are kids
at these schools that can't go to class.  You pay all
this money to these high-priced schools that are
supposed to be of great esteem and you can't even go
to class, you're afraid to go to class because these
lunatics are running around with covers on their face,
screaming terrifying things.  If you told us that's
what you intended to do when you came to America, we
would have never let you in.  And if you do it once
you get in, we're going to revoke it and kick you out.

Sec. of State Marco Rubio Remarks to Press, March 12, 2025 at 7

(emphasis added), Ex. 30, Stipulation No. 6.

[44]

Add.112

On **March 12, 2025**, HSI issued an ROA for Mohsen Mahdawi ("Mahdawi"), a Lawful Permanent Resident.  Mahdawi ROA 1, Ex. 235.  Mahdawi had one incident concerning a drug seizure at the United States/Canada border in Derby, Vermont in 2019.[21]  Id. According to the report, news articles and social media posts attached thereto indicated, among other things, that Mahdawi was a co-President of the Palestinian Student Union and "organizer of pro-Hamas rallies."  Id.  Other posts relate to his appearance on 60-Minutes and his support of the death of his cousin.  Id.

On **March 13, 2025**, Deputy Secretary of Homeland Security Troy Edgar spoke about the Khalil arrest in an interview with National Public Radio's Michel Martin.  During that interview, Deputy Secretary Edgar would not provide a direct answer concerning the contours of deportation:

> Michel Martin:  Mahmoud Khalil says he acted as a spokesperson for pro-Palestinian demonstrators and as a mediator with Columbia University, where he was a graduate student. **As you know, Mr. Edgar, any conduct that can be legally sanctioned must be described.  So, what is the specific conduct the government alleges that Mr. Khalil engaged in that merits removal from the United States.**
>
> Troy Edgar:  I think what you saw there is you've got somebody that has come into the country on a visa. And as he's going through the visa process, he is

---

[21] This incident is now a matter of public record, Mahdawi v. Trump, 781 F. Supp. 3d 214, 221 (D. Vt. 2025), and was not a basis asserted by Secretary Rubio as a basis for applying Section 4C to him.

[45]

coming in to basically be a student that is not going to be supporting terrorism.  **So, the issue is he was let into the country on this visa.  He has been promoting this antisemitism activity at the university.  And at this point, the State Department has revoked his visa for supporting a terrorist type organization.  And we're the enforcing agencies, so we've come in to basically arrest him.**

Martin:  A White House official told the Free Press that there's no allegation that he broke any laws.  So, again, I have to ask, **what specifically constitutes terrorist activity that he was supporting? What exactly do you say he did?**

Edgar: **Well, like I said, when you apply for a visa, you go through the process to be able to say that you're here on a student visa, that doesn't afford you all the rights of coming in and basically going through this process, agitating and supporting Hamas.  So, at this point, yeah, the Secretary of State and the State Department maintains the right to revoke the visa, and that's what they've done.**

Martin: **How did he support Hamas?  Exactly what did he do?**

Edgar: Well, I think you can see it on TV, right? **This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity.**  And at this point, like I said, the Secretary of State can review his visa process at any point and revoke it.

Martin: **He's a permanent resident.  He's not a visa holder. He's a legal permanent resident.  He has the green card, at least he did, until it's alleged that it was revoked.**

**If the allegation is that Mr. Khalil organized protests and made speeches after which other people engaged in prohibited activity, or, say, violent activity.**  Well, Mr. Trump gave a political speech on January 6, 2021, after which some individuals engaged in violent and illegal acts.  How is this any different?

[46]

Add.114

Edgar: President Trump's a citizen and the president of the United States. **This is a person that came in under a visa. And again, the secretary of state at any point can take a look and evaluate that visa and decide if they want to revoke it.**

Martin: **He's a legal permanent resident. I have to keep insisting on that. He is a legal permanent resident. So what is the standard? Is any criticism of the Israeli government a deportable offense?**

Edgar: Like I said, **I think that at this point when he entered into the country on a student visa, at any point we can go through and evaluate what his status is.**

Martin: **Is any criticism of the United States government a deportable offense**?

Edgar: **Like I said, if you go through the process and you're a student and you're here on a visa and you go through it, at any point . . . .**

Martin: **Is any criticism of the government a deportable offense?**

Edgar: Let me put it this way, Michel, imagine if he came in and filled out the form and said, "I want a student visa." They asked him, "What are you going to do here?" And he says, "I'm going to go and protest." We would have never let him into the country.

Martin: **Is protesting a deportable offense?**

Edgar: **You're focused on protests. I'm focused on the visa process. He went through a legal process . . . .**

Martin: Are you saying he lied on his application? He's a lawful permanent resident, married to an American citizen.

Edgar: I think if he would have declared he's a terrorist, we would have never let him in.

[47]

Add.115

Martin: **And what did he engage in that constitutes terrorist activity?**

Edgar: **I mean, Michel, have you watched it on TV? It's pretty clear.**

Michel: **No, it isn't. Well, explain it to those of us who have not or perhaps others have not. What exactly did you do?**

Edgar: Well, **I think it's clear or we wouldn't be talking about it. I mean, the reality is that if you watch and see what he's done on the university . . . .**

Martin: Do you not know? Are you telling us that you're not aware?

Edgar: I find it interesting that you're not aware.

Martin: **I think you could explain it to us. I think others would like to know exactly what the offenses are, what the propaganda was that you allege, what the activity was that you allege. Well, perhaps we can talk again and you can give us more details about this.** We really appreciate your coming to join us, and we do hope we'll talk again.

Edgar: Thank you.

March 12, 2025 Interview, NPR, (emphasis added), Ex. 29, Stipulation No. 7.

On **March 13, 2025,** Vice President J.D. Vance appeared on Fox News:

Vice President Vance: Laura, a green card holder, even if I might like that green card holder doesn't have an indefinite right to be in the United States of America. Right? **American citizens have different rights from people who have green cards, from people who have student visas. And so my attitude on this is: this is not fundamentally about free speech. And to me, yes, it's about national security, but it's**

[48]

Add.116

**also, more importantly, about who do we as an American public decide gets to join our national community? And if the Secretary of State and the President decide this person shouldn't be in America, and they have no legal right to stay here, it's as simple as that.**

Laura Ingraham: Do you see more such deportations happening?

JD Vance: **I think we'll certainly see some people who get deported on student visas if we determine that it's not in the best interest of the United States to have them in our country.  So yeah, I don't know how high that number is going to be, but you're going to see more people.**

Fox News, "JD Vance Reveals Whether More Deportations of Green Card Holders Are Coming" (Mar. 13, 2025), https://www.foxnews.com/video/6369982152112 (emphasis added), Ex. 31, Stipulation No. 8.

More arrests were coming.

> **h.   AD Watson issues DHS Referral Letters as to Mahdawi and Khan Suri**

On **March 14, 2025,** AD Watson signed, but did not compose, two DHS Referral Letters to SBO Armstrong.

First, AD Watson signed a DHS Referral letter concerning Mahdawi.  Trial Tr. vol. I 97:17-19, Jul. 17, 2025; Mahdawi DHS Referral Letter, Ex. 244.  In that letter -- similar to the other referral letters -- Watson wrote "to provide a summary of the actions by Mohsen Mahdawi in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether" Mahdawi's "presence or activities in the U.S.

[49]

Add.117

compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with" INA 237(a)(4)(C). Id.

AD Watson confirmed Mahdawi's Lawful Permanent Residence status, and related that his "involvement in disruptive protests at Columbia University align with the executive orders' focus on deporting 'Hamas sympathizers.'" Id. The letter recites "[h]is leadership and involvement in these disruptive protests." Id. AD Watson cites to news media articles referring to Mahdawi's calling for Israel's destruction, and justifying Hamas terrorism **in late 2023**. Id. AD Watson also cites to Mahdawi's using the slogan, "From the river to the sea, Palestine will be free." Id. There is also reference to a poem attributed to him glorifying terrorism. Id. The poem purportedly "praises Dalal Mughrabi, who perpetrated the 1978 Coastal Road massacre." Id. Mahdawi was also allegedly co-president of DAR Palestinian at Columbia University, and **in 2023** was affiliated with "the pro-terror activist group Within Our Lifetime" and "reportedly a member of Students for Justice in Palestine." Id.

AD Watson concluded by stating that "HSI is concerned that Mahdawi's participation in the above activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." Id. at 2. Accordingly, AD Watson requested that

[50]

Add.118

"the Secretary of State [to] determine whether . . . [Mahdawi's] . . . presence and activities compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences for the United States consistent with" INA 237(a)(4)(C), and stated that if it did make that determination, "HSI would initiate removal charges against" Mahdawi.  Id.  The letter attached a copy of the ROA. Id.

That same afternoon, AD Watson sent a DHS Referral Letter concerning Khan Suri.  Trial Tr. vol. I, 99:6-14, Jul. 17, 2025; Khan Suri DHS Referral Letter, Ex. 246.  In that letter, Watson wrote "to provide a summary of the actions by Badar Khan Suri in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether the alien's presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with" INA 237(a)(4)(C).  Id.

AD Watson stated Khan Suri's nonimmigration exchange student (J-1) visa status, and, relying on the ROA, related that he was "identified as a research exchange student at Georgetown University actively supporting Hamas terrorism, who actively spreads it's [(sic)] propaganda and promotes antisemitism on social media."  Id.  The letter also identifies that Suri Khan's

[51]

Add.119

wife, a U.S. citizen, is a daughter of a "known or suspected terrorist, who is a senior advisor to Hamas." Id. Watson claimed that "HSI is concerned that Suri's direct connection to Hamas leadership and involvement in antisemitic activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." Id.

AD Watson concluded by requesting that "the Secretary of State . . . determine whether . . . [Khan Suri's] . . . presence and activities compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences for the United States consistent with" INA 237(a)(4)(C)] and that if he did make that determination, "HSI would initiate removal charges against" Suri Khan. Id. The letter attached a copy of the ROA. Id.

### i. SBO Armstrong Issues Separate Action Memoranda to Secretary Rubio on Mahdawi and Suri Khan

On **March 15, 2025,** SBO Armstrong authored an "Action Memo for the Secretary" of State Marco Rubio concerning Mahdawi. Mar. 15, 2025 Action Memo for the Secretary, Ex. 244. In Recommendations No. 1, Armstrong recommended "that [Secretary Rubio] determine the presence and activities of" Mahdawi "have potentially serious adverse foreign policy consequences for the United States and would compromise a compelling U.S. foreign

[52]

Add.120

policy interest, rendering him deportable under" INA 237(a)(4)(C).  Id.  SBO Armstrong relied solely on the referrals from HSI and the ROAs in making his recommendation to the Secretary.  Armstrong relayed information concerning Mahdawi's activities at a protest at Columbia in which Mahdawi was accused of "instructing protestors to physically push a small group of pro-Israel students, events that university officials later acknowledged as threatening rhetoric and intimidation."  Id. at 2.  Armstrong relayed that "[o]pen-source reporting also identifies Mahdawi as behind anti-Semitic rhetoric in the fall 2024 protests, referring to Israeli Defense Force soldiers as terrorists and shouting through a megaphone at Jewish bystanders and Israel supporters."  Id.

SBO Armstrong concluded that "[t]he activities and presence of Mahdawi in the United States have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest" because of his "participation and roles in anti-semitic protests and reported intimidating and harassment of Jewish students during fall 2024 protests at Columbia University undermine U.S. policy to combat anti-Semitism around the world and in the United States."  Id. 2-3. Armstrong cites Executive Order 14188, and also Executive Order 14150, "America First Policy Directive to the Secretary of State."  Id. at 3.  Armstrong also asserted his belief that

[53]

Add.121

"protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regionals [sic] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict." Id.

As with SBO Armstrong's earlier Action Memos, there were caveats. First, SBO Armstrong highlighted that "DHS/ICE/HSI has not identified any alternative grounds of removability applicable to Mahdawi, including any indication that Mahdawi has provided material support to a foreign terrorist organization or terrorist activity." Id. While there had been a prior visa revocation, that occurred after his Legal Permanent Resident status, and there was no information assessing Mahdawi as having a current link to terrorism. Id.

Second, Armstrong, although apparently not a lawyer, properly raised Constitutional concerns with the proposed actions:

> Like the legal challenge brought by Mahmoud Khalil with respect to your March 8, 2025, [INA 237(a)(4)(C)] determination regarding him, as an Legal Permanent Resident, Mahdawi is likely to challenge his removal under [INA 237(a)(4)(C)] authority, including whether the Department [of State] in fact has a compelling basis for determination. Given the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination. We understand that Khalil intends to seek an injunction

[54]

Add.122

of the determination in his case, and we could anticipate Mahdawi to do the same.

Id. (emphasis added).[22]

That same day, **March 15, 2025,** SBO Armstrong issued an Action Memo for the Secretary, recommending to Secretary Rubio that he make an INA 237(a)(4)(C) determination and provide notification to Secretary Noem as to Khan Suri.  Mar. 15, 2025 Action Memo for the Secretary, Ex. 249.  SBO Armstrong related that Khan Suri was married to the daughter of a "a senior Hamas figure in Gaza and a senior advisor to Hamas leadership."  Id. at 2.  SBO Armstrong also related DHS/ICE's assessment that Khan Suri was "'actively supporting Hamas terrorism' and 'actively spreads its propaganda and promotes antisemitism on social media.'"  Id. SBO Armstrong summarized the ROA information, but pointed out that "we have not uncovered additional open source information regarding  Suri's involvement in antisemitic conduct or intimidation of Jewish students.  Id.

---

[22]  Director Armtrong's warning to Secretary Rubio was, once again, warranted.  After his arrest, Mahdawi challenged his INA 237(a)(4)(C) determination, and a federal district judge in Vermont ordered bail pending the resolution of his habeas corpus proceeding.  Mahdawi v. Trump, No. 2:25-CV-389, 2025 WL 1243135, at *14 (D. Vt. Apr. 30, 2025)(Crawford,J.).  The Second Circuit Court of Appeals denied the government's motion to stay.  Mahdawi v. Trump, 136 F.4th 443, 456 (2d Cir. 2025).  That case remains pending, and this Court takes no position on the merits of that action.

SBO Armstrong also noted that Consular Affairs was unable to locate any independent information, and "DHS/ICE/HSI has not provided [Consular Affairs] with an assessment of any alternative grounds of removability that would be applicable to Suri, including whether Suri may be removable under the terrorism-related grounds based on his relationship with Ahmed Yousef." Id. at 3. Interestingly, the recommendation under INA 237(a)(4)(C) was "based upon the assessment of DHS/ICE/HSI, **to which we defer as ICE is the principal investigative unit of DHS**, that "'Suri's direct connection to Hamas leadership and involvement in antisemitic activities . . . [creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization.'" Id. (ellipses and brackets in original, emphasis added). Similar to Mahdawi, Armstrong relied upon Executive Order Nos. 14188 and 14150 as to antisemitism and "America First" policies. Id. He further stated, "the type of intimidation and incitement attributable [to] Suri potentially undermines the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional[] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict." Id.

As in his other Action Memos, SBO Armstrong cautioned Secretary Rubio in light of Khalil's response to his arrest:

[56]

Add.124

Like the legal challenge brought by Mahmoud Khalil with respect to your March 8 determination regarding him, Suri is likely to challenge his removal under [INA 237(a)(4)(C)] authority.  Such a challenge would likely question whether the Department in fact has a compelling basis for determination.  **Given the reliance on Suri's public statements as an academic, and the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination.** We understand that Khalil intends to seek an injunction of the determination in his case, and we could anticipate Suri to do the same.

Id. 3 (emphasis added).[23]  SBO Armstrong also requested "the opportunity to consult with the DHS on any public statements regarding this determination."  Id.

> **j.  Secretary Rubio Issues Memoranda Determining Deportability For Foreign Policy Reasons under INA 237(a)(4)(C) for Mahdawi and Khan Suri**

On **March 15, 2025,** Secretary Rubio issued a Memorandum for the Secretary of Homeland Security concerning Mahdawi.  Mem. Sec. Homeland Security (undated), Ex. 12.  In that memorandum,

---

[23]  SBO Armstrong's caution to Secretary Rubio, again, was well-taken.  Khan Suri immediately challenged Secretary Rubio's INA 237(a)(4)(C) determination.  Khan Suri was granted bail pending determination of his habeas corpus petition. Suri v. Trump, No. 1:25-CV-480 (PTG/WBP), 2025 WL 1392143, at *1 (E.D. Va. May 14, 2025) (Giles, J.).  In denying the Public Officials motion for a stay pending appeal, the Fourth Circuit ruled that "[t]he government doesn't contest the district court's finding that it detained Suri in retaliation for his First Amendment activity. . . . 'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"  Suri v. Trump, No. 25-1560, 2025 WL 1806692, at *9 (4th Cir. July 1, 2025) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).  That case remains pending, and this Court takes no position on the merits of that action.

[57]

Add.125

Secretary Rubio explains that he has exercised his authority to classify Mahdawi as deportable under the foreign policy exception, INA 237(a)(4)(C). Id. He explained the reasoning, incorporating much of SBO Armstrong's recommendation:

> These determinations are based on information provided by DHS/ICE/HSI that Mahdawi, through his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction. Mahdawi has been identified at those protests as having engaged in threatening rhetoric and intimidation of pro-Israeli bystanders. The activities and presence of Mahdawi in the United States undermines U.S. policy to combat antisemitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and intimidation in the United States. Under E.O. 14188, Additional Measures to Combat Anti-Semitism, it is the policy of the United States to combat antisemitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning antisemitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective. Moreover, protests of the type led by Mahdawi potentially undermines the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional [(sic)] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

Id.

On **March 15, 2025,** Secretary Rubio issued a Memorandum for the Secretary of Homeland Security concerning Khan Suri. Mem. Sec. Homeland Security (undated), Ex. 21. In that memorandum,

[58]

Add.126

Secretary Rubio explained that he has exercised his authority to classify Khan Suri as deportable under the foreign policy exception, INA 237(a)(4)(C).  Id.  He explained the reasoning, incorporating much of SBO Armstrong's recommendation:

> These determinations are based on the assessment and conclusion provided by DHS/ICE/his [(sic)], to which we defer as DHS/ICE is the principal investigative unit of DHS, that . . .  "Suri's direct connection to Hamas leadership and involvement in antisemitic activities . . . [creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization.  In addition, DHS/ICE/HIS also assess that Suri is "actively supporting Hamas terrorism" and "actively spreads its propaganda and promotes antisemitism on social media."  The activities and presence of Suri in the United States undermines U.S. policy to combat antisemitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and intimidation in the United States.  Under E.O. 14188, Additional Measures to Combat Anti-Semitism, it is the policy of the United States to combat antisemitism, using all available  and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence.  Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning antisemitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.  Moreover, the type of intimidation and incitement attributable to Suri potentially undermines the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional[] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

Id. (brackets with "(sic)" added).

[59]

Add.127

**k.    Secretary Rubio Appears on CBS's Face the Nation
News Program and Discusses Revocations**

On **March 16, 2025,** Secretary Rubio appeared on CBS's Face

the Nation:

QUESTION:   I want to ask you about a decision you
made to revoke a student visa from someone at Columbia
University this past week.  **The Wall Street Journal
editorial board writes:  "The… Administration needs to
be careful . . . [it's] targeting real promoters of
terrorism . . . not breaking the great promise of a
green card by deporting anyone with controversial
political views."  Can you substantiate any form of
material support for terrorism, specifically to Hamas
–**

SECRETARY RUBIO:  Yes.

QUESTION:  **– from this Columbia student, or was it
simply that he was espousing a controversial political
point of view?**

SECRETARY RUBIO:  Well, not just the student **-- we're
going to do more.  In fact, every day now we're
approving visa revocations, and, if that visa led to a
green card, the green card process as well.**  And
here's why -- it's very simple.  When you apply to
enter the United States and you get a visa, you are a
guest, and you're coming as a student, you're coming
as a tourist, or what have you.  And in it, you have
to make certain assertations.  **And if you tell us when
you apply for a visa, I'm coming to the U.S. to
participate in pro-Hamas events, that runs counter to
the foreign policy interests of the United States of
America.  It's that simple.  So you lied.  You came --
if you had told us that you were going to do that, we
never would have given you the visa.  Now you're here,
now you do it, so you lied to us.  You're out.  It's
that simple; it's that straightforward.**

QUESTION:  But is there any -- but **is there any
evidence of a link to terrorism, or is it just his
point of view?**

[60]

Add.128

SECRETARY RUBIO:  Sure -- yeah, they take over -- I mean, do you not -- **I mean, you should watch the news.  These guys take over entire buildings.  They vandalize colleges; they shut down colleges.**

QUESTION:  We covered it intensely.

SECRETARY RUBIO:  Well, then you should know that this is –

QUESTION:  **I'm asking about the specific justification for the revocation of his visa.  Was there any evidence of material support for terrorism?**

SECRETARY RUBIO:  Well, **this specific individual was the spokesperson, was the negotiator -- negotiating on behalf of people that took over a campus, that vandalized buildings.  Negotiating over what?  That's a crime in and of itself that they're involved in being the negotiator or the spokesperson, this, that, the other.  We don't want -- we don't need these people in our country.  We never should have allowed them in . . . the first place.  If he had told us, I'm going over there and I'm going over there to become the spokesperson and one of the leaders of a movement that's going to turn one of your allegedly elite colleges upside down, people can't even go to school, the library -- buildings being vandalized, we never would have let him in.**  We never would have let him in to begin with.  **And now that he's doing it and he's here, he's going to leave and so are others, and we're going to keep doing it.**

We are -- and by the way, I find it ironic that a lot of these people out there defending the First Amendment speech -- alleged free speech rights of these Hamas sympathizers --

QUESTION:  Yes.

SECRETARY RUBIO:  -- they had no problem, okay, pressuring social media to censor American political speech.  So I think it's ironic and hypocritical.  But the bottom line is this: **If you are in this country to promote Hamas, to promote terrorist organizations, to participate in vandalism, to participate --**

[61]

Add.129

QUESTION:  Yeah.

SECRETARY RUBIO:  **-- in acts of rebellion and riots on campus, we never would have let you in if we had known that, and now that we know it, you're going to leave.**

QUESTION:  **Is it only pro-Palestinian people who are going to have their visas revoked, or other points of view as well?**

SECRETARY RUBIO:  No, I think anybody who's here in favor -- look, we want to get rid of Tren de Aragua gang members.  They're terrorists too.  We -- the President designated them, asked me to designate, and I did, as a terrorist organization.  We want to get rid of them as well.  You are -- we don't want terrorists in America.  **I don't know how hard that is to understand.  We want people -- we don't want people in our country that are going to be committing crimes and undermining our national security or the public safety.**

QUESTION:  Yeah.  Okay.

SECRETARY RUBIO:  **It's that simple.  Especially people that are here as guests -- that is what a visa is.**

QUESTION:  Yes.

SECRETARY RUBIO:  **I don't know when we've gotten it in our head that a visa is some sort of birthright. It is not.  It is a visitor into our country, and if you violate the terms of your visitation, you are going to leave.**

QUESTION:  Yeah.  Okay.  Secretary Rubio, we'd like to have you back, talk to you about a lot more on your plate another time, but we have to leave it there.

SECRETARY RUBIO:  Thank you.

CBS Face the Nation, Mar. 16, 2025 (emphasis added), Ex. 33,

Stipulation No. 10.

[62]

Add.130

### l.   Khan Suri is Arrested in Rosslyn, Virginia

On **March 17, 2025**, Khan Suri was arrested in Rosslyn, Virginia.  See Ex. 22, Notice to Appear; see also Suri v. Trump, No. 1:25-CV-480, 2025 WL 1310745, at *2 (E.D. Va. May 6, 2025) (Giles, J.).  Two days later, on **March 19, 2025**, DHS Assistant Secretary for Public Affairs Tricia McLaughlin ("McLaughlin") posted: "Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media."  Ex. 34; Stipulation No. 11.

### m.   HSI Investigates Öztürk

On **March 17, 2025**, HSI issued an ROA on Rümeysa Öztürk ("Öztürk"), a Tufts University graduate student on a student visa. Öztürk ROA 1, Ex. 232.  According to the report, HSI located no criminal history or HSI investigations associated with Öztürk.  Id.  HSI attached a February 6, 2025 Canary Mission posting describing Öztürk as having "engaged in anti-Israel activism in March 2024" and as "a supporter of the Boycott, Divestment, Sanctions (BDS) movement."  Id. at 3.  The ROA attached articles, including an article co-authored by Öztürk entitled "Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions" ("the Op-Ed").  Id.; see also Ex. 226.  The Op-Ed took the position that Tufts University should "disclose its investments and divest from companies with direct or indirect ties to Israel"

[63]

Add.131

because of "[c]redible accusations against Israel include[ing] accounts of deliberate starvation and indiscriminate slaughter of Palestinian civilians and plausible genocide." Id.

Attached to the ROA was a news article from Boston.com showing the suspension of the group "Tufts Students for Justice in Palestine[("Tufts SJP")]." Id. The analyst wrote: "This article ties into the Op-Ed and demonstrates that the Tufts SJP was suspended by the university for violations of having signs demonstrating weapons and calls for student intifada," but that "[a]nalysts were unable to locate images matching the exact reference to signs." Id. Nothing in that article is attributed to Öztürk.

### n. ICE Issues Öztürk DHS Referral Letter to the Secretary of State

On **March 21, 2025,** AD Watson signed, but did not compose, a referral letter to SBO Armstrong concerning Öztürk. Trial Tr. vol. I, 98:1-25, Jul. 17, 2025; Öztürk DHS Referral Letter, Ex. 245. Similar to other DHS Referral letters, Watson indicated that his letter was "to provide a summary of the actions by Rumeysa Ozturk for consideration of actions that may constitute violations of President Trump's executive orders on anti-Semitism, and for the Secretary of State to assess whether . . .[her] . . . presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have

[64]

Add.132

potentially serious adverse foreign policy consequences consistent with" INA 237(a)(4)(C). Id.

AD Watson described Öztürk's student F-1 visa status. Id. He then identified Öztürk as a co-author of the Op-Ed. Id. Watson then connected this to the Graduate Students for Palestine's joining Tufts SJP's call to reject Tufts' response to proposed resolutions by the Coalition for Palestinian Liberation at Tufts ("the CPLT"). Id.

Although there is no direct connection alleged between Öztürk and the Tufts SJP, Watson relates that that organization was suspended. Id.

Although the logic is somewhat hard to follow, AD Watson concluded that Öztürk's co-authoring of an Op-Ed, that the authors joined in voicing opposition to Tufts' investment in Israel with a different group that later was suspended for alleged violent imagery and a call for intifada, somehow was itself an "association" that "**may** undermine U.S. foreign policy by creating a hostile environment for Jewish students and **indicating** support for a designated terrorist organization." Id. at 2 (emphasis added). AD Watson, accordingly, provided that information for the Secretary of State to assess whether Öztürk's Op-Ed "compromise[ed] a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences for the United States consistent with" INA

[65]

Add.133

237(a)(4)(C), which would require the Secretary of State's personal determination. Id. In addition, AD Watson also provided the information to determine whether Öztürk's visa ought be revoked pursuant to INA 221(i), which would only require a consular officer officer's sign off, in which case Öztürk would, in turn be removable under 8 U.S.C. § 1227(a)(1)(B). Id.

### o. Secretary of State Personnel Recommended SBO Armstrong Revoke Öztürk's Visa

Later that day, Deputy Assistant Secretary Stuart Wilson ("DAS Wilson") determined that the latter course of action was the appropriate way to proceed, and prepared an "Action Memo for Senior Bureau Official John Armstrong" recommending a "silent" revocation of Öztürk's F-1 student visa, and a notification to the Department of Homeland Security of the revocation of her visa. Öztürk Action Memo, March 21, 2025, Ex. 250.

DAS Wilson's memorandum recounts that Öztürk co-authored the Op-Ed and that the co-authors wrote "Graduate Students for Palestine joins Tufts Students for Justice in Palestine (TSJP), the Tufts Faculty and Staff Coalition for Ceasefire, and Fletcher Students for Palestine to reject the University's response . . . ." Id.

DAS Wilson relied on the ROA's language that Öztürk's "involvement in these activities and associations with these

[66]

Add.134

groups may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization." Id. (quoting Öztürk ROA at 2).

DAS Wilson continued:

> While Öztürk has been **involved with actions protesting Tufts' relationship with Israel, DHS/ICE/HSI has not, however, provided any evidence showing that Öztürk has engaged in any antisemitic activity or made any public statements indicating support for a terrorist organization or antisemitism generally.** While the [Öztürk ROA] **implies** a connection between Öztürk and the now-banned Tufts Student[s] for Justice in Palestine (TJSP), **the report presents no evidence other than Öztürk's membership in Graduate Students for Palestine which supported proposals to Tufts which were also supported by TJSP. Nor has DHS/ICE/HSI shown any evidence that Öztürk was involved in any of the activities which resulted in TJSP being suspended from Tufts.**

Id. at 2-3 (emphasis added). The Öztürk Action Memo recounted no other information linking Öztürk to terrorist activities. Id. at 3. In summary, Wilson concluded that "[a]lthough information provided by DHS/HSI/ICE **does not establish any potential ineligibility for Öztürk**, you may in your discretion and in accordance with Department policy in 9 FAM 403.11-5(B), approve revocation of her F-1 visa effective immediately based on the totality of the circumstances." Id. at 3 (emphasis added).[24]

---

[24] As set forth earlier, the "FAM" is the State Department's Foreign Affairs Manual. 9 FAM concerns visas , and guidance is

[67]

When presented with the question by the Court of whether "engaging in a student protest, nonviolent and standing alone, is inconsistent with a student's visa status -- I'll state it differently -- is grounds for revoking his visa status?", SA Smith answered:

> I think it's a difficult question to answer. If it's a nonviolent protest and it's not a protest that is supporting terrorism, then I'm not sure that that would be a problem. I think that we would probably see it in a negative light if the person were **protesting in a way that supports terrorism, even if it's a nonviolent protest.**

Trial Tr. vol. I 55: 11-20., Jul 11, 2025 (emphasis added).

### p.  SBO Armstrong Revokes Öztürk's Visa

SBO Armstrong approved the recommendation that same day.

Action Memo for John Armstrong

SBO Armstrong was responsible for the decision to revoke Öztürk's visa. He testified, and this Court credits, that he "thought long and hard about Öztürk's case." Trial Tr. vol. I 57:13, Jul. 18, 2025. SBO Armstrong wrote, among other things, "actions, not words" in his notes, testifying that he viewed it as a "totality of the circumstances" case, in particular her purported "connection with [a] banned student organization." Id. 59:2-3. The Court inquired further:

> The Court: As you looked at this paragraph and evaluated it and the totality of the circumstances, is

---

also provided by cables, among other things. Trial Tr. vol. I, 21-23, Jul. 11, 2025.

[68]

Add.136

it correct that you, um, considered or were considering at least two actions, and I'll name them. One, is the writing of the Op-Ed. And the second is the, um, affiliation with the group that sponsored the Op-Ed, which, um, had, you're inferring from this, a connection with the now-banned student group. Have I got that right?

SBO Armstrong: Okay. In reviewing it, the key thing is looking -- and as I recall it, and based on my notes, the key thing that made -- was key in my decision, were her actions. The, one, actions of protesting Tufts' relationship with Israel. Secondly, her activities and associations, which are not speech. Activity and associations with these groups may undermine foreign policy by creating a hostile environment for Jewish students in indicating support for a designated terrorist organization. Those were the key things. Her activities and associations creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. And then the actions of protesting against Israel.

Id. 61:4-62;1.

The Court credits SBO Armstrong's testimony as to his reasons, but what his testimony reveals is a misunderstanding of the contours of speech in the Constitutional sense, which the Supreme Court has determined incorporates expressive actions, not only words.[25]  To be sure, a consular officer is, indeed,

---

[25] The First Amendment protects to a large extent, even reprehensible expressive conduct.  For example, the burning of the American flag, an action this Court views as utterly abhorrent, is nonetheless quite properly protected speech under the First Amendment.  See Texas v. Johnson, 491 U.S. 397, 404 (1989) (holding burning of the American flag protected speech). As the Supreme Court held in that case:

The way to preserve the flag's special role is not to punish those who feel differently about these matters.

[69]

Add.137

looking at the totality of the circumstances.  Nevertheless,

there is no evidence that Öztürk did anything but co-author an

op-ed that criticized the University's position on investments

with Israel, that she criticized Israel, and that the

organization of which she was member joined in **that** criticism

with an organization that was banned on Tufts campus, with which

she was not affiliated.[26]  Id.

---

It is to persuade them that they are wrong.  "To
courageous, self-reliant men, with confidence in the
power of free and fearless reasoning applied through
the processes of popular government, no danger flowing
from speech can be deemed clear and present, unless
the incidence of the evil apprehended is so imminent
that it may befall before there is opportunity for
full discussion.  If there be time to expose through
discussion the falsehood and fallacies, to avert the
evil by the processes of education, the remedy to be
applied is more speech, not enforced silence."
Whitney v. California, 274 U.S. 357, 377, 47 S.Ct.
641, 649, 71 L.Ed. 1095 (1927) (Brandeis, J.,
concurring).  And, precisely because it is our flag
that is involved, one's response to the flag burner
may exploit the uniquely persuasive power of the flag
itself.  We can imagine no more appropriate response
to burning a flag than waving one's own, no better way
to counter a flag burner's message than by saluting
the flag that burns, no surer means of preserving the
dignity even of the flag that burned than by -- as one
witness here did --according its remains a respectful
burial.  We do not consecrate the flag by punishing
its desecration, for in doing so we dilute the freedom
that this cherished emblem represents.

Id. at 419-20.

[26] Öztürk has pressed her direct claim in a habeas petition
challenging her detention.  In that case, the court ruled that
"The only specific act cited by the government so far as
justification for any of their adverse actions towards Ms. Öztürk

[70]

Add.138

Based upon that notification, DHS issued an administrative I-200 warrant. Öztürk Warrant, Ex. 18. An HSI Assistant Special Agent was notified by headquarters that Öztürk's visa had been revoked. Trial Tr. vol. I, 45:11-17, Jul. 15, 2025.

### q.  Öztürk is Arrested In Somerville, Massachusetts

On **March 25, 2025**, Öztürk was arrested by HSI agents in Somerville, Massachusetts, a city adjacent to Boston. Id. 48: 21-23. Öztürk's arrest was captured on a security camera. Trial Tr. vol. I, 52:8-9; Öztürk Arrest Video, Ex. 225 ("Öztürk Arrest Video").[27]

At 1:51 of the Öztürk Arrest Video, three plain-clothes[28] officers exit a grey SUV, none initially wearing masks, and appear to wait. Id. At 2:21 of the Öztürk Arrest Video, two plain-clothes federal officers appear to identify and approach Öztürk. Id. Again, neither are masked, but the closest is

---

is her co-authored op-ed" and that "that Ms. Öztürk's op-ed does not readily fall into one of the established exemptions to the First Amendment's protection from government speech regulation." Ozturk v. Trump, 779 F. Supp. 3d 462, 490 (D. Vt.) (Sessions, J.), amended sub nom. Ozturk v. Hyde, 136 F.4th 382 (2d Cir. 2025). The action remains pending, and this Court takes no position as to the merits of that action.

[27] Earlier that day, this action was filed. Compl. ECF No. 1.

[28] HSI agents do not have uniforms and are plainclothes officers. Trial Tr. Vol. I, 51:24-52: 5, Jul. 15, 2025. With the exception of an armored vehicle, not applicable to the arrests at issue here, HSI vehicles are unmarked because of the nature of their investigatory work. Id. 53: 1-12.

[71]

Add.139

wearing a baseball cap with a hooded jacket.  Id.  As that agent approaches and converses with her, he grasps her hands:



Öztürk Arrest Video 2:34.  All three agents were unmasked.  Id.
Öztürk appeared confused, pulled away, and screamed.
Öztürk Arrest Video 2:36-2:37.  The closest of the unmasked agents appeared to pull out his badge on a lanyard and show it to Öztürk.  Other agents appeared almost immediately on scene, and identified themselves.  Id. 2:37-2:50.  To all of the

[72]

Add.140

federal agents' credit, as menacing as their approach initially may have appeared to Öztürk, they acted promptly to assuage and deescalate Öztürk's apparent shock and fear.

The agents then all masked up, with the exception of one agent who already had a hood covering his head. Öztürk did not resist. Her wrists were cuffed behind her back and, taking her arms, the agents led her to a car which then sped away out of Massachusetts.

At 3:30 in the video, a voice can be heard asking, "Why are you hiding your faces?" Öztürk Arrest Video 3:30.

A fair question.

HSI personnel testified with respect to the use of masked agents in Öztürk's arrest that it had no policy on masks; rather, HSI agents are permitted to wear masks. Trial Tr. vol. I: 49: 18 – 24, Jul 15 2025. It is a personal choice, likely to protect their identity from threats and to facilitate their involvement in other undercover work where secrecy is required.[29] Id. 49:25 - 50:1-17.

---

[29] Even crediting this concern, whether intentional or not, images of plain-clothed, masked federal agents -- faceless agents of the federal government -- snatching a non-violent person off the streets of Boston has caused fear in citizens and non-citizens alike. While there are of course occasions when obscuring identities of agents is necessary, law enforcement in the United States has usually been performed in the open. Days after the trial, Defendant Todd Lyons stated in an interview that he is "not a proponent of the masks," but permits mask wearing because he is concerned about agents' safety. See

[73]

Add.141

Öztürk was transported to Vermont where she was processed and detained by HSI and, at that point, turned over to ICE-ERO. Trial Tr. vol. I, 55:13-16, Jul. 15, 2025.[30]

Again, there was concern about the novelty of the arrest. ICE Assistant Special Agent in Charge had never seen that type of direction from the State Department and HSI headquarters, and while he assumed the direction to be sufficient because it was coming from the top, that agent consulted with a lawyer from ICE's Office of the Principal Legal Advisor. Id. 73:7-10, 75:2-5, 74:13-15 ("I . . . did contact our legal counsel to ensure that we were on solid legal ground.").

---

https://www.cbsnews.com/news/todd-lyons-ice-director-face-the-nation-transcript-07-20-2025. Crediting the Public Officials' assertions that the masks are not worn deliberately to instill fear, they nevertheless appear to be a byproduct of using special agents whose work was previously focused on criminal, high-risk operations in a new way, that is, to arrest noncitizens who have not been accused of violent crimes or direct association with a terrorist or other potentially violent organization; and, of course, after the first such use of masks, the Public Officials were on notice of how it might appear and of the fear it might cause, but have not disavowed their use going forward.

[30] As the Second Circuit Court of Appeals recently recounted, upon Ozturk's arrest, the agents "drove her away in an unmarked vehicle, crossing state lines and transporting her first to New Hampshire, then to Vermont, and the next day, flying her to a correctional facility in Basile, Louisiana . . . ." Ozturk v. Hyde, 136 F.4th 382, 389 (2d Cir. 2025). "Oztürk was not afforded an opportunity to speak with counsel or to tell anyone where she was until after her arrival in Louisiana, almost twenty-four hours after her arrest in Massachusetts." Id.

[74]

Add.142

**r.** **The State Department Issues Cable for Enhanced Screening and Social Media Vetting for Visa Applicants.**

On March 25, 2025, Secretary Rubio issued a diplomatic Cable entitled "Enhanced Screening and Social Media Vetting for Media Applicants. 25 STATE 26168, Ex. 64. That Cable, referencing Executive Orders 14161 and 14188, and Secretary Rubio's March 16, 2025 statements, required consular officers to screen social media of visa applicants and also those who already had been issued visas for both immigrant and non-immigrant visas. Id. at 4-5.

**s.** **The Plaintiffs' and their Members' Speech Is Chilled, and the Government Publicizes Öztürk's Arrest**

The Court denied the Plaintiffs' motion to permit witnesses to testify anonymously, and this Court issued an order forbidding retribution against **any** witness testifying in this action by **anyone**. Order ¶ 2, ECF No. 174 ("This Court is a safe place. The plaintiffs and their witnesses may fully participate in the trial process without fear of retribution knowing they are protected by this Court's order. . . . Likewise, law enforcement officers testifying about enforcement of the laws passed by the Congress of the United States will receive the same courtesy and respect that has long been a hallmark of this Court. Any retribution from any quarter by anyone will be met

[75]

Add.143

with the full rigor of the Court's resources."). The Plaintiffs' witnesses testified anyway.

Professor Hyska, an AAUP member, testified as to her reaction to the arrest:

> Q. I'm not going to show you the video, Ms. Hyska, but can you tell us how you felt when you saw it?
>
> Professor Hyska: Yeah, I was extremely disturbed by this video. I don't believe that the video, at least the version that I saw had any audio, but you can see this young woman, Ms. Öztürk, walking along and sort of like it's startling, she's grabbed by the wrist by some individuals who are not discernible in the video, who I deemed law enforcement, although they weren't clearly wearing uniforms. She looked very deeply frightened. And I felt frightened and disturbed upon seeing it.
>
> * * *
>
> Q. Okay, you said that when you saw the video you felt frightened and disturbed. Why did you feel frightened and disturbed?
>
> Professor Hyska: So in the first place, because I looked at Rumeysa Öztürk as somebody who could be, um, you know potentially one of my students, someone for whom I feel like -- like a kind of presumptive feeling of caring and concern, and also because she was somebody that I could identify with myself. And this feeling grew more acute for me as I learned she was apparently being detained mostly, as far as I could read, entirely on the basis of this Op-Ed, particularly because I myself had recently drafted an Op-Ed that was critical of the Trump administration.

Trial Tr. vol. I, 52:17 - 53: 2, 53:17-25, July 7, 2025.

Professor Hyska further testified that she refrained from publishing an Op-Ed that she had already drafted as a result of the Öztürk arrest, because she believed "it would not be safe

[76]

Add.144

for [her] to try to publish it, even though [she] had in the past published things that are critical of the Trump administration."  Id. 59:11-16; Professor Hyska Unpublished Op-Ed, Ex. 66.

Professor Al-Ali also testified that seeing the arrest video was "very scary."  Trial Tr. vol. II, 135:14, Jul. 7, 2025.

Professor Nickel recalled that his level of concern "came much more sharply into focus . . . when Ms. Öztürk was arrested in the way that she was."  Trial Tr. vol. II, 83:22-24, July 8, 2025.  He further recalled how it affected him:

> I actually love this country.  And it's the kind of love that other immigrants who have been in the situation where they could just affirmatively choose to move here had.  And throughout all the ups and downs and all the different parts of my life and certainly all of the different ways that America came to wrestle with itself and think about the ways it could try to create a more perfect union, that love never changed.  And as my fear of political reprisal grew, I just don't feel that way about the country in quite the same way.  That's depressing and it's destabilizing.

Id. 84:6-17.  After the Öztürk arrest, that was "the turning point" for Professor Nickel, after which he "decided on a blanket policy that [he] would keep his head down completely," that he "would not go to protests . . . not write, . . . not sign on to public letters, and any other potential forms of publicity."  Id. 86:8-13.  He also canceled international travel

[77]

Add.145

to see his terminally ill older brother, for whom he is his only family.  Id. 87:19-25.

AAUP's General Counsel Professor Dubal testified that after the arrests of Khalil, Khan Suri and Öztürk it "redirected . . . a lot of resources to . . . help support our noncitizen members," including two town hall meetings.  Trial Tr. vol. I 73:18-20, Jul. 18, 2025.  The first meeting occurred shortly after the arrest of Khalil.  Id. 74:3-5.  AAUP co-hosted the events with MESA, and addressed many issues concerning whether it was safe for non-citizens to travel, and whether they needed to change their research projects.  Id. 75:1-76:11.  The second town hall was organized because "there were again a series of continuing . . . high-profile detentions of scholars and students that our non-citizen members were watching and were very very afraid that this continuing policy was going to impact them."  Id. 76:15-19.  AAUP has run a number of meetings to address its non-citizen members' fears and concerns.  Id. AAUP's general counsel also related that in response to non-citizen members' concerns directed to her she "created lists of immigration attorneys that [she] could send to our noncitizen members[,] . . . . created new rights information and resources that we could circulate  for people who were not -- who stated that they were too fearful to take in the town hall[.] And I organized [the] two town halls."  Id. 81:7-12.  After almost

[78]

Add.146

every conversation, she referred non-citizen members to immigration attorneys.  Id. 81:18-20.  Professor Dubal also testified that "non-citizen members who were previously very active in our membership meetings, didn't attend them, or attended them with their video off."  Id. 82:19-22.  She explained the effect on AAUP:

> We haven't heard the voices of our noncitizen members, we haven't had their advocacy and insight in our organization, and, um, given that the core of the organization is to protect academic freedom and shared governance, we feel that this is an existential threat to the organization more broadly.

Id. 82:25 – 83:1-5.

MESA also submitted evidence that in response to the alleged ideological deportation policy, it has had to shift resources, had meaningfully fewer submissions with respect to its upcoming flagship annual meeting, and likely lost membership as a result.  See, e.g., Exs. 189, 191.

On **March 27, 2025**, Secretary Rubio in a Press conference equated writing an op-ed with vandalizing universities and harassing students:

> QUESTION: Mr. Secretary, a Turkish student in Boston was detained and handcuffed on the street by plainclothes agents.  A year ago she wrote an opinion piece about the Gaza war.  Could you help us understand what the specific action she took led to her visa being revoked?  And what was your State Department's role in that process?
>
> SECRETARY RUBIO: We revoked her visa.  It's an F1 visa, I believe.  **We revoked it, and here's why -- and**

[79]

Add.147

**I'll say it again; I've said it everywhere.** Let me be abundantly clear, okay. If you go apply for a visa right now anywhere in the world -- **let me just send this message out -- if you apply for a visa to enter the United States and be a student and you tell us that the reason why you're coming to the United States is not just because you want to write op-eds, but because you want to participate in movements that are involved in doing things like vandalizing universities, harassing students, taking over buildings, creating a ruckus, we're not going to give you a visa. If you lie to us and get a visa and then enter the United States and with that visa participate in that sort of activity, we're going to take away your visa.**

Now, once you've lost your visa, you're no longer legally in the United States, and we have a right, like every country in the world has a right, to remove you from our country. So it's just that simple.

I think it's crazy -- I think it's stupid for any country in the world to welcome people into their country that are going to go to their universities as visitors -- they're visitors -- and say I'm going to your universities to start a riot, I'm going to your universities to take over a library and harass people. I don't care what movement you're involved in. **Why would any country in the world allow people to come and disrupt? We gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campuses. And if we've given you a visa and then you decide to do that, we're going to take it away.**

I encourage every country to do that, **by the way, because I think it's crazy to invite students into your country that are coming onto your campus and destabilizing it. We're just not going to have it. So we'll revoke your visa; and once your visa is revoked, you're illegally in the country and you have to leave. Every country in the world has a right to decide who comes in as a visitor and who doesn't.**

**If you invite me into your home because you say, "I want to come to your house for dinner," and I go to your house and I start putting mud on your couch and**

[80]

Add.148

**spray-painting your kitchen, I bet you you're going to kick me out.  Well, we're going to do the same thing if you come into the United States as a visitor and create a ruckus for us.  We don't want it.  We don't want it in our country.  Go back and do it in your country, but you're not going to do it in our country.**

* * *

QUESTION: Could you confirm – there's new reporting that 300 visas -- State Department has revoked 300 (inaudible).

SECRETARY RUBIO:  Maybe more. **It might be more than 300 at this point.  We do it every day.  Every time I find one of these lunatics, I take away their visa.**

Press Remarks, Marco Rubio (emphasis added) at 7-8, Ex. 35;

Stipulation No. 12.[31]  The next day, Secretary Rubio again

addressed the press:

QUESTION: **And what does it mean when you say against the foreign policy of the United States**?

SECRETARY RUBIO:  It runs counter to our foreign -- that's how we issue visas coming in.  **I think about it this way.  If we knew this information –- my standard: If we knew this information about them before we gave them a visa, would we have allowed them in?  And if the answer is no, then we revoke the visa.**

* * *

QUESTION:  Can we go back to visa issue just for a second?  I mean, a lot of people feel freedom of speech concerns about it.  Are you saying that if you come and if you apply for a visa and get a student visa and you don't lie, and you tell the truth and you're not coming to protest or anything, but during the course of your studies, wherever it is in the U.S., you develop views or opinions that are at odds with the administration's foreign policy -- say you learn something [sic] in your course of study that

---

[31] See also https://www.youtube.com/watch?v=5c1idp7Qzd4.

[81]

Add.149

makes you think that what the policy is wrong -- and then you protest it or write something about it, don't do anything violent, is that grounds enough to revoke a visa?

SECRETARY RUBIO:  Well, I think there's a little bit of common sense here.  You come to the States and then you decide you don't like those paper straws that some of the stores are selling and you start protesting or complaining about paper straws -- I mean, we're obviously not going to yank a visa over that.  I think it crosses a line -- think about it this way.  No one has a right to a visa.  These are things that we decide.  We deny visas every day for all kinds of reasons all over the world.  We deny visas because we think people might overstay.  We deny visas because the country they come from are people that historically overstay.  We deny visas every day, and we can revoke visas.  If you have the power to deny, you have the power to revoke.

I would argue that the -- what I would add to it is what we have seen on campuses across the country where students literally cannot go to school, you cannot -- buildings are being taken over, activities going on -- this is clearly an organized movement.  And if you are in this country on a student visa and are a participant in those movements, we have a right to deny your visa.  I think it would make sense to deny your visa.  We're going to err on the side of caution.  We are not going to be importing activists into the United States.  They're here to study.  They're here to go to class.  They're not here to lead activist movements that are disruptive and undermine the -- our universities.  I think it's lunacy to continue to allow that.

QUESTION:  So expressing any kind of view --

SECRETARY RUBIO:  **And by the way, I've been saying that since I was in the Senate.  Now I'm just in a position to do something about it.**

QUESTION:  Mr. Secretary --

SECRETARY RUBIO:  Now that's a broad thing to say -- any kind of views.  **But when you're aligning yourself**

[82]

Add.150

**with groups that are behind these activities, openly aligning yourself with these groups that are behind these disruptive criminal activities in the United States, your visa is going to get yanked.**

QUESTION:  Mr. Secretary, I don't --

QUESTION:  Hamas?

SECRETARY RUBIO:  Yeah, there may be others.  I mean, if you come here and join Tren de Aragua, we're going to yank your visa too.  If --

QUESTION:  Mr. Secretary?

SECRETARY RUBIO:  And so there may be other movements, but that's partly the movement we've seen on college campuses.  **Let's be clear:  It is a movement that is supportive of the group that just slaughtered babies, like deliberately targeted and slaughtered babies and civilians and took hostages and killed hostages. That's the group they're aligning with.**

But beyond that, they are spray-painting buildings. They are taking over buildings.  You must have seen these reports in campus after campus where students can't go to class and can't function and the universities don't know what to do about it.  When you look at it and you realize that some of the people involved in this are here on student visas, it's crazy.  We're not going to keep doing that.  We're not.  Don't come here.  If you're going to do that, go somewhere else.  Don't come here.

* * *

QUESTION:  I guess some of the examples have come up like a student at Tufts University, like all they did was write an op-ed for the student newspaper advocating for a certain point of view.  They're not -- as far as we can tell, they haven't openly advocated for Hamas.

SECRETARY RUBIO:  Well, we will -- those -- as they go, or if they seek to self-deport they can do that, because that's what we've done.  We're basically asking them to leave the country.  That's why they've

[83]

Add.151

been detained.  They can do so tomorrow.  Buy an airplane ticket and leave.  No problem.

QUESTION:  Mr. Secretary?

SECRETARY RUBIO:  **But I would add to this that I would caution you against solely going off of what the media has been able to identify, and those presentations, if necessary, will be made in court.**

QUESTION:  But for example, in that -- the Turkish students, the Tufts student's case, I asked you today did she have -- has she committed, like, or has she carried out any of those things that you just listed?

SECRETARY RUBIO:  **The activities presented to me meet the standard of what I've just described to you: people that are supportive of movements that run counter to the foreign policy of the United States. If necessary and a court compels us, we'll provide that information.  But ultimately it's a visa.  Judges don't issue student visas.  There is no right to a student visa.  We can cancel a student visa under the law just the same way that we can deny a student visa under the law.  And we will do so in cases we find appropriate.**

**The overwhelming majority of student visas in this country will not be revoked, because the overwhelming majority of people that are coming to this country to study are not involved and associated or aligned with organizations that seek to do damage in this country, and that, frankly, organizations that hate the United States Government and hate our way of life.  So I just think it's crazy to continue to provide visas so people can come here and advocate for policies that are in direct contradiction of our national interest.**

Sec. of State Marco Rubio Remarks to the Press, Mar. 28. 2025,

at 3, 5-7, 8-9, Ex. 36; Stipulation No. 13.

[84]

Add.152

### 6. April 2025

#### a. Early April -- The Public Officials' Statements

On **April 8, 2025,** Secretary Rubio appeared on Triggered with Don, Jr.[32]  Secretary Rubio's April 8, 2025 interview on Triggered with Don Jr., Ex. 37, Stipulation No. 14.  Secretary Rubio answered questions concerning revocation of visas:

> QUESTION:  Can you lay out perhaps your mission and priorities as it relates to foreign national [sic] here on visas who are acting against America's interests?

> SECRETARY RUBIO:  Yeah.  So if you go right now to a window somewhere in an embassy and apply for a United States visa, there's all kinds of reasons why we won't allow you to come in: because we think you might overstay your visa, **because we don't like or have questions about some of your political activities and your views.  We just won't give you a visa proactively, on the front end.  My argument is if we identify people like that who we would not have given a visa to, had we known information, but now they've got a visa and now they're here and we know the information, shouldn't we ask them to leave as a result of it?  In essence, if we wouldn't -- if there are things about you that had we known we would not have given you a visa, we should be taking away your visa.  It's as simple as that.**

> There's no – no one's entitled to a visa.  I mean, there are all kinds of reasons why people get denied.  There are people that can't tell you why their visa was denied; they just don't know.  It's just we -- we're not taking more people from that country, or we just -- whatever it may be.  **So I think, at the end of the day, that's what we're trying to do right now, is we're trying to go and identify people who we have information about who, had we known that information, we never would have given them a**

---

[32] "Triggered with Don. Jr." is a video podcast hosted by Donald Trump Jr., the President's eldest son.

[85]

Add.153

**visa. And we're revoking those visas, and they have to leave.**

Now, I think everyone would tell you this -- **if you told me I'm applying for a student visa so I can attend a university, and while I'm at your university I'm going to become a member in support of or even participate in groups that are going to take over libraries, spray paint monuments, start riots, bang drums all day and night, harass Jewish students -- if you told me you were going to be linked to any of that stuff, we never should have given you the visa. Now that you're doing it, we should take away your visa. And that's what we're trying to do and that's what we are doing.**

Id.

On **April 9, 2025,** DHS issued a press release proclaiming:

Today U.S. Citizenship and Immigration Services (USCIS) will begin considering aliens' antisemitic activity on social media and the physical harassment of Jewish individuals as grounds for denying immigration benefit requests. This will immediately affect aliens applying for lawful permanent resident status, foreign students and aliens affiliated with educational institutions linked to antisemitic activity.

Apr. 9, 2025, DHS Press Release, Ex. 38; Stipulation No. 15.

> **b. Mahdawi is Arrested at USCIS Facility in Colchester, Vermont After Completing (and Passing) his Citizenship Examination.**

On **April 14, 2025,** HSI issued an administrative Form I-200 arrest warrant for Mahdawi. Form I-200 Arrest Warrant, Mahdawi, Ex. 14. According to the Acting Special Agent in Charge, he was present for Mahdawi's arrest at the CIS facility where Mahdawi had been summoned to take his citizenship test

[86]

Add.154

(which he completed and apparently passed).  Trial Tr. 15:7-10, 37:20-22, Jul. 15, 2025.  At the conclusion of the test, four agents entered the room, identified themselves, and presented credentials.  Id. 23:9-15, 24: 1-21, 25.  Some of the agents masked up when they entered a public area.  Id. 24:15-21.  As their reason for masking up, similar to the Öztürk arrest, some of the agents had expressed "a concern of their faces being put in the public eye and being victims potentially of doxxing or harassment."  Id. 18:7-20.  After Mahdawi was arrested, he was transported to HSI's South Burlington Vermont office and turned over to ICE Enforcement and Removal Operations.  Id. at 29: 17-25 and 30:1-18.  From there, Mahdawi was driven to the airport where ICE-ERO attempted "to fly out of the district" of Vermont to Louisiana.  Id.  30:19-31:1; 33:18-34:3.

### c. Deputy Chief of Staff Miller and Secretary Rubio Continue Their Publicity of the Arrests

On **April 14, 2025**, Deputy Chief of Staff Miller predicted on Fox News that Khalil would be deported:

INTERVIEWER:  Will Mahmoud Khalil be deported from the United States?

MILLER: Yes, he will, **as will anyone who preaches hate for America**.  His organization said they wanted to eradicate Western Civilization.  **Look, under this country, under this administration, under President Trump, people who hate America, who threaten our citizens, who rape, who murder, and support those who rape and murder are going to be ejected from this country . . . .**

[87]

Add.155

White House Deputy Chief of Staff Stephen Miller's April 14,
2025 interview with Fox News (emphasis added), Ex. 39-1;
Stipulation No. 16.

On **April 17, 2025,** Secretary Rubio appeared on the Ben
Shapiro show:

> QUESTION:  What are the standards that are being
> used to determine whether somebody should stay in the
> United States or should go?  Because obviously
> opponents of the administration are arguing it's
> violations of free speech, people have the ability to
> say what they want.  That's not an argument that the
> administration is actually arguing with.  The
> administration is not trying to crack down on free
> speech.  You're trying to actually stop something
> else.

> SECRETARY RUBIO:  Yeah.  Well, let's start with a
> baseline, okay?  **No one is entitled to a student visa
> to the enter the United States.  No one.  It's not a
> constitutional right.  It's not a law.  Every day,
> consular officers on the ground in face-to-face
> interviews are denying people visas for all kinds of
> reasons -- because we think you're going to overstay,
> because we think your family member is a member of a
> drug ring, whatever it may be.  We deny visas every
> day all over the world.  No one is entitled to a visa.
> Let's start with that, because I hear some of this
> reporting out there like if somehow we -- you're
> allowed to have a visa unless we can come up with a
> reason why you shouldn't have one.  That's not true.**
> The burden of proof is the other way.

> Now, let's say you go to a window somewhere in
> the world and say, "I want to go to the United States
> to study at a university," and as part of that
> interview it comes out you think Hamas is actually a
> good group.  We probably would not let you in.  I
> would hope we wouldn't let you in.  Okay?

> **But let's say we don't ask you that question and
> you get into the U.S. on a student visa, and all of a
> sudden it becomes obvious you think Hamas is a good**

[88]

Add.156

**group.  Well, then we should revoke your visa.**  In essence, if we would have denied -- if we had learned things about you once you're here that would have caused us to deny you a visa when you were overseas, that's grounds for revocation.  **It is not in the national interest of the United States, it's not in our foreign policy interest, it's not in our national security interest, to invite people onto our university campuses who are not just going to go there to study physics or engineering but who are also going to go there to foment movements that support and excuse foreign terrorist organizations who are committed to the destruction of the United States and the killing and the raping and the kidnapping of innocent civilians, not just in Israel but anywhere they can get their hands on them.  That's not in our national interest.**

So we have a right to deny visas before you get here, **and we have a right to revoke them if we believe that your presence in our country undermines our national interest, our national security, and our foreign policy.  And that's what we intend to do.**

Now listen, there are other student visas that are being canceled that have nothing to do with us, by the way.  And that has to do with someone, for example, who is here on a student visa and has a DUI.  And I don't know – that's not us.  That's DHS.  But I don't know if people realize if you commit a crime while you're in the U.S., that's an automatic grounds for revoking your visa.  And no one was ever doing it.  They weren't doing it.  They weren't cross-referencing the system.  Now they're starting to do that.

So that's the majority of these, **but we have identified –- I can't tell you the exact number because it's static and it's constantly moving, but when someone is presented to me and it's clear that this person is a supporter of a foreign terrorist organization, we're going to remove them from the country.  You're not going to be here; it's just that simple.  What a stupid thing, what a ridiculous thing, to invite people in your country so they can be part of these movements that are terrorizing fellow students, tearing up campuses, shutting down campuses. We have campuses in America that couldn't even operate**

[89]

Add.157

**for weeks.** People couldn't go to class. Are we – are we crazy? What other country in the world would allow this? We shouldn't allow it.

Apr. 17, 2025 Interview of Secretary Rubio, The Ben Shapiro Show (emphasis added) at 4-5, Ex. 40; Stipulation No. 17.

On **April 30, 2025**, DHS Assistant Secretary for Public Affairs posted to social media:

> When you advocate for violence, **glorify and support terrorists** that relish the killing of Americans and harass Jews, that privilege should be revoked and you should not be in this country.
>
> **We have the law, facts and commonsense on our side.**
>
> **No judge, not this one or another, is going to stop the Trump Administration from restoring the rule of law to our immigration system.**

Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin's April 30, 2025 post on X (emphasis added), Ex. 41; Stipulation No. 18.

### 7.    May 2025 - Present

On **May 7, 2025**, in the context of Öztürk's court-ordered detention in Vermont, "DHS Assistant Secretary Tricia McLaughlin said having a visa to live and study in the U.S. 'is a privilege not a right' and that the ruling did 'not prevent the continued detention of Ms. Ozturk, and we will continue to fight for the arrest, detention, and removal of aliens who have no right to be in this country.'" Sergio Martínez-Beltrán, Federal Court Rules

[90]

Add.158

*Rümeysa Öztürk Must be Transferred to Detention in Vermont*, May 7, 2025 at 3, Ex. 42; Stipulation No. 19.

Later that evening, Secretary Rubio posted to social media: "We are reviewing the visa status of the trespassers and vandals who took over Columbia University's library. Pro-Hamas thugs are no longer welcome in our great nation." May 7, 2025Secretary Rubio post on X, Ex. 43; Stipulation No. 20.

On **May 8, 2025,** in response to a report of unrest at Columbia, McLaughlin wrote on X:

> **If you are in this country on a visa, green card or otherwise, you are a guest. Act like it.** If you are **pushing Hamas propaganda, glorifying terrorists** that relish the killing of Americans, **harassing** Jews, taking over buildings, or **other anti-American actions** that we have seen lately on these campuses, you can book yourself a ticket home. You can expect your visa will be revoked.

May 8, 2025 10:26 a.m. McLaughlin Post on X; Ex. 44; Stipulation No. 21.

On **May 20, 2025,** Secretary Rubio testified before the Senate Foreign relations Committee. At that hearing, Senator Van Hollen and Secretary Rubio had the following exchange:

> Secretary Rubio: About the student visas let say this: I don't deport anybody. And I don't snatch anybody. The State Department does not have officers in the streets snatching everybody. What I do is revoke visas. And it's very simple: a visa is not a right, it is a privilege. People apply for student visas to come into the United States and study. And if you tell me that you are coming to the United States to lead campus crusades, to take over libraries, and burn down -- try to burn down buildings

[91]

Add.159

and acts of violence we're not going to give you a visa.

Sen. Van Hollen:  Is that what Ms. Öztürk did.  Is that what she did?  Come on Mr. Secretary, you're just blowing smoke.

Secretary Rubio: **In every single one of these cases the factors are different.  The bottom line is if you are coming her to stir up trouble on our campuses we will deny you a visa.  And if you have a visa and we find you . . . we'll revoke it.  And we're going to do more.  There are more coming.  We're going to continue to revoke the visas of people who are here as guests and are disrupting our higher education facilities.  People are paying money, these kids pay money to go to school and they have to walk through a bunch of lunatics who are here on student visas.  It's as simple  as that.  I want to do more. I hope we can find more of these people.**

Ex. CU-1 9:34 – 10:32 (emphasis added) .

On **May 22, 2025,** Secretary Rubio testified before the House

Foreign Affairs Committee.  He was specifically asked questions

about the revocation of Öztürk's visa.

Representative Jayapal:  Do you think the INA trumps the Constitution of the United States, Mr. Secretary?

Secretary Rubio:  **Well, Congress can always change the law if you want, but I'm telling you that while I have the authority, I will continue to revoke the visas of these people that come . . . .  [T]hey are on student visas, they're guests.**

* * *

Representative Jayapal: You revoked [Öztürk's] student visa  --

Secretary Rubio:  -- **Yes, probably, and** -- .

[92]

Add.160

Representative Jayapal: -- because [Öztürk] wrote an
Op-Ed

Secretary Rubio:  -- **And we'll do more, we're going to
do more.**

https://www.youtube.com/watch?v=EAGqh7jvyus (U.S. Dept. of State

Youtube Channel) 3:26:50 – 3:30:00.

On **August 7, 2025,** Secretary Rubio was interviewed by

Eternal World Television Network.

QUESTION:  They say it's a First Amendment violation.

SECRETARY RUBIO:  **Well, it has nothing to do with what
their opinion is.  It has to do what the impact of it
has on the United States.  Let's remember again --
student visas, okay, are not a right.  There is no
constitutional right to a student visa.  A student
visa is something we decide to give you.  And by the
way, visas of every kind are denied every day all over
the world.  As I speak to you now, someone's visa
application to the U.S. is being denied.  So, if I
would have denied you a visa had I known something
about you, and I find out afterwards that I gave you a
visa and I found this out about you, why wouldn't I be
able to revoke your visa?  If I wouldn't have let you
in had I known this – like if this guy, Khalil --
whatever his last name is.**

QUESTION:  Yeah.

SECRETARY RUBIO:  **If that guy had been saying and
doing abroad what he's now doing in the United States,
we never would have given him a visa.**  He was on TV, I
think it was yesterday or the day before —

QUESTION:  Yeah.

SECRETARY RUBIO:  — arguing that October 7th had to
happen – that it had happen -- that it was a necessary
evil that -- he didn't call it an evil.

QUESTION:  Yeah.

[93]

Add.161

> SECRETARY RUBIO: He said it's a necessary thing; it had to happen. **Why is a guy like that allowed into the United States on a visa? He's not entitled to a visa. So, it has nothing to do with what they're saying. It has to do with what they're doing and its implications on the U.S. Student visas are a privilege. They are not a right.**

See https://www.youtube.com/watch?v=8wI45pjCzs4; https://www.state.gov/releases/office-of-the-spokesperson/2025/08/secretary-of-state-marco-rubio-with-raymond-arroyo-of-ewtns-the-world-over.

### E. The Public Officials' Witnesses All Deny the Existence of an Ideological Deportation Policy

The Plaintiffs' witnesses all testified as to their belief that an ideological deportation policy exists based upon their observations and public statements made by our government officials. The Public Officials' witnesses consistently testified that an ideological deportation policy does not exist. See e.g., Trial Tr. vol. II, 121:6-21, Jul. 11, 2025; Trial Tr. vol. I, 59:16-25; 60:1-9, Jul. 17, 2025. The Public Officials' theory of the case is that the ideological deportation policy is merely a theory, conjured up. The Public Officials' counsel summed it up when cross-examining Professor Nickel by quoting Danish philosopher Søren Kierkegaard, for the proposition that "anxiety is the dizziness of freedom," see Trial Tr. vol. II, 114:2-115:1, Jul 8, 2025, dismissing the plaintiffs' claims of collective chill as somehow wholly self-imposed.

[94]

Add.162

## F.    Inferences From the Factual Record

The great paradox of this case is that the government witnesses -- to a person -- are decent, credible, dedicated non-partisan professionals.  True patriots who, in order to do their duty, have been weaponized by their highest superiors to reach foregone conclusions for most ignoble ends.

There was no ideological deportation policy.  It was never the Secretaries' immediate intention to deport all pro-Palestinian non-citizens for that obvious First Amendment violation, that could have raised a major outcry.  Rather, the intent of the Secretaries was more invidious -- to target a few for speaking out and then use the full rigor of the Immigration and Nationality Act (in ways it had never been used before) to have them publicly deported with the goal of tamping down pro-Palestinian student protests and terrorizing similarly situated non-citizen (and other) pro-Palestinians into silence because their views were unwelcome.

The Secretaries have succeeded, apparently well beyond their immediate intentions.[33]  One may speculate that they acted under instructions from the White House, but speculation is not

---

[33] One reason for this, of course, is that this gambit has been accompanied by the Trump administration's full-throated assault on the First Amendment across the board under the cover of an unconstitutionally broad definition of Anti-Semitism.  As it should, this Court confines itself to the facts proven herein and makes no further comment.

[95]

Add.163

evidence and this Court does not so find.  What is clear, however, is that the President may not have authorized this operation (or even known about it), but once it was in play the President wholeheartedly supported it, making many individual case specific comments (some quite cruel) that demonstrate he has been fully briefed.  Such conduct, of course, violates his sacred oath to "faithfully execute the Office of President of the United States, and . . . to the best of [his] Ability, preserve, protect and defend the Constitution of the United States," U.S. Const. art. II, § 1, cl. 8, by ignoring the Constitution's command that the President "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.  The fact that the President is, for all practical purposes, totally immune from any consequences for this conduct, Trump v. United States, 603 U.S. 593 (2024), does not relieve this Court of its duty to find the facts.  Fed. R. Civ. P. 52(a).

In the golden age of our democracy, this opinion might end here.  After all, the facts prove that the President himself approves truly scandalous and unconstitutional suppression of free speech on the part of two of his senior cabinet secretaries.  One would imagine that the corrective would follow as a matter of course from the appropriate authorities.  Yet nothing will happen.  The Department of Justice represents the

[96]

Add.164

the President, and Congress is occupied with other weighty matters.

Nor will there be any meaningful public outcry.  There is an amalgam of reasons.  The President in recent months has strikingly unapologetically increased his attack on First Amendment values, balked here and there by District Court orders.  The issues presented here commenced last March.

ICE has successfully persuaded the public that it is our principal criminal law enforcement agency.  Americans have an abiding faith in our criminal justice system.  After all, ultimately they run it as jurors. "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury[.]" U.S. Const. art. III, § 2, cl. 3.  Despite the meaningless but effective "worst of the worst" rhetoric, however, ICE has nothing whatever to do with criminal law enforcement and seeks to avoid the actual criminal courts at all costs.  It is carrying a **civil** law mandate passed by our Congress and pressed to its furthest reach by the President.  Even so, it drapes itself in the public's understanding of the **criminal** law though its "warrants" are but unreviewed orders from an ICE superior and its "immigration courts" are not true courts at all but hearings before officers who cannot challenge the legal interpretations they are given. Under the unitary President theory they must speak with his voice.  The People's presence as jurors is unthinkable.

[97]

Add.165

And there's the issue of **masks**.  This Court has listened carefully to the reasons given by Öztürk's captors for masking-up and has heard the same reasons advanced by the defendant Todd Lyons, Acting Director of ICE.  It rejects this testimony as disingenuous, squalid and dishonorable.  ICE goes masked for a single reason -- to terrorize Americans into quiescence.  Small wonder ICE often seems to need our respected military to guard them as they go about implementing our immigration laws.  It should be noted that our troops do not ordinarily wear masks. Can you imagine a masked marine?  It is a matter of honor -- and honor still matters.  To us, masks are associated with cowardly desperados and the despised Ku Klux Klan.  In all our history we have never tolerated an armed masked secret police.  Carrying on in this fashion, ICE brings indelible obloquy to this administration and everyone who works in it.  "We can not escape history," Lincoln righty said.  "[It] will light us down in honor or dishonor, to the latest generation."  Abraham Lincoln, Second Annual Message to Congress (Dec. 1, 1862).

Perhaps we're now afraid to stick our necks out.  If the distinguished Homeland Security intelligence agency can be weaponized to squelch the free speech rights of a small, hapless group of non-citizens in our midst, so too can the Federal Home Loan Mortgage Corporation, and the audit divisions of the I.R.S. and the Social Security Administration be unconstitutionally

[98]

Add.166

weaponized against the President's ever growing list of "enemies" or opponents he "hates" notwithstanding that political persecution is anathema to our Constitution and everything for which America stands.

Finally, perhaps we don't much care.  After all, these Plaintiffs, a group of non-citizen pro-Palestinians are relatively small compared to the much larger interest groups who have every right vigorously to espouse the cause of the State of Israel.  Palestine is far away and its people are caught up in the horrors of a modern war with heavy ordinance wreaking massive indiscriminate destruction, a war that is not one of our making.  Why should we care about the free speech rights of their compatriots here among us?

Here's why:

The United states is a great nation, not because any of us say so.  It is great because we still practice our frontier tradition of selflessness for the good of us all.  Strangers go out of their way to help strangers when they see a need.  In times of fire, flood, and national disaster, everyone pitches in to help people we've never met and first responders selflessly risk their lives for others.  Hundreds of firefighters rushed into the Twin Towers on 9/11 without hesitation desperate to find and save survivors.  That's who we are.  And on distant battlefields our military "fought and died for the men [they]

[99]

Add.167

marched among."  Frank Loesser, "The Ballad of Roger Young",

LIFE, 5 March 1945, at 117.

Each day, I recognize (to paraphrase Lincoln again) that

the brave men and women, living and dead, who have struggled in

our Nation's service have hallowed our Constitutional freedom

far above my (or anyone's) poor power to add or detract.  The

only Constitutional rights upon which we can depend are those we

extend to the weakest and most reviled among us.

Expecting no self correction -- or even outcry -- for the

amalgam of reasons above this Court proceeds to lay the legal

groundwork supporting an effective order (Sections III and IV)

and then sketches the special issues extant today (Section V).

## III. RULINGS OF LAW

The Plaintiffs here press three counts against the Public

Officials: 1) a First Amendment challenge to the alleged

ideological-deportation policy as viewpoint-discriminatory, and,

to the extent that the Public Officials rely on "security and

related grounds of inadmissibility" such as the "foreign policy

provisions" of Section 4C, an as-applied challenge to those

provisions for the same reason, Compl. ¶¶ 134-35; 2) a First

Amendment challenge to the Public Officials' alleged campaign of

coercive threats to punish protected speech, id. ¶ 136; and 3)

an Administrative Procedure Act ("APA") challenge, 5 U.S.C. §

706(2)(A)-(C), to the alleged ideological-deportation policy as

[100]

Add.168

arbitrary, capricious, an abuse of statutory discretion, contrary to constitutional right, and exceeding the Public Officials' statutory authority, Compl. ¶ 139.

This Court rules that the Plaintiffs have shown by clear and convincing evidence that Secretaries Noem and Rubio have intentionally and in concert implemented Executive Orders in 14161 and 14188 a viewpoint-discriminatory way to chill protected speech. This conduct violated the First Amendment. The coercion line of case law bolsters this conclusion, and the Public Officials' threats to continue detaining, deporting, and revoking visas based on political speech serves as circumstantial evidence that such enforcement exists, is viewpoint discriminatory, and has objectively chilled the Plaintiffs' speech, but the campaign of threats itself, because not directed specifically at the Plaintiffs, does not separately violate the Constitution under this precise line of case law.

This mode of enforcement policy also violates the APA because, for the same reasons, it is contrary to constitutional right. It is also arbitrary or capricious because it reverses prior policy without reasoned explanation or consideration of reliance interests, and is based on statutes that have never been used in this way.

[101]

Add.169

## A. Standing

This Court ruled on the facts alleged in the complaint that both AAUP and MESA had associational standing to sue, and that at least MESA had organizational standing. AAUP v. Rubio, 780 F. Supp. 3d 350, 374-81 (D. Mass. 2025). The Public Officials renew their challenge to standing at the trial's end, arguing that associational standing violates the Constitution, that because AAUP and MESA provided no student visa-holding standing witnesses they may not challenge the mode of enforcement here as it relates to nonimmigrant student visa holders, that the Plaintiffs' Legal Permanent Resident witnesses testified only to subjective fear and self-censorship and so have no concrete or impending injury traceable to the alleged policy or redressable by a decision of this Court, and that AAUP and MESA do not have organizational standing because they have shown merely a diversion of resources and no restriction of their own political speech. Defs.' Post-Trial Proposed Findings of Fact & Rulings of Law 22-69.

### 1. Associational Standing

This Court is of course bound by vertical precedent establishing and adhering to the associational standing framework. See, e.g., Parent/Pro. Advoc. League v. City of Springfield, Mass., 934 F.3d 13, 33-34 (1st Cir. 2019). It

[102]

Add.170

explained its understanding of that governing precedent in its prior opinion.  AAUP, 780 F. Supp. 3d at 374-79.

Chill-based First Amendment challenges require more than subjective fear, but rather "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and . . . a credible threat of prosecution," or a showing that one is "chilled from exercising [one's] right to free expression or foregoes expression in order to avoid enforcement consequences."  Blum v. Holder, 744 F.3d 790, 796 (1st Cir. 2014) (cert. denied) (quoting Mangual v. Rotger-Sabat, 317 F.3d 45, 56-57 (1st Cir. 2003)).  The Public Officials argue, and the First Circuit has noted in dicta that, in Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013), the Supreme Court "may have adopted a more stringent injury standard for standing than th[e] [First Circuit] has previously adopted in pre-enforcement challenges on First Amendment grounds." Blum, 744 F.3d at 798.

At the same time, courts in this circuit have continued to entertain chill-based and similar challenges after Clapper, see, e.g., Doe v. Hopkinton Pub. Schs., 19 F.4th 493, 510-11 (1st Cir. 2021) (evaluating chill-based overbreadth challenge); Martin v. Evans, 241 F. Supp. 3d 276, 281-83 (D. Mass. 2017) (Saris, J.) (ruling that complaint "sufficiently alleges an intention to engage in a particular course of conduct if not for

[103]

Add.171

[the challenged law]," id. at 282, and observing that "the Court can assume that the plaintiffs will face a credible threat of prosecution should they engage in their intended actions," an "assumption [which] remains good law", id. at 283), as have several courts of appeals in recent years, see Speech First, Inc. v. Cartwright, 32 F.4th 1110, 1120 (11th Cir. 2022) (stating rule that First Amendment standing requires only that a "reasonable would-be speaker" would self-censor in response to the challenged policy); Speech First, Inc. v. Killeen, 968 F.3d 628, 638 (7th Cir. 2020) (stating that "a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result"); Speech First, Inc. v. Fenves, 979 F.3d 319, 335-37 (5th Cir. 2020) (restating rule that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations," id. at 335 (quoting Laird v. Tatum, 408 U.S. 1, 11 (1972)) and thus "[w]here the [challenged] policy remains non-moribund, the claim is that the policy causes self-censorship among those who are subject to it, and the [plaintiffs'] speech is arguably regulated by the policy, there is standing," id. at 336-37). Many of the reasons these other courts have found to distinguish Clapper from true objective chill-based cases apply here: this is a challenge to a mode of enforcement that directly threatens adverse action against the member plaintiffs' own speech, so

[104]

Add.172

"the injury here does not depend on the government enforcing a law against another person with whom the plaintiffs might potentially interact."  Martin, 241 F. Supp. 3d at 283; see also Hopkinton Pub. Schs., 19 F.4th at 511 ("'[A] chill on speech sometimes may be a cognizable injury,' but 'in order to have standing, the plaintiff must be within the class of persons potentially chilled.'" (alteration in original) (quoting Osediacz v. City of Cranston, 414 F.3d 136, 142 (1st Cir. 2005)).  No one asserts "that the plaintiffs [are] in a class that, under the challenged [policy], could not be targeted" as in Clapper, Fenves, 979 F.3d at 336; rather, the Plaintiffs' noncitizen members are squarely within the class that is subject to the alleged mode of enforcement.[34]  As the Supreme Court

---

[34] The Court acknowledges the complexity introduced by the fact that the Plaintiffs challenge an enforcement policy implementing Executive Orders, and so cannot point to a written version of the de facto speech regulation that allegedly chills their speech outside of the Executive Orders themselves, scattered public statements and social media posts, and the operation of the two government departments (Homeland Security and State) themselves.  This is factually similar, however, to the recent campus speech code cases, where plaintiffs challenge harassment policies that they assert violate the First Amendment because they are in fact overbroad or viewpoint-discriminatory. see, e.g., Cartwright, 32 F. 4th at 1114-18.  Here, the Executive Orders articulate a kind of harassment policy, singling out particular kinds of speech.  The facts are also similar to First Circuit precedent allowing challenges to enforcement policies implementing facially neutral statutes based on a First Amendment chill, McGuire v. Reilly, 386 F.3d 45, 55, 59-64 (1st Cir. 2004).  Specifically, the Executive Orders target antisemitic harassment, hateful ideology, hostile attitudes, and support for terrorists, and have allegedly been

observed in <u>Holder</u> v. <u>Humanitarian L. Proj.</u>, in the course of

explaining why plaintiffs, who had previously engaged in conduct

that was subsequently criminalized and said they wished to do so

again, had standing to challenge the criminalizing statute,

"[t]he Government has not argued to this Court that plaintiffs

will not be prosecuted if they do what they say they wish to

do," 561 U.S. 1, 16 (2010).  On the contrary, the Public

---

implemented to target particular viewpoints and protected
speech.  This challenge seems to this Court entirely
appropriate: it would be an odd kind of First Amendment chill
law, after all, that allowed government officials to regulate
speech so long as they did not write the details of their speech
regulations down.  <u>See</u> <u>Speech First, Inc.</u> v. <u>Whitten</u>, 145 S. Ct.
701, 703 (2024) (Thomas, J., dissenting from the denial of
certiorari) (discussing potential chill from campus bias
response program defining bias in a way that "appears limitless
in scope," with "weighty consequenc[es] . . . lurk[ing] in the
background" (citation omitted)); <u>Keyishian</u> v. <u>Board of Regents</u>,
385 U.S. 589, 601 (1967) ("The very intricacy of the plan and
the uncertainty as to the scope of its proscriptions make it a
highly efficient in terrorem mechanism.").  For clarity's sake,
this Court believes that the contours of the alleged speech
regulation may be briefly stated: Lawful Permanent Residents'
green cards and student visa-holders' visas may be revoked, and
these persons may be detained and deported, based on any public
anti-Israel or pro-Palestine speech or association.
Particularly given that a key agency official tasked with
implementing the policy refers consistently to potential
"violat[ions]" of the Executive Orders and to activity that
"aligns with the executive order's focus on deporting 'Hamas
sympathizers,'" and that the statutory authorities invoked here
are themselves sweepingly vague, this approach seems more
aligned with the facts at issue than the more typical approach -
- also invoked by the Plaintiffs, as a back-up position -- that
would focus on the potentially discriminatory application of
specific statutes.  The bulk of the Court's reasoning, however,
would also apply to that kind of challenge, under the same
chill-based precedents.

[106]

Add.174

Officials have forcefully asserted their right to detain,
deport, and revoke visas in response to the very speech-based
activities in which the standing witnesses here previously
engaged and credibly testify that they would engage in again
were it not for the challenged policy.  See Blum, 744 F.3d at
798 n.11 ("Clapper does not call into question the assumption
that the [government] will enforce its own non-moribund criminal
laws.").

In sum, the law of objective chill-based First Amendment
standing remains intact after Clapper, and applies here.[35]  As
Justice Thomas wrote recently and as this Court cited in its
previous opinion (AAUP, 780 F. Supp. 3d at 376), "[i]t is well
settled that plaintiffs may establish standing based on 'the

---

[35] This ought be no surprise, as Clapper addressed a mere
paragraph to the chill issue, which it deemed largely irrelevant
as no prior case "even suggest[ed] that plaintiffs can establish
standing simply by claiming that they experienced a 'chilling
effect' that resulted from a governmental policy that does not
regulate, constrain, or compel any action on their part."  Id.
at 419.  Clapper contrasted this with cases where "the plaintiff
. . . [is] unquestionably regulated by the relevant statute" and
wishes to engage in regulated conduct, showing more than a
subjective chill.  Id. at 420.  The Court expressly acknowledged
that standing may in some circumstances be based on a showing
"that the defendant's actual action has caused a **substantial
risk** of harm," id. at 414 n.5 (emphasis added), citing the First
Amendment chill case Babbitt v. United Farm Workers Nat'l Union,
442 U.S. 289, 298 (1979) as one of several examples.  Babbitt,
in turn, states simply: "A plaintiff who challenges a [law] must
demonstrate a **realistic danger** of sustaining a direct injury as
a result of the [law]'s operation or enforcement."  442 U.S. at
298 (emphasis added) (citing O'Shea v. Littleton, 414 U.S. 488,
494 (1974)).

[107]

Add.175

deterrent, or "chilling," effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights,'" and, "in assessing whether an 'objective chill' exists in a particular case, courts must 'look through the forms to the substance' of the government's 'informal sanctions.'"  Whitten, 145 S. Ct. at 703 (Thomas, J., dissenting from the denial of certiorari) (first quoting Laird, 408 U.S. at 11; then citing Clapper, 568 U.S. at 418; and then quoting Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963)).

On the merits, the Court disagrees that the Plaintiffs' standing witnesses have shown only subjective fear and unreasonable self-censorship.  In particular, standing witness Professor Al-Ali, who is a lawful permanent resident and a member of both AAUP and MESA, testified to a long history of scholarly work and advocacy on issues related to Palestine, including signing and in one case drafting open letters calling for, among other things, Brown University's divestment from companies involved in Israel's military occupation of Palestine, the dropping of legal charges against student protestors in aftermath of the October 7 attacks, and a ceasefire in Gaza. Trial Tr. vol. II, 125:16-126:8, 129:13-19, Jul. 7, 2025; Trial Tr. vol. I, 8:22-11:23, 15:21-17:15; see also Exs. 92, 223, & 224.  Professor Al-Ali credibly testified that news of Khalil and Öztürk's arrests, in addition to the comment from President

[108]

Add.176

Trump that Khalil's arrest would be one of "many," led her to alter international travel plans and to contact an immigration lawyer to track her travel abroad, to decline a public-facing leadership opportunity that might have more firmly associated her with pro-Palestine human rights advocacy, to cease her previous practice of signing open letters related to these issues, to forego specific research projects related to Palestine and funded research opportunities requiring travel, and to stop attending protests and assisting in negotiations between Brown University and its students as she had previously done, all out of fear of being targeted for her pro-Palestinian speech and association with such views. Trial Tr. vol. II, 138:5-15, 140:2-21, 141:9-10, 141:21-142:20, 144:13-145:5, 145:19-146:7, Jul. 7, 2025; Trial Tr. vol. I, 19:2-15, 20:5-14 Jul. 8, 2025. Professor Al-Ali, moreover, bears many of the traits that appear to make one ripe for targeting under the mode of enforcement proved here: she has voiced public support for the BDS movement, which is a particular focus of the Canary Mission website from which many of the policy's targets so far have been drawn, she is already discussed on a similar website that targets such advocacy, and she has served as Director of a campus organization, the Center for Middle East Studies, that has been investigated and subject to public scrutiny based on allegations related to pro-Palestine advocacy. Trial Tr. vol.

[109]

Add.177

I, 19:16-20:1, Jul. 8, 2025; see Fenves, 979 F.3d at 336 (describing Clapper's emphasis on "a history of enforcement or specific facts about the government's targeting practices that might yet give rise to a substantial threat of enforcement").

Other standing witnesses for AAUP and Harvard-AAUP also testified to the chilling effect of the arrests and alleged policy on speech and expressive activity, such as their public-facing writing, public letter signing, and protest attendance. Professor Megan Hysaka, an AAUP member and lawful permanent resident, has previously published a paper discussing media treatment of the Israel-Palestine conflict, regularly attended pro-Palestine protests including student encampments, and signed an open letter in support of pro-Palestine student protests. Trial Tr. vol. I, 36:1-5, 36:18-19, 55:9-16, Jul. 7, 2025.  Now, in response to the arrests and several social media posts by the Public Officials, she has cut back on these activities and, among other things, refrained from publishing a specific op-ed that she drafted in response to Öztürk's arrest, out of fear that the enforcement policy would be applied to her in the same way that it was to Öztürk.  Id. 43:2-44:12, 57:17-66:22; see also Ex. 66.  Professor Bernhard Nickel, a member of AAUP and Harvard-AAUP, previously signed public letters and statements in support of Palestinian human rights and student protestors and attended pro-Palestine protests, including student encampments,

[110]

Add.178

but, in response to the arrests and various threatening statements by the Public Officials, he has ceased signing public letters and attending protests, and canceled travel plans to visit his terminally ill brother abroad and to attend an international academic conference.  Trial Tr. vol. I, 18:17-18, 66:23-67:23, 70:4-8, Jul. 8, 2025; Trial Tr. vol. II, 86:2-13, 87:19-90:10, Jul. 8, 2025.

The Public Officials argued at trial that the fears motivating these episodes of self-censorship were largely self-inflicted, at trial quoting Kierkegaard that "anxiety is the dizziness of freedom."  Trial Tr. vol. II, 114:2-115:1.  It is an odd kind of freedom that compels one to leave writing unpublished, leadership positions unpursued, and terminally ill relatives unvisited.  This Court credits the testimony of AAUP and MESA members that the enforcement policy they challenge objectively chills their speech, and so rules that both AAUP and MESA have associational standing to pursue their claim that the Public Officials are engaged in a policy of targeting noncitizens based on their viewpoints in order to chill speech.[36]

---

[36]  The Public Officials argue that because Plaintiffs did not present nor name nonimmigrant student visa holders among their membership, that those members lack associational standing. This argument, however, overextends the rule.  First Circuit and Supreme Court precedent do not require the naming of every possible sub-group within an association in order to establish standing for each sub-group within the association. Rather, the rule requires only that the association "identify

[111]

Add.179

The issue whether AAUP and MESA also have associational standing to pursue their challenge to the alleged campaign of coercive threats to silence their speech is intertwined with the merits, and so collapses with the liability discussion below. See infra Section III.C.  "Governmental activity constitutes an injury-in-fact when 'the challenged exercise of governmental power [is] regulatory, proscriptive, or compulsory in nature, and the complainant [is] either presently or prospectively subject to the regulations, proscriptions, or compulsions that he [is] challenging.'"  Speech First, Inc. v. Schlissel, 939 F.3d 756, 764-65 (quoting Laird, 408 U.S. at 11).  All standing witnesses testified to having been exposed to some combination of the public threats by the Public Officials and the publicized arrests of Khalil and Öztürk on which the plaintiffs base this claim, to have self-censored in response to this exposure, and all are potentially subject to the threatened consequences. Whether the threats were directed at the Plaintiffs with

---

[a] member[ ] who ha[s] suffered the requisite harm.'  Housatonic River Initiative v. United States Env't Prot. Agency, New England Region, 75 F.4th 248, 265 (1st Cir. 2023) (citing Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009)). Thus, defendant's delineation between legal permanent residents and nonimmigrant student visa holders in the context of associational standing is a distinction without a meaningful legal difference. Plaintiffs identified and solicited testimony from several noncitizen members who have suffered the requisite harm, thus satisfying the identification prong of the associational standing test.

[112]

Add.180

sufficient particularity to support a claim under this line of case law is factually and legally complex, and so better left to the discussion of how First Amendment law applies to the facts proved at trial.

As to organizational standing -- which is ruled on separately here, because it may affect the scope of the relief this Court can offer -- this Court rules that MESA has organizational standing to pursue these claims for substantially the same reasons stated in this Court's previous opinion denying in part the Public Officials' motion to dismiss. AAUP, 780 F. Supp. 3d at 379-382. MESA alleged, and has now substantiated, that the challenged mode of enforcement and campaign of coercive threats has significantly harmed its core activity of facilitating academic discourse and scholarship about issues impacting the Middle East, including by reducing projected membership numbers and so membership dues, a reduced anticipated participation in its flagship annual meeting in November based on current submission numbers, and, as testified by Professor Al-Ali, by pressuring members to self-censor and so not to contribute scholarship and perspectives that they would otherwise contribute, which scholarship and discourse are the lifeblood of the organization. MESA has thus shown harm to its "core [] activities," rather than a mere voluntary diversion of resources "in response to a defendant's actions" still

[113]

essentially within that mission.  Food & Drug Admin. v. Alliance

for Hippocratic Med., 144 S.Ct. 1540, 1564 (2024).

While acknowledging that the lines in this field are

uncertainly drawn, this Court rules that AAUP's demonstrated

harms -- deterred and diminished noncitizen participation in

AAUP events and diverted resources from more typical core

advocacy issues such as "adjunctification" to dealing with

immigration law -- fall within the Supreme Court's warning

against permitting an organization to "spend its way into

standing simply by expending money to gather information and

advocate against the defendant's action."  Id. at 1563.  This

formulation ought not give the impression that this Court does

not acknowledge or credit the real hardships that the proven

mode of enforcement and coercion campaign may have caused AAUP.

Rather, it is a judgment that organizational standing doctrine,

which stems from what the Supreme Court has called an "unusual

case" that it "has been careful not to extend . . . beyond its

context," forbids a kind of coming-to-the nuisance, such that

organizations that respond to their members' injuries within

their core mission, without suffering "direct[] . . .

interfere[nce] with" their own "core . . . activities," may not

[114]

Add.182

benefit from this relatively unusual form of standing, id. at 1564.[37]

In sum, the challenged "government policy would cause a reasonable would-be speaker to 'self-censor,'" such that "the challenged policy 'objectively chills' protected expression." Cartwright, 32 F. 4th at 1120. As noted above, the Public Officials do not disavow an intention to detain, deport, or revoke student visas in response to what would inarguably be constitutionally protected speech if engaged in by a citizen. In this Court's view, then, the Public Officials have

---

[37] The Court acknowledges, conversely, that MESA's organizational standing is premised on the arguably novel theory that, because its members are chilled, the organization itself is harmed, which could be viewed as insufficiently direct. See Texas State LULAC v. Elfant, 52 F.4th 248, 256-57 (5th Cir. 2022) (finding no chill-based organizational standing where organization itself faced no substantial risk of penalty under the challenged statute). This Court understands this, however, to be a unique case, like Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982), where the alleged enforcement policy cuts straight to the core of the organization's mission: without candid speech about the most pressing issues facing the Middle East, after all, what is MESA for? In other words, the challenged policy has, as alleged, made it a potentially deportable offense to do what the organization exists to facilitate. Havens Realty itself involved a challenge to a defendant's illegal racial steering practices that allegedly harmed the organization's **clients** by misleading them, which in turn made the organization's own core work of correctly counseling its clients more difficult; that is, it involved another form of arguably third-party, indirect harm. See 455 U.S. at 378-79. The focus of Havens Realty as interpreted by Hippocratic Med. is, again, on whether the defendant's "actions directly affected and interfered with [the plaintiff's] core business activities." 602 U.S. at 395.

[115]

Add.183

essentially conceded that it is objectively reasonable for the Plaintiffs' noncitizen members to believe that, if they choose to engage in pro-Palestine or anti-Israel advocacy of any meaningfully public kind, they will expose themselves to the consequences they fear.[38]

Having ruled that both MESA and AAUP have associational standing, and that MESA has organizational standing as well, the Court proceeds to the merits.[39]

## B.  First Amendment Viewpoint Discrimination (Count I)

Two preliminary questions must be settled before the Plaintiffs' First Amendment viewpoint discrimination claim can be analyzed: (1) what First Amendment rights the noncitizens at issue here possess; and (2) what standard of review applies to the Plaintiffs' challenge to an "ideological deportation policy" implementing the President's Executive Orders.  The first

---

[38] It is, of course, somewhat speculative whether these particular plaintiffs would end up on the particular anonymously-sourced lists from which the Public Officials have so far drawn the names of the noncitizens they have targeted, were they to attend a pro-Palestine protest or write an anti-Israel article.  But it seems objectively reasonable to this Court to fear that any published writing, or any attendance at a protest, might render them so.

[39] With the exception of the testimony of Professor Nickel, who is a member of Harvard-AAUP, the Plaintiffs did not provide evidence of the challenged policy's effects on the individual AAUP chapters that initially sued, and they do not press the issue in their briefing.  This Court therefore rules that, in addition to MESA, only AAUP itself, and not these individual chapters, has standing.

[116]

Add.184

question is dealt with more easily, in part because the Court has already addressed it and ruled that noncitizens have at least the core First Amendment right to political speech without reprisal.  AAUP, 780 F. Supp. 3d at  382 (D. Mass. 2025). Despite that ruling, the Court pauses to acknowledge the complexity of this issue, and to explain its reasoning.

**1. The First Amendment Rights of Noncitizens**

This Court appreciates, as the Plaintiffs have urged, that several courts to have addressed the issue of noncitizen speech in recent months have stated in no uncertain terms that noncitizens' speech rights are identical to those of citizens. See, e.g., Mahdawi, 781 F. Supp. 3d 214, 229 (D. Vt. 2025)(Crawford, Ch. J.).  Although the Court broadly agrees with these analyses, the Public Officials are not wrong to suggest that the matter is complex.  Unlike with citizens, the question involves a collision between two doctrines that do not admit of easy compromise: plenary power doctrine in the immigration context and this nation's steadfast and foundational commitment to freedom of speech.  See Bustamante v. Mukasey, 531 F.3d 1059, 1061-62 (9th Cir. 2008) (discussing Kleindienst v. Mandel, 408 U.S. 753 (1972), where the Supreme Court "acknowledged that First Amendment rights were implicated, but emphasized the longstanding principle that **Congress** has plenary power to make policies and rules for the exclusion of aliens") (emphasis

[117]

Add.185

added); but see Bridges v. Wixon, 326 U.S. 135, 162 (1945)
(Murphy, J., concurring) ("[T]he First Amendment and other
portions of the Bill of Rights make no exception in favor of
deportation laws or laws enacted pursuant to a 'plenary' power
of the Government."). Judicial review of Executive Branch
decision-making with respect to noncitizens is importantly
limited in certain contexts, even where recognized rights may be
implicated. See, e.g., Trump v. Hawaii, 138 S.Ct. 2392, 2419-20
(2018) (applying rational basis review, and citing Mandel's more
deferential "facially legitimate and bona fide" reason standard,
408 U.S. at 762, when evaluating Establishment Clause challenge
to allegedly discriminatory admission policy affecting aliens
abroad, which policy involved "matters of entry and national
security"); Reno v. American-Arab Anti-Discrim. Comm., 525 U.S.
471, 491-92 (1999) (holding that "[w]hen an alien's continuing
presence in this country is in violation of the immigration
laws, the Government does not offend the Constitution by
deporting him for the additional reason that it believes him to
be a member of an organization that supports terrorist
activity," but not "ruling out the possibility of a rare case in
which the alleged basis of discrimination is so outrageous" that
this rule might be overcome); Kandamar v. Gonzalez, 464 F.3d 65,
72 (1st Cir. 2006) ("The Supreme Court has long held that

[118]

Add.186

judicial review of line-drawing in the immigration context is deferential.").

Broadly speaking, however, "the Supreme Court [has] applied to aliens the same First Amendment test then applicable to citizens," American Arab Anti-Discrim. Comm. v. Meese, 714 F. Supp. 1060, 1081 (C.D. Cal. 1989), vacated, 970 F.2d 501 (9th Cir. 1992), with the significant exception that citizens generally cannot be deported.  This makes sense of the cases from the early Cold War era relied on by the Public Officials, where Anarchist and Communist speech and association were sometimes penalized as to citizens and noncitizens alike, although the penalties differed.  See, e.g., Harisiades v. Shaughnessy, 342 U.S. 580, 587-92 (1952) (upholding statute allowing deportation of former Communist Party members based on "[c]ongressional apprehension of foreign or internal dangers short of war," id. at 587, including Congress' receiving "evidence that the Communist movement here has been heavily laden with aliens and that Soviet control of the American Communist Party has been largely through alien Communists," id. at 590, based on distinction between lawful advocacy and "advocating overthrow of government by force and violence," id. at 591-92); Dennis v. United States, 341 U.S. 494, 502-11 (1951) (upholding criminal conviction of citizens based on conspiracy to teach Communism against First Amendment challenge, applying

[119]

Add.187

same test later used in Harisiades, again citing potential

"attempt to overthrow the Government by force and violence" id.

at 517).  Furthermore, some of the most notorious Red Scare

First Amendment Supreme Court cases were significantly cabined

by the infamous "Red Monday" cases of 1957.  See e.g., Yates v.

United States, 354 U.S. 298, 318 (1957) (distinguishing between

"effort to instigate action to th[e] end" of "forcible

overthrow", id. at 318, of the government, which was illegal

under the Smith Act's advocacy or organizing provisions, and

"advocacy and teaching . . . divorced from any [such] effort,"

which, even when done with "evil intent," was not, id.).  The

Court therefore continues to assume that the best reading of the

relevant First Amendment case law entitles noncitizens to the

protection of the Court's post-Cold War development of an

"incitement test" requiring "a likelihood of imminent harm" in

order to render otherwise lawful political speech subject to

adverse government action.  See Brandenburg v. Ohio, 395 U.S.

444 (1969).

The Public Officials urge, and this Court acknowledges,

that Harisiades has not been expressly overruled by the Supreme

Court.  Even assuming that the First Amendment law of the second

Red Scare era still applies to noncitizens in its entirety, the

Public Officials' reliance on these Red Scare era cases only

accentuates two important distinctions between this case and the

[120]

Add.188

cases on which the Public Officials most rely.  First,

Harisiades carefully examined a specific congressional

determination that the organization of which the plaintiffs were

former members advocated the "methodical but prudent incitement

to violence," and ultimately "incitement to violent overthrow"

of the United States government.  Harisiades, 342 U.S. at 592.

Here, there is no alleged membership of any organization and no

congressional determination specific to it or to the targeted

noncitizens, much less a determination that the targeted

noncitizens are involved in advocating for the government's

violent overthrow, 342 U.S. at 592.  Second, Mandel and Hawaii,

which the Public Officials cite for the proposition that all

burdens on noncitizens' First Amendment rights are subject to

only a "facially legitimate and bona fide" reason standard of

review, are exclusion cases, and "[t]he distinction between an

alien who has effected an entry into the United States and one

who has never entered runs throughout immigration law," Zadvydas

v. Davis, 533 U.S. 678, 693 (2001); Gastelum-Quinones v.

Kennedy, 374 U.S. 469, 479 (1963) ("[D]eportation is a drastic

sanction, one which can destroy lives and disrupt families, and

. . . a holding of deportability must therefore be premised upon

[meaningful evidence of the relevant violation].").  In any

case, political speech is not, on its own, a facially legitimate

reason for expelling persons from this country, see Abourezk v.

[121]

Add.189

<u>Reagan</u>, 592 F. Supp. 880, 887 & n.23 (D.D.C. 1984) (Greene, J.) ("[A]lthough the government may deny entry to aliens altogether, for any number of specific reasons, it may not, consistent with the First Amendment, deny entry solely on account of the content of speech."), <u>vacated and remanded on other grounds</u>, 785 F.2d 1043 (D.C. Cir. 1986); <u>American Acad. of Relig.</u> v. <u>Chertoff</u>, 463 F. Supp. 2d 400, 415 (S.D.N.Y. 2006) (Crotty,J.) ("[W]hile the Executive may exclude an alien for almost any reason, it cannot do so solely because the Executive disagrees with the content of the alien's speech and therefore wants to prevent the alien from sharing this speech with a willing American audience."). Indeed, even at the height of the second Red Scare, and even when examining loyalty oaths required to obtain union leadership rather than the far more serious consequence of deportation, the Supreme Court stressed the need for some connection to intended, concrete violent action in order to attach **any** negative consequences to political speech and association: "The congressional purpose is therefore served if we construe the [challenged statutory language requiring an anti-Communist loyalty oath] to apply to persons and organizations who believe in violent overthrow of the Government as it presently exists under the Constitution **as an objective, not merely a prophecy. . . . Of course we agree that one may not be imprisoned . . . because he holds particular beliefs.**" <u>American Commc'ns Ass'n,</u>

[122]

Add.190

C.I.O. v. Douds, 339 U.S. 382, 407-08 (1950) (emphasis added). And again, in the deportation case Harisiades, the Supreme Court specifically rejected the proposition "that the First Amendment allows Congress to make no distinction between advocating change in the existing order by lawful elective processes and **advocating change by force and violence**," and observed that "Communist Governments avoid the inquiry by suppressing everything distasteful." 342 U.S. at 592 (emphasis added). The Supreme Court "apprehend[ed] that the Constitution enjoins upon [courts] the duty, however difficult, of distinguishing between" pure political speech and incitement to violence. Id.

For these reasons, this Court rules that here the Plaintiffs have shown that Secretaries Noem and Rubio are engaged in a mode of enforcement leading to detaining, deporting, and revoking noncitizens' visas solely on the basis of political speech, and with the intent of chilling such speech and that of others similarly situated. Such conduct is not only unconstitutional, but a thing virtually unknown to our constitutional tradition.

Lastly, as is relevant to its analysis below, this Court observes that, on its face, the First Amendment does not distinguish between citizens and noncitizens; rather, it states simply, "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I. As the Supreme Court's now

[123]

Add.191

frequently cited statement in <u>Bridges</u> v. <u>Wixon</u> confirmed, this text at least arguably implies that "[f]reedom of speech . . . is accorded aliens residing in this country."  326 U.S. 135, 148 (1945).  It also suggests something a little less obvious, but still worth saying, which is that its chief concern is with the character and quality of the "speech" that occurs on American soil, in what Justice Holmes called "free trade in ideas," which is "the best test of truth," <u>Abrams</u> v. <u>United States</u>, 250 U.S. 616, 630 (1919), and ensuring that Congress may not twist that speech in the federal government's preferred direction.  In other words, as Professor Zechariah Chafee Jr. put it, the First Amendment declares a "national policy in favor of the public discussion of all public questions." <u>Freedom of Speech in War Time</u>, 32 Harv. L. Rev. 932, 934, 956 (1919); <u>see also</u> <u>Mandel</u>, 408 U.S. at 775 (Marshall, J., dissenting) ("The freedom to speak and the freedom to hear are inseparable; they are two sides of the same coin.  But the coin itself is the process of thought and discussion.  The activity of speakers becoming listeners and listeners becoming speakers in the vital interchange of thought is the 'means indispensable to the discovery and spread of political truth.'  Its protection is 'a fundamental principle of the American government.'  The First Amendment means that Government has no power to thwart the process of free discussion[.]" (citations omitted)).  Although

[124]

Add.192

this Court rejected the Plaintiffs' arguments that their citizen members had standing to sue on the basis of chilled listening and association as such, it nevertheless takes seriously their concern that their own speech rights and rights to hear and to associate are implicated in this case.

## 2. The Standard of Review

As for the second question, that is, what standard of review ought apply to the Plaintiffs' First Amendment viewpoint discrimination challenge to the alleged procedures, this Court rules that it need not decide, because even under the "facially legitimate and bona fide" standard proposed by the Public Officials under <u>Department of State</u> v. <u>Munoz</u>, 602 U.S. 899, 908 (2024), or <u>Hartman</u> v. <u>Moore</u>, 547 U.S. 250 (2006), on this record, the Plaintiffs prevail.[40]

---

[40] The Court acknowledges that this sidesteps the tiers-of-scrutiny question raised by both parties, which seems somewhat beside the point: without a direct challenge to the Executive Orders or the statutes, there is no text to scrutinize; the question, then is what the policy mode of enforcement is, and whether it is, as the Plaintiffs allege, viewpoint-discriminatory. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys," and "[d]iscrimination against speech because of its message is presumed to be unconstitutional." <u>Rosenberger</u> v. <u>Rector & Visitors of Univ. of Va.</u>, 515 U.S. 819, at 828 (1995). Likewise, "[t]he adoption of a facially neutral policy for the purpose of suppressing the expression of a particular viewpoint is viewpoint discrimination." <u>Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law</u> v. <u>Martinez</u>, 561 U.S. 661, 736 (2010) (Alito, J., dissenting). The intent element addresses the difficulty of definition in defining the policy: a policy of intentionally targeting pro-Palestine and anti-Israel

[125]

Add.193

The Court credited at the motion to dismiss stage that the Plaintiffs might plausibly be able to show that the implementation of the specific Executive Orders cited amounted to a discrete policy or practice, and that that discrete policy or practice targeted protected political speech.  AAUP, 780 F. Supp. 3d at 383-84.  There is nothing unusual, after all, in objecting to the implementation of Executive Orders, which may serve as a focal point for review even when they are not directly challenged.  See Woonasquatucket River Watershed Council v. U. S.  Dep't of Agric., 778 F. Supp. 3d 440, 462 (D.R.I. 2025) ("[T]he [plaintiffs] can challenge the

_____

speech in order to chill it is of course viewpoint discriminatory, and, to the extent that it applies, would also fail strict scrutiny for want of being narrowly tailored to the invoked end of combating antisemitism, as would a more generously interpreted version of the policy as something like "Hamas-sympathizers may be deported," without defining who such sympathizers are.  See Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 168, 171 (2015) (stating rule that content-based restrictions, of which viewpoint-based restrictions are an especially "egregious" kind, "can stand only if they survive strict scrutiny," requiring the government to show that the law furthers a compelling interest and is narrowly tailored to achieve it).  The relevant Executive Orders do not purport to be content-neutral, but they do purport to target antisemitic harassment and violence; and, in lieu of a facially discriminatory statute or regulation, a policy of combating harassment that only incidentally burdens speech would raise different questions.  See Test Masters Educ. Servs., Inc. v. Singh, 428 F.3d 559, 580 ("Courts have made a distinction between communication and harassment.  The difference is one between free speech and conduct that may be proscribed. Although restrictions based upon conduct may incidentally restrict speech, the courts have found that such a restriction poses only a minimal burden on speech." (citations omitted)).

[126]

Add.194

implementation of an [Executive] order without challenging the order itself[.]"); <u>Franklin</u> v. <u>Massachusetts</u>, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and concurring in the judgment) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive[.]").

At the same time, this Court also expressed a related concern that it was not clear that the plaintiffs could mount a typical "facial" First Amendment challenge to an unwritten policy, or, alternatively, an "as applied" challenge to statutes applied in implementing the challenged policy, when those statutes have not been applied to the Plaintiffs who are before the Court. <u>AAUP</u>, 780 F. Supp. 3d at 383 n. 10. The Court cited <u>McGuire</u> v. <u>Reilly</u> as the best controlling analogue to what the First Circuit in that case described as an "enforcement policy," against which the plaintiffs mounted "a different sort" of as-applied challenge, which "must be based on the idea that the law itself is neutral and constitutional . . . , but that it has been enforced selectively in a viewpoint discriminatory way." 386 F.3d 45, 61 (1st Cir. 2004). The Plaintiffs here argue that the enforcement actions are viewpoint discriminatory and so unconstitutional all the way down, and thus they need not show intent, <u>see</u> <u>Iancu</u> v. <u>Brunetti</u>, 588 U.S. 388, 393 (2019) (describing as "a core postulate of free speech law" that "[t]he

[127]

Add.195

government may not discriminate against speech based on the ideas or opinions it conveys." Iancu described viewpoint-discriminatory laws "presumptively unconstitutional" (quoting Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829-30 (1995)).

On the other hand, the Public Officials invoke a framework requiring a showing not just of retaliatory intent but of no probable cause for any adverse actions, see Hartman, 547 U.S. at 263, 265-66 -- but it seems to the Court to capture the essence of what the Plaintiffs allege: a pair of Executive Orders that, although couched in a concern for hateful ideologies, antisemitism, and antisemitic harassment, and accompanied by appropriate disclaimers as to the lawfulness of any actions taken pursuant to them, in fact incorporated a definition of antisemitism that encompassed protected political speech, and, by means of intentionally discriminatory enforcement procedures implementing them, led to the singling out of pro-Palestine and anti-Israel speech for a campaign of speech-chilling retribution.[41]

---

[41] This framework also addresses the Public Officials' reasonable concern that the Executive's prosecutorial discretion not be micromanaged by the Judiciary, a concern which the Supreme Court has described -- albeit in the context of concern over delay in specific deportation proceedings, which has not been threatened here -- as "greatly magnified in the deportation context." Reno, 525 U.S. at 489-90. Under a McGuire-type standard, the Plaintiffs take on the heavy burden of showing

[128]

Add.196

This Court continues to find McGuire, and similar cases relied on by the Plaintiffs, helpful in guiding its review here. See Hoye v. City of Oakland, 653 F.3d 835, 856 (9th Cir. 2011) (ruling that, alongside a written Ordinance, the defendant was "instead enforcing **a different, unwritten, rule . . . i.e., the Ordinance as erroneously understood by [the defendant]**" which was itself "impermissibly content-discriminatory"); Lozman v. Riviera Beach, 585 U.S. 87, 100 (2018) (noting that "[a]n official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive" and "difficult to dislodge."  The Court in Lozman declined, in view of the "compelling need for adequate avenues of redress," to apply a no-probable-cause standard to such a claim).

The Plaintiffs have alleged, and here have proved, a discrete practice of targeting pro-Palestine and anti-Israel speech, which arose from a kind of intentional ratcheting-up of

---

that the Public Officials have not just systematically selectively prosecuted, but intentionally have done so to chill speech.   A more demanding rule, like the one from Hartman suggested by the Public Officials, would risk doing serious violence to the First Amendment: the government could intentionally selectively deport for the express purpose of chilling speech, so long as at least sometimes it turned out that there were other, perhaps trivial, reasons justifying the removals, which occasional instances of "correct" selective prosecution would break the showing of an intentional pattern.

[129]

Add.197

the Executive Orders' instruction to target antisemitic harassment and violence, while referencing a definition of antisemitism that includes protected speech such as comparing Israel's policies to those of the Nazis. See Iancu, 588 U.S. at 395 ("The facial viewpoint bias in the law results in viewpoint-discriminatory application.").

On this Court's understanding of the law, however, this is not enough: because "some showing of intent on the part of government officials probably is necessary to make out an as-applied First Amendment viewpoint discrimination claim in this case." McGuire, 386 F.3d at 63. The Plaintiffs must show that the Public Officials' implementation of the Executive Orders through the challenged enforcement steps was targeted intentionally at specific viewpoints in order to chill speech.

This Court finds that the Plaintiffs have made this showing. The evidence presented at trial included the Public Officials' many public statements suggesting that they wished to staunch public protest related to Israel's treatment of Palestinians, including the President's campaign promise that he would put an end to the student protests on this issue by kicking out protestors and subsequent promise that the Public Officials would deport and cancel the visas of those "who joined in the pro-jihadist protests" and Secretary Rubio's plainspoken guarantee to deport "Hamas-supporters" and those who

[130]

"participat[e] in pro-Hamas events."  Evidence introduced at trial also showed that the Public Officials consistently referred to campus protests related to Palestine as per se "pro-Hamas," key inter-agency meetings included discussion of whether protesting alone could be grounds for visa revocation, and the tasking of HSI with investigating protestors for violations of laws based on anonymous website lists targeted at protesters. The Plaintiffs have proved that, as the fruits of this investigation percolated up the chain of command, decisionmakers at every step of the challenged implementation interpreted the "support" for terrorists (a key term from Executive Order 14161) that they construed as potentially subject to the penalty of detention, deportation, and visa revocation to encompass, and indeed to be centered on, core First Amendment speech and expressive conduct, such as attending public protests, leading such protests, or even publishing op-eds.

This review process, such as it was, was essentially frictionless.  Despite the apparent good intentions and professionalism of the Public Officials' subordinates, the Court saw virtually no evidence that anyone along the way seriously questioned whether pure political speech in support of Palestine or against Israel could be construed as support for terrorism, whether support for terrorism as such could be grounds for the adverse actions that were contemplated, or whether any targeted

[131]

Add.199

individual had met any circumscribed, ascertainable standard of speech or conduct that might be grounds for these actions. Trial produced no evidence that the challenged procedures contemplated the speech to have been as incitement to imminent violence or, per the terms of an older test, clear and present danger. Rather, the subordinates spoke the language of "violat[ing]" the Executive Orders, as if they were the law, and of "align[ing] with the executive order's focus on deporting 'Hamas sympathizers,'" as if "Hamas sympathizers" were a self-interpreting term.  They appear to have treated "antisemitism," which, however heinous, is, without more, protected speech, as something that, in essence, one simply knows when one sees it. In short, if it looked like the Executive Orders might have disapproved of it, that was potential grounds for deportation.

This might seem a matter of recklessness or even indifference as to how the Executive Orders ought be interpreted or what the Constitution requires.  But just as a general matter ignorance of the law is no excuse, the Secretary of State's and other high officials' apparent indifference as to whether support or sympathy for terrorism, as opposed to material support, could be grounds for adverse action by law, or whether such support could be construed to include the voicing of support for Palestine or objection to the policies of the State of Israel, is no defense to the charge that they have done what

[132]

Add.200

they have repeatedly said they were doing: intentionally

targeted political speech in order to stop campus protests.[42]

The Public Officials' selection of anonymously sourced lists of

campus protestors to supply the thousands of names initially

subject to investigation, moreover -- despite their

representations, which the Court credits, that HSI may at other

---

[42] An important component of this ruling has to do with what was not shown at trial.  The Public Officials might conceivably have demonstrated that the Homeland Security Council that directed this initiative via weekly inter-agency meetings appropriately channeled their inferiors' review, and thus that any targeting of protected speech was an accidental byproduct of a good faith attack on penalizable conduct such as the violence and antisemitic harassment referred to in the Executive Orders; but, in view of their sweeping assertion of privileges as to these meetings and otherwise, including the assertion that the names of the council members were themselves privileged as presidential communications -- assertions with at best unsteady support in the law of the privilege, see In re Sealed Case, 121 F.3d 729, 752 (D.C. Cir. 1997) ("[T]he presidential communications privilege should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected. . . . [T]he privilege only applies to communications that [White House-level] advisers and their staff author or solicit and receive in the course of performing their function of advising the President on official government matters.  This restriction is particularly important in regard to those officials who exercise substantial independent authority or perform other functions in addition to advising the President . . . .  The presidential communications privilege should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President.") -- they have forfeited that opportunity to explain what they intended in detail.  To be clear, this Court draws no inferences from the assertion of any privileges as such; at the same time, "[s]ilence is often evidence of the most persuasive character."  United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 153-54, (1923) (Brandeis, J.).

[133]

Add.201

times act on totally anonymous tips -- belies any suggestion that whatever unnamed person who supplied the lists to HSI for review did not intend the policy to operate as it did.  Due to the frictionless quality described above, once one was on the lists, one was potentially subject to adverse action so long as, it seems, there was any online mention of one's pro-Palestine activities.[43]  The Public Officials' argument that few of the originally investigated names were targeted is little comfort. Those names that were passed up the chain of command by the investigating subordinates were almost universally approved for adverse action, and, again, the reasons for being passed up the chain of command included any form of online suggestion that one was "pro-Hamas," including Canary Mission's own anonymous articles.  Watching the process at work, and not wishing to credit the Public Officials with incompetence, it would require a remarkable naivete not to conclude that this process worked as intended.[44]

---

[43] For instance, in at least one case, a significant source of corroboration of allegations from the Canary Mission list appears to have been the Canary Mission article itself.  In other cases, news articles describing the target's pro-Palestine protesting, or social media posts making anonymous accusations, were also passed on as relevant.

[44] In Trump v. Hawaii, where the Supreme Court found scattered campaign trail and other statements by the President and his advisors too little to support an inference of discriminatory intent regarding "a Presidential directive, neutral on its face, addressing a matter within the core of

[134]

Add.202

For these reasons, in addition to the reasons discussed below with respect to Count II -- which this Court considers collapsed ultimately into Count I -- the enforcement policy adopted by the Public Officials to implement the President's Executive Orders are intentionally viewpoint-discriminatory, and thus violate the First Amendment.

### C. First Amendment Coercion Campaign (Count II)

This Court denied the motion to dismiss as to the Plaintiffs' claim of an unlawful coercion campaign in part because it judged that the essence of this claim overlapped somewhat with their claim on Count I. Given the substantiated allegations of generalized threats to noncitizen speech, the Plaintiffs had plausibly alleged a targeted campaign under the line of cases associated with Bantam Books, Inc. v. Sullivan, 372 U.S. 58 (1963); see AAUP, 780 F. Supp. 3d at 383-84. Ultimately, because the Plaintiffs have not produced evidence of

---

executive responsibility," and implemented pursuant to "a statute that grants the President sweeping authority to decide whether to suspend entry, whose entry to suspend, and for how long." Here, the Plaintiffs have shown that the ultimate decisionmakers, that is, Secretary Rubio and SBO Armstrong, have taken Executive Orders targeted at antisemitism, which already incorporated a definition of antisemitism encompassing protected speech, and implemented them in a way that systematically centered that latent focus on protected speech, under the aegis of statutes that, while sweeping on their face, have never historically been used in this way. 585 U.S. at 693, 702 . This determination further guides the Court's ruling that Hawaii does not govern here.

[135]

Add.203

threats targeted specifically at their members, but rather of threats targeted at noncitizens in a general way, the Court rules that the Plaintiffs have not proved a campaign of coercion as defined by this line of case law.

The Court notes, however, that the general principles underlying Bantam Books, and, more recently, National Rifle Ass'n of America v. Vullo, 144 S.Ct. 1316 (2024), have significantly informed its analysis of Count I. The Court considers evidence relevant to Plaintiffs' campaign of threats claim as further circumstantial evidence that the chilling of speech at issue here was intentional. Because "a government official cannot do indirectly what she is barred from doing directly," Vullo, 144 S.Ct. at 1328, the Public Officials may not in effect regulate speech by means of an unwritten enforcement procedure implementing a facially lawful Executive Order, as if speech codes were permissible so long as they were not written down. Again, an unwritten speech code seems, if anything, potentially **more** threatening to core constitutional values than a written one, and the ambiguity recognized and criticized by several courts of appeals in the recent run of campus speech code cases discussed above, see supra Section III.A.1. The Plaintiffs' noncitizen members here have all been made to understand that there are certain things that it may be gravely dangerous for them to say or do, but have not been told

[136]

Add.204

precisely what those things are (or are not); the diffuseness and ambition of this coercion campaign do not render it less constitutionally suspect.

This understanding of danger has been conveyed, moreover, not just by means of the threatening statements and speech-targeted arrests, detentions, and visa revocations already discussed, but also by the manner in which these arrests, detentions, and revocations have been conducted: by often-masked agents, without prior notice of visa revocation or altered status, sometimes on the street or at immigration appointments, followed by conveyance quickly out of district and across the country. This Court credits the testimony of the agents involved that at least some of these practices were not per se abnormal for HSI arrests and detentions; but this only begs the question, however, why special agents previously deployed for sensitive intelligence matters have been deployed to enforce this particular policy of, in essence, rounding up campus protestors and op-ed writers? Or why, having observed the first arrests that were made under this policy and seen that these arrests by these agents involved an obvious, highly publicized atmosphere of secrecy and fright, the Public Officials responsible for it did not adjust the policy to make the arrests less obviously chilling? Or why the members of the inter-agency advisory council whom the Public Officials will not name, did

[137]

Add.205

not adjust the policy to make the arrests less obviously chilling?  Again, deprived of any real attempted explanation as to what the members of this council intended by the selected means of these arrests, this Court must draw the most reasonable inference: that the manner and method of their execution was adopted, or at least approved of once the first such arrest had been made, in part intentionally to chill the speech of other would be pro-Palestine and anti-Israel speakers, including Plaintiffs' noncitizen members.

The intended effect of the policy proved by a preponderance of the evidence on Count I is essentially the same as the aim that was held unconstitutional in the Bantam Books line of cases.  The lessons of Bantam Books are incorporated into the governing case law's appropriately keen focus on First Amendment chills, which this Court has deemed best captured here by the First Circuit's framework in McGuire.  See Whitten, 145 S. Ct. at 703 (Thomas, J., dissenting from denial of certiorari).  The Plaintiffs' case on Count I is therefore strengthened by this line of case law with its emphasis on indicia of coercion and thus of intended chill, but this Court does not extend that particular doctrine here.

### D. APA Claims (Count IV)

The policy described above is final agency action, and as such is unlawful as contrary to constitutional right for the

[138]

Add.206

reasons described above.[45]  The policy is also arbitrary or capricious because it represents an unexplained reversal of the agencies' position without accounting for reliance interests. It is also, in significant respects, without clear statutory authorization.  The Public Officials have simply denied the practice and offered no reasonable explanation.

The same actions challenged on Counts I and II ground the Plaintiffs' APA claims, and this Court rules that the requirements of the "zone of interests" test for these claims, to the extent that it applies, are easily satisfied.  See Seafreeze Shareside, Inc. v. United States Dep't Interior, 123 F.4th 1, 20 (1st Cir. 2023).  The plaintiff organizations and their noncitizen members are beneficiaries of the immigration laws on which this action depends and thus fall within the INA's

---

[45] The Court ordered extra-record discovery because the Plaintiffs' two surviving constitutional claims did not totally overlap with their APA claim.  It now rules that the Administrative Record submitted, ECF No. 106, which provided no more than the most bare-bones information about the statutes invoked and the procedural steps taken toward arrest and detention in the five examined cases, is incomplete, and thus supplements the record with all extra-record materials produced at trial, which the Court deems necessary to evaluate the agencies' actions.  See Roe v. Mayorkas, No. 22-cv-10808, 2024 WL 5198705, at *2 (D. Mass. Oct. 2, 2024).  The Court's focus in this section remains, properly, on the administrative record itself.  Given the thinness of that record, however, it is unable to analyze the agency's action and the grounds for it without these extra-record materials.  See Housatonic River Initiative v. United States Env't Prot. Agency, New Eng. Region, 75 F.4th 248, 278-79 (1st Cir. 2023).

[139]

Add.207

zone of interests.  See e.g., Doe v. United States Immigr. &
Customs Enf't, 490 F. Supp. 3d 672, 685 (S.D.N.Y. 2020) (finding
that organizational plaintiffs fall within the INA's zone of
interests."); Al Otro Lado, Inc. v. Nielsen, 327 F. Supp. 3d
1284, 1301 & n.7 (S.D. Cal. 2018) ("Other district courts have
found that organizational plaintiffs . . . can fall within the
INA's zone of interests when it has members or clients targeted
by the government action.")(collecting cases).  As the
Plaintiffs point out, moreover, it is not clear that their
contrary-to-constitutional-right claim under the APA faces the
zone-of-interests hurdle at all.  See Sierra Club v. Trump, 929
F.3d 670, 702 (9th Cir. 2019) (expressing "doubt" that zone of
interests test applies "where Plaintiffs' theory derives from
the Constitution," in view of recent Supreme Court precedent).
To the extent that the Public Officials argue the INA's claim-
channeling provisions render all actions related to deportation
unreviewable outside of those provisions because such review
conflicts with the statute's purpose, this Court disagrees.  See
Patel v. United States Citizenship & Immig. Servs., 732 F.3d
633, 636 (6th Cir. 2013) (observing that "it is folly to talk
about 'the purpose' of the statute when the statute reflects a
compromise between multiple purposes," and, with reference to a
different provision of the INA, that "there is no basis in the
text of the statute -- none -- to conclude that Congress was

[140]

Add.208

completely indifferent to the interests of the 'qualified immigrants' themselves").

Having determined that there is a procedure of roughly the kind alleged by the Plaintiffs, the Court is compelled to rule, as the final agency action test requires, that the agency Public Officials reached the consummation of their decision-making on a matter that determines rights and obligations or from which legal consequences flow. Bennett v. Spear, 520 U.S. 154, 177-78 (1997). Evidence at trial of this decision-making included the "tiger team" compiling ROAs to AD Watson and SBO Armstrong's subsequent review and referral of those reports pursuant to the guidance of the Executive Orders and their own sense of what antisemitic conduct entailed at every step of the process reviewed here. The persons involved have testified to a discrete enforcement initiative that targeted speech in an unprecedented way, making new use of the invoked statutes to dramatic legal effect. See Norton v. Southern Utah Wilderness All., 542 U.S. 55, 62 (2004) (stating that final agency actions must be "circumscribed" and "discrete"). It would be an odd interpretation of the "flexible" and "pragmatic" final agency test that did not capture such a discrete and novel agency initiative and attempted-alignment. Abbott Labs. v. Gardner, 387 U.S. 136, 149-51 (1967). Given this discreteness and novelty, the Public Officials' insistence that this was a mere

[141]

Add.209

matter of shifting enforcement priorities, not a final agency action, is unavailing.  See Heckler v. Chaney, 470 U.S. 821, 832 (1985) (contrasting decisions not to enforce with "when an agency *does* act to enforce," which "provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner").

Proceeding to the merits, this agency action is unconstitutional for the reasons described as to Counts I and II above: nothing in the text, history, or tradition of the First Amendment suggests that persons lawfully present here may be subject to adverse action based on their political speech, where that speech is primarily concerned with the actions of foreign nations with whom the United States is not at war and Congress has not made a specific determination that a specific organization threatens the violent overthrow of the government. This is a new invention that in important ways goes beyond its closest analogues in the Red Scare.

This action is also arbitrary or capricious.  As the Plaintiffs point out, 2021 DHS Guidelines for the Enforcement of Civil Immigration Law, which the agency had given no sign of altering at the time when the initially targeted protests occurred, specified that "[a] noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action."  Memorandum from Secretary

[142]

Add.210

of Homeland Security Mayorkas to Tae Johnson, Acting Director of U.S. Immigration and Customs Enforcement, Guidelines for the Enforcement of Civil Immigration Law (Sept. 30, 2021), www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf. Although "[a]n agency policy statement" in general "merely represents an agency position with respect to how it will treat -- typically enforce -- the governing legal norm," and thus "[t]he agency retains the discretion and authority to change its position -- even abruptly -- in any specific case because a change in its policy does not affect the legal norm," Syncor Intern. Corp. v. Shalala, 127 F.3d 90, 94 (D.C. Cir. 1997), here it is the legal norm itself that has been changed -- pure political speech has never before been grounds for adverse immigration action -- and, "when 'bizarre' interpretations are made out of 'regulatory zeal,' deference is not appropriate," Matter of Seidman, 37 F.3d 911, 924 (3d Cir. 1994); see also Texas v. United States, 86 F. Supp. 3d 591, 649 (S.D. Tex. 2015) (finding final agency action test satisfied by Deferred Action for Parents of Americans and Lawful Permanent Residents program ("DAPA") where, in the obverse of what has occurred here, it "makes the illegal presence of . . . individuals legal"). The policy identified above not only reverses course on the 2021 guidance, and on the way the relevant statutes had been enforced in the past, without explanation -- the Executive Orders

[143]

Add.211

themselves are not the agencies' explanation, and do not explain the policy of targeting speech rather than harassment -- but also does so in part by means of a statute which does not on its face clearly apply to speech done only in this country. The Public Officials not only do not explain this policy; they deny that it exists. Thus, the agencies have engaged in quintessential arbitrary action: an abrupt reversal of course, using statutes in new and constitutionally suspect ways, with no explanation. See F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502 (2009) (explaining that, although an agency need not always provide a more detailed explanation for a changed policy than a new one, it must "ordinarily . . . display awareness that it *is* changing position," such that it "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books," and must provide a "more detailed justification" when the "prior policy has engendered serious reliance interests") (id. at 515).

To conclude, and to be clear, this Court has no sympathy for terrorism, or for those who genuinely support it. It has proudly sentenced terrorists, see United States v. Reid, 206 F. Supp. 2d 132 (2002), and understands its own role as one small part of a federal scheme that exists significantly to protect this Nation's national security. Nor does the Court take a position on any foreign conflict or express special sympathy for

[144]

Add.212

any side of any political debate, foreign or domestic.  Rather, the judicial role is limited to safeguarding the rights of all persons lawfully present in this country.  This includes the freedom of speech that allows those persons to understand each other and to debate.  If "terrorist" is interpreted to mean "pro-Palestine" or "anti-Israel," and "support" encompasses pure political speech, then core free speech rights have been imperiled.

Throughout these proceedings, the Public Officials have emphasized that the noncitizens at issue are present at our grace.  They describe their presence here as a privilege, which can be revoked for almost any reason, or at least when we begin to feel we would not have invited them here had we known what they were going to say to us.  This Court in part must agree: non-citizens are, indeed, in a sense our guests.  How we treat our guests is a question of constitutional scope, because who we are as a people and as a nation is an important part of how we must interpret the fundamental laws that constrain us.  We are not, and we must not become, a nation that imprisons and deports people because we are afraid of what they have to tell us.  See Dennis v. United States, 341 U.S. 494 554-55 (1951) (Frankfurter, J., concurring in the judgment) (describing, in the context of the second Red Scare, "a danger that something may occur in our own minds and souls which will make us no

[145]

Add.213

longer like the persons by whose efforts this republic was
founded and held together, but rather like the representatives
of that very power we are trying to combat: intolerant,
secretive, suspicious, cruel, and terrified of internal
dissension because we have lost our own belief in ourselves and
in the power of our ideals")(quoting George F. Kennan, <u>Where do
You Stand on Communism?</u>, New York Times Magazine, May 27, 1951,
at 53)); <u>Whitney</u> v. <u>California</u>, 274 U.S. 357, 377 (1927)
(Brandeis, J., concurring) ("Those who won our independence by
revolution were not cowards.  They did not fear political
change.  They did not exalt order at the cost of liberty.  To
courageous, self-reliant men, with confidence in the power of
free and fearless reasoning applied through the processes of
popular government, no danger flowing from speech can be deemed
clear and present, unless the incidence of the evil apprehended
is so imminent that it may befall before there is opportunity
for full discussion.  If there be time to expose through
discussion the falsehood and fallacies, . . . the remedy to be
applied is more speech, not enforced silence.  Only an emergency
can justify repression."); <u>Carlson</u> v. <u>Landon</u>, 342 U.S. 524, 554
(1952) (Black, J., dissenting) ("To put people [law-abiding
people] in jail for fear of their talk seems to me to be an
abridgment of speech in flat violation of the First Amendment. .
. .  My belief is that we must have freedom of speech, press and

[146]

Add.214

religion for all or we may eventually have it for none.  I further believe that the First Amendment grants an absolute right to believe in any governmental system, discuss all governmental affairs, and argue for desired changes in the existing order.  This freedom is too dangerous for bad, tyrannical governments to permit.  But those who wrote and adopted our First Amendment weighed those dangers against the dangers of censorship and deliberately chose the First Amendment's unequivocal command that freedom of assembly, petition, speech and press shall not be abridged.").

## IV.   CONCLUSION

For all these reasons, this Court finds as fact and concludes as matter of law that Secretaries Noem and Rubio and their several agents and subordinates acted in concert to misuse the sweeping powers of their respective offices to target non-citizen pro-Palestinians for deportation primarily on account of their First Amendment protected political speech.  They did so in order to strike fear into similarly situated non-citizen pro-Palestinian individuals, pro-actively (and effectively) curbing lawful pro-Palestinian speech and intentionally denying such individuals (including the plaintiffs here) the freedom of speech that is their right.  Moreover, the effect of these targeted deportation proceedings continues unconstitutionally to chill freedom of speech to this day.

[147]

Add.215

**V. JUSTICE IN THE TRUMP ERA**

The Court's finding and ruling above resolves phase one of these proceedings. The wrong suffered by these plaintiffs is amply established. **What now?**

It is not enough for the Court simply to determine that the plaintiffs' First Amendment constitutional rights have been violated. The Constitution is not self-effectuating. There must be some prospect of an effective remedy (we call it "redressability") in order to proceed. Diamond Alternative Energy, LLC v. Env't Prot. Agency, 145 S. Ct. 2121, 2133 (2025) ("The . . . redressability requirement generally serves to ensure that there is a sufficient relationship between the judicial relief requested and the injury suffered.")(citations and quotations omitted). Otherwise, this Court ought terminate these proceedings at this point lest it become no more than a divisive scold. When this Court denied the motion to dismiss herein, AAUP, 780 F. Supp. 3d at 379, it thought an effective remedy might be obtainable; today it is not so sure.

The reason is the rapidly changing nature of the Executive Branch under Article II of our Constitution and, while he is properly not now a defendant in these proceedings, the nature of our President himself. It is appropriate, therefore, briefly to address each of these concerns and then limn the constraints that properly must govern the remedy phase of these proceedings.

[148]

Add.216

## A. The unitary presidency

In other proceedings involving the Trump administration, this Court has already set forth its understanding of what may be called "the unitary presidency" and I repeat it here:

> THE COURT: We've never had a President like President Trump. He espouses, [and] he's the first President in our history to espouse, a concept of the unified Presidency.  The idea is that the President of the United States -- and certainly he's duly-elected -- after a full and fair election, the President of the United States -- he is the single, superior, executive, motive force for all federal employees employed under Article II.  [T]here's issues about whether that actually works out with the Federal Reserve and the like, but none of it's before this Court, and I make no comment on it. Nor do I make any comment on the wisdom of this approach, it's not for me, but it's fair to say that that's his view, or it appears to me to be his view. Now, though he's not been in office all that long, a couple of things are evident here.
>
> One is that the approach to innovation is entirely different. We're not looking to the various Cabinet Secretaries, agencies, divisions, departments, to innovate and create new ways to serve the public. I'm not saying there's no innovation, but it's all got to go through or appear to go through or emanate from the President himself. [46]  That's one thing.
>
> The second thing is that the President, this President, expresses his view -- and he's certainly transparent -- he expresses his view through orders, through directives, through requirements. So the idea of "reasoned discourse,"  in the sense of Lincoln's "Team of Rivals"[47] or FDR combating the Depression or mobilizing for World War II and creating these

---

[46] As Marquis de Louvois, Minister of War to Louis XIV told a subordinate, "His Majesty must not be served any better than he wants to be!" THE READER'S COMPANION TO MILITARY HISTORY, Robert Cowley & Geoffrey Parker eds. (1996) at 278.

[47] Doris Kearns Goodwin, TEAM OF RIVALS: THE POLITICAL GENIUS OF ABRAHAM LINCOLN (2005).

[149]

Add.217

> bureaucratic empires that sparred with one another under his final decision, that's absent from our discourse today. I mean I ask you, we're not seeing wonky white papers out of this Administration.

New York v. Trump, 25-11221-WGY (D. Mass. Sept. 4, 2025), Case Stated Hearing, 6:19-8:3, ECF No. 215 (cleaned up).

### B. President Donald J. Trump

**"He seems to be winning. He ignores everything and keeps bullying ahead."**

Half admiring, half quizzical, a very wise woman -- my wife -- made this comment about our 47th President in an entirely different context.[48]  I quote it here because it so perfectly captures the public persona of President Trump, especially as it pertains to the issues presented in this case.  A brief explanation will suffice.

### 1.   He seems to be winning.

Triumphalism is the very essence of the Trump brand.  Often this is naught but hollow bragging: "my perfect administration," wearing a red baseball cap in the presidential oval office emblazoned "Trump Was Right About Everything," or most recently depicting himself as an officer in the First Cavalry Division.[49] Unfortunately, this tends to obscure the very real and sweeping changes President Trump has wrought in his first year in office.

---

[48] I do not discuss pending cases with anyone outside chambers.

[49] I do not deride any of this in the least. Evidently, this is markedly effective with a broad swath of our people.

[150]

Add.218

If change is a mark of success, President Trump is the most successful president in history.

### 2.  He ignores everything . . .

This is indubitably true.  The Constitution, our civil laws, regulations, mores, customs, practices, courtesies -- all of it; the President simply ignores it all when he takes it into his head to act.  A broad swath of our people find this refreshing in what they may feel is an over regulated society.  After all, lawyers seem to have a penchant for telling you what you can't do.  President Trump simply ignores them.[50]

This is not to suggest that he is entirely lawless.  He is not.  As an experienced litigator he has learned that -- at least on the civil side of our courts -- neither our Constitution nor laws enforce themselves, and he can do most anything until an aggrieved person or entity will stand up and say him "Nay," i.e. take him to court.  Now that he is our duly elected President after a full and fair election, he not only enjoys broad immunity from any personal liability, Trump v. United States, 144 S.Ct. 2312 (2024), he is prepared to deploy

---

[50] Let's be honest.  In our secret heart of hearts, many of us are tiny Trump wannabes.  After all, who does not feel the urge to stride about, "sticking it to The Man," wrecking institutions and careers simply because we find them irksome? Most of us, however, ascribe to Shakespeare's famous adage: "O, it is excellent To have a giant's strength; but it is tyrannous To use it like a giant." MEASURE FOR MEASURE, act 2, scene 2.66.

[151]

Add.219

all the resources of the nation against obstruction. Daunting prospect, isn't it?[51]

Small wonder then that our bastions of independent unbiased free speech -- those entities we once thought unassailable -- have proven all too often to have only Quaker guns.[52] Behold President Trump's successes in limiting free speech -- law firms cower,[53] institutional leaders in higher education meekly appease the President,[54] media outlets from huge conglomerates to small niche magazines mind the bottom line rather than the ethics of journalism.[55]

---

[51] The federal courts themselves are complicit in chilling would-be litigants. It is not that we are less than scrupulously impartial. We demonstrate our judicial independence and utter impartiality every day whatever the personal cost. It is, rather that in our effort to be entirely fair, thorough, and transparent, we are **slow**, ponderously slow. This in turn means we are **expensive**, crushingly so for an individual litigant. Frequently, the threat of federal civil litigation, however frivolous, is enough severely to harass an individual and cause his submission.

The flurry of activity on the Supreme Court's emergency docket is itself a tacit admission that, when dealing with an administration that is admittedly seeking to "flood the zone," it needs to intervene to correct rulings that, if not immediately remedied, will remain in effect far too long.

[52] A term from our Civil War – logs painted black to look like cannons.

[53] But not all of them. See infra.

[54] But not all of them. See infra.

[55] But not all of them. See infra.

[152]

Add.220

### 3.    . . . and he keeps bullying on.

Whether it's social media,[56] print, or television, President Trump is the master communicator of our time.  His speech dominates today's American idiom.  Indeed, it may be said to define it.  It is triumphal, transactional, imperative, bellicose, and coarse.  It seeks to persuade -- not through marshaling data driven evidence, science, or moral suasion, but through power.

While the President naturally seeks warm cheering and gladsome, welcoming acceptance of his views, in the real world he'll settle for sullen silence and obedience.  What he will not countenance is dissent or disagreement.  He recognizes, of course, that there are legislative and judicial branches to our government, co-equal even **to** a unitary Presidency.[57]  He meets dissent from his orders in those other two branches by demonizing and disparaging the speakers, sometimes descending to personal vitriol.[58]

---

[56] Recent perusal of the White House social media posts displays a meme of the President that, at a quick glance, depicts him as a comic book superhero.  People apparently go for this.

[57] I keep a copy of the Boy Scout pamphlet for the Citizenship in the Nation Merit Badge ready to hand. It well explains our nation's system of checks and balances among the three branches of our government.

[58] He's really quite inventive and, in this respect, he joins a rich tradition of American political invective.  Lincoln was called "a gorilla", Michael Burlingame, ABRAHAM LINCOLN, A LIFE VOL. ONE (2008) at 63, and John Randolph said of Edward Livingston

[153]

Add.221

Dissent elsewhere among our people is likewise disfavored, often in colorful scurrilous terms.  All this the First Amendment capaciously and emphatically allows.

When he drifts off into calling people "traitors" and condemning them for "treason," however, he reveals an ignorance of the crime and the special burden of proof it requires.  More important, such speech is not protected by the First Amendment; it is defamatory.  In his official capacity as President, however, President Trump enjoys broad immunity from any civil liability.  Nixon v. Fitzgerald, 457 U.S. 731 (1982).

### 4.  Retribution

Everything above in this section is necessary background to frame the problem this President has with the First Amendment. Where things run off the rails for him is his fixation with "retribution." "I am your retribution," he thundered famously while on the campaign trail.[59]  Yet government retribution for speech (precisely what has happened here) is directly forbidden by the First Amendment.  The President's  palpable

---

"He shines and stinks like rotten mackerel by moonlight." W. Cabell Bruce, John Randolph of Roanoke (1923), vol. II, at 197. As Mr. Dooley said "Politics ain't beanbag." Finley Peter Dunne, MR. DOOLEY IN PEACE AND WAR (1898) (quoted in William Safire, SAFIRE'S POLITICAL DICTIONARY (2008) at 45-46).  No president before President Trump, however, has so consistently and personally, attacked America's independent judiciary.

[59] See, e.g., Speech at CPAC, (March 4,2023), https://www.c-span.org/clip/campaign-2024/former-pres-trump-i-am-your-justicei-am-your-retribution/5060238 at 00:32-:00:34.

[154]

Add.222

misunderstanding that the government simply cannot seek

retribution for speech he disdains poses a great threat to

Americans' freedom of speech.  It is at this juncture that the

judiciary has robustly rebuffed the President and his

administration.

> a.   **Law Firms –** <u>Susman Godfrey LLP</u> v. <u>Exec. Off. of President</u>, No. 25-1107, 2025 WL 1779830, at *25 (D.D.C. June 27, 2025) ("In April 2025, President Donald J. Trump issued an Executive Order targeting the law firm Susman Godfrey LLP ('Susman') based on the clients it represents and the causes it supports.  The order was one in a series attacking firms that had taken positions with which President Trump disagreed. In the ensuing months, every court to have considered a challenge to one of these orders has found grave constitutional violations and permanently enjoined enforcement of the order in full. Today, this court follows suit, concluding that the order targeting Susman violates the U.S. Constitution and must be permanently enjoined.") (citations omitted) (AliKhan, J.); <u>Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President</u>, No. 25-917, 2025 WL 1502329, at *33 (D.D.C. May 27, 2025), <u>amended sub nom.</u> <u>Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President</u>, No. 25-917, 2025 WL 2105262 (D.D.C. June 26, 2025) ("The Order is unconstitutional, and thus defendants do not have a legitimate interest in enforcing the Order. In fact, it is 'obvious' that the 'enforcement of an unconstitutional law is always contrary to the public interest.' . . . Enjoining the Order serves the public interest by, for example, eliminating an obstacle to free speech and preserving the independent and adversarial nature of our judicial system.") (citation omitted)(Leon, J.); <u>Jenner & Block LLP</u> v. <u>U.S. Dep't of Just.</u>, No. 25-916, 2025 WL 1482021, at *9 (D.D.C. May 23, 2025) ("[T]he order targets Jenner not merely for the fact of its speech but for the specific views it expresses thereby. . .

[155]

Add.223

. The order thus engages in the 'egregious form of content discrimination' known as 'viewpoint discrimination,' making its inconsistency with the First Amendment 'all the more blatant.'.") (Bates, J.)(citations omitted); <u>Perkins Coie LLP v. U.S. Dep't of Just.</u>, 783 F. Supp. 3d 105, 180 (D.D.C. 2025)("The U.S. Constitution affords critical protections against Executive action . . . Government officials, including the President, may not 'subject[ ] individuals to "retaliatory actions" after the fact for having engaged in protected speech.' They may neither 'use the power of the State to punish or suppress disfavored expression,' nor engage in the use of 'purely personal and arbitrary power.' In this case, these and other foundational protections were violated by EO 14230. On that basis, this Court has found that EO 14230 violates the Constitution and is thus null and void.") (citations omitted).

b.   **Higher Education -** <u>President & Fellows of Harvard Coll.</u> v. <u>United States Dep't of Health & Hum. Servs.</u>, No. 25-CV-10910, 2025 WL 2528380, at *37 (D. Mass. Sept. 3, 2025) ("The First Amendment is important and the right to free speech must be zealously guarded. . . . Now it is the job of the courts to similarly step up, to act to safeguard academic freedom and freedom of speech as required by the Constitution, and to ensure that important research is not improperly subjected to arbitrary and procedurally infirm grant terminations, even if doing so risks the wrath of a government committed to its agenda no matter the cost.") (Burroughs, J.);

[156]

Add.224

> c.   **Media** – <u>Associated Press</u> v. <u>Budowich</u>, 780 F.
> Supp. 3d 32, 39 (D.D.C. 2025) (McFadden, J.)
> (granting motion for preliminary injunction
> against public officials' First Amendment
> viewpoint discrimination and retaliation of
> barring Associated Press from press room after
> it continued to refer to the Gulf of Mexico as
> the Gulf of Mexico in its style book, ruling:
> "under the First Amendment, if the Government
> opens its doors to some journalists -- be it to
> the Oval Office, the East Room, or elsewhere --
> it cannot then shut those doors to other
> journalists because of their viewpoints. The
> Constitution requires no less.") (McFadden, J.)
> [60]

It is these soundly reasoned decisions which today constitute the major bulwark of our right to free speech.

It is upon these decisions this Court relies in framing the remedy herein. For there must be a remedy (not a monetary remedy). In light of all the considerations just discussed, it will not do simply to order the Public Officials to cease and desist in the future. The harm here and the deprivation suffered runs far deeper. The following constraints will, however, govern the Court's remedy hearing.

---

[60] The public officials sought and received a stay at the D.C. Circuit, except as to access to the East Room. <u>Associated Press</u> v. <u>Budowich</u>, No. 25-5109, 2025 WL 1649265, at *13 (D.C. Cir. June 6, 2025), reconsideration en banc denied, No. 25-5109, 2025 WL 2047025 (D.C. Cir. July 22, 2025).

[157]

Add.225

1.  Though there is scholarship that urges otherwise,[61] there can be no constraint of any sort on the speech of the President of the United States, be that speech statesmanlike, magnanimous, and unifying or "foolish" and "knavish."[62] As President he has the absolute and undoubted right to speak. Indeed, no injunction of any sort may touch upon or constrain his executive powers under the law.  Such purported order would violate the Separation of Powers.  Mississippi v. Johnson, 71 U.S. (4 Wall.) 475 (1866) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.")

2.  While the remaining defendant Public Officials here are subject to an injunctive order, any such order must necessarily be limited.  Pre-speech injunctive restraints can easily violate those Public Officials broad free speech rights that are largely unencumbered by the First Amendment.  See Walker v. Texas Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.  That

---

[61] See Michael Kang & Jacob Eisler, Rethinking the Government Speech Doctrine, Post-Trump, 2022 U. Ill. L. Rev. 1943 (2022).

[62] See James Iredell, Charge to Grand Jury, 9 Fed. Cas. 826, no. 5,126 C.C.D.Pa. 1799.

[158]

Add.226

freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech.  Thus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas.") (citations omitted).  Any such overbroad injunction would be improper.

3.  No order entered by this Court shall materially interfere with the defendant Public Officials and their agents abilities properly[63] to enforce the laws passed by Congress.

To this delicate task the Court will turn in the remedy phase.

> **Freedom is a fragile thing and it's never more than one generation away from extinction.  It is not ours by way of inheritance; it must be fought for and defended constantly by each generation, for it comes only once to a people.**

---

[63] Certain aspects of these laws presently face constitutional challenges. See Khalil v. Trump, 784 F. Supp. 3d 705, 757, 767 (D.N.J. 2025) ("When the First Amendment is implicated, as here, vagueness doctrine becomes especially unforgiving." Id. at 757.  "The Court holds: the Petitioner is likely to succeed on the merits of his claim that Section 1227, as applied to him here through the Secretary of State's determination, is vague in violation of the Due Process Clause of the Constitution." Id.) (footnote omitted).  Should any of them be held unconstitutional as applied -- a point this Court necessarily does not address -- such holding would naturally affect the scope of the work "properly."

[159]

Add.227

President Ronald Reagan, Inaugural Address as Governor of the State of California (January 5, 1967).[64]

I first heard these words of President Reagan's back in 2007 when my son quoted them in the Law Day celebration speech at the Norfolk Superior Court.  I was deeply moved and hold these words before me as a I discharge judicial duties.  As I've read and re-read the record in this case, listened widely, and reflected extensively, I've come to believe that President Trump truly understands and appreciates the full import of President Reagan's inspiring message –- yet I fear he has drawn from it a darker, more cynical message.  I fear President Trump believes the American people are so divided that today they will **not** stand up, fight for, and defend our most precious constitutional values so long as they are lulled into thinking their own personal interests are not affected.

Is he correct?

---

[64] https://www.reaganlibrary.gov/archives/speech/january-5-1967-inaugural-address-public-ceremony.

[160]

Add.228

A hearing on remedy will promptly be scheduled.

BY THE COURT,

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[65]

**I hope you found this
helpful. Thanks for writing.
It shows you care. You
should.**

      **Sincerely & respectfully,
    Bill Young**

**P.S. The next time you're in
Boston** [the postmark on the card
is from the Philadelphia area]
**stop in at the Courthouse and
watch your fellow citizens, sitting
as jurors, reach out for justice.
It is here, and in courthouses
just like this one, both state and
federal, spread throughout our land
that our Constitution is most vibrantly
alive, for it is well said that "Where a
jury sits, there burns the lamp of
liberty."**

---

[65] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.

[161]

Add.229

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS -- HARVARD FACULTY CHAPTER, AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY, RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS, and MIDDLE EAST STUDIES ASSOCIATION,<br><br>   Plaintiffs,<br>  v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and the DEPARTMENT OF HOMELAND SECURITY, TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, DONALD J. TRUMP, in his official Capacity as President of the United States, and UNITED STATES OF AMERICA,<br><br>   Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO.<br>25-10685-WGY |

YOUNG, D.J.                                                     January 22, 2026

**ANNOTATED JUDGMENT**

This Court, upon a full hearing and nine-day bench trial,

ECF Nos. 231-248, entry of findings of facts and rulings of law,

Add.230

American Ass'n of Univ. Professors v. Rubio, 802 F. Supp. 3d 120 (D. Mass. 2025)("AAUP"), and a hearing on the appropriate remedy, ECF Nos. 306, 310, hereby **ORDERS, ADJUDGES, and DECREES:**

### I.    Judgment

Judgment shall enter in favor of the Plaintiffs against the Defendants on Counts I and IV of the Complaint as follows:

### II.   Declaration of Rights

This Court ruled that the Plaintiffs American Association of University Professors ("AAUP") and their associate chapters, and the Middle East Studies Association ("MESA") "have shown by clear and convincing evidence that Secretaries Noem and Rubio have intentionally and in concert implemented Executive Orders in 14161 and 14188 a viewpoint-discriminatory way to chill protected speech" that "violated the First Amendment."  AAUP, 802 F. Supp. 3d at 175.  Further, "the Public Officials' threats to continue detaining, deporting, and revoking visas based on political speech serves as circumstantial evidence that such enforcement exists, is viewpoint discriminatory, and has objectively chilled the Plaintiffs' speech."  Id.  The "enforcement policy also violates the APA because, for the same reasons, it is contrary to constitutional right.  It is also arbitrary or capricious because it reverses prior policy without reasoned explanation or consideration of reliance interests, and is based on statutes that have never been used in this way."

[2]

Add.231

Id.  Indeed, "[t]his Court credits the testimony of AAUP and MESA members that the enforcement policy . . . objectively chills their speech."  Id. at 179.  The Court therefore declares, for the reasons set forth in its findings, that that the "enforcement policy" and its implementation: (1) violates the First Amendment right of freedom of speech set out in the Constitution of the United States, and (2) the Administrative Procedure Act.

### III. Order of Vacatur

Pursuant to 5 U.S.C. § 706(2), the Court declares that the Public Officials' enforcement policy and the implementation thereof as set forth in the findings is **OF NO EFFECT, VOID, ILLEGAL, SET ASIDE, AND VACATED.**[1]

### IV. Sanction

In view of the concerted action of the highest Cabinet Officials of the Executive Branch deliberately to violate the First Amendment right of Free Speech of the Plaintiffs' non-

---

[1] In Trump v. CASA, Inc., the Supreme Court expressly did not decide "the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."  145 S. Ct. 2540, 2554 n.10 (2025).  Since CASA, courts have held that vacatur is an available remedy, distinct from injunctive relief.  See Ass'n of Am. Universities v. Dep't of Def., No. CV 25-11740-BEM, 2025 WL 2899765, at *27 (D. Mass. Oct. 10, 2025) (Murphy, J.); Make the Rd. New York v. Noem, No. 25-5320, 2025 WL 3563313, at *17 (D.C. Cir. Nov. 22, 2025) ("When an agency's action is unlawful, vacatur is the normal remedy.") (quoting Bridgeport Hosp. v. Becerra, 108 F.4th 882, 890 (D.C. Cir. 2024)).

[3]

Add.232

citizen members, the Court, pursuant to its broad equitable powers of remediation, imposes the following remedial sanction to protect certain of the Plaintiffs' non-citizen members from any retribution for the free exercise of their constitutional rights.

A.   Any non-citizen member of the plaintiffs AAUP or MESA, who was a member on or after **March 25, 2025** and continued as a member through **September 30, 2025** ("Sanction Plaintiff")[2], shall have a right to institute a proceeding ("Sanction Action") in the United States District Court in which the Sanction Plaintiff resided at the time such Sanction Plaintiff suffered an adverse

---

[2]   Relief is limited pursuant to CASA to these Sanction Plaintiffs as they constitute the group within the plaintiff organizations who both had the courage to stand as part of such organizations' legal action and suffered the constitutional deprivation.  See CASA, 145 S. Ct. at 2557.  The actual effect of the Public Officials' unconstitutional misconduct is, of course, much broader.  See Stanford Daily Publishing Corporation v. Rubio, No. 25-CV-06618-NW, 2026 WL 125241, at *3 (N.D. Cal. Jan. 16, 2026) (Wise, J.) (denying motion to dismiss similar claims as those made by non-citizen members in this action); Note, CASA's Complete Relief Paradox, 139 Harv. L. Rev. 646, 668 (2025) ("The nature of the right does not warrant nonparty **relief** even if it allows nonparty benefits); Lincoln Caplan, The Kingmaker?, Havard Magazine, Nov.-Dec. 2025) 21, 29, 70 (quoting Jackson, J. concurring in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 655 (1952) ("With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.  Such institutions may be destined to pass away. But it is the duty of the Court to be last, not first, to give them up.")).

[4]

Add.233

immigration action changing such Sanction Plaintiff's immigration status from what it was on January 20, 2025.[3]

B.   In such action, the Sanction Plaintiff shall prove by a fair preponderance of the evidence that said Sanction Plaintiff was a member of AAUP or MESA as set forth above in par. IV.A.   Upon such proof, it shall be presumed that the alteration in immigration status is in retribution for the exercise during the course of the present case of their First Amendment rights.

C.   Such proof is conclusive and voids the alteration in immigration status unless the government proves[4] by clear and convincing evidence that:

---

[3]   See Appendix for illustrative potential examples.

[4]   In light of the Defendants' intentional abridgement of Constitutional rights, this Court advises that the government ought not avail itself of the Deliberative Process Privilege as to such alteration of immigration status prior to the commencement of the Sanction Action.   The reason for such advice is that, upon reflection, this Court gave the Defendants far too much latitude in asserting such privilege throughout the course of the trial herein, in derogation of the truth.   The Government Misconduct exception to the Deliberative Process Privilege should thus be presumed.   See Texaco Puerto Rico, Inc. v. Dep't of Consumer Affs., 60 F.3d 867, 885 (1st Cir. 1995) ("The [deliberative process] privilege 'is a qualified one,' FTC v. Warner Communications Inc., 742 F.2d 1156, 1161 (9th Cir.1984), and 'is not absolute.' First Eastern Corp. v. Mainwaring, 21 F.3d 465, 468 n. 5 (D.C. Cir. 1994"); Edward J. Imwinkelried, The Government Misconduct Exception to the Deliberative Process Privilege, 65 S.D. L. REV. 76, 90 (2020).

Add.234

1.    the Sanction Plaintiff's immigration status has expired by its own terms or any expansion thereof;

2.    the Sanction Plaintiff was convicted after September 30, 2025[5] of **any** crime as to which trial by jury was their right under federal or state law; or

3.    there is an **APPROPRIATE** reason under governing immigration law that the Sanction Plaintiff's immigration status should be altered.[6]

D.    Upon the moment of commencement of any Sanction Action by the filing a complaint, the Sanction Plaintiff's removal from the United States is automatically **STAYED** during the pendency of the Sanction Action.   The United States bears the burden

---

[5]  This limitation is necessary to avoid vindictive evasion of this judgment by dredging up some by gone conviction in retribution for participation in the present action.

[6]  "Appropriate" in this context is intended to guarantee, for example, the Sanction Plaintiff's ability to challenge the constitutionality of such governing immigration law. See, e.g., Khalil v. Trump, 786 F. Supp. 3d 871 (D.N.J. 2025), rev'd on other grounds Khalil v. President, No. 25-2162, 2026 WL 111933 (3d Cir. Jan. 15, 2026). See also Michael Kagan, When Immigrants Speak: The Precarious Status of Non-Citizen Speech Under the First Amendment, 57 B.C. L. Rev. 1237, 1284 (2016); Gregory P. Magarian, Centering Noncitizens' Free Speech, 56 Ga. L. Rev. 1563, 1590 (2022); Katherine Shaw, Beyond the Bully Pulpit: Presidential Speech in the Courts, 96 Tex. L. Rev. 71, 138 (2017)("[W]here the conduct in question is executive action, statements by executive branch officials supply the most relevant evidence of intent"); Note, Protecting Noncitizens Liberty When the Executive Seeks to Punish, 139 Harv. L. Rev. 799 (2026).

[6]

Add.235

affirmatively to ascertain and determine whether such person has filed a Sanction Action in the United States District Courts.[7]

 E. The Court recommends that an advisory jury be empaneled to assist the court in deciding factual issues.[8]

### V. Jurisdiction

The Court retains jurisdiction to enforce or modify this Annotated Judgment. The Court shall not retain jurisdiction over any Sanction Action, should any there be, which shall be subject to the jurisdiction of the appropriate United States District Judge presiding in such Sanction Action.

**SO ORDERED.**

---

 [7] The reason for this burden-shift is to prevent the apparent present practice of whisking non-citizens out of the district to avoid jurisdiction. The burden is minimal: all the United States need do is check the Sanction Plaintiff's name on PACER in the district of residence to determine whether a Sanction Action has been filed.

 This stay is akin to those temporary stays presently in effect in many district courts. See, e.g., United States v. Russell, 797 F. Supp. 3d 552 (D. Md. 2025). It in no way derogates from the precedential effect of Khalil v. President, No. 25-2162, 2026 WL 111933 (3d Cir. Jan. 15, 2026) within the Third Circuit, as it has no bearing on administrative immigration proceedings.

 [8] The moral effect of a jury verdict cannot be overstated. The American Jury is the most robust and vital expression of direct democracy extent in the world today. The people's participation in this act of government is long overdue.

[7]

Add.236

**Freedom is a fragile thing and it's
never more than one generation
away from extinction.  It is not
ours by way of inheritance; it must
be fought for and defended
in every generation, for it comes
only once to a people.[9]**

President Ronald Reagan, Inaugural Address as Governor of the

State of California (January 5, 1967).

WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[10]

---

[9] https://www.reaganlibrary.gov/archives/speech/january-5-1967-inaugural-address-public-ceremony.

[10] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.

[8]

Add.237

## APPENDIX

I have two hypotheticals here. And you'll understand now these are hypotheticals. I am going to make reference to real-life events, but they are not of record in this case, and I personally don't know and I'm expressing no opinion on any of that.

[L]et's say people resident in the United States, noncitizens from Venezuela, have temporary protected status. And I don't know that. But let's say the President were to revoke that temporary protected status. And that one of these Venezuelans is a member of -- because they're a teaching assistant or a graduate student, they're a member of the American Association of University Professors, within the appropriate time period, and she says, "Wait a minute, I'm in this class, you can't revoke it." And then the government -- and neither of the other two [exemptions] apply, her visa is perfectly valid, she hasn't been convicted of any crime, and . . . the government says, "No, come on, that's ridiculous."

Now Venezuela has nothing to do with the events that gave rise to this lawsuit . . . But the government's got to prove it [i.e. that the Presidential action in no way constituted retribution]. And that's part of the sanction.

[9]

Add.238

Let me give you another situation closer to our case or I think harder for the government to prove.

I read somewhere . . . in the wake of the tragic and horrific assassination of Charlie Kirk, that because certain noncitizens said something about that event, the Department of State had something to say about their visas.  And I remembered, when I saw that, I said, "Well that's our case."

So what are they doing?  If it's just speech -- it may be repulsive speech or disgusting speech, but if it's just speech. Well the Department of State can't do that.  And again this is a hypothetical.  [B]ut let's say that happened, we'll assume that happened.  And then the person comes in and says, "I'm a member of this class, you can't do that to me."

Well again, the government's going to have to prove that their reason was not in fact in retribution . . . and in addition, my second, that it's an appropriate exercise of governmental power.

AAUP v. Rubio, No. 25-10685 WGY (D. Mass. January 15, 2026), Transcript of hearing on remedy 17-19, ECF No. 310.

Add.239

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I electronically filed the foregoing Brief and Addendum with the Clerk for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 /s/ Paul F. Stone
PAUL F. STONE
  *United States Department of Justice*