Nos. 26-1141 & 26-1195

# In the United States Court of Appeals for the First Circuit

**AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS - HARVARD FACULTY CHAPTER; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY; RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN FEDERATION OF TEACHERS; MIDDLE EAST STUDIES ASSOCIATION,**

Plaintiffs–Appellees/Cross–Appellants,

v.

**MARCO RUBIO, in the official capacity as Secretary of State; U.S. DEPARTMENT OF STATE; MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, in the official capacity as Acting Director of U.S. Immigration and Customs Enforcement; DONALD J. TRUMP, in the official capacity as President of the United States; UNITED STATES,**

Defendants–Appellants/Cross–Appellees.

*On Appeal from the U.S. District Court*
*for the District of Massachusetts*
*Docket Number 1:25-cv-10685-WGY*

## JOINT APPENDIX Volume III

BRETT A. SHUMATE
*Assistant Attorney General*
*Civil Division*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

PAUL F. STONE
*Acting Chief*

LINDSAY M. MURPHY
*Deputy Chief*

RAMYA KRISHNAN
XIANGNONG WANG
STEPHANY KIM
RAYA KOREH
CARRIE DECELL
SCOTT WILKENS
ALEX ABDO
JAMEEL JAFFER
*Knight First Amendment Institute*
*at Columbia University*
*475 Riverside Drive, Suite 302*
*New York, NY 1011*

VICTORIA SANTORA
*Senior Counsel for National Security*

JESSE BUSEN
*Counsel for National Security*

*National Security Unit*
*Office of Immigration Litigation*
*U.S. Department of Justice*
*P.O. Box 878, Ben Franklin Station*
*Washington, DC 20044-878*
*(202) 305-9647*

EDWINA CLARKE
DAVID ZIMMER
*Zimmer, Citron & Clarke, LLP*
*130 Bishop Allen Drive*
*Cambridge, MA 02139*

NOAM BIALE
MICHAEL TREMONTE
ALEXANDRA CONLON
COURTNEY GANS
*Sher Tremonte LLP*
*90 Broad Street, 23rd Floor*
*New York, New York 10004*

AHILAN T. ARULANANTHAM
*Professor from Practice*
*UCLA School of Law*
*385 Charles E. Young Dr. East*
*Los Angeles, CA 90095*
*(310) 825-1029*
*arulanantham@law.ucla.edu*

# TABLE OF CONTENTS

July 14, 2025 Trial Transcript........................................................................JA1043

July 15, 2025 Trial Transcript........................................................................JA1105

July 17, 2025 Trial Transcript........................................................................JA1232

July 18, 2025 Trial Transcript........................................................................JA1349

July 21, 2025 Trial Transcript........................................................................JA1455

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Monday, July 14, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

P R O C E E D I N G S

(Begins, 9:05 a.m.)

THE COURT: Good morning.

As I've authorized internet access to these proceedings, let me say, as I've said each morning, if you are observing these proceedings via the internet, the rules of court remain in full force and effect, that is to say there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

It's very important also that you keep your microphone muted. If you do not, you'll be cut off.

With that said, we have one witness this morning, which is the only trial time, and then we have matters to discuss. But let's start with the witness and call the witness.

MS. CONLON: Your Honor, um, as we previewed in our e-mail to the Court, we would be and now have filed a motion for additional time, because of course we didn't expect a ruling by today, we made a very difficult decision to not call -- and understanding that we won't have the opportunity at a later time to call Mr. Reger, whose testimony we frankly think is important, but we need to be able to cross-examine the government's witnesses with these documents with the

time that it takes. So we have -- we have withdrawn our request to present testimony out of order and call Mr. Reger.

THE COURT: I follow that. So the witness, Reger, is not going to be called?

MS. CONLON: That's right.

THE COURT: Then we'll start then with the discussion without -- trial time is not being recorded now and I need your help really, and I have some observations to make about further proceedings in light of the stay, but before we do that, um, two --

Yes, Ms. Strokus, I simply want to offer an apology for not getting your name right.

MS. STROKUS: No problem, your Honor.

THE COURT: No, in my mind it's a problem. By now in the trial I should recognize your name and I have mispronounced it and I apologize.

Thank you.

MS. STROKUS: Thank you, your Honor.

THE COURT: And, Mr. Kanellis, I was brusk at 1:00 only to -- it had nothing to do with the trial or the mandamus proceedings, I had someplace to go. And as you have said, and now I say, I'm apologizing for being brusk.

But let's start with whatever it was you wanted to

say at 1:00 on Friday, and we'll go from there.

MR. KANELLIS: Thank you, your Honor.

I note that the Court has scheduled the post-trial briefs to be due this Friday. Is my understanding shared with your Honor?

THE COURT: I think that's correct.

MR. KANELLIS: Your Honor, I believe, and I don't -- we've talked about it with the plaintiffs and I'm not sure what their position is, I believe that all parties would be benefitted if we were given a few extra days to capture the final testimony that's going to be presented on --

THE COURT: Actually I've had a chance to reflect on these things as well. I'm not disposed to give -- let's start there. I'm not disposed to give the plaintiffs any extra trial time. Of course I'm going to devote all the time that we agreed to concluding the trial, which until the stay, and this is not whining, was going swimmingly.

So let's be clear. This is a case that involves, among other things, motive and intent, and, um, since I've had another of these cases that involve the administration, um, and I thought it appropriate -- and I absolutely thought it appropriate, that right after final arguments I had various important things to say,

um, and then following it up with a written opinion. The ***Kennedy*** case involving the National Institutes of Health. But this case is not like that. Here's what I expect to happen in this case.

In one part it's a, um, what I hope will happen with respect to the trial. I hope that, with respect to the trial, the stay will be lifted, and either I'll -- either lifted and I'll be allowed to muddle through to the end of the trial or will be lifted with instructions, which of course I will scrupulously follow. But action will be taken promptly by the Court of Appeals and I will get through the trial this month.

Now, um, this is a case in which I'm going to need requests for findings and rulings and I've appreciated the fact that you've ordered daily copy so that I have a full transcript. So, um, there's going to be a period of time, um, once the matter has been taken under advisement and these post-trial filings have been submitted to the Court before the Court -- and we understand we're only in the first phase. The first phase may be the last phase, the case may come to an end after the Court's findings and rulings on the first phase. And, um, contrary-wise the opposite result is possible, that that may result in what we might call a "finding of liability," and then the Court would have to

wrestle with the second phase, which is the issue of redressability, the issue of a correction, if any is possible.

So, um, what Mr. Kanellis -- if we start there, I am, um, perfectly amenable to extending the time for such filings because I have a lot of under-advisement work to do. And, Mr. Kanellis, thank you.

So here I guess is -- what would be helpful to me, now that I have the detailed privilege log -- I will say in a font so small that I need a magnifying glass to read it.

(Laughs.)

I want to talk with you, um -- well let's start the talk like this, because it's a matter of interest to me.

What, um -- on the plaintiffs' -- the plaintiffs have rested but for certain witnesses, and that makes perfect sense, and these witnesses include the cross-examination of Armstrong, Watson, and who else?

MS. CONLON: As far as we know, that's it.

THE COURT: Well --

MS. CONLON: Oh, I'm sorry, I thought you were asking me about whose cross-examinations were affected, in our view, by the documents. Is that not the question?

THE COURT: I agree that those two are affected by the documents which have been disclosed to the plaintiffs, those two.

MS. CONLON: Yes.

THE COURT: So if any event, the stay, however construed, applies until the Court of Appeals permits me to go forward, and that's perfectly fine. But now I'll ask the broader question.

What else did you observe?

MS. CONLON: Yeah, I see. We reserved testimony from our two witnesses who are traveling into the U.S. to testify in this case who will both testify, time-permitting on the 18th. And that's Veena Dubal, who is the General Counsel to the AAUP, and Cinzia Arruzza, who is a noncitizen member of the AAUP. And the person we are not able to present, take testimony for, is Jeffrey Reger, who is the Executive Director of MESA.

THE COURT: Yeah, understood.

MS. CONLON: Oh, I'm sorry, your Honor, my colleague corrected me. We also anticipate -- we had told your Honor that we -- rather than asking the law-enforcement witnesses who are set to come tomorrow, these four, um, ICE agents who are of a supervisory level who the government intends to present, we also want the chance to question them potentially more

broadly than the soap of their directs, which the government I think has agreed to rather than asking that we bring them back a second time. And so to the extent that we need to go outside of their direct, I suppose that's off the part of our case that remains.

THE COURT: Thank you, that's a helpful answer. And again, just to move things along, as to those witnesses, my custom is to allow you to go beyond the direct. Of course the rule requires you to take them as though -- on direct as though it is cross. But I've allowed you to treat those witnesses as adverse because they are employees of, um, one of the agencies where the defendant public official is the top of that agency. So there's the answer of what the plaintiffs are going to do with the remainder of their time.

What else are we going to hear -- what witnesses, beyond what has been mentioned, do the defendant public officials want to present?

MS. CONLON: Your Honor, if I may correct myself one more time, my smarter colleagues reminded me of another point, which is that at least -- there's sort of two components to this.

As I understand, we have now questioned one of the agents who will be testifying tomorrow in a deposition and there were many fights about privilege yet again,

um, relating to the scope of the law enforcement privilege, as well as, I think, the deliberative process privilege. So to the extent that the Court's guidance to the parts on how those privileges apply or don't, with the documents in front of the Court, I think that will potentially affect -- in other words I anticipate --

THE COURT: To make use of that.

MS. CONLON: Yes, exactly.

Unlike Mr.(s) Armstrong and Watson, these agents are not, um, senders or receivers of the documents, the affected documents, but we very well may have questions for them based on those documents in terms of the content. And so I don't -- I'm correcting my having misspoken and saying, "Oh, the documents are totally separate and apart from these agents," I should not have made that representation. Just to complicate things a little further to the Court.

THE COURT: No, no, that's very helpful. Very helpful, and I thank you.

Mr. Kanellis, what are the defendants' public officials going to present?

MR. KANELLIS: Your Honor, as indicated, tomorrow we will present the four agents, as your Honor has requested, who were at the sites of the arrest. On

Thursday, we have put aside time for, um, AD Armstrong -- sorry, AD Watson with HSI to describe the HSI's role in these, um -- in these, um, facts at issue.

THE COURT: Thank you.

MR. KANELLIS: We have -- we intend to present a summary witness. It's not extensive, but some summary exhibits through a summary witness. And then there's a witness, you Honor, that falls outside the purview of the Court's jurisdiction, that we will have briefly. That witness is Brian Shuvea's deposition testimony entered pursuant to 804(a) and (b) as an unavailable witness. That is the extent of what we anticipate our case to be.

THE COURT: The deposition testimony -- in other words, he's not going to be a live witness, but you're going to present his deposition?

MR. KANELLIS: Yes, your Honor, it will be very brief, I just think it's significant, so it's important.

THE COURT: I'm sure you do.

So, um, that shouldn't take any time, because the, um, plaintiffs, if you have portions that you think are inadmissible, they can be indicated on the deposition and I will read the transcript and make rulings, and my rulings will decide what's part of the record or not.

All right, let's -- and I appreciate what you've

said, all of this makes sense. Let's talk then about, um, what I call the core documents that the Court -- and I don't -- well that's an appropriate phraseology.

I see the issues about the submission of documents by the government to fall into three parts. The core documents, by which I mean the documents which evidence the procedures of the Department of Homeland Security transmitting ROAs to the Department of State and the, um, procedures that the Department of State followed in acting on those documents. They started out as B through K, which have been subject now to cross-examination. And, um, they involve, um, without characterizing them in -- or I think it's permissible at least to identify them in light of the stay, Watson letters and, um, also these decision procedures, the "agree," "disagree," um, "discuss," forms that were used to present matters to the Secretary of State, those have been mentioned. And, um, in reviewing them -- and I want to talk about them as a group. I consider them core documents here. I note that certain of them have attorney-written, um, data on the documents.

So not having reviewed the privilege log in detail, um, but I think it's a good place to start, and I think it will be helpful to the Court of Appeals to -- for the Court -- I can address this issue of waiver, and

I intend to, but -- which the Court specifically -- which the Court of Appeals specifically invited me to speak, but I think it would be helpful for us to discuss now where I have agreed to entertain the privilege log and the claims of privilege with respect to the core documents, and that's what I'd like to discuss. And hopefully rule on. I'm familiar with these documents. The ones that have been disclosed to the plaintiffs, the plaintiffs are surely familiar with them. And defense counsel is familiar with them.

So let me, um, identify first, as a place -- because it affects various aspects of what the Court's duties are here, let's identify in the core documents those written statements by attorneys.

Now as to those, I understand that the defense raises the attorney-client privilege.

Is that correct?

MR. KANTER: Your Honor, I understand you to be referring to the action memo with the -- you refer to "agree," "disagree," "discuss." So I think we're talking about the same sort of thing, there are some handwritten notations --

THE COURT: Right.

MR. KANTER: -- which presumably Mr. Armstrong, who -- this is his action memo.

THE COURT: No, I understand that.

MR. KANTER: They'll be able to clear that up, or the meaning or significance of it. And what I understand you to be asking is what is the nature of the privilege --

THE COURT: But not as to Armstrong, he's not an attorney. There is an attorney --

MR. KANTER: Yeah, there was attorney-client privilege with regard to other e-mails in that core subset.

THE COURT: That's what I'm talking about.

MR. KANTER: Yes, discussions of ICE officials with their counsel.

THE COURT: Right.

MR. KANTER: And as your Honor knows, redactions -- proposed redactions have been made with respect to that attorney-client privilege. Obviously, um, CK counsel is to be encouraged in the government. And, um, this is a matter of some importance, um, I would say -- I would put it this way, on principle. Because as your Honor also knows, the content -- I remember when you were telling me, "Why" -- "This shows the government in a good light, why would you not want to, in effect, just voluntarily?" And our response was "That's of course" --

THE COURT: So you were listening, and it does show that.

MR. KANTER: That's for the client and the attorney-client relationship to, you know, at a minimum say, "I want to keep it privileged," right? And as a result, we, um -- we are pursuing that privilege on their behalf. And --

THE COURT: That's fair. That's fair. And I understand it. I overrule it.

Now what other privilege applies? And I'll work out from this with the implication. And I overrule it on the ground that, um, you cannot give such data to the -- the factfinder and then say, "Here it is, but it's privileged, and therefore you can't consider it." That -- and the basis is that is a knowing and intelligent waiver of the privilege as to that data. That's the ground that the Court's ruling.

Now are there other grounds to seek, um, a privilege?

MR. KANTER: Over those e-mails?

THE COURT: Yes.

MR. KANTER: The proposed redactions reflect the identities of the participants to those exchanges. Your Honor's initial ruling was only e-mails and phone numbers --

(Interruption.)

THE COURT: Okay.

MR. KANTER: Not identities, um, where the government had proposed to redact, including the identities, as law enforcement privileged. But otherwise putting --

THE COURT: I guess I don't -- no, no, I hear you. Why should the names of the people be redacted, they're public officers of the United States?

MR. KANTER: The, um -- your Honor, it has to do with the, um, the individuals and their responsibilities and the nature of their responsibilities. There are sometimes law enforcement interests that pertain to identity that the government, um, seeks to maintain the integrity -- for example, an analogy would be maintaining the integrity of an investigation.

THE COURT: Well, of course. You see that I understand. But, um, these are in-house people doing their in-house work, um, I don't understand why their names -- we ought not know who they are?

MR. KANTER: The contents of the communication, um, absent an attorney-client privilege, reflect the nature of the discussion. The agency, um -- and there are limitations to what I would say in open court. Your Honor has --

THE COURT: Well that's fine.

MR. KANTER: Okay.

THE COURT: And I -- I hear you, Mr. Kanter.

So again, I'm not disposed to redact the names, absent some showing, um, which may -- an affidavit, which may show the ongoing, um, concern that the identity of a particular person, um, his or her name be redacted. That may be filed under seal and I will consider it.

Is there anything else?

MR. KANTER: Yes, there is one other matter that your Honor enumerated, um, related to the action memos, which, um -- the issue here is --

MR. ABDO: Your Honor, before you move on from this --

MR. KANTER: May I finish my remark?

THE COURT: Yes, I will hear Mr. Kanter.

Mr. Abdo, I'll hear you in time.

Go ahead, Mr. Kanter.

MR. KANTER: I'll get right to the point.

THE COURT: Please.

MR. KANTER: The lead contention of my friend is if you find that the action memos are not privileged under the deliberative process privilege, then the cross-examination of Mr. Armstrong and Mr. Watson may go

forward, that's their contention, and I would like to address it.

THE COURT: Yes, and I agree. I agree that that is a central issue here. And, um, let's -- but I want to start out with the attorney's, the attorney advice that's here in the e-mail.

I've overruled the -- I've overruled the assertion of the attorney-client privilege because these were voluntarily submitted to the adjudicator, on the basis that that is a knowing and intelligent waiver. Now the deliberative process privilege, in this Court's mind, is something else again. And the analogy -- I think in analogies too, and I was talking with the law clerk, that if -- it isn't the same thing as the deliberative process privilege, but courts hold certain things absolutely privileged, and it's roughly the same, how the Court comes to a decision.

So if, for instance, a civil case, like this is a civil case, a motion for summary judgment, before it are briefs and affidavits. None of those are in a deliberative process privilege, though they are what the parties have served up that will form the basis of the Court's decision.

Then an attorney on the Court's staff takes an affidavit, this happened more often in the covid days

when we were working remotely, and underlines, writes in the margin, advice. We're not deliberating, we're not in a meeting. There was that meeting, for instance, that Hatch attended and I have sustained the deliberative process privilege and allowed him to be asked only what came out of the meeting, which was the classic situation in my mind and easy to follow.

Here when an attorney does that, I think these things fall within the deliberative process privilege. I'm talking about the attorney. And indeed you've -- you've, um, anticipated it.

So it's conceptually, it's easy for me to think about it with these attorney interlineations on e-mail. That's my concern.

So let's say I sustain that because I think that that is within the deliberative process privilege, that is, that's the attorney advising, albeit remotely, the decision-maker to make the decision, the actual policy, what the Secretary of State decided, that's public, and no one -- there's no objection as to that. So it falls within the deliberative process privilege, it seems to me.

We're in the middle of trial. And then we get to the next problem. If I say, "No, that's within the deliberative process privilege," candidly I've dealt --

in jury-waived cases, criminal cases, the stakes are higher where matters were suppressed and I felt perfectly comfortable in putting aside matters which legally had to be suppressed. Perhaps not in every case, but certainly in most cases. And making my rulings on matters properly before me. But this is different because we're in the middle of trial and these have been disclosed to the plaintiffs.

So the truth is, as I always try to speak the truth and be transparent, that as to the lawyer interlineations, I could put those aside. I could characterize them -- well I don't know that I have, and I'll say no more. I can put those aside. But I'll say this, well certainly some of the things that they said are things that occurred to me before I read these documents, that is, "Is this unprecedented?" "Are we concerned about blow-back?" I need not go on. But things which, um, you could readily argue are informed by reading what lawyers, in their lawyer-like way were saying, that both occur to the Court and I'm sure have occurred to, um, plaintiffs.

So suppose, because I'm -- I think I'm prepared to say, we can put those to one side, what the lawyers had to say.

Now when -- because attorneys can fashion

questions that don't depend on it, you can't cross-examine -- "Oh, but do you see here your own lawyer said this and that?" We can exclude that. But are you saying that I should curb their cross-examination to questions that don't depend directly on, um, what the lawyers had to say?

MR. KANTER: I --

THE COURT: You're following my --

MR. KANTER: I am following it, and I have -- I've seen your Honor make these distinctions throughout this trial frankly about many matters, admitting evidence, for example, as limited, not for the content but for the reaction, distinctions are made. This is a bench trial. Your Honor is the judge and the jury, as it were. And, um, those decisions and distinctions are yours to make.

I think the key, um -- the key aspect of this process for the government, um, was the -- in handing over the core documents to the plaintiffs, your Honor, um, made a very important stipulation, the stipulation was they were attorneys' eyes only, which I understood, and your Honor can correct me if I am mistaken.

(Pause.)

THE COURT: Go ahead.

MR. KANTER: However I think your Honor was trying to strike a balance, which is acknowledging either the

asserted privileges of the government or if the matter of waiver is, um, pending before the First Circuit, or there were other considerations related to attorney-client or deliberative or law enforcement, your Honor was striking a balance to enable the trial to proceed and the examinations to proceed, attorneys'-eyes only. And I think in asking me, "Can there be a robust cross-examination based on these core documents?" I think the government's answer is "Yes."

There may be matters which, for example, I had to talk around in open court and matters for which a sidebar was required, um, but what I'd like to underscore is the plaintiffs have the documents, they have all the documents. In fact, they have them unredacted.

With respect to the, um, "agree," "disagree," "discuss" memos that your Honor, um, they not only have those unredacted, they have the Secretary of State's decisional memos unredacted. Why? Because we gave it to them when we agreed to file it under seal with the Court. The decision memos are, um, not, um, under seal in full, there's a companion set that is public.

The plaintiffs have the information. They have the ability to fashion questions. And if any of those questions were to touch on areas of sensitivity, whether

the Court has ruled directly with respect to the privilege or the government maintains their -- for example, the other day when there was an exhibit, most of which we had no objection to the questions based on that exhibit, we never stood up and objected, but there was one part of that one exhibit, and we brought it to the Court's attention, and you acted immediately, and my friends complied immediately. I think we were all on the same page there. But the --

THE COURT: All right, that's very helpful, Mr. Kantor, and I'm listening to you.

One last question before I hear Mr. Abdo, because I -- you've -- I hear no suggestion in our discussion that, um, while I said I could set aside the attorney interlineations as, um, part of the deliberative privilege, and I want to hear him on that, um -- and if I decide to do that, I can do that, it does not affect the integrity of my factfinding. No one suggests, when I come to decide this case, because, as you have characterized and I think accurately, these documents cut both ways. I can't be more transparent. They do cut both ways.

No one says -- on the government's side, no one says I can't look at the documents, even if I excluded the attorney data, the core documents, isn't that

correct?

MR. KANTER: Yes, that's absolutely correct.

THE COURT: Thank you.

MR. KANTER: And if I may? One last point or not. I can sit down.

THE COURT: No, no, go ahead.

MR. KANTER: If the issue is -- what I'm saying is the issue of whether it's deliberative or not is a nonissue in terms of being able to question the witness about it, work around it --

THE COURT: That's what I heard you say.

MR. KANTER: That's my main point.

As to whether it's deliberative? I do have an argument that it is deliberative, even putting aside the delineation, because this action memo is a proposed decision.

THE COURT: Oh, you're talking about the interlineations of Mr. Armstrong?

MR. KANTER: Mr. Armstrong's memo -- the whole memo is a proposal to the Secretary of State. It's not a decision, it's an offer recommending approval.

So "approve," right, can, like your Honor said, things can be -- have two meanings at once.

THE COURT: Well that intrigues me. So we're talking about these action memos now.

MR. KANTER: Yes.

THE COURT: In which there are interlineations by Mr. Armstrong, the witness here at trial. We've all seen them in their unredacted form. But you now make an argument that the memo, because it has the interlineations, is, um, part of the deliberative privilege.

MR. KANTER: Yes, I do.

THE COURT: Yes, I understand.

MR. KANTER: And I think my friend helped me with my argument for the following reason.

THE COURT: Well we'll let them make their own arguments.

MR. KANTER: Okay, then I won't say that.

THE COURT: All right.

MR. KANTER: They made an argument that it's not deliberative when it becomes final. Those are two different things actually, but they make the critical point that they're virtually identical in content, right?

THE COURT: Yeah, let me. Let me hear their argument from them.

MR. KANTER: Thank you, your Honor.

THE COURT: Mr. Abdo, we've talked about the attorney -- the attorney statements and e-mails, we've

talked about these memos of -- we're pretty clear what they are, that Mr. Armstrong gives to the Secretary of State. Please address both.

MR. ABDO: Thank you, your Honor. And before I address those, if I could just say one thing.

Last night, as you may know, we e-mailed Ms. Belmont with a filing that we had hoped to file under seal later today. We provided a copy to opposing counsel. And if your Honor would like to have a copy of it, I'd be happy to approach and provide it.

THE COURT: I have it, don't I?

MR. ABDO: Well I don't know if you have the printout. But if you don't, I'm happy to provide you one.

THE COURT: Oh, I have a printout.

MR. ABDO: Oh, okay. So let me just -- a few points your Honor.

First, with respect to the attorney-client privilege, we understand your Honor's ruling. We would just encourage you to overrule the assertion of privilege for the additional reason that, with the exception of maybe one or two sentences in the e-mail thread that we're talking about, nothing in that e-mail thread is plausibly protected by that privilege. Most of it concerns, um, decisions already made, not sought

-- you know not offered in the context of seeking legal advice or received in that context.

The fact that attorneys happened to have been copied on the e-mail is relevant, but it certainly isn't dispositive to the assertions of privilege, and we'd ask you to base your ruling on that additional basis, which we think would, you know, clear up the record.

A second point with respect to, um, the interlineations. I think I now understand where things, um, have landed, but just to be clear. The interlineations we're talking about, and I believe Mr. Kanter was talking about, were ones made apparently by Mr. Armstrong on the action memo, not by a lawyer.

THE COURT: I -- I never was under a misapprehension as to that. The problem is we're being cautious about documents, and he started off talking about interlineations by Mr. Armstrong, I said, no, no, no, and he moved to e-mails. We talked about e-mails, I allowed him to expand now to interlineations, undisputed apparently by Mr. Armstrong on this decision memo. And, um, I've heard his argument. I'll hear yours.

MR. ABDO: Thank you.

And then a third point, your Honor, has to do with the deliberative process privilege and connects to the action memo that we were just talking about. As you'll

have seen from our filing, we don't think the deliberative process privilege covers any of the documents that have been turned over to plaintiffs for a variety of reasons. We explained four in the memo. I won't repeat them here. But let me just highlight two of them.

One is that all of the documents we're talking about have been adopted, including especially the action memo that we were just talking about. Mr. Armstrong -- well I don't want to go into any details, but I think a review of the document on its face makes clear that it was adopted, and once a document is adopted as a decision of the government, whatever predecisional and deliberative character it had before that might have justified invocation of the privilege falls away.

So, you know, we think it would be proper to overrule all the government invocations for that reason.

THE COURT: There have been opinions of this Court which, if you looked at the draft, which otherwise was privileged, I -- I don't know as I'll use the word "confess," the only changes I made were to avoid split infinitives, which is an issue of mine, and to move a few, um, commas. So that reveals that the draft, by the law clerk, was 95 percent acceptable to the responsible judicial officer when I signed my, um, my -- put my

signature on it.

I do not conceal from the bar that in the main, um, I delegate to clerks and interns initial drafts. Frequently I do rewrite or add sections and subtract, and all of that business. But, um, it does add a little more information if you were to know the last draft before the judge put, in my case, his signature on it. And I always thought that was privileged.

I think that's correct, your Honor, but two points about that. One is that once you put your signature on the document, then it is expressly adopted.

THE COURT: Exactly.

MR. ABDO: I don't think there's any debate in the doctrine about that proposition.

And the second point is that, even with respect to documents that were once predecisional and deliberative, if they were incorporated by reference into the decision, or relied upon, as many of these documents were expressly in the decisional document, that incorporation waives whatever deliberative process privilege there would be.

So just to be very concrete. In the decisional memos we have, in the certified administrative record, you know the ones from the Secretary, those memos expressly base their decision on underlying memoranda

setting out the factual understanding of the Department of State or the Department of Homeland Security. They quote them. They site them. They list them as attachments. That incorporation also waives whatever predecisional and deliberative character the underlying memos might otherwise have had prior to the final decision.

And we think that applies to the bulk of -- and between those two arguments, we think it covers all of the documents over which the government has asserted the privilege.

THE COURT: And I'm saying it back to you now. At some stage I will write an opinion here, and in legal writing they'll be citations, and the citations will be to the record, or to opinions and the like, all of which -- and your point is, "If you do that, Judge, all of those necessarily are public, because, in legal writing, that is explication of what you relied on, it shows your reasoning."

MR. ABDO: Precisely, that is the basis for your decision. And the bases cannot be withheld under the deliberative process privilege.

THE COURT: Okay.

MR. ABDO: One final point, your Honor, has to do with our ability to cross-examine on the basis of these

documents. And to that I'd like to turn it over to Ms. Conlon. If that's okay?

THE COURT: Of course it is.

MS. CONLON: I have a very extra-vested interest because I am, as you know, have begun the cross-examination of Mr. Armstrong.

So our friends on the other side make the point that even if the documents couldn't be used by us in terms of entered into evidence or shown to a witness, that we wouldn't be hampered because we could ask important, you know well-crafted questions.

THE COURT: He didn't say you wouldn't be hampered, he says you can think of ways around it.

MS. CONLON: And I want to let the Court know some important context that there's no reason the Court would have known, which is this.

I sat in a room with Mr. Armstrong for a whole day. He did not recall and could not answer a single question about the basis for any of these decisions, even the manner of these decisions, and he repeatedly said, "Please show me the documents." I cannot tell you how many times he asked me to show him the action memo and the Watson letter, and of course I didn't have them because, until the Court shared them with us, we had never seen them. We could not effectively get at the

truth without them.

THE COURT: Wait. Now, um -- I'm going to cut you off, Ms. Conlon, but only for this witness. My ask to the Court of Appeals is that they lift their stay, um, not really that they, um, dismiss -- and I don't know that it properly is before me, that they dismiss the petition, that's up to counsel arguing the several positions.

But at their invitation, I am going to ask that they lift the stay, and as I put it, "allow me to muddle through to the end of the evidentiary process." Mr. Kanter referred to it, and respectful to plaintiffs' counsel, deservedly so. And I -- the counsel I have here in the courtroom before me, I have genuine respect for you all. We have worked cooperatively and I have been able to make rulings that I have thought prudential.

I'm talking to the -- I can't decide -- I'm having this discussion. We have daily copy. You can transmit it all to the Court of Appeals. But I can't -- I put on the record that I'm ruling that the assertions of attorney-client privilege are, um, overruled on the basis of waiver, because they were put before the factfinder.

I am ruling that the, um, claim of deliberative

privilege as to -- I want to reflect on what Mr. Abdo said, but as to so much of the e-mails that actually reflect attorney advice is sustained, so long as we are clear, as Mr. Kanter has made it clear, that the Court may look at those things, draw inferences and the like. But I'm going to treat those as having sustained, um, that on the deliberative process privilege.

Beyond that, I'm not making any rulings as to the reach of the deliberative process privilege because the process Mr. Kanter has described is, um, both acceptable to the Court and workable. And if the Court of Appeals will allow me to proceed with Mr. Armstrong and Mr. Watson, um, I don't think there's any more I can say. I've tried to be transparent to counsel and to the Court of Appeals.

Yes?

MS. STROKUS: Your Honor, I just wanted to put on the record before you that Ms. Conlon has mischaracterized what occurred at Mr. Armstrong's deposition. I was also there the entire day. And plaintiffs repeatedly asked him to speculate on documents that they could not produce to him. So he's under oath --

THE COURT: Well because they --

MS. STROKUS: So he's under oath. It's important

that he tell them, "I'm not going to speculate on the contents of these documents."

THE COURT: I'm not drawing any conclusions. If the Court of Appeals will allow him to resume the stand, I can handle the examination.

Now that --

Yes?

MS. CONLON: Your Honor, may I ask you a question?

THE COURT: Oh, of course you may. We're talking now. And I'm fine with talking, but I can't -- I've made the rulings I've made to try to be helpful, because I have enough of a basis to make those rulings. Beyond that, I'm asking that they let the trial go on, and a trial is a trial.

MS. CONLON: And when your Honor said, "If the trial is permitted to continue with examinations of Mr. Armstrong and Mr. Watson, that we can use the process we have used so far," which I understand -- that's the part I wanted to get clarification on. I take that to mean to deal with things as they come up.

THE COURT: Yes.

MS. CONLON: Okay. We have discussed the action memos today and we've discussed the e-mails, but we have not discussed, unless I missed it, the letters from Mr. Watson to the State Department. I wanted to make

sure that that's also something we're addressing today to the extent that the Court is willing.

THE COURT: I am willing, because I consider them core documents. And, um, maybe I should go back to Mr. Kanter to be -- to see if, um, there's any ruling I can make.

Mr. Kanter, as to the Watson letters?

MR. KANTER: Yes.

The Watson letters are referrals from one agency to another, and, um, the government stands on the, um, log entries as to those documents we submitted to the Court.

THE COURT: Yeah, but they really are very fine points.

MR. KANTER: (Laughs.) Fine?

THE COURT: What are your objections?

MR. KANTER: You're right, and I apologize for that.

THE COURT: No, no, that's all right.

MR. KANTER: I strained to read them myself.

THE COURT: I have a magnifying glass.

MR. KANTER: Um -- okay.

In my recollection, the referral letters are law-enforcement sensitive, they were the subject of a motion to compel by the plaintiffs, which your Honor

denied. They were among the documents that your Honor held the privilege had been waived.

We have not changed the assertions as to those documents. They remain law-enforcement sensitive. Your Honor handed them to plaintiffs with the AEO stipulation. We, um, believe that is a compromise that enables the trial to proceed.

THE COURT: Thank you. Yeah, I think that's well-said.

MR. ABDO: Your Honor, if I may just add one note with respect to those?

THE COURT: Yes, please.

MR. ABDO: You know those documents appear on the chart that we provided to the Court last night. Among the first, I think 9 or 10, all withheld only under the law-enforcement privilege. And we understand your court to have overruled that assertion of privilege with respect to these documents based on your Court's conclusion, which we fully agree with, that the government had interpreted that privilege far too broadly to cover not just information that was disclosed with compromise and investigation, but the sort of information we've seen from these memos, which is largely factual information. And using techniques that have already been disclosed to the public and described

in open court, mainly the collection of social media information and the like.

So we think the Court has already ruled with respect to those documents on the merits, not on the basis of waiver, such that the First Circuit's order doesn't even implicate our use of these documents at trial.

THE COURT: Actually you've stated it better than I. But the use of the word "waiver" there, by the Court, was infelicitous, because while I went on to explain my focus on the law-enforcement privilege and explain what I believed was the scope of the law-enforcement privilege and functionally overrule that privilege as to these documents, as you have properly said and more effectively described, the use of the word "waiver" was infelicitous. And now that I've gone back and looked at the transcript, I said, "You may submit law-enforcement privileged data and I used words much like "and I will honor it." And that's their basis for saying, in effect, that they were snookered. They were not snookered. That didn't estop the Court from making a ruling on the privilege. I made the ruling on the privilege. But they did not waive it by asserting it and giving me the documents.

What they did was give me the documents, allow me

to rule on the privilege, I overruled it, and as a matter of trial management, have decided, and persist in that decision, that they may be used to get in the trial. Everyone agrees I may look at them. But I think that, um, I may look at them more effectively if I permit cross-examination, which has been the Court's reason and process for turning things over under the stipulation of attorneys'-eyes only. Thank you.

MS. CONLON: Your Honor, I'm so sorry, may I ask you a question?

THE COURT: Don't apologize. You know we're talking.

Go ahead, Ms. Conlon.

MS. CONLON: Okay.

So understanding the Court's point that if we can continue, we will use the process that we have used, which is collaborative with the Court and the government, the concern that I hope was clear in our application for time is that that process takes time, meaningful time, and I am deeply concerned that with only several hours we will not be able to even finish this process.

THE COURT: I'm sure you're concerned, but that was clearly to be anticipated in a trial of this sort. No additional time.

Now, um, there's one other document and we haven't talked about it and I actually talked about it in trial, but we haven't talked about it here. And I think my, um -- I think, one, the document, as I understand it, is not implicated in this application for a writ of mandamus, and that is the single document marked A as to which the government has asserted the Executive Privilege. They call it the "Presidential Privilege," which has thrown me a little bit, but it's the same thing as the "Executive Privilege," which I am somewhat familiar.

As to that document, I have characterized it in open court saying, "It appears to be peripherally relevant." Here's how I'm going to handle that document, if it hasn't been clear. And again all of this I fact expect you to transmit to the Court of Appeals should you take a position with respect to it or have issue with it.

The Executive Privilege has not in any way been waived, and has been asserted, and timely asserted. The matter was and is under advisement by the Court without respect to the, um -- without respect to the mandamus proceedings.

It seems to me there are three possible outcomes. The Court determines that the privilege applies. If

that happens, the document itself will be returned to the government forthwith. But notification will be put either by my saying so during the trial or if it's in the under-advisement period, um, by notification on the docket.

Second, that, um, the ruling, whether it applies, um, is deferred by the Court until the, um, time I am writing up the opinion and I decide that while relevant, it's so peripheral that no mention of the document need be made in the opinion, nor reference to it. If that happens, the document at that point will be returned to the government forthwith, physically, no copies retained in the file of the Court at all. It's treated in our procedures as a highly-sensitive document. I have custody of it.

The third possibility is that the Court finds that the privilege -- rules that the privilege does not apply, and further, um, wants to cite. The second option, I don't have to decide whether the privilege applies, if I'm not going to cite it, I'll give it back, because I'm not relying on it in any way. If I find that the rule -- that the privilege does not apply, and the -- and I'm going to cite it or use it, in that case I will give notice, and then I would think that would be ripe, um, and indeed -- why don't I say it right now, I

will not do anything for -- I will automatically, I'm putting it on the record now, stay any further action as to the document for 7 days so that the government may, um, seek to protect the document.

I have said one thing that, on reflection, I want to retract, and I'm looking for you, Mr. Kanter, who's arguing these privileges. I suggested the possibility that assertion of the privilege could be a basis, even if it wasn't national security, for an adverse inference. That's error. And I would not do that. And the reason, on the record, is there is an institutional, um, reason, wholly apart from this case, for the Office of the President of the United States to assert the Executive Privilege and vigorously to patrol its parameters to preserve the Office of the President of the United States, both as to Congress and the courts and the public. That's established in the case law. I fully respect it. And, um, the privilege asserted here, I can readily conceive of reasons why the government, as an institutional matter, would assert it, utterly regardless of any issue laid before the Court.

So any adverse inference from asserting it is -- will be improper, and I assure you I would draw no such inference. That's how I'm going to handle that. So we're clear on that.

Now with that I think I -- let me tell you what I plan to do. I plan to go back and talk to the law clerk, um, we'll say a 20-minute recess. Then I'm going to come back and I propose, really briefly, to -- subject to Mr. Abdo being heard here, to briefly, um, accept the Court of Appeals invitation and to explain myself on the record. Again, this is not a brief. I will just explain how I -- if permitted, I will ask to have the stay lifted, but the writ I take no position on, the proceedings for the writ could depend, um, and that will constitute my response. And I will, because we've got daily copy, I will transmit a copy of my remarks, soon to be made, to the Court of Appeals.

I do want to add, with thanks, the Chalk HN, it really sort of walks through the -- what I've described as the "Core" documents. And, um, I should append it to my remarks and I'll see that that's done. So I'll ask you to wait for that because I think it will be helpful for you to, um -- my whole reason for doing it this way is for you to hear it.

And, Mr. Abdo.

MR. ABDO: Thank you, your Honor, just one brief point.

We obviously don't have Exhibit A, the document for which the government has asserted the Executive

Privilege or the Presidential Communications Privilege. Just one note about that document, if the Court determines it is relevant and is weighing the question of whether it is properly privileged.

One of the key elements of the Presidential Communications Privilege is that the information in the document at issue not have been distributed beyond the President's close advisors involved in the decision-making at issue. Mr. Lapowski's declaration which asserted the privilege does not address the distribution of this document. And so it is our position that the government has not yet met its burden of invoking that privilege. We obviously have no basis to know the distribution of the document, but it's our position that they have yet to satisfy that element of the burden. And so we'd ask them, at the very least, to supplement their filing in that regard.

THE COURT: Thank you.

I thank you all. We'll take a recess for 20 minutes and, um, the Clerk will advise you as to what will next happen. But I'm hopeful to come back and briefly accept the invitation of the Court of Appeals and, um, so that you may all support or take issue with it and the like.

And with that done, I think that would, um,

conclude the proceedings for today. Because when I'm done, I'm going to recess. So let me go around.

Is there anything else that you think we ought be discussing today? I've told you what I'm going to ask for.

(Silence.)

MS. CONLON: Um, to make sure we understand we're proceeding tomorrow. If there is no ruling from the First Circuit with respect to the, um --

THE COURT: If there is no ruling, then, um, I understand the boundaries of the stay and I will scrupulously adhere to them.

MS. CONLON: And to make sure that I understand that same understanding, when we are questioning the ICE agent tomorrow, so that we don't run afoul of anything here, um, if there is no ruling from the Court of Appeals, are we permitted to ask questions that rely upon information that we know from those documents?

THE COURT: It depends upon how you ask them.

MS. CONLON: Okay.

THE COURT: I don't, in any way, mean to be coy. We can't unring the bell. For good and sufficient reason, I have turned the documents over to you because candidly I wanted them, um, to subject them to cross-examination so that I could better understand the full

context. That's where we are in this case.

MS. CONLON: A related question, your Honor.

These documents, in particular the Watson letters and the action memos, does the Court understand and review them as part of the record that's in evidence that the Court may consider in reaching its findings or are these from the Court's perspective outside of the --

THE COURT: No, the Court -- that I think I made clear, and I don't think the government has an objection to that.

I take these documents, with the exception of attorney, um, volunteering of, um, or giving -- I shouldn't say "volunteering," giving legal advice, as to which I am prepared to exclude as part of the deliberative process, I'm not saying the whole e-mails, um, and I'm going to put that to one side.

MS. CONLON: Okay.

THE COURT: Having said that, everything else -- and I don't hear defense counsel objecting to it, unredacted, is part of the record on which -- except perhaps for this Executive document as to which Executive Privileges -- well let me start again.

As to the core documents -- I'm speaking to the core documents. As to the core documents, I can look and rely upon them all, with the one exception that I've

just now stated in open court. As to the document as to which Executive Privilege is asserted, I've told you how I'll handle that.

As to the other documents, if there are more, um, I take the position -- we haven't discussed it here today, but I take the position that the privileges that I have allowed now to be asserted are asserted with respect to those documents, and I will rule upon them. Rather broadly I have, um, overruled the assertion of the attorney-client privilege. I intend to sort through them, in the deliberative process, post-trial and, um -- it's a benal phrase, "Let the chips fall where they may." If I accept the privilege, I won't rely on it. If I don't, I will. And it should be clear.

Has that answered your question? That is a good question. And that's what I intend to do.

MS. CONLON: Nearly. Nearly. I think I nearly have an understanding.

A concern, your Honor, or a related question, is, um, if we spend time of our remaining time questioning witnesses about the content of certain documents -- and I'll call them the "core documents," forgetting the e-mails, putting aside the e-mails, the "core documents," being the Watson letters and the action memos. If we spend time questioning witnesses on them

and the Court later concludes those materials are under some sort of a privilege and therefore the Court can't rely on them or use them, you can see how it puts us -- all of us, I think, in a difficult position if we've elicited all of this testimony --

THE COURT: We're all in a difficult position.

MS. CONLON: You too, of course. And in particular, because the Court knows I'm quite focused on this time issue, it puts us in the hard position of potentially having used all our time on stuff that I think the Court can't even consider. And so --

THE COURT: No, what I've heard from them, I can consider them. I'm going to consider them, the core documents. I'm going to consider them all. Whatever your cross-examination, I'm going to consider them. With the exception of what attorneys may have advised -- may have advised, but as we've said in open court, those were logical questions which I was asking before I'd even looked at the documents. But I am permitted, they are part of the record on which the Court will make its decision. Part of the record. If I cite them, implicit in that is I've overruled any privilege of any sort.

MS. CONLON: And the Court will likewise consider testimony from witnesses about those documents?

THE COURT: Of course.

MS. CONLON: Okay.

THE COURT: Well I don't understand -- well the Court of Appeals can instruct me as it wishes. I would be -- look, I'd be very surprised. The Court of Appeals, because I've made clear to the government I'm going to -- with one exception, I am going to look at the core documents. If the Court of Appeals were to instruct me otherwise, I would have seriously to -- to strike some or most or, um, but a significant part of the core documents, if I have made such a mistake, I would seriously have to consider recusal. Because if this -- then if this case comes out and plaintiffs lose, the integrity of the Court's factfinding will always be suspect, truly suspect, that if only I had considered those things, you would win.

Contrary-wise, if I were to find these high, significant, the President of the United States, among others, liable for infringing core constitutional rights on such a truncated record, it will always be believed that this Court didn't put it aside, as I've asserted, all the attorney stuff I could put aside. I was asking those questions. And I'm not going to be put in that position. I should recuse and we'll start over in accordance with the, um, decisions of the Court of Appeals, which of course I will follow scrupulously.

So if I've made that mistake, um, I'd seriously considering recusal. But I don't hear anyone saying that. Now maybe I'm mistaken.

MS. CONLON: No, your Honor.

THE COURT: Yes? Mr. Kanellis, before I take the recess.

MR. KANELLIS: Just briefly, your Honor. That instruction we will plan on presenting four witnesses tomorrow, one of them testifying from London.

THE COURT: Oh, he was the one from London. And that's fine, that's worked well.

MR. KANELLIS: Thank you, sir.

THE COURT: All right. 20 minutes, we'll recess. Thank you.

THE CLERK: All rise.

(Recess, 10:25 a.m.)

(Resumed, 10:55 a.m.)

THE COURT: The Court takes this opportunity, on the record, in the presence -- in open court, in the presence of counsel, to accept gratefully the invitation of the Court of Appeals to address the, um, mandamus petition both generally and expressly to address the issue of waiver with respect to that petition.

I'm going to start by, um, making a request to the Court of Appeals. I'm not going to argue in any way the

substance of the petition. That's for the parties. The Court's conduct is all a matter of record. And the transcript governs and is more, um, important than anything I say now. But I'm going to start with the request, simply as a matter of case management, that I would make of the Court of Appeals. And it is this.

I request the Court of Appeals to lift the stay, though I express no opinion on the disposition of the petition for mandamus, and it might well, um -- it's entirely up to the Court of Appeals, it might well make sense to let the petition survive so that it may have the benefit of further proceedings in this court.

But I would ask the Court of Appeals to lift the stay so that the evidentiary portion of this first phase of this jury-waived trial might complete.

We are in the, um, second week of a two-week -- 9-day trial, and once that trial is over, or the evidentiary portion is over, it's appropriate for this Court to sketch what I anticipate will be the necessary further proceedings.

This is a case -- and I know the Court of Appeals appreciates this, but this is a case where intent and motive play a significant role, and once the evidence is fully before the Court, it's the Court's intention to take the matter under advisement. This is not a case

where even as to a portion of the case the Court expects that, because of the evidence, to be in a position to make any ruling from the bench, rather the Court expects to take the case under advisement, seek, um, requested findings and rulings from all parties, carefully review the record, and then issue a full written opinion.

The actual likelihood of that opinion emerging before September is unlikely. So the urgency to fully decide the, um, petition is, um, not grave. Given the fact that what's done is done, the plaintiffs have access to the material which the Court deemed appropriate to subject to cross-examination during the trial, and I adhere to that decision and expect to adhere to it, subject to a proper, um, a claim of privilege during the course of the remaining proceedings. And I'll speak to that in a moment.

And one can anticipate, of course, that as this is only the first phase of this case, if the case were to resolve in favor of the defendant public officials, then of course the plaintiffs would have the right to a plenary appeal. Contrary-wise, if the case were, at least on what I'll call the "liability phase," resolved against one or more, and I treat them separately, of the defendant public officials, um, that would afford an opinion -- that would afford a place for an

interlocutory appeal, should the Court of Appeals wish to evaluate the propriety of that decision while this Court wrestled with the very real problem, even if that's how it were to play out, of redressability, something this Court has not addressed in the -- its hearings thus far. So that's the Court's approach to the management of this case.

Let me then, without arguing the point, um, explain the Court's position with respect to matters to be considered on the petition for mandamus. And I think it's important to understand that the Court, and I believe the parties, place the documents in question, because at bottom, this is an issue over evidentiary rulings mid trial as to certain documents produced.

I separate the documents into three buckets. What I've called the "core documents," these documents are documents that evidence the transmission of materials about certain target subjects, which I've required the plaintiffs to designate, which they are arguing are exemplars of their so-called "ideological deportation policy." The Court of Appeals will understand that the defense asserts there is no such policy and that the proceedings of the government agencies were lawful in every relevant part.

So the core documents are the "ROAs," so-called,

and transmittal letters, um, e-mails commenting thereon, that were transmitted from the Department of Homeland Security to the Department of State, specifically to the Bureau of Consular Affairs, and certain of those, the transmittal letters that so transmitted them, and, um, thereafter the "decision memos," so-called by this Court, that the Director of the Bureau of Consular Affairs transmitted most, but not all, of the packet to the Secretary of State for decision, as required under the law.

The actual interplay is -- and the standard procedure is best illustrated in a chalk that the Court has marked HN, and will attach to the cover letter sent to the Court of Appeals, which, um, so far as this Court can see, accurately describes the standing procedure of both executive departments in handling matters. It of course does not answer the key question which concerns the content of the materials so transmitted. So those core materials are the materials that I understand the petition to center upon, and I'll come back to them.

There are two other packets of materials that I transmitted in bulk to the Court all together, but I've broken them out for this discussion. As to one document, which I'll call Exhibit A, the government has properly, and the Court recognizes the proper --

"proper" in the sense that I recognize that it's been properly asserted and not waived, the government has asserted an Executive Privilege. That's a, in this Court's eyes, a difficult issue and one the Court has not resolved and which the Court understands it is free to resolve as the case goes on. So it's appropriate to indicate to the Court of Appeals what I've told the parties about how it will be resolved.

It seems to this Court that there are three possible resolutions. First, that the Court resolves that the specific document in question is subject to an Executive Privilege. If it is, whenever the Court makes that determination, it physically forthwith will return the document to defense counsel and make a notation on the record.

The second possibility is that, without deciding whether the document is, um, subject to an Executive Privilege, the Court, as it comes to analyze the case -- I've read the document and I largely understand it, um, it makes no difference to the decision and the Court needs not cite it. If that is, um, decided, the Court will immediately return it to the defense counsel and again make a notation on the record.

The third possibility is that the Court, um, rejects, overrules the assertion of an Executive

Privilege and also decides that the document, which the Court has thus far characterized as "peripherally relevant," is in fact relevant to some conclusion the Court determines to make. In that case, if the -- if this present petition were, um, still pending, a dispute over this document might be beholden to that petition. And I've told counsel, if I make that decision, I will stay it for 7 days so that they may take action with respect to that document.

The third packet of documents are documents as to which I have now allowed privileges to be asserted, and they have been, but which will not figure in the, um, oral testimony as no further documents are going to be produced to the plaintiff -- the plaintiffs by the Court, but which all parties agree the Court may look at, determine privileges, as it goes forward, and I shall do so.

Again, if I decide to rely upon and cite a document, implicitly or explicitly, it will be clear that I have overruled the privilege. If I don't cite the document, it, um -- no ruling is necessary and those documents no longer figure in the case.

The written -- were a decision on the petition of mandamus -- for mandamus to await either appeal or allow an interlocutory appeal, again that could all be

reviewed in the ordinary course, and evidentiary error will be reviewed, and of course it is, as to whether it makes a substantial difference in the outcome. And I would have the liberty of, on a full record, to make the findings and rulings that, um, I believe either have or have not been proved by a fair preponderance of the evidence.

So let me conclude simply by focusing on the core documents and reiterate -- which do seem central to the issues raised by the petition for mandamus, and, um, respond directly to the Court's use of the word "waiver," which the invitation expressly sought the Court's further explanation.

The use of the word "waiver," upon reflection, was infelicitous, so, um, it caused no prejudice to anyone, because the Court followed it up with an explanation. Here is the Court's view of what has happened.

The -- during a discussion on the plaintiffs' motion to compel certain documents for, um, which the plaintiffs claim were part of the record of decision of its so-called "ideological deportation policy," the Court declined to, um -- the Court denied the plaintiffs' motion. But did say -- and again the transcript of what I actually said at the time governs, but I'll characterize it, said, "But I would receive

documents as to which the law-enforcement privilege was asserted and I would honor it."

Now again the transcript governs. What happened happened, was that ultimately over 300 documents were submitted to the Court where the defense asserted not only the law-enforcement privilege, but various privileges, and, um, took, with respect to -- when you look at these documents, a very aggressive, um, position. The Court's -- the Court's review of the documents became more, um, thorough as trial approached and as the acting trial became to the front burner and trial commenced, and the Court, as to these core documents, um, came to the conclusion that the law-enforcement privilege was inapplicable and was asserted extraordinarily overbroadly. The Court therefore was in a quandary.

Should, having overruled the -- that privilege, should the documents be disclosed to the defense? And the Court determined, to have the fairest possible trial, that such disclosure was in the interests of justice, and I did disclose it. Disclose them.

Various minor issues with respect to the -- I shouldn't call them "minor," but with respect to those -- to that disclosure have been worked out, I believe, to the satisfaction of the parties. The

documents in their raw form I anticipated and expected redaction of e-mails and telephone numbers. The defense wants more. The, um -- there was indeed one reference to something that, in all fairness, in fact bore on the law-enforcement privilege, despite the Court's ruling. That was corrected by full cooperation between all parties, and the proper redaction made.

I say the use of the word "waiver" was infelicitous because the Court did ask the defense to submit the documents with respect to which it claimed a law-enforcement privilege. The government now says that they were -- they don't say this expressly, but their position is they were snookered, and I got the documents just to disclose them. Well that's not so. I certainly never conceived that anything I said could be thought to estop the Court from making proper rulings with respect to the documents. And again, the transcript will govern. But it's the Court's position that proper rulings have been made.

One last point which, um, I state again simply to be of assistance to the Court of Appeals. Today the parties and the Court have had a very productive discussion, the full transcript is of course available to the Court of Appeals, and I recite only determinations that I believe I am still authorized to

make with respect to these core documents. And I have made the following.

Actually I've made the following with respect to the assertion of the attorney-client privilege. Having reviewed the documents and the arguments, I do rule that the attorney-client privilege has been waived. It simply is inapplicable in a situation where counsel has provided documents to the factfinder, um, on the theory that these documents are relative -- are relevant to the decision, as certainly the core documents are. That constitutes a waiver of the attorney-client privilege, and the Court, less there be any doubt about it, so rules.

In one respect the Court sustains the, um, claim of deliberative process privilege and I have sustained it as to, um, certain provision of legal advice by attorneys in certain e-mails that form a portion of the core documents. Beyond that sustaining, after discussion with counsel, I make no further rulings as to the deliberative process privilege, or any other privilege, as to the core documents. And, um, I won't say it's by agreement, but we've worked out that if permitted to continue the trial, I will make what the Court considers appropriate rulings on a question-by-question basis.

Essentially the issues relate to the Director of the Bureau of Consular Affairs, Mr. Armstrong, whose testimony had just commenced cross-examination when the stay, um, was transmitted, and a Mr. Watson, who wrote, um, the transmittal letters from the Department of Homeland Security to the State Department.

One other thing is significant and I will state it. I understand that whatever ruling the Court makes as to cross-examination in the course of the trial, the Court is empowered, without objection by the government, to review all the records in its possession, make proper privilege rulings, and rely upon those which it rules the privilege or qualified privilege does not apply.

With those explanations, which I truly hope are helpful, the Court will respectfully submit this transcript, just as soon as I get my hands on it, to the Court of Appeals, respectfully and with appreciation for being given the opportunity to comment on these proceedings.

All right. So much for reporting to the Court of Appeals.

Is there anything else we should discuss before tomorrow at 9:00?

MR. ABDO: No, your Honor.

THE COURT: The defense?

MR. KANELLIS: No, your Honor.

THE COURT: Thank you.

All right, 9:00 tomorrow morning. It's good to see you all.

We'll recess.

(Adjourned, 11:20 a.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Monday, July 14, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-14-25
__________________________
RICHARD H. ROMANOW Date

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 1, Page 1 to 82

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Tuesday, July 15, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WILLIAM CROGAN (By Zoom) | | | | |
| By Ms. Safavi (By Zoom) | 5 | | | |
| By Ms. Conlon | | 33 | | |
| PATRICK CUNNINGHAM | | | | |
| By Ms. Santora | 39 | | | |
| By Mr. Tremonte | | 63 | | |

E X H I B I T S

(None marked.)

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT: Good morning. As I've allowed internet access to these proceedings, let me say if you are attending this session of the court via the internet, the rules of court remain in full force and effect, that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these materials.

It is very important that you keep your microphone muted. If you do not, I shall have to cut off your access.

I believe we're ready to go. The first witness is remote. And if the witness is available, let's swear the witness.

(WILLIAM CROGAN, sworn.)

THE CLERK: And can you please state your full name and spell your last name for the record.

THE WITNESS: My name is William Crogan. My last name is spelled C-R-O-G-A-N.

THE COURT: Thank you.

**************

WILLIAM CROGAN

**************

DIRECT EXAMINATION BY MS. SAFAVI: (By Zoom:)

Q. Good afternoon, Mr. Crogan.

(Interruption by Court Reporter.)

THE COURT: Just a moment. The Court Reporter needs you to state your name again. And I'm talking to the attorney, Ms. Safavi.

Would you state your name so the Court Reporter may make a complete record.

MS. SAFAVI: Sure. My name is Nancy Safavi.

THE COURT: And you are an attorney for the government?

MS. SAFAVI: Yes.

THE COURT: And now you may proceed.

MS. SAFAVI: Thank you.

Q. Mr. Crogan, good afternoon. I'd like to ask you some questions about your background and your employment with the U.S. government.

When did you first start working for the government?

A. I began my career with the government in 2004 when I was hired by Homeland Security Investigations.

Q. And why did you decide to enter into a career with the federal government?

A. I wanted to work in public service and work as a

criminal investigator.

Q. And what was your first job with the federal government?

A. As a Special Agent with HSI.

Q. And where were you located?

A. I was assigned to Philadelphia, Pennsylvania.

Q. And what were your day-to-day duties in that position?

A. I worked as a Special Agent and I was assigned to a narcotics investigation group where I investigated narcotics smuggling and other violations related to drug activity.

Q. And how long were you there?

A. I worked in Philadelphia for 12 years where I was also promoted to Supervisory Special Agent where I also investigated financial crimes as well as crimes against children.

Q. Okay. And then what was your next role?

A. I was transferred to headquarters for Homeland Security Investigations in Washington D.C. where I worked in multiple capacities including an Operations Chief for the Northern region of the United States. I worked as a liaison for the U.S. Department of Justice. And I also worked in our International Operations Division.

Q. And, um, how long were you there?
A. I was assigned to Washington D.C headquarters for approximately 4 years.
Q. And then, um, where did you go after that?
A. After my headquarters tour, I was assigned to Homeland Security Investigations in New England where I worked as an Assistant Special Agent in charge, which assigned me responsibility for HSI operations in the states of Vermont, New Hampshire, and Maine.
Q. Okay. And, um, how long were you there?
A. I was assigned in the ASAC role for approximately 5 years.
Q. Okay. And where did you go after that?
A. I recently reported to HSI International Operations and I'm working at the embassy in London in the United Kingdom.
Q. And what is your current title?
A. Attache.
Q. And what are your day-to-day duties as an HSI Attache?
A. I represent HSI's interests, as well as the Department of Homeland Security, here at the embassy with the Department of State, and I work as a liaison with members of the United Kingdom's law-enforcement community.

Q. Okay. So now I'd like to ask you about the training that you've received throughout, um, your service as an agent.

What was the first training that you received when you, um, entered on duty?

A. The first training I received upon duty was attending the Federal Law Enforcement Training Center, where HSI runs its academy, which is approximately 6 months long, and it introduces instruction on constitutional law, criminal justice matters, and instruction on HSI policies and procedures. The goal of the academy is to train future Special Agents to work in the capacity as criminal investigators.

Q. Okay. And after that, um, what other types of training have you received?

A. I've received different types of training throughout my career, and it's maybe prompted by an assignment to a particular investigative group. I've received training in advanced financial crimes and fraud, in asset forfeiture, I've received training in cyber crimes and investigations, as well as national security matters. I've also attended multiple trainings for management and leadership.

Q. So you have been trained in, um, basic law-enforcement techniques and HSI procedures and

protocols?
A. Yes.
Q. And is the training continuous?
A. The training is, um, periodically introduced per policy. So some policies by HSI require maintenance and proficiency on a regular basis to be displayed for the use of firearms. Or there's other regular trainings regarding other policies that occur throughout the career.
Q. So how often would you say that you received training?
A. Regularly.
Q. Okay. And, um, how long were the trainings usually?
A. A training can take many shapes and forms, sometimes it can take place over an hour, and it can be in a classroom environment or online. Or it can take place over a matter of weeks in a more intensive classroom instruction environment as well.
Q. And, um, throughout your 20 years of federal service and receiving, um, these various trainings on, um, protocols and procedures, has anything substantially, um, changed in terms of how to make an arrest?
MS. CONLON: Objection.

THE COURT: No, overruled. We'll let him answer.
A. HSI's practices in terms of affecting arrests have stayed relatively stable throughout my career. The fundamentals of what HSI does to maintain safety and accountability, in my experience, has been very consistent.
Q. Okay. And this would be the case as well as for the past 5 years?
A. Yes.
Q. And what about the past 6 months?
A. Yes.
Q. Okay. So now I'd like to turn to your role at HSI.
Currently as an Attache, um, are you a supervisor?
A. Yes.
Q. So how many individuals do you supervise?
A. I supervise approximately 12 to 14 employees that are based in the UK and, um, other parts of Western Europe.
Q. And when you say "employees," are they all Special Agents?
A. It's a mix of employees. It's mostly Special Agents as well as some locally-employed staff.
Q. Okay. And prior to this when you were an ASAC, did you supervise employees?

A. I did, yes, I supervised approximately 80 employees across the three-state region for which I was responsible for.
Q. Okay. And of those employees, were they all Special Agents?
A. No. The -- similar to by current position, it's a mix of different employees and positions. In the capacity as an ASAC, the majority of the employees were HSI Special Agents, but we also host Task Force Officers, which are police and law-enforcement officers hailing from different police organizations, as well as support staff, which includes Mission Support Specialists, clerical staff, and analysts as well.
Q. So in supervising the Special Agents, both as an ASAC and as an Attache, do all of the Special Agents receive the same training you have on law-enforcement techniques?
A. Yes.
Q. Okay. And you are aware of those, correct?
A. I am.
Q. Okay. And, um, what steps do you take to insure that those protocols and law-enforcement techniques are followed by your Special Agents?
A. It's my responsibility, as a leader and a manager, to review operational planning, to engage in regular

discussions with, um, agents and supervisors under my command as to their activities and what they're planning. So this takes shape in, again, different forms, in regular conversations, but it's also prompted by law enforcement actions that are planned, which require us to, um, make plans, organize, um, manpower to affect operations. So all of these things take place very regularly, almost on a daily basis.

Q. Okay. And in part of those operations you're describing, um, when you were an ASAC and currently as an Attache, um, do any of your Special Agents conduct Title VIII investigations?

A. Yes, as an ASAC, Title VIII investigations were part of our investigative workload.

THE COURT: What's a "Title VIII investigation"?

THE WITNESS: Your Honor, "Title VIII" is a reference, in our vernacular, to the INA. So any, um, either criminal or civil immigration violation.

THE COURT: Thank you.

Q. Okay. And so now I'd like to ask you, um, some specific questions about HSI's policies or protocols for making arrests.

Would you explain, for the Court's benefit, what "operational security" is?

A. Yes, "operational security" can be a broad

concept, but it's essentially the priority to protect the, um, the presence of an operation or an initiative from opponents, or a bad actor. So when HSI talks about "operational security," we talk about discretion, and we talk about, um, keeping or protecting government information. So the presence of an investigation may not be revealed unnecessarily or before the government wants to make an official act. That's what "operational security" means to me.

Q. Okay. And so Agent Crogan, you mentioned a "bad actor." Do -- in terms of operational security, do Special Agents factor into account, um, a subject's history of violence?

A. Yeah, as law-enforcement officers, when we're conducting an investigation, um, many times a, um, person of interest or the subject of an investigation may already have a criminal history that, um, details crimes of violence. We also investigate people that may have never been arrested or convicted of a crime, but are participating in violence. And whether or not the indication comes from a criminal record or comes from an observation or information we received, one of the factors we, um, prioritize and consider is any and all information we have about someone's indicators for violence, about things they do, or things they may have

said, or planned to do. We're very vigilant for that because then that informs how we would handle a potential interaction with said subject.

Q. So in terms of, um, how you would handle a specific subject, are there variations then based on the specific circumstances?

A. There are, there are many variables, and it can be influenced also by environmental factors. If someone were to be placed under arrest or planned to be placed under arrest, the location is also a critical factor. The number of other subjects or people around or maybe aligned with the person is a factor as well. And these are all things we consider. Because, um, it's a priority for myself and other HSI agents to conduct our business in a safe and accountable manner. No one wants to get hurt.

Q. You mentioned conducting an arrest in a safe and accountable manner.

So what would be the circumstances for an agent to use handcuffs during an arrest?

THE COURT: Well wait a minute.

A. These --

THE COURT: Wait a minute. I'm allowing all of this, but it seems somewhat theoretical, now you're asking subjunctive questions, "What would be the

circumstances?" Let's tie it to something, and then I'll allow you to expand it into these areas.

Go ahead.

MS. SAFAVI: Yes, your Honor.

Q. Agent Crogan, you familiar with Mr. Mahdawi?

A. Yes, I am.

Q. Were you -- did you play a role in his arrest?

A. I was present for Mr. Mahdawi's arrest and I was aware of the investigation of him and the planning for his arrest.

Q. In terms of planning for an arrest with Mr. Mahdawi, um, what factors would an agent consider for using handcuffs?

THE COURT: No, I have a problem with "would." What factors did or were considered? And of course I'll let you have that.

MS. SAFAVI: Okay, thank you, your Honor.

THE COURT: In this case. Do you want to ask it? Let's ask it.

In this case what factors were considered, sir, with respect to the use of handcuffs?

THE WITNESS: Yes, your Honor.

A. The factors that contributed to the use of handcuffs were our training and experience as agents, the policy and practice of HSI to restrain individuals

who were being arrested for violations of law, and the transportation, the movement of the subject from one location to another.

When we arrest somebody, we, um, put them under restraints, typically it's a set of handcuffs, and that subject is patted down. We check a subject to make sure they don't have any dangerous items on their person, that they could use to hurt themselves, or the officers, or a member of the public. And it's also our policy, when a subject who is under arrest is transported, they are restrained, during that transportation, to again protect subjects and the officers.

Q. Okay. What factors did you consider in, um -- actually withdrawn.

How many agents, including yourself, were a part of Mr. Mahdawi's arrest?

A. I don't recall the exact number, but I was certainly present. I would say approximately 10 to 15.

Q. Okay. What factors did you consider in determining the number of agents who would be involved in the arrest?

A. The -- the location of the arrest. And again, as I mentioned earlier, the environment that the arrest is anticipated to take place in is a major factor. And the location was a -- a public, um, building and a CIS

office that, um, had a three-sided parking lot, and, um, it required, um, elements of surveillance, so we could observe the exterior of the building as well as an arrest team that would be located inside the building. So these are all factors that contribute to the approximate number of law enforcement officers that would be present for the -- for the operation.

Q. Is that a typical number for an arrest?

A. It's hard to say what's typical for an arrest, but for one subject and a, um, physical location of that type, in my experience that is consistent, um, that number.

Q. What factors, um, were considered, um, in terms of the agents deciding to wear masks during the arrest of Mr. Mahdawi?

A. The use of masks, um, is a decision that's made by the Special Agent or the officer at -- you know at the time of the planning of the arrest. And this is a more common practice, in my experience it's occurred in the past, that it's not necessarily a new thing in my experience. We've traditionally done this for undercover agents who may be acting or are acting in an undercover capacity and we don't want to betray their true employment as law-enforcement officers, but they also have to go out and help out and perform an arrest

and --

THE COURT: Who makes the decision here?

THE WITNESS: The individual employees, your Honor.

THE COURT: And how was that choice conveyed to them?

THE WITNESS: It was articulated to me, your Honor, by the individual employees because of a concern of their faces being put in the public eye and being victims potentially of doxxing or harassment, because these employees --

THE COURT: How many of them expressed that concern?

THE WITNESS: For this operation? I'd say two or three of the agents expressed that concern to me.

THE COURT: And at the time the operation went down, how many were masked?

THE WITNESS: Two were masked, your Honor, and a third agent, I recall, pulled a baseball cap low over his head and put a hood over his head.

THE COURT: Now you talked about the instance of this in the past and you gave, as an example, people you were using undercover.

When before this -- and I don't need specifics, we're focused on this case, but you were the ASAC there

for a while.

When before this, um, were masks used in an arrest? And we're not going into the subjects, I just want to know when was the last time before this?

THE WITNESS: I recall in, um, years past. So within the 5-year time period, your Honor, as working as an ASAC.

THE COURT: Thank you.

THE WITNESS: Yes, sir. I recall an undercover agent who was under my command.

THE COURT: But that's an undercover agent. Other than undercover agents, when before this?

THE WITNESS: I recall other instances in the more recent past where agents are out in the public eye conducting other operations and media was anticipated and they were masked there. These are multiple occasions since I was an ASAC.

THE COURT: All right. And am I correct in assuming that these were Title VIII investigations, Title VIII arrests?

THE WITNESS: Yes, your Honor, some of these were Title VIII, and some of these were also criminal investigations, like narcotics investigations.

THE COURT: And in narcotics investigations, um -- and again I'm not wanting any specifics, but in

narcotics investigations when you, um, mask-up, um, when was that done, um, other than in undercover situations, in the past 5 years, while you were an ASAC here in New England?

THE WITNESS: I only specifically remember the undercovers, your Honor.

THE COURT: Thank you.

All right, go ahead Ms. Safavi.

MS. SAFAVI: Thank you, your Honor.

Q. During the arrest of Mr. Mahdawi, did the Special Agents wear, um, plain clothes?

A. Yes, the Special Agents wore plain clothes, which is a common and frequent practice for an operation where the individual was going to be observed before the arrest was initiated.

We have some operations, um, for the Court I would explain it as a search warrant or arrest warrant execution of a residence with a warrant in hand, and the agents may not be in plain clothes, they may be donning their garments that are labeled with "Police." But very frequently, and in many different forms of investigations, we don't have the luxury of identifying the target or the subject positively right away, and we have to, um, surreptitiously or discreetly observe from a distance or in plain clothes. And --

THE COURT: I think I understand, and forgive me for the interruption, but you used the word "search warrant."

On those occasions where, um, HSI officers, which you supervise, Special Agents, are executing a search warrant, where does the search warrant come from?

THE WITNESS: A court of law, your Honor.

THE COURT: Yes. All right.

Now when you are, um -- well let's come to Mr. Mahdawi's situation.

When Mr. Mahdawi was taken into, um, custody, what was the authority for taking him into custody?

THE WITNESS: Your Honor, the authority was conducted with an I200 arrest form, which is a civil and administrative arrest form, that, um, was produced after a body of facts were reviewed by the ICE, the Office of Principal Legal Advisor, and --

THE COURT: Yeah, actually, thank you, that answer is very helpful to the Court. Let me, um -- really I just want to repeat it to you and see if I understand it, because I have not understood this.

Because this is a civil proceeding -- though obviously you have the right to detain, deprive someone of their liberty, there's a form, and it's an ICE 200 form?

THE WITNESS: Yes, your Honor.

THE COURT: And that form, um, goes to -- it is reviewed, you said, by an ICE legal officer?

THE WITNESS: Yes, your Honor.

THE COURT: Okay. Now, um -- and -- all right, that's helpful.

Go ahead, Ms. Safavi.

MS. SAFAVI: Okay, thank you, your Honor.

Q. In terms of Mr. Mahdawi's arrest, did the agents use a marked vehicle?

A. No, HSI does not typically have or use marked vehicles, and again akin to the same principle of plain-clothes operations, because criminal investigators are not a uniformed police service who respond to or react to calls for service, whereas it's implied that a law-enforcement officer needs to very clearly and overtly label and present as a law-enforcement officer. We are investigators, and by that nature much of what we do starts out in a discreet and again surreptitious manner. So the vehicles are much of the same.

We do, um, equip our vehicles with lights and sirens that comply with local codes of law, and those are used in enforcement situations when we need to, um, basically identify ourselves in the vehicle as law-enforcement officers.

Q. So in terms of when the Special Agents, um, make an arrest, when would they identify themselves as law enforcement?

THE COURT: Well again I'm having trouble, Ms. Safavi, with the "would." We're focusing on Mr. Mahdawi's arrest, properly, and if he knows, I'd like to know when did they?

MS. SAFAVI: Okay, so I'll rephrase.

Q. When did they identify themselves as law enforcement?

A. Immediately. I was present for, um, our encounter with Mr. Mahdawi at the conclusion of his interview with CIS and I identified myself as an HSI Special Agent, I presented, um, my credentials, and I was accompanied by three other Special Agents who presented their credentials, and this occurred in a small office inside of the CIS work space.

THE COURT: When you say you "presented your credentials," can you describe what that means? Is that an identification card? Do you have a badge? Both? Don't let me suggest. You tell me what you meant by that.

THE WITNESS: Yes, your Honor. When I refer to "credentials," I refer to my agency-issued ID card and badge that corresponds to my HSI identification number.

THE COURT: Are you able to tell me whether the other Special Agents present had the same identification that you just described you had, and produced it?

THE WITNESS: Um, I don't recall exactly, your Honor, but what I do recall is that it was clear that the other three agents were with me. And, um, because we were in plain clothes, um, sometimes agents wear belt badges, which is essentially a badge affixed to someone's waist.

THE COURT: And these folks who now, in this small office, how many of them, if any, were masked, and were you masked?

THE WITNESS: No, sir, I was not masked.

THE COURT: How about the agents?

THE WITNESS: I recall that, um, 2 of the 4 of us eventually placed masks on. I don't recall exactly when they donned their masks. But, um, they -- I'd presume they placed them on when they were -- between the time when they left the office and when they were outside in a public area where the HSI transport vehicle was waiting.

MS. CONLON: Objection, move to strike the last portion as speculation.

THE COURT: No, I'm going to let it stand.

And proceed, Ms. Safavi.

MS. SAFAVI: Thank you, your Honor.
Q. Mr. Crogan, um, was there -- I'm sorry, Agent Crogan, were there any, um, other things, um, that you, um, participated in in terms of Mr. Mahdawi's arrest?
THE COURT: I don't understand the question? Well evidently he does.
(Laughter.)
THE COURT: Well if you understand it, sir, go ahead and answer.
THE WITNESS: Yes, your Honor.
A. I understand it to be as my involvement was part of the planning and the supervision of the planning for Mr. Mahdawi's investigation, which came first, um, and eventually the arrest, when that was authorized.
Q. And when did you first learn of Mr. Mahdawi, when did he first come to your attention?
A. Um, approximately mid March of 2025.
Q. And, um, did you receive a communication informing you about this subject?
A. Yes, I did. My supervisor communicated to me that the State Department may be providing a finding against Mr. Mahdawi, and then eventually a finding was transmitted to me via e-mail, where I recall there was an attached document, um, produced by the U.S. Department of State, referencing Mr. Mahdawi.

Q. Was there any other communication involving Mr. Mahdawi that you received?

A. Yes, I also, um, engaged with the HSI New York office, um, on Mr. Mahdawi, and the HSI New York office provided information about Mr. Mahdawi's, um, alleged activities and engagement with, um, police and law enforcement in the past. And, um, yeah, I believe that's, you know, most of what I recall.

Q. And after receiving --

THE COURT: Wait a minute.

And how did the New York office communicate this data to you, sir?

THE WITNESS: The New York office provided information, your Honor, regarding, um, Mr. Mahdawi's interactions with the FBI of being --

THE COURT: My question was not for you to characterize it, but how did you get it? E-mail? Snail mail? Telephone call? That type of thing.

THE WITNESS: Yes, your Honor. I received it principally by e-mail and also phone calls.

THE COURT: Thank you.

Q. And after receiving the communications, what did you do next?

A. I ensured that agents at the HSI Vermont office were proceeding with their investigation and following

up with the information that came from New York.

Q. Was Mr. Mahdawi, um -- was there surveillance operations?

A. There were -- inside of that information package, if you will, there were addresses for Mr. Mahdawi in Vermont. I believe that's why we were contacted, because the government records had addressed this for Mr. Mahdawi in New York and in Vermont. And as a matter of routine investigative procedure, agents checked the addresses in Vermont, um, trying to determine if Mr. Mahdawi was present in the district.

Q. And, um, when did you -- what date did you make the arrest?

A. The arrest of Mr. Mahdawi occurred in mid April of 2025, I believe April 14th.

Q. And where did it occur?

A. It occurred at the CIS office in Colchester, Vermont.

Q. Okay. And, um, in terms of Mr. Mahdawi's arrest, um, as the supervisor, was the arrest consistent with HSI's procedures and policies?

A. Yes, it was.

THE COURT: Did I hear an objection? No. Very well.

Proceed.

MS. SAFAVI: Thank you, your Honor.

THE COURT: Go ahead, Ms. Safavi.

MS. SAFAVI: Thank you, your Honor.

Q. And, um, in your oversight of the arrest, um, was there anything inconsistent, um, that the agents did in terms of arresting Mr. Mahdawi?

A. Um, no, not that I recall.

Q. And, um, were you -- did anyone ever communicate to you or ever suggest that Mr. Mahdawi's arrest was because of his pro-Palestinian views?

MS. CONLON: Objection.

THE COURT: No, overruled.

A. No, I don't recall that either. No.

Q. Did anyone ever tell you or suggest that Mr. Mahdawi's arrest was, um, based on his criticisms of Israel?

A. No.

Q. Did anyone ever communicate to you or suggest that Mr. Mahdawi's arrest is based on his political views?

A. No.

MS. CONLON: Objection, asked and answered.

THE COURT: Overruled, and his answer, "No," may stand.

Q. And, um, in terms of, um, after the -- Mr. Mahdawi was arrested, in your role as, um, ASAC, are you

involved with any of the decisions regarding the detention of Mr. Mahdawi?

A. No, HSI relies on other elements of ICE and Homeland Security to maintain custody or detention of someone who's arrested for a civil immigration violation.

THE COURT: Well let me just follow that up because I'm not clear what you know.

So you make the arrest in the little CIS office there in Colchester, Vermont. You, um -- he's handcuffed. You take him out to a -- to an HSI vehicle. A couple agents put masks on because you go into the public area. And then what happens to your --

THE WITNESS: Yes, your Honor.

THE COURT: Wait a minute.

THE WITNESS: Yes, your Honor.

After Mr. Mahdawi is placed, escorted to a vehicle, the vehicle drives to the HSI office and --

THE COURT: Which is where?

THE WITNESS: Which is in South Burlington, Vermont.

THE COURT: Okay. All right.

THE WITNESS: I --

THE COURT: Do you -- all right, keep going.

THE WITNESS: Yes, your Honor.

Eventually I also travel to the South Burlington office, um, and Mr. Mahdawi is presented paperwork, um, to finish essentially what we term as "processing," his paperwork is processed, and he is then transferred to the custody of Enforcement and Removal Operations, commonly referred to as "ERO."

THE COURT: So as -- as HSI is organized here, um, evidently that -- that ends your part of it, and Enforcement and Removal Operations takes over, is that -- do I have it right?

THE WITNESS: Yes, your Honor.

THE COURT: And where did that -- to your knowledge, this is what you personally know. Where did that take place?

THE WITNESS: I did not, um, directly observe Mr. Mahdawi's transfer, um, from HSI to ERO, but it's my understanding it happened at the HSI office in South Burlington.

THE COURT: All right. So -- and do you know where he went from there?

THE WITNESS: Yes, your Honor.

THE COURT: Where?

THE WITNESS: Mr. Mahdawi, it's my understanding, was transported by ERO, from the South Burlington office, to the airport in Burlington, and they attempted

to fly out of the district.

THE COURT: Why?

THE WITNESS: I don't know. I don't have any involvement with custody location or determination.

THE COURT: I see. All right.

Go ahead, Ms. Safavi. Anything else for this witness?

MS. SAFAVI: Your Honor, at this time the defendants pass the witness.

THE COURT: Well I have a question. I don't know -- I'm going to ask it of the defense team generally.

The written records here, the, um, the ICE 200 form, the State Department authorizations, the e-mails from the New York office, have I got all of those? Can anyone answer that? Including Ms. Safavi.

MR. KANELLIS: Your Honor, I'll do my best.

I'm not sure about the latter, the e-mail from the New York office. I don't recall that information being even -- yeah, I don't recall that that information is --

THE COURT: Well he's so testified, and I heard him testify in the plural. So you're not speaking to that.

But the others?

MR. KANELLIS: I believe those are -- those are in

the administrative record. The bases for -- if you're asking what the bases --

THE COURT: Well the documents to which he referred.

MR. KANELLIS: I believe they are.

THE COURT: Thank you.

Ms. Conlon?

Or excuse me?

MR. TREMONTE: I wish I were as good as Ms. Conlon. This is Michael Tremonte, your Honor, for the plaintiffs.

THE COURT: Thank you, Mr. Tremonte, you did just right. I expected her to be standing there. I still can see that far.

(Laughter.)

THE COURT: Mr. Tremonte.

MR. TREMONTE: Thank you, your Honor.

So at least 2, if not 3 of the 4 depositions, we specifically requested the production of the documents that your Honor is focused on, in addition to other documents that these witnesses have mentioned in connection with their sworn testimony. Some of the -- a very small subset I believe we have, the rest we do not. And if it would help the Court, we would be pleased to prepare a list before the end of the day of the

documents that we have requested but still have not received.

THE COURT: All right.

MR. TREMONTE: And to be clear, we requested them before testimony today and we did not receive them.

THE COURT: Well prepare such a list.

Very well. And it's your witness.

Who's going to -- yes, Ms. Conlon.

MS. CONLON: Yes. And, your Honor, I'll question from here since the witness is --

THE COURT: Of course you may.

MS. CONLON: Okay.

CROSS-EXAMINATION BY MS. CONLON.

Q. Good morning, Mr. Crogan.

A. Good morning.

Q. Okay. So going back for a moment.

You were just asked by the Court about, um, what happened to Mr. Mahdawi after you tendered him to ERO and indicated that he was going to be flown out of the district.

He was going to be flown, so far as you know, to Louisiana, right?

MS. SAFAVI: Objection.

THE COURT: No, overruled.

A. Yes, I recall one of the documents I was shown yesterday, that there was an address in Louisiana on custody-type paperwork for Mr. Mahdawi.

Q. Okay. Now going back to your learning about Mr. Mahdawi.

When you learned of Mr. Mahdawi, you were told to prioritize his investigation, right?

A. Yes, I think that's fair to say.

Q. You were told that by people senior to you in HSI, correct?

A. That was my understanding from my supervisor.

Q. Right, the supervising agent or the Special Agent in charge, is that right, that's who supervised you at the time?

A. Yes.

Q. And you had multiple follow-up conversations about the status of that investigation with your Special Agent in charge, right?

A. Yes.

Q. And it was your understanding that the order to prioritize Mr. Mahdawi came from above the Special Agent in charge, from someone senior to him, correct?

A. That's the impression I was working under, yes.

Q. Okay. Now the decision to arrest Mr. Mahdawi at his citizenship interview was made in coordination with

HSI New York, right?

MS. SAFAVI: Objection.

THE COURT: Overruled.

A. I recall that the HSI New York office made us aware, they shared information about Mr. Mahdawi's appointment they learned from their communications with CIS.

Q. In other words, HSI New York had looked for him, had not found him, and then let you know that he was going to have an interview at a CIS office in Vermont, correct?

MS. SAFAVI: Objection.

THE COURT: Well I do -- that assumes a lot.

Is that what the New York office told you?

THE WITNESS: No, your Honor. Um, what I characterize it as the HSI office in New York, and HSI collectively in the New England area, shared information about Mr. Mahdawi as routine practices, and they made me aware of his possible presence at this appointment in Vermont with CIS. I -- I haven't observed myself, but it's my understanding that, like surveillance and address checks that we performed in the District of Vermont, I also understand it that HSI New York also did address checks for Mr. Mahdawi in their AOR as well.

THE COURT: Thank you.

Go ahead, Ms. Conlon.
Q. So you said you learned about his possible presence at the CIS interview. You say "possible presence" because that was a voluntary decision for Mr. Mahdawi, correct?
A. I don't know what the decision was for Mr. Mahdawi. I don't know what he decided.
Q. It's your understanding that he was invited to attend an interview at the CIS building in Vermont, right, for his citizenship?
A. I know he had an appointment with CIS that had to do with his immigration process.
Q. He wasn't brought there in handcuffs, right?
MS. SAFAVI: Objection.
THE COURT: Well I really don't know where this is going, it's undisputed that he went there for a naturalization interview or as part of the potential naturalization process. Now I guess that I get that from, um, the newspapers, but that's what I understand. And that was the -- so he came there voluntarily. Unless that's disputed, and I don't think anyone does dispute it, I accept it and as a basis for going forward.
MS. CONLON: Okay, then I can move on from that.
Q. Now Mr. Mahdawi entered the CIS building through

the metal detector and security procedures they have in the lobby of that building, right?

A. Yes.

Q. In other words, he was processed like any person would be in that building to make sure that he had no weapons on his person?

A. Yes.

Q. And Mr. Mahdawi was there with his lawyer, right?

A. Yes.

Q. Now after Mr. Mahdawi had gone through security, he and his lawyer were alone in a room with a CIS officer doing the interview, right?

A. Yes.

Q. There were no special security precautions taken about Mr. Mahdawi being alone in this room with the CIS agent, right?

A. No, it's my understanding that it was a routine entry into the states, like you mentioned, anyone else, and he proceeded with his scheduled interviewer meeting.

Q. And in fact you waited to arrest him until he had done his entire interview to become a citizen, right?

A. Yes. We also learned that it was -- he was positively identified by the CIS employee, um, as a matter of the interview. When they proceed with the the interview, the CIS employee checks the identity of the

subject who appears. So we also knew that by waiting.

Q. Now to be clear, this arrest was not a criminal violation arrest, right?

A. No, this arrest was based on the A4(c) citation that came from the Department of State.

Q. And speaking of that determination, in your 20 years of law enforcement, you have never seen a determination under 4(c) of the INA before, isn't that right?

A. Yes, I believe so. Yes.

Q. You have never seen a memo like the one you received about Mr. Mahdawi from the Secretary of State's Office before, have you?

A. No.

Q. You have never seen a removal from the United States based on similar facts to those alleged about Mr. Mahdawi, correct?

A. I -- I don't recall others.

Q. Thank you.

MS. CONLON: Nothing further.

THE COURT: Nothing further, Ms. Safavi?

MS. SAFAVI: Um, no, your Honor.

THE COURT: Very well.

Thank you, Mr. Crogan. And you are excused.

And the government may call its next witness.

Yes?

MS. SANTORA: Your Honor, the defendants call Special Agent Patrick Cunningham.

THE COURT: He may be called.

(Witness takes the stand.)

(PATRICK CUNNINGHAM, sworn.)

THE CLERK: Can you please state your full name and spell your last name.

THE WITNESS: My name is Patrick Cunningham, my last name is C-U-N-N-I-N-G-H-A-M.

THE CLERK: Thank you.

THE COURT: Ms. Santora, you may proceed.

*****************

PATRICK CUNNINGHAM

*****************

DIRECT EXAMINATION BY MS. SANTORA:

Q. Good morning, Special Agent Cunningham. Thank you for being here today.

A. Good morning.

Q. Where do you currently work?

A. I'm currently an Assistant Special Agent in charge with HSI Homeland Security investigations here in Boston.

Q. And how long have you held that role?
A. About one year.
Q. What are your responsibilities?
A. I oversee three investigative groups. Within those groups there's first-line supervisors and then Field Special Agents as well as Intel Analysts and Task Force Officers.
Q. When did you begin working for the United States government?
A. I started as an student intern in 2006 and I became a Special Agent in 2008.
Q. And you were an intern of HSI?
A. Correct. At the time it was "ICE Investigations," but we rebranded to "HSI."
Q. And where was your first job after you were an intern with HSI?
A. I was a Special Agent in our San Diego field office.
Q. What were your responsibilities in that job?
A. Mainly narcotics investigations.
Q. Did you receive training before entering into that job?
A. I did.
Q. And where did you receive that training?
A. At the Federal Law Enforcement Training Center in

Brunswick, Georgia.
Q. And what type of training did you receive there?
A. All types of training pertinent to the job. Everything from basic investigative techniques to, um, entry tactics, arrest tactics, handcuffing, um, driving, Things of that nature. Firearms.
Q. You testified that after that training you worked as a Special Agent in San Diego. How long did you work there?
A. I was there from December of 2008 until February of 2018.
Q. And in 2018, what was your next job?
A. I transferred here to Boston.
Q. And what was your role there?
A. Um, first, it was a Special Agent.
Q. And following your role as a Special Agent in Boston?
A. So I was a Special Agent in our drug smuggling group, or strike force, and about 6 months later I became the acting group supervisor of that group.
Q. And following that, what was your next role at HSI?
A. I became the full-time group supervisor of that group, um, and then I spent some time as a, um, acting Assistant Special Agent in charge.

Q. And you were acting in a supervisory capacity in that role?
A. I was.
Q. What did you do after acting as an ASAC?
A. I became the group supervisor of our Cyber Crimes Group here in Boston.
Q. And following that?
A. Following that, in November of '22, I took a headquarters assignment in Sterling, Virginia.
Q. And what was that assignment?
THE COURT: A headquarters assignment in?
THE WITNESS: Sterling, Virginia.
THE COURT: Thank you.
A. That assignment I was assigned to the National Targeting Center Investigations, um, working mainly as a liaison to Customs and Borders Protection, as well as providing assistance to HSI agents in the field.
Q. And following your role in Sterling, Virginia, what did you do after that?
A. I came back here as an Assistant Special Agent in Charge.
Q. And that's your current role?
A. Correct.
Q. All right. Does your office do work involved in enforcing criminal laws?

A. Yes.
Q. Does HSI's work also involve enforcing Title VIII?
A. Yes.
Q. What is Title VIII?
A. Title VIII is immigration law.
Q. In the time that you have worked for HSI, has HSI always had the authority to enforce Title VIII?
A. Yes.
Q. In you time working at HSI, have you made arrests?
A. Yes.
Q. Have you supervised people who have made arrests?
A. Yes.
Q. And do the agencies supervised to make arrests receive the same training that you describe receiving at --
A. Yes.
Q. Are you familiar with HSI arrests, protocols, and procedures?
A. I am.
Q. Where are those found?
A. Um, they're in the Special Agent manual. There's also a manual, "Specifics for Arrests, Calls, and Procedures."
Q. Are you agents that you supervise familiar with HSI arrest protocols and procedures?

A. They would be trained on those, yes.
Q. Have arrests -- HSI's arrests, protocols, and procedures, changed since you received, um, the training that you described receiving on arrests when you first started as an agent?
A. Protocols and procedures not so much. Maybe techniques have changed in the ways that, you know, people are, you know, reapplying handcuffs, or things of that nature, there's been ways that's evolved. But in terms of procedures and stuff like that, they're, um, mostly the same.
THE COURT: How has applying handcuffs evolved?
THE WITNESS: So basically the way that we would be instructed to put a -- a target in a position of disadvantage has changed. So when I came on the job, we learned to like have their hands out like an airplane and apply a cuff and then bring the cuff to the lower back. But now we're trained to put the hands behind the head in some cases or -- and sometimes in the field it comes down to just the most effective way to apply the handcuffs. But the way that, you know, it's trained in training that we're drilled on --
THE COURT: You're just pointing out that that's --
THE WITNESS: -- a technique that --

THE COURT: You're answering as to -- and the idea is to protect the safety of the officers and effectuate the restraint?

THE WITNESS: Correct. Correct.

THE COURT: Go ahead, Ms. Santora.

Q. All right. I'd like to talk to you about a particular arrest.

Were you involved in the arrest of Rumeysa Ozturk?

A. I was involved and aware of it, yes.

Q. What was your role in that arrest?

A. So I received the information from headquarters, um, passed down to the chain of command, um, that Ms. Ozturk had had her Visa revoked by the State Department. And from there my role is mainly to apply resources and, you know, delegate agents on the street and -- and help to delegate agents on the street to locate Ms. Ozturk and effectuate her arrest.

Q. Um --

THE COURT: Well let me pause there.

Everyone who has a Visa revoked is not taken into custody, are they?

THE WITNESS: Everyone? I'm not sure.

THE COURT: All right, that's your answer.

But that was the cause that you had been given to take her into physical custody, because she had lost her

Visa?

THE WITNESS: Correct. Right, we received information that her Visa had been revoked by the State Department and that was the cause that we went with to take her into custody.

THE COURT: I understand.

Q. Generally speaking, when HSI is informed -- well withdrawn.

You said his HSI enforces Title VIII, correct?

A. Correct.

Q. And if someone's Visa has been revoked, are they in violation of Title VIII?

A. Yes.

Q. So if you are informed that a Visa has been revoked, would HSI have the authority to arrest that person?

A. If it meets the legal --

MR. TREMONTE: Objection.

THE COURT: Well, that's the problem, if it meets the legal standards. Here's what I understand. If he's got to the knowledge to correct anything, let me know.

My understanding is that not everyone who has their Visa revoked is arrested. Now if they don't leave or if there are other reasons, it appears they are subject to arrest and detention and removal. That's

where I'm starting from, but I have to reflect on that.

Go from there, Ms. Santora.

(Silence.)

THE COURT: And to come to this case, um, I don't think it's an issue whether the -- there was legal authority to take Ms. Ozturk into custody. The question is a broader question as to the reasons for all that.

But you go ahead.

Q. I want to ask you some specifics about Ms. Ozturk's arrest.

First of all, did you act as the supervisor for her arrest?

A. So, as I mentioned last week, there are -- there were a lot of hands in the fish bowl. I was a supervisor. And so, um, at the time, you know, we received the information, I was in a position to delegate that information down to the field, um, and also to, um, socialize what information we knew to be able to effectively put agents on the street and try and locate her.

Q. Okay. Stepping back for a second.

So does HSI -- does HSI receive information, um, that Visas have been revoked, generally speaking?

MR. TREMONTE: Objection.

THE COURT: No, if he knows.

A. Generally speaking? I know we received the information in this case. Generally speaking, I can't answer that.

Q. Does HSI receive information that people are out of immigration status?

MR. TREMONTE: The same objection.

THE COURT: Well we'll see what he knows.

Are you able to answer that?

THE WITNESS: Well what we'll do is we conduct investigations, HSI's an investigative agency. So if during the course of that investigation you might learn that someone is out of status as far as immigration goes, that might be something that we would look into further -- into potentially enforcing those violations.

MR. TREMONTE: Objection. And I'm going to move to strike. He's speculating.

THE COURT: No, we'll let that stand.

Q. Going back to Ms. Ozturk's arrest.

Were you physically present at the arrest?

A. No.

Q. Um, when was she -- do you know when she was arrested?

A. She was arrested on, I believe, um, it was March 25th, 2025.

Q. And do you know if agents handcuffed her when she

was arrested?

A. I believe that they did.

Q. Do you know why?

A. Um, per our policy, you know, anyone -- per HIS's policy, anyone that is going to be arrested, whether it be a criminal violation or an administrative violation, would be restrained in handcuffs.

Q. So everyone that HSI arrests is handcuffed?

MR. TREMONTE: Objection. Mischaracterizes it.

THE COURT: No, it may stand.

A. It's HSI's policy to handcuff those that we arrest, yes.

Q. And why is that HSI's policy?

A. Um, officer safety is the main concern really. As I alluded to earlier, in training we're taught that an individual's hands are dangerous. Basically it's just to ensure the safety of those involved.

Q. Were agents present at Ms. Ozturk's arrest wearing masks?

A. As far as I know, yes.

Q. Does your office have a policy on agents masking?

A. There's no policy I'm aware of.

Q. Are agents allowed to wear masks?

A. Yes.

Q. Why are they allowed to do that?

A. Various reasons. Um, it's up to the personal, you know, um, choice of the agent really. But, um, they might wear them because they want to protect their identity. You know HSI's in a position now where we're on the street quite often working not just Title VIII cases, but, um, really any case. In the age of camera phones and the ability of people to identify, you know, those agents, that people would want to protect themselves if they're members of this community, or they live here, have families here, that sort of thing.

Another reason might be, um, if agents are working undercover -- in an undercover capacity in another case, they might want to protect their identify for that reason. Or if simply they're working that area and they want to, you know, not have their identity revealed to the general public to know that they were in this area and are working as an HSI agent.

Q. Do you know how many HSI agents participated in Ms. Ozturk's arrest?

A. The exact number? I don't know.

Q. Was there more than one?

A. I believe -- I know of at least two or three people that were out there, yes.

Q. Does HSI have a policy on the number of agents that should conduct an arrest?

A. So a minimum number of agents to conduct an arrest, per policy, is 2. However, that will fluctuate on a case-by-case basis.
Q. Are there commonly more than two agents to make an arrest?
A. Yes.
Q. Why is that?
A. It all goes back to officer safety.
Q. If HSI is arresting someone with a criminal history, does that factor into how the arrest is done?
A. That's one of the factors.
Q. Even if HSI is arresting someone who does not have a criminal history, is it necessary to take any precautions with respect to an arrest?
A. Yes, I mean you always take precautions with respect to an arrest.
Q. Why is that?
A. You just don't know what type of situation you're going to encounter, you don't know who might be in the area, you don't know who else might be involved. It's just really to make sure -- to ensure the safety of everyone, including the general public, including the people we're arresting.
Q. Did the agents who arrested Ms. Ozturk wear uniforms?

A. I don't believe. No.
Q. Why not?
A. We don't have a uniform with HSI.
Q. So were they wearing plain clothes?
A. Yes.
Q. And do you know if the agents identified themselves as agents when they made Ms. Ozturk's arrest?
A. I mean again I was not there. I -- I have seen video of Ms. Ozturk's arrest, but I don't know what was said to her, I don't know -- I mean it would be common practice for agents to identify themselves.
Q. So it's the common practice of your office to identify -- for agents to identify themselves before making an arrest?
A. Yes.
Q. And, um, do you have any information that that did not happen to Ms. Ozturk's arrest?
A. I do not.
Q. Did HSI transport Ms. Ozturk following her arrest?
A. Yes.
Q. And in what vehicle did they transport her?
A. It would have been a government vehicle. I'm not sure which.
Q. Would it have been a marked vehicle?
A. No.

Q. Does HSI have marked vehicles?
A. We have a marked Special Response Team vehicle, it's a large, um, armored vehicle. That's the only one that I know of that's marked. Otherwise agents are assigned vehicles that do not have markings.
Q. Why do the HSI vehicles not have markings?
A. Um, we're investigators, so I mean over the course of an investigation you're not trying to give up your, um, you know your cause or your reason for being out on the street, you don't want to necessarily identify yourself as police until it's time. And, um, those are the reasons why we wouldn't have police markings.
Q. Does that relate to officer safety?
A. It relates to officer safety, it also relates to protecting the integrity of investigations.
Q. Where did HSI transport Ms. Ozturk?
A. She was transported to Vermont.
Q. And what happened when she got to Vermont?
A. My understanding, um, was that after she was in Vermont -- the transport was out of my purview, but she was processed and detained in Vermont.
THE COURT: Why was she transported from Somerville to Vermont?
THE WITNESS: So the way it was explained to us -- and this is from ICE Enforcement and Removal Operations,

they determine, um, where, um, detainees are housed, my understanding at the time was that there was no bed space for her in Massachusetts.

THE COURT: When did you get that understanding?

THE WITNESS: Um, the night -- the -- I'm trying to remember exactly. I believe it was the night that she was taken into custody. It might have been before, when we knew that -- well when the plane was in place to arrest her and we were making a plan to arrest her, I think it was socialized that we were going to take her to Vermont.

THE COURT: When you say it was "socialized," you mean it was discussed with the appropriate authority?

THE WITNESS: Correct.

THE COURT: That's fine to use the word, I just want to be clear what you mean.

So as part of those discussions, so she's arrested, um, you understood they don't have a bed for her here in Massachusetts, so they drive her up to Vermont?

THE WITNESS: Correct.

Q. And you said that was a determination of Enforcement and Removal Operations, that they did not have a bed for Ms. Ozturk?

A. Yes.

MR. TREMONTE: Objection, hearsay.

THE COURT: Well I'm not going to admit it for the truth, but the facts of what was being discussed, I think are relevant and I'm allowing it, as limited.

A. Can you repeat the question, please?

Q. Yes. The determination that there was no bed space for Ms. Ozturk in Massachusetts was made by ICE Enforcement and Removal Operations?

A. Correct, they explained to me the day after -- the morning after actually, the specific reasons why. But, um, the decision was impressed upon us by them to transport her to Vermont.

Q. And at what point was HSI no longer in custody of Ms. Ozturk?

A. It would have been after she was processed in the Vermont AOI, I don't know exactly at what point.

Q. Okay. Were you ever told that Ms. Ozturk was being arrested because of her support of Palestine?

A. I was always -- I was understanding that the cause for her arrest was the revocation of her Visa, that she no longer had status.

Q. Were you ever told that Ms. Ozturk was being arrested because of her criticism of Israel?

A. Again the basis of her arrest was the revocation of her Visa by the State Department. The reason for the

revocation, um, that's the State Department. I mean we were given, you know, the kind of the causes behind that, and I don't know if I had all of them, but I understood, you know, she was arrested -- in what our plan in place was, from my level, was that the legal ground we had to stand on was that, um, she had her Visa revoked.

Q. Thank you.

MS. SANTORA: No further questions.

THE COURT: Now before we go any further, um, I have the, um, the Form 200 with respect to her, and I have various documents with respect to her arrest, some of which, um, the attorney-client privilege is asserted, and which include attorney comments and advice, and I have a couple of documents that share information among the, um, parties.

But other than the, um, Form 200, which appears to bear, in its completed form, his, um, name as the, um, authorized immigration officer, none of them appear to involve him. So, um, does the -- having overruled the attorney-client privilege, it would seem to me that I should show them to the plaintiffs.

What does the defense say, Ms. Santora, or whoever?

MS. SANTORA: Your Honor, to be clear, these

documents are an arrest warrant. Can you repeat what the other documents are?

THE COURT: (Laughs.) These are the documents you gave me.

MS. SANTORA: I'm sorry. We've given you a lot of documents.

THE COURT: Yes, you have, all in undifferentiated form, and I have criticized you. Now I have this extensive privilege log in a font too hard to read.

But other than that, these are documents that pertain to her arrest. Some of them, um, if this were pretrial and it had been timely asserted, um, they have attorney comments, they have the name of someone called a "deportation officer, Fugitive Operations." The documents discuss the basis for her arrest. But only, um -- there's a gentleman, "Assistant Chief Counsel, Office of the Principal Legal Advisor, Boston." But only the Form 200 has Mr. Cunningham's name on it, as best I can, um, ascertain.

MR. KANTER: Your Honor?

THE COURT: Yes?

MR. KANTER: I think we are -- we are all, um, searching our recollection as to comparing what you are describing against the --

These documents were submitted in-camera to your

Honor, correct?

THE COURT: That's correct.

MR. KANTER: Okay.

THE COURT: That's how they came into my hands.

MR. KANTER: The arrest warrants for each of the five noncitizens, um, are in the certified administrative record. What your Honor is describing as e-mails and communications --

THE COURT: In other words, that's this Form 200, it's --

MR. KANTER: Yes.

THE COURT: -- its title is "Warrant for Arrest of Aliens"?

MR. KANTER: Yes.

THE COURT: And they have those, the plaintiffs?

MR. KANTER: Yes, they are in the certified administrative record.

I recall that we filed part of the record under seal. Whether there's a portion of those arrest warrants that was the subject of sealing, I don't recall.

THE COURT: Okay, Ms. Conlon can answer.

Do you have these or not?

MS. CONLON: My understanding is that we have the I200s with redactions. I suspect what the Court has is

unredacted. And that may be the reason for the difference, why you received them in-camera.

THE COURT: Yeah, thank you.

MR. KANTER: And I will inquire on the reason -- the particular reason for the redaction.

THE COURT: That's actually helpful, because I -- I propose the following.

Because -- again I'm in the middle here, since these documents have all been dumped on me. I did take the precaution of reordering them, so I have a little file on things that I think pertain to Ms. Ozturk.

Now I see what witness is called. I don't see what he can add. Counsel might think there's something to be added, but I don't see what he can add to these documents. But whether you get to see them before closing argument or not, that is an issue.

And also the stay is still in effect, I granted that that seemed to apply to Mr. Watson and to Mr. Armstrong, but among the report that I made with the Court of Appeals, again because we're doing things in the middle here, I said, because I believed, that no further production was contemplated. Well now I'm contemplating one.

I've overruled the attorney-client privilege. I just don't see what additional cross-examination can be

garnered if I do the documents now. But of course I'm not -- I'm no longer an advocate.

Mr. Tremonte?

MR. TREMONTE: Your Honor, I of course don't know what your Honor has --

THE COURT: It always makes it sound like a smoking gun, since I'm sitting here with a file folder.

MR. TREMONTE: But as to the question, your Honor, of whether or not this witness can add to the Court's understanding of relevant documents, may I conduct the briefest of voir dires to figure out whether or not no such document is in their possession.

THE COURT: They were done. They were done and I am going to give you cross-examination, that's in essence why I spoke now, I invite you to do so. It's within, I think, appropriate examination, cross-examination of this witness. But I'm not passing the documents out --

MR. TREMONTE: Understood.

THE COURT: -- in part because I want to scrupulously honor the stay and, um, Mr. Kanter is reflecting, and appropriately so, because we may reach some sort of agreement.

MR. TREMONTE: May I just ask a handful of questions, then I think my purpose will become clear.

THE COURT: You go ahead with your questions, we'll see if they do.

MR. TREMONTE: Thank you.

Mr. Cunningham, we met at your deposition, correct?

THE WITNESS: We did.

MR. TREMONTE: Okay. And at your deposition -- strike that.

In advance of the arrest of Ms. Ozturk, you received an e-mail communication from somebody named Eulia Garolini, correct?

THE WITNESS: Correct, she was involved in the e-mail traffic. I can't recall -- I know I said it was from her. Her name stands out to me, because I've known her for over a decade. But I can't recall if it was directly from her to me or if it was through my chain of command.

MR. TREMONTE: But you do remember receiving the e-mail?

THE WITNESS: Yes.

MR. TREMONTE: And Mr. Garolini, at the time, was the Desk Officer for Domestic Operations at HSI headquarters?

THE WITNESS: So to clarify that, she oversaw the Desk Officer. The Desk Officer is someone that we, um,

that works at a headquarters' capacity, that represents our office at headquarters. There's an Op-Chief that supervises them. My understanding is that was her position.

MR. TREMONTE: Okay. And the e-mail that you received from Ms. Garolini included attachments, correct?

THE WITNESS: Correct.

MR. TREMONTE: And those attachments, um, were first a memo from someone at the State Department, correct?

THE WITNESS: One of the attachments was a memo from the State Department.

MR. TREMONTE: And second was the Op-Ed that Ms. -- was an Op-Ed that Ms. Ozturk had authored?

THE WITNESS: The Op-Ed was included in the attachments.

MR. TREMONTE: Thank you.

Your Honor, I ask those questions because I think it may assist the Court in determining whether or not it has documents in its file folder that this witness may be in a position to shed light on.

THE COURT: I fully understand that and it doesn't look like these documents are those.

Any other questions for this witness?

MR. TREMONTE: I do, your Honor.
THE COURT: And of course you may proceed.
MR. TREMONTE: Thank you.

CROSS-EXAMINATION BY MR. TREMONTE:
Q. So you were asked on direct examination, um, whether or not HSI has always had the authority to enforce Title VIII violations, correct?
A. I was asked that question.
Q. Okay. I'd like to get some precision on the particulars of your expertise and responsibilities, because HSI is a very broad term in that question, you would agree?
A. I would agree with that.
Q. Okay. In fact, it is generally the remit of ERO to effectuate arrests for Title VIII violations, correct?
A. So ERO, that's their primary responsibility, yes. HSI has those authorities.
Q. Okay. And you are not now and have not been a member of ERO, correct?
A. I am not now and have never been a member of ERO.
Q. Okay. And at the time of Ms. Ozturk's arrest, you were not a member of ERO?
A. I was not a member of ERO at the time of

Ms. Ozturk's arrest.
Q. You were involved with HSI, correct?
A. That's correct.
Q. And HSI's scope of responsibility has to do with criminal investigations, right?
A. Correct, however, you know, we do enforce Title VIII violations as well.
Q. I understand that you're eager to correct me that there is some role for Title VIII enforcement, but that is really a very limited component of what HSI does, correct?
A. Well, um, prior to this administration I would say it was a -- it was a component that, you know, was part of our portfolio. But I'd say in the last 6 or 7 months we've been prioritizing Title VIII more than we had since I can remember in my 17 years on the job.
Q. Right, and when you say "we," you specifically mean HSI, correct?
A. I mean HSI, yes.
Q. You are an ASAC in HSI, right?
A. I am an ASAC with HSI.
Q. Okay. And what was unusual about the new focus since the inauguration is that HSI has so much work relating to Title VIII, correct?
MS. SANTORA: Objection.

THE COURT: Overruled.
A. So the -- let me understand your question. Can you please ask it one more time? I'm sorry.
THE COURT: Here's what he's getting at.
He's saying now, in the last 6 months, HSI has a lot more work as to Title VIII in addition to the work it's always done?
A. Correct, yeah, I mean we've always had the authority, um, but the prioritization of that work has certainly increased.
Q. And you were asked questions about how HSI generally plans for arrests, correct?
A. In general?
Q. Yeah, you were asked questions about that on direct, right?
A. I was.
Q. And you gave answers at a general level, correct?
A. (Silence.)
Q. But isn't it -- strike that.
Isn't it true that until very recently you had no familiarity with how ERO plans for and conducts administrative Title VIII arrests because you'd never done one, correct?
MS. SANTORA: Objection.
THE COURT: Overruled.

A. I've -- I've -- um, I've been wracking my brain over the years about the Title VIII enforcement that I --

Q. And you have to really wrack your brain because you really haven't done any, correct?

MS. SANTORA: Objection.

THE COURT: No, no, he may inquire and he may do it in that form.

Is that why you have to wrack your brain?

A. Yeah, I mean most of my career as an agent, as a supervisor, has been in the enforcement of drug laws, drug smuggling, money laundering, that sort of thing.

Q. Right, drugs and financial crimes, right?

A. Well, yeah. Partially, yes.

Q. And crimes, as opposed to civil violations with the immigration laws, correct?

A. Correct. But that's changed recently. But, yes.

Q. Okay. And with the shift that resulted after the inauguration, meant that your group at HSI has been prioritizing immigration-related cases and arrests, right?

A. Immigration enforcement, yes.

Q. Okay. And that wasn't your idea, correct?

A. No, it was not.

MS. SANTORA: Objection.

THE COURT: Overruled. I understand the question was those were instructions, is that correct?

THE WITNESS: That's correct.

Q. Right, the new focus on immigration cases came from above your level in the chain of command, right?

A. That's correct.

Q. In fact it was the Special Agent in charge of HSI who told you about this new focus, right?

A. Yes, the information usually comes from his level and is delegated down.

Q. And when you say "his," you mean specifically Mike Krol, he's the one, your SAC, who told you you were going to prioritize Title VIII immigrations enforcement?

A. Yes, we had a meeting shortly after the inauguration, um, maybe several meetings actually, that impressed upon us that Title VIII enforcement was going to be prioritized.

Q. Okay. And, um, you characterized that work, since the inauguration, this new focus, as a "surge" of effort directed on immigration cases, right?

A. Well I think the "surge" is specific to, um, an enforcement action that we were doing in the midst of receiving the information from Ms. Ozturk. What I would describe as the time prior to that surge operation would be just the reprioritization to Title VIII enforcement.

Q. You said at the time of the arrest of Ms. Ozturk, correct?
A. At the time I received the information regarding Ms. Ozturk.
Q. Okay. But the arrest of Ms. Ozturk on March 25th, 2025, the instructions with respect to Ms. Ozturk came from headquarters, right?
A. That's correct.
Q. And that was separate from the surge operation, correct?
A. That's correct.
Q. Okay. So I just want to be crystal clear about that.
THE COURT: I'm sure he does.
But how is headquarters different than Mr. Krol, um, your SAC?
THE WITNESS: So headquarters oversees all federal domestic field offices. Our Special Agent in Charge would have a first-line supervisor who sits at HSI headquarters.
THE COURT: And headquarters is in Washington or Sterling, Virginia?
THE WITNESS: Washington D.C. My job at headquarters was at Sterling, but, um --
THE COURT: So headquarters is Washington?

THE WITNESS: Yes, correct.

THE COURT: So is ours.

All right.

Q. And so the instructions with respect to Ms. Ozturk, which were separate and apart from anything else, as we discussed, you learned about initially in this e-mail from Ms. Garolini, correct?

A. That's correct.

Q. Okay. And as you testified earlier, that e-mail included a communication from the State Department, right?

A. That's correct.

Q. Okay. And it included the Op-Ed or an Op-Ed that Ms. Ozturk had written, correct?

A. It included the Op-Ed.

Q. And you read those attachments, right?

A. I read, um -- I opened the attachments. I read through them. I didn't study them. But I did read through them.

Q. You familiarized yourself with them?

A. I sure did.

Q. Okay. Because obviously it was part of your responsibility as a supervising agent to understand the communication to you on this matter of importance to headquarters, right?

A. Correct. And you also want to ensure that, you know, if I'm the one that's pushing the information out to the field, that, um, they have the information that's relevant to what they need to know.
Q. And this matter had special sensitivity, didn't it, because you've never received a communication like this before?
MS. SANTORA: Objection.
THE COURT: Overruled.
A. Um, I can't recall receiving a communication like this.
Q. (Pause.) And the instruction that you gave, in response to this unique directive, was to find a good address for Ms. Ozturk, correct?
A. Well that was part of the -- that was part of what we needed to do. If we were going to prioritize the arrest, we would first need to locate where she was.
Q. Okay, well since I haven't seen the e-mail communication from Ms. Garolini yet, um, was the instruction to find an address for and arrest Ms. Ozturk contained in that communication?
A. I don't believe that it was, I believe that would have been an intelligence workup. That at the time last week when we first discussed it, I didn't recall actually all the information detailed within those

attachments. I did see, um, a document yesterday, when I was preparing for trial, that refreshed my memory on that information.

Q. Okay, what was that document?

A. That was an analysis report that included -- it also included the Op-Ed, and it included, um, certain information like most recent known addresses, um, her criminal history, or lack thereof, I should say, and, um, additional information that may help locate Ms. Ozturk.

Q. Okay.

MR. TREMONTE: As I don't have the deposition, I'm going to make a request of the defense that we receive a copy of that document, um, before this examination is done.

MS. SANTORA: Your Honor, we believe that plaintiffs have that document.

THE COURT: I assume -- I assume that that is in the materials that the Court ordered disclosed as the ROA.

Can you confirm that?

MS. SANTORA: Yes, we can confirm that that is the document.

THE COURT: All right. Thank you.

Q. Some of the communications that you -- so the

e-mail from Ms. Garolini, just referring back to that.
Some of the communications you received at that time about Ms. Ozturk were e-mail-forwards, correct?
A. I believe so.
Q. Okay. All right. And, um, after you received this, um, set of instructions and these materials, um, a decision was made to effectuate an arrest of Ms. Ozturk, is that right?
A. A decision was made to try and locate her, and, you know, we were then, um --
Q. Whose decision was that?
A. So as I mentioned that surge operation, we were -- it was a pure coincidence that Ms. Ozturk's information came in at that same time we were doing that. I was in a room with my Special Agent in Charge and other senior officials from other agencies. So we were all talking. And it was like, "Okay, go" --
Q. So you just happened to be with all these other officials at the time when the direction from headquarters came in?
A. That's correct.
Q. Okay. And was it a group decision to effectuate the arrest?
A. I mean the decision ultimately lies with the Special Agent in Charge to impress upon us to go out and

effectuate the arrest.
Q. So we have clarity, was it the Special Agent in Charge who directed you to arrange for the surveillance and arrest of Ms. Ozturk?
A. It was his direction to prioritize it and, yes, to, you know, put resources towards Ms. Ozturk.
Q. Okay. And at some point after that instruction was given to you, you separately consulted with one of HSI's lawyers in your office, didn't you?
A. I did.
Q. And you did that to make sure that the arrests that you have been instructed to make was legally appropriate, correct?
A. As I mentioned last week --
MS. SANTORA: Objection, this is attorney-client privileged, your Honor.
THE COURT: It is. I sustain it.
MR. TREMONTE: I'm not asking for the contents of the communication, your Honor.
THE COURT: Well, you're asking as to why.
MR. TREMONTE: Yes.
THE COURT: Of course. So the privilege covers both the request for legal advice and the legal advice that is, um, given. And it's -- I sustain the privilege.

Of course there may be a cost for that, but that can be briefed, in the sense of an adverse inference. I don't say I'm drawing one, and that's only the Commonwealth of Massachusetts, but I do mention it.

Go ahead.

Q. Mr. Cunningham, at your deposition you testified that the reason why you consulted with a lawyer was to ensure that the arrest that you'd been instructed to make was legal and appropriate, didn't you?

A. I testified to that. I did also testify to the fact that, you know, when you receive information from headquarters, at this level, top down, um, it -- you make the assumption that it's legally sufficient. But I did contact our legal counsel to ensure that we were on solid legal ground.

Q. Right, because for whatever reason, under these unique circumstances with which you had no prior experience, you thought it was important --

MS. SANTORA: Objection.

Q. -- to have a lawyer weigh in, even though you'd been given a direct demand by your headquarters?

MS. SANTORA: Objection, mischaracterizes --

THE COURT: Sustained, but not on that ground. Sustained, because it goes beyond what he testified as to the reasons for consulting the lawyer.

Who's the lawyer here?

THE WITNESS: It was a lawyer from the Office of the Principal Legal Advisor.

THE COURT: And what's his or her name?

THE WITNESS: His name is Lincoln Jalalian.

THE COURT: Thank you.

Q. And absent consulting with a lawyer, you were not in a position to make an independent judgment about the lawfulness of the arrest, correct?

A. No, with my basis of knowledge in, you know, immigration law, I would defer to legal counsel before taking any action. And the same thing with criminal law.

Q. And again, an administrative civil arrest based on a Visa revocation was not within the heartland of your experience as an agent, correct?

A. It was not something that I had, um, much experience with, no, if any.

Q. Right. And all you knew was that Ms. Ozturk's Visa had been revoked, correct?

A. I knew that her Visa had been revoked, um, and also the contents of the e-mail, the additional information. But the most important portion of it was that her Visa was revoked and that was the grounds for, you know, the apprehension.

Q. Okay, you knew her Visa had been revoked, you knew that she authored this Op-Ed, correct?
A. I did.
Q. And you knew that in the State Department memo there was a reference to "Ongoing ICE operation security, as a result of which the revocation would be silent," correct?
A. That's what the memo states. I don't have the memo in front of me, but I remember reading that.
Q. And you understand that as a consequence of that information, you could not reveal to Ms. Ozturk in advance that her Visa had been revoked, correct?
A. I don't know that I can say it could not be, um, I never -- I don't recall receiving instructions saying she could not be, but it was a determination made that she would not be.
Q. Your determination?
A. I mean that was also -- again we were in a room with a Special Agent in Charge. The operation kind of developed pretty quickly where it was just, "Okay, what's the" -- "pull resources to find her." I don't remember having a discussion like that to talk about notifying her or anything like that.
Q. Okay, there was a decision made to keep that information secret from Ms. Ozturk, that her Visa had

been revoked, correct?
A. We did not plan on alerting her to the fact that her Visa had been revoked.
Q. So I take that as a "Yes"?
A. Yes.
Q. Okay. To your understanding the State Department memo did not establish that Ms. Ozturk had committed a criminal offense?
MS. SANTORA: Objection.
THE COURT: Well I think we're talking about the same memo and it speaks for itself, and I've read it.
Q. To your knowledge there is no basis for concluding Ms. Ozturk had committed any criminal offense?
MS. SANTORA: Objection.
THE COURT: No, he may be asked that, that's not conclusive on the issue of whether she's deportable lawfully.
Did you have any knowledge of a criminal offense that she had committed?
THE WITNESS: I had not.
Q. And in fact you did not independently develop any evidence, any information at all to indicate that she had committed a crime?
A. No, the only information was that her Visa had been revoked and she was now subject to apprehension,

she no longer had status in the United States.

Q. And then, um, turning now to the Op-Ed.

You said you read it and you saw nothing in the Op-Ed suggesting that Ms. Ozturk had committed a crime, correct?

A. I didn't see anything in the Op-Ed that suggested she committed a crime.

Q. And in fact, you did not believe, based on anything in the Op-Ed, that Ms. Ozturk posed a national security risk, correct?

MS. SANTORA: Objection.

THE COURT: Well I'm going to sustain that, that's not -- and I have great respect for all witnesses, but he's not asked that question. So sustained.

(Pause.)

Q. You weren't asked to sign an arrest warrant for Ms. Ozturk's, um, being taken into custody, were you not?

A. So the arrest warrant was forwarded to me as a Supervisory Agent at the scene and I -- I, um, I signed that arrest warrant.

THE COURT: And so I'm clear, because we're talking about it, this is this ICE 200 form?

THE WITNESS: That's the I200, correct.

THE COURT: All right.

Q. And you understood it was urgent, it was a matter of urgency to find Ms. Ozturk, correct?

MS. SANTORA: Objection.

THE COURT: Overruled.

A. A matter of urgency in what sense?

Q. That your supervisors wanted it.

A. Yeah, the supervisors were -- headquarters was inquiring about it, um, asking questions, and we were, um, then putting resources towards that.

Q. And, um, you prioritized the arrest of Ms. Ozturk because of the headquarter's oversight, in fact, right?

A. We did, we prioritized it. You know headquarters, like I said, I can't recall a time that it's come top-down like this with a Visa revocation, um, under my purview anyway. And so with the superiors that were, you know, inquiring about this, it made it a priority, because we worked for them.

Q. And I'll take that also as a "Yes."

A. That's a "Yes," yeah.

Q. Okay. And finally you were asked on direct about the reasons why your office took Ms. Ozturk into custody, correct?

A. I was.

Q. And you testified about "officer safety," correct?

A. I did.

Q. And you testified that with respect to an individual's hands, they are often "dangerous," correct?

A. That -- well we're trained that an individual's hands, that makes them -- whatever item can be accessible is accessible. You want to control the hands.

Q. In this matter you did not completely abdicate your responsibilities as an investigative agent, did you?

MS. SANTORA: Objection.

THE COURT: No, on this foundation I'm going to sustain that.

Q. You had developed no evidence whatsoever to suggest that Ms. Ozturk, a graduate student who had written an Op-Ed, would be dangerous to your agents with her hands, did you?

MS. SANTORA: Objection.

THE COURT: I'm going to sustain that.

MR. TREMONTE: No further questions.

THE COURT: Very well.

Nothing further for this witness?

MS. SANTORA: Nothing further.

THE COURT: You may step down and thank you.

(Witness steps down.)

THE COURT: All right, we're going to take the

morning recess. It's a good time, there are four such witnesses, we have done two. Each one is going, I hope, faster than the last. And we'll resume at 11:15.

We'll recess.

(Recess, 10:45 a.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Tuesday, July 15, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-15-25
________________________
RICHARD H. ROMANOW Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 2, Pages 83 - 127

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

********

BENCH TRIAL DAY 7

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 15, 2025

********

Court Reporter: Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way
Boston, Massachusetts 02210
mortellite@gmail.com

A P P E A R A N C E S

RAMYA KRISHNAN
ALEXANDER ABDO
SCOTT B. WILKENS
XIANGNONG WANG
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Ethan.kanter@usdoj.gov
and
SHAWNA YEN
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Shawna.yen@usdoj.gov
(617) 748-3100
For Defendants

INDEX

| WITNESS | PAGE |
|---|---|
| DARREN MCCORMACK | |
| Direct Examination By Ms. Santora | 86 |
| Cross-Examination By Ms. Conlon | 101 |
| CHRISTOPHER HECK | |
| Direct Examination By Ms. Strokus | 110 |

E X H I B I T S

None

(Resumed, 11:18 a.m.)

THE COURT: Call your next witness.

MS. SANTORA: Your Honor, defendants call Special Agent Darren McCormack.

THE COURT: He may be called.

DARREN MCCORMACK, Sworn

COURTROOM CLERK: Can you please state your full name and spell your last name for the record.

THE WITNESS: Darren McCormack, M-c-C-o-r-m-a-c-k.

THE COURT: Ms. Santora, you may proceed.

DIRECT EXAMINATION BY MS. SANTORA:

Q. Good morning, Detective McCormack. Thank you for being here today. Where do you currently work?

A. HSI New York.

Q. What is your job title?

A. Deputy special agent in charge.

Q. How long have you held that role?

A. Approximately three years.

Q. What are your responsibilities in that role?

A. Operational and administrative oversight of Division 1, which was comprised of criminal investigators, special agents, administrative staff and intel.

Q. When did you begin working for United States Government?

A. 2005.

Q. In what capacity?

A. As a special agent with HSI.
Q. Where were you located?
A. My first duty assignment was Newark, New Jersey.
Q. Did you receive training before you started that duty assignment?
A. I did.
Q. Where did you receive training?
A. The Federal Law Enforcement Training Center in Glynco, Georgia.
Q. Can we refer to that as FLETC?
A. Yes.
Q. What training did you he receive at FLETC?
A. I received three months of criminal investigative training and three months of ICE-specific special agent training.
Q. And you said that following that you worked as a special agent in Newark, New Jersey?
A. Yes.
Q. How long were you there?
A. Approximately seven years.
Q. And what was your job after that?
A. From there I went to HSI headquarters in Washington, D.C. and worked on a technical development project as a special agent.
Q. How long were you there?
A. Approximately three years.

Q. And what was your job after that?
A. Following that I was the assistant attache in the U.S. embassy in Vienna, Austria.
Q. How long were you in Vienna?
A. Four years.
Q. And after Vienna?
A. After Vienna, back to Newark, New Jersey, as a supervisory special agent for approximately a year and a half to two years.
Q. And following that?
A. Following that to New York, HSI New York as an assistant special agent in charge for approximately two years.
Q. And following that?
A. My current role.
Q. Your current role. Does your office's work involve enforcing criminal laws?
A. Yes.
THE COURT: Let me interrupt. I'm one question behind here. So you were assistant to special agent in charge, and now you're an assistant special agent in charge, but they're different. Can you explain that to me.
THE WITNESS: I was an assistant special agent in charge, and now I'm a deputy special agent in charge.
THE COURT: Which is higher.
THE WITNESS: One rank higher. And then one above that is the special agent in charge, which is essentially the

CEO of the office. That's the number one of the office.
THE COURT: Thank you.
THE WITNESS: Yes.
BY MS. SANTORA:
Q. Does your office's work also involve enforcing Title 8?
A. Yes.
Q. What is Title 8?
A. Criminal immigration law.
Q. In the time that you have worked at HSI, has HSI always had authority under Title 8?
A. Yes.
Q. How many people do you supervise as a deputy special agent in charge?
A. Approximately 120 to 130 special agents, plus task force officers, plus mission support, plus intelligence officers.
Q. Do the agents that you supervise make arrests?
A. Yes.
Q. And in your career working at HSI, have you made arrests?
A. Yes.
Q. Do the agents who work for you who make arrests receive the same training that you received at FLETC?
A. Yes.
Q. And does that include training on making arrests?
A. Yes.
Q. Is making arrests important to HSI's work?

A. Making arrests is a fundamental function of a criminal investigator. So special agents are charged with running criminal investigations, which ultimately should yield arrests and seizures.
Q. Are you familiar with HSI's protocols and procedures for making arrests?
A. For the most part.
Q. Where are those procedures found?
A. In the special agent handbook.
Q. And are the agents who you supervise familiar with those processes and procedures?
A. Yes.
Q. And how are they familiar with them?
A. Through training.
Q. Have protocols and procedures changed in any material way since you received training at FLETC in 2005?
A. Not that I'm a aware of.
Q. I want to talk to you about a particular arrest. Were you involved in the arrest of Mahmoud Khalil?
A. Not personally involved but had some operational oversight of it.
Q. What was your role in that arrest?
A. My role was disseminating information that I received from headquarters to field agents.
MS. CONLON: Your Honor, I apologize for interrupting.

If we could ask the witness to put the microphone closer to him so we can hear him more easily.

THE WITNESS: Sure.

THE COURT: It moves. You be comfortable.

THE WITNESS: Thank you. Is that better?

THE COURT: It is.

MS. CONLON: That's much better. Thank you.

BY MS. SANTORA:

Q. What information did you receive about Mr. Khalil?

A. I received an intelligence packet that had some biographical information on Mr. Khalil, along with some social media posts and some pertinent intelligence information, which is typical for any sort of law enforcement subject of investigation or person of interest.

I received that from my headquarters with instructions. And with the instructions at the appropriate time, I disseminated that intel packet to the appropriate people.

Q. Did you determine that Mr. Khalil was amenable to arrest?

A. At some point I confirmed that Mr. Khalil was amenable to arrest.

Q. And why was he amenable to arrest?

A. Because his immigration status had changed pursuant to the Department of State.

Q. I want to ask you about some specific issues related to his arrest.

What date was he arrested?
A. March 8, 2025.
Q. And do you know if he was handcuffed when he was arrested?
A. He was handcuffed. Eventually he was handcuffed, yes.
Q. Was he not initially handcuffed?
A. He was not initially handcuffed. When he was encountered by special agents, he was free to move freely in the vestibule of his apartment building for a period of time until ultimately the time came that he had to be handcuffed and taken for processing.
Q. And does HSI have a policy on handcuffing people who are arrested?
A. Yes.
Q. What is that policy?
A. Two people, two are present when an individual is placed in custody in handcuffs. Based on the fact and circumstances, safety or otherwise, handcuffed for the safety of the individual and but also for the safety of officers. Hands will be handcuffed either in the front or in the person's back.
Q. And all individuals who are arrested by HSI are handcuffed?
A. Yes, absent some exigent circumstance like a potentially pregnant woman or some other outstanding health issue.
Q. And why is that HSI's policy?
A. For the safety of officers and the people we arrest.

Q. And I think you just said that HSI has a policy that two officers must participate in an arrest?
A. Correct.
Q. Can more officers participate in an arrest?
A. Yes.
Q. What determines how many officers participate in an arrest?
A. It's situational. Every case is different. Because generally we are making criminal arrests, criminals tend to have violent tendencies or violent criminal histories, so more is always better for safety of the agents and for the people present, and there may also be bystanders who are present, depending on where the arrest takes place.
Q. In the event that a person does not have a violent or criminal history, would precautions still be taken with regard to the arrest?
A. Yes, always.
Q. And why is it that you always take precautions with respect to an arrest?
A. Because you're placing somebody under arrest, so reasonably speaking, people who get arrested may not want to be arrested. So for the safety of agents, officers, individuals present and the person being arrested, we have more than -- more is better than less, but by policy at least two.
Q. Do you know how many officers participated in Mr. Khalil's

arrest?
A. Four were present.
Q. Did the officers who arrested Mr. Khalil identify themselves as HSI agents?
A. Yes.
Q. Is it HSI's policy that agents should identify themselves when arresting someone?
A. Yes.
Q. Why is that HSI's policy?
A. Because, again, for the safety and as a sworn law enforcement officer, if you are going to effect an arrest or act in the capacity of a sworn law enforcement officer, you have to identify yourself as such. And during the course of this arrest, all four agents had neck badges visible. Upon encountering Mr. Khalil and his wife they identified themselves but also had visible badges the whole time.
MS. CONLON: Your Honor, I'm going to object to the questions about the specifics of the arrest that this witness wasn't there for as speculation.
THE COURT: I've been listening. You didn't object.
MS. CONLON: I'm sorry. I am objecting now.
THE COURT: You can't object after the question has been answered. If it went beyond the question, you could move to strike. It didn't go beyond the question. It stands. If you have objections, you've put her on notice. Go ahead. She

may go ahead and ask the next question.
BY MS. SANTORA:
Q. You said you did not participate personally in Mr. Khalil's arrest?
A. I did not.
Q. How do you know the circumstances surrounding his arrest?
A. I'm sorry, say that again.
Q. How do you know the circumstances surrounding his arrest?
A. I read the report of investigation about the arrest itself, and I also watched videos of the arrest.
Q. And was that pursuant to your duties as a deputy special agent in charge?
A. Yes.
Q. Did the agents who arrested Mr. Khalil wear uniforms?
A. No.
Q. Why not?
A. HSI's special agents are criminal investigators who are special agents. They run transnational criminal investigations, and we do not have uniforms. We don't identify -- we always work in plainclothes, have unmarked government issued vehicles, all in furtherance of being undetected, appearing not to be law enforcement.
Q. Did the agents who were involved in Mr. Khalil's arrest wear masks?
A. No.

Q. Does HSI have a policy on whether agents can wear masks?
A. No policy, no.
Q. Does your office allow agents to wear masks?
A. We do.
Q. Why?
A. Well, during COVID, masks were sometimes mandatory, but also often for health and safety reasons. Currently in the world of social media and doxing and for safety of agents and their families, agents will wear masks to protect their identities.
Q. Do undercover agents typically wear masks?
A. We have undercover agents who specifically do undercover work. And if they are assigned to do some sort of fieldwork, they very often will wear masks to conceal their identity as their true identity but also their undercover identity.
Q. Following Mr. Khalil's arrest, did HSI transport him anywhere?
A. Agents transported Mr. Khalil to 26 Federal Plaza, which is a federal processing facility for HSI and ERO. At the completion of processing, Mr. Khalil was turned over to ERO custody.
Q. So at that point HSI no longer had custody of Mr. Khalil?
A. Correct.
Q. Were you told that Mr. Khalil was being arrested because of his support of Palestine?

MS. CONLON: Objection.
THE COURT: Overruled.
A. No.
Q. Were you told that Mr. Khalil was being arrested because of his criticism of Israel?
A. No.
Q. Why were you told that Mr. Khalil was being arrested?
A. Because of the change in his immigration status, the change in his immigration status which now left him illegally present in the United States and amenable to arrest.
MR. SANTORA: Thank you. No further questions.
THE COURT: Ms. Conlon.
MS. CONLON: Before I begin, Your Honor, I'd like to make a record that we have not received any reports of investigation about Mr. Khalil's arrest, and we would want them. And if the court has them and they're disclosable to us, we would love to receive them before we question this witness.
THE COURT: That's appropriate, an appropriate request. I have various data that has not been disclosed. I understand that the ROA has been disclosed.
MS. CONLON: That's right.
THE COURT: You know, in all honesty, there's nothing here that I recall -- yes, there's a report here of his arrest. It's on the documents that I have, it's numbered 23 and 24 and 25 of the 337 pages that have been given to me. I'd call that

a report of arrest.

And does the government object to turning this over to the plaintiffs?

MS. SANTORA: Your Honor, we do based on privilege grounds.

THE COURT: Well, what privilege, though, applies to this?

MS. SANTORA: Your Honor, I'd have to see the document that you're looking at.

THE COURT: Here, take a look at it. Report of the arrest is what she asked for. I mean, you called this witness.

MS. CONLON: My understanding is the privilege that we think was asserted with respect to this document, though it's a little hard to know --

THE COURT: She hasn't identified any privilege yet that I heard.

MS. CONLON: Okay. Your Honor.

MS. SANTORA: Your Honor, we would assert law enforcement privilege over this document.

THE COURT: Law enforcement privilege for something that's happened?

MS. SANTORA: Well, this talks about the officers' actions leading up to the arrest.

THE COURT: Well, yes, so it does, but these are the common -- it doesn't reveal any special technique. It doesn't

reveal anything that is uncommon. I don't mean it critically, but this is what law enforcement officers do.

MS. SANTORA: To the extent it reveals their methods and techniques leading up to the arrest.

THE COURT: But that's true. If the privilege were that broad, no police report could ever be produced if the government decided not to produce it. That's not the law enforcement privilege. You give me some case that sweeps that broadly.

That's what has baffled me from the outset here. This has no forward-looking aspect. It has no revelation as to planned law enforcement operations, and at least in my limited experience this all looks like just sound police work carrying out their directions.

MS. SANTORA: Your Honor, to the extent that it reveals the methods that the officers used in surveilling an individual, that could be extrapolated to other cases and allow other individuals to potentially --

THE COURT: Let me see. Since you don't seem to be able to put your finger on it and we have to work from the -- now, this you say can be extrapolated from -- actually, we have another copy. But so if you need one, Mr. Hohler will give you one.

You did surveillance and had his picture. I don't see anything -- and I mean no disrespect -- anything specifically

secret about going about criminal investigations that way. No. It's overruled.

And I really scrupulously want to honor the stay of the Court of Appeals, but this does not seem to fall within that order, and it may be given to the plaintiffs, and Mr. Hohler will give a copy to the plaintiffs, pages 23, 24 and 25 of 337.

MS. SANTORA: Your Honor, unfortunately, we only have a copy that is double-sided, which will reveal an additional page.

THE COURT: We'll give you our copy. It happens I have two copies, and I have a wonderful law clerk who can find it. You may have it.

MS. CONLON: May I receive a copy?

THE COURT: Oh, yes. I said we have all these copies. Now I'll give you the one that I have.

MS. CONLON: Thank you.

THE COURT: There's two sets. And what we'll do is we'll let her cross-examine. We'll xerox the copy, or when she's done her cross-examination, she can give you the copy she's been operating from and you can use it for redirect if you wish. Go ahead, Ms. Conlon.

MS. CONLON: Yes, Your Honor.

THE COURT: Once again, after all this work, it's hardly a smoking gun.

MS. CONLON: I take the court's word for it, and one of my colleagues will surely let me know.

THE COURT: We lawyers have to act like lawyers.

THE WITNESS: I understand. You're doing a good job, Judge.

MS. CONLON: For better or worse.

THE COURT: Go ahead.

CROSS-EXAMINATION BY MS. CONLON:

Q. Okay. Agent McCormack, is that -- what's the right title to use?

A. That's fine.

Q. On March 6, thereabouts, you received initial instructions concerning Mahmoud Khalil, right?

A. No.

Q. Okay. On what date?

A. I became with aware of Mr. Khalil on or around the 7th, March 7th.

Q. And on the date that you became aware of him you received some initial instructions about him, right?

A. Yes.

Q. Those instructions included conducting pattern of life surveillance; is that right?

A. The instructions were to locate him and, yes, establish a pattern of life with surveillance.

Q. And those instructions came from HSI senior leadership,

right?

A. Through other channels, but yes, ultimately through HSI leadership at headquarters.

Q. And through other channels, meaning it filtered to you through the special agent in charge?

A. Correct.

Q. Now, at that time when you first were made aware of Mr. Khalil, you did not understand him to be the subject of a criminal or civil enforcement action; is that correct?

A. Can you repeat the question?

THE COURT: When you first heard of him, you didn't understand that he was the subject of a criminal or civil investigation, when first you heard of him?

THE WITNESS: No, I did not understand him to be either.

BY MS. CONLON:

Q. You understood at that time that somebody at a higher level than you had some interest in him; is that right?

A. I was informed that somebody at a higher level than the people I was speaking to had an interest in him for whatever reason.

Q. Someone at a higher level even than the special agent in charge, in other words?

A. Correct, but this conversation was not with the special agent in charge.

Q. Who was this one with?
A. The acting assistant director.
Q. The acting assistant director --
A. For domestic operations, for HSI's domestic operations.
Q. William Walker?
A. Yes.
Q. And William Walker conveyed to you that the State Department had an interest in him, right?
A. I believe at some point the State Department's interest came up in conversation, yes.
Q. Just a moment.
He conveyed to you, specifically, that Secretary Rubio was interested in Mr. Khalil, correct?
A. At some point I was made aware that the Secretary of State and/or the White House had an interest in Mr. Khalil.
Q. And you were made aware of that through Mr. William Walker?
A. Correct.
Q. Now, approximately the day after you began or HSI began surveilling Mr. Khalil, you received a memo from the State Department about him, right?
A. Can you repeat the first part of the question, for the timing.
Q. Sure. The day after you became aware of Mr. Khalil and were surveilling him, you then received a memo about him from

the State Department, right?
A. Correct.
Q. The memo indicated that the State Department had determined that he was removable, correct?
A. The memo indicated that his status, his immigration status in the United States had changed. It did not say anything about -- if we're talking about the same document --
Q. I'm not sure if we are.
A. I don't recall it saying anything about his removability.
Q. That his status had changed in a manner that made him no longer a lawful permanent resident or something to that effect?
A. Something to that effect.
Q. Now, you had never seen a memo like this?
A. When you say "like this" --
Q. A memo from the State Department in this manner.
MS. SANTORA: Objection. If we're discussing a document, can we show the witness?
MS. CONLON: My time is short and I think we all know the document I'm talking about so I'd prefer not to.
THE COURT: I'm not sure that he knows it. They talk about these A4(c) memos. Is that what you --
THE WITNESS: I'm understanding the memo written by Secretary of State signed at the top.
THE COURT: Right.
THE WITNESS: Yes, yes, if that's what we're referring

to.

THE COURT: She may question.

MS. SANTORA: Your Honor, we would ask that to the extent they continue to question on the document the witness be shown the document.

THE COURT: Show him the document. She may continue.

Q. In your current position, you had never seen a memo like this before signed by the Secretary, correct?

A. When you say "like this," can you be more specific?

Q. A memo from the Secretary indicating that a person's status had changed, correct?

A. I've seen memos from the Secretary of State before when I worked overseas.

Q. I'll ask you again. In your current position you had never seen a memo from the Secretary of State indicating that a person's status had changed, correct?

A. I have not, correct.

Q. Now, you got this memo, and after you received it, you checked in with somebody named William Joyce who works in ERO, right?

A. Yes.

Q. And you did that because civil Title 8 enforcement is usually in the purview of ERO, correct?

A. I did that because while Title 8 or any sort of civil, criminal or administrative enforcement is in the statutory

authority of HSI agents, we historically, in the recent time, had not enforced those laws. So in an effort to comply with what my headquarters was asking, I wanted to confirm there was a legal basis for arrest with Mr. Joyce.
Q. Right. So headquarters HSI told you to make the arrest, but you checked in about it with William Joyce at ERO, correct?
A. HSI headquarters said, "Do your best to find him. If you find him, arrest him."
Q. And then you checked in about it with ERO, right?
A. Correct.
Q. And you checked in with ERO because they're the steward, historically at least, of all things immigration that are civil in Title 8, right?
A. It's more of their priority mission set, yes.
Q. And after checking in with ERO, that was when you determined that Mr. Khalil could be arrested; is that right?
A. I had confirmation from ERO that he was arrestable, given the change in status referenced in the Secretary of State's memo, at which point I informed -- I delegated the same instructions of locate and arrest to people in my chain of command.
Q. You weren't there for the arrest, correct?
A. I was not there for the arrest.
Q. What you know about it is what the people who effected it told you and whatever you saw in videos; is that right?

A. And what I read in multiple records reports.
Q. There were multiple reports about his arrest?
A. There was a synopsis that was provided to me that night. There was a synopsis emailed to me. There was a traditional report of investigation. There was what I believe the judge was just looking at, the report, I think it's an I-213. I think that's it.
MS. CONLON: Okay. I'm going to make the court aware that that, to us, sounds like there are several more documents relating to this arrest that we have not received, and I'll just turn to finish this examination.
Q. You don't know why HSI had to do this civil arrest of Mr. Khalil rather than ERO, do you?
A. Repeat the question.
Q. You're not sure why it was that this got assigned to HSI when it was a civil enforcement action as opposed to ERO, correct?
A. No, I'm not sure why.
Q. You wondered about it at the time, and you still don't know, correct?
MS. SANTORA: Objection.
THE COURT: Well, it's compound, so I'll sustain it.
Q. You wondered at the time why it was coming to you, correct?
MS. SANTORA: Objection.

THE COURT: Overruled.

THE WITNESS: Am I answering that?

THE COURT: Yeah, you answer.

A. I wondered why HSI was effectuating this arrest, not ERO, yes.

Q. And you still don't know?

A. I don't know.

MS. CONLON: Nothing further.

THE COURT: Nothing further, Ms. Santora?

MS. SANTORA: Nothing further.

THE COURT: You may step down. And may I have the document back? Simply because -- what we'll do is, the record is clear I showed it to you. Today we'll cause copies to be made both to the government and for plaintiffs so you know exactly what it is that I asked --

MS. CONLON: Your Honor, with respect to those additional documents, does the court know whether the court is in receipt of these additional reports that the witness mentioned?

THE COURT: No. I'm not going to be put in a position of culling through everything. I'm doing the best I can. You're going to give me a list, and in addition to the list I suppose you're going to give me a request, and I will take my time promptly and address it.

MS. CONLON: With respect to the next witness --

sorry.

THE COURT: Let's call the next witness while we're talking.

MS. CONLON: Okay. Well, it's an application to preclude the next witness, so I don't know if you want him in the room for it or not.

THE COURT: It's what?

MS. CONLON: An application to preclude the next witness, simply on this ground. Your Honor indicated Friday of last week very clearly that we weren't going to be putting on witnesses who had not been deposed. This is a witness who we did not get to depose. We had asked the government to let us. We brought that to the court's attention. The court said, "Work it out between the parties." It didn't work out. We didn't depose him. We move to preclude him.

MS. STROKUS: Your Honor, may I be heard?

THE COURT: Yes.

MS. STROKUS: Your Honor, since last Friday we have made Agent Heck available to plaintiffs. They simply have not asked to depose him yet.

THE COURT: He may testify. I'll give rather broad cross-examination. He may be called.

MS. SANTORA: Your honor, defendants call acting special agent in charge Christopher Heck.

THE COURT: He may be called.

CHRISTOPHER HECK, Sworn

COURTROOM CLERK: Can you please state your full name, and spell your last name for the record.

THE WITNESS: Sure. It's Christopher Reid Heck, H-e-c-k.

THE COURT: Thank you. You may be seated.

Ms. Strokus, you may continue -- or you may commence.

DIRECT EXAMINATION BY MS. STROKUS:

Q. Good morning, Mr. -- excuse me, Special Agent Heck.

A. Good morning.

Q. Where do you currently work?

A. I currently work in the Immigration and Customs Enforcement, Homeland Security Investigations, Washington, D.C. field office.

Q. And what is your current job title?

A. My current job title is acting special agent in charge.

Q. How long have you held that role?

A. Approximately five months.

Q. And what does a special agent in charge do?

A. Sure. In my current capacity, I'm responsible right now for administrative and operational oversight of our office's operations in the District of Columbia, the Commonwealth of Virginia and West Virginia.

Q. When did you begin working for the United States Government?

A. Approximately June 2003.
Q. And what were you doing?
A. When I first became employed by the U.S. Government, I started out as a U.S. Customs inspector in Tampa, Florida.
Q. What did you do after that?
A. So U.S. Customs transitioned into U.S. Customs and Border Protection after the merger after 9/11. Then I became hired by Immigration and Customs Enforcement, Homeland Security Investigations around November of 2008.
Q. Can you briefly walk us through the different roles you've had at HSI?
A. Sure. Upon graduation of the Federal Law Enforcement Training Center in Glynco, Georgia, I was initially assigned to the New York field office for approximately eight or nine years.
Within that stint, I was assigned an 18-month TDY or temporary duty assignment to our headquarters in Washington, D.C. And then upon arriving back at the New York field office, I was promoted to a program manager in the front office where the special agent in charge worked at the executive leadership and was supporting executive leadership at the time.
Then I was promoted again in the New York field office to a group supervisor or supervisory special agent over our trade enforcement group in New York.
Q. And after that you became the acting special agent in

charge in Washington?
A. No. So after New York, I took a promotion as the resident agent in charge in Jackson, Mississippi, and that was in roughly February 2019.
And then I became an assistant special agent in charge in our St. Louis office, overseeing operations in most of Missouri outside of the suburban Kansas City area as well as the eastern part of Iowa.
After a short stint there, I took a temporary detail, temporary duty assignment to our headquarters again where I became the acting deputy assistant director for our public safety and border security division in headquarters.
From there, in 2003, I was the HSI chief of staff for approximately two years prior to this current role.
Q. And you mentioned that you had received training all the way back when you first started with HSI, correct?
A. Yes, ma'am.
Q. And that was at what is commonly referred to at HSI as FLETC, the FLETC training center?
A. That is correct.
Q. And what type of training did you receive there?
A. Sure. You receive basic law enforcement training, such as firearms training, arrest techniques, handcuffing, defensive tactics, physical fitness and also, because we are investigators, we also receive criminal investigator training

program, criminal investigator training where we receive customs law, a little bit of immigration law as well as other activities.

Q. And after that training was complete, did you receive any other training?

A. Sure. Throughout the course of my career and every special agent's career, we get annual training, legal training, firearms training, defensive tactics training. Depending on what type of investigative discipline you're assigned, whether it is criminal investigations or Title 8 work, you receive on-the-job training and sometimes advanced training as well.

Q. So would it be fair to say that you've received continuous training on law enforcement techniques?

A. Yes, ma'am.

Q. As the acting special agent in charge for the Washington, D.C. area, how many people do you supervise?

A. Between administrative and government law enforcement officers as well as state and local task force officers, it's roughly 400.

Q. And of the agents that you supervise, do they also receive the same training that you receive?

A. The special agents do, yes.

Q. And that includes continuous training on law enforcement techniques as well?

A. Yes, quarterly defensive tactics training as well as

firearms training.
Q. What type of work do the agents that you supervise perform?
A. Agents under my purview, with any HSI special agent, we conduct criminal investigations pursuant to Title 18 of the U.S. Code, Title 19 of the U.S. Code, as well as Title 8 enforcement operations.
Q. In your rather long career at HSI, have you personally performed arrests?
A. I have.
Q. And are you familiar with the protocol surrounding arrest operations?
A. I am.
Q. Are your agents that you currently supervise similarly familiar with arrest protocols and practices?
A. Yes, they are.
Q. I would like to ask you a few questions about the arrest of Mr. Badar Khan Suri. Were you involved in that arrest in any capacity?
A. In charge of the field office, I oversaw the arrest, but I was not physically present at the time of arrest.
Q. So what was your role in the arrest?
A. To oversee the administrative arrest of Badar Khan Suri.
Q. Were normal HSI procedures followed with respect to Mr. Suri's arrest?

A. Again, I was not out there present on the street with the arrest. However, there would be no -- yes, the proper protocols would have been followed if I would have been --

MS. CONLON: Objection, Your Honor. I'm moving to strike this as speculative based on his response.

THE COURT: Well, I'll let what he responded to stand and I'll stop him at that point. He doesn't know of any deviation from procedure is what I get from him.

Q. Would you have been informed if there were any deviations from regular HSI procedures that occurred at Mr. Suri's arrest?

MS. CONLON: Objection. Calls for speculation.

THE COURT: Sustained. It does.

Q. With respect to Mr. Suri, when did you first become aware of Mr. Suri?

A. Sometime in mid March. I don't recall the specific date.

Q. And how did you become aware of Mr. Suri?

A. I received a phone call from our headquarters stating that the Department of State may deem Mr. Suri removable and that he may be amenable to administrative arrest at some point should that removability happen.

Q. And did you receive any instructions from headquarters on what to do with respect to Mr. Suri at that time?

A. Yes, sure. Headquarters just stated to get out and start beginning surveillance to try and locate Mr. Suri in the event that the State Department deemed him removable.

Q. Did HSI engage in this surveillance of Mr. Suri?
A. We did, yes.
Q. And at what point did HSI arrest Mr. Suri?
A. A few days later. Again, I don't remember the specific dates. I want to say I was notified on the weekend, and I believe he was arrested on a Monday night, from my recollection.
Q. Are you familiar with how Mr. Suri was arrested?
A. I'm aware that he was arrested in the Rosslyn, Virginia area and taken into custody there administratively, yes.
Q. Are you aware of any specifics with respect to Mr. Suri's arrest?
A. The specific arrest, he was apprehended in Rosslyn and taken into custody as normal protocol policies would dictate.

MS. CONLON: Objection, Your Honor. Moving to strike that last portion as speculative.

THE COURT: He doesn't know any evidence that they were not. I'll let it stand for that. Go ahead.

Q. At any point were you told or was it ever suggested to you that Mr. Suri was going to be arrested because of his support for Palestine?

MS. CONLON: Objection, form.

THE COURT: Overruled. I've allowed questions in this form. It goes to the heart of the case. They may get his answers.

A. Can you repeat the question, please?
Q. Sure.
THE COURT: Were you ever told or was it suggested to you that the reason for his arrest was his support for Palestine?
A. No.
Q. Were you ever told or was it ever suggested to you that Mr. Suri would be arrested because of his criticism of Israel?
A. No, never told that.
Q. Did you ever receive any communication of any kind at any time indicating that Mr. Suri was being arrested because of his political views?
A. No.
MS. STROKUS: I tender the witness, Your Honor.
THE COURT: Thank you.
Any questions for this witness?
MS. CONLON: No, I don't think we do.
THE COURT: You may step down. Thank you.
All right. That concludes the testimony for today. I'm not charging this last hour to anyone because witnesses that are available and could be called clearly fall within the stay of the Court of Appeals, and to honor that stay, it would be unfair to charge the time. Let me tote up the time that we have used and we'll recess.
Total elapsed time, plaintiff three days, one hour, 35

minutes. Defense, one day, three hours, five minutes.

One thing, anticipating that we may get Mr. Armstrong back and I think we've discussed it sufficiently that I'm able to rule. I do rule that the assertion of the deliberative privilege applies to those statements apparently of Mr. Armstrong on the discussion letters, so I'm not going to consider those statements. However, given Mr. Armstrong's central role here, he may be examined as to his views about the matters where he has written something on those statements.

Should he not remember, the discussion letters may be used to refresh his memory without them being in evidence, and I think that's sufficient under the circumstances.

MS. CONLON: Your Honor, may I -- sorry.

THE COURT: Actually, I saw Ms. Santora first. We'll go with their side first, but I could use the recess.

Ms. Santora, anything before we recess?

MS. SANTORA: Yes, Your Honor. We do have documents that the plaintiffs requested earlier today.

THE COURT: Then they may of course be disclosed.

Mr. Kanellis.

MR. KANELLIS: Your Honor, yesterday we raised the question of the timing of the posttrial --

THE COURT: You did and I didn't answer it. I don't know that I can answer it, but I'm thinking about it.

Here is what I'm thinking. Suppose my hopes are

realized and at least the stay is lifted. My primary goal, as I reported to the Court of Appeals, is to get through the evidentiary portion, and I'm going to do that. And then I'm going to entertain final arguments. I'm open to 45 minutes a side final arguments, but don't take this as an expansion of the time limits. If they go that long, probably that will be on another day. But final arguments, as I conceive of it, should be immediate or the next day because everything is out here, I will be more imbued with the case than at any time.

MR. KANELLIS: Your Honor, just a point of clarification. Sorry to interrupt.

THE COURT: I'm over-speaking, I know. Go ahead.

MR. KANELLIS: No. I'm interrupting. When you say final, are you talking about the written briefs?

THE COURT: No, no. I'm talking about the oral arguments.

MR. KANELLIS: And we'll be prepared to do the oral argument on Friday, but my question is about the written posttrial brief.

THE COURT: I was getting there.

MR. KANELLIS: I apologize.

THE COURT: Right. At that time, because I expect this to be interactive as I have been throughout, especially when you're making the arguments, both sides, I will say, as I have at other times, "But what about the statute," for example.

I can imagine my saying in anticipation of some expected argument, "But don't you think that," whatever, and we'll go back and forth.

Now, how you take my initial reactions is going to inform the briefs. So when we're done with that, as I reported to the Court of Appeals and it remains my intention, that's the time we will say, "When can you get me, I want requested findings of fact and rulings of law addressed to phase one." And of course I will accept posttrial briefs which have the appropriate citations to what's going on here at trial.

Does that answer your question?

MR. KANELLIS: Yes, Your Honor. I just want to make sure that you're not expecting from us a written posttrial brief on Friday.

THE COURT: Why did I just speak?

MR. KANELLIS: Yes.

THE COURT: Okay.

MS. CONLON: Your Honor, we have some questions and requests. Regarding closing arguments and posttrial briefing, we'd I guess ask the court and the government to consider this. We think that the court and the parties could benefit from having briefed the legal argument before it is argued so that the court may ask questions as to the arguments that are actually being put forward by the parties. In other words, we would suggest strongly that we be able to submit the posttrial

brief and then have the legal argument on the brief.

It seems difficult to do that on Friday before the court has actually received an articulation of what these arguments are, and we want to make sure we are responsive to the court's questions. And we have been working on our brief throughout diligently because we understood it was due Friday.

So if the court -- I understand the government wants more time for their brief. If the briefs were submitted Monday, we could appear truly as soon as the court wanted to do argument about it, but we want to make sure that we are as efficient as we can be with the court's time and that we are responsive to the court's questions. So that's my first request.

THE COURT: I've got to think about it. My initial reaction is, I think I'm a pretty transparent person, and I've got in mind the questions I have about the issues that are before the court. I don't know that I need some separate argument. In other words, do it in two stages.

And my hesitancy is this. Some of it depends on the finding. And to me the finding, it is very -- findings, plural, are first and foremost. What do I think of all this? And as to that, I hope I've been, as judges should be, appropriately cagey, but that's because I very much want to hear it all before, in a written opinion, I commit myself in a sound written opinion.

I'm not embarrassed by the objections. The guts of it are before the court, and I really think counsel on both sides have done a fine job. I just don't know what --

MS. CONLON: Would the court consider --

THE COURT: I mean, arguing the law, the law doesn't make much difference until we know what the facts are.

MS. CONLON: With that, I think we're on the same page. And what I would like to propose is we argue on the facts on Friday. We all have heard the testimony. The court sat through it too, we're all in a position to discuss it, but that you allow us to appear to respond to Your Honor's questions on the law after we have submitted to you how we think the law applies to these facts. In other words, two parts. So what we would propose is that on Friday we do the findings of fact.

THE COURT: If I need it, I'll call you back.

MS. CONLON: Okay.

THE COURT: Go ahead. What else?

MS. CONLON: Yes, next, okay. In terms of the sort of the thing you said at the very beginning about Mr. Armstrong, since I will be, if we're allowed to, resuming that cross and I want to make sure I heard it. I missed part of what you said. You said the deliberative process privilege applies. Is it only to his annotations?

THE COURT: Yes.

MS. CONLON: Okay. I just wanted make sure I got that. Then with respect to certain documents, obviously, we understand that this is in front of the circuit right now, but we wanted to make the court aware that in what we have received from the court we have not seen the action memos, the Armstrong action memos for Mr. Suri or for Mr. Mahdawi.

We can tell from various filings the government has made that the court received those as exhibits to docket 131, Exhibit M and Exhibit N. We received L and O, not M and N as in Nancy. And we are making the request for those in advance of -- depending on what happens, but in advance of Mr. Armstrong's cross-examination. We think they are part of the core documents in the case.

THE COURT: When you say "depending on what happens," you mean depending what the Court of Appeals does?

MS. CONLON: Well, I think we've made our position to this court and the circuit clear that we think that these particular documents should be squarely permitted to be part of this examination, but I'm saying -- yes, so yes.

THE COURT: That's right. Because reading their order, and it's an order, fairly, I'm not disclosing anything that trenches on that order. Depending upon what I am told, to the extent that I have discretion, I will wisely exercise that discretion. Beyond that, there's nothing I can say.

MS. CONLON: And one more thing to ask the court to

consider, if the court will allow me. Obviously, the court knows that we are very focused on time, and we appreciate that the court is, too. The court indicated that closing arguments could occur Friday, up to 45 minutes. We just want to make sure we understand whether that comes out of --

THE COURT: That comes out of your trial time.

MS. CONLON: Okay. And then we understand the court to have calculated our trial time as three days, one hour and 35 minutes and wanted to clarify whether that is inclusive of the ten-minute-or-so colloquy I had with the court and the government about whether they would give us this report before I began my cross-examination. I'm scraping for -- I'll take, even if I can get my ten minutes back, I'll take them. That's the level of desperation.

THE COURT: That's the ruling of the court. I've done it fairly since I came on the bench at 9:00.

All right. I do thank you all.

I don't know as you're going to be done by Friday. I mean, I think we might well shoot for Monday here, so -- well, I don't know. We have Armstrong's cross, redirect, et cetera, and we have -- those are the only two witnesses that are left, right?

MS. CONLON: Armstrong, Watson, the government's summary witness, and Veena Dubal for the plaintiffs.

THE COURT: Okay. I don't know if we're going to be

done. You know, let me say, and I probably shouldn't do this. I don't have much trouble with their summaries. It seems to me that the summaries are, broadly speaking, relevant. I do have trouble with one witness trying to put in all these summaries, unless that witness had something to do with preparing the summaries. That does seem to be the First Circuit law. But I'd just as soon not waste time on the witness and accept the summaries. They're peripheral, but assuming they're accurate, that's what people were posting or not posting, and it might be helpful to see it.

MS. CONLON: Your Honor, I would defer to my colleague.

THE COURT: Wait a minute. The gentleman I haven't heard from, just simply --

MR. WILKENS: Yes, Your Honor. Mr. Wilkens, Scott Wilkens.

THE COURT: Mr. Wilkens again, yes, sir.

MR. WILKENS: Yes. One quick question, which is, did you receive the motion in limine that we filed yesterday on these exhibits?

THE COURT: I did.

MR. WILKENS: Okay.

THE COURT: That's what caused me to speak.

MR. WILKENS: Okay. Thank you, Your Honor.

THE COURT: It's not a ruling. I'm just talking.

See, if I sit here and talk with you, the time goes by.

Ms. Conlon.

MS. CONLON: I hear the court, and unfortunately I think that our view would be that we -- we have concerns about the reliability of the summary exhibits and whether they show what they purport to show, in other words. We of course don't know -- we don't know who prepared them, obviously, so I can't address that.

THE COURT: Well, a summary exhibit, if it was a jury, let's say they pass 1006, I would always say to the jury, "Now, I'm letting you see this because this, they say, purports to summarize voluminous exhibits." Then I trash it in front of the jury. I say, "Now, understand, they made this up for this trial."

Now, I give myself the same instruction. But I'd just as soon have a more complete record rather than a less.

Mr. Kanellis.

MR. KANELLIS: I'll just note for the record this summary witness will comply with the *Milavetz* decision, which is the controlling First Circuit decision on 1006 summaries, and you'll be relieved to know he's going to be ten minutes on the stand. That's it.

THE COURT: Now it's time for me to recess. We'll recess. I don't sit tomorrow, as I said. 9:00 on Thursday, assuming we have something to do, but we have at least the

witnesses not covered by the First Circuit's order, and I would like to hear those witnesses. Thank you. We'll recess.

(Adjourned, 12:17 p.m.)

* * * * *

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 15th day of July, 2025.

/s/ Kelly Mortellite

________________________________

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Thursday, July 17, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MOHAMED MAKLAD | | | | |
| By Mr. Kanellis | 5 | | | |
| By Mr. Biale | | 18 | | |
| ANDRE WATSON | | | | |
| By Mr. Kanellis | 26 | | | |
| By Ms. Krishnan | | 60 | | |

E X H I B I T S

EXHIBIT 240.............................. 22
EXHIBIT 241.............................. 22
EXHIBIT 242.............................. 80
EXHIBIT 243.............................. 97
EXHIBIT 244.............................. 98
EXHIBIT 245.............................. 99
EXHIBIT 246.............................. 99

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT: Because I have authorized internet access to these proceedings, it's appropriate to say that if you are attending these proceeding via internet, you must remember that the rules of court remain in full and effect, and that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

Also, you must keep your microphone muted. That's very important. And if you do not, I shall have to cut you off.

Very well. The plaintiffs are calling two witnesses. You may call your first witness.

MR. KANELLIS: Your Honor, today the government will be calling two witnesses.

THE COURT: I misspoke. And, Mr. Kanellis, you may call the first of the two.

MR. KANELLIS: Your Honor, the U.S. government calls Mohamed Maklad.

THE COURT: He may be called.

(MOHAMED MAKLAD, sworn.)

THE CLERK: Can you please state your full name and spell your last name for the record.

THE WITNESS: My name is Mohamed Maklad, and my

last name is M-A-K-L-A-D.

THE COURT: Mr. Kanellis, you may proceed.

**************

MOHAMED MAKLAD

**************

DIRECT EXAMINATION BY MR. KANELLIS:

Q. Mr. Maklad, where do you work?

A. I work at Homeland security Investigations.

Q. And that's a part of the Department of Homeland Security?

A. That is correct.

Q. And what is your job at Homeland Security Investigations?

A. I'm a Supervisory Analyst.

Q. And what do you do as a Supervisory Analyst?

A. I conduct research and analysis in support of our agency's needs.

Q. As a Supervisory Analyst, have you had any experience retrieving data and information from public sources?

A. I have.

Q. And in that role have you had any experience analyzing and summarizing data from public sources?

A. I have.
Q. Why are you here to testify today?
A. I'm here to provide summary exhibits on public events and publications by AAUP and MESA.
Q. You said by AAUP and MESA?
A. Yes, correct.
Q. And those are two of the plaintiffs in this case, correct?
A. Yes, sir.
Q. And then you said, um -- did you say "public events"?
A. Yes, I did.
Q. What do you mean by "public events"?
A. Events that we're able to access through publicly-available information that occurred of some kind of gathering.
Q. You also mentioned, I think, "publications," is that right?
A. I did, sir.
Q. What do you mean by "publications"?
A. Anything that would be associated with the plaintiffs.
Q. Okay. Can you describe for the Court the volume of public events and publications you've retrieved when searching for the information that underline these

charts?

A. For all of --

MR. BIALE: Objection.

THE COURT: Well the chart's not yet before the Court, but this is where he's going. Overruled. He may have it.

A. Thousands, sir. Over a thousand of volumes that we got to make these exhibits.

Q. And have you compiled these thousands of references to the summary charts?

A. I have.

Q. Did you compile the sources for the work underlying these summary charts?

A. I have.

Q. And how did you do so?

A. I did so on an EXCEL spreadsheet, sir.

Q. Did you say an EXCEL spreadsheet?

A. EXCEL spreadsheets.

Q. Can you move the microphone a little bit closer to you?

A. (Moves mic.)

Q. Yes, thank you.

Was the spreadsheet with the sources for the data you compiled provided to plaintiffs in this case?

A. It was.

MR. BIALE: Objection.

THE COURT: Well do you know that?

THE WITNESS: I provided it to the defense.

THE COURT: Well my question is to you, do you know that it was provided? And you started to answer. You provided them?

THE WITNESS: I provided it to the defense team.

THE COURT: Okay. And when did you do that?

THE WITNESS: I did that on July 3rd, sir.

THE COURT: Thank you.

Go ahead.

MR. KANELLIS: Your Honor, may I approach?

THE COURT: You may.

MR. KANELLIS: Let the record reflect I'm handing you, the witness, three exhibits marked for identification.

THE COURT: And which are they?

MR. KANELLIS: Sir, they are HJ, HL, and HH.

THE COURT: All right.

(Hands to witness and judge.)

THE COURT: Proceed.

Q. Are these exhibits that you prepared for this litigation, sir?

A. They are.

MR. KANELLIS: Let's pull up Exhibit HJ, labeled

"Comparison AAUP Public Events 2022 through 2025."

(On screen.)

Q. Can you explain to the Court what information you're attempting to summarize with this exhibit?

A. This is a summary of the total number of events listed on AAUP's websites, between 2022 and 2025.

Q. And does it include the entire year of 2025?

A. It includes just the first 6 months of 2025.

Q. And what do you mean by "public events"?

A. These were events listed on the AAUP websites, um, various webinars, gatherings, and things that would bring people together over a certain cause.

Q. And how were you able to determine that these public events were sponsored or promoted by the plaintiff, AAUP?

A. I determined that by pulling it from their website directly.

Q. And how do you know you were looking at AAUP's website?

A. Based on the AOR, sir, the AAUP network.

Q. Now with respect to looking at AAUP's website, is it possible, in your mind, that AAUP sponsored more events than are listed on this website?

MR. BIALE: Objection.

THE COURT: Well I'm going to sustain that, "Is it

possible?" Let's get to the guts of it.

What's the difference between blue and red here?

THE WITNESS: Your Honor, blue represents the overall events and red is events that have been identified as being related to Palestine and Israel.

Q. And how many events total did you see promoted on AAUP's website?

THE COURT: Well the document speaks for itself. What's the relevance of this?

MR. KANELLIS: Your Honor, this shows AAUP's political activity after 2025. After the ideological deportation policy was in place, it increased, it did not decrease. It was unaffected by AAUP's --

THE COURT: Yes, I understand your point.

Yes?

MR. BIALE: Your Honor, if I may?

THE COURT: Yes.

MR. BIALE: No one is claiming, in this case, that the organization's speech has been chilled. The organization's --

THE COURT: That's understood. I've limited it.

MR. BIALE: Yes.

THE COURT: But it's peripherally relevant, and so I'll admit it.

HJ is admitted.

MR. BIALE: Your Honor, I'm sorry, I have a further objection to this document.

THE COURT: Yes?

MR. BIALE: We don't know anything about the methodology that this witness used to determine what is a Palestine/Israel-associated event.

THE COURT: He's here for cross-examination. I'll reconsider it.

MS. CONLON: He stated --

THE COURT: I said it's "peripherally relevant." It's a line in their closing argument, I suppose.

MR. BIALE: And, your Honor, the data about these events is also not in evidence. He's saying he pulled it from the website.

THE COURT: But it's available to you?

MR. BIALE: But we don't know what he looked at, your Honor.

THE COURT: Oh, wait a minute. Wait a minute. Well that slows me down.

And so Mr. Kanellis can address that?

MR. KANELLIS: Your Honor, we made the witness available, then we produced --

THE COURT: No. No.

MR. KANELLIS: They elected not to question him.

THE COURT: No, the data has got to be produced.

MR. KANELLIS: We produced it.

THE COURT: Is this all you gave them is this?

THE WITNESS: And the source data, your Honor.

THE COURT: And the source data?

THE WITNESS: Yes, your Honor.

THE COURT: And what does the source data look like?

THE WITNESS: It's an EXCEL spreadsheet, your Honor, that contains all of the --

THE COURT: Okay.

Is that one here?

MR. KANELLIS: Um, yes, your Honor.

THE COURT: Can I see it?

MR. KANELLIS: We can pull that. It's on --

Your Honor, we -- we don't have the --

(Discussion.)

MR. KANELLIS: We don't have a physical copy, your Honor, with us.

(Pause.)

MR. KANELLIS: The source data, your Honor, was sent to plaintiffs.

THE COURT: No one's impugning that, he so testified.

MR. BIALE: Well, your Honor --

THE COURT: I mean can I see what it looked like?

MR. KANELLIS: Yes, your Honor, we will -- but we're going to have to print that out.

THE COURT: All right, then we'll reserve on admitting it.

MR. BIALE: For clearing the record, your Honor, I believe he testified that he sent the source data to defendants. Now we received spreadsheets, but I don't know what this data relates to.

THE COURT: Well all right. I need help on this, so I'll vacate the admission of this, but he can go on.

Let's find out about these other ones, quickly.

MR. KANELLIS: Um --

THE COURT: You said 10 minutes, Mr. Kanellis.

MR. KANELLIS: Yes, I did.

THE COURT: Go ahead.

Q. How many events are listed by AAUP in Exhibit --

THE COURT: Well the document speaks for itself. If you get it in evidence, the numbers will be there. Let's look at the evidence.

(Pause.)

MR. KANELLIS: Let's go to "Hotel Lima," Exhibit HL.

(On screen.)

Q. And what's the purpose of this chart?

A. The purpose of this chart is to show, um, what the

witness has identified, to testify in this case, um, their searches or their associations related to Palestine or Israel in Google Overtime in 2024 and '25.

THE COURT: Forgive me for interrupting.

THE WITNESS: Yes, sir?

THE COURT: I don't know what that means, "associations relative to Palestine"?

THE WITNESS: Yes, your Honor.

THE COURT: Tell us what you mean by that?

THE WITNESS: So basically, sir, what we've done is we've taken all the names on the bottom on the, um -- in random, in Google, and identified whether their name, and "Israel" and "Palestine," has come with a result in Google in 2024 and 2025, showing an association between that name and some kind of publication on Israel and Palestine.

THE COURT: I see. I see. And blue is 24 and red is 25?

THE WITNESS: Yes, your Honor.

MR. BIALE: Your Honor --

THE COURT: Wait a minute. Wait a minute.

How is this relevant?

MR. KANELLIS: Your Honor, the plaintiffs have claimed that -- the individual witnesses have claimed that they were active and associated with issues with

Palestine and Israel prior to the implementation of the ideological deportation policy in 2025. This shows that if there was any public association with those witnesses and the issue of Palestine and Israel, it increased after -- for most of these witnesses, after the implementation of the ideological deportation --

THE COURT: If I understand though, this is some Google search where -- and we'll take Professor Nickel as an example, where his name and "Palestine" is in the same reference.

Is that correct?

THE WITNESS: That's correct, your Honor.

THE COURT: Yeah, that's too remote. It's excluded. Let's look at the, um --

MR. KANELLIS: Let's go to the final exhibit.

THE COURT: Yes.

MR. KANELLIS: "Hotel Hotel."

(On screen.)

Q. And, Mr. Maklad, what does Exhibit "Hotel Hotel" depict?

A. Exhibit "Hotel Hotel" depicts a single -- the number of events in a single day in 2024 and 2025 sponsored by AAUP under the Day of action for Higher Education.

Q. What is your understanding of the Day of Action

For Higher Education?

MR. BIALE: Objection, foundation.

MR. KANELLIS: I'm laying a foundation.

THE COURT: And you may.

A. My understanding of the Day of Action for Higher Education is it is sponsored by AAUP and others to engage in free speech activities across college campuses.

Q. And how do you know this was sponsored by AAUP, this National Day of Action for Higher Education?

A. AAUP was quoted saying that they spearheaded this action in 2024, and in 2025, their logo and on their website, "A Day of Action," indicates that they've sponsored these events.

MR. BIALE: Objection, move to strike. Quoted from where? We have no idea where he's getting this information, your Honor.

THE COURT: Well you can inquire.

All right.

Q. And what does this chart show about, um, the, um, political activity of AAUP and MESA from April 17th, 2024 compared to the same day, April 17th, 2025?

MR. BIALE: Objection. There was no testimony that this is activity of MESA. He stated that this was activity of MESA.

THE COURT: Correct.

MR. BIALE: Although the exhibit says "MESA," and I'm not sure where that comes, your Honor.

MR. KANELLIS: Oh, I can give you that foundation, your Honor, I can explain.

Q. Why do you include "MESA" on the title page of this exhibit?

A. MESA was also included as a sponsor on their website, "Day of Action."

Q. And how do you know that?

A. I saw the emblem on the website where I pulled the information from.

MR. BIALE: Objection.

Q. And then what did the exhibit show about the political activity of MESA and AAUP comparing 2024 and 2025?

A. In 2024, there were approximately 9 events that occurred, um, according to the website where I pulled this information. And in 2025, there were approximately 191 events that occurred, according to this --

Q. What is the increase percentage-wise in events sponsored by AAUP and MESA from 2024 to 2025?

A. Approximately 2000 percent.

Q. 2000 percent?

A. Yes, sir.

MR. KANELLIS: Your Honor, we tender the witness.

Oh, your Honor, actually -- my apologies. We move into evidence the Exhibits HH and, um, the first exhibit?

THE COURT: HJ.

MR. KANELLIS: Yes, sir.

MR. BIALE: Your Honor --

THE COURT: I'll reserve until I've heard cross-examination.

Mr. Biale, go ahead.

MR. BIALE: Okay. And very briefly.

CROSS-EXAMINATION BY MR. BIALE:

Q. You said that these are related to the National Day of Action, right?

A. Yes, sir.

Q. And the National Day of Action is an event that, um, has, um, relates to topics -- a variety of topics that AAUP and MESA have an interest in, right?

A. Correct.

Q. And in fact, in the source data you provided, the very first event description is "Indiana Graduate Workers Coalition went on Strike at Indiana University," right?

A. That's correct, that's what I provided.

Q. Okay. You don't know -- you have no idea whether that strike had anything to do with Israel or Palestine, right?

A. On the website it claims that these were, um, looking for opportunities to combat, um -- to provide opportunities for free speech to include Palestine and divestment issues, according to the Day of Action website.

Q. What website are you talking about? You keep mentioning a website.

A. The Day of Action website where I obtained this information from.

Q. Okay. And what is the URL for the Day of Action website?

A. I can retrieve it. It's a "Coalition for Higher Ed.org."

Q. Okay. And a "Coalition for Higher Ed," that's a different organization from AAUP, right?

A. It's sponsored by AAUP on the website.

Q. "Yes" or "No." Is the Coalition for Higher Education the same as AAUP?

A. It is not.

Q. Is the Coalition for Higher Education the same as MESA?

A. It is not.

Q. Okay. Now looking at these charts that you show. Assuming, just for the sake of argument, that these are in fact political activities engaged in by these organizations between 2024 and 2025, what this shows, right, is that the organizations have engaged in much more political activity in 2025, correct?
A. That is what is shown, correct.
Q. Okay. So whatever resources that they were deploying to other things in 2024, in 2025, they've deployed those resources much more to political activity, right?
MR. KANELLIS: Objection, your Honor, vague.
THE COURT: No, overruled.
A. Can you repeat the question, please?
Q. I said whatever resources they had to direct to other activities in 2024, they have directed more of those resources to political activities to 2025, "Yes" or "No"?
A. I'm not sure I -- I cannot answer that. I don't know what the resources were in 2024 versus 2025.
Q. Well presumably it took some resources of the organization to plan these events, right?
MR. KANELLIS: Objection, calls for speculation.
THE COURT: Well, on this foundation, I have to sustain it.

MR. BIALE: All right. If I could have one moment?

(Pause.)

Q. Now with respect to HJ, sir, you testified that these were public events, right?

A. That is correct, from the AAUP website under the events tab.

Q. Okay. And when you said "public," you meant that there was public information available about them on the website, correct?

A. That is correct.

Q. You don't know whether these events were attended by members of the public, right?

A. I am not aware of that. I just know what I was able to pull from the website.

Q. Okay. And that website, again, doesn't have any information about whether these were public events in the sense that everyone from the public was invited, right?

A. All this is showing is the number of events over time and what was displayed on the AAUP website. Whether they were public or private? I don't know.

Q. You don't know. Okay.

(Pause.)

Q. And all you know is they were advertised, you

don't actually know if these events occurred, right?
A. I do not know if they occurred, but I know they're advertised by AAUP.
MR. BIALE: Nothing further.
THE COURT: I will admit both Exhibits HH as Exhibit 240 and HJ as Exhibit 241.
(Exhibits 240 and 241, marked.)
THE COURT: You have nothing else for this witness, do you, Mr. Kanellis?
MR. KANELLIS: No, sir.
THE COURT: All right, you may step down.
Call your next witness.
MR. KANELLIS: Your Honor, the United States -- the government defendants call Assistant Director Andre Watson.
MS. CONLON: Your Honor --
THE COURT: Now wait a minute.
MS. CONLON: I just want an exhibit number.
THE COURT: Ms. Conlon, I have no direction from the Court of Appeals. Now my understanding is that Mr. Watson is familiar with documents that to which the stay undoubtedly applies, so I don't know what we're doing.
I -- in other words, I am not going to -- I recognize that when the stay went into effect, we, um,

had heard the direct examination of Mr. Armstrong, and we had one question or two on the cross-examination, and then the stay went into effect.

Now I suppose I could take his direct examination, um, but we're not going to get anywhere on cross-examination in light of the stay. Though I'm not going to consider the direct of either Armstrong or Watson if somehow I am precluded from considering the documents as to which the stay presently applies.

So with that said, I'm not clear what we're doing. And I'll start with you.

MR. KANELLIS: Well, your Honor, it was our understanding, and perhaps it was an misimpression, that certainly we are delaying Mr. Armstrong's cross, or the remainder of it, until we hear from the First Circuit. But it was our understanding we could proceed with Mr. Watson today with direct and cross on the --

THE COURT: But they can't cross on the documents that are, um -- I mean I'm not going to permit it, because I have to obey the stay. Even if you told me, "Well we'll waive it," I must obey it. And so of course I will.

So, I'm sorry, this is part of the problem of a stay in the midst of trial proceeding. But, um, I just don't think it will be as coherent as if we did it all

at once.

So --

MS. KRISHNAN: Your Honor, may I be heard on the issue of documents?

THE COURT: Yes. Why don't you, once again, introduce yourself.

MS. KRISHNAN: Yes. Good morning, your Honor, my name is Ms. Krishnan.

THE COURT: Yes.

MS. KRISHNAN: So I'll start by saying that the only documents that are part of the core documents that we plan to cross-examination Mr. Watson on are the letters that he authored that went to the State Department, and our understanding is that the First Circuit stay doesn't reach those documents because those documents are ones over which the government only claims the law enforcement privilege, and we had understood your Honor to have overruled the assertion of that privilege.

THE COURT: And your understanding is correct. Your understanding of what I've done is correct. But I read the order of the Court of Appeals -- and I'm not at all clear that their understanding is the same as mine.

So unless the government agrees with you and has no problem with -- I certainly accept your

representation that there's no problem allowing cross-examination as to those transmittal letters, then I'd be fine.

But Mr. Kanellis?

MR. KANELLIS: That's fine with us, your Honor.

THE COURT: Oh, it is?

MR. KANELLIS: Yes.

THE COURT: All right.

MR. KANELLIS: That is the --

THE COURT: No, no, I'll hold her to it. I mean she's an officer of the court.

He made be called.

(Pause.)

THE COURT: And while he's coming, are we clear then that the only thing that remains for the evidentiary presentation is the cross-examination of Mr. Armstrong, if you press to have Armstrong as a witness, is that right?

MS. KRISHNAN: Yes, in addition to, um, one of plaintiffs' witnesses, Professor Veena Dubal, who is the General Counsel of AAUP.

THE COURT: Yeah, when are we going to hear her?

MS. KRISHNAN: Friday.

THE COURT: Okay, thank you.

(ANDRE WATSON, sworn.)

THE CLERK: And please state your full name and spell your last name for the record.

THE WITNESS: Yes, ma'am. Andre Watson. My last name is spelled W-A-T-S-O-N.

THE CLERK: Thank you.

************

ANDRE WATSON

************

DIRECT EXAMINATION BY MR. KANELLIS:

Q. Good morning, Mr. Watson. I'm going to call you "AD Watson," because your title is "Assistant Director." Is that all right with you?

A. Yes, sir.

Q. AD Watson, who do you work for?

A. U.S. Immigrations and Customs Enforcement.

Q. And what is your current position?

A. The Assistant Director of the National Security Division.

Q. And for how long have you held the position of the Assistant Director for the National Security Division?

A. Since July of 2020.

Q. Let's talk briefly about your background. Where did you grow up?

A. I grew up in the Tidewater Region of Virginia, sir.
Q. And did you go to college?
A. Yes, sir.
Q. Where did you go to college?
A. Ultimately the Old Dominion University in Norfolk Virginia.
Q. After you graduated from college, um, what year was that actually?
A. In 1993, sir.
Q. And what did you do after you graduated from Old Dominion University in 1993?
A. I accepted an appointment to the position of Special Agent with the United States Customs Service.
Q. Briefly describe for the Court your responsibilities as a Special Agent for the Customs Service?
A. Conducting criminal investigations as to violations of customs and federal law, in addition to revenue collection investigations in furtherance of customs duties.
Q. Was that your first employment with the federal government?
A. Yes, sir, it was.
Q. May I ask you why did you want to work for the

federal government?
A. I grew up in a house that had military backgrounds with my father and I always saw a career either in the military or in law enforcement.
Q. How long did you remain as a Special Agent for the U.S. Customs Service?
A. Until the creation of the Department of Homeland Security.
Q. And when was that?
A. March of 2003, sir.
Q. Do you have an understanding, based upon your experience, of why the Department of Homeland Security was formed in 2003?
A. Yes, sir, I do.
MS. KRISHNAN: Objection.
Q. What is your understanding?
A. It was created in response to the terrorist attacks that occurred on 9/11.
Q. And what -- can you describe generally the changes that occurred with respect to the U.S. Customs Service in 2003?
MS. KRISHNAN: Objection, relevance.
THE COURT: No, no, he may do it. Generally.
How did things change?
A. For Special Agents assigned to the U.S. Customs

Service, we were merged with Special Agents from the Immigration and Naturalization Service, and for uniformed personnel with U.S. Customs Service, they were merged with uniformed personnel from the Immigration and Naturalization Service, and two agencies were created therein, being one, um, Immigration and Customs Enforcement, and the other being U.S. Customs and Border Protection.

THE COURT: Just so I'm clear, prior to this merger, the first agency was in what Cabinet Secretary?

THE WITNESS: For U.S. Customs Service, that was within the Department of Treasury, your Honor.

THE COURT: And --

THE WITNESS: And the Immigration and Naturalization Service was within the Department of Justice.

THE COURT: Understood. Thank you.

THE WITNESS: Yes, sir.

Q. So since 2003, you said the Department of Homeland Security was created. Was the Department of Homeland Security Investigations also created at that time?

A. Um, ICE was.

Q. Uh-huh. And what about -- can you explain to the Court the difference between ICE and HSI, if there is one?

A. Yes, sir. Homeland Security Investigations is a program office within U.S. Immigrations and Customs Enforcement.
Q. Okay. Now since 2003, you've worked for HSI, correct?
A. Yes, sir.
Q. And has HSI's mission changed or stayed the same since 2003?
A. It has stayed the same.
Q. Have priorities changed with different administrations since your -- since its inauguration in 2003?
A. Yes, sir.
Q. Can you give some examples of priorities changing with different Presidential administrations?
A. Yes, sir. I can begin with during the Obama administration that our priorities realigned to organized crime and firearms trafficking, to include firearms smuggling from the United States into the Republic of Mexico.
Q. Okay. And were there any other changes after the Obama administration left office?
A. Yes, sir, with the first Trump administration.
Q. Okay. Now you're aware that this case centers around HSI's enforcement of its Title VIII mission,

right?
A. Yes, sir.
Q. Can you explain to the Court briefly what your understanding of the Title VIII mission is?
A. The Title VIII mission for HSI focuses on opportunities to conduct criminal investigations as it relates to violations of United States Code. That sometimes goes into the space of Title VIII in areas such as Alien smuggling and so forth.
Q. Does Title VIII also include civil law violations?
A. It can.
Q. And in 2003, was HSI's mission, did it include the ability to enforce civil immigration laws?
A. Yes, sir.
Q. And just to be clear, were HSI's authorities, in 2003, different than they are now?
A. No, sir.
Q. You've talked about, um -- strike that.
Has the emphasis on Title VIII enforcement changed over time?
A. Yes, sir, it has.
Q. Well can you describe how it's changed?
A. It has changed in areas like investigations -- criminal investigations, in furtherance of worksite enforcement, labor trafficking. So there have been

times where HSI Special Agents have leveraged opportunities to conduct criminal investigations into those activities and allegations.

Q. And has the emphasis on Title VIII enforcement changed with different administrations?

A. Yes, sir.

Q. Does the -- do these changes impact the way HSI does business, in your experience?

A. No, sir.

Q. Can you explain to the Court why, if the priorities regarding Title VIII are different, your responsibilities remain the same?

A. Pursuant to our statutory authority, by way of the Homeland Security Act of 2003, as well as DHS delegation Order 7030.2, we've always had that authority to conduct criminal investigations to include enforcement of the Immigration and Nationality Act. So if we encounter a scenario where we're conducting a criminal investigation and we in turn identify an undocumented alien or a foreign student that is present without inspection or out of status or here otherwise contrary to law, we can, in coordination with the principal legal advisor and/or Enforcement and Removal Operations, take action.

Q. Let's take a step back to your background for a moment after you began working at HSI in 2003.

Can you briefly describe for the Court your professional background and promotions?

A. Um, yes. So again, beginning with my employment as a Special Agent with the U.S. Customs Service, I began in Atlanta, Georgia and served there for just under 8 years. And prior to that I took a reassignment to the U.S. Customs Service post in Vancouver or British Columbia as a Customs representative. And from that location I promoted out and became a Supervisory Special Agent in the Wayne Washington field office. At the time we merged and became DHS and then ICE. And then I took reassignment to ICE headquarters serving as a Section Chief and Unit Chief within the National Security Division.

And then on to an Assistant Special Agent in Charge in our Houston, Texas field office. Then back to headquarters to serve at the Department of Justice International Organized Crime Intelligence Operations Center. And then a reassignment to the Office of the Director to serve as the Chief of Staff to the Deputy Director. And then as a Deputy Special Agent In Charge in the Washington, D.C. field office. Then Special Agent in Charge in the Baltimore, Maryland field office. Before a detail assignment to DHS headquarters to serve as the Principal Deputy Assistant Secretary for the

Countering of Weapons of Mass Destruction field office.

Q. And what do you do now, again?

A. The Assistant Director for the National Security Division.

Q. How many people work for the National Security Division approximately?

A. Up to 400 employees, sir.

Q. What is the mission of the National Security Division?

A. Our mission is to leverage Customs and Immigration Authorities through programmatic support for HSI Special Agents that are assigned to the FBI's Joint Terrorism Task Force, as well as the Counterintelligence Task Force, to HSI Special Agents that are assigned to our Human Rights Violators and War Crimes Center -- as well as Unit, and also to our Special Agents that are working in the Counterintelligence Development Unit. And finally, with regards to the Student and Exchange Visitor Program compliance and oversight functions for just over 7,000 certified schools and universities in a student population of just under 1.3 million.

Q. The Student and Exchange Visitors Program, I think I mixed up that. Can you describe that a little bit?

A. Yes, sir. So that has primacy for oversight and compliance functions as it relates to colleges and

universities that are SEVP certified. So you're looking at a population of just under 7,000 schools. But you also have designated school officials, just under 40,000, that are certified by SEVP, to coordinate the functions of schools and universities in compliance with the code of federal regulations. And again, the student population is just under 1.3 million currently in the United States.

Q. How does the enforcement of immigration laws under Title VIII touch on issues of national security?

A. With regards to Title VIII, um, we are talking about non-immigration Visa holders and overstays, alien overstays, but also foreign students that are studying in the United States. So by way of the movement of people comes the opportunity for the United States government to screen and vet those persons that are coming into the United States.

So through our lines of effort and through partnerships across the agencies, we work hand and glove with the Department of Justice and the Department of State to identify risk and innate vulnerabilities as it relates to individuals that are presenting themselves for inspection or entry into the United States. But also while they're here in the United States, to ensure that they are in compliance with the laws thereto. If

there are threats or concerns that are raised, we coordinate with the inner agency to take action as appropriate.

Q. Why do these threats or concerns cause -- or how does that cause you, in the NSD, to take action?

A. With threats and concerns, we look to activities, associations, and/or conduct, and if there is linkage to foreign terrorist organizations or there are other national security or public safety concerns, those are indicators of opportunities whereby further analysis and review is required to determine if that person's presence is contrary to law.

Q. Since your work in 2003 with HSI, are you aware of historical events where immigration concerns have overlapped with the National Security Division's mandate?

A. Yes, sir.

Q. And can you provide examples of those?

A. Most recently, um, we've had instances of foreign students that have made threats at colleges and universities, and based on reports that came to the attention of law enforcement either by way of local law-enforcement representatives assigned to the Joint Terrorism Task Forces or to the school officials. HSI was brought in to conduct criminal investigations in

coordination with the JTTF in the case of one school, and in the case of another, after the fact, successfully taking action by one, issuing NTAs, in the case of one school, for individuals that were arrested on state charges, and in the instance of the other, issuing an NTA pursuant to a threat made by a student against a university Professor.

THE COURT: What's an "NTA"?

THE WITNESS: A "Notice to Appear," your Honor.

THE COURT: Thank you.

Q. And are there other historical events where the National Security Division has investigated matters relating to immigration?

A. Yes, sir, there is a continuous requirement in that space where the National Security Division has supported our Special Agents that are assigned to the Joint Terrorism Task Forces, and I have the privilege of seeing that information by way of reporting from my personnel at FBI headquarters, sir.

Q. Okay. Was the Boston Marathon Bombing, was that an example of such an immigration-related national security concern?

A. Yes, sir.

Q. And how about the San Bernadino attack?

A. Yes, sir.

Q. Okay, let's be clear about something. Does HSI make evaluations about whether someone may or may not receive a Visa?
A. Yes, sir.
Q. You make the evaluations or -- or how do you make those evaluations?
A. We contribute to that process.
Q. I see. And has that always been the case since HSI was formed in 2003?
A. To the best of my knowledge.
Q. Does HSI make decisions to revoke a visitor's Visa?
A. No, sir.
Q. What agency do you understand makes that decision?
A. The Department of State, sir.
Q. You were aware of the charges in the complaint, um, filed by the American Association of University Professors and other organizations, right?
A. Yes, sir.
Q. I'm going to refer to that organization as AAUP.
Are you familiar with the allegations that the government is targeting certain foreign Visa and green card holders for protesting?
A. Yes, sir.
Q. So that we can address them, describe your

understanding of what those allegations are?
A. That we are looking to, um, foreign students and/or potential faculty members and targeting them based on their speech alone.
Q. Does the U.S. government target individuals for removal from the U.S. based solely on participating in public protests?
A. No, sir.
MS. KRISHNAN: Objection.
THE COURT: The objection's overruled. The answer may stand.
Q. In the last couple of years, have you been aware of incidents relating to public safety at public protests?
A. Yes, sir.
Q. And, um, how are you aware of that?
A. Through reporting, um, to my division by way of personnel assigned to the Joint Terrorism Task Forces.
Q. Okay. And I believe earlier you discussed threats at school offices, right, is that what you're referring to here?
A. Yes, sir.
Q. Has HSI turned its attention to what is happening at certain on-campus protests?
A. HSI is aware of those activities based on

referrals that come to our agency, sir.
Q. AD Watson, people have the right to protest in this country, don't they?
A. Yes, sir.
MS. KRISHNAN: Objection.
Q. And people have the right to --
THE COURT: Overruled in that form and the answer may stand.
Q. People have the right to peaceably assemble in this country, correct?
A. Yes, sir.
Q. Then why is HSI aware or -- of what's happening at protests around the country?
A. Upon receipt of referrals and/or information to our Office of Intelligence, sir.
Q. And how does that trigger HSI's statutory authority?
A. The first opportunity comes from the allegation, and then it is to, one, identify either associations or activity, or conduct by persons that are identified in the referral.
Q. Why doesn't HSI just wait until an action or a violence has happened to act?
MS. KRISHNAN: Objection.
THE COURT: Well I think that's too general.

Let's come to this case.
Q. How many different Presidential administrations have you worked under?
A. At least 4 to 5, sir.
Q. With the 4 to 5 administrations you've worked under, have HSI's statutory authorities changed in any material respect?
A. No, sir.
Q. A different question.
With any of these 4 to 5 administrations, has HIS's priorities executing its statutory mission changed?
A. Yes, sir.
Q. When the Trump administration was voted in in November, did that alter in any respect HSI's statutory mission?
A. No, sir.
Q. Since the beginning of President Trump's second term, have the protocols or standards for HSI's enforcement of its statutory mission changed in any respect?
MS. KRISHNAN: Objection, lack of foundation.
THE COURT: Well to the extent of his authority and knowledge, I'm going to let him answer.
Has it within your purview?

THE WITNESS: No, sir.
THE COURT: All right, that may stand.
Q. Are you familiar with what an "Executive Order" is?
A. Yes, sir.
Q. Can you describe for the Court your understanding of what is an Executive Order?
A. An Executive Order is what I will frame as the Commander's intent, by way of the President of the United States, and direction for the Executive Office, and the agencies and department therein, to action accordingly pursuant to the laws that they have available.
Q. In your career, have you had occasion to be part of HSI's response when implementing the objectives of an Executive Order?
A. Yes, sir.
Q. And based on that experience, describe for the Court how HSI responds to Presidential executive orders?
A. Upon more recently notification of an Executive Order from the Trump administration, we look to identify existing lines of effort in program divisions that can complement the requirements or the desired in-state. So we're already looking at our lines of effort to include tactics and procedures that could prove helpful in

fulfilling the requirements therein.

THE COURT: Let me tell you what I heard you say.

In the current administration, upon receipt of Executive Orders, you align your resources and priorities, within the statutory framework or regulatory framework, best to accomplish those goals, is that fair?

THE WITNESS: Yes, your Honor.

THE COURT: All right.

Q. AD Watson, this year you referenced an Executive Order, um, issued by the Trump administration. Was this Executive Order relating to national security?

A. Yes, sir.

MR. KANELLIS: Your Honor, may I approach?

THE COURT: You may.

MR. KANELLIS: Let the record reflect I am presenting the witness what has been marked and admitted into evidence as Exhibit 70.

Your Honor, I have a copy for you, if you would like.

(Hands up.)

MR. KANELLIS: 70.

(On screen.)

Q. Mr. Watson, have you had an opportunity to -- AD Watson, have you had an opportunity to look over this document?

A. Yes, sir.
Q. Are you familiar with this document?
A. Yes, sir.
Q. Briefly describe for the Court what is this document?
A. "Protecting the United States Against Foreign Terrorists and other National Security and Public Safety Threats."
Q. And when did you, um, see this document for the first time?
A. The latter part of January 2025, sir.
Q. And this came from President Trump's office, correct?
A. Yes, sir.
Q. And what was your understanding of what this order related to?
A. Screening and vetting of, um, foreign nationals and aliens.
Q. When you received this Executive Order, did HSI already conduct screening and vetting of foreign aliens?
A. Yes, sir.
Q. What did you do with respect to your responsibilities in your office in response to this, um, upon receipt of this Executive Order?
A. Ensured that my subordinate staff, one, was aware,

and to executing operations accordingly.

Q. What do you mean by "executing operations accordingly"?

A. Existing screening and vetting operations, sir.

Q. And can you elaborate a little bit about what that means in terms of what the National Security Division actually did?

A. Yes, sir. So through process on an annual basis, the National Security Division receives just under 1.3 million records from the U.S. Customs and Border Protection arrival and departure information system. In addition to that, we also receive records from the Student Exchange Visitor Information System, and we also receive records from the Department of State Bureau of Consular Affairs as it relates to potential overstays that are believed to be within the Continental United States.

Q. Did you understand this Executive Order, when you reviewed it and received it, to change HSI's authorities in any way?

A. No, sir.

Q. Did you understand this Executive Order to change HSI's protocols for arrest or investigation?

A. No, sir.

Q. Did it change or alter the tools HSI already had

available with respect to conducting investigations?
A. No, sir.
Q. Did you -- did HSI, in response to this Executive Order, and your office in particular, develop a plan of action to implement the objectives of this Executive Order?
A. Yes.
Q. And can you describe, um, generally to the Court what did that plan entail?
A. That plan entailed a unit within the Office of Intelligence to process referrals, um, from a variety of sources, um, to complement the Executive Order and our existing lines of effort.
Q. Did that, um, initiative that you've just described involve coordination with the Department of State?
A. Yes, sir.
Q. And can you describe for the Court, um -- well, strike that.
Had -- prior to this Executive Order, had HSI in the past coordinated with the Department of State to implement national security interests?
A. Yes, sir.
Q. And describe how you've done so, you, HSI and NSD, have done so in the past?

A. So in the past, with regards to coordination from the Department of State, we've had that through our Human Rights Violators and War Crimes Center, we've had the pleasure of a virtual and/or part-time representative from the Department of State supporting that initiative in the space of human rights violators and war criminals.

Conversely, we've also leveraged that Department of State asset through our Counterthreat Lead Development Unit, as it relates to international military students that are in the United States, that sometimes go absent without leave. And upon receiving notifications from the Department of Defense of that declaration, we then in turn coordinate with the Department of State to make sure that they are aware of that status issue, and then take appropriate action as deemed necessary.

Q. With respect to the Executive Order that is contained in Exhibit 7, you indicated you coordinated with State. Well how did you -- what steps did you take to coordinate with State?

THE COURT: Actually I'm going to interrupt.

Your testimony is that following the Executive Order, you developed a plan of action concerning these matters.

Is that written down anywhere?

THE WITNESS: Not to my knowledge, sir.

THE COURT: All right. Describe it, as best you can, what's the plan now?

THE WITNESS: The plan was -- a team, based within the Office of Intelligence, that would conduct analysis on referrals from a variety of sources and prepare Reports Of Analysis for review and consideration and potential referral to the Department of State.

THE COURT: And these Reports of Analysis, I've heard them referred to as "ROAs," is that correct?

THE WITNESS: Yes, your Honor.

THE COURT: And that's -- in essence, that's the plan?

THE WITNESS: Yes, your Honor.

THE COURT: Go ahead, Mr. Kanellis.

MR. KANELLIS: Your Honor, you anticipated my next line of questions.

THE COURT: Well go ahead.

Q. Which is, um, AD Watson, for purposes of this trial, have you reviewed a visual depiction of the collaborative process between DHS and State?

A. Yes, sir.

Q. And would this chart help you to explain to the Court in understanding how that process worked?

A. Yes, sir.

(Interruption.)

THE COURT: He hasn't shown it to you yet. You're assuming it will help you. I assume he's going to show you what we have marked as HN.

Is that right?

MR. KANELLIS: HO?

THE COURT: Well maybe this is something else. All right.

MR. KANELLIS: I'm not sure about HO. I have the exhibit here, your Honor, and we will --

(On screen.)

MR. KANELLIS: Your Honor, may I approach?

THE COURT: You may.

(Hands to witness and judge.)

Q. AD Watson, we have on the screen here a visual PowerPoint presentation to assist in your testimony to the Court.

Can you describe to the Court, in a little more detail, how this initiative between State and DHS works with respect to DHS's response to the Executive Order?

A. Yeah. So as I understand it, the HSI Office of Intelligence was the "process owner," if you will, by way of their employees being criminal analysts to conduct analyses of referrals of information from a

variety of sources. Those analysts in turn, um, upon receipt of those referrals, would conduct open-source analysis and various checks to, one, validate the availability of information and/or the referral, and they would put together what's called a Report of Analysis. That Report of Analysis was prepared and reviewed and ultimately submitted for approval within the Office of Intelligence leadership framework, and then from there, um, with a letterhead memorandum prepared, in coordination with the Office of the Principal Legal Advisor as well as HSI's Special Agents assigned to the Office of Intelligence on detail, a package for referral to me as the Assistant Director.

Q. Okay. And so here we have, on the screen, depicting the HSI Director for National Security -- the Assistant Director for National Security Division, and that's you?

A. Yes, sir.

Q. Now what did you do when you received this packet?

A. Upon receipt of the approved packet, um, I then reviewed the letterhead, um, memorandum -- the letterhead memorandum letter, as well as the ROA, and with approval signed it, meaning I'm approving the submission package together, and providing a digital signature, and then referred it to the Department of

State.

THE COURT: I just want to -- your testimony was you reviewed it, and with approval, signed it, those were the words that you used. But I understand that to mean you reviewed it, and if you approved it, you signed it?

THE WITNESS: Yes, your Honor.

THE COURT: All right. I understand.

Q. And with respect to the State Department, did you participate in the internal processes of the State Department regarding this referral you sent to them?

A. No, sir.

Q. Did you hear back from the State Department at any point in time?

A. Sometimes.

Q. Sometimes. Not all the time?

A. Correct.

Q. Okay. Well let's pick up again from when you heard back from the State Department.

What happened then?

A. Thank you. We, on occasion, would receive notification from the Department of State that an action letter is forthcoming by way of transmission from the Department of State's Executive Secretary to the ICE Executive Secretary.

Q. And what happened next?

A. Upon receipt of that correspondence, we would then transfer it to the HSI Office of Domestic Operations and then from there to the appropriate HSI field office for action as deemed appropriate.

THE COURT: Just so as I understand this chart. Back it comes with the notation, "Action Letter," but it's parallel, it runs through you and through the ICE Executive Secretary, have I got that correct?

THE WITNESS: Yes, your Honor.

THE COURT: So who, um -- but once that action letter comes out, I don't see any place where action stops, it -- in any event you're notified, the Secretary is notified, and the action letter moves on, because this is a letter for action, to the HSI Domestic Operations Division.

Have I got that right?

THE WITNESS: Yes, your Honor.

THE COURT: So you're notified, but you're not asked to do anything else. Now comes the action from the Department of State?

THE WITNESS: Yes, your Honor.

THE COURT: Okay.

THE WITNESS: And I would further add to that, that in the beginning, some went to me directly, and the

others flowed through the Executive Secretary. So that's the reason why you have two arrows. There were, um, variations in who it went to. But those were the two recipients, either myself or the ICE Executive Secretary.

THE COURT: Or both?

THE WITNESS: Yes, sir.

Q. So then it went to the HSI SAC office, right?

A. Yes, sir.

Q. And in the SAC office, these are regional offices that would be in the place where the individual and his targeting is supposedly located, is that a fair statement?

A. Yes, sir.

Q. Okay. And then were arrests, um, made at that point?

A. Yes, sir.

Q. And what if somebody had left the country, were arrests made?

A. No, sir.

Q. Okay.

THE COURT: Well he's given an example that would justify these red boxes that say "No action." But other than having left the country already, where there other grounds at that stage for no action? Does my question

make sense?

THE WITNESS: It does, your Honor.

For the purpose of this, um, matter, um, no. But in other contexts the answer can be no action. Because if someone does leave by way of a voluntary departure, then there's no action, they left on their own accord.

THE COURT: All right.

THE WITNESS: So that's the reason why you would have that box there.

THE COURT: Thank you.

MR. KANELLIS: Your Honor, we, pursuant to Rule 107, we move into evidence, as a pedagogical exhibit, um, the exhibit, um, you have in your hand.

MS. KRISHNAN: Objection, this is a chalk, it doesn't need to be in evidence.

MR. KANELLIS: Your Honor, you --

THE COURT: Wait a minute. I'm a little unclear here, I guess. I'm perfectly willing to take this as a chalk as I took HN. Isn't that satisfactory?

MR. KANELLIS: Yes, your Honor, it's just a device to aid the Court.

THE COURT: It is, and it is as I understand it.

Q. AD Watson, as HSI's Assistant Director for National Security, do you have some familiarity with the volume of protests that have occurred in the United

States after the attacks of October 7th, 2023?
A. Yes, sir.
Q. And, um, how would you describe the number of protests based on your personal knowledge?
A. It increased.
Q. Have these protests occurred around the country?
A. Yes, sir.
Q. And to your knowledge have any of these protests included speech against the State of Israel or in support of Palestine?
A. Yes, sir.
Q. With respect to the volume of leads that the National Security Division has reviewed, through this process you've just described, has the volume of leads increased by HSI -- received by HSI increased over the last 6 months?
A. Yes, sir.
Q. How much would you say?
A. Um, I'd give it a modest increase, sir.
Q. And have you received leads regarding individuals who have been associated with protests?
A. Yes, sir.
Q. And with respect to the leads you received regarding individuals associated with these protests, about how many total have you reviewed?

A. At least 20. But I don't believe more than 30, sir.

Q. So between the thousands of protests, you've reviewed 20 or 30 referrals, is that a fair statement?

A. Yes, sir.

MS. KRISHNAN: Objection, misstates testimony.

THE COURT: No, he just adopted it. I'm going to let that stand.

Q. I'm going to ask you about five individuals who passed through this referral process you've just described?

Are you familiar with the name "Rumeysa Ozturk"?

A. Yes, sir.

Q. Is Ms. Ozturk one of the individuals referred in the vetting process between DHS and State that you just described?

A. Yes, sir.

Q. Was Ms. Ozturk's referral processed through the vetting procedures you've outlined above?

A. Yes, sir.

Q. And was Ms. Ozturk arrested?

A. Yes, sir.

Q. Was Ms. Ozturk arrested because she engaged in political speech?

MS. KRISHNAN: Objection.

THE COURT: Well I'm going to sustain that. You are leading this witness. You called him.

MR. KANELLIS: All right, that's fine.

Q. Are you familiar with the name "Badar Khan Suri"?

A. Yes, sir.

Q. Is Mr. Suri one of the individuals referred in the vetting process between DHS and State described above?

A. Yes, sir.

Q. And was Mr. Suri's referral given the same multilevel vetting review you've described before?

A. Yes, sir.

Q. Was Mr. Suri arrested?

A. Yes, sir.

Q. Was Mr. Suri arrested because of his political speech?

MS. KRISHNAN: Objection, your Honor.

THE COURT: Sustained.

MR. KANELLIS: Your Honor, what is the basis for the --

THE COURT: You're leading the witness.

Q. Do you know why Mr. Suri was arrested?

A. Yes, sir.

Q. Why was he arrested?

A. Because the State Department took action on his immigration status, sir.

Q. Are you familiar with the name "Mohsen Mahdawi"?
A. Yes, sir.
Q. Is Mr. Mahdawi one of the individuals referred in the vetting process between DHS and State that you described to the Court?
A. Yes, sir.
Q. Did Mr. Mahdawi receive a full vetting for the multiple levels of review you described?
A. Yes, sir.
Q. And was Mr. Mahdawi arrested?
A. Yes, sir.
Q. And why was Mr. Mahdawi arrested?
A. A change by the Department of State in his immigration status.
Q. Are you familiar with the name, um, "Mahmoud Khalil"?
A. Yes, sir.
Q. Is Mr. Khalil one of the individuals referred to in the -- that's referred in the vetting process between the Department of Homeland Security and State that you've described to the Court?
A. Yes, sir.
Q. Did Mr. Khalil's case receive a full vetting through the process you've described to the Court?
A. Yes, sir.

Q. Was Mr. Khalil arrested?
A. Yes, sir.
Q. And why was Mr. Khalil arrested?
A. Action by the Department of State against his immigration status.
Q. Are you familiar with the name "Yunseo Chung"?
A. Yes, sir.
Q. Is Ms. Chung one of the individuals referred in the process you've described regarding the State and DHS collaboration you've described to the Court?
A. Yes, sir.
Q. And did Ms. Chung's case receive a full multilevel review, the same multilevel review you've described to the Court?
A. Yes, sir.
Q. In your career, AD Watson, going back more than 20 years to 2003, have you ever heard of a policy instituted by the U.S. government to target people for deportation based upon engaging in political speech?
MS. KRISHNAN: Objection.
THE COURT: Overruled.
A. No, sir.
Q. In the last year, have you heard about any Visa revocation decisions or removal decisions made by anyone in the U.S. government that remains solely because

someone engaged in political speech?

MS. KRISHNAN: Objection.

THE COURT: Sustained.

Q. Are you aware, in the last year, of any decisions made by anyone in the U.S. government regarding removing a person from the United States for political speech?

MS. KRISHNAN: Objection.

THE COURT: Overruled.

A. No, sir.

MR. KANELLIS: We tender the witness.

THE COURT: Ms. Krishnan.

CROSS-EXAMINATION BY MS. KRISHNAN:

Q. Good morning, Mr. Watson.

A. Good morning.

Q. You were the Assistant Director at the National Security Division, correct?

A. I am.

Q. In HSI?

A. Correct.

Q. That makes you the senior-most official in the National Security Division?

A. Correct.

Q. You report to Acting Deputy Executive Associate Director William Russo?

A. Today, yes.
Q. And you've been in your current role since July 2020?
A. Correct.
Q. And you've worked at DHS since its inception?
A. Correct.
Q. In 2003?
A. Correct.
Q. The President has issued several Executive Orders that relate to HIS's work, right?
A. There are overlaps in the Executive Orders and HSI's investigative authorities, yes.
Q. You need to be familiar with these Executive Orders to do your job?
A. I'm sorry, I'm not following the question, Madam.
Q. Well the Executive Orders that you say overlap with HSI's work, you have to be familiar with those Executive Orders to do your job, correct?
A. We have to be familiar with our authority by way of statute and that training comes from the Federal Law Enforcement Training Center in Brunswick, Georgia. So those are the authorities that give us the ability to conduct investigations. So I would reference the Homeland Security Act of 2003 as well as DHS Delegation Order 7030.2, it is those authorities that give HSI the

ability to conduct criminal investigations.
Q. So your testimony is that you don't need to be familiar with Executive Orders that touch on HSI's work?
MR. KANELLIS: Objection, mischaracterizes --
THE COURT: Sustained, that wasn't his testimony.
Q. Do you need to be familiar with Executive Orders to do your job?
A. (Pause.) Do I need to have situational awareness of Executive Orders? It's helpful.
Q. Did you tell Mr. Kanellis that you were familiar with Executive Order 14161?
A. May I see it again to make sure I'm speaking to the correct one.
THE WITNESS: (From Judge.) Thank you, sir.
A. (Looks.) Yes.
Q. This Executive Order is titled "Protecting the United States from Foreign Terrorists and other National Security and Public Safety Threats"?
A. Yes, ma'am.
Q. Okay. And you are also familiar with Executive Order 14188?
A. By way of this matter, yes.
Q. And it's titled, "Additional Measures" --
THE COURT: Your answer then, that, um -- here's what I hear.

Once this case came up and you were preparing to testify and the like, you became more familiar with that Executive Order, is that accurate what you were saying to me?

THE WITNESS: Yes, your Honor.

THE COURT: And before that you may have known that it existed, but at least in terms of touching on what you say "situational awareness," doing your job, you didn't have any particular, um, awareness of that?

THE WITNESS: Yes, your Honor.

THE COURT: Are my statements fair? I don't want to put anything in your mouth.

THE WITNESS: Your statements are fair. Yes, your Honor.

THE COURT: All right.

Go ahead.

Q. ICE is enforcing Executive Order 14188, is that correct?

A. I'm sorry, state that again. Someone was coughing.

Q. ICE is enforcing Executive Order 14188, isn't it?

A. "Enforcing" the Executive Order?

Q. Yes.

A. May I see it, please?

Q. You'd like to see the Executive Order?

A. Yes, ma'am. I don't have it in front of me.
Q. It's being pulled up on the screen.
A. Okay. (Looks.)
Q. All right. I'm going to ask you again.
Is ICE enforcing the Executive Order 14188?
A. So, Counselor, I only see Page 1 in front of me, and this Executive Order speaks to specific lines of effort and gives primacy to various departments. So I'll reference in Section 3, um, Section C, that the attorney in general is encouraged to employ appropriate civil rights enforcement authorities. ICE is a component within the Department of Homeland Security and not within that framework. So since I can only see the first page, I don't think it's wise to speak beyond that under oath.
Q. And, Mr. Watson, you were deposed in this case, correct?
A. Yes.
Q. You were deposed just over a month ago on June 11th?
A. The month of June, yes. The date I don't remember.
Q. And you understood that you were then under oath?
A. Yes.
Q. And you had an attorney present with you at that

deposition?
A. Yes.
Q. You were asked this question and gave this answer at that deposition.
Question: "So as you indicated in your declaration, ICE enforces the Executive Order 14188, correct?" And your answer was "Yes, ma'am"?
MR. KANELLIS: Objection, your Honor. Can the witness and can I see the transcript so we can --
THE COURT: Well she's read it, and in these circumstances, she's entitled to read it. If she wants to question him, then she should show it to him. But that's what he said on his deposition and I'm allowed to pair it with his testimony at trial, and I do.
Go ahead. Go ahead, Ms. Krishnan.
MS. KRISHNAN: Thank you.
Q. HSI is implementing the two Executive Orders we've discussed?
MR. KANELLIS: I'm going to object again, your Honor, what she said mischaracterizes --
THE COURT: Wait a minute. When I need your argument, I'll ask for it. The objection is sustained.
See he hasn't said it.
MS. KRISHNAN: I was reading from the data, but I believe we've now got the deposition transcript up on

the screen. And this starts at the bottom of Page 11, um, 111, my apologies, and it runs on to the top of 112.

(On screen.)

Q. So it says: "So as you indicated in your declaration, ICE enforces this Executive Order 14188, correct?" And the answer states, "Yes, ma'am."

You said that, right?

A. It's captured in the transcript, Counselor.

Q. Okay, thank you.

And HSI is implementing --

A. I'm sorry, the screen just went dark. I apologize. I can't see it anymore.

Q. Understood. I'm not asking -- this question isn't about your deposition transcript.

HSI is implementing EO 14161 and EO 14188, is that right?

A. (Looks.) HSI has participated in support of Enforcement and Removal Operations as it relates to Title VIII initiatives. So by virtue of that support that HSI, as a program office, has provided to ERO, that that can apply on a large macro scale. But I can't speak to individual instances as I do not have oversight of every operation or investigation that is being conducted in the United States.

Q. HSI has implemented the Executive Orders we've

discussed by initiating a new program, right?
A. That's fair.
Q. Uh-huh. And you learned of this program through an executive briefing in March?
A. That's correct.
Q. Attended by senior HSI leaders?
A. That's correct.
Q. Including Acting Deputy Executive Associate Director Derrick Gordon?
A. Gordon, yes.
Q. And then Acting Executive Associate Director Robert Hammer?
A. That's correct.
Q. Assistant Director of the Office of Intelligence Peter Hatch was also present?
A. That's correct.
Q. As was your deputy, Bradley Etter?
A. That's correct. Well not my deputy, Mr. Etter is the deputy of Assistant Director Peter Hatch. Mr. Etter works within the Office of Intelligence. He's not my deputy.
Q. Understood. And the purpose of this program, what you called the Plan of Action letter, it was to identify protesters whose actions violated the Executive Orders?
A. (Pause.) The plan of action was to address the

referrals of information, um, as it relates to it. So I can't say, as you stated, that is the plan of action, that's not what I recall specifically.

Q. But you became aware of activities at student protests from the Reports of Analysis, that was your testimony?

A. Me personally, yes.

Q. Okay. And the program we'd been discussing, it led to a new process, right?

A. I don't know that it's a new process, because I can't speak to the lines of effort that the Office of Intelligence already has in place.

Q. Well I'm going to return to the deposition transcript. (Pause.) All right, well before I get to the transcript.

This process was new in your time at HSI, is that right?

A. It's new in my role as the Assistant Director where we, by way of the National Security Division, are providing a resource in support thereof.

Q. Were you aware of this process before you assumed your current role as Assistant Director in the National Security Division?

A. Not to my knowledge, no.

Q. Okay. And the process we're discussing, that

involved collaboration between the Office of Intelligence, the National Security Division, and the State Department, right?

A. If you're referencing the meeting between Mr. Hammer, Mr. Gordon, Mr. Hatch, Mr. Etter, and myself? Yes.

Q. And pursuant to this process, the Office of Intelligence creates Reports of Analysis?

A. The Office of Intelligence creates Reports of Analysis by way of a mission-essential function, that's what they do regardless.

Q. "Yes" or "No," the Office of Intelligence creates Reports of Analysis?

MR. KANELLIS: Objection, asked and answered.

THE COURT: It was. But just so I'm clear.

You've always been providing Reports of Analysis, is that correct?

THE WITNESS: Yes, your Honor.

THE COURT: All right. But then you have this meeting -- here's what I'm getting from this.

So you have this meeting, and so your focus in doing what you've always done, that does change about the emphasis on a certain aspect of things.

Isn't that right?

THE WITNESS: Yes, your Honor.

THE COURT: All right.

Q. And at this briefing, you discussed Reports of Analysis on activities contrary to the Executive Orders, those were the specific Reports of Analysis you discussed at this meeting?

MR. KANELLIS: Objection, your Honor.

THE COURT: Sustained, on the deliberative process privileged, what they discussed.

MS. KRISHNAN: This concerns an instruction that was provided at the briefing.

THE COURT: Well you're cross-examining, you may frame it that way, you were instructed thus and so.

MS. KRISHNAN: Okay.

Q. Was the Office of Intelligence instructed to create Reports of Analysis on activities contrary to the Executive Orders?

A. I don't recall that instruction being given or hearing it. I don't recall.

Q. Well as part of the process that we're describing, the Office of Intelligence producing Reports of Analysis on activities contrary to the Executive Orders?

THE COURT: I guess I'm not following. In other words, among the duties that he was expected to see implemented, was Reports of Analysis of activity that ran contrary to the Executive Orders?

MS. KRISHNAN: That's correct.

THE COURT: All right. I follow that.

Is that what you were told? Is that what you were expected to emphasize or focus on, Reports of Analysis of conduct that, among other things, ran contrary to the President's Executive Orders?

THE WITNESS: That was a deliverable that would be produced upon completion of analysis. So it's an output, your Honor, that could result from their efforts to review information received from various sources.

THE COURT: Right, I follow that. So let me put it to you another way.

One of the things you were directed to do was look at your leads and see if, having done your professional work, there's conduct contrary to the Executive Orders?

THE WITNESS: Yes, sir, your Honor.

THE COURT: All right.

Go ahead, Ms. Krishnan.

MS. KRISHNAN: Thank you.

Q. And these reports were then sent to the National Security Division?

A. If they were approved.

Q. Approved by the Office of Intelligence?

A. That's correct.

Q. Uh-huh. And upon receipt of these reports, the

National Security Division reviews them?
A. That's correct.
Q. And if the National Security Division determines that an ROA should be referred to the State Department for potential action, it refers that Report of Analysis to the State Department?
A. In coordination with the Office of the Principal Legal Advisor.
Q. Senior leaders at HSI have been continually updated about the new program, correct?
A. I don't understand the question in terms of "continually updated"?
Q. Well have senior leaders received updates about the new program?
A. They have received briefings and updates on the work and progress thereto.
Q. This program has been discussed in numerous meetings since the executive briefing, right?
A. (Pause.) It has come up on several occasions from its inception, but I can't say when those briefings ceased.
Q. Well it has been discussed on at least a weekly basis, right?
A. At its inception, yes.
Q. And in these meetings, senior HSI leaders were

present?

A. Yes.

Q. I want to talk more about your role in the process we've been discussing.

You received instructions in connection with the process, right?

A. Yes.

Q. From senior HSI leaders?

A. Yes.

Q. Including Derrick Gordon?

A. Yes.

Q. And Robert Hammer?

A. Yes.

Q. You were instructed to make referrals to the State Department?

A. Yes, when deemed appropriate.

Q. Uh-huh. These referrals included the Report of Analysis?

A. Yes.

Q. And an accompanying letter?

A. Yes.

Q. That was signed by you?

A. Yes.

THE COURT: I just want to get the names right. From Derrick Gordon and Robert --

THE WITNESS: Hammer.

THE COURT: Hammer. Yes. Thank you.

Q. And when deemed appropriate, you sent these referrals directly to John Armstrong?

A. He was one recipient, yes.

Q. He's the head of the State Department's Bureau of Consular Affairs?

A. That is my last understanding.

Q. HSI couldn't act on these referrals alone?

A. Correct.

Q. HSI needed Secretary of State Marco Rubio or Senior Bureau Official John Armstrong to decide whether it was appropriate for HSI to act or not?

A. (Pause.) Their decision is pursuant to their authorities, not ours.

THE COURT: Well I think what she's asking is you understood that, um, when she says you "needed them" under the law to take it any further, it was a decision that resided by law in the Secretary of State or in some instances Mr. Armstrong, is that what you thought?

THE WITNESS: Yes, your Honor.

THE COURT: All right.

Q. And some of these referrals sought the Secretary of State's assessment whether a noncitizen's activities in the U.S. would compromise a compelling U.S. foreign

policy interest, right?
A. Correct.
Q. In some of these referrals, it was the State Department's assessment whether to revoke a Visa, correct?
A. Correct.
Q. You had conversations with the State Department about these referrals?
A. Only to inform that they are coming.
Q. Okay. The first time you had one of these conversations was in March?
A. That seems accurate.
Q. You made the referral in Mahmoud Khalil's case?
A. I signed the letter, yes.
Q. And in Yunseo Chung's case?
A. I signed that letter too.
Q. In Rumeysa Ozturk's case?
A. I signed that letter.
Q. In Mohsen Mahdawi's case?
A. I signed that letter.
Q. In Badar Khan Suri's case?
A. I signed that letter.
Q. And these referrals I just mentioned, they were part of any process we've been discussing?
A. Yes.

Q. All of these referrals went through you?

A. Yes.

Q. And you've made other referrals through this process?

A. Yes.

Q. And as part of this new process, you've seen Reports of Analysis that discuss a person's pro-Palestinian views?

A. (Pause.) Some could have contained that information, but I can't speak to every one without the benefit of the document in front of me.

Q. Some did in fact contain that information, correct?

THE COURT: Well he just answered that.

MS. KRISHNAN: He said "could have."

THE COURT: Okay, I stand corrected. You are right.

Are you able to testify that some did?

THE WITNESS: I would respectfully ask your Honor, since I'm under oath, to have the benefit of a review.

THE COURT: All right.

Q. At your deposition you were asked, "Since this new program began in March, have you seen any ROAs that discussed someone's pro-Palestinian views?" And your answer was "Yes."

Do you recall saying that?
A. I do.
Q. And you have seen ROAs that discuss a person's anti-Israel view?
A. I have seen those, yes.
Q. You've also seen ROAs that discuss a person's alleged pro-Hamas advocacy?
A. Yes.
Q. You've seen ROAs that discuss a person's alleged antisemitic activities?
A. Yes.
Q. And your best recollection is that the number of referrals that you have made since March is between 10 and 50?
A. I do recall giving that answer, yes.
Q. Uh-huh. This was as of June, when we had the deposition?
A. Yes.
Q. In deciding to make referrals as part of this process, you have relied only on information contained in the Reports of Analysis that you received, right?
A. Yes.
Q. In other words, the basis for referral in each case was the Report of Analysis?
A. Yes.

Q. You read the ROAs you received before deciding whether to refer them to the State Department?
A. I review them, yes.
Q. And you review them to determine whether they are complete?
A. Yes.
Q. In other words, you review them to make sure that they're readable?
A. That's fair.
Q. And to make sure the ROA contains what it says it contains?
A. That's fair.
Q. And if they are complete, you send them to the State Department?
A. Yes.
Q. In fact in every case you have received a Report of Analysis as part of the new program we've been discussing, you've referred it to the State Department?
A. (Pause.) Yes.
Q. Because the question whether a Visa should be revoked or whether a removability determination should be made, that's a determination for the State Department to make?
A. Yes.
Q. I'd like for us to look at one of the letters that

you wrote. I will show you a document that has been premarked as D by the government.

MS. KRISHNAN: Your Honor, may I approach?

THE COURT: This is not yet in evidence?

MS. KRISHNAN: It's not in evidence, your Honor.

THE COURT: You may.

(Hands.)

MR. KANELLIS: Your Honor, I'm going to object to the extent that this document is attorneys-eyes only.

THE COURT: For that reason we're not going to put it on the public screen, but we may use it.

MR. KANELLIS: Thank you, your Honor.

A. (Reads.)

Q. This is a true and accurate copy of the referral letter that you sent in Mr. Khalil's case?

A. It appears to be the case. But for clarification, you said earlier a letter I "wrote," and there's a difference between you writing a letter and signing a letter. So I want to be clear that in the questions you've asked me up to this point, signing is applicable.

Q. Okay, so this is a true and accurate copy of the referral letter that you sent in Mr. Khalil's case?

A. That I signed and that I sent.

Q. Thank you.

MS. KRISHNAN: I'd like to offer this as an

exhibit, um, Number 242.

MR. KANELLIS: Objection, your Honor, no foundation for a hearsay exception.

THE COURT: Overruled. It's admitted as Exhibit 242 in evidence.

(Exhibit 242, marked.)

Q. Now you testified at your deposition -- you testified at your deposition that you don't --

THE COURT: Well I think I should simply say for everyone's guidance that my receiving it in evidence means only that it is part of the record in this case and, um, it does not lose its attorneys-eyes only designation. I think I've made that clear with respect to documents given to plaintiffs and the like. Where it's agreed they're attorneys-eyes only, that restriction remains until further order of the Court.

But go ahead, it is in evidence, and it's part of the record upon which I will review and base my decision.

Go ahead.

MS. KRISHNAN: Thank you, your Honor.

May I just clarify that, um, what you just said means that I can't, um, quote anything from the document?

THE COURT: No, you can.

MS. KRISHNAN: Oh, I can quote. Thank you.

Q. Now you testified at your deposition that you don't determine whether an activity is antisemitic in your work, correct?

A. Ma'am, I don't have my testimony in front of me to confirm that, so it would be helpful, if that's available, to see it.

MS. KRISHNAN: Let me show it to you.

(On screen.)

Q. Could you read lines -- this is on Page 135, Lines 4 to 10.

A. (Reads.)

Q. And please tell me when you're done reading.

A. Yes, I see that. Yes, ma'am.

Q. Thank you.

So you testified at your deposition that you don't determine whether an activity is antisemitic, correct?

A. Yes.

Q. And you testified that you don't know how someone else at HSI determines whether an activity is antisemitic?

A. Correct.

Q. Now if you look at, um, 242, in the first sentence here you state: "I am writing to provide a summary of the actions by Mahmoud Khalil that violate President

Trump's Executive Orders on antisemitic"?
A. Uh-huh.
Q. So you don't know how HSI determines activities are antisemitic?
A. I don't because I didn't.
Q. Okay. And so you don't know -- but you say here, um, that Mr. Khalil's actions violate President Trump's Executive Orders on antisemitism?
A. I signed the letter, yes.
THE COURT: Who -- these letters, they may differ in detail of course, but who would prepare such a letter for your signature?
THE WITNESS: The letters that --
THE COURT: And I don't mean that disparagingly, people prepare letters for my signature.
Go ahead.
THE WITNESS: Thank you, your Honor.
So the letters accompany the ROA. I don't know who prepared it within the Office of Intelligence --
THE COURT: But within the team that put the packet together -- you get a packet?
THE WITNESS: Yes, sir.
THE COURT: And you testified -- and I don't mean to delay it, but you've testified to your review of the packet, and having reviewed it and read the letter, you

have signed it.

Is that a proper characterization of your involvement in these letters?

THE WITNESS: Yes, your Honor.

THE COURT: Go ahead.

Q. When you signed this letter, did you adopt its contents?

THE COURT: Well I think that's what "signing" means and that's the inference I'm going to draw.

MS. KRISHNAN: Thank you, your Honor.

Q. And just to be clear, the Executive Orders referred to in this first sentence, they are EO 14161 and EO 14188, correct?

A. That's fair.

Q. Now during your deposition you testified that you don't know how HSI assesses whether a person's presence or activities in the U.S. could have adverse foreign policy consequences?

MR. KANELLIS: Objection, your Honor, what he testified to in his deposition is irrelevant, she can just ask him the question.

THE COURT: Well I'll make that determination. But he's present and so I think your use of the deposition should be confined to impeaching him. And I'll sustain the objection on that ground.

Q. You don't know how HSI assesses whether a person's presence or activities in the U.S. could have adverse foreign policy consequences?
A. Can you repeat that question again, please?
THE COURT: You don't know whether a person's presence or activities in the United States could have adverse foreign policy consequences?
THE WITNESS: Correct.
Q. And you don't know who at HSI makes that determination?
A. Correct.
Q. So turning to -- back to the first sentence of the first paragraph of Exhibit 242.
It states that Mr. Khalil's actions, quote, "may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences to the U.S. from Mr. Khalil's presence here," right?
A. (Looks.) I'm sorry, when you're reading that sentence, did you say the first sentence in the first paragraph?
Q. Yes.
A. (Reads.) Okay. "May be sufficient for the Secretary of State to determine" -- yes.
Q. So you don't know how HSI made that assessment?
A. (Pause.) I don't, but I would defer to the Report

of Analysis that was completed by the Office of Intelligence and the intelligence professionals that were responsible for it.

Q. Is your testimony that the Report of Analysis created by the Office of Intelligence included that assessment?

A. When you say "included that assessment," what do you mean?

Q. Well the assessment we've been talking about is the Secretary -- that it may be sufficient for the Secretary of State to determine that there are compelling adverse foreign policy consequences to the U.S. from Mr. Khalil's presence in the United States?

A. The Report of Analysis that's done by the Office of Intelligence professionals is materials that they have found through their research, those materials are what is provided in that determination for the benefit thereof.

Q. "Yes" or "No." The Report of Analysis created by the Office of Intelligence included the assessment that I just described, that it may be sufficient for the Secretary of State to determine that there are compelling adverse foreign policy consequences for the U.S.?

MR. KANELLIS: Objection.

THE COURT: No, she may have the question in that form. Overruled.

You may answer.

A. By including the Report of Analysis as part of the package? I think that's fair.

Q. And I'm asking about the contents of the Report of Analysis?

A. I understand, but I don't have that in front of me.

THE COURT: He answered your question that he thought it was fair.

MS. KRISHNAN: Okay, well the ROA will speak for itself.

Q. And the agency has not decided what activities contrary to the EO means?

A. I'm sorry, which agency?

Q. ICE. ICE has not decided what activities are contrary to EO 14161 and EO 14188, correct?

A. This letter is coming from HSI, so I can't speak for ICE. I can only speak to the program office on the letter.

Q. All right. Let me ask about HSI then.

Has HSI -- withdrawn.

HSI has not decided what activity is contrary to the Executive Order means?

A. I'm sorry, is that a question for me?
Q. That is a question for you.
A. By way of the Report of Analysis being submitted with the letterhead referral, it's for that consideration. Hence the word "may."
Q. "Yes" or "No," Mr. Watson. Has HSI decided what activities are contrary to the Executive Orders?
THE COURT: I guess really I don't understand the question. He's got before him a Report of Analysis. He signs the letter which was intended to move the thing along to the Secretary of State, or to Mr. Armstrong anyway, and I infer that he adopts what he signed after reviewing the Report of Analysis. So the logical inference from that, given the language here, is that the appropriate individuals who did the investigation came to that conclusion. But if you're asking whether there was a separate, um, standard, "This conduct fits," "This conduct does not," that's a different question. That's my confusion.
MS. KRISHNAN: Your Honor, that's precisely why I want to ask this question, because in his deposition testimony he stated that HSI had not decided what activities are contrary to --
THE COURT: Well I haven't heard any evidence to suggest that HSI has, as a general matter, decided it,

and -- but again, I say that to help.

About how much more have you got for this witness? Or phrased another way, do you want to take the morning recess?

MS. KRISHNAN: Yes, thank you.

THE COURT: All right. We'll take the morning recess for one half hour till 11:15. We'll stand in recess.

(Recess, 10:45 a.m.)

(Resumed, 11:15 a.m.)

THE COURT: Ms. Krishnan, you may continue.

Q. Mr. Watson, just to finish the topic we were on before the break.

HSI has not adopted standards for deciding what activities violate the two EOs we have been discussing, correct?

A. Not to my knowledge.

Q. And just returning to the letter, Exhibit 242. The first sentence of the third paragraph states that: "Mr. Khalil's involvement in the March 6th, 2025 protest at Barnhard College aligns with the Executive Orders focused on deporting Hamas sympathizers."

Do you see that?

MR. KANELLIS: Objection, she misreads it.

THE COURT: Well it's not exactly what it says,

but, um --

Do you see that sentence, sir?

THE WITNESS: Yes, your Honor.

THE COURT: That was her question. So focus on that sentence.

Now your question?

(Pause.)

Q. So your testimony is that HSI has not adopted, um, a standard for deciding what activities --

THE COURT: He just testified to that. Let's move on.

MS. KRISHNAN: All right.

Q. You don't know whether EO 14188 indicates that it is the foreign policy of the U.S. to combat antisemitism, correct?

A. I'm sorry, ask that question again, please?

Q. You don't know whether EO 14188 indicates that it is the foreign policy of the U.S. to combat antisemitism, correct?

A. I don't have that EO in front of me. So maybe that could be helpful, considering that I'm under oath.

Q. I don't -- the question is whether you know or you don't know?

A. I don't know.

Q. Okay. And you haven't been told whether the U.S.

has a policy of combating antisemitism domestically or abroad?

A. I'm sorry, I haven't been told. I'm trying to understand the question. There's an Executive Order.

Q. The question is, you haven't been told that the U.S. has a policy of combating antisemitism in America and abroad?

A. I don't recall being told, no.

Q. In your letter, um, at the second line of the last paragraph on the first page, you state that: "HSI is concerned that Mahmoud Khalil's protest activities, quote, 'may undermine U.S. foreign policy.'" Correct?

A. Correct.

Q. "May undermine U.S. foreign policy by creating a hostile environment to Jewish students," right?

A. That is one part of the sentence, yes.

Q. You testified earlier, during your direct examination, that your job at HSI is to protect national security and public safety, right?

A. Yes.

Q. That is HSI's mandate?

A. One of them, yes.

Q. And you don't know whether antisemitic activity falls within HSI's national security and public safety mandate?

THE COURT: Ask it again? I didn't understand the question.

Q. You don't know whether antisemitic activity falls within HSI's national security and public safety mandate?

MR. KANELLIS: Objection, foundation.

THE COURT: Well to me it's too vague, because it could. It's so vague.

MS. KRISHNAN: Okay.

Q. Does antisemitic activity fall within HSI's national security mandate?

THE COURT: Again, I don't know what you mean by "antisemitic activity." Two of the witnesses you have called have defined "antisemitism." When we -- if we have any time this morning, it's sort of sensitive, I think -- we're not going to have a bifurcated trial argument, but now that we're pretty much done with evidence, I was going to make some observations sort of to tee up what I'm thinking going into final arguments and to define certain things. One of the things I'm going to define is "antisemitism." And now that I started talking -- and I'm going to define it in the way plaintiffs' witnesses defined it, that is "hostility based upon one's faith or ethnicity to the group." That's what "antisemitism" is.

Now antisemitic activity can range from pure speech to -- and we've seen it, horrific violence. So I don't know what that means.

The objection is sustained.

MS. KRISHNAN: Understood, your Honor. My question is about antisemitic activity as that term is used in Mr. Watson's letter.

THE COURT: Well then can we ask him, to what did you think that phrase meant? What did you think that phrase meant, "antisemitic activity," when you saw you letter?

THE WITNESS: Well there's more to that phrase, and what's left out in the sentence you read was the part about indicating support for a designated terrorist organization, that is where HSI would be concerned pursuant to, as you referenced, our posture and mission as it relates to national security and public safety, and by way of our participation on the Joint Terrorism Task Forces.

Q. So HSI is concerned about antisemitic activity only insofar as it is tied to support for a designated foreign terrorist organization?

A. In this instance it's captured in the letter, each is a case-by-case determination.

Q. Well I'm asking generally, in the context of the

program that we've been talking about, is HSI concerned about antisemitic activities only so far as it demonstrates support for a designated foreign terrorist organization?

A. That could be a trigger in reference thereto, yes.

Q. So is HSI -- so HSI is concerned about antisemitic activity outside of that circumstance?

A. I don't understand the question?

THE COURT: No, no, that question makes sense because your answer was "It could be a trigger."

THE WITNESS: Yes.

THE COURT: And as I listen to that, that suggests that there's other forms of antisemitic activity that also could be a trigger.

Is that what you meant to say?

THE WITNESS: Yes.

THE COURT: Tell me what they are?

THE WITNESS: Other triggers could relate to associations, activities, or conduct that violates the Immigration and Nationality Act or U.S. law.

THE COURT: Well do associations violate the Act? You used the word "associations" and then you went to conduct.

THE WITNESS: Not necessarily, it's a case-by-case determination. Associations would warrant a further

investigation.

THE COURT: For instance, as to one of these individuals, it turned out that the wife of one of these individuals, her father, was an alleged Hamas leader. Now a law-enforcement agency, one imagines, would be interested in that fact. The fact itself might not be useful, but that's certainly an interesting fact. Whatever she's trying to get at, that's what I'm --

What else is there?

THE WITNESS: So --

THE COURT: Something like that? That's an association.

THE WITNESS: The association could be relevant as to a determination of admissibility. So if that factor is known by --

THE COURT: Well my duty here is people we've already admitted they're lawfully in here and the issue the plaintiffs claim is that the way they were -- their Visas were taken away or their status was taken away, they challenge that, that's the issue. So they're lawfully here.

And we'll let you ask the next question.

(Pause.)

Q. And so to be clear, HSI is concerned about associations that demonstrate antisemitic activity

whether or not it's linked with terrorist activity?

A. Foreign terrorist activity can be a cornerstone and it can expand. I would defer to the investigation and the analysis to determine if this is something that should be referred for consideration in coordination with the Office of the Principal Legal Advisor.

Q. Does antisemitic activity, as that term is used in your letter, fall within either the national security or public safety mandates of HSI?

A. It can based upon conduct.

Q. Okay. At your deposition you were asked, quote, you said that "HSI's topics in areas of interest include national security and public safety." My question is "Whether antisemitism falls within either national security or public safety for HSI?" And your answer was "I don't know."

A. I recall that, yes.

Q. And you don't know whether pro-Palestinian advocacy falls within HSI's national security and public safety mandates?

A. I don't know. But if an allegation is received or information is referred, an investigation or inquiry can be conducted to determine if the activity or conduct is contrary to law.

Q. Contrary to law?

A. Uh-huh.
Q. Not contrary to the Executive Orders?
A. Contrary to law, as I stated.
Q. Well does "contrary to law" include the two Executive Orders we've been discussing?
A. It could if the conduct aligns within that framework.
THE COURT: No, no, she's trying to get at whether, in your view, the Executive Orders, standing alone, are another source of action?
THE WITNESS: No, sir, not alone.
THE COURT: Okay.
Q. You have written other letters like the ones we've been discussing relating to Mahmoud Khalil, correct?
A. Yes.
Q. I'd like to show you a document that has been premarked as B by the government.
THE WITNESS: And, your Honor, if I may?
A. Once again, you're saying the word that I've "written" other letters. I've clarified it earlier in my testimony that I've signed them.
Q. My apologies. You've signed other letters like this one?
A. Yes.
MS. KRISHNAN: May I approach, your Honor?

THE COURT: Of course.

(Hands to witness.)

Q. This is a true and accurate copy of the referral letter that you sent in Ms. Chung's case?

A. (Looks.) Yes.

MS. KRISHNAN: I offer this as Exhibit 243.

THE COURT: Any objection?

MR. KANELLIS: Um, no, your Honor. But it is attorney-eyes only. I'll just make that --

THE COURT: And I've spoken to that. It's admitted in evidence, Exhibit 243. We understand it's attorneys-eyes only.

(Exhibit 243, marked.)

Q. I'd now like to show you a document that's been premarked as Exhibit F by the government.

A. (Looks.)

Q. Is this a true and accurate copy of the referral letter that you sent in Mr. Mahdawi's case?

A. (Looks.) It appears to be.

MS. KRISHNAN: I offer this as Exhibit 244.

MR. KANELLIS: No objection subject to the attorneys-eyes only designation, your Honor.

THE COURT: And I understand that it is. It's Exhibit 244 in evidence.

(Exhibit 244, marked.)

Q. I'd now like to show you a document which has been premarked as Exhibit H by the government.
A. (Looks.)
Q. Is this a true and accurate copy of the referral letter that you sent in Ms. Ozturk's case?
A. It is one that I digitally signed, but the reproduction uses off-key terminology in the header on Page 2.
THE COURT: I guess I -- I appreciate your patience, Mr. Watson, but looking back at Exhibit 244 and its second page, it reads, um, on the second page, "Homeland Security Investigations RE," and then the individuals, and in that case it was Mahdawi, um, and Page 2. Here what's left off, as I compare them, is "Homeland Security," and the second line is hard to make out, but it appears to be "Rumeysa Ozturk, Page 2."
Have I compared them correctly?
THE WITNESS: Affirmative, your Honor.
THE COURT: Very well.
Go ahead.
MS. KRISHNAN: I'd like to offer it as Exhibit 245.
MR. KANELLIS: No objection subject to the --
THE COURT: No objection, it's Exhibit 245 in evidence.

(Exhibit 245, marked.)

Q. I have one more letter that I would like to show you. This document has been premarked as Exhibit I by the government.

A. (Reads.)

Q. Is this a true and accurate copy of the referral letter that you sent in Mr. Suri's case?

A. Yes, ma'am.

MS. KRISHNAN: I'm offering this as Exhibit 246.

MR. KANELLIS: No objection, subject to the attorneys-eyes only restriction, your Honor.

THE COURT: Noted, and it is, but it's admitted as Exhibit 246 -- not but it's admitted, and it's admitted.

(Exhibit 246, marked.)

Q. Just so we're clear. Before an official determination is made by the State Department after receiving a referral letter, a notice goes from the State Department to HSI about the State Department's forthcoming action?

A. I'm not following on that question, ma'am?

THE COURT: Nor am I, Ms. Krishnan.

(Pause.)

MS. KRISHNAN: I'll clarify.

Q. Before an official determination is made by the State Department, there are sometimes informal

communications between the State Department and HSI, correct?

MR. KANELLIS: Objection, foundation.

THE COURT: Well that's pretty general. But in letters of this sort where the basis is the concern about a Title VIII violation, um, limited to that, and limited to, um, subsequent to January 20th in the Trump administration, is that correct?

THE WITNESS: It can happen.

THE COURT: Well do you -- and I've been given this chalk and the next arrow on the chalk is the arrow that says "Action Letter."

Now she properly asks, between your transmittal letter in and an action letter out, with the limitations that I've just posed, do you recall interaction with State Department officials? Do you recall? You don't have to be the one interacting, but do you recall such interactions?

THE WITNESS: I don't recall them.

THE COURT: You don't. All right.

THE WITNESS: With the referral going over in between?

THE COURT: Right.

THE WITNESS: I don't recall it.

THE COURT: Once they got it.

THE WITNESS: Right. I don't recall that.

THE COURT: All right, that's his answer.

Q. A change in a person's immigration status doesn't have to result in arrest, correct?

THE COURT: Well there's been this whole -- it's not a matter of this case, but I can take judicial notice of proceedings in other cases.

There was this whole business where apparently tapping into the FBI's database, a whole raft of student Visas were cancelled. I had 9 in one case, 2 in another. And about 50 temporary restraining orders resulted. The reason being that the FBI's database, for perfectly logical reasons, has arrests in it. It isn't just limited to convictions. So action allegedly was being taken that these people had committed crimes. It is still the fact in the United States that a person is innocent until convicted. And, um, my understanding, as far as I've spoken, I think I'm on sound ground.

My understanding is that they -- but I'm not clear who "they" is, has revised that policy and now is scrutinizing things in a different way. I don't see what that has to do with this case?

But go ahead, Ms. Krishnan.

MS. KRISHNAN: Thank you.

Q. You said, in your direct examination, that people

were arrested because of a change in their immigration legal status, correct?

A. Correct.

Q. A change that was affected by a determination by the State Department?

A. Correct.

Q. And that change in a person's immigration status, that doesn't have to result in arrest, correct?

A. (Silence.)

THE COURT: Well, again if we're talking about this case --

MS. KRISHNAN: We are.

THE COURT: All right.

My belief is that, um, for instance, taking away someone's student Visa does not automatically unleash the enforcement and removal officers of Homeland Security. I'm talking about something else.

So is the question you're asking, um, once an action letter is received, an action letter from the Department of State is, um -- I'll ask this question.

An action letter from the Department of State, that does trigger an arrest, it triggers action. That's the action that it triggers, isn't it?

THE WITNESS: It can, yes.

THE COURT: It can. But it need not, is that

right?

THE WITNESS: When you receive the action letter from the Department of State saying that the Visa has been revoked or the status has changed, it, one, can trigger a redetermination. So with that notice, that goes to Domestic Operations and it goes to the HSI field office. That HSI field office works in coordination with the Principal Legal Advisor in, one, crafting and preparing a notice to a peer for the person in question before an immigration judge, pursuant to the action from the Department of State.

THE COURT: I see. I see. And you've already gone over the -- which we needn't go over again. If you can't find the person, it turns out they've left the United States, then that action letter, no further action is necessary?

THE WITNESS: Yes, your Honor.

THE COURT: But your answer to me is back comes the action letter, out goes -- in the usual course, a notice to appear --

THE WITNESS: Yes, sir.

THE COURT: -- and proceedings follow?

THE WITNESS: Yes, sir.

THE COURT: Thank you.

Go ahead, Ms. Krishnan.

Q. You don't know what inquiry the State Department does once it receives a referral letter from you, correct?
A. Correct.
Q. Mr. Khalil was arrested on March 8th of this year. Do you know the date of his letter from his case?
A. (Looks.) March 7th is the date stamp.
Q. Thank you.
MS. KRISHNAN: No further questions.
THE COURT: Nothing further for this witness?
MR. KANELLIS: No, sir.
THE COURT: Very well. You may step down. Thank you.
(Steps down.)
THE COURT: Is that all the -- as I hear it, that's all the witnesses we have for today?
(Silence.)
THE COURT: All right. Let me stop the clock then.
(Pause.)
THE COURT: The total elapsed time is the plaintiffs, 3 days, 2 hours, 45 minutes. The defense, 2 days, 40 minutes.
There are motions for the Court that I should act upon and I am going to at this time.

There is a motion to seal the, um -- a certain motion, a discovery motion. That motion is -- the motion to seal is allowed. The motion to compel is denied as wholly untimely.

The matter of an adverse inference is premature. We're not going to -- I'm not going to consider adverse inferences until I come to consider the whole case.

So that takes care of ECF documents. I just ruled on Document 214. The motion to seal was Document 215.

I also have Document 211, a motion to compel additional documents. This appears to be the list to which reference has been made in the course of the trial.

The -- I think these documents are within the scope of the stay. The request asks for documents within the scope of the stay. So I'm not going to rule on it. But because it might be helpful, um, if I were permitted to rule on it, I can give an indicative ruling. My indicative ruling is that I would deny it as to the first bullet point on the first page as overbroad, and the last bullet point on the second page, because it's imprecise.

As to all the other documents, I would allow the motion, and if those documents are in the possession of the Court, and I believe certain action memos are, I

would, um -- and having reflected on it, I would deny -- excuse me, I would overrule the, um, asserted privileges and, um, turn them over to the defense, at least to subject them to cross-examination. They'll be before the Court in any event, but I will turn them over to the defense, um, and they might be used during the cross-examination of Mr. Armstrong, if ever I'm permitted to cross-examine Mr. Armstrong.

Now let's talk about what we're going to do here.

MR. KANTER: Your Honor, may I pose a question?

THE COURT: Yes.

MR. KANTER: Your reference, if I am permitted to allow the cross-examination of Mr. Armstrong. The question pertains to your Honor's deliberative process ruling privilege on Monday regarding the Armstrong action memos in which you denied the deliberative process privilege claimed on the merits except as to certain interlineations which you found were.

THE COURT: Right.

MR. KANTER: It is our understanding that the mandamus petition concerns privilege rulings that either have not yet been made or were made solely based on waiver. Therefore it is our understanding that your ruling regarding the action memos on the merits permits those action memos to be, um, the subject of cross-

examination of Mr. Armstrong, which, um, there's no objection from the government on, um, allowing that, they are subject to attorneys-eyes only, which occurred today regarding Mr. Watson.

Therefore, as it relates to action memos, um, that is not, in our understanding, as an impediment to the cross-examination of Mr. Armstrong, which we'd like to put on tomorrow morning.

THE COURT: And you've answered me.

What do you say to that?

MR. BIALE: I'd say that we agree, your Honor.

THE COURT: Wonderful.

MR. BIALE: Except insofar as the other action memos have not been disclosed, I think those should follow within the same rubric.

THE COURT: But we're going to.

MR. BIALE: I'm sorry, I should let Ms. Conlon address this.

THE COURT: I said what I would do. The other action memos in the possession of the Court will be disclosed forthwith, subject to attorneys-eyes only, and we will make copies just as soon as I get off the bench. And the copies, the government will have copies of what we may copy, so they know exactly what it is. Now I find that very helpful.

And that being so, and I think it will be clear that we will finish the evidence tomorrow, now let's talk about what will happen.

MR. KANTER: And one -- I'm sorry to interrupt.

THE COURT: But please don't be. The one time I didn't want to be interrupted, I was quick to say so. But other than that --

Go ahead.

MR. KANTER: Okay.

Mr. Armstrong, although he appeared in person for direct is unable to appear in person for cross-examination tomorrow. If he can appear by --

THE COURT: So long as you can arrange it, that will be fine with the Court, I'm eager to get it concluded.

MS. CONLON: Your Honor, I understand the Court is willing, but I want the record to be clear that we object, because he testified here in person and the Court had the benefit of seeing his demeanor and everything else, and we don't think it's fair that we don't get the benefit of having him back here. So I appreciate the ruling is moot, but I just want to lodge our objection.

THE COURT: And you have, but I adhere to my ruling. I've tried entire civil cases remotely. I can

see his demeanor sufficiently.

All right, now let's talk about what's going to happen.

45 minutes for argument. The plaintiffs will argue last. The defense will argue first. When shall we do it? Shall we do it on Monday or do you want to put it off further?

MR. KANTER: Um --

THE COURT: What's the government's position?

(Pause.)

MR. KANELLIS: Your Honor --

THE COURT: You were ready Friday.

MR. KANELLIS: We can do it tomorrow or -- I would defer to the Court. I think you are in a better position to guide us as to what you want.

THE COURT: Well I'm going to make the determination.

MS. KRISHNAN: Your Honor, if the Court would be amenable, Monday would be preferable to the plaintiffs.

THE COURT: Monday. We'll do it Monday -- well I work for Ms. Belmont, but I believe we are able to do it.

45 minutes a side is an hour and a half. I know I'll have questions. And, um, shall we start at 10:00, will that be more convenient? You're all here ready to

start at 9:00. I'll be ready to start at 9:00. I'm asking if it would be more convenient to start at 10:00?

MS. KRISHNAN: 10:00 is fine.

THE COURT: Very well.

MS. CONLON: Your Honor, we have another question concerning closing arguments, if that's okay?

THE COURT: Of course it's okay.

MS. CONLON: If plaintiffs wish to split the closing argument between two attorneys is that permissible?

THE COURT: That's fine for this case.

MS. CONLON: Okay.

And with respect to time, if plaintiffs have less than 45 minutes remaining of trial time, we presume plaintiffs just have less than 45 minutes for argument. But we just want to confirm our understanding.

THE COURT: Your understanding is correct.

MS. CONLON: Okay.

THE COURT: Now before I move off that, but recognizing that, um, we're going to have final arguments on Monday, um, I think it's appropriate to say a few words about -- I think they're words in a definitional sense, and I'm going to mention words as I did with antisemitism. And all I'm stating, and I just state it to be helpful, is how I think these words

figure in this first amendment case.

I do it with some diffidence because, um, I recognize that, um, a quick definition that I give here necessarily may lead or apply in a somewhat different guise in the totality of the circumstances as presented by the facts. But I really do think that it would be helpful if my operating definitions were known to the parties. That does not make them right. And it's open to the parties to simply say that they are wrong and support it with both factual support in the case and, um, legal support, if I'm wrong.

So let me just start, because these words are used in the documents before the Court, and this is the meaning to which, as I approach final argument, I ascribe to them. I've already spoken to antisemitism.

"Antisemitism" is that feeling of hostility to a person or a group on account of faith or certain ethnicity. I consider that it is a fit subject of the United States government to discourage antisemitism and, um, just as it would and should discourage Islamophobia, any sort of anticlericalism, and indeed hostility to atheists, sectarian hostility, it's not part of the America cannon. And it is a fit object of government to discourage it and encourage inclusiveness and, um, our ability to live together as citizens and lawful

visitors.

Antisemitism or antisemitic speech, standing alone, is not illegal. It may be repulsive, but it's not illegal. It is protected under the First Amendment.

Now let me jump to a word, a very broad-brush word on foreign policy, because it is not within the purview of this Court's authority to comment on the foreign policy of the United States, that, quite clearly, perhaps more than anything else in our separation of powers, is committed to the Executive. But because events that figure in this case are significant, um, and truly trying to stay away from any commentary, I think I go into final argument thinking this.

That Hamas, in October 2023, initiated a horrific, I'll use that normative word, against the State of Israel and its people. Israel responded with its full military force and the struggle between the two continues to this day. The foreign policy of the Biden administration was strongly to allie itself and support the State of Israel. That foreign policy has been followed by the Trump administration and if anything made more supportive.

And I mean nothing normative by this, but it appears that at least with respect to the conduct of the State of Israel in its war -- and I will call it "war,"

against Hamas, the foreign policy of the United States is to allie virtually, 100 percent with the foreign policy of the State of Israel.

Now to get back to definitions. Criticisms of the State of Israel are not antisemitism, they're political speech, protected speech. Even strong, violent criticism speech -- well violence is not acceptable, and that use of the word was probably wrong. But I meant vile criticisms of the State of Israel and its policies are protected speech. I think I can be this specific saying that, um, the conduct of the State of Israel is -- involves war crimes, it involves genocide, um, those matters are protected speech. Anyone is allowed -- well put aside the "anyone," but it's protected speech under the First Amendment to our Constitution.

What else? (Pause.) I think that's probably sufficient. Well a couple of legal questions.

The, um -- I take it we're agreed that Executive Orders do not have the force of law. But feel free to challenge the Court on this.

I have asked the question at the beginning, um, and I'm not sure of the answer, but I asked whether a person not a citizen of the United States, but lawfully here in the United States, has the same First Amendment rights as a citizen? As I have worked on this case

during the course of the case, and my own research, leads me to think that probably they do. The answer is in the affirmative. Again we're talking about pure speech, we're not talking about conduct that puts someone in fear or even more than that is, um, a threat of violence against a person.

Oh, there is one other definition. Criticism of the State of Israel, the use of the words that I mentioned, does not -- it's political speech, it does not constitute pro-Hamas, um, support. Pro-Hamas support has to be something more than, um, that.

And I think that's the -- I think that's where I'll stop. I'm not going to entertain questions on this. When you get to arguing, I will pull hypotheticals and we can go back and forth. Please feel free to challenge anything the Court has said, I've said it just to help.

The Court is authorized to take judicial notice at any time in a proceeding so long as I give notice that I am taking judicial notice. I think -- and I don't know how this plays at all, honestly, and everything I say to you is honest, but I am prepared to take judicial notice that Steven Miller is the President's prime advisor on immigration matters. That's all. I mean nothing normative by that.

Now one other matter we should raise, and I think it's ripe now, but we can raise it on Monday. How long do you want after final argument, where you will heard my hypotheticals and where I push back and where I don't, how long would you like for the filing of requested findings and rulings?

MR. KANELLIS: Your Honor, we ask for two weeks, if that's not too long.

MR. BIALE: And, your Honor, we would ask to submit it next Friday.

THE COURT: No, I'm going to give the two weeks. I'm not insensitive to how this case started, but the matter is complex.

So two weeks from, um, next Monday will be -- well Monday is the 21st, so that is Monday the 4th of August.

Now the matter, as I indicated when I spoke the other day, the matter then will be under advisement. I'll move with all speed to address the matter.

The only other loose end is, um, these orders are how we will proceed and conclude unless the Court of Appeals enters some affirmative order that requires action by this Court, and if it does, I will obey.

Are there any questions? Though I'm not going to get into any discussion, definitions, or legal issues.

Any questions on the part of the plaintiffs?

MS. KRISHNAN: No, your Honor.

THE COURT: The defense?

MR. KANELLIS: No, your Honor.

THE COURT: Again, thank you all. 9:00 tomorrow morning.

We'll recess.

(Ends, 12:10 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Thursday, July 17, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-17-25
__________________________
RICHARD H. ROMANOW Date

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Vol 1, Pages 1 to 84

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Friday, July 18, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOHN ARMSTRONG (Continued, via zoom.) | | | | |
| By Ms. Santora (via Zoom) | | | | |
| By Ms. Conlon | | 5 | | |
| VEENA DUBAL | | | | |
| By Mr. Wang | 67 | | | |
| By Mr. Kanellis | | | | |


E X H I B I T S

(None marked.)

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT: Good morning. Because I have made these proceedings available on the internet, it's appropriate to say that if you are accessing these proceedings on the internet, be aware that the rules of court remain in full force and effect, and that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

You must also keep your microphone muted at all times. If you do not, we will have to cut you off immediately.

Very well. The Clerk informs me we're ready to go. I see Mr. Armstrong on the screen.

And, yes, I'll ask the Clerk to remind you, sir, that you remain under oath.

THE CLERK: Sir, you remain under oath, do you understand?

THE DEFENDANT: Yes, I understand that I remain under oath.

THE COURT: And thank you.

And Ms. Conlon.

MS. CONLON: Thank you, your Honor.

THE COURT: You may examine.

CROSS-EXAMINATION BY MS. CONLON: (Continued.)
Q. Good morning, Mr. Armstrong. Can you hear me?
A. Good morning. I can hear you.
Q. Okay. You're in D.C. right now?
A. That is correct, I am in my office at 619th Street, Northwest.
Q. And can you just tell us who is in the room with you other than Ms. Santora?
A. We have two lawyers from the State Department, Sarah Tulkowski and, um, Taylor Beaumont.
Q. All right. Okay. Thank you.
Now, um, you testified that you would be very surprised if a policy related to Visas exists that you don't know about, is that correct?
A. I can't see how that could be the case. That the head -- at least for the time being, the Head of the Bureau of Consular Affairs, which at the State Department is the, um, part of the State Department that is responsible for Visas and issuing Visas abroad. So, yes, I would be extremely surprised. I do not see how this could happen.
Q. Now I want to talk about what "policy" means in the context of your work.
State has a policy-making process, right?
A. Yes, they're a policy-making process in the U.S.

government and the State Department also does that.
Q. Before a policy is finalized, a few things have to happen, right?
A. Yes, usually -- yes, that is correct.
Q. An action memo, with a proposed policy, must be cleared by all offices who have any equities in it, correct?
A. Yes, I think that is correct.
Q. A policy could require clearance from as many as 20 different offices, right?
A. Um, even more actually. I have seen some memos, although they weren't necessarily a policy memo, that had over 60 clearances.
Q. In once an action memo with a policy has been cleared by all relevant offices, it then has to go to Secretary Rubio, right?
A. It depends.
Q. If it's a policy that the Secretary needs to sign off on, he has to sign off on it before it's final, right?
A. That is true. But there are also -- I have the ability to sign off on policies too, to approve policies for the Bureau of Consular Affairs, after the necessary clearance process.
Q. Once a policy has been cleared, signed off on by

whoever the senior-most official is that has to sign off on it, then it can be publicly announced, correct?
A. Well not all policies are publicly announced, sometimes they're classified or they're sensitive but unclassified. But they would certainly be announced to those people who need to deal with them. In the case of Consular Affairs, most of our things are, um, but not all are unclassified.
Q. In other words, whoever needs to know could then be told about it?
A. Yes, that is correct, on a need-to-know basis, it's a good rule for OF-SAC.
Q. Now once a policy had been finalized and those who need to be made aware of it are made aware of it, guidance about that policy can be conveyed to folks who work in the State Department who have to implement it, right?
A. That's correct. And usually guidance in that form is especially for policies that affect these operations abroad, and it would go out then in the form of a, um, cable or telegram, and I believe we discussed these previously. And usually in the form of an All-Back, to all diplomatic and Consular posts.
Q. A cable --
A. And oftentimes at --

Q. Sorry. I didn't mean to interrupt you, sir.
A. No, I interrupted you. Please go ahead. Unless you'd like me to finish.
Q. I'll move on.
Other than a cable, sent "All-Back" as you say, another way that guidance can be conveyed to State employees is by making additions or revisions to the Foreign Affairs Manual, correct?
A. Yes, that is absolutely true, and the cables often -- or the All-Backs often announce this guidance and refer to the changes in the Foreign Affairs Manual. That makes sure that everybody knows that this has happened. Because otherwise you could change the Foreign Affairs Manual and there could be a new or a modified policy and no one would know about it.
Q. Now in your view, a decision by the Secretary on an action memo is not, in and of itself, guidance, correct?
A. No -- well it depends what's part of the action memo. Sometimes you have the FAM revisions, the Foreign Affairs Manual revisions, are also included and are part of the action memo. There can be more than one decision made in the action memo, or --
Q. I'm sorry. In an action memo --
A. -- or it's just --

Q. It's so hard to do this where you can't see me.
A. No, I apologize.
Q. No, it's okay, we'll figure this out together.
In an action memo on a decision, something other than an update to the FAM, a decision, that is an action, that's, in your view, is only an action, that is not a policy, correct?
MS. SANTORA: Objection.
THE COURT: Well I'm not really clear as to the relevance of this.
MS. CONLON: I can, your Honor --
THE COURT: In these charts I've been given, Mr. Armstrong, there's relevant -- well not relevant, there's mention of something that is called an "action letter." So, um, I'll ask this question and I'll make reference to our case specifically.
In our case you've testified, and I assume she's going to cross-examine you at some stage, on, um, communications you had with the Secretary, and then, um, the Secretary of State, um, came up, in the relevant individuals in our case, with something in it on those chalks, these guidances I have, called an "action letter."
Now when you get an "action letter," I understand that to be a -- a direction for action. It's not the

policy, it's the implementation of procedures, um, within the Department.

Am I correct?

THE WITNESS: Sir, no disrespect intended, your Honor, but could I see the chalk?

THE COURT: Sure.

THE WITNESS: Do we have a copy?

THE COURT: Ms. Santora may have one.

MS. SANTORA: Yes, your Honor, I can find one, if you give me one second.

THE COURT: Yes.

MS. CONLON: We're talking about H -- well it was HN. I thinks it's still HN.

THE COURT: Yes.

MS. CONLON: But we can backtrack in particular.

THE COURT: Correct. Yes.

(Silence.)

THE WITNESS: I apologize for needing to refresh my memory.

THE COURT: No, I understand. But it's those that I'll ask Ms. Conlon, so you can hear --

MS. CONLON: Yes.

THE COURT: -- It's those action letters that you're talking about?

MS. CONLON: That's correct, your Honor.

THE COURT: All right, then we're clear. That's what she wants to ask about.

MS. SANTORA: Okay. I can share a copy of the document that I had on the screen. Just give me one second.

THE COURT: That's fine.

MS. CONLON: And, Ms. Santora, we have copies here, so I think it's just Mr. Armstrong who needs to be able to see it.

MS. SANTORA: Okay, then I'll just share a copy with him on my screen, um, to save time.

THE COURT: Exactly.

THE WITNESS: Could you just make it larger? My eyesight has gotten worse with time.

MS. SANTORA: Sure.

(Enlarged.)

THE WITNESS: Yes, thank you.

All right. Consular Affairs. "Action memo goes to Secretary of State." (Looks.) "There will no action of foreign policy." (Looks.)

Oh, I understand the CALC -- the action letter is what goes back to the Department of Homeland Security informing them of the action taken and letting them know that the --

THE COURT: So -- and I'm interrupting, so do I.

So that's what we're talking about, that's what her next question is going to deal with, I take it.

Go ahead, Ms. Conlon.

Q. Well now I think just to make sure we're all clear in using words in the same way, there are action memos that are sent to you, or to Secretary Rubio, and from those there may be action letters that are sent from State to Homeland Security, is that correct?

A. That's my understanding, reviewing this, and based on my knowledge of my job, and that informs the, um, whatever person at the Department of Homeland Security who gets it. Of course if it's Secretary Rubio, it goes to Secretary Noem. If it's someone else like me writing back, then it would go to the person who sent it. And that is closing the loop then because the referral on this CALC is what started the whole process.

Q. So my question is about -- is twofold, I suppose, action memos that go to you, or the Secretary, decisions that are made on those. You've said before, and I just want to make sure I understood it, that that's just a decision, an action, that is not the creation of policy, in your view, correct?

A. I think that is accurate. A single decision does not a policy make in most cases. Of course it can depend on the situation. I'm sure we could find a

hypothetical where it might. But I get action memos all the time, to send this cable, do that, um, agree to this meeting or conference, and that is not a policy.

Q. And an action letter sent by State to the Department of Homeland Security, that is an example of implementation of a policy, but that in and of itself is not the creation of policy, right?

MS. SANTORA: Objection.

THE COURT: No, he may be asked the question. Overruled.

THE WITNESS: Thank you, your Honor.

A. The action letter informs of the decision. For example, on the CALC, the Secretary would make a decision on the action memo in the case of an alien. For example, a 4(c) finding, I'm referring to INA 237(a)(4)(c). And then that action letter informs the Department of Homeland Security. So to be informing of a decision, not necessarily a policy.

Q. Got it. Now we can move on from this. I think I understand what you mean when you say "policy." I want to turn to guidance you've received, um, relating to revocations of Visas.

So you've discussed revocations of Visas from student protesters with senior officials inside and outside of State, right?

A. Yes, I've discussed revocation of student Visas with senior officials both inside the State Department and outside the State Department.
Q. That's inclusive of senior officials at Homeland Security, right?
A. Yes.
Q. Senior officials at the White House, correct?
A. Yes.
Q. In the first few months of your job, you spoke with folks in the White House about the revocation of student Visas at least 20 times, right?
MS. SANTORA: Objection. This calls for information that's privileged.
THE COURT: What privilege?
MS. SANTORA: It would be Presidential communications, your Honor.
THE COURT: All right, I, um --
MS. CONLON: No, no, the question only asked, Judge, did he speak with anyone in the White House? There's no indication that it was something that went to the President. And also he testified about it in his deposition. So if they want to do a search-out privilege, then it's waived.
THE COURT: Well then go through the deposition.
MS. CONLON: Sure.

Q. Turning your attention to the deposition transcript from June 12th, 2025, Page 203 to 204, starting at Line 4. You were asked this question.

"Do you have the occasion to speak with anyone in the White House about the revocation of student Visas?" Line 7, you gave the answer, "I have had such an occasion." And continuing on down the page, "You were clarifying the occasions you had to do that," starting at Line 17, and you said, "So the number of total conversations wee probably more, more than over 20. I would say at least a dozen occasions."

I could keep going, but that was your testimony, right?

A. Um, that -- excuse me, Counselor, but I'm still looking it up here.

Q. Sure.

A. What was the page? 220 was the page number?

Q. No, sir, Page 203.

A. Thank you.

Q. And I first read to you from Lines 4 through 7.

A. (Looks.)

MS. CONLON: Your Honor, this might be more efficient if we could just put it on the screen for Mr. Armstrong so we can draw his attention to the portion we're using.

THE COURT: Fine. As you seek to --

(Pause.)

MS. CONLON: No, never mind, your Honor, I'm told it's not more efficient.

Q. Okay. So, Mr. Armstrong, you've had a chance to look at Page 203. You gave that testimony in your deposition, I read that correctly, right?

A. I believe you read it correctly, um, based on -- I didn't compare it word for word, but I -- and I think it is accurate, but somewhere between a dozen and over 20.

Q. And those conversations included Steven Miller, correct?

A. Yes.

Q. Those conversations also included his Deputy, Adam Leason, right?

A. Yes.

Q. Now most --

A. But not as many with Mr. Leason.

Q. More with Mr. Miller.

Now most of the conversations about the revocation of student Visas that you had with Mr. Miller took place in March of this year, correct?

A. It seems to be, yes, but I didn't keep an exact tally at the time. But it seems in March.

Q. And some of those conversations with Mr. Miller

were interagency, that is between you and folks of other relevant agencies were part of those discussions, right?

A. Yes.

Q. Interagency --

A. They were telephonic. I have never met Mr. Miller in person to this day.

Q. Interagency, in the context of these discussions about student Visa revocations, included folks from Homeland Security, the State Department, the Department of Defense, and the White House, correct?

MS. SANTORA: Objection. Your Honor, this is bearing into Presidential communications, I believe, he --

THE COURT: Here, um, here's the line I'm walking, Ms. Santora.

If it's in the deposition, it's waived. If she's gone beyond the deposition, and I don't have the deposition before me, but I'm following carefully, then I think your assertion must be sustained.

So I take it your position is that the question she just asked goes beyond what was set forth in the deposition. Is that your representation? And I'm being handed a copy of the deposition here.

MS. CONLON: And, your Honor, I'm looking at Page 207 of the deposition.

THE COURT: Fine.

But, Ms. Santora, talking to you, is it your position it goes beyond what's set forth in the deposition?

MS. SANTORA: Yes, I believe that question did go beyond what was set forth in the deposition.

THE COURT: Well then she'll be more specific in the deposition. I'm looking at Page 207.

MS. CONLON: And I'm looking at, um, Lines 12 through 24, in particular the question that begins at Line 16. Which I can read if it's helpful to anybody.

THE COURT: Well you know to save time, um, let me propose this, to save time, Ms. Santora, and Ms. Conlon.

I'm going to honor her, um, claim of Executive Privilege in the course of your oral cross-examination of Mr. Armstrong. At the same time what's revealed in the deposition, um, in absence of his oral testimony, which I'm sustaining, is waived and is before the Court and I can read. So all you need to do, again to save time, is to say, "We want in Pages X, Lines whatever," and we don't need to question him about it.

MS. CONLON: Okay.

THE COURT: If you're on this vein of talking to people, even by telephone, at the White House.

So with that guidance, um --

MS. CONLON: Yes, that makes sense.

THE COURT: -- proceed, Ms. Conlon.

MS. CONLON: Okay. So, your Honor, we will submit a designation after this cross-examination.

THE COURT: That's fine. Proceed then.

MS. CONLON: Okay.

(Pause.)

Q. Now, um, I'd like to turn to -- we're going to move away -- well one other question.

You attended meetings of the Homeland Security Council, correct?

A. No, I did not attend meetings of the Homeland Security Council in person, I took part in telephonic discussions with people who were on the Homeland Security Council.

Q. Okay.

A. I'm not of that rank to go to the Homeland Security Council.

Q. Well they invited you to speak. We can leave it there.

A. In telephone conversations with members of the Homeland Security Council, yes.

Q. And those conversations concerned student Visa revocations, is that fair?

A. They concerned many issues, but student Visa

revocations were also discussed, as were general Visa revocations.

MS. CONLON: Okay, so I will rely on the deposition for the remainder of what I'm questioning him on.

Q. Okay. So some of the determinations that we are going to talk about today involve U.S. foreign policy, so I want to understand what you mean when you're talking about U.S. foreign policy in these decisions that you wrote.

It's your understanding that it is the foreign policy of the U.S. to combat antisemitism at home and abroad, is that right?

A. Yes, it is my understanding that is the policy of the United States, and actually President Trump's Executive Order in a way codified long-term policy. The United States, at least in my tenure of over 30 years, has always been opposed to antisemitism both in the wider world and in our great country.

Q. And when you say the "Executive order," that is 14188, right?

A. I don't know the number offhand. I believe there was only one that dealt with antisemitism. I can try and look it up, if you'd like, ma'am.

Q. No, I think that we can assume it's what you mean

here for our purposes.

Now your understanding about the long-time U.S. policy combating antisemitism is also drawn from public statements made by Secretary Rubio, right?

A. Yes, Secretary Rubio has gone on record, it is my recollection, to be strongly against antisemitism, both domestically and, um, even more importantly, in the world.

Q. Now --

A. I personally am also against antisemitism, just for the record, and I have no embarrassment in stating that.

Q. Nor should you.

Now Secretary Rubio has made many public statements about antisemitism, correct?

A. It's my --

MS. SANTORA: Objection.

THE COURT: Well that's pretty vague and it's a matter of record. Sustained.

Go ahead.

Q. With respect to Secretary Rubio's position on pro-Palestinian student protests, your understanding is he's against foreign aliens organizing antisemitic activity in the U.S., is that right?

A. It's my understanding that he's against anyone

organizing antisemitic activity in the United States. He -- and again, my understanding is he has no power against you, American citizens, doing such things. He does have power, under the law, as has every Secretary of State, against aliens who could do such things.

Q. Aliens organizing antisemitic protests in his view, is that right?

MS. SANTORA: Objection, lack of foundation.

THE COURT: Sustained. It's sustained. This witness can't state his view.

MS. CONLON: Well, your Honor, I'm actually interested in this witness's understanding of his boss's --

THE COURT: Well you didn't in that question.

MS. CONLON: Yes, I'll clarify.

Q. So, Mr. Armstrong, to be clear, I'm not asking you to read Mr. Rubio's mind, but I want to focus on your understanding of the State Department's position based on Secretary Rubio's public statements.

Now it's your understanding that Secretary Rubio has expressed that the State Department has a policy of opposing antisemitic protests on U.S. college campuses, correct?

A. It's my understanding that Secretary Rubio has stated he opposes antisemitism both at home and abroad,

so that would include public campuses, that would include everywhere in the United States, and in the whole world.

Q. You have reviewed some of Secretary Rubio's public statements in the course of your work, correct?

A. Yes.

Q. You have cleared written guidance for State Department employees that actually quotes from Secretary Rubio's public statements, right?

A. It's my recollection that I cleared some cables that quoted from the Secretary. And there may have been other documents, but there were a couple of cables in particular that had stuck in my mind.

Q. Okay. And some of those --

A. And why? I do not know.

Q. Some of those cables in particular related to Visas and Visa revocations, right?

A. I believe so, yes, that is my recollection.

Q. You said, when we started this line of questioning, that EO 14188 codifies a longstanding U.S. policy against antisemitism. And do I understand you correctly to be saying, in other words this policy existed, but it was first written or memorialized or codified in that Executive Order. Is that what you meant?

A. What I meant was that I used -- I said "In a manner, I believe, codified it," because of course it's not a legal code, it's an Executive Order. It's not the same as if Congress had passed it. But, um, in my career, in the over 30 years that I've served the American people as a Foreign Service Officer at the State Department, both at home and abroad, we have come out repeatedly, various Secretaries of States, various State Department officials, against antisemitism. The U.S. government has done that too. And this is the first Executive Order that I recall, um, where it was said that "We are against antisemitism." So in that sense it memorialized, formalized, whatever way we want to describe this, took this policy to the next concrete level. It was always there, um, since Day 1 of my Foreign Service career.

Q. Now you've talked about antisemitism just now in that order, but I want to talk about your understanding of it.

You have had to review referrals from HSI concerning alleged antisemitic activity in the past few months, right?

A. Um, from DHS, but I don't remember what office in DHS.

Q. Those referrals were part of the implementation of

Executive Order 14188, right?
A. That's an interesting question. Yes, I think they could be seen as an implementation. Certainly we reviewed a number of cases, actually several thousands of students, um, for various things.
Q. So just to bring you up to my question. The referrals you got from the Department of Homeland Security concerning alleged antisemitic expression and activity, that was pursuant to or the implementation of EO 14188, correct?
A. I think it was also the implementation of our longstanding policy of being against antisemitism. It is not a new policy. Again, it was brought to a higher level. But we've always been against antisemitism.
Q. Isn't it true that people in the State Department were asked to review activities of students for antisemitism pursuant to the Executive Order 14188?
A. We were asked to review their activities. I don't remember whether the Executive Order was cited in the request. But we were asked to review their activities on antisemitism, and on other things too, on criminal activity, like the 800 students who, um, had assault charges.
Q. To your knowledge the State Department has not issued any guidance about what should be treated as

antisemitic, correct?
MS. SANTORA: Objection.
THE COURT: Overruled.
A. I cannot remember a concrete piece of guidance. It, um, seems to me there may have been -- been some. But I do not remember a concrete cable where I can say "This cable defines antisemitism."
Q. I'll ask you again.
You haven't received any guidance from anyone on what the State Department should treat as being antisemitic, yes or no?
MS. SANTORA: Objection.
THE COURT: Yeah, sustained. I think he's answered that.
MS. CONLON: Your Honor, I believe he just said he can't recall, and maybe not in a cable, and then --
THE COURT: I understand. I understand. The transcript will speak for itself. But the effort is to persuade me. And here's what I hear. Anyone can -- and he can correct it.
I hear him say there's been no guidance, formal or informal, as to what should be treated as antisemitism. I think that's the point.
MS. CONLON: It is.
Q. And fair to say you don't know whether your

subordinates in the Visa office, who write the action memos that you review, have received training on how to determine what activity is antisemitic?

MS. SANTORA: Objection.

THE COURT: No, overruled.

A. I do not -- I do not know all what training they have. To my knowledge I do not know of any of them having received formalized training on what is antisemitism.

Q. When employees in the Visa office are making these assessments that come to you in writing, you don't know where there's any written materials they review or refer to, correct?

A. Could you clarify, what kind of materials? You mean instruction materials? Or are they looking at the evidence that a person has engaged in antisemitic activity or has supported a terrorist organization?

Q. Materials about how to make that assessment.

A. The assessment of antisemitism or not?

Q. Yes.

A. I do not know of any such materials.

Q. You don't know what definition or standard the Visa office uses to determine whether speech or conduct is antisemitic, right?

MS. SANTORA: Objection.

THE COURT: Overruled.

A. I do not know of any materials. I do know that there's a common understanding in our culture in our society of what antisemitism is. It's just --

THE COURT: And -- thank you. I'd like to now ask, would you state that, so I understand it? What do you think is the common understanding of what "antisemitism" is?

THE WITNESS: In my opinion, antisemitism is unjustified views, biases, or prejudices, or actions against Jewish people, or Israel, that are the result of hatred towards them.

THE COURT: Thank you.

Q. In other words, in your understanding antisemitism includes hatred or prejudice against Israel and the Israeli people, right?

A. Yes. In my understanding antisemites will sometimes try to hide their views and say they're not against Jews, they're just against Israel, which is a farcical argument in my mind. It's just a dodge.

Q. It's a dodge. It's a way of obscuring a person's antisemitic views?

A. In my opinion, yes, Counselor.

Q. Now there are some cables that you cleared this past few months concerning, um, the espousal or

endorsement or support of terrorism and antisemitism, right?

A. There may have been. I believe so. I don't remember all the cables I cleared. But I believe that I did clear some, yes. And actually probably approved them.

Q. Not only cleared, but also approved, as in the final approver, right?

A. Yes, that is correct.

Q. Okay. Now once such cable, which I will draw everybody's attention to, it's Exhibit 64 in evidence. It's a cable from March of this year. And I just want to ask about your understanding of a part of that as it relates to endorsing, espousing, supporting terrorism, and antisemitism.

MS. CONLON: And tell me if you need a second to pull it up, Ms. Santora.

A. I am pulling it up. Wait. Wait. Now, sorry, I have to use my mouse. (Pause.) This is, um, an "Action Request Enhanced Screen and Social Media Vetting for Visa Applicants," yes?

Q. Yes.

A. Exhibit 64.

Q. Exactly. And so if you go to Paragraph 9 of this document.

A. (Turns.) I'm at Paragraph 9.
Q. Excellent. I'd like to draw your attention to the bottom few sentences, because I'll be asking you about them.
A. Okay.
Q. So this paragraph of this March cable that, um, for clarity, did you approve or just clear this one, can you tell?
A. I have to look at the bottom. (Looks.)
Q. Can you go ahead and do that, please.
A. (Looks.) I believe I approved this one.
Q. Okay. So turning to --
A. Also I can tell by looking at the tags, it's see "See this," and "See management," "Counselor viewed this," "Counselor management."
Q. So looking at Paragraph 9, the bottom few sentences, this portion of the cable concerns the understanding of 3(b), which is one of the grounds for potential ineligibility, on the basis of supporting terrorism, correct?
A. Yes, 3(b) is support for terrorism, a terrorist activity, or a terrorist organization.
Q. Now this cable provides guidance on how to determine whether a person, um, endorses or espouses or supports terrorism, right?

A. This part talks about that, yes. I'd have to flip back up to see what the title is.

Q. And some indicators, according to the cable, said a person may endorse, espouse, or support a terrorist organization, include evidence that an applicant added a case for terrorist activity, correct?

A. Can I read the lines, Counselor?

Q. Oh, sure, and I'm actually not quoting, but go ahead.

A. Okay.

Q. The last few sentences.

A. Okay. (Reads.)

Q. Okay. So I'm going to ask you.

It's fair to say this cable here has, um, understandings of how a person may reflect that they endorsed or espoused or support a terrorist organization, um, which could include bearing a hostility towards U.S. citizens or U.S. culture, among other things, right?

A. Yes, it does note that as a possible indicator.

Q. Potential sympathy for a foreign terrorist organization, right?

A. (Looks.) Yes, as a possible indicator. This requires judgment and it's not an easy task.

Q. Okay. Now if we can set this cable aside for a

moment, but I want to stick with the discussion of 3(b), um, so you can put that aside.

The State Department has, as I understood you to say on direct, a policy of revoking Visas based on a person's support for a terrorist organization, if that is their viewpoint, correct?

A. Support --

MS. SANTORA: Objection.

THE COURT: No, she may ask the question. Overruled. He may answer.

A. Support for a terrorist organization, or terrorist activity, is a reason to have a Visa revoked, yes.

Q. And on direct you were asked the question, does State have a policy to revoke Visas based on political viewpoints? And in responding to a question about political viewpoints, you said, "If you're supporting a terrorist organization, yes." That's correct, right, that's what you said?

A. Yeah, support for Hamas will get your Visa revoked.

Q. Now I want to --

A. No, I'd like to finish my answer, because it doesn't seem that the full complexity of what we deal with is being carried out.

THE COURT: You may -- you may, sir. Go ahead.

THE WITNESS: Thank you, your Honor.

A. This is not a mundane thing. If we get this wrong, we get the Molotov cocktail attack in Colorado. If we get these sort of things wrong, you get the Boston Bomber. If we get this stuff wrong, you get 9/11.

MS. CONLON: Your Honor, I'm going to ask that you --

A. This is very serious stuff, Counselor, and I don't think you realize --

THE COURT: Wait. Wait a minute. Wait. Wait. I've said you could amplify your answer. You've gone on to characterize the question.

THE WITNESS: I apologize.

THE COURT: We're not doing that. I fully accept, sir, that you take this very seriously. She's trying to flesh out what's meant by the phrase "Support Hamas." That is important to this Court, an understanding of that. And I'm going to allow her to ask questions along that line. That's what I need to get out of this. What does it mean to support Hamas?

As far as I can see, in this case, there is no dispute, and I don't see how there could be, that Hamas a terrorist organization. That said, she's trying to pin down what that means.

Go ahead, Ms. Conlon.

MS. CONLON: Thank you, your Honor.

Q. Now in your view, the phrase, "From the river to the sea, Palestine will be free," could be covered by the endorsing, espousing, supporting, a terrorist organization provision, correct?

A. It's basically calling for genocide of all Israelis, because there's no space for Israelis in that "river to the sea."

Q. In your view, a statement denouncing Zionism could be covered because Zionism is Jewish patriotism or Israeli patriotism, correct?

A. It could be, yes.

Q. In your view, a statement criticizing Israel's actions in Gaza could be covered, depending on the statement, right?

A. Yes, depending on the statement. It could definitely. If you say that "They're worse than Hitler in what they're doing in Gaza," that would be a statement that I think would be leading in that direction that you seem to go going, Counselor.

Q. In other words, a statement comparing the policy of Israel to that of the Nazis?

A. I'm saying it's worst than the Nazis.

Q. A statement calling for an arms embargo on Israel could be covered, correct?

A. It could be.

MS. SANTORA: Objection.

THE COURT: Wait. Wait. The objection is noted, but overruled. She may follow this line of questioning.

Q. A statement calling for limiting military aid to Israel could be covered, correct?

A. In my opinion, yes.

Q. A statement --

A. You'd have to look at the totality of the situation and the whole thing that's being said. Just one statement by itself is probably not going to make the decision.

Q. A statement calling Israel an "apartheid state" could probably be covered?

A. It might be. We'd have to look at the totality of the case. Which is what we do in the Visa revocations.

Q. Now you said a second ago, "Well that's just your opinion." But, Mr. Armstrong, you are the senior bureau official in Consular Affairs, right?

A. I am the senior --

THE COURT: Wait a minute. You may answer.

A. I am the senior bureau official at the present time in the Bureau of Consular Affairs at the State Department. I've been in the position since February 27th of this year and continue to be in it.

Q. And when you receive action memos about particular persons alleging that they have expressed support for terrorism, what we're talking about here, these understandings inform your decision-making, right?

A. Yes, my understanding does inform my decision-making, as does any other guidance that I have. And I actually discuss my decisions, if I have questions, with the people who sent the memos to me to make them.

Q. In the cable we looked at a moment ago, there was a reference to a person's hostile attitude toward U.S. citizens, government, and culture, as potential indicators that they support or sympathize with terrorist organizations. And I want to understand your view of that as well.

In your view, criticism of this administration's policies or actions toward Israel could be covered by this provision, right?

MS. SANTORA: Objection.

THE COURT: Well this deals with Visa applications and so I'm going to sustain that.

(Pause.)

MS. CONLON: Just a moment, your Honor.

(Pause.)

Q. The Court made the point that I'm asking you about

3(b), to endorse or espouse or support a terrorist organization, but you're familiar with 4(b) as well, correct?

A. Could you refresh my memory, please.

Q. Sure. You're familiar with the provision of the INA, which you in your deposition referred to as 4(b), which has these exact same grounds that are in 3(b), but as a ground for the revocation or the determination of removability, as opposed to something relating to the ineligibility to come into this country, correct?

MS. SANTORA: Objection.

THE COURT: No, she may ask him to characterize it, and the answer may stand.

MS. SANTORA: Well if she's asking him about a statute or a document, he's asked if she could show him the statute or document.

THE WITNESS: Well I would like to see it, ma'am, if you have it there.

THE COURT: Yes.

MS. CONLON: I'm just trying to be very efficient with our time, but I understand you want to see it. So maybe the easier way to do this is actually the cable you just looked at, 64.

A. Okay.

Q. This cable is not only about Visa applicants, but

it is also about Visa revocations, correct?
A. I'm going to have to answer -- honestly I'm going to have to look at the cable.
Q. No, all we want are your honest answers, so please pull up the cable.
A. For March.
Q. So please pull up the cable, and I'm going to draw your attention first to Paragraph 2, on the first page, and next to Paragraph 11, titled "Revocation of Valid Visas." And once you've had a chance to read both of those paragraphs, please let me know.
A. 2 and 11, yes?
Q. Okay. So having reviewed that --
A. No, I'm sorry, Paragraphs 2 and 11?
Q. Yes, please.
A. Thank you. (Reads.)
Q. Okay, so having looked at this cable, you agree with me that this cable --
A. I apologize, I'm still reading Paragraph 11. Could I please be allowed to finish?
Q. Of course.
A. Thank you. (Reads.) I have completed it.
Q. Okay. So you have looked at Exhibit 64, the cable we've been discussing, about the grounds for the endorsing, espousing, the support for a terrorist

organization, and you can see that this cable addresses not only applicants, but those who are here in our country, correct?
A. They may be here in the country, because actually, um, looking at Paragraph 11, um, you could have a -- someone could have a valid Visa and not be in the country and have the Visa revoked. Your previous question, if I understand it and remember it correctly, was "Was there a discussion of revocation in this cable?" "Yes, there is." And specifically in Paragraph 11. That's a good example. Reading through it quickly, I didn't see it, but it's definitely there in 11.
But the holder of the Visa can be -- for example, if someone from Peru applies for a Visa, they get it, additional information later comes to light, that Visa can be revoked whether they're in Peru or whether they're in the United States.
Q. Okay. So to answer my question, yes, this cable applies to people who are Visa holders inside the United States as well, correct?
THE COURT: He just said it --
A. It could, yes.
Q. Okay. Now you asked me to refresh your recollection about the INA provision that, in your deposition we described as 4(b). I'm going to try to do

that very quickly here so we are all on the same page.

MS. CONLON: Can we please show Mr. Armstrong Page 7 of what was identified as Exhibit 222.

(On screen.)

Q. I'm going to show you, Mr. Armstrong, a copy of --

MS. CONLON: Oh, and we can't scroll? (Scrolls.) Yes. Okay.

Q. So, Mr. Armstrong, I'm showing you a copy of a statute. And this is just to refresh your recollection.

A. Yes, I appreciate that.

Q. This is codified in the U.S. Code as 8 U.S.C. 1227, Deportable Aliens. And you have control of the mouse here, so I'm going to ask you to scroll to Page 7 of this, Section 4, titled "Security and Related Grounds."

A. (Scrolls.) Yes, I see it, and I see "terrorist activities."

Q. Now you can see here, under 4(a), that this statute applies to people who engage in the same grounds we're talking about in 3(b), another part of the INA, but here, instead of it being that they're ineligible, as in Number 3, under 4 they are deportable, correct?

A. I haven't compared the exact wording in 3(b), but it does say that, yes, if they engage in, it's 1, 2, 3, that they are deportable.

Q. Just like --
A. And I believe the finding in that would be done by the Secretary of State.
Q. And under (C), 4(c) here, which says "Foreign Policy," so that rolls on to the top of Page 8, here we can see a person who's present in the United States, as determined by the Secretary, to have adverse consequences for foreign policy, that person is deportable, correct?
A. Yes, the Secretary of State makes that determination.
Q. Right. So my point is that you said, well, 3(b), 3(c), that's both -- Oh, our screens just did something strange. You said that those refer to applicants. And you would agree with me that 4(b) and 4(c) are applicable to people who already have a valid Visa or a green card, right?
A. Based on a quick review here, yes, that makes sense, they would, um --
Q. Okay, well you say a "quick review." But am I recalling correctly that you testified on direct examination that you have to be familiar with statutes, about revocations, removability, to do your job, isn't that what you said?
A. I don't remember my testimony. And I'm clearly

familiar with it, because I'm able to discuss it. So, yes, I am familiar with this. And again the 4 -- the 4 authorities, those are determined by the Secretary. Like the 4 -- excuse me, the 4(c).

Q. So earlier I tried to ask you about the language in that cable, about whether a person's alleged hostile attitude towards U.S. Citizens, government, and culture, may be indications that that person supports or sympathizes with terrorist organizations. I'm asking that question with respect to 3(b) and 4(b). And the question is this.

In your view, criticism of the Trump administration's policies or actions toward Israel could be relevant to a 3(b) or 4(b) determination, correct?

MS. SANTORA: Objection.

THE COURT: No, overruled.

A. It could be. I would look at the totality of the situation. For example, if the person said that Hamas should kill all of the Trump administration because of the policy, yes, I would say that a statement like that, which would be a criticism of the Trump administration, would be indicative of support for a terrorist organization. So, yes, it could be.

Q. (Pause.) Hang on just a moment.

So you've given a pretty outrageous example of

what could be covered. But you've been asked this question and given this answer.

"Could a criticism of the administration's policy or actions of Israel be covered by Paragraph 9?" And your answer is simply "Possibly," correct?

A. Yes, it could be. But again you have to look at the totality of it. Perhaps my example seems extreme, but we deal with a lot of extremist people trying to get into the United States and we've got to get it right, Counselor, otherwise it results in terrorist attacks or threats to our own citizens.

Q. Well let's talk about some particular people whose cases you dealt with.

You testified, on direct examination, that the State Department uses only existing authorities and policies to implement EO 14188 and 14161, correct?

A. That's my recollection, yes, it is. We have --

Q. No, go ahead.

A. We have, with revocations, long established the, um, 3(c), um, 3(b), or 4(b), and 4(c) are long established in the INA, I believe since the beginning when it was initially -- when it became law in the '50s, so it's over 70 years. Yes, long-established policies and methods, tools.

Q. Long-established. Your point has been that the

EOs did not create new legal authorities, right?

A. Yes, that is -- they did not create a new revocation.

Q. Now just after you started in your current role, which was February 27th, you were confronted with the cases of Mahmoud Khalil and Yunseo Chung. Are you familiar with those names?

A. I remember Mr. Khalil's name. Um, Chung, Mr. Chung is ringing a bell, but I don't remember that one quite as well. But there could have been someone by that name.

MS. CONLON: Your Honor, I'd like to show, um, Mr. Armstrong what has been premarked as Exhibit EX, it's an attorney's-eyes only document that we received from the Court, the action memo concerning Mr. Khalil and Ms. Chung. I won't -- we want to be cognizant of not putting it on the screen, because it's AEO.

THE COURT: I'm assuming Ms. Santora has it.

MS. SANTORA: Um, I -- can they share it with the witness not on the public screen?

THE COURT: Well you're saying it, and everyone is cognizant, it's attorney's-eyes only. I assumed you had it?

MS. SANTORA: I can get it, your Honor, um, if --

THE COURT: Well so long as it's on your screen

only, that would be sufficient. We can do that.

MS. SANTORA: Okay. If opposing counsel would share it just to the witness's screen?

MS. CONLON: We're trying to ensure that we do that and do not show the public, so.

MS. SANTORA: Yes, thank you.

Q. So while we're getting you the document, Mr. Armstrong, you mentioned that there are certain determinations under 4(c), for example, that only the Secretary of State can make. One such determination is that a person's presence or activities in the U.S. posed a potential adverse foreign policy consequence to the United States, right?

A. Yes. I cannot make that determination, only the Secretary of State, whoever that person may be.

Q. Okay, we're still working on getting you the documents.

(Pause.)

MS. SANTORA: Your Honor, I think I may have them now.

THE COURT: Thank you.

MS. CONLON: That would be really helpful. We just don't want to mess up and put it publicly when we're not supposed to.

MS. SANTORA: Which one are you referring to?

MS. CONLON: For Mr. Khalil and Ms. Chung, it's an action memo.

(Pause.)

MS. CONLON: Are you able to find it?

MS. SANTORA: Yes. Hold on one second. I want to be sure we have the right one.

MS. CONLON: It's on DEF 121 is the Bates.

(Pause.)

MS. CONLON: And is the Court able to see the Court's copy?

THE COURT: I have access to it.

You have about 45 minutes total in the examination, if you want to reserve 45 minutes for closing. So go ahead.

MS. CONLON: I'm sorry, your Honor, could you say that again? I didn't understand.

THE COURT: You have 45 minutes for examination and 45 minutes for closing, as we stand now at 10:00.

MS. CONLON: Oh, I see. I understand. Okay.

MS. SANTORA: I'm sorry, I don't think our copy has numbers on them.

THE COURT: Well it's before the Court.

MS. CONLON: Okay, I'll just ask my questions and we'll do our best.

THE COURT: Yes, thank you.

Q. So, Mr. Armstrong, you passed along, after approving, action memos concerning Mahmoud Khalil and Yunseo Chung to Secretary Rubio, correct?
A. I believe there was an action memo. If it went up to the Secretary and I was working, I would have been the last person to look at it before it went. And my name should be on it.
Q. That's right. I'm trying to show it to you, because I'd like it to be in evidence and have a number.
A. Counselor, if it has my name on it, I believe you.
Q. I appreciate that.
THE COURT: Well, look, these materials are before the Court in their tortured history and I have made it clear they are part of the record on which I am going to make a decision.
MS. CONLON: Okay.
THE COURT: Now if you want to separate this out and give it a number, I'm fine with that, we can do that without the time running.
MS. CONLON: Okay, thank you.
THE COURT: Because it may help you, in both sides, with the requests for findings and rulings.
MS. CONLON: Exactly.
THE COURT: So go ahead with your questions to the witness.

MS. CONLON: Okay.
Q. So my question is that prior to issuing this action memo to Secretary Rubio on March 8th, you were not aware of any prior exercises of the Secretary's removal authority under 4(c), correct?
MS. SANTORA: Objection.
THE COURT: Overruled.
A. I do not recall any. That doesn't mean there weren't any. I can only --
Q. Mr. Armstrong, please look at the end of your action memo. Sorry, I should have drawn your attention to it to just make this faster. Would you please look at the last line of your action memo.
MS. SANTORA: There's a copy here, but it has redactions applied to it, so I --
MS. CONLON: All right, we'll just move on.
Q. So you don't recall, as you sit here today, whether before you, in almost the first week of your job, authorized this action, whether it was something the State Department had ever done before?
A. I believe it was done before, just not under Secretary Rubio, it was the beginning of March, I believe that this took place. Yes, the first week in March?
Q. This was March 8th, that's correct.

A. Yeah, so Secretary Rubio would have been in the saddle for 6 weeks. But that doesn't mean it was never used by other Secretaries of State. As noted, the INA has been in effect for over 70 years. So I believe it was used at other times. But I would not be surprised if Secretary Rubio had not used it within those 6 weeks of his tenure.

Q. So, Mr. Armstrong, you're saying that it was just about Secretary Rubio being new to his role, but isn't it true that what you wrote in the action memo was that Mr. Khalil and Ms. Chung were likely to challenge their removal under this authority, that the courts might scrutinize its basis, and that's because there was no prior exercise of this authority before, not just under Secretary Rubio, under anyone, isn't that correct?

A. No, my recollection is it was used at sometime earlier as a matter of fact in this century.

Q. In this century?

A. But I don't remember a date.

Q. Okay. Let's move on to Mr. Mahdawi.

This is the action memo, which is also attorneys-eyes only, and I believe it's something we can share with the witness if Ms. Santora doesn't have an unredacted copy of it.

You also prepared, or passed along, the action

memo concerning Mr. Mahdawi to Secretary Rubio, right?
A. This is, um, 5. Okay. Sorry. I'm getting the right document.
Q. I appreciate that.
A. On March 15th, "Action Memo for the Secretary." Yes, from CA John Armstrong. That is me.
Q. Now these -- this action memo concerns a number of people, but in particular Mohsen Mahdawi, right?
A. I see three people. Momodou Taal. Badar Khan Suri. And Mohsen Mahdawi.
Q. The action memo concludes, for those mentioned, that they are removable under 4(c), correct?
A. Just a second. (Looks.) Yeah, and it asks the Secretary to make that decision. I can't make that decision. It's recommending that he make that decision. But I didn't make that decision. I made the case and those who drafted it did and I approved that argument, but it's the Secretary's decision. Which he did find those three people to be removable under 4(c). You can see at the top, um, ma'am, it says the recommendations, "Recommendation 1 approved," "Recommendation 2 approved." So, yes, the Secretary agreed with the recommendation.
Q. Now for Mr. Suri and Mr. Mahdawi, for whom these actions were approved about a week after Mr. Khalil's

removability determination was issued, you specifically anticipated that there could be concerns around the fact that the determination was inextricably tied to their speech, correct?

MS. SANTORA: Objection.

THE COURT: Overruled.

A. Okay, can I review the memo so I can see what it is I signed? I mean this was 3 months ago.

Q. You don't recall, is that correct, without having to look?

A. Ma'am -- I mean, ma'am, I have -- in a week I can have 50 action memos go across my desk.

Q. I understand that you have a very important job with a lot to do. I'm focused on these particular people whose determinations led to determinations of their removability. So if you need to turn to the last paragraph to remember what you said about it, that is just fine, it's the last page of the memo.

A. Thank you. I appreciate that. (Looks.) Now the question is Mr. Mahdawi, yes?

Q. Yes, the question is Mr. Mahdawi and Mr. Suri. But if you have Mr. Mahdawi in front of you, we can just use that.

A. Yeah, actually in the memo it's clear that it was activities. "Antisemitic conduct." "Disruptive

protests" and "antisemitic conduct."

Q. Mr. Armstrong, do you see where it says "Given the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination."

Do you see that?

A. Which page is this on, on Page 4?

Q. Yes, sir, the last page.

A. (Looks.) Yes, I see that.

Q. Now this memo, that you noted the action and it was approved, um, the date on the top, on the first page, is March 15th. I now understand from you that what I see in the upper left, "Rec 1 approved," "Rec 2 approved," means the date -- means that the Secretary approved the recommendation.

Is the date next to those two provisions on the top left, by "Rec 1," "Rec 2," the date that the Secretary approved the recommendation?

A. Yes, that's --

MS. SANTORA: Objection.

THE COURT: No, overruled.

A. That's my understanding, those are the dates of the approval.

Q. And do you see on the first page where it says,

right under "Background," "On March 14th, the Assistant Director of NSD referred this information to CA"?
A. Yes.
Q. So this referral came on the 14th, the action memo was produced on the 15th, and it was approved on the 15th. Am I understanding all of that correctly?
A. Yes.
Q. And in that 24-hour period in which the action memo was generated, 13 people in departments cleared it, does that sound right? If you look at the last page for me. Just making sure I'm understanding that chart correctly.
A. Yeah, it could actually be more than 24 hours, depending on when it came in and when the memo went up. But let's say, for the sake of argument, it was approximately 24 hours.
Q. So you do see that, am I right?
A. Yes, I see the list of clearers.
Q. Okay.
MS. CONLON: Just a moment.
(Pause.)
A. And you'll note, on a couple of them, it's "Info."
Q. I'm so sorry, I missed that last thing you said. What did you say?
A. On a couple of them it's "Info."

Q. And "info" just means someone's letting them know, is that right?
A. That's correct. So those people actually did not bring any changes or express any opinion about the document.
Q. So it would be more accurate to say that 10 offices or persons cleared this memo and three people reviewed it, is that fair?
A. I count, um, 9. But, yeah, approximately 10.
Q. Okay. Now I have one more action memo I want to discuss quickly. And I would like you to, um --
MS. CONLON: Ms. Santora, if you have Ms. Ozturk's action number, that's what I'll be asking him about.
Q. Now you decided to revoke Rumeysa Ozturk's Visa, right?
A. I believe that was under, um -- yes. Yes, I believe that was under authority that I did exercise in my current position.
Q. Meaning, um -- meaning as Senior Bureau Official, you were empowered to make that choice, without needing approval from the Secretary, is that what you mean?
A. That's correct.
Q. Now --
A. In other words, it wasn't a 4(c).
Q. In reaching that decision, you did -- I assume

what you always do, you reviewed the action memo in its entirety, right?

A. Yes, actually it was proposed to me -- I believe if it would have come to me, it would have been from the, um, Deputy Assistant Secretary for Visa Services, um, Stuart Wilson.

Q. That's right, Stuart Wilson is the person who issued this action memo to you, correct?

A. Yes, the, um -- I believe so. I mean I'm -- yes, that would make sense.

Q. Do you have access to the action memo, sir?

MS. SANTORA: Um, I am looking for it.

MS. CONLON: I understand that it's on your screen, Ms. Santora, we've shared it with you. So perhaps you can --

MS. SANTORA: Oh, it is, okay. It's on the witness's screen, yes.

A. Thank you. Exhibit EY, yes?

Q. Yes.

Now this memo reflects, on Page 1, that HSI initially identified Ms. Ozturk as deportable potentially under 4(c), the foreign policy provision, right?

A. Wait a minute. Yes, in the background.

Q. Yes, exactly. Do you see that?

A. Yes, and I see I underlined that. Those are my notes.
Q. Yes, I understand, but I also understand that the Court has determined that your notes are protected by a privilege, so I am not going to ask you about any of them, um -- I'll leave that there.
Q. Now on the second page of the memo, it gets into the factual basis for the proposed action, um, in that big middle paragraph. Do you see that paragraph, it's the middle, the paragraph on the middle of 2?
A. (Looks.) Yes, the one that begins "Ozturk was issued an F-1 Visa on December 14th, 2020, valid until December 9th, 2025." Yes?
Q. Yes. Now there are various factual allegations in this paragraph compiled by HSI, correct?
A. There's information from HSI, yes.
Q. Now I'm not going to get into the specifics, but it's fair to say, because you have this in front of you, that this memo considered whether or not she had engaged in antisemitic activity, right, is that a fair characterization?
A. Just a moment.
Q. Sure.
A. (Looks.) Antisemitic activity was part of it. I'm reading it. I see that "S. Wilson noted the

totality of the circumstances."

So as I believe I stated in my deposition, and have said before, we have to look at the totality of the cases, something that we do with a fair amount of effort. And I think my notes, whether they're protected or admissible or not, the copious amount of them indicates that I looked at this with a fair amount of effort and actually thought about the decision before making it.

As a matter of fact, exceptionally, for all the paper I go through in a week or a month or a day sometimes, I actually remember taking some of these notes. I thought long and hard about Ms. Ozturk's case.

MS. CONLON: Your Honor --

THE COURT: Wait a minute.

MS. CONLON: Okay.

THE COURT: It's appropriate to say that, um, I think I have erred. I don't think any deliberative privilege applies to ones notes to themself, and they reflect precisely what the witness has testified, and I now vacate the order as to these, Mr. Armstrong's notes, on the memo to him, as to which he made the decision.

Go ahead.

Q. Now these notes indicate, in that bottom paragraph, the first line, you wrote the words "actions

not words," concerning Ms. Ozturk, correct?

A. Yes, that is my handwriting. And the emphasis on that was that it wasn't just her statements, it was things that she did.

Q. Yes, now that is exactly what I want to talk to you about. That whole sentence states, "While Ozturk has been involved with actions, protesting Tufts' relationship with Israel, DHS, ICE, HSI, has not however provided any evidence showing that Ozturk has engaged in any antisemitic activity or made any public statements indicating support for a terrorist organization or antisemitism generally."

What this sentence describes are things she did not do, correct, actions she did not take?

THE COURT: Well it says what it says. But go ahead with your question.

A. I would read it with the whole paragraph, things taken out of context do not reflect the totality of complicated cases, which this was a complicated case, as the amount of my notes indicate.

Q. Now the whole --

A. The next thing her --

Q. I'm sorry, I'm going to walk you through the whole paragraph, so don't worry, we're not going to ignore the rest of it.

The rest of the paragraph --
A. I would -- yeah, I would point out that she had a connection with this banned student organization.
Q. Now you say she had a connection, but what the report to you actually says is that the report from HSI implies a connection between her and a now-banned student group. And if you look at the paragraph above that, that implied connection is that she co-wrote an Op-Ed where she agreed with the proposal that had also been agreed to by that student group, isn't that correct, that that's the activity with the connection?
A. No, that is not the connection. They said clearly there's a connection, and the connection is not just the Op-Ed in my understanding.
Q. But your understanding was only based on this action memo, right, you don't have independent knowledge about Ms. Ozturk's activities apart from what was presented to you here?
A. My decision was based on the action memo, that is correct.
Q. And it goes on to say that the report presents no evidence other than her membership in a group, which notably is not the group that was banned, but a group that supported a proposal by a banned group, it said it had no evidence other than that, of her connection,

right? That's all there was?

MS. SANTORA: Objection.

THE COURT: No overruled. The question is leading, um, strongly leading, but it's appropriate.

A. (Pause.) Is the question that you are asserting that the only evidence was that she belonged to an organization that was a satellite or an ally of another organization, yes?

Q. A "satellite"?

A. Or associated with another organization.

Q. Yes, I guess that is my question. The activity that was the basis for your reaction here, I just want to make sure I understand, because I agree your notes are important.

There seem to me to be two actions here described. One, is her writing of an Op-Ed, that is a supposed action. Two, what's treated here, it seems as an action, is that she was part of a group that in the Op-Ed supported a proposal of another group. So some sort of attenuated affiliation with this other group.

Am I understanding that correctly?

MS. SANTORA: Objection.

THE COURT: No, the objection is made, but overruled.

A. I'm sorry, there's too many talking at me at once.

I'm trying to focus on this. I'm really trying to answer the question.

THE COURT: I don't doubt it, sir. Let me try it.

As you looked at this paragraph and evaluated it and the totality of the circumstances, is it correct that you, um, considered or were considering at least two actions, and I'll name them. One, is the writing of the Op-Ed. And the second is the, um, affiliation with the group that sponsored the Op-Ed, which, um, had, you're inferring from this, a connection with the now-banned student group.

Have I got that right?

THE WITNESS: Okay. In reviewing it, the key thing is looking -- and as I recall it, and based on my notes, the key thing that made -- was key in my decision, were her actions. The, one, actions of protesting Tufts' relationship with Israel. Secondly, her activities and associations, which are not speech. Activity and associations with these groups may undermine foreign policy by creating a hostile environment for Jewish students in indicating support for a designated terrorist organization. Those were the key things. Her activities and associations creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. And

then the actions of protesting against Israel.

THE COURT: Go from there, Ms. Conlon.

Q. It's fair to say that the Op-Ed that she wrote is also being construed as an action here?

MS. SANTORA: Objection.

THE COURT: Overruled.

A. If it's in a -- it wasn't the key factor.

Q. Can you please answer the question.

A. Sure, it wasn't a key factor. If writing -- I suppose one could consider that an action. I think it was more indicative of her motivation in her activities, in her associations and in her activities to create a hostile environment for Jewish students. And I also noted that the Tufts -- and its underlined, "images of weapons." Tufts Students for Justice in Palestine was placed in suspension, the organization she was associated with.

Q. Right, associated in your view, because she supported a proposal of another organization that this organization also agreed with. You agree with me this doesn't say she was a part of the group that you've just described?

THE COURT: Too long. Start another question.

Q. Mr. Armstrong, this memo found that there were not grounds under the foreign policy provision, correct,

that that was not presented here?

A. Just one moment. I believe so, yes, because we didn't use that provision, which would have required the -- also the approval of the Secretary of State.

Q. And just so the record is --

A. Yes, I think that's -- yes, a short answer is, yes, the foreign policy grounds did not apply. Of course if the Secretary of State were to determine that, then a different story. But we didn't believe -- Deputy Assistant Secretary Wilson did not believe that they applied.

Q. And just so the record is clear, whatever you've said about her alleged affiliation with that group, this action memo says that there was no evidence that she was involved in any of the activities of the suspended group. It says that very clearly. Do you see that? It's the bottom of the second page, the top of the third.

A. It says "any antisemitic activity or public statements indicating a support for a terrorist organization, or antisemitism generally." That's what it says.

Q. Sir --

A. She was clearly involved with the Palestine -- I'm sorry, the Tufts Students for Justice in Palestine.

Q. Okay, just so we're really clear here, because I really don't think she deserves to be besmirched further, it says --

THE COURT: Just a moment. That's inappropriate. All you do is ask questions.

Are we very clear on that, Ms. Conlon?

MS. CONLON: Yes, your Honor.

THE COURT: All right. It's the witnesses who are testifying here. And though I play a bit role, I'm the one who is going to draw the inferences. Not you.

Go ahead.

Q. It states, quote, "Nowhere has DHS, ICE, HSI, shown any evidence that Ozturk was involved in any of the activities which resulted in TJSP's being suspended from Tufts," correct?

A. Which paragraph are we in, please?

Q. We're in the sentence at the bottom of the page that rolls onto the top of the next one, that's right in front of you.

A. (Looks.) Yes, I see that.

Q. So you said --

A. "Nonetheless she was associated with the organization, the Tufts Student for Justice in Palestine. She was against Tufts' relationship with Israel. An association is an activity. She was

involved in the Tufts Students for Justice for Palestine activity including when they had the interim suspension for the use of images of weapons to promote a protest rally. You know if you know join the student intifada --

Q. Okay, Mr. Armstrong, we're short on time and I think this memo is in evidence --

A. It's sort of like saying -- I mean I don't want to waste your time, ma'am, but it's sort of like saying --

Q. I'm going to stop it right here, but I have one question, just so I'm clear.

This was done under 221(i), not 4(c), correct?

A. Just one moment. I believe it was 221(i), but let me look at the top of the memo. Yes, 221(i). Not 4(c). Not 3(c).

Q. And that's a provision that let's you revoke not for foreign policy reasons, but for any reason?

A. That is correct.

Q. Or for none at all?

A. There is a reason. It's a discretion. I treat that power, as I believe all Consular Officers, and I try to instill this in them, should treat it seriously. A revocation is a serious decision.

Q. Okay, thank you very much.

MS. CONLON: Nothing further.

THE COURT: And, Ms. Santora, do you have any questions for this witness?

MS. SANTORA: No, we don't, your Honor.

THE COURT: Mr. Armstrong, thank you. And you're excused.

THE WITNESS: Thank you, your Honor.

(Zoom ends.)

THE COURT: And call the last witness.

MR. WANG: Good morning, your Honor, Xiangnong Wang for the plaintiffs, and the plaintiffs call Veena Dubal.

(Interruption by Court Reporter.)

THE COURT: And you did just right, but the first thing you did was state your name and it seemed to come from nowhere.

MR. WANG: You know after two weeks, I've learned.

THE COURT: So have we, sir.

The witness may take the stand.

(Take stand.)

(VEENA DUBAL, sworn.)

THE CLERK: And can you please state your full name and spell your last name for the record.

THE WITNESS: Veena Dubal. My last name is D-U-B-A-L.

***********
VEENA DUBAL
***********

DIRECT EXAMINATION BY MR. WANG:
Q. Good morning, Professor Dubal. And the first question for you, Professor, is where do you work?
A. I work at the University of California, Irvine, the School of Law.
Q. And what do you do there?
A. I'm a Professor of Law.
Q. Do you have a role with the American Association of University Professors?
A. Yes, I am the General Counsel of the AAUP.
Q. Right. So I'm going to call that organization the "AAUP," going forward, is that all right?
A. Great.
Q. When did you begin your role as General Counsel with the AAUP?
A. Um, late October, 2024.
Q. And turning to the organization itself. What is the AAUP?
A. So the AAUP is one of the nation's oldest professional organizations, um, representing faculty, um, and graduate student workers at Universities and

colleges in the U.S., and the goal of the organization is to, um, define and protect academic freedom and shared-governance principles.
Q. Does the AAUP's mission encompass protecting its members right to engage in speech outside of their scholarly work?
A. Yes, we call that "extramural speech," um, and from our inception it has been central to the mission of the organization.
Q. And so what do you mean by "extramural speech"?
A. So "extramural speech" is generally defined as speech in which a speech was made as a citizen, a person who makes it as a citizen, as opposed to in the context of being a, um -- in the context of their expertise as a researcher and a scholar.
Q. And when you say as a citizen there, do you mean in their personal capacity?
A. In their personal capacity, yes.
Q. Does that include engaging in political protests?
A. Yes.
Q. What about signing public protests?
A. Yes.
Q. Why is protecting extramural speech part of the AAUP's mission?
A. That's a great question. So it was first

articulated in our principles from 1915, our first set of principles on academic freedom and tenure, and the reason that extramural speech has long been integrated into how we define academic freedom is because so often our extramural speech is really hard to define outside of the context of our professorial speech.

It is often that we speak about public issues, um, in areas that we may be getting new research in, in areas which we may be considered public intellectuals on, um, it is broadly a part of our, um, identity as thinkers, as intellectuals, as people whose job it is to do, um, research, writing, um, debate, be part of -- be part of discourse.

And so because, you know, it is so easy to often say, "Well this is extramural speech and therefore not protected and therefore, you know, terminate or discipline someone," it has been critical, over 110 years, that extramural speech is protected as academic freedom.

THE COURT: Who is eligible to be a member of AAUP?

THE WITNESS: So, um, professors, both adjunct and tenure, tenure-track, and graduate students.

THE COURT: And how do you become a member?

THE WITNESS: That's a great question. You, um --

it depends on where you are. If you're at a University or college where we have a chapter, you sign up with your local chapter. Alternatively you can sign up directly with the national. You pay dues. And, um, you're a member.

THE COURT: So, um, if there's a chapter, you become a member of the AAUP, um, the name of the college or university, um, chapter?

THE WITNESS: Correct. And there are different types of chapters. We have advocacy chapters and then we have collective bargaining chapters. And so our collective bargaining chapters function as local unions for faculty, and the advocacy chapters function more as professional associations on campus.

THE COURT: What role does one citizenship play, if any?

THE WITNESS: Well ideally it shouldn't play any role, um, noncitizens and citizens should benefit from the same principles of academic freedom, be engaged in shared governance in the same way that, um -- that citizens are.

THE COURT: Thank you.

Go ahead, Mr. Wang.

Q. How many members does the AAUP have?

A. We have, excuse me, approximately 50,000.

Q. And is, um, membership in your local chapter, does that also mean you have membership in the national AAUP?
A. That's correct. If you're a member of the local, you're automatically a member of the national.
Q. And you mentioned the citizenship status of the AAUP's members earlier. How did the AAUP's noncitizen members contribute to its mission?
A. In the same way that the citizen members contribute. And maybe in more critical ways. You know often it is, with rights and freedoms, that the most marginal people are first affected by the -- by the withering of those rights and freedoms. And so the fact that our noncitizens are engaged in protecting academic freedom and upholding freedoms of shared governance is sort of central to how we, um, how we define ourselves as an organization.
Q. So I want to turn to this case now. Why is the AAUP a plaintiff in this lawsuit?
A. We are --
MR. KANELLIS: Objection, your Honor.
THE COURT: They're not a plaintiff. Various chapters are plaintiffs.
MR. WANG: Your Honor, the National AAUP is also a plaintiff in this lawsuit.
THE COURT: All right, I stand corrected, and I

appreciate it.

Why is that relevant?

MR. WANG: Your Honor, um, Professor Dubal is the General Counsel of the plaintiffs and --

THE COURT: I know. I know. But tell me what it adds?

MR. WANG: It speaks to the AAUP's interest in challenging the policy that --

THE COURT: And I've already ruled on that. Let's move on. Sustained.

MR. WANG: All right.

Q. Are you aware of, um, the ideological deportation policy that is at issue in this lawsuit?

A. I am.

Q. And when did you become aware of that policy?

A. Um, late February, early March, um, I would say specifically when Mahmoud Khalil was first arrested and detained.

Q. And do you believe that this policy is ongoing?

A. Absolutely. In fact, um, we are closely watching the, um, situation unfolding at Harvard in which the University just received, a few days ago, subpoenas from the federal government asking specifically for the, um, records of international students with respect to any disciplinary proceedings and activities and protests

since 2020.
Q. After the arrest of Mahmoud Khalil, anything about your role as General Counsel change?
A. My role changed dramatically. I went from doing what the General Counsel has traditionally done, which is write amicus briefs primarily, to essentially being a legal aid attorney. I talked every day to, um, noncitizens, members who were extremely afraid, who expressed fear about how the ideological deportation policy was going to affect their economic livelihoods and personal lives, and, um, all of my attention, most of my attention became -- became, um, focused in on, um, the academic freedom and shared governance rights of our noncitizens.
Q. And besides your personal duties changing, did the AAUP, as an organization, change after -- do anything differently after Mr. Khalil's arrest?
A. Yes. So we redirected, um, a lot of resources to, um, help support our noncitizen members. We put together two town halls for our noncitizen members. We spent a lot of time, our Executive Director, organizers, in addition to my own time, our staff time was redirected and devoted to these issues. And, um, so, yeah, organizationally not only were noncitizen members affected, but we, um, we had to sort of redirect time

and resources.

Q. So you mentioned these two town halls. I want to ask you about those. And starting with the first one. When did that occur?

A. So soon after Mahmoud Khalil was detained and, you know, soon after that, Rumeysa Ozturk, and Badar Khan Suri, and we were getting such a deluge of fear from questions from our noncitizen members, that given that I have a full-time job as a law professor, I thought it was in the best interests of efficiency to put together a town hall in which those questions could maybe get answered in a larger context. And so we reached out to various immigration attorneys, and together with the Middle East Studies Association, we put together our first town hall, um, where we talked about what was happening, answered people's questions, and, um, shared resources and information, information about immigration attorneys and information about certain basic rights and principles.

Q. And in your answer you mentioned the Middle East Studies Association. That's also known as "MESA," is that right?

A. That's right.

Q. Were you personally involved in organizing this event?

A. I organized it.
Q. And why did you organize this event?
A. Because we got so many questions from noncitizens. Every day there was such a clear concern among our membership that I felt that a town hall would not only sort of help to answer those questions and help people make decisions about their lives, but that I also thought it would be a good opportunity for people to come together and, um, have sort of a shared, um, a shared time where they could understand that they were not alone, that the AAUP was, um, standing up for its noncitizen members, and that we were behind them.
Q. Had the AAUP ever organized an event like that one before?
A. Not to my knowledge.
MR. KANELLIS: Objection, foundation, your Honor.
THE COURT: Well I don't know that it's relevant. Sustained.
Q. Okay. So turning to the second event that you mentioned earlier. When did that one occur?
A. That one occurred after the detentions and attempted deportations continued, a number of high-profile ones, so we got feedback that our noncitizen members would appreciate another town hall, especially before summer travel began. And so it was

late May, um, as people were wrapping up their semesters and, um, thinking about research projects that they were doing abroad, particularly noncitizen members, whether they had to change their research projects altogether, and whether it was safe for them to travel. And so we did another one.

Q. And, um, were the topics discussed at the second event similar to the ones discussed at the first event?

A. They were the same.

Q. Did MESA also co-host this event?

A. Yes.

Q. And so why did you organize another event, similar to that first town hall, only a few months later?

A. Because we got so much feedback that the town hall was so greatly appreciated and there were again a series of continuing, um, high-profile detentions of scholars and students that our noncitizen members were watching and were very very afraid that this continuing policy was going to impact them.

MR. KANELLIS: Objection, your Honor, the foundation.

THE COURT: No, the objection comes too late. That may stand.

Q. Are you planning any other events similar to the ones that you just described?

A. Yes, we have another one that we plan to have later this month or early August, before people, um, are coming back into the U.S to teach in the fall, to address ongoing fears about what may happen at the U.S. border.

Q. And the content of these events, are they different from what the AAUP has typically put on in its events?

A. To my knowledge the AAUP has never had to focus on immigration law.

Q. And other than content, did the events that you just described differ from the AAUP's other events in any other ways?

A. Yes. Um, we have -- so I myself am not an expert on immigration law, so we have had to reach out specifically to, um, to, um, experts in this area. We have, um, had to sort of think about, um, how to make our noncitizen members feel less vulnerable even in attending the events. And so I think a great deal of thought and time has gone into shaping, um, shaping not only the content, but also the structure of the events.

Q. And were these events public events?

A. They were private events made specifically so that people might feel safe attending them.

Q. So you testified earlier about how your personal

duties as General Counsel changed after the arrest of Mr. Khalil. How did they change?

A. So, um, I was hired or appointed specifically for my expertise in, um, in work law, so I do research and writing on contingency, and there is a rising adjuntification, um, that is the rising use of contract faculty to do the work of professors teaching in universities. And so one of the AAUP's goals, um, under this leadership has been to address adjunctification which we see as a threat to academic freedom. And so that was why I was appointed.

THE COURT: "Adjunctification" is where someone teaches a course as an Adjunct Professor, an employee for that course, but otherwise typically they're in practice or, um, their profession embodies that topic?

THE WITNESS: So that is true in law schools, but in other disciplines, in physics, in anthropology, in history, often those adjuncts have no other jobs, they are just PhDs who do not have security of employment.

THE COURT: Thank you.

A. And so because I study precarious work, um, this was something that I was going to focus on. And instead, um, I have spent a lot of time reading about areas outside of my expertise. I'm not a First Amendment scholar. I'm not an immigration law scholar.

I have devoted many number of hours to reading cases, Hornbooks, talking to experts in the field, to meet the needs of our noncitizen members in this moment. And again that was not what I accepted when I accepted this appointment in late October. It's not what I had envisioned myself doing. But doing more of what I felt I was equipped to do.

THE COURT: You have just a few more minutes, Mr. Wang.

MR. WANG: Yeah, just a few more minutes for me.

Q. So, um, did this also include having conversations with individual members?

A. Yes, I had many conversations with our individual members in an attorney-client context.

THE COURT: Wait. Wait a minute.

MR. KANELLIS: I just --

(Laughter.)

THE COURT: I understand. So we'll let that stand.

Go ahead, Mr. Wang.

A. Yes, I had many -- I was contacted by many noncitizen members, individually had attorney-client conversations with them, in which I would refer them to immigration attorneys, sometimes also private security, because people were so afraid of even walking to class.

MR. KANELLIS: Objection, your Honor, now she's waived privilege and I can ask her questions about privileged communications.

THE COURT: We'll see what you can ask her. But I don't take that as an objection, you're just trying to tell me that he's opened the door.

Go ahead, Mr. Wang.

Q. Without telling me what you discussed specifically with those members, how many of these conversations have you had since Mr. Khalil's arrest?

A. It's hard to know. This has been really -- it feels like an emergency, like a nightmare over many months. But I would say, um, somewhere between 80 and 100.

THE COURT: I mean it's your case to try, but now if you reserving 45 minutes for closing, you're into that time. But go ahead.

MR. WANG: Thank you, your Honor. I'll be very brief.

Q. So, um, without discussing the specifics again, can you tell me generally about what the number of conversations that you just described something about?

MR. KANELLIS: Objection, your Honor, it calls for hearsay.

THE COURT: It does.

MR. WANG: Your Honor, um, I think without hearing what Professor Dubal has to say, it's, um -- (Speaks with co-counsel.)

Okay, it's withdrawn.

Q. After you had these conversations, what did you do in response?

A. I, um, created lists of immigration attorneys that I could send to our noncitizen members. I created new rights information and resources that we could circulate for people who were not -- who stated that they were too fearful to take in the town halls. And I organized these two town halls.

Q. And how --

MR. KANELLIS: Objection, your Honor, move to strike about fearful of attending town halls.

THE COURT: Well she's already so testified. In the exercise of discretion, I'll let that stand.

Q. How often, after these member conversations, did you refer members to immigration attorneys?

A. Almost always.

Q. And before Mr. Khalil's arrest, was it part of your role, as GC, to speak with individual members?

A. No.

Q. And, um -- okay. So I'll just move to a couple final questions.

Okay. So in addition to what you've already described, are there other ways that the policy challenged here, that you mentioned earlier, impacted the AAUP?

A. The AAUP's central mission is to protect academic freedom and shared governance. I don't believe that there has been a time, since the McCarthy era, where those things have been so deeply and troublingly challenged. The idea that noncitizen members could not express, um, their --

MR. KANELLIS: Objection, your Honor, as nonresponsive.

THE COURT: Yeah, I think it is nonresponsive. Sustained. Sustained.

Q. So, um, you testified earlier that, um, you referred some members to immigration attorneys. Did you observe that these members, um, changed the way that they engaged with the AAUP?

A. I observed that noncitizen members, who were previously very active in our membership meetings, didn't attend them, or attended them with their video off.

Q. And how has, um, what you've just described impacted the AAUP's mission?

A. We haven't heard the voices of our noncitizen

members, we haven't had their advocacy and insight in our organization, and, um, given that the core of the organization is to protect academic freedom and shared governance, we feel that this is an existential threat to the organization more broadly.

MR. WANG: No further questions, your Honor.

THE COURT: Do you wish to examine this witness?

MR. KANELLIS: I certainly do, your Honor.

THE COURT: About how long do you think you're going to take?

MR. KANELLIS: Oh, maybe 30 minutes.

THE COURT: Okay, we'll take a recess for 15 minutes, until 5 minutes after 11:00.

During the recess, um, because when we're done here, I expect the -- I expect everyone finally to rest, you might -- if you want to encapsulate certain documents that are now in the record, and give them exhibit numbers, you might prepare a list, it can be an informal list, with the next numbers. And if I'm satisfied with it, I'll simply recite it as part of the record before you rest.

We'll stand in recess for 15 minutes. We'll recess.

(Recess, 10:50 a.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Friday, July 18, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-18-25
________________________
RICHARD H. ROMANOW   Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 2, Pages

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

********

BENCH TRIAL DAY 9

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 18, 2025

********

Court Reporter: Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way
Boston, Massachusetts 02210
mortellite@gmail.com

A P P E A R A N C E S

RAMYA KRISHNAN
ALEXANDER ABDO
SCOTT B. WILKENS
XIANGNONG WANG
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Ethan.kanter@usdoj.gov
and
SHAWNA YEN
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Shawna.yen@usdoj.gov
(617) 748-3100
For Defendants

# INDEX


| WITNESS | PAGE |
|---|---|
| VEENA DUBAL | |
| Cross-Examination By Mr. Kanellis | 86 |


## E X H I B I T S


| Exhibit No. | Received |
|---|---|
| 247 | 102 |
| 248 | 102 |
| 249 | 102 |
| 250 | 102 |

P R O C E E D I N G S

(Resumed, 11:06 a.m.)

THE COURT: Mr. Kanellis.

CROSS-EXAMINATION BY MR. KANELLIS:

Q. Ms. Dubal, you testified on direct that you joined AAUP as general counsel in October 2024, correct?
A. Yes.
Q. That's actually when you became a member of AAUP; is that right?
11:06 A. Yes.
Q. You've been a general counsel for less than a year?
A. Yes.
Q. And you've described in your direct testimony how this alleged ideological deportation policy has caused you to shift the work you're doing at AAUP; is that right?
A. Yes.
Q. You claim that the effect of the ideological deportation policy was to cause you to shift away from issues like adjunctification to other issues. Fair statement?
11:07 A. Yes.
Q. Okay. That took you away from the work you intended to do at AAUP when you signed on in October of last year, right?
A. And the work I'd begun to do, yes.
Q. I just want to make one thing clear. Are you a U.S. citizen?

11:08
A. I am.
Q. You're not a noncitizen member of AAUP, correct?
A. Correct, I am the general counsel and a U.S. citizen.
Q. Okay. And with respect to the noncitizen members of AAUP, you have not directly observed noncitizen members being restrained from their First Amendment rights, correct?
MR. WANG: Objection.
THE COURT: I'm not sure I understand the question. "Restrained" as in physically restrained?
11:08 MR. KANELLIS: Restrained in any respect, Your Honor.
THE COURT: Including being chilled?
MR. KANELLIS: Yes, sir.
THE COURT: She may answer it.
A. I would say that I have.
Q. You have. You predominantly work in California, correct?
A. Yes.
Q. And so your participation as general counsel for AAUP has generally been through telephone conversations and remote work. Fair statement?
11:08 A. Yes.
Q. You're not physically present at AAUP's headquarters in Washington, D.C., are you?
A. No.
Q. How many times have you visited the headquarters?
A. I have never been in the headquarters.

Q. Never been once in the headquarters of AAUP.
How many physical meetings with other members of AAUP present have you attended since October of 2024?
A. Physical, maybe three or four.
Q. Three or four, okay. Now, your primary job is as a law professor at the University of California Irvine, correct?
A. Yes, sir.
Q. About how many hours do you spend working in that capacity per week?
11:09 A. As a law professor at USC Irvine?
Q. Yes, ma'am.
A. Depends on the week but a good 40 hours.
Q. 40 hours a week. And your work at AAUP is not a full-time job, right?
A. No. It is a service position.
Q. Service position. And your work at AAUP since you began working at AAUP has been about five to eight hours a week. Fair statement?
A. Yes.
11:09 Q. And that's remained relatively consistent since you began until now, correct?
A. Yes.
Q. Let's talk about AAUP itself. You talked about AAUP's mission. AAUP stands for the American Association Of University Professors, right?

A. Yes.
Q. It's not the International Association of University Professors, right?
A. We do have Canadian members.
Q. Okay. You have Canadian members, but the primary focus of American Association of University Professors is American universities. Fair statement?
A. Yes.
Q. In fact, the vast majority of chapters associated with AAUP are located on campuses in the United States. Fair statement?
A. Yes, although some of our universities have campuses abroad as well.
THE COURT: Excuse me. I had to think why you picked out Canada, but then it came to me it's the "American." Do you have Mexican members?
THE WITNESS: I don't think so.
THE COURT: Citizens of Mexico?
THE WITNESS: Oh, citizens of Mexico, yes.
THE COURT: Who are members of AAUP?
THE WITNESS: Yes, absolutely.
THE COURT: All right.
BY MR. KANELLIS:
Q. And the focal point of the university chapters is -- and there are hundreds of those chapters, correct?

A. Yes.
Q. There are hundreds, they're in Syracuse, Nebraska, even in Arcadia?
A. Correct.
Q. Question for you: Does AAUP track the citizenship of its members?
A. No.
Q. In fact, when you applied to become a member of AAUP, you didn't list your nationality or citizenship, did you?
11:11 A. No, I did not.
Q. So you can't tell just by looking at a membership form who or what country a member comes from. Fair statement?
A. Yes.
Q. The only way that you would discern whether or not someone is a citizen or noncitizen member is if they actually told you, right?
A. Correct.
Q. AAUP has been seeking to expand its membership. Fair statement?
11:12 A. Yes.
Q. Yeah, you're actively trying to increase the number of individuals who are members of AAUP. That helps the organization. Fair statement?
A. Sure.
Q. In fact, just in the last, since the Trump administration

was voted in in November, AAUP has actually increased the number of chapters that it has formed, correct?

A. I think that's correct, and I think that the fact that so many people have lost their research, have had their jobs threatened and generally the attacks on higher education make it so that not only is our organization of increased importance but that many people see that importance, and so we've seen our membership rise.

Q. Seen your membership rise, and it has bolstered, it has

11:13 bolstered the membership of AAUP and has increased the ability of your organization. Fair statement?

A. Yes.

Q. You are employed by AAUP as general counsel, correct?

A. I am not employed.

Q. You are a contract worker?

A. I am in a service position for which I receive a stipend.

Q. You receive money for what you do, right?

A. Yeah, I receive 1,250 a month.

Q. $1,250 a month?

11:13 A. Yeah.

Q. For the work that you do.

And that's for five to eight hours a week of work?

A. Yeah.

Q. And you're testifying here today in your capacity as AAUP's lawyer, isn't that right?

A. As the general counsel, correct.
Q. You understand that it's in AAUP's interest that the testimony you give support the claims AAUP made in the complaint, isn't that right?
A. Yes.
MR. WANG: Objection.
THE COURT: No. Overruled. They're entitled to bring that out.
You do understand, I mean, you're here representing AAUP.
11:14
THE WITNESS: Yes.
BY MR. KANELLIS:
Q. It's in your interest because AAUP pays you money, isn't that right?
A. I would say no.
Q. No. You want to remain employed by AAUP, correct?
A. I am not employed by AAUP. This is a service position. The amount of money that I receive is negligible, and I am doing this because I care about academic freedom and shared governance.
11:14
Q. And you're not going to give testimony contrary to the statements in the complaint, are you?
A. I don't intend to, no.
Q. You testified earlier that the IDP, the deportation policy, was implemented in late February or early March in your

opinion; is that right?
A. Yes.
Q. And what was the basis for your opinion?
A. It was both the fact of the detention and deportation attempt of Mahmoud Khalil as well as what I was reading in the media.
Q. In the media on the Internet?
A. We get the New York Times in its physical form but, yes, in the media.
11:15 Q. Okay. You read the New York Times, and then you saw reports on the Internet. Fair statement?
A. Yes.
Q. Did you read the executive orders issued by the President in January of this year?
A. I did, yeah.
Q. And is that also the basis for your belief that there's an ideological deportation policy?
A. I would say yes as I sit here now, but I would need to go through and look at the executive orders again to be point to specific things.
11:16 Q. Okay. But you're not aware of any specific language sitting here in the executive orders that would indicate that there was an ideological deportation policy, correct?
A. Not without looking at them again.
Q. Right. The executive orders that were issued to your

recollection don't even contain the word "Palestine," do they?
A. I think that there were a record number of executive orders issued in the last many months, so I couldn't answer that question with any degree of certainty.
Q. Okay. You indicated, I believe, there were two virtual conferences that were held this year by AAUP, correct?
A. That's right.
Q. And you were the person who organized those conferences, right?
11:16 A. Correct.
Q. And I believe those conferences were held over Zoom, correct?
A. Yes.
Q. And you again did not physically attend, you were not physically present in a room with a bunch of other members. Is that a fair statement?
A. We had members from all over the country, and it was done in a digital space.
Q. In a digital space. So you were sitting alone in an
11:17 office, and then other members who attended were also at various different locations, correct?
A. Yes.
Q. You did not have the opportunity to talk to individuals who attended that conference outside of that space that you had created on Zoom. Fair statement?

A. I spoke to some of them both before and after the conference in individual capacities.
Q. Okay. With respect to the Zoom, I want to make sure I understand how the Zoom meeting was set up.
When the Zoom meeting was set up, was there an identifier associated with the different attendees so that you could identify who they were?
MR. WANG: Objection, objection.
THE COURT: No. Overruled.
11:17 A. Sometimes people included their actual names. Sometimes they used, you know, a fake -- you know, just like words that didn't make sense so they couldn't fully be identified. And oftentimes many people had called in so you could only see their phone number.
Q. Okay. And to be clear, under the names, it didn't list the citizenship of the people who attended, correct?
A. No.
Q. You couldn't tell from just observing the Zoom meeting whether somebody was a U.S. citizen or a citizen of another country, could you?
11:18 A. I could not.
Q. And then when people spoke at this meeting, people didn't announce, "I'm a member" or "I'm a citizen of this country," before they spoke, right?
A. Actually, people often did when they answered the

question. So they would say, you know, "I'm here on a J visa, this is what's happening," and then they would sort of frame their question in that way, which I at the time felt very worried about because I was worried that stating their nonimmigrant status, if the Zoom were being observed, could make it easier to identify who that person was by a government entity. And I remember thinking, gosh, I really wish they wouldn't do that, but people did.

Q. To be clear, did you think these meetings were being observed?

11:19

A. I thought that that was a possibility.

Q. Possibility. These were private meetings, right?

A. They were private meetings, but we also had a private meeting that was put up on Zoom, so the privacy of our meetings were, you know, not foolproof. A full membership meeting was leaked onto Zoom by someone who was not a member. So I had to consider the possibility that even though we stated that these were private meetings, we intended them for them to be private meetings, that there could be observers, either vigilante observers or government observers who could leak the identity of people who stated that they were noncitizens or who attended the meetings to ICE.

11:20

Q. And with respect to these, what you're saying is third parties could have accessed these meetings. Fair statement?

A. They could have, and they certainly did in at least one

instance that I became aware of.
Q. Okay. And with respect to -- so with respect to the individuals who attended, you didn't know if they were members of AAUP or they were not members of AAUP, isn't that right?
A. The emails went out to only our members. So we assume that the large number of people -- largest -- you know, that the people who signed up to the Zoom were members. But as with any digital meeting, it is possible that it could have been accessed by other people.
11:21 THE COURT: Do you remember how many, can you estimate, were at the first town hall?
THE WITNESS: So I remember that the first town hall that we had 700 people sign up and about half of those people attended.
THE COURT: And the second.
THE WITNESS: Around the same. I think less people signed up, but more people attended. I can get the exact numbers for you from our staff if that's useful.
BY MR. KANELLIS:
11:21 Q. So the attendance at these events increased from the first to the second, right?
A. Yes.
Q. And you don't know who was at the events because, as you indicated, third parties could have accessed these events, correct?

A. They could have done so surreptitiously, but our staff does know who signed up for the events.
Q. Well, I'm asking about whether you know that anybody outside of the organization, AAUP, attended the event. That's quite possible --
A. I considered that it was a possibility, yes.
Q. So you don't know whether these were members who attended or they were people outside of the organization who attended?
MR. WANG: Objection. Asked and answered.
11:22 THE COURT: It has been. Let's move on.
Q. You know it's possible that the people who attended the meeting were completely unassociated with AAUP, isn't that right?
MR. WANG: Your Honor, same objection.
THE COURT: Sustained as to what's possible.
A. I'm sure that's --
THE COURT: No. That's sustained.
THE WITNESS: Sustained, okay. Sorry.
Q. And you did not, after the meeting you did not speak to
11:22 members to confirm that they were members -- or sorry.
You did not speak to the attendees to confirm whether or not they were members who attended?
A. I did not follow up with each attendee, no.
Q. And you indicated that certain members had kept their screens black, right, or attendees had kept their screens

black, right?
A. Correct.
Q. But you don't know the reason why they kept their screens black, do you?
A. I can only guess.
Q. You can only assume, right? They could have just not wanted -- they may have had a bad hair day and that may the reason they didn't want appear --
THE COURT: I think we understand. Using the word guess and the like, she drew inferences, this court can draw inferences, and having a bad hair day may be one of them. Go ahead.
Q. You have no -- you did not confirm with members after the meeting why they kept their screens black, isn't that right?
A. Sir, I would say that based on my experience in other AAUP meetings that are open to our members that most people keep their screens on and their names clear, and they state who they are before they speak. And it is very common to have meetings in which people are fully present and want their presence to be known. This was a very different kind of meeting.
Q. It's because some people had their screens blackened?
A. And -- yes.
MR. KANELLIS: No more questions, Your Honor.
THE COURT: Nothing further.
MR. WANG: Nothing further.

THE COURT: Thank you. You may step down.

THE WITNESS: Thank you, sir.

THE COURT: But for denominating -- let me stick to the plaintiffs here. But for denominating part of the record that you want culled out as to individual exhibits, plaintiffs rest?

MS. CONLON: Sorry. But for -- there's two pieces, just so I'm really clear. The first is there are several documents we just used with Mr. Armstrong that we want to 11:24 assign exhibit numbers to, and we have a proposed list that we could hand to the court if the court wants to read them into the record.

And then the second component -- sorry, I see your outstretched hand. My colleague can -- okay. This is just proposed exhibit numbers for the action memos that have been provided to us and then a related piece for us. We want to submit -- the court noted that we could submit designations from Mr. Armstrong's deposition in particular relating to some of the executive privilege stuff that came up in his 11:25 examination pursuant to Federal Rule 32(a)(iii).

THE COURT: Are you ready to recite it?

MS. CONLON: The rule?

THE COURT: Not the rule but the portions of the exhibit.

MS. CONLON: The portions of his deposition, you mean?

THE COURT: The deposition.

MS. CONLON: I am not going to recite it; nor am I ready to pass it to the court --

THE COURT: Right. You can do that on Monday.

MS. CONLON: Relatedly, Your Honor, there are other government officer depositions that we have provided designations of to the government in the event that they have counter-designations that I understand they have not had the opportunity to yet counter-designate but that we would like to submit to the court for consideration on Monday.

11:26

THE COURT: All right. Wait a minute. Wait a minute. All right, Monday. And we'll meet at 9:00, not at 10:00 to --

MS. CONLON: Okay.

THE COURT: Because it's so important to settle the record. What's in the record I'll look at. What's not in the record I'm simply not going to look at.

What I was fishing for is to hear both sides say they rest. The plaintiffs don't. But now I'll do what I said I would do.

11:26

The action memo that covers Khalil and Chung is admitted in evidence, Exhibit 247. The action memo related to Mahdawi is admitted in evidence, Exhibit 248. The action memo related to Suri is admitted in evidence as Exhibit 249. And the action memo related to Ms. Ozturk is admitted into evidence as Exhibit 250.

(Exhibits 247, 248, 249, 250 admitted into evidence.)

THE COURT: Now, the defense doesn't have to formally rest until the plaintiffs have rested, but you have more evidence you wish to produce?

MR. KANELLIS: Your Honor, yes, we do.

THE COURT: What's that?

MR. KANELLIS: We have an unavailable witness under Rule 804 that is outside this court's jurisdiction, and pursuant to 804(a) and 804(b), we would like to designate his testimony and read part of his testimony into the record because we do have some extra time.

11:27

THE COURT: You have extra time on the timing. But one, again, I have somewhere to go, frankly. I propose the following: that we meet at 9:00, we work through theirs, we work through yours, but I don't see any need to read it in open court because I can read.

MR. KANELLIS: Your Honor, I appreciate that you can read. We believe these are -- we're not going to read the entire thing, just a short excerpt that I think bears emphasis that we would like to highlight.

11:28

THE COURT: That's a candid statement. I read fast. So we'll see where we go on Monday.

Thank you. So we're clear then, once we've done that and both sides formally rest, I'm in a position for oral argument. The more I think about it, I want to revise it in

this wise, and I give you warning now. Plaintiffs will argue first, then the defense will argue, because there's questions I have to -- as I've indicated, and as I sit here I think I stand right with it, the matter is sufficiently complex that I'm pretty clearly going to take everything under advisement and wait for proposed findings and rulings. But it will just make more sense, thinking about it, if I pose my questions first to the plaintiffs, who have the burdens of proof, and then as to those questions and given the tenor of their argument, I think 11:29 it would make more sense in posing my questions to the defense counsel for the government officials. And we'll do that on Monday.

I do have somewhere to go. It's a very nice day out.

MS. KRISHNAN: Your Honor, I don't want to detain you any further. I just want to clarify how much time we have left.

THE COURT: You have 40 minutes. They have 45. We'll stand in recess until 9:00 a.m. Monday morning, but I assume we can get through the talky-talk pretty fast. We won't start the 11:30 arguments until 10:00 to give you a sense to pull yourselves together for the arguments. We'll recess.

(Adjourned, 11:30 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 18th day of July, 2025.

/s/ Kelly Mortellite

______________________________

Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Monday, July 21, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 540-0675
Email: Cgans@shertremonte.com
For Plaintiffs

ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
DOJ-Civ
P.O. 878
Ben Franklin Station
Washington, DC 20044
(202) 616-9123
Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Email: Shawna.yen@usdoj.gov
For Defendants

# I N D E X

PRELIMINARY MATTERS.................................. 4
CLOSING ARGUMENT BY MS. KRISHNAN/MS. CONLON........ 12
CLOSING ARGUMENT BY MR KANELLIS/MR. KANTER......... 36

# E X H I B I T S

(None marked.)

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT: Good morning. Because we have -- I have authorized internet access to these proceedings, it's appropriate for me to say that if you are accessing these proceedings via the internet, the rules of court remain in full force and effect, that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

Also, it is especially important that you keep your microphone muted at all times. If you do not mute your microphone, we will necessarily have to cut you off right away.

All right. I will start with the plaintiffs. I've been given, um, 6, I think the Clerk said, and I do have 6 binders that have, um, deposition designations, um, in them, um, and --

Yes?

MR. ABDO: Yes, your Honor. Alex Abdo for the plaintiffs.

THE COURT: Yes, Mr. Abdo.

MR. ABDO: If I could just briefly lay out what happened?

THE COURT: I think so. That would be helpful.

MR. ABDO: Sure. The 6 binders are the

government's designations of the deposition of one witness. Our counterdesignations in a separate binder, so that's two of the binders. And the other 4 are our designations -- um, targeted designations with respect to 4 of the other witnesses. And we believe that those designations should come in under Rule 32 (a)(3), and are happy to explain why. But that's what you have before you.

THE COURT: Thank you. Let me go step by step.

So as to 2 -- and I take it, um, Brian, um --

MR. ABDO: Shuve, your Honor.

THE COURT: Which are the 2? So we're clear on that.

MR. ABDO: So the 2 that involve the government's designation and our counterdesignations are Mr. Shuve's deposition transcript.

THE COURT: All right, so I'll just start there.

And, Mr. Kanellis, I will read the designations and counterdesignations. I will make notations so that, for possible review, it's very clear what I've sustained. If there are objections -- if there are no objections, I will read the designations or counterdesignations. And other than that, as to Mr. Shuve, I may consider this deposition.

MR. KANELLIS: Yes, your Honor, pursuant to Rule

804(a), and that is because the witness is unavailable, and 804(b) because it is under 804(b) --

THE COURT: Well I'll get to specifics when there's objections. I hear no objection. So you can be sure that I will read the designations, the counterdesignations, and rule on any objections.

MR. KANELLIS: Your Honor, and I apologize, we would ask -- because we do have additional time and because we are about to go into closing arguments --

THE COURT: Right.

MR. KANELLIS: There are select excerpts that we think are important to highlight for the Court as far as our affirmative case.

THE COURT: Understood, but denied. I can read. However, if you want to make mention of them in closing, I'll leave this on the bench so I may look at it.

Now back to Mr. Abdo.

So is there a second witness in the same situation?

MR. ABDO: No, your Honor, that's the only witness we --

THE COURT: All right. So now we have -- I have four other, um, binders.

And you offer them?

MR. ABDO: Yes, your Honor.

THE COURT: Do you object to these?

MR. KANELLIS: Oh, absolutely, your Honor.

THE COURT: Well absolutely. So now I have to think about ruling.

MR. KANELLIS: Sure.

THE COURT: And, Mr. Abdo, I'll hear you.

Why -- on what basis -- well let me be clear. Are there -- there are designations in here.

So on what basis ought I consider the designations in these as part of the record in this case?

MR. ABDO: Yes, your Honor. We think they should come in under Rule 32(a)(3). That rule allows an adverse party to use, for any purpose, the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6). We think these individuals, all of four of them, qualify as officers or managing agents of the defendant agencies which we have sued in this case.

THE COURT: Okay, just a moment. I clearly know who Mr. Watson is, and he testified, and I know who Mr. Armstrong is. I have Mr. Veprek and, um, a person by the name of Stuart Wilson.

And, Mr. Kanellis, what is the objection?

MR. KANELLIS: The objection, your Honor, is that the -- your Honor has given us guidelines about

witnesses, your Honor has said that it expects to hear parties to identify witnesses in advance of trial. Mr. Veprek and Mr. Stuart Wilson -- the second individual, Mr. Wilson, the plaintiffs did not call them as witnesses, their statements do not qualify under Rule 804 for admission, because they were. They did not, um -- they were available to be subpoenaed, they were able to testify. They are trying to circumvent your Honor's rules about time by adding in ex-post testimony from witnesses out of context.

THE COURT: What about Andre Wilson and John Armstrong?

MR. KANELLIS: Mr. Armstrong and Mr. Watson, your Honor, we don't have an issue with respect to those designations, those witnesses testified, and we think your Honor can fairly balance, um --

THE COURT: Well so now --

MR. ABDO: Your Honor --

THE COURT: Again, so I'm clear, I heard you briefly there -- so we're clear, the record will include the designations as to Andre Watson and John Armstrong. And now I'll let you respond to what Mr. Kanellis said about these other two.

MR. ABDO: Yes, absolutely.

Mr. Kanellis is relying on the notion of witnesses

being unavailable. That proposition is --

THE COURT: He isn't, he's saying you never designated these as witnesses.

MR. ABDO: They don't need to be designated, respectfully, your Honor, under Rule 32(a)(3) to come in as deposition transcripts because they are the depositions of adverse parties -- of the officers or managing agents of an adverse party. And the rule is very clear that unavailability or the presence of a witness at trial is not a precondition to designation under that rule.

I can direct the Court's attention to --

THE COURT: No, no, no, that's okay.

So who is Veprek?

MR. ABDO: Your Honor, if you just give me one moment.

(Talks to counsel.)

MR. ABDO: A Special Assistant to the Counselor, your Honor. These are both senior officials.

THE COURT: Special Assistant to the Counselor. Of who?

MR. ABDO: Of the counsel who reports to Secretary Rubio, your Honor. Of Michael Needham, who is the counsel who reports to the Secretary.

THE COURT: All right.

And who is Stuart Wilson?

MR. ABDO: Your Honor, if I can turn it over to Ms. Conlon, who is more familiar with this.

THE COURT: Who are these people?

MS. CONLON: Good morning, your Honor. Stuart Wilson reports directly to John Armstrong, he is the person directly below John Armstrong. So he oversees not only the Visa Office, but other aspects of the Bureau of Consular Affairs. He is the person who, if you were to look at Mr. Armstrong's deposition, Mr. Armstrong repeatedly suggests would know a lot of the details about this program that Mr. Armstrong couldn't recall.

THE COURT: All right, I'll take the matter under advisement, um, as to these.

And I take it, having worked through yours, the plaintiffs now rest?

MS. CONLON: Yes, your Honor.

THE COURT: And the defendant public officials now rest?

MR. KANELLIS: Your Honor, there was one -- we do except for -- there was one outstanding issue, very early, the first day of trial, about the admissibility of an exhibit that your Honor has not ruled on. Subsequent to that first hearing, the plaintiffs

indicated that there was a just a miscommunication about what document it was and they assented to its admissibility.

THE COURT: And the number is, or the designation is?

MR. KANELLIS: I will, um -- your Honor, if you'll allow me, I will identify that document.

THE COURT: That's fine. And assuming there's no disagreement, we'll, um -- I will of course receive it in the record.

Now I have said we'll take a deep breath now and get ready for final argument. I acknowledge the filing of two additional briefs, which I have had the opportunity to read and I thank counsel for them. I'm prepared now to recess until 10:00, unless you want to start before that.

What's the plaintiffs' pleasure?

MS. KRISHNAN: We're fine to start at 10:00 a.m.

THE COURT: At 10:00. Very well.

We'll stand in recess until 10:00 a.m. We'll recess.

THE CLERK: All rise.

(Recess, 9:15 a.m.)

(Resumed, 10:00 a.m.)

THE COURT: All right. The plaintiffs will argue

first and then I'll hear the defendants.

CLOSING ARGUMENT BY MS. CONLON/MS. KRISHNAN:

THE COURT: Ms. Conlon, let me start with a question.

What -- you've assumed throughout -- I don't quarrel with it, you've talked to your witnesses as though this ideological deportation policy was just self-evident and it existed. Tell me what it is and where the evidence of it is?

MS. CONLON: Yes, your Honor, in fact what I hoped to do is to, in 10 minutes, summarize for you what we put into evidence that showed what it is and that it exists, and our intention is that Ms. Krishnan will then explain why that policy violates the First Amendment. But in short, the policy is one of revoking the Visas and green cards of noncitizen students and faculty based on their pro-Palestinian advocacy.

THE COURT: Why? In other words, what's the goal of that policy?

MS. CONLON: Oh, I think that the goal is quite clear from the -- both from what you heard from the witnesses, the documents in evidence, and the statements of public officials. The goal is to chill speech, the goal is to silence students and scholars who wish to

express their pro-Palestinian views. It is stifling dissent, your Honor, that's the goal.

Now the government says that the policy that we've challenged is a figment of our imagination, that it doesn't exist. But outside of this courtroom, the government speaks about it quite freely and demands credit for it.

And, your Honor, over the past two weeks the government officials that you've heard from have acknowledged the policy even if they won't use that word. They've told you that there's a new process, a new program, a new guidance, new lines of effort --

THE COURT: Well there are existing processes which have been put to new uses perhaps, um --

MS. CONLON: Well, your Honor, in particular Mr. Hatch and Mr. Watson didn't say it was an existing process, I mean Mr. Hatch and Mr. Watson literally --

(Interruption, cell phone ringing.)

THE COURT: You'll have to excuse me. Go ahead.

MS. CONLON: Mr. Watson and Mr. Hatch used the word "new," they did that over and over, they just didn't call it a "policy." And if you look back both at the deposition designations we've submitted and the trial transcripts, I'm confident you'll see that, that they said that this was a new process set up to manage

this influx of referrals that needed to be dealt with quickly.

THE COURT: Well, yes, an influx of referrals, but, um -- and they dealt with that. I guess I -- you seem to be trying to cram this into some sort of Administrative Procedure Act context.

Suppose this Court is unpersuaded of that, does the case fail?

MS. CONLON: No, your Honor.

THE COURT: Why not?

MS. CONLON: Well, your Honor, the policy -- whether you call it a "policy" or something else, the fact is that the government is systematically violating the First Amendment by revoking the Visas and green cards of people based on their speech. So whether you call it a "practice," a "pattern," a "policy," what they are doing is unconstitutional, and what they're doing is having the effect of chilling the speech of the plaintiffs, which is the basis for our claim.

You know, your Honor, I hear you about the sort of cramming it into an Administrative Procedure Act claim. The reason we have spent so much time introducing evidence about the process is because our view is that the creation of the new process, and the manner in which it was executed, proves what the point of the whole

thing was, the fact that this process was developed to be as quick as possible.

The government tells you "Oh, well this is about independent layers of screening and vetting," but the evidence shows that that's not what happened and that's not true, and all of that matters, the Court's examination of the process matters for understanding the existence and the purpose of the policy that we're challenging. So with respect to the process, there's a few things we want to point out.

The Reports of Analysis, that your Honor heard so much about from the Office of Intelligence, relied almost entirely on unvetted allegations supplied by Canary Mission, an extremist pro-Israel group that compiles black lists of students and scholars that it deems to be --

THE COURT: On Canary Mission, yes, you've now characterized it as an "extremist group." Do I have that in evidence?

MS. CONLON: You do.

THE COURT: Well apparently it's a group who, um, who doxxes people -- I would say the evidence shows, it's a group who doxxes people who they say hate Israel.

MS. CONLON: Yes, and your Honor actually has in evidence the web pages. We put them into evidence. We

didn't spend a lot of time looking at them, because they speak for themselves.

But when you can look at them, you will see that that is -- what the website sets out and purports to do is only to identify people who have these views. It's not to identify people who are breaking the law. It's not to identify people who are supporting terrorism. It's to identify people who have views that they disagree with.

And the fact that that is a pool of people that the government started with for this process tells you what the point of this policy was. They started by looking at people who hold certain views to see whether there was any enforcement action they could take against those people. This is why we talked so much about the process, because we think it proves the point.

MS. CONLON: But the other critical part of the process I wanted to -- no, go ahead.

THE COURT: It's perfectly appropriate for the government to take leads from any source, it would seem to me. I mean frequently this Court sits where the lead comes from a wrongdoer or a rival gang or something like that.

MS. CONLON: Yes.

THE COURT: And that's perfectly-appropriate law

enforcement.

MS. CONLON: Well two points about that.

The first, in the instances your Honor just described, those are leads about alleged law-breaking, those are leads about alleged criminal activities. The "leads," if you call it that here, are just about people who allegedly have criticisms of Israel or criticisms of the United States. But the second point I want to make is about what you leaned about the next step in the process.

Now I assume, when the Court hears about these leads from law enforcement in other matters in criminal cases, the Court then hears about an investigation that was done, diligent steps that were taken to ensure the accuracy of those leads, particularly when they're found in an unknown or an unreliable source. But that is not what happened here.

The letters that Watson and his team wrote purport to summarize what's in Mr. Hatch's ROAs, from the Office of Intelligence. But if you line up a Watson letter next to a Hatch ROA, what you're going to see is that the Watson letter makes enormous inferential leaps that are not supported by what is in the ROA.

What happens in the ROA, as your Honor heard from Mr. Hatch quite candidly, is just a collection of what

somebody said about someone on the internet, the fact of the allegation. But what happens in the Watson letter is the adoption of those allegations as true without any explanation of how that conclusion was reached, without any vetting of the underlying sort of substance of the allegation. And that's how you wind up with someone like Ms. Ozturk being described as "pro-Hamas." The whole process relies ultimately on DHS and the State's indefensible conflation of antisemitism with speech that is anti-war, pro-Palestinian, or critical of Israel.

Now I think it's really very important that nobody from DHS or the State Department have told you that there was a defined meaning of "antisemitism" that's guiding everybody's work or that there was guidance about what that means, either to be "antisemitic" or to express support for a foreign terrorist organization. Instead, the evidence shows that senior officials, like Mr. Armstrong, relied on their own views to guide this work. And Mr. Armstrong was quite candid about his views. He believed that slogans calling for a "free Palestine" are inherently antisemitic, or that anti-Israel sentiment is in fact just antisemitism masquerading as a viewpoint, or a "dodge," as you put it. And importantly, he believed that mere association is not protected expression, but an action that can

warrant the revocation of a Visa or a green card.

And, your Honor --

THE COURT: And at least under the law he may be right?

MS. CONLON: Well in terms of whether he has the authority to revoke a Visa for any reason he wants, sure, the statute says "revoke for any reason at any time," but the statute doesn't trump the Constitution. And, Ms. Krishnan, I will not step on her toes, because she is ready and eager to talk about that.

Being mindful of my time, there's a few other -- oh, go ahead.

THE COURT: But help me out now with -- there is evidence that, as an advocate, to support the things you've just said. Where is the -- what's the best evidence of the intent now, directed not just to the people we've been talking about -- and I recognize that I limited it to 5, to have a manageable case. But not just to them, where's the evidence of, um, concern, proper concern on the part of your clients, where's the evidence of intent to influence them to chill their speech?

MS. CONLON: So I hear that as a two-part question.

THE COURT: It is.

MS. CONLON: All right. So I'll start with the evidence of intent to chill their speech. Now I think there are two very easy examples to point to.

The first are the unprecedented arrests of these targeted noncitizens, arrests that your Honor heard, from the people who have to oversee the effecting of those arrests, are not part of the ordinary course, and arrests that your Honor heard from the plaintiffs, um, terrifies them.

I think the second thing I would point to is the government officials' public statements about these arrests and what they have done. And we didn't spend time here reading into the record those statements --

THE COURT: Well what's the link between those two?

MS. CONLON: Your Honor, the statements are to the effect of, "You saw what we did to Mr. Khalil, you can be next." The public statements are designed, by the government officials, to terrorize everyone else who shares the views of the people who they have arrested. The government officials don't post on social media about every Visa they revoke, every green card holder who they determine is removable, but in evidence -- and your Honor will see it in all of the exhibits, government officials went out of their way, over and

over again, to make exactly those kinds of statements here.

THE COURT: One fact point that I think falls in what I understand is your area. I don't hear any evidence, I don't think, but I have to go back over the whole record, that any, um, member of the group, um, groups, whom you represent was on that Canary Mission list. There is no such evidence.

MS. CONLON: There is in fact, your Honor. Yes.

So, first, you heard from Nadia Abu El-Haj who described not only that she's on the list, but inaccuracies about her in her Canary Mission profile. You heard testimony from her about that. And I believe you also heard testimony from Veena Dubal about members being on Canary Mission.

And then, um, you heard -- if your Honor were to look at some of the profiles we've put into evidence -- and just one moment, I want to confirm that what I'm saying is correct.

(Speaks to co-counsel.)

MS. CONLON: The other thing we have in evidence, your Honor, is that MESA, the Middle Eastern Studies Association, is one of the groups highlighted on the Canary Mission website. In other words, that the Canary Mission website suggests that the people who are members

of MESA share the views of all of the people that they have identified on the website.

THE COURT: And that I can confirm by looking at the matters in evidence?

MS. CONLON: Yes, your Honor.

(Pause.)

MS. CONLON: And in terms of the harms, your Honor, um --

(Speaks to co-counsel.)

MS. CONLON: Okay, so I think there's a few things.

The first, um, I think it's clear from the government's public statements that it was the fact of the advocacy by the targeted noncitizens that led to the enforcement efforts against them, and that is one of the things that was terrifying for the plaintiffs.

Second, your Honor, you heard directly from three of the noncitizen plaintiffs who described to you the chilling effect that this had on them. And one point I want to make about that is that the government went out of its way in its opening to characterize the plaintiffs as "academics obsessed with theories and ideas and, you know, not grounded in reality." But here's the reality.

Some of the people you heard from are the professors of the students who were targeted for

deportation, like Ms. Abu El-Haj. Some of the people that you heard from had made the exact same statements that Mr. Armstrong told you could be the basis potentially for an immigration action against them, have said, you know, "Free Palestine," have said -- have made public criticisms of Israel. And that, I think, is a point that makes the plaintiffs' fear objectively reasonable here.

And in terms of harms, because I thought that was the other part of the question you asked me, in terms of harms, you heard that the plaintiffs refrained from publishing Op-Eds they wrote, abandoned scholarship they were engaged in that touched on this issue, to avoid any potential consequence for being associated with it by the government. You heard about protests that they, you know, attended, um, taking precautions to attend or didn't attend at all.

And I know your Honor was listening carefully to them, so I will not belabor everything that they said, but those individuals, who testified, the noncitizens, established that the government's policy is working exactly as the government intended, that it is intimidating and scaring students and scholars into silence, to our collective detriment.

I think it may make sense at this point for

Ms. Krishnan to explain to you the First Amendment -- what the -- that the policy we're challenging is exactly what the First Amendment was meant to prevent.

THE COURT: Thank you.

Ms. Krishnan.

MS. KRISHNAN: Good morning, your Honor.

And I have three points that I would like to make this morning, um, two of which are responsive to questions your Honor has asked during trial.

The first is that noncitizens lawfully present in the United States have the same First Amendment rights as citizens do. The second is that the policy is unconstitutionally viewpoint discriminatory. And the third is that this Court need not reach the constitutionality of the foreign policy provision or any other INA provision that defendants rely on to carry out their policies.

THE COURT: Why not, as to the third?

MS. KRISHNAN: Well to be clear, we're not resisting the idea that this Court reach the question whether these, um, provisions would be unconstitutional as applied to the government using these authorities to deport people based on viewpoints, the reason why relief against the policy is essential is one that I think Ms. Conlon made, which is that defendants rely on any

number of statutory authorities to carry out their policies.

You've heard about the foreign policy provision, but as you've heard a bit in Ms. Ozturk's case, the government relied on 221(i) of the INA, which is the State Department's Visa revocation authority. You've heard from Mr. Armstrong about 4(b), which he said, um, would cover a broad range of statements that express support for Palestinians as well as statements that criticize Israel, and so that testimony made clear that those statements may form the basis of deportation.

And there's another provision too, 214(b) of the INA, which defendants have made clear, um, they believe entitles them to revoke the Visas of students when they engage in activities inconsistent with their student Visa. And in public statements, as well as in the cables that are before this Court, defendants had indicated that engaging in activism, and in particular activism they consider to be pro-Palestinian or anti-Israel, are activities inconsistent with holding a student Visa. And so that's why, you know, our argument, our primary argument is that the policy violates the First Amendment and this Court should reach that question.

And secondarily, and this is a point that we made

in our supplementary brief, um, we think that a ruling on that question would provide a complete basis for relief in this case.

THE COURT: Without -- and your point is, um, without having to hold that, as to any individual's dispute with the government, the, um, the legal authorities invoked are unconstitutional as applied. But as I follow that argument. Which is what I was pressing Ms. Conlon on. It seems to me that you have to prove an intent -- implicit perhaps, but an intent to reach the groups that you represent, and chill their speech. Retribution against these identified people to chill the speech of the larger group that you represent.

Do I understand the argument?

MS. KRISHNAN: So to be clear, your Honor, we think that intent is an essential component of our ***Bantam Books*** claim, that is that the defendants are engaged in a campaign of threats to intimidate noncitizens into silence, but we don't believe that intent is a necessary element of our claim that the policy on its face is unconstitutionally viewpoint discriminatory.

THE COURT: I hear you. All right, go ahead. I'm having trouble with this policy.

Look, it seems to me -- and I'm not making any

findings here, I'm just trying to be helpful. It seems to me we have a new administration who has, you know, absolutely the primary authority over the foreign policy of the United States. If anything is in the executive, the foreign policy of the United States is in the executive. Public statements are made by the President, by the Secretary of State, the key officials, um, dealing with the foreign policy of our nation. And, um, changes are made lower down in Homeland Security and in the State Department. Procedures may be the same, but Ms. Conlon points to the evidence, that certainly the empathies are different, and then she develops all of that.

Now one can easily say that's an attempt by the professionals, lower-down, implicit or explicit instructions, to see what can be done under the existing legal framework, and indeed they find ways to proceed under the existing legal framework, and they do. You say, having a consequence on the people you represent. And I guess all I'm saying is, "Well we've got to find some intent to do that because how that worked out with specific individuals is a matter for those individuals and the legal processes in which they're involved, not this Court." I guess that's the framework.

Now have I got that right? Your argument, if I

hear you, is "But you have proved that," whether we call it a "policy" or, um, it is what chilled your clients unconstitutionally, because they fear retribution on the same basis.

Isn't that the essence of your argument?

MS. KRISHNAN: Yes, your Honor. Our argument is that the intent and effect of this policy was to chill, um, noncitizens, students and faculty, including our clients' members --

THE COURT: From the get-go.

MS. KRISHNAN: From the get-go. From the get-go. But I want to -- I would like to come back to the point that I made earlier, which is that our claim that the policy is viewpoint discriminatory, does not turn on us being able to show an intent to chill noncitizens into silence. Suddenly, for standing purposes, we need to show that this policy has harmed our clients. And our theory of associational standing turns on us showing that the policies have caused, um, the AAUP's and MESA's members to self-censor based on a credible threat of enforcement, and we believe that we have carried that burden.

But to be clear, the claim that the policy is unconstitutionally viewpoint discriminatory, as the Supreme Court cases on viewpoint discrimination make

clear, um, what you need to show is that the regulation is viewpoint-based on its face and that the government hasn't carried their burden to show that that regulation satisfies scrutiny.

The Court has been clear that if a regulation is viewpoint-based, and it said this in ***Reid,*** it is subject to strict scrutiny, quote, "regardless of the government's designed notice of a content-neutral justification or lack of animus towards the ideas contained in the regulated speech."

And it's true that the government -- you know, um, one of their defenses in this case is that we've always had these statutory authorities.

THE COURT: And that appears to be the rule. I mean they go back to the McCarthy era. And I don't mean that as a normative point, but that's true. And we're all complicit in that, in the sense that there have been administrations of different political stripes and the like and the majority of our people have voted them in, and Congress hasn't touched those statutes, those statutes, the regulations under which they operate. That's what's been used here in this fashion.

MS. KRISHNAN: That's true, your Honor. But the fact that these authorities were already on the books does not foreclose this Court from finding that the

administration has adopted a new enforcement policy. And one of the cases that your Honor cited in its motion to dismiss opinion, um, the case of ***Hoye*** from the Ninth Circuit, which we cite in our supplementary brief.

THE COURT: I saw that you did.

MS. KRISHNAN: I think it's a good illustration of this. Because the policy that the Court there found unconstitutional was a policy that was adopted after the statute was passed. And the Court found that notwithstanding the fact that these -- that the authority there was, um, constitutional on its face, the enforcement policy there was content discriminatory, and the government had not shown that it was narrowly-tailored to a compelling government interest. And the policies that we challenge in this case, um, we believe is one that you can find unconstitutional on a similar theory.

THE COURT: Go ahead.

MS. KRISHNAN: And it's true that the government has also pointed to national security and foreign policy concerns. But the mere indication of these concerns cannot immunize the government's actions here from judicial accountability.

THE COURT: Well I -- I urge you -- I've been thinking about that, and I urge you to, um, all of you,

to read a really brilliant law review article by Judge Jacobs of the Second Circuit called "The Secret Life of Judges," and that article has had a significant effect on my consideration of cases. And the reason that -- the essence of that article is this. All professionals look at the world through the lens of their profession. And I think that's true.

So, you know, these public officials, the lower-level professional officials that have testified in this case, they're looking at these things through the national security, um, implications of the responsible positions that they hold. That may not be determinative in this case given the cases that you cite, which of course I'm bound by, and I will carefully scrutinize. But I've got to take that testimony with respect to their job, which is not my job. I'll exercise my judicial independence.

But do you see where I'm going? The government doesn't just cite national security, these people are an aspect of our national security.

I mean one of the problems I have, and I'll tell them straight out, is here, because we've got this 5,000 list of people from Canary Mission, professionals have to be taken off international terrorism, off human trafficking, off transnational corporate greed, to deal

with this. Why? Evidently it's a pretty clear inference, they were told to do that. Not just take a look at this list and see if there's anything here, "Go through these 5,000." That is -- if not compelling, it's certainly a permissive inference.

I've got a real question about that. But that's for them. In essence I must -- I guess I'm just saying, I have to look at what they say -- and in the main it seems credible, I believe that's what they're doing, and I believe that's why they're doing it. With a couple of exceptions perhaps. And you say, "Go ahead, Judge, we still win," right?

MS. KRISHNAN: That's exactly right, your Honor.

THE COURT: All right.

MS. KRISHNAN: And no one has to doubt the sincerity of the objectives that these government employees pointed to, and we don't dispute that protecting national security is a government objective of the highest order. Our complaint is that the government has not carried its burden in showing that targeting students and faculty based on their support for Palestinian and their criticism of Israel is necessary to achieve that objective. That is our argument.

Now the other interests that the government has

pointed to in this case is countering antisemitism, and I want to be clear, that is a fourth legitimate government interest, um, that's commonly found in the case. The question in this case is over the means the government is using to pursue that interest.

The policy here -- and you've heard this from Ms. Conlon, conflates legitimate anti-war pro-Palestinian speech with antisemitic speech. It conflates criticism of Israel, support for Palestinians, and criticisms -- even if this government, the U.S. government's policies towards Israel, with antisemitism, and as a result this policy sweeps in a broad swath of speech that falls at the very core of the First Amendment's protection.

Now even if the policy was more narrowly focused on antisemitism, and in particular the suppression of antisemitic speech, the policy would still be impossible to square with the First Amendment for the reason that your Honor has alluded to at several of our -- you know during the trial and at several case-management conferences, which is that the First Amendment does protect speech that is offensive, it protects even bigoted speech. But the policy challenged here sweeps far more broadly than speech that is properly characterized as "antisemitic," and so clearly cannot be

reconciled with established First Amendment doctrine.

The last point I wanted to address is one that your Honor posed during opening statements, which is whether noncitizens lawfully present in the U.S. have the same First Amendment rights as citizens do? And as Justice Ginsburg noted in her concurrence in ***AADC vs. Reno***, it has been well-settled, since ***Bridges vs. Wixon***, that noncitizens residing in this country enjoy the freedoms of speech and the press, including in the deportation context. And in fact the Supreme Court has gone further, observing that the First Amendment doesn't acknowledge any distinction between citizens and noncitizens who reside here. Justice Murphy first made that observation in his concurrence in ***Bridges***, and it was later endorsed by the Court in ***Qualified Shoe vs. Colin***.

Since then, three courts have appealed. The Second, the Fourth, and the Ninth, have all held that noncitizens present in the U.S. were entitled to First Amendment rights, including in the immigration enforcement context. To my knowledge no court of appeals has gone in the opposite direction. And that makes sense. Any other rule would make a mockery of noncitizens' First Amendment rights and of political discourse in this country.

If noncitizens can be deported based on their political speech, then they have no First Amendment rights at all, because they must always always worry that their speech and association will displease those in power. In a country where free speech is the safeguard of democracy, that cannot be the law.

And one note about the cases that the government cited when we were, um, litigating the motion to dismiss, the ***Red Scare*** line of cases, um, which predates modern First Amendment doctrine. As you recognized in your motion to dismiss opinion, they don't control.

***Turner***, one of the cases they cited Is an exclusion case and it predates development in constitutional and First Amendment law that recognized that the government can't deprive a person of a benefit in violation of their constitutional rights even if they have no right to the benefit at all.

And then there's ***Harisiades***. And as the Ninth Circuit recognized in ***AADC***, and as Judge Wilson recognized in a ***Central District Court of California*** case from the '80s, ***Harisiades*** just stands for the proposition that the Supreme Court applies the same standard to noncitizen speech that they apply to citizen speech.

At the time ***Harisiades*** was decided, um, even

citizens didn't have a First Amendment right to affiliate with and be a member of a communist party, and that explains the Supreme Court's decision in this case. But it actually redounds to plaintiffs' favor because it shows that the same standards that apply to citizens apply to noncitizens.

(Pause.)

MS. KRISHNAN: And unless your Honor has any further questions?

THE COURT: No, I don't.

Mr. Kanellis. Let's start though where she ended, and it's the question that I have posed.

Do the defendants here agree that a person, a noncitizen, lawfully present in the United States, um, has the same right to free speech as a citizen?

CLOSING ARGUMENT BY MR. KANELLIS/MR. KANTER:

MR. KANELLIS: Good morning, your Honor, and may it please the Court, William Kanellis for the United States. I also have with me Mr. Kanter, and Mr. Kanter has much more First Amendment expertise than I do and I will refer to him and allow him to answer this specific question before I go into my discussion of the facts of this case, if your Honor would permit it.

THE COURT: We can, just as I did with them, um,

we can. But that is my first question.

So, Mr. Kanter.

MR. KANTER: Yes. Thank you, your Honor, and may it please the Court.

The answer to the question of whether aliens and citizens have equivalent rights under the First Amendment is "No, they're not equivalent." But, your Honor, there is no rule --

THE COURT: And what's your authority for saying that?

MR. KANTER: My authority for saying that are the cases, one after the next, um, that find a lack of equivalence, and that it is context-dependent. So those cases. ***Bluman***. ***OPAWL***, which is O-P-A-W-L, it's an acronym, ***vs. Feminist Leadership Association***. It's a Sixth Circuit decision, your Honor. The ***Amback***, a Supreme Court case. These are cases involving election law contributions to campaigns, to ballot initiatives, in which money obviously is equated with speech, and they directly address whether aliens, noncitizens, lawful permanent residents -- or simply nonlawful permanent residents, but lawfully in the U.S., aliens have equivalent rights. And in those cases they hold they do not.

In the context of the national security and

foreign policy, we have many cases that go to the same point and result. The ***Munoz*** case, ***Trump vs. Hawaii***, ***Kleindienst vs. Mandel***, and, um, they all derive from what is and what must be, your Honor, a, um, a flexibility.

The nature of the right is context dependent and in relation to the competing government interests in play. That is what these cases demonstrate. And that's not to say that in every instance aliens lack First Amendment rights. It's not to say that. But both Congress and the courts have identified discrete areas in which aliens are not afforded the full panoply of free speech rights.

For example, we know that they do have lesser interests when foreign policy and national security are in play. Why? Because Congress has determined as much. It did so, um, with regard to the provisions of law that my friends have referenced, "endorsing, espousing," which is in 212(a)(3)(b) of the INA, the (a)(4)(c) foreign policy ground, which has been the subject of much testimony and evidence in this case, and it did so with regard to the charges, um, the removal charges and the five so-called "targeted noncitizens" that plaintiffs point to as a reflection of an allegedly unlawful policy.

But, your Honor, in attacking that policy, the plaintiffs are really at odds with a line already drawn by Congress, drawn by Congress in (a)(4)(c). In (a)(4)(c).

THE COURT: But do I have to reach that? You see, um, I understand what you say, and it would seem that 221(i) is even broader with respect to Visa holders.

MR. KANTER: Yes.

THE COURT: But that's not their argument as I conceive it. Their argument here is that what was done -- we'll let those cases all resolve however they resolve. But they're claiming that what was done there -- and in other cases, I limited it to 5, was intended to chill recognized free speech rights of the people whom they represent. They cite ***Bantam Books***, they cite other cases. They seek to distinguish yours. Do I have to reach what Congress has done?

So you're telling me, "Well Congress has done this and that." Ms. Krishnan, her repost is "You don't have to get into that." Here the government has not, I -- it's speech, I'm supposed to subject it to strict scrutiny. I do. And they have not borne their burden, she says.

MR. KANTER: Yes, the answer, your Honor, is "No," you don't have to reach that question, the

Constitutionality, the statutory validity of these provisions. And plaintiffs have been quite clear, they're not challenging the validity of these laws, they are challenging these laws as applied.

Now Mr. Kanellis will go into great detail on other reasons why your Honor does not need to reach this question. For example, there's no retaliation. Not one member of the plaintiffs' organizations have been arrested, detained, or removed, or charged with --

THE COURT: They're concerned about the preenforcement chilling of their speech.

MR. KANTER: Yes.

THE COURT: There's ample evidence of that. What, um, weight I give it here is ultimately going to be part of my analysis. But there's surely evidence of it.

MR. KANTER: If your Honor will permit me to, um, attempt to land the point that the Congressional provisions of the Congress's statute, the foreign policy provision "endorsing and espousing," is the representation of a line drawn by Congress in saying -- "endorsing and espousing," that's speech, and yet Congress said, "but when it relates to terrorism." We are making the judgment. We are drawing the line that it must yield.

THE COURT: "When it relates to terrorism"?

MR. KANTER: Well it is -- the provision says what it says and it has to be applied by executive branch officials.

My point is that, in the implementation of those provisions, this is simply another line that has to be drawn in difficult circumstances. And plaintiffs search for some objectionable rule of thumb to pin on government officials, something simple, something -- they've been frustrated, I believe, that's my view, in finding it in the evidence. But it's not easy and it's not simple.

For example, there's no rule -- as we heard from government agents, there's no rule requiring that masks be worn in effectuating an arrest, and there's no rule prohibiting it either.

THE COURT: No, isn't that strange? You know I don't know of a single law enforcement agency in the United States that permits their members, apparently at their option, to wear masks when carrying out their duty. Not one. And, um, it would seem that the -- the common sense inference is that that is to spread fear. And if it's at the option of the agents themselves, what -- they're afraid of doxxing? We've heard a lot about doxxing in this case. You know perhaps they're afraid considering what they're being called upon to do

is a matter of concern.

Go back to -- the Marshal Service -- hear me out.

MR. KANTER: Yes.

THE COURT: The Marshal Service -- the distinguished United States Marshal's Service was, in the course of their history, required to enforce an odious law of the United States, the Fugitive Slave Law. A marshal was killed in this city seeking to enforce that law passed by Congress. None of them ever wore masks.

Masks are an indicia that by its very nature spreads fear. Isn't it a common sense inference that your clients understand that? In allowing, alone, among all the law enforcement agents, it goes against -- in municipal law enforcement there are whole sociological tracks written on neighborhood policing and how, um, in, um, all different communities, the law enforcement can better be carried out by making the law enforcement people, um, as much as possible, as one with the community.

Now I recognize that these are federal officers, federal officers who may be deployed in different places of the United States. Of course this is much more broader, given the policies of the administration, then these, um, people that we're concerned with here.

But when you tell me about masks, I'm not so sure that that's, um -- that the inference somehow is supportive of the government's position here.

MR. KANTER: Your Honor has spoken about the masks in particular at prior hearings and that's precisely why I raised it to discuss with you, because -- and I take all of your points and, um, we thought carefully about them, and one of the most significant of course is you are the factfinder and you are the one drawing the inference, and that is why, um, I point to the testimony of the, um, HSI, um, officers who testified in this court about that practice and your Honor heard them explain. And some of them -- these are detectives in -- it's a component of ICE, HSI, Homeland Security Investigations --

THE COURT: So I beat around the bush. I, um, again, and I think it's fair to say, I generally credit them, I believe that, I believe what they say, these supervisors.

MR. KANTER: I am not disputing that. Merely to note that they -- why is there no rule requiring or prohibiting it? Because they are in undercover operations --

THE COURT: They are not in undercover operations. They weren't in an undercover operation arresting

Ms. Ozturk, were they?

MR. KANELLIS: That's true. I will accept your Honor's point, which is a good one, however it's because they're in another undercover operation, that they don't want to be seen -- they're effectuating an arrest on one individual, that draws attention, and we live in the age of cell phones and cameras and everything. The videotape is always rolling, your Honor, and wherever you are. These are some of the points that they brought to light in their testimony.

They may be --

THE COURT: Why don't then other law enforcement agencies of equal repute wear masks as a common matter?

MR. KANTER: That evidence, to my knowledge, was not the subject of testimony. These HSI detectives testified from their personal knowledge about their own practices and procedures, their own protocols.

THE COURT: That's correct.

MR. KANTER: So to the -- ultimately what they testified, your Honor, is it came down to the judgment, experience, and the operational needs of a given agent as to whether that choice was made.

And my -- because I don't want to -- I don't want to intrude on my co-counsel's presentation, your Honor, so I'll end with this. That plaintiffs' critique of

where those lines have been drawn does not prove the unlawfulness or unconstitutionality of the alleged policy in this case, it is second-guessing a judgment they are not empowered to make. Congress, in its plenary power, gave it to the agencies who are empowered to make those judgments.

Thank you, your Honor.

THE COURT: Mr. Kanellis.

MR. KANELLIS: Your Honor, if I may reframe our closing and say thank you to my colleague for discussing the First Amendment, but after hearing the closing arguments and listening to the evidence at trial, if you'll permit me, I can't help but be reminded of a classic story in literature about two adventurers crossing Spain in the 17th Century. And as they crested on the corner they saw in the distance 30 giant windmills. And upon seeing those windmills, the leader of this expedition said --

THE COURT: I think you're going into German, but now I'm with you in the literature. Go ahead.

MR. KANELLIS: I will not speak German. I promise you. Lesson learned.

THE COURT: No, go ahead.

MR. KANELLIS: But as they spotted these windmills on the horizon, the leader said to the other, "Look

there, Sancho Panza, where 30 giant -- monstrous giants present themselves, all of whom I will engage you now to slay." And upon that he raised his lance and he charged, tilted it towards these windmills, his jousts becoming caught up in the blades, knocking him off his horse. And upon sitting on the ground, now apparently before a giant windmill, he refused to relinquish his illusion, he refused to admit that these were windmills, insisting that instead what must have happened is that these were monsters and they were transforming into windmills after the fact.

And the reason I bring this up, your Honor, is because just as Don Quixote of La Mancha imagined that windmills were monsters, plaintiffs in this case imagined that the lawful arrests of individuals pursuant to laws and standards that have existed for up to 70 years amount to some grand government conspiracy, is this idea that there is an ideological deportation policy targeting individuals merely because they speak out in support of the State of Palestine. And just as Don Quixote, well-intentioned and sincere, imagined that these monsters were windmills -- I'm sorry, that windmills were monsters, erroneously, this policy is a product of the imagination and creative, um, conjuring of the plaintiffs.

Your Honor, if I may approach the slides?

As your Honor has seen the evidence in this case, what happened in this instance was the result of an extensive process exercised by career officials of the United States government pursuant to statutory authority.

THE COURT: In ways never before seen.

MR. KANELLIS: Within their authority, your Honor.

The INA -- you heard testimony that the INA has been an element of the HSI's jurisdiction since its founding in 2003.

THE COURT: My point was only in ways never before seen.

MR. KANELLIS: In ways that made, um, my point of emphasis, in different administrations, your Honor. Certainly every administration -- and your Honor has acknowledged this, every administration has the prerogative, every President has the prerogative to exercise, to deem it important, what he or she feels is most important. And our point here, your Honor, is the evidence is in, the trial is over, you have heard the facts, you've heard the testimony, you've seen the contemporaneous documents of these that articulate that it wasn't speech alone that was the basis for the making those decisions, it was speech and conduct. Your Honor,

the trial and the facts are in. Plaintiffs have been knocked off their horse.

And what I will do, in the remaining time I have, is I will present two prongs of evidence, the factum provanda, the two questions that this Court must decide factually in order for them to prevail. And the first one is is there a ideological deportation policy? And then the second is, if there is such a policy, then how does that harm the plaintiffs? The plaintiffs, your Honor, the institutions, the organizations.

This trial, your Honor --

THE COURT: No, you know, um -- they're very big on talking policy and I've pushed back on that. Maybe it's not policy. I've got to reflect on these things. Maybe it's concerted action. Let me give you a historical anecdote, and I think maybe this suits their argument.

So here's Henry II and he's going around his court and he's saying, "Who will rid me of this troublesome priest?" And two errant knights go out and they hatch down a bishop, maybe it was an Archbishop, Thomas Becket, in front of his alter. Now that happened. That was then.

Now, you know, the President, um, does -- it's in evidence in this case, makes various, um, raises various

concerns about campus protests and, um, you know he doesn't have errant knights, but he's got Stephen Miller, and then, um, at the level you're addressing -- and we have the statutes that Mr. Kanter quite properly raised. You see it's not like the people who testified here are lawless, that they are just going to go ahead and ignore the law. If anyone thinks that's what I've gotten from this evidence it's not. But the law is used in a -- it appears to me, in new and somewhat different ways. And that's why I've pressed the plaintiffs on intent. If there was no intent to chill the speech of their clients, they lose.

Have they proved it? They would like to say, "Well given the way it was used, it affects speech and therefore the burden is on you to show that it was completely neutral." But the framework is, that I'm grappling with, and that's the my only reason for speaking, is closer to my Henry II example.

So what's wrong with that?

MR. KANELLIS: There's nothing wrong with that example.

THE COURT: No, but on this evidence, where does the evidence -- where are the holes in the evidence in that approach to analysis?

MR. KANELLIS: The holes in the evidence, your

Honor, it's not holes, it's that we have all those that contradict that evidence, that is manifested in the contemporaneous action memos, that is manifested in the contemporaneous documentation created by the career professionals public service who articulated the actual basis for the removal decision, which was not expressly based on free speech. Those contemporaneous documents, your Honor, that's why we have argued that this case could have been resolved as an APA case. It is an APA case. And in an APA case, one of the questions before this Court is whether the agency is articulating a rational basis for its decision, and they have.

THE COURT: Well I'm telling you I have real problems with their APA case. You're absolutely right. If this is only an APA case, I think they have a -- they, the plaintiffs, have a very long road to hoe. But as I've heard the evidence develop, it appears that this is just a straight First Amendment case, um, they think they have proved concerted government action at the cabinet level and below, um, to carry out the President's wishes, they say in a manner that as to their clients is unconstitutional.

MR. KANELLIS: Your Honor, the ***Hartman*** decision -- the ***Hartman*** decision dictates that the question that the Court must ask in determining whether the threshold

question in determining whether there has been a First Amendment violation is whether or not there was legitimately probable cause for the government action. In this case, your Honor, we demonstrated that the evidence of that is overwhelming. ***Hartman*** controls. And because we have demonstrated through contemporaneous evidence that there's a rational basis, there's the processes that were in place that were followed and adhered to, the criteria that had been in place for up to 70 years, 70 years, were followed, and that is the inquiry as to whether or not this is a First Amendment violation.

Let's go to the first slide.

(On screen.)

MR. KANELLIS: Your Honor, we don't have a lot of time here, thanks to Mr. Kanellis. (Laughter.) But let me go through some of the evidence.

And I think it's helpful to compare -- and you can see on your screen, your Honor, that we have some slides, but we're not going to get through them all. But you can see on the screen that we can compare the statements that were made in the complaint, in the motion for a PI, and we can show that the evidence at trial, after a trial, we now have the benefit of trial, hearing witnesses, and the evidence hasn't bore it out.

They talked about an announced intent to carry out large-scale arrests based upon people who supported pro-Palestinian protest. Where's the evidence in there? There is none.

They talked about the government launching a new social media surveillance program, when in fact the testimony bore out that the U.S. CIS started monitoring social media in 2016, and then in 2019 and 2020, well before this administration came about. The State required Visa applicants to be on social media.

THE COURT: That is -- I won't say that's a matter of concern, and I think your recitation of the facts is exactly right, but, um, one of the things that I have to grapple with here, and as I look at the decided cases, is that today, um, we have the internet that allows people ostensibly to, um, say all sorts of things on the internet and get audiences that, um, we never had before. But on the other hand, the government knows more about us than they ever have in the past. And they especially know, since 2016, about those people who are Visa holders. No one quarrels with the justification for it. But these people -- and indeed many Americans now, after DOGE, um, the government knows an awful lot about us.

So, um, I raise that because that -- again just

thinking of the common sense inferences, would make more logical that people would be afraid.

Isn't that so?

MR. KANELLIS: Perhaps, your Honor, that issue is really not before this Court, it's not an issue. It would be an interesting trial if we were to have one on that issue. But my point is merely that the suggestion that this occurred with the new administration is simply not true.

You also heard testimony that the Executive Orders -- from two witnesses, the Executive Orders did not have the effect of law, that they simply set forth the President's priorities, and you heard testimony from AD Watson that every administration that comes in has its -- issues Executive Orders and sets its priorities.

In other words, your Honor, what happened here -- although you may disagree or people may disagree about the wisdom of these policies coming out of the --

THE COURT: Well let's be clear, I may not. That's not before this Court. And, um, while I'm trying to be vigorous in grappling with argument and while I respect and enjoy the trial process, I have nothing to say about the wisdom or unwisdom of Executive Action. The people have spoken as to that.

MR. KANELLIS: And that is our point, your Honor.

That what happened here was an exercise, a lawful exercise. That you heard Mr. Watson testify to this. You heard Mr. Armstrong testify to this. How can we implement the objectives, the broad objectives in these Executive Orders if they are existing authorities? And that is merely my point, that every President gets to choose what he or she believes is important and what was done here was done pursuant to law.

THE COURT: But at the same time, it is my unalterable duty to determine what the First Amendment to the Bill of Rights has to say about the issues that are presented in this case. I'm not going to duck that.

MR. KANELLIS: Of course not, your Honor. I think the evidence though, getting back to the point about whether there is or is not an ideological deportation policy, let's look at the hard facts, let's look at the numbers.

You heard Ms. Dubal testify that AAUP had 50,000 members and yet not a single member was arrested or deported. I will take note, your Honor, that a representation was made that Ms. Dubal testified something about Canary Mission. She did not. I did not hear Ms. Dubal say anything about Canary Mission or their identification on our list. Let's put that aside.

50,000 members of AAUP. 5,000 to 6,000

protesters, not only from Canary Mission, your Honor, because you heard these sources came from other sources outside of Canary Mission, but out of 5,000 to 6,000 protesters, they were 18 total arrests. 5,000 names were received, and HSI created Reports of Analysis for about 2 percent of the 5,000 names received.

And the next slide.

(On screen.)

And, your Honor, I think -- I remember in law school the first Latin term that I learned was res ipsa loquitur, and I think this is a classic embodiment of res ipsa loquitur right here, with this slide. There is no policy, your Honor, we started with 5,000 protesters.

Next.

(On screen.)

We moved down to 100 of all of our Reports of analyses.

Next.

(On screen.)

We moved down to HSI, NSD recommending 20 to 30 of those for, um, to State.

We moved down to State writing about 20 removal -- or justifying removal for about 20. And then we have 18 or fewer arrests.

THE COURT: One of the inferences is that once you

get on this recommendation list, it moves pretty swiftly through State.

MR. KANELLIS: Your Honor, this is res ipsa loquitur.

Next.

(On screen.)

THE COURT: It may be.

MR. KANELLIS: That is not a policy, your Honor. This is not even a statistical anomaly.

If this is a policy, it must be the worst policy in the history of the United States government. That is why Mr. Armstrong described this allegation as an "ideological deportation policy" as "silly." "Silly." Because it is. Because the evidence demonstrates that there is no such policy, because if there was, you would see at least hundreds, you would see many more.

Next slide.

(On screen.)

THE COURT: Armstrong, pause on him.

It does seem, from his testimony, that he equates, um, what I have defined here as "political speech" with antisemitism, and, um, he equates antisemitism with support for Hamas. One could at least draw those inferences.

(Pause.)

MR. KANELLIS: May I respond to that, your Honor?

THE COURT: That's why I raised it, yes.

MR. KANELLIS: He was asked a hypothetical question about his personal definition.

THE COURT: He was asked about his personal -- but of course he was the, in essence, the decision-maker.

MR. KANELLIS: But you need not speculate about what his motivation is, your Honor, you have contemporaneous documents that recorded, that memorialized his decision. And those contemporaneous documents, you saw his handwritten comments reflecting that action is not words. That is the manifestation of the decision, actions, not words.

The next slide.

(On screen.)

And from each of the 5 -- you have in front of you, your Honor, you have the 5 removal -- bases for the removal decisions for the 5. They're self-evident, as your Honor has indicated, you can read, you can read those documents and you can see what the contemporaneous justification was. That ends the input.

The next slide.

The next slide.

(On screen.)

Let's talk about -- I'm running out of time. I've

got 10 minutes.

THE COURT: You do.

MR. KANELLIS: Let's talk about First Amendment standing.

Your Honor, we'll brief this after trial, but I want to focus on one aspects of this. To establish Article III standing, the harm must be concrete, particularized, actual, or imminent, and the problem with their case is that it is so attenuated from the actual allegation -- from the actual allegation of these arrests.

Let's go through them. The next slide. Skip the next couple. I want to go to the chart.

(On screen.)

Your Honor, let's talk about what their theory is. Their theory is that these protesters spoke out and supported Palestine and as a result were arrested. And that news of their arrests -- now the protesters aren't the parties here, okay? But the news of their arrests were in the media, who broadcast their arrest, and that ran into a second party. This second party is also not a plaintiff. This second party heard news of the arrest and interpreted that to be an ideological deportation policy, and that ideological deportation policy, they communicated their fears. Now we haven't heard from any

of the supposed students who were terrified or disturbed, but then that was communicated to finally the plaintiffs.

This is not immediately -- this is not something that this Court makes -- I go back to the --

THE COURT: Well I guess wait a minute. You've lost me with the little green man there.

(Laughter.)

THE COURT: It's your chart. But I followed until we got down to the little green man.

MR. KANELLIS: Because, your Honor --

THE COURT: I thought that we had witnesses who embodied the little green man, and the people who are, um, members of the AAUP who, um, and one is MESA, saying "I am scared," "I am scared to go out of the country," "I am scared to go to a protest." And, yes, it's from the media reports of these arrests, which the media largely, um, portrayed as, um, baseless arrests. Yeah, I don't see the other steps, is all I'm saying.

MR. KANELLIS: Your Honor, because the plaintiffs are AAUP, the plaintiffs are trying to demonstrate to the Court how they were harmed. We had a trial, um, and the harm has been articulated by AAUP.

THE COURT: But so we're clear, I'm only going to give standing to those people who were in the zone of

concern, that is noncitizen members, graduate students, and professors, um, as -- with respect to Professor Nickel, they're noncitizens.

MR. KANELLIS: Yes. Yes, your Honor.

THE COURT: Look, this isn't as complex. Now this is extra records, but they fit themselves within this pattern.

The President, um, is a master of speech and is certainly, um, brilliantly uses his right to free speech. Whether he recognizes it or not, whether other people have any right to free speech, is questionable. Take he and the falling out with Elon Musk. Take he and the latest things he had to say about Adam Schiff. Not my case. But in each of those, there is at least the allegations which track the allegations here.

Then he talks as he talks, the President. Then the lower-level people look into the contracts, look into the, um, housing situation, in the Schiff case, and things happen or don't happen or the like. That's their argument here. And that is a concerning pattern, I have to tell you, because if it's a selective prosecution based upon protected speech, it would seem -- and I'm focusing and will focus only on the record I have before me, but if that's what happened here in actual fact -- not at the Presidential level, he didn't know Mahmoud

Khalil or any of these peoples, one imagines, but at the cabinet level and below, um, to please the President of the United States, um, that's a matter I have to deal with.

Isn't that right?

MR. KANELLIS: That, um -- I don't believe it is correct, your Honor, because --

THE COURT: 4 minutes to tell me why not?

MR. KANELLIS: I'll tell you in under 30 seconds. Because ***Hartman*** dictates that the first question you ask is whether there was a legitimate basis for the decisions that were made and the evidence shows that there was a legitimate basis.

THE COURT: Thank you.

MR. KANELLIS: With respect to the harm, your Honor, I have one more slide.

(On screen.)

And that is I've heard, a lot in this case, a lot about feelings in this case. You remember that I asked Harvard philosophy chair, Mr. Nickel, about -- a question about Kierkegaard and Kierkegaard's definition of anxiety, "Anxiety is the business of freedom," and I didn't do that as a throwaway question or because of my predilection for 19th Century Western European existentialism, it was because Kierkegaard made the

point, and that is that anxiety is not about the deprivation of freedom, it's about the abundance of freedom. And the individuals who have testified in this case have all thrived, they've talked about what they've been able to do.

Anxiety, your Honor, federal courts, Article III courts, do not litigate about the nebula of anxiety, they deliberate about material harms, about actual material injury. And the testimony that you've heard from these witnesses is entirely speculative.

You heard Professor Nickel talk about the heightened risk that someday he may be deported. That does not satisfy an injury-in-fact requirement of Article III.

Your Honor, I have 2 minutes, I think.

THE COURT: Go ahead.

MR. KANELLIS: Let's summarize by looking at this chart of the plaintiffs.

Have we even heard the words "AAUP" and "New York University" mentioned? No, we haven't. They're gone.

Have we heard "Rutgers" mentioned at all in this case? No. They're gone.

Have we heard the "Middle Eastern Studies Association," has the witness articulated how the Middle Eastern Studies Association was impacted by this

supposed policy? They're gone.

All we have left is reference to two associations, AAUP, and AAUP Harvard, which I will note, after Khalil's arrest, held a public protest in Harvard Square criticizing the University's decision. That is not -- that is an exercise of the First Amendment, it is not an abrogation of it.

Your Honor, subject to any questions, the government rests.

THE COURT: Thank you very much.

MS. CONLON: Your Honor?

THE COURT: Let me say --

MS. CONLON: Okay, we did have 10 minutes remaining and I was hoping to use 3 of them.

THE COURT: No, you don't have 10 minutes remaining and I don't give rebuttal. I take that back, you don't have 10 minutes, a few minutes were remaining, but I don't give rebuttal. You have the opportunity to submit the requests for findings and rulings.

I simply wanted to say how, um, pleased I am by the vigorous advocacy that's been displayed in this courtroom and by the high level of, um, civility and responsiveness and devotion to the facts that's been shown by everyone in this case, and I include the witnesses as well as the attorneys.

It's my responsibility now to deliver a fair and just written opinion on Phase 1. We have our schedule for submitting the requests for findings and rulings, and I will, um, be about that task.

But my thanks to all of you is most sincere. We'll recess.

(Ends, 11:20 a.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Monday, July 21, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-22-25
__________________________
RICHARD H. ROMANOW  Date

# CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I electronically filed the foregoing Joint Appendix with the Clerk for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Paul F. Stone
PAUL F. STONE
*United States Department of Justice*