# In the United States Court of Appeals for the First Circuit

---

**AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS - HARVARD FACULTY CHAPTER; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY; RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN FEDERATION OF TEACHERS; MIDDLE EAST STUDIES ASSOCIATION,**

Plaintiffs–Appellees/Cross–Appellants,

v.

**MARCO RUBIO, in the official capacity as Secretary of State; U.S. DEPARTMENT OF STATE; MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, in the official capacity as Acting Director of U.S. Immigration and Customs Enforcement; DONALD J. TRUMP, in the official capacity as President of the United States; UNITED STATES**

Defendants–Appellants/Cross–Appellees.

---

*On Appeal from the U.S. District Court for the District of Massachusetts Docket Number 1:25-cv-10685-WGY*

---

## JOINT APPENDIX Volume II

---

BRETT A. SHUMATE
  *Assistant Attorney General*
  *Civil Division*

DREW C. ENSIGN
  *Deputy Assistant Attorney General*

PAUL F. STONE
  *Acting Chief*

LINDSAY M. MURPHY
  *Deputy Chief*

RAMYA KRISHNAN
XIANGNONG WANG
STEPHANY KIM
RAYA KOREH
CARRIE DECELL
SCOTT WILKENS
ALEX ABDO
JAMEEL JAFFER
  *Knight First Amendment Institute*
  *at Columbia University*
  *475 Riverside Drive, Suite 302*
  *New York, NY 1011*

Victoria Santora
  *Senior Counsel for National Security*

Jesse Busen
  *Counsel for National Security*

*National Security Unit*
*Office of Immigration Litigation*
*U.S. Department of Justice*
*P.O. Box 878, Ben Franklin Station*
*Washington, DC 20044-878*
*(202) 305-9647*

Edwina Clarke
David Zimmer
*Zimmer, Citron & Clarke, LLP*
*130 Bishop Allen Drive*
*Cambridge, MA 02139*

Noam Biale
Michael Tremonte
Alexandra Conlon
Courtney Gans
*Sher Tremonte LLP*
*90 Broad Street, 23rd Floor*
*New York, New York 10004*

Ahilan T. Arulanantham
*Professor from Practice*
*UCLA School of Law*
*385 Charles E. Young Dr. East*
*Los Angeles, CA 90095*
*(310) 825-1029*
*arulanantham@law.ucla.edu*

# TABLE OF CONTENTS

July 8, 2025 Trial Transcript.......................................................................................JA511

July 9, 2025 Trial Transcript.......................................................................................JA659

July 10, 2025 Trial Transcript.....................................................................................JA780

July 11, 2025 Trial Transcript.....................................................................................JA912

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 1, Page 1 to 74

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants

\* \* \* \* \* \* \* \*

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Tuesday, July 8, 2025

\* \* \* \* \* \* \*

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

JA511

A P P E A R A N C E S

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
    Knight First Amendment Institute at Columbia
    University
    475 Riverside Drive, Suite 302
    New York, NY 10115
    (646) 745-8500
    E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
    Sher Tremonte LLP
    90 Broad Street, 23rd Floor
    New York, NY 10004
    (212) 540-0675
    Email: Cgans@shertremonte.com
    For Plaintiffs


ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
    DOJ-Civ
    P.O. 878
    Ben Franklin Station
    Washington, DC 20044
    (202) 616-9123
    Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
    United States Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    Email: Shawna.yen@usdoj.gov
    For Defendants

JA512

                        I N D E X


 WITNESS                     DIRECT  CROSS  REDIRECT  RECROSS


 NADJE AL-ALI (Continued.)

     By Mr. Biale              6

     By Mr. Kanellis                  22


 MICHAEL J. MATHIS

     By Mr. Wang              47

     By Mr. Kanellis                  51


 BERNHARD NICKEL

     By Mr. Biale             53

     By Mr. Kanellis


                      E X H I B I T S


         EXHIBIT 223.............................  11

         EXHIBIT 224.............................  17

         EXHIBIT 225.............................  74

JA513

PROCEEDINGS

(Begins, 9:00 a.m.)

THE COURT: Good morning. Because I've allowed internet access to these proceedings, I should say that if you are observing the proceedings on the internet, the rules of court remain in full force and effect, and that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

Further, it is very important that you keep your microphone muted at all times. If you do not, you will be cut off, because we don't want these proceedings interrupted.

There was a witness on the stand and she may --

Or are you done?

MR. BIALE: No, your Honor, and I'll call her back in a second. I just wanted to give the Court a quick update on the evidence. It will take 30 seconds.

I'm sorry, Noam Biale for the plaintiffs. Good morning, your Honor.

So the parties were able to work together productively yesterday and we have given the Court a joint numbered exhibit list and you have now all of the numbered exhibits that we have stipulated are coming into evidence.

JA514

You also have our lettered exhibits.  I understand the government had a printing problem, but they are working to get a copy of their lettered exhibits to the Court.

So we do have the witness we were examining at the end of the day yesterday.  We're going to have also a couple of our authentication witnesses.  One other, um, professor witness who will testify today.  And there's a chance we will get to our remote witness.  I've spoken with the government about that.  It looks like we're getting there.  We will test out the system during the break.  I just wanted to give the Court a preview.

THE COURT:  Are you going to start with one of these authentication witnesses or recall the witness?

MR. BIALE:  I'm going to recall the witness first.

THE COURT:  She may be recalled.

MR. BIALE:  Okay.  Thank you.

(Pause.)

MR. BIALE:  And just for the record, the plaintiffs recall Nadje Al-Ali.

THE COURT:  She may be recalled.

And if you would remind the witness she's still under oath.

THE CLERK:  Ms. Al-Ali, I remind you that you remain under oath.

Do you understand?

THE WITNESS:  I do understand.

THE COURT:  And you may continue with your interrogation.

MR. BIALE:  Thank you, your Honor.

DIRECT EXAMINATION BY MR. BIALE:  (Continued.)

Q.  Good morning, Professor Al-Ali.

A.  Good morning.

Q.  Thank you for coming back.

Professor Al-Ali, how do you define "antisemitism."

A.  Well as someone who grew up in Germany, um, I encountered antisemitism as the way that Jewish people were seen as inferior and a threat to Germans, but later on more current definitions evolved around prejudice, harassment, discrimination, of Jewish people as Jews, which can be -- I mean that can manifest in various contexts in speech, in action, in policy, and target individuals or institutions or organizations.

THE COURT:  Well I was following, I think, until the end --

THE WITNESS:  Uh-huh.

THE COURT:  -- with the definition.  You, um, were saying that it was an animus towards Jewish people.

THE WITNESS:  Yes.

THE COURT:  And I followed that.  And then you were talking about manifesting itself as to institutions?

THE WITNESS:  Right.  I mean when it's sort of, um, if prejudice or sort of conspiracy theories are being used to describe -- I mean so, for example, I would make a distinction between a critique of the State of Israel in terms of policies, but if someone says, "Well, um, all Jews are responsible for the policies of the state of Israel," if there is a conflation, then that would be antisemitic.  So I make that distinction.

THE COURT:  Yes.  And to see if I understand it, while the line is never perfectly clear --

THE WITNESS:  Yes.

THE COURT:  -- policies of the State of Israel, in your mind, whether you're supportive or hostile, that's not antisemitism?

THE WITNESS:  To critique those, no.

THE COURT:  To critique those.  But animus toward Jewish people, as you use the word, that is antisemitism?

THE WITNESS:  Absolutely, yes.

THE COURT:  And it may be that the two are conflated in someone's mind.

Is that what you're saying to me?

THE WITNESS: Yes. Yes.

THE COURT: All right.

Q. Thank you for that definition.

With that in mind, in your opinion, Professor, does the United States have a legitimate interest in combating antisemitism?

A. Yes, I hope so.

Q. Now, um, I want to go back to -- we spoke yesterday about some of the ways in which the policy, um, that was enacted and manifested in the arrests of, for example, Mr. Khalil and Miss Ozturk, in March of 2025, we talked about how that has affected your behavior.

Do you remember that?

A. Yes.

Q. So I want to go back to, um, prior to March 2025 now.

A. Okay.

Q. Tell us again, when did you arrive at Brown University?

A. In January 2019.

Q. Okay. And around that time do you recall signing onto an open letter, um, to the Brown, um, administration?

A. Not directly, just generally. But I think it was a

few months later, 3 or 4 months later, there had been a referendum on divestment on, um -- many of us felt that the reaction of the President was worrying, so I signed a statement.

Basically it was about -- it referred to -- we wanted to make sure that there would not be a Palestine exception to academic freedom. We knew that in the past at Brown, there were other forms of political activism, um, that were seen to be part of Brown's legacy, against antiblack racism, for example, and also the legacy of slavery, um, apartheid in South Africa. And, um, so I don't remember the exact wording of the letter.

Q. Well why don't I show it to you.

THE COURT: I just need to be clear.

When you said the "President" --

THE WITNESS: Oh, sorry, the President of Brown University. Yes, that is unclear.

THE COURT: Yes, thank you.

Q. And just so I can clarify. When you said it was about a referendum about divestment, what did you mean?

A. Yes, sorry. That was, um, the students put together a referendum on the question whether Brown University should divest from all companies that are involved in the, um, occupation of Palestine, so that are contributing to, um, the Israeli military occupation.

Q.  Thank you.  Let me show you what has been marked for identification as Exhibit K.

MR. BIALE:  And for the benefit of my friends on the other side, this is AAUP 690 to 696.

Can you pull that up, Mr. Kumar.

(On screen.)

Q.  Okay.  Take a look at this document, if you can.

A.  (Reads.)  Yes.

Q.  Okay.

MR. BIALE:  And, Mr. Kumar, go to the second page, please.  (Scrolls.)  And now go to the third page.

(On screen.)

Q.  Okay.  Professor Al-Ali, do you recognize this document?

A.  Yes.

Q.  What do you recognize it to be?

A.  I recognize it to be a letter signed by a number of faculty of Brown University addressed to the President of Brown University, um, asking the President to not treat student activism around Palestine differently from other forms of student protest, and specifically this was around the question of the referendum.  And it asked her to not engage in a Palestine exception of academic freedom and protest.

Q.  Okay.  And if you look, I think it's 4 lines down

JA520

in the signature block, um, is that your name?

A.    Yes.

Q.    Indicating that you signed the letter?

A.    Yes.

MR. BIALE:  Okay, your Honor, we offer Exhibit K into evidence.

MR. KANELLIS:  No objection.  But, your Honor, it is hearsay.

THE COURT:  Well it is.  But do you object?

MR. KANELLIS:  Yes.

THE COURT:  All right, they object.  And I admit it.

MR. BIALE:  It's not for its truth, your Honor, we're simply introducing it to --

THE COURT:  That's what I thought you'd say.  So why is it relevant?

MR. BIALE:  It's relevant to show that she was signing open public letters prior to the ideological deportation.

THE COURT:  Not for its truth, but it's admitted. It will be Exhibit 100 -- it's 223.

MR. BIALE:  Yes, thank you, Judge.

(Exhibit 223, marked.)

Q.    Okay.

MR. BIALE:  And, Mr. Kumar, if you could please go

back to the first page, um, and pull up the date of the letter, which is on her -- yeah.

(On screen.)

Q.  Okay.  So you see this was sent in April 2019, correct?

A.  Correct, yes.

Q.  And I think you said that this was a few months after you arrived at Brown University?

A.  Yes, correct.

Q.  Did you have any concerns that by signing onto this letter supporting the students who had passed the divestment referendum, that that could cause you any problems with your employer, Brown University?

A.  No, I did not.

Q.  Did you have any concerns that signing onto this letter could affect your immigration status in the United States?

A.  At the time, definitely not.

Q.  Okay.  And when you say "at the time" that would be not, can you elaborate?

A.  Well retrospectively, I mean now I'm worried that these letters might be used against me.

Q.  Okay.

        MR. BIALE:  And you can take that down, Mr. Kumar.

        (Off screen.)

JA522

Q. So we talked a little bit yesterday about how, um, I think the year after you arrived at Brown University you became the Director of the Center for Middle East Studies, correct?

A. Correct.

Q. Approximately when was that?

A. Um, approximately in July of 2020.

Q. Okay. And, um, I think we talked a little bit yesterday about how your role there and the, um, activities of the Center changed after October 7th, 2023. Can you just very briefly remind us?

A. Well, um, it -- in addition to all that I was doing before, um -- so, first of all, some of the content changed, so there was more emphasis on Israel/Palestine and to the events we organized, but an additional responsibility that I took upon was pastoral care of students who were distressed by the situation and didn't feel they had any other space to go to for organizing, more social-type of events.

Q. And, um, following the attacks of October 7th and the Israeli military campaign in Gaza, were there protests by students on the campus of Brown University?

A. Yes, there were several protests.

Q. Can you just tell us a little bit about what form those protests took?

A.  I mean it took different forms.  I mean the first one that I remember was, um, I think in November.  It was a group of students, um, that were part of Jews For A Cease Fire who engaged in a peaceful, um, sit-in in University Hall, and they were, um, singing and praying.  But that specific protest ended in their arrest, I mean first by campus security, and then campus security handed them over to private police.  That was one.  And later on there were other protest marches.  And there was encampment as well.

Q.  Okay.  And you spoke about a demonstration in November, um, I think you said it was by a Jewish organization on campus?

A.  Yeah, Jews For A Cease Fire.

Q.  Okay.  Did you, um, attend that protest?

A.  No, I did not attend the protest, but I was there.  I had watched on Instagram.  They had sent out like your sort of documentation of the time that they were inside University Hall.  But I then went on campus to watch the way that the students were let out of the building one by one and handed over to the Providence police.

Q.  And based on what you saw on Instagram and then, um, in your personal observations of what it sounds like was the end of the protest, did you see any conduct or hear any slogans that you interpreted to be antisemitic?

JA524

A.    No, the opposite.  It was actually a very, um, proud moment for myself to see that the police got involved.  But in terms of the whole atmosphere, there were actually people -- students and faculty singing songs in Hebrew and in Arabic as the students were let out, and it felt like a very peaceful and community-based event.  It was very moving, although it was also very sad.

MR. BIALE:  Mr. Kumar, can you pull up Exhibit 92.  And, your Honor, this is in evidence by stipulation of the parties.

THE COURT:  And to save time, that's my protocol.

MR. BIALE:  So I won't say that.

THE COURT:  It's got a number.  I trust the lawyers, it's in evidence, it will be part of the record.  I'll review it.

MR. BIALE:  Thank you, your Honor.

Q.  Professor Al-Ali, um, can you take a look at Exhibit 92 on your screen.

A.  Yes.

Q.  What is this document?

A.  This was a letter that was published in the student paper, but it was actually a letter that, um, many of us drafted and signed, and I had personally handed to the President of Brown, um, asking or protesting the

involvement of Providence police, and asking the President to reconsider, um, criminal procedures against the students. We felt that they had acted very peacefully. And following me handing in the letter, the President agreed to have a meeting with faculty, which I facilitated.

Q. Okay. And just to be clear, and you may have said this. You said you handed this letter to the President of Brown University. Did you also sign the letter?

A. Yes, I signed the letter as well.

Q. Okay. Around this time, so it looks like this letter was sent, um, November 9th or rather sent by hand-delivery November 9th, 2023, um, around this time did you sign onto any other letters that you recall?

A. To be honest I don't, um, really remember. I just know that, um, the only other thing that I know, at some point I signed, was on a cease fire request for the President of Brown to make a public statement asking for a cease fire.

Q. Okay, so let me show you something, um, that may refresh your recollection.

MR. BIALE: Mr. Kumar, if you can pull up Exhibit L. And folks, this is Bates Number AAUP 697 to 704.

(On screen.)

Q. And take a look at that document, please.

JA526

A.  (Reads.)

Q.  Have you taken a look at that?

A.  Yes.

Q.  Do you recognize this document?

A.  Yes.

Q.  What do you recognize this to be?

A.  I recognize this to be a letter drafted by faculty, um, addressing the President, um, of Brown University, Christina Paxson, and asking her to make a statement asking for a cease fire -- a cease fire in the context of the war, Israel and Gaza.

Q.  And is this the letter that you were just referencing in your testimony?

A.  Yes.  Yes, that's letter.

MR. BIALE:  And, your Honor --

Q.  And what's the date of the letter?

A.  It's the 7th of November, 2023.

MR. BIALE:  Your Honor, we offer Exhibit L.

THE COURT:  I take it not for the truth?

MR. BIALE:  Correct.

THE COURT:  Any objection?

MR. KANELLIS:  No objection, your Honor.

THE COURT:  L will be admitted, Exhibit 224, with that limitation.

(Exhibit 224, marked.)

JA527

MR. BIALE: Okay. Thank you. You can take that down, Mr. Kumar.

(Off screen.)

Q. Now you mentioned, Professor, that you facilitated a meeting between the faculty of Brown University and the President?

A. Correct.

Q. Did you facilitate any other meetings, um, that in any way related to the pro-Palestinian protests?

A. Um, well, yes, I facilitated, um -- I mean what I remember for sure is that I facilitated a meeting between the President and some students following one of the more pastoral care-mentored lunches and, um, sort of with students saying that they feel alienated, ignored, um, and there was lots of stress and grief. And so I approached the President and she agreed to meet with a group of 20 students. And so I told the students, "Well you should self-select and then have a meeting with the President."

Q. And approximately when did that meeting occur?

A. So that was pretty early on, I would say, um, the end of October or November of 2023.

Q. So around the same time as --

A. Around the same time, yes.

Q. Okay. And did you attend that meeting?

A.  I attended the meeting, yes.

Q.  So, um, Professor Al-Ali, we have look at some letters you signed and heard about some meetings that you attended.

Since the arrests of Mr. Khalil and Ms. Ozturk, have you signed onto any letters having anything to do with the situation in Israel and Palestine?

A.  No, I have not.

Q.  Why not?

A.  Because now I'm scared to do so.  Now I'm worried that what I signed before would be used -- and it was, I mean there are -- some of the letters that I signed before are now quoted, um, by several organizations, like Camera, and distorted to portray me as antisemitic and pro-Hamas.

Q.  And I think you mentioned this yesterday, what are those reports by Camera that you're referring to?

A.  Aside from Camera having a list of names of faculty and then links to letters that they signed or articles that they wrote, there are also two reports that specifically focus on Brown and the Center for Middle East studies, um, in which several of my colleagues are mentioned, and I'm obviously the Director, or the former Director of the Center for Middle East studies, um, is also mentioned.  And, I have to say, very outrageous

allegations about me and my work and my politics.

Q. And you mentioned facilitating these meetings between, um, the Brown administration, on the one hand, and the faculty and students on the other.

Since the arrests of Mr. Khalil and Ms. Ozturk, have you, um, facilitated any such meetings that related in any way to issues around Israel or Palestine?

A. I have not.

Q. Why not?

A. For two reasons. One, I mean I am not the Director of the Center for Middle East studies anymore. But nevertheless, I mean I'm still going to other events at the University. But the -- but the reason is that I'm scared, just the same reason why I'm not signing letters.

Q. So if an opportunity like that arose for you to be sort of a mediator/facilitator around these issues now, would you accept that opportunity?

A. I mean it's very hard for me to say yes or no. But if it was with the University, possibility. But I would still be worried that there would be people reporting this outside.

Q. And what about anything that had a public component?

A. Yeah, I mean right now I'm trying to stay away from anything public that is linked to Palestine and Israel.

JA530

Q. And just to --

A. Well I'm here now, so --

Q. Yeah, I'm going to ask you about that in a moment.

A. Yes.

Q. You know we've talked about various ways that, um, you, um, have changed your behavior based on fear you've experienced from learning about the ideological deportation policy.

If that policy were ruled unlawful, would you do anything differently?

A. Well, I, um -- it would not be like from one day to the next, because I think I would want to see that the change in law would translate into implementation. Um, but that would certainly allow me to pursue my research and be able to attend meetings and conferences and travel again. But, yeah, I mean I would first want to see what is actually happening in practice.

Q. Okay. And if that were to happen, would you, for example, attend Mesa's annual meeting this year?

A. Yeah. Yes.

Q. And you just mentioned that you're testifying here. Tell us why you're testifying here?

A. Well, um, I'm testifying -- I think I started out by saying that one of the things that shaped me in terms of my upbringing in Germany is the awareness that

JA531

silence means complicity, and I feel like if I wouldn't participate here, I am complicit on several accounts.

One is that I do feel that I want to speak out on Palestinian, what's happening in Gaza, and Palestinian more broadly. And secondly, I also worry about what's happening in this country, and I -- that's, you know, a big reason. And I mean I want to believe still in the force and the importance of the legal system. So if a judge of this country says there shouldn't be retaliation against witnesses, I want to believe that there is no retaliation against witnesses.

Q. Okay.

MR. BIALE: No further questions.

THE COURT: Mr. Kanellis, you wish to examine this witness?

MR. KANELLIS: Yes, your Honor.

THE COURT: You may.

MR. KANELLIS: Thank you.

William Kanellis for the Justice Department.

CROSS-EXAMINATION BY MR. KANELLIS:

Q. Good morning, Professor, how are you?

A. Good morning. Okay.

Q. I'd like to ask you a few questions about the responses you've given here.

JA532

A.   Sure.

Q.   You did grow up in Germany?

A.   Correct.

Q.   And in your childhood did you live anywhere other than Germany or did you live primarily in Germany?

A.   I lived primarily in Germany, but traveled to Iraq to visit my family.

Q.   Did you have any time to live in Iraq full-time?

A.   I never lived in Iraq full-time.

Q.   Okay.  I'd like to talk about your reference to an organization called Camera.

A.   Yes.

Q.   You just referenced that.  And then there was a second organization that you referenced that I did not catch the name of.

     Do you remember the other organization that was critical of you for supposedly being antisemitic?

A.   I mean I haven't checked all of them, to be honest, so I'm aware of Camera.  I don't remember --

Q.   Well perhaps I misspoke.

     Now Camera, is that a -- you indicated yesterday it was run by a particular individual, is that right?

A.   No, I don't think it's run by a particular individual, um, and I -- but there was one specific individual by the name of David Litman who was the main

JA533

writer and researcher and that person, um, has lost his position. I don't know why. But it's a broad organization.

Q. Is Camera associated with the United States government?

A. No.

Q. Do you believe that Camera is working in any respect with the United States government?

A. Um, I don't know.

Q. Do you -- well do you have a belief, one way or another, of whether it is?

MR. BIALE: Objection.

THE COURT: No, she was asked about that. He may ask what --

THE WITNESS: Okay, yes.

THE COURT: Say what you think.

THE WITNESS: Yes.

A. No, I don't believe that Camera is working for the U.S. government, but I am not sure that, um, the U.S. government is not looking at Camera reports.

Q. Okay. You don't know, one way or the other, whether the U.S. government is looking at Camera reports?

A. Um, well I think that based on -- well, okay, I don't know, let's put it this way. I don't know.

Q. You indicated that after these acts of October 7th,

JA534

the Center for Middle East studies took on additional responsibilities, correct?

A.  Yes.

Q.  Now one of those responsibilities you referenced is "pastoral care"?

A.  Yes.

Q.  Would you elaborate on what that means?

A.  So usually as an academic and dealing with students, it's about academic mentoring or advising, um, but following the 7th of October, there was sort of a sense of distress and grief and upset and there was a feeling that, um, that there was no specific space dedicated to Muslim students or students of Middle East origin.  And so it meant like providing a space where people could gather, talk, um, and also hear what the words were so that I could transmit that immediately to the administration.

Q.  How did that, if it did, affect the Center for Middle East Studies, that additional pastoral care you described?

A.  I mean only that it increased my work load.  But otherwise it did not affect us.

Q.  And that additional pastoral care began in October or November of 2023?

A.  Yes, I mean additional.  I mean that's always an

element of pastoral care that faculty engages in.  But it was on a very different scale following the attacks of the 7th of October and then the war in Gaza.

Q.  And did that pastoral care, was that administered by AAUP in any respect?

A.  No.

Q.  And was that pastoral care administered by Mesa in any respect?

A.  No.

Q.  You are not the Director of -- I'm going to call it CMES?

A.  That's fine, yes.

Q.  We're talking about that.  That's the program that -- you were the Director of that, did I get that right?

A.  Yes.

Q.  Okay.  And I believe you said you were the Director for about 4 years, correct?

A.  Correct.

Q.  You have, um -- since the beginning of this year, you have participated in public conferences, haven't you?

A.  You mean since January of 2025, this year was a calendar year?

Q.  Yes, ma'am.

JA536

A.  Um, I have to think very carefully.  Um, I -- I don't think I attended any conferences.  I gave some talks in Switzerland.  But I can't, 100 percent -- but I don't recall attending conferences.

Q.  Did you give a talk at Washington University this year?

A.  I gave a talk in the fall, I think.  Oh, in February I gave a talk.  Yes, that's true.

Q.  At Washington University?

A.  Yes.

Q.  And then you gave a talk in Switzerland.  And when was that?

A.  So that was in March.

Q.  In March of this year?

A.  Yes.

Q.  Okay.  And then you've also given -- you've been a featured speaker or made presentations in other public events this year too, haven't you?

A.  Yeah, well I had a book lunch.  So I was co-editing a book and there was a book lunch in Berlin in January, and then, um, there was a book lunch in Providence at Brown University as well.

Q.  And that book was related to gender studies, is that generally what it was about?

A.  Yeah, the book, um, looked comparatively at the

JA537

importance of anti-gender discourses and policies in far right movements in Europe and the Middle East.

Q. Okay. And did that include that influence on, um -- in combat or war situations in the Middle East?

A. Um, no.

Q. Okay. Your conference in Switzerland, what was the subject of that conference?

A. So it wasn't a conference, it was me giving papers. Actually I gave one paper that was based on the book, and then I facilitated -- I gave a short paper and I facilitated a workshop for graduate students where I held a discussion for other people's papers.

Q. And prior to this conference, you were aware this conference was being advertised or promoted publicly, correct?

A. No, the workshop was not promoted publicly.

Q. You're not aware that there was a -- there's materials on the internet relating to this conference in Switzerland?

A. There was a workshop that was provided for students. I'm pretty sure it was not advertised. I'm not aware of it. And then there was a talk that I gave, a public lecture.

Q. And where was that public lecture given?

A. The public lecture was in Brown or -- well I think

in Brown probably.

Q. Okay. And there's two public lectures or there was just one?

A. It was one, one public lecture.

Q. I see. And what was the date of that lecture?

A. I don't know. I don't remember. It was in March. It was during my -- it must have been mid March, sort of.

Q. Yesterday you mentioned that upon the election of the new administration in November, you had a reaction that was, um, I'll characterize it as "somewhat anxious." Is that a fair characterization of your reaction after the new administration was --

A. I don't remember speaking about that. I spoke about, um, statements of President Trump, while he wasn't President, and I think even before election, and after he was elected. So I think I mentioned that.

Q. Okay. Well let me ask you. After -- and these are statements that Candidate Trump made about immigration, is that fair to say?

A. Yes, Candidate Trump and President Trump both.

Q. Okay. And he made those statements prior to his election?

A. Prior and following his election.

Q. Okay. And that -- and his election was in November

of 2020?

A. Yes.

Q. Okay. And did those statements cause you anxiety?

A. Yes.

Q. How?

A. How?

Q. Yes.

A. Well I mean it caused anxiety. You mean why? I don't understand what you mean by "How"?

Q. Well you're indicating that it caused you anxiety. Can you elaborate on that statement. How did it cause you anxiety?

A. Well I, um, my level of worry and, um, sense of concern increased in relation to the possibility that there might be, um, a crackdown or some form of oppression against those of us who engaged in pro-Palestinian speech. And a fear that once President Trump or -- I mean once the new government would be in place, yeah, that would be put into action. And that pro-Palestinian speech might be equated with support for Hamas.

THE COURT: When -- I'll characterize Candidate Trump's speech as, broad brush --

THE WITNESS: Uh-huh.

THE COURT: -- I'll characterize it as

antiimmigrant.

Now when first did you feel that a concern for Palestinians was -- the focus of that animus, during the time he was a candidate or after he was President and inaugurated? If you can tell me.

THE WITNESS: Yeah, I really can't remember whether I already felt it while he was a candidate, but I certainly felt it after he became President, there were statements. I might have felt it before. There was this sort of sense of this more general anxiety, but I don't know how much it was specific at the time. It certainly became more specific following the inauguration and some of the statements.

THE COURT: Go ahead from there.

MR. KANELLIS: Thank you, your Honor.

Q. Now, with respect to the statements, was your concern amplified in any way by your connection to the Center for Middle East Studies?

A. Yes.

Q. Why is that?

A. Because it's a public role. I'm not just an academic working tangentially on Israel/Palestine. I was for 4 years directing a center that's probably known in the U.S. and internationally, and that center had been under attack. And there were false allegations

JA541

made against not just me, but faculty in the Center. So certainly the fact that I was the director was very significant to this.

Q. Did you make any statements, in your capacity as a member of AAUP, relating to the issue of Palestine?

A. No.

Q. And the same question with respect to Mesa. Did you make any statements relating to Palestinian in your capacity as a member of Mesa?

A. I mean not directly, but everything I do I -- I mean I'm a member of Mesa, so I don't know how to distinguish. But I didn't like go on record, "Mesa Member Al-Ali."

THE COURT: I think that's what he was saying.

A. No, I didn't do that.

Q. You indicated that you, feared being deported, is that a general characterization of the concerns you had after the Trump administration came into power?

A. Yes, I feared being deported. But more than fearing being deported is the fear that I'm silent as an academic, as a person, that I can't speak my mind, that I can't do my research, that I can't engage with my students in a free way. That in some ways is the worst fear that I have.

Q. Okay. And one of the things that I think you

indicated yesterday was that you, um, did not follow through on an article that you had written that contained a nuanced criticism of Hamas, is that correct?

A.  Correct.

Q.  And about what time were you thinking about doing this article?

A.  Well I started thinking in January.  I mean it had been on by mind for a while, to be honest, since last summer, I mean the summer of 2024.  But, um, more concretely I started thinking and started reading about it in the beginning of this calendar year.

Q.  Okay.  Did you write anything with respect to that article?

A.  No, I didn't write anything.  I just -- yeah. That's okay.

Q.  I interrupted you?

A.  No, I didn't write anything.  I started reading and, um, you know I sort of reflected on it.

Q.  You also indicated that you didn't attend protests after the Trump administration was in power because of this fear of being deported, is that a fair characterization of what you said?

A.  Yes.

Q.  And you said you didn't attend the No Kings protest, right?

A. Yes.

Q. Do you know, um, how -- how -- what was the No Kings protest, can you describe that briefly for the Court?

A. Yeah, it was, um, a national protest where tens of thousands of, um, Americans and immigrants went on the streets of many cities, um, fighting for democracy and, um, against -- I mean "The king" stands for the idea that there is one person who has all the power and can do whatever he wants. So it was sort of -- I saw it as a protest to save democracy and also linked to that a protest to protest the immigration policies. But this was a wider sort of appeal for democracy in this country.

Q. And you didn't attend the King's protest because you were afraid of being deported?

A. I was afraid that there would be some, I mean -- you know there could be some police altercation and I somehow, against my will, would get involved in it, and then that would lead to me being checked out and then, you know one thing after another. I mean, yes.

Q. So you indicated that tens of thousands of people attended these protests, correct?

A. Yes.

Q. And you believed that the U.S. government was going to single you out?

A.  No, no, not the U.S. government, but you never know what happens.  I mean sometimes peaceful protests, as we've seen for example in LA, I mean the majority of people are peaceful, but then there might be some people who are kind of, you know, not peaceful, and maybe rioting, or there are some altercations with the police, and then things go out of hand.  And I was worried that in that situation I would be very vulnerable.  I didn't think that I would be, out of 10,000 people, singled out.  But if something were to happen, which could happen in a protest, then I think I would have felt -- I would have been more vulnerable than a U.S. citizen or someone who was not formerly the Director of the Center for Middle East Studies.

Q.  You weren't intending on -- no, strike that.

Have you ever rioted?

A.  No, never.  No, I think I made it clear -- I hope I made it clear yesterday that I'm very much, um, a peaceful person who believes in nonviolence.  I've never rioted.

Q.  So it was not your intention in any respect to engage in physical altercations or a riot at any of the protests that you --

A.  It was not my intention, but I know that these things can happen when you -- when people are around

JA545

you, and also it could be that the police might be, um, not so friendly. You know there are examples in many different contexts in this country where we've had issues, where there were clashes. And I think that, um, I feel it's reasonable to fear that if something were to happen, that I would be more vulnerable than other people, than you, for example.

Q. You indicated you that attended a protest relating to DOGE? D-O-G-E. I don't know how you pronounce it.

A. Yeah, the one that was, um, about Elon Musk and the cuts. So, yeah, I, um -- under different circumstances I would have liked to attend it.

Q. And you didn't attend it because you feared that the government was going to identify you and pick you out of a crowd?

A. Exactly what I said before. It's not that I was worried that they would sort of look for me specifically, but I was -- I didn't know whether these were going to be peaceful protests, I don't know what was going to happen, and I was worried that if something was going to happen, I would be in a particularly vulnerable situation.

Q. Have you -- how many protests have you attended in your lifetime, could you give an estimate?

A. Um, I don't know, maybe -- I don't know, maybe 30,

40 protests.

Q. 30 or 40?

A. Yes.

Q. Have you ever been arrested at a protest?

A. No.

Q. Have you ever been detained or questioned at a protest?

A. No.

Q. And still thought that that could happen?

A. I mean most of those were not in the U.S. I mean I was -- for 25 years I was living in the UK, in London, and most -- I might have attended some protests in Germany while I was still in school. But most of the protests I attended were in the UK. But even if I had attended all these protests in the U.S., I mean it's different now precisely because of the -- what I mentioned, the threats to get rid of pro-Hamas students and faculty and, um, the detainment and deportation of pro-Palestinian students. So that's definitely a shift.

Q. You indicated that people from Camera had accused you of associating with pro-Hamas causes. Has anybody from the U.S. government ever accused you of that?

A. Not that I'm aware of. No.

Q. Okay. And with respect to this article that you indicated that you are refrained from writing. Your

opinion is that this article would have been viewed by the government as a reason to deport you?

A.  To be perfectly honest, I don't trust the government to make a distinction between a critique of Israel and pro-Palestinian positions and the support for Hamas.  I haven't seen evidence of that distinction.

Q.  Did I hear you correctly yesterday when you indicated that this article that you were thinking of writing you intended to be somewhat critical of Hamas?

A.  Yes, critical of Hamas and critical of the Israel government both.  I don't believe that you have to do one or the other.

Q.  Of course.

THE COURT:  Forgive the interruption.  I want to go back to how you answered the earlier question.

THE WITNESS:  Yes.

THE COURT:  Do I understand you to say that you don't understand the United States government to make a distinction between criticism of the State of Israel and its conduct in Gaza, and with respect to Palestinians, and activities that are pro-Hamas?

THE WITNESS:  Yes, correct.

THE COURT:  I understand that's what you think?

THE WITNESS:  Yes.

Q.  And your opinion, or your belief, your professed

JA548

belief, is that if you wrote an article that was critical of Hamas, that might expose you to the heightened risk of deportation?

A.   Correct.  But not because of my criticism of Hamas, because of my -- but also the criticism of the Israeli government.  And because I'm already, um, due to my previous role as Director, and, um, it's not just Camera, I mean it's one person who has an entire blog dedicated to write about the Center of Middle East Studies and has mentioned me.  So overall it's wider than just one organization.

Q.   Those organizations that you indicate --

A.   Yes.

Q.   -- were, um, alleging that you were tied to Hamas or supportive of Hamas in any respect, those weren't government organizations, were they?

A.   No.

Q.   Okay. And with respect to those, um -- those criticisms, have you heard -- have you had any communication from the United States government, or its agents, regarding any of those publications -- well any of those allegations?

A.   Um, I don't know whether I can speak about this, but there has been an HHS Title VI investigation of Brown and, um, some of this came up.

JA549

Q. Without going into details because --

A. Yeah, I don't think I should talk about it.

Q. -- there's concern about possibly intruding upon other litigation, um, apart from that belief, is there anything else that would lead you to believe that the government has associated -- the U.S. government has associated you with pro-Hamas activity?

A. No.

Q. Now you indicated that you had traveled overseas in 2025?

A. Yes, correct.

Q. Can you help me remember when you left to travel overseas?

A. Yeah, so, um, I traveled -- first of all, in December 2024, I traveled to, um, spend the break with my, um, family, with my daughter, and, um, I saw my mother in Germany, and my partner, and I was in the UK and then in Germany. And I came back early -- no, I also spent a week in Berlin. And I came back early, um, because Brown University asked everyone who was not a U.S. citizen to come back prior to the inauguration, um, there was a worry that there would be -- that there would be issues at the airport. So I came back. I think it was the 18th of January. I don't know exactly, but sometime, um, just a couple of days before the

inauguration, which was on the 20th, I think.

And then I, um, had -- I traveled on the 8th of March. It was my mother's birthday and my mother was not well, she's in a care home, and my father passed way and I'm the only daughter, so I went and I arrived on the 9th of March, and I arrived to the news of the arrest of Mahmoud Khalil.

And at that point, as I said yesterday, I mean I -- I was quite nervous, but I decided that I had to see my mother, and I did. And I did go on to Switzerland to give my talk and I didn't go home on the holiday. And I came back a couple of weeks after I traveled -- I mean after I left the country.

Q. Was your return to the United States in approximately April of 2020?

A. No, no, it was like two weeks later. So it must have been on the 8th or whatever was two weeks later. So it was before the end of March. I know it was before the arrest of Rumeysa Ozturk, because I remember after I arrived a few days later, I heard about the arrest and then I saw the pictures. So, um --

Q. So you've traveled to the United States twice since the Trump administration -- strike that.

You've traveled outside the United States twice since the Trump administration was voted in, correct?

A. Correct.

Q. Now when you -- and your concern that you've articulated with respect to your fears about being deported --

A. Yes.

Q. -- those are concerns you had, um, since even prior to Trump's election, correct?

A. No.

MR. BIALE: Objection. Sorry I'll drop it.

A. Not those concerns. I mean generally when I came early, it wasn't my concern, it was that the University asked everyone, all students, all faculty, who are not citizens, no matter whether they have spoken out on Palestinian or not to come back before the inauguration. So I was just following, you know, what Brown wanted. It wasn't that I was worried coming in.

It is true that in March when I returned from my travel to see my mother and give the talk -- or give a couple of talks in Switzerland, that, um, I was scared. I mean by that time, as I said, I left on the 8th and arrived on the 9th, and I think Mahmoud Khali was arrested on the 8th.

Q. And by that time your views, expressed through your work and the, um, CMES, those were well-known in your opinion?

JA552

A.   What do you mean by "well-known."

Q.   You indicated you were the Director of the CMES prior to that point in time?

A.   Yes.

Q.   And then the allegations about, um, you supporting Hamas had manifested publicly prior to that trip to Switzerland?

A.   I mean I don't know what you mean by "manifested publicly."  I have never been at the forefront, the first avante-garde in terms of pro-Palestinian speech or activism, okay?  So I didn't think that I would be like one of the first people.  But I also saw that things are moving in a certain direction and eventually it would be my turn, given my role and what is out there.  And so if someone was going to do some research, as I was answering, or if my name were mentioned, then, yes.  But I didn't think it would be like first-row.

Q.   Where did you fly into after your trip to Switzerland, what airport in the United States?

A.   I always fly into Boston.

Q.   To Boston, Logan?

A.   Uh-huh.

Q.   And when you arrived at Boston, Logan, were you detained by ICE?

A.   No.

JA553

Q. Were you, um -- were you questioned by anybody at CBP regarding your prior scholarship?

A. No.

Q. Were you questioned in any way about your prior work or the issue of Palestine?

A. No.

Q. Now you're aware that sometimes people who come into the United States are pulled aside for additional questioning, you're aware of that, correct?

A. Yes.

Q. And were you -- sometimes they call that "secondary." Do you understand that term?

A. Yes.

Q. Were you called into "secondary" for questioning?

A. No.

Q. You weren't. In fact at no point in time, upon your return from your Switzerland trip, were you ever, by any representative of the United States, questioned about the prior work or your, um, the allegations regarding your connection to Palestine, isn't that right?

A. Yeah, that's right. But as I said, I'm not frontline. So me being able to enter in March doesn't mean that I would be able to enter in November or December. I mean I -- yeah.

Q. You believe that eventually the government would

JA554

come for you?

A. Well I hope not. I mean that's why I'm here.

Q. Okay. And that belief was -- I believe you indicated yesterday, informed in part by your upbringing, is that a fair characterization?

A. Which belief?

Q. The belief that you were a potential target for deportation?

A. No, it has nothing to do with my upbringing in Germany.

Q. Okay. Yesterday, and perhaps I misheard.

Yesterday you indicated that you were sensitive to issues regarding immigration because you grew up in Germany. Did I misremember that?

A. Yes. Yes, that is, um -- what I was trying to say is that, um, I, growing up in Germany, I became sensitive to ideas around silence and complicity, because of the history of Nazi Germany and the holocaust, and you know the majority of -- well many many many Germans, the majority of Germans, just stayed silent or pretended that they didn't know, or they didn't speak up, and in my mind that is complicity and contributed to the holocaust. So that's what I said in terms of it shaped my, um, you know my awareness.

Q. Okay. And you did not grow up in the 1940s in

JA555

Germany, did you?

A.   No, I did not grow up in the 1940s.  (Laughs.)  But I grew up in the '60s and '70s and '80s where, um, education, beyond history classes, was very much focused on making sure that that history is never going to happen again.  And at the same time I -- as I was enjoying the privilege of living in a democratic country that was trying to come to terms with its past, I also saw how my relatives in Iraq were living under the Bathe regime, the dictatorship, how my relatives were scared to even speak on the phone.  My, um, one of my uncles was executed by Saddam Hussein.  So I saw what a dictatorship should be like.  I feel that I have to use my privilege, as someone who is educated and grew up in Germany, to fight for democracy, freedom of speech, academic freedom, that's where my background comes in.

Q.   Your -- your family's experience in Iraq, that you just described, did that in any way inform your concern that you might be deported from the United States?

A.   Um, no.

(Pause.)

MR. KANELLIS:  We tender the witness.

THE COURT:  Anything else?

MR. BIALE:  No redirect.

THE COURT:  You may step down.  Thank you.

JA556

Call your next witness.

MR. BIALE:  The plaintiffs call Mike Mathis.

THE COURT:  He may be called.

(MICHAEL J. MATHIS, sworn.)

THE CLERK:  State your full name, spelling your last name, please.

THE WITNESS:  Mr. Michael J. Mathis.  My last name M-A-T-H-I-S.

MR. WANG:  Good morning, your Honor.  I'm Xiangnong Wang for the plaintiffs.


*****************

MICHAEL J. MATHIS

*****************


DIRECT EXAMINATION BY MR. WANG:

Q.  Mr. Mathis, good morning, thank you for joining us today.

Where do you live, Mr. Mathis?

A.  I live in --

THE COURT:  Just the city and town.

A.  Somerville, Massachusetts.

Q.  And how long have you lived there?

A.  I moved in June 2019.

Q.  And do you have a security system installed at your

home in Somerville?

A.   Yes, I do.

Q.   And who installed the system?

A.   It's a mixture between the previous owner of my unit and me.

Q.   Okay.  And when did you install the system that you had had a part in installing?

A.   I installed it roughly, um, in 2020.

Q.   Could you please briefly describe the security Camera system?

A.   Yes.  There are two security cameras facing the rear of the house.  Two security cameras facing the front of the house.  And two in the interior.

Q.    And is one of the cameras facing the front of the house, does that show the street or sidewalk in front of your house?

A.   Yes, it does.

Q.   And is that one of the cameras that you yourself installed?

A.   Yes, it is.

Q.   Does your security system record continuously or does it record by motion?

A.   It does both, I have a continuous stream and a motion stream.

Q.   And does your system add a date and timestamp to the

videos that it records?

A. Yes, it does.

Q. Do you have footage from your security camera system from March 25th, 2025 at around 5:00 p.m.?

A. Yes, I do.

Q. And why do you remember that date and time specifically?

A. Because there was a large police presence outside my house after that time. I went to look at the security cameras. I saw something notable. So I saved it off.

Q. And have you reviewed this footage again?

A. Yes, I have.

Q. Can you describe what the video footage you're talking about shows?

A. Yes. I see two cars parked in front of my house and a group of masked people getting out of the car, approaching a young woman, and moving her into the car, and later driving away.

Q. And to your knowledge was your system functioning properly at the time?

A. Yes, I believe it was.

Q. Did you take any steps to preserve this video that you're talking about today?

A. Yes, I saved it off to the side.

Q. And why did you do that?

A. Oftentimes the secured camera footage will lapse and it will be deleted and I thought that this was notable so I should save it off to the side.

Q. Did you share this video that you're talking about with anyone else?

A. Yes, I shared it with, um, various news outlets, I shared it with my Congresswoman's office, Anna Preston, and I shared it with the plaintiffs here.

THE COURT: I didn't catch the last bit?

MR. WANG: "And the plaintiffs here."

THE COURT: Oh, yes.

Q. Just to confirm that last part, you did share it with counsel in this case?

A. Yes.

Q. That's great.

I'm now going to show you what's been premarked as Exhibit B, and that's Bates stamps AUP 01823-1.

A. (Looks.)

Q. Do you recognize what this is?

A. Yes, I do.

Q. And what do you recognize it to be?

A. This is the front of my house.

Q. Yes, there you go.

A. (On screen.)

Q. And how do you recognize this to be the front of

your house?

A.  That's my driveway and it's the corner of Electric Ave. and Mason Street.

MR. WANG:  So with the Court's permission, I'd like to play a couple of minutes of this video.

THE COURT:  Well he's authenticated it, it seems to me, and you want to offer it?

MR. WANG:  Yes, I would like to offer Exhibit B.

THE COURT:  Any objection?

MR. KANELLIS:  No, your Honor, but I don't see any need to play it --

THE COURT:  I don't see any need -- again in the interests of time.

Unless, um --

MR. WANG:  No further questions.

THE COURT:  Very well.

So B is admitted in evidence as Exhibit 225, in evidence.

Any questions for this witness, Mr. Kanellis?

(Exhibit 225, marked.)

MR. KANELLIS:  Just one question, your Honor.

CROSS-EXAMINATION BY MR. KANELLIS:

Q.  Did you personally observe the conduct outside your home separate and apart from what's on the video?

A. I did not see what was on the video, but I saw the police presence soon after, and that's when I went outside.

Q. Okay. Did you -- did you see it and hear it or did you hear it -- I'm sorry, see it?

A. Are we talking about what's on the video?

Q. No, the police presence outside.

A. Yes, I saw it out my window.

Q. You saw it out your window. Did you hear -- was there any sound associated with what you --

A. There was a police officer on my front steps talking to my upstairs neighbor and I heard that.

Q. Okay. Did you hear the specific conversation at all?

A. No, I didn't.

Q. Okay. Other than the police officer speaking to a neighbor on your front steps, did you hear anything else?

A. No, I did not.

MR. KANELLIS: No more questions, your Honor.

THE COURT: Nothing further for this witness?

MR. WANG: Nothing further.

THE COURT: Thank you. You may step down.

225 is in evidence.

Call your next witness.

JA562

MR. BIALE: Your Honor, the plaintiffs call Bernhard Nickel.

THE COURT: He may be called.

(Witness takes stand.)

(BERNHARD NICKEL, sworn.)

THE CLERK: Please state your full name and spell your last name for the record.

THE WITNESS: It's Bernhard Nickel, and the last name is spelled N-I-C-K-E-L.

MR. BIALE: May I proceed, your Honor?

THE COURT: You may.


* * * * * * * * * * * * *

BERHARD NICKEL

* * * * * * * * * * * * *


DIRECT EXAMINATION BY MR. BIALE:

Q. Good morning, Professor Nickel.

A. Good morning.

Q. So where do you work?

A. At Harvard University.

Q. And what's your position at Harvard University?

A. I'm a Professor of Philosophy.

Q. And is that your title?

A. Yes.

Q. Have you recently held any other titles or positions at Harvard?

A. Yes, I've been Chair of the Philosophy Department for the last 3 years. My term ended at the end of June.

Q. Um, so where were you born?

A. In Germany.

Q. And, um, of what country are you a citizen?

A. Germany.

Q. How long have you lived in the United States?

A. About 30 years now.

Q. And what's your immigration status here?

A. I have a green card.

Q. Approximately when did you get your green card?

A. About 20 years ago.

Q. Now, are you familiar with a, um, the following term, the "Ideological Deportation Policy"?

A. Yes, I am.

Q. What do you understand that term to mean?

A. Well it's a deportation policy insofar as it's a policy in either removing or getting people to remove themselves from the United States, um, noncitizens, that is, and it's ideological insofar as it seems to be targeted specifically at people who have a certain ideological profile, specifically people who have spoken up or are politically engaged in pro-Palestinian causes.

JA564

Q. Do you believe that the Ideological Deportation Policy, as you have just described it, is a policy of the current Presidential administration?

A. Yes.

Q. In broad strokes, um, Professor Nickel, how has the Ideological Deportation Policy affected you personally?

A. Well I've stopped going to protests, I've stopped signing on to public letters, and I've cancelled international travel.

Q. Okay. I'm going to ask you about the specifics of some of those, but let me go back, if you don't mind, to, um, when you moved from Germany to the United States. What prompted that move?

A. So I came to the United States to attend college, I went to college at Cornell, in Ithica, New York, in Upstate New York, and, um, it had been a dream of mine to come to the U.S. for a very long time. I felt an affinity for the United States for almost as long as I can remember. I grew up in Germany. I was born in '75. I'm of the generation that, um, felt deeply grateful for what America did during World War II. And more specifically in my case, I grew up next to an American Air Force hospital, and so I was exposed to American pop culture a lot, watched American TV, listened to American radio, played basketball with the American service

members and the kids who went to high school there.  And America was always deeply attractive to me, it held the promise of being a place where history isn't quite destiny, where you can be very different things than perhaps your own history or your country's history would have set you up to be.  And that was deeply attractive to me at the time.

Q.  And when you came to Cornell University, did you, um -- did America live up to your expectations?

A.  Yes.  (Laughs.)

Q.  Okay.  What did you plan to study at Cornell?

A.  I came in planning to be an Economy major.

Q.  Okay.  That's economics?

A.  Yes, Economics.

Q.  Did you end up majoring in economics?

A.  I did not.

Q.  Why not?  What happened?

A.  I took a course in economics.  (Laughter.)  But more seriously, one of the things I was very attractive of coming to school in America, as opposed to staying in Germany, is at the American college level one gets a very broad education, one doesn't just sign up for a single major and basically start a MMA program.  And, um, so I was exposed to many different areas of study, including history and philosophy.  And not only did

economics not attract me, other fields did.

Q. And did you end up majoring in one of those fields?

A. Not officially, officially I was at Cornell, I was called a "cult scholar," which was designing your own major, but I ended up focusing most of my studies in philosophy.

Q. And after you graduated from Cornell University, what did you do immediately after college?

A. I took a gap year and I lived in Southern California, um, in San Diego, volunteering for Habitat For Humanity.

Q. And I take it you built houses for Habitat For Humanity during that year?

A. That's right.

Q. And then after that gap year, what did you do?

A. I matriculated at MIT, at the Massachusetts Institute of Technology, in their PhD program in Philosophy.

Q. Okay. And, um, did you complete the PhD program in philosophy at MIT?

A. I did.

Q. And did you write a dissertation?

A. I did.

Q. And after you, um, completed your PhD, what did you do next?

A. First, um, I worked as an Adjunct Professor at Tufts University for a year. I did that because a couple of weeks before I had to finish my PhD, my daughter was born, and it made sense to me, and given where my wife was career-wise, for me to take a year, basically a gap year, and be a stay-at-home dad.

Q. And then after your position as an Adjunct at Tufts, did you obtain a full-time position at a university?

A. I did, I obtained a tenure-track position at Harvard.

Q. Okay. And what year was that?

A. 2006.

Q. Okay. And you've been at Harvard ever since then?

A. That is correct.

Q. And I take it you were able to get tenure?

A. I did.

Q. Tell us, Professor Nickel, about your scholarly, um, writing?

A. So my areas of specialization are in the philosophy of language and linguistics, and very broadly speaking I'm very interested in the way that, using the tools of linguistics and understanding language, to illuminate much broader concerns about human nature, about communications, how we're going to make sense of the world, and my case study was the focus of my work. It

concerns what I called the "language of stereotypes," generalizations about the natural and social world that you might call the "Rule of Thumb," like ravens are black, tigers have stripes, lions have manes, Germans don't have a sense of humor. (Laughter.) And those generalizations aren't purely statistical generalizations, it doesn't seem, for one thing they mean very different things. Most ravens are black, but it's certainly not true that most lions have manes.

But more importantly, if I think about the kinds of generalizations about national groups, about racial groups, ethnic groups, genders, very often those come in clusters. So along with the nonhumorous aspect of being German, there's the idea of being detail-oriented, which is why you get precision German engineering. There's an idea of being good at planning, but perhaps not very creative, and perhaps also aggressive, which is perhaps part of the explanation as to why Germany started a couple of world wars in the previous century. Not that these explanations are any good, but the idea that seems reliable is that there's something like a nature that explains various other features, and I'm interested in understanding what those claims really amount to.

Q. So if you'll permit me, and this may be dumbing it down way too much, but essentially you study the

structure of language and you look at how that informs us about broader issues, including issues of history and politics, is that fair?

A. Yes.

Q. Okay. What courses have you taught at Harvard?

A. So I've taught a broad range of courses. Almost immediately after coming to Harvard I took over one of the main introductory courses, which is a course named "First-year students, to introduce them to the field." I've taught just about every year that I've been on staff, except for those years I was on sabbatical. I've also taught survey courses in my own area of specialization, the philosophy of language. I've recently started teaching an introductory logic course. And then I've taught smaller seminars on far more specialized topics.

Q. Do any of your courses or, for that matter, any of your scholarly writings touch on issues related to the Israeli/Palestinian conflict?

A. No.

Q. Separate and apart from your work as a scholar and your work as a teacher, have you be politically active since you came to the United States?

A. To some extent, yes.

Q. Tell us about what you've done?

A.   Well in the more distant past, I've gone to some protests, especially as America started to wrestle much more with its history as it concerns race and also structural issues around gender, and so I took my daughter to some Pink Hat protests.  I also went to some Black Lives matter protests in Boston.  And more recently, I was more politically active signing on to public letters having to do with political issues, and also, um, going to some more protests.

Q.   And so you mentioned public letters that you've signed more recently.  Did any of those letters have to do with the Israeli/Palestinian conflict?

A.   Yes.

Q.   Okay.  Before we get more deeply into that, let me just ask you, are you a member of any organizations?

A.   Yes.

Q.   What organization?

A.   I'm a member of the AAUP, and the Harvard Chapter. I'm also a member of the American Philosophical Association.

Q.   And when did you join AAUP?

A.   Right around the time that the Harvard Chapter was founded, so I believe it's been about a year now.

Q.   Okay.  So the Harvard Chapter of AAUP is relatively new?

A.   Yes.

Q.   And you joined, fair to say, right around the time it started?

A.   About then, yes.

Q.   Why did you decide to join the AAUP Harvard Chapter?

A.   Um, over the past couple of years, you know over the past 2 years, 2 1/2 years, questions of faculty governance have become very important at Harvard. Harvard is one of the very few schools that doesn't have a faculty Senate.  And the AAUP, as an Association of University Professors, is one way for faculty to organize in order to make their voices heard in a more concerted way.

Q.   Okay.  I want to get now into some of the letters that you talked about that you signed.

         MR. BIALE:  Mr. Kumar, can you pull up Exhibit 83 in evidence.

         (On screen.)

Q.    And, Professor Nickel, could you take a look at the, um, first page of that document.

A.   (Looks.)  Yeah.

Q.   Okay.  And what's the date of the letter?

A.   July 1, 2019.

Q.   Okay.  And it looks like, um, it has some authors at the top.  But in addition to those individuals, did you

also sign this letter?

A. I did.

Q. Okay. Tell us generally what this letter is about?

A. It is about a strategy of historiography concerning the holocaust. And, um --

Q. I'm sorry?

A. Is it possible to scroll to another page?

Q. Yes.

MR. BIALE: Mr. Kumar, if you could go down.

(Scrolls.)

THE COURT: Let us know where we should stop.

THE WITNESS: Yes, that's good. Thank you.

(On screen.)

A. So there's -- okay. So the policy that's under discussion is "Unequivocally Rejecting Efforts to Create Analogies Between the Holocaust and Other Events, Whether Historical or Contemporary," and the letter demands that this, um, not be followed -- or asks that this not be followed.

Q. And why did you sign a letter advocating, um, that a policy of not making analogies between the holocaust and other events be followed?

A. So in Germany there certainly was a very strong historiographical tradition that, um, treated World War II, and the Nazi regime, the Third Reich, and the

holocaust, as sue generis, a "thing unto itself," something that cannot be understood, perhaps with the ordinary tools of historiography. And I certainly understand why that might seem appropriate insofar as, um, the horror of the holocaust are almost incomprehensible. At the same time I think this also led to not thinking about the times before and after the Third Reich, the things that led up to it, and its effects.

And so for somebody like me, who grew up in Germany in the '70s and '80s, it is often very difficult to understand the longer-term effects of World War II, of the Nazi seizure, of power and its maintenance of power, because I knew that there were the Nuremberg trials, the very top echelon of the Nazi hierarchy was eliminated. Of course Hitler didn't make it to the trials. But so much of the underlying structure was still there. And I think it's important that we understand, or at least that it's a possible avenue of understanding, that we think of, even something as horrific as the holocaust, as something that was brought about by people in all walks of life.

In fact, right around the time that I came to Cornell in the mid '90s, um, an American historian, Daniel Jonna Goldhagen had published a book, "Hitler's

JA574

Growing Executioners," in which he documented, quite extensively the way that ordinary Germans were part of the Nazi machinery, and he was celebrated in Germany, not because he made Germans feel good about themselves, anything but, but I think because it allowed many Germans to begin to wrestle with their past, because many of us have parents, grandparents in my case, who were members of the party.

Q. Let me just ask you. You've mentioned a term "historiography," just to make sure that we're all on the same page. Would you explain what that means?

A. Oh, the way that I use it, I just mean approaches to how to pursue historical inquiry and how to write history.

Q. And, um, you talked about sort of a broader understanding of the forces that brought about the holocaust and the lingering effects in Germany. And can you just explain to us how, um, those concerns apply to this idea of analogizing the holocaust to other events?

A. Well the holocaust, as a major event, was the effect of many people working more or less in concert, making lots of decisions, and I think it's one form of analogy to ask where does something like that -- where else does something like that happen? I think that's a form of analogy that, given the statements here, would

be, um, forbidden.

THE COURT: That would be --

THE WITNESS: Forbidden.

THE COURT: Forbidden.

Q. And in your view that's a form of analogy that should be permitted?

A. Yes.

Q. Did you have any concerns, um, when you signed on to this letter, about how it could affect your employment in the philosophy department at Harvard?

A. No.

Q. Did you have any concerns, when you signed onto this letter, about how it could affect your immigration status in the United States?

A. No.

Q. Let me show you another document. This is Exhibit 84 in evidence.

A. (Looks.)

Q. And I'm happy to show you additional pages of it, if that would be helpful. Just let us know.

A. (Reads.) Okay.

Q. What's this document?

A. It's a Harvard faculty statement in support of Palestinian liberation.

Q. And did you sign onto this document?

JA576

A. I did.

Q. Why did you sign onto this document? I'm sorry, before we get there, can you just tell the date of this document.

A. Yes, it's dated May 20th, 2021.

Q. Okay. And now tell us why you decided to sign on to this statement and generally what the, um, what the gist of the statement was?

A. (Reads.) Would you mind scrolling down just a little bit. (Scrolls.) Thank you.

The demand, at the end of the statement, is an end to U.S. support for Israel's apartheid regime and the condemnation of state aggression.

Q. Okay. And why did you decide to align yourself with this particular statement?

A. I've become aware of, um, the conditions in Gaza and, um, I became aware that the conditions are horrifying, and it seemed important to try to support and, um, mark this fact, and express my support for people who are living under these horrifying conditions.

Q. And did you, um -- and was this letter, um, released publicly?

A. Yes.

Q. And were the signatories publicly identified?

A. Yes, I believe so.

Q. Did you have any concerns, when you signed this letter, that public identification of your name with this message could lead to, um, problems with your employer?

A. No.

Q. Did you have any concerns, when you signed this letter, that your name being associated with it could lead to problems with your immigration status?

A. No.

Q. Okay. I want to just talk to you briefly and then I guess I will show you one more letter. I want to just talk about the attack of October 7th, 2023, um, and ask you about, um -- and the subsequent Israel military campaign in Gaza. I'm going to ask about your personal reaction to those events and what the reaction was like on the Harvard campus?

THE COURT: Well that's something of a compound question. Let's break it down. First, your reaction -- but the questions are appropriate.

First, your reaction to the events of October 7th?

A. So the, um, the attack by Hamas, um, horrified me, just it -- it's just viscerally, it's almost incomprehensible the brutality of the attacks.

Q. And how about the, um, subsequent Israeli military campaign that was a response to the attack?

A.   Well I was also deeply saddened and also horrified by all this blood and casualties that the campaign caused.

Q.   And now -- and I appreciate the Court's objection to my question, now you can talk about the reaction on the Harvard campus to those events?

A.   I think it probably makes sense to start with a statement released by several student groups shortly after the Hamas attack, holding Israel alone responsible for the events, for the attack.

MR. KANELLIS:  Your Honor, I apologize for the interruption, but an objection to the extent this calls for hearsay.  He's quoting a letter by --

THE COURT:  He is.  I'm not clear -- I have a more fundamental concern.  I've allowed all this on the issue of bias, because people's motivations are at issue here.  Why -- in my subsequent events really, why do we need this testimony here?  How does it help us in the issues in this case?

MR. BIALE:  Understood, your Honor.  Let me cut to the chase.

Q.   Did there come a time, Professor Nickel, that there was an encampment on Harvard's campus?

A.   Yes.

Q.   Okay.  And what was that encampment about?

JA579

A. It was, um, an encampment that, um, asked for, um, and demanded Harvard's divestment from Israel and condemnation of the military campaign.

Q. Did you attend the encampment at any point?

A. Yes.

Q. Approximately how many times did you attend the encampment?

A. I guess around 10.

Q. And just so we can get a timeframe, do you remember around what time period this was?

A. I believe it was, um, starting about 5 or 6 weeks before the end of the spring semester of 2025, and it lasted, I believe, for about 4 -- 4 weeks or so.

Q. And just to make sure, you said 2025. Was this the spring semester -- you mean the semester that just ended or are we talking about the spring of 2024?

A. Um --

Q. In other words, was this a year ago or was this in the last couple of months?

A. Oh, no, I'm sorry, you're right. It's 2024.

Q. Thank you.

A. Yes, of course.

Q. Why did you go to the encampment approximately 10 times, as you testified?

A. For a couple of reasons. At first I went because,

JA580

um, I knew some of the students at the encampment, they had been students in my classes, um, and some of them were philosophy majors.  And then later on, when the university began to start disciplinary proceedings against some of the students, I met with students there, because as part of the disciplinary process at Harvard, students that are brought before the administrative board are entitled to a faculty advisor, and I served as the faculty advisor for a couple of the students.

Q.  And did you, um, other than going to visit your particular students, did you wish to express sympathy or support for any of the positions that the protesters were talking at the encampment?

A.  Yes.  I mean it was a -- a somewhat complicated thing, because on the one hand, to the extent that the protesters were drawing attention to the continuing, um, terrible human toll that the war took, um, I thought that was very important, and I supported that.  On the other hand, my own attitudes towards thinking about the university specifically, the best thing, as a means of bringing about broader political change in the world, um, I mean I don't find that all that compelling.  And so that part of it, um, I probably wasn't deeply in support of.

Q.  Did you see anything at the encampment or hear about

JA581

anything that occurred there that you, um, would deem to be antisemitic?

A. Yeah, unfortunately.

Q. What was that?

A. Um, I saw a large-scale caricature of what looked to me like our then interim President Garber, um, with, I believe, the Devil's horns and a Devil's tail. And that's just a very, from now on, antisemitic trope.

Q. And I think you sort of alluded to this in your answer, but did you approve of that, um, the use of that image in the students' protest?

A. No.

Q. Okay. Now, um, when you, um, went to the encampment, did you have any concerns that your presence there would cause you problems with your employer, Harvard University?

A. No.

Q. Did you have any concerns that your presence there would, um, create problems for your immigration status?

A. No.

Q. I want to turn your attention to, um, the election in 2024.

So after President Trump was elected, did you send --

THE COURT: I interrupt only because I'm going to

take a recess at quarter to 11:00.  Do you want to take it now and then pick up half an hour out?

MR. BIALE:  I think that makes sense, your Honor, I have a little bit more with the witness.

THE COURT:  I'm not crowding you, it's just you said "turning to another point in time," that's why I interrupted.  It's your call.

MR. BIALE:  I think it's a good time to take a break, your Honor.

THE COURT:  We'll take the morning recess.  We'll start at 10 minutes after 11:00.

We'll recess.

THE CLERK:  All rise.

(Recess, 10:40 a.m.)

JA583

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Tuesday, July 8, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-8-25
_____
RICHARD H. ROMANOW   Date

JA584

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 2, Pages 75 - 148

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
            Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
            Defendants

********

BENCH TRIAL DAY 2

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 8, 2025

********

Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                 Official Court Reporter
                 United States District Court
                 One Courthouse Way
                 Boston, Massachusetts  02210
                 mortellite@gmail.com

JA585

A P P E A R A N C E S

RAMYA KRISHNAN
ALEX ABDO
    Knight First Amendment Institute at Columbia
    University
    475 Riverside Drive, Suite 302
    New York, NY 10115
    (646) 745-8500
    ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
    Sher Tremonte LLP
    90 Broad Street, 23rd Floor
    New York, NY 10004
    (212) 540-0675
    cgans@shertremonte.com
    For Plaintiffs


ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
    DOJ-Civ
    P.O. 878
    Ben Franklin Station
    Washington, DC 20044
    (202) 616-9123
    ethan.kanter@usdoj.gov
and
SHAWNA YEN
    United States Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    shawna.yen@usdoj.gov
    (617) 748-3100
    For Defendants

JA586

INDEX


WITNESS                                                          PAGE


BERNHARD NICKEL

   Direct Examination By Mr. Biale (continued)                    78
   Cross-Examination By Mr. Kanellis                              93
   Redirect Examination By Mr. Biale                             116

SARA JOHNSON

   Direct Examination By Mr. Abdo                                121


NADIA ABU EL-HAJ

   Direct Examination By Ms. Conlon                              131



        E X H I B I T S


Exhibit No.                    Received


   226                            125

   227                            129

JA587

P R O C E E D I N G S

(Resumed, 11:12 a.m.)

THE COURT:  Mr. Biale, you may continue.

MR. BIALE:  Thank you, Your Honor.

BY MR. BIALE:

Q.   Professor Nickel, when we left off at the break I was about to ask you about the November 2024 election of President Trump.  You recall that event?

A.   Yes.

Q.   Let me ask you, without getting into your personal views, at the time you were chair of the philosophy department, right?

A.   That's correct.

Q.   And so as a faculty member and university administrator, what was your reaction to the election?

A.   Well, especially in my role as chair, I think it's part of my job to help the community and help hold the community together, create community as much as possible.  So I, as part of that, I would at times send out emails to the community at large to talk about things that concerned all of us.

Q.   And when you say "the community," what are you referring to?

A.   I mean, my colleagues in the department, the graduate students in the department and our undergraduate majors.

Q.   Okay.  So you mentioned that you sent out emails.  Do you recall if you sent out one of these emails to the department or

to the department community, I'll say, around the time of the election, shortly after the election?

A. Yes, I did.

MR. BIALE: Okay. Mr. Kumar, if you could pull up Exhibit 77 in evidence.

Q. Professor Nickel, take a moment to look at that document on the screen.

Is this the email that you sent to the philosophy department community shortly after the 2024 election?

A. Yes.

Q. Okay.

THE COURT: Say again the exhibit number, excuse me?

MR. BIALE: Sure, Your Honor. It's Exhibit 77.

THE COURT: Thank you.

Q. Now, if I can direct your attention -- let me just, just focusing quickly on the date, when was it sent?

A. November 7 of 2024.

Q. Okay. And we won't get into it what day of the week that was, but you see at the beginning it says, "In the wake of Tuesday's election." So fair to say this was sent shortly after the election?

A. Yes.

Q. Okay. I want to direct your attention to the second paragraph, and you say there, "I take the campaign's rhetoric about, among other things, deportations and using the resources

of the state to go after political opponents both seriously and literally." What did you mean by that?

A. Well, during the campaign there were statements by both Candidate Trump and others in the campaign, including Vice President Vance, arguing that -- Vice President Vance, for instance, said that the universities are the enemy, and Candidate Trump at various points suggested that if he were elected he would use the powers of the state to prosecute his enemies, his political opponents.

Q. When you say "political opponents," in that context, who are you talking about?

A. You know, unfortunately a very broad range of people, but they certainly included people who might have been politically active, especially in pro-Palestinian causes, in large part because in many of the statements he made concerning the campus protests that had preceded the election, the protesters seemed to be characterized as antisemitic quite broadly and pretty much universally.

And to the extent that antisemitism is a very good ground for bringing the powers of the state to bear, it seemed that that was a case where a lot of students potentially might be threatened.

Q. And when you said "deportations," is it that issue specifically that you had in mind, student pro-Palestinian protesters?

JA590

A.    It's certainly one of them I had in mind.  I'm not sure if that's the only one.

Q.    And then in the next sentence you said, "I'm also keenly aware of the chilling effects on freedom of expression."

Just tell us a little bit about what you were thinking of when you wrote that.

A.    So I think as an international student one is particularly vulnerable.  When I came to America, I came here on an F-1 student visa before I got my green card.  And even me who was coming usually from Europe, whenever I had to go through immigration, it was a moment of deep anxiety because I felt very much at the mercy of a bureaucracy that may or may not -- that I may or may not have protections from.

So I felt it especially to the extent that international students would be the targets of some of these activities, I could easily imagine them wanting to keep a very low profile and not speak up in favor of not just pro-Palestinian causes, certainly those as well but others as well that might run afoul of the administration.

Q.    Okay.  Mr. Kumar, you can take that down.

I asked you at the beginning of your testimony about the ideological deportation policy.  In your view, has the Trump administration since being inaugurated put that policy into effect?

A.    Yes.

JA591

Q.   What have you seen or heard about that makes you believe that the administration has done that?

A.   Certainly the arrests of Mr. Khalil and Ms. Ozturk, along with broader statements that were covered in the press to the effect that protest is not something that is welcomed, certainly not all forms of protest.  And so there are the statements and then there are the arrests.

Q.   So I want to ask you about each of those.  Just first focusing on the statements, is there a specific statement that you have in mind or a specific government official that you have in mind who made a statement, if you remember?

A.   No.  At this point I don't remember.

Q.   Okay.  Let me ask you then about the arrest of Mr. Khalil.  How did you hear about that?

A.   In the media.  I read it in the newspaper.

Q.   What did you read?

A.   That he was arrested, apparently very close to his -- I don't recall if it was in his home or close to his home.  And that this was in the presence of his, I believe, at the time pregnant wife.

Q.   And what about that incident that you learned at that time led you to believe that this was a manifestation of the ideological deportation policy?

A.   Nothing in the coverage of this case indicated that he had done anything other than exercising his political speech.  He

was very active. He was, as far as I could tell, one of the leaders of some of the campus protests at Columbia, but that was the extent of it.

Q. Okay. And did you read at the time about what Mr. Khalil's immigration status was in the country?

MR. KANELLIS: Objection, Your Honor. We're getting into a lot of hearsay.

THE COURT: Again, that's not for the truth but what he came to understand was his status and then this individual himself. So I'll allow it but not for the truth.

So what did you come to think his immigration status was?

THE WITNESS: I believed that he had a green card.

Q. Okay. Based on what you heard about Mr. Khalil, his arrest, his prior activities and his immigration status, how did learning about all that make you feel?

A. It scared me because I didn't think that those kinds of -- yeah, I didn't think that those kinds of arrests would happen in America, but they did.

Q. And other than how it made you feel about America generally, did it affect you personally in any way?

A. I mean, that, although I think this became much more sharp, this came much more sharply into focus a little while later when Ms. Ozturk was arrested in the way that she was.

So I told you earlier that I came to America because I

have something like an affinity, and I hadn't planned to be an immigrant. I thought I'd come here for four years, maybe six, maybe do a master's and then go back to Germany.

Of course that didn't happen. I ended up going to college, finding my career here and meeting my wife, having a kid. And I did that in part because I actually love this country. And it's the kind of love that other immigrants who have been in the situation where they could just affirmatively choose to move here had.

And throughout all the ups and downs and all the different parts of my life and certainly all of the different ways that America came to wrestle with itself and think about the ways it could try to create a more perfect union, that love never changed.

And as my fear of political reprisal grew, I just don't feel that way about the country in quite the same way. That's depressing and it's destabilizing.

Q. So let me ask you, you said that that sort of came into sharper relief with Ms. Ozturk's arrest. How did you hear about that incident?

A. Also in the media.

Q. Okay. And just tell us what you remember hearing.

A. So first I just read accounts in the newspapers saying that she was picked up in broad daylight off the street. And what I remember is that the only thing that she had done which

JA594

could have anything to do with the arrest was publishing a piece in the Tufts student newspaper.

Q. And you mentioned that she was picked up on the street. Do you recall seeing a video of that incident?

A. I did.

Q. Approximately when did you see that video?

A. Probably like two or three days after it happened. I read accounts of what was in the video. And I didn't really want to see it. I thought it would be really disturbing. But then after a while I thought it's important that I see it, and so I did see it.

MR. BIALE: So let me ask you, Mr. Kumar, to pull up Exhibit 225. And Your Honor, we're not going to play the whole video. I just want to play a couple of seconds of it so the witness can see it.

THE COURT: You may.

MR. BIALE: Mr. Kumar, if you can take us to 2 minutes and 30 seconds and play maybe five seconds of the video.

(Video played.)

MR. BIALE: Okay. Thank you, you can pause it.

Q. Professor Nickel, is this the video that you saw that you were just talking about?

A. Yes.

Q. Okay. By the way, you mentioned Mr. Khalil's arrest. Do you recall ever seeing a video of that arrest?

JA595

A.   No.

Q.   Okay.  Now, after you learned about these two incidents and saw the video of Ms. Ozturk's arrest, did you start to think about how you might change your behavior?

A.   Yes.

Q.   Okay.  And we covered that a little bit, but if you can just tell us again, what were the specific things you did?

A.   So for me, the arrest of Ms. Ozturk was the turning point. That was the moment that I actually just decided on a blanket policy that I would keep my head down completely.  I would not go to protests.  I would not write, I would not sign on to public letters, and any other potential forms of publicity I would just avoid.

Q.   And did you attend any protests between Mr. Khalil's arrest and Ms. Ozturk's arrest?

A.   I did.

Q.   Tell us about that protest.

A.   There was one on the grounds of Harvard University in the yard.  I believe it was organized by the AAUP in support of Mr. Khalil.  And I was -- I had begun to be somewhat scared because of the arrest, but I decided I could still go to the protest.  I wouldn't be in the front row, and I have to admit I was glad that I wasn't in the picture that was published in the Harvard student newspaper when that protest was covered.

Q.   Why were you glad that you were not in the picture that

JA596

was published in the student newspaper?

A.   I didn't want to draw attention to myself.

Q.   Why not?

A.   Well, I thought that if I drew attention to myself, I might potentially be the target of something.  Specifically I had been hoping to do some international travel and go to Europe a couple of times earlier this year, well, once earlier this year and once right around now.  And I was worried about potentially being detained at the border.

There had been stories about people being detained at the border and then moved to a detention center in Louisiana or being turned away and being sent back to Germany.  And I was worried about those possibilities.

Q.   Let me ask you about the planned travel.  So you said there was one that you planned to take earlier this year and one that you would have gone on around now.

Tell us about the first trip.  Where did you plan to go and what was the purpose of your travel?

A.   I planned to go back to Germany pretty close to where I grew up because I wanted to see my half brother, and I wanted to take my daughter to see him.  He's about ten years older than me, and earlier this year he was diagnosed with terminal cancer.  Right now he probably has about nine or ten months to go.  And the trip in May would have been a chance for me to see him and for my daughter to spend some time with him.

JA597

He's at this point the only family I have left. I'm an only child. Both of my parents are gone. I don't really have connections with my extended family. And so this was important for me and would have been important for my daughter.

MR. BIALE: Mr. Kumar, can you show us what's in evidence as Exhibit 170.

Q. Professor Nickel, can you take a look at this exhibit?

A. Okay.

Q. I'm not going to ask you to -- it's in German. I'm not going to ask you to translate it, but can you just tell us the date and tell us what this email is.

A. So the date is March 11 of this year, and it's an email that I sent to my brother. And there's some chitchat, but the basic point was to say that my daughter's summer plans had become more fixed and so I would be available to travel -- we would both be available to travel between the middle of May and the middle of June, from the 15th of May to the 15th of June.

Q. So this was March 11, so this was I guess a couple of days after Mr. Khalil was arrested; is that right?

A. Yeah.

Q. But before Ms. Ozturk was arrested?

A. That's right.

Q. And so after Ms. Ozturk was arrested, did you change your plan?

A. Yes.

Q.   Tell us what happened.

A.   Well, I decided not to go and see him.  And instead my daughter and I still took a trip here in the U.S.  Just because it was nice to spend some time with her after both of our semesters were over, but we very consciously took a domestic trip.

Q.   And I take it you were not able to see your brother on that domestic trip, right?

A.   That is correct.

Q.   And let me ask you then about the trip that you planned to be on now.  What was the purpose of that trip and where were you going to go?

A.   I was planning on going to Edinburgh in the U.K. for an academic conference.  And depending on exactly how my plans shaped up, I had planned to see some other people who work in the same area as I do, same discipline area I mean.

Q.   Was that a conference you were invited to?

A.   As a participant, yeah.  It's put on by several fairly close friends of mine.

Q.   Have you previously, I'm talking now before March of 2025, previously attended conferences, academic conferences outside of the United States?

A.   Yes.

Q.   Approximately how many?

A.   Well --

JA599

Q.   That may be an unfair question.

Is that something that you used to do frequently?

A.   Fairly frequently, yes, certainly once COVID ended.

Q.   Okay.  And this trip to Edinburgh for the academic conference, did you go on that trip?

A.   No.

Q.   Why not?

A.   Because I was worried about international travel, and specifically I was worried about potentially being detained at the border when I tried to re-enter.

MR. BIALE:  Okay.  Now, if I can just have a moment, Your Honor.

Q.   I want to go back now -- Mr. Kumar, you can take that down -- to, you said that after the arrest of Ms. Ozturk you decided as a blanket policy not to sign on to any more public statements, right?

A.   That's correct.

Q.   Were you still chair of the philosophy department at that time?

A.   I was.

Q.   And did you still engage in your practice of at times sending emails to the department community?

A.   Yes.

Q.   Did you consider that to be making a public statement?

A.   No.

JA600

Q.   Why not?

A.   It's an email.  So usually I sent these emails, and they're emailed to a very specifically defined group of people, the faculty, graduate students and undergrads in the department.

Q.   And in some of those emails, if you recall, did you say anything that was critical of the Trump administration and its policies?

A.   Yes.

Q.   Why did you feel comfortable doing so in that medium?

A.   I wouldn't quite say that I felt comfortable.  I did feel like I had to do it.  I think it was -- I thought it was important to do it.  And I chose to do it because I thought that these are emails that are not public but are aimed at a very specific community, within which we all know each other fairly well.

Q.   And if you recall, was an excerpt from one of those emails at some point printed in The Harvard Crimson, the student newspaper?

A.   Yes, it was.

        MR. BIALE:  Mr. Kumar, if you can pull up Exhibit 81.

        THE COURT:  81?

        MR. BIALE:  81, 8-1.

Q.   This is -- I apologize for the big advertisement for the D. E. Shaw Group, but this is an internet printout of the

JA601

article. Mr. Kumar, if you can just go down to page 2 and if you can enlarge the second paragraph.

So this is quoting something you said. It says, "Philosophy Chair Bernhard Nickel wrote to his department."

Is this quotation from one of the emails that you sent, private emails, to the philosophy department community?

A.    Yes.

Q.    When you sent that email, did you anticipate or intend -- strike that.

When you sent the email, did you intend that your words would be publicized more broadly?

A.    No.

MR. BIALE:  Okay.  You can pull that down.

Q.    So Professor Nickel, you've testified about some of the concrete ways in which the ideological deportation policy has affected your plans and your activities, and you testified about how it's affected your feelings about this country.

Is there any other way that it's affected you that you think is important for this court to understand?

A.    I mean, I can share with you because of my role as chair but also my job as just a faculty member, I've spoken to students, students who at some points were also worried about this, this policy. And there's just there's a fair amount of fear among our student body, to the extent that I feel for them. I suppose that's a way that it's affected me. And I

JA602

don't want to make it about myself.

Q. I understand. Well, to ask you one more question about yourself. Why have you decided to come testify as a witness in this trial?

A. You know, anybody can sign on to an open letter. Anybody can go to a protest. My sense was that, in this trial, somebody in my quite specific situation, somebody who is a senior scholar with a secure position at Harvard and who was not a citizen and who felt the effects of the policy, I don't know that there are that many people who could have done this. So I thought this is something that's worth it.

And frankly, I told you how my feelings have changed. This is still, this is where I live, and I want this to be a country and a nation of laws, not of men. And so I believe in these kinds of processes and procedures. And this is me doing my part.

MR. BIALE: Thank you. No further questions.

THE COURT: Mr. Kanellis, do you wish to question?

MR. KANELLIS: Yes, sir.

THE COURT: You may.

CROSS-EXAMINATION BY MR. KANELLIS:

Q. Professor Nickel, good to see you again.

A. Hi.

Q. I'd like to ask a couple of questions about your membership in AAUP. You indicated that you joined AAUP about a

year ago?

A. I think that's about right.

Q. Roughly. And do you have a leadership position within the AAUP?

A. I do not.

Q. Okay. And you mentioned a protest that you attended on behalf of AAUP this year, correct?

A. I believe it was organized by AAUP. I think it was on behalf of Mr. Khalil.

Q. And with respect to other meetings of AAUP, beyond that protest, have you attended any of those?

A. Yes.

Q. How many?

A. So these are meetings, like chapter meetings, as opposed to public protests. Probably two or three.

Q. Two or three in the last year?

A. Yeah.

Q. And outside of attending the public protest and those AAUP chapter meetings, have you done anything else on behalf of AAUP?

A. I think I may have when I first -- when AAUP, when the Harvard chapter was first founded, I may have mentioned to my colleagues that the chapter is now founded and that they could consider joining.

Q. Okay. Other than that, have you done anything else

JA604

related to AAUP other than what you've described?

A. No.

Q. Let's talk about your scholarship for a little bit. You've been here in the United States, did you say, for 30 years?

A. Just about. I came here in the fall of 1996.

Q. Okay. And you've been a green card holder for 20 years? Did I hear that correctly?

A. About that, yes.

Q. Okay. In the 30 years, just to be clear, you've never taught a course relating to the subject of Palestine, have you?

A. That is correct.

Q. In the 30 years you've been here you've never taught a subject relating to the topic of Israel, have you?

A. That is correct.

Q. With respect to seminars or other teaching opportunities you've had, have you led a seminar or engaged in any other teachings relating to the subject of Palestine or Israel?

A. No.

Q. You did, you have written letters, though, correct?

A. I've signed on to letters.

Q. Signed on to letters, and we've discussed a few of those. And we talked about a few letters that you had written regarding the Holocaust Memorial Museum?

A. You're saying I wrote the letter?

Q.   That's fair.  Strike that.  Let me correct that.

You've signed on to letters relating to -- public letters that could be interpreted as relating to Palestine.  Fair statement?

A.   Yes.

MR. KANELLIS:  Okay.  Can you pull up, whoever is handling the exhibits, Exhibit 83?

Your Honor, may I approach the witness?

THE COURT:  You may.

MR. KANELLIS:  Actually, if you're able to pull it up.  I can shortcut this, Your Honor, and bring it up.  This will be very brief.

THE COURT:  Yes.  We should help each other.

Q.   You referenced this briefly in your direct examination.  This is a letter you wrote in 2019, correct?

A.   No, I did not write this letter.

Q.   This is a letter you signed on to in roughly 2019, correct?

A.   Yes.

Q.   Okay.  When signing on to that letter, that reflected to some degree your agreement with at least some of the statements in the letter.  Fair statement?

A.   Yes.

MR. KANELLIS:  Okay.  Can we go to the -- can we actually flip through the pages.  This may go quicker, Your

Honor, if I just give the witness the document so he can --

THE COURT: However you --

MR. KANELLIS: May I approach?

THE COURT: You may.

Q. Professor Nickel, please just take a moment and review that document just to make sure it's what you remember it to be.

Have you had an opportunity to review that?

A. Yes.

Q. Can you go to the last page, please. And can you describe -- the last page reflects the number of signers to the letter. Do you see that?

A. At least on my printout there aren't any numbers. I'm willing to be instructed on this.

Q. I'm sorry. Go to the penultimate page. Okay. There aren't numbers.

How many pages are in this entire document; can you count them?

A. 23 pages of signatories.

Q. And is it fair to say that the majority of those pages are filled up with the names of signers of that document?

A. Yes.

Q. Would you estimate that the number of signers of that document is over 100 people?

A. Yes.

JA607

MR. KANELLIS: Okay. Your Honor, may I approach the witness?

THE COURT: You may.

Q. Now, Professor Nickel, is it your opinion that your signature on this document relating to an open letter to the director of the U.S. Holocaust Memorial Museum was one of the factors that caused you concern after the Trump administration took over in November of 2024?

MR. BIALE: Objection.

THE COURT: No. Overruled. He may have it.

A. Not at the time.

Q. Not at the time. How about after the fact, and I'll ask that question just to be clear. After the fact, now that the Trump administration has come into power, do you believe that your signature on this letter could be a cause for the Trump administration to target you for purportedly pro-Palestinian views?

A. Yes.

Q. Okay. And so there are hundreds of signatures on this document, and your testimony is you believe that you will be singled out for potential deportation because of your signature on this letter?

A. That is not my testimony.

Q. Okay. Well, do you believe that there is a heightened risk that, because you signed this letter, that the Trump

administration would target you for deportation?

A.   That I do believe.

Q.   And your signature on this letter was one of hundreds?

A.   Yeah.

THE COURT:  Okay.  And your signature on this letter was?

MR. KANELLIS:  Exhibit 83.

THE COURT:  No.  I didn't hear the last part of your question.  "And your signature on this is letter was."

MR. KANELLIS:  Thank you, Your Honor.

Q.   It was one of hundreds of signatures on this document?

THE COURT:  Thank you.

Q.   Correct?

A.   Yes.

Q.   You also signed what has been entered into evidence as Exhibit 84.  It's a Harvard faculty statement in support of Palestinian liberation.

Do you remember your testimony regarding that letter?

A.   Yes.

Q.   Okay.  I have a quick question for you.

MR. KANELLIS:  But, Your Honor, may I approach?

THE COURT:  You may.  While he's doing that, 83 is an example of your view of historiography relative to the Holocaust, 83?

THE WITNESS:  Mm-hmm.

THE COURT: It's better if you say yes or no.

THE WITNESS: Yes. Sorry, yes.

BY MR. KANELLIS:

Q. And with respect to -- is that Exhibit 84?

A. Yes.

Q. Okay. With respect to be Exhibit 84, can you just flip through there and tell the court how many people signed that letter?

MR. BIALE: Sorry, Your Honor. Can we just have him pull it up.

THE COURT: I have copies of these and I'm looking at it.

MR. BIALE: I know, but I don't have a copy so I just want to make sure it's on the screen once we're talking about it.

THE COURT: Well, I can answer this question. This has 66, so the document speaks for itself. Go ahead.

Q. There are 66 signatories on the letter, correct?

A. That's correct.

MR. KANELLIS: May I approach, Your Honor?

THE COURT: That at least is what it says. Go ahead.

Q. Same question about this letter, Exhibit 84. Do you believe, now believe that your signature along with 65 other individuals on this letter written in 2021 would lead to the Trump administration deporting you?

JA610

A.   Do I believe that this signature by itself would cause the administration to deport me?

Q.   Yes.

A.   Categorically?  I believe that it creates a risk.  That it would definitely happen?  No.

Q.   It creates a risk that it would definitely happen?

A.   No.  It creates a risk, yes.  That it would definitely happen, no.  I do not believe that it will definitely happen.

MR. KANELLIS:  Okay.  Could can we pull up Exhibit 77, please.

Q.   This is an exhibit you saw -- do you see your screen.  This is an exhibit that you wrote on -- an exhibit -- this is an email you wrote on November 7, 2024, correct?

A.   Yes.

Q.   This was immediately after the Trump administration was elected into office, correct?

A.   Yes.

Q.   Okay.  And immediately after the Trump administration was elected, you were issuing cautions to students relating to the potential adverse effects of the Trump administration, correct?

MR. BIALE:  Objection.

THE COURT:  I beg your pardon?

MR. BIALE:  Objection.

THE COURT:  He may press the question in that form.

Can you answer the question?

A.   I don't know that I'd treat this as a caution.

Q.   Setting aside what's written in this letter, were you writing statements to students at Harvard after the Trump administration was elected that expressed your anxiety about the potential effects on students of the Trump election?

A.   To some students, yes.

Q.   To some students, all right.

        MR. KANELLIS:  Your Honor, may I approach?

        THE COURT:  You may.

        MR. KANELLIS:  Let the record reflect -- one moment, Your Honor.

        Your Honor, we're checking to make sure this hasn't already been admitted.  Otherwise I'll lay a foundation.

Q.   Can you take a look at that, sir.

        MR. KANELLIS:  Your Honor, I have not provided you a copy.  I think that would help.  Sorry about that.  Let the record reflect the witness has been handed an exhibit I marked for identification as HB, and I believe it's in --

        MR. BIALE:  We're just going to confirm it's in evidence.  We believe it's in evidence as Exhibit 78.

        THE COURT:  I have it.  It is Exhibit 78 in evidence.

        MR. KANELLIS:  My apologies for the confusion on my behalf, Your Honor.

        THE COURT:  No problem.  Go ahead.

Q.   Mr. Nickel, this is a letter or email you wrote on

February 13, 2025, correct?

A.   Yes.

Q.   And you're touching upon, among other things, on the impact of the inauguration of the new administration.  Fair statement?

A.   I'm sorry.  Did you ask me if it's the impact of the inauguration itself?

Q.   I'll put another question.  If you look at the second paragraph, you're discussing attacks on our institutions.  Do you see that?

A.   Yes.

Q.   And what do you mean by "attacks on our institutions"?

A.   So specifically -- well, I have to admit I'm not sure whether I meant higher education specifically or also things like the legal system more generally.

Q.   All right.  Fair enough.

If you go to the To line at the top of the page, do you see it says "Fill grad-list."

A.   Yes.

Q.   Was that an internet group that was set up at Harvard to communicate with members of certain communities at Harvard?

A.   It's a mailing list that was up that includes all and only the graduate students in the philosophy department.

Q.   With respect to that list, how many people were on that list; do you remember?

A.   I would think about 45.

Q.   45 people.  And anywhere on this document do you indicate that you don't want this document shared with other people?

A.   No.

Q.   So you understood when you wrote this email that it was possible that people may share this document here with third parties.  Fair statement?

A.   Yes.

Q.   And this document is critical, would you say, of the Trump administration?

A.   Yes.

     MR. KANELLIS:  Let's go to -- and I appreciate you doing this -- can we go to Exhibit 171, please.  The type here is very small.

     MR. BIALE:  You can zoom.

     MR. KANELLIS:  If you want to zoom in, that may help.

Q.   Do you recognize this document, Mr. Nickel, Professor Nickel?

A.   Yes.

Q.   And what is the purpose of this email that's sent by you?

A.   Yes.  It's an email that I forwarded to the faculty members in my department informing them of information that's made available by the Harvard International Office.

Q.   Okay.  And it's --

A.   Actually, I'm sorry.  It was actually, the thing that I

forwarded was written by our graduate school, but most of the resources point to the HIO, the Harvard International Office.

Q. And this was written on March 31, 2025, correct?

A. That is correct.

Q. And why did you send this email to the faculty members of your department?

A. Because, unfortunately, during the semester, the past semester, spring of 2025, information wasn't widely shared between different elements of our administration, and so the graduate school might sometimes send things just to the chair of the department, just to the director of graduate studies, even though the information would be very helpful to any faculty member who advised graduate students, for instance.

So the purpose of this email was to forward some of the information that I received to make sure that faculty members in my department had access to the information as well.

Q. And when you wrote this, you intended that they distributed it to their students, the recipients of these emails -- the recipients of these emails; is that right?

A. I did not intend for them to forward the email to the students. I intended for them to make use of the resources that were in the email that I forwarded.

MR. KANELLIS: Can we pull up Exhibit 172, please.

Let the record reflect the witness is being shown Exhibit 172, it's in evidence, from Bernhard Nickel, Subject:

JA615

Additional Conversation on April 2, 2025.

Q. Do you see, did you have an opportunity to review this document, sir?

A. I did.

Q. And what's the purpose of this document that you sent on April 2, 2025?

A. It's an invitation to the current graduate students but also prospective graduate students. So this was written at a time when students who had been offered admission to our Ph.D. program were on campus for a campus visit to determine if Harvard would be a good fit for them.

And during that time, I invited both the current grads and the prospective grads who were on campus to attend a conversation that I would facilitate but where they would be able to ask me questions but also talk to each other.

Q. Did you end up having such a conversation you've just described?

A. I did.

Q. You did. And when was that?

A. At the time that I indicated in the email, so whenever the following Thursday, I guess that would be April 3, at 5:00 p.m.

Q. Did you instruct any of the recipients of this email not to share this email --

A. No.

Q. -- with third parties?

A.   I did not.

Q.   So you knew it was a possibility that this email also could be shared with the public, correct?

A.   You know, it's a possibility that any email that I write could be shared.

Q.   Thank you.

And that email is warning of threats of the Trump administration, correct?

A.   I don't think that it's a warning.  It's a chance to discuss attacks and threats, yes.

MR. KANELLIS:  Apologize for doing this.  Can we confirm that this has not been admitted?  Our paralegal is printing documents, so we have to rely on this.  I just want to make sure.

While, we're waiting for that confirmation, may I approach, Your Honor, to facilitate things?

THE COURT:  You may.

MR. KANELLIS:  Professor Nickel, let the record reflect, is being handed what has been marked as for identification as HC, and we will confirm whether this has been admitted into evidence in just a moment.

MR. BIALE:  Your Honor, I'm being told by my expert team here that it's in evidence as Exhibit 79.

THE COURT:  Exhibit 79.

MR. KANELLIS:  Yes, sir.  So the document you're

reading --

THE COURT:  HC is in evidence, Exhibit 79.

BY MR. KANELLIS:

Q.   Professor Nickel, have you had an opportunity to review this document?

A.   Yes.

Q.   And this document discusses that you are facing serious threats as a community.  That's in the second paragraph, correct?

A.   That is correct.

Q.   And this document was written to whom; what groups are identified in the To and CC lines?

A.   So in the To lines, it is the graduate students in the philosophy department and our undergraduate majors at Harvard, they're called concentrators, which is the list is called "conc" for concentrators.  The CC is the list of faculty members of the department.

Q.   About how many recipients are on all of these lists combined, if you can estimate it?

A.   Maybe about 200.

Q.   200 recipients of this email?

A.   Yes.

Q.   And this email warns -- strike that.

And this email is very critical of the Trump administration.  Fair statement?

JA618

A.   It's critical of the administration, yes.

Q.   So all of these emails that we've discussed were written after the Trump administration took office in 2025, correct?

A.   Yes, I believe so.  I'm sorry, you've shown me several emails.  I had to think about it for a while.

Q.   You discussed how, after the attacks of October 7 in 2023, you were horrified by the Hamas attacks?

A.   Yes.

Q.   And did you publicize in any respect the fact that you were troubled by the Hamas attacks?

A.   Publicize?

Q.   Did you make public your views that you were troubled by the Hamas attacks?

A.   In the media?

Q.   In any respect.

A.   I sent emails to the philosophy department.

Q.   Okay.  Now, you also indicated that there was an encampment on Harvard campus in 2024 that you attended.  Do you remember that?

A.   Yes, I remember.

Q.   Did you publicly announce your attendance at this?

A.   No.

Q.   Okay, you kept that private.

     And to your knowledge, was anyone from the federal government monitoring that encampment?

JA619

A.   To my knowledge, no.

Q.   Okay.  You wanted to show your sympathy and support for protesters, right?

A.   Yes.

Q.   Okay.  And with respect to that sympathy and support for protesters, did you publicize that?  Did you make that sympathy public?

A.   I believe that I signed on to some public letters that could be construed as making -- as expressing that kind of sympathy and support.

Q.   And is it your concern that your signature on those public letters would cause the Trump administration to target you for deportation?

A.   Yes, it's among the causes.

Q.   You indicated that in response to the arrests of Mr. Khalil and Ms. Ozturk, it scared you.  Is that a fair summary of your reaction to that, those arrests?

A.   Yes.

Q.   Now, just to be clear, you didn't work for the United States Government; you've never worked for the United States Government, right?

A.   That is correct.

Q.   And so you are unable to say with certainty that the arrests were for a reason other than the political speech of those individuals.  Fair statement?

MR. BIALE: Objection.

THE COURT: If he understands that. In other words, here is how I understand it, which I think is a proper question.

So far as you know, and you formed the opinion that the arrest of these two individuals named were for their expression of political beliefs. That's what you thought; is that right?

THE WITNESS: Yes, that's right.

THE COURT: And that was your question?

MR. KANELLIS: Yes.

THE COURT: You go ahead, feel free.

MR. KANELLIS: Thank you, sir.

BY MR. KANELLIS:

Q. You indicated that you watched a video, correct?

A. Yes.

Q. And the video was of the arrest of Ms. Ozturk?

A. That is correct.

Q. Okay. Had you ever seen anyone arrested before?

A. Have I seen -- no.

Q. Okay. Do you have any basis for an opinion that the arrest of Ms. Ozturk, based upon your observation, was contrary to law enforcement practices in the federal government?

MR. BIALE: Objection.

THE COURT: Sustained on this foundation. We may get

into those practices, but his opinion neither adds nor detracts anything because I don't know what are the practices.

Q. Do you have any basis for an understanding of what federal law enforcement practices are with respect to arrests?

A. No.

Q. You indicated that you attended a protest in the yard that was sponsored by AAUP. Do you remember that testimony?

A. I do, I do.

Q. By "the yard," what is the yard?

A. It's part of the grounds of Harvard College.

Q. Okay. And that was a public protest, correct?

A. That is correct.

Q. Was that the only protest that was sponsored by AAUP to your knowledge?

MR. BIALE: Objection. If we can get a more specific timeframe.

THE COURT: I think that's fair, but he may press the question.

MR. KANELLIS: Certainly. I can fix it, Your Honor. Not a problem.

Q. In the last year, are you aware of any other protests other than this one that were sponsored by AAUP at Harvard?

A. I don't recall.

Q. You don't know of any?

A. I don't recall.

Q.   So the only protest that you're aware of that was sponsored by AAUP was done this year in 2025, correct?

MR. BIALE:  Objection.

THE COURT:  No.  He can have it.

A.   The only one that I recall.

Q.   And that was after the Trump administration was already in power, correct?

A.   That is correct.

Q.   And you attended that public protest, didn't you?

A.   I did.

Q.   And you were aware that other people could see you attending that protest; isn't that right?

A.   Yes.

Q.   I'd like to talk about, you said you had feelings in reaction to what you interpret as the ideological deportation policy.  And I want to ask you about how you felt.  Did you have anxiety?

THE COURT:  I guess I don't understand.  They explored this, and of course you may.  You're saying when he had what he conceived of as that policy in mind, did he have anxiety.  Is that your question?

MR. KANELLIS:  Yes, sir.

THE COURT:  And you may answer it.

A.   Yes.

Q.   You had anxiety.  You're a philosophy professor, correct?

JA623

A.   Yes.

Q.   Okay.  And you know what Kierkegaard said about anxiety, right?

A.   Actually, I don't.

Q.   You don't?

A.   I'm not that kind of philosopher.

Q.   Angst ist der Schwindel der Freiheit.  Anxiety is the dizziness --

THE COURT:  Perhaps more to the point, I don't know what --

MR. KANELLIS:  I'll say it in English.

THE COURT:  But I'm open to be instructed.

MR. KANELLIS:  I can ask, it's very easy, Your Honor.

Q.   Angst ist der Schwindel der Freiheit.  That means anxiety is the dizziness of freedom.  Did I translate that correctly?

A.   I don't even speak Danish, you know.  So to the extent that's a German translation of Danish and into English, close enough.

Q.   Close enough.  Thank you.

Your German is obviously better than mine.  Let me ask you, do you disagree with that sentiment?

MR. BIALE:  Objection.

THE COURT:  No.  I'm going to let him have it.

MR. BIALE:  Okay.

THE COURT:  Do you agree?

THE WITNESS: I don't even know what that means.

BY MR. KANELLIS:

Q. Fair enough. In the 30 years that you've been in the United States, have you ever been contacted by the federal government about political views that you've expressed?

A. No.

Q. And in the 30 years that you've been in the United States, has anyone at the federal government expressed to you that they have been monitoring political speech that you've engaged in?

A. No.

Q. Since November of 2025, have you received any communication in any form from anyone in the government regarding your political participation?

A. I'm sorry, did you say November of '25?

Q. Since November of 2024, thank you. I'll re-ask.

Since November of 2024, have you received any communication from anyone in the government relating to political speech that you've engaged in?

A. No.

Q. And since November of 2025, have you received any indication or suggestion that the government has been monitoring your political speech?

A. I'm sorry, I think you asked me about November '25 again.

Q. I should fix that, shouldn't I?

Since November of 2024, have you received any indication

or communication that the government has been monitoring your political speech?

MR. BIALE: Objection. Compound question.

THE COURT: Not really. Overruled. You may answer.

A. No.

MR. KANELLIS: We tender the witness.

THE COURT: Anything further?

MR. BIALE: Brief redirect.

THE COURT: You may.

REDIRECT EXAMINATION BY MR. BIALE:

Q. Professor Nickel, you were asked a number of questions on cross-examination about how your feelings and actions had changed since -- I believe the question was since the Trump administration came to power.

To be clear, what is the event that you discussed on your direct testimony that you said is the most critical that's changed your behavior and feelings?

A. It's the arrest of Ms. Ozturk.

Q. And when did that occur, approximately?

A. I believe it was the end of March.

Q. Now, and as to that, you were also asked about a protest that you attended on Harvard Yard that was organized by AAUP?

A. That is correct.

Q. Did that occur prior to the arrest of Ms. Ozturk?

A. Yes.

Q.   Now, you were shown a number of emails that you sent to graduate students in the philosophy department, right?

A.   Yes.

Q.   And to your fellow faculty members in the philosophy department?

A.   Yes.

Q.   How many faculty members are there in the philosophy department?

A.   About 25.

Q.   And do you know them all personally?

A.   Yes.

Q.   Do you know all the graduate students personally?

A.   Yes.

Q.   Did you intend for those emails that you sent to those groups to be shared with third parties, as the question was put to you?

A.   No, I did not.

Q.   Did you anticipate that any of those people who you know who you sent those emails to would share them with third parties?

A.   No.

Q.   Let's bring up Exhibit 171.  You were asked about this document.  And Mr. Kumar, if you can just pull up the part that the witness wrote.

     So you were shown this document and asked some questions

JA627

about this email, right? And I think you testified that you wanted to pass along information for resources such as the legal representation clinic and know your rights resources for faculty who are here on visas or green cards?

A. Yes.

Q. Why did you think it was important for faculty who were here on visas and green cards to be in touch with the legal representation clinic and to know their rights?

A. Because I thought that some of them might be targeted by the administration.

Q. And some of them might be targeted for what?

A. For their political speech, including potentially their pro-Palestine speech.

Q. Now, you were asked questions about any communications that you have received personally from the government regarding -- well, sorry, withdrawn.

You were asked questions about any communications you received from the government. Do you remember that?

A. Yes.

Q. Are you aware of any communications that Harvard University has received from the government?

A. Yes.

Q. Okay. Are you aware that -- well, let me show you what's in evidence as Exhibit 216.

THE COURT: Wait a minute here now. This is redirect,

and I don't think he's opened up any -- there is this investigation and this back and forth between Harvard and the administration, but I don't think that's been opened up.

MR. BIALE: Your Honor, let me ask it this way.

Q. You were shown some emails that you sent to the philosophy department that referenced specific threats to Harvard. Do you remember that?

A. Yes.

Q. Okay. And did you feel more vulnerable as a noncitizen who had spoken out about pro-Palestine issues who was also a professor at Harvard?

MR. KANELLIS: Objection, leading, Your Honor.

THE COURT: Sustained on that ground. How did that make you feel? Look, it's not a game, but following the rules, he's correct. So he sets up the situation. You're a long-time green card holder, lawful permanent resident to the United States. You're also a professor at Harvard. The situation between Harvard and the administration I think is an expansion beyond what anyone's asked you. We're not going there on redirect.

Having that in mind, how do the two events, the two situations make you feel?

THE WITNESS: I'm sorry. The reason I took a moment is because this is very serious, and there was a moment of laughter --

THE COURT: And his question --

A. -- and so I wanted to just go back and --

THE COURT: -- posited two situations. You occupy both, tenured faculty member at Harvard, green card holder.

THE WITNESS: Yes.

THE COURT: But I think it's an appropriate question, if you can answer it.

THE WITNESS: Yes. I felt, as a green card holder, I felt more exposed than simply in my role as not just faculty member but also department chair of a department.

Q. And how about specifically in your role in having those titles at Harvard University?

A. I certainly felt like -- I felt very exposed, and it made me very worried about, for instance, engaging in international travel.

Q. Okay. And you've testified to this, but just tell us why.

A. Because I was concerned that between being department chair and also having been politically active in the ways that I have, I might be identified at the border and either detained or sent back.

MR. BIALE: If I can just have a moment to confer with co-counsel.

THE COURT: Of course you may.

MR. BIALE: No further questions.

THE COURT: Nothing further for this witness?

JA630

MR. KANELLIS:  No, Your Honor.

THE COURT:  You may step down.  Thank you.  Call your next witness.

MR. ABDO:  Good morning, Your Honor.  Alex Abdo for the plaintiffs.  The plaintiffs call Sara Johnson to the stand.

SARA JOHNSON, Sworn

COURTROOM CLERK:  Can you please state your full name and spell it for the record.

THE WITNESS:  Sara Johnson.  S-a-r-a, J-o-h-n-s-o-n.

COURTROOM CLERK:  Thank you.  You may be seated.

DIRECT EXAMINATION BY MR. ABDO:

Q.   Good afternoon, Professor Johnson.  Can you tell us your name for the record.

A.   Sara Johnson.

Q.   And what do you do, Professor Johnson?

A.   I am a professor in the Eliot-Pearson Department of Child Study and Human Development at Tufts University.

THE COURT:  Where do you work at?

THE WITNESS:  Tufts.

THE COURT:  Tufts, thank you.

BY MR. ABDO:

Q.   How long have you had that position at Tufts university?

A.   Since August 2016.

Q.   Are you familiar with someone named Rumeysa Ozturk?

A.   Yes, I am.

JA631

Q.   Who is she?

A.   She's one of my doctoral students.

Q.   How long has she been your student?

A.   She's been my student since January 2023.

Q.   Have you known her since then?

A.   I've actually known her since September of 2020, which is when she started as a student in our doctoral program.

Q.   Is Rumeysa Ozturk your student the same Ms. Ozturk who has been in the news recently?

A.   Yes.

Q.   And what has she been in the news for?

A.   She has been in the news for being detained in Louisiana.

Q.   Have you seen any videos of her detention?

A.   Yes, I have seen the video.

        MR. ABDO:  Mr. Kumar, if you could pull up --

        THE COURT:  Well, "the video," the one we have in evidence here is of her apprehension by ICE.

        THE WITNESS:  Yes.

        THE COURT:  Is that the video?

        THE WITNESS:  That is the video, yes, Your Honor.

        MR. KANELLIS:  Your Honor, just one quick question, a question about relevancy.  I'm not sure why this witness watching a video is relevant to this proceeding.

        THE COURT:  No one said that it was.  I just want to be clear what she's seen.  All right.  We'll see what questions

Mr. Abdo asks.

MR. ABDO: Mr. Kumar, if you wouldn't mind pulling up Exhibit 225. And Your Honor, with your indulgence, I'd like to show the witness about 10 to 15 seconds of the video as the foundation for her testimony.

THE COURT: And what's the relevance of it?

MR. ABDO: The relevance is her identification of Ms. Ozturk in the video. The government has refused --

THE COURT: It's not disputed.

MR. ABDO: The government has refused to stipulate to that, is my understanding, Your Honor.

THE COURT: If they dispute it, I take that as essentially undisputed. Let's go on.

MR. KANELLIS: Your Honor, we can stipulate.

THE COURT: There, there. Trials have a purpose. So stipulated.

MR. ABDO: Thank you, Your Honor.

THE COURT: It is Ms. Ozturk on the video. Now that that is taken care of, go ahead.

MR. ABDO: Thank you, Your Honor.

Q.   Professor Johnson, are you generally familiar with the public writings of the students you advise?

A.   Yes, I am.

Q.   And why is that?

A.   Public writings are one component of the skills that our

doctoral students are required to develop during the program.

Q. And are you generally familiar with Ms. Ozturk's public writings in particular?

A. Yes.

Q. Are you familiar with any op-eds she's written?

A. I'm familiar with one op-ed that she wrote in The Tufts Daily.

MR. KANELLIS: Your Honor, I have to object because I think we're now intruding into the specific facts of matters that may be litigated in District Court.

THE COURT: They may be, but overruled. I've said I'm making no rulings on any of these things. I didn't say I wasn't going to take evidence. I am. Go ahead, go ahead, Mr. Abdo.

MR. ABDO: Thank you, Your Honor.

Q. When did you become aware of Ms. Ozturk's op-ed in The Tufts Daily?

A. In March of 2024.

Q. Do you remember how you became aware of it?

A. I saw it in The Tufts Daily.

Q. Did you look at it at the time?

A. Yes.

Q. I'm going to show you, Professor Johnson, what's been marked as Exhibit AG for identification. Do you recognize this exhibit?

A.   I do.

Q.   What do you recognize it to be?

A.   It looks like the op-ed that Rumeysa was a co-author on that I saw in The Tufts Daily.

        MR. ABDO:  Your Honor, we would offer into evidence Ms. Ozturk's op-ed from the Tufts Daily.

        MR. KANELLIS:  Classic hearsay.

        THE COURT:  He's not offering it for the truth.  He's offering it for the fact of its existence, isn't that correct?

        MR. ABDO:  That's correct, Your Honor.

        THE COURT:  Overruled.  It may be admitted.  It will be exhibit -- so what are we up to now?  226, in evidence.

        (Exhibit 226 admitted into evidence.)

Q.   Professor Johnson, did you ever discuss this op-ed with Ms. Ozturk?

A.   I did.

Q.   And when was that?

A.   That was in March 2025.

Q.   Without yet going into what she told you or what you spoke to her about during that conversation, can you tell us the circumstances of that conversation?

A.   The circumstances of that conversation were when she came to my office for our weekly advising meeting and appeared very upset.

Q.   Can you explain what you mean by, "She appeared very

JA635

upset"?

A.   She had -- her eyes were red.  Her face was puffy.  She was clearly trying to hold back tears with a fistful of Kleenex.

Q.   And what did she say to you at that time?

A.   I said --

MR. KANELLIS:  Objection, calls for hearsay.

THE COURT:  Yes, it does.

MR. ABDO:  Your Honor, it's not offered for the truth of the matter.

THE COURT:  Why is what she said at that time relevant?

MR. ABDO:  It will be relevant to the effect on the witness, Your Honor, for a foundation for what she did next.

MR. KANELLIS:  That turns upon the statement itself.

THE COURT:  It does indeed.  As a result of that conversation, what did you do?

THE WITNESS:  I asked her to come into my office and asked her whether she was okay, and she said no.  And then I asked her if she wanted to talk about it.

THE COURT:  I'll let that stand.

MR. ABDO:  Thank you, Your Honor.

Q.   Professor Johnson, did Ms. Ozturk explain to you why she was upset?

A.   Yes.  She came, it took --

MR. KANELLIS:  Objection, Your Honor.

THE COURT:  He's objecting.  You know, how do you think you can get that in?

MR. ABDO:  Your Honor, this should come in under 803.2 as an excited utterance.  I think Ms. Ozturk was clearly in a state of distress at the moment.

MR. KANELLIS:  Your Honor, an excited --

THE COURT:  Wait a minute.  When I need argument, I'll take the time for it.  Sustained.

MR. KANELLIS:  Thank you.

THE COURT:  No thanks is necessary.  Go ahead.

BY MR. ABDO:

Q.   Professor Johnson, did you come to learn during this conversation with Ms. Ozturk of any basis for why she might be upset?

THE COURT:  Well, you know, I have to follow the rules of evidence here, and now he is objecting to this.  I haven't got a basis for getting into the substance of this conversation.  I mean you no disrespect at all, but this has got them on their feet, so I have to play my bit part here.  Go ahead.

MR. ABDO:  Understood, understood.

THE COURT:  Go ahead.

BY MR. ABDO:

Q.   Professor Johnson, as a result of this conversation, what

JA637

did you do?

A.   As a result of this conversation I looked on the website Canary Mission for Rumeysa's profile.

Q.   And did you read the profile that you saw?

A.   I did.

Q.   Were you previously familiar with the Canary Mission website?

A.   No, I was not.

Q.   Did you come to an understanding of what the website was when you reviewed it?

A.   My understanding is that the website is where the organization posts profiles of individuals who they believe have engaged in antisemitic activity.

Q.   Do you recall what you saw when you reviewed Ms. Ozturk's profile on the website?

          MR. KANELLIS:  Objection, hearsay.

          MR. ABDO:  It's not offered for the truth of the matter, Your Honor, just to demonstrate its existence.

          THE COURT:  Well, am I going to see it?

          MR. ABDO:  Yes, Your Honor.

          THE COURT:  Well, then let's get to it.

          MR. ABDO:  Great.

          Mr. Kumar, if you wouldn't mind pulling up, as you have, Exhibit CZ for identification.

Q.   Professor Johnson, do you recognize this exhibit?

JA638

A.   I do.

Q.   What do you recognize it to be?

A.   This is the profile of Rumeysa on the Canary Mission website.

Q.   And if you wouldn't mind taking a moment to review it. Does it reflect a true and --

THE COURT:  Are you going to offer it?

MR. ABDO:  Momentarily, Your Honor, yes.

Q.   -- true and correct copy of what you saw when you reviewed it shortly after or during your conversation with Ms. Ozturk?

A.   Yes.

MR. ABDO:  Your Honor, we would offer this into evidence, not for the truth of the matter.

MR. KANELLIS:  Objection, to the extent the contents are admitted.  We have no objection to --

THE COURT:  He's offering it not for the truth but for the fact of its existence, which I do deem relevant, so as limited, CZ is admitted, Exhibit 227, as limited.

(Exhibit 227 admitted into evidence.)

MR. ABDO:  Thank you.  No further questions, Your Honor.  Thank you.

THE COURT:  Thank you.  Any questions for this witness?

MR. KANELLIS:  No, Your Honor.

THE COURT:  You may step down and thank you.

Call your next witness.

MR. BIALE:  Your Honor, this is the remote witness, so it will just take a moment.

THE COURT:  I understand and that's fine.

While you're doing that, just to save time, because there is something I was going to do at 2:00, but you keep setting up.  Actually, counsel, it's you that reminded me to do this now.  You made a request about documents that I might turn over to you.  I have a packet of documents, which I'm not going to turn over to you, but I'm going to give copies which I've made to the government.  And while we're only going to take a brief recess tomorrow, if you have any particular objection to these documents, I will hear you during the recess tomorrow.  I have final arguments in another case at 2:00 this afternoon. If we're ready, let's go on.

MS. CONLON:  To be clear, Your Honor, you meant if the government has objections to the court --

THE COURT:  You're not asked to do anything.  I'm giving them, really I'm giving them every chance.  I'm letting them look at what, if I overrule the objections, I will then hand to you at about 10:45, 11:00 tomorrow.

MS. CONLON:  Okay.  Great.  Then I will go to the podium.

THE COURT:  Yes, if we're ready.  Alexandra Conlon for the plaintiffs.

JA640

I did just see our witness a second ago.  Okay.  Ms. Abu El-Haj, are you there?  I think if you speak we may then see you on the screen.

THE WITNESS:  I am, I'm trying to start the video.  There we go.

MS. CONLON:  Are you able to see us, just before you're sworn?  Are you able to see the courtroom and to see the judge?

THE WITNESS:  Yes, I am.

THE COURT:  Let's swear the witness.

NADIA ABU EL-HAJ, sworn

(Witness testifying via teleconference.)

COURTROOM CLERK:  Can you please state your name and spell your last name for the record.

THE WITNESS:  Nadia Abu El-Haj, A-b-u, E-l, apostrophe, H-a-j.

DIRECT EXAMINATION BY MS. CONLON:

Q.   Okay.  Ms. Abu El-Haj, can you hear us clearly on the Zoom link?

A.   Yes, I can.

Q.   And you can see everybody as best you can tell?

A.   Yeah, yes.

Q.   I know you can't see my face, but you can hear my voice; is that right?

A.   Yes.

JA641

Q.   Okay.  So please tell us where you work.

A.   I am a professor at Barnard College and Columbia University.

Q.   Okay.  And you are a professor of what subject?

A.   I am a professor of anthropology, and I am the co-director of the Center for Palestine Studies.

Q.   Staying for a moment with your background, what kind of anthropology do you teach?

A.   I am a sociocultural anthropologist, and I work regionally on the Middle East, specifically on Israel and Palestine, although I've also written a book on the U.S.

Q.   And approximately when did you begin working as an anthropologist on Israel and Palestine?

A.   The late 1980s, when I was in a Ph.D. program.

Q.   Did you do a dissertation on Israel and Palestine?

A.   Yes, I did.

Q.   And what in particular was that about?

A.   The dissertation looked at the practice of archeology, both Biblical archeology and Israeli archeology, in terms of transforming the land of Palestine into the land of Israel and then the consequences for Israeli nationalist ideology.

Q.   Now, you mentioned in addition to your work as a professor that you are a co-director of the Center for Middle East Studies -- or Center for Palestine Studies, rather.

Can you tell us about the Center, please?

JA642

A.   Yes.  The Center was founded I think about 12 years ago by a group of faculty.  I was involved from the beginning.  We wanted to create a space where we could both foster a more serious sort of discussions and scholarship in Palestinian studies.  It is a -- it's a center that is not a teaching center at the university.  So we run programs.  We have a postdoctoral fellowship.  We run some public programs as well as workshops, which are sort of more closed spaces where students and professors get together and discuss the people's work.

Q.   You said that the center is not a teaching center; is that right?  What does that mean?

A.   Well, it means that we do not -- we do not -- we do not offer classes.  At Columbia only institutes offer classes, not centers.

Q.   But the center puts on programming for students; is that right?

A.   Yes, yes.

Q.   Now, what in particular do you do for the Center for Palestine Studies?

A.   I'm the co-director.

Q.   So what does that mean your work entails?

A.   It entails overseeing the programming with my co-director and the administrative director.  I can't remember the exact title.  It means vetting the postdoctoral applications for our

JA643

postdoctoral fellowships, and it means working with other faculty who want to -- who propose events to us that we host and fund.

Q. Are there any faculty affiliated with the Center, other than you?

A. Yes, there are.

Q. About how many people?

A. I'd say maybe 15 to 18. Could be more. I haven't looked in a while, honestly.

Q. Do they all teach in the area or research in the area of Middle East studies?

A. No. Actually, some do and some do not.

Q. And are they all at Columbia?

A. Almost everyone is at Columbia. We have over the years had a few people like poets or unaffiliated scholars who have been affiliated with us. But for the most part it is Columbia faculty and Barnard faculty.

Q. Now, you're testifying remotely. Where are you in this moment testifying from?

A. I'm in Beirut, Lebanon.

Q. And are you a full-time resident of Lebanon?

A. No.

Q. Were you born in Lebanon?

A. I was not. I was born in New York.

Q. So it's fair to say you're a United States citizen?

JA644

A.    Yes, I am.

Q.    Are you in Beirut for work right now?

A.    I'm in Beirut for a combination of personal and work reasons.

Q.    And what is the work you're doing in Beirut?

A.    I am affiliated with the German Orient Institute.  I'm a visiting fellow there, and I'm just writing some essays on the war in Gaza.

Q.    Now, I want to turn to AAUP.  Are you familiar with the American Association of University Professors?

A.    Yes, I am.

Q.    How are you familiar with AAUP?

A.    Well, I've known about AAUP for decades, and I joined about a year and a half ago when the chapter at Columbia, which isn't that old, really expanded a year and a half ago as part of faculty attempt to push back against the administration, the Columbia administration.  Sorry.

Q.    You anticipated exactly what I was going to ask.  What made you personally decide to join the AAUP at that time?

A.    It felt both like the university administration was cracking down on issues that are central to the AAUP, such as academic freedom and faculty governance, and it was also because there had been Congressional hearings in December of 2023.  And then we knew that the Columbia president was going to be testifying as well.

JA645

It also felt like there was increasing pressure from Congress on the administration to crack down on faculty governance and academic freedom.  So it felt like the best way to counter the administration as a collective faculty.

Q.   Do you pay dues to AAUP?

A.   I do.

Q.   Are you familiar with the Middle Eastern Studies Association?

A.   Yes.

Q.   I'm going to call it MESA.  Are you a member of MESA?

A.   I am.

Q.   And how long have you been a member?

A.   So this round, it's going on two years.  I've been a member off and on for, you know, through my career.

Q.   What is your understanding of what MESA does, what its purpose is?

A.   Well, MESA is the sort of major -- is the major and most important organization of Middle East scholars both in the U.S. and beyond.  It brings together faculty.  I mean, there's an annual meeting which is its biggest event, which is an important event for faculty, who get to know each other and meet each other and participate in intellectual conversations, but also quite centrally for graduate students who are just entering the field, and that's where they initially present their work and also begin to get to know members of the field,

JA646

including fellow graduate students and, quite importantly, established faculty members as well.

Q. Have you attended MESA's annual meeting before?

A. I have.

Q. And do you have an understanding of the purpose of MESA apart from the sort of networking? And if you don't, that's fine.

A. Well, I mean, it's not just a networking thing. It's a place where -- I mean, it's really, it's an intellectual hub for people who work on the Middle East as well.

Q. Now, when you say "an intellectual hub for work on the Middle East," I am silly asking, but I just want to confirm that relates to scholarship related to Israel and Palestine?

A. Yes, absolutely.

Q. Based on your experience as a member of MESA, are you aware of whether -- well, withdrawn.

How would you describe MESA's membership generally in terms of where the other members are from?

MR. KANELLIS: Objection, Your Honor. Relevancy. This is a U.S. citizen.

THE COURT: Yes, well, she is. I'm not -- why is that relevant?

MS. CONLON: Well, Your Honor, MESA is the plaintiff. This is a witness. So we're trying to establish that MESA's membership, who we represent, include both citizens and

JA647

noncitizens and the extent to which they have both been chilled as a result of the policy that we challenge.

THE COURT: All right. I understood really from the motion to dismiss that MESA had both citizen and noncitizen members indeed. I understood that the other plaintiff associations in the different universities have both citizen and noncitizen members. This court reaches the standing of the noncitizen members, not further. But I'm going to sustain that objection, and I'll give you some brief time with this witness. Go ahead.

BY MS. CONLON:

Q. Do you engage, Ms. Abu El-Haj, with noncitizen members in MESA in your work with MESA?

A. I do. I mean, when I've participated in the -- for example, the conference I was at in the fall of 2023, I was on a panel with noncitizen members.

Q. And to your understanding -- withdrawn.

Can you describe generally whether, are the other members of MESA, for example, only from U.S. universities, or are you aware of members from international universities?

A. I am aware of members from international universities, yes.

Q. Now, just a moment. Turning back for a moment to the Center For Palestine Studies, you described programming and events that the Center puts on generally. Did there come a

JA648

time this year where the Center's approach to its work changed?

A.   Yes.

Q.   And around when did that happen?

A.   It happened around mid March after Mahmoud Khalil's arrest.

Q.   Did it only begin to happen in March?

A.   We were aware of the rhetoric coming out of the newly inaugurated Trump administration that was threatening to deport student activists who were protesting on behalf of Palestine and against the war in Gaza.  But we did not -- so that was in the background, but we weren't sure what was going to happen with that, and it was sort of on our radar, but it didn't affect what we did until after first Ranjani Srinivasan -- I think that's her last name -- who was a graduate student in the graduate school of architecture at Columbia went into hiding because she was fleeing an ICE detention -- or ICE was trying to detain her, and then the following day Mahmoud Khalil's arrest, and then things changed.

Q.   You mentioned a student who had gone into hiding.  Can you say their name again for the record?

A.   Ranjani Srinivasan I think is her last name.  I do not know her.

          MR. KANELLIS:  Objection, Your Honor.  Now we are going beyond the five individuals --

          THE COURT:  We may.  That was the discovery order.

She may inquire.

BY MS. CONLON:

Q.   And what was your understanding as to why Ranjani Srinivasan went into hiding at the time?

A.   ICE agents knocked on the door of her apartment in a Columbia graduate student housing building.  She was not home at the time.  Her roommate told her --

MR. KANELLIS:  Objection, foundation.

THE COURT:  It's not timely, but I'll entertain it at this time.  It was all hearsay, but we'll let the first part stand.

Go ahead, Ms. Conlon.

MS. CONLON:  Your Honor, this is for the effect on the listener.  We anticipate that Ms. Abu El-Haj will testify about the effect of these ICE actions on campus on the noncitizen students she teaches, noncitizen colleagues --

THE COURT:  Well, then get to it.

MS. CONLON:  We are trying to do so expeditiously, Your Honor.

THE COURT:  I'm not troubled with the timing because I've set my time limits.  When they're up, they're up.  And I want you to try your case.  But as I've tried to follow, I have to follow the rules of evidence.

Now, you can get in effects on a relevant community.  So I -- well, I don't give advisory opinions, but then let's

JA650

get to it.

MS. CONLON: Your Honor, I apologize for interrupting. Just to be clear, I want to make clear to this court that it's our understanding and view that the relevant community is not only the noncitizens but also, as Your Honor may recall, we have advanced a theory of standing for citizens who have been prevented from affiliating with and hearing from noncitizens, and so that is important --

THE COURT: You have.

MS. CONLON: Yes.

THE COURT: And respectfully, I have rejected it, saying that's a step too far. And I'm not taking -- they don't have standing. Citizens don't have standing. I could be in error, and I've been known to be in error, but the record is clear, and I'm not spending trial time on matters as to which I've got to make rulings and findings. So let's go to noncitizens' concerns about these events. She's in a position to know.

MS. CONLON: Your Honor, just to close the loop on this, it was our understanding from your order that we were permitted to advance this theory through the testimony of one or two people and that Your Honor had not foreclosed this theory of standing, though Your Honor had found that we had sufficiently alleged standing on another basis, so we are doing as we suggested that we ought to do and that we understood the

JA651

court was open to us doing, and this is the only person through which we are trying to do that, just to be transparent about the effort here.

THE COURT: I always appreciate transparency, but I've now made my ruling. If I have ruled erroneously, a higher court can correct me.

Now, let's find out if she has anything to say about the feelings of noncitizens who would have standing to personally be concerned about actions of these official defendants and those who work for them.

BY MS. CONLON:

Q. Okay. Ms. Abu El-Haj, we were just speaking about Ms. Srinivasan. You mentioned that things changed as well after Mahmoud Khalil's arrest, so I want to turn to that.

Are you personally familiar with Mr. Khalil?

A. Yes, I am.

Q. And how do you know him?

A. I know him as, I got to know him as a participant in the student activist movement, particularly in the academic year '23-'24 and because he emerged as a leader within that movement. And, yeah, I just got to know him in that capacity.

Q. When you say the student activist movement in '23 or '24, you are referring to the student activist movement regarding the rights of Palestinians; is that correct?

A. Correct.

Q. And you said he emerged as a leader. What do you mean by that? What did you observe of him?

A. He was someone -- I mean, a leader not in an organizational sense. He is a graduate student, so he is somewhat older than many of the students who participated, and he really was someone a lot of the undergraduates, I think, particularly the Palestinian undergraduates, turned to and relied on for emotional support.

He also was one of the handful of people who were willing to be public and make statements, talk to the press without being masked. And he was one -- he was the key negotiator between the administration, Columbia administration and the students during the encampment.

Q. Turning to the statements you mentioned, are you familiar with any of the public statements he made about the protests at Columbia?

A. Yes. I mean, I can't quote them verbatim, but yes.

Q. Did you see him speak publicly?

A. I saw him give a few -- I mean, I saw him when he was being interviewed by the press a few times during the encampment.

Q. And you also mentioned his role as a negotiator with the school. What was it that he was negotiating?

A. He was negotiating a peaceful end to the encampment. He was trying to reach, to find an agreement that would bring the

students and the administration close enough together that the students would voluntarily leave the encampment before the university called the police in for the second time.

Q. You've mentioned the encampment. Did you observe the encampment yourself in person at any point?

A. Yes. I spent a lot of time there while it was ongoing.

Q. Did you have an opportunity to observe Mr. Khalil in person at any encampment or protest at Columbia?

A. Yes.

Q. Now, what did you see about his conduct on campus when you observed him?

A. I found him very, very thoughtful, very calm and really, you know, politically savvy in many ways. He was certainly not an agitating presence in any way. He was never arrested. He never broke any rules. I mean, he never committed any crimes or was accused of any crimes. And I found him a really thoughtful person who was quite mature for someone who was his age, which at the time was 29.

Q. And did you have an understanding of his citizenship status?

A. I knew he was not a citizen. I'm not sure, I don't recall if I knew he had green card status at least last spring.

Q. Now, you said that his arrest changed things. What did you observe about how Mr. Khalil's arrest affected first the students that you teach and interact with at Columbia?

JA654

A.    I mean, students were really terrified.  Mahmoud had been out front, again, he never masked up, even after other students did.  And I want to be clear, students were masking up because they were being doxed really badly initially and then now increasingly because they're worried about being identified by the federal government.

But he never did because he never thought he was at risk.  He never said anything violent or promoted violence.  And he really understood himself, and the other students did too, that his speech would be protected because he had a green card.  He was --

MR. KANELLIS:  Objection.

A.    -- not a U.S. citizen, but he had a green card.

MR. KANELLIS:  Objection, foundation, hearsay.

THE COURT:  I will strike so much -- that's not for the truth.  And further, I will strike her statement because and what follows as to why they were afraid, but I will let stand the business about they were already masking up and they, in her words, were terrified.  I'll let that stand.  Go ahead, Ms. Conlon.

BY MS. CONLON:

Q.    You used the word "doxed."  What does doxed mean to you?

A.    Students were, their private phone numbers and addresses were listed online.  They were threatened.  I had one student, non-U.S. citizen who had a note slipped under her door that

said "We know where you live.  Sleep with one eye open."  Some were accused of being antisemitic and pro-Hamas supporters and the blow-back was often a lot of threatening emails and sometimes, you know, more than that.

MR. KANELLIS:  Objection, Your Honor.  Again foundation.

THE COURT:  Well, it wasn't timely.  I'm going to let it stand.

Q.   Did you have direct conversations with any noncitizen students after Mr. Khalil was arrested?

A.   Yes, I did.

Q.   Is that how you learned about what you've testified to just now with respect to their fears?

A.   Yes.

Q.   Did noncitizen students convey fears apart from being doxed after Mr. Khalil's arrest by ICE?

A.   Yes.

Q.   What other fears did they convey to you?

A.   Fears of being detained.

Q.   Detained by who?

A.   By ICE.

THE COURT:  All right.  It's 1:00.  I have a meeting, and so we'll stop at this time.  We'll start promptly at 9:00 a.m.

Professor, I apologize for the time differences, but I

JA656

appreciate your testimony, and we will resume at 9:00 a.m. tomorrow morning.

Total elapsed time out of the four and a half days available to each side, the plaintiffs have used up one day, one hour, five minutes.  The defense has used up two hours, 25 minutes.  Tomorrow we will stop at noon.  We'll recess.

(Adjourned, 12:58 p.m.)

JA657

CERTIFICATE OF OFFICIAL REPORTER


I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 8th day of July, 2025.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

JA658

                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS

                                         No. 1:25-cv-10685-WGY
                                         Volume 1, Pages 1 - 76


AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants


                         ********


                     BENCH TRIAL DAY 3



             BEFORE THE HONORABLE WILLIAM G. YOUNG
                UNITED STATES DISTRICT JUDGE



                    United States District Court
                    District of Massachusetts (Boston.)
                    One Courthouse Way
                    Boston, Massachusetts 02210
                    July 9, 2025



                         ********



        Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                    Official Court Reporter
                    United States District Court
                    One Courthouse Way
                    Boston, Massachusetts  02210
                    mortellite@gmail.com

JA659

A P P E A R A N C E S

RAMYA KRISHNAN
XIANGNONG WANG
    Knight First Amendment Institute at Columbia
    University
    475 Riverside Drive, Suite 302
    New York, NY 10115
    (646) 745-8500
    Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
    Sher Tremonte LLP
    90 Broad Street, 23rd Floor
    New York, NY 10004
    (212) 540-0675
    Cgans@shertremonte.com
    For Plaintiffs


ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
    DOJ-Civ
    P.O. 878
    Ben Franklin Station
    Washington, DC 20044
    (202) 616-9123
    Ethan.kanter@usdoj.gov
and
SHAWNA YEN
    United States Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    Shawna.yen@usdoj.gov
    (617) 748-3100
    For Defendants

JA660

INDEX

WITNESS                                                          PAGE

ABU EL-HAJ

   Direct Examination By Mr. Wang (continued)            5
   Cross-Examination By Mr. Kanellis                     36

PETER HATCH

   Direct Examination By Ms. Conlon                      42

E X H I B I T S

Exhibit No.                      Received

  228                            16

  229                            32

  230                            33

  231                            34

JA661

P R O C E E D I N G S

(Begins, 9:04 a.m.)

THE COURT:  Have we got the witness on the video?  But before we do, forgive me, I should say that I've allowed internet access to these proceedings.  It's appropriate therefore to say that if you are accessing these proceedings on the internet, the rules of court remain in full force and effect, which means there's no taping, streaming, rebroadcasts, screenshots or other transcription of these proceedings, and it is important that you keep your microphone muted.  If you do not and interrupt the proceedings, we will turn you off.

Now, with that stated, counsel, are we ready to continue?

MR. WANG:  Your Honor, one brief preliminary matter before we recall Ms. Abu El-Haj.  Due to witness scheduling, we reached out to the government yesterday to see if they would be okay with me continuing the questioning of the witness in lieu of my colleague, Ms. Conlon.  They consented on the understanding that we would extend them the same courtesy, and if you are amenable to it --

THE COURT:  I am.

MR. WANG:  Great.  Thank you.

THE COURT:  But state your name again.

MR. WANG:  Yes.  That's Xiangnong Wang for the plaintiffs, Your Honor.

JA662

THE COURT: Yes, Mr. Wang. Forgive me, but there's a large number of you all.

MR. WANG: Absolutely, understood.

THE COURT: I see the witness, and if the clerk could remind the witness that she remains under oath.

COURTROOM CLERK: I remind you that you remain under oath. Do you understand?

THE WITNESS: Yes, I do.

THE COURT: Thank you, Professor. Mr. Wang, you may continue.

DIRECT EXAMINATION BY MR. WANG:

Q. Good morning, or perhaps afternoon, Professor Abu El-Haj. Thank you again for joining us today.

So yesterday you began to talk about Mahmoud Khalil, and you mentioned that you heard Mr. Khalil speak on a number of occasions; is that correct?

A. Yes, that's correct.

Q. To the best of your recollection, where have you heard him speak?

A. I've heard him speak, he gave -- I've heard him speak to the press, press conferences, some at the encampment and one, definitely one after the raid of Hamilton Hall when the encampment was shut down.

Q. And the encampment you're speaking of, just to be clear, is the encampment at Columbia University between 2023 and 2024;

JA663

is that correct?

A.   Correct, in April 2024.

Q.   Have you heard Mr. Khalil speak publicly about Israel and Palestine?

A.   Yes.

Q.   What do you believe is Mr. Khalil's general message in his speech about Israel and Palestine?

MR. KANELLIS:  Objection.  Calls for speculation.

THE COURT:  Why, even if not offered for the truth, why is it relevant?

MR. WANG:  Well, I'm asking the witness to, from her personal knowledge of speaking with Mr. Khalil --

THE COURT:  No, no.  I'm following.

MR. WANG:  Right.  Just about --

THE COURT:  If the speech itself is relevant, I understand.  But she's already said about his maturity and about his negotiating skills, and based upon the record, as I understand it, he has made statements that are -- I must choose my words with care -- pro-Palestinian.

I don't know that anyone -- I don't know how we're going to get at relevant evidence here.  That's my problem with the question.  Because if they say he's speaking to recruit recruits for Hamas, a terrorist organization, but I have no evidence that he ever did that.  And so her hearing him talk on some other occasion about something else, it doesn't help me.

JA664

MR. WANG:  Understood, Your Honor.

THE COURT:  Very well.  Then ask another question.

MR. WANG:  Understood, understood.

THE COURT:  Sustained.

Q.   Have you ever heard Mr. Khalil espouse violence?

A.   No.

Q.   Have you ever seen Mr. Khalil engage in violence?

A.   No, I have not.

Q.   Have you heard him threaten another student?

A.   No.

Q.   Have you heard him threaten anyone else?

A.   I have not, no.

Q.   Have you ever seen Mr. Khalil harass another student?

A.   No.

Q.   Have you seen Mr. Khalil engage in antisemitic behavior?

A.   I have not.

Q.   All right.  I want to take you back to the day of Mr. Khalil's arrest.

THE COURT:  Excuse me.  And let me ask, Professor, because definitions are important here, when you answered that you've never seen him engaged in antisemitic behavior, can you define, how do you use the term "antisemitic behavior," if you can tell me.

THE WITNESS:  Yes.  So I understand antisemitic behavior and speech to be speech and behavior that targets

JA665

individuals on the basis of their Jewish identity. Mahmoud Khalil's speech was always speech about the Israeli state, the critical speech about the Israeli state, about its conduct in Gaza, which you referred to -- the genocide in Gaza and sometimes he refers to it as the atrocities and about the inequality that the Zionist Project as a political ideology and as the governing institutions of the Israeli state, the inequality that that produces, both the disenfranchisement that has produced for Palestinians who were forced out or in the occupied territories and the inequality that it produces for citizens of the state who are Palestinian. So it never was reference to a non-state project.

THE COURT: One other term you use that it will be helpful if you define it for me, you said he spoke about the Zionist Project. What does that mean, in your mind?

THE WITNESS: Well, the Zionist Project was, is, the project to have -- is the project of a Jewish state. In other words in the structure of law -- sorry?

THE COURT: I shouldn't interrupt, having asked the question and you're right ready to answer it. I want to let the lawyers ask the questions, and I think you've answered mine. I understood what you mean by Zionist Project. They can inquire if they wish. Go ahead, Mr. Wang.

MR. WANG: Thank you very much, Your Honor.

BY MR. WANG:

JA666

Q. So I want to take you back to the day of Mr. Khalil's arrest. When did you first learn of his arrest?

A. I don't remember precisely, but I either learned late at night the Saturday night, if I recall correctly, that he was arrested or first thing in the morning.

Q. And you how did you hear of his arrest?

A. Various students and faculty members reached out. Yeah, that's how I heard.

Q. And what do you remember about how Columbia University's campus felt to you in the days immediately following Mr. Khalil's arrest?

A. Well, I wasn't -- well, actually I was on campus that Sunday. But there was -- it was, I would say the feeling was both shock -- people were quite shocked that he was detained, especially when it became clear on top of everything else that he's a green card holder, and a sort of anxiety and panic about what might happen next.

Q. So Professor Abu El-Haj, you testified yesterday that things changed after Mr. Khalil's arrest. Do you believe that Mr. Khalil's arrest had an impact on the campus speech environment at Columbia?

A. Absolutely.

Q. And what impact do you believe it had?

A. A lot of students who reached out to me were panicked that they -- students who had been publicly critical of the Israeli

JA667

state and the genocide in Gaza reached out to me, people who participated in the demonstrations feeling like they could be very vulnerable to ICE detention.

I do want to say that included students, Palestinian students who are U.S. citizens but not natural born citizens because that was a rhetoric also coming out of Washington. I also definitely have faculty friends who felt like they needed to withdraw a bit from -- withdraw from public speech out of fear of the possibility of their deportation.

Q. And did you observe a change in the student protests at Columbia following Mr. Khalil's arrest?

A. I definitely know that many of the Palestinian and Muslim students withdrew while they were trying to catch their breath and figure out what might happened next. There was a demonstration that was -- actually, it wasn't a demonstration. There was a sit-in, I don't know, a week maybe, I don't remember exactly when, after Mahmoud's detention. And it was organized by JVP, Jewish Voice for Peace and attended really I actually think exclusively by Jewish members of the community because they, as someone articulated it to me, they felt like they were the least likely to be --

MR. KANELLIS: Objection, Your Honor. This is hearsay.

THE COURT: I'll stop it there, but what she's testified to may stand.

JA668

MR. WANG: Thank you, Your Honor.

Q. I want to ask you about another individual now. Are you familiar with Mohsen Mahdawi?

A. Yes, I am.

Q. And how do you know Mr. Mahdawi?

A. I got to know him in the previous academic year, '23-'24, as part of the Palestinian student groups and political movement.

Q. And to your knowledge did Mr. Mahdawi have a role in the student protests at Columbia from 2023 to 2024 that you mentioned yesterday?

A. He did. He was definitely one of the more vocal public voices about the student movements, particularly in the first five or six months. He was another person who spoke out publicly without ever masking up.

I personally did not see him at the encampment, so I'm not sure he was there, but he was definitely at many of the activities before that.

Q. And what was his role in these campus protests?

A. He often -- well, first of all, he was a head of the Palestinian -- there's a Palestinian student group called, I think Dawb -- I can't even remember. And he was the president of that, if I recall correctly. And basically he was often a person who spoke at the demonstrations and rallies.

Q. Have you heard Mr. Mahdawi speak publicly about Israel and

Palestine?

A. Yes, I have.

Q. And do you, in your mind is there something distinctive about the viewpoints that Mr. Mahdawi presented when speaking about Israel and Palestine?

MR. KANELLIS: Objection, Your Honor.

THE COURT: Well, I'm going to receive the answer since it's jury-waived, subject to your objection and a motion to strike. You may answer, Professor.

A. Yeah. In some ways there is something distinctive about him. He really speaks in the language of restorative justice. And he speaks in the language of sort of liberty, a very American language of liberty and democracy. He really sees himself as influenced by Martin Luther King and the nature of a nonviolent resistance and restorative justice. That's his language.

MR. KANELLIS: Your Honor, move to strike.

THE COURT: Move to strike? The motion to strike is denied. I'm asking accepting that that's what she heard of him, heard or what she got from what he said. Go ahead.

MR. WANG: Thank you, Your Honor.

Q. Did you ever recall seeing Mr. Mahdawi speak on Columbia's campus?

A. Yes, I did, I do.

Q. How many times do you remember him speaking on Columbia's

JA670

campus?

A.    I don't know.  I mean, probably four or five times maybe.

Q.    Are there any events at Columbia in which he spoke that you remember specifically?

A.    I remember him speaking at what was organized as a vigil, I would say it was November sometime, 2023.

Q.    So I'm going to show you a video that's been pre-marked as Exhibit DJ for identification purposes.  Sorry, DJ1, I'm sorry.

        MR. WANG:  Mr. Kumar, would you please pull up that video.

A.    Okay.  I am really sorry, but I seem to be -- oh, I found it.  Never mind.  Okay.  Sorry.  I found it.

Q.    Professor Abu El-Haj, do you see the --

A.    I see a document, yeah.

Q.    -- the screen?

A.    Okay, yes.

        MR. WANG:  Do we have that up here in court?

        THE WITNESS:  Yes, I see it.

        MR. WANG:  Your Honor, would you be amenable to us playing just a few seconds of this video clip?

        THE COURT:  Well, I haven't heard any objection, so go ahead.

        MR. KANELLIS:  Well, I'm just going to object, Your Honor, to relevancy, unless she's going to lay -- if she's going to authenticate this.  If she took the video, that's one

thing. Otherwise, relevancy.

THE COURT: Well, it's not necessary that she have taken it, so we can all stand a few seconds. The time counts against them. Go ahead.

MR. WANG: Thank you, Your Honor.

(Video played.)

THE COURT: You move to strike it.

MR. KANELLIS: Yes, Your Honor. It's not relevant.

THE COURT: No, I don't think it's relevant. You're right to say it, but I'll let it stand.

MR. WANG: Thank you, and can we have -- thank you very much, Ms. Belmont.

Q. Do you recognize what the video clip you just watched depicts?

A. It is a video of the -- sorry, I've lost you -- of the vigil that I mentioned before.

THE COURT: And who is speaking, ma'am, if you know of your own knowledge?

THE WITNESS: That is Mohsen Mahdawi.

THE COURT: Thank you.

Q. Just for the record, you were in attendance at the event that was depicted; is that correct?

A. I was sitting in the background with some faculty members, watching the event.

Q. And to the best of your knowledge, is the video an

JA672

accurate representation of the event where Mr. Mahdawi spoke?

A.   Yes.

MR. WANG:  Your Honor, we offer Exhibit DJ1.

THE COURT:  Why is this relevant?

MR. WANG:  Your Honor, it's relevant to show Mr. Mahdawi's protected speech.

THE COURT:  Well, I think that actually I have some question about whether it's protected speech in the sense that in one connotation of the cry "From the river to the sea" is in fact a call for genocide.  I don't adopt that or reject it, but there's that possibility.  Your point is that you've now authenticated that this is speech anyway --

MR. WANG:  That's correct.

THE COURT:  -- by what has been characterized as a target subject.  Why is that relevant here?  That's one snippet of speech.  How long is the whole video?

MR. WANG:  The whole video I think goes on for another maybe couple of minutes.  One minute 20 seconds.  Thank you.

THE COURT:  So what's the relevance?

MR. WANG:  So the relevance, Your Honor, is that it is an example of speech that Mr. Mahdawi, one of the targeted individuals, has engaged in, and part of plaintiffs' argument is that the policy -- that the government has engaged in a retaliatory policy that may involve showing that our targeted individuals engaged in protected speech, again, understanding

that the protected part of that is a legal inquiry, but we believe that --

THE COURT: I'm not saying that it's not entirely protected speech because he was using the subjunctive phrase and was asserting that so-called "they" ignore as he went on atrocities I take it in Gaza.

MR. WANG: Mm-hmm.

THE COURT: So that would seem to be just an example of political speech.

MR. WANG: You're correct, Your Honor, except that the government has cited Mr. Mahdawi's participation in protests as part of Secretary Rubio's determination.

THE COURT: Yes. Well, I don't -- actually, I think it would be best to have a full record here, so I'm going to overrule it. DJ for identification?

MR. WANG: Yes, DJ1. I believe the next exhibit number is Exhibit 228.

THE COURT: I think it is. DJ1 is admitted.

(Exhibit 228 admitted into evidence.)

THE COURT: Now, understand, you're touching on something that is going to recur in this case, and I've said throughout there's a statute here passed by the Congress of the United States. You people don't challenge that statute, and indeed I have doubts whether you have standing to challenge that statute. But you don't challenge it.

JA674

So long as the Secretary of State is following the law as the Congress has passed it, I don't see what I have to say about that, but a complete record is essential.

MR. KANELLIS:  Your Honor, may I, for clarification?

THE COURT:  You may.

MR. KANELLIS:  So I just want to preserve our objections.  This is hearsay.

THE COURT:  It is.  I acknowledge it.

MR. KANELLIS:  And it's not relevant.

THE COURT:  Well, they're not offering it for the truth.  They're offering it for the fact that he spoke, and a competent witness has testified that it is his speech.  So, no, I don't think it's hearsay.

MR. KANELLIS:  For that purpose, Your Honor, then we -- if it's just -- if it's not for his statements but actually for the fact he spoke, we don't with a problem.

THE COURT:  Well, he spoke and it's for, it's an example of his speech.

MR. KANELLIS:  Sure.  That's not a problem.  Just not for the substance.

THE COURT:  But I don't -- that's the line I don't understand.  It is for the substance.

MR. KANELLIS:  No, it's not --

THE COURT:  Suppose in the course of presiding I utter a racial slur.  I'm not quoting from something, but I utter a

JA675

racial slur. Well, that fact of that speech, which is utterly inappropriate from a judicial officer, would be relevant, one imagines, in certain circumstances.

Here is one of the alleged target individuals speaking. He's speaking on a subject of both political interest and arguably a call for antisemitic violence, arguably. I take no position. It seems to me that's relevant.

MR. KANELLIS: No. That's fine, Your Honor. By "substance," I meant the statements that were made therein for the truth. That's what I was referring to.

THE COURT: Oh, that somehow -- I understand.

MR. KANELLIS: Thank you, Your Honor.

THE COURT: We're arguing over how many angels dance on the head of a pin. I do not accept this as evidence of atrocities by anyone in Gaza. Go ahead.

MR. WANG: Your Honor, just two brief clarifications on the colloquy we just had.

THE COURT: I try my best and now we have qualifications or clarifications on the clarifications. Go ahead.

MR. WANG: I'm sorry, Your Honor.

THE COURT: Don't apologize.

MR. WANG: I just wanted to briefly mention that, to be clear, we do challenge the statute that you were just referring to --

THE COURT: Oh, you do?

MR. WANG: -- in the complaint as a technical matter and, you know, as applied --

THE COURT: On constitutional grounds?

MR. WANG: That's right, Your Honor.

THE COURT: Do you think, since you're clarifying things, let me clarify, because I think you have a very high hurdle here, and it's this: When I read the complaint -- and I've read it recognizing this was an issue to begin with, I don't see how your clients who are the people chilled here but who have not come within the ambit of that, you haven't challenged -- you haven't -- I don't know that you have standing to challenge the constitutionality of that statute. And if you think you do, that's something that I really need briefing on.

I've solicited it from the government, and I pause to clarify that I solicit it from you. If you challenge it, fine. I don't know that your clients have standing to challenge it, as the statute has never been used against any of them. Mahdawi does, Khalil does, Ozturk does. But this court, and I'll be very clear, is not going to express any opinion. I don't instruct other judges or advise other judges. I handle the case before me. I respect other judges, but you've got to brief that.

MR. WANG: Of course, Your Honor.

THE COURT: I seem to remember Ms. Krishnan in her opening saying you didn't challenge the statute. But if you do, you've got to convince me you have standing to do that. And the fact that you got past a motion to dismiss doesn't establish it.

Go ahead, Mr. Wang. You don't need any clarification on that, Mr. Kanellis. Go ahead.

MR. WANG: Understood, Your Honor, and we'd be happy to address that in the brief.

THE COURT: I'm eager for it.

MR. WANG: And one final point on the video that was just played, you know, as I mentioned before, it does extend longer, and so now that it is in evidence, I would invite Your Honor to view the whole thing. Thank you.

THE COURT: That's my duty now that it's in evidence.

MR. WANG: Absolutely.

THE COURT: You can be sure that I will, but on my own time, not yours. Go ahead.

MR. WANG: Of course. Thank you, Your Honor.

BY MR. WANG:

Q. So returning to the event that we were just speaking about that you authenticated in the video, can you describe this event?

A. So it was organized primarily as a vigil with an art installation. It started out, in my memory -- this was a long

time ago and there have been many events -- it probably lasted about an hour and a half. I think a lot of the first half hour or 40 minutes was either silent or people were singing, and then there were some speeches, included Mohsen's, I don't really remember who else spoke, but I didn't know a lot of the students. I wouldn't necessarily know.

Q. And is there any reason why this event stuck in your mind?

A. I mean, it stuck in my mind for one thing because towards the very end of the event, I think it was towards the end, somebody who approached from behind where the security, Columbia security was standing and started yelling some antisemitic thing, I don't remember what. And the students immediately shut this person down and Mohsen himself actually walked over to him and asked him to leave, et cetera, and then made a statement about antisemitism.

Q. Thank you. So I am going to show you now what's been pre-marked as Exhibit D1. And Your Honor, if I may approach, I can provide you a paper copy.

THE COURT: Of course you may.

MR. WANG: Sorry, D1.

THE COURT: This is D1?

MR. WANG: Yes. Do you need a paper copy, Your Honor?

THE COURT: Do I need a paper copy? Apparently I do not. So go ahead.

MR. WANG: Thank you.

JA679

BY MR. WANG:

Q. Do you recognize what -- sorry. Professor Abu El-Haj, do you see the document I'm referring to that's been pre-marked as DI?

A. Yeah, I do.

Q. Do you recognize what this is?

A. I mean, it's an article in The Columbia Spectator, which is Columbia's daily newspaper.

Q. And can --

A. And it -- go ahead.

Q. Can you please take a moment to review the article.

A. Yeah. Okay.

Q. Is the event this article describes the same event that you just discussed?

A. Yes.

Q. And how do you know it's referring to the same event?

A. Both because I remember aspects of the description, but also that panel that's at the top of artwork or whatever was only at that event.

MR. WANG: Thank you. Your Honor, we offer Exhibit DI.

MR. KANELLIS: Hearsay, not relevant.

THE COURT: It is, it is.

MR. WANG: Your Honor, we're offering it just to corroborate Professor Abu El-Haj's account.

JA680

THE COURT: Of course you are. That means substantively. It's hearsay. Sustained.

MR. WANG: Thank you, Your Honor.

MR. WANG:

Q. So moving on, have you ever seen Mr. Mahdawi engage in violence?

A. No.

Q. Have you heard him threaten another student?

A. No.

Q. Have you heard him threaten anyone else?

A. No, I've never heard him threaten anyone.

Q. Have you ever seen Mr. Mahdawi harass another student?

A. I have not.

Q. And based on the articulation of antisemitic behavior that you gave before, have you seen Mr. Mahdawi engage in antisemitic behavior?

A. No. And like Mahmoud Khalil, he often speaks out against antisemitism.

Q. Did you speak with Mr. Mahdawi in the days after Mahmoud Khalil was arrested?

A. I did, yes.

Q. And did Mr. Mahdawi tell you how he was feeling at the time?

A. Yes. He was very --

MR. KANELLIS: Objection. Calls for hearsay.

THE COURT: No. Well, it does, but I'll limit it to what's admissible under 803. What did he say?

THE WITNESS: He said that he was worried that he was going to be the next target, and he asked me to convince the Columbia University president to move him from his Columbia housing that was off campus to inside the gates because at that point the university was requiring a judicial warrant for ICE agents to enter the gates of Columbia, and the properties outside were less secure.

MR. KANELLIS: Objection to the first, not to the second.

THE COURT: Just a moment, just a moment.

MR. KANELLIS: Sorry. Objection to the second, not the first.

THE COURT: So much of the answer as follows "because," I strike. The rest of it may stand. That's his then present state of mind and an expression of intentions as to the future. Go ahead.

MR. WANG: Thank you, Your Honor.

BY MR. WANG:

Q. Did you see, did you observe Mr. Mahdawi change his behavior in any way after Mr. Khalil was arrested?

A. Yes. He stayed in his apartment. He did not leave the apartment. People brought him food, et cetera.

Q. And how do you know that?

JA682

A.    He told me.

Q.    And --

          MR. KANELLIS:  Objection.  Move to strike, hearsay.

          THE COURT:  Yeah, it is.  Sustained.  I'll strike that out -- well, I will not include it in the record.  All right.

          MR. WANG:  Thank you, Your Honor.

Q.    During the period that you just described, did he tell you how he was feeling at the time?

          THE COURT:  Haven't you just asked that?  Now it's during the period?

          MR. WANG:  That's correct.

          THE COURT:  All right.

A.    Well, he was very anxious.

          THE COURT:  Did you talk --

A.    Yes.

          THE COURT:  I'm sorry, I spoke over you.

          THE WITNESS:  Sorry.

          THE COURT:  It was my fault.  I heard you say he was anxious.

          THE WITNESS:  Yes.

          THE COURT:  Thank you.

          THE WITNESS:  And I did speak with him further.

          THE COURT:  And thank you for that.

BY MR. WANG:

Q.    Did you perceive Mr. Mahdawi's arrest as having an effect

JA683

on the speech environment at Columbia?

A.   I think it really just kept, it just escalated a sense of anxiety and panic at Columbia, including I think the feeling that Columbia was really kind of ground zero of the attacks on universities at that point.

Q.   And did you continue to hear from noncitizens after Mr. Mahdawi's arrest?

A.   I did, yes.

Q.   Sorry.  Just for the record, was Mr. Mahdawi arrested?

A.   Yes, he was arrested when he went to his citizenship interview in Vermont three weeks I think after Mahmoud's arrest or about therein.

Q.   Thank you.  So I just want to move on to another topic now.

     Yesterday you mentioned that some students were terrified about being doxed, and you described what you believe "doxed" means.

     Why do you think students were so afraid of being doxed at that time?

          MR. KANELLIS:  Objection, foundation.

          THE COURT:  Sustained.  She can't testify to what's in someone else's mind.

Q.   Based on your -- yesterday you mentioned that you had conversations with noncitizen students who expressed concerns about being doxed.  What were some of the concerns that they

JA684

expressed to you?

MR. KANELLIS: Same objection. Calls for hearsay.

THE COURT: We'll see. You may tell us. What did such students say to you about the doxing?

THE WITNESS: Well, so let me start with Mohsen. He specifically said that his name, like Mahmoud's name, had been tweeted at Secretary Rubio with a photo of his presence at a sit-in at Barnard College a few days before he was arrested with the tag, "he should be deported," or something like that.

Mohsen was, then subsequently his name was also tweeted -- this is what he told me -- at Rubio and maybe the White House, I don't recall, with the same, him being added to the list that a couple -- well, one organization in particular was creating.

And I think there was -- so that was -- that's the most specific I can tell you, but that was generally what students were saying to me. They were worried that their photo and names would be tweeted at the administration, and in their understanding, that was a key or that is what helped get Mahmoud arrested.

MR. KANELLIS: Okay. Your Honor, move to strike.

THE COURT: I will strike it all but for when she says "They were worried that they would be tweeted," et cetera. The rest of it is stricken as hearsay. Go ahead, Mr. Wang.

MR. WANG: Thank you, Your Honor.

BY MR. WANG:

Q.   Are you familiar with the organization Betar U.S.?

A.   Yes, I am.

Q.   And what to your understanding is Betar U.S.'s purpose?

A.   So Betar U.S. sees itself, or defines itself -- not sees itself -- as in the tradition of the Betar youth movement, which started in the pre-state period in Palestine and was led by Jabotinsky, who was the leader of the more right wing faction of Zionism that was at the very beginning committed to expelling Arabs, I mean explicitly committed.

I don't know what their -- I mean, I'll reword it a bit. I know what they say that they are doing.  They see themselves as defenders of the Israeli state and in particular even its right wing iteration, the Netanyahu government.

They have been very explicit that they are creating lists of noncitizens in the U.S. or who they think are noncitizens, I don't know, they often -- I don't know how they know -- and calling for their deportation.

They have also, if I'm recalling correctly and I think I am, sent a list of American anti-Zionist Jews to the Israeli government and asked, these are the list of people you should not let in.  They have also shown up at events and passed out or given a speaker a plastic pager, which is an explicit threat because it refers to the pagers that were exploded by Israeli intelligence in Lebanon that killed, I don't remember, but a

JA686

lot of people, over a thousand people and wounded more than that in my memory.

MR. KANELLIS: Objection. Move to strike --

A. That's what they do.

MR. KANELLIS: Objection. Move to strike the entirety of that prior statement as hearsay.

THE COURT: Well, there was no objection until she got to the interesting point about pagers. That, I will strike.

MR. KANELLIS: No, Your Honor. I was letting her finish her answer, but she said "they say."

THE COURT: Indeed.

MR. KANELLIS: I was being polite and letting her finish before I interjected.

THE COURT: That's my ruling. Go ahead, Mr. Wang.

BY MR. WANG:

Q. Professor, you mentioned earlier that it is your belief that Betar has provided names to the current administration. What is the basis of that belief?

A. Their Twitter account or X account. They state that in their account.

MR. KANELLIS: Objection. Move to strike.

THE COURT: Well, I mean, that's stating her basis for making the statement. I'm going to let that stand, but it confirms your objection, Mr. Gonzalez, that the basis of her knowledge is third-party declarations, not admissions,

JA687

certainly not admissions by the government, then I can't see any other basis for attributing it to the government. So I'll let the answer stand, but I don't really see what this adds, unless somehow the government is making use of this information.

MR. WANG: Sorry, Your Honor. Was that directed at me or --

THE COURT: No. I was just talking. I'm looking at you, but just talking.

MR. WANG: Thank you, Your Honor.

BY MR. WANG:

Q. Okay. Just a few more questions, Professor Abu El-Haj.

Are you familiar with a website called Canary Mission?

A. I am, yes.

Q. And when did you first learn about Canary Mission?

A. I don't really recall because it's been around for a long time. I would say maybe 15 years ago, maybe a little longer, but it's not an accurate estimate.

Q. And what do you understand --

A. It's not --

Q. Excuse me. Have you seen the Canary Mission website?

A. I have.

Q. Is there a profile page on Canary Mission about you?

A. Yes.

Q. Have you visited it?

JA688

A.    Yes.

Q.    And what generally does it say about you?

          MR. KANELLIS:  Objection.

          THE COURT:  At this point he objects.  I sustain it.
If there's such a website, if it has data that's relevant,
that's the data, not the hearsay.

          MR. WANG:  Understood, Your Honor.

Q.    Are there profiles of other people on Canary Mission who
you personally know?

A.    Many, many.

Q.    Do you know if Mahmoud Khalil has a Canary Mission
profile?

A.    Yes.

Q.    And have you visited this profile?

A.    I have.

Q.    When did you visit it?

A.    I think around the time when he was arrested -- detained
by ICE.

Q.    And do you know if Mohsen Mahdawi has a Canary Mission
profile?

A.    Yeah.

Q.    And have you visited his profile?

A.    Yeah, I think around the same time.

Q.    When did you visit it?

A.    Around the time of the detentions.  I don't remember

JA689

precisely.

Q. Okay. Just a couple more questions, Professor.

Professor, I'm going to show you -- sorry, let me find my exhibit list. Thank you. I'm going to show you what has been premarked as Exhibit CC.

Professor, do you have that in front of you?

A. Yeah.

Q. What do you recognize this to be? Sorry. Do you recognize it?

A. I do.

Q. And what do you recognize it to be?

A. I mean, it's on the Canary -- I don't know if it's their home page or whatever, but it's the Canary Mission's explication of their own mission, as it says.

Q. And have you visited this website before?

A. Yes, I have.

MR. WANG: We offer Exhibit CC.

MR. KANELLIS: Objection, hearsay.

MR. WANG: Not for the truth, Your Honor.

MR. KANELLIS: And relevancy.

THE COURT: Since it's not for the truth, it is relevant. CC will be admitted as limited, 229 in evidence.

(Exhibit 229 admitted into evidence.)

Q. Next I will show you Exhibit CY, what has been marked as Exhibit CY. Do you recognize what this is?

JA690

A.   Yes.  It's a photo of Mohsen Mahdawi on the Canary Mission website.

Q.   And have you visited that web page before?

A.   Yes, but briefly, not in a sustained manner.

MR. WANG:  Your Honor, we offer Exhibit CY.

MR. KANELLIS:  Objection.  It's hearsay and it's not relevant.  She's already testified she visited the website.  It adds no value.

THE COURT:  Not for the truth but for the fact of it being there.  I need to be sure, Professor, you saw this entry on this website, you?

THE WITNESS:  Yeah.  I occasionally check out their website, who is on and what they're saying.

THE COURT:  Well, but I'm looking at a specific here. It starts with a photo, and it's got a red arrow towards someone speaking.  You've looked at this entry?

THE WITNESS:  Yeah.

THE COURT:  Is that your testimony?

THE WITNESS:  Yes, I have, yes.

THE COURT:  Overruled.  CY is admitted.  Exhibit 230 in evidence.

(Exhibit 230 admitted into evidence.)

MR. KANELLIS:  Pardon me, Your Honor.

THE COURT:  Limited.

MR. KANELLIS:  Limited, thank you.

BY MR. WANG:

Q. And one more. I'm going to show you what has been pre-marked as Exhibit DA.

A. Yeah.

Q. Do you recognize this exhibit?

A. Yes, I do.

Q. And what is it?

A. It's the Canary Mission entry on Mahmoud Khalil.

Q. And have you seen this web page?

A. Yes, I have.

MR. WANG: Your Honor, we offer Exhibit DA.

THE COURT: Same.

MR. WANG: For the same reason.

THE COURT: Same limitation, DA, with the same limitation, is admitted, Exhibit 231.

(Exhibit 231 admitted into evidence.)

MR. WANG: All right. Thank you, Your Honor.

Q. Just a couple last questions.

Are you familiar with the term "ideological deportation policy"?

A. I am familiar with it through the framing of this case.

Q. And what do you understand that term to mean in your mind?

A. So in my mind it refers to -- it refers to the fact that the government is committed to deporting noncitizens who hold beliefs that they do not agree with.

JA692

Q. And do you believe that Mahmoud Khalil's arrest, detention and attempted deportation are part of this ideological deportation policy?

A. Yes, I do.

Q. And why do you hold that belief?

A. Well, Senator Rubio said that the grounds of his arrest is some obscure, I think, law, that allows the Secretary of State presumably to deport someone who poses a risk or undermines U.S. foreign policy. And Rubio said that Mahmoud Khalil is promoting antisemitism and that contradicts the U.S. foreign policy goal of fighting antisemitism worldwide.

Q. Do you believe that Mahmoud Mahdawi's arrest, detention and attempted deportation are part of this ideological deportation policy?

A. Yes, I do.

Q. And why do you hold that belief?

A. Because he was arrested under the same statute and for the same reasons on the allegation that he is promoting antisemitism which undermines an important foreign policy goal of the U.S., which is fighting antisemitism globally.

Q. And final question, Professor. What do you perceive has been the effect of this policy, including the actions taken against the two individuals you just mentioned, on the community of Palestinian students at Columbia?

A. It has been terrifying for Palestinian students at

JA693

Columbia, especially those who do not hold U.S. citizenship. But as I said earlier, even students who are naturalized citizens are nervous.

MR. WANG: No further questions, Your Honor.

THE COURT: Mr. Kanellis, do you wish to examine this witness?

MR. KANELLIS: Yes, Your Honor. May I remain seated while I question?

THE COURT: You may, absolutely.

MR. KANELLIS: Thank you.

CROSS-EXAMINATION BY MR. KANELLIS:

Q. Professor, you are a U.S. citizen, correct?

A. I am.

Q. You've always been a U.S. citizen?

A. Yes. I was born in New York.

Q. Born in New York. And so this ideological deportation policy you've described does not relate to your fear of deportation, correct?

A. Correct.

Q. You indicated that after the arrest of Mr. Khalil, I believe you said there was a change in student protests, didn't you?

A. Yes.

Q. And those student protests are the ones that you're familiar with on the campus of Columbia University, correct?

JA694

A.   Correct.

Q.   And those protests, your involvement in those protests relates to your role with the Center for Palestine Studies at Columbia, correct?

A.   No.  I was not involved in the protests, and the Center for Palestine Studies does not work with student groups.

Q.   Okay.  Thank you for the clarification.  You said the effects of the policy were terrifying, this ideological deportation policy?

A.   Yes --

Q.   But in fact --

A.   -- for many people.

Q.   But in fact, protests continued at Columbia after the arrest of Mr. Khalil, didn't they?

A.   Yes.  However, the students, many -- I don't -- the Palestinian students I know, certainly the ones without U.S. citizenship but including a few that have U.S. citizenship, stopped participating.  And at least one person I know who does not hold U.S. citizenship went out and tried to -- what do you call it -- erase her social media presence.

Q.   Okay.  And that's based upon what the student told you, correct?

A.   Yes.

Q.   And that's not based upon anything you personally observed; you didn't watch that student delete her social media

account, did you?

A.   No, I did not.

Q.   And the protests, after the arrest of Mr. Khalil, continued at Columbia University and were very well attended, weren't they?

A.   I -- as far as I know, there were three protests.  Two of them were organized by JVP and quite small.  The third one was larger.

Q.   The third one was huge in --

A.   And the students I know about which I am speaking did not attend those protests.

Q.   Okay.  But --

A.   The third protest -- any of them.

Q.   One of the protests was huge in your opinion, wasn't it?

A.   Yes, but I don't know who took part.  Were they all U.S. citizens?

Q.   Okay.  Do you know who took part in the protests that were smaller in size?

A.   I know -- sorry.

Q.   Did you interview the students who were there to determine their nationality?

A.   I did not.

Q.   Okay.  And in fact, you don't know who did or who did not attend the protests as far as their nationality or citizenship, do you?

JA696

A.   No, but I do know that there are international students who explicitly said to me that they were not going to attend the protests or be public going forward.

MR. KANELLIS:  Okay.  I'll move to strike, Your Honor, on the basis of hearsay.

THE COURT:  I will strike her last answer on that ground.

Q.   Not only were there huge protests, but there were press conferences protesting the arrest of Mr. Khalil after his arrest, isn't that right?

A.   I participated in press conferences, but I don't recall any by students.

Q.   And in the press conference you participated in, you made a speech criticizing the U.S. Government for the arrest of Mr. Khalil, didn't you?

A.   I did.  I'm a U.S. citizen.

Q.   And you said, in that press conference, you said, "Mahmoud's story is in short the Palestinian story, par excellence."  You said that, didn't you?

A.   I did.

Q.   And you said, "But let us be clear, Mahmoud has been detained for his political speech."  You said that, too, didn't you?

A.   Yes.

Q.   You said, "It is the political speech that some of our

JA697

colleagues and students and many agitators outside the university do not like."  You also said that in your speech at this public protest, didn't you?

A.   Yes.

Q.   "It is political speech that they have tried to shut down by slandering Palestinians and pro-Palestinian protesters as antisemites and even as providing material support for terrorists with absolutely no evidence to back it up."

You also said that, didn't you?

A.   I did.

Q.   And when you said that, you were standing before a series of microphones from many news organizations, weren't you?

A.   Yes, but I'm a U.S. citizen.

Q.   Fox News was there, right?

A.   Yes.

Q.   AP was there?

A.   Yes, but again, I'm a U.S. citizen.  I'm not scared of deportation.

Q.   ABC was there, correct?

A.   I honestly do not remember everyone who was there.  I remember there was a lot of press there.

Q.   A lot of press there.  And this press conference was given in the middle of New York City, right?

A.   Correct.

Q.   On Columbia's campus?

JA698

A.   No, it was not on Columbia's campus.  It was -- well, I don't know if that's Columbia's campus.  It was up at 125th Street on a plaza in front of, I think it was a Columbia arts building, but I honestly do not know if that is considered legally Columbia's campus.

Q.   The press conference was given at the Lenfest Center For Arts at Columbia University --

A.   But we were not inside, we were not inside the building.

Q.   Ah, I see.  You were outside.  So in that respect you question whether or not it was at Columbia University?

A.   Look, I generally just don't know whether legally that public space is owned by Columbia University.  That's all I'm saying.

Q.   New York has over eight million residents, doesn't it?

         MR. WANG:  Objection.

         THE COURT:  I don't know that she is a demographer.

         MR. KANELLIS:  She can tell me if she knows.

         THE COURT:  I'll allow it.

A.   That sounds right.

         THE COURT:  All right.  We'll let that stand.

Q.   Okay.  And you knew that by giving this press conference, in making these statements critical of the United States and the policy regarding Palestine and the arrest of Mr. Khalil, that this could be heard by a great number of people; isn't that right?

A.   Yes.

MR. KANELLIS:  No more questions.

A.   And I repeat, I'm a U.S. citizen.

THE COURT:  Nothing further for this witness, Mr. Wang?

MR. WANG:  Nothing further from us.

THE COURT:  We thank you, Professor.  All right.  Call your next witness.

MR. BIALE:  Your Honor, this is Noam Biale for the plaintiffs.  Plaintiffs call Peter Hatch.

THE COURT:  He may be called.

PETER HATCH, Sworn

COURTROOM CLERK:  Can you please state your full name and spell your last name for the record.

THE WITNESS:  Peter John Hatch, H-a-t-c-h.

COURTROOM CLERK:  Thank you.  You may be seated.

DIRECT EXAMINATION BY MS. CONLON:

Q.   Good morning.  Is there a way for me to adjust the volume on this?  Okay.  Good morning, Mr. Hatch.

A.   Good morning.

Q.   My name is Alex Conlon.  Thank you for being here.

So just to situate us all, Mr. Hatch, you work for the United States Government?

A.   Yes, I do.

Q.   Okay.  You work in the Department of Homeland Security?

JA700

A.   Yes, for the component called Immigration and Customs Enforcement.

Q.   ICE?

A.   Yes.

Q.   And specifically, within ICE, you work for the Office of Intelligence; is that right?

A.   I work for a subcomponent of ICE called Homeland Security Investigations, and within Homeland Security Investigations, I'm the assistant director for the Office of Intelligence.

Q.   Okay.  Now, you and I of course didn't get to prepare together because you are here with the defendants, so I want to give you a sense of what we're going to cover today for you and the court.

In early March you were given the names of student protesters for the Office of Intelligence to produce analysis -- reports of analysis on; is that correct?

A.   Yes.

MS. STROKUS:  Objection, Your Honor, leading and foundation.

MS. CONLON:  Your Honor, this is an adverse witness and under Rule 611 --

THE COURT:  Please, I'm familiar with the rules of evidence.  What's your response to that?

MS. STROKUS:  Your Honor, Mr. Hatch is a federal government employee.

THE COURT: He is.

MS. STROKUS: And he is prepared to testify honestly and truthfully here today.

THE COURT: Well, that's the presumption, and I certainly respect him, as I do all witnesses. She may lead him. I'm familiar with leading, and of course it bears on the weight to be given to the answers, but she may proceed in that fashion.

MS. CONLON: Okay.

BY MS. CONLON:

Q. Many of the names of the student protesters provided to you for the Office of Intelligence to produce reports of analysis on came from the website Canary Mission, correct?

A. It's true many of the names, even most of the names came from that website, but we were getting names and leads from many different sources.

Q. The reports of analysis on the student protesters, you had the chance to review, or read, rather, many of them, right?

A. I have read several but not all of the reports of analysis coming out of that effort.

Q. And the reports of analysis on the student protesters that you've read, you have seen ones that mention Israel, correct?

A. Yes. They've mentioned several of the nations involved in the Middle East conflict.

Q. You've seen reports of analysis that mention Palestine,

JA702

correct?

A.   Yes.

Q.   You've seen reports of analysis that mention pro-Palestinian protests, correct?

A.   I've seen reports of analysis that mention Palestine and issues related to Palestine.

Q.   You've specifically seen reports of analysis that mention pro-Palestinian protests, correct?

THE COURT:  Well, I guess now she's framing it, so I guess the way I hear her, she wants to have you say, when you read reports, did the phrase "pro-Palestinian" -- what was her third word -- "pro-Palestinian activities" or the like, did you receive reports that had those phrases in it?

THE WITNESS:  I don't think the reports of analysis mentioned that phrase as you've described it.  I think the reports of analysis mentioned students involved in protests or personnel involved in protests.  I don't know if a report of analysis specifically said, mentioned pro-Palestine protests, you know, those words.  I just don't remember.

THE COURT:  All right.  How about pro-Hamas?

THE WITNESS:  I do remember reports of analysis that mentioned Hamas, but it isn't the analyst's job to make the determination whether something is pro or con.  They would just make the determination that a Hamas leader was, for example, mentioned in the protest or there was some sort of activity or

JA703

statement made in support of Hamas or related to Hamas. But the analyst would not make the decision of or classify it as this is pro-Hamas activity, this is pro-Palestine activity. They just don't make those determinations.

Q. So I want to make sure we get off on sort of the right foot here, and if I'm misunderstanding something that you've said in your deposition, you can tell me.

But we spoke to you in a deposition maybe a week ago; is that right?

A. That's correct.

Q. In that deposition -- and for the government's benefit, I'm looking at page 233, lines six to eight.

You were asked this question and you gave this answer.

Question: Do you recall seeing any reports of analysis that mention pro-Palestinian protests?

Answer: Yes.

MS. STROKUS: Objection, Your Honor, improper impeachment. Can she please show the witness the testimony to which she's referring?

THE COURT: Under Queen Charlotte's case, that's appropriate.

MS. CONLON: I'm happy to show the witness.

THE COURT: Yes, let's do it.

MS. CONLON: We're queueing it up. While we queue it up --

JA704

THE COURT: Government counsel, I just want to call people by names, and again, your name, I'm sorry?

MS. STROKUS: Yes, Your Honor. I'm Jessica Strokus on behalf of defendants.

THE COURT: Thank you, Ms. Strokus.

BY MS. CONLON:

Q. So Mr. Hatch, this deposition took place June 25, right?

A. Yes.

Q. And you had government counsel there with you?

A. Yes.

Q. And of course you were under oath in the deposition?

A. Yes.

Q. And at the outset of that deposition you were instructed that if a question was unclear, you could ask for clarification, right?

A. Yes.

Q. And in fact, many times you did ask for clarification, right?

A. Yes.

Q. Okay. So turning your attention now to the section that you see here on the screen, and this again is page 233, starting at line six, you see where it says, Question: "Do you recall seeing any report of analysis that mentions pro-Palestinian protests?"

Answer: "Yes."

Do you see that there?

A.    I do, but that's not what it says.

Q.    I'm sorry, that's not what it says?

A.    I'm looking at line -- the question above that was, "Do you recall seeing any report of analysis that refers to pro-Palestinian protests."

Q.    You then asked that the question be rephrased, right?  Do you see that on line four?

A.    Yes.

Q.    And then the question was asked -- and I hate to repeat it, but it says, "Do you recall seeing any report of analysis that mentions pro-Palestinian protests?"

That is the question that was put to you, and the response you gave was, "Yes."  Isn't that right?

A.    "Do you recall seeing any report of" -- yes.

MS. CONLON:  Okay.  You can take it down.

Q.    Now, the reports of analysis about the student protesters, you said that you only reviewed several of them, correct?

A.    That's correct.

Q.    When you say "several," can you give us a sense of how many that means?

A.    For this particular effort, I probably reviewed a couple of dozen, maybe a dozen, maybe 20.

THE COURT:  When you say "this particular effort," to what do you refer?

THE WITNESS: I review probably almost a thousand, maybe up to a thousand ROAs in total during a year, and we do, the Office of Intelligence does approximately 25,000 to 30,000 ROAs a year.

THE COURT: But my question was, you're able to say this particular effort, you reviewed about 20. What do you mean by "this particular effort"? What was the mission or the effort that we're talking about?

THE WITNESS: When we were looking at the protests. So personnel from -- individuals from the lists of people who were involved in protests.

THE COURT: Protests at Columbia or other places as well?

THE WITNESS: Other places as well.

THE COURT: Thank you. Just so I understand, college protests or --

THE WITNESS: Student, student protests and personnel who was participating in those protests.

THE COURT: Thank you.

BY MS. CONLON:

Q. When you say "personnel participating in the student protests," does that extend to faculty?

A. It extends to everyone other than -- yes, and all others who are involved who may not have been associated with the university at all.

JA707

Q. You said a moment ago that the Office of Analysis -- or Intelligence, rather, produces upwards of 25,000 reports of analysis on all kinds of subjects in a given year, right?

A. That's correct.

Q. And you said that you review a small slice of that in a given year, maybe a thousand. Did I understand you right?

A. That's about right.

Q. And you said that in this line of effort, which was compiling reports of analysis on student protesters, that you recall reviewing several dozen; is that correct?

MS. STROKUS: Objection, Your Honor. It misstates his testimony.

THE COURT: That's not exactly what he said.

MS. CONLON: I'm seeking -- I'm sorry.

THE COURT: But I understand, and let me try.

MS. CONLON: Okay.

THE COURT: So with respect to student protests, you recall reviewing about 20?

THE WITNESS: That's correct.

THE COURT: All right. Now go from there.

MS. CONLON: Okay.

BY MS. CONLON:

Q. So again, I just want to make sure I'm understanding you and we're on the same page.

When you say "dozens," a couple dozen, you mean

JA708

approximately 100, isn't that right?

A.    No.  We said about -- I've reviewed about 20 of those.

Q.    Okay.

A.    I don't recall the exact number.  Like I said, I review a lot of ROAs, so I'm estimating here.

Q.    Okay.  I'm going to ask -- I'm going to ask that we put the transcript back up.  And can we please go first to page 83.  So first -- and we're going to have to do this in a few parts, but Mr. Hatch, I want to direct your attention to lines 13 to 16 so that you're clear on the context for what I'm going to show you next here.

In line 13 you're asked, "Do you recall whether any of these reports of analysis on student protesters mentioned the terms 'Israel' or 'Palestine,'" to which you said yes, which you've also said today.  And now moving ahead to page 84, lines 10 to 12, when you were asked about those reports, the question was, "And when you say dozens, what's a ballpark figure?"  And in line 12 the answer you gave was, "Approximately, 100."

So you testified that you know that approximately 100 of the reports of analysis on student protesters mentioned the terms "Israel" or "Palestine," isn't that right?

MS. STROKUS:  Objection, Your Honor.  It's unclear from the what's on the screen right now what the original question was.

THE COURT:  If it's clear to the witness -- if it's

clear to the witness, it's sufficiently clear. Do you understand the question?

THE WITNESS: Can you show me page 83?

MS. CONLON: Of course. And for ease -- sorry, the lines --

MS. STROKUS: You honor, we ask that the witness be provided a paper copy so we don't have to keep flipping back and forth.

THE COURT: Do you have one? Do you have one?

MS. STROKUS: No, Your Honor.

THE COURT: I was thinking that it might be helpful if I had one, but we live in the real world.

MS. CONLON: We may have extra copies. Can I take a moment to look?

THE COURT: Well, of course you may.

In the hierarchy of getting at the truth, among us, if you have a copy, let's give it to the witness.

MS. CONLON: If the court happens to have the pretrial brief exhibits here, the court then does have a full copy, and we have a copy we could give the witness as well.

THE COURT: Give that to the witness.

MS. CONLON: It's Exhibit 2 to the pretrial brief.

THE COURT: Thank you, and I do.

MS. CONLON: May I approach to give the witness the binder?

THE COURT: You may.

Q. So Mr. Hatch, when you have a chance to look at pages 83 and 84, that's where I've been directing your attention, just let me know.

A. Yes.

Q. Okay.

THE COURT: It isn't Exhibit 2 in mine, but don't slow down.

MS. CONLON: Okay. I apologize. We're going to get clarification on that, Your Honor, but I won't stop, as you say.

Q. So Mr. Hatch, in the deposition you testified that approximately 100 of the reports of analysis on student protesters mentioned the terms "Israel" or "Palestine," correct?

A. Yes, I did.

Q. Okay. When you testified earlier a moment ago that you reviewed only maybe 20 or more of these reports of analysis, you were talking about the same reports that you mentioned in the deposition, right?

A. Yes, I was.

Q. Okay.

THE COURT: It's Exhibit 6, but go right ahead.

MS. CONLON: Okay.

Q. And just to be clear, the 100 or so reports of analysis

JA711

that mentioned the terms "Israel" or "Palestine" was a subset of the total reports of analysis on student protesters generated in this line of effort, correct?

A.   Yes, I believe it was a subset.

Q.   In other words, there were more than 100 reports of analysis generated about student protesters, right?

A.   Slightly more, yes.

Q.   How many more?

A.   There were less than 200.

Q.   More than 100, less than 200?

A.   Yes.

Q.   Okay.  So I want to back up for a moment to -- so at a high level, so you understand, those are the topics I want to get into, but I want to get back for a moment to your work.

So you told us that you work in HSI, which is part of ICE, and ICE works to, among other things, dismantle transnational criminal organizations, right?

A.   Yes, HSI's mission is to dismantle transnational criminal organizations.

Q.   As in, ICE's mission is broader, but HSI's work is focused on dismantling transnational criminal organizations; is that correct?

A.   That is correct.

Q.   HSI, where you work, identifies and investigates people suspected of breaking criminal laws, right?

JA712

A.   We don't investigate.  We only analyze.

Q.   You analyze, okay.  You research and analyze?

A.   Yes.  We're talking about the Office of Intelligence.

Q.   Yes.  And let's talk about that.  So you are the assistant director of the Office of Intelligence, right?

A.   Yes, I am.

Q.   And you have worked in law enforcement overall for more than 35 years, correct?

A.   Yes, I have.

Q.   You joined the Department of Homeland Security in 2019?

A.   I became an HSI employee in 2019.  Before that I was an officer in the Coast Guard.

Q.   And when you joined in 2019, you moved into the senior role that you are in now, right?

A.   I did.

Q.   It may be obvious to others from your title, but so that I'm clear, you are senior-most office -- official in the Office of Intelligence; is that right?

A.   I am.

Q.   And you report directly to senior leadership of the umbrella that is also Homeland Security Investigations?

A.   Yes, I report to the deputy.

Q.   The deputy is Derek Gordon?

A.   That is correct.

Q.   You oversee more than a thousand investigative analysts?

A.   Approximately a thousand.

Q.   Now, the Office of Intelligence focuses on criminal networks, criminal conspiracies, those engaged in criminal conduct, right?

A.   That is correct.

Q.   Its work is divided into different types of crimes or program areas like child exploitation or human trafficking?

A.   Yes.

Q.   Okay.  So you said earlier that the Office of Intelligence doesn't do investigation.  It does research and analysis.

A.   Yes.  We are, investigative analysts are not law enforcement officers.  They do not have arrest powers.  They don't have investigative powers.

Q.   Okay.  And the Office of Intelligence supports investigations, though it does not do them itself, through factfinding, right?

A.   Yes, we -- yes, we do.

Q.   And those facts get memorialized in a report called a report of analysis?

A.   Yes, the report of analysis is the way the investigative analyst documents their work.

Q.   So I want to talk about what reports of analysis ordinarily contain, and I will be direct with you and tell you I have never seen one.  They have been withheld as privileged in this case.  So if I ask you a question and it doesn't make

JA714

sense or it's off-base, please tell me.

A report of analysis can focus on a particular person?

A.    Yes, they can focus on individuals, yes.

Q.    For our purposes, I'll call an individual that's the subject of a report "the subject," just so I don't have to keep repeating it.

The report can have a great deal of factual information about the subject, right?

A.    The report should have a lot of factual information about the subject and only factual information.

Q.    And the factual information they should have are facts that could be relevant to a suspected violation of a criminal law; is that right?

A.    Violations of primarily criminal law but violations of law, and for HSI's mission, violations of immigration and customs law, which is our specialty.

Q.    And when you say "immigration and customs law," are you referring to the Immigration and Nationality Act?

A.    Title 8 for immigration.

Q.    Okay.  The reports of analysis on a subject include, among other things, the person's immigration history?

A.    Yes, that would be part of it.

Q.    The history of their activity in the United States?

MS. STROKUS:  Objection, Your Honor.  This line of questioning is teetering on the law enforcement privilege.

JA715

What goes into the report of analysis --

THE COURT: I haven't heard it yet.

MS. STROKUS: Your Honor, what goes into a report of analysis has been withheld as privilege.

THE COURT: It may have, but ultimately that's the court's decision. She may have the question.

BY MS. CONLON:

Q. A report of analysis may contain history of the subject's activity in the United States, right?

A. It would contain things like their criminal activity, perhaps employment, travel. But without getting into -- I want to keep it in general terms because people know -- if criminals learn what we write in a report of analysis, then they can make adjustments.

THE COURT: Actually, you've touched on the line I'm trying to draw. As I view the law enforcement privilege, and you're a person who works in this area, so I want you to tell me if you think a question trenches on it.

Nothing here should mess up or impair your office's or any knowledge you have of government operations' ability to enforce the laws and protect the nation generally.

Having said that, we're engaged in a search for truth here about certain things that have happened or haven't happened and are in factual dispute. So it's not wrong for her to start this way because documents have been withheld. But if

JA716

you think -- I'll be satisfied with the 30,000-foot view if I can understand what you were doing, and then we may drill down on things that have happened which may bear on what I've got to sort out here.  Do you understand my instructions?

THE WITNESS:  Yes, Your Honor.

THE COURT:  And so feel free to use them.  I'm not at all disrespectful of counsel.  You should listen to your counsel, but that's the line I'm following.  Go ahead.

MS. CONLON:  Your Honor.

MS. STROKUS:  Your Honor, may I be heard?

THE COURT:  Yes.

MS. STROKUS:  These questions and the line of questioning that already began and we are anticipating go straight to methods, indicators, techniques that are privileged under the law enforcement privilege and that will have wide-ranging impacts on criminal and immigration investigation.

THE COURT:  I'm not clear why you've withheld, if such documents exist, why you've withheld them with respect to the specific targets because that's in the past.

MS. STROKUS:  Yes, Your Honor, it is in the past. What I'm saying here is we're talking about reports of analysis generally and what goes into them.

THE COURT:  So we are.  So I'd be interested to see the reports of analysis about any of the people that were denominated targets here.  She says you withheld that.  I'd be

JA717

interested in seeing that. Maybe we can save a lot of time.

MS. STROKUS: Yes, Your Honor, I believe those were submitted to you in camera and withheld from plaintiffs' counsel as law enforcement privilege.

THE COURT: I understand.

MS. CONLON: If I may assist. The court redirected yesterday the government to submit a log indicating the basis for its withholding of a certain packet of materials you provided to them --

THE COURT: I read the materials.

MS. CONLON: They submitted a log that I think makes reference, the one that was just filed last night I think refers to, from what I can tell, at least two reports of analysis on targeted noncitizens, so I know at least the court has those, but of course not what else.

MS. STROKUS: Yes, Your Honor. You were provided the individual for the five allegedly targeted individuals in this case in camera.

THE COURT: Okay. We'll address that in 15 minutes, or maybe we should address it now, have him step down, and we'll see where we go. Would you prefer to do it that way?

MS. CONLON: I understand the witness has limited time, and I want to be to respectful of it.

THE COURT: Yes, I do, too. So let's go ahead and get him on his way.

JA718

BY MS. CONLON:

Q. Okay. So Mr. Hatch, without revealing any techniques of law enforcement, a report of analysis includes only factual information; is that right?

A. That is correct.

Q. It does not include, for example, a summary of anyone's opinion about the facts, correct?

A. No, it should not include any opinions at all.

Q. And a report of analysis in describing factual material may append the underlying source materials to it for someone else to review, correct?

A. Yes, as part of our procedure, is to make sure that it's repeatable and you can find out why certain things were included or what the source material was for something being included.

Q. I want to talk about how ordinarily the Office of Intelligence gets tasked in the ordinary course as opposed to in this line of effort with creating these reports of analysis. And a report of analysis can be generated by the Office of Intelligence in response to a request from a law enforcement partner, correct?

A. Yes. In fact, most of the time it's a special agent who is asking the investigative analyst for help in finding more information out about an individual.

Q. A special agent who, for example, is already investigating

someone and seeking help from the Office of Intelligence to gather information?

A.   That's one of the ways, yes.

Q.   And that is most often the way, correct?

A.   That is most often the way.  But it's not the only way.

Q.   The agents who make such requests of the Office of Intelligence can be situated outside of the Office of Intelligence and in other parts of HSI, right?

A.   Yes, the domestic offices, the programs, even leadership.

Q.   Requests for reports of analysis can also come from outside of HSI and outside of the Department of Homeland Security, correct?

A.   As long as it goes through HSI leadership and I get my tasking from HSI leadership, we can be asked to look into any individual.

Q.   Now, I want to talk about what ordinarily happens when the Office of Intelligence receives such a request.  The office gets the request from an agent, and when the report of analysis is created, it goes back to the agent who asked for it, correct?

A.   In most cases, yes, but not in every case.  It could be provided to a related program.  And again, we're only talking right now about what we receive from a special agent, but we do get tips and leads before an investigation that needs some background information or needs some information to be gathered

JA720

before it's given to the investigator to determine whether or not to continue an investigation or to start an investigation.

Q.   And when you say the Office of Intelligence gets tips or leads, so something outside of an agent in HSI asking for help, do you mean tips and leads like outside of the government, like civilians?

A.   It includes civilians.  We have a tip line that civilians can call and provide information.

Q.   Can civilians also provide information through the agency's social media channels, for example, by tweeting at the Department of Homeland Security?

A.   I suppose they could.  I have never seen an instance of that.

Q.   So you're aware only of tips through a tip line and not any other means; is that right?

A.   Tips through the tip line or some other connection point with HSI.  Sometimes tips are left in emails or sent to emails or sometimes to other public-facing phone numbers or email boxes, not to an individual but to a box.

Q.   Now, ordinarily, after a report of analysis is generated, and for clarity, that's done at the level of an analyst in the Office of Intelligence; is that right?

A.   What's your question?  Can you repeat that?

THE COURT:  She hasn't asked it yet.

Q.   Reports of analysis are created not by you but by

JA721

investigative analysts in the Office of Intelligence, right?

A. Yes, the analysts write the ROAs. I have not written ROAs.

Q. Not ever probably?

A. Right.

Q. Okay. Once the ROA is drafted by an investigative -- or by an analyst, the ROA -- and I apologize for the record. That's what I'm abbreviating, report of analysis.

THE COURT: I am following.

Q. The ROA does not have to go through any formal sign-off procedure within the Office of Intelligence before it can leave the office and be given to whoever requested it, correct?

A. Yes. They do not go through me, if that's what you're asking. I do not have approval process where I sign off on every ROA.

Q. Right, because there's like 25,000 of them in a year?

A. Correct.

Q. Okay. And you have a deputy, correct?

A. I have one deputy.

Q. Mr. Etter, Bradley Etter?

A. That's correct.

Q. He also doesn't have to sign off on ROAs before they go outside of the Office of Intelligence, right?

A. No. The relationship is the analyst works with the agent, and that's a partnership that we try to encourage.

JA722

Q.   In other words, we're talking about direct collaboration between the analyst in the Office of Intelligence and the agent who asked for the office's help?

A.   That's correct.

THE COURT:  This may all be relevant, but how much more do you think you have for this witness?

MS. CONLON:  In general or on this topic?

THE COURT:  No, in general.

MS. CONLON:  I have a great deal more.

THE COURT:  And you want to get him out of here today?

MS. CONLON:  I do.  I understand that he has a lot on his plate.

THE COURT:  He may very well.  They may have questions for him.  All right.  You go ahead.  I guess I'm thinking, though he's being perfectly responsive to your questions as far as I can see, it might be helpful to get to this case.

MS. CONLON:  I'm almost there, I promise.

BY MS. CONLON:

Q.   So in the ordinary course, sticking with your regular process, not the student protester process for a moment, after the Office of Intelligence gives the report of analysis to the party who requested it, that is often the end of the Office of Intelligence's involvement in that case, correct?

A.   Yes.  Oftentimes we don't hear back from the agent on any results of the investigation.

Q. Now, you've been in your role for six years, approximately?

A. Since 2019.

Q. For your first five and a half years in your role, you were never involved in the investigation of a foreign student engaged in political protest, correct?

A. I was never asked -- again, I don't do investigations.

Q. Sorry.

A. So I was never -- I don't recall any instance where I was asked to review protest activity.

Q. Now, prior to 2025, to the best of your knowledge, you also weren't involved in cases involving lawful permanent residence for potential action by the State Department, correct?

A. No. We -- I don't recall any actions where we provided information to the State Department, but we were -- that is, that referral to the State Department is one of the statutes in Title 8, and we've been investigating or we've been analyzing Title 8 offenses since I've been there.

Q. So just to bring you back to the question, you had seen reports of analysis on visa holders that went to the State Department prior to 2025 but not reports of analysis on green card holders, lawful permanent residents that went to the State Department before 2025, correct?

A. That I don't recall because I thought your question was

JA724

related to the protesters.  So if you're asking me, I don't recall any instances of LPRs being referred to the State Department because of protest activity.  I don't know the answer if we referred to any LPRs -- "we" being HSI referred any LPRs for other types of activity, I just don't -- I'm not sure I would remember those.

Q.   You don't think you'd recall whether you reviewed reports that went to the State Department about lawful permanent residents before?

A.   Yes.  It's not something I would, as the assistant director, that I would be involved in in the normal course of business.  It wouldn't really rise to my level as an issue.

Q.   Do you recall ever seeing see a referral of a student protester for a visa revocation before 2025?

A.   I don't recall that.

Q.   Now, President Trump was inaugurated in January, right, of this year?

A.   Yes.

Q.   January 20.  Is that a yes, if you know?

A.   Yes.

Q.   And shortly after he took office, he issued several executive orders that relate to the work of the Department of Homeland Security, correct?

A.   Yes.

Q.   You read, for your work, executive orders that relate to

the work of HSI, correct?

A.   Yes, the ones that I can find and interpret, yes.

Q.   Okay.  And one of the orders that has affected the work of HSI this year is Executive Order 14161, which is titled Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats.  Is that right?

A.   Yes, but if you're going to ask me questions about it, can I have it, can I read it?

Q.   Of course.

MS. CONLON:  Your Honor, you look like you were going to say something.  Should I continue?

THE COURT:  No.  I didn't understand your question. But go ahead and ask your question.  He understood it, and I think I do.  He's familiar with that executive order, but if you're going to question him --

MS. CONLON:  He wants to see it.

THE COURT:  -- we better look at it.

Q.   Okay.  So we have put a document that has been marked as Exhibit 70, which is in evidence, in front of you.  Do you see it on the screen there?

A.   Yes, I do.

Q.   Do you recognize that as Executive Order 14161?

A.   Yes.

Q.   And you can see it was issued January 20, 2025?

A.   I can see that.

JA726

Q.    Okay.  You've seen this before, right?

A.    I have seen it.

Q.    Now, part of this executive order relates to HSI's work, correct?

A.    It does.

Q.    The part that most directly relates to HSI's work I think appears in Section 2, little (a), little number (4), so if you would direct your attention there.  We may be able to make it bigger, maybe.

A.    I can read it.

Q.    Great.  That part of the executive order calls for the vetting and screening to the maximum degree possible all aliens who intend to be admitted, enter or are already inside of the United States, particularly those aliens coming from regions or nations with identified security risks; is that right?

A.    Screening and vetting is part of HSI's mission.

Q.    That is exactly what I wanted to ask you.

Screening includes looking, from HSI's perspective, at an individual to see if there is any derogatory information about that person, right?

A.    Yes, that's also almost quoted directly from my deposition.

Q.    I'm glad that you also remember it.

OI, Office of Intelligence screens a particular person and then writes a report of analysis with any derogatory

information if they find it, right?

A. Yes. And we are one of the agencies that does screening and vetting. There are an umbrella of agencies or cluster of agencies that do this in coordination.

Q. Including and pursuant to this executive order, right?

A. That's correct.

Q. President Trump has issued other executive orders that also affect your work this year, right?

A. Yes.

Q. Are you familiar with Executive Order 14188, which regards combatting antisemitism?

A. I am, but as you recall from the deposition, that was the first time I had read that executive order.

Q. So that's not one you had read closely?

A. No.

Q. Okay. Then I will not ask you to read it now.

So turning to early March of this year, after this executive order that we just looked at, Exhibit 70 --

THE COURT: Now we're turning? Just a matter of case management here.

MS. CONLON: Sure.

THE COURT: I said we'd take a brief recess, at which time I would hear the government, who is asking me to reconsider on a subset of documents which I'm familiar with which don't include but now they point out these ROAs at least

JA728

as to what we've denominated target individuals here.

I appreciate what you're doing. I'm prepared to go on or stop and have argument. You're not part of it. It doesn't count against anyone's time. How do you wish to proceed, Ms. Conlon?

MS. CONLON: I'd like to keep going if that's okay?

THE COURT: It is okay, as long as I can pay full attention. We will take a recess out of necessity. Go ahead.

MS. CONLON: Okay. Did Your Honor want to recess now?

THE COURT: No. Do you want to keep going?

MS. CONLON: I do, if that's okay.

THE COURT: We will.

MS. CONLON: Okay, great.

BY MS. CONLON:

Q. So in early March of this year you attended a briefing on student protests, correct?

A. I did.

Q. This briefing on student protests in March included your boss, Derek Gordon?

A. Yes, my boss, Derek Gordon, the chief of operations, William Walker, a number of other people, but the senior -- many of the senior leadership of HSI.

Q. So you mentioned that the briefing on student protests in March included William Walker, we've said Derek Gordon. Do you recall whether Robert Hammer was there?

A.   I think so.

Q.   And Mr. Hammer is the deputy executive associate director of Homeland Security Investigations or rather he was just before Mr. Gordon took over; is that right?

A.   He was at the time, yes.

Q.   Okay.  I see.  So the meeting occurred when Mr. Hammer was still incumbent in that seat and then Mr. Gordon took over?

A.   That's correct.

Q.   The meeting also included Roy Stanley, the chief of the analysis division for the Office of Intelligence; is that right?

A.   I believe he was there and he is the unit chief for the analysis division within Office of Intelligence.

Q.   Do you recall who else from senior leadership was there, or is that the group?

A.   I don't -- I don't remember who else was there.

Q.   Okay.  Now, in this meeting, the meeting was convened by HSI's leadership, correct?

A.   Yes.

Q.   And the meeting was held as part of HSI's effort to implement Executive Order 14161, correct?

A.   I do not characterize it that way because, as I recall from the discussions, I don't think that was the topic of the meeting.  The meeting was to talk about protest activity or student protesters who may be in violation of U.S. law.

JA730

Q.   So it's your understanding that the meeting was about an effort to gather information on student protesters, but you don't understand it to have been --

THE COURT:  Let's not beat around the bush.  I'm interested in this meeting.  You're the witness.  Not how she characterizes things.  What were the instructions or the like from the briefing?

MS. STROKUS:  Objection, Your Honor.

THE COURT:  Overruled.

MS. STROKUS:  Objection, Your Honor, deliberative process privilege.

THE COURT:  They weren't deliberating.  They were being briefed.  When you're briefed, you're told what's going to happen.  Were you deliberating?

THE WITNESS:  We weren't briefing.  We were discussing.

THE COURT:  I stand corrected.  It was referred to as a briefing.

So you were discussing and you have characterized the discussion as student protesters who may have broken the law?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  And having been corrected and I appreciate your persistence, I sustain the objection.

And now I'll ask this.  So as a result of that meeting, what instructions, if any, were adopted?  And again,

JA731

I'm going to explain the line I'm drawing because I have some trust that you're following the line.

When you're kicking stuff around, the rest of us aren't entitled to know that, just as I kick stuff around with my law clerks. Once I've decided what we're going to do, well, then in the judicial end I have to write it all out and that's all above it. In your executive end, whatever is decided that bears on this case and student protesters, we're entitled to know that, and I need to know it.

Do you have that in mind?

THE WITNESS: Yes, Your Honor.

THE COURT: So recognizing that's the line, what came out of it?

THE WITNESS: To look at the protesters, to develop reports of analysis on the protesters, specifically looking for violations of U.S. laws, including and specific to immigration and customs laws.

THE COURT: Can you be any more specific as to the immigrations and customs laws that you were looking for were?

THE WITNESS: Thinking in general terms, it was anything that may relate to national security or public safety issues, things like were any of the protesters violent or inciting violence? I think that's a clear obvious one. Were any of them supporting terrorist organizations? Were any of them involved in obstruction or unlawful activity in the

JA732

protest?

THE COURT: What do you mean by "obstruction"?

THE WITNESS: Like blocking normal citizens from going about their business.

THE COURT: Okay. Thank you.

THE WITNESS: And that we would use the normal report of analysis process and our normal trade craft for this.

THE COURT: Proceed, Ms. Conlon.

MS. CONLON: Okay. Thanks.

BY MS. CONLON:

Q. So you characterized it as a meeting, not a briefing; is that right?

A. I characterized it as a discussion.

Q. You would call it a discussion?

A. Yes.

Q. The discussion was led by HSI leadership?

A. I think only HSI was in the room.

Q. So by default.

THE COURT: We're going to --

MS. CONLON: Sorry.

THE COURT: I'm not the only one who needs a break here. The court reporters need to switch. So what we're going to do is we're going to take a break until 11:00. That's the break. If you want to leave some time to have argument about issues that are to be discussed, fine. Otherwise you can run

until 12:00, and I'm stopping and we will take this matter up tomorrow without any further argument. And hopefully we can get him on his way.

MS. STROKUS: Your Honor, we were told by plaintiffs that Mr. Hatch would be going first today. He made his travel arrangements to testify today. I understand that we are going into tomorrow. May I request that we do, after the break, arguments on the issues that are percolating so that Mr. Hatch is able to rearrange his travel schedule?

THE COURT: In other words, you'd like to cause him to rearrange his travel schedule so that we get that taken care of, argument about -- you call it the issues percolating -- the issues about the documents I said could be turned over but I wanted to give you a chance to argue. That's how you'd like to do it?

MS. STROKUS: Your Honor, just based on the outline that Ms. Conlon started in the beginning, it does not sound like direct will be completed today.

THE COURT: So long as he's going to be here tomorrow, I'm fine with that. She's nodding her head. But for now, five-minute break for all of us. I will hear you at 11:00, no more than ten minutes of argument. That's not an invitation to take ten minutes. And when that's resolved, you may resume the stand, and we'll have the pleasure of your company tomorrow probably. We'll recess. (Recess, 10:53 a.m.)

JA734

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 9th day of July, 2025.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

JA735

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 2, Page 78 to 121

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants

\* \* \* \* \* \* \* \* \*

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Wednesday, July 9, 2025

\* \* \* \* \* \* \*

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

JA736

APPEARANCES

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
   Knight First Amendment Institute at Columbia
   University
   475 Riverside Drive, Suite 302
   New York, NY 10115
   (646) 745-8500
   E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
   Sher Tremonte LLP
   90 Broad Street, 23rd Floor
   New York, NY 10004
   (212) 540-0675
   Email: Cgans@shertremonte.com
   For Plaintiffs


ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
   DOJ-Civ
   P.O. 878
   Ben Franklin Station
   Washington, DC 20044
   (202) 616-9123
   Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
   United States Attorney's Office
   1 Courthouse Way, Suite 9200
   Boston, MA 02210
   Email: Shawna.yen@usdoj.gov
   For Defendants

I N D E X

WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

PETER HATCH   (Continued.)

   By Ms. Conlon          12

   By Ms. Strokus

E X H I B I T S

(None marked.)

P R O C E E D I N G S

(Resumed, 11:00 a.m.)

THE COURT: All right. We'll start with this issue which Ms. Strokus characterizes as a "percolating issue."

But, Mr. Kanellis --

MR. KANTER: Mr. Kanter, your Honor.

THE COURT: Mr. Kanter. I'm sorry. And I have read your briefs, and I am appreciative about them, and in at least one respect I do reconsider my order. And let me say I appreciate the careful way you have, um, suggested redactions in the subset of materials. And you're absolutely right in at least two respects. There's no reason to disclose e-mails or cell phones, you can redact those.

I guess I do want to say one other thing. I don't understand why you're objecting so vigorously to this subset? And I'll tell you why.

What I get from this -- the whole exercise is trying to persuade me, is this shows officers of the government -- some are attorneys, actually seeking to follow the law, to bring the conduct of enforcement agents and the like, in accordance with the law. And it reveals the process that they went through to follow the law. That's what I get about it. And that's really

what drew my interest.  There's a larger group of material, but that's what drew my interest to this subset.  I'll say no more.

Why shouldn't I, um, subject to the protective order that it's used, "Just for the purposes of this litigation.  It's not to be spread around.  We'll see if any of it gets in evidence."  I'll hear you.

MR. KANTER:  Thank you, your Honor.

I will start with one clarification in light of the examination that is, um, we're in the middle of, and that was the reference to the so-called "ROAs," "Reports Of Analysis," and Ms. Conlon can correct me, I thought I heard, um, her to say that some of the ROAs are in the subset.  They are not.

MS. CONLON:  And I stood up to say exactly that. I wanted to indicate to the Court that I think I made a mistake.

THE COURT:  Okay, so we're not talking about that.

MR. KANTER:  I just want to --

THE COURT:  Go ahead, as to the materials I have here.

MR. KANTER:  To begin with and that I think as the -- and that three of the documents in the subset -- this is the thing.  There were two in-camera submissions.  The third, we explained the confusion

JA740

there, which had to do with merely, you know -- the first in-camera submission was redacted and we provided it to the plaintiffs, it's been the subject of the plaintiffs' motion to compel, which your Honor decided in the government's favor, denying the plaintiffs' motion to compel.

So the point regarding the subset that I wanted to make was that the first document in the subset and the last two were part of what was litigated in that motion to compel. That's the only sort of point of clarification. Because, um, the documents in the subset straddled the two submissions.

THE COURT: Understood. All right. I don't want to take up your time.

MR. KANTER: Yes.

THE COURT: But let me say this. On this issue, and indeed throughout the litigation I've made it clear, that I'm not impugning in any way the good faith of counsel for the defense, or of the plaintiffs. All right? Trials are living things. Now -- it's one thing in the run-up to a trial, you're ruling on discovery motions, but now it's put to me. I am the factfinder here. I take that with extraordinary seriousness.

And so now -- though in a jury-waived case I'm perfectly able to look at something and say -- for

JA741

instance, I've adhered to the enhanced Visa scrutiny. I think "Well that's national security, put that out," we're dealing with people who at one time we invited in and we gave them Visas, green cards, and the like, and that's what I'm looking at. And that's the class, if I think of it as a class, the class of people who these lawyers represent.

So putting that to one side, I look at the rest of it, some of it's interesting to me. And I'm not judging anything, I'm simply telling you why it's interesting to me.

MR. KANTER: Your Honor, I take your point --

THE COURT: So you tell me why I should put it aside and not have it part of the record.

MR. KANTER: Exactly. I will offer this up. That it is a difficult calculus that often the law enforcement, um, officers and investigators, and so forth, are confronted with.

THE COURT: Except where's the government if I reveal any of it?

MR. KANTER: We represent the defendant agencies.

THE COURT: Correct.

MR. KANTER: And those agencies reviewed these documents carefully, at multiple levels, and it's -- it's a question. As your Honor pointed out, there are

JA742

instances in which the government may choose to -- not with waiving a privilege, but nevertheless turn something over. And in the case we have decided that certain materials will only be shown attorneys' eyes only. That is an ongoing discussion and consideration.

But I take the point your Honor is making, which is we're saying this goes to the matters at issue in the factfinding of the Court. And you're asking why is it that the government would stand on its privileges with respect to some of that information? I take that point. I will take it back to the agencies. And -- but, you know, we, um, we want to represent the agencies, extend the privileges that are theirs to assert. And, um --

THE COURT: All right, here's what we're going to do. Now -- you go ahead and do that, but -- and I'll take responsibility.

By 5:00 this afternoon, redact -- if I've missed any, all cell phone numbers, all e-mail addresses, and otherwise turn it over. Subject to a complete call-back if the agency -- because the question is am I going to have it as part of the record or not? It's attorneys' eyes only, it's used for the purposes of this litigation. That's the order. Let's call the witness back and we'll run till 12:00.

MR. KANTER: I take the order, I'm not challenging

JA743

it --

THE COURT: Feel free in the appropriate way.

MR. KANTER: A point of information, which is we have redacted and we've shown the Court our redactions with respect to what you just referenced. Already it is before your Honor. And secondly, to the extent that your Honor is proposing to turn over material that is outside those redactions, we would request a stay of the ruling so the Solicitor General can decide whether or not to seek mandates. But I don't understand your Honor to be turning over material that we have redacted.

THE COURT: Wait a minute. Wait a minute. I just -- I just -- yes, and I've made --

MR. KANTER: We provided redactions.

THE COURT: I know you have, and I've sustained so much of them as, um -- excuse me. I've sustained so much of them as excised cell phone and e-mail addresses. You're going to have to do it again, because as to the rest of it, I overrule it. Now you make a motion to stay --

MR. KANTER: I make a motion to stay.

THE COURT: Of course, which is your right. I allow the motion until 9:00 tomorrow morning. You will then turn it over unless there is a stay from some court of competent jurisdiction. I have the obligation to try

this case and there's exigencies in moving through the case. That's the order of the Court.

All right.

MR. WILKENS: Your Honor, may I be briefly heard for the plaintiffs? Scott Wilkens.

THE COURT: Well I don't think you'll be part of it, but, Mr. Wilkens, we've got a witness coming in, but it's always a pleasure for you to fill the time.

(Pause.)

MR. WILKENS: I will sit down, your Honor. Thank you.

THE COURT: Well there's no need, I spoke seriously.

Yes, Mr. Biale?

MR. BIALE: Your Honor, briefly there's another issue.

We have a lawyer who went down to New York for the deposition that was --

THE COURT: Oh, I know. That's right.

You know I'm troubled by this nonproduction of witnesses. I sense some gamesmanship here. Having said that, I'm not going to compel his attendance. It bears on the Court's assessment of these witnesses when he's called upon to testify. Believe me, it bears on it that he was not produced against this background.

I have urged cooperation in significant respects, though I don't challenge anyone's good faith, there has not been cooperation. I need to get through the trial. The parties are benefitted if I get through the trial. Now let's get the witness in here.

(Pause.)

THE COURT: Where'd he go?

MS. SANTORA: Your Honor, Victoria Santora for the defendants. If I may? We were not able to respond to the motion to compel, but I do just want to note that as plaintiffs --

THE COURT: You just won it?

MS. SANTORA: So I did -- just to the extent that you said that you will consider the witness's conduct in not appearing at trial, I do want to note that it was a logistical issue more on the part of the attorneys than on the witness.

THE COURT: Then it could be worked out rather than having to make motions. You know we have days. We have a weekend here.

MS. SANTORA: I agree, your Honor. And we are willing to cooperate with opposing counsel.

THE COURT: I expect it. And that's helpful. Thank you, Ms. Santora.

What happened to -- usually when we have a jury

and we have sequestered witnesses and they don't come when you call them, I tell stories about the courtroom to the jury.

MS. CONLON:  We'll hear your stories, your Honor.

THE COURT:  No, here he is.

(Mr. Hatch, the witness, enters courtroom.)

THE COURT:  And, Ms. Conlon, you may continue.

MS. CONLON:  Thank you, your Honor.

DIRECT EXAMINATION BY MS. CONLON:  (Continued.)

Q.  Okay, Mr. Hatch, before the break you were describing for the Court, um, the instructions that you received at the March meeting with HSA leadership concerning student protestors.  One of the things you said was that you were directed, um, to review and analyze whether any of the student protestors had, for example, supported terrorist organizations.

Did anybody specify Hamas in particular in the meeting?

A.  I don't --

MS. STROKUS:  Objection, your Honor, to the extent it calls for the deliberative process in the discussions in the meeting.

THE COURT:  Oh, actually, Ms. Strokus, you're right, you must ask were any of the directions relative

to Hamas?

MS. CONLON: Yes, I will rephrase it.

THE COURT: (To the witness.) Do you see the line? Not the discussions, but the directions about what you were going to do.

Did anyone mention that you were, among other things, going to take a look at Hamas or pro-Hamas activity?

THE WITNESS: Um, yes, we -- the -- supporting Hamas would be, um, relative to a violation of law. So it would be standard practice for an analyst to that anyway. However, um, my direction to the team, um, was to look for, um -- as an example, to look for Hamas, any statements in support of Hamas, or any activities.

THE COURT: And a question for me.

Hamas was a designated terrorist organization well before January 20th of this year, correct?

THE WITNESS: Yes, your Honor, that's correct.

THE COURT: All right.

Go ahead, Ms. Conlon.

MS. CONLON: Thank you.

Q. You were just talking about the directions that you gave to others, but I want to bring it back to the directions you received from HSI leadership before we discuss what you may have directed others to do. So

sticking with what you were directed to do as a result of this meeting.

Were you specifically directed to look at whether student protesters supported Hamas as opposed to just all foreign terrorist organizations, was there any specific direction concerning Hamas?

A. I don't recall receiving any specific direction to me to look at Hamas.

Q. You don't recall anything in the meeting about student protestors resulting in a direction to review whether the student protestors expressed support for Hamas?

MS. STROKUS: Objection, your Honor, deliberative process privilege. He's asking about --

THE COURT: Please. Please. I'm not a fan of speaking objections. It's sufficient, and I think it is your right, to say "Objection, deliberative process privilege." That calls into mind what we're talking about. If I need argument, I'll ask for it.

This is directions. It's limited to directions.

And do you understand the question?

THE WITNESS: Yes, but I think, um, counsel rephrased the question from one to the other.

THE COURT: Go ahead.

A. So I do not recall receiving any specific direction

from my supervisors to, um, focus directly and solely on Hamas.

Q. Do you recall receiving any direction to focus on any particular foreign terrorist organization?

A. I recall receiving direction to focus on violations of the U.S. law. I don't -- I don't recall any instruction to me specifically to Hamas.

Q. Well earlier when you were answering the Court's questions about the instructions you received, you give certain examples of the kind of things that the Office of Intelligence was supposed to be on the lookout for. And your examples, as I recall, included inciting violence, supporting terrorist organizations, etc.

But it's true that the direction was actually broader, it was to look for any potential violations of Title VIII, correct?

A. Yes, any violations of U.S. law.

Q. Including Title VIII?

A. Our organization specializes in immigration and customs law.

Q. And the examples you were giving were examples that might be particularly relevant to the review of a student protester's conduct, is that correct?

A. Yes. You're asking me to speculate and those are the ones that would be -- those are the ones that I can

think of that would be relevant right now.

Q.  Well you are an authority here, so I'm happy to have your understanding of it.

Now when you say "supporting terrorist organizations," in this context, were you given any direction about what "supporting" means here for the work of the Office of Intelligence?

A.  I was not.

THE COURT:  From something you said earlier, I got the sense, but let's see if I heard it right.  And thereafter you carried out that mission, but you carried it out in your usual way?

THE WITNESS:  Yes, sir.

Q.  What kind of evidence does the Office of Intelligence look for as indicative potentially that a noncitizen supports a foreign terrorist organization?  Can you -- I'm trying to understand what you mean when you say "supporting a terrorist organization"?

MS. STROKUS:  Objection, your Honor.

THE COURT:  Yeah, sustained.

Q.  What does "supporting a terrorist organization" mean when you say it?

A.  (Pause.)  Again the analyst looks for indicators, does not make the judgment on whether the activity actually supports or doesn't support terrorism.  So we

look for activities, um, such as, um, support for a terrorist -- statements in support of a terrorist leader, um, everything from that to material support, which would be providing money to a terrorist organization or making, um, donations to an organization that's affiliated with a terrorist organization. But I really don't want to say any more detail than that.

THE COURT: And that's perfectly acceptable to the Court. Let me give you this example.

If you find out that a person was saying, um, statements like this, "Hamas is right, what Hamas is doing is right for the situation, or for the Middle East, or just right." And I'll stop there.

How does that fit or doesn't it?

THE WITNESS: Yes. In that example, the analyst would be, um, within policy to include that statement, because again the analyst is just collecting the facts.

THE COURT: Right.

THE WITNESS: If the person actually didn't say that or someone alleged they say that and the analyst found out that they didn't say that, then they would write the facts and not the allegations. So it's just factfinding.

If they, um, made a statement in support of the Yankees, the analyst wouldn't put it in there because

it's not related to a national security or public safety issue. Although in the case of the Yankees, it might be.

Q. Are you a Nationals' fan?

A. I'm a Red Sox fan.

Q. Oh, then you're in the right place.

So the Court gave you an example of a statement that say, for example, "Hamas is right," that could be relevant to, um, an analyst's compiling of a report of analysis about a student protester.

Could a statement like "Free Palestinian" be similarly relevant?

A. Again all of these are on a case-by-case basis. But it could be, depending on the circumstances of that individual. But as long as that statement was factual and we could corroborate that it was made by the individual under the circumstances described.

Q. And just to understand the flip side of it. Could a statement condemning the actions or the existence of Israel still be relevant to a report of an analyst in the same way?

A. Again, it depends on the circumstances of the individual. It depends on the individual circumstances. But the analyst would -- as long as that statement is factual, the analyst would not be against policy in

including that in the Report Of Analysis. And it isn't the, um, the presence or existence of a Report of Analysis does not presume guilt or innocence, it's just factfinding.

Q. Okay. So it's fair to say the analyst's job is to include whatever facts could be relevant to a determination that a person, um, act contrary to U.S. law and that could include the person's speech, correct?

A. That's correct. It includes all kinds of activities.

Q. Now, um, this -- back to the March meeting -- we'll move on from it momentarily, but back to this March meeting where you received this guidance to produce these reports.

A team was formed to carry out that line of effort, correct?

A. I don't believe the team was formed during that meeting, I think the team was formed after that meeting, maybe a week after, several days after. I don't know the exact timeframe.

Q. And for our ease of reference here, that team's nickname was the Tiger Team?

A. It was called the "Tiger Team," yes.

Q. And the Tiger Team included senior officials carrying out this line of effort?

A.   The Tiger Team consisted of not senior officials, it consisted of analysts, an agent, um, and led by the unit chief you mentioned earlier, Roy Stanley.  He was not the unit chief at the time -- he was not the division chief at the time, he was the unit chief.

Q.   Were you part of the Tiger Team?

A.   No, I was not part of the Tiger Team.

Q.   Who, um, briefed you on the progress of the Tiger Team?

A.   Um, the unit chief, often through my deputy Brad Edder, was the one briefing me on the activities, or the progress of the Tiger Team.

Q.   Now the Tiger Team, which was formed shortly after this March, um, meeting had rolling discussions over the following days about its work, right?

A.   I believe they had daily discussions.

Q.   "Daily," you said?

A.   Within the team, you're asking me about discussions within the team?

Q.   Actually, um, now understanding you're not a part of the team, I'm interested in your contact with the team.

     So how often did you speak with the team?

A.   I did not speak with the team as a group, I spoke with the team leader maybe once a day on all issues, not just, um, the team's issues, and specifically with the

JA755

team, um, I mean over the last -- over -- maybe
initially once a day. But after weeks, when the team
was home, maybe every other day, um, three times a week
maybe.

Q. And the team itself, so far as you knew, did its
work on a daily basis, right?

A. Yes.

Q. When you had discussions with senior leadership
about the work of the Tiger Team, those discussions
included the people you mentioned earlier, Derrick
Gordon, Robert Handler, William Walker, Roy Stanley, is
that right?

A. Yes.

Q. Okay. So I want to talk about the Tiger Team's
process for this line of effort.

The Tiger Team was -- well, withdrawn.

At the March meeting, I understand that a
procedure to expedite this work was set up, and I'm
thinking of what you said in your deposition, in
particular that the Office of Intelligence would do the
factfinding, the National Security Division of Homeland
Security Investigations would compile the information in
a letter to the State Department, and the State
Department would make the decision on what action to
take.

JA756

Is that a fair summary of the process that emerged as a result of this meeting?

A. Yes, that's a fair summary of the three steps.

Q. Okay. Now you have said, a couple of times, that Reports Of Analysis that the Office of Intelligence created did not have a recommendation of actions to take, right?

A. That's correct.

Q. The recommendations for any actions to take it overlaid when the Report Of Analysis goes from the Office of Intelligence to the National Security Division, correct?

A. The National Security Division is the first step in the decision-making process on making judgments or assessments of the facts collected in the ROA.

Q. And it's your understanding that the National Security Division conveys its views of the next appropriate step in a letter that the National Security Division sends to the State Department, correct?

MS. STROKUS: Objection, your Honor, this calls for speculation. He does not work in the National Security --

THE COURT: Well we'll see if he knows, whether he worked there or not.

Is that correct?

THE WITNESS:  That is the description of the process.  How the mechanics worked and how it was conveyed to the State Department?  I don't know the details of that.

Q.  Well we talked in your deposition, right, about how the National Security Division would send a letter to the Department of State called a "DHS referral."  Do you remember that?

A.  Yes, only because you showed me -- I did not know it was even called a "DHS referral."  I just knew it as the National Security Division's letter.

Q.  Okay.  So from your perspective, the way it works is, you, your Office of Intelligence gives the report to the National Security Division, and that division, which is led by Andre Watson, gives a letter, we'll call it the "DHS letter," to, um, the State Department?

A.  That's how I understand it.

Q.  Okay.  Now the first instance of a recommendation being made by anyone in the chain of decision-makers occurs in that step that the National Security Division takes, correct?

A.  Yes, that's not made in the Office of Intelligence.

Q.  And I mention this, but just for clarity.

The head of the National Security Division is Andre Watson, is that right?

JA758

A.   That's correct.

Q.   And he is the person who sends the letters that come from the Office of Intelligence -- or I'm sorry, withdrawn, and strike that.

He's the person who sends the letter from the Department of Homeland Security to the Department of State conveying both the ROA produced by the Office of Intelligence and the letter from the Department of Homeland Security, correct?

A.   He's the one who signs the letter?  I do not know how it gets sent.

Q.   Yes, a good distinction.  He's the signer.  We don't know who the sender is.

Okay.  So you understood and understand that this three-step process is intended for the State Department to be able to make a determination, one way or the other, about whether a person's Visa, in the case of a Visa holder, should be revoked, correct?

A.   No.

Q.   Okay, tell me what's wrong with that?

A.   I think that's -- that may -- the State Department can use the ROA and the information we collect in whatever way they need to to make decisions related to the State Department.  I think Visa revocations is one way they may use it.  But it may not be the only way.

JA759

Q. Okay. Are you talking right now about how it generally works or how it worked in this 3-step process on student protesters?

A. It's my understanding that this way would include -- what I just said would include both of your scenarios.

Q. All right. And to be clear, what you're saying is that it would be up to the State Department to determine what the appropriate action was to take?

A. That's correct.

Q. And that could include you understood and understand a Visa revocation, right?

A. It could include a Visa revocation.

Q. And it could include a determination that a lawful permanent resident is removable, correct?

A. It could anything under their authorities and I believe in that case -- the example you just mentioned is one of their authorities.

Q. Now this process was -- the 3-step process was developed in conjunction with, um, Mr. Watson, who again is the head of the National Security Division, right?

A. Yes, but I don't -- this process could have existed. It's not a complicated process of factfinding, a letter to the authoritative decision-maker. So, um, this could have been used -- like I said, Title VIII's been around since the 1950s. This process would have been possible,

JA760

um, would have been acceptable at any time since Title VIII.

Q.  It may have been.  But you've been in your job for 6 years, and until the Tiger Team was formed and this meeting occurred, you had never seen the process work this way, is that right?

A.  That's right, since 2019, I had never seen it used.

Q.  And it is, as you say, a simple and sort of expedient process, just three steps, but to you it was new, correct?

A.  Yes, for me it was new.

Q.  Now when the State Department did act on these referrals, that information traveled back to DHS, correct?

MS. STROKUS:  Objection, your Honor, calls for speculation?

THE COURT:  Well I don't know that he knows, but we'll see.

If you know the answer, you may give it.

A.  I don't know the process for how it got back to, um -- I don't know the steps it took or the pathway it took to get back to HSI.

THE COURT:  That's his answer.

Q.  In this case, you were in Tiger Team discussions, consistent with this process, where you understood that

the Tiger Team received updates on whether the State Department had acted on its referrals, correct?

A. Yes, I believe that through National Security Division representatives, um, I believe the team knew if there was an action taken.

Q. An action like an arrest?

A. Yes.

Q. An action like detention?

A. Yes.

Q. Now you said earlier --

A. It did not go through me.

Q. Right.

A. So I'm making a, um, a speculation just from what I saw. But I did not dictate the process or have usability of how the mechanics worked.

Q. When you say it's speculation, but it's also from what you saw, referring to what you saw, you mean the meetings that you heard, whether or not you led them, correct?

A. Well I would hear back potentially from the unit chief or Brad Edder, my deputy, that there had been an action taken.

Q. Well it is not required that the State Department let the Department of Homeland Security know that it's taking an action on a referral, right?

JA762

MS. STROKUS: Objection, calls for speculation.

THE COURT: Sustained. Sustained.

Q. In your experience, you often do not learn whether or not the State Department has acted on a referral that HSI has sent, correct?

A. Me personally? No.

Q. And it's your understanding that HSI often is not informed of what happens to a referral that it sends to the State Department, right?

A. You ask me? I'm only speaking for the Office of Intell. HSI? You'd have to ask -- that's the operational part, the investigative part, the law enforcement part of the agency, not the intelligence part. So I don't have visibility in how or when or under what circumstances they would or would not be notified.

Q. And when you say "HSI," the operations part is separate from the Office of Intelligence, are you referring to Mr. Watson of the National Security Division?

A. The National Security Division. The other divisions I mentioned in my deposition, all, um, none of them report to me, um, they all report to the same deputy that I do. So, no, I don't have any authority over them. I don't have, um -- I'm not required to have

visibility of their actions.

Q. Just a moment. (Pause.)

It is your understanding that HSI leadership has had ongoing conversations with State Department employees about the student protesters, correct?

A. It is my understanding that, um, HSI -- members of HSI have had conversations with the Sate Department. I don't know if I'm qualified to make the determination if they're ongoing or at what frequency.

Q. Okay. So this three-step simple process, um, required HSI to reallocate some of its personnel, right?

A. It required me to reallocate some of my analysts, um, because of the workload.

Q. People were moved from the Counterterrorism Intelligence Unit to work on this effort, correct?

A. From the Counterintelligence Unit, the Counterterrorism Intelligence Unit, from the Cyber Intelligence Unit, from the Global Trade Intelligence Unit, from all different parts of HSI intelligence.

Q. And that was, as you say, because of the workload?

A. That's correct.

Q. Now, um, I want to talk about that workload and what it resulted in.

Here hours of labor were generated in response to lists of names of student protesters, right?

JA764

A. Yes, but we were working off a number of sources, including lists.

Q. Now you saw a number of sources, but the lists were communicated to you through Derrick Gordon, correct?

A. They were communicated to the leadership, including through the people we mentioned before.

Q. None of the student protester names came to you from any source other than HSI leadership, correct?

A. They always came through, um, HSI, um, yes, leadership positions. We did not get -- I did not get any lists sent to me directly from anyone outside the agency.

Q. These names were given to you. Were they given to you in a written form or verbally?

A. Again, um -- I think most of them were -- I don't know how they were --

Q. If you don't recall --

A. I don't recall how.

Q. Okay.

A. And again, they usually did not go through me either, they went to my deputy or to the team leader.

Q. The names went from Mr. Gordon either to you or to your deputy or the leader of the Tiger Team, is that right?

A. That's correct.

JA765

Q. And actually, I understand just now, and I can understand why, you don't recall how the names were transmitted to you. I'd like to see if we can refresh your recollection. So just give me one moment to see if I can find something that might be useful. (Pause.)

Okay, I'd like to show you -- or actually we don't even need to use the screen, because you have a binder. Could you just look for me at Page 88 of the transcript, and would you review just Lines 15 to 22. And when you've had a moment to do that, just let me know that you've done that, and then I'd like to ask you a question.

MS. STROKUS: Your Honor, can I request that we do actually use the screen as well here for the government's counsels' purpose?

THE COURT: You don't have it? Yes, that may be done if it can be done. But you may press on, Ms. Conlon.

MS. CONLON: I can press on. Okay, we'll start putting it up.

(On screen.)

Q. Okay. Does looking at Page 88 refresh your recollection at all as to whether you received any names and requests to generate reports from Mr. Gordon in writing or orally?

A. Yes, in my deposition I said verbal, but when you asked me about it now, I was thinking about the Canary list, which was over 5,000 names, and I don't think we got them verbally.

Q. I will turn to that in a moment.

THE COURT: Wait, I'm now not understanding. The what list, um, over 5000 names?

THE WITNESS: The Canary Mission list.

THE COURT: Oh, the Canary Mission list had over 5,000 names. So it didn't make any sense when you said you got that verbally. You mean someone said, "Here is a list that the Canary Mission has put together?

THE WITNESS: Yes.

THE COURT: I just want to understand.

THE WITNESS: Yes, sir. And actually, um, I need to correct myself, because, um, when I was answering the question I was thinking of the Canary Mission list, which is thousands of names, and I was thinking we would not have gotten that verbally. But actually we, um, the direction was to look at the website and that was a verbal direction, so. I'm trying to recall a conversation from a long time ago.

THE COURT: And I'm equally trying to understand. So here's what I understand.

Because the Canary Mission had a website, you were

directed to take a look at this website for leads?

THE WITNESS: That's correct, yes, sir.

THE COURT: All right.

Q. Okay. The direction to look at the Canary Mission website for its list was given to you in the March meeting that was discussed or was it given to you at another time?

A. I don't recall when it was given to us.

Q. And do you recall who gave you the direction?

A. I don't remember who mentioned it.

Q. Do you recall in what setting you received the direction, like a briefing, a meeting?

A. I don't know.

Q. Okay. But your understanding is that the Office of Intelligence should generate Reports Of Analysis on the names of persons on the Canary Mission's website lists, is that correct?

A. That we should look at the individuals named in the Canary Mission website and, um, in that process, when we look at an individual and do research on an individual, it is our process to do an ROA when we have relevant information and activities.

THE COURT: So that's over 5,000 people, is that right?

THE WITNESS: Yes, sir.

THE COURT: Yeah. Okay.

THE WITNESS: Which shows why we needed a Tiger Team. A normal division, a normal unit or section or group of analysts, um, operating in our normal organizational construct couldn't handle that workload.

THE COURT: Yes. Thank you.

Q. And was there a particular timeframe in which the Tiger Team needed to try to get through this very long list?

A. We are an organization or an agency that, um, in a world where, um, taking months to do things is not acceptable. So, yeah, it -- we were not -- I was not going to be allowed to say we've got 5 -- well you know a small number of analysts on this, it's going to take them 6 months to get through 5,000 names. I was not given a deadline. But I knew from how we were organized and how we worked that we needed to work through this expeditiously.

Q. What is your understanding of why the Canary Missions list was the list to use for this project?

A. It was one -- it was a list that made accusations or, um, asserted a lot of information like, um, these protesters are involved in violent activities, are condoning or supporting violence, possibly even terrorist organizations, and that list was, I think,

visible to -- or known to a lot of people. And because we're one of the agencies that is responsible for investigating this type of activity, as it relates to immigration and customs offenses, it seemed natural that we would get the list and have to review it.

Q. And when you say "get the list," um, is it your understanding Canary Mission provided the list to someone in the government?

A. I don't -- I don't know how we, um, got the notification. I don't know who notified us that this website exists. But I can say that Canary Mission is not part of the U.S. government. It is not information that we would take as an authoritative source or -- and we did not work with the individuals who created the website. I don't know who creates the website. We don't have a relationship with the creators of the website.

Q. You had never, prior to 2025, been asked to specifically review people identified on the Canary Mission website, right?

A. I did not know the Canary Mission website existed until I think after March, March or later of this year.

Q. But you have since then seen the Canary website?

A. I have looked at the Canary Mission website once.

Q. What was the occasion that led you to look at it?

A.   I was curious, because I had heard of it.

Q.   Do you recall approximately how long ago that was?

A.   Maybe March, April.

Q.   Do you have an understanding of what Canary Mission does, like, as an organization, what it is?

A.   No, I don't have any details on what, um -- only in what type of information was presented on the website.

Q.   And in broad strokes, do you understand that Canary Mission identifies people who allegedly promote hatred of the United States, Israel, and the Jewish people?

        MS. STROKUS:  Objection.

        THE COURT:  Well on this foundation, I'm going to sustain that.  He's told us what he knows about it.

Q.   So it's fair to say that what you know about it comes from what's on this website?

A.   Yes, that's correct.

Q.   Okay.  Do you have an understanding of how Canary Mission identifies the people on its website?

        MS. STROKUS:  Objection, your Honor.

        THE COURT:  Well I'm going to let him answer that yes or no.

        Do you have an understanding?

        THE WITNESS:  No.

        THE COURT:  That may stand.

Q.   Do you have any understanding of what process they

use or don't to verify the information they put on the website?

MS. STROKUS: Objection, your Honor.

THE COURT: Well you know she's objecting vigorously and there's no foundation for this. He answered no to the last question. He looked at the website once. An understanding? I suppose he might have an understanding if there was some statement from some other person or a source. But this isn't discovery.

MS. CONLON: No, your Honor, I don't want to touch on anything that could be deliberative, but I want to better understand this witness's understanding of the work that he was doing.

THE COURT: I have it.

MS. CONLON: Okay.

THE COURT: Again, this isn't a game, you're trying to persuade the factfinder here. And here's what I'm getting from this witness.

That, um, they got the -- I shouldn't even say "got the list," somebody had access to this website. Somebody, a superior, said, "Look here, check these people out." Well that's not precisely what he said, but the transcript will govern. And he got on it. And that because there's a reference to Canary Mission, he

JA772

went and looked at it once and saw whatever he saw. And he's careful to point out, "They're not us." His looking at it told him that they make accusations. And I will tell you, it's significant to me that he said, "We approached it with an independent view," not simply accepting accusations that they got. Now it's not a discovery deposition. I think we've gotten his knowledge. But I'll ask this question.

Have I accurately characterized your testimony? Because I didn't use your words exactly and I was just saying this is what I'm hearing.

Have I accurately characterized it?

THE WITNESS: Yes, your Honor.

THE COURT: All right. I think that's what he knows.

MS. CONLON: And, your Honor, if that's all he knows, that's all he knows. But we heard about a list of 5,000 people on the website. And I appreciate this isn't discovery, but it's news to us that that is how it worked.

THE COURT: Well it's news to me, and I find it very interesting. But I'm telling you what I got from it. And now we've gotten it, so let's move on.

Q. So, Mr. Hatch, um, understanding that you have not spent time looking at the website, have you seen Reports

JA773

of Analysis that were generated in response to the directive to look at the Canary Mission website?

A.  We, um -- the analysts wrote ROAs on personnel or individuals who are named in the website.

Q.  To your knowledge, did the analysts include, in their ROAs, the allegations from the Canary Mission website as relevant -- as information that could be relevant to a potential violation of Title VIII?

MS. STROKUS:  Objection, your Honor.

THE COURT:  Sustained.  The best evidence are the ROAs.

MS. CONLON:  And, your Honor, it's ironic because I don't have them and I wish I did.

THE COURT:  I understand.

MS. CONLON:  But I can't offer them to you.

THE COURT:  And we will see about that.  Because they would seem, at least with respect to the target individuals, to be relevant.  Perhaps they should have been prepared.  I've made a ruling now with respect to a subset of documents.  It's clarified that I don't have them.  I'm wondering about that.

Go ahead.

MS. CONLON:  Okay.  I'm sorry, I'm getting a correction from somebody.  (Talks to co-counsel.)  Yes. Okay.

JA774

It is our understanding that the Court did receive all 5 of the Reports of Analysis on the targeted individuals in a production -- a document production to the Court on June 11th, that is, um --

(To co-counsel.)  I think that's correct?

THE COURT:  Well I'll look at what I have, physically.

MS. CONLON:  Okay.  And for the Court's ease of reference, we understand that to be Docket 131, that docket entry.

THE COURT:  Thank you.

MS. CONLON:  Okay.

Q.  Now, um, you said that the project was to look at this list from Canary Mission.  Did the list of student protesters -- it included information of student protesters identified through other means apart from simply Canary Mission?

MS. STROKUS:  Objection, your Honor, a mischaracterization of testimony.

THE COURT:  Well let me ask this question.

She started out saying how much -- how many ROAs did you look at, and you used the word the "student protester effort," and as you started, I didn't know what you were talking about.

Do we now understand that's the Tiger Team's work

JA775

after you got this list? Well I shouldn't even say "got this list," after the list was provided on the website?

THE WITNESS: Yes, your Honor. But the Canary Mission wasn't the only, um, group of students. It was most of it.

THE COURT: Yes.

THE WITNESS: But it wasn't the only way that we received, um, information on protesters. And also there were duplicates, we received information about the same protester from multiple sources. But Canary Mission was the most inclusive of that.

THE COURT: Do you recall other sources? Without revealing investigatory matters.

THE WITNESS: There was another website that does the same thing. I don't remember the name of it. Um, and --

THE COURT: If I suggested "Betar"?

THE WITNESS: That sounds right, sir.

THE COURT: Okay. Go ahead.

THE WITNESS: And then we would get individual names or we could even get a list from a police department if any protesters were arrested. We could get that.

So the list, um, came in from all different directions. The team -- the source of the information

was not necessarily relevant to the analyst, because the analysts were doing factfinding, and the analysts were not reporting, um, that, um -- where the name came from, because They're independent from that.  Nor would they -- it's not our standard practice, it's not within policy for us to report other people's uncorroborated allegations or assertions.  Everything, like I said before, needs to be collaborated.

THE COURT:  So these sources though that you've now identified, as far as my notes, they came down from Mr. Jordan, is that right?

THE WITNESS:  Mr. Gordon.

THE COURT:  Mr. Gordon.  They all come down from him.  But of course you're looking at them.  And you can see if a police department -- for instance, if it arrested someone at a protest, whether it fit within the scope of what the Tiger Team was doing?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  I think that it's noon.  I am -- and I apologize for this, the time is not counted against you, but we'll start promptly at 9:00 a.m. tomorrow morning.

The total elapsed time for the plaintiffs is 2 days, 15 minutes.  For the defense, 2 hours, 30 minutes.

We'll recess till 9:00 a.m. tomorrow morning.

JA777

We'll recess.

THE CLERK:  All rise.

(Adjourned, 12:00 p.m.)

JA778

CERTIFICATE

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Wednesday, July 9, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-9-25
_____
RICHARD H. ROMANOW   Date

JA779

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 1, Page 1 to 71

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
            Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
            Defendants

*********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Thursday, July 10, 2025

*******

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

JA780

APPEARANCES

RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
   Knight First Amendment Institute at Columbia
   University
   475 Riverside Drive, Suite 302
   New York, NY 10115
   (646) 745-8500
   E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
   Sher Tremonte LLP
   90 Broad Street, 23rd Floor
   New York, NY 10004
   (212) 540-0675
   Email: Cgans@shertremonte.com
   For Plaintiffs


ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
   DOJ-Civ
   P.O. 878
   Ben Franklin Station
   Washington, DC 20044
   (202) 616-9123
   Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
   United States Attorney's Office
   1 Courthouse Way, Suite 9200
   Boston, MA 02210
   Email: Shawna.yen@usdoj.gov
   For Defendants

JA781

I N D E X

WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

PETER HATCH   (Continued.)

  By Ms. Conlon          10

  By Ms. Santora

E X H I B I T S

EXHIBIT 232................................. 29

EXHIBIT 233................................. 47

EXHIBIT 234................................. 53

EXHIBIT 235................................. 60

EXHIBIT 236................................. 66

JA782

P R O C E E D I N G S

(Begins, 9:00 a.m.)

THE COURT:  Let me simply repeat, as I have allowed internet access in these proceedings, that if you are accessing these proceedings by the internet, the rules of court remain in full force and effect, that means there is no taping, streaming, rebroadcast, screen shots, or other transcription of these proceedings.

It is very important that you keep your microphone muted, and if you do not keep it muted, I will have to cut you off from access.

Now there's before the Court, and I've reviewed it, the defendants' motion to clarify the July 9 bench ruling.  There's no reason to clarify.  This is an attempt to cabin in the Court's ruling.  The transcript makes clear it applies to all the documents that were furnished, and I stand on that ruling.

Now, again the question, Mr. Kanter, you've complied with the Court's order?

MR. KANTER:  Yes, your Honor.

THE COURT:  Thank you.

MR. KANTER:  All the documents that have been furnished to the government in the subset have been turned over to the plaintiffs before the deadline.

THE COURT:  And that was the Court's order.  I'm

satisfied with that.

I have also, because it was a matter of issue yesterday, reviewed the documents that I have and I have ROAs for certain of the so-called "targets" here, and the Watson letters, as soon as I can make copies, they'll be turned over to you.

All right.

MR. BIALE: Your Honor, I just wanted to confirm what Mr. Kanter said, and we received a traunch of 18 pages of document. I don't know -- just putting that on the record so that --

THE COURT: Well you may have. You know I really have no reason to, um, impugn anyone's good faith and I'm not starting to.

MR. BIALE: Neither do I.

THE COURT: Please recall the witness.

MS. CONLON: Your Honor, I'm sorry, but before we begin, is there any possibility we could have -- the ROAs are the documents this witness is familiar with, helps oversee the preparation of, and knows about. If there's any chance I can have them before I question him? I don't need a break, if I could have them so I can --

THE COURT: I'm doing the best I can.

MS. CONLON: Thank you.

JA784

THE COURT: As soon as we copy them, you will have them.

MS. CONLON: I'm trying to suggest that even if it's in the course of the examination, I would take them if I could, so I can discuss them with him.

THE COURT: And you understand the Court's procedure.

MS. CONLON: Yes.

THE COURT: When I have them, and I have looked at what I intend to give you, I have a good --

Yes, Mr. Hatch, come on up.

MS. CONLON: Thank you.

MR. KANTER: Your Honor, I have one question for the Court.

THE COURT: Yes, while the witness is returning.

MR. KANTER: And this is for the purpose of, um, the consideration by the government to file a mandamus petition.

THE COURT: Yes.

MR. KANTER: And I want to be accurate in the scope of that petition. Because your Honor indicated that it's an order related to the subset that I have turned over and complied with. The most -- what I would like to clarify --

THE COURT: The order did, yes, and I'm satisfied

JA785

with your compliance with the order.

MR. KANTER: What my question pertains to is an in-camera submission on June 11th that has documents that are not included in that subset.

THE COURT: Yes.

MR. KANTER: And which, if your Honor has ordered that the privileges covering those other documents have been waived, the government will likely be seeking mandamus to overturn that order.

THE COURT: I have made myself clear on the record, and I think I am only reiterating because the record will govern.

I have said that as to the mass of documents that the government has voluntarily submitted to it, evidently to further its case, I have determined that those documents relating to any changes in Visa applications, because they implicate national security, are privileged. I am treating them as in-camera, which I mean the only eyes on those documents are my eyes. And as to the remaining documents, I have overruled the assertions of privilege. I have ordered the production of certain of them. It seems to me the government has complied.

MR. KANTER: We have, your Honor.

THE COURT: I'm now, um, going to -- and they come

out of what's Exhibits B through K.  But you'll have to give me a moment to look it over.  They are the ROAs and the Watson letters and such attachments to particular ROAs that existed.

MR. KANTER:  Has your Honor --

THE COURT:  That does not exhaust the total documents that I have.  And as to those I've said -- I think I can reiterate --

MR. KANTER:  You said Friday noon was to assert LEP on those documents.

THE COURT:  That's correct.

MR. KANTER:  Thank you, your Honor.

THE COURT:  I said I was in a quandary, and I'm trying properly to manage the case.  And that is what I'm trying to do.

MR. KANTER:  As to the document over which --

THE COURT:  Wait.

MR. KANTER:  -- over which --

THE COURT:  Wait a minute.  Wait a minute.

MR. KANTER:  Yes.

THE COURT:  I want to start taking testimony, because time counts.  All right?  We can talk about it this afternoon.

Where is Mr. Hatch?

MS. CONLON:  Mr. Hatch was in the hallway.  He is

JA787

being retrieved.

THE COURT: Well -- but I want to use the time, Mr. Kanter.

MR. KANTER: Yes, I was asking specifically about the indication of the Presidential communications privilege with respect to a report sent by the Agencies to President Trump, as requested in his executive order. The government invoked the Presidential communications privilege. Your Honor held that --

THE COURT: I ordered the documents turned over to me. And as to that -- as to that, I, um, I think I am premature to say I overrule that. You've now identified that. As to that, it's under advisement.

Does that answer your question?

MR. KANTER: Yes.

THE COURT: And as to that, um -- actually I appreciate your correcting me because I accurately restated what earlier I had done. I am again reading these materials, working with them, and reflecting. And as to the document that you just made reference, it's under advisement. I have not overruled the privilege. Nor have I sustained it.

MR. KANTER: At the risk of --

THE COURT: No, the witness is here.

MR. KANTER: Okay, thank you, your Honor.

(Mr. Hatch takes the stand.)

THE COURT:  And would you remind the witness.

THE CLERK:  Sir, you remain under oath.  Do you understand?

THE WITNESS:  I do.

MR. BIALE:  And, Ms. Conlon, you may continue.

DIRECT EXAMINATION BY MS. CONLON:  (Continued.)

Q.  Good morning, Mr. Hatch, how are you?

A.  Good morning.

Q.  Now, um, we talked a bit yesterday about a list of names that you understand came from Canary Mission.  I have some further questions about that.

Canary mission doesn't limit the names on its website to immigrants.  The list you received, was that only for noncitizens?

A.  The list had, um, U.S. citizens on it, um, as well as noncitizens.

Q.  And that list of 5,000 names, which included any number of citizens and noncitizens, that wasn't limited to people who, um, were students, correct?

A.  Correct, I believe it had faculty, um, and others.

Q.  And when you talk about others --

THE COURT:  At the end of your -- and "others"?

THE WITNESS:  Yes, people that weren't faculty,

weren't students.

Q. For example, the list also included medical professionals, which is another category of people that the Canary Mission catalogs information about, correct?

A. I don't recall any -- any information about medical personnel.

Q. Do you recall information about other kinds of professionals who are neither faculty nor students?

A. No details on it, just that they were present.

Q. The list, um, itself, includes, as does the Canary Mission website, people who are thought to have a variety of attitudes, right?

A. I don't understand the question?

Q. For example, Canary Mission's website is not limited to and does not purport to reflect people who have only pro-Hamas views?

A. I don't know -- I only looked at the website once. So you're asking me to comment on what the website does, and I don't have those answers.

Q. Well I'm less interested in the website, I'm interested in the list.

So the list, which came from the Canary Mission website, as you understand it, it's fair to say it was not, um, culled, before it came to you, to remove people who might not be relevant to your work, is that right?

A. As I understand it, the list was just names of people, um, who are in protests.

Q. When you received the list, if you recall, it was a list someone had created of names as opposed to just a direction to go check out this website?

A. As I understand it, it was a direction to check out the website, and the team went through the website and generated the list.

Q. I see. So when you say a list of over 5,000 names, you're just doing your best to estimate the total number of people who are cataloged on the website, is that right?

A. That were listed on the website, that's correct.

Q. I see. It may be more than 5,000 names, for example?

A. It may be.

Q. Now you said -- you testified that the list -- I asked you why -- why start with this Canary Mission website population of people as opposed to something else for this project? And you said that the list made accusations, included protesters who were accused of having been involved in violent activities or condoning or supporting violence. But I understand you now to have just said, in fact, the effort was just to look at everyone on the list. And you would agree that not

JA791

everyone on the Canary Mission website, who was looked at, had been accused of engaging in violence, terrorism, or stuff like that?

A. Yes, I didn't say the website made accusations against every single person on the list. I don't know that. But in general the website was making some accusations. However the list that we looked at was to, um, look at the protesters, again, as I said before, not based on the allegations, but based on what we could find for information relative to violations of U.S. law.

Q. Now just so I'm clear, it was not your understanding that the list included only people alleged to have violated U.S. laws, just that the list was a starting point for the Office of Intelligence to discern whether there was information to support that?

A. Yes, that's what I just said.

Q. Okay. And I guess sitting here you've said that you looked at the website only once, so you're not in a position to speak about the kind of information that the Canary Mission website contained about these people, is that right?

A. Not in any kind of detail.

Q. Okay. The people who actually worked at the Canary Mission website to do this work, those were the investigative analysts?

JA792

A. Yes.

Q. Do you recall any direction or limitation given to those analysts about who to focus on among this large pool of people?

A. Um, the direction was to go through everyone we got a lead on, which would have contained the entire list.

Q. Now the list is a living thing, their website is frequently updated. Is that a direction that you received, was it only to look at who was there at a given point in time, or was it time-limited?

A. I don't know. I would suspect -- as they were going through the list, I would suspect that -- I would guess that the analyst would -- or I would say that the analyst would go through everyone on the list, and if there were additions, they would look at additions as well.

Q. A moment ago you used the --

THE COURT: Just let me interrupt, because she's focusing on this Canary Mission, and properly so to her point of view.

But as I recall your testimony, you were clear yesterday that that was not the only source of leads to which this Tiger Team devoted its time, is that correct?

THE WITNESS: Yes, your Honor.

THE COURT: Now I have notes and I have that in

mind. And I wouldn't -- I didn't mean that as criticism, I just want to be clear in my own mind.

But at least 5,000, give or take, you understood, came through this Canary Mission?

THE WITNESS: Yes, your Honor.

THE COURT: Thank you.

(Pause.)

Q. Now I appreciate the Court's clarification and I do want to move, in a moment, to the other sources of leads. But before we do, um, I understand that at least 75 percent of the leads that the Tiger Team looked at came from the Canary Mission website, is that correct?

A. Yes, most of the names came from Canary Mission.

Q. And whether or not you've spent time reviewing the website, you understand that the Canary Mission only purports or sets out to identify people with hatred at or negative views of Israel, correct?

A. I don't know the intention of --

MS. SANTORA: Objection.

THE COURT: Yeah, it's sustained.

MS. CONLON: Sorry.

THE COURT: I don't -- I don't think he knows that.

MS. CONLON: May I inquire as to his knowledge?

THE COURT: You may inquire.

Q. Okay. So understanding you haven't spent time studying the website, you have an understanding of what the Canary Mission organization purports to do, right?

A. No, I don't.

Q. You have no idea whether the Canary Mission purports to identify people with negative views towards countries other than Israel and the United States?

A. I have -- that's not the question you asked me. I have seen that they have done that. I do not know the intentions. I don't know the purpose, the stated intent of the website. I don't know any of the people behind the website. As I said before, the website is not associated with us or the U.S. government. So you're asking me to comment on their intentions and their purpose. I don't know their -- I don't know their intentions or their goals.

Q. Now I understand you can't speak to the people who organize it or what their personal intentions are, but you're given a list as a starting point for research and analysis. You have some understanding of what that list purported to contain of the population of people it's supposed to include. And you have an understanding that it was including people other than those who hold negative views of the United States, Israel, or Jewish people?

JA795

A.  I don't -- I saw indications of that, but to -- they may have had other intentions that I don't know about, so I can't say truthfully that I know that that's the purpose.

THE COURT:  No, no, as I understood her question, her question was, you have some familiarity with the list as it was generated, and I understood her to be asking, um, as you looked at that list, to the extent you did, were there -- not asking about the credibility of accusations or anything, but accusations of conduct other than hostility to the United States, to the State of Israel, or to Jewish people, other people on the list who have other hostilities or concerns?

THE WITNESS:  I don't -- I don't know if there were others.  I do know, um, what I recall is, um, that there were allegations of, um, anti-U.S., anti-Israel, um, pro-Palestine, pro-Hamas.  There may have been other things on there.

THE COURT:  Thank you.

Q.  And as far as you -- sorry.  Strike that.

All you recall about the general views of this group is what you've just described, is that correct?

A.  That's correct.

THE COURT:  By "this group," you mean the list?

MS. CONLON:  Yes.  Thank you for the

JA796

clarification. Yes, the list.

THE COURT: All right.

Q. Now the list, in terms of the bases proffered that the Office of Intelligence researched, the bases for the claim that any of these people held the views that you described, many of those bases were the people's public speech, correct?

A. Um, more to the bases was from social media or -- yeah, social media.

Q. In other words, something a person might post on their social media website indicating, for example, their support of Palestine, right?

A. That could be one example.

Q. Others on the list were characterized as anti-Israel for supporting boycott, divestment, and sanctions, against the State of Israel, correct?

A. By, um --

Q. Canary Mission.

A. I believe Canary Mission, those are among the allegations that the Canary Mission made.

Q. The allegations included those academics who supported boycotts of Israeli academics, correct?

A. I believe so, but I'm not 100 percent sure about, um, what those comments were. Again, I didn't have the details.

JA797

Q. The allegations included people who had spoken critically about Israel's actions in Gaza, correct?

A. Yes, I believe those were, um -- were some of the allegations, or allegations of that general type.

MS. CONLON: Just a moment.

(Pause.)

Q. Okay. Now, um, the Court clarified that Canary Mission was not the only source of names, another source of names that came up briefly yesterday was "Betar U.S.", correct?

A. That's correct.

Q. So "Betar U.S." you described as similar to Canary Mission, right?

A. I had heard it was similar to Canary Mission. I did not look and have not ever seen that website. I don't know any details about that website.

Q. Um, without speaking about its website, you understand that Betar U.S., like Canary Mission, purports to identify people who hold anti-Israel views, correct?

A. No, I don't know anything about that website. I didn't even know it was called "Betar U.S." I just heard "Betar."

Q. Okay. So how are you aware that any of the names came from Betar?

JA798

A. One of the, um, I believe the supervisor of the, um, of the team, um, mentioned that list and said that, um, the names looked to be the same as Canary Mission.

Q. In other words, a supervisor identified that certain of the people were -- had been, um, cataloged on each website, both Betar U.S. and Canary Mission, is that correct?

A. Could you repeat the question. I couldn't really hear you.

Q. Yes. And I'll just wait one second until -- okay, we're good.

A supervisor indicated to you that some of the names on the Canary Mission website also appeared on Betar's U.S.'s website, is that correct?

A. On Betar's website, yes.

Q. And are you familiar with Betar's deport list?

A. As I said, I don't have -- I didn't see any list from Betar myself. I had not checked that website. I do not know any details about Betar.

Q. Now back for a moment to Canary Mission.

You said that Canary Mission is itself just a source of names for the research and analysis that the Office of Intelligence was going to do, right?

A. It was a list of names of people -- of protesters.

Q. Right. And you testified that the Office of

Intelligence vetted and corroborated claims in the Canary Mission website profiles of these students, right?

A.    The Office of Intelligence did Reports of Analysis and looked at, um, the people on the list.  We did not corroborate all the information that was in it.  I wouldn't use that term to generalize what we did.

Q.  When you say that you looked at the allegations -- and you testified very clearly to the Court yesterday that the Office's research and analysis is independent of, not reliant upon what Canary Mission claims, right?

A.  That's correct.

Q.  So, for example, if Canary Mission included a description of an academic's research, the Office of Intelligence would endeavor to determine whether the person had in fact done the research as described by Canary Mission, right?

A.  Yes, we would not take any leads, information, as fact.

Q.  If a person was described on Canary Mission as having written a news article, the Office of Intelligence would endeavor to confirm whether or not the person had in fact written the article, right?

A.  As I said, we check all the information.  We don't take any leads, information, as fact.

Q. Are you finished?

A. Yes.

Q. Okay. Now in the case of a person alleged by Canary Mission to have written an article that was antisemitic, if that's the allegation, the Office of Intelligence wouldn't make its own determination that the article is antisemitic, because that's a conclusion, the Office of Intelligence would just look at the facts, did they write this article? Is that correct?

A. That's correct. We don't do deliberations. We don't present opinions. We don't make assessments.

Q. So the Office of Intelligence --

THE COURT: Ms. Conlon, I'm talking notes and we'll have the complete transcript, but much of this examination is hypothetical when here we're interested in particular people. I mean I have no problem with the sweep, what types of people, we can look at all of them, or the procedures generally, he's talked about that. But now you're getting into matters that I would think maybe we could talk about this case?

MS. CONLON: Yes, your Honor, and my team is looking at the actual ROAs and --

THE COURT: I understand, and if that's why you're doing it --

MS. CONLON: I'm hoping to return to that, but I

myself have not seen them.

THE COURT: Understood. Understood.

MS. CONLON: Okay. We'll go back in a moment once I've gotten to look at it.

THE COURT: Understand that at some stage my duty is going to be to make findings of fact and generalized statements about procedure unless their relevance isn't going to help me much.

MS. CONLON: I appreciate that, your Honor.

THE COURT: All right.

Go ahead.

MS. CONLON: And I am going to, on the fly, attempt to do my very best to get into the actual facts of these ROAs.

THE COURT: Yes. Go ahead.

Q. Okay. So -- and in sum, what we learn from this, the Office of Intelligence, as you've said, is not a decision-maker about whether a person actually violated a law, but in the role of gathering information that could be relevant to someone else's determination that a person violated U.S. law, is that a fair summary?

A. Can you say that again, please?

Q. Yeah. The Office of Intelligence is not in a position of deciding whether a person's speech or conduct violated any U.S. law, but instead it's just,

JA802

um, tasked with gathering information that could help a later decision-maker make that determination, is that fair to say?

A. The Office of Intelligence is not the decision-maker, it doesn't make the decisions, um, and as I just said, collects the facts.

Q. And lastly, on Reports of Analysis.

Reports of Analysis include everything that the Office of Intelligence identified that could be relevant to a determination that a person violated a United States law, correct?

A. That's what was strived to put into the -- that's the purpose of the ROA.

Q. Okay.

MS. CONLON: Let's please put Exhibit B -- well hold on, just a moment, your Honor. I apologize. I just need one second.

(Pause.)

Q. Okay.

MS. CONLON: Your Honor, if we could please put the exhibit that your Honor just gave us, which I believe is identified as Court Exhibit B --

THE COURT: Well, no, that's how it's on the materials I have, but if you have an exhibit, you might as well identify it by, um --

MS. CONLON:  Something.  Okay.

THE COURT:  -- by the date or something.

MS. CONLON:  Okay.

MR. KANTER:  Your Honor?

THE COURT:  Yes.

MR. KANTER:  There is a matter about the exhibits that counsel has, um, just referred to.  Those exhibits contain law-enforcement privileged information that the government is --

THE COURT:  Well I've overruled that.

MR. KANTER:  -- that the government is going to log, by Friday at noon, as the Court gave us the opportunity to do and, um --

THE COURT:  Well that's not a ground for delay.  I'm sorry.  I did give you that time.

MR. KANTER:  We waived it on June 11th, your Honor, and we brought it to the Court's attention --

THE COURT:  I've made my ruling.  She may use the document.

MS. CONLON:  I am holding here an exhibit that was provided to the Court, which I will mark for identification -- and I need a letter.  What letter again?  EK.  Marked for identification as EK.

THE COURT:  Fine.

MS. CONLON:  And I have only one copy, so I will

have to provide my one copy to the witness, I think, unless the government has an electronic copy that we could have the Court and the witness --

THE COURT: No, we'll work off papers, and I have a copy, so I'll look over his shoulder, and I'll know what he's looking at, and we can go from there.

(Pause.)

(Puts document on screen.)

MR. KANELLIS: Whoa, whoa, whoa, take it down.

MS. CONLON: I need a way of showing it. Okay, we can take it off the public one, but I need to show the witness and I have one copy to work with.

THE COURT: Just a moment. Have in mind that I'm presiding here.

MR. KANELLIS: Yes, your Honor, I just --

THE COURT: All right? And no one just shouts out orders to anybody in this court. I try not to. And you won't.

MR. KANELLIS: Understood, your Honor.

THE COURT: Very well.

The document is for identification. It is not admitted and therefore it is not for the public. The Clerk can take care of that. And the document may be shown to the witness.

MS. CONLON: Is there a way for me to put this so

only he sees it?

THE COURT: Yes, the Clerk can do that. But for identification.

MS. CONLON: Yeah.

(On witness screen only.)

Q. Okay. Here, I'm showing you, the witness, a document, and I'm endeavoring to have it be that you can see the whole thing. Yes, there you go.

(On witness screen.)

THE COURT: May I help you?

THE WITNESS: Sir, may I have moment to review the entire thing?

THE COURT: Yes. There's no magic to it being clipped together, so feel free to unclip it.

THE WITNESS: Yes. Sure.

(Pause.)

MS. CONLON: When you've had a moment to review it, just let me know. I'm not going to show anyone, I just want to ask you a question about it next.

A. (Looks.)

MS. SANTORA: Your Honor, we were under the impression that these documents were provided to plaintiffs' counsel, attorneys'-eyes only, in which case I don't think it's appropriate for the witness to be looking at it.

JA806

THE COURT: I'm going to allow her to use it with the witness.

A. (Looks.)

THE COURT: Mr. Hatch, I'm simply -- feel free to look at anything, but the way I have them clipped together, they may pertain to individuals other than Ms. Ozturk, because I clipped the documents all together. But I think she wants to ask you about Ms. Ozturk and a report -- yeah, why don't you stop there.

MS. CONLON: Yes. Okay.

Q. Mr. Hatch, having reviewed this document, do you recognize what it is?

A. It is a subject profile of, um, Ms. Ozturk.

Q. And when you say "subject profile," that means the HSI subject profile?

A. It's the Report of Analysis.

Q. They are the same thing, the HSI profile and a Report of Analysis?

A. A subject profile is a Report of Analysis.

Q. I see. Is this a fair and accurate copy of the subject profile that the Office of Intelligence created concerning Rumeysa Ozturk?

A. It appears to be.

Q. Okay.

JA807

MS. CONLON: I am offering what was EK for evidence as Exhibit 232.

THE COURT: And I just want to be clear, the documents you looked at -- we've both been looking at together, down to Exhibit I, the page that says "Exhibit I," are those pages, is that how they appeared in the, um, report? Does the question make sense? Is that -- there's attachments, for instance. And were those attachments part of that report?

THE WITNESS: I don't -- I don't remember, um, this report specifically, but it would be within policy to include these other attachments.

THE COURT: And, um, as you look at the document, that's the type of material that would, in the ordinary course, be attached to such a report?

THE WITNESS: Yes, that's correct, sir.

THE COURT: All right.

EK is -- with the pages he's identified, may be admitted as Exhibit 232. The defendants' rights are saved.

(Exhibit 232, marked.)

MS. CONLON: And if the Court would permit me to publish it, while we speak about it, so the government and everybody has it. As well as I'm covering, to be clear, personal identifying information that is on it in

terms of Social Security number or anything else.

MS. SANTORA: Your Honor, we object to the showing of the document publicly.

THE COURT: Overruled. It's a public trial. I've admitted it in evidence.

MS. SANTORA: This document, I believe, is confidential pursuant to the terms of the protective order and --

THE COURT: Well, but the protective order is between you and them. I preside. Now they may use it as evidence. The public is entitled to know what I'm going to base my findings on. And it may be used. And if I were to base them on anything else, um -- let me give you an example here, because this troubles me.

I agreed with Mr. Kanter that I may have spoken too quickly in overruling a Presidential privilege. But if that's so, why was the document given to me, the judge who must make the findings of fact? One can only infer from the submission of the document to me that it, one, was relevant, two, it was authentic, and three, somehow it was intended to persuade me of something.

Now if the privilege is upheld as to that document, then I'll be clear as to what I'm going to do, I'm going to set it aside, it won't have any bearing on this case at all.

Now you say that's so here.  I disagree.  I've made my rulings.  I express no opinion on any of this, but I'm going to look at it.  As other documents as to which I have overruled the privilege.

MS. SANTORA:  Your Honor, if I may?  We did submit this document, um, in-camera at your invitation to us to submit it.

THE COURT:  Yes, and I've ruled for the law-enforcement privilege, which you have significantly interpreted overbroadly, and I have rejected that.

MS. SANTORA:  I just want to reiterate what Mr. Kanter said, that it is our position that this document is law-enforcement privileged and we do intend to submit a privilege log for it on Monday.

THE COURT:  I understand that.  I understand that and we're going forward.  I've said your rights are saved.

Go ahead.

Q.  Now, Mr. Hatch, this is Exhibit 232 on the screen.  I have put Post Its over things like Social Security numbers that I'm not planning to ask you about.  I'd like to turn your attention to the top left corner where it says "Analysis Findings."

Here the first sentence indicates that Ms. Ozturk, who is a Visa holder, is, quote, "A co-author of an

JA810

Op-Ed calling for divestment from Israel and associates with Tufts Students for Justice in Palestinian, which was suspended for cause for student intifada," end quote.

What is the reason that her Op-Ed, which calls for divestment from Israel, is mentioned in the analysis findings?

A. Again it's a fact that she wrote the Op-Ed, and the lead was for Ms. Ozturk, so the analyst, um, was presenting information on her. Again I did not write this ROA. I only read it one time. So I didn't -- I did not approve -- I'm not an approver of ROAs. So, um, all I can comment on is policies and procedures --

Q. Are you --

A. -- in general terms.

Q. I'm sorry, I didn't mean to interrupt you. Are you finished?

A. I finished.

Q. You say you're not an approver for ROAs, but you did read this one. And is it true that this one, as part of a sort of development of the three-step process we discussed yesterday, wherein certain ROAs were reviewed by senior HSI leadership before they were actually referred to the State Department for action, isn't that right?

A.   That process, as I described it yesterday, was already in place, and we read the ROAs -- the review is a connotation that, um, that -- it connotates to me an approval.

THE COURT:  Um, I just need to follow up here.

Do you recall that in the -- in the ordinary course of doing your business, this particular ROA, you've read that, before we gathered in the midst of this lawsuit, is that true?

THE WITNESS:  I have read this.

THE COURT:  You read it back in the ordinary course?

THE WITNESS:  Yes.

THE COURT:  So why did this one come to your attention?

THE WITNESS:  Because of this process, um, I would see the ROAs in the, um -- within the process at times. I didn't see all of them.  What I saw was a few of them, um, especially at first.  And, um, and it looks like this one was written in March.

So, um, at that time I wanted to -- I actually wanted to make sure that the process was working, that the analysts were providing information, and that the analysts were doing what was, um -- what we wanted them to do.

Q.   Now -- I'm sorry.  The Court.

THE COURT:  And so you read it, and in accordance with your view of the processes of your office, you thought that this followed the processes of your office?

THE WITNESS:  Yes, I thought this was within policy for us.

THE COURT:  Yeah.  And so you sent it on to Mr. Watson?

THE WITNESS:  No, I did not send it on to anybody.  Again, I was not, um --

THE COURT:  Well somebody sent it on?

THE WITNESS:  Somebody sent it on, yes.

THE COURT:  So I don't want to put any words in your mouth.

So after you reviewed it, what did you do, if anything?

THE WITNESS:  Um, allowed it to go through the process.  I didn't stop the process because of this ROA, I think that's a better way to characterize it.

THE COURT:  All right.  So if we analogized it to the papers that pass across my desk, there are many thing that I look at and put in an out-box which signifies to the appropriate person that this is okay, take the next step, whatever that may be.  Is that a proper characterization of what you did?

THE WITNESS: Um, it's closer but, um, that implies that you made a decision that there was, um -- there was an in-box and an out-box. The only situation I would be in would be to say, "No." "Stop." "Hold." If I don't say anything, then it goes through the process.

THE COURT: I follow.

THE WITNESS: So only a negative action from me maybe is the best way to describe it.

THE COURT: And so it would be fair, in this case, to say you took no negative action?

THE WITNESS: I took no negative action, sir.

THE COURT: Thank you.

Ms. Colon, go ahead.

Q. Thank you, um, and that clarification is helpful, but I'm still stuck on one thing, which maybe you can help me with.

In the ordinary process -- not the special three-step process, but the ordinary process, ROAs were not normally reviewed by you and other senior HSI leaders before they were released into the State Department, correct?

A. That is correct. But we do read -- it is not correct to say that, um, we don't read ROAs, or, um, that, um, we don't discuss ROAs in other processes. But

in none of those processes are we, um, approving ROAs. I just would not characterize it as an "approval process" like they're trying to -- like you seem to be connoting.

Q. I understand that there are circumstances under which you, or other senior HSI leaders, have at one time or the other read an ROA before it went outside, but it's correct, that as a matter of course, that is not something you do?

A. We don't, um -- we don't typically, um, review or read all ROAs done by personnel, so.

Q. Mr. Hatch, not all ROAs. Isn't it true that as a matter of course you do not read ROAs before they go outside the Office of Intelligence?

A. Yes, that is true, that I don't read ROAs normally before they're sent to an agent or sent to, um, a program.

Q. But for this review, the three-step process that the Tiger Team was engaged in, you and other senior officials in HSI reviewed some of the ROAs, including this one, right?

A. We read some of the ROAs, yes.

Q. And it wasn't just you that read them, it was Derrick Gordon, correct?

A. Um, yes.

Q. William Walker?

A. Yes.

Q. Robert Hammer?

A. Yes.

Q. Roy Stanley?

A. He was the team lead.

Q. And I understand there was an additional layer of review, and tell me if this is part of the normal process or not, wherein the ROAs were informally sent to a Special Agent in the National Security Division, then back to the Office of Intelligence, reviewed by you and senior leadership, and then formally referred back to the National Security Division, and only in this process, isn't that correct?

A. The Special Agent was part of the team, so it wasn't sent -- the Special Agent was working with the analyst.

Q. So the office that was to receive the report, in this instance, also participated in developing the report, is that correct?

A. They helped supervise the team.

Q. Apart from -- moving away for a moment from this sort of extra layers of review, the process, when you participated in discussions about these particular ROAs in this new process with other HSI senior leaders, the kinds of considerations you made, or were supposed to

make, were has there been a violation of the law or was there information relevant to a violation of the law, correct?

A.   That is the instruction given to the analyst.

Q.   But that wasn't just the instruction for the analyst, that's what you, and the senior HSI leaders, sought to do when you sat together and looked at certain of these ROAs before referring them to the National Security Division, correct?

A.   That was our intent to, um, to focus on violations of law.

Q.   And you had specific discussions with other HSI senior leaders about ROAs on the student protesters produced in this effort before they were sent to the National Security Division for a formal referral, correct?

A.   Yes, we did.

Q.   Discussions of the activities that were cited in the Reports of Analysis that you all reviewed, correct?

A.   Yes, we were discussing the ROAs.

Q.   And to be clear, it's not ordinarily the case that the National Security Division, which receives a Report of Analysis from the Office of Intelligence, is involved in the developing of that report, overseeing of that report, it ordinarily just relies on the report and

JA817

sends it to NSD, correct?

A. It is common for analysts and agents to work together, but the analyst does write the ROA.

Q. Now here you specifically recall reviewing Ms. Ozturk's ROA, right?

A. I have read this ROA twice, once today and once back in March.

Q. And when you read it back in March, that was in a meeting with other senior HSI leaders, right?

A. Yes, it was.

Q. Now turning to the actual ROA.

I asked you, and I'll ask again, because I don't think I understood the answer, what possible violation of U.S. law is the fact that Ms. Ozturk co-authored an Op-Ed about divestment from Israel relevant to?

A. Again, the analyst who wrote this, um, was given the task of, um, of producing information or finding information, um, relative, um, to the protest. And so getting -- again, getting the facts on this person and whether they may be related to the law is the emphasis. But getting the facts on the person and what this person did builds the -- builds the understanding of the individual.

Q. So the analyst would include the facts I'm seeing here as part of their effort to gather information

JA818

relevant to the student's participation in protests, is that correct?

A. The -- the student's participation in protests, his contacts of what the individual did or did not do, and whether or not they were in any position to, um, conduct some activity.

Q. So to -- one second. (Pause.)

So you looked at this ROA. You saw that in the analysis findings the only activities cited about Ms. Ozturk's involvement in protests are, one, that she co-authored an Op-Ed calling for a divestment from Israel, and, two, that she associates with Tufts Students for Justice in Palestine. What made you think that here there was any indication that Ms. Ozturk had potentially violated a United States law?

A. I did not make that determination. That was not my job as the Assistant Director of the Office of Intelligence, was to supervise the analyst. I was not making the decision on determinations.

Q. I appreciate that you're not deciding that she did in fact violate the law or deciding that her Visa should be revoked, but the Office of Intelligence collects the facts that are relied upon by all the leader decision-makers to determine whether a violation of law has occurred. And so I'm asking you, as a person who

runs that office, when you look at the ROA in front of you, what do you see here that is, um, to you, potentially indicative of a violation of U.S. law?

A. I don't make those determinations. I'm not a Special Agent. I'm not an attorney. I don't work for the State Department.

THE COURT: That's his answer. Move on.

MS. CONLON: Yes.

Q. Now this ROA itself has a few additional pages. I'm going to, um, not -- I'm not going to remove the Post Its because I want to protect Ms. Ozturk's personal identifying information, but it's fair to say, because you can see the version in front of you that doesn't have any Post Its on it, that nothing in the part that I've covered is relevant to the law-office findings of an allegation of violating U.S. law, right? The parts that are covered have her Social Security number --

MS. SANTORA: Objection, lack of foundation.

THE COURT: No, he's looking at it. The document speaks for itself. So he can see it. And without characterizing what's there, counsel.

The parts that she covered in examining you, and you see the whole document, none of that has any relevance to the investigation beyond identifying a particular person, so we're clear who we're talking

about, is that right?

THE WITNESS: Yes, sir, there is information in the ROA that is for context, for understanding the individual, um, it includes details that, um, have biographical, and don't point to a violation of the law, but provide context for understanding that individual.

Q. And the same is true for the next page, which I'm putting here, which has Ms. Ozturk's travel history, right, that's part of the effort that LI makes to document biographical information about a person that might be relevant, right?

A. That's correct.

Q. Now I'd like to turn to the next page. This page here. (On screen.) It says "Social media and open sources." And the only social media listed here is a Canary Mission profile of Ms. Ozturk stating her participation in anti-Israel activism in March of 2024, is that correct?

A. It does.

Q. And the entire Canary Mission profile for Ms. Ozturk was included as an attachment to the Report of Analysis, correct?

A. It appears so.

Q. The other thing that was included as an attachment was an article that Ms. Ozturk wrote for the "Tufts

Daily," correct?

A. (Looks.) It does.

Q. That is, as I understand it, the Op-Ed referenced by the Canary Mission profile. So I'm going to put this here. (Moves on screen.) Sorry. Here we go.

Do you see where it says -- hang on. Sorry. I'm missing a page.

(Pause.)

MS. CONLON: Hold on.

Q. I'm going to go back actually to the actual Canary Mission profile. (On screen.) Okay, got it. Okay, I'm being told that you can't see it on this printout here, but the Op-Ed is linked in a drop-down on the Canary Mission website. And then I actually have the Op-Ed here. So I'm going to turn your attention to that.

This Op-Ed is the Op-Ed that was written by Ms. Ozturk, correct, cited by Canary Mission?

A. It appears to be.

Q. No, that's the wrong one. Dear Lord, I'm sorry. Doing this on the fly is proving to be a little tough. Okay, here we go.

THE COURT: I'm not sure what this adds?

MS. CONLON: I'm sorry?

THE COURT: I'm satisfied -- the government provided this. I'm satisfied that this is authentic.

And I asked him a question about what pages went along with the facing page, and he said that it appears that the other pages go along with that facing page.

What are we adding?

MS. CONLON: Well, your Honor, in candor the government wouldn't even stipulate that Ms. Ozturk wrote this Op-Ed, so I just want the record to be clear.

THE COURT: The case is being tried to me.

MS. CONLON: Okay. If the Court accepts that, then we can move on.

THE COURT: No one accepts it, I accept that it exists, and that this appears to be the authentic and complete -- I -- the complete ROA.

So far as you know, it's the complete ROA, is that right?

THE WITNESS: That's right.

MS. CONLON: Thank you.

THE COURT: It's always a question whether as factfinder I believe him, and I'm not permitted to say yet. We'll see the whole sweep of the exhibits. But I understand the testimony.

MS. CONLON: Okay.

Q. So it's fair to say that this ROA on Ms. Ozturk includes no allegations about her protest activity apart from what's on the face of it, in other words you're not

JA823

aware of anything missing, any other basis for the HSI to think that she had additional involvement, is that correct?

A. I believe this is what the analyst could find related to Ms. Ozturk.

Q. Okay. All right.

MS. CONLON: Thanks. And you can take that down.

(Pause.)

THE COURT: Are we done with the questions as to Ms. Ozturk?

MS. CONLON: As to Ms. Ozturk, yes.

THE COURT: Then maybe he can give me back those pages.

MS. CONLON: Yes. Sorry.

Q. Now I'd like to turn your attention to another document, and the Court, I believe, has a copy. And I'm sorry to deprive the Court of what may be its only copy, but I would ask that the witness be given the pages concerning Mahmoud Khalil.

THE COURT: Let me do that.

(Pause.)

MS. SANTORA: Your Honor, for the record we would like to preserve our objection with respect to the --

THE COURT: Oh, I think that's fair, you have a continuing objection as to each of the documents I have

provided this morning, on all the grounds you've articulated both in writing and, um, orally, not only today, but in the course of this proceeding.

MS. SANTORA: Thank you, your Honor.

Q. Have you had a chance to skim the document that is -- oh, he doesn't have it yet. Sorry.

(Judge gives documents to witness.)

THE COURT: Now that's the government's, um, not you, but start on the next page. No, no, keep going.

May I have the page before that?

(Hands to judge.)

THE COURT: Okay. For ease of the government following, I'm giving him the pages that were denominated of what was submitted as Exhibit E. They were proceeded by Exhibit D, which appears to be the Andre Watson letter.

Go ahead.

MS. CONLON: Thank you, your Honor.

Q. Okay. Mr. Hatch, do you recognize what I'm going to, for the record, premark as EO, the document in front of you?

A. It is the subject profile from Mr. Khalil.

Q. Does it appear to you to be a true and accurate copy of the subject profile that the Office of Intelligence prepared on Mr. Khalil?

JA825

A. It appears to be.

Q. Does it appear to you to be a complete profile of Mr. Khalil?

A. Again I only in read this one once. It appears to be, but I'm not -- I'd have to see our document.

MS. CONLON: At this time I would ask to move into evidence what's been premarked as EO, as Exhibit 233.

THE COURT: I understand the government to object. I think the foundation is sufficient. Overruled. It's Exhibit 233 in evidence.

(Exhibit 233, marked.)

Q. Now I'm going to show you the first page, and again here I've put Post Its over the personal identifying information that I don't intend to ask you about. The top of the report says "Analysis Findings."

Is that meant to capture everything that follows or does that refer only to the two bullets that appears right underneath the header?

A. The two bullets underneath the header.

Q. Okay so the findings for Mr. Khalil relay that he became a lawful permanent resident, correct?

A. Can you -- can you ask your -- the previous question again?

Q. The findings for Mr. Khalil indicate that he is a lawful permanent resident, correct?

A.    No, I'm --

THE WITNESS:  Sorry, your Honor, I'm confused. Can you start over?  Please ask the question one more time, I wasn't -- you didn't have my full attention.  I was looking at the document.

THE COURT:  Her more general question was, the portion above the picture is the total findings of the examiner including in the report as to Mr. Khalil, the factual findings as to Mr. Khalil, that's how I took her question, is that right?

THE WITNESS:  Not exactly.  That paragraph, the analysis findings paragraph, is kind of what, um, those two bullets are, um, kind of a way for a person to read and get key details quickly.  The entire document is the research and analysis, the totality of the research and analysis.  It provides a partial summary so that the reader can get an understanding very quickly of what we're talking about and what the situation is.

Q.  It's like the "headlines" basically?

A.  Basically, yes.

Q.  Okay.  Now the categories that are covered are under the headline of "Biographical Information" and other such categories.  I want to move to what is the third page of Exhibit 233, the category here is "News Articles."  Now you don't have the benefit of having the

actual articles in front of you, and neither do I, so I'm not going to ask you what they say. However you are an expert in the Report of Analysis process.

Can you explain why these articles would be relevant to a Report of Analysis about Mr. Khalil?

A. Again, providing context for the -- for the individual who was in the lead -- who was the subject of the lead, um, it appears the analyst was, um, trying to get an understanding of his activities.

Q. Now you said it helps to provide context. The third bullet here actually is Mr. Khalil's Canary Mission profile, is that right? Do you see where it says "canarymission.org/individual/mamoud_khalil"?

A. It does appear that that's from Canary Mission, a source of Canary Mission, or --

Q. The italicized language that appears in this page, these are excerpts from articles that the analyst has highlighted as particularly relevant, is that correct?

A. It appears to be that the analyst highlighted where "Khalil" was mentioned.

Q. In other words, your understanding about -- at least how it ordinarily works, is that an analyst pulls out the relevant portions of sources that it is including as those sources relate to the person that the report is about?

JA828

A. Yes.

Q. I'm going to turn to -- and just so we're clear on this, the sources here, so we have an article from the "Wall Street Journal," the "Guardian," Canary Mission, and at the bottom we see "The New York Post"?

A. I see "The New York Post."

Q. Okay. And I'm going to put the next page in front of you and give you a second to -- oh, you have it in front of you already, to just take a look. This last bullet at the top of the next page I think is a continuation -- but tell me if I'm looking at it incorrectly, of what was from "The New York Post" article. Is that a fair understanding of it?

A. It appears to be. (On screen.)

Q. And here you see where it says that Mr. Khalil told the "Columbia Daily Spectrum," reading from the top, that he didn't participate in protests because he was worried about losing his Student Visa status that lets him be in the U.S.

What is the relevance of that to the context here?

A. Again, it's just a news article on him.

Q. You agree that the only articles we're seeing about Ms. Ozturk or Mr. Khalil are ones that relate to protests of Israel and Palestine and not any other topic, right?

A.   That's correct.

Q.   Um, okay.  Just a moment.  (Pause.)  Okay.  I'm going to -- and I guess lastly, you can see here the last category appears to be social media.  There is an Instagram posting of a news clip -- that is an ordinary thing, I take it, to include in a Report of Analysis, an Instagram post, for example?

A.   It could be.

Q.   It could be.  Okay.  I'm going to move to another profile because I think the profile --

THE COURT:  Well since we're working off paper copies, if he could give me that back.  (Hands to judge.)

And the next one is who?

(Pause.)

Q.   Okay.

MS. CONLON:  If the Court could please give -- and thank you for your help, Mr. Hatch the document -- the pages concerning Badar Khan Suri.

THE COURT:  All right.

(Hands to witness.)

(Pause.)

Q.   And when you've had a chance to -- oh, you don't have it yet.  Sorry.

(Pause.)

THE COURT: These are the documents, um, tabbed Exhibit K in the government's submission to the Court, so we're clear. The first page is not the file itself.

Q. I'm just going to give you a moment to look at that.

A. (Reads.)

Q. So you're reviewing right now what I'd like to have marked as -- EN for identification.

THE COURT: It may be so marked.

Q. Do you recognize this document?

A. It appears to be the ROA for Mr. Suri.

Q. Does this appear to be a true and accurate copy of the ROA for Mr. Suri, so far as you can tell?

A. It appears to be, so far as I can tell, not being familiar with this ROA, only having read it once.

Q. But you recall reading it, um, at some point before today, correct?

A. Yes.

Q. And you read it in the same context in which you read Ms. Ozturk's and Mr. Khalil's, which is to say in a meeting with senior HSI leadership, correct?

A. I do not recall where I read this one.

Q. Okay. And it appears to you, as you page through, to be the complete Report of Analysis from Mr. Suri, is that correct?

A. It looks like it.

JA831

MS. CONLON:  We offer what has been premarked as Exhibit EN for identification as Exhibit 234 into evidence.

THE COURT:  The government objects and its rights are saved, but the objection is overruled.  It may be admitted, EN is admitted, Exhibit 234 in this proceeding.

(Exhibit 234, marked.)

MS. CONLON:  Now I'm going to put this up in a second, I'm just covering any biographical, sensitive information, so I apologize.  Just a moment.

(Pause.)

Q.  Okay.  So this page here, Page 1, for Mr. Suri --

MS. SANTORA:  Your Honor, I'm so sorry to interrupt, but I don't think the government has that document, um, in the packet that was handed to us.  He said it was Exhibit K, our packet stops at Exhibit I.

THE COURT:  The law clerks may -- confer with her, um, with Ms. Conlon.

(Pause.)

THE COURT:  Ms. Santora, also confer with Ms. Belmont, the Clerk, because you should have everything that she has, in the exactly the same form.

(Confers.)

Q.  So just to confirm for the record, the government

does have it?

THE COURT: Well now they do.

MS. CONLON: Thank you.

Q. So this ROA for Mr. Suri has more information in the analysis binder than the others we've looked at, right?

A. It does.

Q. It cites here that Mr. Suri is married to a person who is the daughter of a person who is or was a senior Hamas figure in Gaza, is that right?

A. It appears to say that.

Q. And it says that Mr. Suri, according to open source reporting, spreads Hamas propaganda and promotes antisemitism on social media, right?

THE COURT: Well it's in evidence now, it speaks for itself. I can speak and read.

MS. CONLON: I want to ask him about that.

THE COURT: Then why don't you ask him about that.

Q. Where it says "open source reporting," that means there has been reporting in sources online that the government identified?

A. Yes, that's usually what "open source" means.

Q. I'm wondering if it's a term of art or if I'm misunderstanding something. So just to confirm, "open source reporting" means sources online have reported these claims about Mr. Suri, correct?

A. "Open source" usually means press reporting.

Q. Press reporting. Okay.

So turning to the press reporting here, which I think starts on Page 4.

A. (Looks.)

Q. There is -- just making sure you can see it. Okay.

Page 4, there's a Twitter posting included here, by someone else, not Mr. Suri, another person, Anna Stanley, with claims about Mr. Suri. Is that an example of "open source reporting"?

A. (Looks.) It could be.

Q. In other words, social media, in Reports of Analysis, doesn't have to be limited to the subject's social media, it can include things about the subject on social media, correct?

A. It can, yes.

Q. And in this instance the open source reporting about Mr. Suri from social media includes something by someone who isn't him, correct?

A. That's correct.

Q. Now -- just a moment.

A. One correction. One addition to that.

Q. Yes.

A. I'll note that the analyst properly included where the post came from, who posted it, um, and it looks like

JA834

it factually represented what was posted and the details.

Q. Yes. In other words, the analyst didn't suggest this is what the analyst thinks, the analyst made clear this is what somebody else has said?

A. That's correct. And the analyst did not say that that's what the government thinks or did not recommend anything from that, just put the fact that there was an article or a post and this is what it said and this is who it is said by.

Q. Yes, and that is the only sort of job as the ROA, that is what it's supposed to do?

A. That's correct.

Q. Now in the next page of this, at the top, um, here, it says "Khan Suri appears to post pro-Palestinian content." That is not an excerpt from social media, that is a characterization by the analyst about the nature of Mr. Suri's online postings, correct?

A. Again, you'd have to ask the analyst. I don't know -- again it says "It appears to post pro-Palestinian content." So, yes -- and it looks to be that that was written by the analyst, from the context of this report.

Q. That's all I wanted to confirm. I appreciate that you don't know what the content is. But just to be

clear, like if it were an excerpt, it would be in italics with a quotation mark.  This text here, below the Instagram link, is actually something written coming from the analyst, not an excerpt or quotation from someone else?

A.  It looks like it.

Q.  And the -- what's listed as social media includes things other than, um -- you know includes things other than posts on like social media websites.  So it includes things here, for example, about his work profile in the Georgetown website.

Is that, in the ordinary course, something that gets included?

A.  Yes.  We're collecting information about -- or reporting information about the individual, to understand the, um -- the, um, details about the individual.

Q.  And on the next page, in addition to exploring -- the page before, that we just looked at, had descriptions about his research, and here on the next page there's a description of the course he's teaching from some website "Corsical."

So in a Report of Analysis, it's relevant, on a faculty member, what course they teach?

A.  Again, we also put what car he drives or where he

lives. It provides information to understand the individual and what that individual does.

Q. Well just a moment, and I don't want to quivel, but there's nothing in here about, for example, what car he drives, right? I mean you don't know, from looking at this, if this man has a driver's license or drives a car, right?

A. As an example, I put car information and residence and other types of information in the ROA.

Q. But there's nothing in here about his hobbies, right?

A. I don't see anything like that.

Q. There's nothing in here about how he spends his time on the weekends, right?

A. There doesn't appear to be.

Q. Because this is only collect information pertinent potentially to a violation of law, right?

A. That's correct.

Q. And in this instance, for a professor, what was potentially pertinent were articles about his scholarship, his course posting at his university, and things that other people wrote about him on the internet, right?

A. This is what the analyst could find.

Q. And this is all they could find?

JA837

A. I would assume so.

Q. Okay.

MS. CONLON: I would ask that the Court please provide Mr. Hatch with the pages concerning Mohsen Kadar Mahdawi, and we're done speaking about Mr. Suri.

THE COURT: And then what?

MS. CONLON: I'm done with Mr. Suri's pages, so I was suggesting maybe they be returned to the Court.

THE COURT: Yes, and Mr. Hatch will do that while I'm finding Mr. Mahdawi.

MS. CONLON: Yes, Mr. Mahdawi.

(Pause.)

THE COURT: And so we're clear, I'm giving the witness the pages that the government has denominated Exhibit G in the submission to the Court.

And if you'll return what you've got. Yes, thank you. (Witness returns pages.)

Q. Okay. When you've had a moment to take a look, just let me know.

A. (Looks.) Okay.

Q. Now I'm showing you what I'd like premarked as EN for the record.

Do you recognize this document?

A. It appears to be the Report of Analysis on Mr. Mahdawi.

JA838

Q. Does it appear to be a true, accurate, and complete copy of that document as far as you can tell?

A. As far as I can tell, it appears to be.

Q. Okay.

MS. CONLON: I would like to offer this into evidence as Exhibit 235.

THE COURT: The government objects. It's rights are saved. The objection is overruled. The document may be admitted, Exhibit 235 in evidence.

(Exhibit 235, marked.)

Q. Okay. I'm showing you this first page. Here, again, we have the highlights and the analysis findings, which in this instance seem only biographical.

And a question for you. Is that typically the case?

A. That the analysis findings only include biographical information?

Q. We've seen kind of a mix as we look through these, and in some instances there's some indication of why the person is being examined and in some it's just here's when they came, here's their status, and I'm wondering if there's any sort of rhyme or reason into what goes into that section of the report?

A. It's just a summarization of the information they found. I don't know the answer to that.

Q. Okay. Fair enough.

Turning to -- and, Mr. Mahdawi, sorry, before we go on, he's a lawful permanent resident, as you see at the top.

I take it there's no difference in the type of Report of Analysis prepared whether the person is a Visa holder or a lawful permanent resident, is that correct?

A. We don't have Reports of Analysis categories based on those types of considerations.

Q. Okay. The process is the same?

A. Yes.

Q. Okay. Now I'm going to direct your attention to the third page, and I'm going to skip Page 2, which has lots of identifying information, but the third page does not, it has -- this is the section on social and open sources.

And my first question is this. Drawing your attention to the bullet on the left where it says, "has the Twitter X post." It includes the post claiming that Mr. Mahdawi is pro-Hamas based on an appearance he had on "60 Minutes."

You'd agree with me that there's nothing in the report indicating the analyst reviewed his appearance on "60 Minutes" to determine whether the Twitter post characterized his appearance accurately, right?

JA840

A.  I --

THE COURT:  I didn't understand the question.

MS. CONLON:  Sorry, I'm going to break it into multiple parts just so we can all be on the same page.

Q.  So first what we have here on the left is a Twitter post by someone else accusing Mr. Mahdawi of being pro-Hamas based on remarks he's alleged to have made on "60 Minutes," correct?

A.  Yes, it appears to be.

Q.  There is nothing in the Report of Analysis indicating that the analyst reviewed his appearance on "60 minutes" to determine whether what this person on Twitter said about him was correct, do you agree with that?

A.  I don't see anything about the -- I don't know if the analyst reviewed "60 Minutes" or not.

Q.  And is it, in the ordinary course, is that -- I'm trying to understand sort of the extent or the depth of the look that's given by the analyst.

Is it enough for the report if the analyst just indicates "Here is what someone else has accused this person of?"  Is that --

THE COURT:  Enough for what?

MS. CONLON:  For the purpose of following the policies and guidance about making an ROA.  Like is that

JA841

all that's expected?

A. Just on the circumstances you've given me, and in that scenario, I would have expected the analyst to have reviewed the "60 Minutes" report. However, as long as the analyst properly cites this was what it was, it was a statement made by a person about a video they had seen related to the individual, it's not a judgment call from the analyst, it's what they found.

Q. I understand that, that the analyst is not superimposing their characterization of it, they're just reporting what someone else says. But I'm concerned that the only information that's used later by decision-makers is what's in the Report of Analysis --

THE COURT: With all respect, Ms. Conlon, your concerns are not dispositive.

MS. CONLON: Sure. I'm sorry. I'm just trying to explain my question. But I can just be more direct.

Q. At least in this instance for Mr. Mahdawi, there's no indication on the face of this report that anybody reviewed any of the underlying materials that are being characterized by other people on social media, isn't that correct?

A. I don't know if you can make that characterization. I can't look at this and say the analyst -- that they may have looked at the "60 Minutes" report and, um,

JA842

found something or found nothing. They -- I can't make the judgment that you assert.

Q. If a person had looked, an analyst had looked at the "60 Minutes" report, wouldn't you expect them to include, in the report, whether or not that is what happened, whether or not the allegation was true?

A. I would have expected that. But again, if I'm looking at this, um, the ROA, and like you said assessing the -- whether or not the analyst followed policy, I see here that the analyst properly, um, wrote "sourced the material," and showed whoever reads it that this is just a claim somebody made about reading the report. So you could take this report and say, "Okay, the next step is to read the -- to actually look at the '60 Minutes' report," or again that's the other side of this on how the ROA is used. I'm assessing the ROA as to whether or not it's within policy, did the analyst do their job.

Q. So from your perspective -- or withdrawn.

It's not the Office of Intelligence's responsibility to take what you have identified as a potential useful next step, that's not the Office of Intelligence's responsibility, is that correct?

A. In a scenario like this, I or one of the supervisors could have asked the analyst, "Did you look at the '60

Minutes' report?"  And I don't know if that happened.  I don't recall if that happened.  But that's the -- yeah.

Q.  You don't recall -- you did review this one, but just to be clear, you don't recall whether you received any information not contained within this report about Mr. Mahdawi, correct?

A.  I don't remember -- I don't -- I know that I read the report.  I don't recall any actions taken from this report.

Q.  Okay.

MS. CONLON:  One second.

(Pause.)

MS. CONLON:  Okay.  And I think we can hand back to the Court the paperwork on Mr. Mahdawi, and I have one more Report of Analysis that I'd like to show you. If the Court would please provide Mr. Hatch with the Report of Analysis on Yunseo Chung.

(Pause.)

THE COURT:  And I've given Mr. Hatch the documents that appear, and the government's designation, when submitted to the Court, as Exhibit C.

MS. CONLON:  And I'm going to ask that the document be premarked as Exhibit EO for identification.

THE COURT:  It may be so marked.

(Pause.)

JA844

Q. Do you recognize this document?

A. It appears to be the Report of Analysis for Ms. Chung.

Q. And does it appear to you to be a true, accurate, and complete copy of the Report of Analysis on Ms. Chung?

A. It appears to be. Again, the same comments as before. I think I read this one once.

MS. CONLON: Your Honor, I'd like to offer what was premarked as Exhibit EN -- EO rather, into evidence as Exhibit 237.

THE COURT: The government objects under its continuing objection to these, and its rights are saved, but overruled. The document may be admitted and marked Exhibit 236 in evidence.

(Exhibit 236, marked.)

Q. Now I'm going to show that you this exhibit, so you know what we're looking at.

A. (Looks.)

Q. This is a Report of Analysis on Ms. Chung, who is a legal permanent resident, and that is all that's in the headline of her report, right?

A. The report says she's a legal permanent resident.

Q. Okay. Now I want to turn to the substance of it in terms of the information about her activity. (On

screen.)

Here there are two news articles on this page and there are some notes from the analyst about the news articles above the excerpts about the article -- from the article. So turning your attention to the first one from the New York post.

Am I correct that the text that appears below the link where it says -- it describes her as being part of the protest, that is text that was put there by the analyst, and what appears below it is a quote from the article, is that right?

A. That's what it appears to be.

Q. And then again, on the next bullet, the same thing, right? This text here, the nonitalicized text under the link, that's the analyst's input, correct?

A. It appears to be from the analyst.

Q. Okay. And I don't want to put the first page -- I don't want to take the Post Its off this first page, so I'm just -- but I do need to look at it, so I need to direct your attention back to the first page.

There's a section on the first page that says "Criminal History," right?

A. Yes.

Q. And it lists three charges that were apparently related, it would seem, to the protest, is that correct?

A. I don't -- I don't know if I can make that judgment. I see the charges.

Q. The charges have the date -- there's a parenthetical after them that says "March 2025," that would be something that the analyst inputted, is that right?

A. Yes, that would be.

Q. And there's a description of the charges, but no indication of their status, is that correct?

A. That's correct.

Q. In other words, we can tell from this report that she was accused of disorderly conduct, trespass, and obstructing governmental administration, in the second degree, and that those charges were made in the New York County Criminal Court, is that correct?

A. That's what it says.

Q. But you couldn't discern, from looking at this, whether those charges were dismissed, is that right?

A. I cannot.

Q. If the charges had been dismissed or were later dismissed, does the ROA get updated to reflect that or once the ROA's made and goes out the door, that's the end of it?

A. It is our policy for ROAs to be updated.

Q. Okay. And this ROA, the published date at the bottom, that is the date that it was created, March 6th.

JA847

If it had been updated, would there be a second date on it?

A. There usually would be.

Q. It would appear -- would you see only one date, the most recent, or do you see ordinarily the original publication date and then a date of the revision or amendment?

A. It could be both.

Q. Okay.

MS. CONLON: One second.

(Pause.)

Q. Now, um, the five -- and you can put that aside, I don't expect to ask you more that requires you to look at the documents. I hope not to.

The five reports -- oh, sorry, your Honor, I think he's --

THE COURT: Yes. I'm sorry.

Q. The five reports that we've looked at, um, they are -- are they representative of the reports that you saw produced by the Tiger Team on the protestors as part of this effort that began in March?

A. Representative in what way?

Q. Um, is there anything special about --

THE COURT: I understand that question, and it occurred to me.

JA848

Are these typical reports?

THE WITNESS:  They're typical subject profiles.

THE COURT:  Okay.

Q.  And is there anything different about these five subject profiles that you recall from the other subject profiles that you saw produced by the Tiger Team?

A.  No, not substantially.

THE COURT:  Much more for this witness, Ms. Conlon?

MS. CONLON:  A bit more, your Honor, but not much. But more than 5 minutes.

THE COURT:  Would you like to take the recess?

MS. CONLON:  Yes, if your Honor wouldn't mind. Yes, please.

THE COURT:  We'll take the recess for one half hour until 11:15.

We'll stand in recess.

THE CLERK:  All rise.

(Recess, 10:45 a.m.)

JA849

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Thursday, July 10, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-10-25
_____
RICHARD H. ROMANOW   Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 2, Pages 72 - 132

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
        Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
        Defendants

\*\*\*\*\*\*\*\*

BENCH TRIAL DAY 4

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 10, 2025

\*\*\*\*\*\*\*\*

Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                Official Court Reporter
                United States District Court
                One Courthouse Way
                Boston, Massachusetts  02210
                mortellite@gmail.com

JA851

A P P E A R A N C E S

RAMYA KRISHNAN
XIANGNONG WANG
     Knight First Amendment Institute at Columbia
     University
     475 Riverside Drive, Suite 302
     New York, NY 10115
     (646) 745-8500
     Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
     Sher Tremonte LLP
     90 Broad Street, 23rd Floor
     New York, NY 10004
     (212) 540-0675
     Cgans@shertremonte.com
     For Plaintiffs


ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
     DOJ-Civ
     P.O. 878
     Ben Franklin Station
     Washington, DC 20044
     (202) 616-9123
     Ethan.kanter@usdoj.gov
and
SHAWNA YEN
     United States Attorney's Office
     1 Courthouse Way, Suite 9200
     Boston, MA 02210
     Shawna.yen@usdoj.gov
     (617) 748-3100
     For Defendants

INDEX

WITNESS                                                              PAGE


PETER HATCH

     Direct Examination By Ms. Conlon (continued)        75
     Cross-Examination By Ms. Santora                    90
     Redirect Examination By Ms. Conlon                 107

AMY GREER

     Direct Examination By Mr. Biale                    113
     Cross-Examination By Mr. Kanellis                  125


 E X H I B I T S


Exhibit No.                    Received


   237                            124

JA853

P R O C E E D I N G S

(Resumed, 11:19 a.m.)

THE COURT:  The witness may resume the stand.

MS. CONLON:  Ms. Conlon, you may continue.

BY MS. CONLON:

Q.   So we've spoken quite a bit about Canary Mission, that source of names, and the court alluded earlier with you to the fact that names came from elsewhere.  I just want to turn to the "elsewhere" part of that for a moment.

You had previously testified that the names came through Derek Gordon, correct?

A.   Yes, they came through ICE leadership, HSI leadership.

Q.   And they came on multiple occasions, right?  It wasn't one delivery?

A.   Right, there were multiple.

Q.   And certain -- well, you'll tell me if it's for all or some, but in certain instances you received more than just the name of a person to look at, right?

A.   We would get the name, occasionally we would get what protest they were alleged to have attended, maybe where they were a student, some basic information.  The lead usually contained some basic information.

Q.   When you say "the lead," you mean like the verbal information Mr. Gordon gave you about the person?

A.   Yes.

JA854

Q. And when you say that in certain instances Mr. Gordon gave you the name of a student and which protest they had attended, you mean like the date and place and time of a particular protest, correct?

A. I believe so.

Q. And he didn't just give you their name and the protest they went to and the school they went to but also their suspected nationality, correct?

A. No. I don't -- again, these are -- as I said before in my deposition, the leads didn't go through me. Most of the leads went to the team lead or through my deputy.

But as I recall, when hearing the information, I don't know if I could say that they -- I don't know the details of each lead other than they usually had a name, they definitely had a name, that they were a protester and then it may have included what school they were from. I don't recall hearing anything about nationality.

Q. Mr. Hatch, I'm going to be referring to the transcript of your deposition. For the benefit of the court and the government, I'm thinking about pages 213 to 214 of Mr. Hatch's deposition, and I want to make sure you have a copy.

Actually, can we put it up on the screen because it's just one page. 213. We just need a moment. I just want you to be able to see it.

I'm going to draw your attention to the bottom half of the

JA855

page, and you can let me know if it refreshes your recollection because I'm assuming that you simply forgot.

Line 16, you were asked: "Do analysts get anything more than the name of a student protester when they're asked to research that individual?"

Answer: "Yes."

"What information besides the name do they get?"

We're going to start -- Ms. Safavi objected. Starting at line 24, Answer: "As I recall, they could get what protest they were at," and then continuing on to the next page, which may take us technically a moment.

A. Is it possible I can see the whole page? That's better. I can read this.

Q. Okay. "They could get the suspected nationality." Do you see that there?

A. Yes, they could get it. I don't recall but it's possible the nationality could have been part of the lead. I just don't recall it.

Q. So to the best of your recollection -- you can take that down.

To the best of your recollection having reviewed your deposition testimony, they could get the student name, where they were a student, the protests they attended and their suspected nationality, among other things; is that right?

A. They could get it, yes.

JA856

Q. Now, Mr. Gordon would convey that information to them separate from the directive to look at the Canary Mission website. That was a separate source of information; is that correct?

A. Yes, we had multiple sources of information. Canary Mission was not the only one.

Q. And about the quarter of the people identified came through alternate sources other than Canary Mission, right?

A. I guess up to.

Q. I'm sorry?

A. Up to a quarter.

Q. Up to a quarter?

A. I don't know the exact numbers of the leads we got. Sorry.

Q. Sorry, no.

You testified a bit in your deposition about the process, to the extent to which the process involves the front office, which I assume is the front office of HSI, in terms of identifying leads. And I want to ask you about that.

The leads, the list of leads usually goes through the front office, the leadership of HSI, isn't that correct?

A. Could you show the deposition?

Q. Sure. Do you not recall? Because we don't ordinarily just show people their depositions unless they don't remember. If you don't remember, we can if you want to.

JA857

THE COURT:  He's asked and that's your answer, you're not going to show it to him.

MS. CONLON:  I mean, I just -- you're right, not unless you don't recall.

THE COURT:  It's not whether I'm right.  This is your case to try, but that strikes me that when a witness asks -- well, it's your case to try.  Show it to him or not.

A.  You referenced the deposition, so I'd like to see the deposition.

Q.  Sure.  Can we please turn to page 177 of the deposition transcript.  Actually, I guess it's page 178.  I apologize.  Page 178, please.

If you look at lines one through five, you indicated that -- you made a clarification about the list you received.  You testified that, "They usually go through the front office, so the leadership of HSI, but they come from Office of Border Czar, Office of the Secretary."

Do you see that there?

A.  I see that.

Q.  So we can take that down.

So when you say, "They go through the front office," that means who exactly?

A.  So the front office are the people we mentioned before.  It could go through Mr. Gordon, Mr. Hammer.  Again, that's the HSI top leadership.

JA858

Q. And when you say, "They go through the leadership of HSI, but they come from the Office of the Border Czar," you're speaking of the Office of the Border Czar, which is housed, as I understand it, outside of the Department of Homeland Security, right?

A. So when I said that, I was giving you possible examples of where the leads came from. I don't -- as I had said earlier, I don't know exactly, because I'm not familiar with that process and I was not privy to that, I don't know how they got the -- I don't know how HSI got the leads. I don't know how it was sent to them, and I don't know who sent it to them. And at that point I was speculating who it came from.

I think I mentioned they came from possibly the Border Czar, possibly DHS, possibly other partners, even the public. So those leads can come from all directions.

Q. So I hear you saying you don't know for certain where the particular student protester names given to the tiger team came from but that the regular process -- and I'm literally reading your words here, "The clarification would be those lists usually go through the front office so the leadership of HSI but they come from Office of Border Czar, Office of the Secretary." That is the ordinary process, correct?

A. No, it is not. The ordinary process for leads or the ordinary process for the protesters?

Q. The ordinary process for lists. You said, "Lists usually

JA859

go through the front office, so the leadership of HSI, but they come from Office of Border Czar, Office of the Secretary."

A.   The leads go through -- in this case, the leads went through the front office and could have come from those locations.

As I said before, for example, with the Canary Mission list, I don't know how that was presented to us.  I don't know who sent that, notified us of the website.  I don't know of any leads, any particular leads coming from any place outside of HSI.  I can't tell you where each lead came from.

Q.   So I am clear here, when you made a reference in your deposition in response to a question about the leads to the Office of the Border Czar, you were referring to the Border Czar who is appointed by the President outside of the Department of Homeland Security; is that correct?

A.   When I said "Border Czar," I was referring to the Border Czar.

Q.   The Border Czar being Tom Homan.  We can talk about him by name, right?

A.   That's correct.

Q.   Tom Homan was -- withdrawn.  Tom Homan does not work for DHS, right?

A.   I think -- I don't know who the Border Czar works for, if he works for DHS --

Q.   He's not part of HSI's leadership; is that fair to say?

JA860

A.   He's not part of HSI leadership.

Q.   When you said that ordinarily -- or I'm not sure what you're saying about it now, but when you said in your deposition that, "Lists go through the front office but come from the Office of Border Czar or Office of the Secretary," "Office of the Secretary" was a reference to the Secretary of Homeland Security, correct?

A.   Yes.  And what I meant was their offices.  So obviously the Secretary of Homeland Security is not sending us leads personally.

Q.   The executive office?

A.   Yes, her office, her staff, as well as Border Czar.  And for clarification, as I said before in the deposition and now, I don't know where each particular lead came from.  I don't know where each particular list came from.  So I can't say for certain, but I was giving you general where they may have come from.  I could not cite, for example, a specific lead that came from any particular source if you were to ask me.

Q.   Yeah, I understand that you don't know the specific origin of these leads.  I'm asking you how it normally works since you don't know the specifics of this source of leads.  So that's what I wanted to clarify.

A.   To answer your question on how it normally works is I get the lead from the chain of command.  That's the normal process.  How the chain of command gets it is something beyond my

visibility.

Q. Okay. Well, just to be very clear, the question you were asked was about how leadership gets it, and the answer you gave was that the lists go through the front office. Was that untrue? Is that incorrect?

A. The list goes through the front office -- in this case, the lists and leads were coming from the front office, the HSI front office.

Q. And literally in your deposition you said, quote, "But they come from Office of Border Czar, Office of the Secretary." Was that incorrect?

A. They could come from --

Q. That isn't what you said. Do you want to see it?

MS. SANTORA: Objection.

THE COURT: The objection is sustained. I've looked at the deposition. He said what he said. You've read it. It's part of the record. He's given his testimony here today. Let's move on.

Q. Okay. We can move on to -- I only have a few questions remaining.

So we spoke about the ROAs for five particular people, and you looked at them with me. You've mentioned that there were approximately 200, as best you know, ROAs generated by the tiger team, right?

A. Approximately, yes. I don't recall the numbers. I was

JA862

not keeping stats of what I read.

Q. I understand. Now, most of the ROAs, so far as you know, mentioned Israel or Palestine, correct?

A. Yes, as you saw the way they were mentioned in the five we reviewed earlier.

Q. In other words, whether a person -- references to what the person had said concerning Israel or Palestine?

A. Could be.

Q. Many of them mentioned specifically the war in Gaza, right?

A. I don't know.

Q. Do you recall seeing any that mentioned the war in Gaza?

A. I recall, yes.

Q. Is that a yes?

A. Yes. Some mentioned Gaza, I believe.

Q. Some mentioned pro-Palestinian protests, right?

A. I think so.

Q. More than just the one we saw today, correct?

A. Yes, I think so.

Q. Some used the term "pro-Hamas," correct?

A. I believe so.

Q. Some, like the ones we saw today, mentioned a student protester's public writing, correct?

A. If you mean a post as public writing, then yes.

Q. I don't only mean a post. Articles in newspapers, for

JA863

example?

A.   That's possible as well.

Q.   To be clear, I'm not asking you to just summarize what you and I looked at in those five, but I'm asking the broader body of ones --

A.   I understand.

Q.   Okay.  Some mentioned a student protester's social media, right?

A.   That's correct.

Q.   Some of the ROAs mentioned public statements by protesters, not from social media, not from, say, an article, right?

A.   Yes, some mentioned public statements.

Q.   Some mentioned a student protester's chants at a student protest, right?

A.   I believe some did.

        THE COURT:  Some of them mentioned criminal activity.

        THE WITNESS:  Yes, sir.

Q.   Well, the question is about the ones we haven't seen, so I guess the question for you, to build on what Your Honor has asked, Mr. Hatch, approximately how many of them mentioned criminal activity?

A.   I don't recall those numbers.

Q.   Today we looked at five, only one of which made a reference to a person having been arrested.  Is that a

JA864

representative sample?

A. I think there were two with.

Q. I'm sorry?

A. I think that I read two today -- two of those five had criminal activity. One had the ones you mentioned about the New York cases, but another had an LSD possession charge.

Q. I am talking about recent criminal activity at a protest. You're talking about something else. I understand the distinction, so let me be clear.

Of the population of reports of analysis that you reviewed, approximately how many included allegations of recent criminal conduct in connection with a protest?

A. I don't know.

Q. Did any of the reports of analysis you reviewed mention that a person had been convicted of a crime?

A. I don't remember.

Q. Hmm. Some of the ROAs that you reviewed, not just the ones in this courtroom, specifically mentioned a protester's membership in a student group, right?

A. That's possible.

Q. That's possible or that is what you recall?

A. I believe there were some.

Q. Some specifically mentioned a student's membership in the group Students For Justice in Palestine, right?

A. I think that was one.

JA865

Q.   Some specifically mentioned a student protester's statements or views on Israel, correct?

A.   I believe so.

Q.   Fair to say that the vast majority of the ROAs you reviewed said nothing about criminal activity whatsoever?

A.   I don't know.

Q.   You don't know whether the vast majority --

A.   I don't recall the details of those ROAs.

Q.   Now, this whole effort, tiger team effort, began sometime in March, right?

A.   I believe so, yes.

Q.   And it was responsive to two executive orders issued by the President, one of which we've spent some time discussing, and those would be Executive Order 14161 and 14188, correct?

A.   As I said before, the tiger team was formed because of the large number of individuals in the lists.  The tiger team was formed to look at protesters.

Q.   Okay.  And the reason that you were looking at protesters was because of the executive orders, correct?

A.   The reason I was looking at protesters is because I was directed to from HSI leadership.  Whether or not they did it in response to the executive orders was not something I was privy to.

Do the protesters' activities relate to an executive order?  Possibly.  I guess it could be characterized that way.

JA866

But you're asking me if I characterized it that way, and I did not.

Q.   Well, Mr. Hatch, I really don't want to have to go back to your deposition transcript, but I will if you don't recall saying this.

You've previously testified that Mr. Gordon gave you guidance or instructions about the executive orders to produce reports of analysis on student protesters.  You linked those things, isn't that correct?

A.   I think it's fair to say that yes, but that's not my -- I did link those things, but my direction to the team was not execute the executive order.  My direction to the team was look at protesters.

Q.   I don't want to argue with you.  I'm not asking about your direction to your team.  I'm asking about what you received, the directions you got.  And the directions you got were to create these reports of analysis on student protesters as part of HSI's response to Executive Orders 14161 and 14188, isn't that right?

A.   I don't know if -- I'm just trying to answer the question as best I can, Your Honor.  I don't characterize it that way.  I know that the executive orders, I know one of those executive orders existed.  As I said in my deposition, that was the first time I had read one of them.  So the context of everything we were doing is obviously from the executive orders, but in this

JA867

particular effort, my direction to the team and as I received it, my characterization of it is we were looking at protesters.

Q. Can we please put page 149 of the deposition transcript on the screen. Please take a look.

Line 11, Question: "Well, you -- you agreed -- you answered in the affirmative to whether you have received guidance or instructions about the executive orders and you named as one person who has provided that guidance, Mr. Gordon. My question is what was that guidance?"

Ms. Safavi objects. You answered, "Produce reports of analysis on individuals involved in protests as it relates to Title 8."

That's what you said, right?

A. Yes, I think that's what I just said a minute ago. The job was to produce reports of analysis on individuals involved in protests as it relates to Title 8 and violations of law.

Q. I'm not sure why you're so resistant to answer this here.

THE COURT: Don't characterize the witness's answers. I'm listening.

MS. CONLON: Okay. We can take down the transcript.

Q. Now, these protests that we're talking about, the student protests, they began in October of 2023, right?

A. Yes, I believe so.

Q. Okay. This urgent effort by HSI to identify these student protesters didn't start in 2023 when the protests began. It

JA868

started after these executive orders in the spring of 2025, right?

A.   It started in the spring of 2025.

            MS. CONLON:  Okay.  Nothing further.

            THE COURT:  Ms. Santora, do you wish to examine this witness?

            MS. SANTORA:  Yes, I do, Your Honor.

CROSS-EXAMINATION BY MS. SANTORA:

Q.   Good morning.  I want to ask you a few questions.

During your direct testimony yesterday you testified about your role with the Office of Intelligence, correct?

A.   Yes, I did.

Q.   And you are the highest-ranking official in the Office of Intelligence?

A.   I am.

Q.   And are you responsible as leadership in the Office of Intelligence for providing guidance to your analysts?

A.   Yes, I do.

Q.   Are you responsible for providing training to your analysts?

A.   Yes, training, policy, procedures, equipment and allocation of analysts.

Q.   So would it be fair to say that if there were changes to policies and procedures in your office, you would know about those?

A.    Yes, if they related to the analysts, yes.

Q.    And you would provide training to your analysts on those?

A.    That's correct.

Q.    Would it be possible for a new policy or procedure to exist in your office without you knowing about it?

A.    In my office, no.

Q.    And since the beginning of 2025, have there been any changes to the policies and procedures in your office?

A.    No.  We've been doing our analysis the same way since I started in 2019, 2020, and developed the way we do analysis. We haven't changed the way we do subject profiles at any time in say -- during that time we've always done subject profiles this way.  We conduct our analysis the same way.  And for that matter, we've been looking at the same violations of law during that time as well.

Q.    So you haven't changed the content of your reports of analysis?

A.    We have not.

Q.    So it's always included biographical information?

A.    It has.

Q.    Information about criminal activity?

A.    Yes.

Q.    Information about potential violations of law, including Title 8?

A.    Yes.

JA870

Q. And I just mentioned reports of analysis. Can you, for the benefit of everyone, define what is a report of analysis?

A. It's the way the analyst documents their work product, and it is specifically designed for analyzing criminals, criminal networks, criminal conspiracies, and subject profile is just one ROA type that we use.

Q. You mentioned that your office receives leads or tips that can generate the creation of a report of analysis, correct?

A. That's correct.

Q. And from where does the Office of Intelligence receive tips or leads?

A. In general terms, beyond the scope of a protest, we receive them from all different kinds of directions. They can come from an agent's contacts. They can come from interagency partners. They can even come from the tip line, which is a public-facing mechanism for the public to provide tips. They even can be mailed to the office, hard copies.

Q. And with respect to the protesters, did your office receive leads in a different way?

A. I think we were getting the leads from all directions. I don't know in particular where we were getting the leads from.

Q. Okay. When your office receives a lead, generally speaking, what does it do with it?

A. Usually it's provided to an analyst to do exactly what you saw with these ROAs, to look for information, as I said before,

JA871

that's a violation, potential violation of law, with our specialty being immigration and customs laws. But it's also, as we're building that, it's also to get the context of the individual, which is why the biographical information and the car information like I mentioned is in there.

Q. And is a lead ever insufficient for your office to do anything with it?

A. Yes. There are times when a lead just has incomplete information, a nonspecific name, no identifying information to help us identify or narrow down who it was.

Q. And in that case what does your office do?

A. We would just file the lead. We'd move on.

THE COURT: Well, that question interests me. I've had cases where someone's identified as LNU or FNU LNU, first name unknown, last name unknown, and I wondered what we're talking about in my case. And your answer jogged that memory.

When you don't have enough to do anything, do you report that in any way, or you just don't do anything because you haven't got enough to work on?

THE WITNESS: It's mostly the latter, sir.

THE COURT: The latter, all right. Ms. Santora, go ahead.

Q. Assuming that there's sufficient information in the lead, what does -- I guess I'll ask this. Does your office do -- you said you would create a report of analysis; is that correct?

JA872

A.    That's correct.

Q.    And in creating that report of analysis, you testified earlier that you do independent research?

A.    Yes.

Q.    So you look into the information in the lead and independently confirm?

A.    Try to, yes.

Q.    And that's the information that goes into the report of analysis?

A.    Yes.

Q.    So to be clear, the report of analysis is a fact-based document?

A.    Yes, we try, as you saw with those, we try to just report the facts or what the analyst finds and properly source it so anyone reading it knows where this that came from.

Q.    Does a report of analysis make any recommendations?

A.    It does not.

Q.    Does it include any opinions?

A.    Does not.

Q.    Does it make any referrals?

A.    No.

Q.    Or any judgments?

A.    No.

Q.    How do you know that reports of analysis don't include those things I just referred to, recommendations, opinions,

JA873

referrals and judgments?

A.    It's in our policy.

Q.    You spoke during your direct examination about a tiger team, correct?

A.    That's correct.

Q.    Generally speaking, what is a tiger team?

A.    A tiger team is a term of art we use for an ad hoc, temporary standup of analysts or a combination of analysts that get assigned to a project, usually when it's a large workload, and we use it when we have to bring analysts in from other parts so a specific group or section doesn't have the capacity to handle, so we'll bring in others to help.

And it's a way of differentiating between whether someone's doing their normal job or whether they're doing this additional duty or whether they have been reassigned to this duty.

THE COURT:  So tiger team, you've had Tiger Teams more than once on different subjects?

THE WITNESS:  Yes, Your Honor.  We've used a tiger team maybe half a dozen times since I've been at HSI for all different types of things.  It's just a term of art.

THE COURT:  Thank you.

BY MS. SANTORA:

Q.    So why is the term tiger team used, if you know?

A.    I think, I mean we got it from business, military I think

JA874

uses the term as a way to focus analysts. I didn't make up the term tiger team. If I go back to my Coast Guard days, we would set up a tiger team to fix an engine problem when you needed an electrician or mechanic. It's kind of always been in existence.

Q. So you've heard the term back to your Coast Guard days?

A. I have, yes.

Q. So it's a term that's used in government jargon?

A. Yes, and I believe in business, too.

Q. And it sounds a bit intimidating. Is it meant to intimidate?

MS. CONLON: Objection.

THE COURT: Sustained. He said it's a term of art.

Q. Is it meant to intimidate?

MS. CONLON: Objection.

THE COURT: Why don't you ask him whether he means it to intimidate.

Q. Do you mean it to intimidate?

A. No, not at all. It's an internal term.

THE COURT: The sense I get, so we're clear on what I'm hearing, is you mobilize a Tiger Team because you need to do the work assigned, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: And calling it a tiger team conveys to me some sense of urgency and importance in that work.

JA875

THE WITNESS: Yes, sir.

THE COURT: Is that right?

THE WITNESS: That's correct. And we're analysts, so we're nerds. We're the nerds. We're a law enforcement and we're analysts. We're nerds. We're not ferocious.

THE COURT: It's not like painting decals on fighter planes.

THE WITNESS: No, sir.

THE COURT: Go ahead.

BY MS. SANTORA:

Q. I want to talk to you about the tiger team that was created in March of 2025. What topic was that Tiger Team created to address?

A. That was protesters and we had gotten a lot of leads.

Q. Were you asked specifically or was that tiger team asked specifically to look into student protesters?

A. All protesters.

Q. All protesters, okay.

And ultimately how many people did the tiger team look into?

A. Over 5,000, more than 5,000. I don't know the exact number.

Q. And in looking into those people, did the Office of Intelligence analyze any differently than it normally does?

A. A little bit. Normally we do an ROA on everybody, no

JA876

matter what. And that's why you'll see the variation as we saw from the five today where one was two pages and one was longer.

But in this instance, because we had so many names, I told the analysts if you don't find anything beyond the biographic information -- we were looking at violations of law and as it relates to protests. So some of the names, for example, were said to be at a protest, but we never found that they were at a protest. We never found anything. We didn't find any conduct. We didn't find anything related to the individual. So it would have been a one-page ROA. And so I told the team for the sake of expediency to get through this long list to just not do the ROAs on those individuals.

Q. Okay. You talked about the fact that you received information from Canary Mission with respect to these lists, correct?

A. Yes.

Q. To be clear, does your office work with Canary Mission?

A. No. Like I said before, we have no association with Canary Mission. Canary Mission is not associated with HSI at all. I don't know who posts on that website. I don't know who runs that website. I don't know anybody in that organization. I don't have any connection with anybody in that organization.

Q. Does the office treat Canary Mission information differently than it treats other information?

A. We treat it just like any other lead.

JA877

Q.   Was the office asked to look at Canary Mission information differently than other information?

A.   No, we were not asked to look at it differently.  We were not asked to change the ROA process or our process of criminal analysis.

Q.   Would it be relevant to a report of analysis that someone had been charged with a crime but not convicted?

A.   As long as the charge was factual, it could be included in the ROA, so yes.

THE COURT:  I don't understand a charge that wasn't factual.

THE WITNESS:  I guess you're right.  A charge would be included in that section you saw, the criminal history.

BY MS. SANTORA:

Q.   And how would that be relevant to the analysis, a charge that was not a conviction?

THE COURT:  That's pretty hypothetical.  I don't know what to do with that.  This is a law enforcement operation or part of a law enforcement operation.  Of course you include charges because you might want to -- or someone, some enforcer might want to follow up on that.  I just don't understand.

MS. SANTORA:  Okay.  We'll move on.  Thank you, Your Honor.

THE COURT:  All right.

MS. SANTORA:  Preserving the government's objection to

these documents being entered into evidence based on privilege, in case our objection is ultimately overruled -- the overruling objection is upheld, I do want to ask questions about the documents that opposing counsel --

THE COURT:  You don't waive the objection properly preserved by exercising your opportunity during the trial to ask about such documents.

MS. SANTORA:  Thank you, Your Honor.

I want to ask you about a document you looked at earlier.  I believe it was, it was in the packet we received.  It was Exhibit K related to Mr. Mahdawi.  I don't know what letter it's been marked.

MS. CONLON:  It was marked as a number, and it's 235.

MS. SANTORA:  235, okay.  Are you able to show the witness?

THE COURT:  I'm an equal opportunity helper.

MS. SANTORA:  Thank you, Your Honor.

THE COURT:  Here's the documents that have now been marked, and thank you, Ms. Conlon, Exhibit 235 in evidence.

BY MS. SANTORA:

Q.   Do you see subject profile for Mohsen Mahdawi?

THE COURT:

A.   I'm looking at the one for Suri.

THE COURT:  You said K.

MS. SANTORA:  Sorry.  That was K.  I don't know what

JA879

letter this was.

THE COURT: You want Mahdawi?

MS. SANTORA: Mahdawi, yes.

THE COURT: All right. In the packet as it was delivered to the court, it's Exhibit E. And so our record is complete, someone will help me, Exhibit E has become --

MS. CONLON: 235.

THE WITNESS: Are you going to ask me about --

THE COURT: Since I have now become a document custodian. Go ahead.

BY MS. SANTORA:

Q. I believe when you were being questioned earlier --

THE WITNESS: Sir, this is Khalil.

THE COURT: It is, and that's my mistake. I'm not much of a document custodian. Yes.

MS. SANTORA: I can give the witness my copy --

THE COURT: No. I have it right here. Now I've got the right one. Having nothing to do with this exhibit, but it reminds me, the government has made an ex-parte submission, properly. The court has reviewed it, and pertaining to one of these exhibits, and that's something potentially should be redacted or withdrawn. I want to know precisely what it is with the brackets as you've done it in time for our conference at 3:00. You can hand it up to the clerk so I know what we're talking about. Go ahead.

BY MS. SANTORA:

Q.   Mr. Hatch, you are looking at the subject profile now of Mohsen Mahdawi, correct?

A.   Yes, I am.

Q.   And do you remember when opposing counsel was questioning you and they said that in this report of analysis it included only biographical information, correct?

A.   Yes.

Q.   And do you see the last bullet under Analysis and Findings?

A.   Yes, I do.

Q.   That relates to possession of various drugs, correct?

A.   It does.

Q.   Would you describe that as biographical information?

MS. CONLON:  Objection, Your Honor.

THE COURT:  No.  She may have that question in that form.

A.   I don't know.

Q.   Would you describe the drug charges as biographical information?

MS. CONLON:  Objection.  It doesn't even say "charges."

Q.   Would you describe that bullet relating to this individual being in possession of drugs as biographical information?

A.   I'd more likely say it was criminal history.

JA881

Q.    Thank you.

And that bullet appears in the analysis and findings section, correct?

A.    It did, it also appears in criminal history.

Q.    Okay.  Thank you.  I want to ask you about another one of the documents opposing counsel asked you about.  These are the documents related to Rumeysa Ozturk.

THE COURT:  In the packet of documents given to the court, these appear as Exhibit C.  And they are now in evidence as what?  Ms. Conlon.

MS. CONLON:  Sorry.  Ms. Ozturk, 232.

THE COURT:  232.

THE WITNESS:  Do you want this one back, sir?

THE COURT:  Yes.

THE WITNESS:  Okay.

BY MS. SANTORA:

Q.    Opposing counsel asked you earlier about the first bullet under analysis and findings, and they mentioned the coauthoring of an op-ed.  Do you remember that exchange?

A.    Yes.

Q.    And if you look at the rest of that bullet, it says that she wrote the op-ed with Tufts Students for Justice in Palestine, which was suspended for calls for Student Intifada.

Would that part of the bullet factor into the office's analysis?

JA882

A.   Yes, I mean it is part of it.

Q.   Moving on, I would like to ask you, I want to ask you some questions about the executive orders that you referenced in your testimony.

A.   Okay.

Q.   How did your office respond to Executive Order 14161 and Executive Order 14188, if at all?

A.   Can you give me the titles?  I don't know them by the numbers.

Q.   Executive Order 14161 is protecting -- I'm sorry, I don't have the title in front of me.  14188 has to do with antisemitism.  You mentioned that you had not seen that executive order until your deposition, correct?

A.   That's correct.

Q.   So we can put that to one aside.  With respect to the other executive order that you --

A.   Okay.  I'm familiar with that.

Q.   -- yesterday and today, how did your office respond to that executive order?

A.   I recall when I read that executive order, I saw that just about everything related to that executive order and us were things we were already doing.  They all related to existing Title 8 issues.  So it did not task my office with doing anything different.

Q.   And so your office didn't change the way it analyzed

information in response to the executive orders?

A.   No.  And especially in that executive order, it didn't change anything.  It all related to Title 8.  It emphasized things in Title 8, but nothing was new to us.

Q.   So the executive order essentially directed your office to follow Title 8?

A.   That's how I interpreted it for the most part.

Q.   And your office does follow Title 8?

A.   We have been since I've been there and, I mean, since HSI has existed.

Q.   And how long has HSI existed?

A.   HSI, and in its previous form, Customs' Office of Investigations, has been around since the 1950s, and I believe Title 8 has been since the 1950s.

Q.   I want to go back for a second to the ROAs about the protesters.  You said that your office looked into 5,000 leads related to that, correct?

A.   Over 5,000, yes.

Q.   And because of the bulk of work in that particular situation, ROAs were not created in every circumstance, correct?

A.   That's correct.

Q.   Do you know in what percentage of cases ROAs were created?

A.   I don't know the exact numbers, but I would estimate, I think I said 200, so less than -- I'm not good at public math.

JA884

Less than 5 percent.

Q.   Less than 5 percent.  And so 95 percent did not result in the creation of an ROA?

A.   That would seem to be true.

Q.   What happened with those 95 percent of the 5,000 cases?

A.   If we didn't do an ROA, we just moved on to the next person on the list or the next lead.  We didn't do anything with them.

Q.   Okay.  So in 95 percent of those 5,000 cases regarding protesters, your office did nothing?

A.   We moved on to the next lead, yes.

        MS. SANTORA:  Thank you.

        THE COURT:  Ms. Conlon, anything further?

        MS. CONLON:  Yes, Your Honor.

        THE COURT:  You may.

        MS. CONLON:  Is it okay with Your Honor if I examine from here?

        THE COURT:  Of course it is.  So you all understand, I understand that by passing the bar, you have the right to be within the bar enclosure denominated by the rug in deeper blue. It's not an instruction that you have to stay on that rug, but I learned you could move around in the bar enclosure as a lawyer.  Go ahead, Ms. Conlon.

JA885

MS. CONLON: Okay.

REDIRECT EXAMINATION BY MS. CONLON:

Q. So you were just asked about the percentage of ROAs that were generated as a result of this line of effort, and you have estimated -- and don't worry, this won't be an equation. But you've estimated about 5 percent; is that right?

A. Yes.

Q. And your estimate is based on the notion knowing that there were over 5,000 names at least on Canary Mission, and you saw maybe 200 reports; is that right?

A. As I recall, yes, I think that's what I said.

Q. Now, you have said before you didn't look at all the reports generated by the tiger team, right?

A. That's correct.

Q. You happened to have seen about 200, correct?

A. Somewhere in there. I don't know the exact numbers.

Q. Right?

A. I'm giving you an estimate. That's all I'm doing.

Q. No, no. I appreciate that you have seen 5 percent of -- if we're sticking with percentages, I appreciate that what you can tell us is that you've seen 200 and you know that at least more than 5,000 people were looked at. But I understood you to be saying earlier you can't tell us how many ROAs were actually created. Am I mistaken?

A. I'm estimating that somewhere under 200 or around 200 ROAs

JA886

were produced. In my testimony I believe I said, as you mentioned earlier, dozens, I had read -- you asked me how many I had read. I said dozens. And then you brought up my deposition and said, "You said here 100," and I had said earlier 20.

So I would estimate I've read between 20 and 100, but I know the team produced more, and I'm estimating they produced less than 200 in total.

Q. And what is that based on? What is your estimate of what the team produced, I mean, based on?

A. Just my recollection of the effort described to me by the team lead. I'm giving you my best estimate.

Q. I appreciate that. Fair to say you don't actually recall the total number that were created by the tiger team?

A. I do not recall the total number.

Q. Fair to say you are in a position to speak about the total number as an estimate only that you personally reviewed?

A. That's correct.

Q. Now, that 5,000-person list which resulted in -- for many folks resulted in no ROAs, one of the reasons it resulted in no ROAs for so many people is because that list included a lot of U.S. citizens, right?

A. That's correct.

Q. And it's not within the purview of the Office of Intelligence to write reports of analysis about U.S. citizens,

correct?

A. We absolutely are.

Q. Oh, you wrote them about U.S. citizens?

A. HSI intelligence is authorized to write ROAs about U.S. persons. That's the question you asked me, right?

Q. Yes, that is the question I'm asking.

A. Now, are you asking me if any of the protesters that were U.S. citizens had ROAs written on them?

Q. Well, I guess that's a good question.

A. I don't know. I don't recall, I don't recall reading an ROA on a U.S. person.

Q. Now, the circumstance in which you could write an ROA about a U.S. person, that would not be for a violation of Title 8 immigration offense, right, for example, being out of status or any number of things?

A. We are authorized to write ROAs on U.S. persons for any violation of U.S. law, potential violation of U.S. law, suspicion of violating U.S. law, information related to violations of U.S. law, as I've said before.

Q. Sorry. So going back to the question I think you tried to ask if I was asking just a moment ago, the tiger team did not, to your knowledge, create ROAs on U.S. citizen protesters; is that correct?

A. I don't recall reading any ROAs on U.S. citizen protesters.

JA888

Q.    And you did not understand the project at hand to be one that included looking at U.S. citizen student protesters, correct?

A.    I didn't interpret the focus to be U.S. persons.

Q.    Now, you've said that ROAs were only generated for some small number out of the overall group.  And one reason that could happen is if you couldn't sufficiently identify a person; is that correct?

A.    That's correct.  That's one reason.

Q.    Another reason that could happen was if you couldn't confirm that a student had actually attended a protest; is that right?

A.    That's correct, that's one reason.  It's a possible reason, yes.

Q.    In other words, the student protester initiative of the tiger team was meant really to capture people who protested, is that correct, who had attended protests?

A.    I would not use the word "capture."

Q.    Well, we can pick a different word.

THE COURT:  Focus on is the sense of her question.  Do you accept that?

A.    That was the focus, yes.

Q.    So if no protest, no ROA; is that right?

A.    Yeah.  If we found no activity, we would move on to the next one.

JA889

Q.   I'm a little confused because "activity" -- I'm asking specifically about protest activity.  If you did not find evidence of protest activity, the person did not receive an ROA; is that correct?

A.   That is correct.

Q.   Now, the ROAs were not limited to persons who attended protests who had potentially committed a criminal offense, correct?

A.   When we start out with the leads, we don't know what we have to begin with, so we look, as you saw in the ROAs, we focus on the individual.

Q.   And ROAs were generated for students who attended protests who were not suspected of having committed a crime, isn't that right?

A.   That is correct, yes.

        MS. CONLON:  Just a moment.

Q.   You said that you weren't directed to look at the Canary Mission list any differently from how you look at other information.  Did I hear that correctly?

A.   The Canary Mission list, it was one source of leads we get.  We were not directed to look at Canary Mission any differently than we would another lead on a protester.

Q.   You didn't receive a directive to look at any other collection of people from any other single source in the way that you did for the Canary Mission website, correct?

JA890

A.   I think it's fair to say that Canary Mission was unique.

Q.   It was unique because it was the focal point of this effort, wasn't it?

A.   It was unique because it was a large amount of leads, large amount of information on protesters.

MS. CONLON:  Just a moment.

Q.   I think you testified earlier, but tell me if I'm wrong, that you as the director of the office are familiar with training given to analysts about how to do these reports of analysis, right?

THE COURT:  This is redirect.  That's beyond the scope.

MS. CONLON:  Your Honor, I'm sorry, I thought that just came up in the government's questioning.

THE COURT:  I didn't.

MS. CONLON:  You didn't hear that?

THE COURT:  That may not be the same.

MS. CONLON:  Can I have just one second to see?  I'm sorry.

I think that's it.  Thank you so much.  Thank you for your time.

THE COURT:  Nothing more, Ms. Santora?

You may step down.  Thank you.  This witness is excused.  Call your next witness.

MR. BIALE:  Thank you, Your Honor.  Noam Biale for the

JA891

plaintiffs.  Plaintiffs call Amy Grier.

THE COURT:  She may be called.

AMY GREER, Sworn

COURTROOM CLERK:  Can you please state your name and spell your last name for the record.

THE WITNESS:  Sure.  My name is Amy Greer, G-r-e-e-r.

MR. BIALE:  May I proceed, Your Honor?

THE COURT:  You may.

DIRECT EXAMINATION BY MR. BIALE:

Q.   Good afternoon, Ms. Greer.

A.   Good afternoon.

Q.   Where do you work?

A.   At Dratel & Lewis as an associate attorney.

Q.   And what is Dratel & Louis?

A.   It is a small criminal defense firm.

Q.   Where is it based?

A.   In Manhattan.

Q.   And how long have you been a licensed attorney?

A.   Since September 18, 2020.

Q.   Okay.  Good memory for the date.

A.   It was the day RGB died.

Q.   I see.

A.   It was not a celebratory day.

Q.   I see.  And you're admitted to the New York bar?

A.   Yes.

Q. Any other states?

A. Actually that 2020 date I was admitted to the State Bar of Alaska. And since then I've been admitted to the District of New Jersey, the District of New York, and the District of the District of Columbia.

Q. Do you know an individual by the name of Mahmoud Khalil?

A. Yes.

Q. How do you know him?

A. He is my client.

Q. When did you begin representing Mr. Khalil?

A. In or around November of 2024.

Q. And since you began representing him in November of 2024, have you met with Mr. Khalil in person?

A. I have.

Q. Approximately how many times?

A. Approximately two to three times.

Q. In addition to the two to three times you met with Mr. Khalil in person, have you ever met with him in a videoconference or on FaceTime or something like that?

A. Yes. I have met with him numerous times by videoconference, Signal, et cetera.

Q. You said "numerous times." Can you estimate for us how many times you met with Mr. Khalil by videoconference?

A. Sure. Between November and March, probably weekly, so however that adds up to. And then after his detention, I met

JA893

with him nearly daily by videoconference.

Q.   Okay.  So fair to say you've met with Mr. Khalil, at least by videoconference, dozens, maybe even over 100 times?

A.   Yes.

Q.   Are you familiar with Mr. Khalil's wife?

A.   Yes.

Q.   What is her name?

A.   Dr. Noor Abdalla.

Q.   And have you met Dr. Abdalla in person?

A.   Yes.

Q.   Approximately how many times?

A.   Probably five or six times.

Q.   Have you also met with Dr. Abdalla on videoconference?

A.   Yes, numerous times.

Q.   Numerous.  Can you give us a ballpark estimate?

A.   I was one of the primary contacts for Dr. Abdalla throughout the course of this case.  So it's hard to estimate, but probably a few times a week, so at least dozens, if not more.

Q.   And just so we're clear, when you say "this case," you're referring --

A.   Sorry.  The habeas and immigration case post-detention.

THE COURT:  Case in which you represent him as his attorney?

THE WITNESS:  One of them, yes, sir.

JA894

MR. BIALE: Thank you.

Q. Are you familiar with Dr. Abdalla's voice?

A. Yes.

Q. Okay. Have you ever been to the building where Mr. Khalil and Dr. Abdalla live?

A. Yes.

Q. Approximately how many times have you been there?

A. Approximately twice.

Q. Are you familiar with the lobby of that building?

A. Yes.

Q. Okay. I'd like to direct your attention to March 8, 2025. What do you recall happened that day?

A. In the evening of March 8, 2025, I received a phone call from Mahmoud.

Q. Okay. Do you remember approximately what time?

A. I remember exactly what time. It was 8:26 p.m.

Q. And without telling me what -- when you say "Mahmoud," we're talking about Mr. Khalil?

A. Sorry. Mr. Khalil, yes.

Q. Without telling me what Mr. Khalil told you in that phone call, can you tell us about anything that he did in that phone call?

A. I am not sure if he handed the phone to the agent from immigration or if the agent took the phone, but the phone was given to one of the agents.

JA895

Q. And when you say, "one of the agents," can you clarify what you mean?

A. Sure. Mr. Khalil called me because agents had entered, and I know this because I spoke with the agent on the telephone, and so that agent introduced himself to me over the telephone.

Q. Okay. And did the agent identify what agency he was from?

A. He said he was from Department of Homeland Security, HSI.

Q. Okay. And you understood based on the way the phone call went that this agent was physically present with Mr. Khalil at the time?

A. Yes.

Q. Now, were you physically present with Mr. Khalil and with this agent at the time?

A. No.

Q. Okay. Could you hear anything in the background of the phone call?

A. With Mr. Khalil?

Q. Yes.

A. I could hear him speaking, Mr. Khalil speaking, and I was obviously hearing the agent speaking to me. And then I heard other voices, ambient voices in the background.

Q. Okay. And then what happened next after you received this phone call?

A. Well, I spoke to the agent and he hung up on me.

JA896

Q.   Okay.  And what happened after that?

A.   Well, I freaked out a little, to be completely candid, and I called the partners at my law firm.  And then while I was on the phone with one of them, I received another phone call.

Q.   And who was the second phone call -- who did the second phone call come from?

A.   The second phone call came from Dr. Noor Abdalla.

Q.   And Dr. Abdalla call you from her phone or from somebody else's phone?

A.   She called me from Mr. Khalil's phone.

Q.   Okay.  And approximately when did Dr. Abdalla call you from Mr. Khalil's phone?

A.   It was at 8:34, so eight minutes later.

Q.   And when Dr. Abdalla called you, were you able to hear her voice over the phone?

A.   Yes.

Q.   Did you hear any other sounds over the phone?

A.   Yes.  I could hear Mahmoud, or Mr. Khalil, speaking in the background, and I heard other ambient male voices.

Q.   Okay.  I'd like to show you what's been marked for identification as Exhibit A1.

     Mr. Kumar, if you can pull that up and just pause on the first frame.

     Do you see that in front of you, Ms. Greer?

A.   Yes.

JA897

Q.   Just looking at the image in the middle, do you see the location?

A.   On the bottom left there, or do you mean the actual --

THE COURT:  No.  Do you recognize the location?

A.   Yes, I do.

MR. BIALE:  Thank you, Your Honor.

Q.   Where do you recognize that -- what do you recognize that location to be?

A.   That is the lobby of Mr. Khalil and Dr. Abdalla's apartment building.

Q.   And how do you recognize that location to be the lobby of their apartment building?

A.   Because I've been there and because I actually noticed the tiling on the floor when I visited, it's kind of an odd linoleum tile.

MR. BIALE:  Okay.  Mr. Kumar, I'd like you to play -- and I'm hoping that we have sound -- play the video to 7 seconds.

THE COURT:  Well, you're calling her to authenticate this video?

MR. BIALE:  Yes, Your Honor.

THE COURT:  And what do you -- let me ask this preliminary question.  What do you understand this to be?  Yes, what do you think this is, this video?

THE WITNESS:  From what I know of this video, this is

JA898

the video of when Mahmoud, Mr. Khalil, was arrested.

THE COURT: And how did you come to know that?

THE WITNESS: I know that because I received it from Dr. Abdalla on the evening that Mr. Khalil was arrested.

THE COURT: All right. And who do you think took it?

THE WITNESS: Dr. Abdalla.

THE COURT: Thank you. All right. Mr. Kanellis.

MR. KANELLIS: I'll reserve my objection, Your Honor.

THE COURT: Reserved, okay. You may proceed.

MR. BIALE: Could you play it to seven seconds, Mr. Kumar, and with sound.

(Video played.)

BY MR. BIALE:

Q. Okay. You just heard some voices on that video, and you heard at the end it sounded like a woman's voice say, "He's not resisting."

A. Mm-hmm.

Q. Do you recognize that person's voice?

A. Yes.

Q. Who is that?

A. Dr. Abdalla.

MR. BIALE: Now, Mr. Kumar, if you can play a few more seconds to ten seconds.

(Video played.)

MR. BIALE: Stop.

JA899

Q.   Now I'm going to ask you, who do you recognize in the video?

A.   The person facing the camera is Mr. Khalil.

MR. BIALE:  Okay.  And now, with the court's indulgence, I'll ask to play another 20 seconds of the video, if we can do that.

THE COURT:  Proceed.

(Video played.)

Q.   Okay.  You just heard some additional parts of the video, and you heard Dr. Abdalla say "Hi Amy."

A.   Mm-hmm.

Q.   Do you know who she is referring to?

A.   Yes.

Q.   Who is she referring to?

A.   Me.

Q.   And how do you know that?

A.   Because I was on the phone with her.  I answered the telephone when she called.

Q.   Okay.  Can you just tell us about what you remember about that conversation.

A.   Sure.  I was on the phone with Dr. Abdalla and one of the partners at my law firm, and together we were advising Dr. Abdalla, I was saying to her --

MR. KANELLIS:  Objection, Your Honor.  Two bases.

THE COURT:  I'll hear you.

JA900

MR. KANELLIS: First is, if she's going to discuss these communications, she may be waiving her privilege. Second, calls for hearsay.

THE COURT: Well, the first is, I suppose she knows that, and she may make her own determinations.

The second is, what she says is hardly -- well, I'm not so sure it's even hearsay. If she was advising her, it's not for the truth. That's the advice, act in this way. Any response from Mr. Khalil's wife I would think under the circumstances is an excited utterance.

So subject to your motion to strike, you may answer the question. What did you say and -- did the partner speak, before we go any further?

THE WITNESS: We were both speaking, but I was primarily the one speaking.

THE COURT: And what's the name of the partner?

THE WITNESS: Lindsay Lewis.

THE COURT: All right. And tell us what each person said as best you can recall.

THE WITNESS: Okay. When we first got on the phone, we were attempting to calm Dr. Abdalla down. "It's going to be okay. Can you stay with us? Let's talk through this." And that was both Lindsay and myself, Ms. Lewis and myself. I was asking Dr. Abdalla, "How many people do you see? What's happening now? Can you ask them where they're taking him? Can

JA901

you ask them if they will show you a warrant?  Will one of them identify themselves to you?  Can you get a name?  Again, where are they taking him?"

And I honestly do not recall, because this was obviously a rapidly unfolding situation, whether it was myself or Lindsay who asked if we could speak with one of the agents again and to see if Dr. Abdalla could hand one of them the phone.

MR. BIALE:  Okay.  So Your Honor, at this time I would play the rest of the video, given what you've heard about Ms. Greer's memory of what was said on that phone call, but I don't want to take up the time if the court would be prepared to receive the video in evidence now.

THE COURT:  Well, I have this problem, but perhaps Mr. Kanellis wouldn't object on this ground.  That's not the original video because the visages of the agents are obscured. Someone has done that.  If he has no problem with that, I am prepared to receive the video as a video of whatever it records.  So we'll ask him.

MR. KANELLIS:  Your Honor, obscuring the faces is not the issue.  The issue is it hasn't been properly authenticated. If Ms. Abdalla wants to come and lay the foundation, no issue with that.

THE COURT:  I think it's been adequately identified, and that objection is overruled, and A1 is admitted as an

JA902

exhibit, now it will be Exhibit 237. 237. But I'll review it, so we need not play it.

(Exhibit 237 admitted into evidence.)

MR. BIALE: That's fine, Your Honor.

BY MR. BIALE:

Q. Let me just ask so the court understands because it's a good point. The court pointed out that the faces are obscured in the video. And I think you testified before that you received the video from Dr. Abdalla shortly after it was taken; is that right?

A. Yes, approximately two hours later.

Q. In the version that you received from Dr. Abdalla, were the agents' faces obscured?

A. No.

Q. Okay. How did, if you know, how did the faces of the agents come to be obscured in the video?

A. We, as a legal team, knew that there has been a respectful protocol when videos are shown publicly to blur out the faces of other people besides, you know, the person agreeing to make the video public. So as a team, we decided to blur out the video -- excuse me, blur out the faces. And I was privy to part of those conversations, and then one of the legal team members undertook that, the blurring.

Q. Just to be clear, that was to protect the identities of the agents who were involved in the arrest, right?

JA903

A.   Right, to protect the identities of any person who appeared in the video who was not Mahmoud.

Q.   Okay.  Now, you've seen this version of the video before? And by "this version," I mean the exhibit that was just admitted into court.

A.   The Associated Press version, yes, I have seen it.

Q.   And you have also seen the version that Dr. Abdalla sent you two hours after this incident?

A.   Correct.

Q.   Other than the obscured faces of agents, is there any difference between those two videos, or are they identical?

A.   They appear identical to me, yes.

         MR. BIALE:  No further questions.

         THE COURT:  Mr. Kanellis.

         MR. KANELLIS:  Very short, Your Honor.

CROSS-EXAMINATION BY MR. KANELLIS:

Q.   Ms. Greer, is it?

A.   Yes.

Q.   Let's keep that video up.  Have you had -- you are a criminal defense attorney?

A.   Yes, sir.

Q.   And you represent criminal clients who have been accused of breaking the law.  Fair statement?

A.   I represent people who have been accused of breaking the law.

JA904

Q.   And have a few of your clients ever been arrested?

A.   Sure.

Q.   And when they were arrested, have a few of your clients ever been handcuffed?

A.   Yes.

MR. BIALE:  Objection.  Your Honor.

THE COURT:  No.  Overruled, overruled.  This is certainly something that is appropriate.  I don't know how far we'll go, but he may proceed with it.

MR. KANELLIS:  I've made that point, Your Honor.  I'm going to move on to another one.

THE COURT:  All right.

MR. KANELLIS:

Q.   Do you remember in the video that hanging from the chests of the two -- and we can play it back if you need your memory refreshed, but hanging from the chests of the two agents were identification badges, correct?

A.   I recall seeing at least one.

Q.   At least one?

A.   Yeah, I mean, just from memory.

Q.   From memory.  Do you want, we can play the video back.

THE COURT:  It's in evidence.  I'm going to have to look at it.

Q.   All right.  So there was no -- no one was concealing the fact that these were law enforcement officers, right?

JA905

A.    No.

MR. KANELLIS:  Okay.  No more questions, Your Honor.

THE COURT:  Nothing further for this witness, Mr. Biale?

MR. BIALE:  No, Your Honor.

THE COURT:  You may step down.  So call your next witness.

MR. BIALE:  Your Honor, at this time plaintiffs have called all our witnesses who we have not previously identified as being called out of order, and so, except with respect to those witnesses, plaintiffs rest.

THE COURT:  All right.  And who is left, just so we know?

MR. BIALE:  Sure.  Sorry.  One second.

So here is what it includes.  So we have Jeff Reger, who is scheduled to testify on Monday.  He's the executive director of MESA.

On Tuesday, the government is going to be calling the agents who were involved in four of the relevant arrests, and we have agreed with the government that, because both sides wanted to call those witnesses, we have agreed that the cross-examinations could go beyond the scope of the direct so that we don't have to call them separately.

And then on Friday, we will have Veena Dubal, who is the head of --

JA906

THE COURT: Friday of this week?

MR. BIALE: No. Friday of next week. I'm sorry, would you like to know the whole schedule? I was just telling you plaintiffs' witnesses.

THE COURT: No, no. Keep going.

MR. BIALE: So Friday of next week we will have plaintiffs' additional witnesses. These are the ones who are out of the country this week. Veena Dubal, who is the general counsel of AAUP, and Cinzia Arruzza, who is a professor at Boston University.

THE COURT: All that's fine.

MR. BIALE: And we may -- sorry, just to be complete, we may call one very brief summary witness to talk about evidence that's already been admitted or will be admitted, but that's still to be determined.

THE COURT: All right. So the government may call a witness.

MR. KANELLIS: Your Honor, we have operated under the understanding it was going to last -- our first witness would be available tomorrow.

THE COURT: Fine. We'll charge you with the time, but that's fine. Well, actually, we'll charge you with the time, but we'll stop the clock now. There were matters that I was going to see you on at 3:00, once I've handled the proceeding I have on for 3:00. I'm happy to handle it now.

JA907

Where I'd like to start, if anyone could help me, and I'm looking to the government, is the ex-parte submission in the red folder, I want to see what document, to what document does that relate. And in that document -- you don't have to reveal it to them, but in that document to what words or sentence, if you can point it out. It doesn't have to be done -- oh, Ms. Santora is ready to do it.

MS. SANTORA: I was going to confer with our agent.

THE COURT: You go right ahead.

MR. BIALE: Your Honor, sorry. Before we get there, I of course forgot about one witness. We have also indicated to the government that we wished to call Stuart Wilson, who is a government official. We have served a trial subpoena for him on the government. The government so far has not accepted service of that subpoena but has told me that he will be available to come to testify either next Monday or next Friday.

MR. KANELLIS: That's not accurate.

MR. BIALE: Which part of it is not accurate?

MS. SANTORA: I can explain. I think I know what you're talking about. So we had indicated based on -- or I had indicated, and I'm sorry if this was confusing, that based on the trial schedule as the parties had currently set, it seemed like the only days where there would be available trial time is Monday and Friday. And I had tried to indicate that we were inquiring with our witness as to his availability on those

JA908

days, not that he was available.

MR. BIALE:  That's fine.

MR. KANELLIS:  I apologize for multiple people speaking, Your Honor.  One point of clarification, we have I think cooperated very well with respect to sharing time and figuring out how to fill out these two weeks.  Mr. Wilson was not identified on their witness list.  We had no idea --

THE COURT:  Well, I deal with cases in controversy.  So far I don't have controversy.  Assuming we can get him and fit him in, that's fine.

All right.  Have we got the document we're concerned about or the portion of it?

MS. SANTORA:  Yes.  Let us just confer for one minute.  I want to make sure we have the accurate information, Your Honor.

THE COURT:  Well, we've got a whole team here.  What was the matter, the housekeeping or other matter that we were going to have to talk about at 3:00?  Let's talk about it.

MR. KANELLIS:  Your Honor, I would ask that we do that at sidebar.  It contains sensitive information.

THE COURT:  Sidebar on the record I will do it.

MR. KANELLIS:  Yes, sir.

THE COURT:  Very well.

(Sealed sidebar excised from transcript.)

THE COURT:  One minute while I total up the time.

JA909

MR. BIALE: Your Honor, can I ask one clarifying question?

THE COURT: Of course.

MR. BIALE: This relates to what we were just discussing, but the question can be asked on the public record.

THE COURT: Yes.

MR. BIALE: With respect to the ROAs that were admitted into evidence today, other than the particular one that we just handed back --

THE COURT: That we're dealing with.

MR. BIALE: I just want to get clarification. Are those part of the public record?

THE COURT: They are not.

MR. BIALE: Those are sealed?

THE COURT: They're sealed. But all -- for instance, though I take it the last video has been on TV and the like, all the exhibits in this case are for the court. This court's protocol is not to share those during the trial or until the court is done with its decision.

The court in its decision will make reference to those things upon which the court has relied. I've always taken the position that those things, unless classified, and I've dealt with cases that had classified data, are then public so the decision may be thoroughly reviewed by obviously higher courts but anyone who wants to analyze the court's reasoning.

Now, there are various protective orders into which the attorneys have voluntarily entered, and those continue, and you are all subject to those.

MR. BIALE: Thank you for that helpful clarification, Your Honor.

THE COURT: Total elapsed time for the plaintiffs is two days, two hours, 45 minutes. Defense, three hours, 15 minutes. We'll resume tomorrow promptly at 9:00 a.m. Thank you.

(Recess, 12:47 p.m.)

\* \* \* \* \*

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 10th day of July, 2025.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 1, Pages 1 - 65

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants

\* \* \* \* \* \* \* \*

BENCH TRIAL DAY 5

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 11, 2025

\* \* \* \* \* \* \* \*

Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                 Official Court Reporter
                 United States District Court
                 One Courthouse Way
                 Boston, Massachusetts  02210
                 mortellite@gmail.com

JA912

A P P E A R A N C E S

RAMYA KRISHNAN
SCOTT WILKENS
    Knight First Amendment Institute at Columbia
    University
    475 Riverside Drive, Suite 302
    New York, NY 10115
    (646) 745-8500
    Carrie.decell@knightcolumbia.org
and
COURTNEY GANS
NOAM BIALE
ALEXANDRA CONLON
    Sher Tremonte LLP
    90 Broad Street, 23rd Floor
    New York, NY 10004
    (212) 540-0675
    Cgans@shertremonte.com
    For Plaintiffs


ETHAN B. KANTER
WILLIAM KANELLIS
VICTORIA M. SANTORA
JESSICA A. STROKUS
    DOJ-Civ
    P.O. 878
    Ben Franklin Station
    Washington, DC 20044
    (202) 616-9123
    Ethan.kanter@usdoj.gov
and
SHAWNA YEN
    United States Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    Shawna.yen@usdoj.gov
    (617) 748-3100
    For Defendants

JA913

INDEX

WITNESS                                                                    PAGE

MAUREEN SMITH

    Direct Examination By Ms. Strokus                                          8
    Cross-Examination By Mr. Wilkens                                          20

E X H I B I T S

None

JA914

PROCEEDINGS

(Begins, 9:02 a.m.)

THE COURT: Let me say, as I have each day I've authorized Internet access to these proceedings and, therefore, if you are accessing these proceedings via the Internet, have in mind that the rules of court remain in full force and effect. That means there's no taping, streaming, rebroadcasts or screenshots or other transcription of these proceedings. You must keep your microphone muted at all times. If you do not, I shall cut you off from access.

With that said, the government may call its first witness.

MR. BIALE: Can we just briefly raise, before the government calls --

THE COURT: Well, I see some things that perhaps need attending to. I plan to do it during the break this morning. I'd like to take evidence.

MR. BIALE: That's fine, Your Honor. I just want to say I think timing will work out fine. We need to address it and get clarity before the second witness testifies, but it's fine to --

THE COURT: Well, before the second witness, very well.

MR. BIALE: Thank you, Your Honor.

THE COURT: Call the first witness, Ms. Santora.

JA915

MS. SANTORA:  The government calls Maureen Smith.  Ms. Smith is testifying remotely, and I do understand she is having some trouble logging in, so it might take a second for her to get logged in.

THE COURT:  Well, all right, and that's fine.  And I don't know if she can hear me, but I apologize for not starting early with her, but I appreciate her presence.

And since we're waiting, but as soon as she's ready, do you have someone to signal when she's ready?

MS. SANTORA:  Yes.  I think if we could just pull up the Zoom link, we should see if she's been able to log in.  We have an attorney with her who will be questioning her.

THE COURT:  Very well.  Then we can talk about other matters in the interim is what I'm saying.

So, two matters that I think need addressing and I was going to address during the break.  First of all, with respect to Exhibit A, and I see Mr. Kanter here, the document as to which the government has asserted the Presidential communications privilege.  I have that matter under advisement.

MR. KANTER:  Yes.

THE COURT:  In view now of the coordinate proceedings in the Court of Appeals, I state that document is not going to be used, disclosed, at all until the court, if ever, until the court has concluded its analysis of the government's assertion of that privilege.

JA916

Yes, I have looked at it in order to make that determination, and I am considering it. But you understand that's as far as it's going in these proceedings, unless I were otherwise to order, and I will make the order just as soon as I can. If I decide that the privilege applies, as I understand the governing law, I should return the document physically, and I will, to government counsel, and it's certainly not part of the record and that's an end of it.

MR. KANTER: And if Your Honor decides that the privilege does not apply, the result would be --

THE COURT: Well, look, I think since the matter is in limbo, I'm going to be very cautious what I say, but I'll say this.

MR. KANTER: It's still under advisement.

THE COURT: It looks to me like the document is, as to these proceedings, of very peripheral relevance. So let's say that I decide that the privilege does not apply. I note it is to be construed narrowly, but let's say I decide it's not to apply. I don't have any present intention of making any disclosure of it, but I may consider it part of the record.

Does that answer your question?

MR. KANTER: Thank you, Your Honor.

THE COURT: Yeah. All right. The second thing is about these witnesses and service and the like. And I had hoped all this could be worked out. But let me -- and I'm not

JA917

going to entertain argument on this. Let me tell you two lines that I'm following.

One, we're not going to be adding witnesses to this case and so we're limited to the witnesses disclosed in the pretrial order.

Two, the government isn't going to put on, given the fact that the weekend is coming up and witnesses, we're going to have to go through next week and Wednesday we're not going to sit, the government is not going to put on a witness now without making that witness available for deposition if they want, the plaintiffs want to take the deposition.

All right. Are we ready with Ms. Smith?

COURTROOM CLERK: Yes, she's on the Zoom.

THE COURT: Let's go.

MR. BIALE: Your Honor --

THE COURT: Let's go with Ms. Smith.

MR. BIALE: Yes, Your Honor.

THE COURT: We'll take a break and I'll hear you.

MR. BIALE: I'll raise it then.

THE COURT: Do I understand, Ms. Santora, that we're going to have an on camera lawyer interrogate her?

MS. SANTORA: Yes, I think you can see her on camera now.

THE COURT: I can. All right. Let's start by swearing the witness.

JA918

MAUREEN SMITH, Sworn

COURTROOM CLERK: Can you please state your full name and spell your last name for the record.

THE WITNESS: Maureen Amanda Smith.

THE COURT: Thank you. You don't have to keep your hand up.

THE WITNESS: Okay.

THE COURT: And counsel is with you, if she could introduce herself.

MS. STROKUS: Good morning, Your Honor. Jessica Strokus on behalf of defendants. And Your Honor, I have one request. As we are appearing via Zoom, may I remain seated during examination and objections on cross-examination?

THE COURT: Of course you may. Of course you may.

MS. STROKUS: Thank you, Your Honor.

THE COURT: Let me say this, Ms. Smith. I know it would have been more convenient to you if I started early. All I can say is I have plenty to do, and I appreciate you starting at our usual time. Very well. Ms. Gursky, you may inquire.

DIRECT EXAMINATION BY MS. STROKUS:

Q. Good morning, Ms. Smith.

Where do you currently work?

A. I work at the U.S. Department of State.

Q. And how long have you been employed with the State Department?

A. I have been employed since September of 1999.

Q. What was your first position with the State Department?

A. My first position with the State Department was at the United States Consulate General in Guadalajara, Mexico.

Q. And can you please briefly walk us through the duty stations and positions that you've held.

A. Yes. After that I went back to D.C. and I had an orientation class for foreign service generalists. Then I was given language training in Portuguese. I went to Recif, Brazil where I was the sole consular officer and deputy principal officer.

After Recif I went to Merida, Mexico as an entry level officer and after that Santo Domingo, Dominican Republic as the immigrant visa unit chief; after that back to Merida, Mexico as the consular section chief and deputy principal officer; then to Mexico City as American citizen services chief; then back to D.C. for French and Haitian Creole language training. I went to Port-au-Prince for two years as deputy consul general. Then after that I went to Guadalajara, Mexico as the nonimmigrant visa unit chief, and after that to Kingston, Jamaica as deputy consul general, which is where I am now.

Q. Ms. Smith, have you had a change in your employment since February of this year?

A. Yes. As of the beginning of February of this year, I went to Washington, D.C. on long-term temporary duty, TDY, until

JA920

now.  And I'm in Kingston, packing up to report to a one-year position up in D.C.

So thank you for indulging me in doing the testimony from here virtually, everyone there in the court.

Q.   And what was your temporary duty station that's now going to be your permanent station for the next year?

A.   I am a senior adviser in the Bureau of Consular Affairs front office.

Q.   And are there any roles at the Bureau of Consular Affairs immediately superior to your role?

A.   Yes.  My direct supervisor is Mr. John Armstrong, the senior bureau official for consular affairs.

Q.   Ms. Smith, are you familiar with how decisions at the State Department have historically been made?

A.   Yes, I am familiar with how decisions are made historically.

Q.   And has the State Department's policy evolved in the time that you've been employed?

A.   Yes, it has evolved.

Q.   Has the State Department created an exhibit that would assist you in presenting your testimony today?

A.   Yes.

MS. STROKUS:  Your Honor, I'd like to mark --

MR. WILKENS:  Objection.

THE COURT:  Wait a minute.  Well, she's leading, but

JA921

it's background.  I'll let that stand.

MS. STROKUS:  Your Honor, I'd like to mark for identification Exhibit HM.

THE COURT:  Have I got this?

MS. STROKUS:  I believe you do, Your Honor.

THE COURT:  HM for identification.

BY MS. STROKUS:

Q.   And Ms. Smith, are you familiar with this exhibit?

A.   Yes, I am familiar with it.

Q.   Will it help present the evidence to which you are testifying and assist in comprehension today?

A.   Yes, it will assist.

MS. STROKUS:  Your Honor, pursuant to 107(a) and 611, I move Exhibit HM into evidence.

MR. WILKENS:  Objection.  Your Honor, I'd like to voir dire about the how the exhibit was prepared because it hasn't been established.

THE COURT:  Forgive me, but I'll ask you to state your name.

MR. WILKENS:  Scott Wilkens, Your Honor, for the plaintiffs.

THE COURT:  Mr. Wilkens, you're of course welcome, but no voir dire.  I don't understand what the relevance of this is and Ms. Gursky, tell me why you think this is relevant.

MR. WILKENS:  Your Honor, we don't have a copy.

JA922

THE COURT: Well, the government will provide you one forthwith. I have one. But Ms. Gurksy, tell me why this is relevant.

MS. STROKUS: Your Honor, I'm Ms. Strokus, just to clarify.

THE COURT: Ms. Strokus, yes. And you must forgive me. I recognize you. I just hadn't got your name down yet. Forgive me that. Ms. Strokus. And you've gotten a trip now as part of this case. Tell me why it's relevant.

MS. STROKUS: Your Honor, plaintiffs have alleged a new policy which they have termed an ideological deportation policy that they assert that the State Department and the Department of Homeland Security are employing.

THE COURT: I understand that.

MS. STROKUS: This witness is going to testify that the State Department's policies and practices, the way it implements law and regulation have been in place for, in some instances, up to 70 years. And the purpose of this exhibit is to aid, to assist her in presenting her testimony based on her knowledge and aid in the court's comprehension, simply because of the large volume of years to cover for what is currently being implemented today.

THE COURT: But this goes way back before she was employed there, so she doesn't have personal knowledge, for instance, of what was going on in 2004, and certainly she

JA923

doesn't have -- though I can take judicial notice of the Immigration Act of 1924, and she doesn't have personal knowledge of the visa security measures in 1941.

I can take judicial notice of the events, the World Trade Center bombing, September 11 terrorist attacks, one imagines they changed their policies.

MS. STROKUS: Your Honor --

THE COURT: Let's proceed this way. You go ahead and ask her your questions. I understand that central to this case is an alleged policy, and the government denies that there's any such policy. But it's pretty clear the government has procedures, and I'm interested to know what she has to say about those procedures. Let's proceed that way.

I've looked at this. It's hardly conclusive on anything, but I'll defer ruling. So go ahead and ask your questions.

MS. STROKUS: Your Honor, just to clarify, Ms. Smith did just testify that she joined the State Department in 1999. And if I could make a brief offer of proof for all of the testimony that would come before --

THE COURT: No. I stand corrected as to when she joined, and I'm appreciative of that, but I don't need an offer of proof at this time. Go ahead, ask questions.

MS. STROKUS: Thank you, Your Honor.

BY MS. STROKUS:

JA924

Q.   Ms. Smith, when with did the State Department's visa issuance policy originate?

THE COURT:  Which policy?  Excuse me, I didn't hear the type of policy.

MS. STROKUS:  Visa issuance policy.

THE COURT:  Again, forgive me.  Say it again.

MS. STROKUS:  Sure.  My question, Your Honor, was when did today's -- when did the State Department's visa issuance policy originate.

MR. WILKENS:  Objection.

THE COURT:  Overruled.  You may answer.

A.   Thank you, Your Honor.

With the Immigration Act of 1924.

Q.   And Ms. Smith, what did that Immigration Act of 1924 do?

MR. WILKENS:  Objection.

A.   It laid out some basic --

THE COURT:  I'm going to sustain that.  I can look at the Act.  We're back in 1924.  That's over a century ago. Let's come to this case.

MS. STROKUS:  Yes, Your Honor.  Certainly, Your Honor.

BY MS. STROKUS:

Q.   So skipping over some questions that I intended to ask Ms. Smith, Ms. Smith, after World War II, what was the next major development in immigration law?

MR. WILKENS:  Objection.

JA925

THE COURT: No. Overruled. She may tell us.

A. After World War II, the major milestone was the Immigration and Nationality Act in 1952 which laid out rules and regulations on visas and established ineligibilities and what DHS would call inadmissiblities, as well as rules around visa revocation.

Q. And is the INA still the governing law today?

A. Yes, it is still the governing law.

MR. WILKENS: Objection.

THE COURT: Well, overruled. I'm the judge of the law, but I'm going to let that stand. Go ahead. That's the act that's in effect today. Go ahead. Go ahead, counsel.

MS. STROKUS: Yes.

BY MS. STROKUS:

Q. Have there been any amendments that have been relevant to the State Department visa security policy in the years following 1952?

A. Yes. One in particular stands out in my mind that came into effect right before I started with the State Department, which was in 1996, which established the ineligibilities for illegal presence 212(a)(9)(i) and 212(a)(9)(ii).

Q. And you started at the State Department when again?

A. In September of 1999, and I got to my first post in November of 1999.

Q. What was the next major event that impacted the State

JA926

Department's visa security policy?

A.    If I may back up just a little bit because something that impacted the State Department was in 1993, the first World Trade Center bombing when it --

MR. WILKENS:  Objection.

THE COURT:  What's the ground of the objection?

MR. WILKENS:  I mean, she testified that she joined the department in 1999.  Now she's going to back to before she joined, Your Honor.

THE COURT:  Yes, but she has training and the like. To tell you the truth, so far I haven't heard anything that is particularly relevant, but I'd like to move on.  If she doesn't get to something relevant pretty soon, I'll issue a direction. But this is all background and perhaps it's helpful.

Go ahead.  After the World Trade Center bombing, what happened so far as you know?

THE WITNESS:  Yes, Your Honor.

A.    So after the first World Trade Center terrorist bombing, there was a push within Consular Affairs for some system automation as well as limited biometric collection.  And if we fast forward, I started in '99, then the September 11, 2001 terrorist attacks happened.  And that was a major wake-up call for the State Department for Consular Affairs and for the whole U.S. Government in terms of our failure to properly vet visa applicants, since at least a couple of them were in the U.S. on

student visas. At least one had attended flight school in the United States.

So in the immediate years following the September 11 terrorist attacks, there were several laws that came into effect and major changes in the Bureau of Consular Affairs in terms of full biometric collection. And, for example, the INS became DHS with all of its different components, HSI, ICE, also consular officers having access to entry and departure data for all aliens.

Another major shift was that before 9/11 foreigners could transit the U.S. without a visa. And starting in 2002, foreigners needed to obtain a visa in order to even switch planes in the United States.

Also the visa security program was created, which is where HSI has agents co-located in consular sections abroad that conduct additional vetting on visa applicants. And also in the few years following 9/11 it was mandated that U.S. Government agencies needed to share in a very fulsome way derogatory information on visa applicants. And also there was sharing of biometric data especially between DHS and Consular Affairs.

Q. Ms. Smith, was there anything specific to student visa applicants that occurred following 9/11?

A. Yes. Specific to student visa applicants the SEVIS system was created, also referred to as SEVP, Student and Exchange Visitor Program. And that was literally a database that was

JA928

created by ICE to track students from the moment that they are issued their I-20 or DS-2019 form in order to apply for a visa abroad. And it tracks when they report to class in the United States. If they were to flunk out of school, their status would change.

ICE certifies designated school officials at every school that is accredited to issue the I-20 or DS-2019, and the DSO, as they're called, is supposed to update in SEVIS, in the SEVP any and all student movements, including if someone is, for example, adversely terminated at the school.

Q.   Ms. Smith, all of these changes and evolutions that you've mentioned after the September 11 terrorist attacks, are they still being implemented today by the State Department?

A.   Yes, they are still in effect today.

Q.   After the implementation and all of this evolution in response to the September 11 terrorist attacks, was there anything else that occurred that created additional evolution in the State Department's visa security policy?

A.   So for example, in 2013, there was the Boston Marathon bombing that was carried out by a naturalized U.S. citizen and a legal permanent resident. And that brought to the forefront once again for Consular Affairs the need to properly vet all applicants because of serious national and public security concerns.

The next big event was in 2015, the San Bernardino

JA929

shooting that was carried out by a Pakistani national who obtained a K-1 fiance visa in order to enter the U.S. to marry a U.S. citizen. And he had posted on his social media, I think it was the day before or the day of the shooting, he had posted what he was going to do. And then a review of social media revealed afterwards that he had pro-ISIS postings on his social media. So this was when the Bureau of Consular Affairs first started to take a really hard look at how to vet social media.

Q. And for how long has the State Department required visa applicants to provide social media handles for the purpose of visa vetting?

A. So to mention that in 2016, so about a year after the San Bernardino shootings, FDNS, the Forensic Document National Security director within USCIS started social media vetting of certain subsets of applicants.

And in the State Department, in, it was 2019 or 2020, started to require that all visa applicants, whether nonimmigrant or immigrant visa applicants, were obliged to report their social media handles on their DS-160 or DS-260 electronic application forms.

Q. And Ms. Smith, following after, say, 2020, has there been additional development in the State Department's visa security policy?

A. Yes. There have been further developments in terms of interagency and biometric checks. Also there have been some

JA930

innovations, for example, for a while there was a predictive analytic software that was run as a pilot at some posts on visa applicants based on their biographic and other information. Sort of a first foray into an AI type system on visa applicants.

And another is a focus on data-driven decisions and metrics. So everything on refusal rates, productivity, there have been different innovations over the years since around 2019, 2020, leading up until today and continuing.

Q.   Ms. Smith, is the State Department, to your knowledge, continuing to implement the same statutes and regulations today as it has since the passage of the Immigration and Nationality Act in 1952?

A.   Yes.  The State Department and specifically Consular Affairs continues to uphold everything that is in the INA.

MS. STROKUS:  Your Honor, I have nothing further for this witness and tender the witness to the court.

THE COURT:  Yes.  Thank you.

Mr. Wilkens, do you wish to inquire of this witness?

MR. WILKENS:  Yes, I do, Your Honor.

THE COURT:  You may.

CROSS-EXAMINATION BY MR. WILKENS:

Q.   Ms. Smith, you've talked about, I think you called them everything from sort of major changes to changes over the years to innovations.

JA931

And am I correct that when those types of changes have happened, the Department of State and in particular the Bureau of Consular Affairs has regularly issued policy guidance to all posts on how those changes should be implemented?

A.   Yes, that is correct.  One way that the State Department or Consular Affairs issues guidance to the field is via cables, yes.

Q.   And while we're on that topic, in addition to cables, how else does the Department provide policy guidance to visa officers around the world and in Washington?

A.   Another way that the State Department provides guidance is via FAM updates, the Foreign Affairs Manual, 9 FAM in particular, which is everything about how consular officers need to apply the INA abroad, sort of operational instructions.

Another way besides cables and FAM updates, sometimes emails are released until a cable can get fully cleared because any cable that is released from the State Department has numerous layers of clearances both within Consular Affairs as well as throughout the State Department building, many different offices.

And another way that guidance is released to the field is, depending on the topic, Consular Affairs may hold a webinar in order to give information and receive questions from the field.

Q.   And in addition to taking account of the various types of changes that you spoke about earlier, this type of policy

JA932

guidance is also issued to implement executive orders no matter what the Presidential administration, correct?

MS. STROKUS: Objection, Your Honor.

THE COURT: What's the ground?

MS. STROKUS: Scope of her prior testimony.

THE COURT: Overruled. He may have it. Is that the practice?

THE WITNESS: Counsel, can you please repeat the question? I want to make sure I understand.

THE COURT: Yes. His question is, does like policy guidance get issued to consular offices when it's necessary to implement a President's executive orders.

THE WITNESS: Thank you, Your Honor.

The Consular Affairs would release cables or webinar or hold webinars if an executive order is relevant to visa work or let's say U.S. passport adjudications. So it really depends on the topic. We don't hold a webinar or release a cable based on every executive order. It really depends on what the topic of the executive order is.

Q. And under this administration, isn't it correct that the bureau has issued policy guidance with respect to executive orders issued by the President?

MS. STROKUS: Objection, Your Honor.

THE COURT: I'm not getting into how they've changed the visa applications, if at all and on what basis. In my

JA933

mind, all of those things implicate national security, and that's the line I'm following. So that question I'm sustaining on that ground.

Q. So I will come back to a related area in a moment. Let me just step back for a second about your position, Ms. Smith, which you talked about earlier as special adviser. You've been in that role since February, right?

A. That is correct, I've been in that role since February.

Q. And that is the first role that you've had sort of in the head office, the front office in Washington, D.C. since you joined the Department in 1999, correct?

A. Yes, that is correct. That's the first role I've had in the Consular Affairs front office since I joined.

Q. You've, so to speak, been in the field up until taking that role; is that fair?

A. Yes, that's correct. Other than language training, I've been in the field.

Q. Okay. And so would it be fair to say that you've been on the receiving end of the policy guidance we've talked about under various cables that are sent or the Foreign Affairs Manual, the emails that you mentioned that are sent prior to some cables being issued; is that right?

A. Yes, I've been on the receiving end of guidance from D.C.

Q. And in your current role since February, you've been on the, let's say the generating end, the creation end of the

JA934

policy guidance that goes out to consular posts around the world and to the visa office in D.C., correct?

MS. STROKUS: Objection, Your Honor.

THE COURT: No. He may have that. Is that a proper characterization, ma'am?

THE WITNESS: I guess what I'd do is I'd caveat it a little bit, because I am one of many people within the Bureau of Consular Affairs who are attempting to faithfully carry out what the President is releasing via executive orders.

BY MR. WILKENS:

Q. And would it be fair to say that one of the principal responsibilities of your role is to help implement President Trump's executive orders, and in particular, let me refer to a couple of them in particular, Executive Active order 14161, which is titled Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats, and Executive Order 14188, titled, Additional Measures to Combat Antisemitism; is that right?

MS. STROKUS: Objection, Your Honor, scope.

THE COURT: No. Overruled. He may have it.

A. Yes, that is correct. As part of my job in D.C. is to help the Bureau of Consular Affairs implement executive orders out of the White House, including the EOs that you mentioned, EO 14161 and the EO on antisemitism.

Q. And in your role as special adviser since February, you

have in fact undertaken a number of tasks to implement those two executive orders, isn't that right?

MS. STROKUS: Objection, Your Honor, scope.

THE COURT: Overruled.

A. Can you please ask the question again? I think it's two questions. So would you mind separating the questions, please.

THE COURT: Follow that direction.

MR. WILKENS: I'm trying to remember the question, Your Honor.

THE COURT: I'll break it down. He asked about two executive orders. So since you've had this duty in February, have you worked on the executive order relative to measures to combat terrorism and the like, the first one he mentioned?

THE WITNESS: Yes, Your Honor. So EO 14161, I have been a member of the team to help implement that executive order, which basically directed the State Department to find ways to better vet visa applicants abroad. And so it was left to the State Department and specifically the Bureau of Consular Affairs to envision and implement what that entailed, what that means.

THE COURT: And his second question was, the executive order dealing with antisemitism.

THE WITNESS: Yes, Your Honor. Although I've been less involved with that executive order specifically, I have had some dealings with it but not as much as EO 14161.

JA936

BY MR. WILKENS:

Q.   Turning you specifically to the antisemitism EO, what guidance are you aware of that has been issued to visa officers, to consular officers to implement the antisemitism EO?

MS. STROKUS:  Objection, Your Honor, scope.

THE COURT:  Sustained.  But this is not on scope. We're not getting into the vetting of visa applicants.

MR. WILKENS:  Your Honor, let me mark an exhibit to sort of make it clear that some of this material is before the court and has been marked as exhibits that deals with this question.

THE COURT:  Maybe it is.  So we'll have to work out from there, but that's the line I'm following.

MR. WILKENS:  Yes.

Could we pull up Exhibit 64, please.  Terrorists.

THE COURT:  I have it.

THE WITNESS:  I'm viewing it as well.

THE COURT:  Thank you.

BY MR. WILKENS:

Q.   Ms. Smith, please take a moment to look at that, if you need to.

MS. STROKUS:  Your Honor, I'm going to object to the introduction of this exhibit to this witness.

THE COURT:  Wait a minute.  It's a little too late.

This document is in evidence under the pretrial order. So we've got a document in evidence, it's redacted, and I'm not changing that.

MS. STROKUS: I understand, Your Honor. My objection is under Rule 611(b), the scope of cross-examination.

THE COURT: Well, that's within the court -- I see, it's scope. And I overrule the objection. But yes, maybe -- well, no, she's adverse. He may inquire. The matter is within my discretion. He may inquire, but I'm not getting into changes in practice for vetting visa applicants. But hope springs eternal, Mr. Wilkens, so go ahead.

MR. WILKENS: Yes.

BY MR. WILKENS:

Q. And have you seen this cable before, Ms. Smith?

A. Yes, I have seen this cable before.

Q. And is this cable one of the types of policy guidance that's been issued to implement the executive orders we spoke about a moment ago, including the antisemitism executive order?

MS. STROKUS: Objection, Your Honor.

THE COURT: Overruled.

A. Yes, this is one example of how executive orders are implemented.

Q. Okay. And just with respect to cables more generally but including this cable, am I correct that cables don't just apply to visa officers located in diplomatic posts around the world

JA938

but also can provide policy guidance to the visa officers working here in D.C., isn't that correct?  Well --

THE WITNESS:  Were you going to say something, Your Honor.

THE COURT:  No.

THE WITNESS:  Sorry.

MR. WILKENS:  Sorry.  That was me.  Let me withdraw that.

THE COURT:  Withdrawn.

BY MR. WILKENS:

Q.   I'll ask you, so the cables -- yeah.  This cable applies not just to visa applicants who are applying for visas through posts abroad but also applies to visa holders who are present in the United States, isn't that right?

A.   So the question is whether the cable guidance would apply to visa holders in the United States as well?

Q.   Yes.

A.   I think it's a little bit of a broad question to try and answer because if a student has been admitted to the United States, they are admitted by Customs and Border Protection, S, Ms and Js are categories that are submitted, duration of status.  And so there's certain aspects of their presence here that are -- well, actually, most aspects of their presence in the United States are sort of governed by the Department of Homeland Security and not the State Department.

JA939

Q. The State Department, though, is the agency with the statutory authority to revoke visas, correct?

A. That is correct, the State Department has the authority to revoke visas.

Q. And that includes student visas, correct?

A. That is correct, that includes student visas that the State Department has the authority to revoke.

Q. And could I ask you to turn to paragraph 11 of this cable, which is on page five of six?

A. Yes. Could I have a moment to read it, please.

Okay.

Q. Okay. So with respect to paragraph 11, does that make it clear that the cable, the guidance provided by this cable is applicable not just to students applying for visas from abroad at consular posts but also the students in the United States and the possibility that the State Department will revoke their visas?

MS. STROKUS: Objection.

THE COURT: Well, the document speaks for itself. The objection is overruled. No. The objection is sustained. The document speaks for itself. That's what it says.

MR. WILKENS: Okay, Your Honor.

BY MR. WILKENS:

Q. Just to be clear, the questions that I will be asking with respect to policy guidance, I intend to ask those questions

JA940

about policy guidance with regard to visa holders in the U.S., not visa applicants abroad who are applying through U.S. diplomatic posts. I just want to be clear about that, that that's what I want to focus on.

So am I correct that in the bureau in which you are a senior adviser that there is a visa office that handles the revocation of visas for students who are already in the United States, student visa holders?

A. Yes, that is correct, there is the visa office in D.C. that would handle the revocation of visas there; yes, that is correct.

Q. And we spoke a moment ago about different types of guidance, policy guidance that is provided by the Department of State and the bureau, which you mentioned, for example, includes the Foreign Affairs Manual, cables, emails in advance of cables being issued and webinars.

And do those types of guidance -- don't those types of guidance also apply to visa officers in Washington who are working on visa revocations?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. So I think what you're asking is whether the same standards would apply abroad or domestically in the United States on whether there are grounds to revoke a visa.

So there are certainly rules as it does briefly mention in

JA941

paragraph 11 of the cable in Exhibit 64, there is brief mention of that. And so for example, it mentions how in driving under the influence, a consular officer abroad is able to revoke a visa, even if the person is in the United States. But most times it needs to be the visa office in the U.S. that would perform the prudential revocation.

Q. And could you just briefly explain what the term "prudential revocation" means for the court.

A. Yes, a prudential revocation is when a visa is revoked but it actually does not take effect until the person departs the United States.

Q. Okay. And I just want to just back up for one second just to be clear. So the types of guidance we talked about, the Foreign Affairs Manual, cables, emails, webinars, all of that, those types of policy guidance with regard to the two EOs we spoke about apply to students, student visa holders, the revocation of student visas for students who are already present in the United States, correct?

MS. STROKUS: Objection.

THE COURT: No. Overruled.

A. A consular officer, whether they're abroad or in the United States, would need to look at the totality of the circumstances of an applicant's situation, would need to look at all facts their case, any and all criminal history, any aspect of the applicant in order to determine if there are

grounds for revocation or prudential revocation.

Q. And I want to focus on the question of where the guidance that the consular officer, particularly located in D.C., is relying on.

And what I'm asking is, they also rely on the various types of policy guidance that you mentioned, which includes the Foreign Affairs Manual, cables, emails, webinars, isn't that correct?

A. Yes, an officer in D.C. would also rely on the Foreign Affairs Manual, cables, webinars. We are all held to the same standard.

Q. And I think you mentioned a moment ago that with the exception of sort of DUIs, for example, most visa revocations for visa holders in the United States, student visa holders in the U.S. are handled out of visa officers -- are handled by visa officers located in Washington, isn't that right?

A. That is correct.

Q. Okay.

A. The majority of visa revocations are performed from D.C.

Q. If we can just turn back to the first page of this exhibit, 64, and I'm going to direct you to the latter couple of sentences of paragraph two, the summary paragraph.

Do you see where it's quoting from Secretary Rubio there?

A. Yes, I do see the quote from Secretary Rubio.

Q. And that quote from Secretary Rubio is guidance to visa

JA943

officers, including those who are handling the revocation of visas of students who are in the U.S., right?

MS. STROKUS: Objection, hearsay.

THE COURT: No. The document is in evidence. It's not hearsay, but I'm sustaining the objection. The document speaks for itself. That's what it says.

MR. WILKENS: Okay, Your Honor.

THE COURT: Except the identity of who said it is unclear. So we'll let Mr. Wilkens have that.

You understand that the quoted portion in that paragraph, ma'am, comes from the present Secretary of State, Marco Rubio?

THE WITNESS: Yes, Your Honor. That comes from Secretary Rubio.

THE COURT: Thank you.

By MR. WILKENS:

Q. And just to be clear, that's part of the guidance, right?

THE COURT: Well, the document speaks for itself.

MS. STROKUS: Objection.

THE COURT: The objection is sustained. I can read.

BY MR. WILKENS:

Q. Let me move off of this exhibit, Ms. Smith.

Just briefly, to go back to your role as special adviser, you mentioned that you report to Mr. Armstrong, right?

A. Yes, that is correct, I report to Mr. John Armstrong.

Q.   And you also work closely with the Office of the Counselor to Secretary Rubio, correct?

A.   Yes, I do work with the office of the counselor.

Q.   And the Office of the Counselor -- well, could you explain just briefly the Department of State sort of organizational structure?

A.   Yes, I can explain.  So the Office of the Counselor -- the consular reports directly to the Secretary of State, and they are responsible for providing guidance, and also they can take on special projects for the Secretary's office.

Q.   And the Office of the Counselor which reports directly to the Secretary has provided you with various tasks related to the implementation of the two executive orders we've discussed, correct?

          MS. STROKUS:  Objection.

          THE COURT:  Overruled.

A.   I do sometimes receive instruction from the office of the consular, but most times it is through the senior bureau official in consular affairs.

Q.   I just want to be clear, in addition to reporting to Mr. Armstrong, you also have this working relationship with the office of the consular, which reports directly to Secretary Rubio, right?

A.   Yes, I do have a working relationship with the Office of the Counselor.

JA945

Q. And you've received tasks regarding the implementation of the two executive orders from Mr. Armstrong and the Bureau of Consular Affairs and also from the office of the consular to Secretary Rubio, correct?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. Can you clarify which executive orders, please.

Q. Yes. The two we were speaking about earlier.

A. Yes, I have received guidance or instructions for EO 141617 and EO 14188.

Q. You spoke earlier about the connections, the work between the Department of Homeland Security and the Department of State and how that has changed or increased over time, correct?

A. Yes, I spoke earlier about how that has evolved over time, become a much closer relationship, starting really with the 1992 World Trade Center bombing and especially after the 9/11 terrorist attacks, in terms of biometric and information sharing.

Q. And in your role as special adviser, you have worked with the Department of Homeland Security, correct?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. Yes, in my role as senior adviser, I have worked with the Department of Homeland Security.

Q. And I want to just focus on two aspects of that,

JA946

Ms. Smith. You have participated in what is referred to as a student visa working group, right?

MS. STROKUS: Objection.

THE COURT: I'm not clear can where that falls on the line I'm following, so I'm going to sustain it but without prejudice to you following it up.

Q. Okay. Since you became special adviser, some of your work has involved the revocation of visas of students who have engaged in student protests, correct?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. Can you repeat the question, please.

Q. Yes. In your role as special adviser, you have worked on issues related to the revocation of student visas for students who engaged in student protests, correct?

A. Yes, in my role as senior adviser, I have worked on matters related to the revocation of student visas and also frankly revocation of visas for anyone, whether or not they're a student, who has been arrested or otherwise broken our laws in the United States.

Q. But you have worked, in your role as special adviser, you have worked on the revocation of student visas for students engaged in protests only since February of 2025, right?

MS. STROKUS: Objection.

THE COURT: Overruled.

JA947

A.    In my role as senior adviser since February of 2025, I have worked on cases where applicants have derogatory information in our system.

THE COURT:  Wait.  Excuse me for interrupting, but I'm going to pretty strictly follow my line.  His questions, I understood, don't deal with applicants.  They only deal with people who are here lawfully on visas that have issues.  And I've understood your testimony about revocation of visas to apply to such persons.

This last question, as I heard it, is only this.  You first began working on the revocation of visas of the student protesters after the assumption of your role in February 2025.  Is that true?

THE WITNESS:  So to answer your question more directly, Your Honor, since arriving in February of 2025, my work has included not only student visa holders.  So you're asking, sir, about any visa holder in the United States, including students.  And yes, my work has included that.

THE COURT:  But you're making the point that your work is much broader than that, at least in the revocation of visa area?

THE WITNESS:  Yes, Your Honor, my work, yes.

THE COURT:  Yes, I understand.  Mr. Wilkens.

BY MR. WILKENS:

Q.    Let me focus on two different ways, as I understand it, in

JA948

which your work has concerned the revocation of student visas involving student protesters.

One way has been referrals coming from the Department of Homeland Security to the Bureau of Consular Affairs and Mr. Armstrong that recommend -- that have recommended the revocation of the visas of certain students who were engaged in student protests, isn't that right?

MS. STROKUS:  Objection.

THE COURT:  Overruled.

A.    Would you mind repeating the question, please.

THE COURT:  He says, his question is that one way you've been involved in the revocation of visa-holding student protesters is when a recommendation comes from the Department of Homeland Security advising that such visa should be revoked; is that correct?

THE WITNESS:  Thank you for repeating the question, Your Honor.  That is correct.

We, as I stated during my deposition, we sometimes get information from the Department of Homeland Security about student visa holders or other types of visa holders who are in the United States and there is some sort of derogatory information.

And as I stated during my deposition, my role has been fairly limited with regard to specific visa cases, occasionally checking in our system whether the person has a valid

JA949

nonimmigrant visa, if it is an expired nonimmigrant visa, if they are a legal permanent resident, checking if someone is a U.S. citizen. So it's a little bit more verifying the actual status of the person in the United States.

BY MR. WILKENS:

Q. And Ms. Smith, with respect to that limited role, you dealt with, in that way, the case of Mahmoud Khalil, correct?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. Yes, I do recognize the name Khalil Mahmoud.

Q. You were asked by the Office of the Counselor to Secretary Rubio to check in the system whether Mr. Khalil was a visa holder or a lawful permanent resident, correct?

A. I am not sure if it was from the Office of the Counselor or from the Department of Homeland Security, but yes, I did check if Khalil was a visa holder or a legal permanent resident.

Q. And did you have that sort of involvement in the cases involving Rumeysa Ozturk or Badar Khan Suri or Yunseo Chung?

MS. STROKUS: Objection.

THE COURT: Overruled.

A. As I stated during my deposition, I thought I recognized the name Suri, but I thought it was a female, and during the deposition I saw it was a male. So if I worked on it, it would have been just to verify the visa status or an LPR.

Did you say the other name was Chung?

Q.   Yes.

A.   I do not recognize that name.  And can you repeat the name of the other applicant, please?

Q.   Mohsen Mahdawi.  Sorry, go ahead.

A.   Sorry.  I do recognize the name Mahdawi, but I thought -- I think it's a he --

Q.   Yes.

A.   I thought he was from a different country.  And when I saw it during the deposition, it was a different country than I had remembered.  The name does sound familiar.  But again, my role would have been limited to checking if the person was a valid visa holder or a legal permanent resident, visa status.

Q.   Thanks.  I'll ask about one more name, Rumeysa Ozturk. Were you involved in her case in any way?

A.   I do not remember working on her case, no.

          MR. WILKENS:  Okay.  Thank you.  And Your Honor, I just wanted to raise one thing.  It looked to me like Ms. Strokus maybe had been speaking with someone else in the room.  And if there's someone else in the room, I'd like them to be identified.

          MS. STROKUS:  That's fine, Your Honor.  We have agency counsel here.  We just have a limited screen.

          THE COURT:  I appreciate that.

          MR. ANDERSON:  Carl Anderson, with the State

JA951

Department.

THE COURT: And Mr. Anderson, thank you for identifying yourself.

Is that it for this witness?

MR. ANDERSON: Thank you, Your Honor.

MR. WILKENS: Not it for my questions, Your Honor, but yes, thank you for clarifying that.

THE COURT: And Mr. Anderson, you are certainly welcome.

BY MR. WILKENS:

Q. I want to -- so you've just spoken about one way in which the Bureau of Consular Affairs has worked with the Department of Homeland Security on revoking the visas of student protesters, and I want to -- I just want to talk about one other way, as I understand it, that the two agencies have addressed or discussed the issue of visa revocations for student protesters.

And you were part of a student working group with DHS in which the issue of the revocation of student visas for students who are engaged in protests was discussed, correct?

MS. STROKUS: Objection.

THE COURT: Well, I think that may run afoul of the deliberative privilege. Sustained.

I'll ask the question. As part of your job, ma'am, at some time in the period we're talking about, you were part of a

JA952

working group within DHS, the Department of Homeland Security, that concerned itself with student protesters. Is that true?

THE WITNESS: Your Honor, in my role as senior adviser in Consular Affairs, I did participate in a group with the Department of Homeland Security about student visa protesters and other matters, yes.

THE COURT: Thank you.

BY MR. WILKENS:

Q. And I want to ask about what you referred to in your deposition as the Homeland Security Council. Do you remember talking about that?

MS. STROKUS: Objection.

THE COURT: Well, since I don't know -- I don't have the deposition before me, I'll allow her to answer yes or no.

Do you remember mentioning that individual or office in your deposition, ma'am?

THE WITNESS: Yes, Your Honor, I did mention in my deposition that the Homeland Security Council calls meetings, and I have attended several of those meetings.

BY MR. WILKENS:

Q. And in those meetings, the attendees, the meetings that you attended, the issue of student protesters and the revocation of their visas came up, didn't it?

MS. STROKUS: Objection, Your Honor. Presidential communications privilege.

JA953

THE COURT: What? Presidential? Is that --

MS. STROKUS: Yes, Your Honor.

THE COURT: -- the privilege you're asserting?

MS. STROKUS: Homeland Security Council is a direct advisory to the President, Your Honor.

THE COURT: So let me be very clear now. You're asserting the executive privilege of the President of the United States with respect to these meetings?

MS. STROKUS: Yes, Your Honor, the Homeland Security Council is part of the executive, it is part of the White House.

THE COURT: You're all part of the executive, aren't you? You're part the executive.

MS. STROKUS: I am, Your Honor. I mean specifically that this council advises directly to the President. It is part of the Executive Office of the President.

THE COURT: This council we're talking about is part of the Executive Office of the President. What's his or her name?

MS. STROKUS: Yes. Your Honor, it is a council of people who have been collected to advise on Homeland Security. It is termed the Homeland Security Council, and it is part of the Executive Office of the President.

THE COURT: Okay. I appreciate your help. So there's an informal council on Homeland Security.

JA954

MS. STROKUS: No, Your Honor. It is a formal council. It is a formal council that is part of the Executive Office of the President.

THE COURT: And its name is --

MS. STROKUS: The Homeland Security Council.

THE COURT: Thank you. And it's comprised of whom?

MS. STROKUS: Your Honor, that is part of the Presidential communications privilege.

THE COURT: So it's a secret council?

MS. STROKUS: The existence of the council is not a secret, Your Honor.

THE COURT: But its membership is secret?

MS. STROKUS: They are staff members of the Executive Office of the President, Your Honor.

THE COURT: And its membership is secret?

MS. STROKUS: I would not say that it is secret, Your Honor. I would say that it is privileged.

THE COURT: And it's privileged from this court? I may not know who these people are? I mean, you tell me that. Is that what you're saying?

MS. STROKUS: Given the ongoing issues with privilege in this court, Your Honor, I will maintain that this is the Presidential communications privilege and the identities of the individuals on the Homeland Security Council are privileged. The discussions that are had within the Homeland Security

JA955

Council and agencies are privileged under the Presidential communications privilege because this council is part of the Executive Office of the President and provides direct recommendations, direct advice for the President to take action in his duty under the Constitution.

THE COURT: Your position is clear. Let me ask you this, because this pertains to my research on Exhibit A as to which this -- and Mr. Kanter may respond to this as well. And really it does not come up in the context that counsel has now raised it where at least the name of this secret entity is Homeland Security, which the natural inference is it involves national security.

MR. KANTER: Homeland Security Council, not secret.

THE COURT: The name is not secret, no. But now its members are apparently secret.

MR. KANTER: Privilege.

THE COURT: Privilege, you say. So she takes that position, and I'm not in a position to overrule it, and I'm not going to, at least now.

But go back to Exhibit A. If I rule that Exhibit A is privileged, my review of that exhibit is, that has nothing to do with or the claim that -- if any claim were raised that it has to do with national security is so peripheral that, to be almost evanescent. Be that as it may, if it did have to do with national security and the executive privilege of the

JA956

President of the United States is invoked, the decided cases indicate that no adverse inference may be drawn from that. And those are higher courts, and I respect that. But if it didn't have to do with national security, I'm wondering when such privilege is invoked, whether, as you'll find if you were here in Massachusetts dealing with the attorney-client privilege, under the common law of Massachusetts, where I started and still reside, if you invoke the attorney-client privilege, the factfinder is entitled to draw an adverse inference that the attorney-client privilege is invoked, but you're hiding something.

I wonder whether when national security is not at play, as it appears to be as your co-counsel has invoked it, but with respect to Exhibit A where it appears it doesn't, what's the law on that?

I'm not asking now. It's a matter that could be briefed if we even get that far because I haven't ruled whether the privilege applies or not, but it's appropriate to raise it now.

Sorry for the detour, Ms. Smith. We'll let Mr. Wilkens get back to work.

MR. WILKENS: Thank you, Your Honor.

BY MR. WILKENS:

Q. So Ms. Strokus and Ms. Smith, I want to return for a moment to the Homeland Security Council with respect to what is

JA957

public about it. And a great deal has been made public by White Houses over time. And so in particular, the Homeland Security adviser is Stephen Miller, isn't that correct? That's on the White House website; isn't that right?

A. Yes, the Homeland Security security adviser is Stephen Miller.

Q. And can you name the agencies -- I'm not asking for the names of the people but the agencies and agency heads who are as a matter of public record part of the council?

MS. STROKUS: Your Honor, objection again.

THE COURT: Same grounds? Same grounds?

MS. STROKUS: Yes, Your Honor.

MR. WILKENS: Your Honor, I'd like to pull up a White House web page that shows the information that I'm trying to ask about to show that it's public.

THE COURT: Well, you may, but then why don't you pull it up and show it to the witness or read it to the witness --

MR. WILKENS: Yes, Your Honor.

THE COURT: -- because you have it, and let's see what she says about it.

MR. WILKENS: Yes, Your Honor. We'll pull it up now.

MS. STROKUS: Your Honor, I'm going to object to this. This was not produced to the defendants in discovery.

THE COURT: True. But I'm going to allow him to do it if it's on the White House website. Now, a privilege has been

invoked. I think I might want to take a look at it, and it would be helpful, can you people print things out? Why don't you take a screenshot of it and print it out? I'm swimming in paper here.

MS. CONLON: I know. Unfortunately, we have no printer access in the courthouse, but we'll put it on the screen in a second.

THE COURT: All right. Let's put it on the screen.

MR. WILKENS: Pre-marked as EP.

THE COURT: Okay. Now, EP, this is one of your newer documents. So this is EP.

MS. STROKUS: Your Honor, may we have a quick recess so that we can determine what is public and what is not? We have not seen this before, and my understanding --

THE COURT: I don't see the need for a recess. It's sufficiently public that they can get their hands on it. And it's represented to the court that this is the White House's own website. I'm reading it, it says Homeland Security Council.

MS. STROKUS: Your Honor, I would just point out that at the top of the page it says, "Under President George W. Bush," and that this is frozen in time, it is not current.

THE COURT: All right. That's fine. And therefore, the way we'll proceed is you're going to have to move on, Mr. Wilkens, because she says that this is not the current

JA959

council.  When you can get to a printer, print that out, and let me have it.

BY MR. WILKENS:

Q.  Can I ask you, Ms. Smith, if you read that --

THE COURT:  She can't read it.

MS. STROKUS:  Objection on.

THE COURT:  Wait a minute.  He hasn't asked his question yet.  Let him ask the question.

BY MR. WILKENS:

Q.  What I want to ask is, is the description of the Homeland Security Council and its agency members an accurate description of the current Homeland Security Council?

THE COURT:  She doesn't have the document before her.  She does?  She has it before her.

MS. STROKUS:  Objection, speculation, foundation.  This has not been produced in discovery.  It's a historical document.

THE COURT:  Yes, he knows that.  And so what he's asking her is, is the historical document, is the composition the same today?  You object to that, asserting the same privilege, I take it?

MS. STROKUS:  Yes, Your Honor, under the privilege and also because it's speculative.

THE COURT:  Look.  I've heard you.  I understand the grounds of the objection.

JA960

Now, I'm in the middle of the trial. I need to sort this out. So without sustaining this objection in any way, I'm going to direct you to move on, because if the assertion of privilege is correct, the question you ask, since you can only come up with one from a prior administration and that's some time ago, calls for her divulging matters as to which such a claim has been made, an interesting claim. Anything else?

MR. WILKENS: Yes, Your Honor.

BY MR. WILKENS:

Q. I'd like to just briefly focus on a few cables of the type that you testified about earlier, cables that the Bureau of Consular Affairs issued as part of its implementation of the two executive orders that we spoke about.

MR. WILKENS: And I will go through them as quickly as I can, Your Honor.

Q. Let me direct you to, if we can pull up Exhibit 51, please.

MS. STROKUS: Your Honor, I'm going to object to this, make a scope objection.

THE COURT: Your objection is scope. Overruled.

A. Okay. I see Exhibit 51. I would appreciate a minute or two to read through it, please.

Okay, I am ready, sir.

Q. Okay. Thank you. Do you recognize this cable?

A. Yes, I do recognize this cable.

JA961

Q.   Is it one of the cables that you were referring to earlier with respect to providing policy guidance about the implementation of the executive orders?

A.   As we can see in the summary paragraph on page one, it does mention EO 14161, and the cable, to summarize it in a sentence or two, directs visa hosts abroad to catch up on their backlog of what are called system messages.

System messages are derogatory information that appears in our systems abroad when there's a visa holder.  So it's someone who already has a visa, and then it's derogatory information that pops into our system once they've been arrested, or other derogatory information.

Q.   If I could ask you just briefly, based on your understanding -- well, sorry.  Strike that.

If you could turn to paragraph three, please, on page two of seven.

A.   Okay, I see it.  Can I just have a minute to read through it, please?

Q.   Sure.

A.   Okay.

Q.   Okay.  I want to direct your attention to most of the way down the paragraph where the sentence begins, "Visa holders who overstay their admission period."  And in that sentence, I just want to focus on the phrase -- well, it says, "engage in conduct that poses a threat to U.S. national security or

otherwise misuse their visas should have their visas revoked under INA 221(i)." Do you see that?

A. Yes, I do see that.

Q. This is not a statutory exam, but could you briefly describe your understanding of INA 221(i)?

A. I have not read INA 221(i). I'm not an expert on that, I apologize.

Q. Okay. So with respect to the phrase "or otherwise misuse their visas," where can a visa officer in Washington who is looking at the revocation of student visas, where could they go to determine what it means to misuse a visa?

A. Well, my first look as a consular officer would be to the 9 Foreign Affairs Manual which has all of the rules about how to implement visa law and to, as I've said before and as I said during my deposition, to look at the facts for each and every case. Each and every case is analyzed individually. As a consular officer, my job is to took at the totality of circumstances and all of the facts for each and every visa applicant or each and every visa holder.

Q. Okay. Let me direct you to paragraph 11 on page five which is under a heading, "Revocation if the alien is still in the United States."

A. Yes, I see that paragraph.

Q. Okay. Obviously you see that most of it is redacted for law enforcement, but I just want to ask about the unredacted

part.

What do you understand it to mean, that requests for revocation of visas when the individuals in the U.S. have to be sent to what's called here the revocation team?

A.   So it's exactly what it says there, that hosts abroad need to refer to the team in D.C. when they think that a visa merits revocation.

THE COURT:   What do the initials mean, since I'm unfamiliar with your organization, VO, I assume means visa office.   SAC means what?

THE WITNESS:   I believe that SAC is security advisory and clearances, and I am not sure what RC stands for.   But you are correct, Your Honor, it's a team within the visa office.

THE COURT:   Yes.   And that's the visa office in Washington?

THE WITNESS:   That is correct, sir, it is the visa office in Washington.

THE COURT:   Thank you.

BY MR. WILKENS:

Q.   A moment ago you spoke about a visa officer, including you, looking at the totality of the circumstances in deciding whether a visa should be revoked, right?

A.   Yes.   Each case would be looked at individually to gather all of the facts in order to make a decision on a visa revocation.

JA964

Q. And under the two executive orders we've been talking about and the policy guidance with regard to how they should be implemented, the facts, the totality of the circumstances include a student engaging in a student protest, correct?

MS. STROKUS: Objection.

THE COURT: If I understand, your question is a hypothetical. Ask it again.

MR. WILKENS: Sorry, Your Honor.

BY MR. WILKENS:

Q. Since -- when you are considering the totality of circumstances, is engaging in a campus protest inconsistent with a student's visa status?

MS. STROKUS: Objection.

THE COURT: Overruled. She may give us her opinion.

A. Well, I think it's a bit of a hypothetical question, but we would need to look at all of the facts of the case. I mean, I don't want to veer off into, you know, if this, then that. But, you know, if it were someone, a visa holder who engages in violent activity, whether it's during a protest or not, if they were arrested for that violent activity, then that is something that we would consider for possible visa revocation.

Q. So I'm not -- so putting aside student visa holders who engage in some kind of violence or have been arrested, putting that to one side, isn't it accurate to say that engaging in a campus protest -- sorry. Isn't it accurate to say that when

JA965

you are looking at the totality of the circumstances, engaging in a campus protest is inconsistent with a student's visa status?

MS. STROKUS: Objection, asked and answered.

THE COURT: Well, she hasn't answered it, but he stated it the other way. He's asking --

THE WITNESS: Can you repeat the question, please, counsel.

THE COURT: Well, the information ultimately is coming to me, and I guess what he's trying to get at is, do you think that engaging in a student protest, nonviolent and standing alone, is inconsistent with a student's visa status -- I'll state it differently -- is grounds for revoking his visa status? Do you think that?

THE WITNESS: I think it's a difficult question to answer. If it's a nonviolent protest and it's not a protest that is supporting terrorism, then I'm not sure that that would be a problem. I think that we would probably see it in a negative light if the person were protesting in a way that supports terrorism, even if it's a nonviolent protest.

THE COURT: Thank you.

THE WITNESS: Again, I think we'd have to look at the totality of the circumstances for the individual applicants.

MR. WILKENS: Just one moment, Your Honor.

THE COURT: Of course.

While we're waiting, I've waffled on the document, HM for identification, which was proffered by the defendants as admissible evidence under 611. Reviewing it and on reflection, it's not. It doesn't meet the criteria of 611, but the court receives it as a chalk or demonstrative aid, illustrative of the witness's testimony.

MS. STROKUS: Your Honor, just to clarify, it was also offered under 107(a).

THE COURT: And I am excluding it. Thank you for your precision. Your rights are saved.

Is that it for this witness?

MS. CONLON: No.

MR. WILKENS: Your Honor, we're trying to pull up a document. We're going to return for a moment, but it will be brief, to the Homeland Security Council and a current White House document that describes, it's a Presidential memorandum from President Trump issued since he entered office that describes the National Security Council and also describes when that becomes the Homeland Security Council through the change of agency heads who are part of the Homeland Security Council but not the National Security Council.

THE COURT: Well, you know, where does it come from?

MR. WILKENS: The Whitehouse.gov. It's an executive -- it's in the same part of the Whitehouse.gov website that has the executive orders that we've been talking

JA967

about.

THE COURT: If it does, I mean, I suppose it's something of which I could take judicial notice. I mean, you proffered something that was not current, so the objection was very well taken. But if you have something current, I don't know what this witness can add to it because, at least for presiding here in the midst of trial, I'm not going to take it upon myself to overrule the objection that's been stated as to Presidential communications. I am going to reflect on it.

MR. WILKENS: Yes, Your Honor. We would like to just offer it. It's EQ for identification.

THE COURT: Where is it physically?

MR. WILKENS: It's coming up.

MS. STROKUS: Your Honor, I object.

MR. WILKENS: It will come up on screen.

MS. STROKUS: Objection.

THE COURT: Yes. And your objection is sustained because that's too evanescent for this old guy, a ruling not found in the Federal Rules of Evidence.

Look, when you get me a paper copy, life goes on, then I'll take a look at it.

MR. WILKENS: Yes, Your Honor. We'll do that over the break.

THE COURT: And it seems to me that it's a type of thing as to which I can take judicial notice. It doesn't have

JA968

to be marked as an exhibit, unless of course there's some dispute that that is in fact what the White House website itself is putting out.

BY MR. WILKENS:

Q.   So Ms. Smith, just returning to the issue of student -- a student protest and a student visa holder who is present at a student protest, when that is inconsistent with the student visa status, which we spoke about a couple of minutes ago, I want to ask you, so a nonviolent protest but a protest that can be considered pro-Hamas, that is consistent with a student's visa status, correct?

MS. STROKUS:  Objection.

THE COURT:  Sustained.  These questions are argumentative.  The language is what it is.  She's an employee of the agency, and therefore you may argue that's a statement of the agency, but these matters are all subject to argument here.

No.  Sustained.  And I've allowed her to give her answer, not on your specific question, but as to how she would go about it.

MR. WILKENS:  Thank you, Your Honor.  Let me just quickly go --

THE COURT:  How much more have you for her?

MR. WILKENS:  Just, I think, Your Honor, we're going to break soon.  I think I just need ten, ten more minutes.

JA969

THE COURT: I think I can go ten more minutes. Go ahead.

MR. WILKENS: Thank you, Your Honor.

BY MR. WILKENS:

Q. So if we could turn to Exhibit 50 and pull that up, please.

A. Okay. I have Exhibit 50 open. The subject is "Caught and revoked."

Q. Okay.

A. Could I have a minute to read through it, please?

Q. Oh, yes. Please go ahead.

A. Okay, I'm ready.

Q. Okay. And do you recognize this cable?

A. Yes, I recognize this cable.

Q. And is it one of the cables that we referred to earlier that was put in place as policy guidance to implement the executive orders?

MS. STROKUS: Objection, scope.

THE COURT: Overruled.

A. Yes, it is related to EO 14161 as it mentions in the opening line of the cable.

Q. Okay. And one thing we didn't do when we looked at Exhibit 51, and maybe we can do this without turning to it, but that exhibit, the cable is titled "Catch and Revoke, National Security Through Timely Processing of Visa Systems Messages."

JA970

This one, as you mentioned, is titled "Caught and Revoked, Updated Guidance."

Is it fair to say that this cable here is an update, updated guidance to the cable that we were speaking about earlier, Exhibit 51, "Catch and Revoke"?

A. I'd just like to check Exhibit 51 to make sure that we're referring to the other one.

Q. Sure.

A. Just a moment. Yes, Exhibit 51 is "Catch and Revoke" and Exhibit 50 is, "Caught and Revoked." So yes, that is correct that it is a follow-up cable to Exhibit 51.

Q. Thank you.

Let me just quickly address two more cables. If we can turn to Exhibit 53, please.

A. Okay, I see Exhibit 53. Let me just open it and review it, please.

Q. Sure.

A. Okay, I'm ready.

Q. Thank you. Do you recognize this cable as well, Ms. Smith?

A. Yes, I do recognize this cable.

Q. Okay. And just quickly to confirm, this is also one of the cables that provides policy guidance on the implementation of the two executive orders we've been talking about, correct?

MS. STROKUS: Objection to scope.

JA971

THE COURT: Well, I've been overruling scope objections, and of course this is an agreed-upon exhibit, but this one seems directed entirely to visa applicants, so I'm just not going to permit it, because of the implications for national security. Sustained.

MR. WILKENS: Objection.

BY MR. WILKENS:

Q. If I could pull up Exhibit CG, which is another cable.

A. Okay. I am clicking on it now. I'm going to look at it. I need a minute to read through.

Q. Yes.

MS. STROKUS: Your Honor, I'm going to object to this exhibit. It doesn't appear that -- it has been pointed out to me by the witness that there's something in this document that is incorrect.

THE COURT: Well, it can be corrected then, if it's necessary. The document has been marked for identification. She can be inquired of.

MS. STROKUS: Your Honor, it has been pointed out to me that this exhibit is marked by the plaintiffs. It appears to be a leaked cable. It was not produced by the defendants in discovery, and therefore we cannot verify the accuracy of this exhibit.

THE COURT: Well, that may be. He may inquire about it. You're saying it may not be authentic. I can follow that.

JA972

BY MR. WILKENS:

Q. Ms. Smith, you have seen this cable before, correct?

A. Let me -- so the other documents that are produced here in AgileLaw have a REF number at the bottom, and this one does not. This one has a number in the bottom right-hand side. And there are some -- it looks, as Jessica said, it looks to be a leaked cable because someone provided it from their email I can see. So I really can't attest to the veracity of the document.

There's also some, I can see, like, for example, on the bottom of page one and the top of page two, there appear to be some sort of like black fuzzy markings. So I'm not sure I feel comfortable attesting to the veracity of this document.

THE COURT: Well, I take your testimony, ma'am, and I appreciate it. But his question was have you seen this cable? Do you recognize it?

THE WITNESS: Let me just take a minute to look at it, please. Okay. Yes, Your Honor, this cable does look familiar.

BY MR. WILKENS:

Q. All right. And when you say it looks familiar, you recall seeing this cable with the subject line "Action Request Expanding Screening and Vetting For FMJ Applicants," correct?

THE COURT: I don't see anything here that goes to people who are valid visa holders in the United States. This concerns itself with increased scrutiny of the issuance of visas. And so I'm going to sustain it, consistent with my

JA973

other rulings, though it appears to be an authentic document, albeit perhaps leaked.

MR. WILKENS: Your Honor, this cable states at paragraph two, the bottom of paragraph two it states that it -- "This guidance supersedes REF B." And if you look at page one of the cable, where it says "Reference," REF B is a cable that we earlier, the witness earlier talked about and put into evidence, which is 25 State 26168. That's Exhibit 64, which applies to the revocation of visas. So this cable that the witness has just --

THE COURT: But it doesn't talk about that.

MR. WILKENS: So the specific relevance of what's in this cable to revocation of visa holders is that it addresses activities that are inconsistent with holding a visa.

THE COURT: Where? Where does it do that?

MR. WILKENS: Let me -- it's -- maybe, let me just come at this it a different way, Your Honor.

THE COURT: All right.

BY MR. WILKENS:

Q. Ms. Smith, am I correct that -- am I correct that one ground for revoking a visa of someone present in the U.S. is if the visa officer considers that they would not have been granted a visa in the first instance?

A. Okay. So just to clarify, are we moving on from Exhibit CG? Because I thought we were talking about Exhibit CG.

JA974

THE COURT: We are. I'm moving on from it. We'll see where we go. He's over ten minutes now. Final few questions, Mr. Wilkens?

But you can answer that. Is it a valid ground to revoke a visa that never should have been issued in the first place?

THE WITNESS: Yes, that is a valid ground. If we see that a consular officer should not have issued a visa in the first place, that there are facts to support that, yes, that would be grounds to revoke a visa.

THE COURT: All right.

MR. WILKENS: Your Honor, could we -- I may have just very few questions. If we could take a break now, I will quickly determine whether --

THE COURT: Very few questions? You told me ten minutes. You're at 13 by my counting.

MR. WILKENS: I apologize, Your Honor.

THE COURT: We'll take the recess for one half hour.

MR. WILKENS: Thank you, Your Honor.

THE COURT: Understand, we are not getting into the application for visas. That's an inventive strategy, I follow that. I'm not going to let her answer questions now because they could now, under their heightened scrutiny, use it to revoke a presently existing visa. So far in this case I haven't seen that ground asserted at all, but the very few I

JA975

take it, and you will represent to the court, will not exceed five minutes, right, not exceed five minutes?

MR. WILKENS: I'll do my best, Your Honor -- yes.

THE COURT: I hear the answer yes. We'll recess until 25 minutes after 11:00. We'll recess.

(Recess, 10:56 a.m.)

* * * * *

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this  11th day of July, 2025.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:25-cv-10685-WGY
Volume 2, Page 66 to 131

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants

* * * * * * * * *

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Friday, July 11, 2025

* * * * * * *

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

JA977

APPEARANCES


RAMYA KRISHNAN, ESQ.
CAROLINE DeCELL, ESQ.
ALEXANDER ABDO, ESQ.
SCOTT B. WILKENS, ESQ.
ALEXANDRA CONLON, ESQ.
    Knight First Amendment Institute at Columbia
    University
    475 Riverside Drive, Suite 302
    New York, NY 10115
    (646) 745-8500
    E-mail: Ramya.krishnan@knightcolumbia.org
and
COURTNEY GANS, ESQ.
NOAM BIALE, ESQ.
    Sher Tremonte LLP
    90 Broad Street, 23rd Floor
    New York, NY 10004
    (212) 540-0675
    Email: Cgans@shertremonte.com
    For Plaintiffs


ETHAN B. KANTER, ESQ.
WILLIAM KANELLIS, ESQ.
VICTORIA M. SANTORA, ESQ.
JESSICA STROKUS, ESQ.
    DOJ-Civ
    P.O. 878
    Ben Franklin Station
    Washington, DC 20044
    (202) 616-9123
    Email: Ethan.kanter@usdoj.gov
and
SHAWNA YEN, ESQ.
    United States Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    Email: Shawna.yen@usdoj.gov
    For Defendants

JA978

I N D E X

WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

MAUREEN SMITH   (By Zoom, continued.)

   By Ms. Strokus

   By Mr. Wilkens                    69


JOHN ARMSTRONG

   By Ms. Santora        78

   By Ms. Conlon                     124

E X H I B I T S

     EXHIBIT 238................................ 72

     EXHIBIT 239................................ 76

JA979

P R O C E E D I N G S

(Resumed, 11:30 a.m.)

THE COURT: Mr. Wilkens, go ahead, for your 5 minutes. I have been given a document, the heading is the "White House Organization of the National Security Council and Subcommittees," January 20th, 2025.

Go ahead.

MR. WILKENS: Yes, your Honor, and I will come back to that in a little while. I want to focus --

THE COURT: In your 5 minutes?

MR. WILKENS: Yes. I want to focus my 5 minutes on Visa revocations, not applications for Visas. But with respect to Visa revocations, why the cable that we were talking about, marked as CG, is relevant to Visa revocations.

CROSS-EXAMINATION BY MR. WILKENS: (By Zoom, Continued.)

Q. So you earlier, several times today, have spoken about the Foreign Affairs Manual. Do you remember that?

A. Yes, I have referred several times to the Foreign Affairs Manual today.

Q. Okay.

MR. WILKENS: And if we can pull up Exhibit CK, please.

(On screen.)

A.   Okay, I see the document.  I'm going to open it and review it.  I just need a minute or two.

Q.   Sure.  And I'm going to only ask you about one specific provision, but -- on Page 6.

A.   Oh, okay.

Q.   And I can tell you which number.

MS. STROKUS:  Your Honor, I'm going to object again on the same grounds as the prior document.

THE COURT:  I haven't got it yet.  I haven't got it.

It's on Page 6?

MS. STROKUS:  This document was not produced by the government in discovery, and we therefore cannot attest to its authenticity.  It appears to be a leaked version.

THE COURT:  Yeah, once again this is allegedly a "leaked version" of a government document.

All right, um, so you're going to have to prove authenticity, and that's fine.  Go ahead.

MR. WILKENS:  Your Honor, if I could?  In the bottom left this shows that it's the public version of the FAM.  There is a nonpublic version, but this is from the state.gov website, that's where it comes from.  And it was produced by the plaintiffs in this case.

THE COURT:  Yeah, all right.

MS. STROKUS: I'll withdraw my objection that it is, um -- that it is leaked. However, I continue to state that the government did not produce this document.

THE COURT: It isn't even offered yet, so let's see his question. But we'll take it as authentic.

Q. Ms. Smith, do you recognize this document?

A. Yes, this appears to be a section of 9 FAM.

Q. Okay. And you're aware that portions of the 9 FAM are publicly available, correct?

A. Yes, that is correct. There is one version online for the public that has some sections that are labeled unavailable, um, and we have the full version internally in Consular Affairs.

A. Okay. And you'll see the heading here, that this 9 FAM 403.11 deals with or covers Visa revocations, correct?

A. That is correct, 9 FAM 403.11 does cover Visa revocations.

Q. Okay. And let me ask you to turn to -- oh, um, let me first move this into evidence. What exhibit number?

MS. STROKUS: Objection, your Honor, proper foundation. Foundation and authenticity. Again, it was not produced by the government in discovery.

THE COURT: Understood. But I thought you waived

the foundation when you agreed that it was part of the public manual, the Foreign Affairs Manual?

MS. STROKUS: Your Honor, it was not stipulated to as part of the exhibit list.

THE COURT: Isn't it marked as one of the, um, unagreed-to exhibits?

MS. STROKUS: It is not agreed to.

THE COURT: I know it's not agreed to, but it was marked for identification as a nonagreed-to exhibit, isn't that correct?

MS. STROKUS: Yes, your Honor.

THE COURT: Overruled. It may be admitted and it will be Exhibit 200 and --

MR. WILKENS: 238, your Honor.

THE COURT: 238. Thank you.

(Exhibit 238, marked.)

Q. If I could direct you, Ms. Smith, to Page 6 of Exhibit 238, and to the provision at the bottom, which is titled 9 FAM 403.11-5(b), "Prudential Revocations." Do you see that?

A. I do. I would like a minute to read through that paragraph, since you're focusing on that one.

Q. Sure.

A. (Reads.) Okay.

Q. Okay. And just looking at this paragraph, um, if

you go down to the third line, after that first word classification, there's a comma, it says, "The Department may revoke a Visa if an ineligibility or lack of entitlement is suspected when an individual would not meet requirements for admission or in other situations where warranted."

Do you see that?

A.     Yes, I do see that text.

Q.     Okay.  And so based on that text, isn't it correct that the bases for eligibility or for admission and the reasons for ineligibility for admission are relevant to the prudential revocation of a Visa?

MS. STROKUS:  Objection.

THE COURT:  Overruled.

A.     So, um, I'm not qualified to talk about admission because that is a Customs and Border Protection decision, they deal with inadmissibility.  So would you mind repeating the question, um, focusing on what you would like me to answer, please?

Q.     Yes.  So with respect to the granting of Visas, um, isn't this passage indicating that with respect to the revocation of Visas, the factors that a Visa officer can look at for the, um, eligibility of a person for the granting of a Visa are relevant to Visa revocations?

MS. STROKUS:  Objection.

THE COURT: No, overruled. I'll let him have that question and one more.

A. Well I think it's a complicated question to answer because Visa eligibility is covered in other sections of the FAM. This citation that you're noting on Page 6 of Exhibit CK is related to, um, revoking a Visa, and as it, you know, pretty simply states in the text, if, um -- the Department can revoke a Visa if ineligibility is um, you know, identified, um, or if an -- if the person is believed to no longer be entitled to their Visa. And so, um, I hope that answers the question.

THE COURT: All right. One more.

MR. WILKENS: Yes, your Honor.

Q. If we could turn to Exhibit CG, the cable that we were speaking about earlier, please. Oh, sorry. Yes, CG.

A. Yes, I'm bringing that up now. Just a moment. Okay. I am ready.

Q. Okay. And if we turn to a Page 6 of that exhibit, and, um, the paragraphs, um -- well beginning with 20, that describe, um, factors that can be taken into account for the eligibility or ineligibility for the granting of a Visa.

A. Okay, I'll read through Paragraphs 20 and 21. Just a moment, please.

Q.    Yeah.

A.    (Reads.)  Okay.

Q.    Am I right that these factors, identified here in this cable, can be taken into account in revoking a Visa?

MS. STROKUS:  Objection, your Honor.

THE COURT:  Overruled.

A.    Yes, the information contained in Paragraphs 20 and 21 of Exhibit CG can be taken into account when a decision is made to revoke a Visa.  Paragraphs 20 and 21 talk about if an applicant is not credible, um, if their activities are inconsistent with, um, their Visa class, um, if there are inconsistencies or derogatory information that is discovered during vetting, and so all of these factors could be relevant to a Visa revocation.  And as I've stated prior, a Consular officer always looks at the totality of circumstances, um, and all facts for every case, um, before making, um, a decision to revoke a Visa.

Q.  Okay.

MR. WILKENS:  Your Honor, I would move this exhibit into evidence.

THE COURT:  Do you object?

MS. STROKUS:  Objection, your Honor.

THE COURT:  Overruled.  It may be admitted,

JA986

Exhibit 239.

(Exhibit 239, marked.)

THE COURT:  Now do you have any further questions for this witness?

MR. WILKENS:  I do not, your Honor.

THE COURT:  I take it you do not.

(Laughter.)

THE COURT:  And counsel for the government, any further questions for the witness?

MS. STROKUS:  No, your Honor, and cognizant of the Court's time.

THE COURT:  Thank you.  And thank you, Ms. Smith.

Very well.  Call your next witness.

MS. SANTORA:  Your Honor, the government calls John Armstrong.

MR. BIALE:  And, your Honor, before this witness comes in, and this is just the issue I raised at the beginning --

THE COURT:  Yes, and I'll hear you.

MR. BIALE:  With respect to -- you know we have a dispute about what documents can be used.  Our plan is to cross-examine this witness, Ms. Conlon will cross-examine this witness using some of the documents that were initially produced in-camera --

THE COURT:  I understand.  I'm not surprised.

JA987

MR. BIALE: I just want to make that clear, so we don't have a fight about it in the middle of the testimony.

THE COURT: Well they can object, but I intend, having given the documents to you, if they pertain to his cross-examination, they may use them.

MR. BIALE: Thank you, Judge.

THE COURT: Mr. Armstrong may be called.

(Witness takes the stand.)

(JOHN ARMSTRONG, sworn.)

THE CLERK: And please state your full name, spelling your last name for the record.

THE WITNESS: John Armstrong, A-R-M-S-T-R-O-N-G.

THE COURT: And if I may start, um, welcome. I had originally thought we were going to hear your testimony remotely because you were or are on your way to the United Kingdom?

THE WITNESS: Um, no, that is not me, sir. I just run things in Washington. Although we do have official travel from time to time.

THE COURT: Okay, I am mistaken. But you are welcome.

THE WITNESS: Thank you, sir.

THE COURT: Ms. Santora, go right ahead.

MS. SANTORA: Thank you, your Honor.

JA988

\* \* \* \* \* \* \* \* \* \* \* \* \*

JOHN ARMSTRONG

\* \* \* \* \* \* \* \* \* \* \* \* \*


DIRECT EXAMINATION BY MS. SANTORA:

Q.    Hello, Mr. Armstrong, thank you for being here today.

      Can you tell us your current role at the State Department?

A.    My current position is Senior Bureau Official in the Bureau of Consular Affairs.

Q.    And how long have you been in that role?

A.    I assumed it on the 27th of February of this year.

Q.    How long have you worked for the State Department?

A.    It's, um, over 30 years.  It will be 31 in October.

Q.    So when did you first start working for the State Department, in what year?

A.    1994, in October, I believe.  It was October 14th.

Q.    And in what capacity?

A.    When I began, I started as a Foreign Service Officer.  I continue to be one today.

Q.    Can you briefly tell the Court about your assignments starting with your first and going up

JA989

through your current role?

A.    I'd be happy to.  Initially when I came in in October of 1994, I was assigned, um, following basic training, to take consular training, and then Rumanian language, and then sent to Rumania for 2 years as a Vice Consul where I ran the nonimmigrant Visa section and the fraud prevention section.

After Rumania, I went to Warsaw Poland where I served as the trade officer on -- working on trade issues for two years.

And then from there, I went back to Washington D.C. where I served as the Belarus desk officer in the Office of Western Slavic and Moldovan Affairs.

Following that position -- just a moment, I have to think.  I went back to Warsaw for four years, where I was a political officer and I was also the labor officer.

Following that time in Warsaw, I went to the Russia desk, the Office of Russia Affairs, where I was a Senior Political Officer for two years.

After that I studied Ukrainian for a year and then went to Kyiv Ukraine to our embassy where I was the Deputy Consul General.

Following Kyiv, I went to -- my next posting was in the Bahamas, at Embassy Nassau, where I was the

JA990

Consular Section Chief, which I did for a year, and then I was Acting Deputy Chief Admission, the Number 2 position, for two years.

Following that, I returned to Washington D.C. where I was the Director of the Washington Passport Agency for three years.

After that, I went to Embassy Warsaw in Poland where I was the Economic Counselor running the Economics Section for three years.

After that, in 2020, during covid, I returned to Washington and was the Director of the Office of Eastern European Affairs which deals with Ukraine, Belarus, and Molodova.

Following that position, where I was for two years, I was a Senior Advisor in the Office of Sanction Coordination, also at the main building of the State Department.

Following that, I studied Spanish and went to Lima, Peru, where I was Consul General, and I served until returning to Washington in the middle of February of this year, and I was briefly the Deputy Assistant Secretary for Overseas Citizen Services.

And then I assumed my current position on February 27th of this year.

Q.    And are you -- is there anyone senior -- can you

remind the Court of what is your current position?

A.   My current position is Senior Bureau Official in the Bureau of Consular Affairs.  I'm the top official in the Bureau of Consular Affairs.

Q.   And who is senior to you at the State Department?

A.   The Undersecretary for Management.

Q.   Anyone else senior to you at the State Department?

A.   Um, yes.  Well there's the two Deputy Secretaries, the Deputy Secretary, and then the Deputy Secretary for Management and Resources.  And above them is the Secretary of State.

Q.   What does the Bureau of Consular Affairs do?

A.   Basically we have three missions.  First of all, we're responsible for passport issuance throughout the United States at 29 passport bureaus and centers.  It's approximately 25 million passport products a year.

Secondly, we are in charge of, um, processing Visas at Foreign Missions -- our Foreign Missions abroad or diplomatic posts, that's over 200 of them, and there's approximately 14 million applications a year.

And then finally, we are responsible for the welfare of American citizens abroad and providing them services they need.  If they're in need, we try to help them.  Overall we have a staff of approximately 13,000 and a budget of $5.5 billion.

Q.  What are your responsibilities as a Senior Official in the Bureau of Consular Affairs?

A.  I am responsible for the operations of the Bureau. The buck stops with me.

Q.  And that includes being responsible for the Visa section that you mentioned?

A.  Yes, ma'am.

Q.  Are you aware of the policies applicable to Visas?

A.  Yes.

Q.  Would you say that you're aware of all policies applicable to Visas?

A.  In general, yes, I would say that.

Q.  Would you say it would be possible for a policy related to Visas to exist without you knowing about it?

MS. CONLON:  Objection, your Honor.

THE COURT:  She may have it in that form.

A.  I would be very surprised if there was such a policy.  I have a good hand on the pulse of what's done by the Visa office, your Honor.

Q.  Does the Bureau of Consular Affairs get involved in issuance of Visas, is that correct?

A.  Could you repeat the question please?

Q.  Is the Bureau of Consular Affairs involved in the issuance of Visas?

A.  Yes, it is, we are responsible for that overseas.

Q.    And are there different types of Visas?

A.    Yes, there are.  There are two basic types, or the nonimmigrant Visa and the immigrant Visa.

Q.    What is a nonimmigrant Visa?

A.    Nonimmigrant Visas are for people who are coming for temporary purposes in the United States and will be leaving and returning -- leaving the United States for another destination, students, tourists, um, people coming to work, um, journalists.

Q.    And how is an immigrant Visa different from that?

A.    Immigrant Visas are for people who are coming to remain in the United States, permanently.

Q.    Are you familiar with the allegations in this case?

A.    I have some knowledge, but I haven't ever seen all of them.

Q.    Is it fair to say, based on your knowledge, that this case does not involve immigrant Visa holders?

A.    Yes.

Q.    So when I ask you questions about Visa holders, if I don't specify, I'm referring to nonimmigrant Visa holders.  Okay?

A.    I understand.

Q.    I believe you mentioned this, but what type of Visa, nonimmigrant or immigrant, is a student Visa?

A. Student Visas are nonimmigrant Visas, they're Fs, Ms, and they can be Exchange Visitors, which are Js.

Q. What standards apply to the issuance of nonimmigrant Visas?

A. Could you clarify the question?

Q. What legal authorities apply to the issuance of nonimmigrant Visas?

A. The applicant for the Visa has to, um, show that they are qualified for that Visa. In some cases they need a petition. In others they need forms, like students will need a form from an accredited university. Students also, as do tourists, have to overcome Section 214(b) of the Immigration and Nationality Act, which is an intending immigrant. They have to show that they do not intend to remain in the United States to the satisfaction of a Consul Officer at an interview. The law, which we all follow very strictly, places the burden of proof on the applicant, on the alien. If our Consul Officer is not convinced, the Consul Officer -- of that, they must refuse that application.

Q. Does the Bureau of Consular Affairs deal with the revocations of nonimmigrant Visas?

A. Yes, we do. Yes. And it has for years. It's in the Immigration and Nationality Act, I believe it's Section 221(i).

JA995

Q.   And what standards apply -- I believe you just mentioned one, what legal authorities apply to Visa revocations?

A.   The key legal authority for a revocation is Section 221(i) of the Immigration and Nationality Act, which if I remember correctly, your Honor, gives the Secretary of State and any Consular Officer the ability to revoke a Visa at any time for any reason.  We treat this seriously.  And of course some sort of evidence is needed.  We don't go do this on a whim.  We review each case individually and carefully.

Q.   Does the Bureau of Consular Affairs make removability determinations?

A.   I'm sorry?

THE COURT:  I didn't catch it either.  Would you ask the question again.

MS. SANTORA:  Sure, I'll rephrase it a little bit.

Q.   Does the State Department make removability determinations?

THE COURT:  Removability determinations.

A.   Yes, the Secretary of State can make those determinations, I believe it's, um -- it's also in the INA.  We call it 4(c) is the section.  But it's a longer section citation.

Q.   Would that be INA Section 237(a)(4)(c)?

JA996

A.    I believe that's it, yes.

Q.    Okay.  Are you familiar with the State Department's process and protocols for, um, the revocations of Visas, which we talked about a few questions ago?

A.    Yes, I am.

Q.    And are you familiar with the State Department's process and protocols for making determinations under 237(a)(4)(c), the statute you just referenced?

A.    Yes, ma'am, I am.

Q.    How are you familiar with those, um, processes and protocols?

A.    It's part of my job.  I have to know about these things in order to lead the Bureau of Consular Affairs.

Q.    Have you prepared a chart to assist the Court with explaining how the process and protocol works?

A.    My staff and I have reviewed the chart, yes.

Q.    Okay.

      MS. SANTORA:  Your Honor, I would like to identify Exhibit H, or mark for identification Exhibit HN.  This is the chart that Mr. Armstrong referred to.

      THE COURT:  Um, do I have it?

      MS. SANTORA:  It should be in a binder.

      THE COURT:  Yes, well I have -- yes, I do have it.  Yes.  HN.  And I will permit this chalk to be used as --

JA997

I will permit this chart to be used as a chalk.

Go ahead.

MS. SANTORA:  Thank you.

Q.    Mr. Armstrong, I think we're going to pull the chart up on the screen.

(Technical difficulties.)

MS. SANTORA:  Your Honor, may I approach?  I can also give him a paper copy.

THE COURT:  He can use mine.  But of course you may.

THE WITNESS:  I'll take this one, sir, so you can also see it.

THE COURT:  Thank you.

(Hands up.)

THE COURT:  A question I have, and I've seen these initials come up.  I'm roughly familiar with this chart. But do you see, um, the Bureau of Consular Affairs is there roughly in the center.  And then to the right, there's two little boxes, "NIV" and "LPR."  What do those initials stand for?

THE WITNESS:  Your Honor, "NIV" is "Nonimmigrant Visa," and "LPR" is "Legal Permanent Residence."

THE COURT:  Yes, understood.

Proceed.

THE WITNESS:  No problem.

JA998

Q. Okay, it looks like we might not be able to pull the chart up on the screen, so, um -- um, okay.

Mr. Armstrong, is this the chart that you were just referring to when I asked if you had prepared a chart?

A. Yes, it is.

Q. Okay. Based on your experience at the Bureau of Consular Affairs, does the chart accurately represent the State Department's process and protocol for Visa revocations and foreign policy determinations under INA Section 237(a)(4)(c)?

A. It accurately represents that in the case of referrals from the Department of Homeland Security.

Q. Okay. So does the State Department rely on information when it is revoking a nonimmigrant Visa or making a foreign policy determination under INA Section 237(a)(4)(c)?

A. I'm sorry, I don't understand the question. Do we rely on information? From various sources. We do rely on information from various sources, including it may come from the Department of Homeland Security, it may come from sources that we have, it may come from law enforcement, diplomatic sources abroad, the media. So a variety of sources. Yes, we do actually look at information.

Q.   Okay, let's focus on information that you received from, you mentioned, the Department of Homeland Security.  Do you see them referenced in the chart?

A.   Yes, on the left-hand side, the big blue box.

Q.   Okay.  And how does information come, if it does, to the Bureau of Consular Affairs from the Department of Homeland Security?

A.   From my experience it comes in the form of an e-mail, which serves as a cover letter, and then an attachment with additional information about the case.

Q.   And is that attachment referred to as a "referral"?

A.   Yes.

Q.   And when the Bureau of Consular Affairs receives the information, um, what do they first determine about the individual?

A.   Well the first thing they do is confirm receipt to DHS, that we have actually received this, your Honor, and that we are acting on it.  After that, um, the -- as related to your Honor's question, the question is whether it's a nonimmigrant Visa or whether it's a legal permanent resident.  Nonimmigrant Visas go for processing and review to the Visa office.  The legal permanent residents take a different track and go up to the Secretary of State if we find that the evidence is

sufficient to take action.

Q. Okay, let's stick with the nonimmigrant Visas first. You said they go to the Visa office. What does the Visa office then do with the referral after they receive it?

A. The Visa office examines the information, seeing if it's serious enough to enact a revocation. It will also consult with, um, lawyers at the State Department who work for the Legal Advisor, they don't work for Consul Affairs directly, but there are lawyers assigned to look at it from a legal point of view.

After that, if the Visa office finds it's sufficient, they'll discuss it with whoever received the, um, referral from DHS, and if that person agrees, then it will go into the revocation process and the Visa will be revoked. If not, um, then -- well actually in either case, whether it's revoked or whether it's not, there'll be a communication back to DHS telling DHS what was done in that case. Or there's one other possibility. If I may?

Q. Sure.

A. There may be a request for more information.

Q. And who would they request more information from?

A. They would write back to whoever in DHS had sent the referral.

Q.   Okay.  Let's talk now about the other part of the chart, relating to this "LPR" on the chart.  That's a "Lawful Permanent Resident"?

A.   Yes.

Q.   And how is a lawful permanent resident different from a nonimmigrant Visa?

A.   Um, first of all, we cannot revoke the status of a lawful permanent resident.  Um, the Secretary of State can have a finding that that person is removable, but we cannot do that in the -- in the Bureau of Consular Affairs.  So what happens in that case, after an analysis of information -- and this is done in each case individually, an action memo, um, sometimes called a "decision memo," is sent to the Secretary of State, and the Secretary of State will have a choice then, and from my experience in most cases there are three choices. One, agree and find the person removable, usually under, um, 4(c), as we talked about.  Um, disagree and find the person not removable.  Or discuss, in other words ask for more information.

Q.   And in the event that the Secretary of State finds the person removable, um, what happens after that?

A.   Um, the, um, Department of Homeland Security is informed of this, and this usually take two routes. There will be an informal notification back to the

JA1002

person who sent the original referral, as a courtesy, but the official notification goes from the Secretary of State to, um, the DHS secretary, because the DHS secretary is his interlocutor.

Q.    And I believe you also mentioned that it's possible for the Secretary of State to determine that the person is not removable, correct?

A.    That's correct.  And in which case the Bureau of Consular Affairs would contact the person in DHS who made the referral and say the Secretary has found -- has disagreed and does not fine the person removable.

Q.    Okay, I want to go back to --

THE COURT:  Just to get a feel for this.

THE WITNESS:  Yes, sir.

THE COURT:  With respect to, um, legal permanent residence.

THE WITNESS:  Yes, sir.

THE COURT:  Under the statute, this is a determination that is, um, by statute, given to the Secretary, that officer in the government, that cabinet Secretary himself or herself?

THE WITNESS:  Yes.

THE COURT:  And then as I'm listening to you, pretty much as a matter of courtesy, since it's a Cabinet Secretary who's made that determination, the

JA1003

communication as to the result, goes to the Cabinet Secretary in the Department of Homeland Security, and in today's world, she, then takes action, because action falls within the Department of Homeland Security.

Is that right?

THE WITNESS: That is correct, sir. The actual formal -- Homeland Security will not take action in those cases until they receive the official notification Secretary to Secretary. What we would send to Consular Affairs is a courtesy that, yes, the Secretary has made this finding. Then the official notification will go from Executive Secretary to Executive Secretary.

THE COURT: Thank you.

THE WITNESS: Certainly.

Q. I want to go back, for a second, to nonimmigrant Visas.

Does the Visa office independently analyze the referral that it received from DHS?

A. Yes, most definitely, that's our job. We're not a rubber stamp for DHS.

Q. Do all referrals of nonimmigrant Visa holders from DHS that go to the Visa office result in Visa revocations?

A. No.

Q. Do you have any idea of the percentage that does

result in Visa revocations?

A.    Based on my time in my current position, I would say approximately 25 to 30 percent are sent back without action be taken, either to ask for more information or we just find the information not significant enough to take action.

Q.    Okay.  And you've been in your position since February of 2025, correct?

A.    Yes, ma'am.

Q.    And has the Bureau of Consular Affairs handled DHS referrals consistently with this chart that we've been discussing since that time?

A.    Yes, and it's my understanding even before.  We do not create any policy or procedure here.

      MS. CONLON:  Objection, move to strike as nonresponsive.

      THE COURT:  Overruled.  That may stand.

Q.    Does this chart depict how the Bureau of Consular Affairs handles all referrals from DHS?

A.    Yes.

Q.    Does it accurately depict how the Bureau of Consular Affairs would handle a DHS referral involving protesters?

A.    Yes, all referrals from DHS.

Q.    Okay.  So the chart focuses on a referral from

DHS, but you mentioned that the State Department, in revoking Visas and, um, making removability determinations, can rely on information from other sources, correct?

A.    That is correct.

Q.    And, um, what are those other sources?

A.    For example, the media.  There can be derogatory information that comes up after a Visa was issued, some action the Visa holder took or is planning to take, and if it's significant enough, that could lead to a, um, revocation of the Visa.  Information received from law enforcement.  Information that happens that is, um, sent by the public.  Poison pen letters.

I, in fact, know of a case like this, when I was in Ukraine, of a security guard who worked at the embassy, who supposedly was going as a tourist, but one of his colleagues revealed his true intention, which was to remain in the United States.  And we revoked that Visa and fired him.

Q.    And so would you say that some of the information, um, is internal information to the State Department?

A.    It can be, yes.

Q.    And in the case of information that it not based on a referral, um, say we're talking about a nonimmigrant Visa holder, so it goes to the Visa office

JA1006

and the Visa office determines that the Visa should not be revoked.  In those circumstances, again where there's no referral, does the Visa office tell DHS about the Visa revocation?

A.    No, DHS is not involved in this.

Q.    Okay.

(Pause.)

MS. SANTORA:  Your Honor, I move to introduce into evidence this chart.

MS. CONLON:  Your Honor, we understand it doesn't aid or assist with testimony, so we object for it coming in for sort of its truth, but to the extent that it's a demonstrative aid, I don't even know that it needs to be admitted.

THE COURT:  I think that's a proper characterization.  If he says this is accurate and it's been accurate throughout his tenure, as I understand it, it will be part of the record, but as HN, a chalk.  And the difference is, as factfinder, I have to decide whether to believe, disbelieve, or believe in part any witness's testimony.

Here the chart depends on my belief of this witness's testimony, it doesn't stand alone.  They created it for this trial.  And I accept it in that fashion.  I mean no disrespect, that's just my

JA1007

responsibility. Actually I find this helpful and I will be referring to it. But it was created for the witness, for his testimony, and so what he has to say about it really governs.

Go ahead.

MS. SANTORA: Thank you, your Honor.

Q. Mr. Armstrong, I'm going to show you a document that is an exhibit in this case, this is Exhibit 70.

MS. SANTORA: Your Honor, may I approach to hand this document to the witness?

THE COURT: Of course.

(Hands to witness.)

THE WITNESS: Thank you.

May I familiarize myself with it?

THE COURT: Of course.

THE WITNESS: Thank you, sir.

A. (Reads.) I have finished my review.

Q. Okay, thank you. Have you seen this document before?

A. Yes.

Q. And what is it?

A. It's an Executive Order from the President.

Q. What is the title?

A. "Protecting the United States from Foreign Terrorists and other National Security and Public Safety

Threats."

Q.    In what capacity have you seen it?

A.    In my official capacity as the top official in the Bureau of Consular Affairs.

Q.    What is the purpose of the document?

A.    The purpose is to protect the United States and the American people from foreign threats.

Q.    Have you relied on this document to do your job?

A.    Yes, we have referred to this document in doing my job, as have other people in the Bureau of Consular Affairs, and not only.

Q.    How would you use it with respect to doing your job?

A.    Well I think the key thing is, um, to summarize this document, is it instructs all of us to use existing procedures to maximize the security of the American people.

Q.    Does it require anything of the State Department?

A.    It requires quite a few things of the State Department.  They're enumerated.  Again, to summarize, it's increasing our vigilance and to make sure we're using all existing mechanisms, procedures, and policies that we have to ensure the security of the American people.

Q.    Did it create new legal authorities related to the

State Department's work?

A.    To my knowledge, no.

Q.    Did the State Department do anything in response to the Executive Order?

A.    Yes, we take our orders from the President, whoever that is, and we increase our use of the -- it reviewed actually what we were doing, and that review is actually ongoing.

Q.    And can you explain what exactly, if anything, the State Department did in response to this Executive Order?

A.    Well one thing I can actually say, and it's -- it's a bit of "Inside Baseball," your Honor, if I may? Um, there's -- in our nonimmigrant Visa system, there are messages that come when derogatory information appears, and a lot of our posts are very -- have a lot of work to do, a lot of people to interview, they have backlogs, and they don't always review those messages in a timely manner and act upon them.  We noted this and we emphasized to our diplomats overseas that they need to review this information, and when justified, to revoke Visas, not to let it build up.  It needs to be kept up. Because people -- if there is negative information and they have a Visa and it should be revoked, we need to do that, and not delay.  I think this was talked about,

JA1010

some people have called it the "Catch and Revoke Policy."

Q.   I'd like to show you -- okay, I'd like to show you the document, um, you just referred to.

MS. SANTORA:  Your Honor, may I approach?

THE COURT:  You may.

MS. SANTORA:  This is Exhibit 21 for the record, and I'm going to show it to the witness.

(Hands to witness.)

THE WITNESS:  Thank you.

THE WITNESS:  May I review it?

THE COURT:  Of course.

THE WITNESS:  Thank you.

A.   (Reads.)  I've completed my review.

Q.   Okay.  Is this the document you were referring to?

A.   Yes.

Q.   And can you explain what it is?

A.   This is an instruction, a guidance to our diplomatic posts abroad, over 200 posts.  In particular you can see that because it says "All diplomatic and consular posts collective," it's known as an "all-back." It was sent out talking about this very thing I spoke about, about the need to review systems messages on a regular timely basis, and to take action where warranted.

Q.   Okay.  And is this document implementing the Executive Order we were just talking about, Executive Order 14161?

A.   Yes, it even refers to it in the second paragraph.

Q.   And how does it implement the Executive Order?

A.   By increasing the emphasis on and the vigilance in reviewing systems messages which carry -- can carry significant negative information about Visa holders, and then when justified, revoking these Visas, which is done at the diplomatic posts.

Q.   Does it provide new legal authority for revoking Visas?

A.   No, not -- no, it's using the 221(i).

Q.   So in revoking Visas under this guidance, the State Department is relying on existing legal authority, correct?

A.   Yes, I believe so.  I believe 221(i) has been in the INA since the beginning, 70 years ago.

Q.   Okay.  Are you aware of anything else that the State Department has done in response to Executive Order 14161?

A.   We've issued guidance to the field, again emphasizing the importance of security and the importance of reviews, for example the importance of 214(b) has been an issue that we've raised with the

field. Again, these are using existing policies and authorities, it's nothing new in that regard.

Q. I'd like to show you another document.

MS. SANTORA: This has been entered into evidence as Exhibit 53 in this case, your Honor.

THE COURT: Say again the document number?

MS. SANTORA: Exhibit 53.

THE COURT: 53.

MS. SANTORA: No, I'm sorry, your Honor, it actually is Exhibit 64.

THE COURT: 64.

MS. SANTORA: May I approach to give a copy of this document --

THE COURT: You may.

(Hands to witness.)

THE WITNESS: Thank you.

May I review it, your Honor?

THE COURT: Of course.

THE WITNESS: Thank you, sir.

A. (Reads.) I've completed my review.

Q. Okay. Do you recognize that document?

A. Could you repeat the question please?

Q. Do you recognize that document?

A. I do recognize this document.

Q. What is it?

A.    It is a guidance to the field.  As discussed previously, it is an all-back, it's sent out to all our posts abroad.

Q.    And, um, what is the guidance related to?

A.    It's related to, um, social media and online screening of students and exchange visitors, the F, M, and J Visa classes.

Q.    And is it guidance that was issued in response to the Executive Order we were just talking about?

A.    Yes.

Q.    And how does it implement that Executive Order?

A.    It increases the vetting of, um, a class of Visa applicants.

Q.    Why does it do that?

A.    In order to improve the security of the United States.

Q.    What class of Visa applicants does it increase vetting to?

A.    Students and exchange visitors.

Q.    And that's social media vetting, correct?

A.    Yes.

Q.    And why does it focus on students and exchange visitors?

A.    Well I can think of a couple of reasons.  First of all, the social media is -- when the INA was written --

and in the past this hasn't been considered, it didn't exist, but it's a gold mine of information. And also, um, people who are younger, students, and most students and exchange visitors are -- I'm 60 and I don't use social media much, but they do use social media a lot. So they're a group that uses all that information and those tools. And so it makes it available to us.

Q. Does it create new legal authority, um, for vetting through social media chats?

MS. CONLON: Objection, your Honor, these questions about legal authority seem to call for a legal conclusion.

THE COURT: No, I want to hear his view.

You may answer, sir.

THE WITNESS: Thank you, your Honor.

A. No, it doesn't. It talks about Section 214(b) of the Immigration and Nationality Act, and also, um, Section 212(a)(3)(b), which is, um, support for terrorist organizations. These are not new.

Q. And how do those sections that you just referred to relate to vetting?

A. In the vetting one could find information that would lead to a 214(b) refusal under an intending immigrant, for example, if someone talks about their previous unauthorized work in the United States. Or it

could lead to a finding on support for a terrorist organization, someone brags about how they've given money to Hamas.

Q. And both of those would bear on someone's eligibility for a Visa?

A. Most definitely.

Q. Are you aware of anything else that, um, the Department of State did in response to Executive Order 14161?

A. There were, um -- there was a review, um, at least a partial review of 3(c) policies, and, um, that's a foreign policy ground for refusal under the INA, um, and there were some that the Secretary authorized to be added. One, for example, for, um, government officials who assist in a legal migration to the United States.

Q. You said 3(c) policies. Are you referring to a section of the INA when you say that?

A. Yes, ma'am.

Q. What section is that?

A. I don't know the whole number, we call it "3(c)." It's the foreign policy section. Ineligibility on foreign policy grounds.

Q. Okay.

(Pause.)

MS. SANTORA: Your Honor, I'd like to mark for

identification Exhibit JJ, the statute that the witness just referred to.

THE COURT: The statute?

MS. SANTORA: Yes.

THE COURT: I see no reason for adding statutes in.

MS. SANTORA: Okay.

THE COURT: A citation to them is sufficient.

MS. SANTORA: Okay. May I approach to show the witness a copy of the statute to refresh his recollection?

THE COURT: Of course.

(Approaches, hands document to witness.)

THE WITNESS: Thank you.

May I review it, your Honor?

THE COURT: Well it's pretty thick, I don't even know what she's going to ask here. But of course take a look at it.

THE WITNESS: May I ask which part you're referring to? It is rather thick.

MS. SANTORA: Yes, I was referring to the section you referenced, which I believe is Section (a)3(c), it's INA 312 of 1182, the statute.

A.   (Looks.) Is this, ma'am, the section that says "See foreign policy"?

JA1017

Q.    Yes.

A.    Yes, I believe that is it.

Q.    Okay.  Can you take a moment to review it.

A.    (Looks.)  I've reviewed it.

MS. SANTORA:  If you don't mind, may I approach also to get it back?

(Approaches witness to get document back.)

Q.    So the statute you just reviewed, Mr. Armstrong, was that the statute you were referring to when you referred to "3(c) policies"?

A.    Yes.

Q.    And do 3(c) policies apply to, um, Visa holders or to Visa applicants?

A.    It could be both actually, um, if a Visa holder was outside the United States.  But also an applicant could be found ineligible under 3(c).

Q.    Okay.  So 3(c) policies do not apply to Visa holders in the United States?

A.    No.  That's my understanding.

Q.    Okay.  I'd like to show you another document.

MS. SANTORA:  If I could approach?  This has been marked as Exhibit 71 in this case.

(Approaches witness with document.)

THE WITNESS:  Thank you.

A.    (Looks.)  I'm familiar with this document.

JA1018

Q.    Okay, what is the document?

A.    It's an Executive Order from the President of the United States.

Q.    And what is it titled?

A.    "Additional Measures to Combat Antisemitism."

Q.    And how are you familiar with that document?  In what capacity have you seen that document before?

A.    In carrying out my job.

Q.    And how have you relied on it to do your job?

A.    It makes clear that the official policy of the United States is to combat antisemitism both at home and abroad.

Q.    Did the State Department rely on this document to revoke Visas?

A.    We would rely on the Immigration and Nationality Act.  It doesn't give us any authority here, it instructs us and emphasizes.  It's a document that informs what we're doing, yes, but not as a part of the law that we would use to revoke a Visa.

Q.    Okay.  Did the document change the State Department's authority to revoke Visas?

A.    It's my understanding it didn't.

Q.    Did the document change the State Department's process and protocols for revoking Visas?

A.    No.

JA1019

Q.   Did the document change the State Department's authority to make removability determinations?

A.   No.

Q.   Did the document change the State Department's process and protocols for making removability determinations?

A.   No.

Q.   I'd like to show you a few more documents.

MS. SANTORA:  Your Honor, the documents that I'm intending to show the witness are not privileged but have been marked as confidential, um, based on the protective order signed between the parties.  We would ask that the courtroom be cleared of the public for the purposes of putting on this document.

THE COURT:  I'm not going to clear the courtroom unless I see what the documents are.

MS. CONLON:  What documents are we talking about?

MS. SANTORA:  So they are -- the documents will be Exhibits 8, 12, 16, 19, and --

THE COURT:  8.

MS. SANTORA:  8.  12.

THE COURT:  Wait a minute.

MS. CONLON:  Sorry, are these the documents from the certified administrative record in this case, are those all from that record?

JA1020

MS. SANTORA: They're from the sealed version of the administrative record.

MS. CONLON: I see. So 8, 12 --

MS. SANTORA: So 16, 19, and 21.

THE COURT: Well I'm not disposed to clear the courtroom, there's a constitutional right --

MS. CONLON: And we would object to that.

THE COURT: -- to have a public courtroom for public trials. So, um -- and these have been marked in evidence in this case, which means they are documents upon which I may, and I may be required, to make my decision. So that request is denied. You see -- I'm not doing it.

MS. SANTORA: Thank you, your Honor.

Q. Mr. Armstrong, I would like to show you a document, I'll show you one at a time.

MS. SANTORA: If I may approach?

Q. The first has been marked as Exhibit 8 in this case.

(Approaches witness, hands document.)

THE WITNESS: Thank you.

May I review it?

MS. SANTORA: Sure.

THE WITNESS: Thank you.

A. (Reads.) I've completed my review.

Q.   Okay.  Do you recognize this document?

A.   I do.

Q.   What is it?

A.   It's a memorandum from Secretary Rubio to the Secretary of Homeland Security.

Q.   And in what capacity have you seen this document?

A.   In doing my job, my official duties at the State Department.

Q.   What does the memorandum relate to?

A.   The memorandum informs, um, the Secretary of Homeland Security of Secretary Rubio's finding in a case of a particular alien, finding the person, um, removable under 273(a)(4)(c) of the Immigration and Nationality Act.  Actually two people, one is blacked out.

Q.   Okay.  Who is the person whose name is not redacted?

A.   Mahmoud Khalil.

Q.   And can you summarize what the document finds with respect to Mr. Khalil?

A.   That section of the INA deals with foreign policy grounds for finding removability, which the Secretary of State does, or if given a different document.  It informs of it here and then talks about Mr. Khalil's antisemitic -- role in antisemitic protests and disruptive activities that foster a hostile environment

JA1022

for students in the United States.

Q.    And it provides that as the basis for finding Mr. Khalil removable?

A.    Yes, it describes it on the back, on the second page.

Q.    What does it say about Mr. Khalil's activities?

THE COURT:  Well in view of your objection, remember it's in evidence.  I've read it.

MS. SANTORA:  Okay, thank you, your Honor, we can move on.

Q.    Mr. Armstrong, I'd like to show you another document.

MS. SANTORA:  If I may approach?  This has been marked as Exhibit 12 in this case.

(Approaches witness, hands document.)

THE WITNESS:  Thank you, your Honor.  May I review it?

THE COURT:  Of course.

THE WITNESS:  Thank you.

A.    (Reads.)  I've completed my review.

Q.    Do you recognize this document?

A.    I do.

Q.    Have you seen it before?

A.    I have, in performance of my official duties in leading the Bureau of Consular Affairs.

Q.    Okay.  And what is the document?

A.    The document's similar to the previous one, it's a memorandum from the Secretary of State informing the Secretary of Homeland Security of a decision made regarding the removability of an alien.

Q.    What alien does it refer to?

A.    It refers to Mohsen Mahdawi.

Q.    And what does it find with respect to Mr. Mahdawi?

A.    Oh, sorry I pronounced it wrong.  The Secretary of State informs us that he found Mr. Mahdawi removable under Section 237(a)(4)(c)(1) of the Immigration and Nationality Act.

Q.    And does the document provide the Secretary's rationale for that finding?

A.    It does, on the second page.  That rationale was Mr. Mahdawi's involvement and leadership of disruptive protests at Columbia University, and that included antisemitic conduct and calling for the destruction of Israel.  The Secretary also noted that this is clearly against U.S. policy to counter antisemitism.  And Mr. Mahdawi's activities undermine the peace process in the Middle East, including coming to a peaceful resolution of the ongoing conflict in Gaza.

Q.    Thank you.  I'd like to show you another document.

      MS. SANTORA:  If I can approach?  This is Exhibit

Number 19.

THE COURT: Say again the number?

MS. SANTORA: 19.

THE COURT: Thank you.

(Approaches, hands to witness.)

THE WITNESS: Thank you.

May I review it, your Honor?

THE COURT: Of course.

THE WITNESS: Thank you.

A. (Reads.) I've completed my review.

Q. Do you recognize this document?

A. I do.

Q. Have you seen it before?

A. I have, in performance of my duties as the senior Bureau official of the Bureau of Consular Affairs at the State Department.

A. What is the document?

A. The document is a communication, a memorandum from Secretary Rubio to the Secretary of Homeland Security.

Q. And what is the memo about?

A. The memo informs Secretary Noem that Secretary Rubio has found two aliens, um, one is Yunseo Chung, and the other one is blacked out, so I don't know who the person is, um, to be removable under the foreign policy section of the INA, Section 237(a)(4)(c)(1).

Q.   And does the document provide the Secretary's rationale for this determination?

A.   Yes, it does.  It found that Ms. Chung and the other unnamed person were involved in, um, participation and apparently leadership roles in antisemitic protests and disruptive activities.  It created a hostile environment for Jewish students in the United States.

Q.   Thank you.  I'd like to show you another document.

MS. SANTORA:  If I could approach.  This is labeled as Exhibit 21 in this case.

(Approaches, hands witness document.)

THE WITNESS:  Thank you.

Your Honor, may I review it?

THE COURT:  Yes.

THE WITNESS:  Thank you.

A.   (Reads.)  I've completed my review.

Q.   Do you recognize this document?

A.   I do.

Q.   And have you seen it before?

A.   Yes, I have, as in my leadership role of the Bureau of Consular Affairs at the Department of State.

Q.   What is the document?

A.   The document is a memorandum from Secretary Rubio informing Secretary Noem, the Secretary of Homeland Security, of Secretary Rubio's decision to find Badar

Khan Suri deportable under INA Section 273(a)(4)(c)(1), which is the foreign policy section.

Q. And does the memo provide the rationale for the Secretary's determination?

A. Yes, it does, it cites Mr. Suri's direct connection to Hamas leadership as well as his involvement in antisemitic activities that created a hostile environment for Jewish students in the United States.

Q. Okay, I have one more document to show you.

MS. SANTORA: If I could approach? This is Exhibit 16.

(Approaches, hands to witness.)

THE WITNESS: Thank you.

Your Honor, I'd like to review?

THE COURT: Sure.

THE WITNESS: Thank you.

A. (Reads.) I've completed my review.

Q. Do you recognize the document?

A. I most certainly do.

Q. What is it?

A. It's a communication, um, a memorandum from me to Andre Watson, who's the Assistant Director of the National Security Division of ICE, at DHS.

Q. And you wrote that in your official capacity as

JA1027

the Senior Bureau Official at the Bureau of Consular Affairs, correct?

A.   I did not write it, I signed it.  Other people drafted the document.

Q.   Okay.  But you have reviewed what the memo said, correct?

A.   I did, before signing it, yes.

Q.   And, um, what is the purpose of the memorandum?

A.   The purpose is to inform Mr. Watson of the decision made to, um, revoke, um, Rumeysa Ozturk's Visa due to her activities in the United States, and it was revoked under Section 221(i) of the Immigration and Nationality Act.

Q.   And --

A.   And I signed it on the back.  That's me.

Q.   Thank you.

What was the basis for your determination?

THE COURT:  His determination?

Q.   What was basis for your determination that the Visa should be revoked?

THE COURT:  He may answer.

THE WITNESS:  Thank you, your Honor.

A.   The basis was her antisemitic activities in the U.S., as detailed.  It talks about creating a hostile environment for Jewish students, and indicating support

for a designated terrorist organization. I believe it was Hamas, but it might have been Hezbollah. I don't remember exactly.

Q. I want to direct your attention to the last line, the last line of the first paragraph of the memorandum. It says, "Due to ongoing ICE operations, security of this revocation will be silent. The Department of State will not notify the subject of the revocation."

Does the Department of State, when it revokes nonimmigrant Visas, typically inform the Visa holder that their Visa has been revoked?

A. Yes, we usually do.

Q. And in this case you did not?

A. That is correct. And judging from the context, ICE had made a request that we not inform so that they could take action to remove Ms. Ozturk from the United States.

THE COURT: Let me ask you a couple of questions here, but I'm going back to the other four that you've been shown, and I'm talking about the chart.

You know about the Secretary's actions because, as I understand it, your involvement here, as the Director of the Bureau of Consular Affairs, you're the one who causes the memo or in fact sends the memo to the Secretary of State saying "Agree," "Disagree,"

"Discuss"?

THE WITNESS:  Yes, I'm the last one who looks at it, yes.

THE COURT:  All right.  So, um, my question is broader than the, um, what you've been shown.

But since you've been there, in your official capacity, can you estimate how many such memos involve student protests, protesters, and concerns about antisemitism, limit it as to that.  About how many such memos have you sent to the Secretary of State?

THE WITNESS:  I would estimate the number of such memos would be between 15 to 20.

THE COURT:  All right.  And of those 15 to 20, if you can break down how many were agreed and executed, how many were disagreed, how many were discussed?

THE WITNESS:  In my recollection, almost all were agreed.  There may have been one that was not.  I'm the not sure.  And there may have been another one that was discussed and later agreed to.

THE COURT:  Yeah, just asking for your best recollection.

Go ahead, Ms. Santora.

Q.    And related to those memos that your Honor was just discussing, um, the -- your office, before sending an action memo to the Secretary, independently analyzes

JA1030

the information in referrals, correct?

A.    That is correct, we analyze it.  The Visa office, along with legal counsel, analyze it, um, independently of DHS, the information.

Q.    And then makes a recommendation on removability to the Secretary, correct?

A.    That is correct.  And the recommendation is reviewed by many people.  And then I -- or whoever is sitting in the position I am currently in, makes the final determination of whether it goes forward to the Secretary or not.  My practice is to read the whole memo.

Q.    And the Secretary, um, makes the ultimate determination on removability, correct?

A.    That is correct, the Secretary of State, Marco Rubio.

Q.    You said before that you were familiar with the allegations in this complaint, correct?

A.    I have some knowledge of them, I have not read the complaint.

Q.    Are you familiar with the fact that the plaintiffs in this case allege that the government is implementing an ideological deportation policy?

A.    I have heard that --

        MS. CONLON:  Objection, your Honor.

JA1031

THE COURT: No, she may so characterize it. And she may ask the question. And his answer may stand.

A. I have heard that accusation. I believe it's groundless.

Q. So is there an ideological deportation policy?

A. No.

Q. How do you know?

A. I run the Bureau of Consular Affairs. I'm responsible for everything those 13,000 people do. At the end of the day, the buck stops with me. I would know if there was an ideological deportation policy going on that involved the Bureau of Consular Affairs or the State Department for that matter. It's silly to suggest that there's such a policy that I didn't know about.

Q. Does the State Department have any policy to revoke Visas based on protected speech?

A. No.

Q. Does the State Department have any policy to find people removable based on protected speech?

A. No.

Q. Does the State Department have any policy to revoke Visas based on political viewpoints?

A. Um, if you're supporting a terrorist organization, yes, in that case. And it's been made clear by the

statements of Marco Rubio and, um -- this is not something that we started with Marco Rubio. If you support terrorism, you can have your Visa revoked.

Q. And is that a provision of the law?

A. It's in the law. There's the ineligibility, the 3(b) that we talked about. And actually that example you gave me, right before 3(c), they have 3(b) that goes into several pages of discussion of this. These officers abroad are required to put in a security advisory opinion on any case that they think that there's any indication of support for terrorism. We treat this very seriously.

Q. Has anyone ever told you to revoke the Visas on the basis of protected speech?

A. No.

Q. As anyone ever told you to find someone removable on the basis of their protected speech?

A. I can't find anyone removable, but no one has instructed me to prepare the materials for the Secretary to make that finding.

Q. Could the State Department be deploying an ideological deportation policy in secret without your knowledge?

MS. CONLON: Objection.

THE COURT: Based upon the entire record, I'm

going to sustain that.

(Pause.)

Q.    To be clear, it's your testimony that it would not be possible for an ideological deportation policy to be implemented at the State Department without your knowledge, correct?

A.    That is my --

MS. CONLON:  Objection.

THE COURT:  No, no, he can -- and I sustained the earlier objection because the whole gravamen of the case is that it is an avowedly public operation supported by the statements of the -- here the defendant public officials.  And I'll let his testimony stand.

Anything else for this witness?

MS. SANTORA:  No, that's it.  Thank you, your Honor.

THE COURT:  All right.

Ms. Conlon?

MS. CONLON:  Yes, may I, um, go to the podium?

THE COURT:  You may.

THE WITNESS:  Your Honor, may I stand up for a minute?

THE COURT:  Of course you can.

THE WITNESS:  Thank you, sir.

(Stands.)

(Then Sits.)

CROSS-EXAMINATION BY MS. CONLON:

Q.    Good afternoon, Mr. Armstrong.

A.    Good afternoon.

Q.    Okay.  So you were asked --

THE COURT:  Wait.  Wait a minute.  Wait a minute.
I have, at this moment, received an order from the Court
of Appeals, so let me read it.

(Reads.)

THE COURT:  Here's how we're going to proceed.
Let me read this in open court and you'll all have
copies.  This is entered and I received it as you hear
it, and this is the order of the Court of Appeals in the
First Circuit.

"The government has filed a mandamus petition and
accompanying request for interim relief.  Plaintiffs
have opposed.  After initial review of the parties'
submissions and relevant portions of the record, we
grant the government's request for a stay of any further
disclosure of documents for which the government says it
has claimed privilege and where waiver is the only basis
stated for rejecting the claim of privilege.  Plaintiffs
may file a more fulsome answer to the petition by
Monday, July 14, 2025, at 5:00 p.m.

JA1035

The District Court is invited to address the petition by Tuesday, July 15, 2025 at 5:00 p.m.  The Court's response should identify what the reason was for the in-camera review and detail the rationale for its waiver rulings on the government's assertion of certain privileges.  The motion for administrative stay is denied as moot.  The Court will rule promptly on the petition."

In light of the order of the First Circuit, and because it's 5 minutes to 1:00, I think we'll suspend proceedings at this time.

Ms. Conlon?

MS. CONLON:  Could I begin my examination, with the 5 minutes remaining, without anything that will affect the order from the First Circuit just so we can get started?

THE COURT:  Well I'm deferential to their order. I've got to reflect on what it reaches.  But for my review of this order, it reaches everything that has been -- that this Court has disclosed to you as to which the government has objected.

And you've got 5 minutes.

MS. CONLON:  5 minutes to argue it or 5 minutes to --

THE COURT:  No, no, 5 minutes to question him.

MS. CONLON: Okay. Just for the clarity for the Court and the record, our understanding, I think, is different in terms of the group of documents that we understood the government to be filing the petition about, um, but I am certainly able to start examining this witness without using any documents at all. So I just wanted to be clear, because I hear the Court saying that the Court thinks that the documents that I might use in this examination, which is to say the ones we received from the Court yesterday, are implicated by the government's petition, and I want to be clear that our understanding is that they are not, and that that relates to documents that have yet to be disclosed to us. But I understand the Court needs to review the document that's in front of you more thoroughly. So if I may begin the examination --

THE COURT: It's not a document, it's an order.

MS. CONLON: Correct, the binding order. So I will not -- I have no intention, in this remaining minute --

THE COURT: Right. You have 4 minutes. Go ahead.

MS. CONLON: Thank you, your Honor.

(Pause.)

Q. Mr. Armstrong, you testified on direct examination about certain noncitizens, um, by name, that the

government asked you about.  To be clear, um, you had personal involvement in the decisions with respect to all of them, is that right?

A.   That's my recollection, because in the case of the ones that went to the Secretary of State for decision, the action memo would have gone through me before it went up.  And in the one remaining case, I -- as I recall, the action memo actually went to me from one of the Deputy Assistant Secretaries.  So, yes, I was involved, in my professional duties, in these cases.

Q.   And when you say that it went to you before it went up to Secretary Rubio, it's the case that you actually had to clear the document to go to Secretary Rubio, is that right?

A.   That's correct.  I'm the -- for the action memo, before it can leave the Bureau of Consular Affairs, it comes from -- it's actually from me, um, the decision -- the action memo is from me.  And as I stated, it's my practice to read, um, the documents before they go up. I treat it seriously, I treat my duties seriously to read it in full.  And make corrections, if needed, I may add.

Q.   And when you say "corrections," what kind of corrections?

A.   Um, there's any number.  It's part of the

JA1038

clearance or the approval process. It's serious business. For example, sometimes, despite best efforts, there's simple grammatical errors or punctuation errors. I can't send something to the Secretary with not enough commas or a semicolon in the wrong place. Sometimes it's more serious, there are what I believe, in my position, I judge to be something that is not phrased in the clearest way to get across our point or, for example, not the best evidence is used to make our point. Sometimes I disagree completely and send the document back to the drafter and I say, "This can't stand, you have to fix this."

Q.    You're describing a sort of searching review before it goes to the Secretary, is that right?

A.    That's correct, much of my time is spent doing such activities.

Q.    With respect to the five individuals whose documents you just reviewed with the government, you didn't make any corrections about those, right?

A.    I -- I'm trying to be helpful, but I review in a week, you know, sometimes 10, 15, or more action memos that go to other parts of the State Department, and I can't recall what I did on a memo that was, you know, several months ago.

Q.    You don't have an independent recollection of the

back and forth on these memos that the government showed you, is that right?

A.    I do not.  But my general practice is that I review things thoroughly and judiciously before I sign them.  I have to sign off on it, and that's my responsibility, even if it's someone else's fault.

Q.    And if you disagreed with a memo that came to you that was intended for the Secretary, you could stop it from going to him, right, by not clearing it?

A.    That's correct, I could send it back.

Q.    You didn't do that for any --

THE COURT:  I think that's a good place to stop.

MS. CONLON:  Okay.

THE COURT:  We'll stop taking testimony today. We'll start promptly at 9:00 a.m. on Monday next week.

The total elapsed time is, um, for the plaintiffs, 3 days, 55 minutes.  For the defense, 1 day, 1 hour, um, 35 minutes.

Understand you've only got four days -- four and a half days for the plaintiffs, and I thought that that included -- I intend that that include closing arguments.  So assuming you want some cross-examination here, um, time is of the essence.

Now have a good weekend.

MR. KANELLIS:  Your Honor, I apologize.

THE COURT:  Well now the apology is properly sought.  I said we're stopping at 1:00.  We're stopping.  We'll recess.

(Adjourned, 1:00 p.m.)

JA1041

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Friday, July 11, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 07-11-25
_____
RICHARD H. ROMANOW   Date

JA1042

# CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I electronically filed the foregoing Joint Appendix with the Clerk for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 /s/ Paul F. Stone
PAUL F. STONE
*United States Department of Justice*