# In the United States Court of Appeals for the First Circuit

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS - HARVARD FACULTY CHAPTER; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY; RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN FEDERATION OF TEACHERS; MIDDLE EAST STUDIES ASSOCIATION,

Plaintiffs–Appellees/Cross–Appellants,

v.

MARCO RUBIO, in the official capacity as Secretary of State; U.S. DEPARTMENT OF STATE; MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, in the official capacity as Acting Director of U.S. Immigration and Customs Enforcement; DONALD J. TRUMP, in the official capacity as President of the United States; UNITED STATES,

Defendants–Appellants/Cross–Appellees.

*On Appeal from the U.S. District Court*
*for the District of Massachusetts*
*Docket Number 1:25-cv-10685-WGY*

## JOINT APPENDIX Volume IV

BRETT A. SHUMATE
  *Assistant Attorney General*
  *Civil Division*

DREW C. ENSIGN
  *Deputy Assistant Attorney General*

PAUL F. STONE
  *Acting Chief*

LINDSAY M. MURPHY
  *Deputy Chief*

RAMYA KRISHNAN
XIANGNONG WANG
STEPHANY KIM
RAYA KOREH
CARRIE DECELL
SCOTT WILKENS
ALEX ABDO
JAMEEL JAFFER
  *Knight First Amendment Institute*
  *at Columbia University*
  *475 Riverside Drive, Suite 302*
  *New York, NY 1011*

VICTORIA SANTORA
   *Senior Counsel for National Security*

JESSE BUSEN
   *Counsel for National Security*

*National Security Unit*
*Office of Immigration Litigation*
*U.S. Department of Justice*
*P.O. Box 878, Ben Franklin Station*
*Washington, DC 20044-878*
*(202) 305-9647*

EDWINA CLARKE
DAVID ZIMMER
*Zimmer, Citron & Clarke, LLP*
*130 Bishop Allen Drive*
*Cambridge, MA 02139*

NOAM BIALE
MICHAEL TREMONTE
ALEXANDRA CONLON
COURTNEY GANS
*Sher Tremonte LLP*
*90 Broad Street, 23rd Floor*
*New York, New York 10004*

AHILAN T. ARULANANTHAM
*Professor from Practice*
*UCLA School of Law*
*385 Charles E. Young Dr. East*
*Los Angeles, CA 90095*
*(310) 825-1029*
*arulanantham@law.ucla.edu*

# TABLE OF CONTENTS

Defendants' Designated Portions of the
Depositon Transcript for Brian Shuve ........................................................JA1520

Plaintiffs' Designated Portions of the
Depositon Transcript for John Armstrong ................................................JA1539

Memorandum from Alejandro N. Mayorkas, Sec'y,
U.S. Dept. of Homeland Sec., to Tae D. Johnson,
Acting Director, U.S. Immigr. & Customs Enf't 5 (Sept. 30, 2021)..........JA1551

Trial Exhibit 7, 25 STATE 26168 "(U) Action Request:
Enhanced Screening and Social Media Vetting for Visa Applicants" .......JA1558

Trial Exhibit 8, Notice of Removability (Khalil) ...........................................JA1564

Trial Exhibit 9, Certified Administrative Record –
Notice to Appear (Khalil) ...................................................................JA1566

Trial Exhibit 10, Certified Administrative Record –
Form I-261 (Khalil)..............................................................................JA1569

Trial Exhibit 11, Certified Administrative Record –
Warrant (Khalil).................................................................................JA1571

Trial Exhibit 12, Notice of Removability (Mahdawi) ....................................JA1572

Trial Exhibit 13, Certified Administrative Record –
Notice to Appear (Mahdawi) ...............................................................JA1574

Trial Exhibit 14, Certified Administrative Record –
Warrant (Mahdawi)..............................................................................JA1580

Trial Exhibit 15, Certified Administrative Record –
Notice of Custody Determination (Mahdawi) .............................................JA1581

Trial Exhibit 16, Notice of Visa Revocation (Ozturk) ...................................JA1582

Trial Exhibit 17, Certified Administrative Record –
Notice to Appear (Öztürk) ......................................................................JA1587

Trial Exhibit 18, Certified Administrative Record –
Warrant (Öztürk) ....................................................................................JA1588

Trial Exhibit 19, Notice of Removability (Chung) ........................................JA1589

Trial Exhibit 20, Certified Administrative Record –
Unserved Warrant (Chung) .....................................................................JA1591

Trial Exhibit 21, Notice of Removability (Suri) ...........................................JA1592

Trial Exhibit 22, Certified Administrative Record –
Notice to Appear (Khan Suri) .................................................................JA1594

Trial Exhibit 23, Stipulation and Order .........................................................JA1597

Trial Exhibit 24, Secretary of State Marco Rubio's
March 6, 2025 post on X..........................................................................JA1602

Trial Exhibit 25, Department of Homeland Security's
March 9, 2025 post on X..........................................................................JA1603

Trial Exhibit 26, Secretary of State Marco Rubio's
March 9, 2025 post on X..........................................................................JA1604

Trial Exhibit 27, President Donald J. Trump's
March 10, 2025 post on Truth Social .......................................................JA1605

Trial Exhibit 28, White House Press Secretary
Karoline Leavitt's March 11, 2025 Press Briefing transcript.....................JA1606

Trial Exhibit 29, Deputy Secretary of Homeland Security
Tony Edgar's March 13, 2025 interview with NPR ..................................JA1623

Trial Exhibit 30, Secretary of State Marco Rubio's
March 12, 2025 remarks to the press in Shannon, Ireland .........................JA1642

Trial Exhibit 31, Vice President J.D. Vance's
March 13, 2025 Fox New Interview Transcript ..........................................JA1655

Trial Exhibit 32, Department of Homeland Security's
March 14, 2025 Press Release ..............................................................JA1656

Trial Exhibit 33, Secretary of State Mark Rubio's
March 16, 2025 interview on CBS's Face the Nation...............................JA1657

Trial Exhibit 34, Department of Homeland Security
Assistant Secretary for Public Affairs Tricia McLaughlin's
March 19, 2025 post on X.....................................................................JA1667

Trial Exhibit 35, Secretary of State Marco Rubio's
March 27, 2025 remarks during a Joint Press
Availability with Guyanese President Irfaan Ali.......................................JA1668

Trial Exhibit 36, Secretary of State Marco Rubio's
March 28, 2025 remarks to the press.........................................................JA1681

Trial Exhibit 37, Secretary of State Marco Rubio's
April 8, 2025 interview on Triggered with Don Jr. ....................................JA1698

Trial Exhibit 38, Department of Homeland Security's
April 9, 2025 Press Release ......................................................................JA1719

Trial Exhibit 39-1, Fox News Video Clip of Interview
with Stephen Miller on April 14, 2025 ......................................................JA1720

Trial Exhibit 40, Secretary of State Marco Rubio's
April 17, 2025 interview on the Ben Shapiro Show....................................JA1721

Trial Exhibit 41, Department of Homeland Security
Assistant Secretary for Public Affairs Tricia McLaughlin's
April 30, 2025 post on X...........................................................................JA1728

Trial Exhibit 43, Secretary of State Marco Rubio's
May 7, 2025 post on X...............................................................................JA1729

Trial Exhibit 44, Department of Homeland Security
Assistant Secretary for Public Affairs Tricia McLaughlin's
May 8, 2025 post on X..........................................................JA1730

Trial Exhibit 45, January 30, 2025 White House
Fact Sheet Titled "Fact Sheet: President Donald J. Trump
Takes Forceful and Unprecedented Steps to Combat Anti-Semitism" ......JA1731

Trial Exhibit 49, Office of Visa Services, *Enhanced Vetting and
Social Media Screening of Visa Applicants*, Webinar (April 3-4, 2025) ...JA1735

Trial Exhibit 50, 25 STATE 45612, "Caught and Revoked:
Updated Guidance on Systems Messages" (May 15, 2025).......................JA1755

Trial Exhibit 51, 25 STATE 17178, "Catch And Revoke:
National Security Through Timely Processing of
Visa Systems Messages" (Feb. 28, 2025)......................................JA1759

Trial Exhibit 55, 9 FAM 402.5-5(C)(1)
"(U) Intent to Solely Pursue a Full Course of Study" ...............................JA1766

Trial Exhibit 57, Marco Rubio, 100 Days of an America
First State Department, Statedept.substack.com (Apr. 30, 2025)...............JA1769

Trial Exhibit 64, 25 STATE 26168 "(U) Action Request:
Enhanced Screening and Social Media Vetting for Visa Applicants" .......JA1775

Trial Exhibit 66, Megan Hyska Draft Op-Ed ....................................JA1781

Trial Exhibit 67, "An Open Letter from 171 Faculty –
Do not ban protest at NU" signed by Megan Hyska .................................JA1784

Trial Exhibit 68, Supporting Dr. Steven Thrasher
signed by Megan Hyska........................................................JA1789

Trial Exhibit 69, April 17, 2025 Letter to President
Michael Schil and Provost Kathleen Hagerty
signed by Megan Hyska........................................................JA1834

Trial Exhibit 70, E.O. 14,161 "Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats" (90 FR 8451) (Jan. 20, 2025)...........................JA1866

Trial Exhibit 71, E.O. 14,188 "Additional Measures to Combat Anti-Semitism" (90 FR 8847) (Jan. 29, 2025).............................JA1869

Trial Exhibit 72, April 4, 2025 Board of Trustees Chair Letter signed by Megan Hyska .......................................................JA1871

Trial Exhibit 78, February 13, 2025 email from Bernhard Nickel to Philosophy Graduate List............................................JA1879

Trial Exhibit 79, April 17, 2025 email from Bernhard Nickel to Philosophy Graduate List............................................JA1881

Trial Exhibit 83, An Open Letter to the Director of the US Holocaust Memorial Museum signed by Bernhard Nickel .................JA1883

Trial Exhibit 84, Harvard Faculty Statement in Support of Palestinian Liberation signed by Bernhard Nickel ...................JA1907

Trial Exhibit 85, Nadje Sadig Al-Ali CV .......................................................JA1915

Trial Exhibit 92, "Faculty letter in support of BrownU Jews for Ceasefire Now" signed by Nadje Al-Ali......................................JA1928

Trial Exhibit 95, AAUP News webpage.........................................................JA1931

Trial Exhibit 100, Trump's Immigration Actions: What to Know Webinar .......................................................................JA1935

Trial Exhibit 101, MESA Members: Know Your Rights Webinar ................JA1938

Trial Exhibit 103, MESA Board Joint Statement with the TFCHR regarding deportations, April 11, 2025...........................JA1940

Trial Exhibit 105, Launching MESA's Academic
    Freedom Initiative, May 13, 2025..................................................JA1946

Trial Exhibit 106, MESA Know Your Rights Town Hall..............................JA1950

Brian Shuve Deposition Designations

| Page | Statement |
|---|---|
| 47-48 | Q. What was your citizenship at birth? <br> A. Canadian. <br> Q. Where were you born? <br> A. In Oakville, Ontario, Canada. |
| 48 | Q. And what is your citizenship status currently? <br> A. American. <br> Q. Do you remain a Canadian citizen as well? <br> A. Yes. |
| 59-61 | Q. Have you ever presented at a conference? <br> A. Yes. <br> Q. About how many conferences would you estimate you have presented on just at the time you have been at Harvy Mudd? <br> A. I really can't estimate. <br> Q. How about in just the past three years? <br> A. Five to ten maybe, but I can't say. <br> Q. How about just in the past year? <br> A. One or two probably. <br> Q. Do you remember where those conferences were? <br> A. I attended a workshop in Germany. Yeah. And I attended a conference in Anaheim. <br> Q. When was the Germany conference? <br> A. First week of June, 2025. <br> Q. And you presented there? <br> A. Yes. <br> … <br> Q. Okay. And then what about the conference in Anaheim, when was that? <br> A. That was in March of 2025. <br> Q. What did you present there? <br> A. Actually, now that I think of it, I did not present there. |
| 63-64 | Q. In addition to your job, are you a member of any organizations? <br> A. How do you define "organizations"? <br> Q. Any sort of groups that you are a member of. <br> A. Yes. <br> Q. What groups are those? <br> A. I am a member of the American Association of University Professors. <br> … <br> Q. Okay. Any others? <br> A. I am—I'm not sure we would call it membership, but there is a group of faculty at the Claremont Colleges called Faculty for Justice in Palestine, and I am part of that group. <br> … <br> Q. When did you become a member of AAUP? <br> A. In 2020. <br> … <br> Q. How do you become a member? <br> A. So there are two types of membership. One is that the national-level organization, and I can't remember the specific of how I joined that. And then at the Claremont Colleges level, there is a Google form, and you fill it out. <br> Q. Do you have to pay a fee to be a member? <br> A. Yes. <br> Q. Both on the national level and on the local level? |

JA1520

| | |
|---|---|
| | A. Yes. Although I will say that on the local level we have been kind of loosey-goosey with whether their people are paying or not. The pandemic messed it up. So in principle, it's a paid membership. |
| 68-69 | Q. And you said before that you would estimate that the Claremont Colleges chapter of AAUP has about 200 members?<br>A. About that number on the mailing list.<br>Q. On the mailing list. Okay. Do you have a leadership role in the local AAUP chapter?<br>A. Yes.<br>Q. What is it?<br>A. Our leadership structure is that we have an executive committee which has representatives from most of the colleges, and I am a Harvy Mudd representative.<br>…<br>Q. How long have you been the representative?<br>A. Almost two years? |
| 70-71 | Q. Have you worked on different things for the national organization and the local chapter?<br>Ms. Gans: Object as to form.<br>Q. You can answer if you can.<br>A. I don't recall ever working with the national AAUP.<br>Q. Okay. Do you ever recall doing anything with the national AAUP?<br>A. I don't recall.<br>Q. And that includes attending meetings?<br>A. I don't recall.<br>Q. Attending conferences?<br>A. I don't think I attended a conference. Yeah, I don't recall.<br>Q. Is it fair to say that all of your involvement with AAUP, to your recollection, has been with the local chapter?<br>A. To my recollection, yes. |
| 71-78 | Q. Okay. So let's talk, then, about the time period after that, so summer 2023 to present. What specific things do you recall having done as a member of AAUP Claremont Colleges chapter?<br>A. A lot of what we did was writing statements that are advocating for positions that are supported by our membership or that are in alignment with AAUP principles. So we issued statements on academic freedom and on police on campus, and I can't recall if there were other topics of those public statements. WE also addressed concerns that are brought to us by individuals, sometimes with respect to their contract conditions or some working condition that is—that they perceive of as a problem, and we will try and work with that individual for how they can resolve that.<br>Q. Okay. You mentioned drafting statements on academic freedom and police on campus. Do you remember any other statements that the AAUP local chapter released or published between 2023 and the present day?<br>A. Not that I can recall.<br>Q. The statement—and it was a—you said these statements were published?<br>A. Yes.<br>Q. Where are they published?<br>A. On the Claremont Colleges AAUP website.<br>Q. And the statement on academic freedom, when was that published?<br>A. October 2023.<br>Q. And can you describe the content of that statement?<br>A. It's been a while, so it's only to the best of my recollection, but the—the context was concerns about the ability of scholars to speak on contentious issues specifically with respect to Israel and Palestine. And I believe the substance of the statement was repeating |

JA1521

| | |
|---|---|
| | the AAUP principles, and I believe there was a national AAUP statement on academic freedom in times of conflict or something like—called—I can't remember the specific wording, and so it was reminding and bringing to campus administrators and campus members what the AAUP principles are on this topic.<br>Q. And what are those principles?<br>A. That's in the course of academic discourse, that there can be positions that are expressed that may be controversial or that some people find problematic, and that the way that academic freedom is structured is that in order to have free inquiry, those perspectives are allowed to be shared even in times that are challenging.<br>Q. What about the statement about police on campus, when was that published?<br>A. So I recall that there were two instances. One was in December 2023, and it was in response to an incident at Pomona College where a faculty member had been arrested.<br>Q. Can you describe that instance?<br>A. I was not there for the incident.<br>Q. Do you know why the faculty member was arrested?<br>A. Based on reports, there was a protest, and the faculty member was playing music and had a teacher that was supportive of Palestine, and I don't know the specifics, but someone called campus security who called the police, and they arrested the faculty member.<br>…<br>Q. How do you know about this incident?<br>A. I was told about it by two other members of the AAUP executive committee.<br>…<br>Q. And so you said the statement related to that instance. What did the statement say, the December 2023 statement?<br>Ms. Gans: Objection. I think the witness has covered that question.<br>Q. You can answer.<br>A. According to the information that was available, and I have not heard anything more recent to suggest this, the faculty member who was arrested was not doing anything in opposition to campus policy, and so it was a—I can't remember the specific message, but it was about pointing this out as a consequence of a breakdown in academic freedom ff and a reminder of the importance of allowing speech on campus<br>Q. You said there was another statement released by the AAUP local chapter regarding police on campus. When was that?<br>A. I believe it was in November 2024.<br>…<br>Q. And what was the statement advocating?<br>A. More faculty involvement and transparency from administrators about, first of all, what types of weapons or crowd control campus safety might have, the terms under which they would be used, and faculty involvement in policies related to, you know, determining code of conduct. That's my recollection.<br>Q. Was the statement written in response to any particular incident?<br>A. Yes. That part followed from the incident at the Harvy Mudd career fair that we discussed earlier.<br>Q. And when did you say that incident occurred?<br>A. Late September 2024. |
| 78-79 | Q. I want to ask you a little bit more about your AAUP involvement. How much time would you say per month you spend doing AAUP activities?<br>A. That really varies a lot from month to month.<br>Q. Okay. Let's just go through the past few months. So in May of 2025, for example.<br>A. A few hours, but that was after the semester had ended.<br>Q. Okay. So you would say you do more work for the organization during the semester? |

JA1522

| | |
|---|---|
| | A. On an average month, I would estimate.<br>Q. Okay. Then let's just take this last semester. So how about January of 2025?<br>A. I don't know that I could actually do it at the granular level of months, so maybe an average—could I give an average over—<br>Q. Sure.<br>A. I would estimate somewhere 10 to 15 hours, but that would vary.<br>Q. Okay. And is there any particular month or time period when you tend to be—when the local chapter tends to be more busy or less busy?<br>A. We try to have one gathering per semester of all of the membership of the chapter. And so that moves around, but I would say that there is more time at those moments. But a lot of what we do is responding to concerns as they arise, and so it's often, like, when things are quiet, we are quiet. |
| 81-82 | Q. When was the last time you had a local chapter gathering or information—or listening session?<br>A. Towards the end of April, 2025.<br>Q. And what sorts of issues were raised at that meeting?<br>A. Same we have already discussed.<br>Q. No others than what we have already discussed?<br>A. Not that I am aware of or that I can recall right now. |
| 83-85 | Q. Any meeting that you can remember between those two dates? So between September 2024 and April 2025?<br>A. We had a meeting in mid April, 2025.<br>Q. And that's different than the meeting that we discussed?<br>A. Yes.<br>Q. Okay. So you had—so there were two meetings in April 2025?<br>A. Yes.<br>Q. Okay. What was—were they for the same purpose?<br>A. No.<br>Q. What was the—so just to be clear, the meeting that we have already discussed was for the purpose of allowing faculty to raise concerns?<br>A. Correct.<br>Q. And so the other April 2025 meeting that you mentioned, what was the purpose of that meeting?<br>A. The national AAUP organization organized an event that was called the National Day of Action and Higher Education with the title "Free Higher Ed Now." And there were a number of events like webinars that took place over the course of the day. Our specific involvement was there was, like, a national webinar that was kind of the main event, let's say, of the day. So we had a gathering where people could watch that, and then we had a social get-together beforehand just to facilitate community among AAUP membership. |
| 86-89 | Q. Did you watch the webinar?<br>A. I did, most of it. I think I left—I left at some point towards the end.<br>…<br>Q. What form was it in?<br>A. Well, I guess it depends what you mean by "panel discussion." There were—there was not a discussion among panelists, but here were a number o short speakers, you know, speakers who talked for maybe ten minutes or so.<br>Q. What did they speak about?<br>A. It was various topics related to what the speakers perceived or they said they perceived as challenges in higher education.<br>…<br>Q. Do you remember any specific topics of any speech that day? |

JA1523

| | |
|---|---|
| | A. I don't know about for specific speeches. The topics that were touched on included funding for sciences, academic freedom of free speech, international students, but I don't remember, you know, individual—which individual speaker mentioned which thing. <br> … <br> Q. Did anyone speak about support for Palestine? <br> A. Yes. <br> Q. Who spoke about that? <br> A. I don't recall specifically. <br> Q. What did that person say? <br> A. I guess I don't remember specific speeches, but I think it was brought up as a topic that people, you know, at universities were afraid to speak about or were facing retaliation for speech related to Palestine. |
| 91-92 | Q. Have you ever spoken on behalf of AAUP such as at a conference? <br> A. No, not that I can recall. <br> Q. Have you ever spoken on behalf of AAUP in any other capacity? <br> A. I don't know what you mean, "speak on behalf of AAUP." <br> Q. So as a representative of the organization. <br> A. I have spoken to the Harvy Mudd faculty as a representative at faculty meetings, basically telling them what AAUP is, how they can join if they want to. I don't know if that counts as speaking as a representative, but that is something that I did. |
| 96-98 | Q. And then the last organization that you mentioned being a part of, I wrote down "FJP," so Faculty for Justice in Palestine, is that correct? <br> A. Yes. <br> Q. And what is the mission of that organization? <br> A. "Organization" may be a strong word. It's a collection of faculty at the Claremont Colleges who are opposed to violence against Palestinians, and believe in self-determination for Palestinians, and advocate for that. <br> Q. Okay. When you say "self-determination for Palestinians," what do you mean? <br> A. I can't speak on behalf of the group. <br> Q. What do you personally mean when you say that? <br> A. I believe in a situation where Palestinians have equal rights and are able to live in peace where they live. <br> Q. Is FJP critical of Israel? <br> A. Yes. <br> Q. In what ways? <br> A. FJP is critical of the way sin which—or, my interpretation, I should say, because I can't speak on behalf of other people, it's critical of the conduct of Israel's military actions in Gaza as well as the  military occupation and treatment of Palestinians in the West Bank, Gaza, and east Jerusalem, as well as discrimination against Palestinians within Israel. <br> … <br> Q. When did you become a member of FJP? <br> A. So like I said, it's a little bit dicey because it's not really a formal organization, but I would say that it was around January of 2024 that there were discussions about faculty who share similar values or goals who come together in that way. |
| 101 | Q. What does the organization do—or the group do? [FJP] <br> A. Largely, we have put out statements which advocate for, you know, the positions that I mentioned earlier, and I would say that's the, really, main activity of the group. <br> Q. And the statements have been published? <br> A. Yes. <br> Q. Where have they been published? <br> A. They are available on, I think, maybe the Linktree. There is a website that has several of them. |

JA1524

| | |
|---|---|
| | Q. Okay. Do you know the name of the website?<br>A. No. |
| 103-08 | Q. Have you been involved in drafting any of the statements FJP has poste don its website?<br>A. Yes.<br>…<br>Q. What were the topics of the statements you had been involved in drafting?<br>A. Ant his is as FJP?<br>Q. Uh-huh.<br>A. I recall that in February of 2024 at Pomona College there was a student referendum on the topic of divestment from companies that were connected to oppression of Palestinians, and I believe that there was a statement on—basically, responding to an e-mail from the Pomona College president and also just giving some perspective on divestment.<br>…<br>Q. What do you mean when you say "oppression of Palestinians"?<br>Ms. Gans: Objection as to form, and speculation.<br>Q. You can answer.<br>A. I believe that there are—that in the occupied territories—West Bank, Gaza, east Jerusalem—that there is Palestinians who do not enjoy human rights in the way that is expected under international law, and that there are institutions which support the expansion of Israeli settlements in those areas, and so I would include institutions that provide material support for that ongoing discrimination and violence.<br>Q. You said that the FJP statement was in response to an e-mail from the Pomona College president regarding the referendum; is that correct?<br>A. Yes.<br>Q. And what did that e-mail say, if you know?<br>A. I don't remember the entirety of it, but the part that I remember was the allegation that the student referendum was alleged to be anti-Semitic and that academic freedom meant opposing things like boycotts.<br>Q. I'm sorry. The president's email said that academic freedom meant opposing things like boycotts?<br>A. Something to that effect. That was part of the email.<br>Q. Okay. And what did the FJP statement, which you were involved in drafting, say?<br>A. Essentially provided a counterargument to the idea that supporting the rights of Palestinians was anti-Semitic, and also challenging what academic freedom means in a particular context; that, you know, for instance, all the universities in Gaza have been destroyed. And so discussing the limitation, or what we perceive to be the limitations, or choices that the president had made in articulating her perspective.<br>Q. Why did it say that supporting Palestine was not anti-Semitic?<br>Ms. Gans: Objection as to form.<br>Q. I can rephrase that. What reasons did it provide for saying that supporting Palestine was not anti-Semitic?<br>A. I mean, I can't speak to the motivations of anyone else. For me, I believe that everybody is entitled to human rights and freedom from attacks on civilians, and so advocating for the human rights of one group of people does not entail advocating against or discriminating against another group.<br>…<br>Q. Do you recall the names of who drafted the statement with you?<br>A. I recall two names. |
| 109-12 | Q. Okay. Other than the February 2024 statement regarding the Pomona College student referendum, were you involve din drafting any other FJP statements? |

JA1525

| | |
|---|---|
| | A. Yes.<br>Q. How many?<br>A. I don't recall.<br>Q. Do your recall the topics of any others?<br>A. Yes.<br>Q. What was it?<br>A. There was a statement in early April 2025 that was immediately after an incident at Pomona College where a group of students occupied the—some part of the building of the office of the president—<br>Q. Okay.<br>A. –at Pomona College.<br>Q. Were you there when that happened at Pomona College?<br>A. No.<br>Q. What do you know about that instance?<br>A. I guess I was not there to observe. What I have heard is that students had made an appointment to meet with the president of the college. They then decided to hold a sit-in. I don't know—they held a sit-in, as far as I know. I don't know who decided or how. And at some point, Pomona College or campus safety called Claremont Police Department, and they came and arrested the students.<br>…<br>Q. What did the FJP statement on that incident say?<br>A. To the best of my recollection, one of our main concerns was the fact that they were heavily armed police with long guns that had been brought in to arrest students who were peacefully protesting. There was no weapons or violence that I am aware of. And as I recall, the substance—or some part of the substance of the statement was that Pomona has a history of student engagement and activism and social issues. And, in fact, if you go to the Pomona College website—I can't remember the year; it was 1993 or 1994. But they celebrate a student sit-in at the office of the president, which was instrumental to—I think it was reforming hiring practices and treatment of race and racial discrimination in hiring at Pomona, although I can't remember the specifics. And so drawing a contrast between the history with which, as far as I am aware, similar types of protests were treated. |
| 114 | Q. Other than those two statements, the February 2024 statement and the April 2025 statement that you contributed to drafting, did you contribute to drafting any other statements for FJP?<br>A. Yes.<br>Q. What statements were those?<br>A. There was one, I believe, in October 2024.<br>Q. Okay. And what did that statement say?<br>A. That statement was talking about the ongoing genocide in Gaza and largely providing updated information as of October 2024 of the situation there. |
| 116-21 | Q. Okay. Other than drafting statements that FJP publishes, does FJP engage in any other activities?<br>A. I will need a moment to think. There were two in-person events which were small-scale demonstrations.<br>Q. Okay. When was the first one?<br>A. I believe it was in December 2024.<br>Q. And what was the purpose?<br>A. I was not involved in organizing it, so I can't speculate.<br>Q. Did you attend?<br>A. No.<br>Q. Have you heard anything about the event?<br>Ms. Gans: Objection; speculation. |

JA1526

Q. If you have?

A. I think, from what I have heard, it was some people holding signs outside of the library for maybe half an hour or so.

…

Q. What did the sign say?

A. I was not there.

Q. Were they supportive of Palestine?

Ms. Gans: Objection; speculation.

Q. If you know?

A. I would speculate yes.

Q. Critical of Israel?

A. I would speculate yes.

Q. The—moving on to the other in-person event, when was that?

A. It was sometime in spring of 2025, so maybe late March or early April.

Q. Okay. And what was the purpose of that event?

A. It was to express opposition to the administration's attempt to target students who have expressed positions in support of Palestine, particularly with respect to immigration.

Q. Did you organize that event?

A. No.

Q. Did you attend?

A. Yes.

Q. What did you do at the event?

A. We stood in a circle, and I think basically had a chance for individuals to express their feelings on the situation.

Q. Did you express your feelings on the situation?

A. Yes.

Q. What did you say?

A. I don't remember my specific words.

Q. Just the sentiment.

A. The sentiment was, yeah, that students are scared of being targeted for their political positions that they have expressed and that that's not acceptable, and it's also taking the focus away from human-rights violations against Palestinians.

Q. Did anyone there express a fear—I'm sorry. Did you personally express a fear that you would be targeted?

A. No.

Q. Did anyone there express a fear that they personally would be targeted?

A. Not that I recall.

Q. Were there noncitizen students present, if you know?

Ms. Gans: Objection; speculation.

Q. If you know?

A. I don't believe there were any students.

Q. Were there noncitizen faculty members there, if you know?

A. I was there.

Q. You were not a citizen at that point?

A. I was not a citizen at that point. I don't know. I don't know the immigration status of the other people there.

Q. And so these faculty members were raising concerns—if they were not raising concerns about being personally targeted, they were raising concerns that other noncitizens would be targeted?

Ms. Gans: Objection to form.

Q. Were they raising concerns that other noncitizens would be targeted?

A. Yes.

8

JA1527

| | |
|---|---|
| | Q. Were they raising concerns that their students would be targeted?<br>A. Yes.<br>Q. Concerns that their colleagues would be targeted?<br>A. Yes.<br>…<br>Q. Did anyone reference a specific person who feared they would be targeted?<br>A. Not that I can recall. |
| 122-26 | Q. Has it held meetings? [FJP]<br>A. Yes.<br>…<br>Q. What happens at meetings, generally?<br>Ms. Gans: Objection; vague.<br>Q. You can answer.<br>A. I would say that people talk about what's happening on their campuses, both with respect to any discussion of divestment or just whatever is the vibe on the campus, and then if there are specific needs, those would be discussed as well.<br>…<br>Q. What are the concerns raised related to deportation?<br>Ms. Gans: Objection as to form.<br>Q. You can answer.<br>A. As best I can recall, because of course, people have different perspectives, but I think fear that individuals who participated in protests or who express pro-Palestinian positions would be targeted for visa revocation or deportation.<br>Q. And you don't have specific examples?<br>A. No, not that I can recall.<br>Q. What has caused this fear?<br>Ms. Gans: Objection as to form.<br>Q. If you know.<br>Ms. Gans: And speculation. It's not really clear who you are asking about.<br>Q. So the people who have raised concerns related to deportation, what has caused their concerns?<br>Ms. Gans: Objection as to form. It's—and speculation. It's…<br>Q. If you know.<br>A. I can talk about my concerns which I voiced, I believe, at one of the meetings. And for me, you know, my concern started with the executive order shortly after the inauguration which, to my understanding, announced an interest in targeting pro-Palestine protesters. Personally, I became much more frightened after the detentions of Mahmoud Khalil and Rumeysa Ozturk.<br>Q. And were you frightened only because of the executive orders?<br>A. Sorry. Could you clarify? I'm not sure I understand.<br>Q. Was there anything else that you made you frightened other than the executive orders?<br>A. Well, as I mentioned, it was not just the executive order. It was the fact that Mahmoud Khalil and Rumeysa Ozturk, Mohsen Mahdawi, and others who have been detained on these grounds and in attempt to, in some instances, revoke permanent resident status and deport those individuals. So the concerns were my immigration status.<br>Q. Okay. So the concerns were based on the executive order and then on immigration actions taken against other individuals?<br>A. To my recollection, yes.<br>Q. Were your fears based on anything else?<br>A. Not that I can recall.<br>Q. Do you recall what specifically in the executive orders raised your concerns?<br>Ms. Gans: Objection; lack of foundation. |

JA1528

| | |
|---|---|
| | Q. If you remember or if you know?<br>A. I don't remember the specific text of the executive order.<br>Q. What is your understanding of the executive order?<br>A. I'm not sure.<br>Ms. Gans: Objection as to form. And if you want to refresh his recollection, show him the executive order. That might help him. |
| 128-31 | Q. Do you attend political protests?<br>Ms. Gans: Objection; vague.<br>Q. You can answer.<br>A. I have attended political protests.<br>Q. In the past year, have you attended political protests?<br>A. Yes.<br>Q. And when was this?<br>A. I attended a protest in June—I can't remember the specific day. June 7th of this year.<br>Q. What was the purpose of that protest?<br>A. That protest was to oppose politically the deployment of the National Guard in Los Angeles.<br>Q. Okay. Have you attended any other political protests this year?<br>A. Yes.<br>Q. When?<br>A. I attended a protest—I can't remember exactly when, but it was one maybe mid April.<br>Q. Mid April of this year, 2025?<br>A. '25, yes.<br>Q. And what was the purpose of that protest?<br>A. That was, I believe, part of the No Kings protests in Claremont.<br>Q. Any other protests you have attended this year?<br>A. In 2025?<br>Q. Uh-huh.<br>A. I don't know if you count the small gathering at the library I already talked about—<br>Q. Yeah, okay. We talked about that one.<br>A. I can't recall any others.<br>Q. Okay. You talked about the protests you attended in April was part of a—the No Kings movement. Can you describe that?<br>A. I don't actually know what the No Kings movement is.<br>Q. You attended the—why did you attend the protest?<br>A. I knew—or I believed that the topic of the protest was opposing the actions of the new administration with respect to funding for science and just the operation of the Government. So that was my understanding of the event.<br>Q. So you understood that you were there protesting the Government's decisions with respect to funding science and, you said, the operation of the Government. Can you explain what you mean by that?<br>A. Well, what I mean is the actions of DOJ, the hollowing out of the Federal Government, the executive not spending money that's been allocated by the legislative branch. |
| 131-32 | Q. So other than the demonstrations that we have talked about that you have attended which you have expressed support for Palestine, have you attended any other rallies supportive of Palestine?<br>A. What time frame?<br>Q. Let's say 2023 to present.<br>A. Yes.<br>Q. And when did you attend those rallies?<br>A. I attended a rally in October of 2024. |

JA1529

| | |
|---|---|
| | Q. Where was that rally? |
| | A. That was at Pomona College. |
| | Q. And what was the purpose? |
| | A. My purpose for being there was to protest in support of the colleges divesting, BDS. |
| | Q. Any other— |
| | (Reporter interruption.) |
| | A. BDS, boycott divestment sanctions |
| | Q. Any other protests you have attended supportive of Palestine dating 2023 to present? |
| | A. I attended a protest—I can't recall exactly when it was; October or November, 2023. |
| | Q. Okay. What was the purpose of that protest? |
| | A. My purpose for being there was advocating for a ceasefire in Gaza. |
| | Q. Any other protest supportive of Palestine 2023 to present that you have attended? |
| | A. I attended a protest—again, I can't remember the precise date; perhaps November or December of 2023. |
| | Q. And the purpose of that protest? |
| | A. The protest was to advocate for Judy Chu, who is a local representative in Congress, to support a ceasefire. |
| | Q. Okay. Any other protests supportive of Palestine, 2023 to present, that you have attended? |
| | A. Not that I can recall. |
| 132-33 | Q. So you said you are currently a United States citizen; correct? |
| | A. Yes. |
| | Q. When did you become a citizen? |
| | A. April—I believe April 23rd, 2025. |
| | Q. Okay. And prior to that, you were a lawful permanent resident? |
| | A. Correct. |
| | Q. When did you become a lawful permanent resident? |
| | A. In March 2019. |
| | Q. How did you become a lawful permanent resident? |
| | A. I was sponsored by Harvey Mudd College. |
| 135 | Q. Did you have to appear for an interview before you naturalized? |
| | A. Yes. |
| | Q. And when was that interview? |
| | A. Also April 23rd, 2025. |
| | Q. So you naturalized the same day of your interview? |
| | A. Correct. |
| | Q. How long was the interview? |
| | A. Are you including the civics test and reading comprehension? |
| | Q. Just how long did you talk to an officer? |
| | A. I would estimate 20 minutes, but I can't remember the specifics; 15 or 20 minutes, maybe. |
| 136-37 | Q. Has anyone ever threatened to revoke any immigration status that you have ever held? |
| | A. Not that I am aware of. |
| | Q. Have you ever been fearful of having an immigration status revoked? |
| | A. Yes. |
| | Q. When? |
| | A. In March and April of 2025. |
| | Q. Why were you fearful that your immigration status would be revoked? |
| | A. Because attempts to revoke immigration status of other people who have expressed pro-Palestine positions. |
| | Q. Did any specific actions of the Government other than the ones you have described cause you to be fearful that your immigration status would be revoked? |

JA1530

| | |
|---|---|
| | A. Yes.<br>Q. Which actions?<br>A. The attempts at mass revocations of visas which I—yeah, of student visas.<br>Q. Can you describe what you mean by that?<br>A. There was a period of time in—I cannot remember exactly when—March or April of 2025 when students were having their visas revoked without any notification. Their status records were being deleted without the institutions being notified. People were being detained. It was a very scary time as an immigration to be in the country.<br>Q. Are you referring to specific individuals?<br>A. No.<br>Q. So do you know anyone who has had their visa revoked?<br>A. No.<br>Q. Do you know anyone who has been placed in immigration proceedings?<br>A. No.<br>Q. Do you know other people who are fearful of their visas being revoked?<br>Ms. Gans: Objection; speculation.<br>Q. If you know.<br>A. Not that I can say.<br>Q. Do you know of anyone fearful that they will be arrested, detained, or deported?<br>Ms. Gans: Same objection.<br>Q. You can answer.<br>A. Not that I recall.<br>Q. All right. Couple more immigration questions. Have you ever been denied entry into the United States for any reason?<br>A. No.<br>Q. Have you ever been stopped and questioned at a United States border?<br>A. What do you mean by "stopped and questioned"?<br>Q. So, for example, have you ever been referred to secondary inspection at customs when flying back to the United States?<br>A. Not that I can recall. I remember going into the secondary inspection building when I, you know, entered on my F-1 visa, but I think that was because of the visa, not because of being called in. That's the only time I can recall.<br>Q. Okay. And what year was that?<br>A. 2007.<br>Q. Okay. And so other than that instance, whether land or air border, you've never—I guess "air border" is not a thing. But whether land or airport borer, you have never been referred for secondary inspection other than that instance we discussed?<br>Ms. Gans: Objection as to form.<br>Q. You can answer.<br>A. Not that I can recall. |
| 152-53 | Q. Thank you. Other than those five documents that I have just shown you, do you— other than the five documents that I have just shown you and the AAUP statements and FJP statements that we discussed earlier, have you written anything else dealing with the topic of Palestine or Israel?<br>Ms. Gans: Objection; compound.<br>Q. You can answer.<br>A. You are asking if I have written anything else about Palestine and Israel apart from these documents?<br>Q. Yes. And the documents that we discussed before, the FJP and AAUP statements; apart from that.<br>A. Can you clarify what you mean by writing anything? That feels very broad.<br>Q. Yeah. Sorry. Published anything. "Published" being in print or online. |

12

JA1531

| | |
|---|---|
| | A. I recall that for a few of these, I shared them on my Facebook wall. I don't know if that would count.<br>Q. Okay. But any—I'm sorry. I didn't mean to cut you off.<br>A. No. Please go ahead.<br>Q. Any other statements, not just re-sharing these statements that we have discussed or the ones that we discussed earlier, any additional writings that you published online or in print regarding Palestine and Israel?<br>Ms. Gans: Objection; vague.<br>A. Not that I can recall. |
| 153-54 | Q. Have you posted on Facebook related—have you made Facebook posts related to Palestine and Israel?<br>A. Yes.<br>Q. What is the content of those posts?<br>Ms. Gans: Objection; vague.<br>Q. What do those posts say?<br>Ms. Gans: Objection; vague.<br>Q. If you can answer.<br>A. The posts that I can recall are largely sharing documents, the documents that are shown here, and as far as I can recall, trying to let those documents speak for themselves.<br>Q. Do you recall any other posts related to Palestine and Israel?<br>A. Not that I can recall. I am not a very active Facebook user. |
| 154 | Q. Okay. What about Bluesky, have you posted on Bluesky related to Palestine and Israel?<br>Ms. Gans: Objection; vague.<br>Q. You can answer.<br>A. I have not posted anything on Bluesky. |
| 154-55 | Q. What about Twitter or X, have you posted anything on Twitter or X related to Palestine and Israel?<br>Ms. Gans: Objection; vague.<br>A. I have not posted anything on Twitter.<br>Q. Have you reposted anything on Twitter?<br>A. No. |
| 155 | Q. How about on Instagram, have you posted anything on Instagram related to Palestine and Israel?<br>A. I have not posted anything on Instagram. |
| 155 | Q. Going back to your Facebook posts related to Palestine and Israel, during what time period did you make those posts, if you remember?<br>A. I remember I posted in and around October/November of 2023, and there were maybe a few other posts in spring of 2024, but I can't recall specifics.<br>Q. And those are the only posts you remember in the fall of 2023 and the spring of 2024?<br>A. That's all I can recall right now. |
| 156 | Q. Okay. So, then, I'll focus on your Facebook account. Did you change what you posted at all in 2025?<br>A. I deactivated my Facebook.<br>Q. In 2025, you deactivated your Facebook?<br>A. Yes.<br>Q. In what month?<br>A. I believe it was in March.<br>Q. And is it still deactivated today?<br>A. No.<br>Q. When did you reactive it?<br>A. After my naturalization interview.<br>Q. Why did you deactivate it in March of 2025? |

JA1532

| | |
|---|---|
| | A. I was scared, as we had discussed earlier, about the ways in which people who had expressed pro-Palestine views were being targeted for immigration purposes, and so I felt it was safest to deactivate the account.<br>Q. What made you scared specifically?<br>Ms. Gans: Objection. I think the witness ahs answered this question several times.<br>Q. Well, I am asking him. He hasn't raised that he deactivated his Facebook account. I am asking him what—I can phrase it differently. What action of the Government caused you to deactivate your Facebook account?<br>A. The—to my recollection, the detention and attempts to revoke immigration status for Mahmoud Khalil and Rumeysa Ozturk.<br>Q. Any other action of the Government that caused you to deactivate your Facebook account?<br>A. As I said earlier, the environment around visa revocations, just that it seemed it was a fraught time for immigrants. So I deactivated in that context.<br>Q. Any specific statement of the Government that caused you to deactivate your Facebook account?<br>A. Like I said, the apprehension and attempts to revoke immigration status and deport individuals like Mahmoud Khalil and Rumeysa Ozturk. |
| 159-71 | Q. Do you agree that there is an ideological deportation policy?<br>A. Yes.<br>Q. What is it?<br>Ms. Gans: Objection; speculation.<br>Q. How would you define the Government's ideological deportation policy?<br>Ms. Gans: Same objection.<br>Q. You can answer.<br>A. Well, I've heard members of the administration all the way up to the President talk in very broad terms about deporting, you know, basically everybody or huge numbers of people who are expressing speech in support of Palestine by casting it as anti-Semitic and a danger. And, like I said, the actions of detaining and trying to revoke the immigration status of people like Mohsen Mahdawi, Rumeysa Ozturk, Mahmoud Khalil, that's just the tip of the iceberg. We have heard even that they are interested in going after citizens or naturalized citizens. So I think from what I have seen in the media and reported about this, to me it seems that there is a very clear connection between the speech that they are targeted that is in support of Palestine and both rhetoric around deportation, but also actions.<br>Q. Are you referring to specific statements of the President?<br>A. I can't disentangle individual statements. So at this point, to me, it's kind of a cloud of things. So no, I can't point to a specific statement.<br>Q. You mentioned rhetoric. Can you point to specific rhetoric?<br>Ms. Gans: Objection. I think the witness just answered that question.<br>Q. Okay. You can answer.<br>A. Like I said, posts on social media, executive orders, conflation of people who support Palestine with anti-Semitism or terrorism all being used. So, yeah, I guess that's what I mean by that.<br>Q. And these are whose posts on social media?<br>A. I can't remember specifics.<br>Q. Are you talking about posts by the Government on social media?<br>A. I feel like I have seen posts by individuals. I don't know if they are speaking—you know, understanding the difference between them speaking in a governmental capacity or personal capacity.<br>Q. What individuals are you referring to? |

14

JA1533

A. The best I recall, the ones that come to mind are Trump and Rubio, but there were probably others I am not remembering.

Q. Okay. So other than Trump and Rubio, you don't remember other individuals who have made statements of the type you are discussing?

A. I don't recall specifics.

Q. Okay. Do you remember anything specific about Mr. Trump or Mr. Rubio's statements?

A. The statement about Rubio that I seem to remember—again, this is going back months, so I don't, you know, promise to have everything straight. But I seem to recall when, in the case of Mahmoud Khalil and Rumeysa Ozturk, posts indicating that they, you know, were running against the foreign-policy interests of the United States and that posts about how—you know, if we invite people into our country but they say things we don't like, then we can—should be able to kick them all out, and so on.

Q. And where did you see these statements?

A. Probably on X.

Q. Okay.

A. I believe they were also reported in the media, to my knowledge.

Q. So with respect to the Government conduct that you were just discussing, has that conduct affected your speech in any way?

A. Yes.

Q. How?

A. Well, one thing that I have already mentioned was the deactivating of my Facebook account, removing myself from social media, having access to seeing other people's posts. In another instance, some students—a student group was planning to be part of what they refer to as Palestine solidarity week where they invited filmmaker Alana Hadid to, basically, give a talk, and they were looking for a faculty member to moderate the discussion, the question-and-answer, and I was asked if I would fill that role. And ordinarily that would be something I would have been happy and excited to do, but I refused because I was concerned about the repercussions that it could have in terms of my immigration status.

Q. And when was that scheduled?

A. That was in early April 2025.

Q. Okay. And do you know if the event went forward?

A. I didn't attend.

Q. Do you know if it occurred?

A. It did.

Q. So other than deactivating your Facebook and turning down the opportunity to moderate that event, has your speech been impacted in any other way?

A. I also—I was more careful about any indication that—of my expression of views and their pro-Palestine at work. For example, as we discussed at the AAUP, there was this April 17th day of action. And at the national level, there were a number of webinars, and many of the webinars touched on the issue of Palestine, anti-Semitism on campus, those sorts of things. And ordinarily I would have shared the information with my campus to— you know, if they wanted to attend those events, but I chose not to. And so when advertised the event, the local event at the Claremont Colleges, I didn't link to any of the national information. I just—that I recall. I think I just linked to the announcement that we had for this viewing of something because I didn't want there to be any reference to Palestine in that information that I was sharing with my colleagues.

Q. Okay. And you share that information via e-mail?

A. Yes.

…

15

JA1534

Q. Okay. So we were talking about ways that your speech has been affected by the Government conduct that you mentioned in your response a few moments ago. Any other ways your speech has been affected? You mentioned deactivating your Facebook, turning down the moderation of an event. You said you have been more careful about expressing pro-Palestinian views at work including not including links to certain national AAUP webinars. Any other way that your speech has been affected by governmental action?

Ms. Gans: Objection as to form.

Q. You can answer.

A. So, yeah. The e-mailing of—it's not just about that one event. For instance, there was an event on anti-Semitism on campus that I think ordinarily would have sent out that I did not send out, not as an AAUP representative but just as someone who is concerned about these topics. In another instance, as I mentioned, there was an event that took place in April 2025 where there was a small gathering at the library, and I did go, but I removed myself from any discussions of—of the event. You had asked if I had organized it, and I said no, and I think one of the reasons why is because they did not want to be tied to any kind of event that was taking place on campus that would be linked to Palestine.

…

Q. Okay. Any other ways your speech has been impacted?

A. I mean, there is a general climate of fear, I would say, that stems from not just Palestine. Like I said, there's concerns about the executive orders around DEI and policing speech about a whole range of social issues on campus. And so I would say that just in general, I have experience maybe a reticence to express political opinions or, you know, to talk about my status as a noncitizen at the time because of concerns that if that were to come out and someone were to report me, that that could have issues.

…

Q. Okay. Beyond speech, any other way that you can think that your behavior in general was affected?

Ms. Gans: Objection; vague.

Q. You can answer.

A. Like I said, I think it was not wanting to do anything that would draw attention to myself. So, you know, e-mails, you know if—I did send a few e-mails on the topic of –to the college president about, you know, visa revocations, but I kept the list—you know, these were not being shared with the whole faculty. It was with a smaller number of people because I was concerned about being tied to any kind of advocacy around immigration. So I can't remember what the question was. Could you repeat it please?

Q. The question was: beyond speech, is there any way that the Government conduct you described before affected your behavior?

A. I was scared. I was supposed to go—well, so I mentioned I went to this conference in Germany at the beginning of June. And I had originally said yes, that i would absolutely go when I was invited the first—maybe it was the first week of February or last week of January. And then after the instance we have discussed involving the detentions and deportation, I made the decision that I was not going to leave the country until after—if I received my citizenship, after I received my citizenship. And so in that sense, I was changing my behavior. Now, it turns out that—at that time, I didn't even know when my interview was going to be scheduled. It had not been scheduled yet, but then it got scheduled for the end of April. And so I was ultimately—felt comfortable going. But that's an instance of behavior that changed. Another instance was being scared in the lead-up to my naturalization interview and being concerned that my interview was a week after the detention of Mahmoud Khalil, who was detained at his naturalization interview. And so apart from just a major amount of fear and anxiety, I think I took steps that I otherwise probably would not have in the lead-up to the interview.

16

JA1535

| | |
|---|---|
| | Q. What steps were those?<br>A. So, for example, I was worried about being detained, and so I made arrangements with my husband to take care of some domestic things if I was not going to be there and, you know, to contact the chair of the department if I had been detained to figure out my teaching schedule, things like that, that I don't think I would have done otherwise. |
| 171 | Q. When did you submit your naturalization application?<br>A. August 2024, I believe; end of August 2024, potentially beginning of September, but I think it was the end of August. |
| 172-73 | Q. I want to ask you now about whether you know anyone else whose speech has been affected by the Government conduct that you have referenced. So do you know anyone?<br>A. No, not that I am aware of.<br>Q. You are not aware of any other people whose speech has been affected by the Government conduct?<br>Ms. Gans: I think the witness just answered that question.<br>Q. I was confirming his answer.<br>A. Of specific individuals?<br>Q. Specific individuals, no. Okay. No one has told you that—has anyone told you that they are fearful, based on actions of the Government related to the conduct that you referenced earlier, the Government conduct you referenced earlier?<br>Ms. Gans: Same objection, and objection as to form.<br>Q. Okay. You can answer.<br>A. Not that I can recall. |
| 175- | Q. So h as an action of the Government ever caused you to stop attending public protests?<br>Ms. Gans: Objection as to form.<br>Q. You can answer.<br>A. I was certainly being more careful about attending protests, but I can't think of a specific instance.<br>…<br>Q. Okay. Has an action of the Government ever caused you to hesitate to engage publicly on issues related to Palestine and Israel?<br>Ms. Gans: Objection as to form.<br>Q. You can answer.<br>A. Yeah, can you clarify what you mean by "engage publicly"?<br>Q. So, I guess, speak at meetings that are open to the public?<br>A. By "public," you mean, like, the general public?<br>Q. Just –<br>A. What do you mean by "public"?<br>Q. So has an action of the Government ever caused you to not make statements on issues related to Palestine and Israel?<br>Ms. Gans: Objection as to form.<br>Q. You can answer if you can.<br>A. And so by "statements"—I am just trying to make sure I answer the question correctly. What do you mean by that?<br>A. So anything that you would say orally or write related to Palestine and Israel, has an action of the Government ever caused you to hesitate to make such statements?<br>Ms. Gans: Objection as to form. It's vague. Any statement ever?<br>Q. In 2025.<br>Ms. Gans: Same objection. I think I am just not following the question.<br>Q. Okay. You can answer if you can.<br>A. As we mentioned already, I deactivated my Facebook. There are instances where I had posted about Israel and Palestine and I—to my recollection, I have not posted about the |

17

JA1536

effects on immigration for people who are advocating for that, and so I think that would be an example.

Q. Have you ever resigned from any groups based on an action of the Government in 2025?

Ms. Gans: objection as to form.

Q. You can answer.

A. Not that I recall.

Q. Have you ever stepped back from or foregone leadership roles in any groups related to—or based on an action of the Government in 2025?

A. Sorry. Can you say—it was stepped back?

Q. Stepped back from or elected not to take a leadership role in any organizations based on actions of the Government in 2025?

Ms. Gans: Objection as to form, again, and it's vague.

A. I did not step down from any leadership position, but as I mentioned, I was more careful about, you know, what I was saying or, you know, how I might be connected to events in AAUP and FJP.

Q. Have you ever, based on actions of the Government in 2025, declined opportunities to publish scholarship related to your work?

A. No.

Ms. Gans: Objection as to form.

A. Sorry. Can you clarify what you mean by my "work"?

Q. So your work as a professor at Havery Mudd College.

A. Like teaching? Research?

Q. Yes.

A. Any of the above? Not that I can think of.

Q. Okay. What about opportunities to publish unrelated to your job, have you declined any of those based on actions of the Government in 2025?

Ms. Gans: Objection as to form, and vague.

A. I don't have any specific instances. I do know that periodically there are opportunities to sing on to statements, you know, which we have already seen, and I think, basically, any instances that came up, I was being vey thoughtful about what I would be willing to sing on to. So I remember that feeling. I can't think of a specific instance where I, you know, absolutely would have and now didn't, but it was certainly a running concern since early March of 2025, or between then and the time of my citizenship and review.

…

Q. Did you ever remove any of your previously published work form the Internet based on actions of the Government in 2025?

Ms. Gans: Objection as to form.

Q. You can answer.

A. Any published work on anything?

Q. Yes.

A. I don't have any recollection of taking my name off anything, but that is a very broad question. So, yeah.

Q. So I was asking about your conduct. Do you know who, based on actions of the Government in 2025, has stopped attending public protests?

A. No, I don't.

Q. Do you know anyone who has resigned from campus groups based on actions of the Government in 2025?

A. Not to my knowledge.

Q. Do you know students who, based on actions of the Government, have stopped contributing to classroom discussions?

Ms. Gans: Objection as to form, and speculation.

18

JA1537

| | |
|---|---|
| | Q. You can answer.<br>A. I have heard from colleagues. A colleague was teaching a course on one of the texts—it was a course on graphic novels, and one of the texts was one of Joe Sacco's graphic novels about Palestine, and that individual reported to me that there was a sense of fear, but I have not directly observed that. That doesn't come up often in physics.<br><br>[more about other people] |
| 202-03 | Q. One final question. Do you feel that in 2025 you have been harmed by conduct of the Government?<br>Ms. Gans: Objection; vague, lack of foundation.<br>Q. You can answer.<br>A. Yes.<br>Q. How do you feel you have been harmed?<br>Ms. Gans: Same objection<br>A. I feel like I have already gone over the ways in which I have been affected, but the ways in which I have not engaged in speech, you know, not hosting moderated events or not sending messages that I wanted to send, the fear that I have nor that I had about the immigration implications and my pro-Palestine advocacy. And even now as a citizen, having heard, you know, social media posts about going after citizens, that remains something that I have some fear about. And, yeah, I think all of those things have contributed to harm that I have experienced. |

19

JA1538

activity?

A.   I do not know with certainty.

Q.   Setting 9 FAM aside for a moment, what is your understanding of what it means for a person to demonstrate a quote degree of public approval or public advocacy or terrorist activity or a terrorist organization?

MS. SANTORA:  I'm sorry.  Can you repeat the question?

BY MS. CONLON:

Q.   Sure.  Setting aside 9 FAM, what is your understanding of what it means when it states quote a degree of public approval or public advocacy or terrorist activity or a terrorist organization?

A.   Seems speculative.

Q.   I'm asking --

A.   My understanding?

Q.   Well, you are the person who approved the cable, so what do you understand that to mean?

A.   Well -- I'm sorry, could you repeat the question?

Q.   Sure.  What do you understand this statement in the cable to mean, quote a

JA1539

degree of public approval or public advocacy or terrorist activity or terrorist organization?

A.    I would understand that to mean, for example, public statement, I support Hamas.

Q.    Would you understand it to mean something less explicit than that?

MS. SANTORA:  Objection.  Form.

MS. CONLON:  You can answer.

THE WITNESS:  Am I required to answer?

MS. SANTORA:  Uh-huh.

A.    It could.  It would depend on the situation where it was at.  Maybe there's some hand sign that could be made in a crowd that shows you're supporting Hamas.  Terrorist and other groups use hand signs or symbols.

BY MS. CONLON:

Q.    The next part of the sentence or the following sentence says [As read] "This may be evident in conduct if there is a hostile attitude towards U.S. citizens or U.S. culture including Government, institutions or founding principals."

What do you understand that to mean?

A. A rejection of our system, the U.S. system of Government based on our founding documents, in particular Declaration of Independence and the Constitution.

Q. What do you understand the provision here about hostility toward U.S. culture to mean?

A. An unjustified rejection of U.S. -- clear U.S. cultural things or icons.

Q. Can you give me an example?

A. Like burning the U.S. flag.

Q. What do you understand the phrase "a hostile attitude toward U.S. citizens" to mean?

A. Would be -- this is speculative because you're asking my opinion.

Q. I'm asking your opinion, yes.

A. My opinion. Not secretary Rubio's?

Q. Unless you're in a position to give that?

A. I am not. I am definitely not.

Q. Yes.

A. It would be a blanket condemnation: All Americans are fat and evil.

JA1541

It would not be:  I hate hot dogs.

Q.   Now, you mentioned earlier that 9 FAM addresses the endorse or espouse language.   Is there any guidance from the State Department that addresses the language we have just discussed?

A.   I do not know.

Q.   It goes on to say, to refer to advocacy or sympathy for foreign terrorist organizations.

What do you understand that to mean?

A.   Advocacy, public declarations of support.

Q.   What about sympathy?

A.   Public declarations of a good feeling toward a terrorist organization or a positive statements about their activities or advocacy could be encouraging people to donate money to a terrorist organization.  Yes, advocacy in my opinion can be an action, not just a statement.  But that is only my opinion.

Q.   I'm going to give you some examples of statements, and I would like to understand whether in your understanding, they meet the criteria set forth in this paragraph.

JA1542

A.   Can I just review the paragraph briefly before you give the statements?

Q.   Please.  Absolutely, will you please read paragraph 9?

A.   Thank you.

MS. SANTORA:  While he's reviewing, do you know about how much longer you plan to go before breaking?

MS. CONLON:  I'm very close to being done with this document, and then I'm happy to take a break for however long, if that is okay with you all.

MS. SANTORA:  Okay.  That's fine. Are you okay?

THE WITNESS:  Yes.  (Witness reviewing document. ) Thank you.  I have reviewed the cable.

BY MS. CONLON:

Q.   Would a statement calling for a free Palestine be covered by the language in paragraph 9 of this cable?

MS. SANTORA:  Objection.  Calls for speculation.

A.   It could be.  What is it?  From the mountains to the sea?

JA1543

BY MS. CONLON:

Q.    A statement "from the river to the sea, Palestine will be free," is that a statement that could be covered by paragraph 9?

A.    It could be.

MS. SANTORA:    Objection.    Calls for speculation.

A.    It could be in my opinion, because by definition, it means the elimination of Israel and the Israeli people.

BY MS. CONLON:

Q.    Could a statement denouncing Zionism be covered by paragraph 9?

MS. SANTORA:    Objection.    Calls for speculation.

A.    In my opinion, yes, because Zionism just is Jewish patriotism or Israeli patriotism.

BY MS. CONLON:

Q.    Could a statement criticizing Israel's actions in Gaza be covered by paragraph 9?

MS. SANTORA:    Objection.    Calls for speculation.

A.    I think it would depend on the

JA1544

statement.

BY MS. CONLON:

Q.    What about a statement calling for an institutional divestment from Israel?

MS. SANTORA:    Same objection.

A.    It could be.

BY MS. CONLON:

Q.    What about a statement calling for an arms embargo on Israel?

MS. SANTORA:    Same objection.

A.    It could be, it would depend on phrasing too, but more so than divestment.

BY MS. CONLON:

Q.    What about a statement calling for limiting military aid to Israel?

MS. SANTORA:    Same objection.

A.    Yes.

BY MS. CONLON:

Q.    What about a statement calling for humanitarian aid to Palestine or Palestinians?

MS. SANTORA:    Same objection.

A.    It would depend, but probably no.

BY MS. CONLON:

JA1545

Q.    A statement calling for a cease fire?

MS. SANTORA:  Same objection.

A.    No.

MS. SANTORA:  Sorry.  Same objection, you can answer.

A.    Our Government has called for a cease fire.  The President has called for a cease fire.  So no.

BY MS. CONLON:

Q.    What about a statement criticizing Israel for being a religious state?

MS. SANTORA:  Same objection.

A.    It could be.  Possibly.  I would need to know the details in a lot of these.  In a vacuum, it's hard to make a determination, and I think the language of this, it also talks about gathering as much evidence as possible, so...

BY MS. CONLON:

Q.    Is a statement calling Israel an Apartheid state covered, in your opinion, by the language in paragraph 9?

MS. SANTORA:  Same objection.

A.    Yes, probably.

JA1546

BY MS. CONLON:

Q.    Is a statement that compares Israeli policy to that of the Nazis covered by the language in paragraph 9?

MS. SANTORA:   Same objection.

A.    I believe so, yes.   You mean Nazi Germany, yes?

BY MS. CONLON:

Q.    Yes.   Is a statement criticizing the state of Israel as a racist endeavor; would that be covered by paragraph 9?

A.    Yes.

MS. SANTORA:  Same objection.

BY MS. CONLON:

Q.    Paragraph 9 also as we discussed speaks of bearing a hostility towards U.S. citizens or U.S. culture.  Could a criticism of the administration be covered by paragraph 9?

MS. SANTORA:  Same objection.

A.    It could be.  It would depend on what words were used.

BY MS. CONLON:

Q.    Could a criticism of administration's policy or actions of Israel be

covered by paragraph 9?

A.    Possibly.

MS. SANTORA:  Sorry, same objection.

A.    Sorry.

MS. CONLON:  I understand you have a standing objection.

MS. SANTORA:  Standing objection to hypotheticals as speculative.  Calling for speculative.

A.    Possibly, it would depend on the phrasing and what words were used.

BY MS. CONLON:

Q.    So you have said some of these statements could be covered by this policy, correct?

A.    In my opinion?

Q.    Yes.

A.    Speculatively, yes.

Q.    And I understand you say "speculatively," but isn't the Bureau of Consular Affairs involved in the application of this policy?

A.    Yes.

Q.    In other words, the Bureau of Consular Affairs is in the position of needing

JA1548

revocation of student Visas?

A. I have not had such an occasion.

Q. Do you have the occasion to speak with anyone in the White House about the revocation of student Visas?

A. I have had such occasion.

Q. Approximately, how many times?

MS. SANTORA: That's fine. Sorry.

A. Five, 10, 15 -- no, I have to raise any number because it's -- and I apologize because as I sit here I remember -- I talk to dozens of people all throughout the day.

BY MS. CONLON:

Q. I understand.

A. So the number of total conversations was probably more. More than -- over 20. And I would say on at least a dozen occasions I had spoken with someone in the White House about the revocation of student Visas and the revocation of the non-immigrant Visas in general, student Visas being part of that set.

Q. Who in the White House have you

JA1549

spoken with about the revocation of student Visas?

A.    Steven Miller.

Q.    Anybody else?

A.    Yeah, his deputy Tony.

Q.    His deputy Tony?

A.    I don't know the deputy's name. Adam, help me out guys.

MR. BEAUMONT:    Lason.

A.    Adam Lason.    Thank you.

BY MS. CONLON:

Q.    Approximately, how many times have you spoken with Steve Miller about the revocation of student Visas?

A.    I would estimate over a dozen.

Q.    Did most of those conversations take place in March, the beginning of your new role?

A.    Yes.

Q.    Have you had any conversations with the President concerning the revocation of student Visas?

A.    No, I have never had a conversation with the President at all ever.

Q.    Me, either.  Okay.  At the

JA1550



Homeland
Security

September 30, 2021

MEMORANDUM TO:     Tae D. Johnson
Acting Director
U.S. Immigration and Customs Enforcement

CC:     Troy Miller
Acting Commissioner
U.S. Customs and Border Protection

Ur Jaddou
Director
U.S. Citizenship and Immigration Services

Robert Silvers
Under Secretary
Office of Strategy, Policy, and Plans

Katherine Culliton-González
Officer for Civil Rights and Civil Liberties
Office for Civil Rights and Civil Liberties

Lynn Parker Dupree
Chief Privacy Officer
Privacy Office

FROM:     Alejandro N. Mayorkas
Secretary

SUBJECT:     Guidelines for the Enforcement of Civil Immigration Law

This memorandum provides guidance for the apprehension and removal of noncitizens.

I am grateful to you, the other leaders of U.S. Immigration and Customs Enforcement, and our frontline personnel for the candor and openness of the engagements we have had to help shape this guidance. Thank you especially for dedicating yourselves – all your talent and energy – to the noble law enforcement profession. In executing our solemn responsibility to enforce immigration

1

JA1551

law with honor and integrity, we can help achieve justice and realize our ideals as a Nation. Our colleagues on the front lines and throughout the organization make this possible at great personal sacrifice.

## I. Foundational Principle: The Exercise of Prosecutorial Discretion

It is well established in the law that federal government officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders. The exercise of prosecutorial discretion in the immigration arena is a deep-rooted tradition. The United States Supreme Court stated this clearly in 2012:

> "A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all."

In an opinion by Justice Scalia about twelve years earlier, the Supreme Court emphasized that enforcement discretion extends throughout the entire removal process, and at each stage of it the executive has the discretion to not pursue it.

It is estimated that there are more than 11 million undocumented or otherwise removable noncitizens in the United States. We do not have the resources to apprehend and seek the removal of every one of these noncitizens. Therefore, we need to exercise our discretion and determine whom to prioritize for immigration enforcement action.

In exercising our discretion, we are guided by the fact that the majority of undocumented noncitizens who could be subject to removal have been contributing members of our communities for years. They include individuals who work on the frontlines in the battle against COVID, lead our congregations of faith, teach our children, do back-breaking farm work to help deliver food to our table, and contribute in many other meaningful ways. Numerous times over the years, and presently, bipartisan groups of leaders have recognized these noncitizens' contributions to state and local communities and have tried to pass legislation that would provide a path to citizenship or other lawful status for the approximately 11 million undocumented noncitizens.

The fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them. We will use our discretion and focus our enforcement resources in a more targeted way. Justice and our country's well-being require it.

By exercising our discretionary authority in a targeted way, we can focus our efforts on those who pose a threat to national security, public safety, and border security and thus threaten America's well-being. We do not lessen our commitment to enforce immigration law to the best of our ability. This is how we use the resources we have in a way that accomplishes our enforcement mission most effectively and justly.

2

JA1552

## II. Civil Immigration Enforcement Priorities

We establish civil immigration enforcement priorities to most effectively achieve our goals with the resources we have. We will prioritize for apprehension and removal noncitizens who are a threat to our national security, public safety, and border security.

### A. Threat to National Security

A noncitizen who engaged in or is suspected of terrorism or espionage, or terrorism-related or espionage-related activities, or who otherwise poses a danger to national security, is a priority for apprehension and removal.

### B. Threat to Public Safety

A noncitizen who poses a current threat to public safety, typically because of serious criminal conduct, is a priority for apprehension and removal.

Whether a noncitizen poses a current threat to public safety is not to be determined according to bright lines or categories. It instead requires an assessment of the individual and the totality of the facts and circumstances.

There can be aggravating factors that militate in favor of enforcement action. Such factors can include, for example:

- the gravity of the offense of conviction and the sentence imposed;
- the nature and degree of harm caused by the criminal offense;
- the sophistication of the criminal offense;
- use or threatened use of a firearm or dangerous weapon;
- a serious prior criminal record.

Conversely, there can be mitigating factors that militate in favor of declining enforcement action. Such factors can include, for example:

- advanced or tender age;
- lengthy presence in the United States;
- a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment;
- status as a victim of crime or victim, witness, or party in legal proceedings;
- the impact of removal on family in the United States, such as loss of provider or caregiver;
- whether the noncitizen may be eligible for humanitarian protection or other immigration relief;
- military or other public service of the noncitizen or their immediate family;

3

JA1553

- time since an offense and evidence of rehabilitation;
- conviction was vacated or expunged.

The above examples of aggravating and mitigating factors are not exhaustive. The circumstances under which an offense was committed could, for example, be an aggravating or mitigating factor depending on the facts. The broader public interest is also material in determining whether to take enforcement action. For example, a categorical determination that a domestic violence offense compels apprehension and removal could make victims of domestic violence more reluctant to report the offense conduct. The specific facts of a case should be determinative.

Again, our personnel must evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly. The overriding question is whether the noncitizen poses a current threat to public safety. Some of the factors relevant to making the determination are identified above.

The decision how to exercise prosecutorial discretion can be complicated and requires investigative work. Our personnel should not rely on the fact of conviction or the result of a database search alone. Rather, our personnel should, to the fullest extent possible, obtain and review the entire criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of the conduct at issue. The gravity of an apprehension and removal on a noncitizen's life, and potentially the life of family members and the community, warrants the dedication of investigative and evaluative effort.

C. Threat to Border Security

A noncitizen who poses a threat to border security is a priority for apprehension and removal.

A noncitizen is a threat to border security if:

(a) they are apprehended at the border or port of entry while attempting to unlawfully enter the United States; or

(b) they are apprehended in the United States after unlawfully entering after November 1, 2020.

There could be other border security cases that present compelling facts that warrant enforcement action. In each case, there could be mitigating or extenuating facts and circumstances that militate in favor of declining enforcement action. Our personnel should evaluate the totality of the facts and circumstances and exercise their judgment accordingly.

4

JA1554

### III. Protection of Civil Rights and Civil Liberties

We must exercise our discretionary authority in a way that protects civil rights and civil liberties. The integrity of our work and our Department depend on it. A noncitizen's race, religion, gender, sexual orientation or gender identity, national origin, or political associations shall never be factors in deciding to take enforcement action. A noncitizen's exercise of their First Amendment rights also should never be a factor in deciding to take enforcement action. We must ensure that enforcement actions are not discriminatory and do not lead to inequitable outcomes.

This guidance does not prohibit consideration of one or more of the above-mentioned factors if they are directly relevant to status under immigration law or eligibility for an immigration benefit. For example, religion or political beliefs are often directly relevant in asylum cases and need to be assessed in determining a case's merit.

State and local law enforcement agencies with which we work must respect individuals' civil rights and civil liberties as well.

### IV. Guarding Against the Use of Immigration Enforcement as a Tool of Retaliation for the Assertion of Legal Rights

Our society benefits when individuals – citizens and noncitizens alike – assert their rights by participating in court proceedings or investigations by agencies enforcing our labor, housing, and other laws.

It is an unfortunate reality that unscrupulous employers exploit their employees' immigration status and vulnerability to removal by, for example, suppressing wages, maintaining unsafe working conditions, and quashing workplace rights and activities. Similarly, unscrupulous landlords exploit their tenants' immigration status and vulnerability to removal by, for example, charging inflated rental costs and failing to comply with housing ordinances and other relevant housing standards.

We must ensure our immigration enforcement authority is not used as an instrument of these and other unscrupulous practices. A noncitizen's exercise of workplace or tenant rights, or service as a witness in a labor or housing dispute, should be considered a mitigating factor in the exercise of prosecutorial discretion.

### V. The Quality and Integrity of our Civil Immigration Enforcement Actions

The civil immigration enforcement guidance does not compel an action to be taken or not taken. Instead, the guidance leaves the exercise of prosecutorial discretion to the judgment of our personnel.

5

JA1555

To ensure the quality and integrity of our civil immigration enforcement actions, and to achieve consistency in the application of our judgments, the following measures are to be taken before the effective date of this guidance:

  A.  Training

Extensive training materials and a continuous training program should be put in place to ensure the successful application of this guidance.

  B.  Process for Reviewing Effective Implementation

A review process should be put in place to ensure the rigorous review of our personnel's enforcement decisions throughout the first ninety (90) days of implementation of this guidance. The review process should seek to achieve quality and consistency in decision-making across the entire agency and the Department. It should therefore involve the relevant chains of command.

Longer-term review processes should be put in place following the initial 90-day period, drawing on the lessons learned. Assessment of implementation of this guidance should be continuous.

  C.  Data Collection

We will need to collect detailed, precise, and comprehensive data as to every aspect of the enforcement actions we take pursuant to this guidance, both to ensure the quality and integrity of our work and to achieve accountability for it.

Please work with the offices of the Chief Information Officer; Strategy, Policy, and Plans; Science and Technology; Civil Rights and Civil Liberties; and Privacy to determine the data that should be collected, the mechanisms to collect it, and how and to what extent it can be made public.

  D.  Case Review Process

We will work to establish a fair and equitable case review process to afford noncitizens and their representatives the opportunity to obtain expeditious review of the enforcement actions taken. Discretion to determine the disposition of the case will remain exclusively with the Department.

**VI. Implementation of the Guidance**

This guidance will become effective in sixty (60) days, on November 29, 2021. Upon the effective date, this guidance will serve to rescind (1) the January 20, *2021 Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* issued by then-Acting Secretary David Pekoske, and (2) the *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* issued by Acting ICE Director Tae D. Johnson.

6

JA1556

We will meet regularly to review the data, discuss the results to date, and assess whether we are achieving our goals effectively. Our assessment will be informed by feedback we receive from our law enforcement, community, and other partners.

This guidance is Department-wide. Agency leaders as to whom this guidance is relevant to their operations will implement this guidance accordingly.

## VII. Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

JA1557



| | |
|---|---|
| **MRN:** | 25 STATE 26168 |
| **Date/DTG:** | Mar 25, 2025 / 251914Z MAR 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CVIS, CMGT, PTER, KFRD |
| **Captions:** | SENSITIVE |
| **Reference:** | 25 STATE 5914 |
| **Subject:** | (U) Action Request:  Enhanced Screening and Social Media Vetting for Visa Applicants |

1. (U) This is an action request.  **See paragraph 7**.

2. **(SBU) SUMMARY:**  The protection of our nation and its citizens is a consular officer's first consideration.  Pursuant to the implementation of Executive Order (E.O.) 14161 and E.O. 14188, known respectively as *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats* and *Additional Measures to Combat Anti-Semitism*, effective immediately, consular officers must refer certain student and exchange visitor (F, M, and J) visa applicants to the Fraud Prevention Unit (FPU) for a mandatory social media check as described below.  As the Secretary stated on March 16, "We don't want people in our country that are going to be committing crimes and undermining our national security or the public safety.  It's that simple.  Especially people that are here as guests.  That is what a visa is…It is a visitor into our country.  And if you violate the terms of your visitation, you are going to leave."  The Visa Office will host webinars for consular officers to discuss this guidance on April 3 and April 4, 2025.  **END SUMMARY.**

3. **(SBU) Consular Officers Play a Critical Role in Protecting National Security:**  As part of screening every case for potential ineligibilities, consular officers MUST ADDRESS any derogatory information indicating that a visa

applicant may be subject to the terrorism-related ineligibility grounds of the Immigration and Nationality Act (INA). This includes advocating for, sympathizing with, or persuading others to endorse or espouse terrorist activities or support a DESIGNATED FOREIGN TERRORIST ORGANIZATION (FTO).

4. **(SBU) Every Visa Decision is a National Security Decision:** In Ref A, the Visa Office directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security. Any nonimmigrant visa applicant who has not established to a consular officer's satisfaction that the applicant meets all standards required in that visa classification should be refused under 214(b), as appropriate. This includes establishing that the applicant does not intend to engage in activities inconsistent with the requested visa status. If 214(b) does not apply to the visa classification, consular officers should refuse any nonimmigrant or immigrant visa case presenting such concerns under section 221(g) of the INA for further review of additional ineligibility grounds, **LE** **LE** as appropriate.

5. (U) This was reflected well by the Secretary's statement on March 16, that "when you apply to enter the United States and you get a visa, you are a guest…if you tell us when you apply for a visa, 'I'm coming to the U.S. to participate in pro-Hamas events,' that runs counter to the foreign policy interest of the United States…if you had told us you were going to do that, we never would have given you the visa."

6. **(SBU) Situations that Cast Doubt on Students' Intent or Credibility:** As described in 9 FAM 402.5-5(C), an applicant applying for an F-1 or M-1 student visa must demonstrate intent to enter the United States solely to pursue a full course of study at an approved institution. In addition, J-1 visa applicants who are college, university, and other post-secondary students are required to pursue a full course of study as described in 9 FAM 402.5-6(E)(11). Evidence suggesting a student visa applicant intends to travel to

AAUP C.A.R.013

the United States to engage in unlawful activities clearly calls into question whether the applicant possesses intent and/or the ability to solely pursue a full course of study.  While many activities may not fall under the INA's definitions of "terrorist activity," you should otherwise consider that information in assessing the credibility of a visa applicant's claimed purpose of travel.  INA section 214(b) requires the applicant to show credibly that all activities in which he or she is expected to engage in while in the United States are consistent with the specific requirements of their visa classification.

7. **(SBU) ACTION REQUEST:  Mandatory Social Media Reviews for Students and Student Exchange Visitors.**  Effective immediately, consular officers must refer all new or returning F-1, M-1, or student J-1 visa applications meeting one or more of the following criteria, that the consular officer has determined is otherwise eligible for the requested nonimmigrant status, to the FPU via ECAS as described in 7 FAH-1 H-945.4,  using the SOCIAL MEDIA REVIEW category.                      **LE**

**LE**

**LE**
                                                                         E

**LE**

8. **(SBU) Documenting the Results of the Social Media Review:**  If the social media review uncovers potentially derogatory information indicating that the applicant may not be eligible for a visa, Fraud Prevention Units are required to take screenshots of social media findings to the extent it is relevant to a visa ineligibility, to preserve the record against the applicant's later alteration of the information.  Limit screenshots to information relevant to connecting the applicant, the applicant's actions, and a visa ineligibility.                      **LE**

9. **(SBU) Support for Terrorist Organizations - Grounds and Definitions for INA 212(a)(3)(B):**  All consular officers should carefully review 9 FAM 302.6 to understand the grounds under which an applicant may be ineligible under 3B, including that an applicant who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization" is ineligible.  Consular officers should consider these grounds and definitions when conducting interviews and pursuing lines of inquiry.  Because terms in INA 212(a)(3)(B) are broadly defined, consular officers should elicit as much pertinent information as possible from visa applicants with suspected ties to terrorist organizations or terrorist activity.  This includes the names of all relevant organizations potentially involved in terrorist activity and the applicant's relationship with them (for example, by current membership or past financial contributions or other support).  Evidence that an applicant advocates for terrorist activity, or otherwise demonstrates a degree of public approval or public advocacy for terrorist activity or a terrorist organization, may be indicative of ineligibility under INA 212(a)(3)(B).  This may be evident in conduct that bears a hostile attitude toward U.S. citizens or U.S. culture (including government, institutions, or founding principles).  Or it may be evident in advocacy or sympathy for foreign terrorist organizations.  All of these matters may open lines of inquiry regarding the applicant's credibility and purpose of travel.  Consular officers should inquire into the nature and activities of those organizations. **LE**

10. **(SBU) Intention to Engage in Unlawful Activity:** Consular officers are also reminded of guidance in 9 FAM 302.5-4 regarding the applicability of INA 212(a)(3)(A)(ii) under which a visa applicant is ineligible if the consular officer knows or has reason to believe that the applicant is traveling to the United States solely, principally, or incidentally to engage in any other unlawful activity. Consular officers should take care to enter detailed case notes regarding the specific activities expected in the United States and request an advisory opinion per 9 FAM 302.5-4(C).

11. **(SBU) Revocations of Valid Visas:** If, subsequent to visa issuance, information becomes available to post that an individual may no longer be eligible for a visa due to particularized information indicating an ineligibility under specific INA provisions, including 214(b), post should follow the procedures to revoke or request prudential revocation as described in 9 FAM 403.11 for nonimmigrant visas or 9 FAM 504.12 for immigrant visas. The Visa Office reminds posts that consular officers do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding - other than a revocation based on driving under the influence (DUI) - and that such cases should be referred **LE** in accordance with 9 FAM 403.11-5(B) for further review. A consular officer's revocation must be based on an actual finding that the individual is ineligible for the visa.

12. **(U) Additional Guidance:** The Visa Office will host webinars for consular officers to discuss this guidance on Thursday, April 3 and Friday, April 4, 2025. Invitations with links to these webinars will be sent separately. The FAM will be updated to reflect this guidance.

13. **(U) Inquiries:** Post must refer any U.S. media inquiries regarding E.O.s to CA-Press@state.gov and congressional inquiries regarding E.O.s to ConsularOnTheHill@state.gov. Posts may respond to requests from

international media regarding E.O.s using CA's cleared press guidance located on CA Web, copying CA-PRESS@STATE.GOV.

14. (U) Minimize considered.

**MINIMIZE CONSIDERED**

**Signature:**   RUBIO

---

**XMT:**   BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL

---

**UNCLASSIFIED**
SBU



SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

MEMORANDUM FOR THE SECRETARY OF HOMELAND SECURITY

FROM:     Marco Rubio

SUBJECT:     (SBU) Notification of Removability Determinations under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)

(SBU) I am writing to inform you that upon notification from the Department of Homeland Security's Homeland Security Investigations (DHS/ICE/HSI) on March 7, 2025, I have determined that ████████████████████ ████████████ and Mahmoud Khalil (DOB ██████████ POB: Algeria), both U.S. Lawful Permanent Residents (LPRs), are deportable aliens under INA section 237(a)(4)(C).  I understand that ICE now intends to initiate removal charges against them, based on assurances from DHS/ICE/HSI.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.  Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Pursuant to these authorities, I have determined that the activities and presence of these aliens in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest.  These determinations are based on

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
Classified by:  Secretary of State Marco Rubio
E.O. 13526, Reason(s):  1.4 (justification sections)
Declassify on:  Month DD, YYYY

AAUP C.A.R.018

JA1564

information provided by the DHS/ICE/HSI regarding the participation and roles of ████ and Khalil in antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States. My determination for ██████ is also based on ████ citations for unlawful activity during these protests. The public actions and continued presence of ████ and Khalil in the United States undermine U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.

**Attachments**
Tab 1 – DHS Letter on ██████████████
Tab 2 – HSI Subject Profile of ████████████████
Tab 3 – DHS Letter on Mahmoud Khalil
Tab 5 – HSI Subject Profile of Mahmoud Khalil
Tab 5 – 8 USC 1227(a)(4)(C)

AAUP.C.A.R.019
JA1565

DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

DOB: ▮▮▮▮▮▮▮▮

Event No: ▮▮▮▮▮▮▮▮

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: ▮▮▮▮▮▮        FINS: ▮▮▮▮▮▮        File No: ▮▮▮▮▮▮▮

In the Matter of:

Respondent: MAHMOUD KHALIL _____ currently residing at:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ _____

(Number, street, city, state and ZIP code)                (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of SYRIA and a citizen of ALGERIA;

3. You were admitted to the United States at unknown place on or about unknown date as a unknown manner;ORYour status was adjusted to that of a lawful permanent resident on November 2024 under section 212 (a)(3)(C) of the Act;

4. The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:    ☐ 8CFR 208.30    ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

830 PINEHILL RD JENA LA 71342. LASALLE DETENTION FACILITY _____

(Complete Address of Immigration Court, including Room Number, if any)

on ___March 27, 2025___ at ___8:30 AM___ to show why you should not be removed from the United States based on the
      (Date)            (Time)

charge(s) set forth above. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(Signature and Title of Issuing Officer)

Date: ___March 9, 2025___    ___26 Federal Plaza, New York, NY___

(City and State)

DHS Form I-862 (6/22)

AAUP.C.A.R.020
JA1566

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____
*(Signature of Respondent)*

_____     Date: _____
*(Signature and Title of Immigration Officer)*

### Certificate of Service

This Notice To Appear was served on the respondent by me on <u>March 9, 2025</u>, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person   [ ] by certified mail, returned receipt # _____ requested   [ ] by regular mail
[ ] Attached is a credible fear worksheet.
[ ] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

(X) *Refused to sign* (B)   ████████████████████
*(Signature of Respondent if Personally Served)*     *(Signature and Title of officer)*

DHS Form I-862 (6/22)

Page 2 of 3

AAUP C.A.R.021



## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

AAUP C.A.R.022


JA1568

**U.S. Department of Homeland Security**
Immigration and Customs Enforcement

**Additional Charges of Inadmissibility / Deportability**

**In:**     [ x ]  **Removal proceedings under section 240 of the Immigration and Nationality Act**

      [ ]  **Deportation proceedings commenced prior to April 1, 1997, under former section 242 of the Immigration and Nationality Act**

**In the Matter of:**
Alien/Respondent: _____ Mahmoud Khalil _____

File No: _A_███████_____    Address: _830 Pinehill Road, Jena, Louisiana 71342_

[ ] - 1.  You are an arriving alien.
[ ] 2.  You are an alien present in the United States who has not been admitted or paroled.
[X] 3.  You have been admitted to the United States, but are removable for the reasons stated below.

There is/are hereby lodged against you the following allegation(s), [ ] in addition to or [X] in lieu of, those set forth in the original charging document:

1.  You are not a citizen or national of the United States;
2.  You are a native of Syria and a citizen of Algeria;
3.  You were admitted to the United States at John F. Kennedy International Airport, Queens, New York, on or about December 20, 2022, as an F-1 nonimmigrant student to attend Columbia University in New York, New York;
4.  Your status was adjusted to that of a conditional lawful permanent resident on November 16, 2024, based on marriage to a U.S. Citizen spouse, under section 245(a) of the Immigration and Nationality Act;
5.  The Secretary of State has determined that your activities and presence in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest;
6.  On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question at part 8, page 9, you failed to disclose that you were a member of the United Nations Relief and Works Agency for Palestine Refugees (UNRWA) from June through November 2023, as a political affairs officer;
7.  On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question at part 3, page 6, you failed to disclose your continuing employment as a Program Manager by the Syria Office in the British Embassy in Beirut beyond 2022.
8.  On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question part 8, page 9, you failed to disclose that you were a member of the Columbia University Apartheid Divest (CUAD).

There is/are hereby lodged against you the following charge(s), [X] in addition to or [ ] in lieu of, those set forth in the original charging document:

Section 237(a)(1)(A) of the Immigration and Nationality Act, as amended, in that at the time of entry or of adjustment of status, you were within one or more of the classes of aliens inadmissible by the law existing at such time, to wit: aliens who seek to procure, or have sought to procure, or who have procured a visa, other documentation, or admission into the United States, or other benefit provided under the Act, by fraud or by willfully misrepresenting a material fact, under Section 212(a)(6)(C)(i) of the Act.

Dated: _3/17/2025_



(Signature of Deportation Officer)

FORM I-261

AAUP C.A.R.023

JA1569

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this Notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents which you desire to have considered in connection with your case. If any document is in a foreign language, you must bring the original and a certified English translation of the document. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing.

At your hearing, you will be given the opportunity to admit or deny any or all of the allegations in the charging document and that you are inadmissible or deportable on the charges contained in the charging document. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government.

You will be advised by the immigration judge before whom you appear, of any relief from removal for which you may appear eligible including the privilege of departing voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

**Failure to appear:** You are required to provide the INS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change you address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the INS.

---

### Certificate of Service

This charging document was served on the respondent on ___3/17/25___ , in the following manner in compliance with section 239(a)(1)(F) of the Act.

☒ in person          ☐ by certified mail, return receipt requested          ☐ by regular mail

to: ___830 Pinehill Rd Jena LA 71342___
(Alien's address)

☒ The alien was provided oral notice in the ___English___ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in Section 240(b)(7) of the Act.

___Refuse to Sign___                    ████████ ████
(Signature of respondent if personally served)          (Signature and title of officer)

AAUP C.A.R.024

JA1570

**U.S. DEPARTMENT OF HOMELAND SECURITY**    **Warrant for Arrest of Alien**

File No. ▮▮▮▮▮▮▮▮▮

Date: _03/09/2025_

To:    **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that _____KHALIL, MAHMOUD_____ is removable from the United States. This determination is based upon:

☑ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☐ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

▮▮▮▮▮▮▮▮▮▮▮

(Signature of Authorized Immigration Officer)

▮▮▮▮▮▮▮▮▮▮▮

(Printed Name and Title of Authorized Immigration Officer)

---

**Certificate of Service**

I hereby certify that the Warrant for Arrest of Alien was served by me at _Federal Plaza, New York,_
(Location)

on ___KHALIL, MAHMOUD___ on ___March 9, 2025___, and the contents of this
(Name of Alien)              (Date of Service)

notice were read to him or her in the _____ language.
(Language)

▮▮▮▮▮▮▮▮▮

| | |
|---|---|
| Name and Signature of Officer | Name or Number of Interpreter (if applicable) |

Form I-200 (Rev. 09/16)

AAUP.C.A.R.025

JA1571

MEMORANDUM FOR THE SECRETARY OF HOMELAND SECURITY

FROM:    Marco Rubio

SUBJECT:    (SBU) Determination of Deportability under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)

(SBU) I am writing to inform you that upon notification from the Department of Homeland Security's Homeland Security Investigations (DHS/ICE/HSI) on March 14, 2025, I have determined that Mohsen MAHDAWI (DOB: ███████; POB: Israel), a U.S. Lawful Permanent Resident (LPR), is a deportable alien under INA section 237(a)(4)(C).  I understand that ICE now intends to initiate removal charges against him, based on assurances from DHS/ICE/HSI.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.  Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Pursuant to these authorities, I have determined that the activities and presence of this alien in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest.  These determinations are based on information provided by DHS/ICE/HSI that Mahdawi, through his leadership

<span style="color:red">JA1572</span>

and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction.  Mahdawi has been identified at those protests as having engaged in threatening rhetoric and intimidation of pro-Israeli bystanders.  The activities and presence of Mahdawi in the United States undermines U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States.  Under E.O. 14188, Additional Measures to Combat Anti-Semitism, it is the policy of the United States to combat antisemitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence.  Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.  Moreover, protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

(SBU) The Department of State also requests the opportunity to consult with the Department of Homeland Security on any public statements regarding this determination.

(SBU) I hereby expressly authorize use of this notification by the Department of Homeland Security in immigration court.

**Attachments**
   Tab 1 – DHS Letter on Mohsen Mahdawi
   Tab 2 – HSI Subject Profile of Mohsen Mahdawi
   Tab 3 – 8 USC 1227(a)(4)(C)

JA1573

DEPARTMENT OF HOMELAND SECURITY

DOB:

## NOTICE TO APPEAR

Event No:

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID:

File No:

In the Matter of:

Respondent: MOHSEN KHADER MAHDAWI AKA: MEHDAWI, Mohsen _____ currently residing at:

_____ WHITE RIVER JCT, VERMONT, 05001 _____

(Number, street, city, state and ZIP code)          (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of Stateless and a citizen of Stateless;

3. You were admitted to the United States, on or about July 1, 2014, at Los Angeles International Airport, Los Angles, California, as a conditional resident (CR6);

4. Your status was adjusted to that of a lawful permanent resident on October 24, 2014, based on marriage to a U.S. Citizen spouse, under section 245(a) of the INA;

5. The Secretary of State has determined that your presence and activities in the See Continuation Page Made a Part Hereof

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:   ☐ 8CFR 208.30   ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

3843 E STAGG AVE BASILE LA 70515. SOUTH LOUISIANA CORR CENTER

(Complete Address of Immigration Court, including Room Number, if any)

on    May 1, 2025    at    8:30 AM    to show why you should not be removed from the United States based on the
      (Date)                (Time)

charge(s) set forth above.    _____

(Signature and Title of Issuing Officer)

Date:    April 14, 2025    _____    South Burlington, Vermont

(City and State)

DHS Form I-862 (6/22)

AAUP C A R 028

JA1574

## DEPARTMENT OF HOMELAND SECURITY
# NOTICE TO APPEAR

DOB: ███████████

Event No: ███████████

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: ███████        File No: ███████████

In the Matter of:

Respondent:  MOHSEN KHADER MAHDAWI AKA: MEHDAWI, Mohsen _____ currently residing at:

███████████ WHITE RIVER JCT, VERMONT, 05001 _____ ██ ████████

(Number, street, city, state and ZIP code)                                          (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of Stateless and a citizen of Stateless;

3. You were admitted to the United States, on or about July 1, 2014, at Los Angeles International Airport, Los Angles, California, as a conditional resident (CR6);

4. Your status was adjusted to that of a lawful permanent resident on October 24, 2014, based on marriage to a U.S. Citizen spouse, under section 245(a) of the INA;

5. The Secretary of State has determined that your presence and activities in the See Continuation Page Made a Part Hereof

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:    ☐ 8CFR 208.30    ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

3843 E STAGG AVE BASILE LA 70515. SOUTH LOUISIANA CORR CENTER _____
(Complete Address of Immigration Court, including Room Number, if any)

on ___May 1, 2025___ at ___8:30 AM___ to show why you should not be removed from the United States based on the
       (Date)              (Time)

charge(s) set forth above.    _____
                              (Signature and Title of Issuing Officer)

Date: ___April 14, 2025___    _____South Burlington, Vermont_____
                                     (City and State)

DHS Form I-862 (6/22)                                                          Page 1 of 4

AAUP C A R 028

JA1575

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____     _____
                                                                              (Signature of Respondent)

_____                    Date: _____
(Signature and Title of Immigration Officer)

### Certificate of Service

This Notice To Appear was served on the respondent by me on **04/14/2025**, in the following manner and in compliance with section 239(a)(1) of the Act.

☒ in person     ☐ by certified mail, returned receipt # _____ requested     ☐ by regular mail

☒ Attached is a credible fear worksheet.

☒ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____**English**_____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

**Refused to sign w/out attorney present** ▬▬▬▬▬▬▬▬▬▬▬
(Signature of Respondent if Personally Served)                    (Signature and Title of officer)

DHS Form I-862 (6/22)                                                                                            Page 2 of 4

JA1576

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____     _____
                                                                     *(Signature of Respondent)*

_____     Date: _____
*(Signature and Title of Immigration Officer)*

### Certificate of Service

This Notice To Appear was served on the respondent by me on **04|14|2025**, in the following manner and in compliance with section 239(a)(1) of the Act.

☒ in person     ☐ by certified mail, returned receipt # _____ requested     ☐ by regular mail

☒ Attached is a credible fear worksheet.

☒ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the __*English*__ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act. ████████████

**Refused to sign w/out attorney present** ███████████████

*(Signature of Respondent if Personally Served)*          *(Signature and Title of officer)*

DHS Form I-862 (6/22)

AAUP C.A.R.029

Page 2 of 4

JA1577

## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (6/22)                     AAUP C.A.R.030                     Page 3 of 4

**JA1578**

**U.S. Department of Homeland Security**

**Continuation Page for Form** I-862

| Alien's Name | File Number | Date |
|---|---|---|
| MAHDAWI, MOHSEN KHADER | ▉▉▉▉▉ | 04/14/2025 |
| | Event No: ▉▉▉▉▉ | |

THE SERVICE ALLEGES THAT YOU:
--------------------------------
United States would have serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest.

| Signature | Title |
|---|---|
| ▉▉▉▉▉▉▉▉▉▉ | Supervisory Special Agent |

____4____ of ____4____ Pages

Form I-831 Continuation Page (Rev. 08/01/07)

AAUP C.A.R 031

JA1579

**U.S. DEPARTMENT OF HOMELAND SECURITY**     **Warrant for Arrest of Alien**

File No. █████████████

Date: ___04/14/2025___

**To:** **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that ___MAHDAWI, MOHSEN___ is removable from the United States. This determination is based upon:

☑ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☑ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

_____
(Signature of Authorized Immigration Officer)

_____
(Printed Name and Title of Authorized Immigration Officer)

---

**Certificate of Service**

I hereby certify that the Warrant for Arrest of Alien was served by me at _South Burlington, VT_
(Location)

on ___MAHDAWI, MOHSEN___ on _04/14/2025_, and the contents of this
(Name of Alien)          (Date of Service)

notice were read to him or her in the ___English___ language.
(Language)

█████████████
Name and Signature of Officer          Name or Number of Interpreter (if applicable)

Form I-200 (Rev. 09/16)

AAUP.C.A.R.032

JA1580

# NOTICE OF CUSTODY DETERMINATION

Alien's Name: MAHDAWI, MOHSEN KHADER

A-File Number: ▓▓▓▓▓▓▓▓

Date: 04/14/2025

Event ID: ▓▓▓▓▓▓

Subject ID: ▓▓▓▓▓

---

Pursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations, I have determined that, pending a final administrative determination in your case, you will be:

[X] Detained by the Department of Homeland Security.

[ ] Released (check all that apply):

    [ ] Under bond in the amount of $ _____

    [ ] On your own recognizance.

    [ ] Under other conditions. [Additional document(s) will be provided.]

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Name and Signature of Authorized Officer

04/14/2025 01:12 PM

Date and Time of Custody Determination

Supervisory Special Agent
Title

11 ELMWOOD AVE STE 240   Burlington, VT US 05402
Office Location/Address

---

You may request a review of this custody determination by an immigration judge.

    [ ] I acknowledge receipt of this notification, and

        [ ] I **do** request an immigration judge review of this custody determination.

        [ ] I **do not** request an immigration judge review of this custody determination.

*Refused to sign w/out attorney present*

Signature of Alien

04/14/25
Date

---

The contents of this notice were read to MAHDAWI, MOHSEN KHADER in the ENGLISH language.

(Name of Alien)     (Name of Language)

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Name and Signature of Officer

Name or Number of Interpreter (if applicable)

Special Agent
Title

AAUP.C.A.R.033

JA1581



United States Department of State

Washington, DC  20520

SENSITIVE BUT UNCLASSIFIED     March 21, 2025

## Memo for ICE – Andre R. Watson, Assistant Director, National Security Division

FROM:        CA – John L. Armstrong, Senior Bureau Official

SUBJECT:        (SBU) Revocation of Visa – Rumeysa OZTURK

(SBU) On March 21, 2025, in response to a request from DHS/ICE and the assessment from DHS/ICE that Rumeysa OZTURK had been involved in associations that "may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization" including co-authoring an op-ed that found common cause with an organization that was later temporarily banned from campus, the Bureau of Consular Affairs approved revocation, effective immediately, of the F-1 visa of OZTURK, DPOB: ███████████, Turkey, Visa Foil ███████ pursuant to authority in section 221(i) of the Immigration and Nationality Act, 8 U.S.C. 1201(i).  Due to ongoing ICE operational security, this revocation will be silent; the Department of State will not notify the subject of the revocation.

(U) The information in this record is confidential under INA 222(f) and specific biographical data about the alien cannot be shared in public statements.

JA1582

(U) I am providing this notice to you with express authorization for use by DHS/ICE in immigration court, as needed.

John L. Armstrong
Senior Bureau Official
Bureau of Consular Affairs

JA1583

## DEPARTMENT OF HOMELAND SECURITY
# NOTICE TO APPEAR

DOB: ▓▓▓▓

Event No: ▓▓▓▓

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: ▓▓▓▓     FINS: ▓▓▓▓     File No: ▓▓▓▓

In the Matter of:

Respondent: RUMEYSA OZTURK _____ currently residing at:

__3843 Stagg Ave Basile, LA 70515__
(Number, street, city, state and ZIP code)          (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of TURKIYE and a citizen of TURKIYE;

3. You were admitted to the United States at Boston, MA on or about June 28, 2024 as a nonimmigrant Student (F-1);

4. On March 21, 2025, your nonimmigrant visa was revoked by the United States Department of State.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, your nonimmigrant visa was revoked under section 221(i) of the Act.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:   ☐ 8CFR 208.30   ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

__1900 E Whatley Rd Oakdale, LA 71463__
(Complete Address of Immigration Court, including Room Number, if any)

on __April 7, 2025__ at __8:30 am__ to show why you should not be removed from the United States based on the
(Date)          (Time)

charge(s) set forth above.   _____
(Signature and Title of Issuing Officer) ▓▓▓▓

Date: __March 25, 2025__   _____   St Albans, VT
(City and State)

DHS Form I-862 (6/22)

AAUP.C.A.R.036

JA1584

Page 1 of 4

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

Upon information and belief the language that the Alien understands is English

---

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____     _Refused to Sign_
                    *(Signature of Respondent)*

_____     Date: _03/25/25_
*(Signature and Title of Immigration Officer)*

### Certificate of Service

This Notice To Appear was served on the respondent by me on **March 25, 2025**, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person    [ ] by certified mail, returned receipt # _____ requested    [ ] by regular mail

[ ] Attached is a credible fear worksheet.

[ ] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the **ENGLISH** language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the A

_Refused to Sign_ _____
*(Signature of Respondent if Personally Served)*            *(Signature and Title)*

---

DHS Form I-862 (6/22)                               Page 2 of 4

AAUP C.A.R.037


JA1585



## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (6/22)

AAUP C.A.R.038

JA1586

**U.S. Department of Homeland Security**                    **Continuation Page for Form** I-862

| Alien's Name OZTURK, RUMEYSA | File Number ▮▮▮▮▮ | Date 03/25/2025 |
|---|---|---|
| | Event No: ▮▮▮▮▮▮ | |

CURRENTLY RESIDING AT:
------------------------------------------------------------------

South Louisiana Imm Center 3843 W Stagg Ave Basile, LOUISIANA 70515

| Signature ▮ ▮▮▮▮▮ | Title SDDO |
|---|---|

_____ 4 _ of _ 4 _ Pages

Form I-831 Continuation Page (Rev. 08/01/07)

AAUP C.A.R.039

JA1587

**U.S. DEPARTMENT OF HOMELAND SECURITY**       **Warrant for Arrest of Alien**

File No. ___ ■ ■ ■ _____

Date: _____ 03/22/2025 _____

**To:**  **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that _____ OZTURK, RUMEYSA _____ is removable from the United States. This determination is based upon:

☑ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☐ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

_____ ■■■■ _____
(Signature of Authorized Immigration Officer)

_____ ■ ■ ■ _____
(Printed Name and Title of Authorized Immigration Officer)

---

**Certificate of Service**

I hereby certify that the Warrant for Arrest of Alien was served by me at _____ St. Albans, VT _____
(Location)

on _____ OZTURK, RUMEYSA _____ on _____ March 25, 2025 _____, and the contents of this
(Name of Alien)            (Date of Service)

notice were read to him or her in the _____ ENGLISH _____ language.
(Language)

■■■■■■■■

_____          _____
Name and Signature of Officer          Name or Number of Interpreter (if applicable)

Form I-200 (Rev. 09/16)

AAUP C.A.R.040

JA1588



<u>SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE</u>

MEMORANDUM FOR THE SECRETARY OF HOMELAND SECURITY

FROM:     Marco Rubio

SUBJECT:    (SBU) Notification of Removability Determinations under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA)

(SBU) I am writing to inform you that upon notification from the Department of Homeland Security's Homeland Security Investigations (DHS/ICE/HSI) on March 7, 2025, I have determined that Yunseo Chung (DOB: ███████ POB: South Korea) and ████████ ████████████████████ both U.S. Lawful Permanent Residents (LPRs), are deportable aliens under INA section 237(a)(4)(C).  I understand that ICE now intends to initiate removal charges against them, based on assurances from DHS/ICE/HSI.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.  Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Pursuant to these authorities, I have determined that the activities and presence of these aliens in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest.  These determinations are based on

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
Classified by:  Secretary of State Marco Rubio
E.O. 13526, Reason(s):  1.4 (justification sections)
Declassify on: Month DD, YYYY
AAUP C.A.R.041

JA1589

information provided by the DHS/ICE/HSI regarding the participation and roles of Chung and ████ in antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States. My determination for Yunseo is also based on her citations for unlawful activity during these protests. The public actions and continued presence of Chung and ████ in the United States undermine U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.

**Attachments**
Tab 1 – DHS Letter on Yunseo Chung
Tab 2 – HSI Subject Profile of Yunseo Chung
Tab 3 – DHS Letter on ██████████████
Tab 5 – HSI Subject Profile of ████████████
Tab 5 – 8 USC 1227(a)(4)(C)

AAUP.C.A.R.042

JA1590

**U.S. DEPARTMENT OF HOMELAND SECURITY**  **Warrant for Arrest of Alien**

File No. ___█████████___

Date: ___March 08, 2025___

**To:**  **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that ___CHUNG, Yunseo___ is removable from the United States.  This determination is based upon:

☐ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☑ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

_____████████████_____
(Signature of Authorized Immigration Officer)

████████████████████████
(Printed Name and Title of Authorized Immigration Officer)

---

**Certificate of Service**

I hereby certify that the Warrant for Arrest of Alien was served by me at _____
(Location)

on _____ on _____, and the contents of this
(Name of Alien)                                    (Date of Service)

notice were read to him or her in the _____ language.
(Language)

_____          _____
Name and Signature of Officer          Name or Number of Interpreter (if applicable)

---

AAUP_C.A.R.043



Form I-200 (Rev. 09/16)

MEMORANDUM FOR THE SECRETARY OF HOMELAND SECURITY

FROM:     Marco Rubio

SUBJECT:  (SBU) Determination of Deportability under Section 237(a)(4)(C)
          of the Immigration and Nationality Act (INA)

(SBU) I am writing to inform you that upon notification from the Department of Homeland Security's Homeland Security Investigations (DHS/ICE/HSI) on March 14, 2025, I have determined that Badar Khan SURI (DOB: ███████ ██████; POB: India), an alien currently in the U.S. in nonimmigrant status as a research scholar, is a deportable alien under INA section 237(a)(4)(C). I understand that ICE now intends to initiate removal charges against him, based on assurances from DHS/ICE/HSI.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States. Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Pursuant to these authorities, I have determined that the activities and presence of these aliens in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest. These determinations are based on the assessment and conclusion provided by DHS/ICE/his, to which we defer

as DHS/ICE is the principal investigative unit of DHS, that that "Suri's direct connection to Hamas leadership and involvement in antisemitic activities …[creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization."  In addition, DHS/ICE/HSI also assesses that Suri is "actively supporting Hamas terrorism" and "actively spreads its propaganda and promotes antisemitism on social media."  The activities and presence of Suri in the United States undermines U.S. policy to combat antisemitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and intimidation in the United States.  Under E.O. 14188, Additional Measures to Combat Anti-Semitism, it is the policy of the United States to combat antisemitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence.  Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning antisemitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.  Moreover, the type of intimidation and incitement attributable to Suri potentially undermines the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

(SBU) The Department of State also requests the opportunity to consult with the Department of Homeland Security on any public statements regarding this determination.

(SBU) I hereby expressly authorize use of this notification by the Department of Homeland Security in immigration court.

**Attachments**
      Tab 1 – DHS Letter on Badar Khan Suri
      Tab 2 – HSI Subject Profile of Badar Khan Suri
      Tab 3 – 8 USC 1227(a)(4)(C)

JA1593

# DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

DOB: ▮▮▮▮

Event No: ▮▮▮▮

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: ▮▮▮▮

In the Matter of:

File No: ▮▮▮▮

Respondent: BADAR KHAN SURI

1209 Sunflower Ln Alvarado, TEXAS 760092810 _____ currently residing at:
(Number, street, city, state and ZIP code)

▮▮▮▮
(Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of INDIA and a citizen of INDIA;

3. You were admitted to the United States at Dulles, VA, on December 10, 2022 as a Exchange Visitor;

4. On March 15, 2025, The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to: ☐ 8CFR 208.30 ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

27991 BUENA VISTA BLVD, LOS FRESNOS, TEXAS 78566. PRAIRIELAND DETENTION CENTER
(Complete Address of Immigration Court, including Room Number, if any)

on ___May 6, 2025___ at ___8:30 am___ to show why you should not be removed from the United States based on the
(Date) (Time)

charge(s) set forth above.

CHRISTOPHER R HECK  Digitally signed by ▮▮  Date: 2025.03.17 21:47:14 -04'00'  ▮▮▮▮
(Signature and Title of Issuing Officer)

Date: ___March 17, 2025___

Chantilly, VA
(City and State)

DHS Form I-862 (6/22)

AAUP C.A.R.046

**JA1594**

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/i-589**. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at **http://www.ice.gov/contact/ero**, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____
(Signature of Respondent)

_____
(Signature and Title of Immigration Officer)

Date: _____

## Certificate of Service

This Notice To Appear was served on the respondent by me on <u>March 17, 2025</u>, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] In person   [ ] by certified mail, returned receipt # _____ requested   [ ] by regular mail
[ ] Attached is a credible fear worksheet.
[X] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the <u>ENGLISH</u> language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_REFUSED_
(Signature of Respondent if Personally Served)

DHS Form I-862 (6/22)         AAUP C.A.R.047         Page 2 of 3

JA1595

Allegations: Denies All; |

### Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (6/22)  AAUP C.A.R.048  Page 3 of 3

<span style="color:red">JA1596</span>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS, ET AL.,

       Plaintiffs,

  v.

MARCO RUBIO, ET AL.

       Defendants.

Case No. 1:25-cv-10685 (WGY)

### STIPULATION AND ~~PROPOSED~~ ORDER

**WHEREAS**, Plaintiffs American Association of University Professors, American Association of University Professors-Harvard Faculty Chapter, American Association of University Professors at New York University, Rutgers American Association of University Professors-American Federation of Teachers, and Middle East Studies Association ("Plaintiffs"), by and through their undersigned counsel, and Defendants Marco Rubio, Kristi Noem, Todd Lyons, and Donald J. Trump ("Defendants") have stipulated and agreed that all statements made by government officials and agents, and quotes attributed to them, in the following documents are authenticated pursuant to Federal Rule of Evidence 901:[1]

  1.  Secretary of State Marco Rubio's March 6, 2025 post on X (available at https://perma.cc/KD9R-BNV3);

  2.  Department of Homeland Security's March 9, 2025 post on X (available at https://perma.cc/3NNQ-235L);

---

[1] Defendants do not waive hearsay objections to any statements other than those by government officials and agents stipulated to in this document.

JA1597

AAUP-01343

3. Secretary of State Marco Rubio's March 9, 2025 post on X (available at https://perma.cc/Q7EH-M4LW);

4. President Donald J. Trump's March 10, 2025 post on Truth Social (available at https://perma.cc/Z5PU-7MZT);

5. White House Press Secretary Karoline Leavitt's March 11, 2025 Press Briefing transcript (available at https://perma.cc/XAJ6-N2CD);

6. Secretary of State Marco Rubio's March 12, 2025 remarks to the press in Shannon, Ireland (available at https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-press/);

7. Deputy Secretary of Homeland Security Tony Edgar's March 13, 2025 interview with NPR (available at https://perma.cc/Q45C-6B9A);

8. Vice President J.D. Vance's March 13, 2025 Fox New Interview Transcript (available at Dkt. No. 14-18);

9. The March 14, 2025 Department of Homeland Security Press Release (available at https://perma.cc/7YAG-38XF);

10. Secretary of State Mark Rubio's March 16, 2025 interview on CBS's Face the Nation (available at https://perma.cc/DV8P-2CWZ);

11. Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin's March 19, 2025 post on X (available at https://perma.cc/JE82-K8CM);

12. Secretary of State Marco Rubio's March 27, 2025 remarks during a Joint Press Availability with Guyanese President Irfaan Ali (available at https://perma.cc/8LC9-S86R);

13. Secretary of State Marco Rubio's March 28, 2025 remarks to the press (available at https://perma.cc/5YPB-GBGX);

JA1598

AAUP-01344

14.    Secretary of State Marco Rubio's April 8, 2025 interview on Triggered with Don Jr. (available at https://perma.cc/6RD7-S8DN);

15.    The April 9, 2025 Department of Homeland Security Press Release (available at https://perma.cc/ZSM5-X5GE);

16.    White House Deputy Chief of Staff Stephen Miller's April 14, 2025 interview with Fox News (available at https://bsky.app/profile/atrupar.com/post/3lmroj5yzz723);

17.    Secretary of State Marco Rubio's April 17, 2025 interview on  the Ben Shapiro Show (available at https://perma.cc/K92W-A4XN);

18.    Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin's April 30, 2025 post on X (available at https://perma.cc/T6JE-3H9Y);

19.    The May 7, 2025 NPR article quoting Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin (available at https://perma.cc/U9JK-G75Z);

20.    Secretary of State Marco Rubio's May 7, 2025 post on X (available at https://perma.cc/RNB6-YUUH);

21.    Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin's May 8, 2025 post on X (available at https://perma.cc/TA4V-8HDP);

22.    The January 30, 2025 White House Fact Sheet Titled "Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism" (available at https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/).

JA1599

AAUP-01345

Dated: New York, New York
June 9, 2025

Michael Tremonte
Noam Biale
Alexandra Conlon
Courtney Gans
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com
nbiale@shertremonte.com

Ramya Krishnan
Carrie DeCell
Xiangnong Wang
Talya Nevins
Jackson Busch
Scott Wilkens
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

Edwina Clarke, BBO 699702
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9423
edwina@zimmercitronclarke.com

*Attorneys for Plaintiffs*

YAAKOV M. ROTH
*Acting Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
LEAH B. FOLEY
*United States Attorney*
SHAWNA YEN
*Assistant United States Attorney*
*District of Massachusetts*

WILLIAM KANELLIS
*Trial Attorney*

ANTHONY NICASTRO
*Acting Director*

/s/ Ethan B. Kanter

ETHAN B. KANTER
Chief, National Security Unit
Office of Immigration Litigation
Civil Division, U.S. Department of Justice
P.O. 878, Ben Franklin Station
Washington, DC. 20044
(202) 616-9123
ethan.kanter@usdoj.gov

*Attorneys for Defendants*

4

JA1600

AAUP-01346

SO ORDERED

_William G. Young_
Hon. William G. Young, U.S. District Judge

5

JA1601

AAUP-01347



**Secretary Marco Rubio** ✓ 🛡
@SecRubio

Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law — including international students — face visa denial or revocation, and deportation.

5:30 PM · Mar 6, 2025 · **3.9M** Views

💬 11K     🔁 18K     ❤️ 83K     🔖 1.4K     ↥

JA1602

AAUP-01348



**Homeland Security** ✔
@DHSgov

On March 9, 2025, in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State, U.S. Immigration and Customs Enforcement arrested Mahmoud Khalil, a former Columbia University graduate student. Khalil led activities aligned to Hamas, a designated terrorist organization.

ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security.

9:29 PM · Mar 9, 2025 · **3.8M** Views

2.9K          3.1K          18K          1K

JA1603

AAUP-01349



AAUP-01350

JA1604



**Donald J. Trump** ✔ ➕
@realDonaldTrump

Following my previously signed Executive Orders, ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again. If you support terrorism, including the slaughtering of innocent men, women, and children, your presence is contrary to our national and foreign policy interests, and you are not welcome here. We expect every one of America's Colleges and Universities to comply. Thank you!

**11.3k** ReTruths   **49.9k** Likes                        Mar 10, 2025, 1:05 PM



JA1605

AAUP-01351



# Roll Call

## Donald J. Trump

**Transcripts**        White House Calendar        White House Press Releases

## Press Briefing: Karoline Leavitt Holds a Press Briefing at The White House - March 11, 2025

| 📊 StressLens | 📁 6 Topics | ☰ 10 Entities | 🕇 Moderation | 👥 2 Speakers |

### Full Transcript

▶ **Karoline Leavitt**  00:00:00-00:00:00 ( sec )          NO STRESSLENS   ✕

How are you?

▶ **Question**  00:00:00-00:00:01 (1 sec)

Great.

**JA1606**

AAUP-01352

X

▶ **Karoline Leavitt**   00:00:01-00:00:33 (32 sec)

Good, I'll let my staff get settled. Uh, there's a lot of news today, so I look forward to taking your questions. Good to see you. Um, and I have some updates for you as well. Later today, President Trump will address the business roundtable's quarterly meeting where he will tout his pro-growth economic agenda and answer questions before more than 100 of our nation's leading CEOs. In fact, it's the largest attendance ever for this event because business leaders are so eager and encouraged by President Trump's return to Washington.

▶ **Karoline Leavitt**   00:00:33-00:00:53 (20 sec)

This follows President Trump's roundtable yesterday with the technology CEO Council here at the White House, where he met with key leaders in the technology industry. And last night, President Trump also held an official swearing in ceremony in the Oval Office for Sean Curran, who is now the 28th director of the United States Secret Service.

▶ **Karoline Leavitt**   00:00:53-00:01:26 (33 sec)

Sean demonstrated unbelievable bravery under gunfire in Butler, Pennsylvania this past July when an assassin tried to kill President Trump. As someone who got to know Sean personally throughout the campaign last year, I can say unequivocally that there is nobody better suited for this important role. And following the confirmation of Labor Secretary Lori Chavez-DeRemer last night, the Senate has now confirmed 21 of President Trump's well-qualified cabinet level nominees far outpacing the previous administration.

▶ **Karoline Leavitt**   00:01:26-00:01:50 (24 sec)

And looking ahead, tomorrow, the president will welcome the Taoiseach Micheal Martin, of Ireland for the annual White House -- White House Shamrock ceremony. And Thursday, President Trump will welcome the NATO secretary general for a working meeting and lunch. On the economy. February's jobs report was good news for America, particularly our manufacturing sector.

▶ **Karoline Leavitt**   00:01:50-00:02:16 (27 sec)

The manufacturing sector gained 10,000 new jobs in just one month under President Trump. This rebound was led by the automobile sector where we saw 9000 new auto jobs created already. That is the most auto jobs added to the economy in 15 months. This was a complete turnaround from the Biden administration where we were losing an average of 9000 manufacturing jobs per month last year.

▶ **Karoline Leavitt**   00:02:16-00:02:37 (20 sec)

Reuters is out with a report that a number of companies are now looking at expanding their presence or bringing their businesses into America because of President Trump's policies. And just moments ago, before coming out here, I saw another report by Reuters revealing that Merck has opened a $1 billion facility at its North Carolina site.

▶ **Karoline Leavitt**   00:02:37-00:03:00 (23 sec)

This is just the latest pharmaceutical company to boost its US manufacturing in lieu of President Trump's tariffs. This announcement follows Eli Lilly's plans to invest at least $27 billion to build four new manufacturing plants here in the United States. And Pfizer has also said it's considering moving their manufacturing overseas right here to the United States of America.

✕

AAUP-01353

JA1607

**Karoline Leavitt**  00:03:00-00:03:27 (28 sec)      NO SIGNAL (0)     X

As the president has said over and over again, when we purchase products made in the USA, the profits stay here, the revenue stays here and most importantly, the jobs stay here. And despite the globalist mainstream media's attempts to worry consumers, President Trump will not repeat the trend of past American presidents who broke their promises to the American public and smiled while they stuck a knife in the back of American workers and shipped their jobs overseas.

**Karoline Leavitt**  00:03:27-00:03:54 (27 sec)      NO SIGNAL (0)

Our country has lost more than 5 million jobs in more than 90,000 factories due to devastating globalization over the last three decades alone. North Carolina lost 300,000 manufacturing jobs, including 60 percent of its furniture manufacturing jobs in the years following NAFTA. And in Michigan, globalist policies destroyed 250,000 jobs, including 40 percent of the auto industry.

**Karoline Leavitt**  00:03:54-00:04:17 (23 sec)      NO SIGNAL (0)

Which again, we know is clawing back because of President Trump's action already. These are harrowing statistics that represent countless towns and families who have been completely destroyed. But the America last globalist era is ending under President Trump. He will no longer allow our country and our workers, our hardworking American families to be ripped off.

**Karoline Leavitt**  00:04:17-00:04:42 (25 sec)     NO SIGNAL (0)

On another very important issue for the president. He continues to work hard to secure the border. If you missed it yesterday, CBP launched an enhanced home mobile app with a new feature, the Intent to Depart, which offers unlawfully present aliens or those aliens whose parole has been revoked an orderly and defined process to notify the US government of their intent to depart the country.

**Karoline Leavitt**  00:04:42-00:05:06 (24 sec)     NO SIGNAL (0)

The CBP home app strengthens our mission to secure the border and provides illegal aliens with a straightforward way to leave now before facing much harsher consequences later. A new report from Bloomberg just found that the number of aliens trying to reach our country by traveling through the jungle to Central America dropped a whopping 99 percent last month.

**Karoline Leavitt**  00:05:06-00:05:29 (23 sec)     NO SIGNAL (0)

And this follows the incredible news that illegal border crossings plummeted last month as well, down 94 percent at our southern border from last February under the Biden administration. As President Trump made clear during his historic address to Congress, we must finish this job and continue to carry out the largest deportation campaign in American history.

**Karoline Leavitt**  00:05:29-00:05:48 (20 sec)     NO SIGNAL (0)

And that is why the president fully endorses the continuing resolution that is before Congress and was negotiated by Speaker Johnson. He is encouraging all Republicans to vote, yes, on this clean CR, which freezes funding at current levels and will prevent the Democrats from getting their long awaited government shutdown.

**Karoline Leavitt**  00:05:48-00:06:10 (21 sec)     NO SIGNAL (0)

Voting against this CR will hurt the American people and kill the incredible momentum that President Trump has built over the past 51 days. And lastly, before I take questions, I would like to commend The Washington Post, who I believe is in the room today. According to a new report from Axios, The Washington Post is overhauling their newsroom structure.     ✕

**Karoline Leavitt**  00:06:10-00:06:46 (36 sec)     NO STRESSLENS

AAUP-01354

JA1608

It appears that the mainstream media, including the Post is finally learning that having disdain for more than half of the country who supports this president does not help you sell newspapers. It's not a very good business model. And that's why we have people in our new media seat. And today, we have Sagar Annette, who is the host of Breaking Points a popular political YouTube news and podcast show that has racked up nearly 1 billion views on YouTube, several hundred million podcast downloads since its launch in June 2021. He's also a former member of the White House Correspondents Association, but is now a part of the thriving independent media.

▶ **Karoline Leavitt**   00:06:46-00:06:50 (4 sec)                                    NO SIGNAL (0)

We're very happy to have you with us here today. Why don't you kick off our briefing? Thank you.

▶ **Question**   00:06:50-00:07:08 (18 sec)                                    NO SIGNAL (0)

Really, really appreciate you having me, Karoline, a couple of questions for you, if I may. First is first on the stock market. So currently it's the 25th anniversary today of the dot-com bubble crash. There's a lot of concern for a lot of Americans right now about the state of the economy. President Trump has refused to rule out a recession.

▶ **Question**   00:07:08-00:07:15 (8 sec)                                    NO SIGNAL (0)

Secretary Lutnick, however, has told us there will not be one, so can the White House just tell and assure Americans today that there's not going to be a recession?

▶ **Karoline Leavitt**   00:07:15-00:07:36 (20 sec)                                    NO SIGNAL (0)

Well, there's a lot to unpack there. So, let me start by saying that first of all, when it comes to the stock market, the numbers that we see today, the numbers we saw yesterday, the numbers we'll see tomorrow are a snapshot of a moment in time. And as President Trump has said, and I'm here to echo the remarks of this president and of this White House, we are in a period of economic transition.

▶ **Karoline Leavitt**   00:07:36-00:07:55 (19 sec)                                    NO SIGNAL (0)

We are in a period of transition from the mess that was created under Joe Biden and the previous administration. Joe Biden left this country in an economic disaster. Several statistics to point out: the delinquency rate on credit card loans increased 63 percent under Joe Biden, hitting a near 12-year high.

▶ **Karoline Leavitt**   00:07:55-00:08:34 (39 sec)                                    NO STRESSLENS

Under Joe Biden, all net job growth went to foreign born Americans. Real wages declined by 1.5 percent under Joe Biden. And as we all know, and this administration continues to combat, prices soared more than 20 percent under Joe Biden because of his reckless spending and economic policies. So, we are in a period of transition from that economic nightmare under a president who had no idea what he was doing, never held the private sector job in his life, into a golden age of American manufacturing under a businessman and a deal maker in chief in President Donald J. Trump who will be implementing, is implementing the formula that we know works.

▶ **Karoline Leavitt**   00:08:34-00:08:50 (16 sec)                                    NO SIGNAL (0)

Look at President Trump's results in his first term. If people are looking for certainty, they should look at the record of this president. That's why the American people reelected him back to this office. And look at everything that President Trump has already done, and his team has already done in just 51 days.

▶ **Karoline Leavitt**   00:08:50-00:09:16 (26 sec)                                    NO SIGNAL (0)

AAUP-01355

The massive efforts to deregulate; tax cuts, which we need congress to pass the Trump economic agenda, the Trump tax cuts, which will unleash economic growth. And the president also addressed this directly I will point out as well, when you look at what he said on Air Force One, and he said he wants the American people to have so much money in their pockets they don't even know what to do with it. That's the intent of this administration and we're working very hard every day on that goal.

**Question**   00:09:16-00:09:36 (21 sec)                    NO SIGNAL (0)

Second question on the CR. So, President Trump came out today in a primary challenge against Congressman Thomas Massie. Congressman Massie has been a supporter of DOGE, he's been a supporter of Make America Healthy Again. What kind of message is this White House sending against a congressman who's sticking up for principles that he's long held in the chamber and voting against continuing resolution and spending?

**Karoline Leavitt**   00:09:36-00:10:00 (24 sec)            NO SIGNAL (0)

I think the president has made it very clear that he believes it's critical for conservatives and republicans and frankly all members of congress to get behind this continuing resolution to keep the government funded. The president wants to continue the momentum that he has built over the last 51 days. In order to keep the government funded, we've got to keep moving with these deportations and he believes that everybody needs to get on board with this bill.

**Karoline Leavitt**   00:10:00-00:10:11 (10 sec)            NO SIGNAL (0)

He's been active in this process. He's been making calls to get this over the finish line. And we're urging every republican, and democrats too, to do what's right for the American public to prevent a government shutdown.

**Question**   00:10:11-00:10:20 (10 sec)                    NO SIGNAL (0)

Just the last question here on Mahmoud Khalil. Does the administration believe that it needs to charge a green card holder with a crime to be eligible for deportation?

**Karoline Leavitt**   00:10:20-00:10:45 (24 sec)            NO SIGNAL (0)

Well, in fact, Secretary Rubio reserves the right to revoke the visa of Mahmoud Khalil. And I'm glad you brought this up. Under the Immigration and Nationality Act, the Secretary of State has the right to revoke a green card or a visa for individuals who serve or are adversarial to the foreign policy and national security interests of the United States of America.

**Karoline Leavitt**   00:10:45-00:11:04 (20 sec)            NO SIGNAL (0)

And Mahmoud Khalil was an individual who was given the privilege of coming to this country to study at one of our nation's finest universities and colleges. And he took advantage of that opportunity, of that privilege by siding with terrorists, Hamas terrorists who have killed innocent men, women and children.

**Karoline Leavitt**   00:11:04-00:11:32 (27 sec)            NO SIGNAL (0)

This is an individual who organized group protests that not only disrupted college campus classes and harassed Jewish American students and made them feel unsafe on their own college campus, but also distributed pro-Hamas propaganda, fliers with the logo of Hamas. That is what the behavior and activity that this individual engaged in. And I have those fliers on my desk, they were provided to me by the Department of Homeland Security.

**Karoline Leavitt**   00:11:32-00:11:54 (23 sec)            NO SIGNAL (0)

I thought about bringing them into this briefing room to share with all of you, but I didn't think it was worth the dignity of this room to bring that pro-Hamas propaganda. But that's what this individual distributed on the campus of Columbia University.

AAUP-01356

JA1610

X

And this administration is not going to tolerate individuals having the privilege of studying in our country and then siding with pro-terrorist organizations that have killed Americans.

**Karoline Leavitt**  00:11:54-00:11:59 (5 sec)                    | NO STRESSLENS |

We have a zero-tolerance policy for siding with terrorists, period. Peter Doocy.

**Question**  00:11:59-00:12:10 (11 sec)                    | NO SIGNAL (0) |

Thank you, Karoline. So, you said that the Dow dropping and dropping and dropping is a period of transition. You're sure nobody here at the White House shorted the Dow.

**Karoline Leavitt**  00:12:10-00:12:11 (1 sec)                    | NO STRESSLENS |

[Laughter] No, I don't think so.

**Question**  00:12:11-00:12:24 (12 sec)                    | NO SIGNAL (0) |

OK. But is there any concern here that it's going to be harder to ask certain federal workers to retire if they look at their retirement accounts and they're getting robbed every day?

**Karoline Leavitt**  00:12:24-00:12:59 (35 sec)                    | NO SIGNAL (0) |

Well, I'm glad you brought up workers because that's exactly who President Trump is looking out for with his America First trade policy and his America First economic agenda. And if you look at -- there's great indication to be optimistic about where the economy stands and the American people, investors, CEOs, small business owners, but most importantly workers, should bet on President Trump, because his tariff policies, what he envisions is reciprocity -- fair trade practices where American workers are put first and are no longer ripped off by foreign countries all over this world.

**Question**  00:12:59-00:13:07 (8 sec)                    | NO SIGNAL (0) |

President Trump says he's going to buy a Tesla today. Did he buy it? And when is the last time he drove a car?

**Karoline Leavitt**  00:13:07-00:13:29 (21 sec)                    | NO SIGNAL (0) |

That's a very good question. I have heard the president remark that he misses being able to drive, that luxury of driving his own vehicle, although the beast is nice. But he is going to be viewing a Tesla that is making its way to the White House complex now I can confirm. Perhaps the press pool today will have an opportunity to witness this very exciting moment later this afternoon.

**Karoline Leavitt**  00:13:29-00:13:36 (7 sec)                    | NO SIGNAL (0) |

But Tesla -- a Tesla is on its way here now and we'll see if the president likes it when he checks it out.

**Question**  00:13:36-00:13:40 (4 sec)                    | NO SIGNAL (0) |

So, they're bringing him a Tesla to look at and if he likes it, he's just going to buy it.

**Karoline Leavitt**  00:13:40-00:13:46 (6 sec)                    | NO SIGNAL (0) |

He's intent on -- he's definitely going to buy one. But he'll take a look at it when it gets here later this afternoon.

×

**Question**  00:13:46-00:13:47 (1 sec)                    | NO STRESSLENS |

Full retail? [Laughter]

AAUP-01357

JA1611

X

**Karoline Leavitt**  00:13:47-00:13:50 (2 sec)                    NO STRESSLENS

▶

Yes, full market price. Kelly?

**Question**  00:13:50-00:14:14 (24 sec)                    NO SIGNAL (0)

▶

Can we talk about Canada? What is the status of President Trump having a conversation with Mark Carney? We have seen the president use the term governor to refer to Justin Trudeau; will that moniker also go to Mr. Carney going forward? And is the decision to increase the tariffs -- is that based on a specific economic metric that he looked at? Is it impulse?

**Question**  00:14:14-00:14:16 (2 sec)                    NO STRESSLENS

▶

How would you describe his reaction to Canada?

**Karoline Leavitt**  00:14:16-00:14:42 (26 sec)                    NO SIGNAL (0)

▶

The president has not yet spoken to Mr. Carney, not since I checked, which was just moments ago, but certainly his phone is always open to leaders who wish to speak with him. As for the tariffs, the president made his position on this quite clear with the statement that he put out. And it was a retaliatory statement due to the escalation of rhetoric that we've seen out of Ontario, Canada.

**Karoline Leavitt**  00:14:42-00:15:04 (22 sec)                    NO SIGNAL (0)

▶

The president saw the premier, Doug Ford, make an egregious and insulting comment threatening to shut down electricity for the American people, for hard working American families. He made that threat. The president saw that and has an obligation and a responsibility to respond accordingly and represent the interests of the American people.

**Karoline Leavitt**  00:15:04-00:15:27 (23 sec)                    NO SIGNAL (0)

▶

So, he has made the decision to add a 25 percent tariff. So, now steel and aluminum tariffs will come into effect tomorrow at the rate of 50 percent. And our steel and aluminum industries have actually applauded these tariffs because, again, they know it's going to grow their industry here. It's going to allow them to export more steel that is made right here in the United States with American workers.

**Question**  00:15:27-00:15:43 (17 sec)                    NO SIGNAL (0)

▶

Egregious and insulting are your words here, but that's what many Canadian leaders have said about the actions President Trump has taken toward Canada. And what do you think the timeline is for speaking to Mr. Carney? Because normally the president -- a sitting president speaks to a close ally very quickly when there's new leadership.

**Karoline Leavitt**  00:15:43-00:16:09 (25 sec)                    NO SIGNAL (0)

▶

Well, the president is again responding to the fact that Canada has been ripping off the United States of America and hard-working Americans for decades. If you look at the rates of tariffs across the board that Canadians have been imposing on the American people and our workers here, it is egregious. In fact, I have a handy, dandy chart here that shows not just Canada, but the rate of tariffs across the board.

×

**Karoline Leavitt**  00:16:09-00:16:31 (22 sec)                    NO SIGNAL (0)

▶

If you look at Canada, since you brought it up, American cheese and butter, nearly 300 percent tariff; you look at India, 150 percent tariff on American alcohol. You think that's helping Kentucky bourbon be exported into India? I don't think so. 100 percent tariff on agricultural products from India. Look at Japan tariffing rice, 700 percent.

AAUP-01358

JA1612

X

**Karoline Leavitt**   00:16:31-00:16:52 (21 sec)                                          NO SIGNAL (0)

▶

President Trump believes in reciprocity, and it is about dang time that we have a president who actually looks out for the interests of American businesses and workers. And all he's asking for at the end of the day are fair and balanced trade practices. And unfortunately, Canada has not been treating us very fairly at all over the past several decades.

**Karoline Leavitt**   00:16:52-00:16:58 (6 sec)                                           NO SIGNAL (0)

▶

To the woman in the purple, because I saw you were making a face at my previous answer. So, what's going on? [Laughter]

**Question**   00:16:58-00:17:18 (20 sec)                                                  NO SIGNAL (0)

▶

Well, actually I have a couple of questions. At the core of pro-Palestinian protests on college campuses and elsewhere, is a demand to end the war in Gaza, a goal that this administration actually supports and has pursued. So, why has this not been acknowledged or highlighted even.

**Karoline Leavitt**   00:17:18-00:17:40 (21 sec)                                          NO SIGNAL (0)

▶

Because these colleges and these protests have again put out Hamas propaganda. The fliers that have been distributed call for violence. The fliers that have been distributed have the logo of an organization that has held Americans hostage, that murdered innocent babies, that murdered men, women and children.

**Karoline Leavitt**   00:17:40-00:18:14 (34 sec)                                          NO SIGNAL (0)

▶

They are a designated foreign terrorist organization. And we are not going to tolerate non-citizens, foreigners who come here on a visa engaging in such behavior siding with terrorists. And the Secretary of State reserves the authority to revoke the -- the green card or the visa of an individual who serves as a -- who -- actually it says right here, reasonable grounds to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences to the United States.

**Karoline Leavitt**   00:18:14-00:18:25 (11 sec)                                          NO SIGNAL (0)

▶

And I think siding with Hamas makes that quite clear. Secretary Rubio exercised that authority, and we fully believe that we are going to move forward with more arrests as President Trump previewed in his statement yesterday.

**Question**   00:18:25-00:18:26 (1 sec)                                                    NO STRESSLENS

▶

Yeah, but the White House also --

**Karoline Leavitt**   00:18:26-00:18:26 (1 sec)                                            NO STRESSLENS

▶

Ed?

**Question**   00:18:26-00:18:27 (1 sec)                                                    NO STRESSLENS

▶

Yeah, thanks, Karoline.

**Karoline Leavitt**   00:18:27-00:18:27 (1 sec)                                            NO STRESSLENS

▶                                                                                                          ✕

Go ahead.

**Question**   00:18:27-00:18:37 (10 sec)                                                   NO SIGNAL (0)

▶

So are there conversations between the administration and the Canadians going on over this tariff? Because the Ontario Premier says the next step is to cut off electricity to the US.

AAUP-01359

JA1613

X

**Karoline Leavitt**   00:18:37-00:19:02 (25 sec)          NO SIGNAL (0)

▶ And the president put out a statement after seeing those comments. And said that it would be -- there would be grave consequences imposed on Canada if they think about shutting off electricity for the United States of America and our citizens. And the president is also determined to ensure that we are depending on American electricity, not the electricity production of foreign nations, including our allies in Canada.

**Karoline Leavitt**   00:19:02-00:19:11 (8 sec)          NO SIGNAL (0)

▶ As for conversations, there is continued correspondence between the president's team, particularly Secretary Lutnick and the Canadians as well.

**Question**   00:19:11-00:19:21 (10 sec)          NO SIGNAL (0)

▶ And the market reaction, how do you -- how do you sell to the American people then after they're looking at what's happening in the markets this week and say that the tariff policy long term is something good?

**Karoline Leavitt**   00:19:21-00:19:40 (19 sec)          NO SIGNAL (0)

▶ Well, just think about what the tariff policy long term will do for our country. I think many of us probably grew up in small towns. I know at least I did. And the main street in my small town looks a heck of a lot worse than it probably did decades ago before I was alive. At least my parents and grandparents tell me so. And I know many Americans feel that same way.

**Karoline Leavitt**   00:19:40-00:19:59 (19 sec)          NO SIGNAL (0)

▶ What the president envisions for this country is for the United States of America to be a manufacturing superpower, where there are American factories and businesses owned by Americans producing goods that we are exporting to the rest of the world. Those revenues will stay here. It will increase wages for people here in our great country.

**Karoline Leavitt**   00:19:59-00:20:17 (18 sec)          NO SIGNAL (0)

▶ It will ensure our national security. And it will boost the morale of the American people to have thriving industries again. Think about Detroit, Michigan, think about North Carolina, as I mentioned. That used to have a thriving furniture industry that no longer exists because of the globalist trade policies of previous and past administrations.

**Karoline Leavitt**   00:20:17-00:20:28 (11 sec)          NO SIGNAL (0)

▶ And the American people gave the president a tremendous opportunity to restore American greatness and restore our manufacturing dominance. And he's intent on doing just that. John?

**Question**   00:20:28-00:20:49 (21 sec)          NO SIGNAL (0)

▶ Thanks, Karoline. Thanks a lot, Karoline. Two questions for you. First on the CR, you put up on the screen, the president's message to Republicans to support this continuing resolution. Is there outreach to Democrats? Because what we've seen since the beginning of the fiscal year is that in order to get a continuing resolution, you need bipartisan support, and you need compromise.

**Karoline Leavitt**   00:20:49-00:21:06 (17 sec)          NO SIGNAL (0)          ✕

▶ Well, right now, we are focused on House Republicans and on the House. Because that's the first step, as you know, John. And so, the president has engaged in correspondence with House Republicans whipping votes and getting them to a yes, which I understand has been pretty successful this morning thus far.

AAUP-01360

**JA1614**

**Karoline Leavitt**   00:21:06-00:21:20 (14 sec)      [ NO SIGNAL (0) ]   X

And so again, the president is encouraging Republicans especially. But again, as I said, all members of Congress to vote to continue funding this government so we can continue the business of the American people which elected President Trump to do.

**Question**   00:21:20-00:21:40 (21 sec)      [ NO SIGNAL (0) ]

And then, on financial markets, we've seen this decline yesterday. We see it today as well. It seems that the read on the president's policies is one in which they do not have confidence in his trade tariffs policy. They do not have confidence in what the president said to Fox News over the weekend that he didn't rule out the idea of a recession.

**Question**   00:21:40-00:21:47 (7 sec)      [ NO SIGNAL (0) ]

What is your read in terms of the decline that we've seen over the last week and a half in financial markets?

**Karoline Leavitt**   00:21:47-00:22:09 (22 sec)      [ NO SIGNAL (0) ]

Well, I think there's actually a lot of reason to be confident. And many people do feel confident. Just look at the nearly $2 trillion in private investment that this President has secured. Look at the comments made by the CEO of Apple, one of the biggest companies in this world who said that he is bullish on the future of American innovation under the leadership of President Trump.

**Karoline Leavitt**   00:22:09-00:22:31 (22 sec)      [ NO SIGNAL (0) ]

Look at CEO confidence. According to the Conference Board measure of CEO confidence in Q1 2025, under the leadership of this president, it jumped to its highest level in three years from cautious optimism to confident optimism. If you, again, look at the $2 trillion in investments from some of the biggest companies in the world, look at the jobs report last Friday.

**Karoline Leavitt**   00:22:31-00:22:55 (24 sec)      [ NO SIGNAL (0) ]

As I also cited in my opening remarks, Fox business reported that Trump sees a manufacturing boom in first folds jobs report of his second term. Look at the auto jobs that have already poured back into America. We added 9000 new auto jobs. Those are sticky jobs. Those are good paying jobs. That's 9000 American families who will now be able to live the American dream because of the policies of this administration.

**Karoline Leavitt**   00:22:55-00:23:15 (20 sec)      [ NO SIGNAL (0) ]

You also look at small business optimism. The NFIB put out a report this morning, small business optimism continues to be far higher than it ever was under the previous administration. There's a lot of reason to be optimistic. And again, the American people, CEOs and people on Wall Street and on Main Street should bet on this president.

**Karoline Leavitt**   00:23:15-00:23:25 (9 sec)      [ NO SIGNAL (0) ]

He is a dealmaker. He is a businessman. And he's doing what's right for our country. He wants to restore wealth to the United States of America. Michael, good to see you.

**Question**   00:23:25-00:23:34 (9 sec)      [ NO SIGNAL (0) ]   X

Hey, Karoline, thank you. Two questions if I may. Will the -- will the administration be providing any relief to states affected by the Ontario Power Tariff?

**Karoline Leavitt**   00:23:34-00:23:49 (15 sec)      [ NO SIGNAL (0) ]

AAUP-01361

JA1615

X

Well, the president has made it very clear that Canada would be very wise not to shut off electricity for the American people. And we hope that that does not happen. As for what would happen, if that does take place, I'll leave it to the president to make those decisions.

Question     00:23:49-00:23:57 (8 sec)                                                         NO SIGNAL (0)

And does President Trump share the Justice Department's concern over rising egg prices and possible collusion of Big Egg? [Laughter]

Karoline Leavitt     00:23:57-00:24:16 (20 sec)                                                NO SIGNAL (0)

Well, we definitely -- we definitely do share the concerns of the American people when it comes to the price of eggs. However, good news, the average cost of a dozen eggs is actually down since Secretary Rollins and President Trump announced their plan. It's down $ 1.85. So that's good news on the cost of eggs.

Karoline Leavitt     00:24:16-00:24:36 (19 sec)                                                NO SIGNAL (0)

And as we know, under the Biden administration, egg prices went up 22 percent. This is another example of an economic mess that President Trump inherited. And the Secretary of Agriculture and the president are focused on fixing it. Secretary Rollins put out a five point plan -- a four point plan rather to address this crisis.

Karoline Leavitt     00:24:36-00:24:49 (14 sec)                                                NO SIGNAL (0)

And she has been honest and realistic with the American people as this administration always is. It will take about three to six months to get the egg supply back to where it should be. But she's focused and this administration is focused on doing that every day. Karen?

Question     00:24:49-00:25:01 (12 sec)                                                         NO SIGNAL (0)

Thanks, Karoline. Just back on the markets, you said that what we're seeing this week right now in Wall Street is a snapshot of a moment in time, but does the president think he bears any responsibility for the turmoil in the stock market this week?

Karoline Leavitt     00:25:01-00:25:16 (15 sec)                                                NO SIGNAL (0)

Look, the president is unwavering in his commitment to restore American manufacturing and global dominance. And I think he doubled down on that this morning with his new statement and the tariffs that will be implemented tomorrow on steel and aluminum.

Question     00:25:16-00:25:32 (15 sec)                                                         NO SIGNAL (0)

And he has said recently he's not looking at the market. He said you can't really watch the stock -- the stock market, but all of the gains since Election Day have been erased in the S&P 500. At what point, how far do stocks have to fall before the president considers it a factor and changes course?

Karoline Leavitt     00:25:32-00:25:44 (12 sec)                                                NO SIGNAL (0)

Again, as I just said, the president will look out for Wall Street and for Main Street just like he did in his first term. And people on Wall Street and Main Street should bet on this president. He's doing what's right for this country. Nick, good to see you.

×

Question     00:25:44-00:25:56 (12 sec)                                                         NO SIGNAL (0)

Good to see you, too. Thank you, Karoline. So is the president prepared like what we saw with Congressman Massie to pressure other Republican lawmakers into supporting this continuing resolution?

AAUP-01362

JA1616

**Karoline Leavitt**  00:25:56-00:26:15 (19 sec)    NO SIGNAL (0)

Well, he is very much, as I said, engaged in this process. He's been making calls to lawmakers on Capitol Hill. And I think his statements against Congressman Massie speak for themselves. And I will let the president put out any additional statements if he chooses to. But he fully expects all House Republicans to vote for this continuing resolution.

**Question**  00:26:15-00:26:24 (9 sec)    NO SIGNAL (0)

And just a follow up, can we start to anticipate seeing more of the president weighing in on upcoming 2026 races like we saw this morning?

**Karoline Leavitt**  00:26:24-00:26:35 (10 sec)    NO SIGNAL (0)

I'm not sure about that. I'm not even sure if I'm allowed to speak about that from this podium. I would check in with our outside political team for guidance on future races and the president's involvement. Elena?

**Question**  00:26:35-00:26:57 (22 sec)    NO SIGNAL (0)

Thank you. I wanted to ask you about some comments Elon Musk made yesterday. He said that there is $500 to $700 billion in waste and fraud in entitlement spending. He called it, "the big one to eliminate." Earlier this month, he also referred to Social Security as a Ponzi scheme. Should Americans expect changes, big changes to Social Security and Medicare?

**Karoline Leavitt**  00:26:57-00:27:14 (17 sec)    NO SIGNAL (0)

President Trump has been unequivocally clear on this. He is going to protect Social Security and Medicare benefits and Medicaid for hard working Americans who paid into these entitlement programs and deserve those hard earned benefits. And unfortunately, the mainstream media has taken Mr. Musk out of context.

**Karoline Leavitt**  00:27:14-00:27:43 (30 sec)    NO SIGNAL (0)

I saw a Bloomberg headline that our team -- wrong, and it took Mr. Musk out of context. What he was specifically referring to cutting was the waste and the fraud and abuse that does exist in these programs. According to an IG report from the Social Security Administration, there's more than $70 billion of fraud in the Social Security program alone that we know of. And so, the president will continue to protect these programs for hard-working Americans.

**Karoline Leavitt**  00:27:43-00:27:48 (5 sec)    NO SIGNAL (0)

And actually, cutting the waste, fraud and abuse out of these programs will protect it for hard-working Americans.

**Question**  00:27:48-00:28:03 (14 sec)    NO SIGNAL (0)

But Karoline, respectfully -- he said around $500 billion to $700 billion, there was no evidence to claim that. And also, if that is the case, that would represent more than a third of what Social Security paid out last year, maybe 20 percent of Social Security and Medicare combined.

**Karoline Leavitt**  00:28:03-00:28:21 (19 sec)    NO SIGNAL (0)

Again, if you read his full quote, he said we think, so it's an estimate based on what he's seen. He's not saying definitively, he's saying that's what DOGE suspects and thinks. And that's exactly why DOGE was created, to ensure that we are investigating the fraudulent spending, the wasteful abuse across our federal government.

**Karoline Leavitt**  00:28:21-00:28:32 (11 sec)    NO SIGNAL (0)

AAUP-01363

JA1617

X

And I would remind everybody in this room that 77 percent of the American people support this effort by Elon Musk and DOGE to identify such waste, fraud and abuse. Go ahead. You're welcome.

Question    00:28:32-00:28:47 (15 sec)    NO SIGNAL (0)

Thanks, Karoline, for doing this. If we could just step back for a second, when President Trump last addressed the BRT, when he was on the campaign trail, his big push was on tax cuts. He's going there today as he's proposing tax hikes in the form of tariffs. And I'm curious --.

Karoline Leavitt    00:28:47-00:28:48 (1 sec)    NO STRESSLENS

Not true. He's not doing that.

Question    00:28:48-00:28:51 (3 sec)    NO STRESSLENS

For why he's prioritizing that over the tax cuts.

Karoline Leavitt    00:28:51-00:29:12 (21 sec)    NO SIGNAL (0)

He's actually not implementing tax hikes; tariffs are a tax hike on foreign countries that again have been ripping us off. Tariffs are a tax cut for the American people. And the president is a staunch advocate of tax cuts. As you know, he campaigned on no taxes on tips, no taxes on overtime, no taxes on Social Security benefits.

Karoline Leavitt    00:29:12-00:29:17 (5 sec)    NO SIGNAL (0)

He is committed to all three of those things and he expects congress to pass them later this year.

Question    00:29:17-00:29:24 (7 sec)    NO SIGNAL (0)

I'm sorry, have you ever paid a tariff, because I have? They don't get charged on foreign companies; they get charged on the importers.

Karoline Leavitt    00:29:24-00:29:43 (20 sec)    NO SIGNAL (0)

And ultimately when we have fair and balanced trade, which the American people have not seen in decades, as I said at the beginning, revenues will stay here, wages will go up and our country will be made wealthy again. And I think it's insulting that you are trying to test my knowledge of economics and the decisions that this president has made.

Karoline Leavitt    00:29:43-00:29:47 (4 sec)    NO STRESSLENS

I now regret giving a question to the Associated Press. Mary, go ahead.

Question    00:29:47-00:30:01 (14 sec)    NO SIGNAL (0)

Hey, Karoline, I have two if that's OK. The first one was on Russia-Ukraine. I know Special Envoy Witkoff said yesterday that Zelenskyy apologized in his letter to Trump. Can you share any more about that letter and what else might be interesting from it that we don't know?

Karoline Leavitt    00:30:01-00:30:20 (19 sec)    NO SIGNAL (0)

Yes, the president did reference that letter, as you're saying, in his joint address to congress, and I do have an update. As you know, Secretary of State Rubio and our National Security advisor Mike Waltz, have been negotiating with the Ukrainians today in Saudi. They will be providing a full readout of that meeting very soon.

AAUP-01364
JA1618

**X**

**Karoline Leavitt**  00:30:20-00:30:42 (22 sec)                                      NO SIGNAL (0)

But I can assure you and everybody here and the American people that the news we've received from that meeting throughout the day and the president has been briefed on is positive. This meeting has been productive. I will let Secretary Rubio and our national security -- Secretary of State Rubio and our national security advisor speak to the specifics of what has taken place today when they are ready to do so when the meeting concludes.

**Karoline Leavitt**  00:30:42-00:30:43 (1 sec)                                      NO STRESSLENS

Lindsay, go ahead.

**Question**  00:30:43-00:30:56 (12 sec)                                      NO SIGNAL (0)

Thank you, Karoline. According to Mahmoud Khalil, the president has said this is the first of many arrests like this. Does the administration have a rough estimate of how many arrests you're planning to make similar?

**Karoline Leavitt**  00:30:56-00:31:14 (18 sec)                                      NO SIGNAL (0)

I don't have an estimate. I do know that DHS, based on very good Intel that they have gathered at the direction of the president's executive order, which made it very clear to the Department of Homeland Security that engaging, as I said, in anti-American, anti-Semitic, pro-Hamas protests will not be tolerated.

**Karoline Leavitt**  00:31:14-00:31:33 (20 sec)                                      NO SIGNAL (0)

So, since the president signed that executive order, and since Secretary Noem has taken the oath at DHS, they have been using intelligence to identify individuals on our nation's colleges and universities, on our college campuses who have engaged in such behavior and activity, and especially illegal activity.

**Karoline Leavitt**  00:31:33-00:31:51 (17 sec)                                      NO SIGNAL (0)

And so, I don't have a readout on how many arrests will come, but I do know that DHS is actively working on it. And I also know that Columbia University has been given the names of other individuals who have engaged in pro-Hamas activity, and they are refusing to help DHS identify those individuals on campus.

**Karoline Leavitt**  00:31:51-00:32:05 (14 sec)                                      NO SIGNAL (0)

And as the president said very strongly in his statement yesterday, he is not going to tolerate that. And we expect all America's colleges and universities to comply with this administration's policy. Jasmine?

**Question**  00:32:05-00:32:18 (13 sec)                                      NO SIGNAL (0)

Thank you so much, Karoline, for the question. On Canada, after all of these threats to increase tariffs or turn off electricity, I wonder, does this administration still consider Canada to be a close ally of the United States?

**Karoline Leavitt**  00:32:18-00:32:36 (18 sec)                                      NO SIGNAL (0)

Well, I think Canada is a neighbor, they are a partner. They have always been an ally, perhaps they are becoming a competitor now. But as the president also laid out in his Truth Social post today, he believes that Canadians would benefit greatly from becoming the 51st state of the United States of America.

X

**Karoline Leavitt**  00:32:36-00:33:08 (32 sec)                                      NO SIGNAL (0)

And I actually looked into some of the research about the cost of living in Canada, and the cost of living is much higher than it is here in the United States of America. The average cost of a home in Canada is much higher. In Quebec, the highest tax rate

**JA1619**

AAUP-01365

X

for an income of 150,000 or more is 53.3 percent, more than half of Canadians incomes they are being taxed on. So, the president has made it clear that he believes Canadians would be better served economically, militarily if they were to become the 51st state of the United States of America.

**Karoline Leavitt**    00:33:08-00:33:08 ( sec)                    NO STRESSLENS

Reagan?

**Question**    00:33:08-00:33:20 (12 sec)                    NO SIGNAL (0)

Thank you, Karoline. A week ago, Attorney General Bondi said a truckload of Epstein files had been delivered to her office from the SDNY. When can we expect those files to be released to the public?

**Karoline Leavitt**    00:33:20-00:33:23 (3 sec)                    NO STRESSLENS

I would defer you to the Department of Justice. I don't have a timeline here.

**Question**    00:33:23-00:33:25 (2 sec)                    NO STRESSLENS

Do you have any update on the JFK files?

**Karoline Leavitt**    00:33:25-00:33:37 (11 sec)                    NO SIGNAL (0)

I don't. At this moment, again, I would defer you to our DNI Director Tulsi Gabbard, and also the Department of Justice. I know that they are working on that diligently as the president requested them to do. Christian?

**Question**    00:33:37-00:33:46 (9 sec)                    NO SIGNAL (0)

Thanks, Karoline. Two questions since we've been talking a lot about tariffs. Have there been any updates on standing up the External Revenue Service to collect revenue from that?

**Karoline Leavitt**    00:33:46-00:34:05 (19 sec)                    NO SIGNAL (0)

Well, we need reciprocal tariffs to go into effect first and, as you know, the president will be rolling those out on April 2nd. And then the next start of that process is collecting that revenue to ultimately create the External Revenue Service, which Secretary Lutnick is working very hard on and is quite enthusiastic about, if you have noticed from his media interviews.

**Question**    00:34:05-00:34:08 (3 sec)                    NO STRESSLENS

Can the president do that through executive action, or will it require legislation?

**Karoline Leavitt**    00:34:08-00:34:23 (14 sec)                    NO SIGNAL (0)

Well, the president already signed an executive order to direct the secretary of commerce to establish the External Revenue Service or at least to identify ways in which it can be done. I would refer you to the Department of Commerce for more on specifics on that. Sure, in the back.

**Question**    00:34:23-00:34:50 (27 sec)                    NO STRESSLENS

×

Thank you very much, Karoline. I have a few questions on South Korea and North Korea. First question, as you know, South Korean President Moon has been released from illegal detention. What is the reaction of the United States as an ally? Is there a possibility of a summit with President Trump when President Moon returns?

**Question**    00:34:50-00:35:04 (15 sec)                    NO SIGNAL (0)

JA1620

AAUP-01366

X

Second question on North Korea, Morth Korea launched the ballistic missile -- several ballistic missiles into the West Coast yesterday. What is the White House's reaction on this --

**Note**   00:35:04-00:35:04 ( sec)                                                                                    NO STRESSLENS

[Crosstalk]

**Karoline Leavitt**   00:35:04-00:35:28 (24 sec)                                                                       NO SIGNAL (0)

Sure, yes, I'll start with your question on North Korea. We condemn these actions, and we call on North Korea to stop their unlawful and destabilizing actions. As for South Korea, the US and Republic of Korea's alliance is ironclad, and the Trump administration remains in close contact with our South Korean counterparts as we work together to promote a free and open Indo-Pacific.

**Karoline Leavitt**   00:35:28-00:35:29 (1 sec)                                                                        NO STRESSLENS

Sure.

**Question**   00:35:29-00:35:36 (7 sec)                                                                                NO SIGNAL (0)

The first question, you didn't answer that. But release of our South Korean president from jail [Inaudible]

**Karoline Leavitt**   00:35:36-00:35:45 (8 sec)                                                                        NO SIGNAL (0)

I don't have anything on that, but I can certainly check in with the National Security Council and get back to you. Sure, good to see you.

**Question**   00:35:45-00:36:04 (19 sec)                                                                               NO SIGNAL (0)

Press secretary, many are concerned about the validity of President Biden's official actions and also his pardons of the possible criminal actions of individuals such as his family members and Liz Cheney as information is emerging that many of his official actions were auto signed, possibly even the pardons and without his knowledge or consent.

**Question**   00:36:04-00:36:21 (17 sec)                                                                               NO SIGNAL (0)

Does the White House have any information available currently that Biden was actually the one that approved and signed those pardons? And second question, will the DOJ investigate whether President Biden's cognitive decline allowed unelected staff to push through radical policy and pardons without his knowing approval?

**Karoline Leavitt**   00:36:21-00:36:28 (7 sec)                                                                        NO SIGNAL (0)

I don't know the answer to that question, but I can check in with our folks here who may know the answer to that question and get back to you. Dasha, go ahead.

**Question**   00:36:28-00:36:46 (19 sec)                                                                               NO SIGNAL (0)

Karoline, you did a great job articulating the vision that President Trump has for what his tariffs -- he believes his tariffs can do in terms of bringing jobs back to the United States. I asked you last week about how much Americans might need to buckle up for some short-term pain. A conversation that the President and Treasury Secretary Scott Bessent have had with the people.

X

**Question**   00:36:46-00:37:11 (24 sec)                                                                               NO SIGNAL (0)

I'm wondering what is the -- how high is the pain threshold for President Trump and for this White House as you watch some of the turbulence in the stock markets, as you field concerns from businesses that potentially see some of those approval ratings

AAUP-01367

**JA1621**

X

drop in the short term? How much is he willing to stomach that and will he stay committed to his vision for tariffs even as all of this comes up?

**Karoline Leavitt**   00:37:11-00:37:28 (18 sec)          NO SIGNAL (0)

Well, the president has been working hard every single day to alleviate the pain that was inflicted by the previous administration through massive deregulation, through drill, baby, drill, as we like to call it, unleashing the might of our energy industry. Which we know will ultimately drive down costs for consumers here at home.

**Karoline Leavitt**   00:37:28-00:37:57 (29 sec)          NO SIGNAL (0)

And again, as I mentioned, the president is intent on signing tax cuts for the American people to put more money back into their pockets, which will ultimately unlock consumer confidence. And again, I'll reiterate the president's words in layman's terms, as he does best. The president wants the American people to have so much more money in their pockets they don't know what to do with it. That's the goal of this administration through tariffs, through tax cuts, through deregulation and through unleashing the potential of our energy industry.

**Karoline Leavitt**   00:37:57-00:38:14 (17 sec)          NO SIGNAL (0)

I have two more quick notes before I wrap up. Um, April 28th, I can confirm that the Philadelphia Eagles will be here at the White House to celebrate their Super Bowl victory. I know there was a lot of fake news about an invitation that wasn't sent or was sent. We want to correct the record. We sent an invitation.

**Karoline Leavitt**   00:38:14-00:38:38 (24 sec)          NO SIGNAL (0)

They enthusiastically accepted. And you will see them here on April 28th. And lastly, on a sad note, I would like to express our condolences to Fox News and to the entire Fox family who did lose a cameraman, Craig Savage, who passed away at 61 years old recently. A very tragic death, an individual who was a great man and covered this building for many, many years.

**Karoline Leavitt**   00:38:38-00:38:51 (13 sec)          NO SIGNAL (0)

So the entire Press Office, the Communications Office here wants to express our condolences with his family and also with Fox News. And I'll see you guys later. Perhaps you'll see the president in a Tesla later this afternoon. Have a good one.

**Roll Call**

THE SOURCE FOR NEWS ON
CAPITOL HILL SINCE 1955

| About | Contact Us | Advertise |
| Events | Privacy | RC Jobs |
| Newsletters | The Staff | Subscriptions |

CQ and Roll Call are part of FiscalNote, a leading provider of political and business risk solutions.

Copyright 2025 CQ and Roll Call. All rights reserved.

×

AAUP-01368

JA1622





MY PLAYLIST



DONATE

---

**Interview highlights**

---

# DHS official defends Mahmoud Khalil arrest, but offers few details on why it happened

MARCH 13, 2025 · 4:18 AM ET

HEARD ON MORNING EDITION

By Michel Martin, Destinee Adams

**5-Minute Listen**

PLAYLIST        TRANSCRIPT

AAUP-01369

JA1623



Troy Edgar testifies during his confirmation hearing before the Senate Homeland Security and Governmental Affairs Committee on February 25, 2025.

*Chip Somodevilla/Getty Images*

President Trump has ramped up efforts to deliver on a campaign promise to carry out the largest ever deportation of immigrants in U.S. history.

Parallel to those deportation plans is a crackdown on what the administration calls antisemitism on college campuses.

Both efforts came to the forefront this week when Immigration and Customs Enforcement officers arrested Mahmoud Khalil, a recent Columbia University graduate student, who has not been charged with any crime yet. This is likely the first high profile arrest of a legal permanent resident in connection with the pro-Palestinian protests that rippled across the nation's campuses last year. Trump has vowed that this is the first of many arrests to come as he lays a framework for

AAUP-01370

increased deportations. Trump officials are standing beside his efforts and doubling down on accusations that Khalil's actions align with those of a terrorist.

One of those officials is Troy Edgar, the deputy secretary of the Department of Homeland Security, who defended Khalil's arrest on *Morning Edition*. When NPR's Michel Martin asked him to explain what Khalil did to be arrested, aligned with terrorist activity and potentially deported, Edgar did not give a clear answer.

"I think you can see it on TV, right?" Edgar said. "We've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity. And at this point, like I said, the Secretary of State can review his visa process at any point and revoke it."

Khalil, a Syrian national of Palestinian descent, does not have a U.S. visa of any kind. Therefore an immigration judge would be the one to decide whether or not his status is revoked, not administration officials. He does however hold a green card, making him a lawful permanent resident in the U.S.

Khalil participated in pro-Palestine student protests at Columbia University last year, and he also negotiated with the administration on behalf of students pushing for the university to divest from Israel because of its war in Gaza against Hamas.

AAUP-01371

After his arrest, Khalil was taken to a detention center in Louisiana. Though ICE officers said that his green card was revoked, U.S. District Judge Jesse M. Furman ordered he cannot be deported while the court weighs a legal challenge brought by his lawyers.

The day before Khalil's arrest, Edgar was sworn into his new position with the Department of Homeland Security. During Trump's first term, Edgar served as the department's chief financial officer.

Edgar spoke to Martin about Mahmoud Khalil's arrest and the Trump administration's ramped-up deportations of migrants.

*The following excerpt has been edited for length and clarity.*

---

## Interview highlights

**Michel Martin:** Mahmoud Khalil says he acted as a spokesperson for pro-Palestinian demonstrators and as a mediator with Columbia University, where he was a graduate student. As you know, Mr. Edgar, any conduct that can be legally sanctioned must be described. So, what is the specific conduct the government alleges that Mr. Khalil engaged in that merits removal from the United States.

**Troy Edgar:** I think what you saw there is you've got somebody that has come into the country on a visa. And as he's going through the visa process, he is coming in to basically be a student that is not going to be supporting terrorism. So, the issue is he was let into the country on this visa. He has been promoting this antisemitism activity at the university. And at this point, the State Department has

JA1626

AAUP-01372

revoked his visa for supporting a terrorist type organization. And we're the enforcing agencies, so we've come in to basically arrest him.

**Martin**: A White House official told the Free Press that there's no allegation that he broke any laws. So, again, I have to ask, what specifically constitutes terrorist activity that he was supporting? What exactly do you say he did?

**Edgar**: Well, like I said, when you apply for a visa, you go through the process to be able to say that you're here on a student visa, that doesn't afford you all the rights of coming in and basically going through this process, agitating and supporting Hamas. So, at this point, yeah, the Secretary of State and the State Department maintains the right to revoke the visa, and that's what they've done.

**Martin**: How did he support Hamas? Exactly what did he do?

**Edgar**: Well, I think you can see it on TV, right? This is somebody that we've invited and allowed the student to come into the country, and he's put himself in the middle of the process of basically pro-Palestinian activity. And at this point, like I said, the Secretary of State can review his visa process at any point and revoke it.

**Martin**: He's a permanent resident. He's not a visa holder. He's a legal permanent resident. He has the green card, at least he did, until it's alleged that it was revoked.

JA1627

AAUP-01373

If the allegation is that Mr. Khalil organized protests and made speeches after which other people engaged in prohibited activity, or, say, violent activity. Well, Mr. Trump gave a political speech on January 6, 2021, after which some individuals engaged in violent and illegal acts. How is this any different?

**Edgar:** President Trump's a citizen and the president of the United States. This is a person that came in under a visa. And again, the secretary of state at any point can take a look and evaluate that visa and decide if they want to revoke it.

**Martin:** He's a legal permanent resident. I have to keep insisting on that. He is a legal permanent resident.

So what is the standard? Is any criticism of the Israeli government a deportable offense?

**Edgar:** Like I said, I think that at this point when he entered into the country on a student visa, at any point we can go through and evaluate what his status is.

**Martin:** Is any criticism of the United States government a deportable offense?

**Edgar:** Like I said, if you go through the process and you're a student and you're here on a visa and you go through it, at any point …

**Martin:** Is any criticism of the government a deportable offense?

AAUP-01374

JA1628

**Edgar**: Let me put it this way, Michel, imagine if he came in and filled out the form and said, 'I want a student visa.' They asked him, 'What are you going to do here?' And he says, 'I'm going to go and protest.' We would have never let him into the country.

**Martin**: Is protesting a deportable offense?

**Edgar**: You're focused on protests. I'm focused on the visa process. He went through a legal process …

**Martin**: Are you saying he lied on his application? He's a lawful permanent resident, married to an American citizen.

**Edgar**: I think if he would have declared he's a terrorist, we would have never let him in.

**Martin**: And what did he engage in that constitutes terrorist activity?

**Edgar**: I mean, Michel, have you watched it on TV? It's pretty clear.

**Michel**: No, it isn't. Well, explain it to those of us who have not or perhaps others who have not. What exactly did he do?

**Edgar**: Well, I think it's clear or we wouldn't be talking about it. I mean, the reality is that if you watch and see what he's done on the university …

**Martin**: Do you not know? Are you telling us that you're not aware?

**Edgar**: I find it interesting that you're not aware.

AAUP-01375

**Martin**: I think you could explain it to us. I think others would like to know exactly what the offenses are, what the propaganda was that you allege, what the activity was that you allege. Well, perhaps we can talk again and you can give us more details about this.

We really appreciate your coming to join us, and we do hope we'll talk again.

**Edgar**: Thank you.

*This story was edited by Kristian Monroe. Ximena Bustillo contributed to this story.*

## The White House is one step closer to defunding public radio.

The House has voted to claw back all federal funding for public media, and the proposal now moves to the Senate.

**We're running out of time to protect public radio's essential news, music, and emergency broadcast services to communities across the nation.**
Those in rural areas — with few other options to get their news and information — will likely be the hardest hit.

But you can still stand up for public radio.

**Spend 10 seconds at the link below.**
The consequences of this vote fall directly on the Americans who rely on local, independent stations serving communities across the country. Take action.

**SAVE PUBLIC MEDIA**

## More Stories From NPR



AAUP-01376

**INTERVIEW HIGHLIGHTS**
## DNC chair says Republicans sold 'their constituents out to help billionaires'

**INTERVIEW HIGHLIGHTS**
## An Alabama food bank braces for big increase in demand if SNAP cuts take effect

AAUP-01377

JA1631

**INTERVIEW HIGHLIGHTS**

## Maine can't afford to lose federal funding, governor says

**INTERVIEW HIGHLIGHTS**

## Republicans' big bill could hit rural hospitals hard

JA1632

AAUP-01378

**MIDDLE EAST CONFLICT**

## Sen. Tim Kaine says Trump likely exaggerated damage done to Iran's nuclear program

**INTERVIEW HIGHLIGHTS**

## What's next for 'Vogue' after Anna Wintour moves away from day-to-day editing of magazine?

AAUP-01379

JA1633

## Popular on NPR.org



POLITICS

## How Trump's big beautiful bill aims to 'supercharge' immigration enforcement

JA1634

AAUP-01380

POLICY-ISH

## 5 ways Trump's megabill will limit health care access

OBITUARIES

## Actor Michael Madsen, known for 'Kill Bill' and 'Reservoir Dogs,' dead at 67

JA1635

AAUP-01381

NEWS

## Congress passed no tax on tips in Trump's 'big, beautiful bill.' Here's how it works

SEAN COMBS TRIAL

## What happens to Sean Combs now?

JA1636

AAUP-01382



POLITICS

**House Republicans pass Trump's megabill, sending the package to his desk to be signed**

## NPR Editors' Picks

JA1637

AAUP-01383

WORLD
**U.K. High Court slams MI5 over informant deception and lack of transparency**

NATIONAL
**Abrego Garcia says he was severely beaten in Salvadoran prison**

JA1638
AAUP-01384

NATIONAL

**Pope Leo's scandal-plagued hometown sees a bright future in buying his childhood home**

SCIENCE

**NASA spots a new comet flying in from a distant star system**

JA1639

AAUP-01385

MUSIC

**How the Irish band Kneecap went from rising hip-hop group to global lightning rod**

NATIONAL

**Ghost guns may make a comeback, despite a Supreme Court ruling**

AAUP-01386

JA1640

READ & LISTEN

Home

News

Culture

Music

Podcasts & Shows

CONNECT

Newsletters

Facebook

Instagram

Press

Public Editor

Corrections

Transcripts

Contact & Help

ABOUT NPR

Overview

Diversity

NPR Network

Accessibility

Ethics

Finances

GET INVOLVED

Support Public Radio

Sponsor NPR

NPR Careers

NPR Shop

NPR Events

NPR Extra

terms of use

privacy

your privacy choices

text only

© 2025 npr

AAUP-01387

JA1641

An official website of the United States Government Here's how you know ⌄

# U.S. DEPARTMENT *of* STATE

Home  >  ...  > Secretary of State Marco Rubio Remarks to Press

★ ★ ★

# Secretary of State Marco Rubio Remarks to Press

**REMARKS**

**MARCO RUBIO, SECRETARY OF STATE**
**SHANNON, IRELAND**

MARCH 12, 2025



Secretary Rubio's remarks to the press

**SECRETARY RUBIO:**  All right, who's got a question?

Cookie Settings

AAUP-01388

JA1642

**QUESTION:** I do.

**SECRETARY RUBIO:** I knew you would have a question.

**QUESTION:** So – Michael Gordon, *Wall Street Journal*. Sir, the Russians are still making gains on the battlefield. There's been no public response to the developments in Jeddah. Are you concerned they're playing for time? Have you had any contact with them? What's been their response officially and are they willing to accept the ceasefire unconditionally?

**SECRETARY RUBIO:** Well, I mean, we don't know the answer to the last question. That's what we want to know, whether they're prepared to do it unconditionally. We'll have contact with them today. There's already been contacts at different levels with counterparts, different members of the administration, and that'll continue. But as far as the Russian reaction to it, that's really the question here, and that is – this is a few hours old. We're going to bring it to them directly. We're going to say that Ukraine is prepared to stop all battlefield activity and begin the immediate process of negotiating an enduring end to the war, and we'll see what their response is.

If their response is yes, then we know we've made real progress and there's a real chance of peace. If their response is no, it'll be highly unfortunate, and it'd make their intentions clear. So that's what we're hoping to hear from them, and obviously, as I said, this was not pre-arranged with them, so they're – they're probably processing the news the same as the rest of the world. And so we hope to have a positive answer from them. The ball is truly in their court.

**QUESTION:** Mr. Secretary —

**QUESTION:** Mr. Secretary, Nike Ching with Voice of America. What would be a good G7 joint statement on Russia and on China?

**SECRETARY RUBIO:** Well, I think the perfect statement would be that the United States has done a good thing for the world in bringing this process forward, and now we all eagerly await and – the Russian response and urge them strongly to consider ending all hostilities so people will stop dying, so bullets will stop flying, and so a process can begin to find a permanent peace. I think the first step in all this is the acceptance that there is no military solution to this conflict. Neither side can militarily achieve their maximalist gains – their maximalist goals. I mean, they're just not going to achieve them through the military side. The only way this conflict can end is through negotiation. That's the only way you're going to have peace is through negotiation.

AAUP-01389

And so we need to start that process.  And it is hard to start a process when people are shooting at each other and people are dying.  And so our hope is that we can stop that, all these hostilities, and get to a negotiating table where both sides – over some period of time with a lot of hard work – can find a mutually acceptable outcome that, in the case of Ukraine, obviously secures their long-term prosperity and security.

**QUESTION:**  Mr. Secretary, could you just update us on Mr. Witkoff's plans for Moscow and whether he'll be meeting with President Putin?

And then separately, if you wouldn't mind elaborating on something that Mr. Waltz said yesterday about the specifics that you discussed with Ukrainians about what the end of the war would look like, you had mentioned we're not going to get maps out and draw lines, but did you actually talk about territorial concessions?

**SECRETARY RUBIO:**  Well, we – we had conversations.  As far as Steve's trip, I'm not here to – I can't – I'm not going to make any announcements about specific dates, times, or even confirm such a trip.  Suffice it to say there is going to be multiple points of contact with the Russians to gauge are they willing to do this or not.  And as far as the conversations that were yesterday, yeah – when you sit down with a counterpart like Ukraine, we're not going to negotiate this publicly, we're not going to actually put out there sort of what we talked about, because in any negotiation there's certainly an element where you don't want one side to be giving away all of this leverage from a public perspective.  We had a broad conversation about what it would – but I think the bulk of our conversation was what a negotiation process would look like in terms of not the specific conditions, but rather the timing of it, sort of the steps they would like to see taken.

The Ukrainians made very clear that this isn't just about ending a war.  They need to get their prisoners of war back; they need to get the children back.  They'd like to see an exchange of prisoners of war; they'd like to see their children back.  So there's all sorts of things tied to the, humanitarian assistance is important as well.  There are areas of Ukraine that have been badly damaged that require immediate assistance.  So these are the sorts of things that we talked about as being inclusive in the negotiation process.

So really the bulk of our conversation, when we got to that stage of it, was discussing the kinds of items that need to be on a negotiation agenda if and when we hopefully get there.

JA1644

AAUP-01390

**QUESTION:**  He also mentioned security guarantees, which is something that there has been some reluctance for the administration to elaborate on.  Have – are you committing to security —

**SECRETARY RUBIO:**  Well, I think the point – no – the point to understand is that we're looking at securing their long-term – what we want to see – like any country in the world, Ukraine wants their long-term security.  They want to make sure that this doesn't happen again.  We all do. What is the point of spending all this time to get a ceasefire hopefully and then a negotiated end to the war only to see it re-spark up again in about six years, four years, three years?  No one's – we're not interested in that, and they certainly aren't, either.

So I think the question really is more about a deterrence.  Can Ukraine create a sufficient deterrent against future aggression, against future attack, against future invasion?  Because every country in the world has a right to defend themselves, and no one can dispute that.  So that will most certainly have to be part of the conversation.  But again, I don't think there's – there isn't a peace to secure until you have a peace.

**QUESTION:**  Not just – not —

**SECRETARY RUBIO:**  There's no way to have an enduring peace without the deterrence piece being a part of it.

**QUESTION:**  Can I just follow up on that particular point?

**SECRETARY RUBIO:**  Yes.

**QUESTION:**  Because the joint statement talks about European partners being involved in the peace process, but that's only attributed to the Ukrainian delegation.  There doesn't appear to be U.S. support for that line —

**SECRETARY RUBIO:**  Well, I think what it says in the statement is that they raised the need for the Europeans.  But I have already said publicly the Europeans have issued a series of sanctions against the Russian Federation, and I would imagine that in any negotiation – if we get there, hopefully – with the Russians that they will raise these European – the European sanctions that have been imposed upon them.  So I think that the issue of European sanctions are going to be on the table —

AAUP-01391

JA1645

**QUESTION:** But it —

**SECRETARY RUBIO:** — not to mention what happens with the frozen assets and the like. And so I think it's self-evident that for there to be a peace in Ukraine, at the end of that process there is going to have to be some decision by the Europeans about what they are going to do with these sanctions and so forth. And so that's why I think they have to be necessarily involved in this regard. Now, whether they're involved at the front end of it or at the back end of it, it'll have to play itself out. And then obviously there is also all sorts of security promises that European countries have made to Ukraine, that that will also be, I imagine, a part of this conversation as we move forward.

**QUESTION:** But —

**SECRETARY RUBIO:** So we don't disagree with that statement. I think the statement just reflects that they raised it.

**QUESTION:** But do you back European peacekeepers in Ukraine, which is something Russia has categorically —

**SECRETARY RUBIO:** Well, we'll see. I mean, there's different ways to – there's different ways to construct a deterrent on the ground that prevents another war from starting in the future. We're not going to go in with any sort of preconceived notion. The bottom line is it needs to be something that makes Ukraine feel as if they can deter and prevent a future invasion. How that looks and how that's put together, that's what we're going to be talking about, if we can get to that stage.

Again, right now we're just trying to get to the stage where there's actual diplomacy happening. Here's what we'd like the world to look like in a few days: neither side is shooting at each other, not rockets, not missiles, not bullets, nothing, not artillery. The shooting stops, the fighting stops, and the talking starts. That's what we want to see. What happens during that talking and how that evolves, I think we're going to have to be flexible and nimble and creative and patient and work hard at it and hopefully turn it into something that's concrete.

You've covered – many of you have covered foreign policy for years. That's how these things happen, and they're not easy, and sometimes they're difficult to predict which way they're going to go in terms of the specifics of it. But we just want to get to that stage. That would be, for lack

AAUP-01392

JA1646

of a better term, a good problem to have, to have to figure out how to negotiate a peace because we're actually negotiating a peace while the shooting has stopped.

**QUESTION:** Is the mineral deal essentially the security guarantee that you guys envisioned?

And then a second question is: President Trump appealed to a lot of Americans during his campaign on free speech arguments and not suppressing speech, especially from the government, but your revocation of the green card to many is seen as one of the most anti-speech actions a secretary can take with his powers. How do you respond?

**SECRETARY RUBIO:** Yeah, I mean, the first question was again the —

**QUESTION:** Is the minerals deal a version of the security guarantee?

**SECRETARY RUBIO:** The minerals deal, yeah. Well, I think that a minerals deal is something that I think is beneficial for both countries. Certainly one of the things that provides for Ukraine's long-term prosperity and security is vibrant economic growth and development. If their GDP is – begins to grow and – that gives them a tremendous amount of leverage and power and the ability to fund their own defenses. So I think certainly any economic development for Ukraine is positive for their own future.

Obviously if the United States has a vested economic interest somewhere, we're tied to them on an economic front, we're in partnership with them on something, we will have an interest in the future of Ukraine as well. I wouldn't couch it as a security guarantee, but certainly if the United States has a vested economic interest that's generating revenue for our people as well as for the people of Ukraine, we'd have a vested interest in protecting it if it were to be challenged or threatened.

On your first point, when you enter the – this is an important point, and I'm glad you asked this question. When you come to the United States as a visitor – which is what a visa is, which is how this individual entered this country, on a visitor's visa, okay – you are here as a visitor. We can deny you that visa. We can deny you that – if you tell us when you apply, "Hi, I'm trying to get into the United States on a student visa, I am a big supporter of Hamas, a murderous, barbaric group that kidnaps children, that rapes teenage girls, that takes hostages, that allows them to die in captivity, that returns more bodies than live hostages" – if you tell us that you are in favor of a group like this, and if you tell us when you apply for your visa, "And by the way, I intend to come

JA1647

    AAUP-01393

to your country as a student and rile up all kinds of anti-Jewish student, anti-Semitic activities, I intend to shut down your universities" – if you told us all these things when you applied for a visa, we would deny your visa.  I hope we would.  If you actually end up doing that once you're in this country on such a visa, we will revoke it.  And if you end up having a green card – not citizenship but a green card – as a result of that visa while you're here and those activities, we're going to kick you out.  It's as simple as that.

This is not about free speech.  This is about people that don't have a right to be in the United States to begin with.  No one has a right to a student visa.  No one has a right to a green card, by the way.  So when you apply for a student visa or any visa to enter the United States, we have a right to deny you for virtually any reason, but I think being a supporter of Hamas and coming into our universities and turning them upside down and being complicit in what are clearly crimes of vandalization, complicit in shutting down learning institutions – there are kids at these schools that can't go to class.  You pay all this money to these high-priced schools that are supposed to be of great esteem and you can't even go to class, you're afraid to go to class because these lunatics are running around with covers on their face, screaming terrifying things.  If you told us that's what you intended to do when you came to America, we would have never let you in.  And if you do it once you get in, we're going to revoke it and kick you out.

**QUESTION:**  Can I ask you about the Canada trip coming up?  The President has taunted, if you will, Canada, calling it the 51st state, calling Prime Minister Trudeau the governor —

**SECRETARY RUBIO:**  Well, he said it should become the 51st state from an economic standpoint.  He says if they became the 51st state, we wouldn't have to worry about the border and fentanyl coming across because now we would be able to manage that.  He's made an argument that it's their interest to do so.  Obviously the Canadians don't agree, apparently, but —

**QUESTION:**  Do you agree with it?  Should there be – are you going to discuss that, becoming the 51st —

**SECRETARY RUBIO:**  Well, that's not what we're going to discuss at the G7, and that's not what we're going to be discussing in our trip here.  So it – they are the host nation, and I – I mean, we have a lot of other things we work on together.  We defend North America through NORAD and the airspace of our continent together, so – not to mention the issues of Ukraine and other

AAUP-01394

JA1648

commonalities.  So we're going to be focused in the G7 on all of those things.  That's what the meeting is about.  It is not a meeting about how we're going to take over Canada.

**QUESTION:**  But more broadly —

**QUESTION:**  But are you concerned at all about the reception that you might be getting, particularly at the event?

**SECRETARY RUBIO:**  I don't know, should I be?  What do you know that I don't know?

**QUESTION:**  They're unhappy.

**QUESTION:**  I don't know, you've got the tariffs in the last 12 hours, you've just seen this escalating trade war – not just with Canada but, with the exception of Japan, all the other members of the G7.

**SECRETARY RUBIO:**  Yeah, so what's your point?

**QUESTION:**  Well —

**QUESTION:**  Are you worried about alienating the Canadians, that they wouldn't work with the United States?

**SECRETARY RUBIO:**  Yeah, I mean, they've invited us to come.  We intend to go.  The alternative is to not go.  I think that would actually make things worse, not better.  So – it's a G7 summit.

**QUESTION:**  One alternative could be not to —

**SECRETARY RUBIO:**  Huh?

**QUESTION:**  The alternative could be not to have tariffs or not to have the language that the President —

**SECRETARY RUBIO:**  No, those are policy decisions.  And so at the end of the day, the President's made those decisions.  He's explained why.  It's not just against Canada, it's not just against Mexico, it's not just against G7 countries.  He's imposed steel and aluminum tariffs now on

JA1649

AAUP-01395

virtually the entire world, and the reason why is not to punish those countries; it's because he has outlined the need to develop a domestic capability.  If you don't have steel and aluminum, you can't build warships, you can't build airplanes, and you are not an industrial economy.  There are things we have to be able to protect and there's a lot of unfair trade practices, a lot of countries out there who subsidize their industries so that they can gain global market share, so they subsidize the industries, they're operating at a loss.  Meanwhile, our industries are trying to compete fairly, and that's why you don't have steel plants and that's why you can't produce the aluminum.  And that really threatens our national security in the long term.

So these are national security concerns when it comes to steel and aluminum and some of these other products.  But ultimately the President feels strongly – and I personally agree – that we have made some decisions when it comes to trade policies that have led to the de-industrialization of America and have left us deeply vulnerable to any sort of interruptions in global supplies and/or it being used to extort us, not to mention our inability to produce things that we need for our own economy and for our own defense.

So that's what those policies are about.  Every country in the world we expect will act in their national interest.  The United States forgot that.  President Trump is reminding us of that and getting us back to that, and I think it is quite possible that we could do these things and at the same time deal in a constructive way with our allies and friends and partners on all the other issues that we work together on.  And that's what I expect out of the G7 and Canada.

**QUESTION:**  Can I just ask on Russia?  Did you have – or Waltz – have any contact with Zelenskyy while you were in Saudi Arabia?  And then —

**SECRETARY RUBIO:**  No, I didn't.  I don't believe Mr. Waltz did either, but I did not.  But that was the team he selected, and it was appropriate.  It was his closest advisor, it was their foreign minister, it was their head of security.  So we felt that that was the counterparts they sent and to deal with us, and that's obviously pretty common in these sorts of things.  Generally the heads of state meet heads of state and appropriate counterparts meet others.  He – I imagine he had to get back, and he's – he – the president of a wartime country, so he's – but we did not have any contact with him there.  But I wouldn't read – read anything into it other than he selected his team for these talks and the President selected his, so —

AAUP-01396

JA1650

**QUESTION:** And was there any discussion with the Ukrainians about how a ceasefire, if Russia agrees, would be enforced? How would the U.S. ensure parties —

**SECRETARY RUBIO:** Yeah, well, the interesting thing about modern warfare is there – it's easier than ever to monitor and – simply because there's so many eyes on the ground and there's also all sorts of overhead commercial satellite and the like. It would be pretty hard to hide drone strikes, it would be hard to hide missile strikes, ballistic strikes, artillery. So we feel like that is something that could be monitored. Obviously, if in fact the Russians say yes – let's hope they say yes. If they say yes, one of the things we'll have to determine is who do both sides trust to be on the ground to sort of monitor some of the small arms fires and exchanges that could happen. But those are practices that have become common in these, and I don't think that would be difficult to set up. We didn't get into specifics, but obviously the need to monitor a ceasefire is clear to everyone.

**QUESTION:** Sir, just a quick follow-up on this question.

**QUESTION:** Can I get a last question? Last question?

**MS BRUCE:** One more question. One more. This is it.

**QUESTION:** The —

**SECRETARY RUBIO:** Yeah, because we're fueling up and have to get back on the plane.

**MS BRUCE:** Right.

**QUESTION:** Last question, sir.

**SECRETARY RUBIO:** Yeah, yeah.

**QUESTION:** The – you haven't – this administration has not hesitated to put a lot of pressure on Ukraine. You reduced their intelligence support in the middle of a shooting war, you temporarily cut off their arms, criticized them publicly – not you, but leadership in public. Are you truly prepared to apply pressure on Russia should it be recalcitrant and not agree to the terms of the ceasefire? There's no been no concrete action that this administration has taken to punish Russia since it's come to office.

JA1651

AAUP-01397

**SECRETARY RUBIO:** Well, a couple points. To be clear, as far as I am aware, the United States has not provided armaments to Russia. The United States is not providing assistance to Russia. Every single sanction that has been imposed on Russia remains in place. Every single sanction the President inherited has – remains in place.

**QUESTION:** Trump inherited, previous administration.

**SECRETARY RUBIO:** Right, but – well, I mean, they're pretty sanctioned up. I mean, there's a lot of sanctions on already. So my point being is that we've – there's been no steps taken to relieve any of these things. These things continue to be in place. But we don't think it's constructive for me to stand here today and begin to issue threats about what we're going to do if Russia says no. Let's hope they say yes.

At the end, let's understand. I remind everybody and bring you back to the point: The President's desire here is to bring about a lasting and enduring peace in Ukraine. He wants the shooting and the fighting to stop – not just for 30 days, not just for 60 days, but permanently. To do that, both sides have to come to the table. We are happy – we are happy that the Ukrainians have agreed to do so. Now it is up to Russia to say yes. If Russia says yes, that's very good news, and we will begin that process and do everything we can to move that process forward. If they say no, then obviously we'll have to examine everything and sort of figure out where we stand in the world and what their true intentions are. I think it'll be – if they say no, it'll tell us a lot about what their goals are and what their mindset is.

But I don't want to go into that before they've even answered us by issuing statements that are abrasive in any way. Our hope is that – when we met with them last, they expressed a willingness under the right conditions, without elaborating on the right conditions, to bring an end to this conflict. That was our question when we met with them. I think I shared it with you that were on our trip. The point of meeting with them was to find out is this a war they wanted to end or is this a war they just wanted to continue in perpetuity until they achieved whatever goals they have in mind, and they expressed a willingness, under the right circumstances, which they did not define, to bring an end to this conflict.

So we have Ukraine ready to come to the table. Now we need to get Russia to come to the table. If they do and the shooting stops, I think that's a very good day in the world. Obviously no one here is pretending that that negotiation's going to be easy or fast or simple, but at least we've

JA1652

AAUP-01398

gotten to that point.  If their answer is no, then obviously we'll have to deal with that and we'll have to at that point make decisions on that basis.  We're not there yet.  Hopefully the answer is yes.

**MS BRUCE:**  Thank you, everyone.

**SECRETARY RUBIO:**  Okay, thanks, guys.

TAGS

Bureau of European and Eurasian Affairs        G-7        Ireland        Office of the Spokesperson

Official International Travel        Peace        Russia        Russia-Ukraine War

The Secretary of State        Ukraine

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

AAUP-01399

JA1653



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

AAUP-01400

JA1654

Fox News, "JD Vance Reveals Whether More Deportations of Green Card Holders Are Coming" (Mar. 13, 2025), https://www.foxnews.com/video/6369982152112.

TRANSCRIPT:

**JD Vance:** Laura, a green card holder, even if I might like that green card holder doesn't have an indefinite right to be in the United States of America. Right? American citizens have different rights from people who have green cards, from people who have student visas. And so my attitude on this is: this is not fundamentally about free speech. And to me, yes, it's about national security, but it's also, more importantly, about who do we as an American public decide gets to join our national community? And if the Secretary of State and the President decide this person shouldn't be in America, and they have no legal right to stay here, it's as simple as that.

**Laura Ingraham:** Do you see more such deportations happening?

**JD Vance**: I think we'll certainly see some people who get deported on student visas if we determine that it's not in the best interest of the United States to have them in our country. So yeah, I don't know how high that number is going to be, but you're going to see more people.

JA1655

AAUP-01401



U.S. Department of Homeland Security

# VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport

**Release Date:** March 14, 2025

*Another student who supported Hamas was arrested by ICE HSI for overstaying her student visa.*

WASHINGTON – Today, Secretary of Homeland Security Kristi Noem announced that one of the Columbia students who had her student visa revoked for advocating for violence and terrorism self-deported using the CBP Home App and ICE arrested a Palestinian student for overstaying her expired F-1 visa.

Ranjani Srinivasan, a citizen and national of India, entered the United States on a F-1 student visa as doctoral student in Urban Planning at Columbia University. Srinivasan was involved in activities supporting Hamas, a terrorist organization. The Department of Homeland Security has obtained video footage (https://x.com/Sec_Noem/status/1900562928849326488) of her using the CBP Home App to self-deport on March 11.

Another student Leqaa Kordia, a Palestinian from West Bank, was arrested by ICE HSI Newark officers for overstaying her expired F-1 student visa. Her visa terminated on January 26, 2022, for lack of attendance. Previously, in April 2024 Kordia was arrested for her involvement in pro-Hamas protests at Columbia University in New York City.

The below statement is attributable to Secretary Noem:

*"It is a privilege to be granted a visa to live and study in the United States of America. When you advocate for violence and terrorism that privilege should be revoked, and you should not be in this country. I am glad to see one of the Columbia University terrorist sympathizers use the CBP Home app to self-deport."*

## Topics

CITIZENSHIP AND IMMIGRATION SERVICES (/TOPICS/CITIZENSHIP-AND-IMMIGRATION-SERVICES)

## Keywords

DEPARTMENT OF HOMELAND SECURITY (DHS) (/KEYWORDS/DEPARTMENT-HOMELAND-SECURITY-DHS)

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

Last Updated: 03/21/2025

JA1656

AAUP-01402



🇺🇸 An official website of the United States Government  Here's how you know  ⌄

**U.S. DEPARTMENT of STATE**

Home  >  …  >  Secretary of State Marco Rubio with Margaret Bre…

★ ★ ★

# Secretary of State Marco Rubio with Margaret Brennan of CBS's Face the Nation

**INTERVIEW**

**MARCO RUBIO, SECRETARY OF STATE**
**MIAMI, FLORIDA**

MARCH 16, 2025

**QUESTION:** Let's get straight to it this morning with Secretary of State Marco Rubio, who joins us from Miami, Florida. Mr. Secretary, for our audience, just to explain, this Red Sea area is a really important transit point for global shipping. The Houthis out of Yemen have been disrupting transit there for some time. President Trump cited these concerns when he announced the strikes. I'm wondering, how long will this campaign last and will it involve ground forces?

**SECRETARY RUBIO:** Well, first of all, the problem here is that this is a very important shipping lane, and in the last year and a half, last 18 months, the Houthis have struck or attacked 174 naval vessels of the United States, attacking the U.S. Navy directly 174 times, and 145 times they've attacked commercial shipping. So we basically have a band of pirates with guided precision anti-ship weaponry, and exacting a toll system in one of the most important shipping lanes in the world. That's just not sustainable. We are not going to have these people controlling which ships can go through and which ones cannot. And so your question is how long will this go on. It will go on until they no longer have the capability to

AAUP-01403

**JA1657**

**QUESTION:**  Well, what does U.S. intelligence tell us at this point?  Because the U.S. had been conducting strikes for some time but has not stopped the Houthis.

**SECRETARY RUBIO:**  No.

**QUESTION:**  So what's going to be different right now?  Do you have more fidelity in the intelligence that would make this more successful?

**SECRETARY RUBIO:**  Well, those strikes were retaliation strikes.  So they launched one missile, we hit the missile launcher, or we sent something to do it.  This is not a message.  This is not a one-off.  This is an effort to deny them the ability to continue to constrict and control shipping, and it's just not going to happen.  We're not going to have these guys, these people with weapons able to tell us where our ships can go – where the ships of all the world can go, by the way.  It's not just the U.S.  We're doing the world a favor.

**QUESTION:**  Yeah.

**SECRETARY RUBIO:**  We're doing the entire world a favor by getting rid of these guys and their ability to strike global shipping.  That's the mission here, and it will continue until that's carried out.  That never happened before.  The Biden administration didn't do that.  All the Biden administration would do is they would respond to an attack.  These guys would launch one rocket; we'd hit the rocket launcher.  That's it.

This is an effort to take away their ability to control global shipping in that part of the world.  That's just not going to happen anymore.

**QUESTION:**  And it could –

**SECRETARY RUBIO:**  So this will continue until that's finished.

**QUESTION:**  It could involve ground raids?

**SECRETARY RUBIO:**  Well, I – those are military decisions to be made, but I've heard no talk of ground raids.  I don't think there's a necessity for it right now.  I can tell you that as of last night, some of the key people involved in those missile launches are no longer with us, and I can tell you that some of the facilities that they used are no longer existing, and that will continue.

**JA1658**

AAUP-01404

Look, it's bottom line – easy way to understand it, okay?  These guys are able to control what ships can go through there.  They've attacked the U.S. Navy.

**QUESTION:**  Yeah.

**SECRETARY RUBIO:**  A hundred and seventy-four times they've attacked the United States Navy.  We're not going to have people sitting around with the missiles, attacking the U.S. Navy.  It's not going to happen – not under President Trump.

**QUESTION:**  The President also referenced Iran in his statement.  Iran provides some support for the Houthis, as you know.  Put this in context for me, because U.S. intelligence has been suggesting for some time that Israel has the desire and intent to conduct an attack on Iran's developing nuclear program in the coming months.  President Trump has extended an offer for negotiations.  Have you heard anything back from Iran?  Is this strike in Yemen a signal to Iran?

**SECRETARY RUBIO:**  This strike in Yemen is about their ability – the ability of the Houthis – to strike global shipping and attack the U.S. Navy, and their willingness to do it:  174 times against the U.S. Navy; 145-some times against global shipping.  That's what the strike is about.  What we can't ignore, and the reason why the President mentioned Iran, is because the Iranians have supported the Houthis.  They've provided them intelligence.  They've provided them guidance.  They've provided them weaponry.  I mean, there's no way the Houthis – okay, the Houthis – would have the ability to do this kind of thing unless they had support from Iran.  And so this was a message to Iran:  Don't keep supporting them, because then you will also be responsible for what they are doing in attacking Navy ships and attacking global shipping.

**QUESTION:**  They also get support from Russia, potentially, which you leveraged sanctions in regard to.  But I want to ask you about tariffs because you were just in Canada this past week.  China is Canada's second-biggest export market; Mexico's third.  In this ongoing trade back-and-forth the U.S. is having, isn't there a risk that China will ultimately be the winner?  If it's too costly to deal with the United States, won't they benefit?

**SECRETARY RUBIO:**  Well, actually, China and Canada are involved in a mini trade war right now.  In fact, the Chinese have imposed a bunch of tariffs, reciprocal or retaliatory tariffs, on Canada after Canada imposed tariffs on them.  So here's the way everyone needs to understand this, okay?  The President rightfully believes that the balance of global trade is completely off-kilter.  For 30 or 40 years, we have allowed countries to treat us unfairly in global trade, much of

**JA1659**

AAUP-01405

it during the Cold War because we wanted them to be rich and prosperous because they were our allies in the Cold War.  But now that has to change.  You look at the European Union.  The European Union's economy is about the same size as ours.  It's not a low-wage economy.  It's very comparable to ours in terms of its composition and so forth.  Why do they have a trade surplus with us?

So what the President is saying is two things.  Number one, there are critical industries – like aluminum, like steel, like semiconductors, like automobile manufacturing – that he rightfully believes, President Trump rightfully believes, the U.S. needs to have a domestic capability, and the way you protect those industries and build that capability is by ensuring that there's economic incentives to produce in the United States.

The second is global, and that is, we are going to put tariffs on countries reciprocal to what they impose on us.  And so this is global – it's not against Canada, it's not against Mexico, it's not against the EU; it's everybody.  And then from that new baseline of fairness and reciprocity, we will engage, potentially, in bilateral negotiations with countries around the world on new trade arrangements that make sense for both sides – fairness.  But right now it's not fair.  We're going to reset the baseline and then we can enter into these bilateral agreements, potentially, with countries so that our trade is fair.

What's not going to continue is – of course these countries are upset.

**QUESTION:**  So this is all just about leverage to get bilateral, not free – not North American free trade deals –

**SECRETARY RUBIO:**  No, it's not leverage.

**QUESTION:**  – renegotiation.

**SECRETARY RUBIO:**  No, no, it's not leverage.  It's fairness.  It's resetting baseline fairness.  And then from there we can work on deals and so forth, because they'll have products we don't make, we have products they don't make.  That's where trade works the best.  It has to be free, but it has to be fair in that – and right now it's only free on one side and it's not fair for the other side.

**QUESTION:**  Well, you know, sir, that –

JA1660

AAUP-01406

**SECRETARY RUBIO:**  It's an unsustainable position.

**QUESTION:** – the ad hoc nature of these policy announcements and pullbacks are causing concern in the marketplace, as we saw this past week.  So I heard you describe what seemed like a strategy to get to negotiations on a bilateral front.  You also seemed to negotiate – say this was national security-minded.  But then we also see –

**SECRETARY RUBIO:**  Yeah.

**QUESTION:**  – comments by the President of, like, 200 percent tariffs on champagne.  That's not a critical industry for the United States.  That seems more emotional.

**SECRETARY RUBIO:**  No, that – I mean, that's called retaliation.  That's what happens in these trade exchanges.  They're going to increase tariffs on – they already have high tariffs.  They're going to add more to their tariffs?  Fine.  Then we'll have to find something to – I mean, you tell me.  I mean, Canada is going after whiskey and orange juice and, I mean –

**QUESTION:**  In retaliation.

**SECRETARY RUBIO:**  Right, exactly.  So that sounds pretty petty to me as well.  So what's the difference?  The point is – I get it.  I understand why these countries don't like it, because the status quo of trade is good for them.  It benefits them.  They like the status quo.  We don't like the status quo.  We are going to set a new status quo and then we can negotiate something, if they want to, that is fair for both sides.  But what we have now cannot continue.  We have deindustrialized this country, okay, deindustrialized the United States of America.  There are things we can no longer make, and we have to be able to make in order to be safe as a country and in order to have jobs.  That's why we had a Rust Belt.  That's why we have suffered all these important jobs that once sustained entire communities, wiped out by trade that basically sent these factories, these jobs, this industrial capability to other places.  That cannot and will not continue.  I don't –

**QUESTION:**  Yeah.

**SECRETARY RUBIO:**  President Trump – this is no mystery; he's been talking about this since the 1980s, actually.

**QUESTION:**  Yeah.

JA1661

AAUP-01407

**SECRETARY RUBIO:**  Even before he was a political figure.  This is going to happen and it's going to happen now.

**QUESTION:**  I want to ask you about Russia.  You said Envoy Steve Witkoff's meeting with Vladimir Putin that happened last week would answer the fundamental question of whether we're moving towards a ceasefire or whether Putin is using a delay tactic.  You spoke with Sergei Lavrov, the foreign minister, yesterday.  Is this a delay tactic?

**SECRETARY RUBIO:**  Well, I think it was a promising meeting.  As I've said repeatedly, we're not going to negotiate this in the public.  Hopefully we'll have something to announce at some point fairly soon.  I can't guarantee that, but I certainly think the meeting was promising, the exchange was promising.  I don't take away from Steve's meeting, from Ambassador Witkoff's meeting, negativity.  There are some challenges.  This is a complex, three-year war that's been ongoing along a very long military front with a lot of complexity to it.

So no one's claiming that it's easy, but I want everyone to understand here's the plan.  Plan A is get the shooting to stop so that we can move to plan B, phase two, which is have everybody at a table, maybe not – maybe with some shuttle diplomacy, to figure out a way to permanently end this war in a way that's enduring and that respects everybody's needs and so forth.  No one is saying that that second part is easy, but we can't get even to that second part until we get past the first part.  It's hard to negotiate an enduring end to a war as long as they're shooting at each other, and so the President wants a ceasefire.  That's what we're working on.  Assuming we can get that done – that won't be easy in and of itself – we move to the second phase, which is negotiating something more enduring and permanent.

That will be hard.  It will involve a lot of hard work, concessions from both sides, but it has to happen.  This war cannot continue.  The President has been clear about that, and he's doing everything he can to bring it to an end.

**QUESTION:**  Okay.  We'll talk about that later in the program as well with Envoy Witkoff.  I want to ask you about a decision you made to revoke a student visa from someone at Columbia University this past week.  The *Wall Street Journal* editorial board writes:  "The… Administration needs to be careful… [it's] targeting real promoters of terrorism… not breaking the great promise of a green card by deporting anyone with controversial political views."  Can you substantiate any form of material support for terrorism, specifically to Hamas –

AAUP-01408

**JA1662**

**SECRETARY RUBIO:**  Yes.

**QUESTION:**  – from this Columbia student, or was it simply that he was espousing a controversial political point of view?

**SECRETARY RUBIO:**  Well, not just the student – we're going to do more.  In fact, every day now we're approving visa revocations, and, if that visa led to a green card, the green card process as well.  And here's why – it's very simple.  When you apply to enter the United States and you get a visa, you are a guest, and you're coming as a student, you're coming as a tourist, or what have you.  And in it, you have to make certain assertations.  And if you tell us when you apply for a visa, I'm coming to the U.S. to participate in pro-Hamas events, that runs counter to the foreign policy interests of the United States of America.  It's that simple.  So you lied.  You came – if you had told us that you were going to do that, we never would have given you the visa.  Now you're here, now you do it, so you lied to us.  You're out.  It's that simple; it's that straightforward.

**QUESTION:**  But is there any – but is there any evidence of a link to terrorism, or is it just his point of view?

**SECRETARY RUBIO:**  Sure – yeah, they take over – I mean, do you not – I mean, you should watch the news.  These guys take over entire buildings.  They vandalize colleges; they shut down colleges.

**QUESTION:**  We covered it intensely.

**SECRETARY RUBIO:**  Well, then you should know that this is –

**QUESTION:**  I'm asking about the specific justification for the revocation of his visa.  Was there any evidence of material support for terrorism?

**SECRETARY RUBIO:**  Well, this specific individual was the spokesperson, was the negotiator – negotiating on behalf of people that took over a campus, that vandalized buildings.  Negotiating over what?  That's a crime in and of itself that they're involved in being the negotiator or the spokesperson, this, that, the other.  We don't want – we don't need these people in our country.  We never should have allowed them in in in the first place.  If he had told us, I'm going over there and I'm going over there to become the spokesperson and one of the leaders of a movement that's going to turn one of your allegedly elite colleges upside down, people can't even go to school, the library – buildings being vandalized, we never would have let him in.  We never would

AAUP-01409

**JA1663**

have let him in to begin with.  And now that he's doing it and he's here, he's going to leave and so are others, and we're going to keep doing it.

We are – and by the way, I find it ironic that a lot of these people out there defending the First Amendment speech – alleged free speech rights of these Hamas sympathizers –

**QUESTION:**  Yes.

**SECRETARY RUBIO:**  – they had no problem, okay, pressuring social media to censor American political speech.  So I think it's ironic and hypocritical.  But the bottom line is this:  If you are in this country to promote Hamas, to promote terrorist organizations, to participate in vandalism, to participate –

**QUESTION:**  Yeah.

**SECRETARY RUBIO:**  – in acts of rebellion and riots on campus, we never would have let you in if we had known that, and now that we know it, you're going to leave.

**QUESTION:**  Is it only pro-Palestinian people who are going to have their visas revoked, or other points of view as well?

**SECRETARY RUBIO:**  No, I think anybody who's here in favor – look, we want to get rid of Tren de Aragua gang members.  They're terrorists too.  We – the President designated them, asked me to designate, and I did, as a terrorist organization.  We want to get rid of them as well.  You are – we don't want terrorists in America.  I don't know how hard that is to understand.  We want people – we don't want people in our country that are going to be committing crimes and undermining our national security or the public safety.

**QUESTION:**  Yeah.  Okay.

**SECRETARY RUBIO:**  It's that simple.  Especially people that are here as guests – that is what a visa is.

**QUESTION:**  Yes.

**SECRETARY RUBIO:**  I don't know when we've gotten it in our head that a visa is some sort of birthright.  It is not.  It is a visitor into our country, and if you violate the terms of your visitation, you are going to leave.

JA1664

AAUP-01410

**QUESTION:** Yeah. Okay. Secretary Rubio, we'd like to have you back, talk to you about a lot more on your plate another time, but we have to leave it there.

**SECRETARY RUBIO:** Thank you.

TAGS

Media Engagement        Office of the Spokesperson        The Secretary of State



White House

USA.gov

Office of the Inspector General

Archives

Contact Us

JA1665

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

JA1666

AAUP-01412

 **Tricia McLaughlin**  ⌀ ···
@TriciaOhio

Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media.

Suri has close connections to a known or suspected terrorist, who is a senior advisor to Hamas. The Secretary of State issued a determination on March 15, 2025 that Suri's activities and presence in the United States rendered him deportable under INA section 237(a)(4)(C)(i).

---

 **POLITICO** ✔ @politico · Mar 19

Exclusive: Trump is trying to deport a Georgetown academic in the country legally who says he's being targeted for the pro-Palestine views of his U.S. citizen wife. politico.com/news/2025/03/1...

---

8:56 PM · Mar 19, 2025 · **378.1K** Views

💬 259        ↻ 487        ♡ 1.7K        🔖 84        ↑



JA1667

AAUP-01413



An official website of the United States Government Here's how you know ⌄

  U.S. DEPARTMENT *of* STATE

★ ★ ★

# Secretary of State Marco Rubio and Guyanese President Irfaan Ali at a Joint Press Availability

**REMARKS**

**MARCO RUBIO, SECRETARY OF STATE**

**STATE HOUSE**

**GEORGETOWN, GUYANA**

MARCH 27, 2025

Secretary Rubio holds a joint press availability with Guyanese President Irfaan Ali



Cookie Settings

AAUP-01414

JA1668

**MODERATOR:**  Please remain standing.  You may be seated.  You will be witnessing the signing of the MOU between Guyana and the United States this morning.  I now invite the Ministry of Foreign Affairs representative, Mrs. Peggy McLennan, to give an overview.

**MS MCLENNAN:**  Thank you, Marcia.  Your Excellency Mr. President, members of cabinet, ladies and gentlemen, today, Minister of Foreign Affairs and International Cooperation Hugh Hilton Todd and Secretary of State Marco Rubio are signing a Memorandum of Understanding between our two countries to deepen security cooperation and address regional challenges, including countering narcotics trafficking and transnational organized crime.  Under this mechanism, Guyana and the United States will strengthen information sharing, synthetic drug detection, transnational organized crime investigations and prosecutions, and military-to-military cooperation.

**MODERATOR:**  Thank you very much.  We now have the signing between the two nations.

(The Memorandum of Understanding was signed.)

(Applause.)

**MODERATOR:**  Thank you very much, and now I invite his excellency to address us.

**PRESIDENT ALI:**  Good afternoon, all.  Secretary Rubio, you are no stranger to Guyana.  Secretary Rubio has been and continues to be a strong advocate for Guyana's development, democracy, and peace.  He has consistently demonstrated his personal commitment to the national rule of law, democracy, and security.

Guyana and the United States share a long bond of friendship and partnership.  Indeed, the best of partnerships are those built on shared values, neutral trust, and a commitment to the rule of law and international order.  This is what underpins our bilateral relationship and friendship.  The United States is our trusted partner as we continue to build a stable, secure, and democratic society here.

This visit has allowed us to consolidate our bilateral agenda – defining policies and outlining clear intentions in areas of security, trade, energy, investments, infrastructure, democracy, regional peace and stability, human capital deployment, and development.  I am very pleased at the reassurance of the U.S. in ensuring the safeguard of our territorial integrity and sovereignty.  Our

JA1669
AAUP-01415

partnership and joint commitment to the safeguard of this region from every disruptive force is key to the maintenance of democracy and adherence to the rule of law.

The threats from Venezuela were specifically discussed.  Their blatant violation of the ICJ order and Argyle Declaration were noted.  Our joint commitment in enhanced partnership in combating transnational crime – inclusive of narcotrafficking, human trafficking, money laundering, and all forms of smuggling – is reflected in an enhanced MOU signed today.

We have reassured our partner that we'll continue to ensure all international and local labor laws are adhered to in the hiring of regional and international labor.  Further, with our expanding healthcare system and critical shortage of human capital, we'll explore areas of collaboration, filling existing gaps.

We were able to identify key infrastructure that are also critical to regional development as possible areas for investment and development.  We have committed to working closely together on the deployment of our energy potential, ensuring greater integration, value creation, and regional energy security, food security, and enhanced trade through joint initiatives to remove hurdles and expand existing areas of interest is key for both countries.  I am confident that the outcome of this visit has further aligned our policy agendas, shared commitment, and partnership that will see enormous benefits for our two countries and the region.

Let me once again thank Secretary Rubio for his personal commitment and that of the U.S. government to Guyana and this region in general.  I thank you.

(Applause.)

**SECRETARY RUBIO:**  Thank you.  Thank you, Mr. President.  And we have been working together and interacting for some time during my time in the Senate, but I told him I wanted to wait until I was Secretary of State to visit, and so here I am.  And I didn't know that was going to happen, but I'm grateful for your – for this visit and for the warm welcome we've received, and it's an exciting time to be here.

I think – and to the people of Guyana, thank you for welcoming us.  I hope you fully appreciate and understand this is one of the most exciting places in the world to be right now, because you have the opportunity, at this moment, to transform this country for generations, and we want to

JA1670

AAUP-01416

be your partner.  We want to be your partner in making that possible.  We think it's of mutual benefit to see that happen.

I get to visit in this job – already have – a number of countries in the nine weeks.  I've only been on the job for nine weeks, so let the record reflect after nine weeks this was one of my first visits here that I've taken abroad.  But we get to visit a lot of counties and when you visit you have some countries, unfortunately, are facing tremendous challenges and they're just looking to stabilize.  Other countries are looking to improve and make progress.  This country has an opportunity to transform.  And that's rare in the history of nations, to have an opportunity for transformative change.  And what I mean by transformative change is not simply oil and gas fields.  And that's very important – natural resources are critical – but that is just the basic ingredient that allows prosperity to happen.

One of the topics that's talked about all over the world today is data centers and the digitization of the economies, artificial intelligence.  Do you know what you need in order to do that?  You need to have really good scientists, and engineers, and technicians that know how to run it.  But the most important thing you need to be a dominant presence in the world in data centers and artificial intelligence is reliable and affordable energy.  That's just one example, among many others.

You have an opportunity to expand, in a responsible way, agriculture production, not just for the needs of your population but for the region, and to do it in a way that safeguards the beauty and the natural environment, that's pristine.  You have an opportunity to expand in issues of ecotourism.  I'm not a big fan of ecotourism – not – I'm not against ecotourism; I'm not an ecotourist.  I like staying at hotels.  I'll do it; maybe I'll go somewhere.  But there are people that love this stuff.  They love it.  And you have an opportunity to do that in an incredibly responsible way.

I'm just touching on a few things, but – that are opportunities before you.  And that shared prosperity for your country that will come as a result of that is transformative.  The lives of your children, the lives of your grandchildren, your lives are going to look very different in five to ten years under this leadership and under this vision as it continues, and we just want to be a partner.

JA1671

Why do we want to be a partner?  Let's – just to be frank, why does the United States care about it?  Number one, we care about it because we think it creates a level of stability in the region which we share – which we share.  Not just stability here, stability for your neighbors, because we believe prosperity can become contagious.  Just like instability can become contagious, stability and prosperity can become contagious.  It won't just help you, it will help all of your neighboring partners in the Caribbean Basin and the region writ large, and we think that ultimately makes life in America safer and more prosperous as well.  And so we wanted to look for every opportunity possible to partner with you.

But the basic element of any of this, the basic element of progress and transformation and prosperity, is always security.  So number one, we want to make sure that some of the tragic regional problems that exist with crime, transnational crime – we have a huge problem in the world right now with organized gangs and narcotraffickers that destabilize societies – we want to make sure that never reaches here.  And that's why today's MOU and the work we'll do together will – is designed not to stop it, but to prevent it from ever taking root, from ever finding its way here.  Because unfortunately, sometimes crime is attracted by prosperity and targets prosperity.

And the other are regional threats – the regional threats based on illegitimate territorial claims by a narcotrafficking regime.  And I want to be frank, and I've said this during my time as a senator, and I have full confidence in saying now as the Secretary of State:  There will be consequences for adventurism.  There will be consequences for aggressive actions.  And that's why our partnership in that regard will be important.  That is not what we want to be a feature of our relationship, but it is a necessity of our relationship, because you have a very difficult challenge on your hands with a dictator that's making illegitimate territorial claims.

And so you have our full commitment and support – today we're demonstrating it – both in tangible ways, and we're going to look for ways to make it long-term and sustainable ways, to make abundantly clear that we are invested both as a nation and from our people in being your partner in transformation and in prosperity.  And we will not allow illegitimate territorial claims to be an impediment to your dreams and to your right to develop this country into a symbol that I hope will inspire others to follow the example you set, Mr. President.

So thank you.  Thank you for the chance to be with you.  (Applause.)

JA1672

AAUP-01418

**MODERATOR:**  Thank you very much, Excellency, and Secretary Rubio.  Members of the media, in the interests of time, we will accommodate four questions.  We will feed two questions from the local media, and two from our visiting media.  I recognize Stabroek News from the local media, as well as Mr. Campbell from the local media.  From the visiting media – okay, you represent?  Good.  Great.  And – all right, we'll start with Marcelle from Stabroek News.

**SECRETARY RUBIO:**  Hi.

**QUESTION:**  Good afternoon, sir.

**SECRETARY RUBIO:**  Good afternoon.

**QUESTION:**  Marcelle Thomas from the Stabroek News.  You just spoke of consequences for aggressive actions, and that the U.S. is Guyana's partner.  Given Venezuela's unprovoked aggression towards Guyana, I want to know if your country would stand by Guyana militarily if Venezuela were to attack this country.  And what would be the U.S.'s response should Venezuela attack U.S. oil major ExxonMobil, which is operating in Guyana's waters?

**SECRETARY RUBIO:**  It will be a very bad day for the Venezuelan regime if they were to attack Guyana or attack ExxonMobil or anything like – it would be a very bad day, a very bad week for them.  And it would not end well for them.  (Applause.)  I'm not going to get into details of what we'll do; we're not big on those kinds of threats.  I think everybody understands, and I want it to be clear – we've made this clear repeatedly – I think the U.S. Navy today is making it clear and demonstrating our ability to – we have a big navy and it can get almost anywhere in the – it can get anywhere in the world.  And we have commitments that exist today with Guyana.  We want to build on those and expand on those.  And we'll leave it for the appropriate time, but suffice it to say that if that regime were to do something such as that, it would be a very bad move.  It would be a big mistake for them.

**MODERATOR:**  We now invite from our visiting media.  Please remember to identify yourself and the media house you represent.

**QUESTION:**  Hi, thank you.  Hello, Mr. Secretary.

**SECRETARY RUBIO:**  Hi.

JA1673

AAUP-01419

**QUESTION:**  Hello, Mr. President.  Thank you for taking questions from us.  We appreciate it.  Humeyra Pamuk from Reuters.  Mr. Secretary, a Turkish student in Boston was detained and handcuffed on the street by plainclothes agents.  A year ago she wrote an opinion piece about the Gaza war.  Could you help us understand what the specific action she took led to her visa being revoked?  And what was your State Department's role in that process?

**SECRETARY RUBIO:**  We revoked her visa.  It's an F1 visa, I believe.  We revoked it, and here's why – and I'll say it again; I've said it everywhere.  Let me be abundantly clear, okay.  If you go apply for a visa right now anywhere in the world – let me just send this message out – if you apply for a visa to enter the United States and be a student and you tell us that the reason why you're coming to the United States is not just because you want to write op-eds, but because you want to participate in movements that are involved in doing things like vandalizing universities, harassing students, taking over buildings, creating a ruckus, we're not going to give you a visa.  If you lie to us and get a visa and then enter the United States and with that visa participate in that sort of activity, we're going to take away your visa.

Now, once you've lost your visa, you're no longer legally in the United States, and we have a right, like every country in the world has a right, to remove you from our country.  So it's just that simple.

I think it's crazy – I think it's stupid for any country in the world to welcome people into their country that are going to go to their universities as visitors – they're visitors – and say I'm going to your universities to start a riot, I'm going to your universities to take over a library and harass people.  I don't care what movement you're involved in.  Why would any country in the world allow people to come and disrupt?  We gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campuses.  And if we've given you a visa and then you decide to do that, we're going to take it away.

I encourage every country to do that, by the way, because I think it's crazy to invite students into your country that are coming onto your campus and destabilizing it.  We're just not going to have it.  So we'll revoke your visa; and once your visa is revoked, you're illegally in the country and you have to leave.  Every country in the world has a right to decide who comes in as a visitor and who doesn't.

JA1674

AAUP-01420

If you invite me into your home because you say, "I want to come to your house for dinner," and I go to your house and I start putting mud on your couch and spray-painting your kitchen, I bet you you're going to kick me out.  Well, we're going to do the same thing if you come into the United States as a visitor and create a ruckus for us.  We don't want it.  We don't want it in our country.  Go back and do it in your country, but you're not going to do it in our country.

QUESTION:  A follow-up?

SECRETARY RUBIO:  Sure.  Just tell me your follow-up and I'll tell every – and depending on your question, I'll answer it or not.

MODERATOR:  No follow-up questions.  All right.  I now invite our Guyanese –

SECRETARY RUBIO:  No, no.  She had – can I get her follow-up real quick?  Go ahead.

QUESTION:  Could you confirm – there's new reporting that 300 visas – State Department has revoked 300 (inaudible).

SECRETARY RUBIO:  Maybe more.  It might be more than 300 at this point.  We do it every day.  Every time I find one of these lunatics, I take away their visa.

QUESTION:  It could – you're saying it could be more than 300 visas?

SECRETARY RUBIO:  Sure.  I hope – I mean, at some point I hope we run out because we've gotten rid of all of them.  But we're looking every day for these lunatics that are tearing things up.  And by the way, we want to get rid of gang members, too.

So Venezuela sent us a bunch of gang members.  I'm sure you've heard of Tren de Aragua, Mr. President – a terrible gang, vicious gang.  They flooded in our – yesterday – just so everybody knows, yesterday one of these gang members who was involved in New York City in attacking a police officer was deported back to Venezuela, because they're now taking flights again because of some strong measures we've taken.  And this guy lands – this guy's a guy that attacked a police officer in New York City and laughed about it in court with a smirk on his face.  When he gets off the plane in Venezuela, he's welcomed by this character named Diosdado Cabello.  I don't know if you've heard of this guy.  And he welcomes him, hugging the guy.  So does anybody have any

JA1675

AAUP-01421

doubt that these people are pushing these people into the United States to destabilize us and the region?

So yeah, we're looking for people like this, and we want to get them out of the United States, absolutely.

**MODERATOR:** Thank you. We'll now field a question from Guyana.

**QUESTION:** Thank you. Kurt Campbell, Newsroom. President Ali, you've already spoken about how President Trump's plans – tariff plans for China's ships could affect regional trade. I just wanted to know if in your trade talks today if that issue was specifically discussed –

**SECRETARY RUBIO:** Yes.

**QUESTION:** – by Secretary of State Rubio.

**SECRETARY RUBIO:** And I can tell you – oh, you're asking him. I'm sorry. (Laughter.)

**QUESTION:** It's for both of you. What assurances can you give Guyana and this hemisphere in terms of stemming indirect consequences?

**SECRETARY RUBIO:** Yes. Well, that's – look, the goal the President has in doing so is we need to have an ability to build ships in this world that don't just come from China, okay. I think it's just dangerous to have one country in the world building all the ships. I assure you that – and we don't want a war, but I mean, they're not going to build ships for us if we get in trouble, right? So we need to have alternatives to Chinese ships, and we're trying to create a market and a demand for alternatives to Chinese shipping construction. And I'm the first one to admit that the United States made a terrible mistake when we deindustrialized and we allowed all these industries to leave our country and go to other places. Now we're paying the consequences, but we have to fix it.

So I do believe – I can't speak – I don't – the trade portfolio does not belong to the Department of State, but I do believe that we will take this back because we've heard this not just here, Mr. President. We've heard it throughout our visits here in the Caribbean. And we're going to take it back and explain to those who are in charge of trade policy that there are some implications to applying it to certain nations who are partners and who are seeking to develop their economies

AAUP-01422

JA1676

in ways that I think serve the national interest of the United States, not to mention the national interest of our partners nations, and seeing what can happen.

So I can't make a commitment to those exempt, because that's not something we handle in the Department of State.  What I can commit to is that I will most certainly raise this issue as a recurring issue, in multiple places, that it would have a real detrimental effect on economic development.  Maybe in 10 years it won't be an issue because there's been some diversification, maybe in five, but right now it would be problematic.  That message I'll take back to Washington and to my colleagues that are handling the trade portfolio, and we'll see how the President decides to proceed.  But rest assured we will take that message back.

**PRESIDENT ALI:**  And just to echo the sentiments that, yes, we did discuss it and the region would have raised it also.  But there Secretary Rubio is – as he said, will take this back and to see whether there can be any special initiative for the region, given our specific circumstances.

But let me say also that we have a responsibility to our friends.  The U.S. is a great friend of ours.  The U.S. would have made it very clear that they are ready to stand by us in our development, in our economic expansion, in our security, and in our defense.  And I will say very boldly that such friends must have some different and preferential treatment, because a friend who will defend me when I need a friend to defend me, must be a friend that enjoys some special place in our hearts and in our country, and that will be the case.  Thank you.

**QUESTION:**  And just quickly, illegal migration was also listed as a topic of discussion.  Could you say what are the expectations from Guyana in this regard and any discussions on third-country deportations?

**SECRETARY RUBIO:**  Well, we want to work with you on that.  I think that's a problem for you as well.  I mean, obviously, because of the combination of your growing economy, labor needs, and your geography, you have been a place where a lot of people have come in, and I think you want it to be the right people, right?  So I think if we have information that someone has entered your country who has bad intentions, we want to be able to share that with your government because you don't want that.

You don't want those – if we have information on a Tren de Aragua gang member from Venezuela, we want to make sure that we're – we have collaboration and we're sharing that

<span style="color:red">JA1677</span>

<span style="color:red">AAUP-01423</span>

information.  If we have information that some narcotrafficker is taking up shop here and has decided to try to turn this into a base of operation, which could become – could lead to violence and warfare here, gang warfare, we want to be able to share that with you.  We want to prevent these problems from happening.

So from the perspective of Guyana, which is not a source country of migration to the United States per se – illegal migration – but it is a country that receives, unfortunately, you're getting a lot of people.  And not everybody that comes here – I mean, most people are probably here to work hard and so forth, but not everyone.  So if we have information that someone is in your country that we know is a bad person, we want to be able to share it with you.  We want to be able to share it with you very quickly.  So that sort of information sharing has to be a cornerstone of this security agreement that we've signed today and want to continue to expand upon.

**MODERATOR:**  We will now field our final question from our visiting media.

**QUESTION:**  Thank you so much.  Vera with the – Vera Bergengruen with Wall Street Journal.

**SECRETARY RUBIO:**  They're very tough, this Wall Street – be careful.  All right.  (Laughter.)

**QUESTION:**  Secretary Rubio, when you and President Bukele – you mentioned Tren de Aragua several times.  When you and President Bukele negotiated the deal to transfer the U.S. deportees to his prison in CECOT, did you discuss any provisions to ensure that individuals mistakenly identified as gang members would have access to legal recourse and that they can secure their release if they are wrongly brought – wrongfully detained?

**SECRETARY RUBIO:**  Yeah, we have – that list was carefully vetted, provided to us by Homeland Security.  We have confidence in it.  What we negotiated is the reality that they, in El Salvador, comply with all the international requirements for imprisonment.  So we sent them people.  It was a combination of people – gang members, people we knew were involved in activities that were not productive to the United States, all of them removable in terms of our laws, all of them; every single one of them was someone who was removable from the United States irrespective – and MS-13 members, some of – many of whom are Salvadoran that we had identified as MS-13 members, that they had helped us identify as well.  And that – so it was a combination of people that we sent.  And we may send more.  We'll see.  I mean, it's up to their willingness to accept, but we are grateful to them for the opportunity to do that.

**JA1678**

AAUP-01424

And remember, one of the reasons why we had to send some of those people there was because at the time Venezuela wasn't taking their people back.  The Maduro regime – I say Venezuela, but it's not – it's the Maduro regime – was not taking their people back.  They refused to take people back, their own people.  They have an obligation.  If you are a country and someone is illegally in another country, you have an obligation to take those people back, whether they're criminals or not.  Venezuela said they wouldn't take them back, so we had to find a place to send them, especially the ones that had records and – or ones that we had strong suspicions and evidence that were involved in illicit activity.

And so we had to send some to El Salvador because of that.  Now they've taken them back.  And one of them yesterday gets off an airplane, and this narcotrafficker Cabello greets him and hugs him on the tarmac.  Now, what I heard ultimately, by the way, is that some of these gang members we sent back were so bad to Venezuela – they were so bad that after hugging them, maybe not this guy but I don't know, they had to put four or five of them back in jail.  Because that's how dangerous these people are, even though they hugged them on the tarmac and put on this show.

These are some really bad people.  Tren de Aragua is one of the most dangerous gangs the world has ever seen, okay?  When they were held temporarily in Guantanamo while being transferred to Honduras because that's when the Venezuelans picked some of them up, the Marines at Guantanamo said these are some of the roughest people we've ever interacted with.  They were worse than the al-Qaida guys that were in their jails.  Think about that.  So that's who we're getting rid of, and we want to get rid of more of them.

**MODERATOR:**  Ladies and gentlemen, members of the media, this brings the end to our media conference.  And I would like to invite his excellency and Secretary Rubio for a photo op right on the stage.  (Applause.)

---

TAGS

Bureau of Western Hemisphere Affairs    Crime    Drugs and Drug Trafficking

Economic Growth and Prosperity    Economy and Trade Policy    Energy    Guyana

Office of the Spokesperson    Official International Travel    The Secretary of State

AAUP-01425

JA1679

Venezuela



White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

JA1680

AAUP-01426



Home > ... > Secretary of State Marco Rubio Remarks to the Pr...

★ ★ ★

# Secretary of State Marco Rubio Remarks to the Press

**REMARKS**

**MARCO RUBIO, SECRETARY OF STATE**
**EN ROUTE MIAMI, FLORIDA**

MARCH 28, 2025

**QUESTION:** Can I ask a non-trip question, because I want to know what's happening with this Ukrainian children grant.

**SECRETARY RUBIO:** Grant?

**QUESTION:** The Ukrainian children who —

**SECRETARY RUBIO:** Oh, the data. The data is secured. We secured the data. We'll transfer it to the appropriate party. We've ensured that. And we'll be able to say that next week. We already notified that. If we haven't, we're about to notify Congress. I think we've gotten some letters.

**QUESTION:** Yeah.

**SECRETARY RUBIO:** So there's no danger to the data that's been collected on that.

**QUESTION:** But is the program back on?

Cookie Settings

AAUP-01427

**SECRETARY RUBIO:**  No, no, the program we're not – the program is not funded.  It was part of the reductions that were made, but we secured the data and we've ensured that we have it and it can be transferred to any appropriate authorities, and we'll issue a congressional – I don't know if it's a notification or just responses to the letters they've written us.

**QUESTION:**  This is the Conflict Observatory?

**SECRETARY RUBIO:**  Yes.

**QUESTION:**  How is the —

**SECRETARY RUBIO:**  You're not going to hit me with that mike like the President got hit?  (Laughter.)  Okay.

**QUESTION:**  And when you were answering the – Mr. Secretary, earlier, you said 300 visas?  It's actually —

**SECRETARY RUBIO:**  Well, the —

**QUESTION:**  Are they all student visas or —

**SECRETARY RUBIO:**  No, no, no, you guys – you asked – the question was, was there 300?  I know that number's been cited.  I said it might be more because we're doing them every day, primarily student visas, some visitors visas.

**QUESTION:**  Okay, so just making sure.  Just making sure.

**SECRETARY RUBIO:**  I don't know actually if it's primarily student visas.  It's a combination of visas.  They're visitors to the country.  If they're taking activities that are counter to our foreign – to our national interest, to our foreign policy, we'll revoke the visa.

**QUESTION:**  Are all of those related to pro-Palestinian protests or (inaudible)?

**SECRETARY RUBIO:**  I'm trying to remember – there's a lot of them now, because I've gone through every one of them.  I think there might be a few that are not, that are related to other groups that are – of people – we've also identified – but this actually is – it should be automatically

<span style="color:red">JA1682</span>

<span style="color:red">AAUP-01428</span>

revoked.  We've also identified people that have criminal charges and even while in the country, and still have active visas.  Some are unrelated to any protests and are just having to do with potential criminal activity.

**QUESTION:**  (Inaudible.)

**SECRETARY RUBIO:**  Huh?

**QUESTION:**  (Inaudible.)

**SECRETARY RUBIO:**  Yeah, I have to sign every single one.

**QUESTION:**  And what is the —

**SECRETARY RUBIO:**  Or the autopen.  I'm kidding.  No autopen.  I'm just joking.

**QUESTION:**  And what does it mean when you say against the foreign policy of the United States?

**SECRETARY RUBIO:**  It runs counter to our foreign – that's how we issue visas coming in.  I think about it this way.  If we knew this information – my standard:  If we knew this information about them before we gave them a visa, would we have allowed them in?  And if the answer is no, then we revoke the visa.

**QUESTION:**  Can I ask you on a different topic, Türkiye?  You had the meeting with the foreign minister a few days ago.  I think yesterday they – yesterday or today they expelled the BBC correspondent.  They arrested an AP photographer.  How concerned are you with how things are going there?

**SECRETARY RUBIO:**  Well, ultimately – and look, we've expressed that we're concerned.  We don't like to see the direction that's going.  It's an ally.  It's a partner in NATO.  Anytime you have instability on the ground, you don't like to see it.  Obviously, they have internal domestic political considerations.  We're not necessarily going to always opine on every single one of them.  To the extent we have deeper concerns, we expect to express them at least privately at the outset, certainly in a new administration when we're trying to establish relations.  But we watch the same news reports everybody else sees about what's going on.  We're certainly concerned about these

JA1683

AAUP-01429

protests and some of the reports.  But we raised that and – but I haven't seen what – what you referenced in the last day, yeah.

**QUESTION:**  Just on Turkey, in your tweet —

**SECRETARY RUBIO:**  Türkiye.

**QUESTION:**  Yes, Türkiye.  In your tweet —

**QUESTION:**  Are you guys going to change that?  Are you going to back to Turkey?

**SECRETARY RUBIO:**  When we're in Türkiye we're going to say Türkiye.

**QUESTION:**  In your tweet, the final sentence is basically about the arrest of Istanbul mayor. You're not saying that explicitly, but those are their (inaudible).

**SECRETARY RUBIO:**  Well, I mean, and we talked about that.  I mean, their argument is that the mayor is involved in corruption, that this has been a longstanding issue that it's finally got acted upon, and that he is seeking refuge behind his politics.  I don't know all the facts about it. Obviously, that's not what the mayor is saying or what the political opposition is saying is that this is a leader that might have won the election had he been allowed to run.

So we're watching it.  We've expressed concern.  We don't like to see instability like that in the governance of any country that's such a close ally, especially, and it —

**QUESTION:**  After your post, Turkish diplomatic sources actually denied that this had come up and you had expressed your concern.  I just wanted to ask you about that.

**SECRETARY RUBIO:**  Well, I did raise it with the foreign minister, and probably exactly in the words that I'm using now, and that is we're watching these reports and obviously it's disturbing to see, and we talked about it in those terms.  But as I said, we don't like to see that kind of instability or these things happening inside countries that we hope to partner with on a bunch of things.  And President Trump had a very good working relationship with President Erdogan in the first administration.  I think they would like to restart that.  But they're a NATO ally, and we would like to cooperate with them in Syria and in other places.  So I think it's possible to raise concerns

JA1684

AAUP-01430

and at the same time understand we have a lot of other things to partner on as well.  We have – that's the balance of conducting a mature foreign policy.

**QUESTION:**  Can you speak about the European leaders who said today that they – they oppose lifting sanctions on Russia, they don't think it's time to do that?  Are you all considering that?  Can you talk about deliberations?

**SECRETARY RUBIO:**  Well, no, so we met with the Russians.  Our team was over there this week.  They came back and they arrived last night, I think, or early some point yesterday.  So we're going to reconvene.  I had some calls about it today.  We're sort of going to analyze what they're – what they're raising and sort of study what exactly it is.  It's a host of sanctions, including sanctions that are not American.  They've raised potentially a couple – my readout of it – they're not even American sanctions, so we couldn't lift them if we wanted to.  We're going to sort of analyze what our team came back with.  We'll present those options to the President.  The President will make those decisions.  We're not there yet.

**QUESTION:**  Have you received Iran's response to the President's letter?

**SECRETARY RUBIO:**  Have I what?  I'm sorry.

**QUESTION:**  Received it, Iran's response.

**SECRETARY RUBIO:**  Yeah, I'm not going to comment on that yet other than to say the President's letter has been publicly reported.  I expect there will be a response, and obviously, at that point, the President will decide what steps, if any, he wants to take next.

**QUESTION:**  Can we go back to visa issue just for a second?  I mean, a lot of people feel freedom of speech concerns about it.  Are you saying that if you come and if you apply for a visa and get a student visa and you don't lie, and you tell the truth and you're not coming to protest or anything, but during the course of your studies, wherever it is in the U.S., you develop views or opinions that are at odds with the administration's foreign policy – say you learn something in your course of study that makes you think that what the policy is wrong – and then you protest it or write something about it, don't do anything violent, is that grounds enough to revoke a visa?

**SECRETARY RUBIO:**  Well, I think there's a little bit of common sense here.  You come to the States and then you decide you don't like those paper straws that some of the stores are selling

AAUP-01431

JA1685

and you start protesting or complaining about paper straws – I mean, we're obviously not going to yank a visa over that.  I think it crosses a line – think about it this way.  No one has a right to a visa.  These are things that we decide.  We deny visas every day for all kinds of reasons all over the world.  We deny visas because we think people might overstay.  We deny visas because the country they come from are people that historically overstay.  We deny visas every day, and we can revoke visas.  If you have the power to deny, you have the power to revoke.

I would argue that the – what I would add to it is what we have seen on campuses across the country where students literally cannot go to school, you cannot – buildings are being taken over, activities going on – this is clearly an organized movement.  And if you are in this country on a student visa and are a participant in those movements, we have a right to deny your visa.  I think it would make sense to deny your visa.  We're going to err on the side of caution.  We are not going to be importing activists into the United States.  They're here to study.  They're here to go to class.  They're not here to lead activist movements that are disruptive and undermine the – our universities.  I think it's lunacy to continue to allow that.

**QUESTION:**  So expressing any kind of view —

**SECRETARY RUBIO:**  And by the way, I've been saying that since I was in the Senate.  Now I'm just in a position to do something about it.

**QUESTION:**  Mr. Secretary —

**SECRETARY RUBIO:**  Now that's a broad thing to say – any kind of views.  But when you're aligning yourself with groups that are behind these activities, openly aligning yourself with these groups that are behind these disruptive criminal activities in the United States, your visa is going to get yanked.

**QUESTION:**  Mr. Secretary, I don't —

**QUESTION:**  Hamas?

**SECRETARY RUBIO:**  Yeah, there may be others.  I mean, if you come here and join Tren de Aragua, we're going to yank your visa too.  If —

**QUESTION:**  Mr. Secretary?

JA1686

AAUP-01432

**SECRETARY RUBIO:**  And so there may be other movements, but that's partly the movement we've seen on college campuses.  Let's be clear:  It is a movement that is supportive of the group that just slaughtered babies, like deliberately targeted and slaughtered babies and civilians and took hostages and killed hostages.  That's the group they're aligning with.

But beyond that, they are spray-painting buildings.  They are taking over buildings.  You must have seen these reports in campus after campus where students can't go to class and can't function and the universities don't know what to do about it.  When you look at it and you realize that some of the people involved in this are here on student visas, it's crazy.  We're not going to keep doing that.  We're not.  Don't come here.  If you're going to do that, go somewhere else.  Don't come here.

**QUESTION:**  And I brought up the protests in Hong Kong in 2019, which I covered, because there were also shutdowns of college campuses back then.  There were foreign students that were involved.  There was graffiti.  They stopped traffic at intersections.  They shut down subway stations.  They were largely peaceful, but there were also these instances that disrupted public life and there were foreign students that were involved there.  And so, like, under your rationale, the Hong Kong authorities or the —

**SECRETARY RUBIO:**  Well, every country in the world can deny visas to whoever they want.  It's that simple.  That's a fact.  Whether we like it or not, they can deny visas.

Number two, that movement was not a movement in favor of a group that slaughtered babies and innocents.  That's not what that – that movement, they were people who were complaining because there was no democracy, but I mean and they were upset about the direction Hong Kong was headed and the Chinese law that was being imposed.  But they have – every country in the world has a right to deny you a visa.  I'm not entitled to a visa.  You're not entitled to a visa.  Nobody is entitled to a visa in any other country.  They can determine it and they can revoke it at any time they want.

Now, let's – I think it's important is that there's a clear distinction between protesting against the democratic order and protesting in favor of groups that advocate the slaughter and murder of innocent people, which is what many of these groups are supportive of.  Beyond that, these groups are not just taking over – these are not sit-ins we're talking about.  We are talking about buildings that have been vandalized, defaced, that where they – for months on end in some

JA1687

AAUP-01433

cases.  We're just not going to continue to allow it.  I don't understand what people don't get.  A visa is a gift.  It's a voluntary thing.  We decide to give you a visa.  We deny visas all over the world every day for a variety of reasons, and that means we can also revoke those visas.  No one is entitled to a visa.

**QUESTION:**  I guess some of the examples have come up like a student at Tufts University, like all they did was write an op-ed for the student newspaper advocating for a certain point of view.  They're not – as far as we can tell, they haven't openly advocated for Hamas.

**SECRETARY RUBIO:**  Well, we will – those – as they go, or if they seek to self-deport they can do that, because that's what we've done.  We're basically asking them to leave the country.  That's why they've been detained.  They can do so tomorrow.  Buy an airplane ticket and leave.  No problem.

**QUESTION:**  Mr. Secretary?

**SECRETARY RUBIO:**  But I would add to this that I would caution you against solely going off of what the media has been able to identify, and those presentations, if necessary, will be made in court.

**QUESTION:**  But for example, in that – the Turkish students, the Tufts student's case, I asked you today did she have – has she committed, like, or has she carried out any of those things that you just listed?

**SECRETARY RUBIO:**  The activities presented to me meet the standard of what I've just described to you: people that are supportive of movements that run counter to the foreign policy of the United States.  If necessary and a court compels us, we'll provide that information.  But ultimately it's a visa.  Judges don't issue student visas.  There is no right to a student visa.  We can cancel a student visa under the law just the same way that we can deny a student visa under the law.  And we will do so in cases we find appropriate.

The overwhelming majority of student visas in this country will not be revoked, because the overwhelming majority of people that are coming to this country to study are not involved and associated or aligned with organizations that seek to do damage in this country, and that, frankly, organizations that hate the United States Government and hate our way of life.  So I just think it's

JA1688

AAUP-01434

crazy to continue to provide visas so people can come here and advocate for policies that are in direct contradiction of our national interest.

**QUESTION:**  Right, but are the schools raising these issues with you?  Are these – are there out —

**SECRETARY RUBIO:**  Oh, I'm sure they're —

**QUESTION:**  Are these outside groups that they're raising —

**SECRETARY RUBIO:**  Oh, I don't know.  I mean, I'm sure they are.  I mean —

**QUESTION:**  Like, how does it come to – come to your desk?  Yeah.

**SECRETARY RUBIO:**  Oh, bringing it to us?  Well, we're not – we're not going to talk about the process by which we're identifying it because obviously we're looking for more people.

**QUESTION:**  Have you seen the video of her being detained?

**SECRETARY RUBIO:**  I haven't.  But look, detention is simple.  Your visa is expired, your visa is revoked, you have to leave.

**QUESTION:**  But it's six hooded figures with masks on their face who don't identify themselves until they already grabbed her wrist.  It's quite horrifying.

**SECRETARY RUBIO:**  Yeah, I mean, unfortunately our agents – I mean, I'm not – that's a DHS or ICE, so I don't know what their practices are.  But our agents have had to protect their identity because they've found themselves targeted – targeted for violence, targeted for operations against them.  I would say most of these protesters are wearing masks too, and they're not in law enforcement.

**QUESTION:**  Can I ask you a different topic?  U.S.-funded media.  Radio Martí is something that I believe you've supported in the past.  What do you think of the cut in funding for that entity?

**SECRETARY RUBIO:**  Well, first of all, they're not part of the – they're not – we don't control that. That's a separate entity that does it.  My understanding is that Martí has actually started rebroadcasting today, and a few others.  I think the executive order called for them to be – all

AAUP-01435

**JA1689**

these agencies to be reduced to the statutory minimum.  And I think the goal ultimately over time, as I understand it, is to reform these entities so that they provide news that, frankly, favors and advances the national interest of the United States.  We have plenty of independent media outlets, including all of you, and then we are interested in media outlets that present America's point of view from our foreign policy standpoint.  And so that review will be ongoing, but obviously that's outside the State Department.  I don't control those.

**QUESTION:**  What about the cuts (inaudible) —

**SECRETARY RUBIO:**  I wish I did, though, but I don't.  Not yet, anyway.  Maybe we'll see, but I don't know.

**QUESTION:**  What about cuts to some of the other programs in Cuba that were supporting dissidents, that were supporting political prisoners?

**SECRETARY RUBIO:**  Yeah, well, some of them were not.  Some of them will be restudied over time.  I think ultimately we're trying to find programs that are effective.  No one's been —

**QUESTION:**  But no, it – as you know, there's (inaudible) in general always in Cuba right now.

**SECRETARY RUBIO:**  Yeah, but there's – I – there's a bunch that were – that we approved that are on the – not even got waivered, just got restarted and we're doing them.  There's others that we have suspended because we didn't think we were getting the return on the investment.  That money may be repurposed to a program that works better for the same cost.

**QUESTION:**  You mentioned that Marines have said – Marines at Guantanamo Bay have said that the Tren de Aragua members there —

**SECRETARY RUBIO:**  Oh, yeah.

**QUESTION:**  — were more violent than al-Qaida members.

**SECRETARY RUBIO:**  Not just more violent, very well organized.  They were able to communicate with each other, the hand signals, all kinds of – I mean, this is a prison gang, so it doesn't surprise me.  That's how the Tren de Aragua originates from, so it doesn't surprise me that they're very effective in that setting.

JA1690

AAUP-01436

They're also very dangerous to keep in our country.  When you keep prison gangs in your country, they grow, they metastasize.  MS-13 was actually a group that was started by Salvadoran – either Salvadoran refugees and/or actually people born in the U.S. of Salvadoran descent in prisons.  MS-13 did not originate in El Salvador; they originated in U.S. prisons and spread down and back to El Salvador.  Prison gangs are very dangerous because they recruit and then they – they almost create academies within the prisons that then metastasize and spill out to the general population.

**QUESTION:**  Have you spoken to the Marines down in Guantanamo, or did they (inaudible)?

**SECRETARY RUBIO:**  I spoke to one that was in Guantanamo because I know them through a family friend, but I've also spoken to both Pete Hegseth about this and, if I'm not mistaken, Secretary Noem as well.  And they both – when I asked them, "Is this true?" they both confirmed that's what their officers and people on the ground were telling them.  So actually I heard this from a personal acquaintance, and then I actually had it affirmed to me by two members of the cabinet.

**QUESTION:**  (Inaudible.)

**QUESTION:**  (Inaudible) some of the people sent down to El Salvador to the prison weren't actually gang members, but that, for example, there was a (inaudible) with a tattoo (inaudible) supporting autism, people with autism, but it looked like a gang tattoo to the immigration agent and then (inaudible) mistakes made.  How do you address that?

**SECRETARY RUBIO:**  Well, ultimately that – all of that was the work of the Department of Homeland Security.  They've identified them.  I have confidence in the assessments that they've made.  They're – but I can't speak to any one of the individual cases because we're not involved in compiling them.  But I have no reason – in fact, I have confidence that they compiled a good list.  And if we have an opportunity to send more, we will – gang members, MS-13, whatever we can send.

**QUESTION:**  (Inaudible) isn't it an issue of due process?  I mean, was that raised with President Bukele?  Do these people have a right to appeal in some way?

**SECRETARY RUBIO:**  Every single one of them was deportable for reasons even beyond the Alien Enemies Act.  The MS-13 as well.  They were all deportable.  Many of these people had orders of

JA1691

AAUP-01437

deportation already and were either in custody or had been recently apprehended.  So every single person that was sent there was deportable.

Unfortunately, if they're of Venezuelan descent, up until this week the Venezuelans were not picking anybody up.  They were not allowing anybody to go back.  They're the only country in the hemisphere that was refusing to accept anyone.  They have restarted those suddenly, and hopefully they'll continue and then we won't have to use El Salvador.

**QUESTION:**  So why use the Alien Enemies Act if they were deportable anyway?  Because that just seems to be (inaudible) inviting a challenge to it.

**SECRETARY RUBIO:**  No, I think the expedited nature of it.  These gangs were organized.  They were – they were presenting very real and immediate risks in a number of communities in our country in an organized fashion.  We have reason to believe that they were actually being pushed towards the United States in large numbers by the regime in Venezuela.  You saw just yesterday one of them arrived in Venezuela and was greeted on the tarmac as a hero.  This is an individual that was arrested for – caught on video – attacking police officers in Times Square, (inaudible) to law enforcement after doing so.  So we believe that in many ways the Venezuelan regime has encouraged that flow of these groups towards the United States to create harm in our country.

**QUESTION:**  The reason I ask is that we know (inaudible) Thursday before we left on Friday (inaudible) spoken to President Bukele twice, and this was all arranged, and —

**SECRETARY RUBIO:**  I've spoken to him a number of times.

**QUESTION:**  I know, but this —

**SECRETARY RUBIO:**  Not just the only time you were around.

**QUESTION:**  Well, no, no, no, this was the (inaudible).

**SECRETARY RUBIO:**  Yes.

**QUESTION:**  This was the Thursday – Thursday night.

**SECRETARY RUBIO:**  Yes.

JA1692

AAUP-01438

**QUESTION:**  So now we're into Friday, and it became clear with this transfer of diplomatic notes from El Salvador and the stuff that the State Department was doing to get the money ready – 20 grand per person per year for this initial tranche of (inaudible).  And it made clear that the President was going to go in and sign the AEA declaration, and yet it didn't come out until after, so Saturday.  Why?  Was that —

**SECRETARY RUBIO:**  Well, about the AEA declaration, that came from the White House.  My conversations with President Bukele were as a follow-up and to finalize in a verbal agreement we had reached in my visit to El Salvador on my first trip as the Secretary, so it was just sort of following up on that and how we were going to proceed with it.  We were ready now to execute at some point, and we were working through those arrangements with them.  And that's what those calls were about.  It was just sort of to finalize what we had agreed on.

**QUESTION:**  So you don't think that the White House delayed (inaudible)?  Because the President did sign the AEA declaration on Friday.

**SECRETARY RUBIO:**  Yeah.

**QUESTION:**  (Inaudible) it wasn't (inaudible)?

**SECRETARY RUBIO:**  I can't speak to the timing of why they released the one they did.  I can tell you – and I think you were on that trip – that the agreement to house criminal aliens was reached with President Bukele back in February.

**QUESTION:**  Yes.

**SECRETARY RUBIO:**  And so we spoke – I've spoken to him since then, but obviously this – those days that I was there we did because we had a couple of open questions that we wanted answers to and that he wanted answers to, and we were finalizing that.

**QUESTION:**  Mr. Secretary, on Russia, about a month ago when we were in Riyadh, you were first starting on speaking with them, and you said something.  You said soon enough we're going to find out whether they're acting in good faith or not, we just need to test it out.  So a month later where do you stand?  Are they (inaudible) —

JA1693

AAUP-01439

**SECRETARY RUBIO:**  Well, I'm not prepared to pass judgment on it.  They're meeting with us.  They're talking to us.  They're making proposals.  They're agreeing to ceasefires but with conditions that we need to analyze.

**QUESTION:**  So is that dragging their feet, actually?

**SECRETARY RUBIO:**  I wouldn't – I'm not prepared to characterize it as one or the other.  What I've said almost from the very beginning is, I mean, this war is complex.  As you can see, it's now going on three years.  And I never said it was going to be simple.  There's a lot of work to be done with both sides, in particular the Russian side, which we haven't talked to in years.  So —

**QUESTION:**  How long do you anticipate these negotiations to continue?

**SECRETARY RUBIO:**  We're going to – we're trying to achieve peace.  We're committed to trying to achieve peace as long as it takes.  That doesn't mean that I can guarantee you that there's going to be an agreement in a week or a month.  I just can't put a timeframe on it because it doesn't depend on us.  It depends on the Russians and it depends on the Ukrainians.  It also depends on our partners in Europe who have sanctions that will have to be taken into account, I believe, as part of any final deal.

But I always think it's progress when at least specifics are being agreed to even though they may not be agreeable to both sides, because we get to determine sort of the negotiating posture and what the impediments are to peace.  So I think when you negotiate, when you sit down with people and they – and you talk about these things, they have to memorialize these things in documents, at least it begins to give definition to what the impediments to peace are.

As far as willingness, that'll be tested when the time comes to sign or if – if we've dealt with impediments and there's still resistance from one side or the other, then we'll know.  But we're not at that stage yet.

**QUESTION:**  Do you anticipate this moving soon beyond the technical level and back to higher-level talks?

**SECRETARY RUBIO:**  Well, I think you have to make more progress on a technical level at this point, but we'll see.  We're going to analyze it.  As I said, when they arrive back from Saudi Arabia I want to sit and talk to our team that was on the ground and get a better sense how those

JA1694

AAUP-01440

negotiations went, because a lot of it isn't just what was written and what was said over 12 hours.  And by the way, we met with the Ukrainians twice as well, so we want to get that perspective, which we met with them on Sunday and again on Tuesday, and the Russians on Monday.  So I need to hear from them directly a little bit more about how it went, and then we'll present that.  We'll meet with the team and we'll present that to the President, and then decide on a path of what the next steps are.

QUESTION:  Can I ask you a different topic?  Sudan.  We've seen certainly an upsurge in violence.  The army says they have kicked out from the presidential palace.  You've seen the strike on the market.  Is there anything diplomatically that the U.S. can (inaudible)?

SECRETARY RUBIO:  We're engaged in conversations with a number of countries, with Ethiopia, with Kenya, in just over the last 72 hours where we've been raising that.  And we're very concerned that we're going to backslide to where we were a decade or less ago, and so we don't want to see that.  And so we're trying to figure out and we've been engaging with our partners about soliciting their ideas about what can we do on this matter to – what contributions can the United States make to stabilize it now.  There are a number of places we're doing that.  We're doing that with DRC-Rwanda as well.  So there are a couple of places like that that we find ourselves sort of asking our regional partners how do they believe we can be most helpful and engaging, and with our partners outside the region as well.  We've spoken – I spoke to the foreign minister of the UK yesterday about this topic.

QUESTION:  (Inaudible) Iran and the (inaudible) letter (inaudible)?

SECRETARY RUBIO:  Oh, he just asked me that, but you couldn't hear.

QUESTION:  Oh, sorry.

SECRETARY RUBIO:  No, that's okay.  I just have to – now I have to remember the answer, because it has to be identical.  (Laughter.)

QUESTION:  You have to (inaudible).

QUESTION:  Give us the details.

AAUP-01441

JA1695

**SECRETARY RUBIO:** It's been publicly reported that the – that the President sent a message. I anticipate a response on that, and – but we have nothing else to announce on that. Is that pretty much what I told you? All right.

**QUESTION:** Can I ask —

**SECRETARY RUBIO:** All right. Well, the game is going to start. That's why. (Laughter.)

**QUESTION:** What brought about your hatred for ecotourism?

**SECRETARY RUBIO:** I don't hate ecotourism. It's just —

**QUESTION:** You said —

**SECRETARY RUBIO:** No, no, no, no. I said I'm not a fan of ecotourism, but I'm not against it. People like to do that stuff. But like, to me, a vacation does not involve snakes and spiders. So that's my view. Maybe that'll change. I don't know.

**MS BRUCE:** All right.

**SECRETARY RUBIO:** All right. Thanks, guys.

---

TAGS

Bureau of European and Eurasian Affairs     Bureau of Western Hemisphere Affairs     Cuba

El Salvador     Office of the Spokesperson     Russia     The Secretary of State     Turkey

Ukraine

---

JA1696

AAUP-01442



White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

JA1697

AAUP-01443



🇺🇸 An official website of the United States Government  Here's how you know  ⌄

**U.S. DEPARTMENT *of* STATE**

**Home** >  ... > Secretary of State Marco Rubio with Donald Trum...

★ ★ ★

# Secretary of State Marco Rubio with Donald Trump, Jr. of Triggered with Don Jr.

**INTERVIEW**

**MARCO RUBIO, SECRETARY OF STATE**

APRIL 8, 2025

**QUESTION:**  Well, guys, joining me now, Secretary of State Marco Rubio.  Good to have you, Marco.  How's everything?

**SECRETARY RUBIO:**  Thanks for having me.  Thank you.  Thanks for having me on here.

**QUESTION:**  Well, I imagine this is a good day given the outcome of the basketball game last night.

**SECRETARY RUBIO:**  Yeah, yeah, yeah.  It was good to – by the way, that young guy, he's – I think he's the youngest coach maybe since – they were saying last night on TV since Valvano to win a national title.  He's only been there three years.  They hired him from the University of San Francisco.  He played, I think, six or seven years in Israel in basketball and then he came over, and he's done a great job.  And that's a team that's not built with a bunch of like high-number recruits, like five-star famous guys.  He's kind of pieced it together.  So it's great.  It's great for the school.

The only thing that's crazy is you watch the videos of these kids – my son's at the University of Florida – and these kids climbing up on the light poles and stuff like that, it's

Cookie Settings

AAUP-01444

JA1698

I don't know.  I don't remember that back in the day.  People just won, they had a parade.  Now they want to tear up the town even the night before.  So that was the only downside of winning, is seeing these people risking their lives over in Gainesville.

QUESTION:  Yeah, listen, kids are going to be kids.  I think I'm okay with kids being kids.  I think we need a little bit more of that as well.  But yeah, we've got to be a little careful.

SECRETARY RUBIO:  Yeah, I draw the line at life-threatening shows of enthusiasm.  Those are the things that – luckily, my son wasn't the guy on the lightpost.  But I saw that last night, I was like, somewhere there's a nervous mom.

QUESTION:  Well, thank you again, Mr. Secretary, for taking the time.  I guess to start off, it was interesting to see the Supreme Court yesterday, in my opinion, smartly lifted the restraining order against the Trump Administration as it relates to the ability to deport Tren del Aragua murderous, drug-dealing gang members to El Salvador.  Can you talk about the significance of this?  I know you've been dealing with this a lot on a daily basis.  I know you were intimately involved, obviously, when they were trying to recall to make sure we couldn't deport murderous thugs.  But can you talk about that historic work coordinating with President Bukele of El Salvador to get these criminals actually off of our streets?

SECRETARY RUBIO:  Well, a couple things.  The most important thing about that court ruling is it said you have to file it, you have to go before the judge wherever those people are being held before they're sent abroad.  Because right now, what was happening is these activists were basically just finding a court – they would find – they'd forum shop.  They'd find, "Where can I find a friendly federal judge that gives me the highest probability of victory in court?"  So you have over 600-something District Court judges, and so you have a guy in New Jersey or a guy in New York or a guy in D.C. basically enjoining the entire country.  I mean, one of these federal judges has the power to stop the entire federal government in all 50 states and every one of our territories.

And so I think the most important thing the court said is, number one, if you want to fight these things, you have to fight it in the jurisdiction where they're being sent from or being held – in this case, Texas – which clearly, for whatever reason, these lawyers, they don't want to go to Texas to file it, right?



AAUP-01445

And then the other is just the power of the federal government to conduct foreign policy.  We have a judge right now that is basically trying to order the federal government, the Executive Branch, to bring people back.  In essence, they are trying to order us to go to the president of El Salvador and tell him you must now send people back to us.  So we can't live in a country – it's just not constitutional – where judges are now conducting the foreign policy of the United States.

The trip to El Salvador was one of the first trips I did.  I think it was two weeks in, maybe three weeks in, as Secretary of State.  I met with Bukele.  I've known him for a long time.  He's very pro-American, very – likes the President a lot.  He's going to be visiting here pretty soon – I think maybe next week it is when he's going to be coming to the Oval Office.  And he agreed; he said, look, I've built these prisons and I will house people here.  First of all, he wants his MS-13 killers that are in the United States, because they're wanted for crimes in El Salvador too.

And then he's also willing to hold members of this dangerous Venezuelan gang, and he's doing it at a fraction of the cost of what it would cost us here in the United States to hold them.  These – this is one of the most dangerous gangs ever, Tren de Aragua, one of the most dangerous gangs you've ever seen.  They go in, they take over entire communities, and we want them out of the country.  And Venezuela wasn't taking them, so we had to find a place to send them, and he has the perfect place to send them.  And that's a deal we cut with him back in early February, and this was the execution of it.  We're very grateful.

And since then, we sent another group over there – not as big, but you look at the roster of people, the next – I think nine or ten that we sent.  You see the rap sheet on some of these people, it's one of the worse collections of human beings I've ever seen in my life, and I'm glad they're no longer in the United States.

**QUESTION:**  Well, watching the leftists try to defend these people, have them released – I mean, it's sort of wild.  I can't imagine a civilization that could survive by releasing arguably some of the most violent people in history back into our streets.  Have they just lost the plot so badly that this is their hill to die on?

**SECRETARY RUBIO:**  Yeah, I think they're so triggered by everything that happens in terms of any sort of removal of people from the country, it's almost automatically assumed that if you are somehow removed from this country you are a candidate for the Nobel Peace Prize or you are

JA1700

AAUP-01446

some sort of – it's amazing.  You read these articles; these are the greatest people who have ever lived, who just somehow all happen to be illegally in our country.

But it's a very simple and basic point:  What country in the world would assume millions of people in a mass migration, not to mention thousands and thousands of people that you know are members of dangerous gangs and either have criminal records in their home country or here or are part of groups that commit crimes, who would – it's the stupidest thing I've ever heard that some country would want to keep them there.  It would make all the – for a real everyday person in America, if you went to them and said, "Should we kick out people that are in here illegally and are dangerous criminals," that's, like, a no-brainer.  That's got to be like a 90/10 issue in the United States, right?

**QUESTION:**  The fact that there's even a 10 is shocking to me.  I mean —

**SECRETARY RUBIO:**  Right, or maybe it's even higher, right?

**QUESTION:**  Yeah.

**SECRETARY RUBIO:**  But these guys consistently fall on the other side of it, right?  They consistently fall on the other side of it.  And what they're basically telling the American people is these people that are in our country illegally, and by the way are dangerous, somehow have the same rights if not more rights than everyday citizens in our country who are law-abiding, were born here or naturalized here or legal citizens of the United States – they basically have the same rights that you have.

It's the same issue with the student visas.  We have this concept that's been built up that this is somehow a right that people are entitled to a visa.  No one is entitled to come into the U.S. illegally, much less remain here, and no one is entitled to a visa.  A visa – we deny visas every day all over the world because we think somebody might overstay, because we have questions about somebody.

So none of these things are right, so it's time – in addition to doing what's good for our country, it's an important opportunity to sort of reset reality on what these things actually are.

**QUESTION:**  Yeah.  I'd argue the Biden administration canceled plenty of visas of people that actually could be the next astronaut, the next nuclear physicist, the next – because

AAUP-01447

JA1701

they probably weren't reliable Democrat voters.  But I think more importantly, as you and my father have both made very clear, gangs like Tren del Aragua – part of Maduro's narco-terrorist regime who've influenced violence on American citizens, murder, as well as the Venezuelan people – this isn't just a foreign problem; it's an American one, and it's right in our backyard.  What else do people need to understand about how deep this really goes?  Because this isn't just, hey, they got rid of a couple people.  I mean, this – this seems to me like a serious op designed to really undermine and hurt America at the base level.

**SECRETARY RUBIO:**  Yeah.  No, there was no doubt that it was used as a tool against us.  I think mass migration's been weaponized against America.  I think as the years go on, as the months go on, as we learn more about it, there'll be evidence and proof of that out there.  There is no doubt there was a concerted effort, among other things.  I mean, there was a lot of people already wanting to come for a lot of reasons.  On top of that, I think you had a concerted effort to push people towards the United States.  It's not unprecedented.  In 1980, Fidel Castro opened up his mental institutions, he opened up his jails, and he basically flooded the United States with criminals from Cuba, and we paid an extraordinary price for it.  So it's not unprecedented.

In the case of Tren de Aragua, that was a prison gang inside of Venezuela.  The Venezuelan regime pushed them out of the country knowing that many of them – first of all, they destabilized all kind of countries neighboring in the region, but ultimately wound their way up here to the United States.  And we saw that trend begin probably in January of 2023 we started to see uptick in people arriving.

It was actually Venezuelans that were telling me this.  People here in the country, they were saying, look, these people that are coming now, they're members of gangs.  And at first you kind of think, well, how do you really know?  But they were right.  They were absolutely right.  And we started to see that.  And you started to see them in the unlikeliest places.  It wasn't like they were all coming to Miami.  They actually were going to places like Chicago and New York and Aurora, Colorado, and sprinkled all over the country.  And then the crimes began.

So there's no doubt that this was a concerted effort by the Maduro regime not just to drive these gang members out of their country but to drive them towards the United States and to inflict a price on this country.  And it's not – it's right out of the Fidel Castro playbook.

JA1702

AAUP-01448

**QUESTION:**  Yeah.  Well, María Corina Machado won 92 percent of the vote there in an open primary despite brutal repression, censorship.  I mean, I had her on the show two or three weeks ago.  She was talking about – I mean, if she went to a restaurant – because she couldn't even fly, driving to a campaign stop – they'd shut down the restaurant for even serving her.  I mean, she is clearly the choice of the Venezuelan people.  She was banned from the ballot.  But even her surrogate, Edmundo González, still won the election by 40 points.  I mean, that's –

**SECRETARY RUBIO:**  Yeah.

**QUESTION:**  That's not like some of these things here where you say, hey, you won by basis points, where are the gains?  I mean, that's pretty decisive even in that regime.  Would you say the Venezuelan opposition today is more unified and credible than perhaps we've seen in the past, and that can actually effectuate real change going forward?

**SECRETARY RUBIO:**  Well, they're as brave as they've ever been, and she in particular.  María Corina Machado is an incredibly brave woman.  I mean, if you – and I'm not criticizing anybody when I say this, right, but if you look at the Venezuelan opposition, a large percentage of the well-known figures in it are now living abroad, because there comes a time where your family's lives is threatened or they force you out of the country or you leave.  You travel overseas to go give a speech and they don't let you back in.  She has stayed.  But she's in hiding.  They're looking – they're hunting her down every day.  Like, they're trying to get a hold of her, they've tried to arrest her a couple times.  Incredible bravery.  One of the bravest people in the world, and I don't think people know enough about her.

But you have to – people have to understand, I mean, being in the political opposition in Venezuela at this point is a life-threatening circumstance to be in.  I mean, they will – they will put you in jail.  They've jailed everybody around her, everybody – and these are not like normal jails.  I mean, these are atrocious conditions that they're in.

So it's not a government.  The Maduro regime is not a government.  They govern territory because they have the guns and they have the security forces, but it basically is a narco-terrorist organization with strong ties to Iran, strong ties to narco-trafficking, and they just happen to control territory.  They don't even control all of Venezuela because the border regions with Colombia are controlled – openly controlled – by narco-guerrilla terrorists.

JA1703

AAUP-01449

So yeah, I mean, if they had a real election in Venezuela, Maduro would lose – like he did – by a lot.  But obviously, the way they stay in power is they kill and jail the people who don't agree with them.

**QUESTION:**  Well, I know the Biden administration – I mean, these were regimes that were largely on the ropes until we shut down our own energy production, the Keystone Pipeline, and allowed Chevron to make a deal with the Maduro regime which gave them the cash that I'm sure was siphoned off and/or funneled through back to the regime to keep them in power.  I mean, I can't think of a more glaring example of basically giving a lifeline to literally a terrorist dictator than what we saw in the past.

How do we reconcile that that even happened in America, despite sort of party differences?  I mean, it's so flagrant, and the fact that the media won't even talk about that, won't even talk about this; but if we do anything here, they're so vocal about any kind of change in what was ultimately a failed policy that boosted up a dictator.

**SECRETARY RUBIO:**  Look, in foreign policy we want to be mature and realistic about it.  You're going to have to deal with some bad people, right?  You're going to have to deal with people that you don't like, people that you don't agree with, but for the purposes of foreign policy, peace, and all that kind of thing, you have to deal with them, okay?

The problem is you can't do it in a stupid way, and that's what the Biden people did.  They went to Maduro and they said, okay, we're going to do a deal.  You promise to hold elections, free and fair elections in like nine months or whatever, and we will immediately lift sanctions and allow you to start producing oil and getting paid for it.  It was a side deal, by the way, because they didn't – they only announced that they did this deal with Chevron.  What they didn't announce was that Chevron – with a side, secret deal – was allowed to pay the Maduro regime royalties.  It accounted for over 25 percent of all the revenue going into that regime from oil.

So they did that deal.  Well, they didn't have – you talked about the election.  The election was fake.  They didn't have an election.  And after that, after that, they left the deal in place.  They left it in place, even though they violated their word on holding free and fair elections.  I think the way – if they were going to do it – and I don't think at this point you can do it – you say first you have free and fair elections, then we'll lift the sanctions.  And then we'll – but they – and even if you do

JA1704

AAUP-01450

it the way that the Biden people did, at least if they don't – if they break their word, undo the thing.  Stop getting – allowing them to get money.  But they didn't do any of that.

So I think it's one more example of stupidity in our foreign policy, which other countries look at and say, well, hell, they got away with that; we should – we could be able to get away with whatever we want as well.  It's really both weakness and stupidity.

**QUESTION:**  Yeah.  I mean, I'm not a foreign policy wonk by any stretch, but I know enough about negotiation to say you don't give up all your leverage, you don't give the other side everything that they want before you get to the table to figure out what it is that you want.  You keep maximum pressure on them so you can actually effectuate real policy changes.

**SECRETARY RUBIO:**  Yeah.  Well, if I want to put it in real estate terms, you don't get to say, okay, pay me for the building and I get to keep the building anyways.  (Laughter.)  And that's pretty much the deal they made.  It's like, here's all this money for your – we want to buy your hotel or your property.  We're going to send you all this money for it.  But by the way, you get to keep the hotel and the property.  You get the money and the hotel.  That's what these guys got.  They got to keep their dictatorship and their deal, but obviously President Trump is a very different kind of president, and that's over now.

**QUESTION:**  I agree.  Mr. Secretary, can you talk about the impact of your successful leadership and what appears to be a broader pivot into the Western Hemisphere?  We've seen comparisons to the Monroe Doctrine.  Can you talk about the opportunities to shake up the foundations of communism in the Western Hemisphere and build strong, long-lasting American alliances in our backyard, whether it's with Bukele in El Salvador, Milei in Argentina, María Corina Machado in Venezuela hopefully eventually, and perhaps others?  What does all of that look like to you?

**SECRETARY RUBIO:**  Yeah.  Well, the baseline is the United States wants to be friends with our friends, right?  So for a long time if you were a U.S. or pro-American ally in the region, we kind of ignored you and in some cases actually treated you bad.  But if you were an irritant like Nicaragua or Cuba or Venezuela, then we made all these deals with you to make you happy, right?  So we made deals with the people that hated us and we either neglected or sometimes were outright hostile towards the countries that were pro-American.

AAUP-01451

JA1705

So we've reversed all of that.  And you – and look, maybe I'll miss a country here, but you talk about places like Guyana, Argentina, Paraguay, Costa Rica; the president of Panama is very pro-American, meaning he wants to be our ally and our partner; El Salvador, the Dominican Republic.  So we've made a concerted effort to reach out to these countries that have governments and leaders that want to be aligned with the United States, not just on regional issues but international issues, and figure out a way – we want those democratically elected leaders to go back to their people and say, hey, there's benefits to being friends of America; here are the benefits.

At the same time, it allows us to clearly define the countries that have governments that are enemies of the United States, unfortunately, in Cuba, in Nicaragua, in – and obviously the regime in Venezuela.  So we identify these.  And then others, we've got some tough issues to work through, like with Mexico.  On fairness, I think the Mexicans are doing more today against the cartels and against migration than they have ever, ever done ever before, and obviously the credit goes to President Trump for being very strong about that.  But that's an example of how positive engagement has allowed us to get things – has allowed us to reach a level of cooperation with the Mexican Government that we never have had before under previous presidents.

**QUESTION:**  How would you like to see that?  Because, I mean, to me that's the biggest thing.  I mean, we spend in trillions in Ukraine; it doesn't matter.  We – I mean, it's not really a clear and present threat to us, we – all of those things.  But, I mean, the Mexican border, whether it's, honestly, a lot of the stuff I'm sure you're probably dealing with on trade as well as the cartels, with the fentanyl trade coming across and then human trafficking and child sex trafficking – I love seeing Mexico do that.  What more can we do to help bolster those efforts?

Because, I mean, I think if we look at it objectively, I imagine there's probably plenty of cartel infiltration into the Mexican military.  You see about X number of presidential candidates in Mexico killed, likely by the cartels.

**SECRETARY RUBIO:**  Yeah, yeah.

**QUESTION:**  There is undue influence.  It's not like a gang in California.  These are very sophisticated, very well-funded paramilitary organizations at this point.  How can we help bolster that?  Because when I look at 100,000 Americans dying a year – two Vietnams a year – indiscriminately across the board with fentanyl, that seems to me like the most obvious clear and



AAUP-01452

present danger to the United States of any foreign issue that we deal with, any war and any conflict.

**SECRETARY RUBIO:**  Yeah, no, no doubt.  So I think the first is to recognize what you just said, and that is – and I'll tell you why we recognize it.  You're absolutely right.  I mean, you have judges – like, let's talk about extraditions.  There are people that are extraditable, like, they're wanted in the United States; they should be extradited.  But they'll literally go to some corrupt judge and say, oh, that's not me, I'm not Jose Sanchez, I'm not Juan Ramirez, that's not me.  And they spend 10 years in this process.  And then you've got some people in that government that have been very – that want to get rid of those people, that want to take those on, and we just have to understand that in Mexico for those people to stand up and say I'm going to take on a drug cartel, it's not like you might lose the next election or be removed from office.  It's like you might be beheaded.  You might be killed.  Your car might blow up.  Your kids might and your family might be killed.  Same with journalists that reveal all that.

So I think part of it is capacity building, meaning working with them.  The Mexicans have capabilities.  I mean, they're not – it's not a Third World country.  I mean, they've got institutions there that we partner with.  It's intelligence sharing, whether it's them alerting us, hey, these guys we think have crossed your border and they're operating in Tucson; or us letting them know, hey, there's a drug shipment or there's a human trafficking network moving across.  Can you guys action that?  So all of those sort of – all of that collaboration is going on right now as we speak, and it's more than it's ever been.

Now, there's more that needs to be done.  And if you look at the border today, it's the most secure border we've probably ever had in my lifetime, that's for sure.  I mean, there's just nobody crossing.  In fact, one of the biggest problems we're facing or complaints we're hearing about now is that there are people that were headed here, coming up through Central America; they realized Trump won the election and he was actually serious.  They made a U-turn and now they're kind of stuck in these countries along the way, whether it's Mexico or Guatemala, Honduras, whatever.  They're making U-turns.  So that has stopped, and I think that's – Mexicans deserve some credit for helping us on that front, because they've actually sent more national guard troops to the border than they ever have before.

Look, they've still got big problems.  We've still got to deal with the fact that there are parts of Mexico where the drug cartels are way more powerful than the government.  In fact, the



AAUP-01453

government might not even be present there.  They are the government.  It's a huge undertaking and it requires – we have to work – it's not just an us issue.  I mean, it's the Department of Defense, it's Kristi Noem in DHS, it's Tom Homan, it's all of these different elements of government that are partnering with the Mexicans.  This is the closest we've ever worked with them.  We have a lot more to do, but this is the closest we've worked with Mexicans, the Mexican authorities, on tackling this problem, and I think there's more to be done.

**QUESTION:**  That's great.  Meanwhile, I guess, the State Department – we talked about visas a little bit earlier, but you guys have been sort of aggressively confronting visa holders tied to terror groups and extremism.  It's sort of shocking to me that that was never done before.  You would think that would be a pretty serious red flag, but apparently it wasn't.  Only people who buy MAGA hats and/or Bibles would be targeted by the Biden administration.  Can you lay out perhaps your mission and priorities as it relates to foreign national here on visas who are acting against America's interests?

**SECRETARY RUBIO:**  Yeah.  So if you go right now to a window somewhere in an embassy and apply for a United States visa, there's all kinds of reasons why we won't allow you to come in: because we think you might overstay your visa, because we don't like or have questions about some of your political activities and your views.  We just won't give you a visa proactively, on the front end.  My argument is if we identify people like that who we would not have given a visa to, had we known information, but now they've got a visa and now they're here and we know the information, shouldn't we ask them to leave as a result of it?  In essence, if we wouldn't – if there are things about you that had we known we would not have given you a visa, we should be taking away your visa.  It's as simple as that.

There's no – no one's entitled to a visa.  I mean, there are all kinds of reasons why people get denied.  There are people that can't tell you why their visa was denied; they just don't know.  It's just we – we're not taking more people from that country, or we just – whatever it may be.  So I think, at the end of the day, that's what we're trying to do right now, is we're trying to go and identify people who we have information about who, had we known that information, we never would have given them a visa.  And we're revoking those visas, and they have to leave.

Now, I think everyone would tell you this – if you told me I'm applying for a student visa so I can attend a university, and while I'm at your university I'm going to become a member in support of



AAUP-01454

or even participate in groups that are going to take over libraries, spray paint monuments, start riots, bang drums all day and night, harass Jewish students – if you told me you were going to be linked to any of that stuff, we never should have given you the visa.  Now that you're doing it, we should take away your visa.  And that's what we're trying to do and that's what we are doing.

I know it's a lot of work, but we – it's something I wanted to do when I was a U.S. senator.  I've been talking about this for two and a half years.  I think it's the craziest thing I've ever seen.  What country in the world – how stupid, how ridiculous is it for some country to say, "Yes, bring more people to our country that are going to disrupt and create riots in our streets and on our campuses."  Who would do that?  It's idiotic, and we're not doing idiotic things anymore.

**QUESTION:**  Yeah.  You would think that one of the major disqualifications would be on the application, if you withheld your true intentions for being there, that in and of itself would be disqualifying.  And that's clearly what so many of these people are doing.  They're coming in under a guise of being a student, but they're far more active in their role as activists for hate than they are actually trying to be students.

**SECRETARY RUBIO:**  That's right.  And look, I mean, at the end of the day one thing is you're a U.S. citizen, you go on campus, you get wrapped up in these movements – it's very unfortunate, and I think that's a societal problem we have to confront as a country, like why are the citizens of the most prosperous and freest country in the history of the world raising kids that are turning out to hate the country that made all of this possible.  But another thing is to say:  And by the way, we're also going to invite people into our country as guests who are going to join and foment these movements.  It just makes no sense to me.

By the way, that's not the only visas that are getting revoked.  That's – like if you have a DUI – if you're here on a student visa and you have a DUI or you have some other crime, that's an automatic suspension.  And they weren't doing that; that wasn't happening.  That should be automatic.  You commit a crime while you're in this country; your visa's gone.  You didn't tell us you were coming here to break the law; you told us you were coming here to study and then go back to your country.  And if they're not doing that, that should be the end of the visa.  And that was something that wasn't being enforced either.

<span style="color:red">JA1709</span>

<span style="color:red">AAUP-01455</span>

**QUESTION:** Yeah. And it's not like there's not precedent for that, right? I mean, you can't get into Canada if you've had a DUI. I mean, you can't lie about an application to go to Mexico on your passports. It feels like we've had the most lax immigration laws as probably the country that most people around the world would want to get into, and yet we don't even hold ourselves to the similar standard of our neighbors and, frankly, everyone else around the world.

**SECRETARY RUBIO:** Yeah. No one else does it this way. No one else does it this way. We're the ones that – I think something has built up in the American mentality that somehow coming to America is a right, that everybody on Earth has a right to come to America legally or illegally if they want. And that's just not true. That's never been true. But that certainly can't be the standard, certainly not the legal standard. And it also makes no sense.

You – every country in the world has to be able to control who comes in, when they come in, why they came in. We have to have standards for all of that. And then you have to enforce those standards. And we just – we've just completely lost focus on that, and instead sort of created this mentality that I think really spanned both parties, that we should just allow anyone who wants to come in to come in, that our default position is yes, come in, and we'll figure it out later. And that can't be our default position anymore.

And by the way, you explain this to foreign countries – they completely understand. At least privately they completely understand.

**QUESTION:** They're all doing it. They may be outraged because they want to get rid of their —

**SECRETARY RUBIO:** Well, and the ones —

**QUESTION:** — less than desirables. But I don't think we can be the world's dumping grounds for criminals and murderers. I always talk about the statistics under the Biden – 13,000 murderers. I mean, that's Joe Biden's ICE. They knew they were murderers and let them in.

**SECRETARY RUBIO:** Yeah.

**QUESTION:** Sixteen thousand rapists and sex offenders; 600,000 criminals overall. I mean, that's insane. They knew it and we're like, "Eh, it's okay." Spread out 16,000 rapists amongst the 4,000 counties in America, four rapists per county in America. I mean,

AAUP-01456

JA1710

it doesn't seem like that would go well.  It's 3.6 murderers per county around the country.  What good could possibly come from these things?

**SECRETARY RUBIO:**  No, nothing good comes up.  But it just tells you we just completely – policymaking in America became completely detached from common sense, completely detached from reality.  We sort of adopted this mentality that we're welcoming – everyone who wants to come in, come in.

You know who else had that mentality?  A bunch of countries in Western Europe that now deeply, deeply regret it.  The Germans made the decision let everybody in, let everybody in.  And now everybody in Germany is like – and all over Europe is like, okay, we made a big mistake here.  Obviously, we're a bigger country, but we've made similar mistakes, right?  And we can't let that continue to happen.

**QUESTION:**  Well, I mean, Europe feels like it's over.  And it feels like they're – actually recognize that, and they can't really do much about it.  But we've had our own issues here as well.  I mean, I know under the previous administration, the State Department made DEI 20 percent of Foreign Service officer performance.  I mean, DEI – I don't know what that has to do with Foreign Service officer performance.  But what did you find out as you got in there, and what are you doing to fix the issue of that?  Because none of that seems accretive to anything that the State Department would actually need to be doing.

**SECRETARY RUBIO:**  Yeah.  I think what you find is that you end up sort of losing focus on promoting people on the basis of merit.  And we have very good, talented people here that never got promoted or got stuck in mid-level ranks.  I mean, they have to wait 25 years to be an ambassador somewhere, or 30 years.  And then it's all because of some – how some supervisor judged you based on some scorecard.

It's like anything else.  People are – you're going to get what you reward.  You're going to get what you value.  It's the reason why we keep – why we score tests.  It's the reason why we have points in sports.  We want to know who won and we want to know – we want to reward good behavior.  We want to award good – we want to reward good qualities and we want to diminish bad ones.



AAUP-01457

So we're changing that standard.  We want to promote people within the State Department on the basis of how good they are at their job.  And there are different jobs people do here.  Some people are on Consular Affairs, which are the ones that review visas.  Some people are diplomats or economic officers, whatever it may be.  But we want people rewarded on how competent they are, how good they are at their job.  And frankly, what I think that opens the door to is the ability to promote people that maybe have been here 10 years instead of 25, but really are better than the people that have been here 25 years.  You know what I mean?

I mean, otherwise, you start to lose talented workforce.  Imagine you're in the Foreign Service.  You're there for 12 years.  You realize there's another 10 years before I get promoted to anything.  And by the way, it all depends on how somebody judged me on some scorecard about whether I hit some DEI metrics.  So we're getting rid of that in terms of how we judge and analyze our workforce, and I think it's going to give us a more accurate way to promote people.  I think it's going to help us with recruiting.  I think we're going to be able to —

**QUESTION:**  Yeah.  Oh, and people need to know that they have a chance.  If you have good talent, to your point, they don't want to know – and you've probably dealt with this in Congress; I saw that all the time.  It's like people who have no business being on the most prestigious committees end up on these committees because they've been there longer and therefore have some sort of tenure, but they're making trillion-dollar decisions about something that they don't understand, whereas a freshman congressman, senator may end up there but they – their life's work was exactly that.  So they actually know what they're talking about, but they have no chance of ending up in these places.

So it's really hard to recruit talent if they know that they may be more qualified than the people that are going to get that job and they've got to sit there for 25 years, not because they don't deserve it but because they just haven't been there long enough.

**SECRETARY RUBIO:**  Yeah, and understand, like, nobody goes into the Foreign Service thinking they're going to become millionaires working for the U.S. Government.  They do it because they want to be involved in foreign policy, they want to get around the world or what have you.  But I think we're going to have trouble attracting people to that career, and I think we're going to have trouble retaining people in that career, given all the other opportunities that now exist out there, if they don't see a pathway to fulfillment, professional fulfillment.

AAUP-01458

JA1712

**QUESTION:**  Yeah.

**SECRETARY RUBIO:**  And so I think that's going to help us do that, but I also think it's going to help us place the right people in the right places, because we're going to be judging them on the basis of how good they are at their job, which really should be how we make decisions about everything.  I always go back to sports.  If you think about it, I mean, how do we judge who gets to – who's on a team or who gets to play?  And it's basically very simple, and that is your performance in practice and in games that determine ultimately who you put on the field or on the court or whatever it may be.  And that's how we need to do it at all levels, including here in government.

**QUESTION:**  Well, yeah, I'm glad that you're making that change.  But how do you see all of that – whether it's the DEI stuff, et cetera – how does all of that tie into the scandal surrounding USAID?  What's the status of USAID today?  Is it gone?  Is what's left of it now kind of completely within your authority to oversee?  I know you've assembled a tough and courageous team, including top deputy Chris Landau, Acting Under Secretary Darren Beattie, who's been on this show many times, and others.  What's it all mean and how do we combat sort of that years of just insanity, actually?

**SECRETARY RUBIO:**  Well, I think that foreign aid is something that we need to do and we're going to continue to do, but every dollar we spend in foreign aid has to achieve at least one of three objectives.  It has to make America stronger, it has to make America more prosperous, or it has to make America safer.  If the program doesn't do one of those three things, it may be a great cause and I encourage the Gates Foundation or charities all over the world to take it up, but it has to be one of those three things.

I think the other big mistake that happened with foreign aid is we turned it into a tool to export our domestic policies of the far left, right?  So the far left decided these are things that we think are good and it also became cultural imperialism.  We began to use foreign aid not as a way to make America stronger, safer, more prosperous, but as a way to impose – impose – the domestic political agenda of the left onto foreign countries.  And it became a vehicle for that.

I think the third thing that developed over time is what I call the foreign aid industrial complex.  And I'm talking about dozens and dozens of these nongovernmental organizations, these NGOs, that were raking in hundreds of millions of dollars to run these programs on behalf

JA1713

AAUP-01459

of the U.S. Government.  And it came out – and this is not me; Samantha Power would have said this – you have to spend – in order to get $12 million to people directly, you have to spend $100 million.  You have to spend 100 million to get 12 million out to – directly, because you have to pay the NGO and then the subcontractor then the sub-sub and the sub-sub-sub.  And before you know it, you're paying Hamas to hand out food or whatever.  And that has to stop and that has to end.

So we conducted a review of 6,000 programs, almost 6,000 programs, at USAID.  We identified close to 900 that we are going to continue to do, either in their current form or amended.  We canceled 5,000-some of those contracts, and now the goal is to bring all of those programs under the State Department so that we can directly review – because remember, USAID was separate from the State Department.  They did whatever they wanted.

**QUESTION:**  Yeah.  Well, it feels like that was on purpose, right?  Once it's at the NGO level, all of a sudden there's no oversight, so who knows where that money is going?  I've always wondered, as you watch – that stuff gets discovered by DOGE, and within three days the top seven people at Act Blue, the big Democrat fundraising apparatus, all of a sudden magically disappear.  And I've always wondered for years:  How is it that they're raising 5x for every congressional seat that – what we can run, how is it that they're raising 10x on some of them?  Do you think there's any ties there to this money basically just being kicked back to Democrat – the fundraising apparatus and/or other shady things?  Because I – I just don't believe in enough coincidence anymore to believe that was just – magically happened at the same time.

**SECRETARY RUBIO:**  Well, some of that's been referred to the Justice Department to look at, but what I can tell you most definitely is that there are people that have made a lot of money by being part of the foreign aid industrial complex, by being part of this network of NGOs who do things.  And then some of it, frankly, just didn't make any sense, right?  Like you – I just came back from a trip to the Caribbean where I went to Jamaica, I went to Guyana, and I went to Suriname – the Caribbean Basin.  And their number one complaint is that USAID-funded NGOs didn't partner with government, right?  And then – and you can even go to embassies.

By the way, this is not really well understood.  There's always been tension between State Department and USAID, because there's some ambassador that's like, okay, I'm trying to get – we're trying to get good relations.  The foreign policy of the U.S. is to have good relations with the

AAUP-01460

JA1714

leader of this country. And then USAID, operating out of their embassy, is, like, funding the political opposition of that leader that —

**QUESTION:** Yeah, or, like, trans Elmo in places where let's just say that's not as popular as it is in California.

**SECRETARY RUBIO:** Another example, right, these sorts of things that you see. But in the case of the Caribbean, it's like, okay, they want to spend all this money on these literacy programs out in the countryside – which we're not against as a government – we're fine with that. The problem is that we can't even get to those schools, kids can't even go to school, until we first, like, get rid of the gangs that are threatening kids from going to school. So our number one priority, if you want to help us, help us with what we need. Don't help us with what you want, which is to get into these rural schools, where now you start indoctrinating people on the social priorities of the far left in the United States. It's part of that exporting of it.

So we're going to realign foreign aid, so we're actually going to be helping countries with what they generally need. And a lot of these countries, it's security assistance. What they want to do is they want to be able to build up police departments and security forces so they can become self-sufficient at taking on these gangs and not require foreign aid in the future. The best foreign aid is foreign aid that ultimately ends because it's successful, because you go in, you help somebody, they build up their capacity, and now they can handle it themselves, and they don't need foreign aid anymore. That's what foreign aid should be geared towards, not perpetual – these programs exist for 25 years. If a foreign aid program has been going on for 25 years, it has not achieved its purpose because it hasn't solved the problem.

**QUESTION:** I think that's very well said. I think, unfortunately, that machine wants to keep those people employed in whatever else they're doing. So, yeah, that's what I was wondering, sort of a – it felt like one big sort of grift, kickback apparatus. Perhaps it's incompetence, but I don't believe that either. I think these people have been very well entrenched, so I'm really glad to see you taking all of that on.

So as we wrap, because I know your time is a little limited today, I do want to say just what an incredible job I think you're doing with this.

**SECRETARY RUBIO:** Oh, thank you.

JA1715

AAUP-01461

**QUESTION:**  It's been so great to see this cabinet, people just getting together, not sort of taking on the positions that they would have otherwise.  And I think even your worldview – JD's worldview, so many of these guys – probably has really evolved over the last 10 years.  I'd love to hear how you see that happening but also how you'd like to sort of assess the almost first 100 days, and what do you see in store for the next 100?

**SECRETARY RUBIO:**  Yeah.  First of all, on your worldview – our worldview should always be under examination because the world is constantly changing.  Like, anyone who has the same worldview today that they had 15 years ago is lost, because the world looks nothing like it did 15 years ago.  So as circumstances change, the way you approach the world has to change.  We're different – we're in a very different era.  Fifteen, 20 years ago, we were the sole uni-power force in the world.  We took on a lot of causes because nobody else could.  The world looks a little different right now for a lot of different reasons.  So I think it's been a very busy – clearly, like I was just saying before we went on the air here with this, that every day here feels like six months' worth of work on every front.

**QUESTION:**  Yeah.

**SECRETARY RUBIO:**  As you know, the President is pushing very hard on every front to get everything done, and I think he has two advantages.  The first is he was president, so it's been the fastest transition you've ever seen because this is not – there was no on-the-job learning here.  It was go.

I think the team is also a very good team of people that have known each other for a long time.  I mean, I look at this cabinet meeting, I look around the room; I've known almost everyone in that room for at least a decade, and you have had relationships with them even before they were in government.  I mean, Pete Hegseth I've known for a long time.  You name it.  And you go – Pam Bondi's from Florida.  I've know her for almost 20 years.  These are people you've worked with before, and they're all aligned with the President's vision.

I think the first time, in the first term, not to be critical of anybody, but I think the President, he wins the election and then he sort of said – they sort of bring in people and say, look, these are the people in the Republican Party that do this kind of stuff.  I think now, having the advantage of having been there before and so forth, he had the ability to put together a team of people who are responsive to the President's tasking to the extent that it's not even a problem, to the extent

JA1716

AAUP-01462

that what I'd say what has been challenge is the challenge is we're moving so fast, there's so much to do, everyone is so eager to deliver, that you need 26 or 27 hours in the day, because we work for someone that apparently has found a way to fit 27 hours in a 24-hour day in terms of how he works.

And so – but it's exciting to be a part of.  You – we truly feel like we are making changes and decisions today in the positions we're in that are going to dramatically improve our country and life in America for two generations.  Like, we feel like we're about – on achieving that, not just here in the State Department but on matters of trade, international relations, domestic economics, rebuilding our industrial capacity.  And I think the President has assembled a great team to do it, and obviously he's always – he's always pushing hard, as you know better than anyone.  It doesn't – what have you done – it's what you did yesterday doesn't matter.

**QUESTION:**  It doesn't matter how many wins you rack up.

**SECRETARY RUBIO:**  Exactly.  (Laughter.)

**QUESTION:**  If you get that call at 6:00 a.m., "What have you done for me lately, Marco?"

**SECRETARY RUBIO:**  That's right.  Why are we not undefeated?  And why didn't we win by 20 instead of 15?  We got the championship, oh, but why didn't we win by 20 or 25?  And it's good.  That's the way you push the envelope and that's the way you achieve excellence.

**QUESTION:**  Well, Secretary Rubio, thank you so much for the time.  I really appreciate it.  Keep up the great work.  I look forward to seeing so many more great things coming out of the State Department and so much more.  Thank you.

**SECRETARY RUBIO:**  Yeah.  Awesome.  Thank you.  Thanks for having me on.

TAGS

[Bilateral Relations and Engagement](#)          [Bureau of Western Hemisphere Affairs](#)          [Crime](#)

AAUP-01463

JA1717

**Drugs and Drug Trafficking**     **El Salvador**     **Elections**     **Energy**

**Foreign Assistance and Humanitarian Aid**     **Foreign Governments**     **Foreign Policy**

**Office of the Spokesperson**     **Outreach and Engagement**     **The Secretary of State**

**U.S. Agency for International Development (USAID)**     **Venezuela**



White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

JA1718

AAUP-01464

 **U.S. Citizenship and Immigration Services**

 MENU

# DHS to Begin Screening Aliens' Social Media Activity for Antisemitism

Release Date : 04/09/2025

**WASHINGTON**— Today U.S. Citizenship and Immigration Services (USCIS) will begin considering aliens' antisemitic activity on social media and the physical harassment of Jewish individuals as grounds for denying immigration benefit requests. This will immediately affect aliens applying for lawful permanent resident status, foreign students and aliens affiliated with educational institutions linked to antisemitic activity.

Consistent with President Trump's executive orders on [Combatting Anti-Semitism](#), [Additional Measures to Combat Anti-Semitism](#) and [Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats](#), DHS will enforce all relevant immigration laws to the maximum degree, to protect the homeland from extremists and terrorist aliens, including those who support antisemitic terrorism, violent antisemitic ideologies and antisemitic terrorist organizations such as Hamas, Palestinian Islamic Jihad, Hezbollah, or Ansar Allah aka: "the Houthis."

"There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here," said DHS Assistant Secretary for Public Affairs Tricia McLaughlin. "Sec. Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-Semitic violence and terrorism – think again. You are not welcome here."

Under this guidance, USCIS will consider social media content that indicates an alien endorsing, espousing, promoting, or supporting antisemitic terrorism, antisemitic terrorist organizations, or other antisemitic activity as a negative factor in any USCIS discretionary analysis when adjudicating immigration benefit requests. This guidance is effective immediately.

For more information on USCIS and its programs, please visit [uscis.gov](#) or follow us on [X (formerly Twitter)](#) , [Instagram](#), [YouTube](#), [Facebook](#) and [LinkedIn](#).

Last Reviewed/Updated: 04/09/2025

 Need Help? Chat with Emma™

AAUP-01465

**JA1719**

**Trial Exhibit 39-1 is a multimedia file that will be separately served on a digital media storage device alongside paper copies of the Joint Appendix**

JA1720



**U.S. DEPARTMENT** *of* **STATE**

Home  >  ...  >  Secretary of State Marco Rubio with Ben Shapiro ...

★ ★ ★

# Secretary of State Marco Rubio with Ben Shapiro on the Ben Shapiro Show

**INTERVIEW**

**MARCO RUBIO, SECRETARY OF STATE**
**WASHINGTON, D.C.**

APRIL 17, 2025

**QUESTION:**  Joining us on the line, Secretary of State Marco Rubio.  Secretary Rubio, thanks so much for joining the show.  Really appreciate it.

**SECRETARY RUBIO:**  Thank you.  Thanks for having me on.

**QUESTION:**  So let's talk about this major move that you just made at the State Department getting rid of a big chunk of the censorship bureaucracy that had been created and pushed a while back but then exacerbated over the course of the last few years, hidden.  What's the story with what you are doing over at the State Department to get rid of the body formerly known as the Global Engagement Center?

**SECRETARY RUBIO:**  Yeah, I think you have to understand the history behind it.  It's real brief.  They started it by saying al-Qaida, ISIS, all these terrible groups are radicalizing people online, we should do something about it.  Back when they came up with that 12 years ago, whatever it was, people were like, well, whatever, it makes sense.

Cookie Settings

AAUP-01467

JA1721

And then it metastasized and it's like, oh, there's foreign interference in our elections, we need to start going after that.  Well then, by 2020, it became a moment to go after voices inside of American politics and begin to label people.  And they put a guy in charge who basically was going around saying Trump is – Trump speaks just like these foreign terrorists, his supporters speak just like these foreign terrorists – so now you have an individual running a State Department entity that was labeling American speech by Americans as foreign interference.

And then really, the kicker was not only were they doing all that formally from the State Department, but they were taking State Department money and they were giving it to these third-party groups who are supposed to be like independent, verified arbiters of what's true and what isn't, what's good and what's bad.  And these groups were deliberately targeting – I believe you were one of the ones they targeted, I think the Federalist – began putting labels on people.

Now you may say okay, "Well, what's the importance of a label?"  Well, that's not just the issue here.  The issue is not only did they put labels on people; that was then used to go to social media companies, it was used to go to outlets and say you have to deplatform these people or you have to cut back on how much views they're getting, you have to go after them – in essence, silence them.

So in essence, it metastasized and the metamorphosis into a government-run entity that was targeting political speech in America, labeling it disinformation, and silencing it – all paid for by the American taxpayers directly and indirectly.  And that ends.

So what happened when we took – right before we took over, they got rid of this Global Engagement Center, they renamed it, and moved it somewhere else.  But renaming something doesn't change it; you still leave the thing around.

So we've undertaken 12 weeks of looking how do we reorganize this whole thing, how do we get rid of it, how do we – and that's what we're announcing today is we're taking the whole thing down.  And it's about $50 million.  I mean, it's not a small amount of money.  And we're not going to be in the business of doing this anymore.  In fact, we're going to be in the business of promoting free speech in America and around the world as a core American value, and that really is what we're going to be about right now.

And we're also going to go back and look at, as an accountability project, all of the instances in which this was used as a weapon against American political voices.  And the reason why that's


JA1722

AAUP-01468

important is not just because of accountability; it's to make sure it never happens again.  You document these things so that someone in the future, when they get some bright idea like this, realize why we shouldn't do it, because this is what it turns into.

**QUESTION:**  And Secretary Rubio, it's a really good object lesson in what happens with some of these government agencies which started off decades ago with the right purposes and then gradually are infiltrated by people with a significant political partisan agenda, who then proceed to weaponize these institutions against Americans.  We've seen this in USAID.

**SECRETARY RUBIO:**  Correct.

**QUESTION:**  Obviously we see this here with the GEC turned into another sort of body that was then hidden inside these agencies.  I mean, when people like President Trump talk about the deep state, this is the kind of stuff that he's talking about.

**SECRETARY RUBIO:**  Yeah.  So USAID is another great example.  Humanitarian aid – it was created for development and humanitarian aid.  Where it really went off the rails is when humanitarian aid and development aid was turned into:  How do we infuse domestic political priorities into what we fund around the world?  So when it became a domestic political priority to take on transgender rights, now all of a sudden you've got programs by Americans couched as humanitarian or development aid in other countries around the world.  In essence, they injected domestic political considerations into foreign aid, and the result is now it has to be rolled back.  So it's another example.

We're going to continue to do humanitarian aid.  What we're not going to do is use humanitarian aid to spread a domestic ideological movement globally.  We're not going to do that.

**QUESTION:**  Secretary Rubio, obviously this is a – it's a big move by the State Department.  You've been making a lot of moves over at the State Department that are different than your predecessor's.  That includes moves to get out of the United States people who are terrorist supporters, not just people who say bad things but people who are actual terrorist supporters, act in ways that are conducive to actual terror groups.

I wanted to give you a moment to sort of explain the approach that the State Department is taking in taking a look at, for example, student visa holders.

**SECRETARY RUBIO:**  Right.

JA1723

AAUP-01469

**QUESTION:** What are the standards that are being used to determine whether somebody should stay in the United States or should go? Because obviously opponents of the administration are arguing it's violations of free speech, people have the ability to say what they want. That's not an argument that the administration is actually arguing with. The administration is not trying to crack down on free speech. You're trying to actually stop something else.

**SECRETARY RUBIO:** Yeah. Well, let's start with a baseline, okay? No one is entitled to a student visa to the enter the United States. No one. It's not a constitutional right. It's not a law. Every day, consular officers on the ground in face-to-face interviews are denying people visas for all kinds of reasons – because we think you're going to overstay, because we think your family member is a member of a drug ring, whatever it may be. We deny visas every day all over the world. No one is entitled to a visa. Let's start with that, because I hear some of this reporting out there like if somehow we – you're allowed to have a visa unless we can come up with a reason why you shouldn't have one. That's not true. The burden of proof is the other way.

Now, let's say you go to a window somewhere in the world and say, "I want to go to the United States to study at a university," and as part of that interview it comes out you think Hamas is actually a good group. We probably would not let you in. I would hope we wouldn't let you in. Okay?

But let's say we don't ask you that question and you get into the U.S. on a student visa, and all of a sudden it becomes obvious you think Hamas is a good group. Well, then we should revoke your visa. In essence, if we would have denied – if we had learned things about you once you're here that would have caused us to deny you a visa when you were overseas, that's grounds for revocation. It is not in the national interest of the United States, it's not in our foreign policy interest, it's not in our national security interest, to invite people onto our university campuses who are not just going to go there to study physics or engineering but who are also going to go there to foment movements that support and excuse foreign terrorist organizations who are committed to the destruction of the United States and the killing and the raping and the kidnapping of innocent civilians, not just in Israel but anywhere they can get their hands on them. That's not in our national interest.

So we have a right to deny visas before you get here, and we have a right to revoke them if we believe that your presence in our country undermines our national interest, our national security, and our foreign policy. And that's what we intend to do.

AAUP-01470

JA1724

Now listen, there are other student visas that are being canceled that have nothing to do with us, by the way.  And that has to do with someone, for example, who is here on a student visa and has a DUI.  And I don't know – that's not us.  That's DHS.  But I don't know if people realize if you commit a crime while you're in the U.S., that's an automatic grounds for revoking your visa. And no one was ever doing it.  They weren't doing it.  They weren't cross-referencing the system. Now they're starting to do that.

So that's the majority of these, but we have identified – I can't tell you the exact number because it's static and it's constantly moving, but when someone is presented to me and it's clear that this person is a supporter of a foreign terrorist organization, we're going to remove them from the country.  You're not going to be here; it's just that simple.  What a stupid thing, what a ridiculous thing, to invite people in your country so they can be part of these movements that are terrorizing fellow students, tearing up campuses, shutting down campuses.  We have campuses in America that couldn't even operate for weeks.  People couldn't go to class.  Are we – are we crazy?  What other country in the world would allow this?  We shouldn't allow it.

**QUESTION:**  Secretary Rubio, I think that the controversy that's arisen over, for example, the detention of Mahmoud Khalil, who is one of the students at Columbia University who has a green card but who was also engaged in protest activities that violated the law, who obviously was sympathizing openly with terror attacks by Hamas and all the rest of this, that the sort of controversy here, there's a common thread to the opposition to the Trump Administration on this stuff, which is, as you mentioned, this bizarre idea that people are somehow owed entry to the United States.

I think that ties in very strongly to the Democrats' new approach to what's going on with this Salvadoran migrant who's now been deported to El Salvador.  The administration has taken a legal position that basically, now that he's in Salvadoran custody, that it's up to the Salvadorans whether to return this person to the United States or not for further due process concerns.

But that's really not the case that's being made by opponents of the administration.  Many of the opponents of the administration are making a more significant case, which is the idea that basically, if you get into the United States, you are somehow owed a permanent status in the United States.  And you're seeing this across the board, ranging from the Trump Administration's moves to get rid of temporary protected status for people who have entered en masse under the Biden administration, to the resistance to DHS or the State Department making moves with regard to the tens of millions, possibly, of illegal immigrants who have brought into the country

AAUP-01471

JA1725

by the Biden administration.  There is this bizarre supposition that everyone on Earth is somehow owed passage to the United States and permanent membership in our society.

**SECRETARY RUBIO:**  Yeah, and I think it explains to you why we have the immigration crisis that we had.  And it was the belief – they would all say we believe we should have immigration laws, of course, but if you get into the United States you should be allowed to stay; if you make it here illegally, no matter how you got here, then you should be allowed to stay.  I mean, I think that that mindset that's being revealed in these cases tells you how you get 12, 13, 14, 20 million people entering the country unlawfully and illegally over the last few years, because of this mindset that, yeah, we have immigration laws, but we don't really mean it; once you get in, you should be allowed to stay here indefinitely, and we have some sort of obligation to accommodate you here in the country.  That's how you create this mindset that led to that crisis, and people know it.

It's all incentive based.  People believed under Joe Biden – rightfully, they believed – if I could just get across the border, I'm going to get to stay.  And in 90-something percent of the cases they were absolutely right, and that's why more people kept coming.  There's a reason why no one's coming now.  You know one of the problems I'm facing right now with countries in Central America and the Western Hemisphere?  U-turns.  A lot of people were headed here, they realized Trump was serious, they made a U-turn, and now these countries are complaining, oh, they're stuck in my country.  Well, you facilitated their transit for years.  And now they're stuck with them as a result of it.

But that's actually happening.  Why?  Because the incentives are no longer to come; the incentives are not to come.  It's been successful.  It's the most secure border we've had in my lifetime, I mean, if you just think about it.  And it's not just because there are people there.  It's because people aren't coming anymore because they know that the President is serious about enforcing our immigration laws.

**QUESTION:**  Well, Secretary of State Marco Rubio, really appreciate your time.  Thanks for what you're doing inside the State Department to get rid of shadow organizations designed to crack down on free speech, as well as to move people out of the United States who actually don't like America very much.  Secretary of State Rubio, thanks so much for stopping by.

**SECRETARY RUBIO:**  Thank you.  Thanks for having me.



AAUP-01472

TAGS

Office of the Spokesperson    The Secretary of State



White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

JA1727

AAUP-01473

 **Tricia McLaughlin**
@TriciaOhio

When you advocate for violence, glorify and support terrorists that relish the killing of Americans and harass Jews, that privilege should be revoked and you should not be in this country.

We have the law, facts and commonsense on our side.

No judge, not this one or another, is going to stop the Trump Administration from restoring the rule of law to our immigration system.
x.com/cbsnews/status...

> This post is unavailable.

Last edited 1:27 PM · Apr 30, 2025 · **17.2K** Views

💬 37          🔁 81          ♡ 332          🔖 10          ⬆️

AAUP-01474

JA1728

 

**Secretary Marco Rubio** ✔ ☺

@SecRubio

We are reviewing the visa status of the trespassers and vandals who took over Columbia University's library.

Pro-Hamas thugs are no longer welcome in our great nation.

9:44 PM · May 7, 2025 · **2.1M** Views

 5.2K      14K      96K      1.2K

JA1729

AAUP-01480



JA1730

AAUP-01481



**Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism**

The White House

January 30, 2025

**COMBATING ANTI-SEMITISM IN THE UNITED STATES:** Today, President Donald J. Trump signed an Executive Order to Combat Anti-Semitism.

- Expanding on his Executive Order 13899, President Trump's new Order takes forceful and unprecedented steps to marshal all Federal resources to combat the explosion of anti-Semitism on our campuses and in our streets since October 7, 2023.

- Every Federal executive department and agency leader will review and report to the White House within sixty days on *all* criminal and civil authorities and actions available for fighting anti-Semitism.

- Immediate action will be taken by the Department of Justice to protect law and order, quell pro-Hamas vandalism and intimidation, and investigate and punish anti-Jewish racism in leftist, anti-American colleges and universities.

- The Order demands the removal of resident aliens who violate our laws.

**GOING ON OFFENSE TO ENFORCE LAW AND ORDER AND TO PROTECT CIVIL RIGHTS:** Immediately after the jihadist terrorist attacks against the people of Israel on October 7, 2023, pro-Hamas aliens and left-wing radicals began a campaign of intimidation, vandalism, and violence on the campuses and streets of America.

- Celebrating Hamas' mass rape, kidnapping, and murder, they physically blocked Jewish Americans from attending college classes, obstructed synagogues and assaulted worshippers, and vandalized American monuments and statues.

- The Biden Administration turned a blind eye to this coordinated assault on public order; it simply refused to protect the civil rights of Jewish Americans, especially

JA1731

AAUP-01482

students. According to a December 2024 <u>U.S. House of Representatives Staff Report</u> on anti-Semitism, "the failure of our federal government departments and agencies is astounding."

**PRESIDENT TRUMP KEEPS HIS PROMISES AND BUILDS ON HIS SUCCESS:** In his first term, President Trump kept his biggest promises:

- He moved the American Embassy in Israel to Jerusalem: After decades of broken promises and despite much criticism, President Trump was the President who finally kept his commitment to Israel to move the American embassy from Tel-Aviv to Israel's true and rightful capital: Jerusalem.

- He established the Abraham Accords: President Trump delivered the greatest breakthrough for peace in the Middle East in decades by brokering the normalization of ties between Israel and the United Arab Emirates, Bahrain, Sudan, and Morocco, protecting Israel and Jews and spreading security and prosperity to the entire region.

Now, President Trump has promised that the Federal Government will:

- Protect the civil rights of our Jewish citizens: "My promise to Jewish Americans is this: With your vote, I will be your defender, your protector, and I will be the best friend Jewish Americans have ever had in the White House."

- Aggressively enforce the law, protect public order, and prosecute anti-Semitic crimes: "I will issue clear orders to my Attorney General to aggressively prosecute terroristic threats, arson, vandalism and violence against American Jews."

- Deport Hamas Sympathizers and Revoke Student Visas: "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."

NEWS

AAUP-01483

JA1732

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



Subscribe to The White House newsletter

| Your email | SIGN UP |
|------------|---------|

☐ Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

 

AAUP-01484

JA1733



WH.GOV

Copyright

Privacy

AAUP-01485

JA1734



**Enhanced Vetting and Social Media Screening of Visa Applicants**

Office of Visa Services
April 3-4, 2025

SENSITIVE BUT UNCLASSIFIED    U.S. Department of State • Bureau of Consular Affairs

███ – welcome to VO Webinar on…

Introduce self + participants (MD ██████████, ████████████ of CA/LE ██████████ of VO/SAC, ████████ [Thurs]/██████████ [Fri] of L/CA)

First/second of two identical webinars, will not be recorded

As a reminder, please be sure you are muted.

JA1735

## Agenda

- Opening Remarks
- Overview of Policy Guidance in 25 STATE 26168
- Conducting and Documenting Social Media Reviews
- Assessing Student Credibility
- Assessing Potential LE ▮ Ineligibilities
- Q&A

SENSITIVE BUT UNCLASSIFIED

▮ to run through agenda

I know there are a lot of questions about this process and we hope to answer many of them along the way.

turn it over to MD ▮





MD

## Secretary Rubio – March 16, 2025

"If you tell us when you apply for a visa, 'I'm coming to the U.S. to participate in pro-Hamas events,' that runs counter to the foreign policy interests of the United States…We don't want people in our country that are going to be committing crimes and undermining our national security or the public safety. It's that simple."

SENSITIVE BUT UNCLASSIFIED



This guidance is part of our implementation of Executive Orders 14161 and 14188 aimed at protecting the U.S. from foreign terrorists, supporters, and other threats as well as combatting antisemitism. As Secretary Rubio has said, engaging in activities that advocate for terrorist activity or organizations is contrary to our foreign policy and national interests.

JA1738

## 25 STATE 26168

- **Purpose:** Protect national security through enhanced vetting of student visa applicants.

- **Key Actions:**

    - Mandatory social media reviews for certain student (F-1, M-1, certain J-1) visa applicants.
    - Enhanced screening for indicators of intent to engage in activities prohibited under ▮LE▮ or inconsistent with the requested visa class.



SENSITIVE BUT UNCLASSIFIED

The guidance that we put out in 25 STATE 26168 is the preventative piece of this policy – ensuring that we address any derogatory information related to intent to engage in prohibited activities or those that are inconsistent with the visa status. Any applicant who has not demonstrated to your satisfaction that they meet **all** of the standards required by their visa classification should be refused.

As part of this screening effort, Consular officers must refer specific student visa applicants to the ▮LE▮ for social media checks. Consular officers should then use the information obtained by the checks as part of their assessment of the totality of the applicant's circumstances.

In the next slide, we'll discuss which students are included in this requirement.

JA1739



## Which Students?

F-1, M-1, certain J-1* visa applicants who are otherwise eligible and who meet one or more of the following criteria:

**LE**

*J-1 applicants in the "student" exchange program category as described in 9 FAM 402.5-6(E)(11): secondary school students, college/university students, degree students, nondegree students, and student interns.

SENSITIVE BUT UNCLASSIFIED

By "students" we mean F-1, M-1, and J-1 applicants in the "student" category of exchange programs as noted at the bottom of the slide. The social media review is not mandatory for J-1 applicants who *happen* to be students but are applying for other exchange programs such as au pair or SWT.

So, this universe of students, who are otherwise eligible and meet one or more of the three criteria:

**LE**

Remember that social media reviews are only for applicants who are otherwise eligible for the visa. If you've already determined they don't overcome 214(b), that's the end of the road for them.

Now moving on from which applicants to review, we'll talk about how to conduct and document the review. I'll turn it over to ███████████ from **LE** .

JA1740

6



CA/

JA1741





CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



## Conducting Social Media Reviews



CA/LE

DEF-072

9

JA1743





# Documenting Social Media Reviews

## Road ahead

- Refining guidance for searching specific social media platforms

- Want to hear your best practices

- Reach to █████ LE █████ LE █ with any questions about conducting or documenting social media reviews





SENSITIVE BUT UNCLASSIFIED

CA/LE

## Assessing Student Credibility

**Consider how the applicant's activity reflects:**

- Intent and ability to solely pursue a full course of study.
- Intent to engage in unlawful activities or those inconsistent with student status.

**Has the applicant credibly shown that *all* activities in which he or she is expected to engage are consistent with FMJ status?**

SENSITIVE BUT UNCLASSIFIED



████ Now, turning to what consular officers should do with the results of the social media review.

We've received a few questions about what activity should or should not be considered derogatory. Broadly speaking, you should look for any information that impacts the applicant's eligibility for the visa — ████████ LE ████████



The FAM requires that an F-1 or M-1 applicant must demonstrate intent to enter the United States solely to pursue a full course of study. Relatedly, J-1 applicants for student programs are required to pursue a full course of study.



For applicants whose activities may rise to a higher level, I'll turn to ████████████████ of L/CA and ████████ of VO/SAC to talk about assessing applicants for ██ LE ██ ineligibilities.





L/CA and SAC

## USG Coordination

- **E.O. 14161 requires all relevant agencies to:**

  - "vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States."

  - "Evaluate and adjust all existing regulations, policies, procedures, and provisions...or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)-(3) of the INA"

SENSITIVE BUT UNCLASSIFIED



█████ We received a few questions related to DHS's involvement in the enhanced vetting procedures, whether that's through screening at the POE or in the removal process. EO14161 tasks all relevant agencies to evaluate their policies and procedures to ensure maximum vetting.

We have been working closely with DHS on several lines of effort related to vetting and information sharing. As one example, we've established a Student Visa Working Group to facilitate information flow and coordinate actions on individuals with derogatory information.

While we won't get into depth today on these efforts, we wanted to reassure you that CA is not doing this alone – we are closely coordinating with our partner agencies on enhanced vetting efforts.



We're going to dig into the Q&A portion of the webinar, starting with questions that were submitted by posts ahead of time. Similar questions have been combined in the interests of time.



JA1749





1. VO/F [redacted] : [redacted]

2. VO/F [redacted] : You aren't limited to conducting social media checks for only student visa applicants. While the social media check is mandatory for student visa applicants who fall into the criteria, if you have doubts about any applicant's activities during their previous stay as a student, and you otherwise intend to issue, post should conduct a social media review to help you assess the totality of the applicant's circumstances.

## Questions

- Can LE Staff conduct the social media review?

- What social networks are we allowed to check? Is Tiktok ok?

- What if the account is set to private?

SENSITIVE BUT UNCLASSIFIED

Back over to ▮▮▮▮ for a few questions about the social media review process.

## Questions

- How should we handle applicants who don't provide accurate/any social media information?

SENSITIVE BUT UNCLASSIFIED

VO/F▓▓▓▓:

1.

JA1752

18





JA1753

19



DEF-083

JA1754

UNCLASSIFIED
SBU



| | |
|---|---|
| **MRN:** | 25 STATE 45612 |
| **Date/DTG:** | May 15, 2025 / 151708Z MAY 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Routine* |
| **E.O:** | 13526 |
| **TAGS:** | CVIS, CMGT, KCSY |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 25 STATE 17178 |
| | B) 25 STATE 5914 |
| **Subject:** | Caught and Revoked:  Updated Guidance on Systems Messages |

1. (SBU) **SUMMARY**:  E.O. 14161 states to "protect Americans the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests.  More importantly the United States must identify them before their admission or entry into the United States."  Thanks to consular sections' **LE** ▮▮▮▮▮▮▮▮ **LE** ▮▮▮▮▮, visa revocation actions increased by 200 percent in the week following the action request (REF A).  To help posts continue to focus resources on priority cases and protect U.S. borders, ▮▮▮▮▮▮▮▮▮▮ **LE** ▮▮▮▮▮▮▮▮▮▮▮ This cable also serves to correct an error in the original request (REF A), which incorrectly stated that INA 222(g) does not apply to overstays of fewer than 180 days.  INA 222(g) renders void an NIV on which an alien entered if that alien remains beyond the period of authorized stay.  The alien does not have to have remained more than 180 days beyond the period of authorized stay for INA 222(g) to apply (see 9 FAM 302.1-9).  **END SUMMARY.**

**A LEG UP FROM WASHINGTON**

2. (SBU)

3. (SBU)

*Contact your VO/F analyst and/or your RCO if you need specific data for your post.

4. (SBU) This initial sweep addressed the backlog of system messages. New messages in these categories will continue to accumulate.

5. (SBU) Following the transmission of REF A on March 1, to protect U.S. borders and Americans in the weeks following REF

JA1756

A. This focused work resulted in an immediate doubling in visa revocations for aliens who no longer qualify for their visas, and a sustained 150 percent increase in visa revocations as compared to March 1-April 15, 2024.

**VISA REVOCATIONS PORTAL**

6. (SBU) With the migration of CAWeb, there is a new link to the Visa Revocations Portal containing the new template spreadsheet for bulk prudential revocation requests, links to 9 FAM revocation sections, and the email address of the VO/SAC revocations team where requests should be sent. There is also helpful guidance on what to consider when submitting revocation requests and tips.

**ADDRESSING ▇ LE RECORDS**

7. (SBU)



**FURTHER GUIDANCE**

8. (U) Please contact your VO/F analyst with questions on this effort. Please contact ▇ LE ▇ with questions about prudential revocations.

| | |
|---|---|
| **Signature:** | RUBIO |

| | |
|---|---|
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**
SBU

**UNCLASSIFIED**
SBU



| | |
|---|---|
| **MRN:** | 25 STATE 17178 |
| **Date/DTG:** | Feb 28, 2025 / 280143Z FEB 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Routine* |
| **E.O:** | 13526 |
| **TAGS:** | CVIS, CMGT, KCSY |
| **Captions:** | SENSITIVE |
| **Reference:** | 25 STATE 5914 |
| **Subject:** | (U) Catch And Revoke:  National Security Through Timely Processing of Visa Systems Messages |

1. (U) This is an **Action Request**.  Please see paragraph 5.

2. (SBU) **SUMMARY**:  Among the best evidence of a person's eligibility for a visa is his or her actual behavior.  Therefore, recurrent vetting conducted throughout the entire validity period of a visa - based on actual travel to the United States and actual encounters with United States law enforcement authorities - is necessary to protect Americans and U.S. borders.   Under Executive Order (E.O.) 14161, "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," the Department is directed to ensure maximum screening and vetting throughout the visa process.  Therefore, consular officers must utilize whole-of-government law enforcement systems to vigilantly monitor the activities of aliens - whether they are inside the United States or not.  In particular, Posts LE                                                    daily and revoke or request revocation of any visas for a visa holder you determine is no longer eligible under Section 214(b) or 212(a) of the Immigration and Nationality Act (INA), or has overstayed.  In other words, when a consular officer catches an alien misusing a visa, the officer should generally revoke it.  Catch and revoke.  **END SUMMARY.**

3. (SBU) Section 1(b) of E.O. 14161 states that, "[t]o protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States." Timely and stringent processing of LE ███████ after visa issuance, and revoking visas when appropriate, is necessary to this effort. Visa holders who overstay their admission period in the United States even by one day, engage in conduct that poses a threat to U.S. national security, or otherwise misuse their visas should have their visas revoked under INA 221(i). In accordance with 9 FAM 403.11-(A), Posts should also carefully review for revocation any visa holders who are arrested or convicted of crimes in the United States, including assessing whether the visa holder remains eligible for the visa classification under INA 214(b).

4. (SBU) LE



**ACTION REQUEST/IMPLEMENTATION GUIDANCE**

5. (SBU) **ACTION REQUEST:** LE

LE

If a post anticipates a large quantity of cases will require prudential revocation, post must also include the VO/SAC revocations team.  Managers should monitor the queue size daily and take action if messages accumulate.

6. (SBU) LE

• LE





8. (SBU) Applicants may not or visa holders may no longer overcome 214(b) if they engage in activities that are inconsistent with the claimed nonimmigrant status (Ref A). Even if an alien has not yet been convicted of crime and his or her visa is not yet revocable under INA 212(a)(2)(A)(i)(1), consular officers must evaluate whether the visa should be revoked under INA 214(b). LE ████████████████████████████████████████████████████████████████████████████████████████ , you must assess whether INA 214(b) applies as a basis for revocation. Every overstay and/or arrest requires you to weigh whether the alien is ineligible under 212(a) or no longer overcomes INA 214(b). Remember, applicants may not, or visa holders may no longer, overcome 214(b) if they engage in activities that are inconsistent with the claimed nonimmigrant status (Ref A).

9. (SBU) If a consular officer already suspects at the interview window that an applicant has committed a crime in the United States, then the consular officer must carefully consider all potentially applicable grounds of ineligibility and enter these considerations through case notes. A consular officer will usually refuse to issue a visa to such a suspected criminal applicant. LE ████████████████████████████

LE

If a consular officer knows at the window that an applicant will overstay a visa even beyond the admit-until date permitted by U.S. Customs and Border Protection authorities at ports of entry (let alone beyond the applicant's stated purpose of travel), then the consular officer will likely refuse to issue a visa to such an applicant. Yet this is exactly what a visa overstay means: a one-day overstay is still an overstay. Even if such a visa holder has not yet overstayed by more than 180 days and his or her visa is therefore not yet void under INA 222(g), nonetheless the alien likely no longer overcomes INA 214(b).

**Revocation If the Alien Has Departed the United States**

10. (SBU) LE

If the alien has departed from the United States, posts should initiate revocation procedures in accordance with 9 FAM 403.11-3(A)(2), including LE

. Consular officers do not have the authority to revoke a visa for individuals who are still in the United States based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding, other than a revocation based on driving under the influence (DUI).

**Revocation If the Alien is Still in the United States**

11. (SBU) Requests for revocation of visas where the individual is in the United States must be sent to the Revocation Team in VO/SAC/RC at LE

**Immigrant Visa (IV) Cases**

12. (SBU) LE ███████████████████████████
████████████████████████████████████
████████████████████████████ For unused, valid
IVs, use the guidance in 9 FAM 303.7-6(C)(1) to determine whether the
information is sufficient to render the person ineligible for an IV. If so,
initiate revocation procedures in accordance with the guidance in 9 FAM
504.12.

**TRAINING & GUIDANCE**

13. (SBU) LE ███████████████████████████
████████████████████████████████████
██████████████████████████

14. (U) Additional guidance and contacts: Guidance related to Executive
Orders can be found on CAWeb. State Department personnel can also join
the CA/VO Transition Coordination Team to review official guidance and
submit questions to VO subject matter experts regarding the E.O.

15. (U) Inquiries: For any media or congressional inquiries on E.O.s, posts
must use pre-cleared language from public talking points located on CA Web
(linked here), and copy CA/P on any responses. When responding to general
or press inquiries about the E.O., copy CAPressRequests@state.gov. When
responding to any congressional inquiries, copy
ConsularOnTheHill@state.gov.

16. Minimize Considered.

**MINIMIZE CONSIDERED**
**Signature:**       RUBIO

**XMT:**       BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL;
              KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL;
YEKATERINBURG, AMCONSUL

---

**<span style="color:green">UNCLASSIFIED</span>**
SBU

JA1765

[REDACTED]

### *9 FAM 402.5-5(C)(1)  (U) Intent to Solely Pursue a Full Course of Study*

*(CT:VISA-2150;   04-29-2025)*

a. **(SBU)** *Evidence suggesting students intend to travel, or have traveled, to the United States to engage in unlawful activities or to pursue activities that are not consistent with a full course of study calls into question whether they possess intent to solely pursue a full course of study.  Evidence suggesting that an*



*applicant has endorsed or espoused terrorist activity, or persuaded others to support a terrorist organization should be submitted* LE ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *(See 9 FAM 304.2). In addition, you should consider whether there is reason to believe that the applicant intends to engage in any form of unlawful activity or any activity that poses a threat to U.S. national security, as part of the totality of the applicant's circumstances in applying 214(b) and other applicable grounds of inadmissibility. See 9 FAM 302.1-2(B)(6).*

b. *(SBU) Mandatory social media reviews: You must refer all new F-1 or M-1 visa applicant cases as well as returning F-1 or M-1 visa applicant cases meeting one or more of the criteria below, and are otherwise eligible,* LE ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ *for a social media review as described in 7 FAH-1 H-945.4:*



(1) LE ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(2) LE ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *; or*

(3) LE ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

c. *(SBU) Documenting the results of the social media review:*



(1) LE ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(2) LE ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

DEF-106

JA1767

LE

(3) *(SBU) When to submit* LE


JA1768

statedept.substack.com

# Secretary Rubio: 100 Days of an America First State Department

*StateDept*

8–10 minutes

---

Author: **U.S. Secretary of State Marco Rubio**

One hundred days ago, America's borders were open, while China could close the Panama Canal at a time of Xi Jinping's choosing. Our leaders seemed content to allow violence to become the permanent norm, from Ukraine to Gaza, to our own college campuses and southern border. From every post abroad, and office in Washington, memos poured in describing what we must do, what we couldn't do, but not what it was possible to do.

Only one hundred days later, change has come. From reorganizing the Department to meet the challenges of the 21st Century, to bringing transparency to foreign assistance, to ensuring Panama's exit from the Belt and Road Initiative, and working hand in hand with regional partners to deport illegal immigrants and designate vicious cartels as Foreign Terrorist Organizations, our team has proven it is possible not merely to admire problems, but to solve them.



JA1769

AAUP-01534



(White House/Molly Riley)

Secretary Rubio (second from left) at President Trump's February 26 Cabinet meeting (White House/Molly Riley)

In the process, [the State Department is becoming a leaner machine](#), eager to deliver for the taxpayers. Gone are offices like the former Global Engagement Center, which sought to censor the American people. Gone are tens of billions of dollars in contracts to NGOs at home and abroad that often undermined the interests and foreign policy of the United States. And gone are the days when merit took a back seat to radical, anti-American ideologies. By consolidating offices, eliminating bureaucracy, and ensuring a culture where the State Department's many talented voices can be heard, our impending reorganization will leave the United States with a foreign policy that is less expensive and more effective.

The State Department has begun, once more, to speak for our citizens' interests abroad. Our hemisphere is our neighborhood, and we cannot allow it to be conquered by an adversary. In my first hundred days, I undertook three trips to our hemisphere, including central America and the Caribbean where I stressed that Chinese efforts to gain control of critical infrastructure threaten the United States, and secured an agreement to terminate Beijing's management of the Panama Canal.

JA1770

AAUP-01535

I brought a similar message to our friends in Europe, making clear that our extensive shared interests, especially in resisting Chinese aggression and Islamic extremism, are precisely why the United States cannot afford to shoulder the burden of every conflict imaginable in Europe. At the recent NATO summit I attended, our allies recognized the need to increase defense spending not to 2 percent as requested in 2017, but to 5 percent, following the lead of nations like Poland. There was a shared understanding that ending the war in Ukraine is in the interests of both the combatants, and the entire Transatlantic alliance.

While in Europe, I also made clear that while we are bound by a common history, faith, culture, and economic interests, friendship is not a one-way street. It requires honesty when reciprocity is lacking, and not just in the realm of defense spending. Efforts to regulate, exclude or censor US companies directly concern the United States, and raise questions about just how common our values may be. Europe's energy policies also directly affect the United States as they left the continent dependent on Russian gas, and exposed "green" supply chains to Communist China control.

In Africa, America needs a policy of trade, not aid, and over the past hundred days the State Department has replaced handouts with firm diplomatic engagement aimed at ending conflicts and expanding opportunities for American companies. Last week, the Foreign Ministers of Rwanda and the Democratic Republic of Congo joined me here at the State Department to sign a Declaration of Principles to end a war that has dragged on in one form or another for over twenty-five years. In Africa, and around the world, our message is that while USAID may be closed, America is open for business.

There is no more immediate American interest than the protection of our nation's borders. Both during my trips to the region, and across dozens

<span style="color:red">JA1771</span>

<span style="color:red">AAUP-01536</span>

of bilateral engagements, I have made clear that the arrival of millions of foreign nationals at our border is unacceptable. Foreign nations have a responsibility to prevent their citizens from illegally entering the United States and possess a duty to assist us in removing those already here. We are working with regional allies in Latin America to secure agreements to take back both their own illegal aliens, but also those from third nations. And we have made it clear to less friendly nations such as Venezuela that a refusal to take back their nationals constitutes a hostile act. Partnership is valued, but hostility will be punished.

Critically, the State Department has now made clear that a visa is a privilege, not a right. Under the Biden Administration's "Catch and Release" policy, illegal aliens were often provided with a get-out-of-jail-free card after arrests for criminal activity including domestic violence, and assault. There is now a one-strike policy: Catch-And-Revoke. Whenever the government catches non-U.S. citizens breaking our laws, we will take action to revoke their status. The time of contemptuously taking advantage of our nation's generosity ends.

This extends to the thousands of foreign students studying in the United States who abuse our hospitality. When Hamas, one of the world's most notorious terrorist organizations, launched its barbaric October 7, 2023, attack on Israel, brutally murdering more than 1,200 innocents, and parading the dead bodies of murdered babies through the streets of Gaza, the Biden Administration did very little to protect our Jewish citizens and the American people at large from foreign terrorist sympathizers in their midst. They allowed campus buildings to be overrun by violent thugs, and Jewish students to be excluded from classrooms.

No more. Under the Immigration and Nationality Act, any alien who "endorses or espouses terrorist activity or persuades others to endorse

JA1772

AAUP-01537

or espouse terrorist activity or support a terrorist organization" is inadmissible to the United States, and henceforth that law will be enforced to the letter. The State Department now reviews law-enforcement information about student visa holders and when we find those who have supported terrorists or otherwise abused our hospitality, their visas are instantly revoked.

Terrorists are on the run not just in America but around the world. With the unyielding support of the United States Department of State, Israel has crippled Hezbollah in Lebanon, and shattered Hamas in Gaza, leaving the terrorist group facing destruction if they do not release their hostages and lay down their arms. We have re-designated the Houthis as what they are – a foreign terrorist organization and made clear that those who disrupt the freedom of navigation and trade in the Red Sea will meet the fate of pirates throughout history. Iran, having seen the consequences its proxies have faced after challenging the new Administration, is now pursuing an agreement that will allow them to save face while surrendering their nuclear capabilities.

I am honored by the trust President Trump placed in me and I am proud of the work the Department of State has done over the past hundred days to implement his agenda and put the American people first. With an impending reorganization that will unleash the Department's talent from the ground-up, the State Department is set to continue to play a pivotal role in ensuring the safety, security and prosperity of the American people over the next four years.

*Marco Rubio was sworn in as the 72nd secretary of state on January 21, 2025. The secretary is creating a Department of State that puts America First.*

JA1773

AAUP-01538

JA1774

AAUP-01539

**UNCLASSIFIED**
SBU



| | |
|---|---|
| **MRN:** | 25 STATE 26168 |
| **Date/DTG:** | Mar 25, 2025 / 251914Z MAR 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | CVIS, CMGT, PTER, KFRD |
| **Captions:** | SENSITIVE |
| **Reference:** | 25 STATE 5914 |
| **Subject:** | (U) Action Request:  Enhanced Screening and Social Media Vetting for Visa Applicants |

1. (U) This is an action request.  **See paragraph 7**.

2. **(SBU) SUMMARY:**  The protection of our nation and its citizens is a consular officer's first consideration.  Pursuant to the implementation of Executive Order (E.O.) 14161 and E.O. 14188, known respectively as *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats* and *Additional Measures to Combat Anti-Semitism*, effective immediately, consular officers must refer certain student and exchange visitor (F, M, and J) visa applicants to the Fraud Prevention Unit (FPU) for a mandatory social media check as described below.  As the Secretary stated on March 16, "We don't want people in our country that are going to be committing crimes and undermining our national security or the public safety.  It's that simple.  Especially people that are here as guests.  That is what a visa is...It is a visitor into our country.  And if you violate the terms of your visitation, you are going to leave."  The Visa Office will host webinars for consular officers to discuss this guidance on April 3 and April 4, 2025.  **END SUMMARY.**

3. **(SBU) Consular Officers Play a Critical Role in Protecting National Security:**  As part of screening every case for potential ineligibilities, consular officers MUST ADDRESS any derogatory information indicating that a visa

applicant may be subject to the terrorism-related ineligibility grounds of the Immigration and Nationality Act (INA).  This includes advocating for, sympathizing with, or persuading others to endorse or espouse terrorist activities or support a DESIGNATED FOREIGN TERRORIST ORGANIZATION (FTO).

4. **(SBU) Every Visa Decision is a National Security Decision:**  In Ref A, the Visa Office directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security.  Any nonimmigrant visa applicant who has not established to a consular officer's satisfaction that the applicant meets all standards required in that visa classification should be refused under 214(b), as appropriate.  This includes establishing that the applicant does not intend to engage in activities inconsistent with the requested visa status.  If 214(b) does not apply to the visa classification, consular officers should refuse any nonimmigrant or immigrant visa case presenting such concerns under section 221(g) of the INA for further review of additional ineligibility grounds,                **LE**
        **LE**        as appropriate.

5. (U) This was reflected well by the Secretary's statement on March 16, that "when you apply to enter the United States and you get a visa, you are a guest…if you tell us when you apply for a visa, 'I'm coming to the U.S. to participate in pro-Hamas events,' that runs counter to the foreign policy interest of the United States…if you had told us you were going to do that, we never would have given you the visa."

6. **(SBU) Situations that Cast Doubt on Students' Intent or Credibility:**  As described in 9 FAM 402.5-5(C), an applicant applying for an F-1 or M-1 student visa must demonstrate intent to enter the United States solely to pursue a full course of study at an approved institution.  In addition, J-1 visa applicants who are college, university, and other post-secondary students are required to pursue a full course of study as described in 9 FAM 402.5-6(E)(11).  Evidence suggesting a student visa applicant intends to travel to

the United States to engage in unlawful activities clearly calls into question whether the applicant possesses intent and/or the ability to solely pursue a full course of study.  While many activities may not fall under the INA's definitions of "terrorist activity," you should otherwise consider that information in assessing the credibility of a visa applicant's claimed purpose of travel.  INA section 214(b) requires the applicant to show credibly that all activities in which he or she is expected to engage in while in the United States are consistent with the specific requirements of their visa classification.

7. **(SBU) ACTION REQUEST:  Mandatory Social Media Reviews for Students and Student Exchange Visitors.**  Effective immediately, consular officers must refer all new or returning F-1, M-1, or student J-1 visa applications meeting one or more of the following criteria, that the consular officer has determined is otherwise eligible for the requested nonimmigrant status, to the FPU via ECAS as described in 7 FAH-1 H-945.4,  using the SOCIAL MEDIA REVIEW category.                **LE**


                    **LE**


                    **LE**                        E

                    **LE**


8. **(SBU) Documenting the Results of the Social Media Review:**  If the social media review uncovers potentially derogatory information indicating that the applicant may not be eligible for a visa, Fraud Prevention Units are required to take screenshots of social media findings to the extent it is relevant to a visa ineligibility, to preserve the record against the applicant's later alteration of the information.  Limit screenshots to information relevant to connecting the applicant, the applicant's actions, and a visa ineligibility.                **LE**

JA1777

**LE**

9. **(SBU) Support for Terrorist Organizations - Grounds and Definitions for INA 212(a)(3)(B):** All consular officers should carefully review 9 FAM 302.6 to understand the grounds under which an applicant may be ineligible under 3B, including that an applicant who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization" is ineligible. Consular officers should consider these grounds and definitions when conducting interviews and pursuing lines of inquiry. Because terms in INA 212(a)(3)(B) are broadly defined, consular officers should elicit as much pertinent information as possible from visa applicants with suspected ties to terrorist organizations or terrorist activity. This includes the names of all relevant organizations potentially involved in terrorist activity and the applicant's relationship with them (for example, by current membership or past financial contributions or other support). Evidence that an applicant advocates for terrorist activity, or otherwise demonstrates a degree of public approval or public advocacy for terrorist activity or a terrorist organization, may be indicative of ineligibility under INA 212(a)(3)(B). This may be evident in conduct that bears a hostile attitude toward U.S. citizens or U.S. culture (including government, institutions, or founding principles). Or it may be evident in advocacy or sympathy for foreign terrorist organizations. All of these matters may open lines of inquiry regarding the applicant's credibility and purpose of travel. Consular officers should inquire into the nature and activities of those organizations. **LE**

AAUP C.A.R.015

JA1778

**LE**

10. **(SBU) Intention to Engage in Unlawful Activity:** Consular officers are also reminded of guidance in 9 FAM 302.5-4 regarding the applicability of INA 212(a)(3)(A)(ii) under which a visa applicant is ineligible if the consular officer knows or has reason to believe that the applicant is traveling to the United States solely, principally, or incidentally to engage in any other unlawful activity. Consular officers should take care to enter detailed case notes regarding the specific activities expected in the United States and request an advisory opinion per 9 FAM 302.5-4(C).

11. **(SBU) Revocations of Valid Visas:** If, subsequent to visa issuance, information becomes available to post that an individual may no longer be eligible for a visa due to particularized information indicating an ineligibility under specific INA provisions, including 214(b), post should follow the procedures to revoke or request prudential revocation as described in 9 FAM 403.11 for nonimmigrant visas or 9 FAM 504.12 for immigrant visas. The Visa Office reminds posts that consular officers do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding - other than a revocation based on driving under the influence (DUI) - and that such cases should be referred **LE** in accordance with 9 FAM 403.11-5(B) for further review. A consular officer's revocation must be based on an actual finding that the individual is ineligible for the visa.

12. **(U) Additional Guidance:** The Visa Office will host webinars for consular officers to discuss this guidance on Thursday, April 3 and Friday, April 4, 2025. Invitations with links to these webinars will be sent separately. The FAM will be updated to reflect this guidance.

13. **(U) Inquiries:** Post must refer any U.S. media inquiries regarding E.O.s to CA-Press@state.gov and congressional inquiries regarding E.O.s to ConsularOnTheHill@state.gov. Posts may respond to requests from

JA1779

international media regarding E.O.s using CA's cleared press guidance located on CA Web, copying CA-PRESS@STATE.GOV.

14. (U) Minimize considered.

**MINIMIZE CONSIDERED**

| | |
|---|---|
| **Signature:** | RUBIO |

| | |
|---|---|
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**
SBU

JA1780

DU[ Y ˙* ˙c Z*

**<u>To resist Trump, draw meaningful red lines</u>**

Many are reckoning with the ways in which the incremental accumulation of Trump 2.0 destruction and brutishness is transforming their day-to-day lives. And we grasp, instinctively, that we must not let the units of bad news blur into one another; we must notice that some changes demand our full attention. These changes are the events that we designate *red lines*.

The impulse to cope with growing authoritarianism by drawing red lines is a good one; at its best, it arrests shifting baseline syndrome, the phenomenon where we continually redefine "normal" in terms of how things are today and, when tomorrow is only *slightly* worse, conclude that nothing much has happened, failing to see our cumulative deterioration since a more remote starting point. It also allows us to act thoughtfully in an information environment designed to derange us.

But our red-line reckoning currently suffers from a few main defects: it is often reactive rather than proactive; theoretical rather than practical; and individual rather than collective. To revive the project of democracy in this country, and to deliberate with dignity in dark times, we must improve this practice in three ways:

**1. Red lines must be proactive**

A dynamic familiar to many organizers is that of being stuck in a reactive loop: something unplanned-for happens, and it feels like a moral imperative that you respond *right now*. Then, halfway through planning your response, something new happens, and this keeps happening until you have expended a great deal of energy and never found the space to identify a strategic orientation to the terrain you're dealing with.

Escaping the reactive loop while a drumroll of urgent moments is already vibrating across the social membrane is very difficult. The ideal solution is one that involves going back in time and building out organizational capacity and a plan for future contingencies adequate to the present moment.

But this isn't possible. In reality, organizers get saved from reactive loops in two ways: first, they can be rescued by forming a coalition with other organizations who have greater pre-existing capacity and, most importantly, a better theorized plan for handling the moment. Second, where there is no one else who already has an authoritative strategy, we break out of the reactive cycle only by letting some moments pass by with minimal response while we develop a branching diagram of future possibilities and decide which of these future events will constitute red lines. These possibilities need to be analyzed with an eye to their significance to the overall terrain. And then we need to figure out which of them will be treated as triggers for which actions. This brings us to point 2.

**2. Red lines must be practical.**

JA1781

they will do when they get there. Only if all this is done can the really hard work of effective political resistance even truly begin.

JA1782

AAUP-00013

A red line isn't a point at which we are allowed to say "ok, now things are really bad". Their proper function isn't to give us permission to feel some kind of way. Rather, they are *thresholds for escalated action*. They are the point we have identified (ideally in advance, per point 1) as making new forms of resistance appropriate.

It does little good to draw all eyes to the imminence of a constitutional crisis if we don't also deliberate about what sort of political action we will engage in once the crisis is announced. Indeed, in the dithering about whether such a crisis is not already upon us it is hard not to discern an anxiety about what happens when the breaching of this red line is announced by the relevant experts but, due to a failure to organize for this eventuality, the announcement proves practically impotent.

It similarly does little good to designate classroom censorship as the red line at universities if we don't talk about what we will do when this line is crossed. Where the red line is deferred off into the future without a practical plan for what we will do when we get there, it is hard not to suspect that the function of the deferral is to make us acquiesce to all the ways in which our academic mission will be compromised prior to that point so that by the time we are unambiguously there (if Columbia's agreeing to put a department into academic receivership doesn't already count), we will be "without any dignity left to protect" and will simply comply once more.

We must of course be thoughtful about what sort of actions will be effective, and which will be possible. These actions will almost certainly require large numbers of people. And unless you are the general of your own private army, associating mass practical responses with future red lines is something that has to be done alongside at least some of the people who would take part in the mobilization. This brings us to point 3.

## 3. Red lines must be identified collectively

Of course, people around the country are reaching practical conclusions about what they will soon have to do. Some who can are deciding to try to move abroad; others are altering what they allow themselves to say on social media; many non-citizens are deciding that it's too risky to leave the country when they can't be sure they won't be detained on their way back through the border. Some are steeling themselves to the sort of personal and professional sacrifices they will have to make in order not to be morally mutilated by complicity with the regime. But too many of us are making decisions for our own individual action while sitting alone in our cars and living rooms reading the news on our phones. In contrast, the most hopeful glimmers in the national firmament are those cases where people are flexing their abilities to voice collective dissent and to work across differences to form collectives that can be mobilized to stare down the authoritarians and to win.

These three rules for the articulation of red lines function in concert. We need groups of people to meet, educate themselves about what is on the political horizon, and collectively plan what

AAUP-00012



# LTE: An Open Letter from 171 Faculty — Do not ban protest at NU

**171 members of NU Faculty**

Dear President Schill and Provost Hagerty,

Northwestern's University Mission declares its commitment to encourage debate; champion access, diversity and belonging; strengthen our community; and care about one another. NU Student Affairs pledges to uphold a commitment to social justice; confront practices that inhibit equity and justice; seek first to listen and understand; be curious and open to learning; and ask questions instead of ascribing intent.

We, the undersigned NU faculty of different backgrounds and political viewpoints, come together in support of these principles and in the firm belief that the University will violate its own commitments if it were to take any action to block our students' rights to peaceful speech, assembly and dissent.

This is a historic moment in which students across the country and around the world are voicing what they want their universities to be and do in terms of policies, ethics, partnerships and finances. These students' visions are based on an informed understanding of our collective well-being and, oftentimes, in a principled objection to that which impedes it.

As NU affirms, students have a right to ask questions. NU's vision statements require us to listen and engage with respect. The University will fail in its most basic promises and commitments if it moves to shut down student gatherings rather than open spaces for transparent and serious discussion.

Northwestern has a long history of successful student protests and strikes dating back to the 1960s. The students who are engaging in protests today are upholding and strengthening that proud tradition. Should the current administration choose to stand in their way, it will be on the wrong side of history.

We return to NU's pledge to "ask questions instead of ascribing intent." We will not tolerate the weaponization of unfounded presumptions of bigotry to smear and silence students who are not engaging in anything of the sort. And as educators, we will not stand for the criminalization of peaceful protest on our campus.

Signed,

Wendy Pearlman, Professor of Political Science and Middle East & North Africa Studies, WCAS
Elizabeth Shakman Hurd, Professor of Religious Studies & Political Science, WCAS
Elizabeth Smith, Assistant Professor of Instruction, Anthropology and WCAS Advising
Josh Honn, Humanities and Prison Education Librarian, University Libraries
Hannah Feldman, Associate Professor of Art History, WCAS
Ipek Kocaomer Yosmaoglu, Associate Professor of History, WCAS
katrina quisumbing king, Assistant Professor of Sociology, WCAS

JA1784

Katherine E. Hoffman, Associate Professor, Anthropology & MENA Studies, WCAS

Michelle N. Huang, Assistant Professor, English & Asian American Studies, WCAS

Michael Loriaux, Professor of Political Science, WCAS

Shirin Vossoughi, Associate Professor, SESP

Zach Wood-Doughty, Assistant Professor of Instruction, Computer Science, WCAS

Nitasha Sharma, Professor and Director, Black Studies and Asian American Studies, WCAS

Kalyan Nadiminti, Assistant Professor of English, WCAS

Moya Bailey, Professor of Communication Studies

Doug Kiel, Associate Professor of History, Center for Native American and Indigenous Research (CNAIR), and Kaplan Humanities Institute

Loubna El Amine, Assistant Professor of Political Science, WCAS

Beatriz O. Reyes, Assistant Professor of Instruction, Global Health Studies Program; Native American and Indigenous Studies, CNAIR

Qiu Fogarty, Associate Director, Social Justice Education

Emrah Yildiz, Assistant Professor, Anthropology & Middle East & North African Studies

Sonya Kaleel, Adjunct Faculty/Coach, School of Education & Social Policy / MSLOC

Erica Weitzman, Associate Professor of German, WCAS

Ian Hurd, Professor & Director, Political Science & Weinberg Center for Int'l & Area Studies

alithia zamantakis, Research Assistant Professor, ISGMH and Medical Social Sciences, FSM

Luis Amaral, E.O. Haven Professor, McCormick

Santiago Molina, Assistant Professor of Sociology, WCAS

Steven W. Thrasher, Daniel Renberg Chair, Medill

Brannon Ingram, Associate Professor of Religious Studies, WCAS

Kim Marion Suiseeya, Associate Professor, Political Science, Environmental Policy & Culture

Sirus Bouchat, Assistant Professor, Political Science, WCAS

Rebecca C. Johnson, Associate Professor, English and Middle East & North African Studies

Barnor Hesse, Associate Professor, Black Studies, WCAS

Robert Orsi, Professor, Religious Studies and History, WCAS

Kelly Wisecup, Professor, English and Center for Native American & Indigenous Studies

James Bielo, Associate Professor, Religious Studies, WCAS

Leslie M. Harris, Professor, History, WCAS

Justin L. Mann, Assistant Professor, English and Black Studies, WCAS

Jamie Carlstone, Authority Metadata Librarian, University Libraries

Mark Hauser, Professor and Director, Anthropology and Latin American & Caribbean Studies

Nicole Spigner, Assistant Professor, Black Studies & English, WCAS

Ivy Wilson, Associate Professor, English, WCAS

Martha Biondi, Professor, Black Studies and History, WCAS

Rebecca Zorach, Mary Jane Crowe Professor, Art and Art History, WCAS

Thadeus Dowad, Assistant Professor, Art History, WCAS

Shalini Shankar, Professor, Anthropology & Asian American Studies, WCAS

Shelby Hatch, Associate Professor of Instruction, Chemistry, WCAS

Helen Tilley, Associate Professor, History, WCAS

Sarah Schulman, Ralla Klepak Professor of English, MFA Program in Creative Writing, English

J. Seawright, Professor, Political Science, WCAS

Miriam Petty, Associate Professor, Radio/Television/Film

Sepehr Vakil, Associate Professor, School of Education and Social Policy

Dotun Ayobade, Assistant Professor, Performance Studies and Black Studies, WCAS

Kennetta Hammond Perry, Associate Professor, Black Studies and History, WCAS

Alec Powers, MPH, FSM ISGMH

Mary Pattillo, Professor, Black Studies and Sociology, WCAS

Elham Hoominfar, Assistant Professor of Instruction, Global Health Studies Program

Spencer Evans, Senior Research Technologist, Dermatology

Sean Hanretta, Associate Professor, Department of History, WCAS

JA1785

Sean Hanretta, Associate Professor, Department of History, WCAS

Lauren Stokes, Associate Professor, History, WCAS

Mérida M. Rúa, Professor, Latina and Latino Studies, WCAS

Gregory Phillips II, Associate Professor, Department of Medical Social Sciences

Tabitha Bonilla, Associate Professor, Human Development & Social Policy, SESP

Brent Huffman, Professor, Medill

Michael Anthony Turcios, Postdoctoral Fellow, Radio/Television/Film; Center for Native American and Indigenous Research

Emily Maguire, Associate Professor, Spanish and Portuguese, WCAS

Saad Ranginwala, MD, Assistant Professor, Feinberg School of Medicine

Jennifer Cole, Assistant Chair, Chemical and Biological Engineering

Megan Hyska, Assistant Professor, Philosophy

Megan Bang, Professor & Director, SESP & Center for Native American & Indigenous Research

Julie Lee Merseth, Assistant Professor, Political Science, WCAS

Curtis Miller, Lecturer, Art Theory & Practice

Kasey Evans, Associate Professor of English, WCAS

Annie Wilkinson, Postdoctoral Scholar, Anthropology, WCAS

Ana Aparicio, Associate Professor, Anthropology and Latina & Latino Studies Program, WCAS

becca greenstein, stem librarian, university libraries

Bimbola Akinbola, Assistant Professor, Performance Studies, WCAS

Ana Arjona, Associate Professor of Political Science, WCAS

Jackie Stevens, Professor, Political Science

Joshua Chambers-Letson, Professor of Performance Studies and Asian American Studies, Performance Studies and Asian American Studies

Anna Parkinson , Associate Professor, German

Michael Metzger, Academic Curator of Cinema and Media Arts, Block Museum of Art

Mary McGrath, Assistant Professor, Political Science, WCAS

Arionne Nettles, Lecturer, Medill

Ray San Diego, Assistant Professor of Instruction, Asian American Studies, WCAS

Sami Hermez, Associate Professor and Director of Liberal Arts Program, Northwestern in Qatar

Jorge Coronado, Professor, Spanish and Portuguese /LACS, WCAS

Samuel Weber, Avalon Foundation Professor of Humanities, German/CLS

David Schoenbrun, Professor, History and African Studies, WCAS

Nichole Pinkard, Professor, School of Education and Social Policy

Averill Curdy Murr, Professor of Instruction, English, WCAS

Hollyamber Kennedy, Assistant Professor, Art History, WCAS

Tracy Vaughn-Manley, Assistant Professor, Black Studies, WCAS

Mariajose Rodriguez Pliego, Assistant Professor, English, WCAS

James Mahoney, Gordan Fulcher Professor of Decision-Making, Political Science and Sociology

Jeffrey A. Winters, Professor, Political Science, WCAS

Ricky Hill, Research Assistant Professor, Sexual and Gender Minority Health & Wellbeing

Nate Cohen, Adjunct Professor of Instruction, Theatre

Michelle Birkett, Associate Professor, Medical Social Sciences

Karen Olivo, Director of Music Theatre Certificate Program, Theatre

Lina Britto, Associate Professor of History, Department of History, WCAS

Kevin Buckelew, Assistant Professor, Religious Studies, WCAS

Liz Hamilton, Copyright Librarian, University Libraries

Alessia Ricciardi, Professor, CLS

LaShandra Sullivan, Associate Professor, Anthropology, WCAS

Gina Petersen, Assessment Librarian, Northwestern University Libraries

Peter H. S. Sporn, MD, Professor of Medicine, Cell and Developmental Biology, and Medical Education, Feinberg School of Medicine

Tara Fickle, Associate Professor, Asian American Studies Program

Alejandra Uslenghi, Associate Professor, Spanish & Portuguese, Comparative Literary Studies

Penelope Deutscher, Professor, Philosophy and CLS

JA1786

AAUP-00008

Penelope Deutscher, Professor, Philosophy and CLS

Marianne Hopman, Associate Professor, Classics and Comparative Literary Studies

Nick Winters, Assistant Professor, Classics

Hasheem Hakeem, Assistant Professor of Instruction, Department of French and Italian

Namratha Kandula, Professor, Medicine, Feinberg School of Medicine

AJ Christian, Professor, Communication Studies

Tara Gonsalves, Assistant Professor, Sociology

Torsten Menge, Assistant Professor, Liberal Arts, Northwestern in Qatar

Katie Risseeuw, Librarian, University Libraries

Charlotte Rosen, Postdoctoral Scholar in Public Service, Center for Historical Studies

Iñigo Manglano-Ovalle, Professor, Art Theory and Practice

Sulafa Zidani, Assistant Professor, Communication Studies

Patty Loew, Prof. Emerita, Medill; Center for Native American & Indigenous Research

Katia Viot-Southard, Associate Professor of Instruction, French and Italian

Megan Baker, College Fellow, Anthropology

Igal Szleifer, Professor, Biomedical Engineering

Jeong Eun Annabel We, Assistant Professor, Asian Languages and Cultures

Rebecca Ewert, Assistant Professor of Instruction, Sociology

Doron Shiffer-Sebba, Postdoctoral Fellow, Sociology

TJ Billard, Associate Professor, Communication Studies and, by courtesy, Sociology

Leila Tayeb, Assistant Professor in Residence, Communication & Liberal Arts, NUQ

Calvin Liang, Postdoctoral Fellow, Communication Studies

Nasrin Qader, Associate Professor, French and Italian, WCAS

Heather Jaber, Assistant Professor in Residence, Communication & Liberal Arts, NUQ

Gretchen Neidhardt, Librarian, Galter Health Sciences Library and Learning Center

Diego Arispe-Bazán, Assistant Professor, Anthropology, WCAS

Cynthia Robin, Professor and Chair, Anthropology, WCAS

Alfonso Fierro, Assistant Professor, Spanish and Portuguese, WCAS

William Leonard, Professor, Anthropology and Global Health Studies, WCAS

Laura Beth Nielsen, Professor of Sociology, WCAS

Noelle Sullivan, Professor Instruction and Associate Director, Program in Global Health Studies

Amanda Logan, Associate Professor of Anthropology, WCAS

Lauren Beach, Assistant Professor of Medical Social Sciences

Laura Brueck, Professor of South Asian and Comparative Literature, WCAS

Lydia Barnett, Associate Professor of History, WCAS

Rayvon Fouché, Professor, Communication Studies and Medill

kihana miraya ross, Assistant Professor, Black Studies

Diane Knoepke, Adjunct Instructor, MS in Learning & Organizational Change

Aldon D. Morris, Emeritus Professor, Sociology and Black Studies

Karrie Ann Snyder, Associate Professor of Instruction , Sociology, WCAS

Kari Lydersen, Assistant Professor, Medill

Domietta Torlasco, Professor, French and Italian/CLS

Patrick Janulis, Associate Professor, Department of Medical Social Sciences

Charlayne Mitchell, Assistant Professor of Instruction, Global Health Studies

Jonathon Glassman, Wayne V. Jones Research Professor Emeritus, History, WCAS

Mary Ann Weston, Associate Professor Emerita, Medill

Kate Masur, Professor of History, WCAS

J. Michelle Molina, Associate Professor, Religious Studies, WCAS

Lakshmi Padmanabhan, Assistant Professor, Radio, TV, Film

Peter Locke, Associate Professor of Instruction, Global Health Studies

Paul Ramirez, Associate Professor of History, WCAS

Sandra L. Richards, Professor Emerita, Black Studies & Theatre

Nina Gurianova, Professor, Slavic and CLS, WCAS

JA1787

Nina Gurianova, Professor, Slavic and CLS, WCAS

Jose Medina, Walter Dill Scott Professor of Philosophy, WCAS

Caitlin Fitz, Associate Professor of History, WCAS

Michael Rakowitz, Professor of Art Theory & Practice and MENA Studies

Jen Munson, Assistant Professor, Learning Sciences, School of Education and Social Policy

Vilna Bashi, Osborn Professor of Race, Ethnicity, and Global Diversity, Sociology, WCAS

Corey Byrnes, Associate Professor, Kaplan, Asian Languages and Cultures, Comparative Literary Studies

Shayna Silverstein, Assistant Professor, Performance Studies and MENA Studies

Patrick Noonan, Assistant Professor, Asian Languages and Cultures, CLS

If you would like to respond publicly to this op-ed, send a Letter to the Editor to opinion@dailynorthwestern.com. The views expressed in this piece do not necessarily reflect the views of all staff members of The Daily Northwestern.

JA1788

AAUP-00010

# Supporting Dr. Steven Thrasher

**March 20, 2025**

We are appalled by Northwestern University's denial of tenure to Dr. Steven Thrasher and call upon Dean Charles F. Whitaker of the Medill School of Journalism to reconsider his decision.

This is the latest in a months-long campaign of retaliation against Dr. Thrasher for engaging in constitutionally protected political speech against Israel's war in Gaza and for defending students who stood against it during a peaceful protest at Northwestern last April. At that demonstration, Dr. Thrasher was among a group of faculty who formed a defense line around students who were setting up tents in Dearing Meadow, on the university's main Evanston campus. Northwestern Police attempted to break the defense line, physically assaulting Dr. Thrasher in the process.

One month after that protest, Northwestern University President Michael Schill was called before a Congressional hearing where U.S. Rep. Jim Banks (R-Indiana) publicly pressured him to fire Dr. Thrasher. Weeks later, Dr. Thrasher was one of four Northwestern University employees charged with Class-A misdemeanors for allegedly obstructing police activities during the April protest. When Cook County's State Attorney declined to prosecute and dropped the charges (charges that have since been formally expunged from Dr. Thrasher's record), Northwestern opened up an ad hoc investigation into his teaching and suspended him from the classroom.

The [Northwestern University](#), [Illinois](#) and [national](#) bodies of the American Association of University Professors (AAUP) all criticized Dean Whitaker's decision to sanction Dr. Thrasher before he was even granted the opportunity for due process. In December, Dr. Thrasher was [formally exonerated](#) by a three-faculty committee of his peers from across the university. The day after Dean Whitaker accepted their report which deemed Dr. Thrasher's suspension to be unwarranted, he announced yet another internal investigation of Dr. Thrasher—this time for his participation in the April protest.

In light of this litany of retaliatory actions, we question Dean Whitaker's ability to impartially assess Dr. Thrasher's case for tenure—the denial of which is tantamount to purging Dr. Thrasher from the Northwestern faculty.

Northwestern recognized Dr. Thrasher as an outstanding scholar when they hired him in 2019 as the inaugural Daniel H. Renberg Chair for Social Justice in Reporting, with a Focus on LGBTQ Issues. His chair was formally renewed in 2023, months before the April protest that made him a target of the university's ire.

As an assistant professor, Dr. Thrasher has already earned an international reputation that is not only tenure-worthy, but would garner a full professorship at most universities. Dr. Thrasher's award-winning first book, *The Viral Underclass,* is an incredible and moving piece of journalism that tackles some of the most pressing questions of our collective moment. In this book, he uses viruses as a lens to reveal and understand startling inequalities of race, class, gender, ability, and sexuality. The public reception for *The Viral*

AAUP-00025



JA1789

*Underclass* was overwhelmingly positive. *The New York Times* named the paperback an Editor's Choice. It was long-listed for the 2023 *PEN/America John Kenneth Galbraith Award for Excellence in Nonfiction Literatur*e and the *Carnegie Medal for Excellence in Nonfiction.*

In both *The Viral Underclass* and his other work, Dr. Thrasher bears witness and stands in solidarity with people the US often considers disposable. He is part of a cohort of journalists of color who collectively challenge the faux objectivity that has long defined the profession. It is not lost on us that as a Black gay man in the academy, Dr. Thrasher is both a rarity and disproportionately likely to be politically targeted, as data from the AAUP confirms. Until recently, Northwestern has touted its commitment to "diversity and inclusion." The demeaning and disrespectful treatment of Dr. Thrasher is wholly inconsistent with that espoused value. Are Black and LGBTQ faculty welcome only to the extent that they remain silent on issues that matter to them and have profound global significance?

The academy is under attack from people committed to dividing the polity, promoting disinformation, and protecting the powerful. These attacks are central to a well-funded campaign to undermine higher education in America as part of a far-right political project. Journalists, scholars, and teachers like Dr. Thrasher are needed more than ever if we hope to learn about and undo the harms inflicted by unequal systems. We call on Northwestern to reject this new McCarthyism and to reconsider its decision to deny tenure to our colleague, Dr. Steven Thrasher.

Anyone willing and able to offer material support for Dr. Thrasher can do so [here](#).

*Institutional affiliations are offered for identification purposes only
1. Kiese Laymon, Moody Professor of English and Creative Writing, Rice University
2. Andrew Ross, New York University
3. Lisa Hajjar, Sociology, UC Santa Barbara
4. Cathy Cohen, University of Chicago
5. Hoda El Shakry, Associate Professor of Comparative Literature, University of Chicago
6. Dan Sheehan, Lit Hub
7. A.J. Bauer, University of Alabama
8. Elliott Powell, University of Minnesota
9. Jeanne Theoharis, Distinguished Professor, Brooklyn College
10. Eman Abdelhadi, University of Chicago
11. Lisa Duggan, Professor, New York University
12. Alireza Doostdar, University of Chicago
13. Anton Ford, Associate Professor of Philosophy, University of Chicago
14. Victoria Law, author and independent journalist
15. Julie Orlemanski, Associate Professor of English and Director of Graduate Studies, University of Chicago
16. Darryl Li, University of Chicago
17. Allyson Nadia Field, University of Chicago
18. Daniel Morgan, Professor, University of Chicago
19. Christina Sharpe, CRC, York University
20. Douglas Foster, Professor, Northwestern University
21. Heba Gowayed, CUNY Hunter College & Graduate Center
22. Shantel Gabrieal Buggs, Associate Professor, Florida State University
23. Louise Seamster, University of Iowa

AAUP-00026

JA1790

24. Sonya Posmentier, New York University
25. Zach Samalin, New York University
26. Nicholas Mirzoeff, Professor and chair, NYU
27. Monica Kim, University of Wisconsin-Madison
28. Cynthia Chris, College of Staten Island
29. Bilge Yesil, CUNY College of Staten Island and The Graduate Center
30. A. Naomi Paik, Associate Professor
31. Karma R. Chavez, Professor, University of Texas at Austin
32. Kevin Murphy, University of Minnesota
33. Leah Feldman, University of Chicago
34. Helga Tawil Souri, NYU
35. Sarah Jaffe, author and journalist
36. Jorge Coronado, Northwestern University
37. Rebecca Zorach, Northwestern University
38. Helen Tilley, Associate Professor, History, Northwestern University
39. Martha Biondi Professor, Northwestern
40. Riché Richardson, Cornell University
41. Lewis Wallace, journalist
42. Luís A Nunes Amaral, Northwestern University
43. Tej Nagaraja, Cornell University
44. Dan Berger, University of Washington Bothell
45. Steven High, Concordia University
46. Natasha Mhatre, Western University
47. Felicity Callard, Professor, University of Glasgow
48. Crystal Shackleford, Yale University
49. Spencer Richards
50. Anthony Tomaso, Northwestern alumni (2004)
51. Charlotte Rosen, Haymarket Books, Northwestern University alum
52. Lisa Stampnitzky, University of Sheffield
53. Ben Kiem, University of Toronto
54. Gabriel Winant, University of Chicago
55. John Pringle, PhD, Independent Researcher
56. Erik Reinbergs, Utah State University
57. Lauren Rendon, UChicago
58. Jacqueline Moss, Attorney
59. Anne Alt, Northwestern alumna
60. Siddhartha Mitter, independent journalist
61. Ben Chappell, University of Kansas
62. Austin B. Harvey, Northwestern alum (2004)
63. Jacob Devine, School of Communication '13
64. Ai Miller, University of Minnesota Libraries
65. Danielle Koonce, PhD, Cage Bird Research
66. Will Newsom, Austin Humane Society
67. Cynthia Gao, Middlebury College
68. Zach Schwartz-Weinstein, PhD
69. Michael Metzger, Northwestern University
70. Gyunghee Park, Westchester Community College
71. David Keegan, MD, Cumming School of Medicine, University of Calgary
72. Kat Naphas, Individual



AAUP-00027

73. Emily Rodriguez, Massachusetts General Hospital
74. Anthony Weems, Coastal Carolina University
75. Jason Guthartz, Northwestern alumnus
76. Shannan Clark, Montclair State University
77. Lauren Rothman, Journalist
78. John Saunders, Independent Researcher
79. Morgan Harper, University of Toronto
80. Lydia Kiesling, writer
81. Victor Ray, The University of Iowa
82. Jarrad Davis, Medill School
83. S. Gronkiewicz-Doran, Northwestern Alum, 2005
84. Jaime Lawson, Student
85. Patrick Hayes, Michigan State University
86. Jennifer Selwyn, History Department, Cal State, Sacramento
87. Steve Rhodes, photojournalist
88. David Palumbo-Liu, Stanford University
89. Rebecca Duffy, Northwestern University
90. Donovan Miyasaki, Professor, Wright State University
91. Tim Mackie, University of Minnesota Class of 2012
92. Javier Gonzalez, Individual
93. Scott Anton, Illinois Resident
94. Julia Valdes, PhD, Northwestern alumnus
95. Vincent Wong, University of Windsor
96. Jake Mann, Northwestern
97. Tiana Reid, York University
98. Ian Liujia Tian, Assistant Professor, Mount Saint Vincent University, Canada
99. Michael Munnik, Cardiff University
100. Alex Lubin, Penn State University
101. J. Benton Heath, Temple University
102. Dr. Sami Schalk, Professor, University of Wisconsin Madison
103. Leor Galil, Chicago Reader
104. Xine Yao, University College London
105. Steve Macek, North Central College, IL AAUP
106. Lauren Eastwood, Professor of Sociology State University of New York at Plattsburgh
107. Alyssa Harad, PhD
108. Sarah Watkins, Western Washington University
109. Andrew Douglas
110. Ali Alkhatib
111. Anne Kosseff-Jones, Journalist and Editor
112. Andrew Douglas, Morehouse College
113. David Loner, independent scholar
114. Steven Melendez, independent journalist and Medill alum
115. Patrick Michels, Northwestern alum
116. Stacey Watson, artist, Canada
117. Amie M Marie, individual
118. Suzanne Faysal Aref Barghouti
119. Nasar Meer, University of Glasgow
120. Elizabeth Meehan, WCAS '17
121. Torsten Menge, Northwestern University in Qatar

AAUP-00028

JA1792

122. Maryann Germaine
123. Lizabeth Roemer, Professor, U Mass Boston (NU '89)
124. Sarah Schulman, Northwestern
125. Genevieve Lakier, University of Chicago
126. Lee Ann Fullington, Brooklyn College
127. Gavin Mueller, University of Amsterdam
128. Christopher Lioi, individual
129. Nathan Alderman (Medill Alum, 2000)
130. Kristin Bergen
131. Ann Kennedy University of Maine Augusta
132. Timothy Babulski, University of Maine
133. Kay Daly, Independent Writer, Scholar, Teacher
134. Christy Thornton, New York University
135. Mary Ensz, individual
136. Daniel Littlewood, Swarthmore College alum
137. Ferial Pearson, University of Nebraska
138. Benjamin Swerdlow, Lake Forest College
139. Caitlin Finn, individual
140. Maggie Dougherty, Northwestern Medill MSJ
141. Abdellali Hajjat, Associate Professor, Université libre de Bruxelles, Belgium
142. Chelsea Herman
143. Brendan Morales-Doyle, NU Alum, Class of 2016
144. Zaeem Haq, Individual
145. Lisa Gilson, Bates College
146. Benjamin Balthaser
147. Julia Métraux, journalist
148. Sabina Sawhney Retired Hofstra
149. Sarah Tuttle, Assocciate Professor, University of Washington, Seattle
150. Benjamin Balthaser, Associate Professor of English, Indiana University
151. Benjamin J. Robertson, University of Colorado, Boulder
152. Dan Immergluck, Professor, Georgia State University
153. Yasmeen Mekawy, Northwestern University in Qatar
154. Maida Avdic, Individual
155. Erica Weitzman, Northwestern University
156. Merve Fejzula, University of Missouri
157. Lauren Carbajal, NU Alum '13
158. Kat Tenbarge, independent journalist
159. Nicholas Garbaty, Northwestern Alum
160. Prof. Sunny Singh, lindon Metropolitan University
161. Sara Chatfield, Associate Professor, University of Denver
162. Sarah Shamash, Assistant Professor Emily Carr University of Art and Design
163. Audra Mitchell, Professor and CRC, Wilfrid Laurier University
164. Tony S. Jugé, Pasadena City College
165. Kapish Bhutani
166. Jeff Doctor, University of Toronto
167. Tashmia Owen. Artist. Writer.
168. John Horn, individual
169. Sunny Xiang, Yale University
170. James M. McCarthy, individual

JA1793

AAUP-00029

171. Nandita Sharma, Professor, Sociology, University of Hawaii at Manoa
172. Cory Barker, Penn State University
173. Lauren Brentnell, Texas State University
174. Terri Friedline, Professor of Social Work, University of Michigan
175. Jason Haslam, Dalhousie University
176. Matthew Lloyd Roberts, University of Cambridge
177. Elise A. Mitchell, Swarthmore College
178. Nate Kruger, Vanderbilt University
179. Derek Ludovici, Anthropology Brooklyn College, CUNY
180. Tommy Craggs (Medill '01)
181. Samuel Harper, coopérative de solidarité Pivot
182. Natasha Kessler, Metropolitan Community College
183. Richard W Morrison, Editorial Director, Fordham University Press
184. Chanda Prescod-Weinstein, Theoretical Physicist
185. David Wittenberg, Professor, University of Iowa
186. Dr. Daniela Nadj, St. Mary's University, London
187. Tariq Khan, Yale University
188. Nick Ward, Loyola University
189. David Wells, Northwestern Alum
190. Siobhán McElduff, University of British Columbia
191. Kelsey Fong, Individual
192. Kimiko Soto
193. Jordan Shannon, Seattle University
194. Shannon Bucci, Graduate student of sociology—CU Denver
195. Philip Holden, University of Westminster, London
196. Bailey Remmers, PhD candidate at the University of Texas at Austin
197. Olivia Lewis,
198. Beatrix Hoffman, Northern Illinois University
199. Grace Kyungwon Hong, UCLA
200. Shannon Townsend, Washington University in St Louis
201. Bruce Simon, SUNY Fredonia
202. Janie Breton, Individual
203. Melanie Brewster, Teachers College, Columbia University
204. Rich DeYoung, Individual
205. Michelle Anya Anjirbag, University of Antwerp
206. Lukas Neville, University of Manitoba
207. David Murakami Wood, Canada Research Chair in Critical Surveillance and Security Studies, University of Ottawa
208. Bill Walker, Chicago Resident
209. Julia Chang, Cornell University
210. Saba Igbe, student - University of the West Indies
211. andré carrington, University of California-Riverside
212. Sarah Disbro, Northwestern Medill MSJ
213. Ebony Elizabeth Thomas, University of Michigan
214. John Knefel
215. Florence Ashley, University of Alberta
216. Greg Burris, Northwestern University in Qatar
217. Tage Rai, UCSD
218. Alithia Zamantakis, Northwestern University ISGMH

JA1794

AAUP-00030

219. Summer House, Northwestern University staff
220. Shelby Seier, All Kinds Accessibility Consulting
221. Marie Salter Northwestern Law Alumnus
222. Megan Jennings Quist, Northwestern
223. Keisuke Sista, Depaul University
224. Izzy Grosof, Assistant Professor, Northwestern University
225. Begum Adalet, Cornell University
226. Andres Pinedo, Vanderbilt University
227. Alex Boodrookas, MSU Denver
228. Orven Mallari, University of Michigan
229. Amina M. Steinfels, Associate Professor of Religion, Mount Holyoke College
230. Taylor Tefft, Loyola University
231. Yuri Cartier, Research staff, University of California San Francisco
232. Jonathan Feingold, Boston University School of Law
233. Cass Turner, UCLA
234. Burcu Baykurt, University of Massachusetts Amherst
235. Leigh Kimberg, MD, Professor of Medicine, UCSF (for ID)
236. Jessie Nguyen, Northwestern University
237. Matthew Vega, University of San Diego
238. Sarah Bracke, University of Amsterdam
239. Micol Bez, Northwestern Philosophy and Comparative Literature
240. Leah Munsey, Case Western Reserve University
241. Tyler Coates, journalist and former Northwestern University employee
242. Danielle Welch, individual
243. Hale McSharry, Northwestern '17, NU Loyal
244. Duncan MacKinnon
245. Zinya Salfiti, Northwestern Medill MSJ
246. Lindsay Ballant, former adjunct professor, Maryland Institute College of Art and School of Visual Arts
247. Kevin McQueeney, Loyola University New Orleans
248. Rinaldo Walcott, University at Buffalo
249. Amber Robinson, librarian
250. Victoria Frye, professor, Columbia University
251. Wesley R. Bishop, PhD, Assistant Professor History, Jacksonville State University
252. Khaleel Rahman, Northwestern University
253. Eli V. Kean, Northwestern University
254. Lisa Diedrich, Stony Brook University
255. Katherine Blouin, University of Toronto
256. Matthew Phelan, journalist (MA, NYU SHERP)
257. Frank Edwards, Associate Professor, Rutgers University
258. Sean Bland, Santa Clara University
259. Elia Silbey, Northwestern Student
260. Nesrien Hamid, University of Michigan
261. Kendall Riley, University of Iowa
262. Grace OLeary, Chicago Resident
263. Ujju Aggarwal, The New School
264. aeriell bach, seiu local 73
265. Marla Jaksch, Professor, The College of New Jersey
266. Carrie Tirado Bramen, Professor, University at Buffalo

AAUP-00031

JA1795

267. Amrie Moraga, California State University Channel Islands
268. Elias Khalil, University of Toronto
269. Olivia Stovicek, editor and journalist
270. James M. Thomas, University of Mississippi
271. David McNally, Distinguished Professor, University of Houston
272. Beth Capper, Assistant Professor, University of Alberta
273. Keith Miyake, University of California, Riverside
274. Kayla Renée Wheeler, Assistant Professor, Xavier University
275. Anthony Rains, Iowa State University (alum)
276. Trey Moody, Creighton University
277. Jessica Daly, College of Lake County
278. Christa Noel Robbins, UVA
279. Dr Mohsin Badat, Queen Mary University London
280. Ruby Daniel, Individual
281. Lyle Jeremy Rubin, Author
282. Salonee Bhaman, NYU
283. W. Carson Byrd, University of Michigan
284. Tristan J Schweiger, Assistant Instructional Professor, University of Chicago
285. Whitney Strub, Rutgers University-Newark
286. Patrick Blanchfield, Brooklyn Institute for Social Research (BISR)
287. Shehram Mokhtar, Northwestern University in Qatar
288. Micah Bazant
289. Tulsi McDaniels with the Chicago Alliance (CAARPR)
290. Altha Cravey, UNC Chapel Hill
291. Molly Schiffer, Northwestern University
292. Kai Ngu, University of Michigan, journalist
293. Paul Renfro, Florida State University
294. Cynthia Franklin, University of Hawai'i
295. Briana Finegan, University of Chicago
296. Anna E. Lindner, Nazareth University
297. Michael Kraus, Northwestern University
298. Noah Berlatsky, journalist
299. Caroline Bowman, Barnard College
300. Lawrence Chillrud, Northwestern University
301. LaToya Baldwin Clark, Professor, UCLA School of Law
302. Joshua L. Mayer, University of Connecticut
303. Nate Holdren, Drake University
304. Cailey Hall, UCLA
305. Laleh Khalili, University of Exeter
306. Daniel Rück, University of Ottawa
307. Jordan Owens, Northwestern Univery
308. Edouard Machery, University of Pittsburgh
309. Richard Wood, Retired Chair, Sociology, DeAnza College, Cupertino, CA
310. Eli Newell, Northwestern University (SoC '18)
311. Mauro Gatti, University of Bologna
312. Peter Chesney, Vanderbilt University
313. Toby Smith, UC Davis
314. Maxim Voronov, York University
315. Ellison Snider



AAUP-00032

316. Julia Steinberger, University of Lausanne, Switzerland
317. Nitish Pahwa, journalist
318. George De Stefano, Alumnus, CUNY
319. Donald Cotter, Mt Holyoke College
320. Caroline Abidin, college graduate, concerned citizen
321. Zsuzsa Kaldy, University of Massachusetts Boston
322. Miriam Posner, UCLA
323. Nicholas Caverly, University of Massachusetts
324. Uahikea Maile, University of Chicago
325. Peter Sheik, individual
326. Albe Gilmore, University of Ottawa
327. Tina Shull, UNC Charlotte
328. Emek Ergun, UNC Charlotte
329. Anne Marie Creighton, University of Michigan, Ann Arbor
330. Aven Peters, Northwestern University
331. Avi Sheehan, UChicago Alum, Northwestern Alum
332. Nadia Aubin-Horth, Professor, Universite Laval, Canada
333. Jonny Diamond, Lit Hub
334. Steven Blevins, Lecturer, Univ. of North Carolina Asheville
335. Natasha Lightfoot, Associate Professor, Columbia University
336. Eric Reinhart, Northwestern University
337. Seema Yasmin, Stanford University
338. C. Riley Snorton, University of Chicago
339. Nikhil Pal Singh, Chair Department of Social and Cultural Analysis, NYU
340. Candice Baumgardner, Western Oregon University
341. Dylan O'Brien, Paraprofessional
342. Anna Drake, Associate Professor, University of Waterloo
343. Leni Zumas, Portland State University
344. Rebecca Slayton, Cornell University
345. Shakuntala Banaji, Professor, London School of Economics and Political Science
346. Susan Kingsland, Individual
347. Michael Tristano Jr., Assistant Professor, Towson University
348. Cristian Valenzuela, Northwestern University
349. Jim Logan, retired journalist
350. Laura Colaneri, University of Chicago
351. Jennifer Nelson, University of Delaware
352. Jonathan Hannau, Roosevelt University
353. Tahera Ahmad (former 15 year Chaplain at Northwestern also wrongfully terminated by the university's discrimination)
354. Allison McCracken, DePaul University
355. Amesika Nyaku, MD, MS; Northwestern University Feinberg School of Medicine
356. Savithry Namboodiripad, University of Michigan
357. David Ponton III, University of South Florida
358. Zeke Pratchett, Individual
359. Derek Silva, Associate Professor, King's University College
360. Kristin Urquiza, co-founder Marked By Covid
361. Danielle Purifoy, UNC Chapel Hill
362. Jason Schulman, John Jay College, CUNY
363. Russell Rickford, Cornell University

AAUP-00033

JA1797

364. Neel Ahuja, University of Maryland, College Park
365. Teke Wiggin, Northwestern sociology PhD student
366. Jennifer Spitzer, Ithaca College
367. Sebastian Avery Morris, MDiv
368. Aradhana Sharma, Professor, Wesleyan University
369. Vernadette Gonzalez, Ethnic Studies, UC Berkeley
370. Mara Mills, New York University
371. Greg Ryan, London Metropolitan University
372. David Schmid, University at Buffalo
373. Will E. Bachar
374. Brian Goldstone, author and journalist
375. Eraldo Souza dos Santos, Cornell University
376. Meredith Farkas, Portland Community College
377. Yusra Shawar, John's Hopkins University
378. Jackson Tenclay, previous TA at Northwestern
379. Oarteze Hunter, University of California, Los Angeles
380. Eskil Elling, PhD candidate, Northwestern
381. Nicholas Rodelo, Researcher
382. Edgar Rivera Colón, University of Southern California
383. Georgios Argyropoulos, University of Stirling
384. Dominick Knowles, Ph.D., UMass Boston
385. Mark Libin, University of Manitoba
386. Carolyn Elerding, PhD, former tenure-track professor
387. Sherry Wolf, Northwestern, Class of 1987
388. Ashlyn Keefe, Individual
389. Alana Lee Glaser, Associate Professor, St Johns University (PhD, Northwestern University, Dept of Anthropology, 2015)
390. Yasser Munif, Emerson College
391. Andres Fabián Henao Castro, Political Science, University of Massachusetts Boston
392. Susan Marsh, individual
393. Ivón Padilla-Rodríguez, University of Illinois Chicago
394. Kevin Delucio, Western Washington University
395. Ali Watts, Bowling Green State University
396. Cameron, UCSF, nurse
397. Amanda Hernandez, Southwestern University
398. Ana Carolina Díaz Beltran, Assistant Professor, University of Texas Rio Grande Valley
399. Lisa Geiszler
400. Tamara Lee, Rutgers University (BSIE, Northwestern University '96)96)
401. Suzanne Abu-Shaaban, DBA
402. Cairo Dye, NU Alumni
403. Marla Arbach, per-course faculty, various institutions
404. Maria Hantzopoulos, Vassar College
405. Terri Ginsberg, Rutgers University
406. Leanne Betasamosake Simpson, Independent Scholar
407. Jairo I. Funez-Flores
408. Sinan Richards, University College Cork
409. Ira Dworkin, Texas A-M
410. Hakim Williams, Gettysburg College
411. Susan Morrissey, University of California, Irvine

AAUP-00034

JA1798

412. Bharat Venkat, UCLA
413. Kristin Burnett, professor, Lakeahead University
414. Caitlin Schroering, Assistant Professor, Global Studies, UNCC
415. John Palmer, Universitat Pompeu Fabra
416. Sanghyuk Shin, UC Irvine
417. Eli Meyerhoff, Duke University
418. Ryan Griffis, University of Illinois, Urbana-Champaign
419. Michael Loeb, CUNY
420. Sarah Hale, SUNY Buffalo
421. Rana Jaleel, Associate Professor, University of California, Davis
422. Melanie Richter-Montpetit, University of Sussex (UK)
423. Brian Cabral, UT Austin
424. Jih-Fei Cheng, Associate Professor, Scripps College
425. Jeff Liss, City College of San Francisco
426. David Bateman, Associate Professor, Cornell University
427. Michael Litwack, Associate Professor, University of Alberta
428. Jake mattox, Indiana university, south bend
429. Catia Cecilia Confortini, Professor of Peace and Justice Studies, Wellesley College (USA)
430. Dan Hirschman, Associate Professor, Cornell University
431. David Polanski, Independent Scholar
432. Christina Heatherton, Everett and Joanne Elting Associate Professor for Human Rights and Global Citizenship and Associate Professor of American Studies
433. Lara Cohen, Swarthmore College
434. Shama Rangwala, York University
435. Steven Louis Goldstein, Medill '15 alum, proud Jewish supporter of Dr. Thrasher
436. Jack Mirkinson, journalist
437. M. I. Bernal Uruchurtu, UAEM, México
438. Kate Quinn, University College London (UCL)
439. Ari Paul, Fairness and Accuracy in Reporting
440. Elena Shih, Manning Assistant Professor of American Studies
441. Christina Dunbar-Hester, Professor, University of Southern California
442. Angela Jones, Stony Brook University
443. Andrea Brower, Gonzaga university
444. Aria Snedegar, Northwestern '21
445. Miles Hentrup, Florida Gulf Coast University
446. Tricia Gallagher-Geurtsen, UC Santa Cruz
447. Yulia Gilich, Institute for the Critical Study of Zionism
448. Victoria C. Chávez, Northwestern University
449. Alana Lentin, Western Sydney University
450. Zareena Grewal
451. Israel Perez, U of I at Urbana-Champaign
452. Aisha Syed
453. Carolynn Ekbaeck, Graduate Student & Union Organizer, UT San Antonio
454. W. David Ball, Santa Clara Law School
455. Stephen Sheehi, William & Mary
456. Tamara Golan, University of Chicago
457. Lara Sheehi, Doha Institute for Graduate Studies
458. Becca Greenstein, Northwestern University

AAUP-00035

459. Sophie McMillan-Myers, University of Chicago
460. Andrés Moreira, Rutgers University
461. J. Mijin Cha, UC Santa Cruz
462. Christina Hanhardt, University of Maryland
463. Nicholas Emmerson, University of Iceland
464. Randy R. Potts, journalist
465. Mostafa Minawi, Cornell University
466. Nicole Guenther Discenza, University of South Florida (but not representing it)
467. Lauren Gutterman, University of Texas at Austin
468. Maurianne Reade, Associate Professor, Northern Ontario School of Medicine University
469. Loretta Capeheart, retired Justice Studies, Northeastern Illinois University
470. Matt Weston, musician - composer
471. Analu Lopez, Librarian
472. Iyko Day, Mount Holyoke
473. Genevieve Renard Painter, Concordia University
474. Brandon Sward, PhD UChicago '23
475. Bill V Mullen Professor Emeritus Purdue
476. Mimosa Shah, Librarian
477. Jeremy Rotner, Northwestern '14
478. Abigail Boggs, Assistant Professor, Wesleyan University
479. Lene Myong, University of Stavanger, Norway
480. Rouhollah Aghasaleh, Cal Poly Humboldt
481. Gordon Beeferman, Adjunct Professor, New York University
482. John King Associate Adjunct Professor NYU
483. Matthew Murrey, MLS - poet and retired librarian, Urbana, IL
484. Lucie Fiala, Environmental Scientist
485. Gulzar R. Charania, University of Ottawa
486. Mabel Wilson, Columbia University
487. Fereshteh Toosi, Florida International University
488. James Schamus, Columbia University
489. Tommy H. Proffitt III, individual
490. Natalie Araujo Melo, Northwestern University
491. Heike Schotten, Professor of Political Science, UMass Boston
492. Cristina Groeger, Associate Professor of History, Lake Forest College
493. Mary Rambaran-Olm, PhD, unaffiliated
494. Melissa Weiner, College of the Holy Cross
495. Deborah Armintor, University of North Texas
496. Laura Bray, University of Oklahoma
497. Celia E. Naylor, Barnard College
498. Chris Cynn, Virginia Commonwealth University
499. Courtney Joseph, Lake Forest College
500. Nahyan Fancy, DePauw University
501. Michelle Birkett, Northwestern University
502. Susan Rinkunas, independent journalist
503. Ashley Dawson, Distinguished Professor, City University of New York
504. Arionne Nettles, Florida A&M University
505. Nate Wagner, Yale University
506. Viva Butler, individual

AAUP-00036



507. Jigna Desai, UC Santa Barbara
508. Fushcia-Ann Hoover, faculty, UNC Charlotte
509. Kathryn Macapagal, Northwestern University
510. Tom Alter, Texas State University
511. Rabab Abdulhadi, San Francisco State University
512. Fadi Ennab, Vanier Scholar, PhD Candidate, University of Manitoba
513. Ira Beare, Northwestern University
514. Maryann Blackburn, individual
515. Anthony Colella, Individual
516. Jessica Rish, DePaul University
517. Steve Rolf, University of Sussex
518. Shabana Mir, Associate Professor
519. Ethan Roberts, Calvary Presbyterian Church
520. Caroline Hugh, MPH, unaffiliated
521. Jamie Carlstone, Northwestern University
522. Sarah Lazare, journalist
523. Margaret Russell, Santa Clara University
524. Adam Murphree, PhD
525. Colleen Wynn, University of Indianapolis
526. Paul de Revere
527. Ben Manski, George Mason University
528. Ragini Shah, Suffolk University NU alum 1993
529. Nitasha Sharma, Professor of Asian American Studies and Black Studies, Northwestern University
530. Danielle Carr, UCLA
531. Violet Fox, Galter Health Sciences Library, Feinberg School of Medicine
532. Maria Arettines, CUNY
533. Ari Appel, (Washington University in St. Louis, undergraduate)
534. Isaac West, Vanderbilt University
535. Steph Brown, University of Arizona
536. Blake Stimson
537. Matthew Kovac, UC Berkeley, Medill '14
538. Theodore Tollefson, Independent Journalist
539. Matt Chorpenning, MSW - Portland State University
540. Jack E Licata, Northwestern University alumnus (B.A., 2013; J.D., 2018)
541. Naoko Shibusawa, Brown University, NU PhD
542. Amira Jarmakani, San Diego State University
543. Raia Small, MFA Candidate at San Francisco State University
544. Elizabeth Ziff, University of Indianapolis
545. Gopalan Nadathur, Professor, University of Minnesota
546. Ashley Lindsey, University of Arkansas
547. Eleanor Chung, MD, University of California-San Francisco
548. Ethan Bleemel, University of Louisville
549. Cristina Kotz Cornejo, Professor, Emerson College
550. Barry Trachtenberg, Rubin Presidential Chair of Jewish History, Wake Forest University
551. Joel Thorson, DePaul University
552. Shubhankar Kashyap, DPhil (PhD), University of Oxford
553. Kerwin Kaye, Wesleyan University
554. Luke Peterson, PhD, University of Colorado Boulder, NU Alumni (2019)

AAUP-00037

JA1801

555. Henry Rogers, Northwestern University
556. Briana Markoff, Michigan State University
557. Hari Ziyad, Author and Journalist
558. Daisy Baeza
559. Sean Hanretta, Northwestern University
560. Fade Eadeh, Seattle University
561. Lyric Hathaway, Northwestern University
562. Alexander Aviña, Arizona State University
563. Natalie Kouri-Towe, Concordia University
564. Nina Farnia, Albany Law School
565. Peter Jamea Hudson, University of British Columbia
566. Joselyne Ruiz Zuniga (teacher)
567. Kim F. Hall, Barnard College
568. Erik Wade, SUNY Oswego
569. Corinna Mullin, CUNY
570. Eli Valley
571. Shaine Scarminach, University of Connecticut
572. Turner Spencer
573. Elizabeth Ford, educator
574. Desiree Poets, Virgínia Tech
575. Christina Garrett
576. John Ritchie,  affiliation near Washington DC
577. David Letwin, Rutgers University
578. Marianna Ritchey, Associate Professor, UMass Amherst
579. Manu Karuka, Barnard College
580. Richmond Eustis, Nicholls State University
581. Myrna Moretti, Northwestern '24
582. Jess A. Goldberg, New Mexico Highlands University
583. Qriddur, AWC
584. Sarah Smith, Anti War Committee Chicago
585. Melixa Abad Izquierdo, Farmingdale State College
586. Hilary Fung, Northwestern University
587. Nathaniel Mills, University of Minnesota - Twin Cities
588. Zach Russo, unaffiliated
589. Shannon Heffernan, journalist
590. Andreas Petrossiants, NYU
591. Amy Kristl, Northwestern University
592. Omer Aijazi, University of Manchester
593. Navid Farnia, Wayne State University
594. William Noseworthy, Cornell University
595. Bethany Letiecq, George Mason University
596. Daniel Sidorick, Rutgers University
597. George Duton, UCLA
598. Brian L. Evans, UT Austin
599. Melanie Gleason, public interest attorney
600. Megan Hyska, Assistant Professor of Philosophy, Northwestern University
601. Maria Guglielmo, Brown University
602. Michael Gallope, University of Minnesota
603. Thomas Moore, Policy Analyst

AAUP-00038

JA1802

604. Charlie Thame, Assistant Professor, Thammasat University
605. Michael Billeaux, Madison Area Technical College
606. Joe Jaggi
607. jj skolnik, journalist
608. Greg McGarry, University of San Francisco
609. Jan L Clausen. adjunct faculty, New York University
610. Natascha Chtena, Simon Fraser University
611. Tiffany N. Florvil, University of New Mexico
612. James Factora, journalist
613. Steve Held, Northwestern Alum 1995, independent journalist
614. Susan Stryker, Distinguished Visitor, Clayman Institute for Gender Research, Stanford University, and Professor Emerita of Women's, Gender and Sexuality Studies, University of Arizona
615. Caeli Kean, Anti-War Committee Chicago
616. Marcy Newman, independent scholar
617. Benjamin Hulett, Columbia University
618. Denish Jaswal, Harvard University
619. Lori Carriere, Stony Brook University
620. Jason Grote, writer
621. Sarah Gilbert, Pitzer College
622. Carrie Heckel, NU Alum
623. Zach D Roberts, Independent Photojournalist
624. Jennifer Greiman, Wake Forest University
625. Elinor Keener, Anti-War Committee
626. Hilah Kohen, University of Pennsylvania
627. Alexander Manevitz, Baruch College, CUNY
628. Seth Sanders, UC Davis
629. Jane Lehr, Professor, Cal Poly
630. Andrew Kadi
631. Lisa Uperesa, UCLA
632. Alejandra Marchevsky, Professor, California State University Los Angeles
633. Huda Ayyad
634. Elaine Chang
635. Michelle Moyd, Michigan State University
636. Ralph Ghoche, Barnard College
637. Erin White, Northeastern Illinois Alumn
638. João Florêncio, Professor of Gender Studies, Linköping University
639. May Fu, California State University, Los Angeles
640. Jessica Halliday Hardie, Hunter College CUNY
641. Mattilda Bernstein Sycamore, Author
642. Malek Abisaab, McGill University
643. James Gross Cornell University
644. Sara Heymann, Library worker
645. Sarah Elizabeth, Formerly NYU, Loyola University, UIC, DePaul University & Roosevelt University
646. Avery Gendell, Virginia Tech
647. Norma Rantisi, Concordia University
648. Marcy J. Dinius, Professor of English DePaul University, Northwestern University Ph.D. 2003

AAUP-00039

JA1803

649. Omar Rahman, Fellow, Middle East Council on Global Affairs
650. Anthony Alessandrini, City University of New York
651. Carl Gelderloos, Binghamton University (SUNY)
652. Maryann Blackburn, Illinois resident
653. Laurel George, New York University
654. Juno Salazar Parrenas, Cornell University
655. Lucien Baskin, CUNY Graduate Center
656. Vivian Lu, Rice University
657. Steven Chappell, 2023 College Media Hall of Fame; 2022 Associated Collegiate Press Pioneer Inductee;
2018 Missouri College Media Association Educator of the Year
658. Travis Chi Wing Lau, Kenyon College
659. Jordan H. Carver, Yale University
660. May Lin, Cal State Long Beach
661. Michael W. Yarbrough, City University of New York
662. Aaron Katzeman, Getty Research Institute
663. Jason Mittell, Middlebury College
664. Katherine Wilson, Fordham University
665. Haleigh Martin-Morrissey, concerned citizen
666. Charlie Wang, PhD Student, Cornell University
667. Rachele Dini, Lecturer in English and Creative Writing, Coventry University
668. Maha Nassar, University of Arizona
669. Minahil Asim, university of Ottawa
670. Heather Atherton, J.D. Candidate, Northeastern University School of Law
671. Joe Iosbaker, Chicago Alliance Against Racist & Political Repression
672. Jordana Silverstein, University of Melbourne
673. Sonia Alexander, Medill alumna
674. Naomi Braine, Professor of Sociology, Brooklyn College, CUNY
675. Ayden Scheim, Drexel University
676. Maggie Clinton, MIddlebury College
677. Meena Hasan, Harvard University
678. Mika Shibuya
679. Kirsten Weld, Harvard University
680. Susila Gurusami, UIC
681. Rebecca Vaughan, CUNY, SUNY
682. Farah Ali, DePauw University
683. Brahim Aoude, professor emeritus-University of Hawaii
684. Teri L. Caraway, Professor of Political Science, University of Minnesota, Twin Cities
685. Edwin Mayorga
686. Aren Aizura, University of Minnesota
687. Don Barry, Cornell University (retired)
688. Christopher J Smith, Texas Tech University
689. Ben Calderwood, UCLA
690. Nick Okafor, Stanford University
691. David Cohen, Swarthmore College
692. Victor Pickard, University of Pennsylvania
693. Stuart Schrader, Johns Hopkins University
694. Gia Yetikyel, Northwestern University alumni
695. Marijke Hecht, The Ohio State University

AAUP-00040

696. Jaden Janak, Assistant Professor of History, St.Olaf College
697. Vernon P Nickerson, MA (BSIE, McC 1981)
698. Elizabeth Koslov, University of California, Los Angeles
699. Shannon Sotomayor, Northwestern University, Brown University
700. Caleb Smith, Brandeis University
701. Semya Hakim, St. Cloud State University
702. Rafael A. Mutis García, Labor4Palestine
703. Georgette Kirkendall
704. Ron J Smith, Bucknell University
705. Sangina Patnaik, Swarthmore College
706. Sophia Lo, Northwestern alum
707. Raya Shapiro, University of Illinois Chicago
708. Samuel P. Catlin, Visiting Assistant Professor of Jewish Thought, University at Buffalo (SUNY)
709. Celena Chong, Northwestern University
710. Christopher Sieving, University of Georgia
711. Saadia Toor, CUNY
712. Helen Smith, University of Wisconsin-Madison
713. Onn Brown, Information Professional
714. John Blank, Berklee College of Music
715. Adam Miyashiro, Stockton University
716. Zack Furness, Penn State University
717. Andrew Ginsberg
718. Rebecca Kurti
719. Amber Martin, Hunter College CUNY
720. David Helps, University of Southern California
721. Ian Alexander, Carnegie Mellon University
722. Gregg Gonsalves, Yale University
723. Brooke Lober, UC Berkeley
724. Anders Tobiason, Boise State University
725. Alicia Badea, University of Chicago
726. Abdul Hasania
727. Eliza Epstein, PhD.
728. Ari Bloomekatz, In These Times
729. Heydy Herbert, Emory University
730. Katie Risseeuw, Northwestern University
731. Jamella Gow, Bowdoin College
732. Kevin Ouyang, PhD Student, Northwestern University
733. Duane Wright
734. helen DeVinney, George Washington University
735. Mike Duncan, University of Houston-Downtown
736. Mark Minch-de Leon, UC Riverside
737. Glen David Kuecker, Professor, DePauw University
738. Frank Anthony, UCLA
739. Joshua Sealy-Harrington, Associate Professor & Chair of Equality Law, University of Windsor, Faculty of Law
740. Jonathan Jenner, University of Manitoba
741. Bikrum Gill, Virginia Tech
742. Abby Kluchin, Ursinus College

AAUP-00041



743. Derek Pavlik
744. Amirah Ford, Northwestern University Medill Alum
745. Molly Talcott
746. Lilian Ha, Columbia University
747. Abraham Flaxman, University of Washington
748. Michelle Chen, Cornell University
749. Rahsaan Mahadeo, University of Minnesota
750. Antonio Ramirez, Associate Professor, Elgin Community College
751. Mohammad Fadel, University of Toronto Faculty of Law
752. Adam Schwartz
753. Esther Isaac, PhD Candidate, University of Chicago
754. Nicole Lopez-Jantzen, CUNY: Borough of Manhattan CC
755. Jessie Fredlund, SUNY New Paltz
756. Colin Vanderburg, New York University
757. Nick O'Reilly
758. Dan Erdman, Media Burn Archive
759. Dorotea Gucciardo, PhD, King's University College
760. Lachina McKenzie, Toronto Metropolitan University
761. Momodou Taal, cornell
762. Natalia Reyes, University of Pennsylvania
763. Suzanne Faysal  Aref AlBarghouti
764. Suzanne Kessler ( retired police officer)
765. Marina Seyffert
766. Molly Benitez, Portland State University
767. Dara Orenstein, George Washington University
768. Amanda Lapid, Northwestern alumni
769. Nicholas Holterman, Northwestern Alumnus
770. Natasha Lennard, The New School
771. Natalie Oswin
772. Ronak K. Kapadia, University of Illinois Chicago
773. Justin Flatt, Rutgers University
774. David Boyk, Northwestern University
775. Jonathan Washington, Swarthmore College
776. Alexandra Barraclough, Northwestern Medill Undergraduate and Graduate Alumna
777. Ellen Schrecker, Yeshiva University, (ret)
778. Issac Shihabi
779. Jared McCormick, NYU
780. Margaret Russell, Santa Clara University
781. Kate Zambon, University of New Hampshire
782. Scott Ritner,. University of Colorado Boulder
783. Dwight K Lewis Jr, University of Minnesota TC
784. Cathy Chu, City University of New York
785. Jennifer Goett, Michigan State University
786. Juliane Hammer, UNC Chapel Hill
787. Charisse Burden-Stelly, Wayne State University
788. Ateka Gunja
789. Esrea Perez-Bill, Northwestern University
790. Jason Horn, Medill MSJ alum ('06)
791. Risa Lieberwitz, Cornell University

AAUP-00042



792. Jeremy Zallen, Lafayette College
793. Michael Rodríguez-Muñiz, Associate Professor of Sociology, UC Berkeley
794. Jamal Ali, Rutgers University
795. Yasmin Nair, Writer
796. Emily Thuma, University of Washington Tacoma
797. Mari Rubio, The New School
798. Andres Guzman, University of Southern California
799. Michael Anthony Turcios, Northwestern University
800. Rachel Slocum, Portland State University
801. Kate Levin, Associate Professor (Teaching), University of Southern California
802. Molly Geidel, Dartmouth College
803. Charles Fogelman, University of Illinois
804. Briallen Hopper, Queens College, CUNY
805. Kate Bronfenbrenner,  Cornell University
806. Seema Golestaneh, Cornell University
807. Donatella Galella, UC Riverside
808. James Holmes, retired
809. Zeynep Korkman, UCLA
810. Naib Mian, Northwestern University
811. Héctor Alcalá, Unversity of Maryland College Park
812. Jalin Sama, Albany Medical College
813. Rae Hamilton-Vargo, Northwestern University class of 2016
814. Tannous Chalhoub, University Professor, Laval
815. Jonathan Basile, University of Toronto
816. Brendan Baum
817. Adam Spanos, University of Southern California
818. Alexandra Mathieu, Yale university
819. Tania Powers - Hofstra University - Bachelor of Arts
820. Corbin Hiday, University of Illinois at Chicago
821. Hana Masri, University of Wisconsin
822. Dina Sorour
823. Ashley Bennett, University of Southern California
824. Winona Xu, UCLA
825. John Keene, Rutgers University-Newark
826. Ashon Crawley, University of Virginia
827. Graeme Blair, UCLA
828. Isabella Schoonover, Northwestern University
829. Levi Vonk, University of Virginia
830. Darren Allumier, University of Wisconsin
831. Courtney R. Baker, Associate Professor, UC Riverside
832. Fernando Hernandez, Ventura College
833. Carlin Christy
834. Stacie Thurman, President Oxnard Educators Association
835. Elizabeth Tang, civil rights attorney
836. Sylvia Chan-Malik, Rutgers-New Brunswick
837. Jonathon Catlin, University of Rochester
838. Asma Sayeed-UCLA
839. Garrett Wright
840. Alyson K. Spurgas, Trinity College

AAUP-00043



841. Hermán Chávez, University of Colorado
842. Harris Kornstien, University of Arizona
843. Armando García, University of California, Riverside
844. Jerome Clarke, American University
845. Armando García, University of California, Riverside
846. Kelly Gillespie
847. Summer Kim Lee, UCLA
848. Annabelle Dowd, Northwestern University alumni
849. Andy Lentz
850. Claire Hancock, Université Paris-Est Créteil, France
851. Stuart Chen-Hayes, CUNY Lehman College
852. Emma Stapely, UC Riverside
853. Farid Azfar, Swarthmore College
854. Matthew Evangelista, Cornell University
855. Carol Quirke, SUNY Old Westbury
856. Elizabeth Anderson, citizen
857. Hailey Bosek, Medill Graduate Student.
858. Zachary Levenson, Florida International University
859. Nir Shafir, UCSD
860. Gail Shuck, Boise State University
861. Reginald Harris, poet & writer
862. Erin Wente, University of Nevada, Las Vegas
863. Anders Riel Müller, University of Stavanger, Norway
864. Sabreen Akhter, Associate Professor, University of Washington
865. Ruari Paterson-Achenbach, University of Cambridge
866. Jennifer Kelly, University of California, Santa Cruz
867. Francisco Perez, University of Utah
868. Professor Christine Ferguson, University of Stirling
869. Anila Daulatzai, UC Berkeley
870. Wendell Nii Laryea Adjetey, McGill University
871. Klementine Burrell-Sander, the University of Sydney
872. Aoife Dare, PhD student, University College Cork, Ireland
873. Steven McAvinue, former Paratrooper and advocate for Human Rights and fact-checking
874. Dana McLachlin, Duke University
875. Ben Ehrenreich, author
876. Keith Zelinske
877. M. V. Ramana, Professor, University of British Columbia
878. Paul O'Keefe, Rutgers University
879. Andrew Delatolla, University of Leeds
880. Mollie Goldstrom
881. Ayesha Omer, York University
882. Premilla Nadasen
883. Arlo Fosburg, UC Santa Cruz
884. Martin Shaw, University of Sussex
885. Varun Bhatnagar, Northwestern alumnus
886. Eli Friedman, Cornell University
887. Afeef Nessouli, Parsons
888. Matthew Nichter, Rollins College

JA1808
AAUP-00044

889. Francesco Amoruso, University of Exeter
890. Ana Ivasiuc, University College Dublin
891. Sarah Besky, Cornell University
892. Daniel Rizk, University of Maryland
893. Ian Alan Paul, Professor Associat, Universitat Pompeu Fabra
894. Ben Shurina, Rensselaer Polytechnic Institute
895. Faye Gleisser, Associate Professor of Art History, Indiana University
896. Filip Stabrowski, LaGuardia Community College CUNY
897. Lisa Tilley, SOAS University of London
898. Maura Finkelstein, independent writer, anthropologist
899. Ian Greer, Cornell University
900. Lukas Dornieden
901. John Cox, UNC Charlotte
902. Ronald Cox, Florida International University
903. J.T. Roane, Rutgers University
904. Anand Patel, University of Chicago (Northwestern alum)
905. Christo El Morr, York University, Canada
906. Ana Maria Candela, historian (Ph.D. UC Santa Cruz)
907. Kirstie Dorr
908. Prithi Kanakamedala, Bronx Community College and The Graduate Center CUNY
909. Antonia Randolph, University of North Carolina Chapel Hill (Northwestern alum)
910. Derek Chang, Cornell University
911. Cami Touloukian, Doctoral Candidate, Teachers College, Columbia University
912. Saida Hodzic, Cornell University
913. Nancy Stern, The City College of New York, CUNY
914. Sarah Geis, lecturer Northwestern University & University of Chicago
915. Jordy Rosenberg, Professor, University of Massachusetts Amherst
916. Lindsay Thomas, Cornell University
917. Sophia Brown, FU Berlin
918. Justine Modica, Cornell University
919. Michael Kranz, individual
920. Sam Markwell, independent researcher and high school teacher
921. Mia Charlene White, The New School
922. Mark Lance, Professor emeritus, Georgetown University
923. Tarik Aougab, Haverford College
924. Ailish Hopper, Goucher College
925. Kelly Vaughan
926. Matthew Morrison, NYU
927. Anjali Enjeti, Antioch University Los Angeles
928. Farah Bakaari, Cornell University
929. Nadia Ahmad, Yale University
930. Anthony Reed, Vanderbilt University
931. Christina Burt, Evanston resident
932. Leah Bernardo-Ciddio (PhD University of Michigan '24)
933. Tey-Marie Astudillo, Medill School of Journalism Alum, M.S. 2012
934. Robert Clines, Western Carolina University
935. Ritty Lukose, New York University
936. Nanette Milner
937. Misty Saribal, Louisiana State University

AAUP-00045

938. Michelle Billies, Kingsborough Community College, CUNY
939. Shelby Capacio, Journalist
940. Amanda Holman, SESP 2021
941. David Delgado Shorter
942. Ames Robb
943. S. Ani Mukherji, HWS Colleges
944. Emma Teitelman, Cornell University
945. Randeep Samra
946. Florence Rushton, Sheffield University
947. Joseph Getzoff, Boston College
948. Shira Robinson, George Washington University
949. Rebecca Weston, LCSW private
950. Jennifer Doyle, UC Riverside
951. Wendy W. Walters, Emerson College
952. James Rushing Daniel, Seton Hall University
953. Griffin Epstein, George Brown College
954. Khaled Hroub - Professor of Middle Eastern Studies, Northwestern Univeristy/Qatar
955. Jack LaViolette, Columbia University
956. Miriam Markowitz, writer and founder of the Jewish Antifascism Alliance (JAFA)
957. Gina Chen, PhD Candidate at Carnegie Mellon University
958. Rose Werth, Northwestern University
959. David Gruskin, Columbia University
960. Tatiana Sifri
961. Kathleen Mills, Cornell University
962. Caroline Levine, Professor of Humanities, Cornell University
963. Siân Silyn Roberts, Queens College, CUNY
964. Carlos Hernandez
965. Reagan Dunham, University of Chicago
966. Dheepa Sundaram, University of Denver
967. Leila Tayeb, Northwestern University in Qatar
968. Jonathan Flatley, University of Chicago
969. Rachel Jones, City University of New York
970. Casey Mathur, UChicago
971. Sara Lefsyk, Ethel Zine & Micro Press
972. Catherine M. Appert, Cornell University
973. Marisel Vera, Novelist
974. Katherine Vallera, Freelance Journalist, Columbia College Graduate
975. Eliza Bettinger, Cornell University
976. Ebonee Johnson
977. Matt Hindman, University of Tulsa
978. Jessica Ross, Northwestern Univeristy '14 and '17
979. Kathryn Montalbano, University of Kentucky
980. Justin Rawlins, University of Tulsa
981. Elizabeth Elliott, alum, PhD Sociology, Northwestern University
982. Jenna Loyd, UW-Madison
983. Liza Bernstein
984. Hillary Haldane, Quinnipiac University
985. Heather Davis, The New School
986. Nathan Kalman-Lamb, University of New Brunswick

AAUP-00046

JA1810

987. Amelia Burke, University of Michigan

988. Aparna Nair

989. Adam Haber, Harvard University

990. Gina Fedock, University of Chicago

991. Erin Durban, University of Minnesota

992. Darlene Evans, Cornell University

993. Cassandra Leveille

994. Elizabeth Dale, University of Florida

995. Professor Ranabir Samaddar

996. Lola Dickinson, Birkbeck, University of London

997. Daniel Wilson, University of Illinois Chicago

998. Patricia Sarrafian Ward, author

999. Avi Steinberg, University of Chicago

1,000. Ashley Sellers, Florida State University, Northwestern alum

1,001. Minju Bae, NYU

1,002. Jennifer Brier, University of Illinois Chicago

1,003. Anna McCarthy, NYU

1,004. Leslyn Stobbs, University of Toronto

1,005. Jieyi Cai, Visiting Assistant Professor, Macalester College

1,006. David Stein, University of California, Santa Barbara

1,007. Simeon Man, UC San Diego

1,008. Jennie Ikuta, University of Missouri-Columbia

1,009. Anjo Brekalo, UW-Madison

1,010. Gail Buttorff, University of Houston

1,011. Nick Burke, University of Sheffield

1,012. Sarah Covington, City University of New York

1,013. Zoe Smith, Loyola University Chicago

1,014. Ameena Ghaffar-Kucher, UPenn

1,015. Cynthia Cox, Northwestern University, 1987

1,016. Andrew Parayil Boge, University of Maryland, College Park

1,017. Auna Stewart

1,018. Frederick Neuhouser, Columbia University

1,019. Jean Beaman/CUNY Graduate Center and University of California-Santa Barbara

1,020. Alan Wald, H. Chandler Davis Collegiate Professor Emeritus, University of Michigan

1,021. Ariel Sheffey, Northwestern University 2020

1,022. Lois Weiner, Professor Emerita, New Jersey City University

1,023. Avik Chatterjee, Boston University

1,024. Charles Gelman, New York University

1,025. Stephen Scapelliti

1,026. Crystal Garcia, Associate Professor, University of Nebraska-Lincoln

1,027. Mark Rice, Baruch College

1,028. Jean Bae, NYU

1,029. Lewis Oh, Northwestern '22

1,030. Shannon Cutler

1,031. Angela Harris, Seattle University School of Law

1,032. Gary Krenz, NU CAS '80, retired Univ of Michigan lecturer and director

1,033. Stephen Wulff, University of Tennessee-Knoxville

1,034. Scott Williams

1,035. Kentaro Toyama, University of Michigan

AAUP-00047

1,036. Benjamin Goldfrank, Seton Hall University

1,037. Sidra Kamran, Assistant Professor, Lewis & Clark College

1,038. Kiran James, Executive Director, Kalapriya

1,039. India Hilty, University of Chicago Pritzker School of Medicine

1,040. Keith Woodward, University of Wisconsin–Madison

1,041. Stephen Charbonneau, Florida Atlantic University

1,042. Samer Ali, Associate Professor, U of Michigan

1,043. KD Thompson, University of Wisconsin-Madison

1,044. Jennifer Row, university of Minnesota

1,045. Gabriel Mercogliano, Evergreen '19, MCAD

1,046. Alan Hedrick

1,047. Jeremiah Chin, University of Washington

1,048. Shoshana Schwebel, University of British Columbia

1,049. Emmeline Kaiser

1,050. Sam Casey, Northwestern University staff

1,051. Kelly Smith-Frank, Carnegie Mellon 2011

1,052. Jake Nussbaum, The Library Company of Philadelphia

1,053. Christopher Martell, Associate Professor, University of Massachusetts Boston

1,054. V.V. Ganeshananthan, University of Minnesota

1,055. Farnoosh Fathi, Barnard College

1,056. Mobina Hashmi, Brooklyn College - CUNY

1,057. Jane Mantey, Dir. of Narrative and Cultural Strategies at Race Forward and freelance writer.

1,058. Naina Khanna, founding executive director, Positive Women's Network-USA

1,059. Michael Drexler, Professor of English, Bucknell University

1,060. Britt Rusert, UMass Amherst

1,061. Brian Sargent, University of Massachusetts Amherst

1,062. John Willoughby, Economics, American University

1,063. Elizabeth Casline, Northwestern University

1,064. Steve Fernandez, (unable to provide affiliation due to employment risk)

1,065. Megan Wilson

1,066. Alan Maass, Northwestern University, 1984

1,067. Madeline Hennessey, University of Michigan

1,068. Haley Stehulak

1,069. Prathim-Maya Dora-Laskey, Alma College

1,070. Ayasha Guerin, UCLA

1,071. David Young, Retired Educator

1,072. Megan Wilson, Clarion Alley MuralProject

1,073. Zirwat Chowdhury, UCLA

1,074. Gabriel Hetland, SUNY Albany

1,075. Yogita Goyal, Professor, UCLA

1,076. Maggie Brown, The College of Wooster

1,077. Em Gunter, Student Worker, University of Virginia

1,078. Adam Parker, journalist

1,079. R. D. Hamilton, Baruch College, CUNY

1,080. Kathleen Forslund , University of Chicago alum

1,081. Gayatri Gopinath, Professor, NYU

1,082. David Levitsky, Cornell University

1,083. Tali Ruskin, university of Pennsylvania

AAUP-00048

1,084. Kaliris Salas, RWJMS

1,085. Ray Bush, Emeritus Uni Leeds

1,086. David Hobbs, University of Lethbridge

1,087. Melissa Barone, teacher

1,088. Robert Lynn, Texas Tech University (PhD student)

1,089. Anjelica O'Brien, SUNY Purchase 2013

1,090. Kuros Charney, William Paterson University

1,091. Jane Marcellus, writer/Medill alum

1,092. Meera Sakthivel, University of Chicago

1,093. Sondra Morin, former Northwestern Employee

1,094. Emmaia Gelman, Institute for the Critical Study of Zionism

1,095. Trevor Lies, University of Kansas

1,096. Katarzyna Bartoszyńska, Ithaca College

1,097. Jacinda Swanson, Western Michigan University

1,098. Dorothy Kim, Brandeis University

1,099. Svati Shah, Associate Professor, UMass Amherst

1,100. Julie DiCaro, Writer

1,096. Katarzyna Bartoszyńska, Ithaca College

1,097. Jacinda Swanson, Western Michigan University

1,098. Dorothy Kim, Brandeis University

1,099. Svati Shah, Associate Professor, UMass Amherst

1,100. Julie DiCaro, Writer

1,101. Miss Rosen, Journalist

1,102. Gina Morong, individual

1,103. Prof. Mario D, Garrett, San Diego State University

1,104. Jules Boykoff, Pacific University

1,105. Natalie Southwick, Medill '10 alum

1,106. Maryam Jamshidi, University of Colorado Law School

1,107. Nadia Segura, Stanford University

1,108. Matthew Thomas Miller, University of Maryland

1,109. Glenn Hendler, Professor of English and American Studies, Fordham University

1,110. Aneil Rallin, Retired Associate Professor of Rhetoric and Composition

1,111. Dr. Earl Aguilera, California State University, East Bay

1,112. Mohammed Albow, University of Denver

1,113. Kate Duva, writer

1,114. Jeff Melnick, UMass Boston

1,115. Sue Breckenridge, Northwestern University alum ('89)

1,116. Emily Fishkin, Northwestern University Class of 2016

1,117. Keona Katrice Ervin, Bowdoin College

1,118. Kelly McHugh, UNC Chapel Hill

1,119. Hannah Jackson, Northwestern alum

1,120. Shannon Gleeson, Cornell University

1,121. Shiraz Ahmed, University of Mississippi (Medill alum 13)

1,122. Maya Mikdashi, Rutgers University

1,123. Ayanna Legros, Northwestern Alumna

1,124. Ronnie Berg, individual

1,125. Daniel Olmos, Associate Professor of Sociology, CSU Northridge

1,126. Leo Parascondola, William Paterson University

1,127. Ryan Marks



AAUP-00049

1,128. Joshua Cooper, University of South Carolina

1,129. Alhaji Conteh, Hunter College-CUNY

1,130. Jennifer Ruth, Professor, Portland State University

1,131. Elena Ailes, School of the Art Institute of Chicago

1,132. Jacob Quinn Shenker, PhD, researcher

1,133. Ann Pellegrini, New York University

1,134. Emma Greenstein

1,135. Walter Meier, San Francisco State University '95

1,136. Raymond Craib, Marie Underhill Noll Professor of History, Cornell University

1,137. Karen Reyes, Medill Alum

1,138. Ernest Hardy, author/journalist

1,139. Samuel Sachs, brother and son of NU alum

1,140. Adrian Avalos, Stanford University

1,141. Dori Rodriguez, Stanford University

1,142. Rashmi Luther, Professor (retired), school of Social Work, Carleton University

1,143. Kristofer Petersen-Overton, Babson College

1,144. Nate Schmidt, PhD, IU Bloomington

1,145. Heather Freeman, PhD

1,146. Jason Read, Professor of Philosophy, University of Southern Maine

1,147. Rosalind Petchesky, Hunter College & the Graduate Center, CUNY (retired)

1,148. Johnicia Bailey, Community Member

1,149. Lukas Daniel Klausner, St. Pölten University of Applied Sciences

1,150. Asli Peker, NYU

1,151. Naka Elelleh, Northeastern University PhD

1,152. Schneur Newfield, Associate Professor of sociology and Jewish Studies, Hunter College, CUNY

1,153. Victoria Barron, Educator

1,154. Joe McComb, University of Colorado Boulder alumni

1,155. Mars Alvarez, Dartmouth College '21

1,156. Michael Letwin, former President, Association of Legal Aid Attorneys/UAW 2325; Labor for Palestine

1,157. Ian Barnard, Professor of Rhetoric and Composition, Chapman University

1,158. Jack Schimmel, class of 2019

1,159. Dr. Eamonn Crudden, Dundalk Institute of Technology, Dundalk, Republic of Ireland

1,160. Kelly Reyna, Emory University

1,161. Hồng-Ân Trương, UNC Chapel Hill

1,162. Queen Adesuyi, Partner, Reframe Health and Justice

1,163. Krishna Stone, activist

1,164. Mila Re, UC Santa Cruz

1,165. Nancy Khalil, UMich Ann Arbor

1,166. Eric Cheyfitz, Ernest I. White Professor of American Studies and Humane Letters, Cornell University

1,167. Cathy Park Hong, Professor, UC Berkeley

1,168. David Faust

1,169. Subini Annamma, Stanford University

1,170. Lauren Baker, PhD Candidate Northwestern University Department of Political Science

1,171. Merryl A. Sloane, academic editor

1,172. Chantal David, Concordia University

AAUP-00050

1,173. Alexis rodriguez, LAUSD, RGBanditos Collective Co-founder

1,174. Refia Aliyeva

1,175. David Klein, Emeritus Professor, Cal State Northridge

1,176. Kathryn Pope, Libraries staff, Columbia University

1,177. JH, University of Reading

1,178. Jill Spiker, Northwestern alum

1,179. Susan Zieger, UC Riverside

1,180. Taylor Billings

1,181. Sandra Radwan, Northwestern Alum '21, Law Student

1,182. Rebecca Cohen, Medill alumna

1,183. Beth Jenkins

1,184. Pheroze Unwalla, University of British Columbia

1,185. Julie Kliegman, Medill '13

1,186. Mohammad Anadani

1,187. Dora Segall, Northwestern alum

1,188. Barbara Strupp, Cornell University

1,189. Boutayna Chokrane, Northwestern Alum

1,190. Lina Asaad,  Graduate from Sciences Po Paris + University of Jordan

1,191. Jana AlSaad

1,192. Murad Banaji, University of Oxford

1,193. Ekin Kiyici, Yeshiva University

1,194. Loraine Frintrup

1,195. Katherine Lee, Sonoma State University

1,196. Jai Broome, University of Washington; WCAS 2013

1,197. Cameron Roberts, Northwestern University

1,198. Taylor Billings

1,199. Sarah Stark, Medill MSJ alumna and freelance journalist

1,200. Tanya Tovar, Northwestern University

1,201. Jared Hanson, individual

1,202. Andrew Bell, Cornell University

1,203. Isabella Soto, Medill '19

1,204. Molly DiTullio

1,205. Violet Barron, Harvard College

1,206. Amanda Lagji, Associate Professor Pitzer College

1,207. Nasser Abourahme, Bowdoin College

1,208. Emma Drake, Northwestern '21

1,209. Melissa Thompson, Professor of Sociology, Portland State University

1,210. Yahya Salem, Northwestern Alum

1,211. Evan Murphy, MS Colorado School of Mines

1,212. Hannah Baggenstoss, NU alum

1,213. Matt Mager

1,214. Charlotte Karem albrecht, University of Michigan

1,215. Zahir Janmohamed, Bowdoin College

1,216. Hanna Kaufman, JD, Illinois resident

1,217. Diane Bush

1,218. Christopher Berardino, UC Riverside

1,219. Jennifer L. Morgan, Professor of History, Dept of SCA, New York University

1,220. Elizabeth Wood



AAUP-00051

1,221. Irie Evans

1,222. Adam Sitze, 951 Professor in Law, Jurisprudence and Social Thought, Amherst College

1,223. Traise Yamamoto, UC Riverside

1,224. Fuson Wang, University of California, Riverside

1,225. Bianca C. Williams, Bowdoin College

1,226. Eran Zelnik, California State University, Chico

1,227. Zenia Kish, Ontario Tech University

1,228. Ranna Shahbazi, Northwestern Alum

1,229. Gabriela Dickson La Rotta, American University Washington College of Law

1,230. Francesca Martinez, NU community member

1,231. Elizabeth Wrigley-Field, McKnight Presidential Scholar and Associate Professor of Sociology, University of Minnesota, Twin Cities

1,232. Kate Ringland, University of California Santa Cruz

1,233. Linus Höller, Medill '23

1,234. Seppo Niemi-Colvin, Indiana University

1,235. Professor David Lloyd

1,236. Enid Blount Press, Individual

1,237. Kevin Winkler, City University of New York

1,238. Rachel Rubin, MD, MPH, University of Illinois School of Public Health

1,239. Kera Bolonik

1,240. Sherene Seikaly, UCSB

1,241. sang kil, job suspended professor at San Jose state

1,242. Albert Armstrong, Adjunct Instructor, University of Massachusetts Boston

1,243. Colin Bossen, Distinguished Scholar, Starr King School for the Ministry1,244. Andrew Montequin, Northwestern University

1,244. Ariek Norford, Stony Brook University

1,245. Syeda Masood, Hamline university

1,246. Konstanze Kobel-Höller, journalist

1,247. Sharareh Frouzesh, UC Irvine

1,248. Sonia Hernandez, Texas A&M University

1,249. Lynn Comerford, CSU East Bay

1,250. Carolyne Thrasher, no relation to Dr. Steven Thrasher

1,251. Neha Pashankar, alumni of Northwestern University 2022

1,252. Maureen Milligan, Staff, University at Buffalo, United University Professions (UUP)

1,253. William Meaney, former SBU grad student

1,254. Xelena González, author (Medill '01)

1,255. Ken habib, Cal Poly

1,256. Max Abrams, Medill '21

1,257. Lorraine Nibut, Designing Justice + Designing Spaces

1,258. Constance Penley, Professor Emerita, University of California-Santa Barbara

1,259. Andrew Gurza, Disability Consultant

1,260. Nantina Vgontzas, City University of New York

1,261. Nerissa Russell, Cornell University

1,262. Sam del Corral, Individual

1,263. Diego Alcalá Laboy, Assistant Professor, Albany Law School

1,264. Nour El Didi, Concordia University of Montreal

1,265. Nicholas De Dominic, University of Southern California

1,266. Will Clark, Assistant Professor,  San Francisco State University

AAUP-00052

1,267. Scott Tobias, The Reveal
1,268. Marta Knapstad Narlesky
1,269. Mildred Williamson, Retired HIV Services Director, Cook County Health
1,270. Rachel Kwak, UC Davis School of Law, Northwestern University Alumna
1,271. Madisyn Robinson, student
1,272. James Nealy, New York University
1,273. Emi Sawada, University of Illinois, Urbana-Champaign
1,274. Jessica Fremland, Brown University
1,275. Cormac Collins, Brown University
1,276. Eva Davis, Curator and Arts Advocate
1,277. Dylan Rodríguez, Distinguished Professor, University of California
1,278. Jill Rounds, University of Rhode Island
1,279. Kushal Gourikrishna, Northwestern University (2018)
1,280. Daria Reaven, NYU
1,281. Matthew Ritchie, Medill '22
1,282. Jason Rogers, Rogers Law Company, P.C.
1,283. Andrew Lee, University of California, Santa Barbara
1,284. Whitney Jordan, Northwestern alum
1,285. James Walker
1,286. Farshid Baghai, Villanova University
1,287. Sean Malloy, University of California, Merced
1,288. Zane Weissman, Worcester Polytechnic Institute
1,289. Gregory J Seigworth, Millersville University
1,290. Trevor Jensen
1,291. Ashley Shew, Virginia Tech
1,292. Ruth Marshall, Associate Professor, University of Toronto
1,293. Franco Barchiesi, Ohio State University
1,294. Caitlin Wood
1,295. Kate Clancy, Professor of Anthropology, University of Illinois Urbana-Champaign
1,296. Muriel Leung, California Institute of the Arts
1,297. Dan Sloan, WCAS '13
1,298. Corey Campbell, writer
1,299. Ahlam Muhtaseb, Media Studies, California State University, San Bernardino
1,300. Alexandra Andrade
1,301. Chris McGowan, Lecturer, Yale University
1,302. Natasha Raheja, Cornell University
1,303. Morgan O'Neill, University of Toronto
1,304. Maryam Kashani, Associate Professor, University of Illinois at Urbana-Champaign
1,305. Martha Jackson, Northwestern University
1,306. Paul David Wadler, Ph.D.
1,307. Kara Gillmore, colleague
1,308. MT Vallarta, Cal Poly San Luis Obispo
1,309. Claire Alexander, BSN, RN, PMH-BC
1,310. Junaid Rana, University of Illinois at Urbana-Champaign
1,311. Anthony Ratcliff, Professor of Pan-African Studies at Cal State Los Angeles
1,312. Brent Armendinger, Professor of English and World Literature, Pitzer College
1,313. Jim DelRosso, Cornell University
1,314. Jennifer Mogannam, UC Santa Cruz
1,315. Ramin Yadegari, Professor, University of Arizona

AAUP-00053
JA1817

1,316. Ashraf Tubeileh, Associate Professor, California Polytechnic State University, San Luis Obispo, CA

1,317. Ahmed Deif, California Polytechnic State University

1,318. James Finley, Associate Professor, Texas A&M University - San Antonio

1,319. Devin Bryson, professor, Illinois College

1,320. Taher Saif, University of Illinois at Urbana-Champaign

1,321. Lauren Kang, The University of Chicago Pritzker School of Medicine

1,322. Richard Zili, Chicago resident

1,323. A.W. Peet, Professor, University of Toronto

1,324. Kevin A. Young, UMass Amherst

1,325. Jan Nespor, The Ohio State University

1,326. Deepa Kumar, Professor, Journalism and Media Studies, Rutgers University.

1,327. David Finkel., editor, AGAINST THE CURRENT magazine

1,328. Naib Mian, Northwestern University (Medill '17)

1,329. Millie Thayer, University of Massachusetts, Amherst

1,330. Tim Charlebois, Political Science, Northwestern University

1,331. Shannon Winnubst, Ohio State University

1,332. Sam Wrigglesworth, The Ohio State University

1,333. Ednie Kaeh Garrison, Cal Poly San Luis Obispo

1,334. Gwyneth Lonergan, Northumbria University

1,335. Shane Young

1,336. Jonathan Combs-Schilling, Ohio State University

1,337. Hunter Felt, writer

1,338. Ruth Sergel, Street Pictures

1,339. Jordan Lome, Disability Consultant

1,340. Marisol LeBrón, Associate Professor of Critical Race and Ethnic Studies at UCSC

1,341. Wendi Williams, Medill School of Journalism alum

1,342. Mark S. James

1,343. Charles Schultz IV, Northwestern University Alumnus

1,344. Ross Smith, Vancouver Public Library, CUPE 391

1,345. Reese Owens, Northwestern University

1,346. Leila Kawar, University of Michigan

1,347. K Ware, parent of enrolled Northwestern University Student

1,348. Lauren Manning, Medill '13

1,349. Sarah Unruh, University of Minnesota

1,350. J. E. Vidal

1,351. Maria Bustillos

1,352. Alyssa Baldridge, UNL alum

1,353. Ann Russo, DePaul University

1,354. Luke Jarzyna, graduate student

1,355. Kelly McElroy, Associate Professor, Oregon State University

1,356. Sophia Artola, WCAS 22

1,357. Javier Osorio, University of Arizona

1,358. Mahruq Khan, U of IL, Urbana-Champaign

1,359. Daisy Conant, Medill '22, thesis advisee of Dr. Thrasher (and winner of the Carl Smith Prize for Best Thesis in American Studies, an award I largely attribute to Dr. Thrasher's guidance)

1,360. Laura Kina, Professor, The Art School, DePaul University

1,361. Marji Mendelsohn-parent of 2NW alums.

AAUP-00054

1,362. Malini Ranganathan, American University
1,363. Jian Neo Chen, The Ohio State University
1,364. Dylan Stillwood, Columbia University alum, CC '04
1,365. Margaret Miller, CUNY Graduate Center and Brooklyn College
1,366. Mark Berrettini, Professor, Portland State University
1,367. Noe Pliego Campos, Assistant Professor of History, Wabash College
1,368. Matt Kavanagh, Okanagan College
1,369. Lydia Saravia, DePaul University
1,370. Sarah Irving, University of Staffordshire
1,371. Sarah Shulist, Queen's University
1,372. Nakho Kim, Drexel University
1,373. Dan Hu, Medill '23
1,374. Arben Kalziqi, PhD, Georgia Tech '19
1,375. Ruha Benjamin
1,376. Liam Lecka, Medill '21
1,377. Rachel G Riskind, Guilford College
1,378. Mel Katz, The College of New Jersey
1,379. Chaz Baker, Mass College of Liberal Arts
1,380. James Tobias, UC Riverside
1,381. Emma Follman, PhD Candidate, Stanford
1,382. David K. Seitz, Harvey Mudd College
1,383. Noe Montez, Emory University
1,384. Katelyn Taylor, Northwestern University
1,385. Michael Palm, UNC-Chapel Hill
1,386. Sky Minkoff, student, SUNY Oswego
1,387. Dana Knisely-Southerland, Individual
1,388. Dror WARSCHAWSKI, Sorbonne Université, Paris, France
1,389. Jasmin Patrón-Vargas, Texas A&M University
1,390. The Rev. Jarrett Kerbel (NU 89, CAS)
1,391. Dana Francisco Miranda, University of Massachusetts Boston
1,392. Stephanie Flores Loyola University MD
1,393. Constance Istratescu, JD, GGU School of Law
1,394. Emily Runde, Columbia University
1,395. Olivia Stent, Northwestern University
1,396. Masa Dajani, Queen's University
1,397. Dr. Randa Tawil, University of Washington
1,398. Rossa Coyle, Student, Queen's University Belfast
1,399. Greg Peshek (Northwestern Alumni 2013)
1,400. Matt Hauske, Purdue University
1,401. Caryn Bell
1,402. Sara Rezvi, Dominican University
1,403. Ellis Garey, Postdoctoral Fellow, Brown University
1,404. Andrew Cornell, PhD, New York University
1,405. Maya Hislop, Cal Poly San Luis Obispo
1,406. Taylor Bell, University of California, Davis
1,407. J. T. Huitt, Angry
1,408. Gary Hoyano
1,409. Natalia Cecire, University of Sussex
1,410. Jocelyn Leitzinger, University of Illinois Chicago

JA1819

AAUP-00055

1,411. Tosten Burks, Los Angeles Review of Books
1,412. Eli Lichtenstein, Lewis & Clark College, Northwestern Alum
1,413. Alex Sher, Northwestern University (Medill 2018)
1,414. Matthew Blesse, Individual
1,415. Adam Gordon, Assistant Professor, Northwestern University
1,416. Kelly McKinney, John Abbott College
1,417. Rebecca Dickinson, University of Northern Iowa
1,418. Marios Falaris, Johns Hopkins University
1,419. Mary Wong, University of New Mexico
1,420. Ashara Ekundayo, Artist As First Responder
1,421. Kendra Calhoun, University of Illinois, Urbana-Champaign
1,422. Anup Grewal, University of Toronto
1,423. Anna-Claire Steffen, UMass Amherst
1,424. Constance Gordon, San Francisco State University
1,425. Carrie Matthews, Assoc. Teaching Prof, UW Seattle
1,426. Matthieu Chapman, SUNY New Paltz
1,427. Eliot Cardinaux, Individual
1,428. Neil deMause, journalist
1,429. Denise M. Walsh, University of Virginia
1,430. Diana Casteel, University of Illinois at Chicago
1,431. Alexander Wallace
1,432. Abou Farman, The New School
1,433. Ivan Albertson, Northwestern University
1,434. Sheila Orr
1,435. Ben Curtis, Rhodes College
1,436. Ranita Ray, University of New Mexico
1,437. Ellen Dichner, City University of New York
1,438. Sarah Gessler, Concerned Citizen
1,439. Samer Hassan, Harvard
1,440. Ann Douglas, author
1,441. Natalie Lin, Medill '22
1,442. Nina Harawa at UCLA
1,443. Annelise Orleck, Dartmouth College
1,444. David Kanj, UC Berkeley
1,445. Anne Mahady, PhD (IU alumni)
1,446. Alexandria Ramos, University of Washington (Seattle)
1,447. Victoria Reyes, University of California, Riverside
1,448. Tamara Malhas, University of British Columbia
1,449. Iman Alfayez, Toronto Metropolitan University
1,450. Zein Haj Hasan, University British of Columbia
1,451. Mirian Martinez-Aranda, Sociology, UC Irvine
1,452. Greg Purcell, UMass Amherst
1,453. Angela Inferrera,
1,454. Daniel Abbe (WCAS 2006)
1,455. Axeen James
1,456. Kayla Little, Northwestern University
1,457. Julilly Kohler Hausmann, Cornell University
1,458. Susanna Collinson, UCSC
1,459. Matthew Farish, University of Toronto

AAUP-00056



1,460. Myca Treat

1,461. S. Shimono, UC Berkeley

1,462. Joan S. M. Meyers, Cal Poly, San Luis Obispo

1,463. Andrea Denny-Brown, University of California, Riverside

1,464. Soo-Young Kim, Princeton University

1,465. Erika L. Iverson

1,466. Hilary Strang, University of Chicago

1,467. Laila Shereen Sakr, UCSB

1,468. Ahmed Elbanna, University of Illinois

1,469. Jade Pagkas-Bather, Assistant Professor of Medicine

1,470. Pedro Alonso Serrano, MPH, CPH

1,471. Jennifer Cypher, PhD

1,472. Laura Quilter, Librarian & Attorney, University of Massachusetts Amherst

1,473. Tristan Cabello (Senior Lecturer, The Johns Hopkins University)

1,474. Zach Watson, University of Virginia

1,475. Alicia Boyce, PhD, Chapman University

1,476. Vivian Yan-Gonzalez, Chapman University

1,477. Alex Chun, Brown University

1,478. Maria Pyra, Northwestern University

1,479. B Waid, CSU Fullerton

1,480. Anna Carvlin, Eastern New Mexico University

1,481. Erika Marin-Spiotta, UW-Madison

1,482. soto jesus

1,483. Brett Story, University of Toronto

1,484. Amber Larks, Washington State University

1,485. Audrey Zhou, Northwestern University '25

1,486. Robin L. Turner, Butler University

1,487. John Gianvito, Emerson College

1,488. Julia Bernier, W&J College

1,489. Nels Highberg, University of Hartford

1,490. Naomi Schneider, University of California

1,491. Natalie Oswin, University of Toronto

1,492. Pamela J. Smock, University of Michigan

1,493. Kendall Thomas, Columbia University

1,494. Faisal Chaudhry, University of Massachusetts

1,495. Brittney Cooper, Rutgers University

1,496. E. Wayles Browne, emeritus, Cornell University

1,497. Barry Eidlin, Associate Professor of Sociology, McGill University

1,498. Jay Jordan, University of Utah

1,499. Ishan Santra, Michigan State University

1,500. Sherryl Kleinman, Professor Emerita, UNC

1,501. Charlotte Jacobs, adjunct associate professor, University of Pennsylvania

1,502. Jodi Howard, Northwestern University 1991

1,503. Mandi Spishak-Thomas, Rutgers University

1,504. Lauren Bailey, NYU '99

1,505. Javiera Barandiaran, UCSB

1,506. Anna Anthropy, DePaul University

1,507. Fatima Suarez, UNLV

1,508. Martin Hunter, Senior Lecturer, Biomedical Engineering, UMass Amherst

AAUP-00057

JA1821

1,509. Jevan Hutson, University of Washington

1,510. Patricio Boyer, Davidson College

1,511. Ruhan Nagra, University of Utah

1,512. Fatima Suarez, UNLV

1,513. Maile Arvin, University of Utah

1,514. James G. Buell, Ph.D., Independent Researcher

1,515. Sara Johnson, Moore College of Art & Design alumna

1,516. Dalton Lackey, University of Maryland

1,517. Cynthia Wu, Indiana U

1,518. Lauren May Washington, Northwestern University Alum

1,519. Krystal Alvarez-Hernandez, Northwestern University

1,520. Heba Khalil, Nebraska Wesleyan University

1,521. Zoë Plakias, Western Washington University

1,522. Franco Posa, McCormick 2016

1,523. Cole Sias, Northwestern University '22 and '25

1,524. Helen Lee, Medill School of Journalism 2018

1,525. Varda Nisar, Concordia University

1,526. Kamel Awayda, UCSF

1,527. Laura Blecha, Associate Professor, University of Florida, NU alum ('05)

1,528. John Hames, PhD

1,529. Morgan Amonett, Graduate Student, University of Virginia

1,530. Mary Moussa, Hunter College

1,531. Christina Connerton, none

1,532. Julie Ming Liang, Northwestern University Alum

1,533. Kristin Meekes, Ottawa ON

1,534. Michael Angland, Northwestern University

1,535. Naomi Banuelos-Lozano, MA University of Macedonia, BA NU

1,536. Kaya Baker

1,537. David Srouji, UC Irvine, USC

1,538. Foaad Khosmood, California Polytechnic State University

1,539. Tosten Burks, Medill '15

1,540. Raphaëlle Fourlinnie, EHESS, France

1,541. Ian Walling, Whitman College

1,542. Brian Shuve, Harvey Mudd College

1,543. P. Kerim Friedman, National Dong Hwa University, TAIWAN

1,544. Jude bawalsa

1,545. Ann E. Lopez

1,546. Maria Paz Noyen, writer

1,547. Sayeedul Islam Associate Professor Farmingdale state college

1,548. Jodi A. Byrd, University of Chicago

1,549. Mara Kelly, Northwestern University '21

1,550. Atalia Omer, The University of Notre Dame

1,551. Rachel Burten, University of Massachusetts Amherst

1,552. Abbas Khan, Medill alum

1,553. Sole Anatrone, Vassar Collehe

1,554. Connie Chow

1,555. Jessica Cook-Qurayshi, DePaul

1,556. Diane Johnson, Ph.D., independent scholar

1,557. Michael McIntyre, Associate Professor of International Studies, DePaul University

AAUP-00058

JA1822

1,558. Michael Rogerson, NU Alum

1,559. Alex Sayf Cummings, Georgia State University

1,560. Megan Unden, UCSB & Rutgers alum

1,561. Douglas Struck, Senior Journalist-in-Residence, Emerson College

1,562. Taina Maki Chahal, Lakehead University

1,563. Tatiana Anoushian, Northwestern University

1,564. Kathleen Brown, University of Michigan

1,565. Alexandria Boutros, DePaul Alumni

1,566. Laura Tanenbaum, LaGuardia Community College/City University of New York

1,567. Chad Anderson, Incheon National University

1,568. Aaron Dorman, Medill alum and journalist

1,569. Ariel Mae Lambe, University of Connecticut

1,570. Chris Robinson, Clarkson University

1,571. Matt Lazio MD, NU WCAS '01

1,572. Susan Bernofsky, Professor, Columbia University

1,573. Ramon Esquivel, California Polytechnic State University, San Luis Obispo

1,574. Meghan A. Watts, PhD Student, North Carolina State University

1,575. Charlotte Tauss, Northwestern Alum

1,576. Albert Stabler, Illinois State University

1,577. Seth Uzman, PhD Student, University of Houston

1,578. Felice Blake, UC Santa Barbara

1,579. Ishan Daya, Northwestern University ('13)

1,580. Christie Toth, University of Utah

1,581. Laila Farah Depaul University

1,582. RiShawn Biddle, Dropout Nation

1,583. Lewis Rosenbaum, individual

1,584. Alexandra Gjesdahl

1,585. Reza Talebi, University of Leipzig

1,586. Sahar D. Sattarzadeh, University of Texas at Arlington; Nelson Mandela University

1,587. Anwar Samad Montgomery, Northwestern Alum C/O 2022

1,588. Yarden Azoulay Katz, University of Michigan

1,589. Alexis Morin, M. Div '24, Union Theological Seminary

1,590. Layna Hong, Northwestern University

1,591. Dr. Emily B. Wong, Africa Health Research Institute

1,592. Ashley Quiterio, Northwestern University

1,593. Chris Baker, Loyola University Chicago

1,594. Andrew McCumber, Virginia Tech Sociology

1,595. Drew Broussard, Rough Draft Bar & Books / Literary Hub

1,596. Romeo Guzman, Claremont Graduate University

1,597. J. Giacalone, Public School Teacher

1,598. Jorge Zeballos, individual

1,599. Deen Sharp, LSE

1,600. Dusty Baker, Northwestern University

1,601. Chance Douglas, Riverside Culinary Academy '21

1,602. Evelyn zermeno, uci alum

1,603. Matthew Cunningham-Cook, NewsGuild-CWA rank and file

1,604. Allyson Byers, Northwestern University, Medill School alum

1,605. Sana Saeed, independent journalist

1,606. Dr. B. Richard Cook, emerita

AAUP-00059



1,607. Fatima Zaheer, Northwestern University 2009
1,608. Adam Pumm, WCAS '10
1,609. Nida Pervez, Northwestern University
1,610. Dylan Flesch, New York Public Radio
1,611. Sana Ali, Northwestern University
1,612. Matt O'Driscoll, reader
1,613. Bassel Ghandour, University of Southern California Alum
1,614. Manal Saleh, NU Class of 2016
1,615. Sarah Shaaban, NU SoC 2012
1,616. Imane Ridouh, Northwestern University
1,617. Heather White, Northwestern University
1,618. Hibah Shariff, Medill 2009
1,619. Scott Kelley, San Diego State University
1,620. Michelle Felix, photographer
1,621. Ariana Thompson-Lastad, University of California San Francisco
1,622. Xiaobo Yuan, Whitman College
1,623. Beth Herbel-Eisenmann, Michigan State University
1,624. Nour Saudi, CUNY Journalism School alum and journalist
1,625. Melissa Phruksachart, Assistant Professor, University of Michigan
1,626. Amanda Fanniff, Northwestern alum
1,627. David A. Briggs
1,628. Karen Sewick
1,629. Ingrid Semaan, University of Connecticut
1,630. Rachel Klein, USC
1,631. Rebecca Givan, Rutgers University
1,632. Brittany Croone, Northwestern alumna
1,633. Sarah Dar, WCAS '09
1,634. Jisoo Kim, University of the South
1,635. Gabriella Martinez, Baldwin Wallace University
1,636. Asma Ahmad, Medill 2010
1,637. Imoye Francis, Individual
1,638. Alissa Weber
1,639. Loren March, York University
1,640. Lydia Platón
1,641. Delaney Glassner, Northwestern alum
1,642. Mariana Gutierrez Lowe, Northwestern University
1,643. S Tanaka Independent Scholar
1,644. Syed Ali, Long Island University
1,645. Shawna Williams, freelance journalist
1,646. Fizza Joffrey, University of Oxford
1,647. Alida Bouris, Associate Professor, University of Chicago
1,648. Professor Priyamvada Gopal
1,649. Dave Lambert, unaffiliated
1,650. Pantea Javidan, Stanford University
1,651. Christopher Alario, librarian, Northwestern University in Qatar
1,652. Ahmad Haidar, McGill university
1,653. Adam El-Sayed, Carleton University (23')
1,654. Steven Pierce, University of Manchester
1,655. Lauren Stokes, Northwestern University

AAUP-00060
JA1824

1,656. Alan Aja, Brooklyn College (CUNY)

1,657. Catherine Denial, Knox College

1,658. Dr. Pauline Strong, U of Texas at Austin

1,659. Patricia Alessandrini, Rieman and Baketel Fellow for Music, Radcliffe Institute for Advanced Studies, Harvard University

1,660. Paula Fernandez

1,661. Mathew Foresta, Writer

1,662. Claudia Calhoon, CUNY York College

1,663. Jessica Becker, individual

1,664. Kenn Vance, John Jay College CUNY

1,665. Ann Braithwaite, University of Prince Edward Island

1,666. Nathan Tempey, journalist

1,667. Kevin Gannon, Queens University

1,668. Kirk Ahrens, individual

1,669. L.H. Roper, State University of New York--New Paltz

1,670. Jamie McHugh, independent researcher

1,671. Derek Newman, Harvard University '90

1,672. Jaclyn Michael, University of Tennessee at Chattanooga

1,673. Sarah Sophie Flicker

1,674. Dr. Sara Fadlalla, Northwestern University 2011

1,675. Alice Finen, Mistwood Educational Center

1,676. Nishant Shahani, Washington State University Vancouver

1,677. Kaelin Rapport, Northwestern Alum

1,678. Jennifer Ibarra, Northwestern alum

1,679. John Maerhofer, Rutgers

1,680. Stella Linder Byrne

1,681. Heather Jaber, Northwestern University Qatar

1,682. Trisha Remetir, UC Riverside

1,683. Max Cavitch, University of Pennsylvania

1,684. Amit Baishya,Associate Professor, English, University of Oklahoma

1,685. Katherine Gillen, Texas A&M University-San Antonio

1,686. Layla Williams, OU

1,687. Nesrine Chahine, TTU

1,688. Ashley Hope Pérez, The Ohio State University

1,689. Hannah Manshel, University of Hawaii Mānoa

1,690. Raj Chetty, St. John's University

1,691. Howard Brick, Professor Emeritus of History, University of Michigan

1,692. Jackson Smith, University of Oregon

1,693. Sharon Conlon, individual

1,694. Aditi Adve, Northwestern University

1,695. Ashvin R. Kini, Stonehill College

1,696. Min Song, Boston College

1,697. Valerie Booth, Teaching Professor, Drexel University

1,698. Laura Mauldin, University of Connecticut

1,699. Sofía Sánchez, Medill '21, Presented at the American Studies Association after I report I wrote in Dr. T's FIRST class at NU was accepted under his critique and mentorship

1,700. Iszy Hirschtritt Licht, Northwestern University 2015

1,701. Maris Kreizman

1,702. Mingwei Huang, Dartmouth College

AAUP-00061

JA1825

1,703. Dominique Heinke, Northwestern 2007

1,704. Catherine Ndovu, Northwestern University

1,705. Maud McInerney, Haverford College

1,706. Jose Camacho, University of Illinois Chicago

1,707. Dina Sorour

1,708. Megan Teramoto, Pritzker School of Medicine student

1,709. Alessondra Springmann, PhD, individual researcher

1,710. Mary Beth Campbell, individual

1,711. Catherine Morrison, University of Rhode Island

1,712. Matthew Shields, Assistant Professor of Philosophy, Wake Forest University

1,713. Andy Carr, The New School

1,714. King Kaufman, journalist, formerly San Francisco Chronicle, Salon.com, Bleacher Report

1,715. Iris Swarthout

1,716. Knar Gavin, University of Pennsylvania

1,717. Richard Estes, Attorney, Sacramento, CA

1,718. Sal Nicolazzo, UC Davis

1,719. Liam O'Loughlin, Capital University

1,720. Scott Gordon, publisher at Tone Madison and Northwestern alum

1,721. Stanley Thangaraj

1,722. Faith Kares, Northwestern Alum

1,723. Soteria Reid, Northwestern University c/o '21

1,724. Emily Van Duyne, Associate Professor of Writing, Stockton University

1,725. Faria Kamal, Assistant Professor. Columbia University Medical Center

1,726. Saffron Turner, individual

1,727. Noah Tamarkin, Cornell University

1,728. Johanna Riordan, Haverford College Libraries

1,729. Sean Tucker, Professor, University of Regina (Canada)

1,730. Nicole Lopez-Jantzen, Associate Professor of History, Borough of Manhattan CC

1,731. Aviva German, University of Toronto

1,732. Marc Spooner, University of Regina

1,733. Joe Wachter, Harper College

1,734. Danielle Allor, Visiting Assistant Professor, Haverford College

1,735. Que-Lam Huynh, CSU Northridge

1,736. Andie Tipton, Northwestern Class of '24

1,737. Alan Cordle Villegas, Faculty Librarian, Portland Community College

1,738. Ayesha Lat, Northwestern University class of 2022

1,739. Robin Ganev, University of Regina

1,740. Jeannine Tang, Assistant Professor, NYU

1,741. Elyse Crystall, UNC-Chapel Hill

1,742. Sukanya Mukherjee, Architect and Filmmaker

1,743. Tammy Kim, writer

1,744. James Huynh, Assistant Professor of Health Management & Policy, University of Michigan

1,745. Sara Tolbert, Univ of Canterbury

1,746. Trude Bennett, UNC Chapel Hill

1,747. Vorris Nunley, Associate Professor of English and Black Study

1,748. William Richardson

1,749. Carole Boyce Davies, Professor emerita Cornell University

AAUP-00062

JA1826

1,750. Eleanor Craig, Emory University
1,751. Matthew Ezzell, James Madison University
1,752. Nazia Kazi, Stockton University
1,753. Lounes Chikhi, CNRS, Toulouse
1,754. Jay M. Smith, University of North Carolina-Chapel Hill
1,755. Anisa Mian, Northwestern University '15
1,756. Tyler Jeremiah, Indiana University Northwest
1,757. Matthew J. Smith, Alma College
1,758. Lucila Vargas, University of North Carolina at Chapel Hill
1,759. Layan Masri, Virginia Tech
1,760. Keerthi Yalamanchili, Northwestern alum (2021)
1,761. Alexsandria Sánchez, Northeastern Illinois University
1,762. Jacinda Tran, Harvard University
1,763. Levon J Polinelli, film producer
1,764. Emily Morris, Northwestern class of 2017; University of Michigan
1,765. Amanda Lanthorne, San Diego State University
1,766. Michael Schwalbe, Professor Emeritus, North Carolina State University
1,767. leslie j yerman
1,768. Marcela Alvarez, University of Illinois Urbana-Champaign
1,769. Musa Syeed, Harvard University
1,770. Crystal Rudds, University of Utah
1,771. Jeffrey Gonzales, Individual
1,772. Samantha Iyer, Fordham University
1,773. Ricky Baldwin, union organizer
1,774. Grace Li, University of Chicago
1,775. Robert W. Barrett, Jr., University of Illinois at Urbana-Champaign
1,776. Matt Ferrel, concerned citizen
1,777. Daniella Tello, Northwestern University
1,778. Catherine Skeen, University of Chicago alumna (AB, MA, PhD)
1,779. Nora Livesay, University of MN
1,780. Ruby Phillips, Northwestern Class of 2020 Alumni
1,781. Natalie Vazquez (Northwestern 2020)
1,782. Catherine Henderson, IWMF, Northwestern '21
1,783. Alexander Chee, Professor of English and Creative Writing, Dartmouth College
1,784. Kaitlyn Maloney, Individual
1,785. Mark Bray, Rutgers University
1,786. Janet Lee, Northwestern alumni
1,787. Daniel D. Kelson, Astrophysicist
1,788. Luodan Rojas, Medill 2020
1,789. Elon Green, writer
1,790. Leslye Guadian, Northwestern University '22
1,791. Allyna Mota Melville, Northwestern Medill alum '19
1,792. Annette Braden-Rozier
1,793. Betsy Wilson, Evanston business owner
1,794. Neha Samuel, University of Illinois Urbana Champaign
1,795. Alethea Deyhle, Evanston born and raised, student at University of Illinois Urbana-Champaign
1,796. Adhy Kim, Cornell University
1,797. Christine Karatnytsky, independent theatre archivist

AAUP-00063

JA1827

1,798. Alyssa Hadley Dunn, Professor of Curriculum and Instruction, University of Connecticut

1,799. Ross Dispenza, Columbia Law School

1,800. Jonathan Rosa, Stanford University

1,801. Bench Ansfield, Temple University

1,802. Anna Guevarra, University of Illinois Chicago

1,803. Timothy Lombardo, University of South Alabama

1,804. Brian Connolly, University of South Florida

1,805. Ann Russo, Professor, DePaul University

1,806. Judith Roeder, SESP Alum

1,807. Nikhil Rao, Harvard University

1,808. McKenzie Scott

1,809. Faith Lazar, Yale

1,810. Jennifer Brody, Harvard Medical School

1,811. Sameer ud Dowla Khan, Reed College

1,812. Michael Galvan

1,813. Jessica Tanner, UNC-CH

1,814. Karlyn Koh, CUNY/LaGuardia

1,815. Dr. Kirt Cundick, Licensed Psychologist

1,816. Matthew Ellis, Portland State University

1,817. Hope McCaffrey, Northwestern University

1,818. Brian Marcus, University of British Columbia

1,819. Adam Mahoney, Medill'20

1,820. Dagmawi Woubshet, University of Pennsylvania

1,821. Tylor Brand, Trinity College, Dublin

1,822. Aree Worawongwasu, University of Hawaiʻi at Mānoa

1,823. Jeremy Littau, Lehigh University

1,824. Kelda Choc

1,825. Francine Almash

1,826. Elyana B. Walling, University of Texas at Austin Moody College 2014

1,827. Laura Jaliff, Northwestern University

1,828. Yiping Xia, Texas A&M University

1,829. Alex Schlehuber

1,830. Abhi Ramakrishnan, Northwestern University

1,831. Elliott Prasse-Freeman, National University of Singapore

1,832. Kelsey Wright, Northwestern University

1,833. Ariel Halle, Northwestern

1,834. Ria Almo, Northwestern University

1,835. Madeleine Vessely, Northwestern University Graduate Worker

1,836. Diane L. Moore, Harvard Divinity School

1,837. Carolynn Gonzalez, Northwestern University

1,839. Joshua Craft, Northwestern University

1,840. Madeleine Straubel, UNC Chapel Hill

1,841. Neethu Nazar, Northwestern University

1,842. Katherine Furl, UNC Chapel-Hill

1,843. Gulrana Syed, MD, Northwestern Medicine

1,844. Braxton Brewington, UNC Chapel Hill

1,845. Chelsie Greene, Northwestern University



AAUP-00064

**JA1828**

1,846. Jori Mills, Northwestern University
1,847. Josephine Ong, Dartmouth College
1,848. Jake Pyne, York University, Toronto, Canada
1,849. Steph Tuazon, UCLA
1,850. Irene Siegel
1,851. Amelia Parenteau
1,852. Sarah Aie, Northwestern Medill '24
1,853. Madeline Farr, Northwestern University
1,854. Grace Kulas, Northwestern University '24
1,855. Chen Chen, University of Connecticut
1,856. Judy Lawrence, Northwestern University
1,857. Cedar Turner, Northwestern University '24
1,858. Hope Mcknight, Northwestern University '24
1,859. Seth Lauver, Northwestern Bienen '23
1,860. Natalie Piehl, Northwestern University
1,861. William Matchett, St. Olaf College
1,862. October Krausch, adjunct faculty & journalist
1,863. Steve Bennett, Western Washington University
1,864. Noelle Dubay, University of Maine Farmington
1,865. Tiffanie Green, Medill BSJ '10
1,866. Gundeep Singh, Cornell University
1,867. Kimberly Robertson, Professor, California state  university long beach
1,868. Mary Maddux, Iowa State University
1,869. Giancarlo Sena
1,870. Anand Vaidya, Reed College
1,871. Cory Johnson, Northwestern University
1,872. Alexandra Carter, Humboldt State Alumni
1,873. Cate Be, Humboldt for Palestine
1,874. Tyler Wall, University of Tennessee
1,875. Travis Linneman
1,876. Michelle Brown, University of Tennessee
1,877. Judah Schept, Eastern Kentucky University
1,878. Jon Shefner, University of Tennessee
1,879. Kim Rybacki, SUNY
1,880. Alejandra Carrillo, JD/MBA Candidate 2025
1,881. Tarek Loubani, Western University
1,882. Gabrielle Bozarth, JD-PhD Candidate The University of Chicago
1,883. Andrea Bartz, Northwestern University '08
1,884. Lisa East, University of Tennessee
1,885. Meghan Conley, University of Tennessee
1,886. Natalie Tuseth, University of Chicago
1,887. Bill McClanahan, University of Tennessee
1,888. Katja Stroke-Adolphe, law student, University of Chicago
1,889. Emily Krebs, Fordham University
1,890. Martha Copp, East Tennessee State University
1,891. Joseph Vess, Medill 2001
1,892. Nathan Reeves, University of Tennessee (Bienen '24)
1,893. Abigail Neill, University of Chicago
1,894. Vincent Mousseau, Dalhousie University

AAUP-00065

1,895. Roger Freedman, U. of California, Santa Barbara

1,896. James Suazo, CSULB, UCLA

1,897. Christine Ferguson, University of Stirling

1,898. Charles Post, Graduate Center-CUNY

1,899. Callum Goetz, Northwestern University

1,900. Marwa Tahboub, Northwestern University

1,901. Tabor Whitney, PhD Candidate Northwestern University

1,902. Jorin Graham, Graduate Worker, Northwestern University

1,903. Emily Anderson, Metropolitan Community College

1,904. Chenjerai Kumanyika, NYU Journalism, AAUP

1,905. Jay Cowit, New York University

1,906. Raul Mata Jr., University of Texas at San Antonio, College of Engineering, Class '16

1,907. Daisy Hernández, Northwestern University

1,908. Helen Poynton, Professor, UMass Boston

1,909. Bebel DeMoura Nilo

1,910. Francesca Hyatt, CUNY-Queens College

1,911. Junior C- University of Texas at San Antonio

1,912. Ryan B. Morrison, University of Michigan

1,913. Ashley Clark

1,914. Kelsey Rodgers, UT Austin

1,915. Talila A. Lewis, Esq.; independent public scholar

1,916. Franklin Bell, Evanston resident

1,917. Rayyan Najeeb, Northwestern University

1,918. Neeti Madan, Medill '89

1,919. Yuki Miyamoto, DePaul University

1,920. David Lawton, Professor emeritus, Washington University in St Louis,

1,921. Kay Whitlock, Co-Author, "Queer (In)Justice" & "Considering Hate"

1,922. Susanna Kemp, Medill '22

1,923. Paul McEwan, Muhlenberg College, Northwestern '03

1,924. ronit kitei, alumni

1,925. Michelle R. Martinelli, Medill MSJ, 2016

1,926. Gesina Phillips, Carnegie Mellon University

1,927. Ananth Shankar, Northwestern University

1,928. Michael Harris, Columbia University

1,929. Anna Piela, Northwestern University

1,930. Larkin Stephanos, Northwestern University

1,931. Newland F. Smith, 3rd  Librarian Emeritus Seabury-Western Theological Seminary

1,932. Karin Ruetzel, PhD.

1,933. Gavin Farrow, DePaul University, Resident of Evanston, IL

1,934. Morgan Willison

1,935. Anna Piela, Northwestern University

1,936. Anna Borges, Northwestern Medill '14

1,937. Timothea Papas, NU '67

1,938. Beth Brady

1,939. José Moya, Phd

1,940. Max Sullivan, Medill student

1,941. Ayesha Rahman, Northwestern University, 2019

1,942. Robin Brown

1,943. Mariah Garcia, Attorney and Evanston Resident

AAUP-00066

JA1830

1,944. Sophia Heath, Northwestern University, Class of 2026

1,945. Kyra Martinez, University of Tennessee

1,946. Asiyah Arastu, Northwestern University

1,947. Justin Liu, Northwestern University '20

1,948. Michelle Bueno Vásquez, Northwestern MS and PhD Candidate

1,949. Erin Bosack, Chicago Area Peace Action (CAPA)

1,950. Camille Beredjick, Medill '13, Medill Equal Media Project Editor-in-Chief

1,951. Paul Farrand, Evanston Reisdent

1,952. Paul O'Connor, Northwestern University

1,953. Heather Shaughnessy, Free Palestine

1,954. Ash Capirala

1,955. Kirby Anwar, CUNY

1,956. Nneoma Adaku, Harvard University

1,957. Nadira Long, Northwestern University '14

1,958. Caitlin Jones, UConn Law

1,959. Zoe Lewis, Northwestern University, Class of 2025

1,960. Wynn Graham Northwestern class of 1968

1,961. Michelle Sheen, Northwestern University

1,962. Ryan Choe, Medill '24

1,963. Kathy McGroarty-Torres, Northwestern University '16

1,964. César Hoyos Álvarez, Northwestern University

1,965. Amanda Torres, CUNY Queens College

1,966. Jackie Stevens, Northwestern University

1,967. Val Dorsey, Northwestern University Class of 2011

1,968. Megha Garg, Northwestern University

Sign in to Google to save your progress. Learn more

* Indicates required question

Name, Affiliation *

Your answer

Email address (won't be shared publicly) *

Your answer

Submit

Clear form

Never submit passwords through Google Forms.

JA1831

AAUP-00067

This content is neither created nor endorsed by Google.   Terms of Service   Privacy Policy

Does this form look suspicious? Report

Google Forms

AAUP-00068

JA1832



JA1833

AAUP-00069

April 17, 2025

To: President Michael Schill and Provost Kathleen Hagerty
CC: Board of Trustees Chair Peter Barris
From: Concerned Faculty

We come together as concerned faculty to ask that you take forceful steps to meet the challenges of the current crisis and strongly defend Northwestern against the ongoing and intensifying attacks on higher education. Bedrock principles of a democratic society, due process, and the rights of free expression and association are now at stake. These attacks threaten Northwestern and other institutions across the United States. In light of this assault, we urge Northwestern's leadership to **take these steps:**

1. **Legally contest the federal funding freeze and refuse to comply with unprecedented demands that threaten academic freedom and university self-governance**. Freedom from political interference has allowed US universities to stand as leaders in producing cutting-edge knowledge across fields—medicine, science, humanities, engineering, and social sciences, among others. The entire country, indeed the world, benefits from the scientific and medical innovations produced by American universities. We call on you to stand up against intolerable threats to interfere in the conduct of teaching and research, and to refuse any further requests to turn over personal data and academic, disciplinary, and personnel records to the federal government.

2. **Be a leader among peer institutions in condemning attacks on universities.** In addition to condemning attacks, use all opportunities to assert the value of higher education visibly and publicly. Be forceful in making the case for the enduring values that are central to institutions of higher learning and the many contributions the sector makes to our society. Insist on the importance of independent voices to a functioning democracy and civil society, highlight the value of the diversity that exists in our institutions, and encourage free expression and vigorous debate within our community.

3. **Support our international students, staff and faculty** by taking the following steps: avoid voluntary cooperation or information sharing with Immigration and

1

JA1834

AAUP-00072

Customs Enforcement or other federal agencies charged with facilitating deportation or other forms of immigration enforcement; maintain the enrollment of international students in the event of visa revocation, legal status termination, detention, and/or deportation; allow any such students and scholars to continue their studies and research remotely, if necessary, ensuring that if enrollment is contingent upon funding through teaching or fellowships, they can continue their coursework, research, and teaching appointments; communicate timely information to international students and scholars, including immediate notification of changes in their legal status; and provide legal counsel for students and scholars whose visas have been revoked without due process.

4. **Work purposefully and proactively with other universities** and Northwestern's alumni networks, taking and creating opportunities to develop coordinated opposition to these anti-democratic attacks.

Thank you for your efforts to stand up for Northwestern and our shared values.

Rebecca Zorach, Professor, Art History, Weinberg College

Shirin Vossoughi, Associate Professor, School of Education and Social Policy

Elizabeth Shakman Hurd, Professor, Religious Studies and Political Science, Weinberg College

Laura Beth Nielsen, Professor of Sociology, Weinberg College

Helen Tilley, Associate Professor, History, Weinberg College

Michael Peshkin, Professor, McCormick School of Engineering

Nitasha Sharma, Professor, Black Studies and Asian American Studies, Weinberg College

Leslie M. Harris, Professor, History and Black Studies, Weinberg College

Rosemary Braun, Associate Professor, Molecular Biosciences, Weinberg College

2

JA1835

AAUP-00073

Izzy Grosof, Assistant Professor, Industrial Engineering and Management Science

Megan Bang, Professor, School of Education and Social Policy

Luis A. Nunes Amaral, Professor, McCormick School of Engineering

Jorge Coronado, Professor, LACS and Spanish & Portuguese, Weinberg College

Martha Biondi, Professor, Black Studies and History, Weinberg College

Vilna Bashi, Professor, Sociology, Weinberg College, and the Buffett Institute of Global Affairs

Daisy Hernández, Associate Professor, English, Weinberg College

Sarah Schulman, Ralla Klepak Professor of English, Weinberg College

Anonymous (Weinberg)

Alyson Carrel, Clinical Professor, Pritzker School of Law

Sara Sommervold, Deputy Director, Center on Wrongful Convictions, Pritzker School of Law

Michael Anthony Turcios, Assistant Professor, Department of Radio/Television/Film, School of Communication

Annie Buth, Clinical Associate Professor, Pritzker School of Law

Lina Britto, Associate Professor of History, WCAS

Eric Sirota, Clinical Associate Professor, Tenant Advocacy Clinic, Pritzker School of Law

AAUP-00074

JA1836

Shayna Silverstein, Associate Professor, School of Communication

Michael Kraus, Professor, Psychology, Weinberg College

Mark Hauser, Professor, Anthropology

Brian J. Reiser, Orrington Lunt Professor of Learning Sciences, School of Education and Social Policy

Karen Olivo, Associate Professor, Director of Music Theatre Area, SoC

Gregory Schwartz, Associate Professor, Ophthalmology and Neuroscience, Feinberg

Sheila Bedi, Clinical Law Professor, Pritzker School of Law

Michael Rakowitz, Alice Welsh Skilling Professor of Art, Department of Art Theory and Practice, Weinberg College

Michelle Birkett, Associate Professor, Medical Social Sciences, Feinberg

Karen M. Ridge, Professor, Medicine (Pulmonary), Feinberg

Ann Shola Orloff, Professor, Sociology, Board of Lady Managers of the Colombian Exposition Chair, Weinberg College

alithia zamantakis, Research Assistant Professor, ISGMH, Feinberg School of Medicine

Barnor Hesse, Associate Professor, Black Studies, Weinberg Collegeies,

Wendy Pearlman, Professor, Political Science, Weinberg College

Darren Gergle, Professor, Communication Studies, School of Communication

4

AAUP-00075

Brannon Ingram, Associate Professor, Religious Studies, Weinberg College

Brady Clark, Associate Professor of Instruction/College Adviser, Linguistics, Weinberg College

Kennetta Hammond Perry, Associate Professor, Black Studies and History, Weinberg

Angela G. Ray, Associate Professor, Communication Studies. School of Communication

Judith T Moskowitz, Professor, Medical Social Sciences, Feinberg School of Medicine

Amesika Nyaku, MD, MS, Assistant Professor, Department of Medicine, Division of Infectious Diseases, FSM

Leiszle Lapping-Carr, Assistant Professor, Department of Psychiatry & Behavioral Science, Feinberg School of Medicine

Jeremy Keys, Assistant Professor of Instruction, McCormick School of Engineering

Lisa Wilsbacher, Associate Professor, Medicine-Cardiology, Feinberg School of Medicine

Natalie Y Moore, Senior Lecturer, Medill

Tabitha Bonilla, Associate Professor, HDSP, SESP

Nick Davis, Associate Professor, English and Gender & Sexuality Studies, Weinberg College

Moya Bailey, Professor, Communication Studies, School of Communication

AAUP-00076

JA1838

Galen V. Bodenhausen, Professor, Psychology, WCAS

Marcelo Worsley, Associate Professor, School of Education and Social Policy & McCormick School of Engineering

Shalini Shankar, Professor of Anthropology and Asian American Studies, Weinberg College

Niall M. Mangan, Assistant Professor, Engineering Sciences and Applied Mathematics, McCormick School of Engineering

Tessie Liu, Professor, History and Gender & Sexuality Studies, Weinberg College

Fabian E. Bustamante, Professor, Computer Science, McCormick School of Engineering and Applied Sciences

Lauren Rivera, Professor, Kellogg School of Management

Kathleen Carmichael, Professor of Instruction, Cook Family Writing Program, Weinberg College

Melissa Simon, Professor, Obgyn, Feinberg

Gregory Ward, Professor, Linguistics and Gender & Sexuality Studies, Weinberg College

Jackie Stevens, Professor, Poitical Science

Alejandra Uslenghi, Associate Professor, Spanish and Portuguese – CLS, Weinberg Vollege

Julia Behrman, Associate Professor of Sociology

Abigail Barefoot, Assistant Professor of Instruction, Legal Studies

6

AAUP-00077

JA1839

Kevin Boyle, Professor, History, Weinberg College

Stephanie Knezz, Associate Professor of Instruction, Chemistry, WCAS

Sepehr Vakil, Associate Professor, School of Education and Social Policy

John W. Rudnicki, Professor, McCormick School of Engineering

Peter Sporn: Professor of Medicine, Cell and Developmental Biology, and Medical Education; Feinberg School of Medicine

Mary Kwasny, Professor, Preventive Medicine, Feinberg School of Medicine

Namratha Kandula, Professor, Medicine, Feinberg School of Medicine

Susan Pearson, Professor, History, WCAS

Maria Pyra, Asst Professor, Medical Social Sciences, Feinberg

Robert Orsi, Professor, Religious Studies, History, American Studies, Weinberg

Nichole Pinkard, Professor, Learning Sciences, SESP

Pascal Brixel, Assistant Professor, Philosophy, Weinberg College

Michelle Molina, Associate Professor, Religious Studies, Weinberg College

Laura Brueck, Professor and Director, Alice Kaplan Institute for the Humanities

Benjamin Owen, Associate Professor of Research, Chemistry, Weinberg College

Alex Kotlowitz, professor, Medill

Elizabeth Casline, Research Assistant Professor, Institute for Sexual and Gender Minority Health and Wellbeing

7

AAUP-00078

JA1840

James Bielo, Associate Professor, Religious Studies, Weinberg College

Rebecca Ewert, Assistant Professor of Instruction, Sociology, Weinberg College

Allison Wade, Assistant Professor of Instruction, Art Theory and Practice, Weinberg College

S.B. West, Associate Professor of Instruction, Gender & Sexuality Studies, Weinberg College

Brent E. Huffman, Professor, Medill School of Journalism

Pablo Durango-Cohen, Associate Professor, Civil & Environmental Engineering, MEAS

Jon Marshall, Associate Professor, Medill

Priyanka Motaparthy, Clinical Professor of Law, Pritzker School of Law

Joe Feinglass, Research Professor of Medicine, Feinberg School of Medicine

Jen Munson, Assistant Professor, School of Education and Social Policy

Jesse Yeh, Asst. Professor of Instruction, Legal Studies, Weinberg College

Cliff Zimmerman, Professor of Practice, Pritzker School of Law

Erica Weitzman, Associate Professor, German, WCAS

Dennis Li, Assistant Professor, Psychiatry/Medical Social Sciences/IPHAM/ISGMH, Feinberg

Josh Honn, Humanities and Prison Education Librarian, University Libraries

Curt M. Horvath, Professor, Molecular Biosciences, Weinberg College

8

JA1841

AAUP-00079

Stephen Adam, Associate Professor, Cell and Developmental Biology, Feinberg

Jonathon Glassman, Professor emeritus, History, WCAS

Bradley Stevenson, Research Associate Professor, Earth, Environmental, and Planetary Sciences, Weinberg College

Anonymous (Feinberg)

Magdalena Osburn, Associate Professor, DEEPS, Weinberg College

Ian Grant, MD, Assistant Professor of Neurology, Feinberg School of Medicine

Dedre Gentner, Professor, Psychology, Weinberg College

Mark Sheldon, Distinguished Senior Lecturer Emeritus, Philosophy, Weinberg College

Michelle Driscoll, Associate Professor, Physics & Astronomy, Weinberg College

Jenna Christensen, Assistant Professor, Molecular Biosciences, Weinberg College

Exal Iraheta, Assistant Prof. of Instruction, RTVF/Performance Studies, School of Communication

Steven Epstein, Professor of Sociology and John C. Shaffer Professor in the Humanities

Christina Kiaer, Professor, Art History, Weinberg College

Douglas Foster, Professor, Journalism, Medill School

Rebecca Johnson, Associate Professor of English, Weinberg College

Zayd Dohrn, Professor, Radio/TV/Film, School of Communications

JA1842

AAUP-00080

Anonymous (Weinberg)

John Flaherty, Professor, Medicine. Feinberg School of Medicine

Kenneth D. Forbus, Professor, Computer Science, McCormick Engineering

Jennifer Jones, Sociology, Weinberg College

Allison Carroll, Assistant Professor, Feinberg School of Medicine

Domietta Torlasco, Professor, French and Italian, Weinberg College

Laura Lackner, Associate Professor, Molecular Biosciences, Weinberg College

Mei–Ling Hopgood, William F. Thomas Professor of Journalism, Medill

Kate Weisshaar, Associate Professor, Sociology, Weinberg College

Ken Gentry, Professor of Instruction, McCormick School

Mary Ann Weston, Associate Professor Emerita, Medill School

Dmitry Tamarkin, Professor, Mathematics, Weinberg College

Aarati Didwania, Profess of Medicine, Department of Medicine, Feinberg School of Medicine

Jonathan Copulsky, Senior Lecturer, IMC, Medill School

Erica Hartmann, Associate Professor, Civil and Environmental Engineering, McCormick School of Engineering

Becca Greenstein, STEM Librarian, University Libraries

Micaela di Leonardo, Professor Emerita, Anthropology, Weinberg College

AAUP-00081

JA1843

Erin Korth, Research Coordinator, Pulmonary and Critical Care, Feinberg School of Medicine

Abe Peck, Professor Emeritus in Service, Medill/NU

Robert Launay, Professor, Anthropology, WCAS

Nasrin Qader, Associate Professor, French and Italian

Marc Sala, MD, Associate Professor, Feinberg School of Medicine

Janice Radway, Walter Dill Scott Professor Emerita, Communication

Miriam Petty, Associate Professor, Radio/Television/Film

Dayne Swearer, Asst. Professor, Chemistry, Chemical and Biological Engineering

Jessica Villagomez, Lecturer, Medill

Anonymous (Weinberg)

Maureen Daly, Assistant Professor, Psychiatry & Behavioral Sciences, Feinberg School of Medicine

Jonathan Moreira, Associate Professor, Feinberg School of Medicine

Peter Locke, Professor of Instruction, Global Health Studies

Anna Parkinson, Associate Professor, German, Weinberg College

Matt Kiefer, Assistant Professor, Journalism, Medill School

Caryn Ward, Professor, Journalism, Medill

Tristram Wolff, Associate Professor, English, Weinberg College

AAUP-00082

JA1844

Noelle Sullivan, Director and Professor of Instruction, Program in Global Health Studies, Weinberg College

J.A. Adande, Director of Sports Journalism, Medill

Nicole Stephens Jeanne Brett Chair of Negotiations, Kellogg School of Management

Jennifer Cole, McCormick School of Engineering

Donna R Leff, Emeritus Professor, Journalism, Medill School

Paola Zamperini, Associate Professor, Weinberg College

Doris Garraway, Associate Professor, French and Italian, Weinberg College

Joseph Schofer, emeritus professor of Civil & Environmental Engineering

Cindy Wilson, Clinical Professor, Law School

William Leonard, Professor of Anthropology & Global Health, Weinberg College

Anonymous (McCormick)

Caitlin Body, Professor, Stage Manager AEA, School of Communication

D.Soyini Madison, Professor Emerita, Performance Studies, School of Communication

Cynthia Coburn, Professor, SESP

Anonymous (McCormick)

Jessica Thebus, Professor, Theater, SOC

12

AAUP-00083

JA1845

Paul Gowder, Professor, Pritzker

Ashy S. Karim, Assistant Professor, McCormick School of Engineering

Bridget Arimond, Clinical Professor of Law, Northwestern Pritzker School of Law

Danielle Hamilton, Asst. Clinical Professor, Northwestern Pritzker School of Law

Sean Hanretta, Associate Professor, History, WCAS

Andrea Lewis Hartung, Clinical Professor, Pritzker School of Law

Lynn Cohn law, clinical professor

**Alessia Ricciardi, Professor, Comp. Lit/French and Italian, Weinberg**

Heidi Kitrosser, William W. Gurley Professor of Law, Northwestern -- Pritzker School of Law

Joanna Grisinger, Associate Professor of Instruction, Legal Studies, WCAS

Heather Hendershot, Professor, Medill and School of Communication

Anna Pfenniger, Assistant Professor, Feinberg School of Medicine

John Elson, Emeritus orofeesor of law, Pritzker School of Law

Nicolette Bruner, Assistant Professor of Instruction, Legal Studies and American Studies, Weinberg College

Sylvester A. Johnson

Shari Diamond, Professor, Pritzker School of Law

Anonymous (Weinberg)

13

AAUP-00084

JA1846

Kimberly Gray, Professor, Civil & Environmental Engineering, McCormick

Karrie Snyder, Associate Professor of Instruction, Sociology, Weinberg College

Jeremy Birnholtz, Professor, School of Communication

Ed Colgate, Professor, Mechanical Engineering, McCormick

Lisandra Vila Ellis, Assistant Professor, Cell and Developmental Biology, Feinberg School of Medicine

Igal Szleifer, Professor, McCormick School of Engineering

Susanna McColley, Professor of Pediatrics, Feinberg School of Medicine

Cristina Lafont, Professor, Philosophy, Weinberg College

Zach Nissen, Assistant Professor of Instruction, Anthropology, Weinberg

Anonymous (Weinberg)

James Schwoch, Professor, School of Communication

Michael Alpert, Research Associate, Neurobiology, Weinberg College

Christopher Bush, Associate Professor and Chair, French and Italian, Weinberg College

Joe Mathewson, professor, Mdill

Melissa Rosenzweig, Associate Professor of Instruction, Anthropology and Environmental Policy & Culture

Keith Woodhouse, Associate Professor, History, Weinberg College

AAUP-00085

JA1847

Shana Bernstein, Clinical Associate Professor, Legal Studies, Weinberg

Kyle Henry, Associate Professor, Radio TV Film, Communications

Anonymous (McCormick)

Lisa Beutler, Assistant Professor, Department, Feinberg of Medicine

Jen Brown, Lecturer, Preventive Medicine, Feinberg School of Medicine

Lily Stewart, Visiting Assistant Professor, Religious Studies Department at NU

Gerry Chiaro, Associate Professor, Medill

Murali Prakriya, Professor of Pharmacology, Feinberg School of Medicine

Aaron Shaw, Associate Professor, Communication Studies, School of Communication

Sadie Wignall, Professor, Molecular Biosciences, Weinberg College

Gregory Wagner, Associate Professor, McCormick School of Engineering

Thomas J Billard, Associate Professor, Communication Studies, School of Communication

Robert Nelson, Professor, Sociology, Weinberg College

Gianluca Cusatis, Professor, CEE, McCormick School of Engineering and Applied Science

Jennifer Brace, Assistant Professor of Instruction, Molecular Biosciences, Weinberg College

15

AAUP-00086

JA1848

Gregory Phillips II, Associate Professor, Medical Social Sciences, Feinberg School of Medicine

Kevin Lynch, Professor, McCormick School of Engineering

Jason Hartline, Professor, Computer Science, McCormick

Samuel Weber, Avalon Professor, German/CLS Weinberg

Elizabeth Gerber, Professor, Mechanical Engineering, McCormick

J.P. Sniadecki, Radio/TV/Film Department

Jamelia Morgan, Professor of Law, Northwestern Pritzker School of Law

Krista Thompson, Professor, Art History, Weinberg

Stephan Moore, Professor of Instruction, School of Communication

Erin Courtney, Associate Professor, RTVF, School of Communication

Denise Meuser, Professor of Instruction, German, Weinberg College

L. Clayton Dahm, Lecturer, Music Education, Bienen

Pedro A. Serrano, Instructor, Feinberg

Morgan Barry, PhD Candidate, History, Weinberg College

Ezra Friedman, Professor, Pritzker School of Law

Anonymous (Weinberg)

Jeong Eun Annabel We, Assistant Professor, Asian Langs. and Cultures, Weinberg

16

AAUP-00087

JA1849

Ji-Yeon Yuh, Assoc. Professor, History and Asian American Studies, WCAS

Linda Gates, Professor of Instruction, Head of Voice, Dept. of Theatre, School of Communication

Ian Hurd, Professor, Political Science

Anonymous (Feinberg)

Hai Zhou, Professor, ECE, McCormick School of Engineering

Douglas Vaughan, Professor, Medicine, FSM

Kyla Ebels–Duggan, Professor, Philosophy, Weinberg College

Anonymous (School of Communication)

Claudio E. Benzecry, Professor, Communication Studies and Sociology, School of Communication and Weinberg

Fay Rosner, WCAS Adviser & Assoc. Prof of Instruction, French

Matthew Kugler, Professor of Law, Pritzker School of Law

Christine Percheski, Associate Professor, Sociology, Weinberg College

Russell Johnson, Assistant Professor, Physical Medicine and Rehabilitation, Feinberg

Anonymous (Weinberg)

Bennett Goldberg, Professor, Physics and Astronomy

Sara Thomas, Research Assistant Professor, Feinberg School of Medicine

17

AAUP-00088

JA1850

Christine Helmer, Professor of German, Weinberg College

Paola Morgavi, Professor of Instruction, French and Italian, Weinberg College

Michelle Falkoff, Clinical Professor of Law

Christina Nguyen, Assistant Professor of Instruction, Radio/Television/Film, School of Communications

Rajeev Kinra, Associate Professor, History, Comparative Literature, MENA, ALC, and ISP

Benjamin Golub, Professor, Economics, Weinberg College

Evan Mwangi, Professor, English, Weinberg College

Deborah Rosenberg, Associate Prof of Instruction, Spanish and Portuguese, Weinberg College

Branden Ghena, Assistant Professor of Instruction, Computer Science, McCormick School of Engineering

Seema Shah, Professor, Pediatrics and Medical Ethics, Feinberg School of Medicine

Angira Patel, MD, MPH, Professor, Feinberg School of Medicine

Mita Sanghavi Goel, Professor of Medicine, Feinberg School of Medicine

Vera Brunner–Sung, Associate Professor, Radio/Television/Film, School of Communication

Surendra Shah, Walter p Murphy Professor(Emeritus),Civil Engineering

Stacy Benjamin, Clinical Faculty, Segal Design Institute, McCormick

AAUP-00089

JA1851

Elizabeth Inglehart, Clinical Associate Professor of Law, Northwestern Pritzker School of Law

Christian Petersen, Professor, Molecular Biosciences, Weinberg College

Rebecca Vonesh, CTD Program Coordinator

David Morton, Professor, McCormick School of Engineering

Barbara Newman, Professor of English, Classics and History

Barry L Nelson, Walter P Murphy Professor Emeritus, IEMS, McCormick

Anonymous (School of Communication)

Gordon Hazen, Professor Emeritus, McCormick School of Engineering

AJ Christian, Professor, Communication Studies, School of Communication

John Anderson, Senior Lecturer, Segal Design Institute

Wendy Murray, Professor, McCormick School of Engineering

Lawrence Stuelpnagel, Clinical Associate Professor Medill/Political Science

Anonymous (Weinberg)

Anonymous (Weinberg)

Shana Cooper, Associate Professor, School of Communication

Carolyn Frazier, Clinical Professor, Pritzker School of Law

Sridhar Krishnaswamy, Professor, Mechanical Engineering, McCormick

AAUP-00090

JA1852

Kyle Henry, Associate Professor, Radio/TV/Film, School of Communications

Talia Lerner, Associate Professor, Neuroscience, Feinberg School of Medicine

Anonymous (School of Communication)

Luisa Morales–Nebreda, Assistant Professor, Feinberg

Kari Lydersen, Assistant Professor, Journalism, Medill

Licheng Gu, Professor of Instruction, Weinberg College

Toshiko Uchida, Professor, Medicine and Medical Education, Feinberg

Shobha Mahadev, Clinical Professor of Law, Northwestern Pritzker School of Law

Stephanie Kollmann, Visiting Clinical Professor, Children and Family Justice Center, Pritzker School of Law

Andrea Russell, Assistant Professor, Psychiatry & Behavioral Sciences, Feinberg

Lauren B. Beach, Assistant Professor, Medical Social Sciences, Feinberg School of Medicine

Mark Werwath, Clinical Professor, IEMS, McCormick

Courtney Scherr, Associate Professor, Communication Studies, School of Communication

Laura Kipnis, Professor emeritus, Radio–TV–Film

Michael Angarone DO FIDSA, Associate Professor, Feinberg School of Medicine

Sylvie Romanowski, Professor emerita of French

AAUP-00091

JA1853

katrina quisumbing king, Assistant Professor, Sociology, Weinberg College

Ariel Rogers, Associate Professor, Radio/Television/Film, School of Communication

Cynthia Robin, Professor, Anthropology, Weinberg College

Edward Malthouse, Professor, IMC and IEMS, Medill and McCormick

Mary Weismantel, Professor, Anthropology, Weinberg College

Zach Wood-Doughty, Assistant Professor of Instruction, Computer Science, McCormick

Anonymous (Weinberg)

Lakshmi Padmanabhan, Assistant Professor, School of Communication

Yusra Cheema, Assistant Professor, Department of Medicine, Feinberg School of Medicine

Theresa L. Walunas, Associate Professor, Medicine, Feinberg School of Medicine

Adia Benton, Associate Professor, Anthropology, Weinberg College

Stephanie Lipscomb Teterycz, Senior Director, Trienens Institute

Anonymous (Pritzker)

JJ Johnson, Pathology, Dermatology, Medical Social Sciences

Haley Bowen, Assistant Professor, History, Weinberg College

Anonymous (School of Communication)

AAUP-00092

JA1854

Anonymous (Weinberg)

Alona Furmanchuk, Research Asst. Prof., Medicine, Feinberg School of Medicine

Caitlin Fitz, Associate Professor of History, Weinberg College

Neil Golden, Sr. Lecturer, Medill School of Integrated Marketing Communications

Daniel Galvin, Professor, Political Science, Weinberg College

Jennifer Bierman, Professor of Medicine, Feinberg

Baron Reed, Professor, Philosophy, Weinberg

Herbert N. Beller, Professor of Practice Emeritus, Pritzker School of Law

Aashish Didwania, Professor, Medicine

Ingrid Zeller, Professor, German Department, Weinberg College

Megan Baker, Assistant Professor, Anthropology, Weinberg College

Ana Arjona, Associate Professor, Political Science, Weinberg College

Anonymous (McCormick)

Sanjiv Shah, Professor, Medicine/Cardiology, Feinberg

Kate Masur, Professor, History, Weinberg

Carol Haywood, Assistant Professor, Department of Medical Social Sciences, Feinberg

Nausheen Akhter, Associate Professor of Medicine, Feinberg School of Medicine

AAUP-00093

JA1855

Daniel Arango, Assistant Professor, Department of Pharmacology

Jill Wilson, Professor of Instruction, McCormick School of Engineering

Elizabeth Son, Associate Professor, Theatre, School of Communication

Nina Gurianova, Professor, Russian and Comparative Literature Studies, Weinberg College

Thrasyvoulos Pappas, Professor, ECE

Quinn Mulroy, Assistant Professor, School of Education & Social Policy

Anonymous (Weinberg)

Andreas Waechter, Professor, Industrial Engineering & Management Sciences, McCormick

Anonymous (McCormick)

LaShandra Sullivan, Associate Professor, Anthropology, Weinberg College

Rachel OConor, Assistant Professor, Feinberg School of Medicine

Anonymous (Feinberg)

David Gatchell, Clinical Professor, Segal Design Institute, McCormick School of Engineering and Applied Science

Stephanie Eisenbarth, Professor, Department of Medicine, Feinberg School of Medicine

Robert Murphy, Professor, Department of Medicine (Infectious Diseases), Feinberg School of Medicine

23

AAUP-00094

JA1856

Tom Wolff, Research Assistant Professor, Medical Social Sciences, Feinberg

Anonymous (McCormick)

Daniel Evans, Associate Professor of Medicine, Feinberg

Mérida M. Rúa, Professor, Latina and Latino Studies, Weinberg College

Anonymous (Feinberg)

Anonymous (School of Communication)

Rachel Kornfield, Assistant Professor, Feinberg

Anonymous (McCormick)

Megan Hyska, Assistant Professor, Philosophy, Weinberg College

Anonymous (Feinberg)

Jeremy O'Sullivan, Research Assistant Professor, Division of Allergy and Immunology, Feinberg School of Medicine

Chloe Thurston, Associate Professor, Political Science, Weinberg College

Anonymous (Weinberg)

Anonymous (Weinberg)

Steven Morrison, Professor, Music Education, Bienen School of Music

Claudia Yau, Assistant Professor, Philosophy, Weinberg College

Betina Yanez, Associate Professor, Feinberg School of Medicine

AAUP-00095

JA1857

David Shyovitz, Assoc. Prof. of History, Weinberg College

Kathleen J Green, Professor, Pathology and Dermatology, Feinberg

Matthew Goldrick, Professor, Linguistics, Weinberg College

Lincoln Quillian, Professor, Sociology, Weinberg College

Neil Verma, Associate Professor, Radio/TV/Film, School of Communication

Mary McGrath, Assistant Professor, Political Science, Weinberg College

Ryan Truby, Assistant Professor, Materials Science and Engineering, Mechanical Engineering

Jose Medina, Walter Dill Scott Professor, Philosophy, Weinberg College

Rachel Amdur, Assistant Professor, Medicine, Feinberg School of Medicine

Beatriz O. Reyes, Assistant Professor of Instruction, Global Health Studies Program

Anonymous (Kellogg)

Teresa H Horton, Associate Professor of Research, Anthropology, Weinberg College

Benjamin Singer, MD, Associate Professor, Feinberg

Anonymous (Weinberg)

Anonymous (Feinberg)

Fei Li Kuang, Assistant Professor, Allergy and Immunology, Feinberg School of Medicine

AAUP-00096

JA1858

Anonymous (Weinberg)

Emily Maguire, Associate Professor, Spanish and Portuguese, WCAS

Will Reno, Professor, Political Science, Weinberg

Kelly Bachta, Assistant Professor, Department of Medicine, Division of Infectious Diseases

Ty Blakeney, Assistant Professor, French and Italian

Emily Esposito, Postdoctoral Scholar, MSS, Feinberg

Eric Zaslow, Henry S. Noyes Chair in Mathematics, Mathematics, Weinberg College

Paul Umbanhowar, Research Professor, Mechanical Engineering, McCormick School of Engineering

Annette D'Onofrio, Associate Professor, Linguistics, Weinberg College

Alexandra Psihogios, Assistant Professor, Medical Social Sciences, Feinberg

Anonymous, Weinberg College

Anonymous, Feinberg

Aaron Godwin, Assistant Professor of Instruction, Theatre, School of Communication

Helen Thompson, Professor, English, Weinberg College

Anonymous, Associate Professor, Medical Social Sciences

Bruce Henschen, Associate Professor, Feinberg School of Medicine

26

AAUP-00097

JA1859

Marquita Lewis, Assistant Professor Feinberg School of Medicine

Peter Slevin, Professor, Medill

Elizabeth Anne Scharle, Assistant Professor, Feinberg School of Medicine

Carole Silver, Professor of Global Law & Practice, Emerita

André de Gouvêa, Professor, Physics and Astronomy, Weinberg College

Amy Partridge, Assoc. Prof. of Instruction, Weinberg College

Cecilia Berin, Professor of Medicine, Feinberg School of Medicine

Robert Weinstock, Clinical Associate Professor of Law, Pritzker School of Law

Frances R. Aparicio, Professor Emerita, Latina and Latino Studies Program, Weinberg College

William A. Muller, MD, PhD, Professor, Pathology, Feinberg School of Medicine

Jeffrey A. Linder, Professor of Medicine, Feinberg School of Medicine

Ciaran Kohli–Lynch, Preventive Medicine, Feinberg School of Medicine

César Hoyos Álvarez, Assistant Professor of Instuction, Spanish and Portuguese, Weinberg College

Alexander Misharin, Associate Professor, Feinberg School of Medicine

Benette Phillips, Research Assistant Professor, Lurie Cancer Center

Katharine Breen, Professor, English, Weinberg College

Christine Schaeffer, Associate Professor, Medicine, Feinberg School of Medicine

AAUP-00098

JA1860

Michael Maltenfort, Assistant Professor of Instruction, Weinberg College Advising and Mathematics

Noah Chaskin, Assistant Professor of Instruction, English, Weinberg College

Ava Thompson Greenwell, Professor, Medill

Anonymous (School of Communication)

Daniel Majchrowicz, Associate Professor, Asian Languages and Cultures, Weinberg College

Shelby Hatch, Associate Professor of Instruction, Weinberg College

Eli Kean, Assistant Professor of Instruction, Gender and Sexuality Studies, Weinberg College

Anonymous (Weinberg)

Anonymous (School of Communication)

Leonard L. Riskin, Visiting Prof., Pritzker School of Law

Lauren Clark, Core Scientist, Center for Synthetic Biology

Anonymous (SESP)

Anonymous (Center for Synthetic Biology)

Anonymous (SESP)

Caitlin Musil, Research Technician, Feinberg School of Medicine

Cuong Nguyen, Assistant Professor, Dermatology, Feinberg School of Medicine

28

AAUP-00099

JA1861

Andrew Tout, Assistant Professor, Medicine, Feinberg School of Medicine

Lisa Del Torto, Professor of Instruction, Cook Family Writing Program, Weinberg College

Andrew Rivers, Professor of Instruction, Physics and Astronomy, Weinberg Collge

Jeffrey Lopez, Assistant Professor, Chemical and Biological Engineering, McCormick

Laura Hein, Professor History, WCAS

William N. West, Professor, English, Classics, and Comparative Literary Studies, WCAS

Anonymous (Weinberg)

Morgan Thompson, Assistant Professor, Philosophy, Weinberg College

Edward Muir, Clarence L. Ver Steeg Professor in the Arts and Science, History, Weinberg College

James O'Laughlin, Associate Professor of Instruction, Cook Family Writing Program, Weinberg College

Julia Yoshino Benavente, Research Assistant Professor, Medicine, Feinberg School of Medicine

David Boyk, Associate Professor of Instruction, Asian Languages and Cultures, Weinberg College

Katie Risseeuw, Preservation Librarian, University Libraries

Elizabeth Addington, Assistant Professor, Medical Social Sciences, Feinberg

AAUP-00100

JA1862

Anonymous (Feinberg)

Anonymous (Feinberg)

Scott Durham, Associate Professor, French and Italian, Weinberg College

Annie Howard, English Department, Weinberg College

Matt Easterday, Associate Professor, School of Education and Social Policy

Brianna Borger, Assistant Professor of Instruction, Theatre, School of Communication

Anthony S. Chen, Associate Professor, Sociology and Political Science, Weinberg College

Sherwin Ovid, Assistant Professor of Instruction, ATP, Weinberg College

Martina Kerlova, Professor of Instruction, German, WCAS

Corey Byrnes, Associate Professor, Kaplan, Asian Languages and Cultures, Comparative Literary Studies

Lizzie Burslem, Lecturer, Mathematics, Weinberg College

Paul Gillingham, Professor, History, Weinberg College

Ronald T. Ackermann, Professor of Medicine, Feinberg School of Medicine

Wei Chen, Professor, Mechanical Engineering, McCormick

J.–F. Gaillard, Professor, Civil and Environmental Engineering, McCormick

Paul Gillingham, Professor, History, Weinberg College

AAUP-00101

JA1863

Anonymous (McCormick)

Helen B. Schwartzman Professor Emerita of Anthropology, Weinberg College

Paloma Martinez, Assistant Professor, Radio, TV and Film, School of Communication

Aparna Gupta, Assistant Professor, Feinberg

Gary Martin M.D., Professor of Medicine, Feinberg

David Liebovitz, Associate Professor of Medicine, Feinberg School of Medicine

Dominic Fullenkamp, Assistant Professor, Feinberg School of Medicine

Deborah Douglas, Senior Lecturer, Medill

Felicia D Henderson, Associate Professor, Radio/Television/Film, School of Communication

Anonymous (Feinberg)

Stephen Persell, Professor, Medicine, Feinberg

Heather Colburn, Professor of Instruction, Spanish & Portuguese, Weinberg

Ranya Sweis, Professor of Medicine/Cardiology, Feinberg SOM.

Juned Siddique, Professor, Preventive Medicine, Feinberg School of Medicine

Robert Anthony Ward, Assistant Professor, Cook Family Writing Program, Weinberg College

Alex Birdwell, Assoc. Prof. of Instruction, Segal Design Institute, McCormick

31

AAUP-00102

JA1864

Sarah Chuzi, Assistant Professor of Medicine at NU Feinberg

Nabil Issa, MD, Professor of Surgery and Medical Education, Feinberg School of Medicine

Carol Saltoun, Associate Professor, Feinberg

Lucia Stein–Montalvo, Assistant Professor, Civil and Environmental Engineering, McCormick

Alison Flaum, Clinical Professor, Pritzker School of Law

Jon Ziomek, associate professor emeritus, Medill School

Lydia Barnett, Associate Professor, History, WCAS

Michael Certo, Assistant Professor of Pediatrics, Feinberg School of Medicine

Miriam White, Professor, Radio/TV/Film, School of Communication

Anonymous (Feinberg)

Brenna Argall, Professor, Mechanical Engineering, Computer Science, and Physical Medicine & Rehabilitation, McCormick and Feinberg

Ceci Rodgers, professor, Medill School of Journalism,

Ana Maria Acosta, Professor, Physical Therapy and Human Movement Sciences, Feinberg School of Medicine

AAUP-00103

JA1865


# Presidential Documents

**Title 3—**

**The President**

**Executive Order 14161 of January 20, 2025**

## Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

(b) To protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States. And the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security.

**Sec. 2**. *Enhanced Vetting and Screening Across Agencies.*

(a) The Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall promptly:

(i) identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

(ii) determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public-safety threat;

(iii) re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

(iv) vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

(b) Within 60 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly submit to the President, through the Assistant to the President for Homeland Security, a report:

(i) identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)); and

(ii) identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20,

JA1866

AAUP-01486

2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States.

(c) Whenever information is identified that would support the exclusion or removal of any alien described in subsection 2(b), the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien unless she determines that doing so would inhibit a significant pending investigation or prosecution of the alien for a serious criminal offense or would be contrary to the national security interests of the United States.

**Sec. 3**. *Additional Measures to Protect the Nation.* As soon as possible, but no later than 30 days from the date of this order, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall also:

(a) Evaluate and adjust all existing regulations, policies, procedures, and provisions of the Foreign Service Manual, or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)–(3) of the INA (8 U.S.C. 1182(a)(2)–(3)), to ensure the continued safety and security of the American people and our constitutional republic;

(b) Ensure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other alien seeking admission or entry to the United States;

(c) Evaluate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States;

(d) Recommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or replacement of the culture on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists;

(e) Ensure the devotion of adequate resources to identify and take appropriate action for offenses described in 8 U.S.C. 1451;

(f) Evaluate the adequacy of programs designed to ensure the proper assimilation of lawful immigrants into the United States, and recommend any additional measures to be taken that promote a unified American identity and attachment to the Constitution, laws, and founding principles of the United States; and

(g) Recommend any additional actions to protect the American people and our constitutional republic from foreign threats.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

AAUP-01487

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20 2025.*

[FR Doc. 2025–02009
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

JA1868

AAUP-01488



**Federal Register**

Vol. 90, No. 21

Monday, February 3, 2025

# Presidential Documents

Title 3—

The President

**Executive Order 14188 of January 29, 2025**

**Additional Measures To Combat Anti-Semitism**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* My Administration has fought and will continue to fight anti-Semitism in the United States and around the world. On December 11, 2019, I issued Executive Order 13899, my first Executive Order on Combating Anti-Semitism, finding that students, in particular, faced anti-Semitic harassment in schools and on university and college campuses. Executive Order 13899 provided interpretive assistance on the enforcement of the Nation's civil rights laws to ensure that they would protect American Jews to the same extent to which all other American citizens are protected. The prior administration effectively nullified Executive Order 13899 by failing to give the terms of the order full force and effect throughout the Government. This order reaffirms Executive Order 13899 and directs additional measures to advance the policy thereof in the wake of the Hamas terrorist attacks of October 7, 2023, against the people of Israel. These attacks unleashed an unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence against our citizens, especially in our schools and on our campuses. Jewish students have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; and intimidation, harassment, and physical threats and assault. A joint report by the House Committees on Education and the Workforce, Energy and Commerce, Judiciary, Oversight and Accountability, Veterans' Affairs, and Ways and Means calls the Federal Government's failure to fight anti-Semitism and protect Jewish students ''astounding.'' This failure is unacceptable and ends today.

**Sec. 2**. *Policy.* It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence.

**Sec. 3**. *Additional Measures to Combat Campus Anti-Semitism.* (a) Within 60 days of the date of this order, the head of each executive department or agency (agency) shall submit a report to the President, through the Assistant to the President for Domestic Policy, identifying all civil and criminal authorities or actions within the jurisdiction of that agency, beyond those already implemented under Executive Order 13899, that might be used to curb or combat anti-Semitism, and containing an inventory and analysis of all pending administrative complaints, as of the date of the report, against or involving institutions of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism.

(b) The report submitted by the Attorney General under this section shall additionally include an inventory and an analysis of all court cases, as of the date of the report, against or involving institutions of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism and indicate whether the Attorney General intends to or has taken any action with respect to such matters, including filing statements of interest or intervention.

(c) The Attorney General is encouraged to employ appropriate civil-rights enforcement authorities, such as 18 U.S.C. 241, to combat anti-Semitism.

JA1869

AAUP-01489

(d) The report submitted by the Secretary of Education under this section shall additionally include an inventory and an analysis of all Title VI complaints and administrative actions, including in K–12 education, related to anti-Semitism—pending or resolved after October 7, 2023—within the Department's Office for Civil Rights.

(e) In addition to identifying relevant authorities to curb or combat anti-Semitism generally required by this section, the Secretary of State, the Secretary of Education, and the Secretary of Homeland Security, in consultation with each other, shall include in their reports recommendations for familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 29, 2025.*

[FR Doc. 2025–02230
Filed 1–31–25; 11:15 am]
Billing code 3395–F4–P

JA1870

AAUP-01490

 Board of Trustees Chair Letter (2025-04-04)

---

TO:      Mr. Peter Barris, Chair, and Members of Northwestern's Board of Trustees
FR:      Concerned Faculty, Northwestern University

**Add your signature**                       18 March 2025

Dear Mr. Barris and members of Northwestern's Board of Trustees:

We are an ad hoc group of concerned Northwestern faculty and we write to request that the Board of Trustees add consultations with faculty, students, and staff to your deliberations during this emergency. We would like an opportunity to brief members of the Board about how the current threats to higher education, civil liberties, and democratic institutions in the United States and beyond are affecting our campus community. The stakes of this moment are high for us all and we need to pull together.

Many of you have invested deeply in Northwestern over the years. We have too. Many of us began our careers here and have spent decades building programs, directing departments, chairing committees, and doing our part to make Northwestern a premier institution in STEM fields, education, medical research, humanities and the arts, the social sciences, journalism, and law, among other fields. We are deliberately working to bridge schools and disciplines because we know Northwestern is greater than the sum of its parts.

In advance of briefings, we want to share our diagnosis of the current situation.

> **1. There is no time to lose:** The new administration is taking steps that are intended to radically destabilize the foundations of higher education in this country.[1] It takes decades to build first-rate programs of the kind Northwestern has in abundance. When crucial funding and staff are cut on so many fronts simultaneously – as this administration is doing – it can serve only one purpose: to destroy precious repositories of knowledge, expertise, and public goods. Historically, we know that when autocratic leaders have targeted their own universities, it has only weakened democracies and exacerbated or re-entrenched inequalities. We see this happening already.

> **2. Young people need us:** We teach our students to wrestle with big questions and societal challenges, placing these in historical context and tying them to debates at the cutting edge of different fields. We have a responsibility as educators to support critical inquiry, engage with multiple perspectives, and explore different knowledge systems, past and present. Given our role in training teachers, doctors, psychologists, counselors, coaches and many others, disruptions to universities have immediate and widespread effects on our society, including K-12 systems.

> **3. We must speak with one voice in defense of our freedoms:** The Trump administration is breaking laws and trampling on governing norms as fast as possible because they know legal challenges and court proceedings move slowly. On February 4th, Georgetown law professor David Super made this point to a *Washington Post* reporter: "So many of these [administrative actions] are so wildly illegal that I think they're playing a quantity game and assuming the system can't react to all this illegality all at once." Ruth Ben-Ghiat, a historian of fascism at New York University, stated that "We're in a real emergency situation for our democracy."[2]

> Northwestern is one of several thousand universities and colleges in the United States. Our collective goal should be to defend our freedoms and call out illegalities as if our lives, and so many others, depend on it, because they do. Malicious and bad faith attacks – on faculty, students, staff, our president, our provost, our research, and our

AAUP-00017




**4. We must not repeat myths or falsehoods:** US universities have an unparalleled breadth of intellectual opinion and are home to diverse constituencies. Yet, as most of us know, things were once much more homogeneous. It took decades of effort and social struggle to make universities more representative of and responsive to the needs of our society. In doing so, universities have played a crucial role in building more tolerant and equitable communities. What we are seeing now is a backlash of *intolerance* and *exclusion*, designed to intimidate and silence a plurality of perspectives and debate itself. Universities provide a necessary antidote to false claims because we endorse debate.

**5. We must protect those who stand for human rights and peace:** We would never expect members of the Board of Trustees to have uniform opinions since we ourselves disagree on points of substance. We do expect Board members to share our concern when constitutional and human rights are objectively under attack. Students, staff, and faculty at Northwestern have mobilized on various social, environmental, and geopolitical issues for decades. These campaigns have sought to extend human rights, redress past and ongoing wrongs, and ensure viable futures for all. Serious problems on all fronts will only get worse if US universities comply with draconian directives to arrest, expel, deport, or fire those who dissent from government policies. These directives are anathema to the values and mission of our University.

We hope that in this moment of crisis, you will make the time to hear from representative delegations and begin to exchange strategies on what we can do to sustain the vibrant intellectual community at Northwestern.

CC:      President Michael Schill
Provost Kathleen Hagerty
Bryan Brayboy, Dean, School of Education and Social Policy
Adrian Randolph, Dean, Weinberg College of Liberal Arts
Francesca Cornelli, Dean, Kellogg School of Business
E. Patrick Johnson, Dean, School of Communications
Kelly Mayo, Dean, The Graduate School
Marwan Kraidy, Dean, Northwestern University in Qatar
Jonathan Bailey Holland, Dean, Bienen School of Music
Eric Neilson, Dean, Feinberg School of Medicine
Hari Osofsky, Dean, Pritzker School of Law
Christopher Schuh, Dean, McCormick School of Engineering
Charles Whitaker, Dean, Medill School of Journalism
Xuemao Wang, Dean of Libraries

**Add your signature**
Helen Tilley, Associate Professor, History, Anthropology (courtesy), and Law (courtesy)
Shirin Vossoughi, Associate Professor of Learning Sciences, School of Education & Social Policy
Martha Biondi, Professor, Black Studies and History
Leslie Harris, Professor, History and Black Studies
Luis A. Nunes Amaral, Professor, ESAM, McCormick School of Engineering
katrina quisumbing king, Assistant Professor, Sociology
Sheila Bedi, Clinical Professor of Law, Pritzker School of Law
Jorge Coronado, Professor, Spanish and Portuguese
Kate Masur, Professor, Department of History
Michelle Birkett, Associate Professor, Medical Social Sciences
Daisy Hernández, Associate Professor, English
Peter Sporn, Professor of Medicine, Feinberg School of Medicine
Elizabeth Shakman Hurd, Professor of Religious Studies and Political Science
Joanna Grisinger, Associate Professor of Instruction, Legal Studies
Megan Bang, Professor of Learning Sciences, School of Education and Social Policy

AAUP-00018



# Board of Trustees Chair Letter (2025-04-04)

Michael Peshkin, Professor, Mechanical Engineering
Namratha Kandula, Professor of Medicine, Feinberg School of Medicine
Sean Hanretta, Associate Professor, History
Sarah Schulman, Professor, English
Vilna Bashi, William and Cathy Osborne Professor, Sociology
Kevin Boyle, Professor, History
Shayna Silverstein, Associate Professor, Performance Studies
Barnor Hesse, Associate Professor, Black Studies
D. Soyini Madison, Professor Emeritus, Department of Performance Studies
Jessica Winegar, Professor, Anthropology and Middle East and North African Studies
Nick Davis, Associate Professor, English and Gender & Sexuality Studies
Susan Pearson, Professor of History
Dotun Ayobade, Associate Professor, Performance Studies/Black Studies
Adia Benton, Associate Professor, Anthropology
Rebecca Johnson, Associate Professor of English and Middle East and North African Studies
Tristram Wolff, Associate Professor, English & Comparative Literary Studies
Anonymous, Black Studies and Gender and Sexuality Studies
Krista Thompson, Professor, Art History
Megan Baker, Assistant Professor, Anthropology
Ji-Yeon Yuh, Associate Professor, History and Asian American Studies
Keith Woodhouse, Associate Professor, History
Paul Ramírez, Associate Professor, History and Religious Studies (courtesy)
Lauren Stokes, Associate Professor, History
Wendy Pearlman, Jane Long Professor of Arts and Sciences, Political Science
Michael Rakowitz, Professor, Art Theory and Practice and Middle East North African Studies
Nasrin Qader, Associate Professor of French and Comparative Literature
Natalie Y Moore, Senior Lecturer and Director of Audio Programming, Medill
Mérida M. Rúa, Professor, Latina and Latino Studies
Helen Thompson, Professor, English
Tessie P. Liu, Professor, History and Gender & Sexuality Studies
Cynthia Coburn, Professor, SESP
Tabitha Bonilla, Associate Professor, Human Development & Social Policy and Political Science
Angela G. Ray, Associate Professor, Communication Studies
Brian Reiser, Orrington Lunt Professor of Learning Sciences, SESP
Laura Lackner, Associate Professor, Molecular Biosciences
Laura Beth Nielsen, Board of Lady Managers of the Columbian Exposition Chair, Professor of Sociology
Doris Garraway, Associate Professor, French and Italian
Laura Brueck, Professor, Asian Languages and Cultures and Comparative Literary Studies
Corey Byrnes, Associate Professor, Kaplan Institute for the Humanities, Asian Languages and Culture, Comparative Literary Studies
Jenna Christensen, Assistant Professor of Molecular Biosciences
Tara Fickle, Associate Professor, Asian American Studies
Robert L. Nelson, Professor, Sociology
Iñigo Manglano-Ovalle, Professor, Art Theory and Practice
Cynthia Robin, Professor, Anthropology
Shana Bernstein, Clinical Associate Professor, Legal Studies and American Studies
Emily Maguire, Associate Professor, Spanish and Portuguese
Benjamin Frommer, Associate Professor, Department of History
Jonathon Glassman, Professor Emeritus, History
Zach Nissen, Assistant Professor of Instruction, Anthropology

JA1873

AAUP-00019

 Board of Trustees Chair Letter (2025-04-04)

LaShandra Sullivan, Associate Professor, Anthropology

Jeffrey A. Linder, MD, MPH, FACP, Michael A. Gertz Professor of Medicine and Chief, Division of General Internal Medicine

Sadie Wignall, Professor, Molecular Biosciences, and Director, Interdisciplinary Biological Sciences PhD program

Zachary Buchner, Assistant Professor of Instruction, Art Theory & Practice

Anonymous, Assistant Professor, Molecular Biosciences

Joe Feinglass, Research Professor of Medicine, Division of General Internal Medicine

Curt M. Horvath, Professor of Molecular Biosciences

Shelby Blythe, Assistant Professor, Molecular Biosciences

Diego Arispe-Bazán, Assistant Professor, Department of Anthropology

Steven Epstein, Professor of Sociology and John C. Shaffer Professor in the Humanities

Michael Kraus, Professor, Department of Psychology

Bennett Goldberg, Professor of Physics and Astronomy

Shalini Shankar, Professor, WCAS, Anthropology and Asian American Studies

Michelle M. Driscoll, Associate Professor, Physics & Astronomy

Robert Launay, Professor of Anthropology

AJ Christian, Professor, School of Communications

Kenzie A. Cameron, Professor of Medicine, Division of General Internal Medicine

Michael Anthony Turcios, Assistant Professor, Department of Radio/Television/Film; Center for Native American and Indigenous Research; Latina and Latino Studies Program

Santiago J. Molina, Assistant Professor, Sociology

Jen Munson, Assistant Professor, Learning Sciences, SESP

Beatriz O. Reyes, Assistant Professor of Instruction, Global Health Studies Program and NAIS minor

Megan Hyska, Assistant Professor, Philosophy

Hector Carrillo, Professor, Sociology and Gender and Sexuality Studies

Peter van Elswyk, Assistant Professor, Philosophy

Lisa Del Torto, Professor of Instruction, Cook Family Writing Program

Ray San Diego, Associate Professor of Instruction, Asian American Studies Program

S. B. West, Associate Professor of Instruction, Gender & Sexuality Studies, Spanish and Portuguese

Peter Locke, Professor of Instruction, Global Health Studies

Matthew O'Brien Associate Professor of Medicine and Preventive Medicine, Feinberg School of Medicine

Annalise Buth, Clinical Associate Professor, Pritzker School of Law

Cliff Zimmerman, Professor of Practice, Pritzker School of Law

Paul Gowder, Professor of Law, Pritzker School of Law

Alejandra Uslenghi, Associate Professor, Spanish & Portuguese - CLS

Melissa Simon, MD MPH, George H. Gardner MD Professor of Clinical Gynecology, Department of Obstetrics and Gynecology

Marc Sala, MD, Associate Professor, Pulmonary and Critical Care Medicine

Cybele Ghossein, Professor of Medicine - Feinberg school of Medicine

Cara J. Gottardi Pulmonary Medicine/Cell&Developmental Biology

Calvin Liang, School of Communication

Moya Bailey, Professor, Communication Studies

Galen Bodenhausen, Professor, Psychology

Aarati Didwania, Professor of Medicine, Feinberg School of Medicine

Alan R. Hauser, Professor, Feinberg School of Medicine

Becca Greenstein, STEM Librarian, University Libraries

Stacy Benjamin, Clinical Professor, Segal Design Institute

John Anderson, Senior Lecturer, Segal Design Institute

John Lake, Instructor, Segal Design Institute



AAUP-00020


Stephanie Knezz, Associate Professor of Instruction, Chemistry

Lakshmi Padmanabhan, Assistant Professor, Department of Radio, TV, Film.

Emma Adam, Edwina S. Tarry Professor of Human Development and Social Policy, School of Education and Social Policy

Gregory Ward, Professor, Linguistics, Gender and Sexuality Studies, Philosophy (courtesy)

Frances R. Aparicio, Professor Emerita, Latina and Latino Studies Program

Cristina Lafont, Professor, Philosophy

Pascal Brixel, Assistant Professor, Philosophy

Claire Kirwin, Assistant Professor, Philosophy

Marcela A. Fuentes, Associate Professor, Performance Studies

Murali Prakriya, Professor of Pharmacology

Claudio Benzecry, Professor of Communication studies and Sociology

Aaron Shaw, Associate Professor, Communication Studies

Sepehr Vakil, Associate Professor, SESP

Kennetta Hammond Perry, Associate Professor, Black Studies and History

Allison Carroll, Assistant Professor, Psychiatry and Behavioral Sciences

Ava Thompson Greenwell, Professor, Medill

Karen M. Ridge, Professor of Medicine/Cell & Developmental Biology Feinberg School of Medicine

Deborah Douglas, Senior Lecturer and Director of the Medill Solutions Journalism Hub

Doug Kiel, Associate Professor, History

Samuel Weber, Avalon Professor of Humanities, German & CLS

Anonymous, Philosophy

Jonathan Moreira, Associate Professor, Feinberg School of Medicine

Jennifer Bierman, Professor of Medicine, Feinberg School of Medicine

Laura Hein, Professor of History

Alyson Carrel, Clinical Professor, Law

Jon Marshall, Associate Professor, Medill

Christian Petersen, Professor, Molecular Biosciences

Stephen Adam, Associate Professor, Cell and Developmental Biology

Mita Sanghavi Goel, MD, MPH, FACP, Professor of Medicine and Medical Education, Feinberg School of Medicine

Susanna A. McColley, Professor of Pediatrics in Pulmonary and Sleep Medicine

Priyanka Motaparthy, Clinical Professor of Law, Pritzker School of Law

Michael P. Angarone, Associate Professor, Feinberg School of Medicine

Andrea Lewis Hartung, Clinical Professor, Pritzker School of Law

Christine Percheski, Associate Professor of Sociology

Kyla Ebels-Duggan, Professor, Philosophy; Director, Brady Program in Ethics and Civic Life

Alfonso Mondragon, Professor, Molecular Biosciences

Amesika Nyaku, Assistant Professor, Feinberg School of Medicine

Brannon Ingram, Associate Professor, Religious Studies

Niall Mangan, Assistant Professor, ESAM, McCormick School of Engineering

Jennifer A. Jones, Associate Professor, Sociology

Jeremy Birnholtz, Professor, Communication Studies

Benjamin D. Singer, Lawrence Hicks Professor of Pulmonary Medicine, Department of Medicine, Feinberg School of Medicine

Karrie Snyder, Associate Professor of Instruction - Sociology

James Mahoney, Professor, Sociology and Political Science

Julia Behrman, Associate Professor of Sociology

Yingdan Lu, Assistant Professor, Communication Studies

Rebecca Ewert, Assistant Professor of Instruction, Sociology



AAUP-00021

 Board of Trustees Chair Letter (2025-04-04)

Ann Shola Orloff, Professor, Sociology and Political Science
Kate Weisshaar, Associate Professor, Sociology
Robert Weinstock, Clinical Associate Professor of Law, Pritzker Law School
Laura Pigozzi, Associate Professor of Instruction, Cook Family Writing Program
Duri Long, Assistant Professor, Communication Studies
Darren Gergle, Professor of Communication Studies and Computer Science (by courtesy)
Laurel Harbridge-Yong, Professor, Political Science
Eli Kean, Assistant Professor of Instruction, Gender & Sexuality Studies
Courtney Scherr, Associate Professor, Communication Studies
Lisandra Vila Ellis, Assistant Professor, Cell and Developmental Biology
Betty Tran, Associate Professor of Medicine, Feinberg School of Medicine
Jamie Carlstone, Associate Librarian, Northwestern Libraries
Linda A. Teplin, Owen L. Coon Professor of Psychiatry and Behavioral Sciences
Sara Thomas, Research Assistant Professor, Feinberg School of Medicine
Krishnan Warrior, Assistant Professor of Medicine, Feinberg School of Medicine
Mary Kwasny, Professor, Preventive Medicine
Judith Moskowitz, PhD, MPH, Vice Chair for Faculty Research, Feinberg School of Medicine
Sera Young, Professor of Anthropology
Thomas J Billard, Associate Professor, Communication Studies and Sociology (courtesy)
Christina Normore, Associate Professor, Art History
Marcelo Worsley, Karr Family Associate Professor, Learning Sciences and Computer Science
Almaz Mesghina, Assistant professor of instruction, Psychology
Brady Clark, Associate Professor of Instruction, Linguistics and WCAS Advising
Wendy Espeland, Professor, Sociology
Anonymous, Professor, Microbiology-Immunology
Mimi White, Professor, Radio/TV/Film
Milkie Vu, Assistant Professor, Preventive Medicine
Rajeev Kinra, Associate Professor, History, Comparative Literature, Middle East and North African Studies,
        Asian Languages and Cultures, and International Studies
Morgan Thompson, Assistant Professor, Philosophy
Shobha Mahadev, Clinical Professor of Law, Pritzker School of Law
Anonymous, Assistant Professor, Department of Medicine
Peter Slevin, Professor, Medill
Janice Radway, Walter Dill Scott Professor of Communication Emerita
Rosemary Bush, Associate Professor of Instruction, Earth, Environmental, and Planetary Sciences
Suzan van der Lee, Professor, Earth, Environmental, and Planetary Sciences
Lawrence Stuelpnagel, Clinical Associate Professor Medill/Political Science
Ashlee Humphreys, Professor, Medill School of Journalism, Media, and Integrated Marketing Communications
Brent E. Huffman, Professor, Medill School of Journalism
Caryn Ward, Professor, Medill
Michael A. Deas, Assistant Professor, Medill
Ajay K. Mehrotra, Professor of Law & History
Greg Wagner, Associate Professor, Mechanical Engineering
Gregory Phillips II, Associate Professor, Department of Medical Social Sciences
Jeremy Keys, Assistant Professor of Instruction, Mechanical Engineering
Manjot K Gill, Professor, Ophthalmology and Medical Education
Kathryn Macapagal, Associate Professor, Medical Social Sciences and Psychiatry
Malcolm A. MacIver, Professor, Mechanical Engineering, Biomedical Engineering
Reema Habiby, Associate Professor of Pediatrics
Lisa Wilsbacher, Associate Professor, Feinberg School of Medicine



AAUP-00022

 Board of Trustees Chair Letter (2025-04-04)

Douglas E Vaughan, Professor, Feinberg School of Medicine
Angira Patel MD MPH, Professor of Pediatrics and Medical Education, Feinberg School of Medicine
Carol Haywood, Assistant Professor, Medical Social Sciences
Shawn Smith, MD, Assistant Professor, Feinberg School of Medicine
Michael Beltran, Senior Lecturer, Mechanical Engineering
Magdalena Osburn, Associate Professor, Earth, Environmental, and Planetary Sciences
John W. Rudnicki, Professor, Mechanical Engineering and Civil and Environmental Engineering
Jeff Rice, Senior Lecturer Emeritus, Political Science
Angela Lee, Professor of Marketing, Kellogg School
Jesse Yeh, Assistant Professor of Instruction, Legal Studies
Doreen Weisenhaus, Associate Professor, Medill School of Journalism/Senior Lecturer, Pritzker School of Law,
Gianluca Cusatis, Professor, Department of Civil and Environmental Engineering, McCormick School of
        Engineering and Applied Science
Elizabeth Shogren, Associate Professor, Medill
Douglas Foster, Professor, Medill School
Josh Honn, Humanities and Prison Education Librarian, University Libraries
Eric Sirota, Clinical Associate Professor of Law, Pritzker School of Law
Igal Szleifer, Christina Enroth-Cugell Professor of Biomedical Engineering
Joshua Hauser, Professor, Department of Medicine
Thrasos Pappas, Professor, Electrical and Computer Engineering
Pablo L. Durango-Cohen, Associate Professor, Civil & Environmental Engineering
Wendy Murray, Professor, Departments of Biomedical Engineering and PM&R
Branden Ghena, Assistant Professor of Instructions, Computer Science
Zach Wood-Doughty, Assistant Professor of Instruction, Computer Science
Lynn Cohn, Clinical Professor, Pritzker School of Law
Nivedita Arora, Assistant Professor, Electrical and Computer Engineering & Computer Science, McCormick
Eleanor O'Rourke, Associate Professor of Computer Science and the Learning Sciences
Mahdi Hosseini, Associate Professor of Electrical and Computer Engineering
Hai Zhou, Professor of ECE and CS (courtesy), McCormick School of Engineering
Mark Sheldon, Distinguished Senior Lecturer Emeritus, Philosophy
Katrina T. Obleada, PhD, Assistant Professor in the Department of Psychiatry and Behavioral Health in
        Feinberg School of Medicine
David Gatchell, Clinical Professor of Engineering, Segal Design Institute, McCormick
Baron Reed, Professor, Philosophy
John Flaherty, Professor, Medicine (Infectious Diseases)
Matthew Grayson, Professor of Electrical & Computer Engineering, McCormick
James Bielo, Associate Professor of Religious Studies
Barry Wimpfheimer, Associate Professor, Religious Studies and Law
Ian Hurd, Professor, Political Science, and President-Elect of Faculty Senate
J Michelle Molina, Religious Studies and History
Robert Orsi, Religious Studies and History
Christine Helmer, Peter B. Ritzma Chair of Humanities, Professor, German and Religious Studies (courtesy)
Anna Parkinson, Associate Professor, Department of German
Erica Weitzman, Associate Professor, German and Comparative Literary Studies
Ian Horswill, Associate Professor of Computer Science
Jason Hartline, Professor, Computer Science
Kenneth D. Forbus, Walter P. Murphy Professor of Computer Science & Professor of Education (by courtesy)
Ivuoma Onyeador, Assistant Professor, Management & Organizations (Kellogg), Psychology (courtesy),
        Pritzker (courtesy)
Fabián E. Bustamante, Professor, Department of Computer Science

AAUP-00023

 # Board of Trustees Chair Letter (2025-04-04)

Anonymous, Professor, Learning Sciences and Human Development and Social Policy
Cindy Wilson, Clinical Professor, Pritzker School of Law
William Reno, Professor of Political Science
Sally Nuamah, Associate Professor, SESP
Kyle Henry, Associate Professor, Radio Television Film
K O, Associate Professor, Director of Music Theater Area, School of Communications

Wendy Muchman, Professor of Practice, Northwestern University Pritzker School of Law
Ed Colgate, Professor, Mechanical Engineering
Tabitha Bonilla, Associate Professor, HDSP and Political Science
Sarah Cushman, Senior Lecturer, History
Lina Britto, Associate Professor, Department of History
Melissa Rosenzweig, Associate Professor of Instruction, Anthropology and EPC
Nicole Stephens Jeanne Brett Chair in Negotiations Professor of Management & Organizations
Annette D'Onofrio, Associate Professor, Linguistics
Quincy Thomas Stewart, Associate Professor, Sociology
Lauren Rivera, Professor of Management and Organizations, Kellogg School of Management
Anonymous, Department of Pediatrics, Division of Pulmonary and Sleep Medicine
Greg J. Beitel
J. Michelle Molina, Religious Studies
Susan Manning, Bergen Evans Professor in the Humanities
Kathleen Carmichael, Professor of Instruction, Cook Family Writing Program
Mark Hauser, Professor, Anthropology
Michael Certo, Assistant Professor of Pediatrics, Feinberg School of Medicine
Zayd Dohrn, Professor, Radio/TV/Film
William R. Leonard, Professor of Anthropology & Global Health Studies
Domietta Torlasco, Professor, French and Italian - CLS
Sarah M. Cushman, Senior Lecturer, History
Mark Sheldon, Distinguished Senior Lecturer Emeritus, Philosophy
Benjamin C. Owen, Associate Professor of Research, Chemistry

---

[1] In a *New York Times* interview on 10th March, Christopher Rufo said that the goal is to "put universities into recession, into declining budgets…in a way that puts them into an existential terror."
[2] During her interview on MSNBC (February 4), Ben-Ghiat referred to this administration's "obsessive haste to purge bureaucracy so quickly," as a *coup*. "I'm a historian of coups," she continued, "and I would use that word." Yale historian of fascism, Timothy Snyder, published his own article the next day headlined "Of Course It's a Coup – Miss the Obvious, Lose Your Republic."
[3] Scholars who study authoritarian leaders have explained that they flourish by invoking a mythic past that bears little resemblance to reality. Autocratic leaders will lie about their targets and repeat these lies until their followers and even opponents start speaking the same language and agreeing to falsehoods.

AAUP-00024

JA1878

Begin forwarded message:

**From:** Bernhard Nickel <bnickel@fas.harvard.edu>
**Subject: A Message from the Chair**
**Date:** February 13, 2025 at 10:14:39 AM EST
**To:** philgrad-list <philgrad-list@fas.harvard.edu>

Dear Grads,

The past few weeks since the inauguration of the new Administration have been unlike anything I imagined at the beginning of 2025. There have been a flurry of orders that directly or indirectly target higher education in general and Harvard in particular. Many of these orders are in a state of suspension, by judicial stay, temporary restraining order, and the like. But all of these responses are temporary, and it's clear that a significant aspect of the strategy is to just overwhelm any of the institutions that might oppose the Administration's agenda through sheer volume of activity — to "flood the zone" as they put it themselves. So the fact that the orders haven't gone into effect doesn't tell us anything about the shape of things to come.

On top of these attacks on our institutions, we see orders and policy proposals that fundamentally affect different members of our community. They add to the sense of unreality and threat I feel every day, that I'm sure you feel every day.

This is not the time to be alone. Seeing so many institutions cooperate or remain silent is disheartening. In this moment, it's been a great help to me to speak to other department chairs, to rely on my colleagues to support me as I do my best to support them, and certainly to speak to some of you as I see you around Emerson. I would like to have the opportunity to speak with more of you, to answer questions to the extent I know these answers, to share experiences with you, and simply to be in community with you. I'm around Emerson a lot, and when my office is open, I'm happy for you to just walk in.

I can't make it to happy hour tonight, but I'm planning on attending more grad-centered events beginning next week. The onus of reaching out to me

JA1879

AAUP-00252

shouldn't just be on you, and it won't be.

- Bernhard.


--
Bernhard Nickel
Professor of Philosophy
Department Chair
Emerson 207
Department of Philosophy
Harvard University
Website  ||  Office Hours Sign-Up
--------------------------------

JA1880

AAUP-00253

Begin forwarded message:

**From:** Bernhard Nickel <bnickel@fas.harvard.edu>
**Subject: A Message from the Chair**
**Date:** April 17, 2025 at 12:25:17 AM EDT
**To:** philgrad-list <philgrad-list@fas.harvard.edu>, <philconc-list@lists.fas.harvard.edu>
**Cc:** philfaculty-list <philfaculty-list@fas.harvard.edu>

Dear Grads, Dear Concentrators,

After the University rejected the Trump Administration's demands of last Friday, the administration has retaliated, first by freezing several billion dollars in funds previously allocated to the University, taking steps to revoke Harvard's tax-exempt status, and now issuing a demand that Harvard release comprehensive information about disciplinary proceedings involving students who are here on visas. Harvard is in a fight with the federal government. I believe that the fight is worth it.

We are facing serious threats as a community. Students who rely on federal grants for research opportunities may see these opportunities curtailed or extinguished completely. International students are exposed, all the more so against the background of lawlessness with which the government is arresting and deporting people. And of course attacks on Harvard's finances may have far-reaching consequences that we cannot survey yet.

It looks as if Harvard will resist not just the demands set forth in the letter from last Friday, but the retaliatory actions, too (see for instance the end of the Crimson's coverage of the DHS demands re: international students.)

I know that many of you have been profoundly affected by the political fight we're embroiled in.

I see you.

AAUP-00254

JA1881

I don't know what the coming weeks and months will bring. I hope that you will stand in solidarity with each other because we won't all be equally affected by everything that happens, and it's important that we not fracture in this moment. Say "hi" to each other in Emerson, ask how the people around you are doing, and be prepared to listen. Allow our shared commitment to philosophy to be a source of connection among us, too. If you need help, reach out. Especially for academic issues, work with your professors to figure out the best way forward. We faculty are all keenly aware of what's going on.

For any of you who want to talk more about this with me, I'll be in my office and available to talk tomorrow (Thursday), starting at 5:30pm. Come to just tell me what's going on with you, share your ideas about moving forward, or discuss some of the issues at stake, such as academic freedom and what it takes to make Harvard a great place to learn for everyone. My dog will be there, too, if you want to just hang out with him.

And of course you can always just stop me in the halls.

Warmly,
Bernhard.


--
Bernhard Nickel
Professor of Philosophy
Department Chair
Emerson 207
Department of Philosophy
Harvard University
Website || Office Hours Sign-Up
-------------------------------

JA1882

# An Open Letter to the Director of the US Holocaust Memorial Museum

## Omer Bartov, Doris Bergen, Andrea Orzoff, Timothy Snyder, and Anika Walke

The Museum's decision to completely reject drawing any possible analogies to the Holocaust, or to the events leading up to it, is fundamentally ahistorical. It makes learning from the past almost impossible.

July 1, 2019

On June 17, Representative Alexandria Ocasio-Cortez, Democrat of New York, posted an Instagram live video discussing the detention camps along the southern US border as "concentration camps" in which she used the phrase "Never Again." This drew sharp criticism the following day from Representative Liz Cheney, Republican of Wyoming, and others for allegedly misappropriating a slogan associated with the Holocaust. After several days of heated media and political debate, the United States Holocaust Memorial Museum released a statement on June 24 condemning the use of Holocaust analogies. We received the following open letter addressed to the director of the museum, Sara J. Bloomfield, delivered by the signatories on July 1.

—*The Editors*

**To Director Bloomfield:**

We are scholars who strongly support the United States Holocaust Memorial Museum. Many of us write on the Holocaust and genocide; we have researched in the USHMM's library and archives or served as fellows or associated scholars; we have been grateful for the Museum's support and intellectual community. Many of us teach the Holocaust at our universities, and have drawn on the Museum's online resources. We support the Museum's programs from workshops to education.

We are deeply concerned about the Museum's recent "Statement Regarding the Museum's Position on Holocaust Analogies." We write this public letter to urge its retraction.

Scholars in the humanities and social sciences rely on careful and responsible analysis, contextualization, comparison, and argumentation to answer questions about the past and the present. By "unequivocally rejecting efforts to create analogies between the Holocaust and other events, whether historical or contemporary," the United States Holocaust Memorial Museum is taking a radical position that is far removed from mainstream scholarship on the Holocaust and genocide. And it makes learning from the past almost impossible.

AAUP-00204

JA1883

The Museum's decision to completely reject drawing any possible analogies to the Holocaust, or to the events leading up to it, is fundamentally ahistorical. It has the potential to inflict severe damage on the Museum's ability to continue its role as a credible, leading global institution dedicated to Holocaust memory, Holocaust education, and research in the field of Holocaust and genocide studies. The very core of Holocaust education is to alert the public to dangerous developments that facilitate human rights violations and pain and suffering; pointing to similarities across time and space is essential for this task.

Looking beyond the academic context, we are well aware of the many distortions and inaccuracies, intentional or not, that frame contemporary discussions of the Holocaust. We are not only scholars. We are global citizens who participate in public discourse, as does the Museum as an institution, and its staff. We therefore consider it essential that the United States Holocaust Memorial Museum reverse its position on careful historical analysis and comparison. We hope the Museum continues to help scholars establish the Holocaust's significance as an event from which the world must continue to learn.

**Signed:**

David Abraham, Professor, School of Law, University of Miami

Deborah Achtenberg, Professor of Philosophy, Faculty Associate in Gender, Race, Identity, University of Nevada, Reno

James R. Adair, Lecturer in Humanities and Religious Studies, University of Texas at San Antonio

Hugh LeCaine Agnew, Professor of History and International Affairs, Elliott School of International Affairs, George Washington University

Carlos Aguirre, Professor of History, University of Oregon

Michal Aharony, Editor, *The Journal of Holocaust Research*, Weiss-Livnat International Center for Holocaust Research and Education, University of Haifa, Israel

Avril Alba, Ph.D., Senior Lecturer in Holocaust Studies and Jewish Civilisation, University of Sydney, Australia

Ángel Alcalde, Lecturer in History, University of Melbourne, Australia

Natalia Aleksiun, Professor of Modern Jewish History, Touro College

Kimberly Allar, Clinical Assistant Professor of History, Co-Director, Online World War II Studies, School of Historical, Philosophical & Religious Studies, Arizona State University

Barbara Allen, Associate Professor of History, La Salle University

Benjamin L. Alpers, Associate Professor, Honors College, University of Oklahoma

Andrew Altman, Professor of Philosophy, Georgia State University

Tarik Cyril Amar, Koç University, Turkey

Claire Andrieu, Professor of Contemporary History, Sciences Po, Paris, France

Emily Abrams Ansari, Associate Professor of Music History, Western University, Canada

JA1884

AAUP-00205

Dora Apel, Professor and W. Hawkins Ferry Endowed Chair in Modern and Contemporary Art History, Wayne State University, UK

Kwame Anthony Appiah, Professor of Philosophy and Law, New York University

Rachel Applebaum, Assistant Professor of History, Tufts University

Celia Applegate, William R. Kenan, Jr. Professor of History, Vanderbilt University

Karen Auerbach, Associate Professor of History, University of North Carolina at Chapel Hill

Leora Auslander, Arthur and Joann Rasmussen Professor of Western Civilization in the College and Professor of Modern European Social History in the History Department, University of Chicago

Akil N. Awan, Senior Lecturer in Modern History, Political Violence & Terrorism, Royal Holloway, University of London

Albena Azmanova, Professor of Politics, University of Kent, UK

Jonathan Bach, Professor of Global Studies, The New School

Mark Baker, Adjunct Associate Professor, Australian Centre for Jewish Civilisation, Monash University, Australia

Monique Rodrigues Balbuena, Associate Professor of Comparative Literature and Jewish Studies, Clark Honors College, University of Oregon

Shelley Baranowski, Distinguished Professor of History Emerita, University of Akron

Ben Barkow, Director, The Wiener Library, London, UK

Lawrence Baron, Professor Emeritus, San Diego State University

Deborah Barton, University of Montreal, Canada

Omer Bartov, John P. Birkelund Distinguished Professor of European History, Professor of German Studies, Brown University

Paul R. Bartrop, Professor of History, Director, Center for Judaic, Holocaust, and Genocide Studies, Florida Gulf Coast University

Rachel N. Baum, Senior Lecturer and Deputy Director of the Sam & Helen Stahl Center for Jewish Studies, University of Wisconsin, Milwaukee

Michael Beckerman, Carroll and Milton Petrie Professor of Music, New York University

Jonathan Beecher Field, Associate Professor of English, Clemson University

Jan Claas Behrends, Senior Fellow at the Centre for Contemporary History (ZZF), Potsdam, Lecturer in East European History, Humboldt Universität zu Berlin, Germany

Cristina A. Bejan, Duke University

Mara Benjamin, Irene Kaplan Leiwant Associate Professor of Jewish Studies, Mount Holyoke College Waitman Wade Beorn, Lecturer, Corcoran Department Of History, University of Virginia

Christine Beresniova, Executive Director, South Carolina Council on the Holocaust, Instructor of Anthropology, Ashford University

Nancy Berg, Professor of Hebrew Language and Literature, Washington University in St. Louis

James Berger, Senior Lecturer in American Studies and English, Yale University

AAUP-00206

Michael Berghoef, Professor of Social Work, Ferris State University

Max Bergholz, Associate Professor of History, Concordia University, Montreal, Canada

Teresa Bergman, Professor of Communication, University of the Pacific

Joel Berkowitz, Professor of Foreign Languages and Literature and Director of the Sam & Helen Stahl Center for Jewish Studies, University of Wisconsin-Milwaukee

Lila Corwin Berman, Professor of History, Murray Friedman Chair of American Jewish History and Director of the Feinstein Center for American Jewish History, Temple University

Nathaniel Berman, Rahel Varnhagen Professor of Religious Studies, Brown University

Olga Bertelsen, Assistant Professor of Intelligence Studies, Embry-Riddle College of Security and Intelligence

Svenja Bethke, Lecturer in Modern European History, University of Leicester, UK

David Biale, Emanuel Ringelblum Distinguished Professor, University of California, Davis

Natalie Belsky, Assistant Professor of History, University of Minnesota Duluth

Elissa Bemporad, Associate Professor of East European Jewish History and the Holocaust, Queens College and The Graduate Center, City University of New York

Doris Bergen, Chancellor Rose and Ray Wolfe Professor of Holocaust Studies, University of Toronto, Canada

Frank Biess, Professor of History, University of California, San Diego

Monica Black, Associate Professor of History, University of Tennessee, Knoxville

David Blackbourn, Cornelius Vanderbilt Distinguished Chair and Professor of History, Vanderbilt University

Adam A. Blackler, Assistant Professor of History, University of Wyoming

Muriel Blaive,* Ústav pro studium totalitních režimu (Institute for the Study of Totalitarian Regimes), Prague, Czech Republic

Daniel Blatman, Max and Rita Haber Professor in Contemporary Jewry and Holocaust Studies, Head of the Harman Research Institute of Contemporary Jewry, The Hebrew University of Jerusalem, Israel

Benita Blessing, Instructor, World Languages and Cultures, Oregon State University

Donald Bloxham, Professor of Modern History, University of Edinburgh, UK

Jeffrey Blutinger, Barbara and Ray Alpert Endowed Chair in Jewish Studies, California State University, Long Beach

Paul Boghossian, Silver Professor of Philosophy, New York University

Andrea F. Bohlman, Associate Professor of Music, University of North Carolina at Chapel Hill

Melissa Bokovoy, Chair and Professor, Department of History, University of New Mexico

Alan Brill, Cooperman/Ross Endowed Professor in honor of Sister

JA1886

AAUP-00207

Rose Thering, Seton Hall University

Tobias Brinkmann, Malvin and Lea Bank Associate Professor of Jewish Studies and History, Penn State University

James M. Brophy, Professor of History, University of Delaware

Martin D. Brown, Lead Researcher, Centre of Excellence in Intercultural Studies, School of Humanities, Tallinn University, Estonia

Timothy Scott Brown, Professor and Chair of History, Northeastern University

Julia Brüggemann, Professor of History, DePauw University

Diana Kormos Buchwald, Robert M. Abbey Professor of History, General Editor and Director, The Einstein Papers Project, California Institute of Technology

Maria Bucur, John V Hill Professor of History and Gender Studies, Indiana University Bloomington

Darcy Buerkle, Associate Professor, Department of History, Smith College

Peter Bugge, Associate Professor of Central European Studies, Aarhus University, Denmark

Melissa K. Byrnes, Associate Professor and Chair of History, Southwestern University

Joy H. Calico, Cornelius Vanderbilt Professor of Musicology, Vanderbilt University

Carlo Spartaco Capogreco, Associate Professor of Contemporary History, University of Calabria, Italy

Karen D. Caplan, Associate Professor of History, Rutgers University, Newark

Holly Case, Associate Professor of History, Brown University

Michael Casper, University of California, Los Angeles; former Mandel Center Research Fellow

Jonathon Catlin, Department of History, Princeton University

Vitaly Chernetsky, Associate Professor of Slavic Languages and Literatures and Director of the Center for Russian, East European & Eurasian Studies, University of Kansas

Mita Choudhury, Professor of History, Vassar College

Anna Cichopek-Gajraj, Associate Professor of Modern Polish-Jewish History, Arizona State University

Samantha Clarke, Department of History, McMaster University, Canada

Shelly M. Cline, Kansas City Art Institute

Shawn Clybor, History Teacher, Dwight-Englewood School

Brigid Cohen, Associate Professor of Music, New York University

Danny M. Cohen, Distinguished Professor of Instruction, School of Education and Social Policy, Northwestern University

Mark B. Cole, College Associate Lecturer, Cleveland State University, Board Member of the Ohio Council on Holocaust and Genocide Education

Tim Cole, Professor of Social History and Director of the Brigstow Institute, University of Bristol, UK

Alon Confino, Pen Tishkach Chair of Holocaust Studies, University of

AAUP-00208



Massachussetts at Amherst

Jazmine Contreras, Ph.D. Candidate, University of Minnesota

N.D.B. Connolly, Herbert Baxter Adams Associate Professor, Johns Hopkins University

Manuela Consonni, Professor, Pela And Adam Starkopf Chair in Holocaust Studies, The Hebrew University of Jerusalem, Israel

Seth Cotlar, Professor of History, Willamette University

Stef Craps, Professor of English Literature, Director, Cultural Memory Studies Initiative, Ghent University, Belgium

Brian Crim, Associate Professor of History, John M. Turner Chair in the Humanities, Lynchburg University

Martina Cucchiara, Associate Professor of History, Bluffton University

Sarah Cushman, Northwestern University

Mikkel Dack, Professor of History, Director of Research, Rowan Center for Holocaust and Genocide Studies, Rowan University

Peter Davies, Professor of Modern German Studies, University of Edinburgh, UK

Valerie Deacon, Clinical Assistant Professor of History, New York University Shanghai

Rachel Deblinger, Director of Documenting Global Voices Project, University of California, Los Angeles

Andrew Dell'Antonio, Distinguished Teaching Professor of Musicology, University of Texas at Austin

Scott Denham, Charles A. Dana Professor of German Studies, E. Craig Wall Jr. Distinguished Teaching Professor in the Humanities, Davidson College

Andrew Denning, Associate Professor of History, University of Kansas

David Brandon Dennis, Associate Professor of History, Dean College

Christoph Dieckmann, Research Fellow, University of Bern, Switzerland/Germany

Hasia Diner, Professor of History and of Hebrew and Judaic Studies, New York University

Skye Doney, Director of the George L. Mosse Program in History, University of Wisconsin-Madison

Alexandra van Doren, Department of Comparative Literature, University of Illinois Urbana-Champaign; Law Student, Immigration and Human Rights; University of Michigan School of Law

Daniella Doron, Senior Lecturer in Jewish History, Australian Centre for Jewish Civilisation, Monash University, Australia

Thomas L. Doughton, Senior Lecturer, College of the Holy Cross

Lawrence Douglas, James J. Grosfeld Professor of Law, Jurisprudence & Social Thought, Amherst College

Jennifer Dowling, University of Sydney, Australia

Theodora Dragostinova, Associate Professor of History, Ohio State University

Elizabeth Drummond, Associate Professor and Chair of History, Loyola Marymount University

Diana Dumitru, Associate Professor of History, Ion Creanga State Pedagogical University, Moldova

Deborah Dwork, Founding Director, Strassler Center for Holocaust

JA1888

AAUP-00209

and Genocide Studies, Clark University

Hilary Earl, Professor of History, Nipissing University

Astrid M. Eckert, Associate Professor of History, Emory University

M. Kathryn Edwards, Assistant Professor of History, Tulane University

Rachel L. Einwohner, Professor of Sociology and (by courtesy) Political Science, Purdue University

Dan Ellin, Archivist, International Bomber Command Centre, University of Lincoln, UK

Jane Ellsworth, Professor of Music History, Eastern Washington University

Robert P. Ericksen, Kurt Mayer Chair in Holocaust Studies Emeritus, Pacific Lutheran University

Andrea Erkenbrecher, Freelance Historian, Karlsruhe, Germany

Jennifer Evans, Professor of History, Carleton University

Sidra DeKoven Ezrahi, Professor of Comparative Literature, The Hebrew University of Jerusalem

Erica Fagen, University of Massachusetts at Amherst

Linda E. Feldman, Associate Professor of German (retired), University of Windsor, Canada

Brian K. Feltman, Associate Professor of History, Georgia Southern University

Heather Ferguson, Associate Professor of Middle East/Ottoman History, Claremont McKenna College

Kate Ferguson, Chair of Policy, European Centre for the Responsibility to Protect, University of Leeds, UK; Co-Executive Director, Protection Approaches

Scott Ferguson, Associate Professor of Humanities & Cultural Studies, University of South Florida

Jonathan Beecher Field, Associate Professor of English, Clemson University

Gabriel Finder, Professor of Germanic Languages and Literatures, Ida and Nathan Kolodiz Director of Jewish Studies, University of Virginia

Eugene Finkel,* Associate Professor, School of Advanced International Studies, Johns Hopkins University

Matthew P. Fitzpatrick, Professor of International History, Flinders University, Australia

Monika Flaschka, Visiting Lecturer, Georgia State University

Sam Fleischacker, Professor of Philosophy, Director of Religious Studies and of Jewish Studies, University of Illinois at Chicago

Tiffany N. Florvil, Assistant Professor of History, University of New Mexico

Darcie Fontaine, Associate Professor of History, University of South Florida

Jennifer L. Foray, Associate Professor of History, Purdue University

Russell Arben Fox, Professor of Political Science, Friends University

Richard E. Frankel, Richard G. Neiheisel Professor in European History, University of Louisiana at Lafayette

Michal Frankl, Masaryk Institute and Archives of the Czech Academy of Sciences, Czech Republic

David M.P. Freund, Associate Professor of History, University of

AAUP-00210

JA1889

Maryland, College Park

Jonathan Friedman, Professor and Director of Holocaust and Genocide Studies, West Chester University

Danielle Fosler-Lussier, Professor of Music, Ohio State University

Joshua B. Friedman, Perilman Postdoctoral Fellow, Center for Jewish Studies, Duke University

Kathie Friedman, Associate Professor of International Studies, Jackson School, University of Washington

Judith Friedlander, Professor of Anthropology, Emerita, Hunter College, City University of New York

Benjamin Frommer, Associate Professor of History, Northwestern University

Mary Fulbrook, Professor of German History, University College London (UCL), UK

Alison Furlong, American Religious Sounds Project

Sheer Ganor, Visiting Fellow in the History of Migration, German Historical Institute West

Luis-Manuel Garcia, Assistant Professor/Lecturer in Popular Music Studies and Ethnomusicology, University of Birmingham, UK

Paul Garfinkel, Associate Professor of History, Simon Fraser University, Canada

Libby Garland, Associate Professor of History, Kingsborough Community College and The Graduate Center, The City University of New York

Alexandra Garbarini, Professor of History, Williams College

Leah Garrett, Professor and Director of Jewish Studies, Hunter College, City University of New York

Edyta Gawron, Assistant Professor, Institute of Jewish Studies, Jagiellonian University, Krakow, Poland

Lily Geismer, Associate Professor of History, Claremont McKenna College

Christian Gerlach, Professor of Modern History, University of Bern, Switzerland

Judith Gerson, Associate Professor of Sociology and Women's and Gender Studies, Rutgers University

Idit Gil, Academic director of Democracy Studies, M.A Program, the Open University, Israel

Catherine Gilbert, Marie Skłodowska-Curie Research Fellow, Cultural Memory Studies Initiative, Ghent University, Belgium

Shirli Gilbert, University of Southampton, UK

Amelia Glaser, Associate Professor of Russian and Comparative Literature, University of California, San Diego

Amos Goldberg, Professor at The Department of Jewish History and Contemporary Jewry, The Hebrew University of Jerusalem, Israel

Randall Goldberg, Associate Professor of Musicology and Director of the Dana School of Music, Youngstown State University

Janet Golden, Professor Emerita, Rutgers University-Camden

David A. Goldfarb, Independent Scholar, New York

Julien Gorbach, Assistant Professor in the School of Communications, University of Hawaii at Manoa

AAUP-00211



Peter E. Gordon, Amabel B. James Professor of History, Harvard University

L. Janelle Gornick, Assistant Professor of Psychology, Virginia Military Institute

Boris B. Gorshkov, Lecturer in History, The University of Tennessee at Chattanooga

William Glenn Gray, Associate Professor of History, Purdue University

Walter D. Greason, Dean Emeritus, The Honors School; Chair and Associate Professor, Educational Counseling and Leadership, Monmouth University

Judith Greenberg, Adjunct Faculty, Gallatin School of Individualized Study, New York University

Henry Greenspan, Emeritus, University of Michigan

Simone Gigliotti, Holocaust Research Institute, Royal Holloway, University of London, UK

Dorota Glowacka, University of King's College, Canada

Jan Grabowski, Professor of History, University of Ottawa

Ronald Granieri, Army War College

Emily Greble, Associate Professor of History and East European Studies, Vanderbilt University

Julie Greene, Professor of History, University of Maryland at College Park

Neil Gregor, Professor of Modern European History, University of Southampton, UK

Glenda E. Gilmore, Peter V. and C Vann Woodward Professor of History Emeritus, Yale University

Atina Grossmann, Professor of History in the Faculty of Humanities and Social Sciences, Cooper Union, New York City

Gary D. Grossman, Professor of Animal Ecology, University of Georgia

Amanda F. Grzyb, Associate Professor of Information and Media Studies, Western University

Liora Gubkin, Professor of Religious Studies, Director Institute for Religion, Education, and Public Policy, California State University, Bakersfield

Debra Guckenheimer, Lecturer, Sociology and Human Development, California State University, East Bay

Edin Hajdarpasic, Associate Professor of Modern European History, Loyola University Chicago

Anna Hajkova,* Associate Professor of History, University of Warwick, UK

Sara Halpern, Ohio State University

Nancy Harrowitz, Professor of Italian and Jewish Studies, Director of the Minor in Holocaust, Genocide and Human Right Studies, Boston University

Cynthia Haynes, Director of Rhetorics, Communication, and Information Design Ph.D. Program, Professor of English, Clemson University

Valerie Hebert, Associate Professor, Lakehead University Orillia, Canada

Susanne Heim, University of Freiburg

AAUP-00212



Elizabeth Heineman, Professor of History and of Gender, Women's, and Sexuality Studies, University of Iowa

Daniel Kupfert Heller, Kronhill Senior Lecturer in East European Jewish History, Australian Centre for Jewish Civilisation, Monash University, Australia

David Helps, Department of History, University of Michigan

Burkhard Henke, Professor of German, Davidson College

David Henkin, Professor of History, University of California, Berkeley

Laura Herron, Assistant Professor of Jewish Studies and History, Oberlin College

Deborah Hertz, Professor of History, Wouk Chair in Modern Jewish Studies, University of California San Diego

Susannah Heschel, Eli Black Professor of Jewish Studies, Dartmouth College

Benjamin Hett, Professor of History, Hunter College and the Graduate Center, City University of New York

Jim Hicks, Executive Editor, The Massachusetts Review, Senior Lecturer in Comparative Literature, University of Massachusetts at Amherst

Steven High, Professor of History, Concordia University, Montreal, Canada

Faith Hillis, Associate Professor of Russian History, The University of Chicago

Susanne Hillman, San Diego State University/University of California, San Diego

Laura J. Hilton, Professor of History, Muskingum University

Marianne Hirsch, William Peterfield Trent Professor of English and Comparative Literature, Columbia University

Erin Hochman, Associate Professor of History, Southern Methodist University

Tobias Hof, Ludwig-Maximilians-University Munich, Germany

Janine Holc, Associate Professor, Political Science Department, Loyola University

Sandie Holguín, Professor of History, University of Oklahoma

Anna Holian, Associate Professor of History, Arizona State University

Alana Holland, Department of History, University of Kansas

Lynn Holly, Architect

Hannah Holtschneider, Senior Lecturer in Jewish Studies, University of Edinburgh, UK

Claire M. Hubbard-Hall, Senior Lecturer in History, Bishop Grosseteste University, UK

Anne P. Hubbell, Professor, Department of Communication Studies, New Mexico State University

Erika Hughes, Senior Lecturer in Drama and Performance, University of Portsmouth, UK

Judith M. Hughes, Professor Emerita of History, University of California, San Diego

Alexandra Hui, Associate Professor of History, Mississippi State University

Samuel Clowes Huneke, Assistant Professor of History, George Mason

AAUP-00213

JA1892

University

Tera W. Hunter, Edwards Professor of American History, Princeton University

Jennifer Hurst-Wender, Director of Museum Operations and Education, Preservation Virginia

Samara Hutman, Former Executive Director, Los Angeles Museum of The Holocaust, 2013-2016

Andreas Huyssen, Villard Professor Emeritus of German and Comparative Literature, Columbia University

Natalia Indrimi, Centro Primo Levi New York

Christian Ingrao, Senior Researcher Institut d'Histoire du Temps Présent, CNRS/Université, Paris, France

Steven Leonard Jacobs, Professor of Religious Studies & Aronov Endowed Chair of Judaic Studies, University of Alabama

Paul Jaskot, Professor of Art, Art History and Visual Studies, Duke University

Tomaz Jardim,* Associate Professor of History, Ryerson University, Canada

Joseph E. Jensen, Adjunct Professor, Georgetown University

Steven Jobbitt, Associate Professor of History, Lakehead University

Richard Ivan Jobs, Professor of History, Pacific University

Elisa von Joeden-Forgey, Dr. Marsha Raticoff Grossman Professor of Holocaust and Genocide Studies, Stockton University

Alison Frank Johnson, Professor of History and of Germanic Languages and Literatures; Chair, Department of Germanic Languages and Literatures, Harvard University

Jason Johnson, Associate Professor of History, Trinity University

Nicholas K. Johnson, Deputy Head, Center for German-American Educational History, University of Münster, Germany

Timothy Scott Johnson, Visiting Assistant Professor of History, Texas A&M University Corpus Christi

Benjamin T. Jones, Lecturer in History, Central Queensland University, Australia

Adam Jones, Professor of Political Science, University of British Columbia Okanagan, Canada

Ari Joskowicz, Associate Professor of Jewish Studies, European Studies, and History, Vanderbilt University

Steffen Jost, Head of Education Department, Dachau Concentration Camp Memorial Site, Germany

Jonathan Judaken, Spence L. Wilson Chair in the Humanities, Rhodes College

Robin Judd, Associate Professor of History, Ohio State University

Pieter M. Judson, Professor of 19th and 20th Century History, European University Institute, Florence, Italy

Kathryn Julian, Visiting Lecturer in History, Maryville College

Irene Kacandes, Dartmouth Professor of German Studies and Comparative Literature, Dartmouth College

Carroll P. Kakel, III, Lecturer, Krieger School of Arts & Sciences, Advanced Academic Programs, Johns Hopkins University

Martin Kalb, Assistant Professor of History, Bridgewater College

AAUP-00214



Brett Kaplan, Professor of Literature, University of Illinois Urbana-Champaign

Marion Kaplan, Skirball Professor of Modern Jewish History, New York University

Thomas Pegelow Kaplan, Leon Levine Distinguished Professor and Director of the Center for Judaic, Holocaust and Peace Studies, Appalachian State University

Alexander Karn, Associate Professor of History, Director, Peace and Conflict Studies Program, Colgate University

Rabbi Henry Jay Karp, Adjunct Professor of Theology, St. Ambrose University

Olga Kartashova, Hebrew and Judaic Studies, New York University

Samuel Kassow, Northam Professor of History, Trinity College

Anthony D. Kauders, Professor of Modern History, Keele University, United Kingdom

Martin Kavka, Professor, Department of Religion, Florida University

Ari Kelman, Chancellor's Leadership Professor of History, University of California, Davis

Michelle Kelso, Assistant Professor of Sociology and International Affairs, The George Washington University

Padraic Kenney, Professor of History and International Studies, Indiana University Bloomington

Audrey Kichelewski, Associate Professor of Contemporary History, Strasbourg University, France

Ben Kiernan, A. Whitney Griswold Professor of History, Yale University

Charles King, Professor of International Affairs and Government, Georgetown University

Lisa Kirschenbaum, Professor of History, West Chester University

Rebekah Klein-Pejšová, Associate Professor of History, Purdue University

Irena Klepfisz, retired, Barnard College, New York

Sarah Knott, Associate Professor of History, Indiana University Bloomington

Adam Knowles, Assistant Teaching Professor of Philosophy, Drexel University

Anne Knowles, McBride Professor of History, University of Maine

Roy G. Koepp, Assistant Professor of Modern European History, Eastern New Mexico University

Ari Kohen, Associate Professor of Political Science and Schlesinger Professor of Social Justice in the Harris Center for Judaic Studies, University of Nebraska-Lincoln

Yuliya Komska, Associate Professor of German Studies, Dartmouth College

Jeffrey S. Kopstein, Professor of Political Science, University of California, Irvine

Alexander Korb, Associate Professor in Modern European History, University of Leicester, UK

Jacques Kornberg, Professor Emeritus, Department of History, University of Toronto, Canada

AAUP-00215



Melissa Kravetz, Associate Professor of History, Longwood University

Barbara Krawcowicz, Post-Doctoral Fellow in Judaic Studies, Norwegian University of Science and Technology, Norway

Leslie Kriebel, Social Science Lecturer, Boston University

Kevin M. Kruse, Professor of History, Princeton University

Lukasz Krzyzanowski, Assistant Professor, Polish Academy of Sciences, Warsaw

Hana Kubatova, Assistant Professor, Charles University Prague, Czech Republic

Emma Kuby, Assistant Professor of History, Northern Illinois University

Thomas Kühne, Director, Strassler Center for Holocaust and Genocide Studies, Clark University

Regina Kunzel, Doris Stevens Chair and Professor of History and Gender and Sexuality Studies, Princeton University

Jacob Ari Labendz, Clayman Assistant Professor and Director of the Center for Judaic and Holocaust Studies, Youngstown State University

Dominick LaCapra, Professor Emeritus of History and Bowmar Professor Emeritus of Humanistic Studies, Cornell University

Richard Lachmann, Professor of Sociology, The State University of New York, Albany

Elizabeth Harrington Lambert, Grand Valley State University

Melinda Landeck, Assistant Professor of East Asian Studies, Austin College

J. Shawn Landres, Senior Fellow, Luskin School of Public Affairs, University of California, Los Angeles

Barry Langford, Professor of Film Studies and Member, Holocaust Research Institute, Royal Holloway, University of London, UK

Neringa Latvyte-Gustaitiene, Faculty of Communication, Vilnius University, Lithuania

Claire Launchbury, Associate Researcher, School of Languages, Cultures and Societies, University of Leeds, UK

Tom Lawson, Professor of History and Pro Vice-Chancellor for the Faculty of Arts, Design and Social Sciences, Northumbria University, UK

Nitzan Lebovic, Associate Professor of History, Apter Chair of Holocaust Studies and Ethical Values, Lehigh University

Kenneth F. Ledford, Associate Professor of History and Law, Case Western Reserve University; Chair, Department of History; Co-Director, Max Kade Center for German Studies

Daniel Lee, Vice-Chancellor's Fellow, Department of History, University of Sheffield, UK

Laurel Leff, Associate Professor of Journalism, Northeastern University

Lori Lefkovitz, Ruderman Professor of Jewish Studies, Northeastern University

Carole Lemee, Senior Lecturer and Researcher, Université Bordeaux, France

Brigitte Le Normand, Associate Professor of History, University of British Columbia, Okanagan; Humboldt Fellow

AAUP-00216

JA1895

Paul Lerner, Professor of History and Director, Max Kade Institute for Austrian-German-Swiss Studies, University of Southern California

Neil Levi, Professor and Chair of English, Drew University

Eve Levin, Ahmanson-Murphy Professor of History, University of Kansas

Paul A. Levine, Independent scholar, Berlin; formerly Research & Education Director, co-founder, The Uppsala University Programme for Holocaust & Genocide Research, Sweden

Beth Lew-Williams, Assistant Professor of History, Princeton University

Mark Leuchter, Professor of Hebrew Bible and Ancient Judaism, Director of Jewish Studies, Department of Religion, Temple University

Laura Levitt, Professor of Religion, Jewish Studies and Gender, Temple University

Laura S. Lieber, Professor of Religious Studies and Director of Jewish Studies, Duke University

Caroline Light, Senior Lecturer, Studies of Women, Gender, and Sexuality, Harvard University

Anna Lind-Guzik, Judith S. Kaye Fellow, Historical Society of the New York Courts, Bard High School Early College, New York

Thomas Lindenberger, Professor for Totalitarianism Studies, Hannah Arendt Institute at Technische Universität Dresden, Germany

Tabea Linhard, Professor of Spanish, Comparative Literature, and International and Area Studies, Washington University in St. Louis

Marcia Sachs Littell, Professor Emeritus, Stockton University; Founding Director of MA program in Holocaust & Genocide Studies

Francis Lowenthal, (Honorary) Professor of Cognitive Sciences, University of Mons, Belgium

Miriam R. Lowi, Professor, Middle East Politics, Department of Political Science, The College of New Jersey

David Luebke, Professor of History, University of Oregon

Aliza Luft,* Assistant Professor of Sociology, University of California, Los Angeles

Stephen Macekura, Associate Professor, Department of International Studies, Indiana University Bloomington

John MacKay, Professor, Slavic Languages and Literatures and Film and Media Studies, Yale University

James Maffie, Senior Lecturer, Department of American Studies, University of Maryland, College Park

Daniel H. Magilow, Professor of German, University of Tennessee, Knoxville

Thomas Maher, Lecturer, Purdue University

Elissa Mailänder, Associate Professor of Gender History, History of Violence and Sexuality, Sciences Po, Paris, France

Barbara Mann, Chana Kekst Professor of Hebrew Literature, Jewish Theological Seminary, New York

Anastasia Mann, Lecturer in Public and International and Affairs, Princeton University

Kate Manne, Associate Professor at the Sage School of Philosophy, Cornell University

JA1896

AAUP-00217

Lisa Marcus, Professor of English, Chair, Holocaust and Genocide Studies Program, Pacific Lutheran University

Judy Margles, Director, Oregon Jewish Museum and Center for Holocaust Education

Deborah J. Margolis, Middle East Studies Librarian, Area Studies Coordinator, Michigan State University

Michael R. Marrus, Chancellor Rose and Ray Wolfe Professor Emeritus of Holocaust Studies, University of Toronto, Canada

David Marshall, Professor of History, Suffolk County Community College

Jill Massino, Associate Professor of History, University of North Carolina at Charlotte

Janice Matsumura, Associate Professor of History, Simon Fraser University, Canada

Christopher E. Mauriello, Director, Center for Holocaust and Genocide Studies and Professor of History, Salem State University

James McAuley, University of Oxford

Jared McBride,* Lecturer in History, University of California, Los Angeles

Erin McGlothlin,* Associate Professor of Germanic Languages and Literatures and of Jewish, Islamic and Near Eastern Languages and Cultures, Washington University in St. Louis

Anthony McElligott, MRIA, Professor of History, University of Limerick, Ireland

John McNeill, Professor of History and University Professor, Georgetown University

Frank Mecklenburg, Director of Research, Leo Baeck Institute, New York

Johanna Mellis, Assistant Professor of World History, Ursinus College

Robert Melson, Professor Emeritus, Purdue University

Margaret Eleanor Menninger, Associate Professor of History, Texas State University

David A. Meola, Bert & Fanny Meisler Assistant Professor of History and Director of the USA Jewish & Holocaust Studies Program, University of South Alabama

David A. Messenger, Professor and Chair of History, University of South Alabama

Jolanta Mickutė, Professor of History, Vilnius University and The Lost Shtetl Museum, Vilnius, Lithuania

John Miller, Technology Librarian, Traverse des Sioux Library Cooperative, Mankato, Minnesota

Karen Miller, Professor of History, LaGuardia Community College and the Graduate Center, City University of New York

Michael D. Miller, Independent Scholar, Author of biographical encyclopedias on the senior perpetrators of the Holocaust, San Francisco

Ann Millin, retired, Levine Institute for Holocaust Education, USHMM; Ida E. King Distinguished Visiting Professor, Sara & Sam Schoffer Holocaust Resource Center, Stockton University

Richard H. Minear, Professor of History (Emeritus), University of

AAUP-00218

JA1897

Massachusetts at Amherst

Amanda Minervini, Assistant Professor, Italian Studies, Colorado College

Guy Miron, Professor of History, Open University of Israel, Israel

Christopher A. Molnar, Associate Professor of History, University of Michigan-Flint

Laura Morowitz, Professor of Art History, Wagner College, New York

Douglas G. Morris, Independent Scholar, Trial Attorney, Federal Defenders of New York, Inc.

Leslie Morris, Professor of German, University of Minnesota

Benjamin Moser, Writer

Imani Danielle Mosley, Assistant Professor of Music, Wichita State University

Dirk Moses, Professor of Modern History, University of Sydney, Australia

Michelle Moyd, Associate Professor of History, Indiana University Bloomington

Samuel Moyn, Henry R. Luce Professor of Jurisprudence and Professor of History, Yale University

Eva Mroczek, Associate Professor of Religious Studies and Jewish Studies, University of California, Davis

Adam Muller, Professor and Director, Peace and Conflict Studies, University of Manitoba, Canada

Alexandru Muraru, Researcher and Lecturer in Political Science, Alexandru Ioan Cuza University of Iasi, Romania

Caitlin Murdock, Professor of History, California State University Long Beach

Devin Naar, Associate Professor of History and Jewish Studies, University of Washington

Norman Naimark,  Robert and Florence McDonnell Professor of East European Studies, Stanford University

Stephen Naron, Director, Fortunoff Video Archive for Holocaust Testimonies, Yale University

Benjamin Nathans, Associate Professor of History, University of Pennsylvania

Denisa Nestakova, Research Associate, Comenius University in Bratislava, Slovakia; Herder Institute, Marburg, Germany

John Paul Newman, Senior Lecturer in Twentieth-Century European History, Maynooth University, Ireland

Roberta Newman, Director of Digital Initiatives, YIVO Institute for Jewish Research, New York

Christian Axboe Nielsen, Associate Professor of History and Human Security, Aarhus University, Denmark

Amber N. Nickell, Ph.D. Candidate, Department of History, Purdue University

Bernhard Nickel, Professor of Philosophy, Harvard University

Sr. Cyndi Nienhaus, Associate Professor of Religious Education, Marian University

Carl Nightingale, Professor of Urban and World History, Department of Transnational Studies, University at Buffalo

AAUP-00219

JA1898

Mary Nolan, Professor of History Emerita, New York University

Marcy Norton, Associate Professor of History, University of Pennsylvania

Meghan O'Donnell, Senior Lecturer of Political and Social History, California State University, Monterey Bay

James W. Oberly, Emeritus Professor of HIstory, University of Wisconsin-Eau Claire

Margaret Olin, Senior Research Scholar, Department of Religious Studies, Program in Judaic Studies, Yale University

Annamaria Orla-Bukowska, Associate Professor, Institute of Sociology at the Jagiellonian University, Kraków and at the Graduate School of Social Research, Warsaw, Poland

Annelise Orleck, Professor of History, Dartmouth College

Andrea Orzoff,* Associate Professor of History and Honors, New Mexico State University

Troy Paddock, Professor of History, Southern Connecticut State University

Katrin Paehler, Associate Professor of History, Illinois State University

Cassandra Painter, Valparaiso University

Roxanne Panchasi, Associate Professor of History, Simon Fraser University, Canada

Elana Passman, Associate Professor of History, Earlham College

Avinoam Patt, Philip D. Feltman Professor of Modern Jewish History, Maurice Greenberg Center for Judaic Studies, University of Hartford

Andy Pearce, Associate Professor in Holocaust and History Education, University College London, UK

Andrew Joseph Pegoda, Women's, Gender, Sexuality Studies Program, Departments of Comparative Cultural Studies and of English, University of Houston

Robert Jan van Pelt, Professor, School of Architecture, University of Waterloo, Ontario, Canada

Devin Pendas, Professor of History, Boston College

Heather R. Perry, Associate Professor of History, University of North Carolina at Charlotte

Terrence G. Peterson, Assistant Professor of History, Florida International University

Joanne Pettitt, Lecturer in Comparative Literature, University of Kent, UK

Toni Pitock, Assistant Professor of History, Co-Director of Judaic Studies Program, Drexel University

Anna Veronica Pobbe, University of Trento, Italy

Keith Pomakoy, Vice President of Academic and Student Affairs, The State University of New York, Sullivan

Emily Richmond Pollock, Associate Professor of Music and Theater Arts, Massachusetts Institute of Technology

Sara Poulin, Doctoral Candidate, Department of History, University of Western Ontario

Renée Poznanski, Head of the Simone Veil Research Centre for Contemporary European Studies, Yaacov and Poria Avnon Professor of Holocaust Studies, Department of Politics and Government (Emerita),

AAUP-00220

JA1899

Ben Gurion University of the Negev, Israel

Patrice G. Poutrus, Research Fellow, Universität Erfurt, Germany

Kim Christian Priemel, Professor of Contemporary European History, University of Oslo, Norway

Stephanie Pridgeon, Assistant Professor of Spanish and Latin American Studies, Bates College

Dan J. Puckett, Chair, Alabama Holocaust Commission, Professor of History, Troy University

Trevor A. Purvis, Assistant Professor, Department of Law & Legal Studies, Carleton University, Ottawa, Canada

Eric Rauchway, Professor of History, University of California, Davis

Anson Rabinbach, Phillip and Beulah Rollins Professor of History Emeritus, Princeton University

Celia E. Rabinowitz, Dean of Mason Library, Keene State College

Michaela Raggam-Blesch, Institute of Contemporary History, University of Vienna, Austria

Ben Ratskoff, Comparative Literature, University of California, Los Angeles

Ian Reifowitz, Professor of Historical Studies, SUNY Empire State College

Dominique Kirchner Reill, Associate Professor of Modern European History, University of Miami

Richard A. Reiman, Professor of History, South Georgia State College

Donald F. Reindl, Assistant Professor of Translation, University of Ljubljana, Slovenia,

James Retallack, University Professor, Department of History, University of Toronto, Canada

Daniel P. Reynolds, Seth Richards Professor in Modern Languages, Grinnell College

Jeff Rice, Senior Lecturer, Political Science, Northwestern University

Curtis Richardson, Research Fellow, Center for Slavic, East European and Eurasian Studies, University of North Carolina at Chapel Hill

Ned Richardson-Little, Nachwuchsgruppenleiter, University of Erfurt, Germany

Michael Riff, Director, the Gross Center for Holocaust and Genocide Studies, Ramapo College of New Jersey

Jennifer L. Rodgers, Research Assistant Professor of History and Assistant Editor, Einstein Papers Project, California Institute of Technology

Aron Rodrigue, Daniel E. Koshland Professor in Jewish Culture and History, Stanford University

Devorah Romanek, Curator of Exhibits, Maxwell Museum of Anthropology, Albuquerque, New Mexico

Sven-Erik Rose, Associate Professor of German and of Comparative Literature, University of California, Davis

Katherine Roseau, Assistant Professor of French, Mercer University

Mark Roseman, Distinguished Professor of History, Pat M. Glazer Chair in Jewish Studies, Indiana University Bloomington

Warren Rosenblum, Professor of History, Politics, and International Relations, Webster University

AAUP-00221



Neal M. Rosendorf, Associate Professor of International Relations History, New Mexico State University

Gavriel D. Rosenfeld, Professor of History, Director of Judaic Studies Program, Fairfield University

Aviel Roshwald, Professor of History, Georgetown University

Lauren Faulkner Rossi, Assistant Professor, Simon Fraser University

Michael Rothberg, 1939 Society Samuel Goetz Chair in Holocaust Studies, Professor of English and Comparative Literature, University of California, Los Angeles

Rachel Rothstein, Independent Scholar

Nadia Rubaii, Co-Director, Institute for Genocide and Mass Atrocity Prevention and Professor of Public Administration, Binghamton University

Jeff Rutherford, Associate Professor of History, Wheeling Jesuit University

Douglas Sackman, University of Puget Sound

Emily Sample, Executive Director, Genocide Prevention Program, George Mason University School for Conflict Analysis and Resolution

Debarati Sanyal, Professor of French, University of California, Berkeley

Sandrine Sanos, Professor of Modern European History, Texas A&M University, Corpus Christi

Derek Sayer, Professor Emeritus of Sociology and (by courtesy) History, University of Alberta, Canada

Rebecca P. Scales, Associate Professor of History, Rochester Institute of Technology

Allison Schachter, Associate Professor of Jewish Studies, Vanderbilt University

Charlotte Schallié, Associate Professor of Germanic Studies, University of Victoria, Canada

Florian Scheding, Senior Lecturer in Music, University of Bristol, UK

Christine Schmidt, Deputy Director and Head of Research, the Wiener Library, London

Gina Schouten, Assistant Professor of Philosophy, Harvard University

Daniel J. Schroeter, Amos S. Deinard Memorial Chair in Jewish History, University of Minnesota

Stefanie Schüler-Springorum, Director, Center for Research on Antisemitism, Institute of Technology, Berlin, Germany

Debra L. Schultz, Assistant Professor of History, Kingsborough Community College, City University of New York

Kevin M. Schultz, Professor of History and Religious Studies, University of Illinois at Chicago

Leslie A. Schwalm, Professor of History and Gender, Women's, and Sexuality Studies, University of Iowa

Peter Schweppe, Assistant Professor of German Studies and History, Montana State University

Rebecca Scott, Adjunct Professor of History

Steven Seegel, Professor of History, University of Northern Colorado

Raz Segal, Assistant Professor of Holocaust and Genocide Studies, Stockton University; James J. Sheehan, Professor Emeritus,

AAUP-00222

JA1901

Department of History, Stanford University

Sasha Senderovich, Assistant Professor of Russian and Jewish Studies, University of Washington

Joshua Shanes, Associate Professor of Jewish Studies, College of Charleston

Scott J. Shapiro, Charles F. Southmayd Professor of Law, Professor of Philosophy, Yale University

Noah Shenker, N. Milgrom & 6a Foundation Senior Lecturer, Australian Centre for Jewish Civilisation, Monash University, Australia

Daniel J. Sherman, Lineberger Distinguished Professor of Art History and History, University of North Carolina at Chapel Hill

David Shneer,* Louis P. Singer Chair in Jewish History, Professor of History and Jewish Studies, University of Colorado Boulder

Marci Shore, Associate Professor of History, Yale University

Jennifer Siegel, Professor of History, Ohio State University

Susanna Siegel, Edgar Pierce Professor of Philosophy, Harvard University

Lewis Siegelbaum,* Jack and Margaret Sweet Professor Emeritus, Department of History, Michigan State University

Zuzana Sihelníková, Department of Mediamatics and Cultural Heritage, University of Žilina, Slovakia

Jordana Silverstein, ARC Postdoctoral Research Associate, School of Historical and Philosophical Studies, University of Melbourne, Australia

Sara Silverstein, Assistant Professor of History and Human Rights, University of Connecticut

Bryant Simon, Professor of History, Temple University

Brad Simpson, Associate Professor of History and Asian Studies, University of Connecticut

Alan Singer, Senior Lecturer in European History, Honors College, University of Wisconsin, Milwaukee

Helene Sinnreich,* Associate Professor, Religious Studies and Director, Fern and Manfred Steinfeld Program in Judaic Studies, University of Tennessee, Knoxville

Shana Sippy, Assistant Professor of Religion, Centre College/Danville, KY, Co-Director, Religious Diversity in MN Initiative/Research Associate, Carleton College

Dawn Skorczewski, Research Professor of English, Brandeis University

David Slucki, Assistant Professor in Jewish Studies, College of Charleston, co-director of Zucker/Goldberg Center for Holocaust Studies, College of Charleston

William Smaldone, E.J. Whipple Professor of History, Willamette University

Dana Smith, Assistant Professor of Holocaust and Genocide Studies, Keene State College

Helmut Walser Smith, Martha Rivers Ingram Professor of History, Vanderbilt University

Timothy Snyder, Richard C. Levin Professor of History, Yale University

Jennifer Sorensen, Independent Researcher & Writer, New Jersey

Daniel Soyer, Professor of History and Jewish Studies, Fordham

AAUP-00223


JA1902

University

Roland Spickermann, Associate Professor, University of Texas of the Permian Basin

Leo Spitzer, Vernon Professor of History, Emeritus, Dartmouth College

Martha Sprigge, Assistant Professor of Musicology, University of California, Santa Barbara

Ronit Y. Stahl, Assistant Professor of History, University of California, Berkeley

Jason Stanley, Jacob Urowsky Professor of Philosophy, Yale University

David E. Stannard, Emeritus Professor of American Studies, University of Hawaii at Mãnoa

Paul Steege, Associate Professor of History, Faculty Director, Lepage Center for History in the Public Interest, Villanova University

Richard Steigmann-Gall, Associate Professor of History and former Director of Jewish Studies, Kent State University

Sarah Abrevaya Stein, Professor of History, Maurice Amado Chair of Sephardic Studies and Sady and Ludwig Kahn Director, Alan D. Leve Center for Jewish Studies, University of California, Los Angeles

Gerald J. Steinacher, Professor of History and Hymen Rosenberg Professor of Judaic Studies, University of Nebraska-Lincoln

Sybille Steinbacher, Professor of Holocaust Studies, Goethe-Universität Frankfurt am Main, Germany

Alexandra Steinlight, Past & Present Postdoctoral Fellow, Institute of Historical Research, University of London, UK

Philipp Stelzel, Assistant Professor of History, Duquesne University

Frances Glazer Sternberg, Lecturer, Jewish Studies Program, University of Kansas

Oren Baruch Stier, Professor of Religious Studies, Director, Holocaust and Genocide Studies & Jewish Studies Certificate Program, Steven J. Green School of International and Public Affairs, Florida International University

Lauren Stokes, Assistant Professor of History, Northwestern University

Alexa Stiller, Research Fellow, University of Bern, Switzerland

Dan Stone, Professor of Modern History and Director, Holocaust Research Institute, Royal Holloway, University of London, UK

Elizabeth Strauss, Assistant Professor of History, Mount St. Mary's University

Dorian Stuber, Isabelle Peregrin Odyssey Professor of English, Hendrix College

Thomas J. Sugrue, Professor of History and Social and Cultural Analysis, New York University

Jelena Subotic, Professor of Political Science, Georgia State University

Charley Sullivan, Department of History, University of Michigan

Irena Šumi, Assistant Professor of Anthropology, University of Ljubljana, Slovenia

Marina Swoboda, Adjunct Lecturer in History, Anglo-American University in Prague, Czech Republic

Guillaume de Syon, Professor of History, Albright College

AAUP-00224



Frances Tanzer, Visiting Assistant Professor, Strassler Center for Holocaust and Genocide Studies, Clark University

Naomi S. Taub, Department of English, University of Illinois Urbana-Champaign

Nicholas Terry, Senior Lecturer in Modern European History, University of Exeter, UK

Kai M. Thaler, Assistant Professor of Global Studies, University of California, Santa Barbara

Fabien Théofilakis, Assistant Professor, Centre d'histoire sociale des mondes contemporains, University of Paris 1 Panthéon Sorbonne, France

Jennifer Thompson, Associate Professor, Maurice Amado Professor of Applied Jewish Ethics and Civic Engagement, Jewish Studies Interdisciplinary Program, California State University, Northridge

Annette Timm, Professor of History, University of Calgary, Canada

Lisa Todd, Associate Professor of History, University of New Brunswick, Canada

Barry Trachtenberg,* Rubin Presidential Chair of Jewish History, Director, Jewish Studies Program, Wake Forest University

Corey L. Twitchell, Assistant Professor of German, Southern Utah University

Matthew Unangst, Assistant Professor of History, Jacksonville University

Daniel Unowsky, Professor of History, University of Memphis

Estibalitz Ezkerra Vegas, Lecturer, Basque Studies, University of California, Santa Barbara

J. David Velleman, Professor of Philosophy and Bioethics, New York University

Alana M. Vincent, Associate Professor of Jewish Philosophy, Religion, and Imagination, University of Chester, UK

Oren Vinogradov, Department of Music, University of North Carolina at Chapel Hill

Elizabeth Vlossak, Associate Professor of History, Brock University, Canada

Nikolaus Wachsmann, Professor of Modern European History, Birkbeck College, University of London

Anika Walke,* Associate Professor of History, Washington University in St. Louis

Charles Walker, MacArthur Foundation Endowed Chair in Global Human Rights, University of California, Davis

James Waller, Cohen Professor of Holocaust and Genocide Studies, Keene State College

Kenneth Waltzer, Professor of History Emeritus, James Madison College, Michigan State University

Steven M. Wasserstrom, Moe and Izetta Tonkin Professor of Judaic Studies and the Humanities, Reed College

Keith David Watenpaugh, Professor and Director of Human Rights Studies, University of California, Davis

Leslie M. Waters, Assistant Professor of History, The University of Texas at El Paso

AAUP-00225

JA1904

Ulrike Weckel, Professor of History in the Media and in the Public, Justus-Liebig University, Giessen, Germany

Joanne Weiner Rudof, Archivist Emeritus, Fortunoff Video Archive for Holocaust Testimonies, Yale University

Alice Weinreb, Associate Professor of Modern History, Loyola University Chicago

Lori R. Weintrob, Professor of History and Director, Holocaust Center, Wagner College

Gary Weissman, Associate Professor of English and affiliate faculty member of Judaic Studies, University of Cincinnati

Eric D. Weitz, Distinguished Professor of History, City College and the Graduate Center, City University of New York

Angela West, Program in History and Culture, Drew University

Benjamin Thomas White, Lecturer in History, University of Glasgow, UK

Thomas White, Associate Director/Coordinator of Educational Outreach, Cohen Center for Holocaust and Genocide Studies, Keene State College

Jonathan Wiesen, Professor of History, University of Alabama at Birmingham

Michał J. Wilczewski, Visiting Lecturer, University of Illinois at Chicago

George Williamson, Associate Professor of History, Florida State University

Rebecca Wittmann, Chair, Department of Historical Studies, University of Toronto Mississauga, Associate Professor, Department of History, University of Toronto, Canada

Sebastian Wogenstein, Associate Professor of German and Comparative Literature, Interim Director, Center for Judaic Studies and Contemporary Jewish Life, University of Connecticut

Diane Wolf,* Professor of Sociology, University of California, Davis

Yoke-Sum Wong, Managing Editor, *Journal of Historical Sociology*, Alberta University of the Arts, Canada

Jamie L. Wraight, Director, The Voice/Vision Holocaust Oral History Archive, University of Michigan, Dearborn

Kathleen Wroblewski, Assistant Professor of History, Missouri State University

Yasemin Yildiz, Associate Professor of German and Comparative Literature, University of California, Los Angeles

Stephenie Young, Faculty Research Associate at the Salem State University Center for Holocaust and Genocide Studies and Professor of English, Salem State University

Tara Zahra, Homer J. Livingston Professor of History, University of Chicago

Michael Zank, Professor of Religion, Jewish Studies, and Medieval Studies and Director, Elie Wiesel Center for Jewish Studies, Boston University

Kimberly E. Zarecor, Professor of Architecture, Iowa State University

Jonathan Zasloff, Professor of Law, University of California, Los Angeles

AAUP-00226

JA1905

Steven Zipperstein, Daniel E. Koshland Professor in Jewish Culture and History, Stanford University

Eve Zucker, Lecturer, Department of Anthropology, Yale University

- *First signatories*

AAUP-00227

Open in app ↗

Sign up    Sign in

# Medium

Q  Search

✎ Write

# Harvard Faculty Statement in Support of Palestinian Liberation

Ajantha Subramanian  ( Follow )  3 min read · May 20, 2021



As US-based scholars who oppose racism and colonial violence in all its forms, we write to express solidarity with the Palestinian people in their struggle for freedom and self-determination. Israeli state violence has devastated Palestinian life through a combination of warfare, territorial theft, and violent displacement. Unwavering US financial, military, and political support has fueled an apartheid system that institutionalizes the domination and repression of Palestinians. The recent reports by Human Rights Watch and the Israeli human rights organization B'tselem are only the latest to document this reality. The current effort to expel Palestinians from Jerusalem's Sheikh Jarrah neighborhood; the violence in Israeli cities like Lydda and Haifa, in which Israeli police stand by and facilitate right-wing extremist attacks on Palestinians; and the military attack on the Gaza Strip are only the most recent events in a decades-long process of dispossession.

Palestinians are not only denied freedom and self-determination, they are even denied the right to resist. Palestinian resistance in all its forms is

AAUP-00228

JA1907

criminalized by Israel and the US. Every measure of self-defense by a people without a state or an army against a nuclear power backed by the US is subject to immediate censure while Israel continues its violent aggressions with impunity.

Suppression of support for Palestinian liberation extends into the US academy where even scholarly criticism of Israeli human rights violations is increasingly equated with antisemitism and forbidden by law. The situation in Israel, Gaza, and the West Bank is far worse. Academic freedom and basic educational rights are unavailable for students and faculty at Palestinian universities, and the rights of Palestinians at Israeli universities are severely curtailed. The Israeli government and academic institutions routinely punish scholars — both Jews and Palestinians — who criticize the state's policies.

In this moment when Israeli ethnonationalist violence is at an all-time high, US military support remains steadfast, and solidarity with Palestine is criminalized, US-based scholars cannot be silent. We demand an end to US support for Israel's apartheid regime, condemn Israeli state aggression, and affirm our support for the Palestinian liberation struggle.

**Signatories**

1. Ajantha Subramanian, Anthropology and South Asian Studies

2. Steven Caton, Anthropology

3. Vijay Iyer, Music and African and African American Studies

4. Walter Johnson, History and African and African American Studies

5. Kirsten Weld, History

AAUP-00229

JA1908

6. Rosie Bsheer, History

7. Diane L. Moore, Religion and Public Life

8. Evelynn M. Hammonds, History of Science and African an African American Studies

9. Robert F. Pharr, Studies of Women, Gender, and Sexuality and African and African American Studies

10. Arunabh Ghosh, History

11. Ju Yon Kim, English

12. Sidney Chalhoub, History and African and African American Studies

13. Teju Cole, English

14. Cemal Kafadar, History

15. Soha Bayoumi, History of Science

16. Caroline Light, Studies of Women, Gender, and Sexuality

17. Bram Wispelwey, Medicine

18. Lucien Castaing-Taylor, Anthropology and Art, Film, and Visual Studies

19. Susanna Siegel, Philosophy

20. Michael Herzfeld, Anthropology

21. Ned Hall, Philosophy

22. Glenda Carpio, English and African and African American Studies

23. Ernst Karel, Anthropology and Art, Film, and Visual Studies

24. Joyce E. Chaplin, History

25. Adaner Usmani, Sociology and Social Studies

AAUP-00230

26. Tara K Menon, English

27. Bernhard Nickel, Philosophy

28. Ali Asani, Study of Religion and Near Eastern Languages and Civilizations

29. Michael Bronski, Studies of Women, Gender, and Sexuality

30. Robin Bernstein, African and African American Studies and Studies of Women, Gender, and Sexuality

31. Alice Jardine, Romance Languages and Literatures and Studies of Women, Gender, and Sexuality

32. Jean Comaroff, African and African American Studies and Anthropology

33. Nicholas Harkness, Anthropology

34. Musa Syeed, English

35. Ingrid Monson, Music and African and African American Studies

36. Sarah S. Richardson, History of Science and Studies of Women, Gender, and Sexuality

37. Alex Rehding, Music

38. Lucie White, Harvard Law School

39. Suzanne Preston Blier, History of Art and Architecture; African and African American Studies

40. Katrina Forrester, Government and Social Studies

41. Christopher Hasty, Music

42. Robb Moss, Art, Film, and Visual Studies

43. Gabriela Soto Laveaga, History of Science

44. Ana Isabel Keilson, Social Studies

AAUP-00231

JA1910

45. Sugata Bose, History and South Asian Studies

46. Peter E. Gordon, History

47. Jesse McCarthy, English and African and African American Studies

48. Jeffrey Schnapp, metaLAB (at) Harvard; Romance Languages and Literatures

49. Vincent Brown, History and African and African American Studies

50. Sylvaine Guyot, Romance Languages and Literatures and Theater, Dance & Media

51. Tracey Rosen, Social Studies

52. Tom Conley, Romance Languages and Art, Film & Visual Studies

53. Glory Liu, Social Studies

54. Linda Schlossberg, Studies of Women, Gender, and Sexuality

55. András Riedlmayer, Aga Khan Program for Islamic Architecture

56. Andrea Wright, Anthropology

57. Mary D. Lewis, History

58. Namwali Serpell, English

59. Malavika Reddy, Anthropology

60. Philip Deloria, History

61. Peter Der Manuelian, NELC and Anthropology

62. George Paul Meiu, Anthropology and AAAS

63. Matthew Liebmann, Anthropology

64. Byron Good, Global Health and Social Medicine, and Anthropology

AAUP-00232

JA1911

65. Mary-Jo DelVecchio Good, Global Health and Social Medicine

66. Claire Messud, English

 **Written by Ajantha Subramanian**

0 followers · 1 following



Follow

Professor of Anthropology, Harvard University

## No responses yet



Write a response

What are your thoughts?

## Recommended from Medium

JA1912

AAUP-00233





 Jordan Gibbs

 In Long. Sweet. Valuable. by Ossai Chinedum

### ChatGPT Is Poisoning Your Brain...

Here's How to Stop It Before It's Too Late.

### I'll Instantly Know You Used Chat Gpt If I See This

Trust me you're not as slick as you think

Apr 29  🖐 17.9K  💬 832  🔖

May 16  🖐 8.3K  💬 453  🔖





 JJ Hart

 In Coding Beauty by Tari Ibaba

### Pride

These days, specifically, Pride Month means many different things to many different...

### This new IDE from Google is an absolute game changer

This new IDE from Google is seriously revolutionary.

Jun 2  🖐 210  💬 2  🔖

Mar 11  🖐 5.9K  💬 349  🔖

JA1913

AAUP-00234





In **ThinkDraft** by **Singh Bhai**

### How to Read Someone's Personality in 10 Seconds (Backe...

The Subtle Signs That Reveal Who Someone Really Is.

Jan 27    17.6K    471

**LUHOG Youth**

### A Letter to the Youth, Written Using a Red Pen

by Divine Domingo, Alexah Dela Cruz, and Jamee Sarte

May 21    55

See more recommendations

AAUP-00235

JA1914

*CURRICULUM VITAE*

### 1. *Personal Data*:

**Name:**      Nadje Sadig Al-Ali

**Address:**      Department of Anthropology



+1 (401) 863-5129
Nadje_Al-Ali@brown.edu

### 2. *Education:*

| | |
|---|---|
| September 1998 | PhD<br>The School of Oriental and African Studies,<br>University of London - U.K.<br>Department of Social Anthropology |
| February 1993 | Masters of Arts<br>The American University in Cairo - Egypt<br>Department of Sociology/Anthropology |
| May 1989 | Bachelors of Arts<br>University of Arizona, Tucson - USA<br>Middle Eastern Studies and French |
| June 1986 | Secondary School Certificate: Abitur<br>Horkesgath Gymnasium, Krefeld - Germany |
| *Languages:* | Excellent English and German; Good Arabic and French |

### 3. *Management & Leadership Roles*

| | |
|---|---|
| 1 July 2020-<br>30 June 2024 | Director, Center for Middle East Studies,<br>Brown University |
| 1 July 2020 | Director of Graduate Studies, Anthropology Department<br>Brown University |
| 1 August 2014-<br>August 2018 | Chair, Centre for Gender Studies, SOAS University of London |
| 1 January 2017<br>August 2018 | Head of Doctoral School, SOAS University of London |
| September 2013-<br>May 2016 | President, University College Union (UCU), SOAS |
| September 2011-<br>May 2012 | Equality & Diversity Officer, UCU, SOAS |
| September 2008-<br>May 2011 | Chair, Centre for Gender Studies |
| September 2004-<br>May 2007 | Director of Postgraduate Studies,<br>Institute of Arab & Islamic Studies, University of Exeter |

JA1915

AAUP-00481

**4. Career Record:**

July 2020 –         Director, Center for Middle East Studies
30 June 2024        Brown University

January 2019 - Robert Family Professor of Middle East Studies;
                     Professor of Anthropology & Middle East Studies
                     Watson Institute for Policy and International Affairs &
                     Department of Anthropology

September 2010-       Professor of Gender Studies
December 2018 Chair of Centre for Gender Studies
                     SOAS, University of London

September 2008-       Reader in Gender Studies
August 2010          Chair of Centre for Gender Studies
                     SOAS, University of London

September 2007-       Senior Lecturer in Gender Studies
August 2008          Centre for Gender Studies
                     SOAS, University of London

October 2005 - Senior Lecturer in Social Anthropology
August 2007          The Institute of Arabic and Islamic Studies
                     The University of Exeter

March 2000 -         Lecturer in Social Anthropology
Sept 2004            The Institute of Arabic and Islamic Studies
                     The University of Exeter

March-July 2003      Visiting Professor in International Women's Studies
                     The University of Bochum, Germany

Oct. 1998 -          Research Fellow
Feb 2000             Sussex Centre for Migration Research
                     University of Sussex

1996-1998           Teaching Fellow (GTA)
                     School of Oriental and African Studies, University of London

1989-1993          Research and Teaching Assistant
                     The American University in Cairo. Egypt

**5. Publications**

**a) Books:**

2024 (Co-edited with Tunay Altay and Katy Galor) *Resisting Far-Right Politics in the Middle East and Europe: Queer Feminist Perspectives*. Edinburgh: Edinburgh University Press.

2019. (Co-edited with Deniz Kandiyoti & Kathryn Spellman) *Gender, Governance & Islam*. Edinburgh: University of Edinburgh Press.

2013. (Co-edited with Deborah Al-Najjar) *We are Iraqis: Aesthetics & Politics in a Time of War*. Syracuse: Syracuse University Press.

2013. *Zhnany Eraq: Chiroke Newtrawekan le 1948-we ta Emro*. National Center For Gender Research: Sulaimaniya, Iraq.

2009. (Co-edited with Nicola Pratt) *Women & War in the Middle East: Transnational Perspectives*. Zed: London & New York.

JA1916

AAUP-00482

2009. (Co-authored with Nicola Pratt) *What kind of Liberation? Women and the Occupation of Iraq*. Berkeley: University of California Press.

2009. *Irakli Kadinlarin: Anlatilmayan Öyküsü 1948'Den Bugüne*. Istanbul, Turkey: ILETIŞIM.

2009. Mujeres iraquíes. Historias nunca contadas desde 1948 hasta la actualidad. Barcelona: Sirpus.

2007. *Iraqi Women: Untold Stories from 1948 to the Present*. Zed: London & New York.

2006. *Al-'almaniya, al-naw wa al-dawla fi shark al-awsat: al-haraka al-nissaiya fi' misr*. Cairo, Egypt: Supreme Council of Culture.

*2002*. (Co-edited with Khalid Koser) *New Approaches to Migration: Transnational Communities and the Transformation of Home*. London, New York: Routledge

2000. *Secularism, Gender and the State in the Middle East: The Egyptian Women's Movement*. Cambridge Middle East Studies, Cambridge University Press.

1994. *Gender Writing - Writing Gender: The Representation of Women in a Selection of Modern Egyptian Literature*. Cairo: The American University in Cairo Press.


***b) Articles:***

2023. (co-authored with Mashuq Kurt) "From Islamists to Religious Patriots: Intersectional Identities of Religious Kurdish Women". *Journal of Middle East Women's Studies* 1 November 2023; 19 (3): 357–378. doi: https://doi.org/10.1215/15525864-10815511

2022 (co-authored with Isabel Kaeser) "Beyond Feminism? Jineolojî and the Kurdish Women's Freedom Movement", *Politics & Gender*, vol. 1, no. 18, 212-243. doi:10.1017/S1743923X20000501.

2022. "Film Review: Maysoon Pachachi's "Our River…Our Sky" in Iraq", *Markaz Review*, 05/30/2022.

2021. (co-authored with Latif Tas) 'Kurdish women's struggles with gender equality: from ideology to practice', *Third World Quarterly*, DOI: 10.1080/01436597.2021.1906642.

2020. 'Covid-19 and feminism in the Global South: Challenges, initiatives and dilemmas'. *European Journal of Women's Studies* 2020, Vol. 27(4) 333–347 (open access). https://journals.sagepub.com/doi/pdf/10.1177/1350506820943617

2019. 'Feminist dilemmas: how to talk about gender-based violence with reference to the Middle East?', *Feminist Review*; Issue 122: 16– 31.

2018. (with Latif Tas) 'Clashes, Collaborations & Convergences: Evolving Relations of Turkish and Kurdish feminists', in *Journal of Balkan and Near Eastern Studies*.

2018. 'Sexual violence in Iraq: Challenges for transnational feminist politics.' *European Journal of Women's Studies*. Vol. 25(1): 10–27.

2018. (with Latif Tas) 'Dialectics of struggle: challenges to the Kurdish women's movement'. LSE Middle East Centre Paper Series, 22. Middle East Centre, The London School of Economics and Political Science, London, UK.

2018. (with Latif Tas) 'Reconsidering Nationalism and Feminism: The Kurdish Political Movement in Turkey', in *Nations & Nationalism* 24 (2): 453-473.

2017. (with Latif Tas) '"War is like a Blanket…:" Feminist Convergences in Kurdish and Turkish Women's Rights Activism for Peace.' *Journal of Middle East Women's Studies*, 13 (3).

2017. 'Reflections from the other side of the pond', *Journal of Middle East Women's Studies*, 13 (3).

3

AAUP-00483

JA1917

2016. 'How to talk about gender-based violence?', in *Kohl: a Journal for Body and Gender Research, Vol. 2, No. 1 (Summer 2016)*.

2014. 'Reflections on (Counter) Revolutionary Processes in Egypt', in *Feminist Review*, Special issue on Revolutions, No. 6. February 2014: 122-128.

2014. 'Potatoes or rice?', in *Feminist Review*, Special issue on Food, 114: 12-13.

2013. 'Feminist Dilemmas in (Counter) Revolutionary Egypt', *NORA: Nordic Journal of Feminist and Gender Research,* 20th anniversary issue, Autumn 2013.

2012. 'Gendering the Arab Spring.' *Middle East Journal of Culture and Communication*, 5 (1), pp. 26-31.

2011. (with Nicola Pratt) 'Between Nationalism and Women's Rights: The Kurdish Women's Movement in Iraq', in *Middle East Journal of Culture and Communication* 4 (2011) 337–353.

2011. 'Iraqi Women: Historical and Contemporary Perspectives.' *Orient: German Journal for Politics, Economics and Culture in the Middle East*, 52, pp. 32-38.

2011. 'A Feminist Perspective on the Iraq War.' *Works & Days,* 29, pp. 99-114.

2011 'Conspiracy of Near Silence: Violence against Iraqi Women.' *Middle East Report (MERIP),* 258, pp. 34-37.

2008. 'Iraqi Women and Gender Relations: Redefining Difference.' *British Journal of Middle Eastern Studies*, 35 (3), pp. 405-419.

2008 'The Perils of Forgetting History [Anthropology in Conflict: An Exchange].' *Survival; global politics and strategy*, 50 (3), pp. 151-155.

2008. (with Nicola Pratt) 'The Iraqi Women's Movement',. *Feminist Review* 88, Special issue on War, pp. 74-85.

2008. (with Nicola Pratt) 'Researching women in post-invasion Iraq: negotiating 'truths' and deconstructing dominant discourses', *Bulletin for Interfaith Studies* (BRIFS), Amman.

2007. 'Iraqi Women in Diasporic Spaces: Political Mobilization, Gender & Citizenship', in *Revue des mondes musulmans et de la Méditerranée*, special issue L'Irak en Perspective, summer 2007, No. 117-118, pp. 137-156.

2006. (with Nicola Pratt) 'Women in Iraq: Beyond the Rhetoric', in *MERIP*, June 2006.

2005. 'Gendering Reconstruction: Iraqi Women between Dictatorship, wars, sanctions and Occupation in *Third World Quarterly*, vol. 26, no. 4-5, pp. 739-758.

2003. 'Gender & Civil Society in the Middle East', in *International Feminist Journal of Politics* 5 (2) July 2003: 216-232.

2002. 'Gender relations, transnational ties and rituals amongst Bosnian refugees', in *global networks: a journal of transnational affairs* 2 (3) July 2002: 249-262.

2001. 'Refugees and transnationalism: the experience of Bosnians and Eritreans in Europe', *Journal of Ethnic and Migration Studies* 7(4 ), October 2001: 615-634.

2001. 'The limits to transnationalism', *Ethnic and Racial Studies* 24 (4) July 2001: 578-600.

2000. 'Nationalisms, national identities and nation states: gendered perspectives', in *Nations & Nationalism* vol. 6, part 4 (October 2000): 631-638.

2000. 'Women and Sanctions in Iraq', in *Economic Sanctions on Iraq*. Published conference proceedings by CASI. Cambridge University Press.

JA1918

AAUP-00484

1999. 'Inside\Out: the Native and the Halfie Unsettled', joined paper with Heba El-Kholy. *Cairo Papers of Social Science* 22 (2): 14-40. Cairo: The American University in Cairo Press.

### c) Book Chapters:

2022. 'COVID-19 and Feminism in the Middle East: Challenges, Initiatives, and Dilemmas', in COVID and Gender in the Middle East, ed. Rita Stephan, University of Texas Press.

2022. 'Women's Movements in the Middle East', Routledge Handbook on Women in the Middle East, eds. Suad Joseph and Zeina Zaatari, Routledge, pp.212-220.

2020. 'Iraqi Women's Agency: From Political Authoritarianism to Sectarianism and Islamist Militancy', in Rita Stephan & Mounira Charrad (eds). *Women Rising: In And Beyond The Arab Spring*. New York: New York University Press, pp. 98-106.

2019. 'Iraq: Gendering violence, sectarianisms and authoritarianism', in Deniz Kandiyoti, Nadje Al-Ali & Kathryn Spellman (eds), *Gender, Governance & Islam*. Edinburgh: University of Edinburgh Press.

2019. (co-authored with Ghiwa Sayegh). 'Feminist and Queer Perspectives on West Asia', in *Queer Asia (*eds.) Jonathan Daniel Luther & Jennifer Ung Loh. London & New York: Zed Books.

2018. 'Arab Family Studies: Iraq', in *Arab Family Studies: Critical Reviews*, ed. by Suad Joseph, Syracuse: University of Syracuse Press.

2018. 'Memory, History and Contestations in present-day Iraq', in Katrina Srigley, Stacey Zembrzycki, and Franca Iacovetta (eds). *Beyond Women's Words: Feminisms and the Practices of Oral History in the Twenty-First Century*. London & New York: Routledge, pp. 137-148.

2017. 'Foreword.' In: *The Political Thought of Abdullah Öcalan: Kurdistan, Women's Revolution and Democratic Confederalism*. London: Pluto Press, vii-xvii. (Politics).
2016. 'Gender, protest and political transition in the Middle East and North Africa.' In: Steans, Jill and Tepe-Belfrage, Daneila, (eds.), *Handbook on Gender in World Politics*.Cheltenham, UK; Northampton, MA, USA: Edward Elgar, pp. 127-136. (International Handbooks on Gender series)

2016. (with Nicola Pratt) 'Positionalities, intersectionalities and transnational feminism in researching women in post-invasion Iraq', in Annick Wibben, ed. *Research War: Feminist Methods, Ethics and Politics,* London and New York: Routledge, 2016.

2013. 'Introduction: Writing Trauma, Memory and Materiality', with Deborah Al-Najjar, in Al-Ali, Nadje & Deborah Al-Najjar (eds) *We are Iraqis: Aesthetics & Politics in a Time of War*. Syracuse: Syracuse University Press.

2012. 'The Iraqi Women's Movement: Past and Contemporary Perspectives', in *Mapping Arab Women's Movements: A Century of Transformations from Within*, ed. by Pernille Arenfeldt & Nawar Al-Hassan Golley. Cairo: The American University in Cairo Press.

2011. 'Iraq's Triple Challenge: State, Nation, and Democracy,' with Nicola Pratt, in Burnell, Peter and Randall, Vicky and Rakner, Lise, (eds.), *Politics in the Developing World*. Oxford: Oxford University Press, pp. 406-416.

2010. 'The War on Terror and Women's Rights in Iraq,' in Robben, Antonius C.G.M., (ed.), *Iraq at a Distance: What Anthropologists Can teach us About the War*. University of Pennsylvania Press, pp. 57-79.

2010. 'Diasporas and gender,' in Knott, Kim and McLoughlin, Sean, (eds.), *Diasporas: Concepts, Intersections, Identities*. London & New York: Zed Books, pp. 118-122.

2007. 'Gender, Diasporas and Post-cold War Conflict', in Hazel Smith (ed.) *Diasporas and Post-Cold War Conflict*, Washington: United States Institute for Peace & United Nations University.

JA1919

AAUP-00485

2006. 'The Enemy of my Enemy of not my Friend: Women's Rights, Occupation and 'Reconstruction' in Iraq', in Nira Yuval-Davis, Kalpana Kannabiran and Ulrike M. Vieten (eds.) *Situating the Politics of Belonging*. London & New York: Routledge.

2004. 'Secular Women's Activism in Contemporary Egypt', in Ayeasha Imam, Jenny Morgan & Nira Yuval-Davis (eds.) *Warning Signs of Fundamentalisms*. London: Women Living Under Muslim Law, pp. 147-154.

2003. 'Gender Relations and Transnational Ties among Bosnian Refugees', in Deborah Bryceson (ed.) *Forging New Frontiers in Europe: Transnational Families and their Global Networks*. Oxford & New York: Berg Publishers.

2003. 'Women and Economic Sanctions in Iraq', in Shams Inati (ed.) *Iraq: History, People and Politics*. Philadelphia: Prometheus Press.

2003. 'A mirror of political culture in Egypt', Kienle, Eberhard (ed.): *Politics from Above, Politics from Below: The Middle East in the Age of Economic Reform*. London: Al-Saqi Publications.

2003. 'Teen Life in Iraq', in Akbar Mahdi (ed.) *Teenagers in the Middle East*. Westport: Greenwood Publishing

2002. "Transnationalism, international migration and home", in Nadje Al-Ali & Khalid Koser *New Approaches to Migration: Transnational Communities and the Transformation of Home,* London, New York: Routledge.

2002. "Trans- or a-national: Bosnian refugees in the UK and the Netherlands', in Nadje Al-Ali & Khalid Koser *New Approaches to Migration: Transnational Communities and the Transformation of Home,* London, New York: Routledge.

2002. 'Self and Generation: Formative Experiences of Egyptian Women Activists'. Mary Anne Faye (ed.). *Women's Biographies in the Middle East,* New York: St. Martin's Press.

2000. 'We Are Not Feminists: Egyptian Women's Rights Activists On Feminism'. Cynthia Nelson & Shahnaz Rouse (eds.) *Globalization And the Indigenization of Knowledge Debate: Comparative Perspectives,* University of Florida Press.

1997. 'Feminism and Contemporary Debates in Egypt', in Dawn Chatty and Anika Rabo (eds.) *Women Organized in Groups in the Middle East: formal and informal groups*. Oxford & New York: Berg Publishers.

***d) Selected Policy Reports & Working Papers:***

2018. Report on strategies to exit violence in the Middle East. International Panel on Exiting Violence (IPEV); Fondation Maison des sciences de l'homme (FMSH), Paris.

2017. 'Expert report on political situation in Turkey'. Westminster Crown Court, London.

2016. Arab Human Development Report 2016: Youth and the prospects for human development in changing reality. UNDP (coordinated chapter on women and gender).
http://www.arabstates.undp.org/content/rbas/en/home/library/huma_development/arab-human-development-report-2016--youth-and-the-prospects-for-/

2013. Review of the June 2013 Country of Origin Report & Country Guidance Notes on Iraq, commissioned by the Independent Advisory Group on Country Information (IAGCI) and Chief Inspector of Borders and Immigration.

2012. (with Irada Al-Jeboury, Inass Al-Enezy, Inass and Huda Al-Dujaili) 'Female Iraqi Academics In Post-Invasion Iraq: Roles, Challenges & Capacities'. London.

2012 (with Muzha Muhammed, Hataw Kareem, Dlaram Salih, and Kawther Akreyi)
'Female Iraqi Academics In Iraqi Kurdistan: Roles, Challenges & Capacities.' London: SOAS.

2011. Review of the March 2011 Iraq Country of Origin Report, commissioned by the Independent Advisory Group on Country Information (IAGCI).

AAUP-00486

JA1920

2006. Commentary on Home Office Iraq Country Information Report, October 2006; prepared for the Advisory Panel on Country Information (APCI).

2005. (with Anita Fabos & Orob El-Abed) Middle East. Developing DFID's Policy Approach to Refugees. Oxford: Refugee Studies Centre; London: DFID.

2002. 'The Women's Movement in Egypt with Selected References to Turkey', Civil Society and Social Movement Series. United Nations Research Institute for Social Development. Commissioned Report. Geneva: UNRSID .

**e) Selected online publications**

2016. (with Ayla Akat and Latif Tas) 'Kurds and Turks are at the edge of a cliff', Interview. Open Democracy, https://www.opendemocracy.net/nadje-al-ali-latif-tas-ayla-akat/kurds-and-turks-are-at-edge-of-cliff

2016. (with Gultan Kisanak and Latif Tas) 'Kurdish women's battle continues against state and patriarchy, says first female co-mayor of Diyarbakir'. Interview. Open Democracy. https://www.opendemocracy.net/nadje-al-ali-latif-tas-g-ltan-ki-anak/kurdish-women-s-battle-continues-against-state-and-patriarchy-

2016 (with Zahra Ali & Isabel Marler) 'Reflections on Authoring the Chapter on Young Women for the 2016 Arab Human Development Report', Jadaliyya. http://palestine.jadaliyya.com/pages/index/25627/reflections-on-authoring-the-chapter-on-young-wome

2016. 'Professor Al-Ali Slams Government of Turkey over Peace Petition'. Bianet. http://bianet.org/english/human-rights/171224-professor-al-ali-slams-

2014. ' Sexualized violence in Iraq: how to understand and fight it'. Open Democracy.https://www.opendemocracy.net/5050/nadje-alali/sexualized-violence-in-iraq-how-to-understand-and-fight-it

2014. 'Egyptian sexual harassment activists battle growing acceptance of violence;. The Conversation. https://theconversation.com/egyptian-sexual-harassment-activists-battle-growing-acceptance-of-violence-23264

2013. 'Iraq: gendering authoritarianism'. Open Democracy. https://www.opendemocracy.net/5050/nadje-al-ali/iraq-gendering-authoritarianism

**d) Selected interviews, media engagements & videos**
2022. Choices program: Feminism in the Middle East; https://mailchi.mp/brown/videos-al-ali

2022. Talk with Hammi:
Part 1: Feminism in the Middle East, Women's Rights Across the Arab World, https://www.youtube.com/watch?v=rP0e3WcLnls&t=21s

Part 2: Feminism in the Middle East, Women's Rights Across the Arab World, https://www.youtube.com/watch?v=YDkqfjyKORg

2022. "Women's Activism in the Middle East"; Berlin Mideast Podcasts; https://www.kas.de/de/berlin-mideast-podcast-naher-und-mittlerer-osten

2022. Women's protests in Iran"; https://trending-globally.captivate.fm/episode/the-protests-in-iran-are-about-more-than-hijabs

2018. Interview – Feminist Freedom Warriors:
In conversation with Profs Chandra Mohanty & Linda Carty
https://vimeo.com/266037388/80fd73d593

2016. Interview – Nadje Al-Ali. E-International Relations. http://www.e-ir.info/2016/01/30/interview-nadje-al-ali/

2016. 'Gendering the Kurdish-Turkish conflict and attempts at peace: a talk with Nadje Al-Ali'.

JA1921

AAUP-00487

https://www.youtube.com/watch?v=4_yOfS3DkTM

2015. 'An Iraqi professor on a Gender Studies international stage'. Al Arabiya News.
http://english.alarabiya.net/en/blog/2015/11/03/Nina-meets-Nadje.html

2014. 'Gender, Violence & Minorities'.
https://www.youtube.com/watch?v=Pc0bxO20nZU

2013. 'Nadje Al-Ali on Women and War in the Middle East'.
https://archive.org/details/scm-227894-nadjeal-alionwomenandwarinthe

2013. 'Iraqi Women Before And After The 2003 Invasion, Interview With Prof Nadje Al-Ali Univ of London'.
Musings on Iraq.
http://musingsoniraq.blogspot.co.uk/2013/12/iraqi-women-before-and-after-2003.html

2012. 'Gendering (Counter) Revolutions in the Middle East, Professor Nadje Al-Ali (SOAS)'
https://www.youtube.com/watch?v=J_WdVPRIUe0

2012. 'Narrating the Arab Spring'
https://www.youtube.com/watch?v=pTfK2zA0kTw

2011. 'Transnational feminist journeys to and from the Middle East', Inaugural lecture.
https://www.youtube.com/watch?v=HbijA8Tgdzl

2010. 'Women and War in the Middle East'.
https://www.youtube.com/watch?v=PesOOpeuo4I

2009. The battle against brutality. *The Guardian*.
https://www.theguardian.com/lifeandstyle/2009/jan/28/iraq-women-rights-us-news

## 8. Teaching experiences

### a) Brown University
- Anthropological methodology & methods
- Gender & Sexuality in the Middle East
- Anthropology of the Middle East
- Transnational Feminist Mobilization & Knowledge Production
- Gendering Migration & Diasporas

### b) SOAS, University of London:
- Gender Theory and the Study of Asia, Africa and the Middle East
- Gender in the Middle East (PG)
- Gender & Sexuality in the Middle East
- Gendering Migration & Diasporas
- PhD students' research methods seminar in Gender Studies

### c) University of Exeter
- Anthropology of Islam (UG)
- Ethnography of the Middle East (UG)
- Gender & Identity of the Middle East (UG & PG)
- Research methods (PGR)

## 11. Membership in professional associations & service to the profession:
- Associate Editor of Journal of Middle East Women's Studies (JMEWS)
- Member of Middle East Studies Association of Northern America
- Advisory board member of the German Orient Institute, Beirut, Lebanon, 2018-2020
- Elected board director of Middle East Studies Association (MESA) – 2012-2015
- Elected member of board of Association for Middle East Women (AMEWS) - 2012-
- Former President of Association for Middle East Women (AMEWS), 2010-2012

AAUP-00488

JA1922

**12.Selected keynotes & lecture invitations**

Invited lecture. "Transnational feminist perspectives on anti-gender discourses and politics". University of Bern, Switzerland. 18 March 2025.

Keynote: "Anti-Genderism in the Middle East", Conference entitled: Anti-Feminism and Anti-Gender Politics in Authoritarian Regimes: The Role of the State, Religion and Feminist Counter-strategies in the Near and Middle East and Eastern Europe, University of Marburg (Germany) 21-23 June 2023.

Invited annual lecture: "Feminist Dilemmas and Ambivalences: Gendered and queer perspectives on the Middle East".  British Middle East Studies Association, 17 November 2022;
https://www.youtube.com/watch?v=XkzoQ4Qq-R4

Keynote: 'Beyond Academia: Transnational Feminist, and Queer Perspectives on the Middle East', German Middle East Studies Association annual conference, Berlin 09/13/2022.

Invited lecture: "Reconstructing Gender: Iraqi Women between Dictatorship, War, Sanctions and Occupation", 27 May 2022; Duke University.

Invited lecture: "Gender, Violence and Authoritarianism in the Middle East: Transnational Feminist Perspectives", Florida State University, 7 April 2022.

Invited lecture: "Beyond feminism and nationalism: Reflections on Kurdish women's activism", Rutgers University, April 6 2022.

Keynote: 'Beyond Backlash: Global Feminist Contestations', keynote at conference  'Conflicts over Women's and Gender Rights: Ambivalences and Contradictions'; University of Bielefeld, 11 March 2022.

Keynote: 'The Politics of Gender: Transnational Feminist Perspectives',  annual Political science conference, AUC, Cairo, 1 March 2022.

Invited lecture: Women and gender in Iraq, The Iraqi Society, University of Exeter, 1 February 2022.

'Gendering Protest and Revolutionary Moments: the significance of body politics in the Middle East', University of Wisconsin Madison, November 2021.

"Women, violence, and exiting from violence with a gendered approach", Sweet Briar College, October 2021.

"Reflecting on the costs of war in the Middle  East", The Costs of War project, Brown University, September 2021.

"Human rights and political change in America and in the Middle East since 9/11".American University, September 2021.

"Feminist anti-imperialism", Panel discussion on the new internationalism, *The Nation* magazine, May 2021.

Women in the MENA Region Before and After the Arab Spring, Foundation Maison des Sciences de l'homme (Paris) and Carnegie Corporation  (New York), May 2021.

'Transnational Feminism in the Middle East', Gender and Sexualities Studies Institute, The New School, April 2021.

"Transnational Feminism in the Middle East", Gender and Sexualities Studies Institute, The New School, April 2021.

'Reflections on Academic Freedom in Global Perspective', 30th Annual Davis, Markert and and Nickerson Academic Freedom Lecture, University of Michigan, February 2021.

AAUP-00489

JA1923

"Space and Time: Crowds, Bodies, Affects". Global Uprising series, Hagop Kevorkian Center, NYU, February 2021.

'Rethinking Orientalism: Gender, Body Politics and Authoritarianism in the Middle East'. Rutgers – Newark, November 2018.

'Gendering Activism: Rethinking Power, Authoritarianism and Resistance'; invited keynote at Connecting Resistances in West Asia, North Africa and Europe; Al-Sharq and Rosa Luxemburg Foundation, Berlin, October 2018.

'Feminist Dilemmas: How to talk about gender-based violence in the Middle East'; invited lecture at Centre for Gender Studies, SOAS University of London, October 2018.

'Feminism in Crisis? Gender and the Arab Public Sphere', invited keynote address, AUB, Beirut, 18-19 January 2018.

'Queering Ethnoheterogenesis in transnational perspective: (De) ethnicising Muslim migrants', invited keynote at Ethnoheterogenesis: The dialectics of hetero- and homogenization in processes of ethnic framing and membership; Hannover, Germany, 14 December 2017.

'Defining the Contours of Activist Scholarship in Human Rights', invited keynote at conference on Activist Scholarship in Human Rights: New Challenges, School of Advanced Studies, University of London, June 2017.

'Transformation(s) in the Middle East and Beyond: Transnational Feminist Perspectives and Dilemmas', invited keynote at conference on Political transformations – transformations of the political: feminist perspectives. University of Frankfurt, Germany, October 2016.

'Gendered perspectives on refugees and refuge', invited lecture, German-Jewish Centre, University of Sussex, Brighton, 20 June 2016.

'Gendering migration & diasporas', keynote at Dutch anthropological association, Utrecht, 20 May 2016.

'Body politics and gendered resistance in the MENA region: A Focus on Egypt and the Turkish-Kurdish conflict,' invited keynote at Athens Biennale, May 2016.

'Between authoritarianism and radical democracy: Women's rights struggles in the Middle East', invited lecture; The Department of Social and Cultural Anthropology of the Vrije Universiteit Amsterdam; Seminar Series: Current Issues in Anthropology; 19 May 2016.

'Protest, Body Politics and Authoritarianism: A gendered perspective on Political developments in the Middle East.', invited lecture, Simon Fraser University, Vancouver, Canada, March 2016.
'Identity & Political Mobilization of Diasporas', keynote lecture; Jewish Community Centre, Duisburg, Germany; 21 April 2015.

'Gendering protest and authoritarianism in the Middle East', keynote, Italian Association of Middle East Studies, Venice, Italy, January 2015.

'Iraq 10 years after', invited keynote at "Gertrude Bell in Iraq", British Academy, September 2013.

'Revolutionary Moments – Reactionary Processes: A Feminist Reflection on Protest, Mobilization and Change in the Middle East', invited keynote address at bi-Annual Feminist & Women's Studies Association (FWSA) University of Nottingham, June 2013.

'Gendering revolutionary and counter-revolutionary processes in Egypt', invited keynote lecture, University of Bergen, Norway, June 2013.

'Transnational Feminism in the Middle East', invited keynote lecture at "Grounding Cosmopolitanism: Theory and Practice through the Prism of Women's Rights", Bahcesehir University, Istanbul, Turkey, March, 2013

'Gendering Rage: Protest, Cultural Productions, and the Making of New Men and Women in the Middle East', invited keynote lecture, Yale University, New Haven, US, April 2013.

10

AAUP-00490

JA1924

Gendering protest and authoritarianism', invited keynote, 8th European feminist conference, May 2012.
'

Public places, alternative spaces', invited lecture at "Women Making Democracy", Radcliffe Institute for Advanced Study, Harvard University, US, March 2012.

'Conspiracy of Silence: Gender-based violence in Iraq', invited lecture at World Affairs Council, Colorado Springs, US, October 2011.

'Iraqi Women between Dictatorship, Sanctions, Wars and Occupation, invited lecture, Colorado College, Colorado Spring, US, October 2011.

'The Iraqi Kurdish Women's Movement', invited lecture, The Women's Empowerment Organization, Erbil; September 2011.

'The Iraqi Women's Movement: past and contemporary Perspectives, invited lecture, University of Jordan, Center for Women's Studies & KAS, September 2011.

'Gendering the Iraqi State", invited conference paper, Memory & Conceptualizations of the Iraq nation, University of Maryland, 1&2 May, 2010.

'Gendering Memory & Resistance in Iraq', invited lecture, Centre for Middle East Studies, Duke University, 22 March 2010.

'What kind of Liberation? Women and the Occupation of Iraq', invited lecture, Department of History, University of North Carolina, 20 March, 2010.

'What kind of Liberation? Women and the Occupation in Iraq', invited lecture, Centre for Middle East Studies, UCLA, Los Angeles, February 13, 2009.

'What kind of Liberation? Women and the Occupation in Iraq', invited lecture, Centre for Near and Middle East Studies, University of Berkeley, Berkeley, February 12 2009.

'The Iraqi Women's Movement Post-Invasion', invited lecture, Women and Gender Studies department, University of Berkeley, Berkeley, February 10 2009.

"Narrating the Nation, Trauma & War: Representing Iraqi Women's Memories", invited keynote, International Symposium Cultural Voices of a Fragmented Nation: War, Trauma, and Remembrance in Contemporary Iraq, University of Marburg, December 2008.

'Gendering War & Violence in Iraq: Historical Context & Contemporary Perspectives', invited lecture, University of Venice, January 2008.

'Gender and Conflict in Iraq', keynote speech at "Transformations in the Middle East", workshop organized by Free University of Berlin, Department of Politics, 12-15 December, 2007.

'What kind of Liberation? Iraqi Women and the Occupation', invited lecture, Centre for Middle East Studies, Harvard, Boston 5 November 2007.

'Iraqi Women between Dictatorship, Wars and Sanctions', invited lecture at Williams College, Williams Town, 6 November 2007.

'Iraqi Women and War', Invited lecture at conference on Women and War, organized by department of women's studies, University of Pennsylvania, Philadelphia 24-26 October 2007.

'Gender and Political Transition in Iraq post 2003', Boston Consortium on Gender, Security and Human Rights, Boston, April 2007.

'What kind of Liberation? Iraqi Women Post 2003', invited lecture, Harvard School of Governance, Harvard University, Boston, April 2007.

'Iraqi Women: Untold Stories', invited lecture, Sarah Lawrence College, NY, April 2007.

AAUP-00491

JA1925

'Iraqi Women: Past and Present', invited lecture, Visiting Speakers Series, Ohio State University, April 2007.

'Iraqi Women: Untold Stories', invited lecture, Denison University, Ohio, April 2007.

'What kind of liberation? Iraqi Women and Occupation', invited lecture at Middle Eastern Studies Seminar, University of Manchester, January 2007.

'Political Mobilization of Iraqi Diaspora Women', invited lecture at Institute for International Integration Studies (IIIS); IIIS Speakers Series, University of Dublin.

'Iraqi Women and Gender Relations post- 2003', invited lecture at Centre for Gender Studies, School of Oriental and African Studies (SOAS), November 2006.

'Iraqi Women under Occupation', invited paper presented at Emory Symposium "The Iraq War and the Wider Conflict", Emory University, Atlanta, November 2006.

'Iraqi Women, Past and Present', invited lecture at Drew College, Madison, New Jersey, November 2006.

'Iraqi Women: Untold Stories from 1948 to the Present', invited lecture at Birkbeck College, London, October 2006, Visiting Speakers series.

'Political Mobilization of Iraqi Diaspora Women', invited paper presented at conference entitled 'Gender & Empire, AUC, Cairo, June 2006.

'Iraqi Women, Citizenship and Transnational Migration', Paper presented at MESA (Middle East Studies Association of Northern America), Washington DC, November 2005.

'Iraqi Women: Past and Future Perspectives', Paper presented at conference entitled 'Iran & Iraq: Past and Future Perspectives', University of Michigan, Ann Arbor.

'The role of Iraqi women in the diaspora', invited lecture at COMPAS Lecture series, University of Oxford, May 2005.

'Iraqi Women between Dictatorship, sanctions, war and occupation', invited lecture at The Middle East Studies Centre, University of Arizona, Tuscon, April 2005.

'Gender and Transnationalism', invited lecture at The Middle East Studies Centre, University of Arizona, Tuscon, April 2005.

'Iraqi Women and Reconstruction', invited Key Note Speech at Graduation of Women's Studies Department, San Diego State University, April 2005.

'Iraqi Women between Dictatorship, sanctions, war and occupation', invited lecture at University of Michigan, Ann Arbor, March 2005.

'Working Woman, Mother of the Nation or Prostitute?' Iraqi Women and Constructions of Identity", invited paper presented at conference entitled "Iraq" Concepts of Self and Other", Amman, Jordan, January 2005.

'Gender and Political Mobilization of Diasporas', invited paper presented at workshop entitled "Political Mobilization of Post-Cold War Diasporas", United States Institute for Peace & University of Tokyo, September 2004, Macau.

'Constructions of Gender Identities in Iraq', Paper presented at workshop entitled "War and Reconstruction in Africa and the Middle East", September 2003, Ahfad University, Khartoum, Sudan.

'Women and Gender Relations in Iraq', invited lecture at University of Bochum, July 2003.

'The Impact of War and Sanctions on Women and Gender in Iraq', invited lecture at Heinrich Boell Foundation, Berlin, April 2003.

JA1926

AAUP-00492

### *12.* **Selected conferences and panels organized**

'Decolonizing Kurdish Studies', joint workshop organized with Center for Middle East Studies at Yale University, October 22 2021.

'Queer Feminist Perspectives on Political Homophobia and Anti-Feminism in the Middle East and Europe', joint conference organized with Humboldt University (Berlin), 24-25 September 2021.

'Comparative Feminist Reflections on War & Peace'; conference organization, Centre for Gender Studies, SOAS University of London 13 & 14 October 2017.

'Gendered Critical Kurdish Studies: Beyond nationalism, statehood and identity', panel organised for International Kurdish Studies conference, University of Exeter, June 2017.

'Gender and Governance in Muslim Contexts', workshop organised at Aga Khan university, London 10-11 February 2017.

'Politicised Sexualities, Marginalised Histories', organised conference on Sexuality in Southwest Asia and North Africa (SWANA), Centre for Gender Studies, SOAS University of London, February 2017.

Gender & Authoritarianism in the Middle East', joint workshop between and Centre for Gender Studies, SOAS; Centre for Middle East Studies, University of Indiana, Bloomington, April 2014.

'Gendering the Transnational in War, Peace-Building and Post-conflict Reconstruction: The case of Iraq & Palestine', panel organised at MESA, Boston, November 2009.

'Contemporary Iraqis: Cultural Voices of Resistance', round table organised at MESA, Montreal, Canada, November 2007.

'The Study of the Arab World in Western Universities', workshop organised at SOAS University of London, December 2008.

'Citizenship, Gender and Conflict in the Middle East', panel organised at MESA, Washington DC, November 2005.

'(Re)construction, Gender, and Transnationalism in the Middle East', panel organised at MESA, Boston, November 2004.

"Transnational Migration, Generation and Gender", workshop organized at the annual international conference of Mediterranean Studies, European University Institute, Florence, March 2002.

"Orientalism Reconsidered". International conference with Edward Said & Mohammed Arkoun, conference organized at the Institute of Arab & Islamic Studies, University of Exeter, April 2001.

JA1927

AAUP-00493

  



### SINCE 1891
# THE BROWN DAILY HERALD

Print Editions
Thursday June 12th, 2025

OPINIONS

# Faculty letter in support of BrownU Jews for Ceasefire Now

> "Please let what happened … at University Hall be not a crisis but an opportunity for Brown to show its moral leadership and to provide a model for how a community may come together and what it may thoughtfully do."

*Editors' Note: This letter was originally sent to President Christina Paxson P'19 P'MD20 on Nov. 9, 2023, with additional signatories who opted not to make their names public.*

We, the undersigned, are writing in response to the events that took place on the evening of Wednesday, Nov. 8, when 20 undergraduate students from the group BrownU Jews For Ceasefire Now were arrested and detained by Providence police at the instruction of the University following a sit-in at University Hall. We are deeply dismayed by the decision to have the students arrested, and we call upon our University leadership to engage with the deeper stakes and matters of conscience that our students have sought to foreground at this difficult time. Specifically, we call on the University:

1. **To insist that all legal charges against the students be dropped immediately**
2. **To exempt the students from any University disciplinary proceedings**
3. **To open a campus wide conversation that engages seriously with the students' demands.**

JA1928

AAUP-00705

In the statement that you shared with Brown faculty on Nov. 7, you emphasized your commitment to "ensure that individual members of the community are free to voice their views, including using their voices to urge lawmakers or other universities to take specific actions or, more generally, express their beliefs on matters of conscience," adding that these are "the rights that freedom of expression guarantees." We agree wholeheartedly, and would further note that freedom of expression is not restricted to speech but includes the right to protest and to perform civil disobedience. The students in question undertook a peaceful act of civil disobedience, following a time-honored American tradition. Protest in the form of sit-ins is a vital part of the legacy of Brown University, of which we can all be proud. Brown's most important historic commitments, including the increased matriculation of students of color in 1975, partial divestment of $4.6 million of holdings from corporations "aiding South African racism" in 1984-85, need-blind admissions in 1992 and our signature Open Curriculum, emerged partly as outcomes of such sit-ins and occupations by which students "express(ed) their beliefs on matters of conscience."

As each student was led out handcuffed from University Hall, they were greeted by hundreds of students — Jewish, Arab, Black, Hispanic and many others — singing prayers and songs of solidarity in Hebrew. Many were watching the livestream of this event and sharing videos that have now received tens of thousands of views nationally and internationally. At a time when peer universities are experiencing unparalleled levels of conflict, tension and toxicity, Brown's students enacted on Nov. 8 the kind of moral courage and peaceful solidarity that we at Brown have historically cultivated and defended. Their action illustrates dramatically that Brown has a singular history and legacy.

In your opinion piece in the New York Times on April 21, 2023 defending free expression as the "bedrock principle of this country," you wrote of college campuses as "a place for controversial issues and emerging ideas to be taught, discussed and debated." You wrote, stirringly, that the "proponents of censorship and repression" who had through history repressed such views as those of Galileo, Darwin or those accused of Communist leanings during the McCarthy era, "all had one thing in common: they were on the wrong side of history." As we all know, the movement of history is one in which views deemed marginal or unpopular gather the moral or evidentiary force to become collectively held commitments. We join the people of the world (as represented by the majority vote in the United Nations General Assembly and protests across the globe) in affirming that a ceasefire is not a radical thing to ask for but the very minimum that the world should ensure — a call to stop the killing and to give the bereaved the time to bury and mourn the dead.

The next few weeks are likely to continue to be very difficult, both in terms of the suffering wrought by the war in Gaza, as well as the continued clashing of viewpoints on the situation. Please let what happened yesterday at University Hall be not a crisis but an opportunity for Brown to show its moral leadership and to provide a model for how a community may come together and what it may thoughtfully do.

We call on you, Madam President, to lead the way in proactively initiating a conversation on the important issues raised by the BrownU Jews For Ceasefire students: the call for a ceasefire in Gaza, the active and explicit protection of students' and faculty's right to speak up for Palestinian rights and the call to reopen discussion on divestment, starting from the basis of the 2020 ACCRIP recommendation on this subject. We note that Yale University is reconsidering its own policies regarding investments in weapons manufacturing companies following student protests.

Once again, we call expressly on the University:

1. To insist that all legal charges against the students be dropped immediately
2. To exempt the students from any University disciplinary proceedings
3. To open a campus-wide conversation that engages seriously with the students′ demands, which are in line with our educational mission and our collective commitment to ″liberation and life for all,″ as described in a Nov. 8 open letter from Jewish students in the Brown Daily Herald.

We urge you to exercise thoughtful, moral leadership at this critical time, Madam President, and thus enable Brown University to be on the right side of history.

JA1929

AAUP-00706

Sincerely,

Nadje Al-Ali, Department of Anthropology, Watson Institute for International and Public Affairs and Center for Middle East Studies

Ariella Aïsha Azoulay, Departments of Modern Culture and Media & Comparative Literature

Anthony Bogues, Simmons Center for the Study of Slavery and Justice

Beshara Doumani, Department of History

Elias Muhanna, Departments of Comparative Literature and History

Matthew Shenoda, Department of Literary Arts and Brown Arts Institute

Suzanne Stewart-Steinberg, Departments of Comparative Literature and Italian Studies

Thangam Ravindranathan, Department of French and Francophone Studies

Vazira Zamindar, Department of History

*To see a full list of signatories, click here*

*Please send responses to this opinion to letters@browndailyherald.com and other op-eds to opinions@browndailyherald.com.*

About us
Contact us
Advertising
Donate
Terms of Service
Privacy Policy
Masthead
Alumni

Subscribe to our newsletter

Your Email Address

Subscribe

**BDH**

The Brown Daily Herald, Inc. is a financially independent, nonprofit media organization with more than 250 students working across our journalism, business and web divisions.

Powered by **WORKS** Solutions by The State News
All Content © 2025 The Brown Daily Herald, Inc.



EXHIBIT
95

AAUP News

**HOME / NEWS**

Founded in 1915, the AAUP remains the nation's leading organization primarily dedicated to protecting academic freedom and shared governance in higher education. Faculty members turn to the AAUP for assistance in the thousands each year. Some of these faculty members are well-known figures with resources and support. Most, however, are ordinary faculty members who need guidance in responding to troublesome or threatening professional attacks.

The AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality and the security of academic freedom, and by ensuring that this country's colleges and universities contribute to the common good. Through the AAUP, faculty determine the principles of our profession and the procedures by which to protect them. When the AAUP speaks, it is the voice of the profession.

Learn what's new at the AAUP or read selected media coverage of our work.

If you are a member of the media seeking comment or interview, contact aaup-news@aaup.org.

Join the AAUP

JA1931

Help protect quality higher education and shape the future of our profession.

JOIN NOW

American Association of University Professors
555 New Jersey Ave NW, Suite 600
Washington, DC 20001

Phone: 202-737-5900
Email: aaup@aaup.org

AAUP FOUNDATION

Sign Up for Updates

**Email \***

GET AAUP NEWS

Not in US?

JA1932

**Quick Navigation**

JA1933

JA1934

View this email in your browser



# Trump's Immigration Actions: What to Know

## Webinar Tomorrow

## Cosponsored by AAUP and MESA

Please join us Thursday, March 27, at 6:00 pm Eastern (3:00 pm Pacific), for a webinar about Trump administration immigration actions and people's legal rights.

Speakers will include deportation law specialist Marc Van Der Hout, who will share information about current immigration actions and the overall political landscape.

Participants will learn about the rights of legal permanent residents (green card holders), visa holders, and US citizens, and be empowered to advocate and protect both themselves and coworkers.

JA1935

AAUP-00287

**This webinar is cosponsored by the American Association of University Professors and the Middle East Studies Association.**

## Register for AAUP-MESA webinar

In addition, next week, MESA will also host a closed webinar for current members only.

**April 1, *MESA Members: Know Your Rights* Webinar at 12:00noon EDT.**

Current (2025) members have been automatically registered. Please see your myMESA email for the link to join.

---

### In case you missed it

MESA, AAUP, and the Knight institute file lawsuit over Trump policy of arresting and threatening deportation for lawful speechfile lawsuit over Trump policy of arresting and threatening deportation for lawful speech.

The Middle East Studies Association (MESA) and the American Association of University Professors (AAUP) yesterday filed a lawsuit seeking to block the Trump administration from carrying out large-scale arrests, detentions, and deportations of noncitizen students and faculty members who participate in pro-Palestinian protests and other protected First Amendment activities.

     



*Copyright © 2025 Middle East Studies Association, All rights reserved.*

JA1936

AAUP-00288

Want to change how you receive these emails?

You can update your preferences or unsubscribe from this list.

JA1937

AAUP-00289

View this email in your browser



# *MESA Members: Know Your Rights Webinar*
## April 1, 2025 at 12noon EDT

MESA will host a closed *Know Your Rights* Webinar at 12:00noon EDT on April 1.

This is available only to current MESA members, and will not be recorded.

For this webinar, we have preregistered 2025 members with the email from your myMESA account to ensure security.

Please see the email sent to your email with the login link if you would like to attend.



*Copyright © 2025 Middle East Studies Association, All rights reserved.*

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.

     

JA1939

AAUP-00291

View this email in your browser



# MESA Board Joint Statement with the TFCHR regarding deportations

**April 11, 2025—**The MESA Board of Directors and the MESA Task Force on Civil and Human Rights condemn in the strongest terms the Trump administration's targeting of noncitizen students and researchers for their constitutionally protected speech and advocacy. As part of an expansive anti-immigrant agenda, President Donald Trump has revoked visas and ordered the detention and deportation of non-citizens, including lawful permanent residents, for their advocacy of Palestinian rights and human dignity. The pretextual use of federal laws and executive orders to penalize political advocacy, speech, and protest is a direct assault on the foundations of democracy. It is a brazen attempt to deter individuals and institutions from expressing and hearing dissenting viewpoints. It is also a direct attack on the academic freedom of US universities, threatening the viability of these institutions as sites of free research, debate, and knowledge production.

On January 20, 2025, President Trump issued Executive Order No. 14,161 stating that it is the policy of the United States to protect its citizens from noncitizens "who espouse hateful ideology," directing the Secretary of State and other cabinet officials to "vet and screen" all noncitizens who are already in the United States "to the maximum degree possible." On January 29, 2025, the president issued Executive Order No. 14,188 stating that it is the policy of the United States "to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." The White House released a fact sheet about the order vowing "to investigate and punish

AAUP-00294

anti-Jewish racism in leftist, anti-American colleges and universities." The fact sheet characterizes the order as demanding "the removal of resident aliens who violate our laws."

The Executive Orders laid the groundwork for a disturbing series of arrests and deportation proceedings of noncitizen academics who participated in pro-Palestine protests or other related expression and association. MESA and the American Association of University Professors (AAUP) have challenged in court this "ideological deportation policy" as patently unconstitutional. In March 2025 alone, the following arrests were carried out or attempted by the Immigration and Customs Enforcement (ICE) agency:

- On March 8, ICE agents arrested Mahmoud Khalil, a recent Columbia University graduate and U.S. permanent resident. The agents ambushed Khalil in the lobby of his university-owned apartment building, separating him from his wife (a U.S. citizen) and whisking him away to an ICE facility in Louisiana.
- On the same day, ICE signed a detention order for Yunseo Chung, a Columbia University student and permanent resident who has lived in the United States since she was seven. A federal judge temporarily stopped ICE from detaining Chung while attorneys litigate the case.
- On March 11, Ranjani Srinivasan, an Indian national and doctoral student at Columbia University's Graduate School of Architecture, fled the United States for Canada after receiving notice that her visa had been revoked, and experiencing two warrantless visits from ICE agents at her Columbia University-owned housing.
- On March 13, Rasha Alawieh, a Lebanese citizen on an H-1B visa, was detained for 36 hours at Boston's Logan Airport and then deported back to Lebanon. A kidney transplant specialist who was to start a position at Brown University's medical school, Dr. Alawieh was deported despite a court order temporarily blocking her expulsion.
- On March 17, ICE arrested Badar Khan Suri, an Indian national and postdoctoral fellow at the Alwaleed Bin Talal Center for Muslim-Christian Understanding at Georgetown University. Suri was surrounded by masked agents, separated from his wife (a U.S. citizen) and three children, told that his visa was revoked, and detained in an ICE facility in Louisiana.
- On March 21, the Justice Department wrote to attorneys for Momodou Taal, a British-Gambian national and doctoral student in Africana Studies at Cornell University, requesting that Taal voluntarily "surrender to ICE custody." Taal had filed a preemptive lawsuit to block his detention, but

AAUP-00295

the court has denied his motion seeking a halt to the administration's deportation efforts.

- On March 25, masked ICE agents surrounded Rumeysa Ozturk, a Turkish national and doctoral student in Child Study and Human Development at Tufts University, outside her home and transported her to a facility in Louisiana. In his defense of the arrest, Secretary of State Marco Rubio told reporters, "We gave you a visa to come and study and get a degree, not to become a social activist that tears up our university campus. We've given you a visa and you decide to do that we're going to take it away." Rubio did not specify what actions led to Ozturk's arrest, beyond her co-authoring of an Op-Ed urging Tufts to divest from companies with ties to Israel.

As the ostensible legal basis of the arrests, the government has invoked a little-used provision that was introduced into the Immigration and Nationality Act in 1990 that empowers the government to deport noncitizens if the secretary of state determines that their activities "would have potentially serious adverse foreign policy consequences for the United States." This provision, which purports to vest extraordinary discretion in a single government official, is of dubious validity. It was ruled as unconstitutionally vague by a federal judge – the sister of President Trump, no less – in 1996, although the decision was overturned on unrelated procedural grounds.

The arrests evince a clear pattern of penalizing Palestine solidarity, by redefining it as hateful, anti-Semitic terrorism, with universities as alleged incubators. President Trump reinforced this framing in a post on Truth Social on March 10, after Mahmoud Khalil's arrest: "This is the first arrest of many to come. We know there are more students at Columbia and other universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country—never to return again."

In addition to these arrests, hundreds of international undergraduate and graduate student visas have been revoked without notice. The government has also taken the unprecedented step of terminating hundreds of individuals' records in the federal database regulating the stay of international students, threatening them with potential deportation proceedings. We do not yet know how many of these moves have been prompted by Palestine-related political alignments and/or impact members of the MESA community but they have created a climate of fear among international students and faculty, and, when

AAUP-00296

JA1942

related to advocacy, are a clear infringement of first amendment rights. The administration's attempt to stigmatize noncitizens and punish them for their protected speech flies in the face of a broad legal consensus that the First Amendment applies to all persons residing in the U.S., regardless of citizenship status.

As the MESA Board emphasized on March 13, "Palestine-related scholarship and advocacy have now become focal points of a frontal assault on universities as centers of critical thinking and knowledge production in a battle to destroy the autonomy of institutions of higher education in the US."

The MESA Board of Directors and Task Force on Civil and Human Rights demand first and foremost that the U.S. government desist from actions designed to repress pro-Palestine speech and expressive conduct and to punish those who have engaged in such constitutionally-protected speech and conduct, especially noncitizens who are being threatened with the pretextual and punitive use of immigration laws for expressing views with which the government disagrees.

At a time when the government is abusing immigration laws in this way, and also possibly threatening to expand repression of speech to citizens through criminal laws, universities and colleges owe heightened protections to members of their campus communities, particularly noncitizens. There are a series of minimal steps that universities and colleges should take to ensure they are protecting their campus communities. The MESA Board of Directors and Task Force on Civil and Human Rights call on our members and colleagues to ask their university and college administrations to:

1. Refuse to turn over personal student information in response to Title VI investigations;
2. Make a clear commitment to avoid voluntary cooperation or information sharing with Immigration and Customs Enforcement or other federal agencies charged with facilitating deportation or other forms of immigration enforcement;
3. Make a clear commitment to not comply with Section 3 of the expanded Executive Order 13899, which calls for universities to "monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens;"

AAUP-00297

JA1943

4. Maintain the enrollment of international students in the event of visa revocation, legal status termination, detention, and/or deportation;
5. Allow impacted international students and scholars to continue their studies and research remotely, if necessary;
6. Ensure that graduate students and workers whose enrollment is contingent upon funding through graduate teaching appointments or fellowships can continue their coursework, research, and teaching appointments;
7. Communicate reliable, timely information to international students and scholars, including immediate notification of changes in their legal status;
8. Provide and pay for legal counsel for those students and scholars whose visas have been revoked;
9. Work swiftly and affirmatively—through lawsuits, if necessary—to stop the termination of legal status of students and scholars without any due process.

Finally, in this climate of escalating fear, we reiterate our commitment to our membership to continue to act as a resource in their defense, and in defense of freedom of speech, academic freedom, and constitutional rights.

**Full statement web version**

**One-page PDF version**



*Copyright © 2025 Middle East Studies Association, All rights reserved.*

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.

     

JA1944

AAUP-00298

JA1945

AAUP-00299

View this email in your browser



# Launching MESA's Academic Freedom Initiative

**May 13, 2025—**Over the last few months, MESA has been building out the Academic Freedom Initiative (AFI), a project funded by the Mellon Foundation to identify and track trends regarding academic freedom and repression on campuses across North America. Since starting the initiative in February, our research priorities have been to document recent mass immigration enforcement and incidents of employment retaliation on campuses, with upcoming projects focused on tracking litigation among other efforts.

**Tracking Higher Education Immigration Enforcement**

We have built a database to track the Trump administration's recent campaign to revoke the visas and terminate the immigration records of thousands of students and scholars across the U.S. Although the Department of Justice announced its intention to reverse these moves on April 25, these measures, along with the numerous cases of individuals currently detained or deported, have created a lasting sense of fear across campuses in recent weeks. It is not yet clear that the government has indeed changed course, or that there have been reversals in all cases where visas were already revoked. Moreover, universities' inability to properly protect or inform their communities has exacerbated this panic.

We have therefore continued to track all visa revocations and immigration record terminations, entry denials, deportations, and detentions of university students, faculty, and staff to comprehensively record and analyze such changes on campuses. Sourcing from open-access data such as court filings and media reports, we have also collaborated with individuals at allied organizations to corroborate our data for accuracy and completion. To date, we have identified 1,708 total cases.

AAUP-00304

JA1946

More than half of the affected individuals were current students (975 out of 1,708), while 250 were recent alumni on temporary employment status.

In 478 cases, we have been able to identify affected individuals by name, citizenship, or immigration status.

From this data, we have identified multiple patterns.

Out of more than 200 universities and colleges with reported cases, over 65 percent of cases were reported from public institutions.

We have also identified a demonstrated national origin pattern across the dataset. Out of the cases where citizenship is known, the affected individuals held citizenship from more than 25 countries. Yet, less than 2 percent of these cases involved European citizenship. The overwhelming majority—over 98 percent of cases for which country of citizenship is known—are nationals of countries in the Global South.

We also have reason to believe the reversals are a prelude to further targeting of vulnerable individuals.

**Academic Freedom and Employment Retaliation Database**
In addition to higher education immigration, we have created a database that tracks all adverse employment outcomes for university employees who have advocated for Palestine since October 2023.

Thus far, we have identified the following incidents of employment retaliation:

| Incidents of Retaliation | |
| --- | --- |
| Suspensions | 27 |
| Terminations | 13 |
| Forced resignations | 3 |
| Rescinded offers | 2 |
| Removals from service positions | 2 |
| Miscellaneous | 14 |
| **Total # of incidents of retaliation** | **61** |

| Individual Data | |
| --- | --- |
| Tenured faculty | 24 |
| Tenure-track faculty | 9 |

AAUP-00305

| Non-tenure track faculty | 22 |
|---|---|
| Staff | 4 |
| **Total # of individuals affected** | **59** |

| Institutional Data | |
|---|---|
| Public universities | 16 |
| Private universities | 21 |
| **Total # of universities** | **37** |

**Future Research Directions**

As new policies continue to emerge, our next area of research will focus on legal actions and lawsuits brought under Title VI of the Civil Rights Act of 1964 to track major cases of lawfare concerning Palestinian advocacy within academia. We will build out a new database to capture Title VI litigation since October 2023, to be launched over the summer.

Across the country, universities and colleges remain under attack. Threats to immigration status, funding opportunities and employment, and to First Amendment protections including academic freedom continue to grow.

MESA will continue to develop our research initiative to address these concerns. Our research will be centralized on a publicly accessible website to be launched before the end of the year. In doing so, we will ensure our data is available to our membership and to the public. In addition to our findings, the new standalone website will house resources that are currently located in the MESA Advocacy Resource Center.

As we face continual threats of censorship, and repression, MESA is committed to defending academic freedom and free speech tenaciously, to document the range of experiences affecting our membership and our field, to encourage campuses to protect their communities, and to provide anticipatory support to all affected.

**See web version**

JA1948

AAUP-00306



*Copyright © 2025 Middle East Studies Association, All rights reserved.*

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.

     

AAUP-00307

JA1949

View this email in your browser



# *Know Your Rights Town Hall*
## Pre-summer webinar focused on immigration law, ideological detentions, and travel safety

## Tuesday, May 27, 2025
## 6:00-7:30 p.m. ET / 3:00-4:30 p.m. PT

We are holding a pre-summer webinar for our members focused on immigration law, ideological detentions, and travel safety. Join MESA, the American Association of University Professors (AAUP), and immigration attorneys Marc Van Der Hout and Johnny Sinodis on **Tuesday, May 27, at 6–7:30 p.m. ET (3–4:30 p.m. PT)**.  We will be discussing updates in the detentions and attempted deportations of noncitizen students and scholars, best practices with respect to travel, and answers to the questions and concerns of international faculty.

Register here, and please submit your questions in advance using this form.

### Register for the webinar

As the Trump administration continues its onslaught on immigrants and foreign nationals, MESA is working with allies on several fronts:

**In the courts**—Together with AAUP National and several AAUP chapters, we filed suit seeking to block the Trump administration from carrying out large-scale arrests, detentions, and deportations of noncitizen students and faculty members for ideological reasons (typically because of pro-Palestinian speech).

AAUP-00308

We overcame the government's motion to dismiss and anticipate going to trial this summer.

**Developing resources—**We have developed and assembled resources that are collected in our [Advocacy Resource Center](#).

MESA members joining the webinar may be specifically interested in accessing the following materials highlighted in the Advocacy Resource Center, some of which we worked jointly with AAUP in developing:

- AAUP letter to college and university legal offices: [Institutions Should Not Provide Student and Faculty Info to Enable Deportations](#)
- AAUP letter to college and university legal offices: [Institutions Should Support Students Under Visa Threats with Legal Aid and Housing](#)
- [Fact sheet on dealing with ICE on your campus](#) (AAUP General Counsel)
- [Fact sheet on rights and risks for workers who are in the United States on visas](#) (AFT)
- [Issue brief on immigration-related campus concerns](#) (American Council on Education)
- [Know Your Rights flyers](#) (AFL-CIO)
- [Family preparedness plan template](#) (Immigrant Legal Resource Center)
- [Immigration legal and digital security resources](#) (AAUP Center for the Defense of Academic Freedom)

Finally, stay tuned for another virtual session that we will be organizing in late summer ahead of international students' and faculty's return to campus.

In solidarity,

Aslı Bâli
President

Jeff Reger
Executive Director

<span style="color:red">JA1951</span>

AAUP-00309



Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.
*Copyright © 2025 Middle East Studies Association, All rights reserved.*

     

JA1952

AAUP-00310

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I electronically filed the foregoing Joint Appendix with the Clerk for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 /s/ Paul F. Stone
PAUL F. STONE
*United States Department of Justice*