# In the United States Court of Appeals for the First Circuit

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS - HARVARD FACULTY CHAPTER; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY; RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN FEDERATION OF TEACHERS; MIDDLE EAST STUDIES ASSOCIATION,

Plaintiffs–Appellees/Cross–Appellants,

v.

MARCO RUBIO, in the official capacity as Secretary of State; U.S. DEPARTMENT OF STATE; MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, in the official capacity as Acting Director of U.S. Immigration and Customs Enforcement; DONALD J. TRUMP, in the official capacity as President of the United States; UNITED STATES,

Defendants–Appellants/Cross–Appellees.

*On Appeal from the U.S. District Court
for the District of Massachusetts
Docket Number 1:25-cv-10685-WGY*

### JOINT APPENDIX Volume V

BRETT A. SHUMATE
  *Assistant Attorney General
  Civil Division*

DREW C. ENSIGN
  *Deputy Assistant Attorney General*

PAUL F. STONE
  *Acting Chief*

LINDSAY M. MURPHY
  *Deputy Chief*

RAMYA KRISHNAN
XIANGNONG WANG
STEPHANY KIM
RAYA KOREH
CARRIE DECELL
SCOTT WILKENS
ALEX ABDO
JAMEEL JAFFER
  *Knight First Amendment Institute
  at Columbia University
  475 Riverside Drive, Suite 302
  New York, NY 1011*

VICTORIA SANTORA
  *Senior Counsel for National Security*

JESSE BUSEN
  *Counsel for National Security*

*National Security Unit*
*Office of Immigration Litigation*
*U.S. Department of Justice*
*P.O. Box 878, Ben Franklin Station*
*Washington, DC 20044-878*
*(202) 305-9647*

EDWINA CLARKE
DAVID ZIMMER
*Zimmer, Citron & Clarke, LLP*
*130 Bishop Allen Drive*
*Cambridge, MA 02139*

NOAM BIALE
MICHAEL TREMONTE
ALEXANDRA CONLON
COURTNEY GANS
*Sher Tremonte LLP*
*90 Broad Street, 23rd Floor*
*New York, New York 10004*

AHILAN T. ARULANANTHAM
*Professor from Practice*
*UCLA School of Law*
*385 Charles E. Young Dr. East*
*Los Angeles, CA 90095*
*(310) 825-1029*
*arulanantham@law.ucla.edu*

# TABLE OF CONTENTS

Trial Exhibit 118, MESA Instagram Post @MESA_1966
    February 19, 2025 ..................................................................................JA1953

Trial Exhibit 119, MESA Instagram Post @MESA_1966
    February 18, 2025 ..................................................................................JA1954

Trial Exhibit 121, MESA Instagram Post @MESA_1966
    February 12, 2025 ..................................................................................JA1955

Trial Exhibit 122, MESA Instagram Post @MESA_1966
    February 11, 2025 ..................................................................................JA1956

Trial Exhibit 123, MESA Instagram Post @MESA_1966
    February 6, 2025 ....................................................................................JA1957

Trial Exhibit 124, MESA Instagram Post @MESA_1966
    January 30, 2025 ....................................................................................JA1958

Trial Exhibit 125, MESA Instagram Post @MESA_1966
    January 23, 2025 ....................................................................................JA1959

Trial Exhibit 126, MESA Instagram Post @MESA_1966
    January 16, 2025 ....................................................................................JA1960

Trial Exhibit 128, MESA Instagram Post @MESA_1966
    January 9, 2025 ......................................................................................JA1961

Trial Exhibit 133, MESA Strategic Plan 2021-2025 .....................................JA1962

Trial Exhibit 134, MESA's Bylaws ...............................................................JA1972

Trial Exhibit 136, MESA About webpage.......................................................JA1983

Trial Exhibit 137, MESA Annual Meeting webpage ......................................JA1985

Trial Exhibit 139, MESA Task Force on Civil and Human Rights webpage JA1987

Trial Exhibit 171, March 31, 2025 email from
Bernhard Nickel to Philosophy Faculty List
"Fwd: Immigration resources"................................................................JA1991

Trial Exhibit 172, April 2, 2025 email from
Bernhard Nickel "Additional Conversation"..........................................JA1993

Trial Exhibit 184, March 27, 2025 Email from
Veena Dubal "Readnow -- Run of Show for Tonight"............................JA1994

Trial Exhibit 191, MESA April 3, 2025 Membership Report.......................JA2007

Trial Exhibit 192, MESA February 12, 2025
Membership Renewal Comparison...........................................................JA2010

Trial Exhibit 196, March 30, 2025 Email from Jeffrey Reger
"Attestation of drop in program submission statistics for lawsuit"...........JA2011

Trial Exhibit 199, EO 13,899
"Combating Anti-Semitism" (Dec. 11, 2019) ..........................................JA2013

Trial Exhibit 210, Department of State, "Defining Antisemitism" ...............JA2015

Trial Exhibit 211, 5 FAM 1200 "State Messaging and
Archive Retrieval Toolset (SMARRT)".....................................................JA2019

Trial Exhibit 212, U.S. Department of State,
Foreign Affairs Manual, Homepage ........................................................JA2026

Trial Exhibit 213, 9 FAM 402.5 "(U) Students and Exchange
Visitors – F, M, and J Visas" ....................................................................JA2030

Trial Exhibit 215, 9 FAM 403.11 "(U) NIV Revocation"............................JA2099

Trial Exhibit 223, "When Brown students speak,
the University should listen: A faculty letter in
support of student activism" signed by Nadje Al-Ali................................JA2108

Trial Exhibit 224, "Brown faculty call for a ceasefire in Israel-Palestine and the protection of academic freedom and student activism" signed by Nadje Al-Ali .............................................JA2115

Trial Exhibit 225, CCTV footage of Rümeysa Öztürk's arrest.......................JA2123

Trial Exhibit 226, Op-ed by Rumeysa Ozturk, Fatima Rahman, Genesis Perez and Nicholas Ambeliotis .........................JA2124

Trial Exhibit 227, Canary Mission, "Rumeysa Ozturk".................................JA2128

Trial Exhibit 229, Canary Mission, "Our Mission".......................................JA2130

Trial Exhibit 230, Canary Mission, "Mohsen Mahdawi"...............................JA2132

Trial Exhibit 231, Canary Mission, "Mahmoud Khalil" ................................JA2140

Trial Exhibit 232, Öztürk, ROA ....................................................................JA2148

Trial Exhibit 233, Khalil, ROA.......................................................................JA2161

Trial Exhibit 234, Suri, ROA ..........................................................................JA2166

Trial Exhibit 235, Mahdawi ROA ..................................................................JA2173

Trial Exhibit 236, Chung ROA........................................................................JA2179

Trial Exhibit 237, iPhone footage of Mahmoud Khalil's arrest.....................JA2182

Trial Exhibit 239, 25 STATE 59756, "Action Request: Expanding Screening and Vetting for FMJ Applicants" (June 18, 2025) ........................................................JA2183

Trial Exhibit 240, Comparison of AAUP & MESA Political Activity, April 2024 and April 2025 ...........................................JA2193

Trial Exhibit 241, Comparison of AAUP Public Events 2022-2025 .............JA2196

Trial Exhibit 242, Mahmoud Khalil DHS Referral Letter...............................JA2197

Trial Exhibit 243, Yunseo Chung DHS Referral Letter ................................JA2199

Trial Exhibit 244, Mohsen Mahdawi DHS Referral Letter ...........................JA2201

Trial Exhibit 245, Rumeysa Ozturk DHS Referral Letter .............................JA2203

Trial Exhibit 246, Badar Khan Suri DHS Referral Letter .............................JA2205

Trial Exhibit 247, Khalil and Chung Action Memo .....................................JA2207

Trial Exhibit 248, Mahdawi Action Memo ..................................................JA2212

Trial Exhibit 249, Suri Action Memo ..........................................................JA2217

Trial Exhibit 250, Öztürk Action Memo ......................................................JA2222

Demonstrative (Chalk) HN, State Department Process
and Protocol for Visa Revocations .........................................................JA2226

Demonstrative (Chalk) HO, HSI Process
& Protocol for Information Sharing,
Referrals, and Enforcement Actions........................................................JA2227

EXHIBIT
118



JA1953

EXHIBIT

119



EXHIBIT
**121**







JA1955

**EXHIBIT 122**



JA1956

EXHIBIT
**123**

 mesa_1966



# CALL FOR PAPERS

**MESA 2025**

📅 November 22-25, 2025

📍 Washington DC

**Don't miss the chance to meet in person in solidarity with one another, and to present and to network at the largest Middle East studies conference in North America!**



♡ 28   💬 1   ✈ 6   🔖

**mesa_1966** Only one week left to submit your abstracts for our upcoming conference in Washington, DC!

Don't miss this incredible opportunity to join our community in solidarity, present your research, and network with leading scholars and professionals in this field. https://mesana.org/annual-meeting/call-for-papers

February 6

JA1957

EXHIBIT

124



JA1958

EXHIBIT
125



JA1959

EXHIBIT
126



JA1960

EXHIBIT
128



JA1961



EXHIBIT

133



# Middle East Studies Association of North America, Inc.

# Strategic Plan

## 2021–2025

JA1962

# Mission Statement

The Middle East Studies Association (MESA) is a non-profit association that fosters the study of the Middle East, promotes high standards of scholarship and teaching, and encourages public understanding of the region and its peoples through programs, publications and services that enhance education, further intellectual exchange, recognize professional distinction, and defend academic freedom in accordance with its status as a 501(c)(3) scientific, educational, literary, and charitable organization.

# Vision Statement

The strength of MESA lies in its dual commitment to scholarship and advocacy. MESA fosters and disseminates inclusive scholarship, intellectual exchange beyond borders, and pedagogy about the Middle East and North Africa. MESA advocates for academic freedom. It is committed to supporting struggles against racism and anti-Blackness. It opposes anti-Muslim racism, anti-Semitism, and all forms of discrimination based on gender and sexuality. This vision of MESA's role will guide the implementation of the Strategic Plan over the coming five years.

# Background and Plan of Action

The Strategic Planning Committee was constituted by the Board of Directors (BoD) in November 2019 to develop a plan with goals and objectives to guide the BoD and the Secretariat over the next five years. These goals serve as guidelines for MESA's leadership as it carries out the association's mission in a changing environment concerning research, pedagogy, employment, and threats to academic freedom and civil rights. MESA is committed to transparency and pluralism. This plan is an evolving document, and was circulated among MESA's affiliated organizations for feedback in December 2020. We continue to welcome input and comments from our members.



MESA Strategic Plan 2021–2025

JA1963

# Long-Term Goals

Guided by MESA's mission and its dual commitment to scholarship and advocacy, the Strategic Plan recommends that MESA's BoD pursue the following goals:

1. Further intellectual exchange in North America and globally
2. Advance research within and across disciplinary and regional boundaries
3. Support undergraduate and graduate students' professional and intellectual development
4. Encourage public understanding of, and reward public scholarship on, the region
5. Recognize the importance of academic freedom and contribute to its defense
6. Foster and promote anti-racism and anti-discrimination in MESA as an organization and in the Middle East as an academic field.
7. Preserve and enhance MESA's organizational independence and financial health



MESA Strategic Plan 2021–2025

JA1964

# Further Intellectual Exchange

## Ongoing Practices:

1. Host an annual meeting which welcomes high-quality, diverse scholarship from a range of disciplines
2. Foster innovative and high-quality research through the publication of *International Journal of Middle East Studies (IJMES)* and *Review of Middle East Studies (RoMES)*
3. Actively maintain ties with scholars from the Middle East and North Africa (MENA) region through the Global Academy, and help Global Academy Fellows to network with one another and with the institutional partners gathered into regional clusters of universities
4. Serve as a clearinghouse for information about programs of study and academic events related to the MENA region
5. Maintain affiliations with other academic organizations focusing on the MENA region in the United States and globally

## Objectives:

1. Collaborate with other area studies professional organizations to support transregional scholarly initiatives
2. Support the professional development of students and junior faculty through webinars and panels or other workshops and gatherings at the annual meeting
3. Apply for foundation funding to support innovative seminars that advance the field of MENA studies, and partner with grant-receiving centers, institutes, or affiliates
4. Create a welcoming meeting space for all attendees through the enactment of policies developed by the Anti-Sexual Harassment Committee (ASH)
5. Incorporate anti-racism and anti-discrimination practices in all areas of intellectual exchange



JA1965

# Teaching, Pedagogy, and Student Support

## Ongoing Practices:

1. Coordinate with MESA's Committee for Undergraduate Middle East Studies (CUMES)
2. Support the organization's Undergraduate Education Award
3. Facilitate the Undergraduate Research Workshop at the annual meeting
4. Devote space in *Issues in Middle East Studies* to essays on pedagogy
5. Recognize excellence in research by graduate students through the Malcolm H. Kerr Dissertation Awards
6. Support graduate student participation in MESA through travel fellowships for students, and sponsoring panels and workshops at the annual meeting to benefit graduate students
7. Recognize the importance of graduate students in the organization through the Student Director position on the MESA Board

## Objectives:

1. Promote research on pedagogy through expanded publication opportunities in MESA outlets and encouraging papers and panels on pedagogy at the annual meeting
2. Connect and seek collaborative opportunities with the teaching and learning programs of other area studies and disciplinary associations
3. Share resources for undergraduate Middle East studies programs (creation of minors, certificates, program development, curriculum and assessment best practices)
4. Encourage the development of resources for pedagogical training, course design, instructional support, and professional development for graduate students in Middle East studies
5. Promote teaching and learning in MENA languages; seek opportunities for collaboration with centers and with language-specific professional associations



MESA Strategic Plan 2021–2025

JA1966

# Academic Freedom Advocacy

## Ongoing Practices:

1. Advocate through letter writing for the protection of academic freedom in North America and the Middle East, North Africa, and Gulf region
2. Publicize the work of the Committee on Academic Freedom (CAF) to the MESA membership and the broader academic and rights communities through the annual academic freedom award and annual meeting panels
3. Advise the board regarding sites or instances of particular concern for possible board action or statements
4. Coordinate with the Task Force on Civil and Human Rights (TFCHR) in seeking to protect institutions and scholars whose academic freedom is threatened in North America
5. Compile and provide resource materials for students, faculty, and administrators to address emerging challenges to academic freedom
6. Provide advice to other associations seeking to address academic freedom issues
7. Join, where appropriate and with board approval, with other associations in academic freedom petitions, letters, and campaigns

## Objectives:

1. Identify ways to further publicize the academic freedom cases adopted
2. Engage in more systematic follow-up on cases about which CAF has written to note changes to or continuation of their circumstances
3. Further develop ties with academic freedom (or similar) committees in other academic associations in North America
4. Offer assistance, when appropriate, to Middle East studies associations based outside the United States seeking to establish academic freedom committees
5. Coordinate outreach and identification of scholars with the MESA Global Academy



MESA Strategic Plan 2021–2025

JA1967

# Promoting Anti-Racism and Anti-Discrimination

MESA is committed to the struggles against racism, anti-Blackness, discrimination and the systemic and systematic prejudices directed against people of different identities and backgrounds. This means actively encouraging within our organization the participation of communities of color including Black, Native American, Indigenous, Latinx, and ethnic minorities as well as of people of different genders and LGBTQ2+ communities. Our commitment entails promoting research and teaching on the experiences of Black communities and other racialized minorities in the MENA region, on the historical and contemporary connections between the Middle East and other regions with an emphasis on Africa, and on themes, categories, and discourses regarding race and colorism in the MENA region.

MESA's centering of anti-racism and anti-discrimination work aims to move beyond increasingly ambiguous terms like "diversity" and "inclusion" by actively advancing, implementing, and institutionalizing processes within MESA that can help dismantle racist and discriminatory practices embedded in academia. This work extends to all the various marginalized histories, languages, and social groups of the Middle East and North Africa, and the variety of academic disciplines we use to study them.

## *Ongoing Practices:*

1.   Continue consulting, as requested, with HBCUs and MSIs on the establishment of programs and centers of Middle East studies

2.   Continue support, as requested, to the Middle East Outreach Council to develop programs and materials that reach K–12 schools with significant Black, Latinx, Native American and Indigenous student bodies

3.   Charge the MESA Program Committee with ensuring that the Annual Meeting covers diverse topics that speak to geographic linkages and marginalized groups, a greater emphasis on African communities and issues relating to transnational networks between Africa, the Americas, and the Middle East, and a broad range of presenters of diverse backgrounds in accordance with the goals described above

4.   Build on previous outreach to sister academic professional membership associations to develop joint activities



MESA Strategic Plan 2021–2025

JA1968

# Promoting Anti-Racism and Anti-Discrimination cont

## *Objectives:*

1.  Establish a committee charged with further articulating and implementing these goals. The committee is encouraged to consider developing some of the following proposals in addition to others it may recommend.

2.  Coordinate with *IJMES* and *RoMES* editorial staffs and boards to develop plans for inclusion of diverse topics and authors in their pages

3.  Work with CUMES to encourage the recruitment of undergraduate students from underrepresented minorities to study the Middle East and attend the MESA Annual Meeting

4.  Develop a fellowship program for the annual meeting to encourage attendance of historically underrepresented groups of students and scholars in Middle East studies

5.  Support panels, webinars, and resource lists on teaching about marginalized communities in the Middle East

6.  Develop a book prize or a best article prize for scholarship on issues of race and color in the MENA region and the connections between the Middle East and Africa

JA1969

# MESA's Organizational Independence and Financial Stability

## *Ongoing practices:*

1. Support the reorganization and the transition of MESA's Secretariat to Washington, DC
2. Ensure that the Secretariat maintains a stable and independent working environment by continuing our productive relationship with the Institute for Middle East Studies at George Washington University's Elliot School for International Affairs
3. Secure the independence of the Secretariat's work.
4. Consult with and support BoD committees such as the MESA Global Academy, ASH, CAF, TFCHR, Committee on Precarity and Adjunctification, and Committee on Anti-Racism and Anti-Discrimination (CAA) on new projects and the expansion of MESA's commitments

## *Objectives:*

1. Reassess the office space needs of MESA's Secretariat in light of the reorganization of its staff and its move to the DC area
2. Set priorities for MESA fundraising in an environment restricted by the economic downturn caused by COVID-19
3. Task the Development Committee with developing a long-term fundraising strategy in consultation with the BoD
4. Approach foundations for programmatic funding of new initiatives, and clear potential approaches by the Global Academy to new funders



MESA Strategic Plan 2021–2025

JA1970

   

   

   

  

   



**MESA Headquarters & Secretariat**
1957 E Street NW, Suite 512H, Washington DC 20052 (USA)
*mailing address:*
3542 N. Geronimo Avenue, Tucson AZ 85705 (USA)
520-333-2577 · fax 520-207-3166
secretariat@mesana.org
mesana.org

JA1971

**EXHIBIT**

**134**

# Bylaws

*These Bylaws incorporate revisions approved on January 15, 1972, January 31, 1975, February 16, 1977, April 1, 1978, May 31, 1980, May 1, 1988, October 15, 1990, November 1, 1995, November 1, 1999, April 20, 2009, April 13, 2012, April 1, 2014, March 15, 2017, and March 21, 2025, of the original Bylaws of the Middle East Studies Association, Inc., of December 8, 1967.*

## ARTICLE I. NAME, NATURE, and OBJECTIVES

**Section 1.** Name. The name of this organization shall be the MIDDLE EAST STUDIES ASSOCIATION of North America, Inc. It shall be known also as The Middle East Studies Association (MESA) (also referred to herein as "MESA" or the "Association").

**Section 2.** Nature and Objectives. THE MIDDLE EAST STUDIES ASSOCIATION is a non-profit association that fosters the study of the Middle East, promotes high standards of scholarship and teaching, and encourages public understanding of the region and its peoples through programs, publications and services that enhance education, further intellectual exchange, recognize professional distinction, and defend academic freedom in accordance with its status as a 501(c)(3) scientific, educational, literary, and charitable organization.

## ARTICLE II. MEMBERSHIP

**Section 1.** Types of Membership. There shall be three categories of full members: Honorary Fellows, Fellows, and Student Members; one category of Associate Members; and one category of Institutional Members.

JA1972

**a.** Honorary Fellows. Honorary Fellows shall be limited to outstanding internationally recognized scholars who have made major contributions to Middle East studies. Honorary Fellowship shall be bestowed by nomination of the Board of Directors and conferred by the majority of those present and voting at any Annual Members meeting of the organization. Honorary Fellows shall retain their status until their resignation or death. Honorary Fellows shall be entitled to all the rights and duties of Fellows but shall not pay dues. There shall be no more than ten Honorary Fellows at any one time.

**b.** Fellows. Fellows are defined as those individuals who have received a Doctorate related to Middle East studies and/or who have taught in Middle East studies and/or who have made a scholarly contribution to Middle East studies. Fellows shall be admitted to membership by approval of the majority of the Board of Directors. Annual dues as established by the Board of Directors must be paid to retain membership.

**c.** Student Members. The Board of Directors may admit as Student Members registered graduate and undergraduate students interested in Middle East studies who may meet such qualifications as may be established by the members of the Association. Annual dues as established by the Board of Directors must be paid to retain membership. The Board of Directors may establish a time-limit for student membership.

**d.** Associate Members. The Board of Directors may elect as Associate Members without the voting privilege persons interested in the study of the Middle East and who meet such qualifications as may be established by the members of the Association. They shall be entitled to attend all public meetings of the Association and to receive all publications of the Association. Annual dues as established by the Board of Directors must be paid to retain membership.

**e.** Institutional Members. The Board of Directors may admit as Institutional Members without the voting privilege academic or philanthropic institutions which meet such qualifications as may be established by the Board of Directors. Institutional Members shall be subject to review every third year, to ensure their missions and objectives continue to coincide with those of MESA, as stated in Article I, Section 2. Annual dues as established by the Board of Directors must be paid to retain membership.

**Section 2.** Voting. Only Full Members in good standing are eligible to vote by ballot (for the purposes of these bylaws "ballot" shall refer to both mailed paper and electronic mail ballot or any other means of electronic transmission approved by the Board of Directors) or voice vote in open sessions. Full Members in arrears of payment of dues shall be considered not in good standing.

**Section 3.** Resignation and Removal of Members. A member of any category of membership may be removed at any time by a vote of the majority of the membership. Any member in any category may resign at any time.

**Section 4.** Compensation. The Board of Directors may authorize reimbursement for expenses incurred by members in connection with the performance of their duties, provided however, that nothing herein contained shall be construed to preclude any member from serving the Association in any other capacity or receiving compensation for such services.

JA1973

**Section 5.** Dues. Membership in any category is subject to such dues as may be fixed by the Board of Directors.

# ARTICLE III. ANNUAL MEETING OF THE ASSOCIATION

**Section 1.** An Annual Meeting shall be held at a time and place to be determined by the Board of Directors.

**Section 2.** An Annual Members Meeting open to members and guests of the Association shall be held at the time and place of the Annual Meeting.

> **a.** The President or, in that Officer's absence, the President-Elect or Past-President, shall preside. In the event that none of these individuals is available, the Board of Directors shall select one of its members to preside.
>
> **b.** Procedure shall be governed by the latest edition of Robert's Rules of Order, and there shall be a parliamentarian who shall advise the presiding officer.
>
> **c.** There shall be a quorum for the Annual Members Meeting of 35 voting members of the Association in good standing. In the absence of a quorum, the Meeting may be held, but no votes may be taken.
>
> **d.** Only Full Members in good standing may vote at the meeting.
>
> **e.** Voting at the Annual Members Meeting shall be of two kinds.
>
> **1).** Voting which seeks only to determine the "sense of the meeting."
>
> **2).** Voting which seeks only to submit the question to the membership at a future time in the form of a ballot. Any vote to submit a matter to the general membership must be passed by a majority of those present and voting, providing there is a quorum at the time the vote is taken. Matters which are passed by the required majority shall be submitted to the membership under procedures described in Article III, Section 5.

**Section 3.** Special Meetings of the members shall be called at any time by the Executive Director of the Association upon the request of the majority of the Board Members or upon request of no less than one-fourth of the voting members of the Association.

**Section 4.** Resolutions

JA1974

**a.** The Board of Directors may present resolutions to the Annual Members Meeting.

**b.** Any member of the Association in good standing with voting rights may, subject to the following rules, present resolutions at the Annual Members Meeting.

**1).** Resolutions must be received in writing by the office of the Executive Director of the Association not later than three weeks prior to the Annual Meeting; must be signed by at least seventy-five members of the Association in good standing with voting rights; must not be more than 300 words in length including background material; and must deal with a matter of concern to the Association or to the academic profession.

**c.** Resolutions may be voted upon at the Annual Members Meeting to determine "the sense of the meeting" or;

**d.** Resolutions designed to determine Association policy, to instruct the Board, or to amend the Bylaws, must be voted upon at the Annual Members Meeting to determine whether they should be submitted to the membership at a future time in the form of a ballot. A majority of those members present and entitled to vote, and constituting a quorum, shall be required to pass such a resolution. Resolutions passed by the required majority shall be submitted to the membership under procedures described in Article III, Section 5.

**Section 5.** Referenda

**a.** Referenda are defined as the casting of votes by the membership in good standing and with voting rights on issues other than elections, providing each member has been furnished with a ballot. Referenda may be initiated by the Board of Directors or by vote at the Annual Members Meeting as specified in Article III, Sections 2 and 4.

**b.** The Board of Directors may present its opinion on a referendum issue in writing at the time the mail ballot is sent to the membership.

**c.** Ballots must be returned by a date determined by the Executive Director, but not less than thirty (30) days from the issue of the ballot to be counted.

**d.** The result of the vote by members in good standing with voting rights shall be decided by a majority of those voting, or two-thirds of those voting for amendments (Article VIII).

# ARTICLE IV. BOARD OF DIRECTORS

**Section 1.** Management. The affairs and the property of the Association shall be managed by the Board of Directors (herein-after sometimes referred to as the Board or the Directors). The membership may originate general policies and give general directives to the Board. The Directors shall act only as a Board and individual Directors shall have no power as such.

JA1975

**Section 2.** Annual Meeting. There shall be at least one Annual Meeting of the Board scheduled on the day before the opening of the annual conference and meetings-in-conjunction day. Such Annual Meetings of the Board shall be general meetings and open for the transaction of any business except in any case where special notice is required by law, by the Certificate of Incorporation, or by the Bylaws. They will be held in executive session and open to Board Members, both voting and ex-officio, and invited guests.

**Section 3.** Special Meetings. Special meetings of the Board shall be called at any time by the Executive Director upon the request of the President or upon the request of no less than a majority of the Directors.

**Section 4.** Notification. All Board Members will be given at least fourteen days notice of the time and location of board meetings.

**Section 5.** Quorum. At all meetings of the Board the presence of a majority of the Directors shall be necessary and sufficient to constitute a quorum. Except as otherwise provided by law or by the Bylaws, the act of a majority of the Directors present and voting shall be the act of the Board.

**Section 6.** Numbers of Directors. The Board of Directors shall consist of nine voting persons: The President, the President-Elect or the immediate Past-President, six Members of the Board, and one Student Member of the Board. The Executive Director and Treasurer shall serve on the Board as non-voting members.

**Section 7.** Election of Members of the Board. The Nominating Committee, described in Article VI, Section 2, shall annually nominate four Fellows as candidates for two vacancies of the Fellows Members of the Board. The Nominating Committee shall biennially nominate two Student Members for the one vacancy of the Student Member of the Board. Additional nominations may be made by petition from the membership to the Nominating Committee. Any Fellows Member may be nominated a candidate for Fellows Member of the Board by a petition signed by seventy-five Fellows in good standing provided the nominee has agreed to run and the petition is received at the Secretariat by the tenth of June. Any Student Member may be nominated a candidate for Student Member of the Board by a petition signed by seventy-five Student Members in good standing provided the nominee has agreed to run and the petition is received at the Secretariat by the tenth of June. The Committee shall, with the help of the Executive Director, conduct the election. Ballots shall be provided by the Secretariat in sufficient time so that they may be reasonably returned by a deadline before the Annual Meeting. The Nominating Committee may instruct the Executive Director to count the ballots and to have the results certified by a notary public. A plurality of the votes cast shall be required for election. Only the Ballots of members in good standing shall be counted. In preparing the list of nominees, the Nominating Committee shall keep in mind the desirability of having representation on the Board from the various sections of the United States and Canada, as well as scholars representing interests in the several regions of the Middle East and the various disciplines represented in Middle Eastern studies. The six Fellows Members of the Board shall be elected by the members of the Association. These six Fellows Members shall be elected from the Fellows by a plurality of the vote cast, with two Fellows Members being elected each year. Each person elected a Fellows Member of the Board shall continue in office until his or her term of three years has expired or until his or her successor shall have been duly elected and qualifies, or until his or her earlier death, resignation or removal in accordance with the Bylaws. The Student Member of the Board shall be elected by the members of the Association. The Student Member of the Board shall be elected from the Student Members by a plurality of the vote cast, with one Student Member of the Board being elected every odd-numbered year. The elected Student Member of the Board shall continue in office until his or her term of two years has expired or until his or

JA1976

her successor shall have been duly elected and qualifies, or until his or her earlier death, resignation or removal in accordance with the Bylaws. Additional Members of the Board to fill any vacancy or vacancies caused by failure to elect the full number of members or the death, resignation or removal of any member may be elected by a majority of the remaining Board of Directors. The term of office begins after the Annual Meeting which follows his or her election. Only Fellows in good standing shall be eligible to serve as Fellows Members of the Board of Directors. Only Student Members in good standing shall be eligible to serve as a Student Member of the Board of Directors.

**Section 8.** Resignation and Removal of Directors. Any Director may be removed at any time with or without cause and with or without notice at any meeting of the members by a vote of the majority of the members of the Association. Any Director may resign at any time.

**Section 9.** Compensation. The Directors shall not receive compensation for their services as such but the Board may authorize reimbursement of expenses incurred by Directors in connection with the performance of their duties provided, however, that nothing herein contained shall be construed to preclude any Director from serving the Association in any other capacity or receiving compensation for any such services.

Each Director and Officer, whether or not then in office, shall be indemnified by the Association against all liabilities, costs and expenses reasonably incurred by or imposed upon him or her in connection with or arising out of any action, suit or proceeding in which he or she may be involved or to which he or she may be made a party by reason of his or her being or having been a Director or Officer of the Association; such expense to include the cost of reasonable settlements (other than amounts paid to the Association itself) made with a view to curtailment of costs of litigation. The Association shall not, however, indemnify such Director or Officer with respect to matters as to which he or she shall be finally adjudged in any action, suit or proceeding to have been derelict in the performance of his or her duty as such Director or Officer, nor in respect of any matter on which any settlement or compromise is effected, if the total expense, including the cost of the settlement, shall substantially exceed the expense which might reasonably be incurred by such Director or Officer in conducting such litigation to a final conclusion; and in no event shall anything herein contained be so construed as to authorize the Association to indemnify any such Director or Officer against any liability or expense by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his or her office. The foregoing right of indemnification shall not be exclusive of other rights to which any Director or Officer may be entitled as a matter of law.

**Section 10.** Action Without Meeting. Any action required or permitted to be taken by the Board of Directors under any provision of the Association Code may be taken without a meeting of the Board of Directors if all Members of the Board shall individually or collectively consent in writing to such action. Such written consent or consents shall be filed with the minutes or proceedings of the Board. Such action by written consent shall have the same force and effect as a unanimous vote of such Directors.

**Section 11.** Limitation of Authority. No Officer authorized to spend or obligate expenditure of MESA funds may expend more than 5% of the total budget or 150% of any line item of budget without approval of the majority of the Board of Directors.

JA1977

**Section 12.** Determination of Organization and Assets. If the number of eligible voting members falls below 80 for two consecutive fiscal years, a majority of the Board of Directors may terminate the organization and liquidate the assets remaining after the payment of all its obligations and these shall be given to one or more non-profit charitable corporations incorporated in the United States if approved by appropriate federal and state authorities as required by law. No member of MESA, other person or corporation except a non-profit charitable corporation, shall by virtue of such liquidation ever receive or be entitled to any of the assets of MESA.

# ARTICLE V. OFFICERS

**Section 1.** Number of Officers. The Officers of the Association shall be a President, who shall serve a two-year term and serve as Chair of the Board, a President-Elect or an immediate Past-President, an Executive Director, and a Treasurer. One person may not hold two or more of the aforesaid offices except those of the Executive Director and Treasurer. The President-Elect and the Past-President shall not hold office at the same time.

**Section 2.** Election of Officers. The President-Elect shall be elected biennially by the members. The Nominating Committee, described in Article VI, Section 2, shall nominate Fellows as candidates for office. It shall nominate two Fellows for the office of a President-Elect. Additional nominations may be made by petition from the membership to the Nominating Committee. Any Fellows Member may be nominated a candidate for Officer by a petition signed by seventy-five Fellows in good standing provided the nominee has agreed to run and the petition is received at the Secretariat by the tenth of June. The Committee shall, with the help of the Executive Director, conduct the election. Ballots shall be provided by the Secretariat in sufficient time so that they may be reasonably returned by a deadline before the Annual Meeting. The Nominating Committee may instruct the Executive Director to count the ballots and to have the results certified by a notary public. A plurality of the votes cast shall be required for election. Only the Ballots of members in good standing shall be counted. In preparing the list of nominees, the Nominating Committee shall keep in mind the desirability of having representation on the Board from the various sections of the United States and Canada, as well as scholars representing interests in the several regions of the Middle East and the various disciplines represented in Middle Eastern studies. Vacancies of Officers caused by failure to elect the full slate thereof or caused by death or resignation, or increase in the number of Officers may be filled by a majority vote of the Board at a special meeting called for that purpose or at any regular meeting. New Officers will fill out the term of existing Officers.

**Section 3.** Additional Officers. The Board at any meeting may by resolution appoint such additional Officers and such agents and employees, and determine their term of office and compensation, if any, as it may deem advisable. The Board may delegate to any Officer or committee the power to appoint such subordinate Officers or agents and to determine their terms of office and compensation, if any. Such additional Officers will not be a Member of the Board of Directors unless so specified in these Bylaws.

**Section 4.** Removal of Officers. Any Officer may be removed at any time with or without cause and with or without notice by a vote of the majority of the body electing or appointing him or her.

**Section 5.** President. The President's term shall be for two years and the President shall be a Member of the Board and all committees ex officio, shall serve as Chair of the Board and shall be a Member of the Board for the year following his or her term in office. He or she shall be the Chief Executive Officer of the Association and shall have general supervision of the affairs and property of the Association and over its

JA1978

several Officers, and shall generally do and perform all acts incident to the office of President, and shall have such additional powers and duties as may from time to time be assigned to him or her by the Board. When authorized by the Board, the President may sign and execute, in the name of the Association, deeds, mortgages, bonds, contracts or other instruments authorized by the Board, except in cases where the signing and execution thereof shall be expressly delegated by the Board or by these Bylaws to some other Officer or agent of the Association. The President begins his or her term immediately after serving as President-Elect, and he or she takes office following the Annual Meeting.

**Section 6.** The President-Elect. The President-Elect, at the request of the President, or in the President's absence or disability, shall perform all the duties of the President subject to all the restrictions upon the President. When authorized by the Board, the President-Elect may also sign and execute, in the name of the Association, deeds, mortgages, bonds, contracts or other instruments authorized by the Board, except in cases where the signing and execution thereof shall be expressly delegated by the Board or by these Bylaws to some other office or agent of the Association. The President-Elect shall perform such other duties as from time to time may be assigned to him or her by the Board or the President. The President-Elect serves for one year as the President-Elect, beginning after the Annual Meeting which follows his or her election.

**Section 7.** The Past-President. The Past-President, at the request of the President, or in the President's absence or disability, shall perform all the duties of the President subject to all the restrictions upon the President. When authorized by the Board, the Past-President may also sign and execute, in the name of the Association, deeds, mortgages, bonds, contracts or other instruments authorized by the Board, except in cases where the signing and execution thereof shall be expressly delegated by the Board or by these Bylaws to some other office or agent of the Association. The Past-President shall perform such other duties as from time to time may be assigned to him or her by the Board or the President. The Past-President serves for one year following his or her term as President.

**Section 8.** The Treasurer. The Board shall appoint a Treasurer and shall determine his or her compensation, if any. The Treasurer shall act under the supervision of the Board and have charge and custody of, and be responsible for, all the funds of the Association and shall keep or cause to be kept and shall be responsible for the keeping of, accurate and adequate records of the assets, liabilities and transactions of the Association. He or she shall deposit all monies and other valuable effects of the Association in the name of and to the credit of the Association in trust companies or other depositories as may be designated in the manner provided in Article VII, Sections 5 and 6. In general, he or she shall perform all duties incident to the Office of Treasurer and such other duties as may from time to time be assigned to him or her by the Board or the President. If required by the Board, the Treasurer shall give a bond for the faithful discharge of his or her duties in such sum and with such surety or sureties as the Board shall determine. The expense of such bond shall be paid by the Association. The Office of Treasurer may be combined with any other office, as the Board may direct.

**Section 9.** Executive Director. The Board shall appoint an Executive Director and shall determine the length of service and compensation of the office holder. The Term of office is not to exceed five years, although he or she will be eligible for reappointment. The organization and management of the Secretariat shall be reviewed by the Board of Directors annually. The Executive Director is subject to removal as specified in Article V, Section 4. The Executive Director shall be the Chief Administrative Officer of the Association. It shall be his or her duty, under the direction of the Board, to oversee the affairs of the

JA1979

Association, to have responsibility for the continuing operations of the Association, to assist the work of its committees, to assist in the formulation of policies and projects for submission to the Board of Directors, to execute the instructions of the President and the Board, to prepare minutes of the meetings of the Board and the meetings of the members of the Association, to authenticate the records of the Association, and to perform such other duties as the President and the Board may direct.

# ARTICLE VI. COMMITTEES

**Section 1.** Executive Committee. The Executive Committee shall consist of the Officers of the Association. It shall act on behalf of the Board of Directors in the operation of the Association and shall have such authority as may be established from time-to-time by the Board of Directors.

**Section 2.** Nominating Committee. The Nominating Committee shall be nominated at the Annual Meeting. It shall consist of five Fellows in good standing and one Student Member in good standing. The Board of Directors shall submit a list of names of at least eight Fellows for five positions and a list of names of at least four Student Members for one position. Additional names may be proposed from the floor at the time of the Annual Members Meeting. The Nominating Committee shall be elected by ballot in advance of the Annual Meeting, under the guidance of the Board of Directors, with the assistance of the Executive Director. The five Fellows and one Student Member receiving the highest number of votes shall be elected. The Executive Director shall serve as the non-voting chair of the Nominating Committee. The elected Nominating Committee shall proceed in the manner described in Article IV, Section 7 and Article V, Section 2.

**Section 3.** Annual Meeting Program Committee. Members of the Program Committee shall be appointed by the Board after it hears the recommendations of the Program Chair- designate. They shall serve from the date of their appointment until the close of the official program of the Annual Meeting for which they are responsible. All panels, plenary sessions, or other aspects of the official program for the Annual Meeting shall be organized under the direction of the Program Committee, and no panels shall be allotted as a bloc to any person or group of persons outside the Committee. Only programs organized and approved under the direct control of the Program Committee shall be printed in the official program, except when the Board, on the recommendation of the Program Committee, decides otherwise. Nothing in this rule shall be construed to prohibit or restrain the Association's policy of, where feasible, making meeting rooms available and assisting in the announcement of special meetings organized to serve the purpose of the Association or its members.

**Section 4.** Publications Committee. The Publications Committee shall consist of five persons: the Editor of the International Journal of Middle East Studies, the Editor of the MESA Review of Middle East Studies (formerly known as the MESA Bulletin), one elected Member of the Board of Directors appointed by the Board, and two members-at-large appointed by the Board. The Editors of the two journals continue to serve on the Committee as long as they hold their editorial positions, the members-at-large serve for a period of three years, and the Member of the Board serves for two or three years, depending upon his or her tenure on the Board. The Member of the Board other than the editors of IJMES and the MESA Review of Middle East Studies shall be the Chair. The Committee shall coordinate and review the publication activities of the Association, and report annually to the Board of Directors.

JA1980

**Section 5.** Personnel Committee. The Personnel Committee shall consist of three persons: The MESA President as chair, and two senior Fellow Members from the Board of Directors—one of whom may be the Past President (if available)—appointed by the President in consultation with the Executive Director. The Committee shall conduct the annual review of the Executive Director, address any personnel issues that arise, and assess the staffing needs of the Association in collaboration with the Executive Director. The Committee shall submit its report and recommendations annually to the Board of Directors for approval.

**Section 6.** Other Committees. The Board may constitute such other committees of Directors, Officers, employees, members, or other persons, with such functions, powers and duties as the Board shall provide. Each such committee shall operate in accordance with these Bylaws and the directives of the Board. Eligibility for membership shall be determined by the Board, and all such committees shall report their activities to the full membership annually. The names of the members of each committee and their terms of office shall be made known to the members at least annually.

# ARTICLE VII. MISCELLANEOUS PROVISIONS

**Section 1.** Offices. The Board may establish, from time to time, and in addition to the location of the Secretariat, one or more offices of the Association at any place or places and may maintain such office or offices for such period or periods of time as it may deem expedient.

**Section 2.** Fiscal Year and Audit. The fiscal year of the Association shall end on December 31 in each year. There shall be an annual audit of the Association, the result of which shall be reported to the members.

**Section 3.** Execution of Contracts. The Board may authorize any Officer, employee or agent, in the name of and on behalf of the Association, to enter into any contract or execute and deliver any instrument, and such authority may be general or confined to specific instance, and the Board may provide for such Officer, employee or agent to delegate such authority to other Officers, employees or agents, subject to the limitations set forth in these Bylaws.

**Section 4.** Loans. No loan shall be contracted on behalf of the Association unless authorized by the Board.

**Section 5.** Commercial Paper. All checks, drafts and other orders for the payment of money out of the funds of the Association, and all notes or evidences of indebtedness of the Association shall be executed on behalf of the Association by such Officer or Officers or employee or employees, as may be determined by resolution of the Board, or by designation of an Officer or Officers to whom such power of designation shall have been conferred by the Board.

**Section 6.** Deposits. All funds of the Association not otherwise employed shall be deposited from time to time to the credit of the Association in such banks, trust companies, or other depositories as the Board may from time to time select or as may be selected by any Officer or employee of the Association to whom such power may from time to time be delegated by the Board (or by an Officer or Officers to whom such power of designation shall have been conferred by the Board), may endorse, assign and deliver checks, drafts and other orders for the payment of money which are payable to the order of the Association.

**Section 7.** Notices. Except as may otherwise be required by law, any notice required to be given under these Bylaws shall be in writing and signed by the President or the Executive Director.

JA1981

**Section 8.** Affiliated Organizations. Organizations having a scholarly interest in the Middle East and whose memberships include a substantial number of members of the Association may be affiliated with the Association. Affiliation is subject to acceptance by the Board of Directors, and affiliations shall be subject to review every third year. Affiliated organizations may meet under the aegis of the Association at the Annual Meeting, and participate in the program of the Annual Meeting, subject to approval and scheduling by the Program Committee of the Annual Meeting.

**Section 9.** Virtual Meetings and Participation by Certain Electronic Means. Subject to the provisions of applicable statutes and these Bylaws, any meetings of the Members and meetings of the Directors, including Annual Meetings, may be held virtually or in a hybrid format approved by the Board of Directors through the use of any means of communication by which all Members and Directors participating may simultaneously hear each other during the meeting and have a reasonable opportunity to participate in the meeting. A Member or Director participating in a meeting by this means is deemed to be present in person at the meeting.

# ARTICLE VIII. AMENDMENT OF BYLAWS

Amendments to these Bylaws may be proposed by 1) The Board of Directors or 2) by petitions signed by 75 voting members in good standing. All amendments shall be governed by the regulations contained in Article III, Sections 4 and 5, except that amendments must have a two-thirds majority of those voting.

JA1982

**EXHIBIT**

**136**

# Mission Statement

The Middle East Studies Association (MESA) is a non-profit association that fosters the study of the Middle East, promotes high standards of scholarship and teaching, and encourages public understanding of the region and its peoples through programs, publications and services that enhance education, further intellectual exchange, recognize professional distinction, and defend academic freedom in accordance with its status as a 501(c)(3) scientific, educational, literary, and charitable organization.

## Vision Statement

The strength of MESA lies in its dual commitment to scholarship and advocacy. MESA fosters, sustains, and disseminates scholarship, intellectual exchange beyond borders, and pedagogy. MESA advocates for academic freedom as well as the civil and human rights of scholars and students in the field of Middle East studies. MESA is proud to serve as an association that gives voice to the value of studying the Middle East in its global context, opposes all forms of discrimination, and defends the mission of higher education in both North America and in the MENA/SWANA region.

## Description

The Middle East Studies Association (MESA) is a private, non-profit learned society that brings together scholars, educators and those interested in the study of the region from all over the world.

MESA is primarily concerned with the study of the Middle East (including Southwest Asia, the Arab world, and North Africa) from the seventh century to today, though not at the exclusion of earlier time periods. Other areas of Africa, Asia, Europe, and the Americas—including diaspora communities—are also included as part of the study of the transnational dimensions of the societies of the Middle East in an interdisciplinary and comparative context.

From its inception in 1966 with 51 founding members, MESA has increased its membership into the thousands and now serves as an umbrella organization for dozens of institutional members and affiliated organizations. The association is a constituent society of the American Council of Learned Societies, the National Council of Area Studies Associations, and a member of the National Humanities Alliance.

JA1983

As part of its goal to advance learning, facilitate communication and promote cooperation, MESA sponsors an annual meeting that is a leading international forum for scholarship, intellectual exchange, and pedagogical innovation. It is responsible for the *International Journal of Middle East Studies*, the premiere journal on the region, the MESA *Review of Middle East Studies* and a biannual newsletter. An awards program recognizes scholarly achievement, service to the profession, and exemplary student mentoring. MESA is governed by a nine-member Board of Directors elected by the membership.

## Strategic Plan

MESA has adopted a strategic plan for 2021-2025.

## Privacy Policy

MESA's privacy policy governs the manner in which MESA collects, uses, maintains and discloses information collected from users of the mesana.org website and the myMESA membership portal.

## Policy on public statements and media appearances

MESA has adopted a spokesperson policy on the authority to represent or speak on behalf of the association.

## Guidelines Governing Donations and Solicitation of Gifts

MESA has adopted guidelines that govern how it receives donations and/or solicits gifts.

## Photo Credits

Our thanks to Richard Doughty, AramcoWorld and Jonathan Bloom, Boston College for permitting MESA to use their beautiful photos of mosaics as banner images on the MESA website.

JA1984

**EXHIBIT**
**137**

# Current Meeting



MESA 2025
November 22-25, 2025
Westin Washington, DC Downtown

ANNOUNCEMENTS AND DEADLINES

## Registration

All are invited to attend MESA's 59th Annual Meeting. You must register to attend. Please see the registration page for further details on rates, policies, and deadlines.

## Program

MESA members may view the tentative, searchable program in their myMESA accounts starting July 1. A printable preliminary program will be available in September.

## Hotel

MESA has contracted with the Westin Washington, DC Downtown for a room rate of $209 for single occupancy (before taxes and fees).
Make your reservation by October 30, 2025 to receive the discounted rate.

## Questions?

JA1985

Email meeting@mesana.org with your questions or inquiries.

JA1986

**EXHIBIT**
**139**

# Task Force on Civil and Human Rights

The Task Force on Civil and Human Rights pays close attention to the legal and political landscape and monitors shifts that may negatively affect our members. It tracks official rhetoric that targets Muslim and Middle Eastern communities and the reported harassment of Muslim and Middle Eastern students and faculty. It is attentive to the ways in which immigration law and the proposed registry program that targets Muslims may pose challenges to Muslim and Middle Eastern communities, and students and researchers working on the Middle East. It serves as a vehicle to monitor such developments and devises ways for MESA to respond effectively to the federal administration and its policies.

## Recent Work

**MAY 13, 2025 · TASK FORCE ON CIVIL AND HUMAN RIGHTS**

### Launching MESA's Academic Freedom

MESA has been building out the Academic Freedom Initiativ
identify and track trends regarding academic freedom and r
datasets focus on recent immigration actions affecting high
university employees since October 2023.

≣ Resources

⊕ US

♢ Academic Freedom Initiative

**FEBRUARY 07, 2025 · TASK FORCE ON CIVIL AND HUMAN RIGHT**

### MESA Advocacy Resource Center

MESA's Task Force has created a new advocacy resource center f
repression of rights on campuses across North America and beyo

≣ Resources

⊕ Canada, North America, US

**FEBRUARY 15, 2024 · TASK FORCE ON CIVIL AND HUMAN RIGHT**

### Documenting Shifts in Campus Climate in

Form for Reporting Changes in Campus Climate and Incidents of
America

≣ Resources

⊕ Canada, North America, US

**MARCH 10, 2025 · TASK FORCE ON CIVIL AND HUMAN RIGH**

### Advisory on Recent Trump Administra Pending Policies

Recommendations regarding recent and ongoing travel restrictions by Trump Administration.

≣ Updates, Resources

♢ travel restriction

JA1987

SEPTEMBER 25, 2020 · TASK FORCE ON CIVIL AND HUMAN RIGH

## Memo on the Circumstances of the Arre⁺ Materials Scientist Dr. Sirous Asgari

The Middle East Studies Association Task Force on Civil and Hum join together in expressing our shock and outrage at reports con scientist Dr. Sirous Asgari.

≡ Interventions

⊕ Iran, US

SEPTEMBER 29, 2020 · TASK FORCE ON CIVIL AND HUMAN |

## Statement on DHS Proposed Rule Impc Duration

The MESA Task Force on Civil and Human Rights calls on DH deprive international students of lawful status for the durat students from much of the developing world to two-year visas insufficient even for undergraduate study. The administration's proposed regulation would effectively mean that the United States no longer welcomes international students. If this rule were to go into effect, students from much of the world would face severe disincentives in considering degree programs in the U.S. Such actions would inflict broad harm on the intellectual life and economic viability of American universities, future generations of students, and the sectors of the economy that require highly qualified researchers and professionals.

≡ Interventions

⊕ US

⌔ DHS, travel restriction, US, visa

JANUARY 28, 2020 · TASK FORCE ON CIVIL AND HUMAN RIGHTS

## Traveling across borders: short guides to

Short guides to expectations of privacy and rights when cross

≡ Resources

⌔ border crossings, digital privacy

JUNE 04, 2019 · TASK FORCE ON CIVIL AND HUMAN RIGHTS

## Memo on OFAC Compliance for Academic

This memo offers basic guidance for those seeking to conduct ac sanctions (notably, Iran, Sudan and Syria).

⊕ Iran, Sudan, Syria

⌔ licensing guidelines, OFAC, sanctions

FEBRUARY 04, 2020 · TASK FORCE ON CIVIL AND HUMAN RI

## TFCHR announces a study of visa and c

MESA's Task Force on Civil and Human Rights notes with cor particularly from Iran, with valid visas, as well as reports of of the issues of visa cancelation, border denials, and deporta North Africa. We are seeking information to better documer MENA region to the US for academic purposes. Please conta information regarding these issues.

≡ Interventions

JA1988

🌐 Iran, Iraq, Libya, Somalia, Sudan, US, Yemen

🏷 border crossings, Muslim ban, travel ban

JUNE 27, 2017 · TASK FORCE ON CIVIL AND HUMAN RIGHTS

## Memo on Impact of Supreme Court Decisi

Task Force for Civil and Human Rights Memo on June 26, 2017 U.

🌐 Iran, Iraq, Libya, Somalia, Sudan, Syria, Yemen

🏷 IRAP v. Trump, MESA Lawsuit, Muslim ban

NOVEMBER 20, 2019 · TASK FORCE ON CIVIL AND HUMAN RIGHTS

## Memo on Public Records Harassment and Defense

This memo offers preliminary guidance for those facing overly broad public records requests, particularly when public records laws are abused for the purposes of harassment and intimidation of scholars or centers for ideological reasons. Please contact tfchr@mesana.org for more information.

☰ Resources

🌐 US

🏷 FOIA, open records, public records

JANUARY 29, 2017 · TASK FORCE ON CIVIL AND HUMAN RIGHTS

## Memo on Executive Order to Limit Entry ⟨
## Immigrants

President Donald J. Trump signed an Executive Order on January admission and vetting of non-citizens to the United States.

🌐 Iran, Iraq, Libya, Somalia, Sudan, Syria, Yemen

🏷 ACLU, IRAP v. Trump, MESA Lawsuit, Muslim ban

JULY 20, 2018 · TASK FORCE ON CIVIL AND HUMAN RIGHTS

## Memo on US Supreme Court Decision on IRAP v. Trump upholding September 24, 2017 Presidential Proclamation of Travel Ban

On June 26, 2018, the United States Supreme Court issued an opinion upholding President Trump's third Muslim Ban. MESA continues to believe that the travel ban is at odds with fundamental principles upheld by the scholarly community including non-discrimination and a commitment to the free exchange of ideas. MESA will continue to take proactive steps to mitigate the adverse impact of the travel ban on research collaborations, scholarly activities and the students in our community.

🌐 Iran, Iraq, Libya, Somalia, Sudan, Syria, Yemen

JA1989

◇ IRAP v. Trump, MESA Lawsuit, Muslim ban, travel ban

MARCH 08, 2017 · TASK FORCE ON CIVIL AND HUMAN RIGHTS

## Memo on Executive Order to Restrict Entry of Individuals from Designated Middle Eastern Countries

On Monday, March 6, 2017, President Donald J. Trump signed a new Executive Order (EO) that restricts entry into the United States for 90 days for all nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen.

⊕ Iran, Libya, Somalia, Sudan, Syria, Yemen

◇ IRAP v. Trump, MESA Lawsuit, Muslim ban, travel ban

JA1990

**From:** **Nickel, Bernhard** bnickel@fas.harvard.edu
**Subject:** Fwd: Immigration resources
**Date:** March 31, 2025 at 1:21 PM
**To:** philfaculty-list philfaculty-list@fas.harvard.edu



Dear Colleagues,

I just received this from GSAS yesterday. Many of the resources mentioned below, such as the legal representation clinic and the "know your rights" resources are relevant for faculty who are here on visas or "Green Cards" as well, so I wanted to share them with you.

All the best,
Bernhard.
—
Bernhard Nickel
Professor of Philosophy
Department Chair
Emerson 207
Department of Philosophy
Harvard University
<u>Website</u> || <u>Office Hours Sign-Up</u>
————————————————————————————————

Begin forwarded message:

**From:** ███████████████████████
**Subject:** **Immigration resources**
**Date:** March 30, 2025 at 2:14:23 PM EDT
**To:** <bnickel@fas.harvard.edu>
**Reply-To:** ███████████████████████

View this email in your browser



HARVARD Kenneth C. Griffin
**GRADUATE SCHOOL OF ARTS AND SCIENCES**
OFFICE OF THE DEAN

> The message below was sent to GSAS students earlier today.

Dear Harvard Griffin GSAS Students,

We've heard from many concerned students and others in our community regarding recent reports of US immigration enforcement actions. While there are still many unknowns, we want to make sure that you're aware of the latest available resources and information.

1. **HIO Information sessions:** The Harvard International Office (HIO) is hosting a "know your rights" information session for all Harvard international students and scholars who wish to attend on Wednesday, April 2, 2025, at 6:00 p.m. EST. To register for this session, please ensure you are logged into Zoom, then register here. Additional sessions are likely to be scheduled in the future as well.

2. **Know your rights information:** Even if you are not a US citizen, you still have constitutional rights. More information and resources can be found on the Mass.gov website and the Immigration Legal Resource Center website.

3. **University policy on enforcement requests:** When law enforcement requests access to nonpublic documents or campus spaces, it is University practice to engage the Office of the General Counsel (OGC) and the Harvard University Police Department to ensure that proper procedures are followed. You can read more about the University's policy here.

4. **Contact information:** If you have any concerns, you should contact HIO. During business hours (Monday through Friday from 9:00 a.m. to 5:00 p.m. EST), you should contact your HIO Advisor, email internationaloffice@harvard.edu, or visit virtual on call advising hours. Additional helpful information, including a guidance document from OGC on entering or re-entering the US at ports of entry, can be found on HIO's "Travel Concerns" webpage. If you're a United States citizen, please contact your Dean of Student's Office.

5. **Legal assistance:** Finally, if you find yourself needing legal assistance, the Harvard Representation Initiative is a pro bono legal clinic and all Harvard affiliates who have concerns about their immigration status are

AAUP-00901

JA1991

eligible to consult with an attorney to determine whether further legal pro bono representation is advisable.

We realize that this is a very difficult and uncertain time for many. Please know that the staff at the Office of Student Services and the Office of Equity, Diversity, Inclusion & Belonging are available to support students. Please reach out to them if you need additional assistance beyond the resources noted above. Our team will continue to communicate and share information that benefits the Harvard Griffin GSAS community as we learn more.

While the HIO has been in regular contact with international students about visas and related issues, we all as a community have concerns about the well-being of our students and peers. We hope that this information will not only provide needed guidance but will also better enable all of us to support those around us who need it.

With all best wishes,



     

Office of the Dean
Harvard Kenneth C. Griffin Graduate School of Arts and Sciences
University Hall, Harvard Yard
gsasdean@fas.harvard.edu
617-496-1464

This e-mail is a communication from the Harvard Griffin GSAS Office of the Dean.

Please do NOT unsubscribe yourself, as this e-mail list is used to provide important and timely information to Harvard Griffin GSAS students.

Want to change how you receive these e-mails?
You can update your preferences or unsubscribe from this list.

AAUP-00902

From: **Nickel, Bernhard** bnickel@fas.harvard.edu
Subject: Additional Conversation
Date: April 2, 2025 at 2:46 PM
To: ██████████████████████████████████████
██████████████████████████████████ philgrad-list philgrad-list@fas.harvard.edu



Dear All (prospective and current grads),

These are unusual times for higher education in general and Harvard specifically, given the various attacks and threats the Trump Administration has levied against Higher Ed. So I've been thinking that it might be good for all of you, prospective and current grads, to just have a conversation about where things stand, what I know about the University's strategy, where there is uncertainty, and so on.

So I'd like to propose that we have an additional event as part of the prospective grads' visit, tomorrow (Thursday) starting at 5 in the grad lounge on the third floor of Emerson where we can have an open conversation about these issues. We'll go as long as we need to and then go to the reception.

All the best,
Bernhard.


```
--
Bernhard Nickel
Professor of Philosophy
Department Chair
Emerson 207
Department of Philosophy
Harvard University
Website  ||  Office Hours Sign-Up
---------------------------------
```

JA1993

AAUP-00903

| | |
|---|---|
| **Subject:** | Readnow -- Run of Show for Tonight |
| **Date:** | Thursday, March 27, 2025 at 5:49:57 PM Central European Standard Time |
| **From:** | Veena Dubal |
| **To:** | ██████, Asli Bali |
| **CC:** | ████████████████████████████ |
| **Attachments:** | image001.png |

Hi, All:

The AAUP and MESA are deeply grateful to you for the amount of time, attention, expertise, and effort you are putting into this webinar. Here is a run of show that reflects the agenda that we created last night. Please join the webinar with your participant link at **2:45pm PT/ 5:45pm ET.**

3pm – Veena & Asli introduction –
3:05pm – ████ Pep Talk
3:10pm – ████ – General KYR on most important themes
3:20pm – ████ – Rights of Visa holding students/faculty
3:27pm – ████ – Best Practices When Traveling & What to Expect

3:35pm – Veena asks the Team questions from Pre-assembled list of questions.
4pm – Veena/Asli ask the Team questions asked AT the webinar in the Q&A
4:15pm – The Team Offers SUMMARY TAKE HOME POINTS.
4:30pm – END

Please let me know if you have questions.

Solidarity,
Veena


--
Veena Dubal, JD, PhD
General Counsel, American Association of University Professors

Professor of Law
Professor of Anthropology (by courtesy)
University of California, Irvine, School of Law
SSRN Author Page

JA1994

**From:** ███████████████████████

**Date:** Thursday, March 27, 2025 at 8:15 AM

**To:** Asli Bali <bali.asli@gmail.com>

**Cc:** ████████████████████████, Veena Dubal <vdubal@aaup.org>, ████████
███████████████████████████████████████████

**Subject:** Re: Readnow --dress for tomorrow--for guys, jacket and tie or not?

Hi all,

So sorry, I set two alarms after putting the little one to sleep, but wasn't able to do it.I'm happy to join tonight to talk about best practices at the border after having decided to travel.

█

On Thu, Mar 27, 2025 at 10:11 AM Asli Bali <bali.asli@gmail.com> wrote:

> https://acrobat.adobe.com/link/review?uri=urn:aaid:scds:US:74318833-cbf9-3923-9180-4434fa5353c7
>
> ---
>
> **From:** ███████████████████████
> **Sent:** Thursday, March 27, 2025 3:04:47 AM
> **To:** Veena Dubal <vdubal@aaup.org>; ██████████████████████
> ██████████████████████████
> **Cc:** ███████████████████████████████████ 'Asli Bali'
> <bali.asli@gmail.com>
> **Subject:** RE: Readnow --dress for tomorrow--for guys, jacket and tie or not?
>
>
> Tks!
>
>
>
> ████████████████
>
> ███████████████
>
> ████████████████
>
> ██████████████████
>
> ██████████████████

JA1995



*is available and accessible. We are fully operational both in-office and remotely, and continue to provide all services with little or no delay.*

This email may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is prohibited. If you are not the intended recipient, please contact me and delete all copies. Thank you.

**From:** ███████████████████████
**Sent:** Wednesday, March 26, 2025 11:33 PM
**To:** ████████████████████████████████████
██████████████████████
**Cc:** ██████████████████████████████ 'Asli Bali' <bali.asli@gmail.com>; ██████████████████████
**Subject:** Re: Readnow --dress for tomorrow--for guys, jacket and tie or not?

Not at all necessary to wear jacket and tie!  Only if you want.

Sent from a handheld device.

Veena Dubal, J.D., Ph.D.

Professor of Law

University of California, Irvine

JA1996

[http://ssrn.com/author=1780991](http://ssrn.com/author=1780991)

---

**From:** █████████████████████████████████
**Sent:** Wednesday, March 26, 2025 11:01:44 PM
**To:** Veena Dubal <[vdubal@aaup.org](mailto:vdubal@aaup.org)>; ███████████████████████████████
████████████
**Cc:** ████████████████████████████████████████ 'Asli Bali'
<[bali.asli@gmail.com](mailto:bali.asli@gmail.com)>; ███████████████████████████
**Subject:** RE: Readnow --dress for tomorrow--for guys, jacket and tie or not?

Let us know please;  not sure of audience custom so whatever you think is fine, but advise.

Tks!

█

---

**From:** Veena Dubal <[vdubal@aaup.org](mailto:vdubal@aaup.org)>
**Sent:** Wednesday, March 26, 2025 8:29 PM
**To:** ████████████████████████████████████████
██████████████
**Cc:** ████████████████████████████████████ 'Asli Bali'
<[bali.asli@gmail.com](mailto:bali.asli@gmail.com)>; ████████████████████
**Subject:** Re: Readnow -ZOOM LINK

The one I sent is what I have.  Here is the zoom link for our 9pm PT /midnight ET call.

AAUP-00973   4 of 13

AAUP Legal Department is inviting you to a scheduled Zoom meeting.


Topic: AAUP Legal Department's Personal Meeting Room

Join Zoom Meeting

https://us06web.zoom.us/j/9098285884?pwd=ZyttY1lneXM0WjJxeVB3U00yYUpmdz09


Meeting ID: 909 828 5884

Passcode: 848034


---


One tap mobile

+16694449171,,9098285884#,,,,*848034# US

+12532158782,,9098285884#,,,,*848034# US (Tacoma)


---


Dial by your location

• +1 669 444 9171 US

• +1 253 215 8782 US (Tacoma)

• +1 346 248 7799 US (Houston)

• +1 719 359 4580 US

• +1 720 707 2699 US (Denver)

• +1 253 205 0468 US

• +1 386 347 5053 US

• +1 507 473 4847 US

JA1998

- +1 564 217 2000 US

- +1 646 558 8656 US (New York)

- +1 646 931 3860 US

- +1 689 278 1000 US

- +1 301 715 8592 US (Washington DC)

- +1 305 224 1968 US

- +1 309 205 3325 US

- +1 312 626 6799 US (Chicago)

- +1 360 209 5623 US

Meeting ID: 909 828 5884

Passcode: 848034

Find your local number: https://us06web.zoom.us/u/kenF1MAfSl

--

Veena Dubal, JD, PhD

General Counsel, American Association of University Professors

Professor of Law

Professor of Anthropology (by courtesy)

University of California, Irvine, School of Law

SSRN Author Page

JA1999

**From:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Date:** Wednesday, March 26, 2025 at 8:27 PM
**To:** Veena Dubal <vdubal@aaup.org>, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Cc:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ 'Asli Bali'
<bali.asli@gmail.com>, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Subject:** RE: Readnow - WEBINAR QUESTIONS

Hi Veena—is there an updated list of questions or going off the ones you sent yesterday is fine?

▓

_____

**From:** Veena Dubal <vdubal@aaup.org>
**Sent:** Tuesday, March 25, 2025 4:13 PM
**To:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓
**Cc:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ 'Asli Bali'
<bali.asli@gmail.com>; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Subject:** Re: Readnow - WEBINAR QUESTIONS

▓▓▓▓ is on the east coast and repping ▓▓▓▓▓▓ He just got a TRO to prevent her detention.

I don't think he needs to join though.

Sent from a handheld device.

Veena Dubal, J.D., Ph.D.

Professor of Law

University of California, Irvine

JA2000

[http://ssrn.com/author=1780991](http://ssrn.com/author=1780991)

---

**From:** ███████████████████████████
**Sent:** Tuesday, March 25, 2025 4:09:44 PM
**To:** Veena Dubal <[vdubal@aaup.org](mailto:vdubal@aaup.org)>; ████████████████████
████████
**Cc:** ████████████████████████████ 'Asli Bali'
<[bali.asli@gmail.com](mailto:bali.asli@gmail.com)>; ██████████████████
**Subject:** RE: Readnow - WEBINAR QUESTIONS

Thanks Veena—agree re 2:50;  and we should go over these q's at our 9 pm PT ca;; tomorrow night both to bat around if Q's and discuss who answers what.  I have only glanced at but wil look at later tonight.  Can ██████ join call tomorrow night or are they on east coast time ?

██████

---

**From:** Veena Dubal <[vdubal@aaup.org](mailto:vdubal@aaup.org)>
**Sent:** Tuesday, March 25, 2025 1:05 PM
**To:** ████████████████████████████████
████████
**Cc:** ████████████████████████████ Asli Bali
<[bali.asli@gmail.com](mailto:bali.asli@gmail.com)>
**Subject:** Readnow - WEBINAR QUESTIONS

████████████████████████

██████████ is my friend and colleague from CUNY CLEAR who *may* be able to join us on Thursday for the webinar.

JA2001

==Attached== are the questions for the webinar that we have received thus far.

Attached are the questions for the webinar that we have received thus far.

Let's get on at 2:50pm PT on Thursday to make sure everything works.   Thanks for doing this.  Pls text if you have any questions.

Solidarity,

Veena

--

Veena Dubal, JD, PhD

General Counsel, American Association of University Professors

Professor of Law

Professor of Anthropology (by courtesy)

University of California, Irvine, School of Law

SSRN Author Page

**From:** ███████████████████████
**Date:** Saturday, March 22, 2025 at 4:13 PM
**To:** Veena Dubal <vdubal@aaup.org>, ████████████████████
████████████████████
**Cc:** ████████████████████████████████████ Asli Bali
<bali.asli@gmail.com>

AAUP-00978

**Subject:** Re: Readnow -- Webinar information for THURSDAY, 3PM PT--call tomorrow sometime (or shortly?) (readnow for ███)

Great! And yes, will do

---

**From:** Veena Dubal <vdubal@aaup.org>
**Sent:** Saturday, March 22, 2025 6:58:54 PM
**To:** ██████████████████████████████████████████████>
**Cc:** ████████████████████████████████████████████
██████████████████████ Asli Bali <bali.asli@gmail.com>
**Subject:** Re: Readnow -- Webinar information for THURSDAY, 3PM PT--call tomorrow sometime (or shortly?) (readnow for ███)

Hi, All:

This sounds great.  I am including our amazing senior staff member ████████████ here.

████ in addition to ████ his colleagues ██████████ and ████████████ will be joining as experts for the webinar.  Can we register them as panelists?  And also register Asli Bai as a panelist?

Thank you!

Veena

--

Veena Dubal, JD, PhD

General Counsel, American Association of University Professors

Professor of Law

Professor of Anthropology (by courtesy)

University of California, Irvine, School of Law

JA2003

SSRN Author Page

---

**From:** ███████████████████████████████████

Date: Saturday, March 22, 2025 at 3:50 PM

To: Veena Dubal <vdubal@aaup.org>, ███████████████████████

Cc: ███████████████████████████████████████████

Subject: RE: Readnow -- Webinar information for THURSDAY, 3PM PT--call tomorrow sometime (or shortly?) (readnow for ████

Damn! didn't add my own readnow! (🙁  resending so reply ot this thread please.

████

---

**From:** ███████████████████████████

Sent: Saturday, March 22, 2025 3:48 PM

To: 'Veena Dubal' <vdubal@aaup.org>; ███████████████████

Cc: ███████████████████████████████████

Subject: RE: Readnow -- Webinar information for THURSDAY, 3PM PT--call tomorrow sometime (or shortly?)

Hi Veena— I would like ██████ who is cocounsel with me on █████ case, and our partner on our employment based imm team to be on panel also. ██████ will add expertise on non imm visa issues like J's. O's H's OPT, SEVIS etc.  I assume you have to add them and send email to register as I cant just forward as their names would not be there??

How about a call tomorrow afternoon or evening  or shortly if all available –if better?  I am free from 2 on tomorrow —and can be earlier if afternoon or evening not good for anyone.

JA2004

I could also talk in a bit if better;  busy starting at 5 today

█

**From:** Veena Dubal <vdubal@aaup.org>
**Sent:** Saturday, March 22, 2025 9:44 AM
**To:** ████████████████████████████████
**Subject:** Readnow -- Webinar information for THURSDAY, 3PM PT

You need to register below!  I'll call you later today to talk about the contents of the webinar.

--

Veena Dubal, JD, PhD

General Counsel, American Association of University Professors

Professor of Law

Professor of Anthropology (by courtesy)

University of California, Irvine, School of Law

SSRN Author Page

**From:** Veena Dubal, AAUP <communications@aaup.org>
**Date:** Saturday, March 22, 2025 at 2:30 AM
**To:** vdubal@gmail.com <vdubal@gmail.com>
**Subject:** Trump's Immigration Actions: What to Know

Error! Filename not specified.

Dear AAUP Member,

Please join us Thursday, March 27, at 3:00 p.m. Pacific time/6:00 p.m. Eastern, for a webinar cosponsored by the AAUP and Middle East Studies Association.

Register here.

Deportation law specialist Marc Van Der Hout will share information about current immigration actions and the overall political landscape. Members will learn about the rights of legal permanent residents (green card holders), visa holders, and US citizens, and be empowered to advocate and protect both themselves and coworkers.

In solidarity,

Veena Dubal
AAUP General Counsel

Error! Filename not specified. Error! Filename not specified. Error! Filename not specified.

Sent via ActionNetwork.org. To update your email address, change your name or address, or to stop receiving emails from American Association of University Professors, please click here.

**Error! Filename not specified.**

--
- tzi -

# Membership Report

April 3, 2025
Submitted by ██ ████

## 2024 Membership Figures

We ended 2024 with 1811 individual members and 42 institutional members. Membership numbers for 2024 were down as anticipated, due primarily to the virtual annual meeting format.

## 2025 Individual Membership

For 2025, the membership year-end total is estimated to be 2400-2600. The range depends on the percentage of members who joined by the Call for Papers deadline, which is typically between 80-90 percent. Both the total at the CFP deadline and the expected year-end membership are about 10 percent below expectations for a DC meeting. We attribute the drop to the political and economic environment in the United States, which is overwhelming to our membership, and potential impacts include reduced funding and travel restrictions.

### New Members

As of April 3, we have 344 individuals who have not been MESA members previously. Typically, a third to half of the members don't renew the following year. In recent years the numbers of new members are 231 in 2024; 515 in 2023; 315 in 2022; 409 in 2021; 511 in 2020; 510 in 2019.

### Membership Type

The following table shows the breakdown of spring figures by membership type (fellows, students, associates, as well as totals) from 2005-25. It is important to account for minor fluctuations due to the date of the spring meeting.

| Spring Statistics | Fellows | Students | Associates | Total |
|---|---|---|---|---|
| 2025 *(4/3/25) Wash, DC Meeting* | 1621 | 539 | 48 | 2208 |
| 2024 *(4/11/24) Virtual Meeting* | 1088 | 363 | 51 | 1502 |
| 2023 *(4/21/23) Montréal Meeting* | 1758 | 600 | 75 | 2433 |
| 2022 *(3/30/22) Denver Meeting* | 1629 | 502 | 56 | 2187 |
| 2021 *(3/10/21) Virtual Meeting* | 1733 | 642 | 68 | 2443 |
| 2020 *(3/18/20) Virtual Meeting* | 1746 | 662 | 54 | 2462 |
| 2019 *(3/20/19) New Orleans Mtg* | 1767 | 664 | 87 | 2518 |
| 2018 *(3/21/18) San Antonio Mtg* | 1422 | 551 | 77 | 2050 |
| 2017 *(4/28/17) Wash, DC Meeting* | 1750 | 656 | 60 | 2466 |
| 2016 *(3/1/16) Boston Meeting* | 1702 | 693 | 102 | 2497 |
| 2015 *(4/6/15) Denver Meeting* | 1737 | 658 | 88 | 2483 |
| 2014 *(3/25/14) Wash., DC Mtg* | 1671 | 726 | 125 | 2522 |
| 2013 *(4/10/13) New Orleans Mtg* | 1860 | 798 | 86 | 2744 |
| 2012 *(4/23/12) Denver Meeting* | 1530 | 626 | 121 | 2277 |
| 2011 *(4/15/11) Wash., DC Mtg* | 1726 | 732 | 144 | 2602 |
| 2010 *(4/26/10) San Diego Mtg* | 1555 | 594 | 154 | 2303 |
| 2009 *(4/22/09) Boston Mtg* | 1569 | 746 | 123 | 2438 |
| 2008 *(4/25/08) Wash., DC Mtg* | 1813 | 774 | 160 | 2747 |
| 2007 *(5/4/07) Montréal Mtg* | 1601 | 657 | 162 | 2420 |
| 2006 *(4/26/06) Boston Mtg* | 1608 | 511 | 152 | 2271 |
| 2005 *(4/15/05) Wash., DC Mtg* | 1557 | 448 | 68 | 2073 |

JA2007

AAUP-01101

# MESA MEMBERSHIP– SPRING COMPARISONS

| | Fellows | Students | Associates | Total |
|---|---|---|---|---|
| **2025** *(4/3/2025)* *DC Meeting* | 1621 | 539 | 48 | **2208** |
| F / M / NB / other / blank | 803/776/8/11/23 | 279/235/7/2/16 | 21/22/1/2/2 | 1103/1033/16/15/41 |
| US | 1116 | 378 | 22 | 1516 |
| Resident outside N America | 391 | 92 | 20 | 503 |
| Canada/Mexico | 92/1 | 57/0 | 6/0 | 155/1 |
| Residence not specified | | | | 33 |
| | | | | |
| **2024** *(4/11/2024)* *Virtual Meeting* | 1088 | 363 | 51 | 1502 |
| F / M / NB / other / blank | 565/514/2/6/12 | 204/144/9/3/4 | 22/16/0/0/1 | 791/674/11/9/17 |
| US | 730 | 243 | 21 | 994 |
| Resident outside N America | 302 | 87 | 13 | 402 |
| Canada/Mexico | 61/0 | 33/0 | 2/0 | 96/0 |
| Residence not specified | | | | 10 |
| | | | | |
| **2023** *(4/21/2023)* *Montréal Meeting* | 1758 | 600 | 75 | 2433 *54 added in April* |
| F / M / NB / other / blank | 768/759/3/1/227 | 187/173/3/3/234 | 17/35/0/0/23 | 972/967/6/4/484 |
| US | 1059 | 295 | 25 | 1379 |
| Resident outside N America | 384 | 69 | 26 | 479 |
| Canada/Mexico | 133/2 | 44 | 3 | 184 |
| Residence not specified | | | | 357 |
| | | | | |
| **2022** *(3/30/22)* *Denver Meeting* | 1629 | 502 | 56 | 2187 |
| F / M / NB / other / blank | 795/779/1/0/54 | 250/200/2/2/48 | 23/30/0/0/3 | 1068/1009/3/2/105 |
| US | 1138 | 389 | 26 | 1553 |
| Resident outside N America | 393 | 79 | 27 | 499 |
| Canada/Mexico | 98 | 34 | 2 | 134 |
| Residence not specified | 0 | 0 | 1 | 1 |
| | | | | |
| **2021** *(3/10/21)* *Montréal Meeting* | 1733 | 642 | 68 | 2443 |
| F / M / NB / other / blank | 852/805/3/3/70 | 322/263/1/1/55 | 29/29/1/0/9 | 1203 / 1097 / 5 / 4 / 134 |
| US | 1097 | 442 | 37 | 1576 |
| Resident outside N America | 504 | 137 | 25 | 666 |
| Canada/Mexico | 129/3 | 62/1 | 6/0 | 201 (197/4) |
| Residence not specified | | | | |
| | | | | |
| **2020** *(3/18/20)* *Wash., DC Meeting* | 1746 | 662 | 54 | 2462 |
| Female / male (not specified) | 845 / 864 (37) | 347 / 268 (47) | 29 / 19 (6) | 1221 / 1151 (90) |
| US | 1223 | 505 | 35 | 1763 |
| Foreign (not in North America) | 457 | 111 | 18 | 586 |
| Canada/Mexico | 64/2 | 46/0 | 1/0 | 113 (111/2) |
| | | | | |
| **2019** *(3/20/19)* *New Orleans Meeting* | 1767 | 664 | 87 | 2518 |

<span style="color:red">JA2008</span>

<span style="color:red">AAUP-01102</span>

| | | | |
|---|---|---|---|
| Female / male (not specified) | 823 / 910 (34) | 347 / 272 (45) | 46 / 35 (6) | 1216 / 1217 (85) |
| US | 1198 | 524 | 55 | 1777 |
| Foreign | 488 | 91 | 28 | 607 |
| Canada/Mexico | 78/3 | 47/2 | 4/0 | 134 (129/5) |
| | | | | |
| **2018** *(3/21/18)* *San Antonio Meeting* | 1422 | 551 | 77 | 2050 |
| Female / male (not specified) | 662 / 741 (19) | 263 / 250 (38) | 39 / 34 (4) | 964 / 1025 (61) |
| US | 1003 | 454 | 58 | 1515 |
| Foreign | 355 | 69 | 18 | 442 |
| Canada/Mexico | 64 | 28 | 1 | 93 |
| | | | | |
| **2017** *(4/28/17)* *Wash., DC Meeting* | 1750 | 656 | 60 | 2466 |
| Female / male (not specified) | 781 / 936 (33) | 321 / 306 (29) | 35 / 21 (4) | 1137 / 1263 (66) |
| US | 1232 | 517 | 40 | 1789 |
| Foreign | 449 | 107 | 19 | 575 |
| Canada | 69 | 32 | 1 | 102 |
| | | | | |
| **2016** *(3/1/16)* *Boston Meeting* | 1702 | 693 | 102 | 2497 |
| Female / male (not specified) | 791 / 884 (27) | 335 / 336 (22) | 56 / 40 (6) | 1182 / 1260 (55) |
| US | 1116 | 528 | 68 | 1712 |
| Foreign | 517 | 132 | 33 | 682 |
| Canada | 69 | 33 | 1 | 103 |

| **Fall Statistics** | **Fellows** | **Students** | **Associates** | **Total** |
|---|---|---|---|---|
| 2024 *Virtual Meeting (12/31/24)* | 1291 | 471 | 49 | 1811 |
| 2023 *Montréal Meeting (12/31/23)* | 1957 | 712 | 106 | 2775 |
| 2022 *Denver Meeting (12/31/22)* | 1727 | 576 | 96 | 2399 |
| 2021 *Virtual Meeting (12/31/21)* | 1937 | 725 | 94 | 2756 |
| 2020 *Virtual Meeting (12/31/20)* | 1926 | 834 | 84 | 2844 |
| 2019 *New Orleans Mtg (12/31/19)* | 1937 | 715 | 70 | 2722 |
| 2018 *San Antonio Mtg (12/31/18)* | 1644 | 606 | 41 | 2291 |
| 2017 *Wash, DC Meeting (12/31/17)* | 1915 | 724 | 54 | 2693 |
| 2016 *Boston Meeting (12/31/16)* | 1996 | 801 | 61 | 2858 |
| 2015 *Denver Meeting (12/31/2015)* | 1902 | 718 | 70 | 2690 |
| 2014 *Wash, DC Meeting (12/31/14)* | 2019 | 840 | 105 | 2964 |
| 2013 *New Orleans Mtg (12/31/13)* | 2023 | 876 | 104 | 3003 |
| 2012 *Denver Meeting (12/31/2012)* | 1780 | 708 | 103 | 2591 |
| 2011 *Wash, DC Meeting (12/31/11)* | 1918 | 845 | 166 | 2929 |
| 2010 *San Diego Meeting (12/31/10)* | 1806 | 716 | 186 | 2708 |
| 2009 *Boston Meeting* | 1879 | 875 | 164 | 2918 |
| 2008 *Washington, DC Meeting* | 2012 | 838 | 192 | 3042 |
| 2007 *Montreal Meeting* | 1857 | 730 | 192 | 2779 |
| 2006 *Boston Meeting* | 1948 | 613 | 186 | 2752 |
| 2005 *Washington, DC Meeting* | 1861 | 585 | 157 | 2603 |
| 2004 *San Francisco Meeting* | 1899 | 548 | 201 | 2648 |
| 2003 *Anchorage Meeting* | 1694 | 432 | 208 | 2334 |
| 2002 *Washington, DC Meeting* | 1809 | 521 | 194 | 2524 |

JA2009

AAUP-01103

| Membership counts | by Jan 15 | % of total | by Jan 31 | % of total | by Feb 7 | % of total | by CFP deadline | % of total | by May 1 | | by July 1 | | by Sept 1 | | by Nov 1 | | Total membership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009 - Boston, MA** | 649 | 22.07% | 940 | 31.96% | 1136 | 38.62% | 2064 | 70.18% | | | | | | | | | 2941 |
| **2010 - San Diego, CA** | 641 | 23.67% | 998 | 36.85% | 1170 | 43.20% | 1976 | 72.97% | | | | | | | | | 2708 |
| **2011 - Washington, DC** | 822 | 28.06% | 1129 | 38.54% | 1313 | 44.82% | 2314 | 79.00% | | | | | | | | | 2929 |
| **2012 - Denver, CO** | 599 | 23.12% | 962 | 37.13% | 1142 | 44.30% | 1909 | 73.68% | | | | | | | | | 2591 |
| **2013 - New Orleans, LA** | 938 | 31.24% | 1300 | 43.29% | 1506 | 50.15% | 2580 | 85.91% | 2772 | 92.30% | 2835 | 94.40% | 2915 | 97.06% | 2996 | 99.76% | 3003 |
| **2014 - Washington, DC** There was a resolution at MESA mtg. | 615 | 20.75% | 1107 | 37.35% | 1363 | 45.99% | 2338 | 78.88% | 2604 | 87.85% | 2669 | 90.04% | 2726 | 91.97% | 2908 | 98.10% | 2964 |
| **2015 - Denver, CO** There was a vote on a resolution. | 1094 | 40.67% | 1446 | 53.75% | 1665 | 61.90% | 2370 | 88.10% | 2519 | 93.64% | 2569 | 95.55% | 2615 | 97.21% | 2684 | 99.77% | 2690 |
| **2016 - Boston, MA** Raised dues. | 761 | 26.62% | 1076 | 37.64% | 1288 | 45.05% | 2441 | 85.38% | 2600 | 90.94% | 2686 | 93.98% | 2738 | 95.76% | 2838 | 99.26% | 2859 |
| **2017 - Washington, DC** There was a vote on bylaws change . | 658 | 24.56% | 1041 | 38.86% | 1247 | 46.55% | 2300 | 85.40% | 2467 | 91.61% | 2529 | 93.91% | 2586 | 96.03% | 2659 | 98.73% | 2693 |
| **2018 - San Antonio, TX** | 629 | 27.45% | 846 | 36.92% | 1065 | 46.48% | 1994 | 87.03% | 2108 | 92.01% | 2163 | 94.40% | 2203 | 96.15% | 2278 | 99.43% | 2291 |
| **2019 - New Orleans, LA** | 689 | 25.31% | 1077 | 39.56% | 1313 | 48.24% | 2459 | 90.34% | 2562 | 94.12% | 2617 | 96.14% | 2652 | 97.42% | 2703 | 99.30% | 2722 |
| **2020 - Virtual (was DC)** Raised dues. Waived reg w/membership. | 546 | 19.18% | 854 | 30.01% | 1031 | 36.27% | 2366 | 83.13% | 2479 | 84.10% | 2543 | 89.35% | 2582 | 90.72% | 2842 | 99.86% | 2846 |
| **2021 - Virtual ( was Montréal)** | 809 | 29.40% | 1052 | 38.20% | 1213 | 44.10% | 2405 | 87.40% | 2513 | 91.3% | 2576 | 93.6% | 2610 | 94.90% | 2663 | 96.80% | 2751 |
| **2022 - Denver, CO** There was a vote on a resolution. | 529 | 21.79% | 968 | 39.87% | 1143 | 47.08% | 1941 | 79.84% | 2257 | 92.96% | 2263 | 93.20% | 2295 | 94.52% | 2356 | 97.03% | 2428 |
| **2023 - Montréal, Canada** | 588 | 21.44% | 868 | 31.64% | 991 | 36.13% | 2366 | 86.26% | 2419 | 88.19% | 2555 | 93.15% | 2606 | 95.01% | 2721 | 99.20% | 2743 |
| **2024 - Virtual** Discounted reg likely reason fall renewals. | 446 | 24.63% | 648 | 35.78% | 735 | 40.59% | 1391 | 76.81% | 1531 | 84.54% | 1634 | 90.27% | 1674 | 93.44% | 1781 | 98.34% | 1811 |
| **2025 - Washington, DC** | 634 | 0.00% | 791 | 0.00% | 953 | 0.00% | | 0.00% | | 0.00% | | 0.00% | | 0.00% | | 0.00% | |
| **Averarage** (All) | | 25.62% | | 37.96% | | 44.97% | | 81.89% | | 90.30% | | 93.17% | | 95.02% | | 98.80% | |
| **Average** (16-24) | | 24.49% | | 36.50% | | 43.39% | | 84.62% | | 89.97% | | 93.11% | | 94.88% | | 98.66% | |

| For estimating membership total | 750 | 25% | 1110 | 37% | 1320 | 44% | 2460 | 82% | 2700 | 90% | 2790 | 93% | 2850 | 95% | 2940 | 98% | 3000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 725 | 25% | 1073 | 37% | 1276 | 44% | 2378 | 82% | 2610 | 90% | 2697 | 93% | 2755 | 95% | 2842 | 98% | 2900 |
| | 700 | 25% | 1036 | 37% | 1232 | 44% | 2296 | 82% | 2520 | 90% | 2604 | 93% | 2660 | 95% | 2744 | 98% | 2800 |
| | 675 | 25% | 999 | 37% | 1188 | 44% | 2214 | 82% | 2430 | 90% | 2511 | 93% | 2565 | 95% | 2646 | 98% | 2700 |
| | 650 | 25% | 962 | 37% | 1144 | 44% | 2132 | 82% | 2340 | 90% | 2418 | 93% | 2470 | 95% | 2548 | 98% | 2600 |
| | 625 | 25% | 925 | 37% | 1100 | 44% | 2050 | 82% | 2250 | 90% | 2325 | 93% | 2375 | 95% | 2450 | 98% | 2500 |
| | 600 | 25% | 888 | 37% | 1056 | 44% | 1968 | 82% | 2160 | 90% | 2232 | 93% | 2280 | 95% | 2352 | 98% | 2400 |
| | 575 | 25% | 851 | 37% | 1012 | 44% | 1886 | 82% | 2070 | 90% | 2139 | 93% | 2185 | 95% | 2254 | 98% | 2300 |
| | 550 | 25% | 814 | 37% | 968 | 44% | 1804 | 82% | 1980 | 90% | 2046 | 93% | 2090 | 95% | 2156 | 98% | 2200 |
| | 525 | 25% | 777 | 37% | 924 | 44% | 1722 | 82% | 1890 | 90% | 1953 | 93% | 1995 | 95% | 2058 | 98% | 2100 |

JA2010

AAUP-01140

 
# Attestation of drop in program submission statistics for lawsuit

**Jeffrey Reger** <jeff@mesana.org>
To:

Sun, Mar 30, 2025 at 10:50 AM

In 2020, our last meeting scheduled to take place in Washington D.C. (with the deadline prior to the Covid-19 pandemic forcing a shift to virtual once it became clear that force majeure prevented a meeting in person), we had at the regular deadline 1,543 abstracts in total, with 235 pre-organized panels and 33 roundtables.

In 2023, which was the only other time that we have offered an extension due to a natural disaster, we had 1,557 abstracts submitted in total after the one-week extended deadline, with 214 pre-organized panels and 67 roundtables.

In 2025, at the original deadline, we had about 1,050 abstracts submitted in total—a significant drop. Individual abstracts were extraordinarily low at 275, a drop by more than half. With the extension of one week, we reached 1,422 total abstracts, which is still reduced lower than the average of a large meeting in a popular location.

In addition, the inability to plan and focus is demonstrated by the reduction in preorganized panels. The total number of pre-organized panels at the original deadline was 157; the final at the extended deadline was 160 pre-organized panels (versus an expected 225 or so), with 69 roundtables in addition. The reduction in pre-organized panels by almost a third was slightly compensated for by a higher-than-average number of individual abstracts (718, versus a typical average in the mid 600s.)

--
Basis:

Submission statistics pulled from myMESA

2025:

718 individual abstracts
704 abstracts on preorganized panels
=
1422

229 sessions, higher roundtables, 69, only 160 panels

at the deadline, we had about 1,060 papers.

1560

**2023:**

283 sessions
🔢 214 panels (199 accepted, 15 rejected)
🔢 67 roundtables (61 accepted, 6 rejected)
645 individual papers (616 accepted, 29 rejected)

Total = 1557
🔢 645 individual abstracts
🔢 912 abstracts on preorganized panels

2020:

Abstracts Total: 1,543

JA2011

AAUP-01336

Individual Abstracts: 657
Pre-Organized Panel Abstracts: 886

Pre-Organized Panels: 235
Roundtables: 33


--
**Jeffrey D. Reger, Ph.D.**
Executive Director
Middle East Studies Association
3700 O St. NW, ICC STE 241
Washington DC 20057
520-338-2216
mesana.org

JA2012

AAUP-01337


# Presidential Documents

Title 3—

**The President**

**Executive Order 13899 of December 11, 2019**

## Combating Anti-Semitism

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1**. *Policy.* My Administration is committed to combating the rise of anti-Semitism and anti-Semitic incidents in the United States and around the world. Anti-Semitic incidents have increased since 2013, and students, in particular, continue to face anti-Semitic harassment in schools and on university and college campuses.

Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. 2000d *et seq.,* prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving Federal financial assistance. While Title VI does not cover discrimination based on religion, individuals who face discrimination on the basis of race, color, or national origin do not lose protection under Title VI for also being a member of a group that shares common religious practices. Discrimination against Jews may give rise to a Title VI violation when the discrimination is based on an individual's race, color, or national origin.

It shall be the policy of the executive branch to enforce Title VI against prohibited forms of discrimination rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI.

**Sec. 2**. *Ensuring Robust Enforcement of Title VI.* (a) In enforcing Title VI, and identifying evidence of discrimination based on race, color, or national origin, all executive departments and agencies (agencies) charged with enforcing Title VI shall consider the following:

(i) the non-legally binding working definition of anti-Semitism adopted on May 26, 2016, by the International Holocaust Remembrance Alliance (IHRA), which states, "Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities"; and

(ii) the "Contemporary Examples of Anti-Semitism" identified by the IHRA, to the extent that any examples might be useful as evidence of discriminatory intent.

(b) In considering the materials described in subsections (a)(i) and (a)(ii) of this section, agencies shall not diminish or infringe upon any right protected under Federal law or under the First Amendment. As with all other Title VI complaints, the inquiry into whether a particular act constitutes discrimination prohibited by Title VI will require a detailed analysis of the allegations.

**Sec. 3**. *Additional Authorities Prohibiting Anti-Semitic Discrimination.* Within 120 days of the date of this order, the head of each agency charged with enforcing Title VI shall submit a report to the President, through the Assistant to the President for Domestic Policy, identifying additional nondiscrimination authorities within its enforcement authority with respect to which the IHRA definition of anti-Semitism could be considered.

**Sec. 4**. *Rule of Construction.* Nothing in this order shall be construed to alter the evidentiary requirements pursuant to which an agency makes a determination that conduct, including harassment, amounts to actionable

JA2013

AAUP-01491

discrimination, or to diminish or infringe upon the rights protected under any other provision of law.

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*December 11, 2019.*

[FR Doc. 2019–27217
Filed 12–13–19; 11:15 am]
Billing code 3295–F0–P

JA2014

AAUP-01492



Home > ... > Defining Antisemitism

★ ★ ★

# Defining Antisemitism

The Department of State has used a **working definition, along with examples, of antisemitism** since 2010. On May 26, 2016, the 31 member states of the International Holocaust Remembrance Alliance (IHRA), of which the United States is a member, adopted a non-legally binding "working definition" of antisemitism at its plenary in Bucharest. This definition is consistent with and builds upon the information contained in the 2010 State Department definition. As a member of IHRA, the United States now uses this working definition and has encouraged other governments and international organizations to use it as well.

## Bucharest, 26 May 2016

In the spirit of the Stockholm Declaration that states: "With humanity still scarred by ... antisemitism and xenophobia the international community shares a solemn responsibility to fight those evils" the committee on Antisemitism and Holocaust Denial called the IHRA Plenary in Budapest 2015 to adopt the following working definition of antisemitism.

On 26 May 2016, the Plenary in Bucharest decided to:

Adopt the following non-legally binding **working definition of antisemitism** 🔗:

"Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions an ... "

Cookie Settings

AAUP-01806

JA2015

To guide IHRA in its work, the following examples may serve as illustrations:

Manifestations might include the targeting of the state of Israel, conceived as a Jewish collectivity. However, criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic. Antisemitism frequently charges Jews with conspiring to harm humanity, and it is often used to blame Jews for "why things go wrong." It is expressed in speech, writing, visual forms and action, and employs sinister stereotypes and negative character traits.

Contemporary examples of antisemitism in public life, the media, schools, the workplace, and in the religious sphere could, taking into account the overall context, include, but are not limited to:

- Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion.

- Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective — such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government or other societal institutions.

- Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews.

- Denying the fact, scope, mechanisms (e.g. gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust

- Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust.

- Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations.

- Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.

- Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation.

- Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis.

JA2016

AAUP-01807

◆  Drawing comparisons of contemporary Israeli policy to that of the Nazis.

◆  Holding Jews collectively responsible for actions of the state of Israel.

**Antisemitic acts are criminal** when they are so defined by law (for example, denial of the Holocaust or distribution of antisemitic materials in some countries).

**Criminal acts are antisemitic** when the targets of attacks, whether they are people or property – such as buildings, schools, places of worship and cemeteries – are selected because they are, or are perceived to be, Jewish or linked to Jews.

**Antisemitic discrimination** is the denial to Jews of opportunities or services available to others and is illegal in many countries.

TAGS

Anti-Semitism    Holocaust Issues    Human Rights    Religious Freedom



White House

USA.gov

Office of the Inspector General

Archives

Contact Us

JA2017

AAUP-01808



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

AAUP-01809

JA2018

**UNCLASSIFIED (U)**

# 5 FAM 1200
# STATE MESSAGING AND ARCHIVE RETRIEVAL TOOLSET (SMART)

# 5 FAM 1210
# PURPOSE AND SCOPE

*(CT:IM-323;   06-20-2024)*
*(Office of Origin:   DT/ES/MCS/GMS)*

## 5 FAM 1211  PURPOSE AND SCOPE

*(CT:IM-272;   03-02-2020)*

a. This subchapter establishes policy for the State Messaging and Archive Retrieval Toolset (SMART) application.  This policy applies to all Department personnel, contractors, and other U.S. Government agency personnel (referred to as "users") who are authorized access to Department facilities and networks (domestically and abroad).

b. All users of SMART must follow the policy in this subchapter and the associated Telecommunications Handbook (5 FAH-2) when using SMART.

## 5 FAM 1212  AUTHORITIES

*(CT:IM-127;   03-05-2012)*

The authorities for this policy are found in 1 FAM 271.5 and 5 FAM 113.

## 5 FAM 1213  DEFINITIONS

*(CT:IM-300;   06-06-2023)*

**Allied Communications Publication (ACP)**:  One of several publications that regulate the use of allied government transmission facilities.  ACPs are identified by a numerical suffix, ACP-127, ACP-131, etc.

**Addressee**:  The post, collective, individual, or distribution list to whom a message is directed by the originator.  Addressees are indicated as either action or info (information).

JA2019

AAUP-00341

**Approver**:  An individual who has the authority (or to whom the authority has been delegated) to authorize release of a message or document that carries the authority of the Department of State, including reporting, policy formulation, and management.

**Archive message**:  Department messages that have long-term record value and are stored in the SMART archive.  SMART has two archive message types: cables and record emails.

**Archive:**  The official Department database of all archive messages sent to and received by SMART.  Users can search the archive for messages, save searches, and opt to enable notifications for when messages that meet their interests are added to the archive.  Access to the archive is controlled by role-based access control (RBAC) restrictions.

**Captions:**  Acronyms or phrases used to provide handling or distribution instructions for a cable or record email.  A caption denotes the expected audience of a SMART message, thereby targeting distribution and limiting archive access.  Captions take precedence over all other handling instructions.  Refer to 5 FAH-2 H-440 for more information.

**Classified message**:  In SMART, an archive message that is marked as Confidential or Secret and can only be received and retrieved from the archive by individuals with an appropriate security clearance.

**Clearer**:  An individual who reviews and concurs with message text or substance. SMART messages can have more than one clearer.

**Collective**:  A distribution list of several posts, agencies, and/or organizations grouped for a specific purpose or type of cable traffic.  There are two types of collectives:

(1) **Department-originated**: Only the domestic designated organizations or bureaus within the Department may originate cable traffic to these collectives (i.e., the originator post must be SECSTATE WASHDC); and

(2) **Field-originated**: Only overseas designated posts may originate a cable to these collectives.  Agencies outside the Department are not authorized to use collectives.

**Critical Intelligence (CRITIC):**  A handling symbol and precedence for specially formatted cables, per the Defense Special Security Communications System Operating Instructions [DOI 103] conveying national security information that must be routed to the National Security Agency [NSA] and then delivered to the highest levels of the U.S. Government as fast as possible.  Overseas personnel may only send CRITIC messages via SMART from a classified workstation.

**Dissemination rules:**  Descriptive logic directives that determine message distribution based on logical expressions of the Department's business rules.  Dissemination rules direct SMART to perform actions based on the properties or metadata of a message, the keyword contents of the message, and job roles assigned to a user.  These rules allow messages to be distributed to

JA2020

 AAUP-00342

necessary recipients through derived addresses rather than only to direct addresses.

**Enclave**:  The Department's two enterprise networks:  ClassNet for processing up to SECRET level information, and OpenNet for processing up to Sensitive but Unclassified (SBU) information.  SMART processes and archives only unclassified and SBU messages on OpenNet.  Both unclassified and classified messages are processed and archived on ClassNet.  With the exception of the United States Department of Agriculture, cable traffic originating from outside agencies is processed on ClassNet.  Almost all unclassified traffic originating from other agencies passes through an electronic cross domain security guard for access on OpenNet.

**Main State Messaging Center (MSMC) administrator**:  An administrator at SMART's central site, the Department's Messaging Center.

**Metadata:**  Descriptive information about the content of a SMART message including, but not limited to, precedence, classification, TAGS, captions, special handling and passing instructions, drafters, clearers and approvers, and addressees.

**Microsoft Outlook:**  The software application on which the SMART Client runs.

**Originator:**  The post or organization that initiates a message.

**Personally identifiable information (PII):**  (as defined by OMB M-07-16) Information that can be used to distinguish or trace an individual's identity; such as their name, Social Security number, biometric records, etc., alone, or when combined with other personal or identifying information, which is linked or linkable to a specific individual, such as date and place of birth, mother's maiden name, etc.  Refer to [5 FAM 460](https://fam.state.gov) for more information.

**Plain language address (PLA):**  A unique readable name for use in the address component of a Command, Control, and Communications (C3) system message (i.e., cable).  A PLA is an organizational address that identifies an organization or a group of organizations (e.g., SECSTATE WASHDC, AMEMBASSY ABUJA, AMCONSUL DURBAN, ALL EUROPE COLLECTIVE).

**Precedence:**  A designation assigned to a cable by the drafter to indicate the relative urgency of the cable's subject matter to the addressee.  The selected precedence dictates the message processing path and alerts addressees to the level of action required.  Generally, there are two precedence categories:

(1)  Standard; and

(2)  High.

**Recipient:**  Someone that SMART delivers a message to based on derived or direct addressing.

**Releaser:**  A user who sends an archive message.  In SMART, a user must be provisioned with release authority to send a cable.  Any user with a SMART account can send a record email.

<div align="center" style="color:red; font-size:2em;">JA2021</div>

AAUP-00343

**Rolebased access control (RBAC):**  A method of restricting information access based on the roles of individual users within an organization.  Users have access rights only to the information they need to do their jobs.  In SMART, RBAC is enforced using captions, traffic analysis by geography and subject (TAGS), sensitivity, assigned post, employee type, and classification.  RBAC is enforced when messages are disseminated and when users search the SMART archive.

**Sensitive but unclassified (SBU) message:**  Information that is not classified for national security reasons, but that warrants a degree of protection and administrative control that meets the criteria for exemption from public disclosure set forth under Sections 552 and 552a of Title 5, United States Code: the Freedom of Information Act and the Privacy Act.  See 12 FAM 540 for details on SBU.

**SMART message:**  Electronically transmitted official and unofficial correspondence known as cables and record emails.

**SMART post administrator:**  The local system administrator at a post abroad or at some domestic offices in the Department who manages the SMART users, messages, and post within their purview.

**State Messaging and Archive Retrieval Toolset (SMART)**:  The Department's cable and record email application designed as a simple, secure, and user-driven system to support the conduct of diplomacy through modern messaging, dynamic archiving, and information sharing.  SMART enables users to send and receive organizational authority messages and other messages with long-term value on both OpenNet and ClassNet.  These messages are stored and searchable in the SMART Archive.

**Traffic analysis by geography and subject (TAGS):**  Abbreviations that aid in identifying subject content, world locations, and programs in communications disseminated throughout the Department and posts.  These markings are metadata that factor into message dissemination, message retrieval, and disposition in the archive.  TAGS types include: subject, geographical, program, organizational, and personal.  SMART requires at least one subject TAGS on archive messages.

# 5 FAM 1214  MESSAGE TYPES AND THEIR USAGE

## 5 FAM 1214.1  Archive Messages

*(CT:IM-300;   06-06-2023)*

a. There are two types of SMART archive messages: cables and record emails.  See 5 FAM 1214.2 and 5 FAM 1214.3 for definitions of these message types.

b. When drafting, approving, and/or releasing archive messages, a user must comply with 5 FAM 400, 5 FAM 1200, 5 FAH-1, 5 FAH-2, 12 FAM 500, 12 FAM

JA2022

AAUP-00344

600, 12 FAH-6 H-540 and any other Department requirements concerning records management, correspondence, and information security.

c.  Other agencies must comply with Department standards and procedures when using the Department's communications systems.  At post, the messaging regulations for other agencies will be followed only when they do not conflict with or adversely impact the Department's systems and requirements.

d. Include at least one subject TAGS (see 5 FAH-1 H-140) and an appropriate subject line on all Department archive messages.  SMART automatically applies Executive Order 13526 information to Department archive messages.

e. All archive messages must be marked accordingly using the appropriate sensitivity marking category designator (see 12 FAM 540).

# 5 FAM 1214.2  CABLES

*(CT:IM-300;   06-06-2023)*

a. Cables are official records of Department of State policies, program activities, post operations, and personnel management.  Cables are archive messages that are sent to organizational addressees (SECSTATE, AMEMBASSY, AMCONSUL, etc.) and are disseminated according to system rules and user profiles.  Cables are always cleared and approved, either directly or through delegation, and carry organizational authority.

b. Cables contain official evidence of the Department's business.

c.  Cables require a PLA in the line.

d. Cables may be addressed to individuals in the info line.

e. Cables must have precedence, TAGS, and classification defined.

f.  Cables may contain captions to restrict dissemination and archive access.

g. Cables may be marked 'Addressee Only' to limit search access to the releaser and message addressees, subject to RBAC permissions.

h. Cables may carry the privacy/PII marking as a reminder to safeguard the content appropriately.  This marking must be used in conjunction with a restrictive caption or SMART's 'Addressee Only' option to limit dissemination and/or search access.

i. Cables must display the signature of the designated principal in charge as the authority for release at the end of the cable.

j. Cables must have message reference numbers as unique identifiers.

k. Cables are saved to the archive.

l. Cables can be searched and retrieved from the archive depending on user RBAC permissions. Unclassified ALDAC messages, without restrictions, are accessible to all authenticated cleared personnel regardless of a SMART account.

JA2023

AAUP-00345

## 5 FAM 1214.3  Record Email

*(CT:IM-300;   06-06-2023)*

a. A record email is a message, or an email converted to an archive message, whose content adds to a proper understanding of the formulation and execution of basic policies, decisions, actions, or responsibilities of Department offices and posts abroad, and as such is stored in the SMART archive for its long-term record value.  Record emails may be analogous to memos, correspondence, important meeting notes, and other documents with long-term value.  There are two types of record email:

   (1)  Message directly addressed (MDA), and

   (2)  For the record (FTR).

b. MDA record emails are addressed to individuals or distribution lists and assigned a unique identifier as a MDA (e.g., 21 MDA 12345).

c.  FTR emails are addressed to the archive and assigned a unique identifier as a message "For the Record" (e.g., 21 FTR 4567).

d. Record emails must have a TAGS and classification defined.

e. Record emails may contain captions to restrict dissemination and archive access.

f.  Record emails may be marked 'Addressee Only' to limit search access to the releaser and message addressees, subject to RBAC permissions.

g. Record emails may carry the Privacy/PII marking as a reminder to safeguard the content appropriately.  This marking must be used in conjunction with a restrictive caption or SMART's 'Addressee Only' option to restrict dissemination and/or search access.

h. SMART does not require record emails to have a clearer or approver.

i. Record emails will not display the signature of the designated principal in charge as the authority for release at the end of the email.

j. Record emails can be searched and retrieved from the archive, depending on user RBAC permissions.


## 5 FAM 1215  REPORTING SMART PROBLEMS

*(CT:IM-272;   03-02-2020)*

Domestic users experiencing problems with SMART should contact the IT Service Center at ITServiceCenter@state.gov or 202-647-2000.  Users abroad experiencing problems with SMART should contact their local information management (IM) staff.

AAUP-00346

JA2024

# 5 FAM 1216  SMART SYSTEM ADMINISTRATOR TRAINING

*(CT:IM-272;   03-02-2020)*

a. SMART post administrators are required to complete annual SMART system administrator training.  For current SMART system administrator course offerings and schedules, please see the FSI OpenNet site.

b. A "Post Administrator Training Report" in SMART's Full Reporting can assist post administrators with tracking their training due date.  SMART also sends reminder emails when training is due.

# 5 FAM 1217  THROUGH 1219  UNASSIGNED

**UNCLASSIFIED (U)**

JA2025

The **Foreign Affairs Manual (FAM)** and associated **Handbooks (FAHs)** are a single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the State Department, the Foreign Service and, when applicable, other federal agencies. The FAM (generally policy) and the FAHs (generally procedures) together convey codified information to Department staff and contractors so they can carry out their responsibilities in accordance with statutory, executive and Department mandates.



| Enter Search Text | Search |
|---|---|

# FAM Volume Listing

## 1 FAM Organization and Functions
Policy Manual

View Table of Contents

View Changes

## 2 FAM General
Policy Manual

View Table of Contents

View Changes

## 3 FAM Personnel
Policy Manual

View Table of Contents

View Changes

## 4 FAM Financial Management
Policy Manual

View Table of Contents

View Changes

## 5 FAM Information Management

AAUP-00358

JA2026

Policy Manual

[View Table of Contents](#)

[View Changes](#)

# 6 FAM General Services
Policy Manual

[View Table of Contents](#)

[View Changes](#)

# 7 FAM Consular Affairs
Policy Manual

[View Table of Contents](#)

[View Changes](#)

# 8 FAM FAM Passports and Consular Reports of Birth Abroad
Policy Manual

[View Table of Contents](#)

[View Changes](#)

# 9 FAM Visas
Policy Manual

[View Table of Contents](#)

[View Changes](#)

# 10 FAM Public, Educational, and Cultural Affairs
Policy Manual

[View Table of Contents](#)

[View Changes](#)

JA2027

AAUP-00359

## 11 FAM Legal and Political Affairs

Policy Manual

View Table of Contents

View Changes

## 12 FAM Diplomatic Security

Policy Manual

View Table of Contents

View Changes

## 13 FAM Training and Professional Development

Policy Manual

View Table of Contents

View Changes

## 14 FAM Logistics Management

Policy Manual

View Table of Contents

View Changes

## 15 FAM Overseas Buildings Operations

Policy Manual

View Table of Contents

View Changes

## 16 FAM Medical

Policy Manual

View Table of Contents

AAUP-00360

JA2028

View Changes

## 18 FAM Programs, Practices, and Planning

Policy Manual

View Table of Contents

View Changes

## 19 FAM Cybersecurity Guidance

Policy Manual

View Table of Contents

View Changes

## 20 FAM Data and Artificial Intelligence

Policy Manual

View Table of Contents

View Changes

© 2025 - Department of State: FAM Website | STATE.GOV | USA.GOV | Privacy and Disclaimers | Contact

JA2029

AAUP-00361

<div align="center">

**UNCLASSIFIED (U)**

# 9 FAM 402.5

# (U) STUDENTS AND EXCHANGE VISITORS – F, M, AND J VISAS

*(CT:VISA-2150;   04-29-2025)*
*(Office of Origin:  CA/VO)*

</div>

# 9 FAM 402.5-1  (U) STATUTORY AND REGULATORY AUTHORITY

## 9 FAM 402.5-1(A)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 101(a)(15)(F) (8 U.S.C. 1101(a)(15)(F)); INA 101(a)(15)(J) (8 U.S.C. 1101(a)(15)(J)); INA 101(a)(15)(M) (8 U.S.C. 1101(a)(15)(M)); INA 212(a)(6)(C) (8 U.S.C. 1182(a)(6)(C)); INA 212(e) (8 U.S.C. 1182(e)); INA 212(j) (8 U.S.C. 1182(j)); INA 214(b) (8 U.S.C. 1184(b)); INA 214(l) (8 U.S.C. 1184(l)), INA 214(m) (8 U.S.C. 1184(m)).

## 9 FAM 402.5-1(B)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

**(U)** 22 CFR 41.61; 22 CFR 41.62; 22 CFR 41.63; 22 CFR Part 62.

# 9 FAM 402.5-2  (U) OVERVIEW

*(CT:VISA-1970;   04-22-2024)*

**(U)** Except for incidental, short-term courses permitted under a B visa (see 9 FAM 402.5-5(I)(3)-(4)), a noncitizen must have a student visa to study in the United States. The course of study and type of school they plan to attend determines whether they need an F-1 visa (academic) or an M-1 visa (nonacademic, vocational). Exchange visitor (J-1) visas are for individuals approved to participate in exchange visitor programs in the United States, which can range from student to research scholar to camp counselor to physician, among other programs.  Students and exchange visitors must be accepted by their schools or program sponsors before applying for visas.

<div align="center">

JA2030

</div>

# 9 FAM 402.5-3  (U) Categories of F, J, and M Visas

*(CT:VISA-1828;   09-12-2023)*

**(U)** 22 CFR 41.12 identities the following F, J, and M visas classifications for noncitizens engaged in study or participation in exchange programs:

| F1 | Student in an Academic or Language Training Program |
|----|----|
| F2 | Spouse or Child of F1 |
| F3 | Canadian or Mexican National Commuter Student in an Academic or Language Training Program |
| J1 | Exchange Visitor |
| J2 | Spouse or Child of J1 |
| M1 | Vocational Student or Other Nonacademic Student |
| M2 | Spouse or Child of M1 |
| M3 | Canadian or Mexican National Commuter Student (Vocational Student or Other Nonacademic Student) |

# 9 FAM 402.5-4  (U) STUDENT AND EXCHANGE VISITOR PROGRAM (SEVP)

## 9 FAM 402.5-4(A)  (U) Background on SEVP

*(CT:VISA-3012;   12-11-2024)*

a. **(U)** The Student and Exchange Visitor Information System (SEVIS) is designed to monitor the academic progress, movement, etc. of foreign students and exchange visitors from entry into the United States to departure. The Student and Exchange Visitor Program (SEVP) manages SEVIS.  SEVP is under the auspices of the National Security Investigations Division of ICE.

b. **(U)** SEVIS monitors schools and programs, students, exchange visitors, and their dependents throughout the duration of approved participation within the U.S. education system.  You can access the SEVIS record associated with the student through the CCD SEVIS report.

c.  **(U)** Contact the Education and Tourism Division CA/VO/F/ET with policy and procedural questions related to F, M, and J visas.

## 9 FAM 402.5-4(B)  (U) Student and Exchange Visitor Information System (SEVIS) Record is Definitive Record

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** While applicants must still present a paper Form I-20 (F or M visa) or Form DS-2019 (J visa) to qualify for a visa, the SEVIS record is the definitive

<span style="color:red; font-size:2em;">JA2031</span>

AAUP-00363

record of student or exchange visitor status and visa eligibility.  You must always check an applicant's SEVIS status before issuing an F, M, or J visa, for two reasons:  (1) You must verify that the SEVIS fee has been paid (see following paragraph); and (2) While presentation of a valid Form I-20 or Form DS-2019 generally indicates that an individual is eligible to apply for a visa, the electronic SEVIS record in the CCD, not the paper form, is the definitive record.

b.  **(U)** The electronic SEVIS record will indicate the applicant's current SEVIS status.  You should issue F, M, or J visas only to visa applicants whose SEVIS record indicates a SEVIS status of "initial" or "active."

c.  **(U)** On occasion, you may encounter an applicant who presents a hard copy Form I-20 or Form DS-2019 but you are unable to locate the SEVIS record in the CCD.  This may occur because records were not "swept" into the CCD from the SEVIS database as usual.  If the applicant is otherwise qualified, refuse the visa under INA 221(g) for administrative processing and alert the Visa Office F/M/J portfolio holder(s) listed in the CAWeb "Who's Who" in VO for assistance in verifying the record.

## 9 FAM 402.5-4(C)  (U) The Student and Exchange Visitor Information System (SEVIS) Fee

*(CT:VISA-2048;   08-15-2024)*

**(U)** All students and exchange visitors, except those exchange visitors who are sponsored by the U.S. government (programs with a serial number that begins with the prefix G-1, G-2, G-3, or G-7 on the Form DS-2019), must pay the I-901 SEVIS fee at FMJFee.com before the visa interview.  You must verify SEVIS fee payment through the SEVIS CCD report.  If the applicant's CCD SEVIS record does not show the fee was paid but the applicant states it was, you can easily and accurately verify the SEVIS payment by entering the SEVIS number, the last name of the applicant, and the applicant's date of birth into the FMJfee.com website.  Applicants who cannot demonstrate that they have paid the SEVIS fee should be refused under INA 221(g).  Questions about SEVIS fee payment should be directed to the Visa Office F/M/J portfolio holder(s) listed in the CAWeb "Who's Who".  Additional details and FAQs on the SEVIS fee can be found on the ICE website and on DHS's Study in the States website.

## 9 FAM 402.5-5  (U) STUDENTS: ACADEMIC AND NONACADEMIC – F AND M VISAS

AAUP-00364

JA2032

# 9 FAM 402.5-5(A)  (U) Related Statutory and Regulatory Authorities

## 9 FAM 402.5-5(A)(1)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

INA 101(a)(15)(F) (8 U.S.C. 1101(a)(15)(F)); INA 101(a)(15)(M) (8 U.S.C. 1101(a)(15)(M)); INA 212(a)(6)(C) (8 U.S.C. 1182(a)(6)(C)); INA 214(b) (8 U.S.C. 1184(b)); INA 214(l) (8 U.S.C. 1184(l)), INA 214(m) (8 U.S.C. 1184(m)).

## 9 FAM 402.5-5(A)(2)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

22 CFR 41.61.

# 9 FAM 402.5-5(B)  (U) Overview

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An F or M visa is usually required for individuals to enter the United States to attend university or college, public or private secondary school, private elementary school, seminary, conservatory, other academic institution, including a language training program, or vocational or other recognized nonacademic institution.  Also see 9 FAM 402.5-6 below regarding the J visa for exchange visitors, some of whose programs include attendance at a U.S. school.

b. **(U)** Citizens of VWP participating countries who intend to study cannot travel on the VWP or on visitor (B) visas, except to undertake recreational study incidental to their visit.

c.  **(U)** Study leading to a degree or certificate conferred by either a U.S. or foreign educational institution is not permitted on a visitor (B) visa, even if it is for a short duration.  For example, distance learning which requires a period on the institution's U.S. campus requires a student visa.

d. **(U)** B-2 visa appropriate for certain students: See 9 FAM 402.5-5(R)(3) below for information on appropriate issuance of B-2 visas to prospective students, 9 FAM 402.5-5(I)(3) on students pursuing a short course of study, and 9 FAM 402.5-5(J)(2) below, 9 FAM 402.1-3 paragraph a, and 9 FAM 402.1-5(C) for derivative children applying for B-2 status.

# 9 FAM 402.5-5(C)  (U) Qualifying for a Student Visa (F-1/M-1)

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** An applicant applying for a student visa under INA 101(a)(15)(F)(i) or INA 101(a)(15)(M)(i) must meet the following requirements to qualify for a

JA2033

AAUP-00365

student visa:

(1) **(U)** Acceptance at a school as evidenced by a Form I-20 (see 9 FAM 402.5-4(B) above and 9 FAM 402.5-5(D) below);

(2) **(U)** Intent to enter the United States solely to pursue a full course of study at an approved institution *(see 9 FAM 402.5-5(C)(1) below)*;

(3) **(U)** Present intent to leave the United States at conclusion of approved activities (see 9 FAM 402.5-5(E) below);

(4) **(U)** Possession of sufficient funds to meet the individual's financial needs (see 9 FAM 402.5-5(G) below); and

(5) **(U)** Preparation for course of study (see 9 FAM 402.5-5(H) below).

b. **(U)** If an applicant fails to meet one or more of the above criteria, the appropriate ground of refusal is INA 214(b).

## *9 FAM 402.5-5(C)(1) (U) Intent to Solely Pursue a Full Course of Study*

*(CT:VISA-2150;   04-29-2025)*

*a. Unavailable*

*b. Unavailable*

   *(1) Unavailable*

   *(2) Unavailable*

   *(3) Unavailable*

*c. Unavailable*

   *(1) Unavailable*

   *(2) Unavailable*

   *(3) Unavailable*

# 9 FAM 402.5-5(D)  (U) Form I-20 Certificate of Eligibility for Nonimmigrant (F-1) Student Status - For Academic and Language Students

## 9 FAM 402.5-5(D)(1)  (U) Form I-20 Required

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A prospective student must have a Form I-20, Certificate of Eligibility for Nonimmigrant Student Status, issued by an SEVP-certified school to be issued an F-1 or M-1 student visa.  Only an SEVP-certified school can issue a Form I-20 to students who have been accepted for enrollment.  The Form I-20 constitutes proof of acceptance at an SEVP-certified school and allows the holder to apply for a visa or change of status and admission into the United

JA2034

AAUP-00366

States.  The Form I-20 has the student's unique SEVIS identification (ID) number on the upper left-hand side with the visa class printed on the top right-hand side.  New forms do not have a bar code.  SEVIS ID numbers are an N followed by 9 digits.  Old Forms I-20 with a bar code ceased to be issued as of June 26, 2015, and became invalid for visa issuance on July 1, 2016.

b. **(U)** An F-1 or M-1 visa may be issued only to an applicant who presents a properly completed and valid Form I-20 from the institution the student will attend and who is otherwise eligible for a visa.  These forms are issued only in the United States by approved institutions to students who will pursue a full course of study.

c. **(U)** F and M visa applicants must present a signed Form I-20 and J Visa applicants a Form DS-2019 before visa issuance.  If there are minor errors on the form (e.g., a program start date that is off by one day) you can process the case using that form.  However, if the form indicates an unrealizable program start date, or has a typographic error in the biographic data, you must verify that the information is correct in SEVIS.  The SEVIS record is the definitive record of student status and visa eligibility.  In most cases, the electronic record can be corrected by the institution without requiring issuance of a new hard copy Form I-20 or Form DS 2019.  You must verify that the SEVIS status is either "initial" or "active".  Make a case note that the electronic record contains corrections, and that the traveler will present the Form I-20 at the POE.  CBP accesses the electronic record using the SEVIS number.

d. **(U)** A Form I-20 must bear the signature of the designated school official (DSO) certifying that:

(1) **(U)** The student's application for admission has been fully reviewed and is approved;

(2) **(U)** The student is financially able to pursue the proposed course of study;

(3) **(U)** Page 1 of the Form I-20 was completed and verified to be accurate before signature; and

(4) **(U)** If the student will be attending a public high school on an F-1 visa, the school indicates that the student has paid the unsubsidized cost of the education (see INA 214(m)) and the amount submitted by the student for that purpose.

e. **(U)** On November 1, 2021, SEVP published policy guidance outlining the new procedure for the use of electronic signatures and transmission of the Form I-20, "Certificate of Eligibility for Nonimmigrant Student Status."  This guidance permits designated school officials (DSOs) to electronically sign and transmit the Form I-20 to initial and continuing international students and their dependents, using software programs or applications or by using electronically reproduced copies of a signature.  Additionally, school officials may scan and email or electronically transmit the Form I-20 via a secure platform, such as a school portal or other secure site, to F and M students

AAUP-00367

JA2035

and their dependents. DSOs may also choose to still physically sign and mail the Form I-20 to students.

f.  **(U)** A Form I-20 issued by a school system must indicate the specific school within the system that the student will attend.

g. **(U)** If the applicant submits a Form I-20 that does not contain all the required information, you must refuse the visa under INA 221(g) and require that the missing information be submitted.

## 9 FAM 402.5-5(D)(2)  (U) Student Must Present Form I-20 at Port of Entry (POE)

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** At the time of admission to the United States, a student must present the entire Form I-20, properly filled out and signed by the DSO and the student. Thus, after the visa interview or after an F-1 or M-1 visa has been issued, you must return the completed Form I-20, together with all supporting financial evidence, to the individual for presentation to the U.S. immigration officer at the POE.  Upon the student's arrival, the immigration officer will examine the documentation and return the financial evidence to the individual.

b. **(U)** The student must always retain the Form I-20 while in the United States.

## 9 FAM 402.5-5(D)(3)  (U) Suspension of Cases Involving Unrealizable Reporting Dates

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Action on the application must be suspended if the program start date specified in the applicant's Form I-20 or Form DS-2019 is already past or you believe that the applicant will be unable to meet that date.  The officer must review the SEVIS record in the CCD to determine whether the DSO (for F and M visas) or responsible officer (J visas) has amended the SEVIS record to change the program start date.  If this has not already been done, the applicant must ask the official to enter a new program start date in SEVIS - one that the applicant can meet.  You may then issue the visa based on the electronic record.

b. **(U)** You may issue an F or M visa to an applicant who is otherwise qualified, was previously admitted in F or M status, and is seeking to renew the visa to continue participation in a student program, if the status of the individual's SEVIS record is "active."

c.  **(U)** Do not renew F or M visas for individuals whose SEVIS status is in any status other than active, regardless of presentation of a hard copy Form I-20 that may appear to be valid on its face.

AAUP-00368

JA2036

## 9 FAM 402.5-5(D)(4)  (U) Fraud Related to Form I-20

*(CT:VISA-2048;   08-15-2024)*

**(U)** Fraud, as it relates to F and M cases, often involves the submission of false records to institutions to secure a Form I-20.  You may also observe unusual patterns of Form I-20 issuance from a particular institution.  If any type of fraud is suspected, refuse the visa under INA 221g and refer the case to the Fraud Prevention Manager through ECAS and to CA/FPP.  In addition, notify CA/FPP/ATD student visa portfolio holder and the F/M/J portfolio manager(s) in CA/VO/F/ET.  If a fraud investigation confirms fraud or misrepresentation of a material fact on the part of the applicant, you must consider an ineligibility under INA 212(a)(6)(C).  Questions concerning an applicant's ineligibility under INA 212(a)(6)(C) must be addressed to L/CA.

## 9 FAM 402.5-5(D)(5)  (U) F-1 Form I-20 Sample

*(CT:VISA-432;   08-08-2017)*

**(U)** See Form I-20 Sample.

# 9 FAM 402.5-5(E)  (U) Residence Abroad

## 9 FAM 402.5-5(E)(1)  (U) Residence Abroad Required

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** INA 101(a)(15)(F)(i) and INA 101(a)(15)(M)(i) both require that an F-1 or M-1 applicant possess a residence in a foreign country they have no intention of abandoning.  You must be satisfied that the applicant intends to depart upon completion of the approved activity; specifically, they must:

   (1)  **(U)** Have a residence abroad;

   (2)  **(U)** Have no immediate intention of abandoning that residence; and

   (3)  **(U)** Intend to depart from the United States upon completion of approved activities.

b. **(U)** Adjudicating student visa applications differs from those of other short-term visitors in that the residence-abroad requirement should be looked at differently.  Typically, students lack the strong economic and social ties of more established visa applicants, and they plan longer stays in the United States.  The statute assumes that the natural circumstances of being a student do not disqualify the applicant from qualifying for a student visa. You should consider the applicant's present intent in determining visa eligibility, not what they might do after a lengthy stay in the United States.

c.  **(U)** If a student visa applicant is residing with parents or guardians, they are maintaining a residence abroad if you are satisfied that the applicant has the present intent to depart the United States at the conclusion of their studies.  The fact that this intention may change is not sufficient reason to deny a

JA2037

AAUP-00369

visa.  In addition, the present intent to depart does not imply the need to return to the country from which they hold a passport.  It means only that they must intend to leave the United States upon completion of their studies.  Given that most student visa applicants are young, they are not expected to have a long-range plan and may not be able to fully explain their plans at the conclusion of their studies.  You must be satisfied when adjudicating the application that the applicant possesses the present intent to depart at the conclusion of their approved activities.

## 9 FAM 402.5-5(E)(2)  (U) Relationship of Education or Training Sought to Existence of Ties Abroad

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** The fact that a student's proposed education or training would not appear to be useful in their homeland is not a basis for refusing an F-1 or M-1 visa.  This remains true even if the applicant's proposed course of study seems to be impractical.  For example, if a student visa applicant from a developing country wishes to study nuclear engineering simply because they enjoy it, they may no more be denied a visa because there is no market for a nuclear engineer's skills in their homeland than they may be denied a visa for the study of philosophy or Greek simply because they do not lead to a specific vocation.

b. **(U)** The fact that education or training like that which the applicant plans to undertake is apparently available in their home country is not in itself a basis for refusing a student visa.  An applicant may legitimately seek to study in the United States for various reasons, including a higher standard of education or training.  Furthermore, the desired education or training in the applicant's homeland may be only theoretically available; openings in local schools and institutions may be already filled or reserved for others.

## 9 FAM 402.5-5(E)(3)  (U) Returning Students

*(CT:VISA-2048;   08-15-2024)*

**(U)** Some students must apply for visa renewals if they go home or travel during their period of study.  Where applicable, returning students may be eligible to apply under an interview waiver authority (see 9 FAM 403.5-4(A)(1)). You should usually issue visas to returning students who are qualified unless circumstances have changed significantly since the previous issuance.  Students should be encouraged to travel home during their studies to maintain ties to their country of origin.  If students feel they will encounter difficulties in seeking a new student visa or that they will not be issued a visa to continue their studies, they may be less inclined to leave the United States during their studies and hence may distance themselves from their family and homeland.  Facilitate the reissuance of student visas so that these students can travel freely back and forth between their homeland and the United States and thereby maintain their ties.

AAUP-00370

JA2038

# 9 FAM 402.5-5(F)  (U) Knowledge of English

## 9 FAM 402.5-5(F)(1)  (U) Notation on Form I-20

*(CT:VISA-1628;  09-13-2022)*

a. **(U)** If the individual's Form I-20 indicates that proficiency in English is required for pursuing the selected course of study and no arrangements have been made to overcome any English-language deficiency, you must determine whether the visa applicant has the necessary proficiency.  To this end, the officer must conduct the visa interview in English and may require the applicant to read aloud from an English-language book, periodical, or newspaper, and to restate in English in the applicant's own words what was read.  The applicant may also be asked to read aloud and explain several of the conditions set forth in the Form I-20.  A student must demonstrate English language proficiency only if an admitting institution has made English language ability a requirement for the intended course of study.

b. **(U)** If a school has admitted an applicant based on the applicant's TOEFL, IELTS, or other English language test scores, the officer must not reevaluate the school's admission decision, even if the applicant seems to know less English than the TOEFL or IELTS score indicates, unless the officer suspects the applicant obtained the results through fraud.  Many students do well on the TOEFL or IELTS but seem to falter in their English when confronted with a face-to-face interview.  Since 2018, hundreds of colleges and universities have started accepting the Duolingo English Test scores as part of their admissions process.

c.  **(U)** If the school is aware of a student's lack of English proficiency and has arranged for the student to study English before enrolling in regular courses, then the lack of English skills is not relevant.

## 9 FAM 402.5-5(F)(2)  (U) Courses for Students Taught in a Language Other than English in which the Student Is Proficient

*(CT:VISA-1;  11-18-2015)*

**(U)** Proficiency in English is not required of a student if the enrolling institution conducts the course in a language in which the visa applicant is proficient.

## 9 FAM 402.5-5(F)(3)  (U) English as a Second Language (ESL)

*(CT:VISA-2048;  08-15-2024)*

**(U)** The fact that an ESL or other education program is available locally is not in itself grounds for refusing an applicant.  Many students find language learning enhanced by living in the country where the language is spoken. Students who intend to study in ESL-only programs must present a valid Form I-20 and be found qualified for an F visa.  Postsecondary institutions that require English

JA2039

AAUP-00371

proficiency for a student to matriculate use a variety of mechanisms, and such arrangements must be evident on the visa applicant's Form I-20.  Contact VO's F/M/J portfolio holder(s) listed in the CAWeb "Who's Who" in VO for additional guidance, as required.

# 9 FAM 402.5-5(G)  (U) Adequate Financial Resources

## 9 FAM 402.5-5(G)(1)  (U) Determining Financial Status of F-1 and M-1 Students

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The sponsoring school is required to verify the availability of financial support before issuing the Form I-20.  Schools may not be as well-versed in local documentation or cultural practices as you may be; therefore, you must still ensure that the student has sufficient funds to successfully study in the United States without being forced to resort to unauthorized employment.

b. **(U) F-1 Student:**  The phrase "sufficient funds to cover expenses" referred to in 22 CFR 41.61(b)(1)(ii) means the applicant must have sufficient funds to successfully study in the United States without resorting to unauthorized U.S. employment for financial support.  An applicant must provide evidence that sufficient funds are, or will be, available to defray all expenses during the entire period of anticipated study.  In addition to personal funds, sources of funding may include scholarships, assistantships, fellowships, and approved on-campus employment.  This does not mean the applicant must have cash immediately available to cover the entire period of intended study, which may last several years.  You must, however, establish, usually through credible documentary evidence, that the applicant has enough readily available funds to meet all expenses for the first year of study.  A student could potentially satisfy this requirement by presenting evidence of an existing student loan, but the mere intention to obtain a loan would be insufficient.  Likewise, a student's plan to use curricular practical training (CPT) or optional practical training (OPT) to cover first-year expenses would be insufficient.  You also must be satisfied that, barring unforeseen circumstances, adequate funds will be available for each additional year of study from the same source or from one or more other specifically identified and reliable financial sources.  Funds derived from CPT or OPT may be considered for returning students, who are authorized to participate.  Mere eligibility and/or intent to engage in CPT or OPT is speculative, both in terms of the amount of money that might be earned and whether authorization to work will be granted and may not be sufficient to demonstrate the necessary funds.  See 9 FAM 402.5-5(N) below for more information on employment for F-1 and M-1 students.

c. **(U) M-1 Student:**  All applicants for M-1 visas must establish that they have immediately available to them funds or assurances of support necessary to pay all tuition and living costs for the entire period of intended stay.

JA2040 AAUP-00372

## 9 FAM 402.5-5(G)(2)  (U) Adequate Medical Insurance

*(CT:VISA-1292;   05-27-2021)*

**(U)** F and M students and their dependents are not required to have U.S. medical or travel insurance to qualify for a visa.

## 9 FAM 402.5-5(G)(3)  (U) Funds from Source(s) Outside the United States

*(CT:VISA-2048;   08-15-2024)*

**(U)** When an applicant indicates financial support from a source outside the United States (for example, from parents living in the country of origin), determine whether there are restrictions on the transfer of funds from the country concerned.  If so, you must require acceptable evidence that these restrictions will not prevent the funds from being made available during the period of the applicant's projected stay in the United States.

## 9 FAM 402.5-5(G)(4)  (U) Affidavits of Support or Other Assurances by an Interested Party

*(CT:VISA-1;   11-18-2015)*

**(U)** Various factors are important in evaluating assurances of financial support by interested parties:

(1)  **(U)** Financial support to a student is not a mere formality to facilitate the applicant's entry into the United States, nor does it pertain only when the individual cannot otherwise provide adequate personal support.  Rather, the sponsor must ensure that the applicant will not become a public charge nor be compelled to take unauthorized employment while studying in the United States.  This obligation commences when the visa holder enters the United States and continues until the visa holder's completion of their program of study and departure.

(2)  **(U)** You must resolve any doubt that the financial status of the person giving the assurance is sufficient to substantiate the assertion that financial support is available to the applicant.

(3)  **(U)** You must also carefully evaluate the factors that would motivate a sponsor to honor a commitment of financial support.  If the sponsor is a close relative of the applicant, there may be a greater probability that the commitment will be honored than if the sponsor is not a relative.  Regardless of the relationship, you must be satisfied that the reasons prompting the offer of financial support make it likely the commitment will be fulfilled.

JA2041

## 9 FAM 402.5-5(G)(5)  (U) Funds from Fellowships and Scholarships for F-1 Student

*(CT:VISA-1837;   09-26-2023)*

**(U)** A college or university may arrange for a nonimmigrant student to engage in research projects, give lectures, or perform other academic functions as part of a fellowship, scholarship, or assistantship grant, if the institution certifies that the student will also pursue a full course of study.

## 9 FAM 402.5-5(G)(6)  (U) Post-Doctoral Research Grants for F-1 Student

*(CT:VISA-1;   11-18-2015)*

**(U)** A visa applicant may be issued an F-1 visa for post-doctoral research even if the college or university provides compensation to the individual in the form of a grant.

# 9 FAM 402.5-5(H)  (U) Educational Qualifications for F-1 and M-1 Students

## 9 FAM 402.5-5(H)(1)  (U) Consular Role in Determining Educational Qualifications

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** The Form I-20 and SEVIS record are evidence that a school has accepted the applicant as a student.  You should normally not go behind the Form I-20 or SEVIS record to assess the applicant's qualifications as a student for that institution.  If you have reason to believe that the applicant engaged in fraud or misrepresentation to garner acceptance into the school, then that information is an important factor to consider in determining if the applicant has a bona fide intent to engage in study in the United States.

b. **(U)** You are not expected to assume the role of guidance or admissions counselor to determine whether an applicant for an F-1 or M-1 visa is qualified to pursue the desired course of study.  You must, however, be alert to three specific factors when determining whether the applicant qualifies for a student visa:

  (1)  **(U)** The applicant has successfully completed a course of study equivalent to that normally required of a U.S. student seeking enrollment at the same level;

  (2)  **(U)** Cases in which an applicant has submitted forged or altered transcripts of previous or related study or training which the institution has accepted as valid; and

  (3)  **(U)** Cases in which an institution has accepted an applicant's alleged previous course of study or training as the equivalent of its normal

<span style="color:red">JA2042</span> AAUP-00374

requirements when, in fact, such is not the case.

c.  **(U)** Through its school certification process, SEVP evaluates the qualifications of a school to issue Forms I-20.  This process includes a determination as to whether the school is a bona fide, established institution of learning which possesses the necessary facilities, personnel, and finances to conduct instruction in recognized courses of study.  Evaluation also involves an on-site visit.  If you have reason to question the authenticity of a school or exchange program, contact the (CA/VO/F/ET) F/M/J portfolio holder and the Office of Fraud Prevention Programs (CA/FPP) so inquiries to ECA or SEVP are appropriately coordinated through CA.

d. **(U)** Many U.S. colleges and universities do not require foreign students to submit SAT, ACT, or other standardized admission test scores, and not all schools require specific grade point averages (GPAs) for admission.  Therefore, you may not require that applicants provide admission test scores, or that applicants have a certain grade point average.  SEVP does not have a role in dictating admissions practices to the schools they approve to issue Form I-20.

## 9 FAM 402.5-5(H)(2)  (U) Choice of Academic Institution

*(CT:VISA-1494;   02-28-2022)*

**(U)** Which school a student chooses is not nearly as important as why they choose it.  The United States has over 4,700 accredited colleges and universities of all types and sizes.  Accreditation is the process that ensures a program or institution meets a certain level of academic standard.  Schools may be public or private; non-profit or for-profit; large or small.  A plan that includes initial attendance at a community college or English language program, and then a transfer to a four-year college is common, for reasons such as affordability, to fulfill academic prerequisites, and due to the flexibility and wide array of options available in the U.S. higher education system.  Some students may seek only to study at community colleges or do short-term programs such as Intensive English Programs (IEP), or pursue studies at specialized institutions, such as medical, business, technology-related, or fine arts schools, which typically award most degrees in a single field.  Attendance at a lesser-known college or university is not a ground of ineligibility and applicants cannot be refused a visa for this reason.  Faced with growing international competition for international students, promoting U.S. colleges and universities is a priority for the Department to ensure that the United States continues to be the top receiver of international students globally.  The Department's EducationUSA network of educational advising centers actively promotes all accredited U.S. colleges and universities, maintaining over 430 advising centers in over 175 countries and territories.  EducationUSA advisers assist international students in identifying accredited U.S. colleges and universities where they may be best positioned for success. There is no legal difference between SEVP-certified community colleges, English language schools, and four-year institutions in terms of their

JA2043

AAUP-00375

authorization to issue Form I-20.  Resources to identify which institutions are accredited can be found at Understanding U.S. Accreditation.

# 9 FAM 402.5-5(I)  (U) Full Course of Study

## 9 FAM 402.5-5(I)(1)  (U) F-1 Academic Student

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** DHS regulations (8 CFR 214.2(f)(6)(i)) specify that "Successful completion of the full course of study must lead to the attainment of a specific educational or professional objective."  Those regulations state that a "full course of study" as required by INA 101(a)(15)(F)(i) means:

(1)  **(U)** Postgraduate study or postdoctoral study at a college or university, or undergraduate or postgraduate study at a conservatory or religious seminary, certified by a designated school official (DSO) as a full course of study;

(2)  **(U)** Undergraduate study at a college or university, certified by a school official to consist of at least 12 semester or quarter hours of instruction per academic term in those institutions using standard semester, trimester, or quarter hour systems, where all undergraduate students who are enrolled for a minimum of twelve semester or quarter hours are charged full-time tuition or are considered full time for other administrative purposes, or its equivalent (as determined by the district director in the school approval process), except when the student needs a lesser course load to complete the course of study during the current term;

(3)  **(U)** Study in a postsecondary language, liberal arts, fine arts, or other non-vocational program at a school which confers upon its graduates recognized associate or other degrees or has established that its credits have been and are accepted unconditionally by at least three institutions of higher learning which are either:

  (a)  **(U)** A school (or school system) owned and operated as a public educational institution by the United States or a State or political subdivision thereof; or

  (b)  **(U)** A school accredited by a nationally recognized accrediting body, and which has been certified by a DSO to consist of at least twelve clock hours of instruction a week, or its equivalent as determined by the district director in the school approval process;

(4)  **(U)** Study in any other language, liberal arts, fine arts, or other non-vocational training program, certified by a DSO to consist of at least eighteen clock hours of attendance a week if the dominant part of the course of study consists of classroom instruction, or to consist of at least twenty-two clock hours a week if the dominant part of the course of study consists of laboratory work; or

AAUP-00376

JA2044

(5) **(U)** Study in a curriculum at an approved private elementary or middle school or public or private academic high school which is certified by a DSO to consist of class attendance for not less than the minimum number of hours a week prescribed by the school for normal progress towards graduation.

b. **(U)** Notwithstanding paragraphs 8 CFR 214.2(f)(6)(i)(A) and 8 CFR 214.2 (f)(6)(i)(B), a noncitizen who has been granted employment authorization pursuant to the terms of a document issued by USCIS under paragraphs 8 CFR 214.2(f)(9)(i) or 8 CFR 214.2(f)(9)(ii) and published in the Federal Register shall be deemed to be engaged in a "full course of study" if they remain registered for no less than the number of semester or quarter hours of instruction per academic term specified by the Commissioner in the notice for the validity period of such employment authorization.

c. **(U) Institution of Higher Learning:** Under DHS regulations (8 CFR 214.2(f)(6)(ii)), "a college or university is an institution of higher learning which awards recognized associate, bachelor's, master's, doctorate, or professional degrees." DHS holds that schools that devote themselves exclusively or primarily to vocational or business schools are not included in the category of colleges or universities but are categorized as M-1 schools.

d. **(U) Reduced Course Load:** The DSO may advise an F-1 student to engage in less than a full course of study due to initial difficulties with the English language or reading requirements, unfamiliarity with U.S. teaching methods, or improper course level placement. An F-1 student authorized to reduce course load by the DSO in accordance with the provisions of 8 CFR 214.2(f)(6)(iii) is maintaining status. On-campus employment pursuant to the terms of a scholarship, fellowship, or assistantship is deemed to be part of the academic program of a student otherwise taking a full course of study.

## 9 FAM 402.5-5(I)(2)  (U) M-1 Nonacademic Student

*(CT:VISA-1090;   06-24-2020)*

**(U)** DHS regulations (8 CFR 214.2(m)(9)) specify that "successful completion of the course of study must lead to the attainment of a specific educational or vocational objective." Those regulations state that a "full course of study" as required by INA 101(a)(15)(M)(i) means:

(1) **(U)** Study at a community college or junior college, certified by a school official to consist of at least twelve semester or quarter hours of instruction per academic term in those institutions using standard semester, trimester, or quarter-hour systems, where all students enrolled for a minimum of twelve semester or quarter hours are charged full-time tuition or considered full time for other administrative purposes, or its equivalent (as determined by the district director) except when the student needs a lesser course load to complete the course of study during the current term;

JA2045

AAUP-00377

(2)  **(U)** Study at a postsecondary vocational or business school, other than in a language training program except as provided in 8 CFR 214.3(a)(2)(iv), which confers upon its graduates recognized associate or other degrees or has established that its credits have been and are accepted unconditionally by at least three institutions of higher learning which are either:

(a)  **(U)** A school (or school system) owned and operated as a public educational institution by the United States or a State or political subdivision thereof; or

(b)  **(U)** A school accredited by a nationally recognized accrediting body; and which has been certified by a designated school official (DSO) to consist of at least twelve hours of instruction a week, or its equivalent as determined by the district director;

(3)  **(U)** Study in a vocational or other nonacademic curriculum, other than in a language training program except as provided in 8 CFR 214.3(a)(2)(iv), certified by a DSO to consist of at least eighteen clock hours of attendance a week if the dominant part of the course of study consists of classroom instruction, or at least twenty-two clock hours a week if the dominant part of the course of study consists of shop or laboratory work; or

(4)  **(U)** Study in a vocational or other nonacademic high school curriculum, certified by a DSO to consist of class attendance for not less than the minimum number of hours a week prescribed by the school for normal progress towards graduation.

## 9 FAM 402.5-5(I)(3)  (U) B-2 Visa for Visitor Who Will Engage in a Short Course of Study

*(CT:VISA-2048;   08-15-2024)*

a.  **(U)** Individuals whose principal purpose of travel (see 9 FAM 402.1-3) is tourism, but who also engage in a "short course of study" while in the United States, are properly classified for B-2 visas.  If the student will earn academic credit toward completion of an academic program, then it is not a "short course of study", and B-2 is not the appropriate visa class.  This guidance applies regardless of whether it is a U.S. or foreign educational institution that will grant academic credit for completion of the short course of study.  You should not advise applicants to obtain an I-20 but should refuse the visa under INA 214(b) as not approvable for the planned activities.

b.  **(U)** An individual whose principal purpose of travel is non-credit-bearing avocational/recreational study, which can itself be touristic in nature, may be properly classified B-2 visas.  See 9 FAM 402.2-4(B)(9).

c.  **(U)** Individuals traveling to the United States to attend seminars or conferences that are required to earn a degree (i.e., the applicant cannot complete the requirements for the degree unless they complete the proposed

AAUP-00378

JA2046

seminar or conference in the United States) are not eligible for B visa classification.  This  includes students engaged in an online course of study traveling to the United States for academic consultations or to take examinations.  In the case of a noncitizen traveling to the United States to attend seminars and conferences for credit toward a degree, the study is neither incidental to a tourist visit, avocational, nor recreational.

d. **(U)** Individuals traveling to attend professional education, seminars, or conferences that do not result in academic credit may qualify for a B-1 per 9 FAM 402.2-5(B).

e. **(U)** It is common for U.S. colleges, universities, and private organizations to offer summer programs tailored for high school or college-aged students. Though these programs are for academic enrichment and are marketed as "study" and the participants attend "classes" the activities do not meet the definition of "full" or "part-time" course of study and therefore do not qualify for issuance of an I-20.  You may not advise applicants to obtain an I-20 for these programs.  In most cases, the activity, which is more like a summer camp with an academic focus, can be undertaken in B-2 status.  Consult L/CA for an AO on the appropriate visa classification.

## 9 FAM 402.5-5(I)(4)  (U) F-1 or M-1 Visa for Visitor Who Will Engage in a Short-Term Program

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Only applicants who present a valid Form I-20 should be adjudicated as F or M applicants.  Do not advise applicants who do not present a Form I-20 to obtain one and return for further adjudication.  Instead, applicants without a Form I-20 should be adjudicated in the most logical category that allows the proposed activities in the United States.  In most cases, this will be a B visa. Consult with L/CA if it is unclear whether the activities proposed are permissible on a B visa.

b. **(U)** An individual may be issued a Form I-20 by a school only if they will engage in a full course of study.

c.  **(U)** If a student is receiving academic credit for the program of study or the program of study is required for their degree, the student must qualify for an F-1 or M-1 visa.  8 CFR 214.2(b)(7) prohibits an individual from enrolling in a course of study on a B-1 or B-2 visa.  See 9 FAM 402.5-5(J)(2) below, 9 FAM 402.1-3 paragraph a, and 9 FAM 402.1-5(C) for possible limited exceptions.

d. **(U)** Students may enroll in online degree programs that allow them to reside overseas but that may require them to travel to the United States for short programs required for their degree.  Such students should apply for F-1 or M-1 visas and should present a properly executed Form I-20 indicating appropriate program dates for this limited period of school attendance on their U.S. campus.

JA2047

AAUP-00379

# 9 FAM 402.5-5(J)  (U) Special Types of Students

## 9 FAM 402.5-5(J)(1)  (U) Students Destined to Schools Which are Avocational or Recreational in Character

*(CT:VISA-2048;   08-15-2024)*

**(U)** DHS cannot approve schools which are avocational or recreational in character for issuance of Form I-20, Certificate of Eligibility for Nonimmigrant Student Status.  Students coming to study in such schools may be eligible for B-2 visas if the purpose of attendance is recreational or avocational.  When the nature of a school's program makes determining its character difficult, consult with L/CA on the appropriate visa classification.

## 9 FAM 402.5-5(J)(2)  (U) Elementary School Students

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Only children qualified for a derivative nonimmigrant classification through a principal parent may attend a publicly funded elementary school.  No public elementary schools or school systems are approved by SEVP to issue Form I-20 for attendance in F-1 nonimmigrant status by children in kindergarten through grade eight.  However, any school age student (kindergarten through grade 12) who is otherwise qualified may receive an F-1 visa under INA 101(a)(15)(F)(i) to attend a private school.

b. **(U)** Occasionally, you may encounter situations in which an American citizen/LPR friend or relative, or an institution in the United States, may offer to accept guardianship of a child to provide an indeterminate period of free schooling at a public school.  You may determine that a parent appears to be seeking a B visa for a child or children to facilitate this arrangement.  Keep in mind that study is usually not allowed on a B visa and that even legal guardianship does not constitute a qualifying family relationship for residence in the United States.  See 9 FAM 402.5-5(K)(4) below.  Separately, see 9 FAM 402.1-3 paragraph a and 9 FAM 402.1-5(C) for situations in which a child applies for a B-2 visa to accompany a parent who is the principal applicant.

## 9 FAM 402.5-5(J)(3)  (U) Candidates for Religious Orders

*(CT:VISA-1;   11-18-2015)*

**(U)** Individuals desiring to enter a convent or other institution for religious training of a temporary nature are classifiable as F-1 students under INA 101(a)(15)(F) if the institution has been approved as a place of study and the applicant will return abroad after concluding the course of study or training.

<span style="color:red">JA2048</span>

AAUP-00380

## 9 FAM 402.5-5(J)(4)  (U) Student Destined to U.S. Military Training Facility

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** Military cadets accepted by any of the U.S. military service academies must be classified as A-2 if attendance is on behalf of a non-NATO foreign government or as NATO-2 if the attendance is on behalf of a NATO country.  Military cadets whose attendance is not on behalf of a foreign government are classifiable as F-1 students are required to present Form I-20 and pay the SEVIS fee.

b. **(U)** Military personnel coming to the United States for education or training at any armed forces training facility are to be classified as foreign government officials and issued A-2 visas for non-NATO member military personnel, or NATO-2 for NATO member military personnel.

## 9 FAM 402.5-5(J)(5)  (U) Graduate of Foreign Medical School

*(CT:VISA-1628;   09-13-2022)*

a. **(U)** Foreign medical graduates seeking to enter temporarily in connection with their profession are not eligible for F-1 visas.  Such applicants must apply and qualify for IV*s* or for exchange visitor (J) or temporary worker (H) visas.  See 9 FAM 402.5-6(B) below and 9 FAM 402.10-4(B).

b. **(U)** At least one school has been approved to issue Forms I-20 to foreign medical graduates for a review-type continuing education course of study in preparation for taking tests in the field of medicine.  Foreign medical graduates seeking to enter the United States to take such a review-type course of study who present a Form I-20 from an approved school are classifiable as F-1 students.

## 9 FAM 402.5-5(J)(6)  (U) Entering the United States for Nursing Training

*(CT:VISA-1628;   09-13-2022)*

**(U)** DHS has approved several hospital-affiliated nurses' training schools for nonimmigrant students.  In cases where a school has been approved, the application may be considered under INA 101(a)(15)(F).

## 9 FAM 402.5-5(J)(7)  (U) Aviation Training

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** All flight training for initial training or subsequent training that will result in a certificate or rating must be undertaken on an F or M visa.  This includes FAA, EASA, and other equivalent certificates.

b. **(U)** Recurrent or refresher training (training related to an aircraft for which the applicant has already received certification) may be undertaken on a B-1.

AAUP-00381

JA2049

Recurrent training is the training required for crewmembers to remain adequately trained and currently proficient for each aircraft crewmember position, and type of operation in which the crewmember serves.  It often consists of flight simulator training but may also entail classroom training to update pilots on such things as recent safety issues, trends in aviation, and modifications to aircraft configuration or operating procedures. This assumes that the applicant's employer is covering the recurrent training costs, incidental costs, and that the applicant does not receive a salary or perform labor in the United States.

# 9 FAM 402.5-5(K)  (U) Applying INA 214(m)

## 9 FAM 402.5-5(K)(1)  (U) Public Primary School or a Publicly Funded Adult Education Program

*(CT:VISA-1628;   09-13-2022)*

**(U)** Congress imposed limitations on noncitizen attendance in publicly funded institutions in the 1996 immigration legislation.  As of November 30, 1996, F-1 visas cannot be issued to persons seeking to enter the United States to attend a public primary school or a publicly funded adult education program. See INA 214(m).  This does not, however, bar a dependent of a nonimmigrant in any classification, including F-1, from attendance at a public primary school, an adult education program, or another public educational institution, as appropriate.  Under INA 214(m), primary school means kindergarten through 8th grade.

## 9 FAM 402.5-5(K)(2)  (U) Secondary School

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** INA 214(m) restricts, but does not prohibit, the issuance of F-1 visas to students seeking to attend public high schools.  Secondary school is deemed to be grades 9-12.  As of November 30, 1996, two new additional criteria were imposed on intending F-1 students at public high schools:

   (1)  **(U)** They cannot attend such school for more than 12 months; and

   (2)  **(U)** They must repay the school system for the full, unsubsidized, per capita cost of providing the education to them.

b. **(U)** You may not issue an F-1 visa for attendance at a public high school if the length of study indicated on the Form I-20 exceeds the 12-month cumulative period permitted under INA 214(m).  F-1 visas issued to attend public secondary schools must be limited to 12 months and payment of the full, unsubsidized, per capita cost must be demonstrated before visa issuance.

c.  **(U)** It is important to remember that public secondary school attendance in a status other than F-1 (including unlawful status) does not count against the 12-month limit, nor does attendance in F-1 status before November 30, 1996.

JA2050

AAUP-00382

## 9 FAM 402.5-5(K)(3)  (U) Reimbursement

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A public school system issuing a Form I-20 for attendance at a secondary school must indicate on the Form I-20 that such payment has been made and the amount of such payment.  School districts may not waive or otherwise ignore this requirement.  If the Form I-20 does not include the requisite information, the student must have a notarized statement stating the payment has been made and the amount from the designated school official (DSO) who signed the Form I-20.  If not, the visa must be refused, under INA 221(g), until the applicant provides the necessary documentation.

b. **(U)** Although the per capita costs vary from one school district to another (and sometimes from one school to another within the same district), the averages across the country have ranged from about $8,000 to more than $20,000.  They run somewhat less than that in Puerto Rico and U.S. territories.  These figures are guidelines only and must not be taken as absolutes.  If, however, a Form I-20 indicates a repaid cost radically different (for example, something less than $7,000), contact the F/M/J portfolio holder(s) in CA/VO/F/ET to coordinate an inquiry through SEVP.

## 9 FAM 402.5-5(K)(4)  (U) Noncitizens Under Legal Guardianship of American Citizen Relatives

*(CT:VISA-1292;   05-27-2021)*

**(U)** Schools sometimes advise relatives to declare themselves as the noncitizen's legal guardian.  The school then admits the foreign student as a resident, wrongfully assuming this would exempt the student from the INA 214(m) requirements.  The student's status as a resident of the school district is irrelevant.  Likewise, the fact that the student's U.S. sponsor has paid local property/school taxes does not fulfill the reimbursement requirement of INA 214(m).

## 9 FAM 402.5-5(K)(5)  (U) Student Visa Abusers

*(CT:VISA-1628;   09-13-2022)*

**(U)** INA 212(a)(6)(G) provides sanctions against foreign students who fail to comply with the INA 214(m) requirements.  A noncitizen in F-1 status who violates INA 214(m) is excludable until they have been outside the United States for a continuous period of five years after the date of the violation (see 9 FAM 302.9-9).  Noncitizens who are not subject to INA 214(m) are not subject to INA 212(a)(6)(G).

JA2051

# 9 FAM 402.5-5(L)  (U) Period of Stay

## 9 FAM 402.5-5(L)(1)  (U) For F-1 Applicants

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An individual entering as an F-1 student or granted a change to that status is usually admitted or given an extension of stay for the duration of status.  Duration of status means the time during which the student is pursuing a full course of study and any additional periods of authorized practical training, plus 60 days following completion of the course or practical training within which to depart.  Since November 30, 1996, however, the duration of status of an F-1 student in a publicly funded secondary school cannot exceed an aggregate of 12 months schooling (see 9 FAM 402.5-5(K)(2) above).

b. **(U)** An academic student is in status during the summer between terms, if eligible and intending to register for the next term.  The student is expected to resume a full course of study at the commencement of the next term. A student compelled by illness or other medical condition to interrupt or reduce studies is in status until their recovery.  The student is expected to resume a full course of study upon recovery.

c.  **(U)** DHS amended its regulations to permit the DHS Secretary to waive the usual limitations, including hours of coursework, on employment for students faced by unexpected severe economic circumstances.  Such circumstances could include substantial fluctuations in exchange rates, loss of on-campus employment, loss of other financial assistance through no fault of the student, etc.  Students granted such waivers are deemed to be in status until the economic emergency is over and the necessity for such reduced studies has passed.

## 9 FAM 402.5-5(L)(2)  (U) For M-1 Applicants

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The period of stay for an M-1 student, whether from admission or through a change of nonimmigrant classification, is the time necessary to complete the course of study indicated on Form I-20 plus 30 days within which to depart, not to exceed one year.

b. **(U)** An M-1 student may be granted an extension of stay if it is established that the student:

(1)  **(U)** Is a bona fide nonimmigrant currently maintaining student status;

(2)  **(U)** Is able to, and in good faith intends to, continue to maintain that status for the period for which the extension is granted; and

(3) **(U)** Has compelling educational or medical reasons which resulted in a delay to the course of study.  Delays caused by academic probation or

JA2052

AAUP-00384

suspension are not acceptable reasons for program extension. Cumulative extensions are limited to three years.

# 9 FAM 402.5-5(M)  (U) Spouse and Child of F-1 or M-1 Student

## 9 FAM 402.5-5(M)(1)  (U) Refusals of Spouse and Child of F-1 or M-1 Student

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** Before issuing an F-2 or M-2 visa to a spouse or child of a principal F-1 or M-1 student, you must be satisfied that the relationship between the principal applicant and the spouse or child exists, and that the spouse or child can be expected to depart from the United States upon completion of approved activities by the F-1 or M-1 principal applicant.  See 9 FAM 402.5-5(E) above. Keep in mind that coming to a different conclusion about family members entitled to a derivative nonimmigrant classification and the principal should be rare.  See 9 FAM 402.1-4(A).  If the derivative F-2 or M-2 is seeking to join an F-1 or M-1 principal applicant already in the United States, you must confirm that the derivative F-2 or M-2 applicants have the requisite nonimmigrant intent and that the family's circumstances have not changed in a way to alter the intent of the principal applicant, to conclude the applicants overcome INA 214(b).  See 9 FAM 402.1-4(C).

b. **(U)** If you doubt an F-1 or M-1 student's intent to return abroad, the student cannot satisfy your doubts by offering to leave a child, spouse, or other dependent abroad.  See 9 FAM 402.2-2(B) paragraph b.

## 9 FAM 402.5-5(M)(2)  (U) Separate Form I-20 and SEVIS Registration Required for Accompanying Spouse and/or Minor, Unmarried Child of F-1 or M-1 Student

*(CT:VISA-2048;   08-15-2024)*

**(U)** Each F-2 or M-2 dependent is required to have their own properly executed Form I-20 and their own unique SEVIS ID number.  It is not possible to issue dependent F-2 or M-2 visas based on the principal's Form I-20.  The F-2 or M-2 must present this evidence to both you and the immigration officer at the POE. F-2 or M-2 dependents are not required to pay a separate SEVIS fee.  Additional details on the SEVIS fee can be found on the SEVP page at the ICE website.

AAUP-00385

JA2053

## 9 FAM 402.5-5(M)(3)  (U) Classification of Spouse or Child Who Will Attend School in the United States

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** A spouse qualified for an F-2, M-2, or any other derivative nonimmigrant classification may only study if those studies are incidental to the primary purpose of travel:  to accompany their spouse to the United States.  A spouse in F-2 status, therefore, may only participate in avocational or recreational programs.  A spouse of an F-1 visa holder may only enroll in a full-time course of study if they independently qualify under INA 101(a)(15)(F)(i) as a nonimmigrant student.

b. **(U)** A child qualified for an F-2, M-2, or any other derivative nonimmigrant classification is not required to qualify under INA 101(a)(15)(F)(i) as a nonimmigrant student even though the child will attend school while accompanying the principal (see 9 FAM 402.1-5(C)).  Moreover, a child in F-1 status could not qualify to attend a public primary school and would be limited to 12 months of attendance at a public high school.  See 9 FAM 302.9-9(B)(1).

# 9 FAM 402.5-5(N)  (U) Employment of F-1 and M-1 Student, Spouse, and Children

## 9 FAM 402.5-5(N)(1)  (U) On-Campus Employment for F-1 Student

*(CT:VISA-1292;   05-27-2021)*

**(U)** An F-1 student may accept on-campus employment with the approval of the designated school official (DSO) in an enterprise operated by or on behalf of the school.  The work must take place either at the school or at an educationally affiliated (associated with the school's established curriculum or part of a contractually funded research project at the postgraduate level) off-campus location.  Work that takes place at the school location could be for an on-campus commercial business, such as a bookstore or cafeteria, if the work directly provides services for students.  Employment located on-campus that does not directly involve services to students (such as construction work) does not qualify as on-campus employment.  Work with an employer that is educationally affiliated with the school is on-campus employment even if the work site is not located on the campus (such as a research lab affiliated with the school).  Such on-campus employment must not displace an American citizen or LPR.  The employment may not exceed 20 hours a week while school is in session but may be full time when school is not in session.  The student must be maintaining status.  An F-1 student who finishes a program, such as a bachelor's degree, and starts another program of study at the same campus may continue on-campus employment if the student plans to enroll in the new program of study for the next term.

AAUP-00386

JA2054

# 9 FAM 402.5-5(N)(2)  (U) Off-Campus Employment for F-1 Student

*(CT:VISA-1970;   04-22-2024)*

a. **(U)** An F-1 student may not accept off-campus employment without first applying to U.S. Citizenship and Immigration Services (USCIS) for employment authorization.  An F-1 student may be eligible to apply for off-campus employment authorization after completing one full academic year in F-1 status.  A student who receives authorization from USCIS for off-campus employment may not work more than 20 hours a week when school is in session.  Such employment authorization is automatically terminated if the student fails to maintain status.  A designated school official (DSO) must request off-campus employment for an F-1 student in SEVIS in support of the Form I-765 which must be filed with USCIS, and the request will appear in the electronic SEVIS record.  To recommend off-campus employment, the DSO must certify that:

   (1)  **(U)** The student has been in F-1 status for one full academic year;

   (2)  **(U)** The student is in good standing and carrying a full course of study;

   (3)  **(U)** The student has established that acceptance of employment will not interfere with the full course of study; and

   (4)  **(U)** The prospective employer has submitted a labor and wage attestation, or the student has established a severe economic necessity for employment due to unforeseen circumstances beyond the student's control.

b. **(U)** A student who has received approval from USCIS for off-campus employment will have an employment authorization document (EAD) showing the duration of the employment authorization, which may be up to one year at a time.  The student's electronic SEVIS record will also show approval for off-campus employment.

c.  **(U)** If a student who has been granted off-campus employment authorization temporarily leaves the country during the period when employment is authorized, such employment can be resumed upon return.  The student must, however, be returning to the same school.

# 9 FAM 402.5-5(N)(3)  (U) Employment as Part of Curricular or Alternate Work/Study Practical Training for F-1 Student

*(CT:VISA-1757;   04-17-2023)*

**(U)** A student enrolled in a college or other academic institution having alternate work/study courses as part of the curriculum within the student's program of study may participate in and be compensated for such practical training when authorized for curricular practical training (CPT) by the designated school official (DSO).  Students may not begin such training before endorsement of their electronic SEVIS record by the DSO with such authorization.  Periods of actual

JA2055

AAUP-00387

off-campus employment in a work/study program are considered practical training.  Students who have engaged in a full year of full-time CPT will not receive authorization to engage in optional practical training (OPT) after completion of the course of study.

## 9 FAM 402.5-5(N)(4)  (U) Practical Training

*(CT:VISA-1757;   04-17-2023)*

a. **(U)** Students are eligible for practical training only after they have completed a full academic year in an approved college-level institution, except for graduate students whose program requires them to participate immediately in curricular practical training (CPT).  Students in English language training programs are ineligible for practical training.  Optional practical training (OPT) is training that is directly related to an F-1 student's major area of study.  It is intended to provide a student with practical experience in their field of study during or upon completion of a degree program and is authorized through the recommendation of the designated school official (DSO) and the filing of Form I-765 with USCIS and subsequent issuance of an Employment Authorization Document (EAD) by USCIS.  CPT is employment that is an integral part of a student's specified curriculum.  In most cases, CPT involves internships and similar work experience specifically required by the student's program of study.  The DSO must authorize CPT before the student begins work.  See the SEVP website for more information on practical training.

b. **(U)** Any authorization for employment for purposes of practical training is suspended in the event of a certified strike or other labor dispute involving a work stoppage at the place of employment.

## 9 FAM 402.5-5(N)(5)  (U) Optional Practical Training

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** An F-1 student may apply for OPT in a job related to their major area of study.  OPT may be authorized pre- and post-completion and on a full-time or part-time basis.  During school vacations, either part-time or full-time OPT is permissible. When school is in session, OPT may not exceed 20 hours per week.  An F-1 student may request post-completion OPT after completion of all course requirements not including thesis or equivalent, or after completion of all requirements for graduation.  Post-completion OPT must be full time.  Such training must be completed within 12 months, although certain F-1 students may be eligible for an extension of post-completion OPT based on their major field of study or a pending change of status to H-1B.  In addition to a DSO's request for OPT which will appear in the student's electronic SEVIS record, the student must apply to USCIS using Form I-765 for an Employment Authorization Document (EAD).  If the student makes a brief trip abroad during a period of post-completion OPT, a valid F-1 visa, the unexpired EAD, the endorsed Form I-20, and the electronic SEVIS record will be required for reentry to complete the training.  A letter of employment may

JA2056

also be required.  F-1 students may also travel abroad during the period following the completion of their academic programs while they have a pending request for OPT, which will appear in their electronic SEVIS record, but such travel should be undertaken with caution. USCIS may send a request for evidence to the U.S. address on the OPT application while the applicant is away. Additionally, if USCIS approves the application, the applicant will be expected to have the EAD in hand to reenter the United States. Like a request for evidence, USCIS can only send the EAD to a U.S. address.

b. **(U)** OPT is different from curricular practical training (CPT), which is part of a student's degree curriculum and can only be authorized during a student's course of study.  OPT, by contrast, can be authorized during the student's degree program, as well as after graduation.

## 9 FAM 402.5-5(N)(6)  (U) Extension of OPT for Science, Technology, Engineering, or Mathematics (STEM) Students, and H-1B Beneficiaries ("Cap Gap")

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Effective May 10, 2008, until May 9, 2016, USCIS could grant an OPT extension of 17 months, for a maximum of 29 months, to an eligible F-1 student on post-completion OPT with a degree in a DHS-approved science, technology, engineering, or mathematics (STEM) field.

b. **(U)** Effective May 10, 2016, an F-1 student with a bachelor's or higher degree in a DHS-approved STEM field who is already in a period of approved post-completion OPT may apply to USCIS to extend that period by 24 months, for a maximum of 36 months.  Eligibility for this extension is based upon the Classification of Instructional Programs (CIP) code *f*or the student's degree program as indicated on the Form I-20, on an official transcript, or as shown in SEVIS (including for eligibility based on a previously obtained degree) and whether the CIP code for the degree program is included on the DHS-approved list of qualifying degree program categories for the extension, which can be found on the SEVP website.  Students are also required to complete Form I-983, Training Plan for STEM OPT Students, with their employer and submit it to the DSO.  See the SEVP website for more information on Form I-983.  The DSO must verify the student's eligibility, including ensuring that Form I-983 has been properly completed and executed, recommend the extension through SEVIS, and provide the student with a Form I-20 annotated with the recommendation.  Once the DSO recommends the extension, the student must submit a Form I-765, Application for Employment Authorization, and all appropriate fees to USCIS.  Additional information can be found on the USCIS website.

c.  **(U)** F-1 students on post-completion OPT must report all employment and periods of unemployment to their DSOs, who then report the information in SEVIS on the student's record.  F-1 students participating in post-completion OPT are initially allowed an aggregate period of unemployment of 90 days.

<span style="color:red">JA2057</span>

AAUP-00389

Students on a 24-month STEM OPT extension are allowed an additional 60 days of unemployment, for a total of 150 days.  This measure allows time for job searches or a break when switching employers.  See the SEVP OPT policy guidance on the SEVP website for more information on how unemployment is counted.

d.  **(U)** If the F-1 student has filed a Form I-765 for a 24-month extension in a timely manner before their end of regular post-completion OPT, then the student's OPT employment authorization is automatically extended for 180 days.  This extension ends once USCIS adjudicates the STEM OPT application.  If USCIS approves the STEM OPT extension the student is provided with a new EAD reflecting the extension dates.  If the petition is denied, the student's period of OPT ends.

e.  **(U)** As the STEM OPT extension is automatic for the first 180 days following regular post-completion OPT (when the student has properly filed Form I-765), the student may not necessarily have a renewed EAD.  Therefore, any students having automatically authorized employment through filing for the STEM OPT extension may not be able to present a valid EAD when they apply to renew their visa.  However, F-1 students in this situation can request an updated Form I-20 from the DSO, annotated for the STEM OPT extension, as well as proof that the I-765 petition was filed in a timely manner.  You must confirm that the student's electronic SEVIS record contains the same information as the updated hard copy Form I-20 before issuing a visa.

f.  **(U)** The STEM Designated Degree Program List provides degree program categories approved for the 24-month STEM OPT extension and significant additional information.

g.  **(U)** If an F-1 student is the intended beneficiary of a timely filed Form I-129 petition for a cap-subject H-1B visa to start on October 1, the F-1 status and any OPT authorization held on the eligibility date is automatically extended to dates determined by USCIS that allow for receipt or approval of the petition, up to September 30.  The Cap Gap OPT Extension is automatic, and USCIS will not provide the student with a renewed EAD.  However, F-1 students in this situation can request an updated Form I-20 from the DSO, annotated for the Cap Gap OPT Extension, as well as proof that the Form I-129 petition was timely filed.  Verify that the electronic SEVIS record has also been updated before issuing a visa.

## 9 FAM 402.5-5(N)(7)  (U) Practical Training for M-1 Student

*(CT:VISA-2048;   08-15-2024)*

**(U)** Except for temporary employment for practical training as set forth herein, an M-1 student may not accept employment.  Practical training may only be authorized at the completion of an M-1 course of study.  An M-1 student who desires temporary employment for practical training must apply to USCIS by filing Form I-765.  If approval is granted, DHS will endorse the student's Form I-20 with the dates the authorization for practical training begins and ends.  Because M-1 students are admitted until a certain date, an M-1 student may

JA2058

AAUP-00390

need to also file Form I-539, Application to Extend/Change Nonimmigrant Status, to apply for an extension of M-1 status in conjunction with the application for employment authorization.  Verify that the electronic SEVIS record has been updated before issuing a new visa.

## 9 FAM 402.5-5(N)(8)  (U) Temporary Absence of F-1 or M-1 Student with Pending or Granted Practical Training

*(CT:VISA-1757;   04-17-2023)*

a. **(U)** An F-1 or M-1 student authorized to accept employment for practical training who leaves the country temporarily may be readmitted for the remainder of the authorized period.  The student must be returning solely to perform the authorized training.  Additionally, a student may travel abroad and be readmitted while the request for practical training is pending with USCIS, but such travel should be undertaken with caution.  USCIS may send a request for evidence to the U.S. address on the application while the applicant is away.  Additionally, if USCIS approves the practical training application, the applicant will be expected to have the Employment Authorization Document (EAD) in hand to reenter the United States.  Like a request for evidence, USCIS can only send the EAD to a U.S. address.

b. **(U)** A valid F-1 or M-1 visa, the Form I-20, EAD (if issued), and an accurate electronic SEVIS record are required to reenter the United States for practical training purposes.  A letter of employment may also be required.  For individuals attempting to travel abroad and be readmitted while an application for the STEM OPT extension is pending, the Form I-20 should be endorsed for reentry by the DSO within the last six months.

## 9 FAM 402.5-5(N)(9)  (U) Employment of F-2 and M-2 Spouse and Children

*(CT:VISA-1;   11-18-2015)*

**(U)** The F-2 spouse and children of an F-1 student may not accept employment. The M-2 spouse and children of an M-1 student may not accept employment.

## 9 FAM 402.5-5(O)  (U) F-3 and M-3 Nonimmigrant Visa Classifications

*(CT:VISA-1757;   04-17-2023)*

a. **(U)** The Border Commuter Student Act of 2002 (Public Law 107-274), which was signed into law on November 2, 2002, amended INA 101(a)(15)(F) and (J) to create the F-3 and M-3 NIV categories for Canadian and Mexican citizens and residents who commute to the United States for study at a DHS-approved school located within 75 miles of the U.S. border.  These students are permitted to study on either a full-time or part-time basis.  Until further notice, applicants applying to study in the U*nited S*tates who present a valid

JA2059

AAUP-00391

Form I-20, have an electronic SEVIS record in INITIAL or ACTIVE status, and will commute to school; i.e., not reside in the United States while attending classes, are to be processed as F-1/M-1 students, and the annotation "border commuter" placed on the visa foil.

b. **(U)** The family members of border commuter students are not entitled to derivative F-2 or M-2 status, given that these students do not reside in the United States.

# 9 FAM 402.5-5(P)  (U) Temporary Absence

## 9 FAM 402.5-5(P)(1)  (U) Applicants Who Apply While Abroad for an F-1 or M-1 Visa

*(CT:VISA-1628;   09-13-2022)*

**(U)** Except as provided below, a student making a short trip abroad during an authorized period of study, who needs to obtain a new visa during such absence, must present their Form I-20, properly executed and endorsed.  You must verify that the SEVIS record of the applicant is in ACTIVE status.  If otherwise qualified, the applicant may be issued the appropriate visa.

## 9 FAM 402.5-5(P)(2)  (U) Temporary Absence of Applicants Applying Abroad for Attendance at School Other than Listed on the Visa

*(CT:VISA-2048;   08-15-2024)*

**(U)** A student temporarily abroad who intends to return to study at a United States institution other than the one for which the original visa was issued may seek admission with the original visa, if still valid, and the Form I-20 from the new school.  If the student wishes to apply for a new visa, however, they must present proof that the transfer has been completed and the student is in "initial" or "active" status at the new school.  Verify that the applicant has a valid SEVIS record showing the applicant is in INITIAL or ACTIVE status at the new institution and that the SEVIS fee has been paid on the new record before issuing a new student visa.

## 9 FAM 402.5-5(P)(3)  (U) Renewing F or M Visas for Returning Students

*(CT:VISA-2048;   08-15-2024)*

**(U)** Where applicable, returning students may be eligible to apply under interview waiver authority (see 9 FAM 403.5-4(A)(1)). You usually should renew F or M visas to returning students who have remained in status and have not had any significant changes in either their academic program or their personal circumstances.  When a foreign student engaged in study takes a short trip abroad and requires a visa to return to the United States, you are encouraged to


AAUP-00392

issue visas, if the student is otherwise qualified, to allow the student to complete their study.  Verify that the student's SEVIS record is in ACTIVE status before issuing a new visa.

# 9 FAM 402.5-5(Q)  (U) Processing F and M Visas

## 9 FAM 402.5-5(Q)(1)  (U) Issue Full Validity Student Visas

*(CT:VISA-2143;   03-26-2025)*

**Unavailable**

## 9 FAM 402.5-5(Q)(2)  (U) Maintenance of Status and Departure Bond

*(CT:VISA-432;   08-08-2017)*

**(U)** See 9 FAM 403.9-8.

## 9 FAM 402.5-5(Q)(3)  (U) Automatic Extension of Validity of Visa

*(CT:VISA-432;   08-08-2017)*

**(U)** See 9 FAM 403.9-4(E).

# 9 FAM 402.5-5(R)  (U) Visa Annotations

## 9 FAM 402.5-5(R)(1)  (U) Name of School and SEVIS ID

*(CT:VISA-2048;   08-15-2024)*

**(U)** An initial F-1 or M-1 visa must be annotated with the SEVIS ID and the name of the institution the student will initially attend.  Ensure that the SEVIS ID is correctly annotated on the visa foil.  Inform an applicant who has been accepted by more than one institution that the visa application will be considered only based on the Form I-20 issued by the school which the applicant will attend.  Also advise the applicant that the immigration inspector at the POE can refuse admission for a student seeking an initial entry with a Form I-20 from a school other than the one named on the visa or if the student indicates an intention to attend a different institution.

## 9 FAM 402.5-5(R)(2)  (U) Entry of Student Before Enrollment

*(CT:VISA-2048;   08-15-2024)*

a. **Unavailable**

b. **(U)** A student who wants to travel to the United States more than 30 days in advance of their program start date must obtain a visa in a different

JA2061

AAUP-00393

classification and seek admission under that other visa.

c. **(U)** If a B-2 visa is issued, advise the applicant that, if admitted to the United States as a B-2 visitor, they are required to obtain a change of nonimmigrant status from USCIS to that of an F, M, or J student, as applicable, before their program start date.

## 9 FAM 402.5-5(R)(3)  (U) Entry When School Not Selected

*(CT:VISA-1090;   06-24-2020)*

**(U)** A prospective student applicant who has neither been issued a Form I-20 nor made a final selection of a school may wish to travel to the United States for the primary purpose of selecting a school.  If the applicant qualifies for a visitor visa, and would appear to qualify for a student visa, a B-2 visa may be issued for this purpose of travel.

## 9 FAM 402.5-5(R)(4)  (U) Admitted Student Traveling Without Form I-20

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A signed hard copy Form I-20 must be presented at the POE for a student to be admitted in F or M status.

b. **(U)** When a student has documentary evidence that admission to a school has been granted, and when circumstances warrant visa issuance before the hard copy Form I-20 has been received, you may issue an F-1 visa based on the electronic SEVIS record.  The electronic SEVIS record must show that the visa applicant is in INITIAL or ACTIVE student status and that the SEVIS I-901 fee has been paid.  Enter a case note stating that you have reviewed the electronic SEVIS record and advised the student to carry the hard copy Form I-20 when travelling.

# 9 FAM 402.5-6  (U) EXCHANGE VISITORS – J VISAS

## 9 FAM 402.5-6(A)  (U) Statutory and  Regulatory Authorities

### 9 FAM 402.5-6(A)(1)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 101(a)(15)(J) (8 U.S.C. 1101(a)(15)(J)); INA 212(e) (8 U.S.C. 1182(e)); INA 212(j) (8 U.S.C. 1182(j)); INA 214(b) (8 U.S.C. 1184(b)); INA 214(l) (8 U.S.C. 1184(l)).

AAUP-00394

JA2062

# 9 FAM 402.5-6(A)(2)  Code of Federal Regulations

*(CT:VISA-1;  11-18-2015)*

**(U)** 22 CFR 41.62; 22 CFR 41.63; 22 CFR Part 62.

# 9 FAM 402.5-6(B)  (U) The Exchange Visitor Program

## 9 FAM 402.5-6(B)(1)  (U) Overview

*(CT:VISA-2048;  08-15-2024)*

a. **(U)** The purpose of the Exchange Visitor Program (J visa program) is to further the foreign policy interests of the United States by increasing the mutual understanding between the people of the United States and the people of other countries by means of mutual educational and cultural exchanges.  The goal is to meet this purpose while protecting the health, safety, and welfare of the foreign nationals participating in the Program as exchange visitors.  Only organizations that have been designated by ECA, may participate.

b. **(U)** The Exchange Visitor Program is administered under the oversight of the Deputy Assistant Secretary for Private Sector Exchange.  The Office of Private Sector Exchange Designation, the Office of Exchange Coordination and Compliance, and the Office of Private Sector Exchange Administration are located at:

> Bureau of Educational and Cultural Affairs
> Department of State
> State Annex SA-4E
> 2430 E Street, NW
> Washington, DC  20522

c. **(U)** Detailed guidance can be found on the Exchange Visitor Program at j1visa.state.gov.

## 9 FAM 402.5-6(B)(2)  (U) Mandatory Exchange Visitor Classification in Certain Cases

*(CT:VISA-2048;  08-15-2024)*

a. **(U)** Participants in exchange visitor programs sponsored by USAID (program serial numbers G-1 and G-2, respectively) are supported by U.S. government funding.  These participants must be documented as exchange visitors (J visa) rather than in another visa category (such as F-1 student), even if they qualify for that visa category.  Participants in exchange visitor programs sponsored by other U.S. government agencies (program serial number G-3) or participants in a federally funded national research and development center program (program serial number G-7), must also be documented as exchange visitors if participation is directly financed in whole or in part by the sponsoring agency.  The only exception to these rules requiring J classification is for an applicant who would otherwise qualify for an A-1 or A-2 visa.  Such

AAUP-00395

JA2063

applicants must always be issued A visas, rather than J visas, regardless of the funding of their travel.  See 9 FAM 402.3-4(A) regarding the rule that there is no alternative to A or G visa classification.  Contact CA/VO/F/ET for additional guidance, if required.

b. **(U)** You may receive visa applications from individuals seeking to participate in exchange programs or conferences that will be funded by a U.S. government agency, but the applicant does not present a Form DS-2019 as the program does not have ECA designation.  As such, these applications cannot qualify for J-1 classification.  You must determine whether the applicant qualifies for another visa classification appropriate for the purpose of travel, usually a B visa.  See 9 FAM 402.2-5(B).  Do not instruct applicants that they must apply for a J-1 visa, even if the planned travel is funded by the U.S. government, if the program does not have an ECA designation.  Contact L/CA with classification-specific questions.

# 9 FAM 402.5-6(C)  (U) Qualifying for an Exchange Visitor Visa (J-1)

*(CT:VISA-2048;   08-15-2024)*

**(U)** An applicant applying for a visa under INA 101(a)(15)(J) must meet the following requirements to qualify for an exchange visitor visa:

(1) **(U)** Acceptance to a designated exchange visitor program, as evidenced by presentation of Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status (see 9 FAM 402.5-6(D) below);

(2) **(U)** Sufficient funds, or adequate arrangements made by a host organization, to cover expenses;

(3) **(U)** Sufficient proficiency in the English language to participate in their program and compliance with the requirements of INA 212(j) (see 9 FAM 402.5-6(G) below);

(4) **(U)** Present intent to leave the United States at conclusion of program (see 9 FAM 402.5-6(F) below);

(5) **(U)** Possession of qualifications for the program offered (see 9 FAM 402.5-6(E) below); and

(6) **(U)** Compliance with INA 212(e) if applicable (see 9 FAM 302.13-2 and 22 CFR 41.63).  Annotate the Form DS-2019 (see 9 FAM 402.5-6(D)(2) paragraph b below and annotate the visa (see 9 FAM 402.5-6(I)(6) below) accordingly.

JA2064

AAUP-00396

# 9 FAM 402.5-6(D)  (U) Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-Nonimmigrant) Status

## 9 FAM 402.5-6(D)(1)  (U) The Basic Form

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-Nonimmigrant) Status, is the document required to support an application for an exchange visitor visa (J-1).  It is a two-page document which can only be produced through SEVIS.  SEVIS is the DHS database developed to collect information on F, M, and J visa holders (see 9 FAM 402.5-4 above and 9 FAM 402.5-6(J) below).  The prospective exchange visitor's signature on page one of the Form DS-2019 is required.  Page two of Form DS-2019 consists of instructions and certification language relating to participation.  Form DS-2019 is generated with a unique identifier known as a "SEVIS ID number" in the top right-hand corner, which consists of an "alpha" character (N) and 10 numerical characters (e.g., N0002123457).

b. **(U)** ECA/EC/D designates U.S. organizations to conduct exchange visitor programs.  These organizations are known as program sponsors.  Designated sponsors have access to SEVIS and the capability of generating Form*s* DS-2019 from SEVIS.  Effective April 27, 2023, designated sponsors are permitted to use digital signatures and electronically transmit Form DS-2019 directly to exchange visitors. As of this date, consular sections should accept printed versions of the digitally signed copy of Form DS-2019 for all J applicants.  Sponsors also may print, physically sign paper forms in any color ink, and continue to mail the forms or scan the signed forms (e.g., into portable document format (PDF) files) and transmit them electronically.  Sponsors may also digitally sign and electronically transmit Forms DS-2019 to eligible J-2 spouses or children of an exchange visitor.

c. **(U)** J visa applicants must continue to present a signed paper Form DS-2019 at their visa interview and at the POE when they travel to the United States.  If there are minor errors on the form (e.g., a program begin date that is off by one day), you can process the case using that form.  You must verify the applicant's SEVIS record in the SEVIS report in CCD.  If corrections are needed, they may be made electronically; there is no need to request a new hard copy of the Form DS-2019.  Make a case note to alert CBP that the electronic record has been updated.  Once the visa is issued, however, the SEVIS record cannot be updated until the participant's program is validated ("Active" in SEVIS).  See 22 CFR 62.13(a).  The sponsor is required to update the SEVIS record upon the exchange visitor's entry and no corrections to the record can be made until that time.  In addition, in the event a visa is needed for a spouse or a minor child and the primary's J-1 visa has already been issued, the system will not permit new Forms DS-2019 to be created until after the sponsor validates the primary applicant's SEVIS record.

JA2065

## 9 FAM 402.5-6(D)(2)  (U) Processing of Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status

*(CT:VISA-1741;   03-30-2023)*

a. **(U)** The Form DS-2019, also known as Certificate of Eligibility for Exchange Visitor (J-1) Status, indicates the visa applicant understands all conditions of the stay in the United States in J status and understands also that a consular or immigration officer will make a preliminary determination as to whether the applicant is subject to the two-year home country physical presence requirement.  Before the visa is issued, the applicant must sign the bottom of page one of the Form DS-2019 certifying they agree to comply with that requirement if it is determined to be applicable.

b. **(U)** A consular or immigration officer makes the preliminary determination regarding the applicability to the two-year home country physical presence requirement under INA 212(e) after a personal interview with the individual unless personal appearance has been waived under 9 FAM 403.5-4(A).  The consular or immigration officer signs page one of Form DS-2019 indicating the determination made by the officer.  The Department*'s* Waiver Review Division (CA/VO/DO/W) reserves the authority to make the final determination whether to issue a favorable recommendation to DHS to waive the two-year requirement under INA 212(e).

## 9 FAM 402.5-6(D)(3)  (U) Serial Numbers of Designated Exchange Visitor Programs

*(CT:VISA-2048;   08-15-2024)*

**(U)** When ECA/EC/D designates an organization or agency as a sponsor, it is enrolled in SEVIS and assigned a unique program serial number (referred to as the program number) that is used to identify the specific program.  The sponsor number is assigned based upon the following series:

(1)  **(U)** G-1—Department of State;

(2)  **(U)** G-2—U.S. Agency for International Development (USAID);

(3)  **(U)** G-3—Other U.S. Federal agencies;

(4)  **(U)** G-4—International agencies or organizations in which the U.S. government participates;

(5)  **(U)** G-5—Other national, State, or local government agencies;

(6)  **(U)** G-7—Federally funded national research and development center or a U.S. Federal laboratory;

(7)  **(U)** P-1—Educational institutions, e.g., schools, colleges, universities, seminaries, libraries, museums, and institutions devoted to scientific and technological research;

(8)  **(U)** P-2—Hospitals and related institutions;

JA2066

       AAUP-00398       

(9) **(U)** P-3—Nonprofit organizations, associations, foundations, and institutions (academic institutions conducting training programs can be classified as a P-3 if they are nonprofit); and

(10) **(U)** P-4—For-profit organizations (business and industrial concerns).

## 9 FAM 402.5-6(D)(4)  (U) Requirement for Form DS-2019 in Case of Spouse and/or Minor, Unmarried Children

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** Each accompanying J-2 spouse or child of a principal J-1 is required to have a separate Form DS-2019 issued by the program sponsor and will have their own unique SEVIS ID number.  You may not issue dependent J-2 visas based on the principal's (J-1's) Form DS-2019.

b. **(U)** A minor, unmarried child qualified for J-2 status is not required to qualify under INA 101(a)(15)(F)(i) as a nonimmigrant student even though the child will attend school while accompanying the principal J-1.  See 9 FAM 402.1-5(C).

c.  **(U)** The J-2 applicant must present their Form DS-2019 to you during the visa interview, and to the U.S. Customs and Border Protection (CBP) officer at the POE.

d. **(U)** Participants in the Summer Work Travel, camp counselor, au pair, and high school exchange programs are not expected to be accompanied by dependents.  If you receive a Form DS-2019 supporting a J-2 visa application from an individual claiming such status, contact CA/VO/F/ET for guidance.

## 9 FAM 402.5-6(D)(5)  (U) Processing of Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, at Port of Entry (POE)

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** After a J-1 visa has been issued, return the completed Form DS-2019 to the exchange visitor.  Inform the exchange visitor that they must carry Form DS-2019 on their person for presentation to the CBP officer at the U.S. POE.  At each admission to the United States, an exchange visitor must present the Form DS-2019 along with the visa to the CBP officer.  Upon the exchange visitor's arrival in the United States, the CBP officer will examine the visa, the Form DS-2019, and any supporting documentation and return the documents to the exchange visitor.

b. **(U)** If the exchange visitor is admitted, DHS will return the Form DS-2019 to the individual.  The exchange visitor must always safeguard the form.  If the exchange visitor loses the Form DS-2019, they must obtain a replacement from the designated sponsor.

AAUP-00399

JA2067

## 9 FAM 402.5-6(D)(6)  (U) Sample Form DS-2019

*(CT:VISA-1090;   06-24-2020)*

a. **(U) J-1 Principal Applicant Sample:**  For a sample of a properly completed DS-2019 for a J-1 Principal, click here, Sample DS-2019 for J-1.

b. **(U) J-2 Dependent Sample:**  For a sample of a properly completed DS-2019 for a J-2 dependent click here, Sample DS-2019 for J-2.

## 9 FAM 402.5-6(D)(7)  (U) Form DS-7002, Training/Internship Placement Plan

*(CT:VISA-1837;   09-26-2023)*

a. **(U)** The Form DS-7002, Training/Internship Placement Plan (T/IPP), is designed to standardize applications in the Trainee, Intern, and College and University Student Intern categories and to increase transparency and accountability and curb potential abuse by having all three concerned parties— the exchange visitor, the U.S. sponsor, and the entity providing the training or internship sign the Form DS-7002 acknowledging the program plan and their regulatory responsibilities.

b. **(U)** You may wish to use the Form DS-7002 to help in formulating interview questions, but you are not required to verify the contents of the form.

c.  **(U)** Electronic signatures (including faxed signatures) are permissible on Form DS-7002, and you should accept these as they adjudicate applications.

d. **(U)** The form requires each participant to have U.S. contact information.  As some prospective exchange program participants may not have this information at the visa interview, you may accept the contact details for the participant's host organization in the United States instead.

## 9 FAM 402.5-6(D)(8)  (U) Sample Form DS-7002

*(CT:VISA-1741;   03-30-2023)*

**(U)** To see the Form DS-7002 see myData.

# 9 FAM 402.5-6(E)  (U) Categories of Exchange Visitors

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** At present, the Department has 15 exchange categories in which foreign nationals may participate.  Participants may only engage in activities authorized for their program.

b. **(U)** The following sections list these categories in alphabetical order with a brief description of key points.

c.  **(U)** The presentation of a valid Form DS-2019 by the visa applicant constitutes evidence that the individual was determined by the designated U.S. program sponsor to be qualified to participate in the specific exchange

JA2068

AAUP-00400

program.  Verify the Form DS-2019 in the electronic SEVIS report in the CCD and determine that the applicant's record is in either INITIAL or ACTIVE status and that the SEVIS I-901 fee has been paid.  Also note the program end date as it appears in the electronic record and ensure that the J visa is issued with a validity that corresponds to the program end or to the reciprocity schedule for the country of the applicant's nationality, whichever is shorter.  See 9 FAM 402.5-6(I)(6).

## 9 FAM 402.5-6(E)(1)  (U) Noncitizen Physician

*(CT:VISA-1628;   09-13-2022)*

a. **(U) Noncitizen Physician:**  This category is for foreign national medical graduates pursuing American medical board certification through graduate education and training at accredited U.S. schools of medicine or other U.S. institutions through a clinical exchange program.

b. **(U)** The Educational Commission for Foreign Medical Graduates (ECFMG) is the only program sponsor authorized to use this category.  Foreign medical graduates under this category must successfully complete examinations administered by ECFMG that measure their command of English and the medical sciences.

c. **(U)** All foreign medical graduates sponsored in the category of Alien Physician are subject to the 2-year home-country physical presence requirement.  See 9 FAM 402.5-6(L) below.

d. **(U) Exception to ECFMG sponsorship:**  A foreign physician may be sponsored by a designated sponsor other than ECFMG (e.g., a U.S. university, academic medical center, school of public health, or other public health institution) as a "research scholar" only if the dean of the accredited U.S. medical school or their designee certifies the following 5 points, and such certification is appended to the Form DS-2019 issued to the prospective exchange visitor Alien Physician:

   (1)  **(U)** The program is predominantly involved with observation, consultation, teaching, or research;

   (2)  **(U)** Any incidental patient contact will be under the direct supervision of a U.S. citizen or LPR physician who is licensed to practice medicine in the State in which the activity is taking place;

   (3)  **(U)** The foreign national physician will not be given final responsibility for the diagnosis and treatment of patients;

   (4)  **(U)** Any activities will conform fully with the State licensing requirements and regulations for medical and health care professionals in the State in which the program is being pursued; and

   (5)  **(U)** Any experience gained will not be credited towards any clinical requirements for medical specialty board certification.  In such cases, the program sponsor's letter of designation will explicitly authorize the sponsor to issue Form DS-2019 using the Research Scholar category.

AAUP-00401

JA2069

The duration of participation as a Research Scholar is limited to 5 years unless the Department approves a program extension for a G-7-sponsored exchange visitor.

e. **(U) Duration:**  The duration of participation is limited to seven years, unless specifically authorized by the Department (ECA/EC).  Such authorization will be indicated by an active SEVIS status with the same SEVIS number and an extended program end date.

f. **(U)** Exchange Visitor Program Regulation**:**  See 22 CFR 62.27.

## 9 FAM 402.5-6(E)(2)  (U) Au Pair

*(CT:VISA-1837;   09-26-2023)*

a. **(U) Au Pair:**  This category is for a foreign national age 18-26 entering the United States for a period of one year to reside with an American host family, or the family of an LPR, while participating in their home life and providing limited childcare services.  Au Pair applicants who are 26 years of age at the time of the program start date are eligible to participate in the Au Pair program.  The Au Pair is also required to enroll and attend classes offered by an accredited U.S. postsecondary institution for not less than 6 semester hours of academic credit, or the equivalent.  As a condition of participation, host-families must agree to facilitate the enrollment and attendance of the Au Pair and to pay the cost of such academic course work in an amount not to exceed $500.  Au Pairs may enroll in appropriate course work after they arrive on the program and are not required to have a plan in place at the time of visa interview for the course work they intend to enroll in. Failure to adhere to the education component is grounds for termination of the Au Pair from the program by the sponsor.

b. **(U) EduCare:**  The regulations governing the Au Pair category were amended to create a subcategory called EduCare.  This component is specifically designed for families with school-aged children requiring limited childcare assistance.  Au Pairs participating in the EduCare component may not be placed with families having pre-school-aged children unless alternative arrangements are in place for these children.  EduCare participants may not work more than 10 hours a day/30 hours a week.  They must complete a minimum of 12 semester hours of academic credit, or its equivalent, during their program.  Host families provide the first $1,000 to the Au Pair toward the cost of the educational component.  EduCare Au Pairs may enroll in appropriate course work after they arrive on the program and are not required to have a plan in place at the time of visa interview for the course work, they intend to enroll in.

c.  **(U) No Family Placement:**  Au Pairs are not to be placed in the homes of family/relatives, irrespective of the distance in relations (e.g., third cousin, great aunt and/or uncle, etc.).

d. **(U) Duration:**  The duration of participation is limited to one year/one sponsor only, unless specifically authorized by the Department (ECA/EC).

<span style="color:red; font-size:2em;">JA2070</span>

AAUP-00402

Such authorization will be indicated by an active SEVIS status with the same SEVIS number as the applicant's initial Au Pair program, and an extended program end date.

e. **(U) Extension of program:**  Designated Au Pair sponsors may request that an Au Pair be granted an extension of program participation beyond the original twelve months.  Au Pair sponsors may request an Au Pair be granted an additional 6-, 9-, or 12-month extension of program participation.  The applicant's age is not a barrier to program extension if they were 18-26 years of age at the time of the initial program start date.

f. **(U) Repeat Participation:**  A foreign national who successfully completed an Au Pair program is eligible to participate again as an Au Pair, including a participant who was granted an extension of an initial program, if they had resided outside the United States for at least two years following completion (program end date) of their initial Au Pair program.  The repeat participant must qualify as an Au Pair under the same rules as an initial participant.

g. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.31.

## 9 FAM 402.5-6(E)(3)  (U) Camp Counselor

*(CT:VISA-1628;   09-13-2022)*

a. **(U) Camp Counselor:**

   (1) **(U)** This category is for a foreign national selected to be a counselor in an accredited U.S. summer camp (during the U.S. summer months) who imparts skills to American campers and information about their country or culture.

   (2) **(U)** Foreign nationals who apply for this program must be bona fide youth workers, students, teachers, or individuals with specialized skills.

   (3) **(U)** While the minimum age of the foreign national is 18 years, there is no maximum age for this category.

   (4) **(U)** While it is recognized that some non-counseling chores are an essential part of camp life for all counselors, this program is not intended to assist American camps in bringing in foreign nationals to serve as administrative personnel, cooks, nurses, physicians, or menial laborers, such as dishwashers or janitors.

b. **(U) Duration:**  The duration of participation must not exceed 4 months.

c. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.30.

## 9 FAM 402.5-6(E)(4)  (U) Government Visitor

*(CT:VISA-1;   11-18-2015)*

a. **(U) Government Visitor:**  This category is for a foreign national who is recognized as an influential or distinguished person in their own country, and who is selected by a Federal, State, or local government agency to participate

AAUP-00403

JA2071

in observation tours, discussions, consultations, professional meetings, conferences, workshops, and travel.

b. **(U)** This category is for the "exclusive use" of United States Federal, State, and local government agencies.

c. **(U) Duration:**  The duration of participation must not exceed 18 months.

d. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.29.

## 9 FAM 402.5-6(E)(5)  (U) Intern

*(CT:VISA-2058;   08-29-2024)*

a. **(U) Intern:**

(1) **(U) The Intern category aims:**  to strengthen U.S. public diplomacy by expanding opportunities for substantive programming for foreign students and professionals; to enhance the skills and expertise of exchange visitors in their academic or occupational fields; to improve participants' knowledge of American techniques, methodologies, and technologies; and to increase participants' understanding of American society and culture.  The requirements in the Intern program regulations are designed to distinguish between a period of work-based learning in the intern's academic field, which is permitted, and casual and unskilled labor, which is not.

(2) **(U)** This category is for a foreign national who is either currently enrolled in and pursuing studies at a degree- or certificate-granting postsecondary academic institution outside the United States or who graduated from such an institution no more than 12 months before their exchange visitor program start date, and who enters the United States to participate in a structured and guided work-based internship in their specific academic field.

c. **(U) Duration:**  The duration of participation must not exceed twelve months.

d. **(U) Program exclusions:**  Sponsors must not:

(1) **(U)** Place Interns in unskilled or casual labor positions; in positions that require or involve childcare or elder care; or in clinical or any other kind of work that involves patient care or contact, including any work that would require them to provide therapy, medication, or other clinical or medical care (e.g., sports or physical therapy, psychological counseling, nursing, dentistry, veterinary medicine, social work, speech therapy, or early childhood education;

(2) **(U)** Place Interns in the field of aviation;

(3) **(U)** Place Interns in positions, occupations, or businesses that could bring the Exchange Visitor Program or the Department into notoriety or disrepute;

(4) **(U)** Engage or otherwise cooperate or contract with a domestic staffing/employment agency in the United States to recruit, screen,

<span style="color:red; font-size:2em;">JA2072</span>

AAUP-00404

orient, place, evaluate, or train Trainees or Interns, or in any other way involve such agencies in an Exchange Visitor Program training or internship program.

e. **(U) Program requirements:**  Sponsors must:

    (1) **(U)** Ensure that the duties of Trainees or Interns as outlined in a Trainee/Internship Placement Plans (T/IPP Form DS-7002) will not involve more than 20 percent clerical work, and that all tasks assigned to Trainees or Interns are necessary for the completion of training and internship program assignments; and

    (2) **(U)** Ensure that all "hospitality and tourism" training and internship programs of 6 months or longer contain at least 3 departmental or functional rotations.

f. **(U) Program Fees:**  Program regulations do not address the fee amount that a program sponsor may charge an exchange visitor to participate in Intern programs, and each program sponsor may set its fees based on its business model.

g. **(U) Training/Internship Placement Plan (T/IPP):**  Sponsors must complete and obtain requisite signatures for a Form DS-7002, Training/Internship Placement Plan, for each intern before issuing a Form DS-2019.  Upon request, visa applicants must present their fully executed Form DS-7002 to the adjudicator during the visa interview.  See [9 FAM 402.5-6(D)(7)](#) above for information on the T/IPP.

h. **(U) Repeat Participation:**

    (1) **(U)** A foreign national can participate in additional internship programs to develop more advanced skills or in a different field of expertise if they maintain student status or begin a new internship program within 12 months of graduation from an academic institution outside the United States.

    (2) **(U)** Participants who have successfully completed an internship program and no longer meet the selection criteria for internship programs may participate in a training program after a two-year period of residency outside the United States following their internship program.  This two-year period should not be confused with the two-year home-country physical presence requirement under INA 212(e) ([9 FAM 402.5-6(L)](#) below).

i. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.22.

j. **(U) Twelve Month Intern Work and Travel (IWT) Program:**

    (1) **(U)** The IWT program began on October 31, 2008, following signing of a Memorandum of Understanding (MOU) by the governments of the United States and Ireland.  IWT was a pilot program initially.  In December 2016, pilot status was lifted.  In January 2023, the MOU was amended to extend the program until January 30, 202*8*.

<div align="center">

JA2073

</div>

AAUP-00405

(2)  **(U)** Citizens of Ireland, who have completed Level VI of the Irish Higher Education System, may participate in the IWT Program, which is governed by existing Intern category regulations in 22 CFR 62.22 and applicable program rules, except for participant placement.  A participant must be a bona fide postsecondary student (i.e., an Irish citizen who will commence their program in the United States within 12 months of the conferring date indicated on their scroll) and provide evidence from the appropriate postsecondary institution to this effect.

(3)  **(U)** IWT Program participants are not required to have site of activity placement before entering the United States, and as such, applicants without placement will not have a Form DS-7002, Training/Internship Placement Plan, at the time of visa interview.  Program sponsors must ensure that participants have placement within 90 days of arrival.  Sponsors must enter "IWT Program" in the Subject Field Remarks box (box #4) of Form DS-2019.

(4)  **(U)** Vocational students pursuing studies at a tertiary level accredited academic institution are not eligible for participation unless such vocational study is part of a structured program leading to a degree or other credential recognized as equivalent to Level VI of the Irish Higher Education System and unless at least 50 percent or their coursework is academic.

(5)  **(U)** The maximum program length is 12 months.  No program extensions are permitted.

(6)  **(U)** IWT Program participants are not permitted to be accompanied by a spouse or dependent children.

k.  **(U) Twelve Month Intern Trainee Program - Austria**

(1)  **(U)** The Professional Development and Cultural Exchange Program with the Republic of Austria began on January 31, 2024, following signing of a Memorandum of Understanding (MOU) by the governments of the United States and the Republic of Austria;

(2)  **(U)** Austrian exchange visitors will be placed as Interns or Trainees for periods of between six (6) and twelve (12) months at up to two U.S. private companies or non-profit institutions;

(3)  **(U)** Austrian exchange visitors must have at least two rotations in their program, evenly divided over the length of their program. The second rotation must build upon the exchange visitor's field of study, a closely related field, or previous rotation and must give the exchange visitor more responsibility than in the first rotation.  The second rotation may be at the same placement institution as the first rotation;

(4)  **(U)** Program participants must be citizens of the Republic of Austria, be 18 to 30 years of age, and have a working knowledge of English.  Austrian exchange visitors are permitted to be currently enrolled in or have recently completed (within 12 months of graduation) studies in an

JA2074

Austrian-accredited post-secondary or dual/vocational education program outside the United States;

(5) **(U)** Austrian exchange visitors are required to have a placement before entering the United States. Upon request, applicants must provide a fully executed copy of Form DS-7002, Training/Internship Placement Plan, at the time of visa interview;

(6) **(U)** The maximum length of program is 12 months. No program extensions are permitted, nor may participants take part in an additional J-Visa training program unless in accordance with 22 CFR 62.22(n); and

(7) **(U)** Austrian participants are not permitted to be accompanied by a spouse or dependent children unless the dependents also are J-1 visa exchange visitors.

## 9 FAM 402.5-6(E)(6)  (U) International Visitor

*(CT:VISA-1628;  09-13-2022)*

a. **(U) International Visitor:**  This category is for the exclusive use of the U.S. Department of State.  It is for an individual who is a recognized or potential leader in their own country and is selected by the Department to participate in observation tours, discussions, consultation, professional meetings, conferences, workshops, and travel.

b. **(U) Duration:**  The duration of participation must not exceed one year.

c. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.28.

## 9 FAM 402.5-6(E)(7)  (U) Professor

*(CT:VISA-1741;  03-30-2023)*

a. **(U) Professor:**  This category is for an individual who is engaged primarily in teaching, lecturing, observing, or consulting at accredited post-secondary academic institutions, museums, libraries, or similar institutions.  The professor may also conduct research and participate in occasional lectures if authorized by the program sponsor.

b. **(U)** The professor's appointment to a position must be temporary, even if the position itself is permanent.  The individual must not be a candidate for a tenure-tracked position.

c. **(U) Duration:**  The duration of participation must not exceed five years unless the participant is directly sponsored by a federally funded national research and development center or a U.S. federal laboratory (program serial number G-7).

d. **(U) Repeat Participation:**  Exchange visitors who have participated in Professor or Research Scholar exchange programs and who have completed their programs are not eligible to participate in another Professor or Research Scholar programs for a period of two years following the program end date, as governed by regulation set forth in 22 CFR 62.20(i)(2).  This regulation

AAUP-00407

JA2075

differs from the two-year home-country physical presence requirement to which certain former exchange visitors are subject under INA 212(e). See 9 FAM 402.5-6(L) below.

e. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.20.

## 9 FAM 402.5-6(E)(8)  (U) Research Scholar

*(CT:VISA-1837;   09-26-2023)*

a. **(U) Research Scholar:**  This category is for an individual whose primary purpose of travel is to conduct research, observe, or consult in connection with a research project at research institutions, corporate research facilities, museums, libraries, post-secondary accredited academic institutions, or similar institutions.  The Research Scholar may also teach or lecture, unless disallowed by the sponsor.  The Research Scholar's appointment to a position must be temporary, even if the position itself is permanent.  The individual must not be a candidate for a tenure-tracked position.

b. **(U)** Minimum qualifications for this category are a bachelor's degree with appropriate experience in the field in which research is to be conducted.

c.  **(U) Duration:**  The duration of participation must not exceed 5 years unless the participant is directly sponsored by a federally funded national research and development center or a U.S. federal laboratory (program serial number G-7).

d. **(U) Repeat Participation:**  Exchange visitors who have participated in Professor or Research Scholar programs and who have completed their programs are not eligible to participate in another Professor or Research Scholar program for a period of two years following the program end date, as governed by regulation set forth in 22 CFR 62.20(i)(2).  This regulation differs from the two-year home-country physical presence requirement to which certain former exchange visitors are subject under INA 212(e). See 9 FAM 402.5-6(L).

e. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.20.

## 9 FAM 402.5-6(E)(9)  (U) Short-Term Scholar

*(CT:VISA-1837;   09-26-2023)*

a. **(U) Short-Term Scholar:**  This category is for a foreign national who is a professor, research scholar, or person with similar education or accomplishments coming to the United States on a short-term visit to lecture, observe, consult, train, or demonstrate special skills at research institutions, museums, libraries, post-secondary accredited academic institutions, or similar institution.

b. **(U)** Exchange visitors who have recently participated in an exchange program as a Professor or Research Scholar in the United States are not expected to attempt to reenter the United States as a Short-Term Scholar to rejoin their

JA2076

AAUP-00408

original sponsor as this would be a continuation of their original program objective.

c.  **(U) Duration:**  The duration of participation must not exceed 6 months.  No program extensions are permitted.

d. **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.21.

## 9 FAM 402.5-6(E)(10)  (U) Specialist

*(CT:VISA-2069;   09-16-2024)*

a. **(U) Specialist:**  This category is for a foreign national who is an expert in a field of specialized knowledge or skill coming to the United States to observe, consult, or demonstrate their special skills except as:

(1)  **(U)** Research Scholars and Professors, who are governed by regulations set forth in 22 CFR 62.20;

(2)  **(U)** Short-Term Scholars, who are governed by regulations set forth in 22 CFR 62.21; and

(3)  **(U)** Alien Physicians in graduate medical education or training, who are governed by regulations set forth in 22 CFR 62.27.

b. **(U) Duration:**  Participation must not exceed one year.  Within the Specialist category there are nine program numbers with approved exceptions to this one-year duration.

(1)  **(U)** The first eight excepted program numbers are for: Israeli Specialists under the Jewish Agency-American Section Inc. (P-3-37641) and the World Zionist Organization (P-3-04530); Japanese language Specialists under the Laurasian Institute (P-3-05588) and the Institute of International Education (P-3-14039); Specialists under the East-West Center (P-3-10434); Specialists under the Middle East Broadcasting Network (P-3-13019); Specialists under the U.S. Agency for Global Media (G-3-00366) and Specialists under the U.S. Department of Energy (G-3-00348).  For these eight excepted program numbers, the duration of participation is three years, and the visa should usually be issued for the full three years.  Note: the program dates listed on the Form DS-2019 in Box 3 will be one year in length.  However, both the Form DS-2019 and the SEVIS record will include a notation that the program has a three-year duration.  The visa should be set to expire two years after the program end date listed in Box 3 on the Form DS-2019.

(2)  **(U)** The ninth excepted program is the German American Partnership Program (GAPP) (P-3-43541).  Participation in the GAPP must not exceed three years and the visa should usually be issued for three years as stated in Box 3 on the Form DS-2019.

(3)  **(U)** Specialists under the GAPP (P-3-43541), Middle East Broadcasting Network (P-3-13019), and U.S. Agency for Global Media(G-3-00366) are permitted one three-year repeat of program.

JA2077

AAUP-00409

c.  **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.26.

## 9 FAM 402.5-6(E)(11)  (U) Students

*(CT:VISA-2048;   08-15-2024)*

a. **(U) Secondary School Student:**

(1)  **(U)** This category affords foreign secondary school students an opportunity to study for an academic semester or an academic year in a U.S. accredited public or private secondary school while living with an American host family or residing at an accredited U.S. boarding school. Participants in this category must meet the following requirements:

(a)  **(U)** Be a secondary school student in their home country who has not completed more than 11 years of primary and secondary study excluding kindergarten; or

(b)  **(U)** Be at least the age of 15 but not more than 18-1/2 years of age as of the program start date; and

(c)  **(U)** Has not previously participated in an academic year or semester Secondary School Student exchange program in the United States or attended school in the United States in either F-1 or J-1 visa status. Screening by the program sponsor of factors such as English language proficiency, maturity, character, and scholastic aptitude are critical.

(2)  **(U)** Sponsors are required to secure host family placement before the student's departure from their home country.  This does not need to happen before visa issuance because it may occur after the student's visa interview.  As a result, the student's Form DS-2019 may list the sponsor's contact information instead of the host family's contact information.

(3)  **(U) Duration:**  Participation is a minimum of one academic semester or a maximum of one academic year.  Sponsors are permitted to issue a Form DS-2019 for an academic semester or academic year.  When a student is from a country whose school calendar is opposite that of the United States, a sponsor can issue a Form DS-2019 for a calendar year cycle.

b. **(U) College and University/Students:**

(1) To participate, a foreign individual must intend to:

(a)  **(U)** Pursue a full course of study leading to or culminating in the award of a U.S. degree from a post-secondary accredited academic institution; or engage full-time in a prescribed course of study in a non-degree program of up to 24 months duration conducted by a post-secondary accredited academic institution; or

(b)  **(U)** Engage in English language training at a post-secondary accredited academic institution, or an institute approved by or

JA2078

AAUP-00410

acceptable to the post-secondary accredited academic institution where the college or university student is to be enrolled upon completion of the language training. A Form DS-2019 for language training can only be issued if the student is fully funded by the student's home government.

(2) **(U)** Exchange visitors participating in the College and University Student category must be supported substantially by funding from any source other than personal or family funds.

(3) **(U) Duration:** Duration of participation is determined by whether the exchange visitor is a degree or non-degree student. An explanation of each is provided in paragraphs c and d below.

c. **(U) Degree Students:** College and University Students who are in degree programs ("Student Associate," "Student Bachelors," "Student Masters," or "Student Doctorate," as stated on the Form DS-2019 and in SEVIS) may be authorized to participate in the Exchange Visitor Program for an unlimited length of time, if they are either:

(1) **(U)** Studying at the post-secondary accredited academic institution listed on their Form DS-2019 and are:

(a) **(U)** Pursuing a full course of study as set forth in 22 CFR 62.23(e); and

(b) **(U)** Maintaining satisfactory advancement towards the completion of their academic program; or

(2) **(U)** Participating in an authorized academic training program as permitted in 22 CFR 62.23(f).

d. **(U) Nondegree Students:** College and University Students who are nondegree students may be authorized to participate in the Exchange Visitor Program for up to 24 months, if they are either:

(1) **(U)** Studying at the post-secondary accredited academic institution listed on their Form DS-2019 and are:

(a) **(U)** Participating full time in a prescribed course of study; and

(b) **(U)** Maintaining satisfactory advancement towards the completion of their academic program; or

(2) **(U)** Participating in an authorized academic training program as permitted in 22 CFR 62.23(f).

e. **(U) Student Intern Subcategory:**

(1) **(U)** Department-designated U.S. colleges and universities can administer internship programs substantially like those detailed herein under their J-1 College/University Student designation.

(2) **(U)** The Student Intern must be in good academic standing with the postsecondary academic institution outside the United States where they are enrolled and pursuing a degree.

JA2079

AAUP-00411

(3) **(U)** The Student Intern will return to her/his academic program and fulfill and obtain a degree from such academic institution after completion of the student internship program.

(4) **(U)** The program sponsor must fully complete and obtain requisite signatures for a Form DS-7002 for each Student Intern before issuing a Form DS-2019.  The sponsor must provide to each signatory an executed copy of the Form DS-7002.  Upon request, a Student Intern must present her/his fully executed Form DS-7002 to the you during the visa interview.

(5) **(U)** Several colleges and universities currently hold J-1 training designations and can be expected to issue Form DS-2019 and Form DS-7002 to applicants as Trainees per the current rulemaking and the program guidelines described herein.

(6) **(U)** The category of Trainee will be reflected on the Form DS-2019 if the sponsor is authorized for this category.

f.  **(U)** Exchange Visitor Program **Regulation:**  See 22 CFR 62.25 and 22 CFR 62.23.

## 9 FAM 402.5-6(E)(12)  (U) Summer Work Travel (SWT)

*(CT:VISA-2143;   03-26-2025)*

a. **(U) Qualifying for SWT:**  A participant is defined as a bona fide post-secondary student in the applicant's own or another foreign country if the applicant is currently enrolled and participating full time at an accredited post-secondary classroom-based academic institution at the time of the application, or as that status is defined by the educational system of the country.  Final year students are eligible to take part in this program during the school's major academic break immediately following their graduation if they apply to participate in the program before graduation.

(1) **(U)** An applicant must have completed at least one semester, or the quarter or trimester equivalent, of postsecondary education to be eligible to participate in this program.

(2) **(U)** Participants must demonstrate sufficient proficiency in English to enable them to not only carry out their job duties but also to interact effectively with law enforcement authorities and medical personnel, read rental agreements, carry on non-work-related conversations, etc.  It is appropriate to conduct SWT visa interviews in English to assess the applicant's proficiency.  U.S. sponsors may use video teleconferencing to conduct interviews with potential participants but assertions by the sponsor that an applicant meets the English language requirement are not alone sufficient to meet the burden of proof for this program requirement.

(3) **(U)** Unless they are final year students, participants must demonstrate that they are bona fide students who are maintaining student status and

JA2080

are actively pursuing their degree per their local educational system.

(4) **(U)** Unless the participant is a final year student, they must demonstrate that they will resume activities as a student after participation in the SWT program.

(5) **(U)** It is not necessary for the student to be enrolled in the same institution both before and after participating in SWT.  Students may participate if they are transferring from one school to another, if they have finished an academic program at one school and are going on to another full-time program, or if they are continuing to graduate school. Documentation, satisfactory to you, that applicants have been accepted for and will commence studies upon their return may be accepted to establish status as a continuing student.

(6) **(U)** Students attending vocational schools are usually not eligible for participation in the SWT program unless they can demonstrate that study in the vocational school will ultimately lead to a degree from a full-time post-secondary academic institution.

(7) **(U)** Students may participate in the program every year that they meet the definition of bona fide student but participation each year is limited to the shorter of four months or the length of the long break between academic years at the school they attend.

(8) **(U)** In no case should there be more than one SWT period per year identified in any country without the concurrence of both the Visa Office and ECA's Office of Private Programs.

b. **(U) SWT Sponsor Obligations:**

(1) **(U)** Designated U.S. sponsors of SWT exchange programs must not place program participants in jobs as described in 22 CFR 62.32(h).

(2) **(U)** U. S. sponsors must ensure that 100 percent of their non-Visa Waiver Program country participants have a confirmed, vetted job placement.  Job placements may be secured directly by the U.S. sponsor or through self-placement by the participant.  See Program Date Chart.

(3) **(U)** For SWT participants from Visa Waiver Program (VWP) countries for whom employment has not been pre-arranged, sponsors must:

(a) **(U)** Ensure that participants have sufficient financial resources to support themselves during their search for employment;

(b) **(U)** Provide participants with pre-departure information that explains how to seek employment and secure lodging in the United States;

(c) **(U)** Maintain and provide a roster of bona fide jobs that includes at least as many job listings as the number of participants entering the United States with pre-arranged and confirmed employment;

(d) **(U)** Undertake reasonable efforts to secure suitable employment for participants unable to find jobs on their own after 2 weeks of commencing the job search; and

JA2081

AAUP-00413

(e)  **(U)** Vet the job placement selected by the participant ***before*** the commencement of employment.

(4)  **(U)** All SWT participants should be cautioned to comply with their responsibility to inform their U.S. sponsor of their arrival and commencement at work and keep the sponsor informed of their whereabouts, should they change locations.  SWT participants who wish to change jobs or to accept an additional job must inform their U.S. sponsor of the desired job placement and wait for the sponsor to perform the same vetting and approval process as for the initial employment **before** beginning work.

c.  **(U) Duration of SWT Program:**

(1)  **(U)** The duration of participation in the SWT program must not exceed four months.  These four months must coincide with the exchange visitor's official academic school break between school years.  *W*hile the program may not be longer than four months, you are permitted to issue visas valid before the program start date.

(2)  **(U)** SWT programs are only permitted once a year during the long break between academic years.

d. **(U) SWT Outreach and Fraud Prevention Measures:**

(1)  **(U)** Designated U.S. sponsors are responsible for conducting the SWT program under the regulations at 22 CFR 62.32.  The U.S. sponsors play a vital outreach role by explaining to audiences of the receiving state the SWT program's purpose, how it is structured, its economic imperatives, and the checks in place to safeguard the welfare of foreign youth while in the United States.  You should seek to develop a good working relationship with U.S. sponsors, which will allow you to better reach local audiences and deal with any problems that come up later, after program participants have entered the United States; but ECA is responsible for managing the administrative relationship with the U.S. sponsors and will officially notify U.S. sponsors of their compliance responsibilities.

(2)  **(U)** The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("Wilberforce Act") requires you to ensure that applicants applying for J visas are made aware of their legal rights under U.S. Federal immigration, labor, and employment laws.  This includes information on the illegality of slavery, peonage, trafficking in persons, sexual assault, extortion, blackmail, and worker exploitation in the United States.  This information is available in the form of a physical "Know Your Rights" information pamphlet or a Quick Response (QR) code, which permits applicants to access an online version of the information pamphlet by scanning the code with their smartphone camera.  During the NIV interview, you must ask applicants if they prefer the QR code, the physical pamphlet, or both, and confirm that the information prepared by the Department has been received, read, and understood by the applicant.  Enter a case note in the NIV system stating the QR code and/or pamphlet was provided, and the applicant has

JA2082

AAUP-00414

acknowledged receipt and understanding of the pamphlet.  See 9 FAM 402.3-9(C)(1) for more information about Wilberforce Act enforcement.

(3) **(U)** It is important to ensure your fraud prevention measures stay within the parameters established by regulations.  You must allow any applicant with a valid Form DS-2019 to apply for a visa.  Each local SWT third-party contractor (foreign agent, recruiter, or partner) operating overseas must have executed a written agreement with the designated U.S. sponsor that explains the relationship between the sponsor and the contractor and identifies their respective obligations.  These agreements must include annually updated price lists for the services provided to the U.S. sponsors and confirm that they will not outsource any core programmatic functions or pay or provide other incentives to U.S. host employers.  ECA has created a "Foreign Entity Report" SharePoint site listing, by country, the designated U.S. sponsors and their affiliated local SWT third-party contractors. Sponsors are required to maintain a current listing of all third-party contractors on the Foreign Entity Report.  The Report must contain the names, addresses, and contact information (i.e., telephone numbers and email addresses) of all third-party contractors that assist the sponsors in fulfilling the provision of core program services.  Share information about misconduct by local third-party contractors with the relevant portfolio holders in CA/FPP and CA/VO/F (see the Who's Who pages on the CAWeb).  In turn, they will work with ECA's Office of Coordination and Compliance so that ECA can review and take appropriate action.

(4) **(U)** When you receive applications from previous SWT participants who failed to return in time for the start of their university classes, this fact may call into question their eligibility (whether they are in fact "bona fide students") for future J-1 visas.  That is the case even when the applicant departed the United States within 30 days of the completion of their exchange program and did not incur a U.S. immigration violation.  Each of these cases must be evaluated on its own merits.

e. **(U) Sample Handout for SWT Participants:**

Congratulations on your acceptance as an Exchange Visitor Program participant in a Summer Work Travel program.  This program is a cultural exchange, and your eligibility for program participation is based on your status as a foreign college/university student.  It is therefore very important that the program does not interfere with your studies and that you return to school in time for the first day of your classes.  Please take a moment to read the following information to ensure that you are familiar with certain requirements of the program.

What do the program BEGIN and END dates on my Form DS-2019 mean?

The program begin and end dates indicate when you may begin work and when you must stop working.  You may begin working at any point on or after the program start date, but you must end your work by the end date of the program.  Working beyond the program end date will impact your ability to participate in the program in future years.

How long before the program begin date may I enter the United States?

JA2083

You may enter the United States up to 30 days in advance of your program begin date but may not begin working until the program begin date is reached.  Please remember that participation in the program cannot prevent you from attending any scheduled classes or taking exams at your university.  If you miss any classes due to participation in the program, you will greatly jeopardize your chances of participating in the program.

How long after the program end date may I stay in the United States?

You have 30 days following the end date of your program to travel and/or to arrange for your return home.  You are not permitted to work during these 30 days, and if you leave the United States during this grace period, you will not be permitted to re-enter the United States on your J-1 visa because you will no longer be in J status.  Please keep in mind that it is your responsibility to return home in time for the start of your scheduled classes, no matter what your program end date is.

Can I switch jobs once I am in the United States?

Please check with your U.S. sponsor before making any changes in your employment.  If you change employment without the permission of your U.S. sponsor your status in the program may be terminated.

If your program is terminated, you must leave the United States immediately.

Can I work more than one job in the United States?

The Exchange Visitor Program regulations do not prohibit a participant from accepting a second job.  However, you must check with your U.S. sponsor before accepting a second job.  Your U.S. sponsor agency must approve and vet all jobs.

What if I have a complaint about the U.S. sponsor or my employer in the United States?

You may register complaints with the Department of State at jvisas@state.gov.  However, your U.S. sponsor has primary responsibility for your program.  If you have a complaint about your employer, you should first contact your U.S. sponsor for assistance.  Contact information for your U.S. sponsor can be found in Box #7 of your Form DS-2019.

What if I have a difficult time finding a job placement once I arrive in the United States, or have concerns about the work conditions?

If you have questions or are experiencing difficulty in finding employment, or have concerns about the work conditions, you should first contact your U.S. sponsor for assistance.  You also may contact the Department of State (jvisas@state.gov).  You may also wish to contact your country's nearest Embassy or Consulate.

If you have other questions not answered here, please consult the following Web page:

J1visa.state.gov or write to the Department of State at jvisas@state.gov.

f. **(U) SWT Pilot Programs for Citizens of Australia and New Zealand:**

(1) **(U)** In September 2007, the U.S. government signed memorandums of understanding (MOUs) with Australia and New Zealand launching 12-month SWT pilot programs.  The MOU with New Zealand became effective on September 10, 2007; the MOU with Australia became effective on October 31, 2007.  The MOUs allow certain Australian, New Zealand, or U.S. citizens who are bona fide postsecondary students or recent graduates (within 12 months of graduation) from postsecondary

AAUP-00416

JA2084

schools to work and travel in Australia, New Zealand, or in the United States, respectively, for up to 12 months.

(2) **(U)** The guidance for the Australia and New Zealand pilot programs differs from other J-1 SWT guidance (see paragraph a above) in the following respects:  Participants are not required to return home in time for the school year to begin, and qualified postsecondary students can enter the United States at any time.

(3) **(U) Duration:**  The duration of participation in this category must not exceed 12 months.  No extensions of program are permitted.

# 9 FAM 402.5-6(E)(13)  (U) Teacher

*(CT:VISA-2020;   07-03-2024)*

a. **(U) Teacher:**  This category is for an individual teaching full time in a primary or secondary accredited academic institution.  A foreign national must satisfy all the following:

(1) **(U)**

(a) **(U)** Meet the qualifications for teaching at the primary (including pre-kindergarten) or secondary levels in schools in their home country; is working as a teacher in their home country at the time of initial application to the sponsor; and has at least two years of full-time teaching experience; or

(b) **(U)** If not working as a teacher in their home country at the time of application, but otherwise meets the qualifications for teaching at the primary (including pre-kindergarten) or secondary levels in schools in the home country has had at least two years of full-time teaching experience within the past eight years; and, within 12 months of their application submission date for the program, has or will have completed an advanced degree (beyond a degree equivalent to a U.S. bachelor's degree) in education or in an academic subject matter that they intend to teach or that is directly related to their teaching subject field;

(2) **(U)** Possess, at a minimum, a degree equivalent to a U.S. bachelor's degree in either education or the academic subject field in which they intend to teach;

(3) **(U)** Satisfy the teaching eligibility standards of the U.S. state in which they will teach (e.g., meets minimum educational requirements, has passed teacher training coursework at a sufficiently proficient level, has provided an evaluation of foreign teaching preparation coursework, has demonstrated the requisite prior teaching experience), to include any required criminal background or other checks;

(4) **(U)** Be of good reputation and character; and

AAUP-00417

JA2085

(5) **(U)** Agree to come to the United States temporarily as a full-time teacher of record in an accredited primary or secondary school. Exchange visitor Teachers may teach a variety of subjects and levels at their host school or schools, if qualified, but at the pre-kindergarten level, may teach only in language immersion programs.

b. **(U) Extension of program:** Designated Teacher program sponsors may request that an exchange Teacher be granted an extension of program participation beyond the original 3 years. Teacher program sponsors may request an exchange Teacher be granted up to a 2-year extension. Extensions will not exceed June 30th of any given year to coincide with the U.S. teaching cycle and December 31st for the year-round cycle discussed above. A Teacher from Germany may be extended an additional 3 years per an agreement between the Department and the government of Germany.

c. **(U)** Exchange Visitor Program **Regulation:** See 22 CFR 62.24.

## 9 FAM 402.5-6(E)(14)  (U) Trainee

*(CT:VISA-1628;  09-13-2022)*

a. **(U) The Trainee category aims:** to strengthen U.S. public diplomacy by expanding opportunities for substantive programming for foreign students and professionals; to enhance the skills and expertise of exchange visitors in their academic or occupational fields; to improve participants' knowledge of U.S. techniques, methodologies, and technologies; and to increase participants' understanding of U.S. society and culture. The requirements in the Trainee regulations are designed to distinguish between bona fide training, which is permitted, and merely gaining additional work experience, which is not permitted.

b. **(U)** This category is for a foreign national who has either a degree or professional certificate from a postsecondary academic institution outside the United States and at least one year of prior related work experience in their occupational field acquired outside the United States; or five years of work experience outside the United States in their occupational field.

c. **(U) Program fees:** Program regulations do not address the fee amount that program sponsors may charge exchange visitors to participate in Trainee programs, and each program sponsor may set its fees based on its business model.

d. **(U) Program exclusions:** Sponsors must not:

(1) **(U)** Place Trainees in unskilled or casual labor positions, in positions that require or involve childcare or elder care, or in clinical or any other kind of work that involves patient care or contact, including any work that would require them to provide therapy, medication, or other clinical or medical care (e.g., sports or physical therapy, psychological counseling, nursing, dentistry, veterinary medicine, social work, speech therapy, or early childhood education;

AAUP-00418

JA2086

(2)　**(U)** Place Trainees in positions, occupations, or businesses that could bring the Exchange Visitor Program or the Department into notoriety or disrepute;

(3)　**(U)** Engage or otherwise cooperate or contract with a domestic staffing/employment agency in the United States to recruit, screen, orient, place, evaluate, or train Trainees, or in any other way involve such agencies in an Exchange Visitor Program training program; nor

(4)　**(U)** Place trainees in the field of aviation.

(5)　**(U)** Designated sponsors must ensure that the duties of Trainee as outlined in the T/IPP will not involve more than 20 percent clerical work, and that all tasks assigned to Trainees are necessary for the completion of training program assignments.

(6)　**(U)** Sponsor must also ensure that all "Hospitality and Tourism" training programs of six months or longer contain at least three departmental or functional rotations.

e.　**(U) Form** DS-7002**, Training/Internship Placement Plan (T/IIP):** Sponsors must complete and obtain requisite signatures on this form for each trainee before issuing Form DS-2019.  Upon request, a J-1 Trainee visa applicant must present a fully executed Form DS-7002 to the adjudicator during the visa interview (see 9 FAM 402.5-6(D)(7) for more information on the T/IPP).

f.　**(U) Repeat Participation:**  Trainees can participate in additional training programs that address the development of more advanced skills or a different field of expertise after a 2-year period of residency outside the United States following their training program.  This two-year period should not be confused with the two-year home-country physical presence requirement under INA 212(e) (see 9 FAM 402.5-6(L) below).

g.　**(U) Exchange Visitor Program Regulation:**  See 22 CFR 62.22.

## 9 FAM 402.5-6(E)(15)  (U) Intern and Trainee Programs with a Management or Supervisory Focus

*(CT:VISA-1292;   05-27-2021)*

a.　**(U)** The occupational category of Management, Business, Commerce, and Finance is up to 18 months for any type of management training, which may include hotel or restaurant management, turf management, office management, etc.  The duration of a trainee's or intern's participation in a training or internship program must be established before a sponsor issues a Form DS–2019.  Except as noted below, the maximum duration of a training program is 18 months, and the maximum duration of an internship program is 12 months.

b.　**(U)** For training programs in the "Hospitality and Tourism" occupational category, the maximum duration is 12 months and must not have less than three departmental or functional rotations for "Hospitality and Tourism"

AAUP-00419

JA2087

training and internship programs of six months or longer.  Training programs in the field of agriculture are permitted to last a total of 18 months, if in the development of the training plan, as documented in the T/IPP, the additional six months of the program consist of classroom participation and studies.  Program extensions are permitted only within maximum durations if the need for an extended training and internship program is documented by the full completion and execution of a new Form DS–7002.

c.  **(U)** Typical rotational programs offered in hotels or restaurants in a variety of related functions leading to a final rotation in a single supervisory position, such as front desk supervisor or manager, floor supervisor, lead chief or room service manager, would fall under the "Hospitality and Tourism" occupational category and be limited to 12 months.

d. **(U)** Non-management placements on farms or other production facilities fall under 'Agriculture' and are limited to 12 months, or 18 months providing that six months of the program consists of classroom participation and studies.

# 9 FAM 402.5-6(F)  (U) Residence Abroad

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The INA requires that a J visa applicant possess a residence in a foreign country they have no intention of abandoning.  You must be satisfied that the applicant has present intent to depart the United States upon completion of their exchange visitor program.  Consequently, you must be satisfied when adjudicating the visa that the applicant:

(1)  **(U)** Has a residence abroad;

(2)  **(U)** Has no immediate intention of abandoning that residence; and

(3)  **(U)** Intends to depart from the United States upon completion of the program.

b. **(U)** The context of the residence abroad requirement for exchange visitor visas inherently differs from the context for B visitor visas or other short-term visas.  The statute clearly presupposes that the natural circumstances and conditions of being an exchange visitor do not disqualify the applicant from obtaining a J visa.  It is natural that the exchange visitor proposes an extended absence from their home country (see 9 FAM 401.1-3(E)(2) paragraph a).  Nonetheless, you must be satisfied when adjudicating the visa application that an applicant possesses the present intent to depart the U.S. at the conclusion of their program.  That this intention is subject to change is not a sufficient reason to refuse a visa.  Although exchange visitors may apply to change or adjust status in the United States in the future, this is not a basis to refuse a visa application if the exchange visitor's present intent is to depart at the conclusion of their program.

AAUP-00420

JA2088

# 9 FAM 402.5-6(G) (U) Knowledge of English

*(CT:VISA-1628; 09-13-2022)*

**(U)** A prospective exchange visitor must have sufficient proficiency in the English language to undertake the anticipated program successfully. Successful participation in exchange programs requires that participants interact with Americans both at the participants' sites of activity and in the broader context of daily life, to achieve the cultural goals of these programs. Some exchange visitor programs provide for an interpreter, and this may be noted on the Form DS-2019. Participants may not avoid the English language requirement by claiming that their site of activity offers a work environment in their native language. If the applicant lacks the English skills described above, but the Form DS-2019 is not annotated to reflect the use of an interpreter, and you are unable to determine whether the program permits use of an interpreter, contact the CA/VO/F F/M/J portfolio holder. Exchange visitors who are deaf or hard of hearing, and who rely on signing, must be proficient in American Sign Language (ASL) or another signing language widely used in the United States.

# 9 FAM 402.5-6(H) (U) Employment

## 9 FAM 402.5-6(H)(1) (U) Employment - In General

*(CT:VISA-2048; 08-15-2024)*

a. **(U)** An exchange visitor may receive compensation for employment when such activities are part of the exchange visitor's program.

b. **(U)** DHS is responsible for authorizing the employment of the spouse and any minor unmarried children (J-2 visa holders) of the exchange visitor (J-1 visa holder). The dependent must file Form I-765, Application for Employment Authorization, requesting permission to work from USCIS.

## 9 FAM 402.5-6(H)(2) (U) College/University Student Employment

*(CT:VISA-1292; 05-27-2021)*

a. **(U) There are two types of employment authorizations available for College/University Students with J status:**

   (1) **(U)** Student employment (see 22 CFR 62.23(g) for more information on student employment); or

   (2) **(U)** Academic training (see 22 CFR 62.23(f) for more information on academic training).

b. **(U)** In both situations, the responsible officer (RO) must approve the exchange visitor's participation in the activity.

c. **(U)** College/University Students (degree and non-degree) granted permission for student employment (22 CFR 62.23(g)) are limited to twenty (20) hours

JA2089

AAUP-00421

per week, except during school breaks and annual vacation, unless authorized for economic necessity.

d. **(U) Some examples of student employment and academic training are:**

(1) **(U) Scholarship, fellowship, or assistantship:** If the employment is required because of a scholarship, fellowship, or an assistantship, such activity usually occurs on campus with the school as the employer. In certain circumstances, however, the work can be done elsewhere for a different employer. For example, an exchange visitor may work in a government or private research laboratory if the exchange visitor's major professor has a joint appointment at one of those locations and the employment is supervised and counts towards the exchange visitor's degree;

(2) **(U) On campus:** The Exchange Visitor Program regulations allow for jobs on-campus, whether the job is related to the course of study.

(3) **(U) Off campus:** Exchange visitors may be authorized off-campus employment by the program's responsible officer (RO) when "necessary due to serious, urgent and unforeseen economic circumstances" that have arisen since the exchange visitor's sponsorship on the J visa.

## 9 FAM 402.5-6(H)(3)  (U) Summer Employment for College/University Students Transferring to Another Program Sponsor

*(CT:VISA-1292;   05-27-2021)*

**(U)** If a College/University Student intends to transfer sponsors during the summer months but wants to remain at the current program to work during the summer, the current sponsor must delay the transfer procedure until after the period of employment. To permit the student to stay in the current program, the period of employment must be included in the exchange visitor's program noted on the Form DS-2019.

# 9 FAM 402.5-6(I)  (U) Visa Application Procedures and Conditions

## 9 FAM 402.5-6(I)(1)  (U) Applicant Qualifications

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, is the basic document required to support an application for an exchange visitor visa and for maintaining valid exchange visitor program participant status. The electronic SEVIS record in the CCD will indicate the applicant's current SEVIS status. Verify that the applicant's SEVIS record is in either INITIAL or ACTIVE status.

AAUP-00422

JA2090

b. **(U)** On occasion, you will see applicants who claim they have followed the established procedure, but you cannot locate their SEVIS records in the CCD. When this occurs, contact the F/M/J portfolio holder(s) in CA/VO/F/ET for assistance. It is important that CA/VO/F/ET and CA/VO/I be made aware of any failure of the records to replicate so that efforts to correct the problem are appropriately coordinated with DHS/ICE/SEVP.

c. **(U)** Ensure the applicant's information is correct in the electronic SEVIS record (see 9 FAM 402.5-6(J)), and that the SEVIS fee has been paid. You can also verify SEVIS fee payment at FMJfee.com.

d. **(U)** If you are uncertain as to whether the applicant's qualifications or planned activities fit within the Exchange Visitor Program or have concerns that the sponsor is not in compliance with sponsor regulations, you should refuse the visa application under INA 221(g) and notify the F/M/J portfolio holder(s) in CA/VO/F/ET who will coordinate with ECA to provide guidance.

e. **(U)** When an applicant applies for a J-2 visa to follow-to-join a principal J-1 applicant already in the United States, or when a J-2 applicant applies to renew their visa when the principal J-1 applicant is already in the United States, you must be satisfied that the principal applicant is maintaining J-1 status before issuing the visa. The J-1 principal applicant's SEVIS record is the official record of whether the J-1 principal applicant is maintaining their status. In some cases, the J-1 applicant's visa may have expired but if the J-1 applicant was approved for an extension of their program, and the dates in SEVIS reflect this program extension, the J-1 applicant has maintained status for the sake of the J-2 visa applicant's eligibility for a visa.

f. *Unavailable*

g. *Unavailable*

   (1) *Unavailable*

   *(2) Unavailable*

   *(3) Unavailable*

h. *Unavailable*

   *(1) Unavailable*

   *(2) Unavailable*

i. *Unavailable*

## 9 FAM 402.5-6(I)(2)  (U) Cases Involving Unrealizable Reporting Dates

*(CT:VISA-1837;   09-26-2023)*

**(U)** If the program start date specified in the applicant's Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, is already past or there is reason to believe the applicant will be unable to meet that date, you may assume the applicant may encounter difficulty at POE. You should determine

<span style="color:red; font-size:2em;">JA2091</span>

AAUP-00423

whether the sponsor has amended the electronic SEVIS record to change the program start date, and make a case note to that effect to alert CBP.  If this has not been done, you should direct the visa applicant to alert the designated U.S. program sponsor.  You should not intervene directly with program sponsors on behalf of visa applicants.

## 9 FAM 402.5-6(I)(3)  (U) Entry of Exchange Visitor Program Participants Before Program Start Date

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** You may issue an exchange visitor visa to an applicant at any time before the program start date if the SEVIS record is in INITIAL or ACTIVE status.  However, the exchange visitor may not enter the United States earlier than 30 days before the program start date.  Applicants continuing an Exchange Visitor Program are not subject to this travel restriction.

b. **(U)** An exchange visitor who desires an earlier entry must obtain a B-2 visitor visa.  If the applicant enters on a B visa, however, they must first obtain a change of status from USCIS, from B status to J status to participate in the exchange program.  The applicant is not allowed to begin the exchange visitor program until USCIS has approved the change of status.  The process to change status may be lengthy and may impact the ability of the applicant to participate in the program.

## 9 FAM 402.5-6(I)(4)  (U) Consecutive Exchange Programs

*(CT:VISA-2048;   08-15-2024)*

**(U)** An exchange visitor may participate in consecutive exchange programs unless otherwise limited or prohibited by the Exchange Visitor Regulations.  Do not issue an individual two separate J-1 visas for two different programs that will run back-to-back (e.g., Au Pair then Trainee; or Summer Work Travel then College University Student).  Following completion of the first program, the exchange visitor is usually expected to return home and may apply for another J-1 visa for the subsequent program.  The exception to this is an exchange visitor who receives approval for a change of exchange visitor category (22 CFR 62.41) while in the United States, allowing him or her to begin the second program without returning to the home country.  Exchange visitors with questions about a change of category should be directed to their program sponsors.

## 9 FAM 402.5-6(I)(5)  (U) 30-Day Post-Completion Period

*(CT:VISA-1628;   09-13-2022)*

a. **(U)** Exchange visitors are no longer issued a paper Form I-94, Arrival and Departure Record, marked "D/S" (Duration of Status) upon entry into the United States.  CBP now gathers travelers' arrival/departure information automatically from their electronic travel records.  However, CBP will still

AAUP-00424
JA2092

issue a paper Form I-94 at land border ports of entry. Visa holders may download a copy of their electronic I-94 at www.cbp.gov/I94.

b. **(U)** The initial period of admission of the exchange visitor will not exceed the period specified on the Form DS-2019 (the start and end dates), plus a period of 30 days "for the purpose of travel" (see 8 CFR 214.2(j)). DHS established this 30-day period at the successful completion of the program to use for domestic travel and/or to prepare for and depart from the United States, and for no other purpose. A program extension and/or transfer cannot be done if an exchange visitor's record in SEVIS is not in active status during this period.

c. **(U)** Any validation study of return rates for J travelers must take this authorized grace period into account.

## 9 FAM 402.5-6(I)(6)  (U) Annotation and Visa Validity

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** A J-1 or J-2 visa must be annotated to show the program number, program dates, and sponsor name of the applicant's exchange program, as well as the SEVIS number of the individual. The J visa must also state whether the applicant is subject to INA 212(e). Keep in mind that you are making a preliminary determination of the applicability of INA 212(e). An exchange visitor cannot use a J visa for a program other than that specified on the annotation, unless the exchange visitor transfers to another sponsor while on program in the United States. In this case, the visa remains valid under the same SEVIS ID and the exchange visitor may exit and re-enter the United States on an unexpired J-visa with the current Form DS-2019. The new Form DS-2019 will include a new program number and a travel validation signature, which may be electronic.

b. **(U)** A new visa is required following the transfer of program when:

(1) **(U)** the exchange visitor travels internationally; and

(2) **(U)** the J-visa has already expired or will expire before the date of U.S. re-entry.

**(U)** Exchange visitors approved for a change of category must obtain a new J-1 visa if/when they exit and want to re-enter the U.S. to continue their exchange program in the new program category.

c. **Unavailable**

d. **Unavailable**

e. **(U)** J-1 visas must be issued for the program dates listed on the Form DS-2019, except as described in para d below or in 9 FAM 402.5-6(E)(10) above or where visa reciprocity only allows for a shorter validity period. J-2 derivatives are subject to the same visa validity as the J-1 principal applicant unless visa reciprocity only allows for a shorter validity period.

f. **Unavailable**

JA2093

AAUP-00425

g. **(U)** For those exceptions noted in 9 FAM 402.5-6(E)(10), you are authorized to issue with a visa validity extending for three years.  The visa should be set to expire two years after the listed program end date found in Box 3 on the Form DS-2019.

## 9 FAM 402.5-6(I)(7)  (U) Renewing J Visas for Returning Exchange Visitors

*(CT:VISA-2048;   08-15-2024)*

**(U)** Where applicable, returning J applicants may be eligible for an interview waiver (see 9 FAM 403.5-4(A)(1)).  You usually should renew J visas to returning exchange visitors who have remained in valid program status and have not had any significant changes in either their program or their personal circumstances.  When an exchange visitor engaged in a program takes a short trip abroad and requires a visa to return to the United States, you are encouraged to issue the visa, if the exchange visitor is otherwise qualified, to allow the individual to complete their program if the status of the electronic record in SEVIS is ACTIVE.

## 9 FAM 402.5-6(J)  (U) The Student and Exchange Visitor Information System (SEVIS)

### 9 FAM 402.5-6(J)(1)  (U) Student and Exchange Visitor Information System (SEVIS) - In General

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** For an overview of the Student and Exchange Visitor Program and SEVIS see 9 FAM 402.5-4 above.

b. **(U)** SEVIS is an internet-based database that tracks students and exchange visitors in F, M, and J visa status while in the United States.  Using SEVIS, designated Exchange Visitor Program sponsors enter information into the individual SEVIS record for a prospective exchange visitor, and that information can then be printed on the Form DS-2019.

c. **(U)** ECA) authorizes designated U.S. sponsor officials - referred to as responsible officers (ROs) and alternate responsible officers (AROs) - access to SEVIS so that they may create and update official records on exchange visitors and their dependents.  SEVIS enables exchange program sponsors to transmit electronic information and event notifications, via the Internet, to the Department and to DHS throughout an exchange visitor's stay in the United States.  The information in SEVIS is updated, as needed, and supersedes information on the printed Form DS-2019.  The SEVIS record is the definitive record of exchange visitor eligibility and you must check it for each applicant.

d. **(U)** Exchange Visitor Program sponsors designated by ECA must use SEVIS.  Only a Form DS-2019 that has been issued through SEVIS, and contains a

AAUP-00426

JA2094

unique SEVIS identification number, may be accepted in support of a J visa application.  The Form DS-2019 must be signed in any color ink by the RO (or ARO).  Digital signatures are also acceptable.  However, the definitive record is the electronic SEVIS record in the CCD (or directly in SEVIS, usually accessible by your FPU).  CBP can also access the electronic record at POE.

## 9 FAM 402.5-6(J)(2)  (U) Responsible and/or Alternate Responsible Officers

*(CT:VISA-1090;   06-24-2020)*

a. **(U)** Exchange Visitor Program sponsors designate individuals to perform the duties attendant to designation.  The responsible officer (RO) is the primary person appointed as being responsible and thoroughly familiar with the Exchange Visitor Program regulations, policies, and SEVIS requirements.  An alternate responsible officer (ARO) is an individual appointed to assist the RO in administering the program.

b. **(U)** The RO (or ARO) is required to ensure that the exchange visitor obtains sufficient advice and assistance to facilitate the successful completion of their exchange program.  ROs and AROs are also responsible for the security of SEVIS.  Only ROs and AROs are authorized access to SEVIS to issue Form DS-2019.

# 9 FAM 402.5-6(K)  (U) J Visa Fees

## 9 FAM 402.5-6(K)(1)  (U) SEVIS I-901, Fee Remittance for Certain J Nonimmigrants, Fee

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** The SEVIS I-901 fee is a one-time fee for persons applying for J-1 visas.  The fee covers the costs of administering SEVIS and related enforcement efforts.  Only principal J-1s must pay the SEVIS I-901 fee.  Even though J-2 derivative applicants have a unique SEVIS ID number, they are not subject to this fee.

b. **(U)** Applicants must pay the SEVIS fee before their visa interviews.  Applicants may schedule interview appointments before paying the fee.  While consular sections must verify that the SEVIS fee has been paid, they are not responsible for collecting it.  Applicants should be referred to FMJFee.com to pay the SEVIS I-901 fee.

c. **(U)** You can verify SEVIS I-901 fee payment through the CCD SEVIS report.  You can also verify SEVIS I-901 fee payment at FMJFee.com if the fee payment information has not yet replicated to the CCD.

d. **(U)** Most exchange visitors will pay the full fee; however, the fee is reduced for some, including those in Summer Work Travel, Camp Counselor, and Au Pair categories.

AAUP-00427

JA2095

e. **(U)** Exchange visitors and their spouses and/or dependents sponsored by a government program (program serial numbers G-1, G-2, G-3, and G-7) are not required to pay the SEVIS fee.  Publicize and explain on post's website how an exchange visitor participating in one of these government-sponsored programs can reach the consular section to schedule a visa interview appointment without paying either the nonrefundable MRV fee or the SEVIS fee (see 9 FAM 402.5-6(K)(2) below).

## 9 FAM 402.5-6(K)(2)  (U) Fee Waivers for Certain Exchange Visitors

*(CT:VISA-2048;   08-15-2024)*

a. **(U)** J-1 visa applicants are exempted from the machine readable visa (MRV) fee if they are participating in a USAID, or other federally funded educational and cultural exchange program.  Exchange programs eligible for the MRV exemption have a program serial number that begins with the prefix G-1, G-2, G-3, or G-7 on the Form DS-2019.  J-2 derivatives of these J-1 applicants are also exempted from the MRV fee.  All other applicants with U.S. Government funding must pay the MRV processing fee.  You must ensure that post's website provides clear guidance to these visa applicants on how to obtain a visa interview appointment without paying the MRV fee, because the fee, once paid, is usually not refundable (see 7 FAH-1 H-728*)*.

b. **(U)** Applicants participating in a U.S. government-sponsored exchange visitor program who are exempt from the MRV fee as described above in paragraph a, are also exempt from any applicable visa reciprocity fee.

# 9 FAM 402.5-6(L)  (U) INA 212(e)

*(CT:VISA-3009;   12-09-2024)*

**(U)** INA 212(e) and implementing regulations prohibits certain exchange visitors from applying for an IV or for adjustment of status to that of a*n* LPR or from changing status to or receiving a visa as a temporary worker (H),  fiancé (K), or intracompany transferee (L) until the applicant has established that they have resided and been physically present in the country of nationality or last legal permanent residence for an aggregate of at least two years following departure from the United States.

## 9 FAM 402.5-6(L)(1)  (U) Subject to INA 212(e)

*(CT:VISA-3009;   12-09-2024)*

a. **(U)** An individual admitted as an exchange visitor under INA 101(a)(15)(J) or who acquires such status after admission is subject to the two-year home-county physical presence requirement under INA 212(e) if:

   (1)  **(U)** The program in which the individual is participating was financed in whole or in part, directly or indirectly, by:

AAUP-00428

JA2096

(a)  **(U)** A U.S. Government Agency, or

(b)  **(U)** The government of the country of the noncitizen's nationality or last legal permanent residence;

(2)  **(U)** The noncitizen is a national or legal permanent resident of a country that has been designated as clearly requiring the*ir* field of specialized knowledge or skill as shown in the 2024 Exchange Visitor Skills List; or

(3)  **(U)** The individual entered the United States, or acquired such status, to receive graduate medical education or training.

b.  **(U)** Individuals participating in the Au Pair and Summer Work Travel exchange visitor program categories are not subject to INA 212(e).

## 9 FAM 402.5-6(L)(2)  (U) Waiver of INA 212(e) Requirement

*(CT:VISA-3009;   12-09-2024)*

a.  **(U)** A noncitizen may seek a waiver of the two-year home-country physical presence requirement if:

(1)  **(U)** A U.S. government agency makes such a request for a noncitizen who is actively and substantially involved in a program sponsored by or of interest to that U.S. government agency; (see 9 FAM 302.13-2(D)(4))*;*

(2)  **(U)** In the case of an individual who entered the United States, or acquired such status, to receive graduate medical education or training: A U.S. state's Department of Public Health makes such a request (see 9 FAM 302.13-2(D)(5))*.*

(3)  **(U)** The noncitizen establishes exceptional hardship to a U.S. citizen or LPR spouse or child, or probable persecution on account of race, religion, or political opinion (see also 9 FAM 302.13-2(D)(3))*;* and

(4)  **(U)** The noncitizen has received a statement of "no objection" from their country of nationality or last legal permanent residence (see 9 FAM 302.13-2(D)(1)).

b.  **(U)** You should refer former exchange visitors who wish to learn more about applying for a waiver of INA 212(e) to Waiver of the Exchange Visitor Two-Year Home-Country Physical Presence Requirement.

## 9 FAM 402.5-6(L)(3)  (U) Department's Policy on Extension of Program Participation While a Waiver of the Two 2-Year Home-Country Physical Presence Requirement Is Pending

*(CT:VISA-3009;   12-09-2024)*

**(U)** Once WRD has recommended a waiver and forwarded to DHS, an exchange visitor is no longer eligible for an extension of program beyond the end date shown on the current Form DS-2019 even though they may not have completed the maximum duration of participation permitted for the category.  If a waiver request was denied, however, and the exchange visitor is still within the

AAUP-00429

JA2097

maximum duration of participation established by the regulations, an extension may be issued by the sponsor up to the maximum duration of time permitted for that category.

# 9 FAM 402.5-6(M)  (U) Exchange Visitor Skills Lists

## 9 FAM 402.5-6(M)(1)  (U) Exchange Visitor Skill List, 2024

*(CT:VISA-3009;   12-09-2024)*

**(U)** See: 2024 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(2)  (U) Exchange Visitor Skill List, 2009

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  2009 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(3)  (U) Exchange Visitor Skill List, 1997

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  1997 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(4)  (U) Exchange Visitor Skill List, 1984

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  1984 Exchange Visitor Skills List.

## 9 FAM 402.5-6(M)(5)  (U) Exchange Visitor Skills List, 1972

*(CT:VISA-3009;   12-09-2024)*

**(U)** See:  1972 Exchange Visitor Skills List.

<div align="center">

**UNCLASSIFIED (U)**

</div>

JA2098

AAUP-00430

<div align="center">

**UNCLASSIFIED (U)**

# 9 FAM 403.11
# (U) NIV REVOCATION

*(CT:VISA-2150;   04-29-2025)*
*(Office of Origin:   CA/VO)*

</div>

# 9 FAM 403.11-1  (U) STATUTORY AND REGULATORY AUTHORITIES

## 9 FAM 403.11-1(A)  (U) Immigration and Nationality Act

*(CT:VISA-1;   11-18-2015)*

**(U)** INA 221(i) (8 U.S.C. 1201(i)).

## 9 FAM 403.11-1(B)  (U) Code of Federal Regulations

*(CT:VISA-1;   11-18-2015)*

**(U)** 22 CFR 41.122.

# 9 FAM 403.11-2  (U) NIV REVOCATION

*(CT:VISA-1;   11-18-2015)*

**(U)** Regulations no longer distinguish between invalidation and revocation in cases when it is determined that the bearer of a visa is ineligible.  The visa should be revoked in accordance with INA 221(i), 22 CFR 41.122 and this subchapter.

# 9 FAM 403.11-3  (U) WHEN TO REVOKE A VISA

## 9 FAM 403.11-3(A)  (U) When You May Revoke Visas

*(CT:VISA-1948;   03-07-2024)*

**(U) There are four circumstances under which you may revoke a visa:**

   (1)  **Unavailable**

   (2)  **(U)** The individual is not eligible for the visa classification (this includes ineligibility under INA 214(b));

<div align="center">

<span style="color:red">JA2099</span>

</div>

AAUP-00464

(3)  **(U)** The visa has been physically removed from the passport in which it was issued; or

(4)  **(U)** The individual is subject to an IDENT Watchlist record in System Messages for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years, pursuant to 9 FAM 403.11-5(B) paragraph c, below.

## 9 FAM 403.11-3(B)  (U) When You May Not Revoke A Visa

*(CT:VISA-1463;   02-01-2022)*

a.  **(U)** You do not have the authority to revoke a visa based on a suspected ineligibility or based on derogatory information that is insufficient to support an ineligibility finding, other than a revocation based on driving under the influence (DUI).  A consular revocation must be based on an actual finding that the individual is ineligible for the visa.

b.  **(U)** Under no circumstances should you revoke a visa when the individual is in the United States, or after the individual has commenced an uninterrupted journey to the United States, other than a revocation based on driving under the influence (DUI).  Outside of the DUI exception, revocations of individuals in, or en route to, the United States may only be done by the Department's Visa Office of Screening, Analysis, and Coordination (CA/VO/SAC).

# 9 FAM 403.11-4  (U) REVOCATION PROCEDURES

## 9 FAM 403.11-4(A)  (U) Visa Revocations by Consular Officers

*(CT:VISA-2088;   10-02-2024)*

**(U)** Although the decision to revoke a visa is a discretionary one, you should not use this authority arbitrarily.  When practicable:

(1)  **(U)** Notify the individual of the intention to revoke the visa;

(2)  **(U)** Allow the individual the opportunity to show why the visa should not be revoked; and

(3)  **(U)** Request the individual to present the travel document in which the visa was issued.

### 9 FAM 403.11-4(A)(1)  (U) Required Procedures

*(CT:VISA-2088;   10-02-2024)*

a.  **(U) Informing Individual of Intent to Revoke Visa:**

JA2100

AAUP-00465

(1) **(U)** Notify the individual of the intent to revoke a visa if such notification is practicable.  The notice of intent to revoke a visa affords the individual the opportunity to demonstrate why the visa should not be revoked.  An after-the-fact notice that the visa has already been revoked is not sufficient unless prior notice of intent to revoke was not practicable.

(2) **(U)** A prior notification of intent to revoke a visa would not be practicable if, for instance, you do not know the whereabouts of the individual, or if the individual's departure is believed to be imminent.  In cases where the individual can be contacted and travel is not imminent, prior notice of intent to revoke the visa is normally required, unless you have reason to believe that a notice of this type would prompt the individual to attempt immediate travel to the United States.

b. **(U) Physical Cancellation of Visa:**  If a decision to revoke the visa is reached after the case has been reviewed, print or stamp the word "REVOKED" in large block letters across the face of the visa.  Also date and sign this action.  If you are at a post other than the one where the visa was issued, the title and location of your post should be written below the signature.

c. **(U) If the Individual Possesses Another Valid U.S. Visa:**  When you have taken action to revoke a visa, you should determine whether the individual holds another current U.S. visa in the same or another passport. You should revoke that visa as well, if the grounds for revoking the first visa apply to any other visa the individual may hold, or if independent grounds for revocation apply.  In the latter case, if practicable, give the individual an opportunity to rebut or overcome that ground(s) of ineligibility.

d. **Unavailable**

e. **Unavailable**

## 9 FAM 403.11-4(A)(2)  (U) When to Notify Department Regarding Revocation

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** If a visa is physically cancelled before the individual's departure to the United States, then there is no need to report the revocation to the Department, except in cases involving A, G, C-2, C-3, or NATO visas.

b. **(U)** L/CA, the Diplomatic Liaison Division (CA/VO/DO/DL), the Chief of Protocol (S/CPR), and the appropriate country desk should be promptly notified whenever any diplomatic or official visa, or any visa in the A, G, C-2, C-3, or NATO classification is revoked.

c.  **(U)** See 9 FAM 403.11-4(C)(1) below for more information about notifying the Department of visa revocations that may have political, public relations, or law enforcement consequences.

AAUP-00466

JA2101

# 9 FAM 403.11-4(B)  Unavailable

*(CT:VISA-2088;   10-02-2024)*

a. **Unavailable**

b. **Unavailable**

c.  **(U)** See <u>9 FAM 402.8-8</u>, Procedures to be Followed When Derogatory Information Received.

# 9 FAM 403.11-4(C)  (U) Revoking Visas in Sensitive Cases

## 9 FAM 403.11-4(C)(1)  (U) Keeping Department Informed in High Profile Cases

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** You should be alert to the political, public relations, and law enforcement consequences that can follow a visa revocation and should work with the Department to ensure that all legally available options are fully and properly assessed.  The revocation of the visa of a public official or prominent local or international person can have immediate and long-term repercussions on our political relationships with foreign powers and on our public diplomacy goals in a foreign state.  The visa laws must be applied to such persons like any others, recognizing that certain visa categories, particularly A's and G's, are not subject to the same standards of ineligibility as others. Hasty action, however, must be avoided in such high-profile visa cases and you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation.  Consultation both within the mission and with the Department may result in a decision that the Department, rather than the consular officer, should undertake the revocation, since Department revocations pursuant to the Secretary's revocation authority provide more flexibility in managing the relevant issues.

b. **(U) When to Consult with the Department:**

   (1)  **(U)** You are responsible for keeping the Department (CA/VO/SAC, CA/VO/F, L/CA, and the appropriate country desk) informed of visa actions that may affect our relations with foreign states or our public diplomacy, or that may affect or impede ongoing or potential investigations and prosecutions by U.S. and other cooperating foreign law enforcement agencies.

   (2)  **(U)** This is particularly true when you use the power granted under INA 221(i) as implemented in 22 CFR 41.122 and this section, to revoke the visas of officials of foreign governments, prominent public figures, and subjects or potential subjects of U.S. and foreign criminal investigations.

AAUP-00467

<span style="color:red; font-size:2em;">JA2102</span>

(3) **(U)** In such cases, you should seek the Department's guidance before any visa revocation unless unusual and exigent circumstances prevent such a consultation.  In the rare cases in which advance consultation is not possible, you should inform the Department immediately after the revocation.

c. **Unavailable**

## 9 FAM 403.11-4(C)(2)  (U) Diplomatic and Official Visas

*(CT:VISA-1650;   11-21-2022)*

**(U)** You must keep in mind that most A, G, C-2, C-3, and North Atlantic Treaty Organization (NATO) visa categories are exempt from most INA 212(a) ineligibility provisions per 22 CFR 41.21(d).  Precipitant action must be avoided in cases involving foreign government officials and other prominent public figures.  Consultations at post and with the Department might result in the decision that the Department, rather than the consular officer, should undertake the revocation.  The Department's revocation authority provides more flexibility in managing relevant issues.  For example, Department revocations may be undertaken prudentially, rather than based on a specific finding of ineligibility and are not subject to the 22 CFR 41.122 requirement with respect to notification to the individual.

## 9 FAM 403.11-4(C)(3)  (U) When Revocation Subject is Subject of Criminal Investigation

*(CT:VISA-2088;   10-02-2024)*

a. **(U)** In cases in which the individual whose visa is revocable is also the subject of a criminal investigation involving U.S. law enforcement agencies, action without prior Department consultation and coordination could:

(1) **(U)** Jeopardize an ongoing investigation;

(2) **(U)** Prejudice an intended prosecution;

(3) **(U)** Preclude apprehension of the subject in the United States;

(4) **(U)** Put informants at risk; or

(5) **(U)** Damage cooperative law enforcement relationships with foreign police agencies.

b. **Unavailable**

c. **(U)** In deciding what cases to report in advance to the Department, err on the side of prudence.  It is always better to report cases requiring no Department action rather than having to inform the Department after the fact in a case that has adverse consequences for U.S. law enforcement or diplomatic interests.  Contact CA/VO/SAC and other functional bureaus, as appropriate.

JA2103

AAUP-00468

# 9 FAM 403.11-5  (U) REVOCATION OF VISAS BY THE DEPARTMENT

*(CT:VISA-1948;   03-07-2024)*

a. **(U)** When the Department revokes a visa, when possible, a revocation notice will be sent to the consular section by email furnishing a point of contact in the Visa Office.  You must follow the instructions in the revocation notice.

b. **(U)** Although the Department is not required to notify an individual of a revocation done pursuant to the Secretary's discretionary authority, you should do so unless instructed otherwise, especially in cases where the revoked visa was issued to a government official.

# 9 FAM 403.11-5(A)  (U) Notice to Department of Presence in United States

*(CT:VISA-2150;   04-29-2025)*

a. **Unavailable**

b. **(U)** Upon receipt of your report, the Department will decide whether the visa should be revoked.  Alternatively, the Department may inform DHS of the data submitted and give DHS an opportunity to initiate proceedings under the pertinent provisions of INA 237.  If the latter course is followed, the Department will request that DHS advise the Department of the individual's date of departure and destination, so the individual's *visa may be physically canceled after their* departure from the United States.

# 9 FAM 403.11-5(B)  (U) Prudential Revocations

*(CT:VISA-2150;   04-29-2025)*

a. **(U)** Although you usually may revoke a visa only if the individual is ineligible under INA 212(a), or INA 214(b), or is no longer entitled to the visa classification, the Department may revoke a visa if an ineligibility or lack of entitlement is suspected, when an individual would not meet requirements for admission, or in other situations where warranted.  This is known as a "prudential revocation."  In addition to the conditions described in 9 FAM 403.11-5(A) above, the Department may revoke a visa when it receives derogatory information directly from another U.S. Government agency, including a member of the intelligence or law enforcement community.  These requests are reviewed by CA/VO/SAC/RC, which forwards an electronic memo requesting revocation to a duly authorized official in the Visa Office, along with a summary of the available intelligence and/or background information and any other relevant documentation.  When prudential revocation is approved, the subject's name is entered into CLASS, the visa case status is updated to "Revoke", and the revocation is communicated within the Department and to other agencies by the following means:

AAUP-00469

JA2104

     (1)  **Unavailable**

     (2)  **Unavailable**

     (3)  **Unavailable**

b. **Unavailable**

c. **(U) Prudential Revocation for Driving Under the Influence:** Either the consular section or the Department has the authority to prudentially revoke a visa based on a potential INA 212(a)(1)(A) ineligibility when an IDENT Watchlist Record appears in System Messages for a CJIS Search of US-VISIT or a CJIS Search of OBIM record. Before doing so, re-send the fingerprints to NGI to obtain a RAP sheet for an arrest or conviction of driving under the influence, driving while intoxicated, or similar arrests/convictions (DUI) that occurred within the previous five years. This does not apply when the arrest has already been addressed within the context of a visa application; i.e., the individual has been through the panel physician's assessment due to the arrest. This does not apply to other alcohol related arrests such as public intoxication that do not involve the operation of a vehicle. Unlike other prudential revocations, you do not need to refer the case to the Department but can prudentially revoke on your own authority. Process the revocation from the Spoil tab NIV and add P1A3 and VRVK lookouts from the Refusal window.

## *9 FAM 403.11-5(C)  Unavailable*

*(CT:VISA-2150;  04-29-2025)*

a. ***Unavailable***

b. ***Unavailable***

c.  ***Unavailable***

     (1)  ***Unavailable***

     (2)  ***Unavailable***

     (3)  ***Unavailable***

d. ***Unavailable***

e. ***Unavailable***

# 9 FAM 403.11-6  (U) RECONSIDERATION OF REVOCATIONS

AAUP-00470

JA2105

## 9 FAM 403.11-6(A)  (U) Reinstatement Following Revocation

*(CT:VISA-2088;   10-02-2024)*

**Unavailable**

   (1)  **Unavailable**

   (2)  **(U) If Visa Has Been Revoked and Physically Canceled:** If a visa has been revoked and the revoked visa physically canceled, the individual may apply for a new visa; however, they may not travel on the physically cancelled visa.

   (3)  **Unavailable**

   (4)  **Unavailable**

# 9 FAM 403.11-7  (U) ACTIONS BY DHS

## 9 FAM 403.11-7(A)  (U) Cancellation of Visas by Immigration Officers Under 22 CFR 41.122(e)

*(CT:VISA-2088;   10-02-2024)*

a.  **(U) When a visa is canceled by a DHS officer, one of the following notations will normally be entered in the individual's passport:**

   (1)  **(U)** Canceled.  Adjusted;

   (2)  **(U)** Canceled.  Excluded. DHS (Office) (Date);

   (3)  **(U)** Canceled.  Application withdrawn. DHS (Office) (Date);

   (4)  **(U)** Canceled.  Final order of deportation/voluntary departure entered DHS (Office) (Date) Canceled.  Departure required.  DHS (Office) (Date);

   (5)  **(U)** Canceled.  Waiver revoked. DHS (Office) (Date); and

   (6)  **(U)** Canceled.  Presented by impostor.  DHS (Office) (Date).

b.  **(U)** Except when a visa is canceled after the individual's status has been adjusted to that of a permanent resident, DHS will inform the consular section that issued the visa of the cancellation action.  The I-275, Withdrawal of Application/Consular Notification form, will be used to inform consular officers at the issuing office of the cancellation action.  The I-275 form and any other attached forms should not be released to individuals or their representatives.

JA2106

# 9 FAM 403.11-7(B)  (U) Voidance of Counterfeit Visas

*(CT:VISA-1275;  05-10-2021)*

**(U)** When DHS has determined through examination that a visa has been altered or is counterfeit, it will void the visa by entering one of the following notations on the visa page, together with the action officer's signature, title, and office location:

(1) **(U)** Counterfeit visa per testimony of individual (file number); or

(2) **(U)** Counterfeit visa per telecon, letter, e-mail from U.S. Embassy (U.S. Consul).

**UNCLASSIFIED (U)**

JA2107

AAUP-00472

 



SINCE 1891

# THE BROWN DAILY HERALD

**Print Editions**

Thursday June 12th, 2025



go.grow.grad.tcnj.edu

**Earn Your Master's at TCNJ**

OPEN >

**OPINIONS**

# When Brown students speak, the University should listen: A faculty letter in support of student activism



> " If principled inquiry is our method and the pursuit of knowledge for a better world is our goal, what do we have to fear? "

Media by Colleen Cronin | The Brown Daily Herald

By **Brown University faculty members**
April 2, 2019 | 1:25am EDT

We, the undersigned Brown faculty, wish to express our concern about the content and tenor of President Christina Paxson P'19's letter to the Brown community March 22 in response to the overwhelming support for a student referendum that called on the University to "divest all stocks, funds, endowment and other monetary instruments from companies complicit in human rights abuses in Palestine and establish a means of implementing financial transparency and student oversight of the University's investments." Following weeks of campus debate which produced a higher-than-average turnout in a much-watched election, 69 percent —1,939 out of 2,810 voting students — voted in favor of the referendum.

Paxson's response, issued to the entire Brown community the day after the referendum results were announced, diminishes the divestment vote as "polarizing" and something that would "detract from the inclusive, intellectually-vibrant community we aspire to be." Belying her own claim that the University does not take sides on contested issues, Paxson also took this opportunity to reiterate her opposition to the global Boycott, Divest, Sanctions

JA2108

AAUP-00690

movement, even though the movement itself was not explicitly on the ballot. These strong statements can have the political effect of stifling student activism. They can also be read as an admonishment of students who organized the referendum and, implicitly, of all those who voted in favor of divestment.

We write in defense of student activism and against making Palestine an exception to the right of free speech on campus. Regardless of one's position on divestment, the roughly two thousand undergraduate students at Brown who, exercising their democratic right, voted in favor of the referendum deserve better than the unfounded accusation that they are politically polarizing an otherwise neutral campus. All students deserve respect, protection and a fair hearing when they exercise their legitimate right to pose questions and vote. That must include those who voted against the President's views.

We are deeply concerned by Paxson's statement that "instead" of calls for divestment, the Brown community should "engage in productive discourse on this issue through our teaching, research and contributions to diplomacy." This statement unacceptably narrows the range of legitimate activism by students and other members of the Brown community. By using the phrase "on this issue" it also sets up a double standard, in that it seems to apply only to activism that is critical of Israeli government policies. The 1968 Black Student Walkout, the 1975 student vote to strike in favor of budget transparency, the 1987 Students Against Apartheid demands for divestment from South Africa and more recently, the 2015 student organizing against university inaction on racial and class representation on campus were also entirely peaceful and democratic forms of activism that sought to challenge indifference or political gridlock that existed at the time. Ultimately, they made Brown a better place.

It is precisely such examples of student activism for social justice that have inspired supporters of Brown Divest. The numerous public events they organized during the six months prior to the March 21 referendum contributed positively to informed and lively debate on campus and reaffirmed that all groups, without exception, are entitled to basic human rights. Through the referendum vote, many students have made clear their view that the Israeli government's policies towards Palestinians are diametrically opposed to Brown University's self-proclaimed values, enshrined in its strategic plan, Building on Distinction, which calls for "Creating Peaceful, Just, and Prosperous Societies." And they are not alone. Similar divestment referendums have passed in student government bodies at other campuses such as Stanford University, New York University, Barnard College, the University of Minnesota and George Washington University, among others.

It is not surprising that many Brown undergraduates resorted to a referendum in order to make their voices heard. As she acknowledges in her March 22 letter to the community, Paxson in 2012 rejected the recommendation of Brown's Advisory Committee on Corporate Responsibility in Investment Policies to initiate dialogue about possible divestment from companies that profit from the Israeli occupation of Palestinian Territories. Indeed, Brown Divest students have worked diligently through University processes and have sought dialogue rather than confrontation. In this, they have shown extraordinary courage in the face of not only Paxson's record of rejection on this issue, but also aggressive national campaigns of intimidation and censorship aimed at college students and professors who dare to speak out against Israeli government policies, as well as attempts by President Donald Trump's administration to conflate legitimate criticisms of Israeli policies with anti-Semitism.

It is vital to recognize that students active in Brown Divest have consistently called for upholding the human rights of all people. They have repeatedly condemned anti-Semitism along with any other form of racism and bigotry. Many attended vigils in honor of Jewish and Muslim victims of recent terrorist attacks by white supremacists in Pittsburgh and New Zealand. Several, also, responded constructively to the arguments of students who opposed the referendum — whose voices should and are being heard — in a succession of spirited op-eds in this newspaper. These exchanges highlighted the diversity of opinions among Jewish students on divestment, many of whom supported the

JA2109

AAUP-00691

referendum. While these students have engaged in productive discourse, Brown's senior administration has yet to condemn egregious blacklisting websites, such as Canary Mission, that have threateningly listed Brown students and professors who criticize the Israeli government's actions and speak up for Palestinian human rights.

At a time when there is as dire a need as ever for moral clarity, transparency and democratic participation in our country, we call on our University administration to take seriously our students' concern about injustices in which our institution may be complicit. Is Brown University a beneficiary of investments in companies that profit from the Israeli occupation of Palestine? That is the still unanswered question at the heart of last week's campus vote. It is not a question we or anyone else should admonish our students for asking. Rather, let us support and honor all our students — and with it Brown's renowned tradition of rigorous, conscientious and engaged scholarship — by organizing campus-wide discussions and debates on that question and others like it. If principled inquiry is our method and the pursuit of knowledge for a better world is our goal, what do we have to fear?

Respectfully,

*Aliyyah I. Abdur-Rahman, Departments of American Studies and English*

*Faiz Ahmed, Department of History*

*Umer Akbar, Department of Neurology*

*Nadje Al-Ali, Department of Anthropology and Watson Institute for International and Public Affairs*

*Leticia Alvarado, Department of American Studies*

*Iradj Anvar, Center for Language Studies*

*Ariella Azoulay, Departments of Modern Culture and Media and Comparative Literature*

*Timothy Bewes, Department of English*

*Leslie Bostrom, Department of Visual Art*

*Lundy Braun, Departments of Africana Studies and Pathology and Laboratory Medicine*

*Palmira Brummett, Department of History*

*Mari Jo Buhle, Departments of History and American Studies*

*Paul Buhle, Department of American Studies*

*Caroline Castiglione, Departments of Italian Studies and History*

*John Cayley, Department of Literary Arts*

*Tamara Chin, Departments of Comparative Literature and East Asian Studies*

*Nitsan Chorev, Department of Sociology and Watson Institute for International and Public Affairs*

*Mirena Christoff, Center for Language Studies*

*Mark Cladis, Department of Religious Studies*

*Joan Copjec, Department of Modern Culture and Media*

JA2110

AAUP-00692

*Denise Davis, Pembroke Center for Teaching and Research on Women*

*Kelly Dobson, Department of Modern Culture and Media*

*Fulvio Domini, Department of Cognitive, Linguistic and Psychological Sciences*

*Beshara Doumani, Department of History*

*Emily Drumsta, Department of Comparative Literature*

*Paja Faudree, Department of Anthropology*

*Masako Fidler, Department of Slavic Studies*

*James Fitzgerald, Department of Classics*

*Scott Frickel, Department of Sociology and Institute at Brown for Environment and Society*

*Lina Fruzetti, Department of Anthropology*

*Leela Gandhi, Department of English and Cogut Institute for the Humanities*

*Alex Gourevitch, Department of Political Science*

*Matthew Guterl, Departments of Africana Studies and American Studies*

*Matthew Gutmann, Department of Anthropology*

*Yannis Hamilakis, Department of Classics and Joukowsky Institute for Archaeology and the Ancient World*

*Françoise Hamlin, Departments of History and Africana Studies*

*Alla Hassan, Center for Language Studies*

*Juliet Hooker, Department of Political Science*

*Lung-Hua Hu, Department of East Asian Studies*

*Evelyn Hu-Dehart, Departments of History and American Studies*

*Jose Itzigsohn, Department of Sociology*

*Lynne Joyrich, Department of Modern Culture and Media*

*Tamar Katz, Department of English*

*William Keach, Department of English*

*Adrienne Keene, Department of American Studies and Ethnic Studies*

*Michael Kennedy, Department of Sociology and Watson Institute for International and Public Affairs*

*Nancy Khalek, Department of Religious Studies*

*Daniel Kim, Departments of English and American Studies*

*Brian Lander, Department of History and Institute at Brown for Environment and Society*

*Robert Lee, Department of American Studies*

JA2111

AAUP-00693

*Mary Rebecca Leuchak, Center for Language Studies*

*Evelyn Lincoln, Departments of History of Art and Architecture and Italian Studies*

*Catherine Lutz, Department of Anthropology and Watson Institute for International and Public Affairs*

*Amanda Lynch, Department of Earth, Environmental and Planetary Sciences*

*Sreemati Mitter, Department of History and Watson Institute for International and Public Affairs*

*Elias Muhanna, Department of Comparative Literature*

*Monica Muñoz Martinez, Department of American Studies and Ethnic Studies*

*Rebecca Nedostup, Department of History*

*Laura Odello, Department of French Studies*

*Adi Ophir, Cogut Institute for the Humanities and Middle East Studies*

*Emily Owens, Department of History*

*Samuel Perry, Department of East Asian Studies*

*Kevin Quashie, Department of English*

*Thangam Ravindranathan, Department of French Studies*

*Marc Redfield, Departments of English and Comparative Literature*

*Syed Rizvi, Department of Neurology*

*Daniel A. Rodriguez, Department of History*

*Ellen Rooney, Department of Modern Culture and Media*

*Christopher Rose, School of Engineering*

*Tricia Rose, Department of Africana Studies*

*Philip Rosen, Department of Modern Culture and Media*

*Nidia Schuhmacher, Department of Hispanic Studies*

*Robert Self, Department of History*

*Thomas Serre, Department of Cognitive Linguistic and Psychological Sciences*

*Naoko Shibusawa, Departments of History and American Studies*

*Elena Shih, Department of American Studies and Ethnic Studies*

*Daniel Jordan Smith, Department of Anthropology*

*Kerry Smith, Department of History*

*Victoria Smith, Department of Hispanic Studies*

AAUP-00694

JA2112

*Susan Smulyan, Department of American Studies*

*Patricia Sobral, Department of Portuguese and Brazilian Studies*

*Silvia Sobral, Department of Hispanic Studies*

*Suzanne Stewart-Steinberg, Departments of Italian Studies and Comparative Literature*

*Lulei Su, Department of East Asian Studies*

*Mark Suchman, Department of Sociology*

*Peter Szendy, Department of Comparative Literature and Cogut Institute for the Humanities*

*Nina Tannenwald, Department of Political Science*

*Peter van Dommelen, Department of Archaeology and Joukowsky Institute for Archaeology and the Ancient World*

*Lingzhen Wang, Department of East Asian Studies*

*William H. Warren, Department of Cognitive, Linguistic, and Psychological Sciences*

*Elizabeth Weed, Pembroke Center for Teaching and Research on Women*

*Deborah Weinstein, Department of American Studies*

*Andre C. Willis, Department of Religious Studies*

*David Wills, Departments of French Studies and Comparative Literature*

*Patricia Ybarra, Department of Theatre Arts and Performance Studies*

*Vazira Zamindar, Department of History*

*Asli Zengin, Department of Anthropology*

An updated list of Brown Faculty signatories can be found <u>here</u>.

**Correction: Due to a miscommunication in the editorial process, an earlier version of this op-ed included the following question: "Is Brown University a beneficiary of investments in companies that profit from companies complicit in human rights abuses in Palestine?" This misstates the authors' original argument and has been corrected to read: "Is Brown University a beneficiary of investments in companies that profit from the Israeli occupation of Palestine?" The Herald regrets the error.**



**Grand Hotel, Mackinac Island**
Get Lost in the Charms of Mackinac Island. Scenic, Historic and Romantic.
Grand Hotel

Book Now >

About us
Contact us
Advertising
Donate
Terms of Service
Privacy Policy
Masthead
Alumni

Subscribe to our newsletter

**BDH**

The Brown Daily Herald, Inc. is a financially independent, nonprofit media organization with more than 250 students working across our journalism, business and web divisions.

X f ⓘ ⓝ

JA2113

Your Email Address

**Subscribe**

Powered by ⬢ **WORKS** Solutions by The State News

All Content © 2025 The Brown Daily Herald, Inc.

JA2114

AAUP-00696





SINCE 1891

# THE BROWN DAILY HERALD

**Print Editions**
Thursday June 12th, 2025

Lawn Mower Recycle LLC
In All 50 States

OPEN

OPINIONS

# Brown faculty call for a ceasefire in Israel-Palestine and the protection of academic freedom and student activism



"It is precisely at such times of crisis, fear and misinformation that we as scholars, faculty and university leaders must demand moral consistency, including the protection of all civilian lives."

By **Brown University Faculty Members**
November 7, 2023 | 11:28pm EST

*Editors' note: The letter below was first internally circulated to faculty Nov. 2, 2023. This letter has been sent to President Christina Paxson P'19 P'MD'20 with additional signatories who opted not to make their names public.*

We, the undersigned faculty at Brown University, are deeply aggrieved by the catastrophic events unfolding in Israel and Palestine, especially but not limited to Gaza. We unequivocally condemn any attacks on civilians, including the horrific attacks by Hamas on Oct. 7 which killed up to 1,400 Israelis, including children, and we call for the immediate release of all hostages. So, too, do we condemn the Israeli military's appalling siege and bombardment of Gaza that, largely with U.S.-made weapons, has now killed over 8,500 Palestinians, 67% of whom are women and children, and displaced over 1 million Palestinians since Oct. 7.

At a time of such staggering civilian casualties and destruction in Gaza, which is coinciding with unprecedented national and media-driven campaigns to silence or stigmatize voices in support of Palestinian human rights, we call on our colleagues and the administration to draw strength from the core values of Brown and use their power to:

JA2115

AAUP-00697

1. Join the international calls for an immediate ceasefire and an end to Israel's siege of Gaza so that life-saving food, water and medicine can reach Palestinian civilians.

2. Affirm and advocate for the protection and ability of our students, staff and faculty to speak up for Palestinian human rights without censorship or intimidation.

In this charged national environment, we understand that universities are under pressure to silence criticism of Israeli government actions and activism for Palestinian human rights by equating such speech and activism with antisemitism. Yet, it is precisely at such times of crisis, fear and misinformation that we as scholars, faculty and university leaders must demand moral consistency, including the protection of all civilian lives. It is precisely now that we must affirm the principles of academic freedom and free speech for all on our campus, alongside the rejection of hate speech including antisemitism, Islamophobia and anti-Arab racism. And it is precisely now that we must allow for open, informed and evidence-based discussions so that the most rigorous, scrupulous and compelling arguments on contested issues can come forward.

At this pivotal historical juncture, we respectfully call on our University president to: (1) Urge Rhode Island's senators to support legislation demanding a ceasefire, an end to Israel's siege and a political resolution to this conflict based on justice and equality; (2) issue a public-facing letter decrying the recent threats to freedom of expression and inquiry on American campuses, which have sought to intimidate those addressing the context and root causes of ongoing violence in Israel-Palestine and (3) issue a letter to our University community affirming that — as with any other subject — the University administration will not tolerate efforts to intimidate, censor or punish Brown students, staff and faculty for exercising their constitutional right to free speech, activism and scholarship when it comes to Israel-Palestine. There must be no "Palestine Exception" to free speech at Brown.

As for a ceasefire, some may say it is not the place of university leaders to interfere in thorny questions of foreign policy. What is happening in Gaza is far beyond that. On Oct. 29, Save the Children reported 3,195 Palestinian children have been killed in Gaza by Israel's air strikes and auxiliary operations over three weeks — surpassing the annual number of children killed across the world's conflict zones (over 20 countries) since 2019. Given the critical role of U.S. munitions and political support for Israel's ongoing military operations in Gaza, we firmly believe this is a moral concern that implicates all Americans regardless of ethnicity, religion or political opinion. It is the same moral concern that — long before Oct. 7, 2023 — inspired the acclaimed legal scholar and civil rights activist Michelle Alexander (author of "The New Jim Crow," Brown First Reading for 2015), to declare that America's civic leaders must no longer remain silent on "one of the great moral challenges of our time: the crisis in Israel-Palestine."

We encourage the ongoing efforts of our University administration to cultivate a campus community in which all students, staff and faculty — especially those with loved ones directly affected by the conflict — are supported and heard. However, we cannot and should not support fanning the flames of war by inflicting collective punishment on innocent Palestinian civilians with American weapons and technology. And no one should be allowed to restrict the right of our students, staff or faculty for raising these points loudly and clearly.

Sincerely,

*Signing Members of the Brown University faculty in Alphabetical Order as of Nov. 7, 2023:*

aliyyah i. abdur-rahman, Departments of American Studies and English

Faiz Ahmed, Department of History

Nadje Al-Ali, Department of Anthropology, Center for Middle East Studies and Watson Institute for International and Public Affairs

JA2116

AAUP-00698

Leticia Alvarado, Department of American Studies

Elsa Amanatidou, Department of Classics

Amanda Anderson, Cogut Institute for the Humanities and Department of English

Peter Andreas, Department of Political Science and Watson Institute for International and Public Affairs

Ariella Aïsha Azoulay, Departments of Modern Culture and Media and Comparative Literature

Saleem Ashkar, Department of Music

Joshua Babcock, Department of Anthropology

Muhammad Baig, Warren Alpert Medical School

Tiraana Bains, Department of History

Richard Baldoz, Department of American Studies

Omer Bartov, Department of History

Laura Bass, Department of Hispanic Studies

Reda Bensmaia, Emeritus, Departments of French and Francophone Studies and Comparative Literature

Susan Bernstein, Departments of Comparative Literature and German Studies

Timothy Bewes, Department of English

John Bodel, Departments of Classics and History

Anthony Bogues, Simmons Center for the Study of Slavery and Justice, Departments of Africana Studies and the History of Art and Architecture

Sheila Bonde, Department of the History of Art and Architecture, Joukowsky Institute for Archaeology and the Ancient World

Leslie Bostrom, Department of Visual Art

Cynthia Brokaw, Departments of History and East Asian Studies

Mari Jo Buhle, Emerita, Departments of American Studies and History

Stuart Burrows, Department of English

Stephen Bush, Department of Religious Studies

Vangelis Calotychos, Department of Classics

Prudence Carter, Department of Sociology

Holly Case, Department of History

John Cayley, Department of Literary Arts

Melody Chan, Department of Mathematics

Silvia Chiang, Department of Pediatrics, Warren Alpert Medical School

Tamara Chin, Department of Comparative Literature

JA2117

AAUP-00699

Mahasan Chaney, Department of Education

Kenneth Chay, Department of Economics

Mark Cladis, Department of Religious Studies

Michelle Clayton, Departments of Hispanic Studies and Comparative Literature

Alexandra Collins, Department of Epidemiology, School of Public Health

Ruth Colwill, Department of Cognitive, Linguistic and Psychological Sciences

Hal Cook, Department of History

Joan Copjec, Department of Modern Culture and Media

Denise Davis, Gender and Sexuality Studies Program, Pembroke Center

Bathsheba Demuth, Department of History and Institute at Brown for Environment and Society

Lisa Di Carlo, Department of Sociology

Fulvio Domini, Department of Cognitive, Linguistic and Psychological Sciences

Beshara Doumani, Department of History

Carolina Ebeid, Department of Literary Arts

Miled Faiza, Center for Language Studies

Paja Faudree, Department of Anthropology and Program in Linguistics

Linford Fisher, Department of History

James L. Fitzgerald, Emeritus, Department of Classics

Lina M. Fruzzetti, Department of Anthropology

Leela Gandhi, Cogut Institute for Humanities and Department of English

Eva Gómez García, Department of Hispanic Studies

Macarena Gómez-Barris, Department of Modern Culture and Media and Brown Arts Institute

Matthew Guterl, Departments of Africana Studies and American Studies

Matthew Gutmann, Emeritus, Department of Anthropology

Yannis Hamilakis, Joukowsky Institute for Archaeology and the Ancient World and Department of Classics

Françoise Hamlin, Departments of Africana Studies and History

Jae Han, Department of Religious Studies

Susan Harvey, Department of Religious Studies

Alla Hassan, Center for Language Studies

Patrick Heller, Department of Sociology and Watson Institute for International and Public Affairs

Alani Hicks-Bartlett, Departments of Comparative Literature, French and Francophone Studies and Hispanic Studies

Bonnie Honig, Departments of Modern Culture and Media and Political Science

JA2118

AAUP-00700

Evelyn Hu-DeHart, Departments of History and American Studies/Ethnic Studies

Laird Hunt, Department of Literary Arts

Jose Itzigsohn, Department of Sociology

Nancy J. Jacobs, Department of History

Julia Jarcho, Department of Theatre Arts and Performance Studies

Lynne Joyrich, Department of Modern Culture and Media

Ieva Jusionyte, Department of Anthropology and Watson Institute for International and Public Affairs

Coppélia Kahn, Emerita, Department of English

William Keach, Emeritus, Department of English

Adrienne Keene, Department of American Studies

Nancy Khalek, Departments of Religious Studies and History

Michael D. Kennedy, Department of Sociology and Watson Institute for International and Public Affairs

Daniel Kim, Departments of English and American Studies

Stephen Kinzer, Watson Institute for International and Public Affairs

Brian Lander, Department of History and Institute at Brown for Environment and Society

Robert Lee, Emeritus, Department of American Studies

Shelley Lee, Department of American Studies

Wendy Allison Lee, Pembroke Center and Gender and Sexuality Studies Program

Jeremy Lehnen, Center for Language Studies and Portuguese and Brazilian Studies

Leila Lehnen, Portuguese and Brazilian Studies

Myles Lennon, Department of Anthropology and Institute at Brown for Environment and Society

Ainsley LeSure, Departments of Africana Studies and Political Science

Patsy Lewis, Department of Africana Studies

Glenn C. Loury, Department of Economics, Watson Institute for International and Public Affairs

Enongo Lumumba-Kasongo, Department of Music and Brown Arts Institute

Catherine Lutz, Emerita, Department of Anthropology

Brandon Marshall, Department of Epidemiology, School of Public Health

Felipe Martinez-Pinzon, Department of Hispanic Studies

Kevin McLaughlin, Departments of English, Comparative Literature and German Studies, and John Nicholas Brown Center for Advanced Study

Brian Meeks, Department of Africana Studies

Kristina Mendicino, Department of German Studies

JA2119

AAUP-00701

Kiri Miller, Department of American Studies

Ourida Mostefai, Departments of Comparative Literature and French and Francophone Studies

Elias Muhanna, Departments of Comparative Literature and History

Rebecca Nedostup, Departments of History and East Asian Studies

Tara Nummedal, Departments of History and Italian Studies

Mark Ocegueda, Department of History

Mohamed Omer, Department of Pathology and Laboratory Medicine, Warren Alpert Medical School

Adi M. Ophir, Cogut Institute for the Humanities and Center for Middle East Studies

Emily Owens, Department of History

Esra Ozdemir, Center for Language Studies

Robert Preucel, Department of Anthropology

Jason Protass, Department of Religious Studies

Michelle Quay, Center for Language Studies and Center for Middle East Studies

Abrar Qureshi, Departments of Dermatology and Epidemiology, Warren Alpert Medical School and School of Public Health

Momotazur Rahman, Department of Health Services Policy and Practice, School of Public Health

Dixa Ramirez-D'Oleo, Department of English

Stéphanie Ravillon, Department of French and Francophone Studies

Thangam Ravindranathan, Department of French and Francophone Studies

Sherief Reda, School of Engineering and Department of Computer Science

Marc Redfield, Departments of Comparative Literature, English and German Studies

Ravit Reichman, Department of English

Gerhard Richter, Departments of Comparative Literature and German Studies

Lukas Rieppel, Department of History and Science, Technology and Society Program

Katie Rieser, Department of Education

Massimo Riva, Department of Italian Studies

Timmons Roberts, Institute at Brown for Environment and Society and Department of Sociology

Gabriel Rocha, Departments of History and Portuguese and Brazilian Studies

Seth Rockman, Department of History

Daniel A. Rodríguez, Department of History

Noliwe Rooks, Department of Africana Studies

Ellen Rooney, Departments of English and Modern Culture and Media

JA2120

AAUP-00702

Tricia Rose, Department of Africana Studies, Center for the Study of Race and Ethnicity in America

Poulami Roychowdhury, Department of Sociology and Watson Institute for International and Public Affairs

Stephanie Savell, Watson Institute for International and Public Affairs

Janine Anderson Sawada, Departments of Religious Studies and East Asian Studies

Rebecca Schneider, Department of Modern Culture and Media

Nidia A. Schuhmacher, Department of Hispanic Studies

Lewis Seifert, Department of French and Francophone Studies

Robert Self, Department of History

Roberto Serrano, Department of Economics

Thomas Serre, Department of Cognitive Linguistics and Psychological Sciences

Ahmed Shahab, Warren Alpert Medical School

Matthew Shenoda, Department of Literary Arts and Brown Arts Institute

Naoko Shibusawa, Departments of History and American Studies

Elena Shih, Department of American Studies

Eleni Sikelianos, Department of Literary Arts

Prerna Singh, Department of Political Science and Watson Institute for International and Public Affairs

Ada Smailbegović, Department of English

Kerry Smith, Department of History

Susan Smulyan, Department of American Studies

Patricia Sobral, Department of Portuguese and Brazilian Studies

Tracy Steffes, Departments of Education and History

Michael Steinberg, Departments of History and Music

Suzanne Stewart-Steinberg, Departments of Comparative Literature and Italian Studies

Kera Street, Department of Religious Studies

Cole Swensen, Department of Literary Arts

Peter Szendy, Cogut Institute for the Humanities and Department of Comparative Literature

Nina Tannenwald, Department of Political Science

Sarah Thomas, Department of Hispanic Studies

Alison Tovar, Department of Behavioral and Social Sciences, School of Public Health

Daniel Vaca, Department of Religious Studies

Peter van Dommelen, Joukowsky Institute for Archaeology and the Ancient World and Department of Anthropology

Rajiv Vohra, Department of Economics

JA2121

AAUP-00703

Lingzhen Wang, Department of East Asian Studies

William Warren, Department of Cognitive, Linguistic and Psychological Sciences

Elizabeth Weed, Pembroke Center for Teaching and Research on Women

Alexander Weheliye, Department of Modern Culture and Media

Annie Wiart, Department of French and Francophone Studies

Andre C. Willis, Department of Religious Studies

David Wills, Department of French and Francophone Studies

Patricia Ybarra, Department of Theatre Arts and Performance Studies

Vazira Zamindar, Department of History

*Affiliations are stated for identification purposes only. An updated list of Brown Faculty signatories can be found here.*



About us
Contact us
Advertising
Donate
Terms of Service
Privacy Policy
Masthead
Alumni

Subscribe to our newsletter

Your Email Address

**Subscribe**

BDH

The Brown Daily Herald, Inc. is a financially independent, nonprofit media organization with more than 250 students working across our journalism, business and web divisions.

Powered by WORKS Solutions by The State News

All Content © 2025 The Brown Daily Herald, Inc.

JA2122

AAUP-00704

**Trial Exhibit 225 is a multimedia file that will be separately served on a digital media storage device alongside paper copies of the Joint Appendix**

JA2123

OPINION | GUEST

# Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions

By **Rumeysa Ozturk**, **Fatima Rahman**, **Genesis Perez** and **Nicholas Ambeliotis**
Published Tuesday, March 26, 2024

On March 4, the Tufts Community Union Senate passed 3 out of 4 resolutions demanding that the University acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments and divest from companies with direct or indirect ties to Israel. These resolutions were the product of meaningful debate by the Senate and represent a sincere effort to hold Israel accountable for clear violations of international law. Credible accusations against Israel include accounts of deliberate starvation and indiscriminate slaughter of Palestinian civilians and plausible genocide.

Unfortunately, the University's response to the Senate resolutions has been wholly inadequate and dismissive of the Senate, the collective voice of the student body. Graduate Students for Palestine joins Tufts Students for Justice in Palestine, the Tufts Faculty and Staff Coalition for Ceasefire and Fletcher Students for Palestine to reject the University's response. Although graduate students were not allowed by the University into the Senate meeting, which lasted for almost eight hours, our presence on campus and financial entanglement with the University via tuition payments and the graduate work that we do on grants and research makes us direct stakeholders in the University's stance.

While an argument may be made that the University should not take political stances and should focus on research and intellectual exchange, the automatic rejection, dismissive nature and condescending tone in the University's statement have caused us to question whether the University is indeed taking a stand against its own declared commitments to free speech, assembly and democratic expression. According to the Student Code of Conduct, "[a]ctive citizenship, including exercising free speech and engaging in protests, gatherings, and demonstrations, is a vital part of the Tufts community." In addition, the Dean of Students Office has written, "[w]hile at times the exchange of controversial ideas and opinions may cause discomfort or even distress, our mission as a university is to promote critical thinking, the rigorous examination and discussion of facts and theories, and diverse and sometimes contradictory ideas and opinions." Why then is the University discrediting and disregarding its students who practice the very ideals of critical thinking, intellectual exchange and civic engagement that Tufts claims to represent?

The role of the TCU Senate resolutions is abundantly clear. The Senate's resolutions serve as a "strong lobbying tool that expresses to the Tufts administration the wants and needs of the student body. They speak as a collective voice and are instrumental in enacting systemic changes." In this case, the "systemic changes" that the collective voice of the student body is calling for are for the University to end its complicity with Israel insofar as it is oppressing the Palestinian people and denying their right to self-determination — a right that is guaranteed by international law. These strong lobbying tools are all the more urgent now given the order by the International Court of Justice confirming that the Palestinian people of Gaza's rights under the Genocide Convention are under a "plausible" risk of being breached.

This collective student voice is not without precedent. Today, the University may remember with pride its decision in February 1989 to divest from South Africa under apartheid and end its complicity with the then-racist regime. However, we must remember that the University divested up to 11 years after some of its peers. For instance, the Michigan State University Board of Regents passed resolutions to end its complicity with Apartheid South Africa as early as 1978. Had Tufts heeded the call of the student movement in the late 1970s, the University could have been on the right side of history sooner.

We reject any attempt by the University or the Office of the President to summarily dismiss the role of the Senate and mischaracterize its resolution as divisive. The open and free debate demonstrated by the Senate process (exemplified by the length, open notice and substantive exchange in the proceedings and the non-passing of one of the proposed resolutions), together with the serious organizing efforts of students, warrant credible self-reflection by the Office of the President and the University. We, as graduate students, affirm the equal dignity and humanity of all people and reject the University's mischaracterization of the Senate's efforts.

JA2124

AAUP-01592

The great author and civil rights champion James Baldwin once wrote: "The paradox of education is precisely this: that as one begins to become conscious one begins to examine the society in which [they are] being educated." As an educator, President Kumar should embrace efforts by students to evaluate "diverse and sometimes contradictory ideas and opinions." Furthermore, the president should trust in the Senate's rigorous and democratic process and the resolutions that it has achieved.

We urge President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions passed by the Senate.

This op-ed was written by Nick Ambeliotis (CEE, '25), Fatima Rahman (STEM Education, '27), Genesis Perez (English, '27) and Rumeysa Ozturk (CSHD, '25) and is endorsed by 32 other Tufts School of Engineering and Arts and Sciences Graduate Students.

---

## TRENDING

**SMFA union files unfair labor practice complaint against Tufts following administrative restructure**
By **Josué Pérez** | June 20



## THE PRINT EDITION

JA2125

AAUP-01593

# THE TUFTS DAILY

### THE INDEPENDENT STUDENT NEWSPAPER OF TUFTS UNIVERSITY EST. 1980

VOLUME XCI, ISSUE 11     Sunday, May 18, 2025     Medford/Somerville, Mass.



# COMMENCEMENT 2025

SECTIONS

News
Features
Arts
Opinion
Sports

QUICK LINKS

About
Masthead
Contact
Submit a Tip
Join Us

Investigative

Science

Magazine

Audio

Video

Newsletter

Advertising

RSS Feeds

Privacy Policy

Terms of Service

## SOCIAL

   

CONTACT

The Tufts Daily

PO Box 53018

Medford, MA 02155

daily@tuftsdaily.com

---

All Content © 2025 The Tufts Daily

Powered by          Solutions by The State News

AAUP-01595

JA2127

# Rumeysa Ozturk

**Status:** Student
**State:** Massachusetts
**Organizations:** BDS
**University:** Tufts, TC



Share:     🔗

Rumeysa Ozturk engaged in anti-Israel activism in March 2024, in the wake of the Hamas terrorist attacks on Israelis on October 7, 2023.

On October 7, 2023, Hamas murdered approximately 1,200 Israelis, kidnapped hundreds and wounded thousands. War crimes included mass rape and torture. Many Palestinian civilians participated in and supported the attacks, and Gazans working in the targeted Israeli communities gave intelligence to Hamas on where to strike.

For more information, see the Canary Mission page on Hamas.

Ozturk is a supporter of the Boycott, Divestment, Sanctions (BDS) movement.

As of January 2025, Ozturk was listed as the course instructor of "Intro to Children's Media - 04" and "Youth and Media - 06" at Tufts University (Tufts).

The courses were scheduled to take place in February and April 2025, respectively. Both course descriptions said: "...reserved for high school students who are rising 10th, 11th, or 12th grade students...students will be prompted to submit an additional application after enrollment..." Tufts is located in Medford and Somerville, Massachusetts.

As of January 2025, Ozturk's LinkedIn profile said she had worked as a graduate research assistant at Tufts since August 2023, and as a course instructor at Tufts from July 2024 to August 2024.

As of the same date, Ozturk's LinkedIn said she was studying for a doctorate in child study and human development at Tufts, slated to graduate in 2026.

Ozturk graduated with a master's degree in developmental and child psychology from Teachers College, Columbia University (TC) in 2020. TC is located in New York, New York.

As of February 2025, Ozturk's LinkedIn said she was located in the Greater Boston area, Massachusetts.

**JA2128**

AAUP-01568

On March 26, 2024, Ozturk co-authored an op-ed published in the Tufts Daily newspaper titled: "Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions." The authors urged "President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions passed by the Senate."

The op-ed referred to the passing of anti-Israel resolutions by the Tufts Community Union (TCU) Senate, which demanded the University "...acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments, and divest from companies with direct or indirect ties to Israel."

On March 4, 2024, Tufts President Kumar published a "Message on TCU Senate Resolutions" addressed to Tufts students, faculty, and staff. Kumar wrote: "...the Tufts Community Union Senate...passed three resolutions, initially proposed by the Coalition for Palestinian Liberation..."

President Kumar's message continued: "...we're disappointed that a majority voted to pass three of the four resolutions. To be clear: as we have done in the past, we reject the Boycott Divestment Sanctions movement, we wholeheartedly support academic freedom and all our academic and exchange programs, and we will continue to work with all companies that we engage with and do business with now."

## ⌃ Social Media and Weblinks

**in** https://www.linkedin.com/in/rumeysaozturk/

🌐 ResearchGate

🌐 Google Scholar

🌐 Academia.edu

| | |
|---|---|
| HOME | ORGANIZATIONS |
| OUR MISSION | EX-CANARY |
| ETHICS POLICY | BLOG |
| CONTACT US | CAMPAIGNS |
| STUDENTS | CANADA |
| PROFESSORS | |
| PROFESSIONALS | |
| MEDICAL | |

Copyright © 2024 Canary Mission Inc.
All rights reserved.

JA2129



# OUR MISSION

Canary Mission documents individuals and organizations that promote hatred of the USA, Israel and Jews on North American college campuses and beyond. Canary Mission investigates hatred across the entire political spectrum, including the far right, far left and anti-Israel activists.

Canary Mission is motivated by a desire to combat the rise in anti-Semitism on college campuses. We pursue our mission by presenting the words and deeds of individuals and organizations that engage in anti-Semitism, racism and bigotry on the far right, far left and among the array of organizations that comprise the anti-Semitic Boycott, Divestment, Sanctions (BDS) movement.

Canary Mission gathers content from publicly available sources. Additionally, we collect and validate materials submitted privately through our website. We aggregate this information into a concise and easily searchable format, providing free access to the general public.

Before publication, all content is verified, meeting our high standards of accuracy and authenticity.

When published content is based on validated information submitted privately, a note indicating this is placed on the page.

The addition of individuals to our database is governed by our Ethics Policy .

Individuals who believe that they should be removed from the Canary Mission website are encouraged to be in touch with us and may become an Ex-Canary.

AAUP-00333

JA2130



CANARY MISSION

we all have the right to know if an individual has been affiliated with movements that routinely engage in anti-Semitic rhetoric and actions, promote hatred of Jews and seek the destruction of Israel.



| | |
|---|---|
| **HOME** | **ORGANIZATIONS** |
| **OUR MISSION** | **EX-CANARY** |
| **ETHICS POLICY** | **BLOG** |
| **CONTACT US** | **CAMPAIGNS** |
| **STUDENTS** | **CANADA** |
| **PROFESSORS** | |
| **PROFESSIONALS** | |
| **MEDICAL** | |

Copyright © 2024 Canary Mission Inc.
All rights reserved.

JA2131



# Mohsen Mahdawi

**Status:** Unknown
**State:** New York
**Organizations:** WOL, SJP, JVP, DAR, BDS
**University:** Columbia, BZU

Share:

## Mohsen Mahdawi's Arrest, Call for Israel's Destruction, Justification of Hamas Terrorism and Support for the Pro-Hamas Encampment at Columbia University (Columbia)



Mahdawi speaking at an anti-Israel rally

JA2132

AAUP-01560

03:10

Mohsen Mahdawi is a leading anti-Israel activist who was arrested in April 2025 for his pro-Hamas activism. He has also called for Israel's destruction and justified Hamas terrorism in late 2023. Ten years earlier, he celebrated a terrorist who had murdered dozens of Israeli Jews in 1978. Mahdawi also showed support for the pro-Hamas encampment at Columbia in April 2024.

Mahdawi made his late 2023 statements after a series of Hamas terror atrocities and war crimes against Israeli civilians, including mass murder, torture, rape, beheadings and kidnappings, which were executed on October 7, 2023. The attacks left over 1,200 Israelis dead, hundreds kidnapped and thousands wounded. Israel retaliated with a war called "Swords of Iron."

Hamas has been designated as a terrorist organization by the U.S., Canada, European Union, Israel and other countries. Founded in 1987, it has killed thousands of Israeli civilians through mass shootings and suicide bombings. Hamas has also kidnapped children, families and the elderly and held them hostage in Gaza. It has desecrated [slide 7] dead bodies and launched numerous rocket attacks against Israeli civilians.

In December 2023, Mahdawi served as co-president of DAR Palestine at Columbia University (Dar at Columbia), Columbia's Palestinian student union, which is reportedly part of a coalition of 80 anti-Israel student groups. Columbia is located in New York, New York.

Mahdawi was also affiliated with the pro-terror activist group Within Our Lifetime (WOL) in 2023. He was reportedly a member of Students for Justice in Palestine (SJP) that same year.

Mahdawi is a supporter of the Boycott, Divestment, Sanctions (BDS) movement.

In December 2023, CBS reported [00:07:10] that Mahdawi "grew up in a refugee camp in the Israeli-occupied West Bank."

As of February 20, 2024, Mahdawi, who also goes by Mohsen Khader Mahdawi, was listed in Columbia's online directory as a student in the Department of Philosophy at Columbia's School of General Studies.

As of March 7, 2024, Mahdawi's since-deleted LinkedIn profile said he was slated to graduate from Columbia in 2024.

As of the same date, Mahdawi's LinkedIn also said he studied computer engineering at Birzeit University (Birzeit) from 2008 to 2014.

Birzeit University's student body has celebrated terrorists since at least 2003. That year, student government elections featured models of exploding Israeli buses, as parties competed on the basis of which Palestinian faction had killed the most Israelis.



JA2133



“Hamas is a product of the Israeli occupation,” he said. Hamas, which has governed Gaza since 2007, has been designated as a terrorist organization by the U.S. and European Union.

Mahdawi shares the view of many Palestinians that Gaza is a longtime “open-air prison” of Israel's doing.

is rooted in international law, under which occupied peoples have the right to resist the occupation of their land,” they wrote. “If every political avenue available to Palestinians is blocked, we should not be surprised when resistance and violence break out.”

On Oct. 12, Mahdawi was among hundreds of pro-Palestinian demonstrators who gathered on Columbia's South Lawn. Supporters were called terrorists and had water thrown at them, he said.

CAPTURED BY CANARY MISSION

## ⌃ Arrested by ICE

On April 14, 2025, ABC News reported that Mahdawi was arrested by agents from the United States Immigration and Customs Enforcement (ICE) at the Immigration Services office in Colchester, Vermont. After his arrest, ICE began the process of deporting him.

In a court filing concerning the immigration status of Mahmoud Khalil, who co-founded the Palestinian Student Union at Columbia with Mahdawi and also faces deportation, United States Secretary of State Marco Rubio asserted that Khalil should be deported because of his role in "antisemitic protests and disruptive activities, which fosters a hostile environment for Jewish students in the United States."

## ⌃ Calling for Israel's Destruction

On November 15, 2023, Mahdawi spoke at an anti-Israel rally titled: “All Out for Gaza at Columbia University,” where he led [00:07:07] the crowd in chanting: “From the river to the sea, Palestine will be free!”

“From the River to the Sea, Palestine will be Free” is a chant used [00:02:47] to call for the elimination of the State of Israel. It has also been employed by Hamas leader Khaled Mashal to call for the replacement of Israel with an Islamic state. In April 2024, the U.S. House of Representatives passed a resolution condemning the chant as antisemitic.

Mahdawi then said [00:07:30]: “We were accused by the administration that we are calling for genocide, while the administration itself is ignoring the current genocide that is taking place in Gaza. Shame on you, Columbia!”

Mahdawi continued [00:09:01]: “[Columbia's] excuse of safety and security is a weaponization of this word, its the same weaponization that Israel has used as a tactic to steal land to con people, to suppress us, to keep us in refugee camps and to commit genocide and apartheid.”

Mahdawi's mention of “refugee camps” referred to a policy known as the “right of return.”

The “right of return” is a Palestinian demand discredited as a means to eliminate Israel. International law mandates no absolute right of return and UN Resolution 194, which defined principles for “refugees wishing to return to their homes,” was unanimously rejected by Arab nations following the 1948 Arab-Israeli War.

The rally, which “ended in front of the university's main entrance,” was reportedly co-organized by WOL and the City University of New York (CUNY) School of Law (CUNY Law) chapter of the Jewish Law Students Association (CUNY JLSA).

Mahdawi appeared at the rally wearing a keffiyeh and standing between WOL co-founder and chairperson Nerdeen Kiswani and leading WOL activist Abdullah Akl.

## ⌃ Justifying Hamas Terrorism in 2023

In an October 22, 2023 interview for a local New England newspaper, Mahdawi said: “Hamas is a product of the Israeli occupation.”

According to the newspaper, soon after October 7, 2023, Mahdawi and leaders of other anti-Israel student groups at Columbia wrote a statement that said: “We remind Columbia students that the Palestinian struggle for freedom is rooted in international law, under which occupied peoples have the right to resist the occupation of their land.”

Anti-Israel activists use the term “resistance” to refer to violence and terror perpetrated against Israeli civilians and their allies. It is used to glorify and encourage anti-Israel and anti-Semitic violence. Anti-Israel activists chant slogans such as: “Resistance by any means necessary!” and “Resistance is justified when people are occupied!” in response to terror attacks.

The statement that Mahdawi reportedly co-authored continued: “If every political avenue available to Palestinians is blocked, we should not be surprised when resistance and violence break out.”

AAUP-01562



mutilation.

Hamas broadcast videos of their butchery on social media, often to victims' accounts for families to see. Israel retaliated with a war called "Swords of Iron." As of November 10, 2023, approximately 1,200 Israelis, the vast majority of them civilians, were murdered during the attacks. Hamas kidnapped 242 Israelis, including at least 30 children. At least 3,500 people were wounded, many severely.

A terrorist detained by Israel admitted he raped an Israeli woman when he broke into a kibbutz house during the October 7, 2023 attack. In March 2024, a former hostage of Hamas publicly stated she was sexually abused and tortured while in captivity.

For more information on the October 7, 2023 terror attacks, see the Canary Mission page on Hamas.

In December 2023, during Israel's war against Hamas, Mahdawi was interviewed [00:06:07] on the television show "60 Minutes" to discuss his campus activism.

During the interview, Mahdawi said [00:08:17]: "When somebody is hurting you, when you see this person is being punched in the face and this feeling, it is: You now feel my pain."

The interviewer replied [00:08:30] back to Mahdawi: "But this Hamas attack wasn't a punch in the face. This was a horrible terror attack."

Mahdawi then said [00:08:43] that he "can empathize" with what Hamas did and continued: "To empathize is to understand the root cause and to not look at any event or situation in a vacuum. This is for me the path moving forward."

## ⌃ Celebrating a Terrorist in 2013

On February 3, 2013, a Facebook user shared a poem Mahdawi wrote that paid tribute to terrorist Dalal Mughrabi. Mahdawi left comments thanking the poster for sharing the text.

The poem said: "I will breathe home… / And fill my shame / And clean my gun / And collect my packages, my bombs / And embrace my gun…"

Dalal Mughrabi, a member of the Fatah faction of the Palestine Liberation Organization (PLO), participated in the 1978 Coastal Road massacre in Israel. She and other terrorists hijacked a bus in an attack that left 38 Israeli civilians dead, including 13 children.

## ⌃ Anti-Israel Activism (BDS)

In January 2024, Mahdawi participated [00:00:04] as a speaker at a "divestment now" rally organized by Columbia University Apartheid Divest (CUAD) and other student organizations. The protest called on Columbia to divest from Israel and promoted [slide 3; 00:00:01] "global intifada."

The term "intifada," which translates from Arabic as "uprising" or "insurrection," carries the connotation of violence. Palestinian intifadas waged against Israel have been marked since 1987 by hundreds of hijackings, shootings, stabbings, bombings and suicide missions.

On December 5, 2023, Mahdawi posted photos of himself speaking at a November 14, 2023 rally organized by DAR at Columbia and held on the Columbia campus. He wrote on his post: "We come here today to stand tall, to raise our voices, and to lift our spirits… chanting for humanity: Free, free Palestine!"

The aim of the November 14, 2023 rally and another one on November 15, 2023, where he called for Israel's destruction, was to protest Columbia's "unjust suspension" of the university's Jewish Voice for Peace (JVP) and SJP chapters for violating university policies.

## ⌃ Showing Support for the Pro-Hamas Encampment at Columbia

Mahdawi appeared [00:06:02] in an AJ+ video in which he was interviewed during the April 30, 2024 "occupation" of Columbia's Hamilton Hall by encampment participants. Discussing the university administration's decision to call in the New York Police Department (NYPD) to clear the locked, barricaded and vandalized building, Mahdawi claimed [00:06:34]: "This [police action] is a strategy that is used by the oppressor, and Columbia University…are doing the same thing."

On April 30, 2024, participants in Columbia's second pro-Hamas encampment forced their way into the university's Hamilton Hall, barricading themselves in the building and taking three Columbia custodians hostage. Protesters also vandalized [00:00:55] and destroyed university property inside the hall. A police raid on Hamilton found knives, gas masks, ropes and literature that read: "…DESTROY zionist business interests everywhere!…DEATH TO AMERICA!…"

AAUP-01563

building and taking a university worker hostage.

Activists protested Israel's war against Hamas and demanded that Columbia "divest from companies and institutions that profit from Israeli apartheid, genocide and occupation…"

The action had reportedly been planned for months and was organized by the Columbia University Apartheid Divest (CUAD) coalition. The encampment was also organized by Columbia's banned pro-Hamas activist group Students for Justice in Palestine (SJP) and the university chapter of Jewish Voice for Peace (JVP). Activists reportedly received training from National SJP and other anti-Israel organizations.

Among the encampment leaders was Columbia student Khymani James who had said [00:00:25]: "Zionists…They are nazis!… They're supporters of genocide! Why would we want people who are supporters of genocide to live?… Be glad, be grateful that I am not just going out and murdering Zionists." Aidan Parisi, another encampment leader, responded to Columbia's demand to disband the encampment by declaring online that: "COLUMBIA WILL BURN."

The encampment was forcibly dismantled at the directive of Columbia's president and administration. The NYPD [New York Police Department] entered the area, cleared the encampment and arrested more than 100 protestors, approximately 80 of whom were Columbia students. The students were charged with trespassing and suspended from Columbia indefinitely.

The next day, activists created a new encampment. When divestment negotiations with Columbia failed, protesters illegally forced their way into the university's Hamilton Hall on April 30, 2024. They smashed [00:00:55] through a glass-paneled door, broke security cameras, threw university property out of the windows and unfurled [00:00:01] a banner in the building's wall that read: "INTIFADA," a term in Arabic for uprising or insurrection that carries the connotation of violence.

While barricading themselves in the building, agitators kept three Columbia custodians hostage and stopped them from leaving. When the NYPD raided and dismantled the encampment a second time, they arrested more than 100 students, nearly half of whom were reportedly not affiliated with Columbia.

NYPD shared on Twitter photos of objects the police found in Hamilton Hall. These included knives, hammers, gas masks, ropes and a pamphlet that read [video 1]: "…DISRUPT/RECLAIM/DESTROY zionist business interests everywhere! DEATH TO ISRAELI REAL STATE! DEATH TO AMERICA!…LONG LIVE THE INTIFADA!"

Just outside the encampment area, Jewish students were called [slide 2]: "Uncultured a** b**ches!" and were told to "Go back to Europe!" Activists also said [slide 3] to them: "Yahoodim [Jews], yahoodi [Jew], f**k you!" and "Stop killing children!" as they walked from campus to their dorm rooms.

Also just outside the encampment area, anti-Israel activists chanted [slide 5]: "Ya Hamas, ya habib, odrob, odrob Tel Aviv! [Oh Hamas, oh loved one, strike, strike Tel Aviv!]", a chant that celebrates Hamas rocket attacks against Israel.

An activist just outside the encampment area held [photo 4] a sign that said, referring to the Izz ad-Din al-Qassam Brigades, Hamas's military wing: "AL-QASAM'S NEXT TARGETS." Her sign contained an arrow pointing to a pro-Israel crowd.

On May 31, 2024, Columbia SJP announced that its activists had set up a third encampment at the university. At the encampment, protesters reportedly displayed on a big screen a video that portrayed Hamas as a peace-seeking organization and made a sign that contained an inverted red triangle, a symbol in support of Hamas.

The Columbia encampment reportedly inspired a wave of protest encampments across North American campuses, where pro-Israel students were blocked or restricted from campus facilities. Jewish students were reportedly harassed in several other ways.

JA2136

AAUP-01564

JA2137

00:22

## ⌃ SJP

SJP is the leading student organization engaged in anti-Israel activity on North American college and university campuses. The first chapter of SJP was founded in 2001 at the University of California at Berkeley by Professor Hatem Bazian, who has spread anti-Semitism and defended the Hamas terror group.

SJP organizes anti-Israel campus campaigns, including running annual Israel Apartheid Weeks and pushing the Boycott, Divestment, Sanctions (BDS) movement. SJP activists have reportedly physically assaulted, intimidated and harassed Jewish students, and SJP chapters have often endorsed and campaigned for terrorists.

01:30

AAUP-01565

The Boycott, Divestment, Sanctions (BDS) movement was founded by pro-terror activist Omar Barghouti in 2005 to turn "Israel into a pariah state, as South Africa once was." Barghouti has also called for Israel's destruction and the BDS movement demands would result in that same goal.

BDS initiatives include calling on institutions and individuals to divest from Israeli-affiliated companies, promoting academic and cultural boycotts of Israel, and organizing anti-Israel rallies, protests and campaigns.

The movement's most notable achievement has been infiltrating university campuses through lobbying for "BDS resolutions." In these cases, student governments propose resolutions to boycott or divestment from Israel or Israeli-affiliated entities. BDS activity is often aggressive and disruptive. It has been noted that universities that pass BDS resolutions see a marked increase in anti-Semitic incidents and pro-terror activism on campus.

06:01

## ⌃ Social Media and Weblinks

🅕    https://www.facebook.com/mohsen.k.mahdawi

𝕏    https://twitter.com/MohsenPalestine/[deleted]

𝕏    https://twitter.com/Mohsen_Mahdawi_[deleted]

🅞    https://www.instagram.com/mohsen.of.palestine/

🅞    https://www.instagram.com/mohsen.palestine/[deleted]

🅞    https://www.instagram.com/mohsen__mahdawi/[deleted]

in    https://www.linkedin.com/in/mohsen-m-843046265/

@    https://www.threads.net/@mohsen.palestine[deleted]

♪    https://www.tiktok.com/@mohsenmahdawi1[deleted]

▶    https://www.youtube.com/@mohsenmehdawi7848[deleted]

AAUP-01566

JA2138

HOME

OUR MISSION

ETHICS POLICY

CONTACT US

STUDENTS

PROFESSORS

PROFESSIONALS

MEDICAL

ORGANIZATIONS

EX-CANARY

BLOG

CAMPAIGNS

CANADA

Copyright © 2024 Canary Mission Inc.
All rights reserved.

JA2139

Search for a Medical P

# Mahmoud Khalil

**Status:** **Student**
**State:** **New York**
**Organizations:** **CUAD, BDS**
**University:** **Columbia**



Share:    🔗

## PROFILE UPDATE - MARCH 12, 2025

- In March 2025, Mahmoud Khalil was arrested by the U.S. Immigration and Customs Enforcement (ICE), which reportedly revoked his student visa. A Department of Homeland Security (DHS) spokesperson said that Khalil "led activities aligned to Hamas, a designated terrorist organization."

- Khalil has been leading anti-Israel protests at Columbia since at least October 12, 2023—just days after Hamas' attack on Israel. That day, he led a rally where activists chanted "From the river to the sea," a slogan condemned by the U.S. House of Representatives as antisemitic and used by Hamas to call for Israel's destruction.

- Khalil is a leader of the Columbia University Apartheid Divest group (CUAD), the current home for Students for Justice in Palestine (SJP) and Jewish Voice for Peace (JVP), after they were suspended for pro-terror activities. It is now a coalition of "over 80 student groups."

- Khalil openly justified Hamas terrorism, speaking as a CUAD representative in a video posted on X. He stated, "We've tried armed resistance, which is legitimate under international law, but Israel calls it terrorism."

- On October 7, 2024, the first anniversary of Hamas' terror attack where they murdered 1,200 Israelis, Khalil held a leadership role in a CUAD-organized pro-Hamas protest at Columbia. The next day, CUAD defined this protest by their desire to "bring the war home"—a phrase tied to the movement's broader strategy of bringing about the downfall of the USA. For more information on their war on America, see Canary Mission's campaign "Bringing the War Home."

- CUAD's members wrote on August 16, 2024, that they "must work hard to weaken US imperialism." The New York Post also reported on March 9, 2025, that Khalil's group seeks the "total eradication of Western civilization."

- On March 24, 2024, CUAD co-organized a pro-terror event titled "Palestinian Resistance 101," featuring Khaled Barakat, a senior member of the Popular Front for the Liberation of Palestine (PFLP), a designated terrorist organization.

- Khalil has acted as a lead negotiator for CUAD during several major incidents in 2024 and 2025.

  - In April 2024, Mahmoud Khalil acted as a lead negotiator for the pro-Hamas encampment at Columbia on behalf of CUAD. The Columbia encampment was a violent, pro-Hamas stronghold where activists took over buildings, held workers hostage, and chanted for Israel's destruction. Police found weapons and antisemitic propaganda, while Jewish students faced harassment and threats.

  - Khalil served as a negotiator after pro-Hamas agitators occupied the library lobby at Barnard College on March 5, 2025, in protest of students suspended for "interrupting a 'History of Modern Israel' class on Jan. 21 and distributing fliers, including one that showed a jackboot squashing a Jewish star." The takeover was organized by CUAD. During the protest, anti-Israel activists reportedly shared posters that read: "DEATH TO AMERICA," writing the same message on the library's guest book. Classes were reportedly disrupted and the police were sent to the location citing a "bomb threat."

## Mahmoud Khalil's Participation in the Pro-Hamas Encampment at Columbia University (Columbia) & Arrest for Pro-Hamas Activities

JA2140

AAUP-01570



Palestinian supporters demonstrate during a protest at Columbia University on Oct. 12, 2023, in New York.

AP Photo/Yuki Iwamura

Mahmoud Khalil participated in the pro-Hamas encampment at Columbia in April 2024 as a lead negotiator [00:36:30] on behalf of Columbia University Apartheid Divest (CUAD), an anti-Israel student coalition. He has also expressed support for Hamas terrorism as a CUAD representative.

CUAD is a coalition of "over 80 student groups working toward the goal of collective liberation." CUAD is part of the Boycott, Divestment, Sanctions (BDS) movement. The group's demands included "a ceasefire in the Israel-Hamas war, divestment from Israel… and to reinstate" the pro-terror campus groups Students for Justice in Palestine (SJP) and Jewish Voice for Peace (JVP) after the Columbia administration suspended them. CUAD members have also declared that their goal is "to weaken US imperialism" and the "total eradication of Western civilization."

In March 2025, Khalil was arrested by U.S. Immigration and Customs Enforcement (ICE), which reportedly revoked his student visa. A Department of Homeland Security (DHS) spokesperson said that Khalil "led activities aligned to Hamas, a designated terrorist organization." Khalil was scheduled to appear before a federal immigration judge.

On October 7, 2024, the first anniversary of Hamas' terror attack on Israel, Khalil participated in a leadership role in a pro-Hamas protest organized by CUAD at Columbia. The next day, CUAD wrote that it was necessary to "bring the war home."

**For more information on the anti-Israel movement's war on America, check Canary Mission's campaign "Bringing the War Home."**

On March 5, 2025, Khalil served [video 1] as a negotiator, after pro-Hamas agitators occupied the library lobby at Barnard College in support of students suspended for "interrupting a 'History of Modern Israel' class on Jan. 21 and distributing fliers, including one that showed a jackboot squashing a Jewish star." The takeover was organized by CUAD. During the protest, anti-Israel activists reportedly shared posters that read: "DEATH TO AMERICA," writing the same message on the library's guest book. Classes were reportedly disrupted. The police were sent to the location, citing a "bomb threat," making a series of arrests.

On March 24, 2024, CUAD co-organized a pro-terror event that hosted Khaled Barakat, a leader of a foreign terror organization. The event was titled: "Palestinian Resistance 101." The event also featured Charlotte Kates and Nerdeen Kiswani. Kates and Barakat are the

JA2141

AAUP-01571

across New York City.

**Mahmoud Khalil's Participation in the Pro-Hamas Encampment at Columbia**

On April 24, 2024, the New York chapter of the Palestinian Youth Movement (PYM) posted on Instagram: "THE PEOPLE'S (POPULAR) UNIVERSITY FOR PALESTINE: For the past week, students at Columbia's Gaza Solidarity Encampment have put on alternative programming for those joining on the lawns, from teach-ins to cultural performances…" The post included a video in which Khalil appeared [00:00:31] dancing at the encampment, alongside other anti-Israel activists.

On April 26, 2024, the New York Post reported: "The anti-Israel tent encampment at Columbia University is being led by a cohort of controversial student leaders…these students are the ones negotiating directly with leaders of the Ivy League university – holding campus hostage with dozens of tents and hundreds of protesters splayed out on the lawn…" The article quoted Khalil saying: "The university understood that we cannot operate on timelines. We cannot operate under time pressure."

In an April 27, 2024 Quds News Network (QNN) interview posted on X, Khalil said [00:00:05] in Arabic: "We have been negotiating since last night for more than 11 hours with the university to meet our demands regarding the cutting economic and academic ties with Israeli universities and the universities involved in slaughtering our Palestinian people…"

On April 29, 2024, Bwog Columbia Student News reported: "…Columbia University Apartheid Divest (CUAD) held a press conference to address the end of negotiations and the University's plans to clear the Encampment…" Speaking on behalf of CUAD, Khalil said: "…the students in this Encampment are a gift to Columbia" and "…the University should be proud of its student activists rather than suspend them and 'trample its reputation.'"

On April 30, 2024, a user posted on Instagram a video interview from CNN in which Khalil was asked [00:00:01]: "Are you…going to listen to the University and leave the encampment here?" Khalil replied [00:00:04]: "Of course not! The University is the one who should listen to us. They should listen to their student body who are demanding to end the war that's happening in Palestine. Our…demands are clear…regarding divestment from the Israeli occupation that companies that are profiting [sic] and…contributing to the genocide of our people…"

Asked by CNN [00:00:47]: "How far are you all willing to go here on campus?", Khalil replied [00:01:08]: "…the students will remain here…until they achieve their…demands."

On April 30, 2024, USA Today reported: "The school…suspended graduate student Mahmoud Khalil, lead negotiator for Columbia University Apartheid Divest in talks with the administration that have failed to resolve the crisis."

On May 2, 2024, the BBC, in a news brief titled: "Columbia student has suspension reversed," reported: "…Mahmoud Khalil…was suspended yesterday. Today…Khalil received a surprising message: it was abruptly reversed." Khalil reportedly said: "[They said] that after reviewing the evidence, they don't have any evidence to suspend…"

The BBC report said: "Khalil, a Palestinian international student who was born in [sic] raised in Syria, said that the thought of suspension had 'been stressful,' given that his visa in the US is dependent on his status as a student."

On April 26, 2024, The Verge reported: "Mahmoud Khalil, a Palestinian student who has been involved in the negotiations with Shafik's office, also spoke, saying international students were especially at risk. 'I am here on a foreign visa. That's why for the past six months, I've barely appeared on the media,' Khalil said."

The encampment was also in support of the BDS movement.



David lederer
@Davidlederer6

CAPTURED BY
CANARY MISSION

On March 8, 2025, Khalil was arrested by U.S. Immigration and Customs Enforcement (ICE), which reportedly revoked his student visa. A Department of Homeland Security (DHS) spokesperson said that Khalil "led activities aligned to Hamas, a designated terrorist organization."

Hamas has been designated as a terrorist organization by the U.S., Canada, European Union, Israel and other countries. Founded in 1987, it has killed thousands of Israeli civilians through mass shootings and suicide bombings. Hamas has also kidnapped children, families and the elderly and held them hostage in Gaza. It has desecrated [slide 7] dead bodies and launched numerous rocket attacks against Israeli civilians.

On March 9, 2025, Marco Rubio, U.S secretary of state, posted on X: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported," and linked to an article about Khalil's arrest.

Khalil was scheduled to appear before a federal immigration judge.

## ⌃ Support for Hamas Terrorism

On October 12, 2023, Khalil led [photo 2] a protest at Columbia where activists chanted [00:00:01]: "..from the river to the sea, Palestine will be free…" Khalil appeared [00:00:05] next to anti-Israel agitator Maryam Iqbal, who led the chant calling for Israel's destruction.

"From the River to the Sea, Palestine will be Free" is a chant used [00:02:47] to call for the elimination of the State of Israel. It has also been employed by Hamas leader Khaled Mashal to call for the replacement of Israel with an Islamic state. In April 2024, the U.S. House of Representatives passed a resolution condemning the chant as antisemitic.

On October 7, 2023, Hamas murdered approximately 1,200 Israelis, kidnapped hundreds and wounded thousands. War crimes included mass rape and torture. Many Palestinian civilians participated in and supported the attacks, and Gazans working in the targeted Israeli communities gave intelligence to Hamas on where to strike.

For more information, see the Canary Mission page on Hamas.

On March 11, 2025, Khalil was featured in a video posted on X, speaking to a crowd as a CUAD representative.

In the video, Khalil said [00:00:01]: "As you've seen, Palestinians have tried multiple times resistance, whether it is armed, unarmed resistance, peaceful, whatever. But Israel and the propaganda always find something to attack."

Among Palestinians and anti-Israel activists, the term "resistance" is a euphemism for nationalistic terror and is used to glorify and encourage anti-Israel and anti-Semitic violence.

## ⌃ Leading Role in a Pro-Hamas Protest

On October 7, 2024, Khalil participated in a leadership role in a pro-Hamas protest at Columbia. CUAD, which organized the protest, called to "bring the war home."

**For more information on the anti-Israel movement's war on America, check Canary Mission's campaign "Bringing the War Home."**

During the protest, demonstrators held [photos 2 and 4] a newspaper with Hamas propaganda, which included an article [p.12] by convicted Popular Front for the Liberation of Palestine (PFLP) terrorist Walid Daqqa and articles [p.4] by the pro-terror groups PYM and [p.7] National SJP.

Walid Daqqa was convicted and sentenced to life imprisonment for reportedly having been part of a PFLP terror cell that abducted and killed an Israeli soldier in 1984.

Also on October 7, 2024, CUAD promoted on Instagram an event titled: "OCTOBER 7 / WALKOUT." The post said: "...After an entire year of uninterrupted genocide...it is our duty to act, to resist...WALK OUT...join the movement for Palestinian liberation."

During the walkout, protesters chanted [video; 00:00:01]: "Resistance is glorious! We will be victorious!" and held [video; 00:00:35] yellow signs that read: "GLORY TO THE MARTYRS. VICTORY TO THE RESISTANCE." Protesters also chanted [00:00:42]: "Intifada, intifada! Globalize the intifada!"

Anti-Israel activists use the term "resistance" to refer to violence and terror perpetrated against Israeli civilians and their allies. It is used to glorify and encourage anti-Israel and anti-Semitic violence. Anti-Israel activists chant slogans such as: "Resistance by any means necessary!" and "Resistance is justified when people are occupied!" in response to terror attacks.

JA2143

missions.

Also on October 7, 2024, CUAD posted on Instagram a video of the protest and wrote: "…We must recognize our liberations as connected and bring the war home. The Palestinian resistance is moving their struggle to a new phase of escalation, and it is our duty to meet them there…WALKOUT NOW! JOIN US! JOIN THE MOVEMENT FOR A FREE PALESTINE!"

## ⌃ Leading Role in a Library Takeover

On March 5, 2025, Khalil served [video 1] as a negotiator, after pro-Hamas agitators occupied the library lobby at Barnard College in support of students suspended for "interrupting a 'History of Modern Israel' class on Jan. 21 and distributing fliers, including one that showed a jackboot squashing a Jewish star."

During the protest, anti-Israel activists shared posters that called for the "DEATH TO AMERICA." They also shared posters in support of former Hamas leader Yahya Sinwar.

Yahya (Yehiya) Sinwar masterminded the October 7, 2023 terror attacks on Israel. While serving four life sentences in Israel, he was released to Gaza following the Gilad Shalit prisoner exchange deal. On October 17, 2024, the Israel Defense Forces eliminated Sinwar in Gaza.

Khalil appeared [00:00:27] in a video during the library occupation, as agitators chanted: "Disclose! Divest! We will not stop! We will not rest!"

During the protest, agitators displayed [slide 2] a puppet of Barnard president Laura Ann Rosenbury and chanted: "Intifada, intifada! Globalize the Intifada!"

The term "intifada," which translates from Arabic as "uprising" or "insurrection," carries the connotation of violence. Palestinian intifadas waged against Israel have been marked since 1987 by hundreds of hijackings, shootings, stabbings, bombings and suicide missions.

On March 5, 2025, the New York Times reported that this was the "second such sit-in to take place at Barnard over the issue," with anti-Israel activists having previously "staged a sit-in at Milbank Hall."

## ⌃ Pro-Hamas Encampment at Columbia University

On April 17, 2024, Columbia students and anti-Israel activists set up a pro-Hamas "Gaza Solidarity Encampment" on the university's main lawn. Many participants were arrested and the encampment featured multiple violent incidents, including taking over a campus building and taking a university worker hostage.

Activists protested Israel's war against Hamas and demanded that Columbia "divest from companies and institutions that profit from Israeli apartheid, genocide and occupation…"

The action had reportedly been planned for months and was organized by the Columbia University Apartheid Divest (CUAD) coalition. The encampment was also organized by Columbia's banned pro-Hamas activist group Students for Justice in Palestine (SJP) and the university chapter of Jewish Voice for Peace (JVP). Activists reportedly received training from National SJP and other anti-Israel organizations.

Among the encampment leaders was Columbia student Khymani James who had said [00:00:25]: "Zionists…They are nazis!… They're supporters of genocide! Why would we want people who are supporters of genocide to live?… Be glad, be grateful that I am not just going out and murdering Zionists." Aidan Parisi, another encampment leader, responded to Columbia's demand to disband the encampment by declaring online that: "COLUMBIA WILL BURN."

The encampment was forcibly dismantled at the directive of Columbia's president and administration. The NYPD [New York Police Department] entered the area, cleared the encampment and arrested more than 100 protestors, approximately 80 of whom were Columbia students. The students were charged with trespassing and suspended from Columbia indefinitely.

The next day, activists created a new encampment. When divestment negotiations with Columbia failed, protesters illegally forced their way into the university's Hamilton Hall on April 30, 2024. They smashed [00:00:55] through a glass-paneled door, broke security cameras, threw university property out of the windows and unfurled [00:00:01] a banner in the building's wall that read: "INTIFADA," a term in Arabic for uprising or insurrection that carries the connotation of violence.

While barricading themselves in the building, agitators kept three Columbia custodians hostage and stopped them from leaving. When the NYPD raided and dismantled the encampment a second time, they arrested more than 100 students, nearly half of whom were reportedly not affiliated with Columbia.

JA2144

AAUP-01574

TO AMERICA!...LONG LIVE THE INTIFADA!"

Just outside the encampment area, Jewish students were called [slide 2]: "Uncultured a** b**ches!" and were told to "Go back to Europe!" Activists also said [slide 3] to them: "Yahoodim [Jews], yahoodi [Jew], f**k you!" and "Stop killing children!" as they walked from campus to their dorm rooms.

Also just outside the encampment area, anti-Israel activists chanted [slide 5]: "Ya Hamas, ya habib, odrob, odrob Tel Aviv! [Oh Hamas, oh loved one, strike, strike Tel Aviv!]", a chant that celebrates Hamas rocket attacks against Israel.

An activist just outside the encampment area held [photo 4] a sign that said, referring to the Izz ad-Din al-Qassam Brigades, Hamas's military wing: "AL-QASAM'S NEXT TARGETS." Her sign contained an arrow pointing to a pro-Israel crowd.

On May 31, 2024, Columbia SJP announced that its activists had set up a third encampment at the university. At the encampment, protesters reportedly displayed on a big screen a video that portrayed Hamas as a peace-seeking organization and made a sign that contained an inverted red triangle, a symbol in support of Hamas.

The Columbia encampment reportedly inspired a wave of protest encampments across North American campuses, where pro-Israel students were blocked or restricted from campus facilities. Jewish students were reportedly harassed in several other ways.

## ^ Background on Pro-Hamas Encampments

The encampment was one of over 140 pro-Hamas and anti-Israel college encampments set up in North America, and over 20 more globally, in the spring of 2024. The first began on April 17, 2024, at Columbia University. The encampments were unofficially known as the "student intifada," borrowing a term associated with terrorist violence.

Protesters harassed Jewish students, blocked Jews from campus facilities and shouted anti-Semitic slogans. They occupied campus grounds, in many cases illegally, caused property damage, violently took over buildings, celebrated terrorism and promoted the Boycott, Divestment, Sanctions (BDS) movement.

Activists set up encampments to oppose Israel's right to wage war against the Hamas terror group following October 7, 2023, when Hamas murdered approximately 1,200 people, including 32 American and 8 Canadian citizens. Hamas also kidnapped 252 people, including 11 Americans and the bodies of 2 murdered Canadians. As of May 26, 2024, 125 hostages remained in Hamas captivity.

For more information on the October 7, 2023 terror attacks, see the Canary Mission page on Hamas.

## ^ The Columbia Student Intifada

JA2146

00:22

^ **The Pro-Terror & Anti-Israel Movement After 10/7/2023**

03:10

^ **Mahmoud Khalil's Work and Education**

AAUP-01576

As of the same date, Khalil's LinkedIn said he had worked as a political affairs officer at the United Nations Relief Works Agency (UNRWA)'s office in New York from June to November 2023.

The United Nations Relief Works Agency (UNRWA) has been infiltrated by Palestinian terrorist organizations to wage war against Israel under the guise of UN immunities. UNRWA employs terrorists who indoctrinate children to hate Jews and kill Israelis. UNRWA facilities, schools and medical clinics are systematically used as terrorist command centers and weapons depots. UNRWA also provided electricity to Hamas's main data center and UNRWA employees have kidnapped and held hostage Israeli civilians.

Khalil's LinkedIn said he was located in New York, New York.

## ⌃ Social Media and Weblinks

ⓘ  https://www.instagram.com/mhod.khalil/[private]

ⓣ  https://www.threads.net/@mhod.khalil

in  https://www.linkedin.com/in/khalilmahmoud/

🌐  Clubhouse

| HOME | ORGANIZATIONS |
| --- | --- |
| OUR MISSION | EX-CANARY |
| ETHICS POLICY | BLOG |
| CONTACT US | CAMPAIGNS |
| STUDENTS | CANADA |
| PROFESSORS | |
| PROFESSIONALS | |
| MEDICAL | |

Copyright © 2024 Canary Mission Inc.
All rights reserved.

JA2147

AAUP-01577

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

**EXHIBIT**
232

tabbies

# (U//LES) OZTURK, Rumeysa

ICE HQINT 30189-25

**SUBJECT PROFILE**

## (U) Analysis Findings

- (U//LES) Turkish national Rumeysa OZTURK holds a F1 visa and is a co-author of an Op-Ed calling for divestment from Israel and associates with Tufts Students for Justice in Palestine, which was suspended for calls for student intifada.

- (U//LES) OZTURK is currently a post doctorate student at Tufts University in the Child Study & Human Development program with a start date of 1 February 2021 and end date of 23 December 2027. OZTURK completed her master's degree at Columbia University in 2019.

- (U//LES) She has prior U.S. travel on an internship in 2016 at Boston University in Psychology and Brain Sciences under a B1/B2 visa.

## (U) Biographical Information



(U//LES)

- (U//LES) **Name:** Rumeysa OZTURK
- (U//LES) **SSN:** ███████
- (U//LES) **DOB:** ███████
- (U//LES) **Immigration Status:** F1 Nonimmigrant Student
- (U//LES) **COB:** Turkey
- (U//LES) **COC:** Turkey
- (U//LES) **Current Passport:** ██████, Turkey (Expiration: 9 July 2029)
- (U//LES) **Visa Type, Number:** F1, ██████ (expiration: 9 December 2025)
- (U//LES) **FIN:** ███████

- (U//LES) **SEVIS ID:** ███████ (program end date: 23 December 2027)

## (U) Criminal History

(U//LES) No associated criminal history or HSI investigation was located for OZTURK. [NCIC, ICM]

## (U) USCIS Applications

(U//LES) No applications found. [PCQS]

## (U) Residences

- (U//LES) ███████ ; ███████ ███████ (April 2023 – January 2025) [Accurint]
- (U//LES) ███████ ███████ 02144 (January 2025) [PCQS]

## (U) Communications

- (U//LES) **Phone Numbers:** ███████ (cell) (January 2025) [Accurint]
- (U) **Social Media:**
  - (U//LES) ███████
  - (U//LES) ███████
  - (U//LES) ███████
  - (U//LES) X ███████ [Commercial]
  - (U//LES) X (Twitter)/ ███████ [Commercial]
- (U) **Email:**
  - (U//LES) ███████ [AFI]
  - (U//LES) ███████ [AFI]
  - (U//LES) ███████ [AFI]

## (U) Travel and Border Crossing History

- (U//LES) 28 June 2024: air travel from Istanbul Airport, Istanbul (IST), Turkey to Logan International Airport, Boston (BOS), Massachusetts. [UPAX]

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

JA2148

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

## (U//LES)  OZTURK, Rumeysa

- (U//LES)  26 May 2024: air travel from BOS to IST. [UPAX]
- (U//LES)  30 December 2023: air travel from IST to BOS. [UPAX]
- (U//LES)  8 December 2023: air travel from BOS to IST. [UPAX]
- (U//LES) 3 July 2023: air travel from IST BOS. [UPAX]

- (U//LES)  9 May 2023: air travel from BOS to IST (IST). [UPAX]
- (U//LES)  9 August 2022: air travel from IST to BOS. [UPAX]
- (U//LES)  29 May 2022: air travel from BOS to IST. [UPAX]
- (U//LES)  31 August 2021: air travel from IST to BOS. [UPA]
- (U//LES)  13 July 2021: air travel from BOS to IST. [UPAX]

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

JA2149

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

**(U//LES) OZTURK, Rumeysa**

ICE-HQINT-30159-25

## (U) Social Media and Open Sources

**(U) Canary Mission profile on Rumeysa OZTURK stating her participation in anti-Israel activism in March 2024 - Posted 06 February 2025**

https://canarymission.org/individual/Rumeysa_Ozturk

REPORT AN INDIVIDUAL    REPORT AN EVENT    X    ⊚

CANARY MISSION    HOME    ABOUT US    PROFILES    BLOG    CAMPAIGNS    CANADA    **DONATE**

Ozturk    🔍    ⇄ FILTERS

Last updated: Feb. 6, 2025

Share: 🔵 X G 🔗

# Rumeysa Ozturk

Rumeysa Ozturk engaged in anti-Israel activism in March 2024, in the wake of the Hamas terrorist attacks on Israelis on October 7, 2023.

On October 7, 2023, Hamas murdered approximately 1,200 Israelis, kidnapped hundreds and wounded thousands. War crimes included mass rape and torture. Many Palestinian civilians participated in and supported the attacks, and Gazans working in the targeted Israeli communities gave intelligence to Hamas on where to strike.

For more information, see the Canary Mission page on Hamas.

Ozturk is a supporter of the Boycott, Divestment, Sanctions (BDS) movement.

As of January 2025, Ozturk was listed as the course instructor of "Intro to Children's Media - 04" and "Youth and Media - 06" at Tufts University (Tufts).

The courses were scheduled to take place in February and April 2025, respectively. Both course descriptions said: "...reserved for high school students who are rising 10th, 11th, or 12th grade students...students will be prompted to submit an additional application after enrollment..." Tufts is located in Medford and Somerville, Massachusetts.



**Rumeysa Ozturk**
Status: Student
State: Massachusetts
Organizations: BDS
University: Tufts, TC

### Sign up for our weekly newsletter

Enter your email

**Subscribe**

Donate

**(U//LES) Open Source**

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

JA2150

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

**(U//LES)  OZTURK, Rumeysa**  ICE-HQINT-30159-25

**SUBJECT PROFILE**

(U)  **The Tufts Daily article synopsizing the four resolutions introduced by the Coalition for Palestinian Liberation at Tufts University** – Date 27 February 2024
https://www.tuftsdaily.com/article/2024/02/ng4hfkjplejxe53

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE
JA2151

**(U//LES) OZTURK, Rumeysa**



## THE TUFTS DAILY

NEWS | UNIVERSITY

# TCU Senate to vote Sunday on genocide acknowledgment, university divestment

The Coalition for Palestinian Liberation proposed four resolution drafts to TCU Senate targeting university connections to Israel.

Aaron Grueu – The Tufts Daily
The Joyce Cummings Center is pictured on Feb. 22, 2023.





By Carly Cohen
Published Tuesday, February 27, 2024

On Sunday, the Coalition for Palestinian Liberation at Tufts introduced four full-text resolutions to the Tufts Community Union Senate which, if passed, will call on the Office of the President and other senior leadership to acknowledge Israel's continued assault on Gaza and to end all ties to the country. Senators will vote on finalized versions of all four resolutions at next week's meeting, just two weeks after the introduction of abstracts on Feb. 18.

(U//LES) Open Source

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

## (U//LES) OZTURK, Rumeysa

"The Coalition for Palestinian Liberation at Tufts has introduced these four TCU Senate resolutions to emphasize the importance of institutional boycott and divestment from Israel at multiple administrative levels," CPLT wrote in a statement to the Daily. "These resolutions demonstrate that any and all measures that the university and its officials can take to end Tufts' complicity in Israel's genocide on Gaza are crucial to the broader goals of the [boycott, divestment and sanctions] movement."

While resolutions are all based on the shared premise of Israel's human rights violations, each of the four takes a different approach to cut the university's ties to the country.

The first, S.24-1, calls on Tufts Global Education to end approval for external study abroad programs in Israel. According to the Global Education website, the school currently approves programs at Ben Gurion University of Negev, Technion Israel Institute of Technology, University of Haifa, Hebrew University of Jerusalem and Tel Aviv University.

S.24-1 "urges Tufts University to end its study abroad programs in Israel indefinitely" and "to

not approve or offer new study abroad programs in Israel." The resolution, if passed, will solicit a written response from Tufts Global Education within two weeks.

The second, S.24-2, calls for Tufts Dining to end the sale of Sabra, Pillsbury and other products connected to Israel at Tufts. In its proposal, CPLT explained the reasoning behind this request.

"Sabra has documented ties to human rights violations in the Occupied Palestinian

Territories. It is 'a joint venture between PepsiCo and the Strauss Group, a multinational corporation and Israel's largest food and beverage company.' ... The Strauss Group has materially supported the Golani Brigade of the Israel Defense Forces. ... Pillsbury, a food manufacturing corporation owned by General Mills, operates a factory in the Atarot Industrial Zone. ... The factory has displaced Palestinians and profits off of their land, water, and other resources,'" the resolution reads.

The resolution "urges the Tufts Dining office to stop selling any Israeli products immediately and indefinitely" and requests a written response from Tufts Dining within two weeks.

CPLT's third resolution, S.24-3, demands that "[University President Sunil Kumar], Deans, and Provosts release a statement both recognizing [and] condemning the Ongoing Genocide in Gaza." The resolution further calls on the administration to "release a statement apologizing for their previous statements" and "urges the Office of the President and the Deans of the school to hold a public open meeting with the Coalition for Palestinian Liberation at Tufts."

The resolution asserts that the "Tufts Administration and President have made several biased statements in the Fall semester of 2023 about the ongoing genocide, under the name of 'Israel-Hamas War.'" Last semester, the university put out several emails addressing the conflict, and Kumar released a video message on campus discourse at the beginning of the spring semester.

(U//LES) Open Source

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

**(U//LES)  OZTURK, Rumeysa**

In this resolution, the coalition requests a written response from the university president, deans and provosts within two weeks.

The final resolution, S.24-4, takes specific aim at the school's investment portfolio.

S.24-4 "urges the Tufts University investment office to immediately disclose all investments, with emphasis on any and all direct and indirect investments in companies based in or which profit from partnership with Israel." The resolution urges the university "to divest from Israeli Companies [and] to divest from companies invested in Israeli Apartheid and with ties to Israel."

S.24-4, as well as S.24-3, cite a TCU Senate resolution passed in 2017, titled "A Resolution Calling for Tufts University to End Investments in The Israeli Occupation." Despite this, the university has continually reiterated its opposition to the BDS movement and has not publicly shared its full investment portfolio.

"With Tufts continuing to not comply with this resolution, we reiterate that it is more important than ever that we do not invest in companies that provide weapons to Israel, or any Israeli companies that are built on stolen Palestinian land," CPLT wrote in the S.24-4 abstract. "Many groups on campus have expressed concern over the Administration's refusal to disclose what investments they hold in Israel and companies tied to it. We are also concerned about other investments that Tufts holds, which do not comply with their 'Anti-racist' promise, and, in this sense, we are asking for the investment office to disclose all the investments they have so that all students are made aware of where tuition dollars are spent."

Both S.24-3 and S.24-4 also reference Tufts' divestment from South Africa during apartheid, in response to student and faculty activism.

"Just as students fought for and ultimately won Tufts' divestment from apartheid South Africa, Tufts students are once again fighting for the university's divestment from apartheid, occupation, and genocide; by making clear the specific ways in which the university is complicit, these resolutions also make clear that divestment is entirely actionable, and that the student body demands these tangible steps be taken against the occupation of Palestine," CPLT wrote in its statement to the Daily.

S.24-4 requests a written response from Tufts Investment Office and the Office of the Board of Advisors within two weeks.

"Resolutions are a vehicle for students at Tufts to advocate for a given change and may be proposed by anyone in the Tufts Community Union," the TCU Senate Executive Board wrote in a statement to the Daily. "This extensive and exhaustive process allows for students to propose reform which then, based on the vote, is directed towards administration or the appropriate management at Tufts. While the Senate takes necessary steps to follow up, the final onus rests on the administration and management, not us."

**(U//LES) Open Source**

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

JA2154

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

**(U//LES)  OZTURK, Rumeysa**

Class of 2026 Senator Anand Patil reiterated that the Senate will carefully examine each of the four resolutions, asking questions and debating before finally voting.

"These resolutions will bring strong opinions and feelings from many members of our community, so all who are planning to attend are strongly urged to treat the resolution process, TCU Senators, and fellow students with the utmost respect and civility," Patil wrote in a message to the Daily.

Senators will vote on the four resolutions at next week's open meeting, taking place on Sunday at 7 p.m. at the Joyce Cummings Center in rooms 160 and 170.

*Matthew Sage contributed reporting.*

                                                    (U//LES) Open Source

UNCLASSIFIED LAW ENFORCEMENT SENSITIVE

## (U//LES) OZTURK, Rumeysa

SUBJECT PROFILE

(U) **Guest Opinion (Op-ed) co-authored by OZTURK on the Tufts Community Union Senate resolutions for University to acknowledge the Palestinian genocide** – Accessed 18 March 2025

https://www.tuftsdaily.com/article/2024/ 03/4ftk27sm6jkj

THE TUFTS DAILY

OPINION | GUEST

# Op-ed: Try again, President Kumar: Renewing calls for Tufts to adopt March 4 TCU Senate resolutions



By Rumeysa Ozturk, Fatima Rahman, Genesis Perez and Nicholas Ambeliotis

Published Tuesday, March 26, 2024

On March 4, the Tufts Community Union Senate passed 3 out of 4 resolutions demanding that the University acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments and divest from companies with direct or indirect ties to Israel. These resolutions were the product of meaningful debate by the Senate and represent a sincere effort to hold Israel accountable for clear violations of international law. Credible accusations against Israel include accounts of deliberate starvation and indiscriminate slaughter of Palestinian civilians and plausible genocide.

Unfortunately, the University's response to the Senate resolutions has been wholly inadequate and dismissive of the Senate, the collective voice of the student body. Graduate Students for Palestine joins Tufts Students for Justice in Palestine, the Tufts Faculty and Staff Coalition for Ceasefire and Fletcher Students for Palestine to reject the University's response. Although graduate students were not allowed by the University into the Senate meeting, which lasted for almost eight hours, our presence on campus and financial entanglement with the University via tuition payments and the graduate work that we do on grants and research makes us direct stakeholders in the University's stance.

While an argument may be made that the University should not take political stances and should focus on research and intellectual exchange, the automatic rejection, dismissive nature and condescending tone in the University's statement have caused us to question whether the University is indeed taking a stand against its own declared commitments to free speech, assembly and democratic expression. According to the Student Code of Conduct, "[a]ctive citizenship, including exercising free speech and engaging in protests, gatherings, and demonstrations, is a vital part of the Tufts community." In addition, the Dean of Students Office has written, "[w]hile at times the exchange of controversial ideas and opinions may cause discomfort or even distress, our mission as a university is to promote critical thinking, the rigorous examination and discussion of facts and theories, and diverse and sometimes contradictory ideas and opinions." Why then is the University discrediting and disregarding its students who practice the very ideals of critical thinking, intellectual exchange and civic engagement that Tufts claims to represent?

(U//LES) Open Source

JA2156

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

**(U//LES) OZTURK, Rumeysa**







THE TUFTS DAILY

The role of the TCU Senate resolutions is abundantly clear. The Senate's resolutions serve as a "strong lobbying tool that expresses to the Tufts administration the wants and needs of the student body. They speak as a collective voice and are instrumental in enacting systemic changes." In this case, the "systemic changes" that the collective voice of the student body is calling for are for the University to end its complicity with Israel insofar as it is oppressing the Palestinian people and denying their right to self-determination — a right that is guaranteed by international law. These strong lobbying tools are all the more urgent now given the order by the International Court of Justice confirming that the Palestinian people of Gaza's rights under the Genocide Convention are under a "plausible" risk of being breached.

This collective student voice is not without precedent. Today, the University may remember with pride its decision in February 1989 to divest from South Africa under apartheid and end its complicity with the then-racist regime. However, we must remember that the University divested up to 11 years after some of its peers. For instance, the Michigan State University Board of Regents passed resolutions to end its complicity with Apartheid South Africa as early as 1978. Had Tufts heeded the call of the student movement in the late 1970s, the University could have been on the right side of history sooner.

We reject any attempt by the University or the Office of the President to summarily dismiss the role of the Senate and mischaracterize its resolution as divisive. The open and free debate demonstrated by the Senate process (exemplified by the length, open notice and substantive exchange in the proceedings and the non-passing of one of the proposed resolutions), together with the serious organizing efforts of students, warrant credible self-reflection by the Office of the President and the University. We, as graduate students, affirm the equal dignity and humanity of all people and reject the University's mischaracterization of the Senate's efforts.

The great author and civil rights champion James Baldwin once wrote: "The paradox of education is precisely this: that as one begins to become conscious one begins to examine the society in which [they are] being educated." As an educator, President Kumar should embrace efforts by students to evaluate "diverse and sometimes contradictory ideas and opinions." Furthermore, the president should trust in the Senate's rigorous and democratic process and the resolutions that it has achieved.

We urge President Kumar and the Tufts administration to meaningfully engage with and actualize the resolutions passed by the Senate.

This op-ed was written by Nick Ambeliotis (CEE, '25), Fatima Rahman (STEM Education, '27), Genesis Perez (English, '27) and Rumeysa Ozturk (CSHD, '25) and is endorsed by 32 other Tufts School of Engineering and Arts and Sciences Graduate Students.    **(U//LES) Open Source**

JA2157

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U//LES)  OZTURK, Rumeysa

**(U) Boston.com News Article: Pro-Palestine group disaffiliates from Tufts after being suspended until 2027. –** Accessed 19 March 2025

https://www.boston.com/news/local-news/2024/11/18/pro-palestine-group-disaffiliates-from-tufts-after-being-suspended-until-2027/

Note: (U//LES) This article ties into the Op-Ed and demonstrates that the Tufts SJP was suspended by the university for violations of having signs demonstrating weapons and calls for student intifada. Analysts were unable to locate images matching the exact reference to signs.



≡        BOSTON                Q

NEWS   LOCAL NEWS   NATIONAL NEWS   POLITICS   OBITUARIES   CRIME   WATCH AHEAD   TRAFFIC

## Pro-Palestine group disaffiliates from Tufts after being suspended until 2027

After an interim suspension earlier this fall, Tufts Students for Justice in Palestine was dealt a full suspension for repeatedly violating university policy.

A sign sits at the entrance to a student protest encampment at Tufts in April 2024. Jessica Rinaldi/Boston Globe

By Ross Cristantiello
November 18, 2024
3 minutes to read

**(U//LES) Open Source**

Tufts University officially suspended a pro-Palestine student organization through January 2027, prompting the group to announce its "formal break and disaffiliation" from the university last week.

Tufts Students for Justice in Palestine has frequently sought to disrupt campus life in the interest of raising awareness about Israel's military practices and any ties between the university and Israel.

A United Nations report released last week found that "Israel's warfare in Gaza is consistent with the characteristics of genocide, with mass civilian casualties and life-threatening conditions intentionally imposed on Palestinians there."

Tufts SJP was officially suspended on Nov. 6. The group was placed on interim suspension in early October after it used images of weapons to promote a protest rally and urged members of the Tufts community to "join the student intifada." That incident was one of five incidents this year that led to the suspension, according to Tufts Executive Director of Media Relations Patrick Collins. Over those five incidents, Tufts SJP was responsible for nine violations of university policy.

ADVERTISEMENT

The group was found to have violated the university's Gatherings, Demonstrations and Protests Policy and its Posting Policy during an October event. It violated the Threats Policy in October when it posted the images of weapons and used the term "intifada" to urge student action. It failed to comply with university officials by refusing to take down threatening posts, violated the demonstration policy in September, did not comply with other officials, and violated the Gambling Policy during a student organization fair at the beginning of the semester, according to Collins.

Tufts SJP "failed to complete sanctions" assigned from previous violations, leading the university to announce a full suspension.

**(U//LES) Open Source**

JA2158

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

(U//LES)  OZTURK, Rumeysa

(U) X.com (Twitter) posting of Eyal Yakoby, "an incoming MIT student dedicated to combating anti-Americanism," stating stickers plastered on Tufts University campus by students – Posted 2 October 2024





UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

## (U//LES)  OZTURK, Rumeysa

(U)  *Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

(U)  *Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

(U)   *This document has been designated by DHS as UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

(U)  *This document contains information that is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

(U)  *This product contains U.S. person information that has been deemed necessary for the intended recipient to understand, assess, or act on the information provided. It has been highlighted in this document with the label ᴜꜱᴘᴇʀ and should be handled in accordance with the recipient's intelligence oversight/information handling procedures. U.S. person information should be protected in accordance with constitutional requirements and all federal and state privacy and civil liberties laws.*

(U//FOUO)  **Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to**
██████████.

JA2160

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

**EXHIBIT**

tabbies 233

# (U) Mahmoud KHALIL

## (U) Analysis Findings

- (U//FOUO) Mahmoud KHALIL received a B1/B2 visa on 30 January 2018 and entered the United States on 11 March 2018. KHALIL was issued an F1 visa on 12 December 2022 and entered the United States under that visa on 20 December 2022.

- (U//FOUO) KHALIL's status was changed to CR6, Spouse of a United States Citizen, on 16 November 2024 and received an LPR status.

## (U) Biographical Information



(U//LES)

- (U) **Name:** Mahmoud KHALIL
- (U//FOUO) **DOB:** ▮
- (U//FOUO) **COB:** Algeria
- (U//FOUO) **COC:** Algeria
- (U//FOUO) **Current Passport:** ▮ : Algeria (expiration: 21 August 2029)
- (U//FOUO) **Former Passport:** ▮ ; Algeria
- (U//FOUO) **SSN:** ▮
- (U//FOUO) **A#:** ▮
- (U//FOUO) **FIN:** ▮

## (U) USCIS Applications

- (U//FOUO) 20 November 2024—Application to Register Permanent Residence or Adjust Status- Family Based (spouse of a U.S. citizen)—Approved.

- (U//FOUO) KHALIL does not have any current pending USCIS applications.

## (U) Residence

(U//FOUO) ▮ (December 2024)

## (U) Communications

- (U) **Phone Numbers:**
  - (U//FOUO) ▮ (cell)
  - (U//FOUO) ▮ (home)
- (U//FOUO) **Email:** ▮

## (U) Travel and Border Crossing History

- (U//FOUO) 5 February 2025–9 February 2025: round-trip air travel from John F. Kennedy International Airport (JFK), Queens, New York to Licenciado Benito Juarez International Airport, Mexico City, Mexico.

- (U//FOUO) 2 February 2025: air travel from Keflavik International Airport (KEF), Keflavik, Iceland to Stewart International Airport (SWF), New Windsor, New York.

- (U//FOUO) 12 January 2025: air travel from KEF to SWF.

- (U//FOUO) 4 December 2024: air travel from Paris-Only Airport, Paris, France to Newark Liberty International Airport, Newark, New Jersey.

- (U//FOUO) 22 November 2024: air travel from JFK to London Gatwick Airport, London, United Kingdom.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

JA2161

UNCLASSIFIED/ LAW ENFORCEMENT SENSITIVE

## (U)  Mahmoud KHALIL

### (U)  News Articles

- (U) **Facing Trump's threats, Columbia investigates students critical of Israel**—Published 7 March 2025

  https://www.wisn.com/article/columbia-university-student-discipline-israel-criticism/64086002

  KHALIL acted as a negotiator for pro-Palestinian protestors during Spring protests.

  *"Mahmoud Khalil, a graduate student who served as a negotiator for pro-Palestinian protesters during the previous spring's encampment, said he was accused by the office of misconduct just weeks before his graduation this December. "I have around 13 allegations against me, most of them are social media posts that I had nothing to do with," he said.*

  *"After refusing to sign the nondisclosure agreement, Khalil said the university put a hold on his transcript and threatened to block him from graduating. But when he appealed the decision through a lawyer, they eventually backed down, Khalil said."*

  *"They just want to show Congress and right-wing politicians that they're doing something, regardless of the stakes for students," Khalil said. "It's mainly an office to chill pro-Palestine speech."*

- (U) **Columbia investigates students critical of Israel amid Trump's threats**—Published 6 March 2025

  https://www.theguardian.com/us-news/2025/mar/06/columbia-university-students-protest

  KHALIL acted as a negotiator for pro-Palestinian protestors during Spring protests.

  *"Mahmoud Khalil, a graduate student who served as a negotiator for pro-Palestinian protesters during the previous spring's encampment, said he was accused by the office of misconduct just weeks before his graduation this December. "I have around 13 allegations against me, most of them are social media posts that I had nothing to do with," he said.*

  *"After refusing to sign the non-disclosure agreement, Khalil said the university put a hold on his transcript and threatened to block him from graduating. But when he appealed the decision through a lawyer, they eventually backed down, Khalil said."*

  *"They just want to show Congress and right-wing politicians that they're doing something, regardless of the stakes for students," Khalil said. "It's mainly an office to chill pro-Palestine speech."*

- (U) **Mahmoud Khalil's Participation in the Pro-Hamas Encampment at Columbia University (Columbia)**—Published 24 February 2025

  https://canarymission.org/individual/Mahmoud_Khalil

  Entire article concerns KHALIL

  *"Mahmoud Khalil participated in the pro-Hamas encampment at Columbia in April 2024 as a lead negotiator [00:36:30] on behalf of Columbia University Apartheid Divest (CUAD), an anti-Israel student coalition."*

- (U) **These are the extremist student leaders of the anti-Israel protest camp bringing Columbia to its knees**—Published 26 April 2024

  https://nypost.com/2024/04/26/us-news/the-extremist-student-leaders-leading-columbias-anti-israel-camp/

  KHALIL previously worked for UNRWA.

  *"The leaders later crowed that they were winning: "We are not actually negotiating on the state of the encampment as of now," Palestinian graduate student Mahmoud Khalil, one of the protesters' lead negotiators, told The Post Friday afternoon."*

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U) Mahmoud KHALIL

*"Khalil —who did his undergraduate degree in Beirut— told the Columbia Daily Spectator that he has not participated in any of the protests over the past week and a half because he is worried about losing his student visa that allows him to remain in the US."*

*"Khalil was a political affairs officer with UNRWA — the United Nations' agency that supports Palestinian refugees — from June through November 2023, according to LinkedIn."*

*"The university understood that we cannot operate on timelines. We cannot operate under time pressure," Khalil said".*



- (U) **Instagram Posting of CNN News Clip of KHALIL**—Posted 30 April 2024 and **Instagram Posting of Canary Mission of KHALIL**—Posted 6 March 2025

https://www.instagram.com/mosheh/reel/C6ZKrh-r5Zx/?hl=en
https://www.instagram.com/canarymission/reel/DG3FdjiNJ5R/



JA2163

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

## (U)  Mahmoud KHALIL

**(U)  X Post of Documenting Jew Hatred on Campus at Columbia U of KHALIL—Posted 6 March 2025**

### (U)  Social Media

(U)  Linkedin (Currently locked) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (No image located)

← Post

  Documenting Jew Hatred on Campus at Columbia U ✓
@CamousJewHate

Mahmoud Khalil is a Palestinian who was raised in Syria. He was enrolled at @columbia as of last year; his current enrollment status remains unknown.

Regardless, Khalil served as a key negotiator for the pro-Hamas encampment in the spring. He kept a low profile until recently when Khalil was spotted at the jihadist protest in front of @Columbia's campus on Tuesday and then again yesterday serving as a negotiator for the jihadists inside the Milstein Library.

Khalil was on a student visa as of last year and may still be on one. This is why he has gone on record as saying he takes fewer risks with the jihadist movement to avoid deportation.

In other words, Khalil is fine having others do the heavy lifting and risking their academic and professional careers, but he is unwilling to in order to save himself. In our view, the person who purchases the gun knowing it'll be used to murder someone is just as culpable as the one who pulls the trigger.

Khalil is a key part of the problem. He is the brains of the operation and needs to be flagged by @columbia and @POTUS for his involvement in the terrorists movement overtaking Columbia and in this country.

We demand consequences for all jihadists on college campuses and across this country!

@presirosenbury and @katrinarmstrong, ban Khalil from your campuses now! And if he is on a student visa tied to @columbia, we call on you to revoke it. It should be an honor and privilege to study at an American university, but we are far from that point right now.

@SecRubio
@EdWorkforceCmte
@EliseStefanik
@SenHawleyPress @SenHawleyPR
@RitchieTorres





A 29-year-old Palestinian refugee raised in Syria, Khalil wanted to get involved in the on-campus activism against the war, but he was nervous.

Khalil faced a dilemma common to international students: He was in the United States on an F-1 student visa. His ability to

12:49 PM · Mar 6, 2025 · **5,765** Views

**UNCLASSIFIED**

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

<span style="color:red">JA2164</span>

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

**(U)  Mahmoud KHALIL**

*(U)  Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U)  Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

*(U)  This document has been designated by DHS as UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

*(U)  This document contains information that is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

**(U//FOUO)  Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to**

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

**EXHIBIT 234**

## (U)  Badar Khan SURI

ICE-HQINT-30148-25

**SUBJECT PROFILE**

### (U)  Analysis Findings

- (U//LES)  Badar KHAN SURI is a research scholar (postdoctoral fellow) sponsored by Georgetown University with a program beginning date of 1 January 2023 and end date of 31 December 2026 and program status listed as active. [SEVIS: 20250312]

- (U//LES)  KHAN SURI entered the United States on a J1 visa issued on 15 November 2022 with an expiration date of 31 October 2023. [SEVIS]

- (U//FOUO)  According to open-source reporting, KHAN SURI is married to U.S. citizen, Mapheze Ahmad YOUSEF SALEH[USPER], a daughter of Ahmed YOUSEF, a senior Hamas figure in Gaza and an advisor to a Hamas leader. KHAN SURI has three children who applied for citizenship based on their mother's U.S. citizenship and were denied in June 2024. [Open Source/ELIS: 20250312]

- (U//FOUO)  According to open-source reporting, KHAN SURI actively spreads Hamas propaganda and promotes antisemitism on social media. [Open Source: 20250311]

### (U)  Biographical Information



- (U)  **Name:** Badar KHAN SURI
- (U//FOUO)  **DOB:** ███
- (U//FOUO)  **COB:** India
- (U//FOUO)  **COC:** India
- (U//FOUO)  **Current Passport:** ███; India (expiration: 16 June 2027)
- (U//LES)  **SSN:** ███
- (U//FOUO)  **FIN:** ███
- (U//FOUO)  **SEVIS ID:** ███
- (U//FOUO)  **Visa Foil:** ███; USA (expiration 31 October 2023)

### (U)  Criminal History

(U)  No associated criminal history or HSI investigation was located for KHAN SURI. [███]

### (U)  USCIS Applications

(U//FOUO)  KHAN SURI has no filings for himself. He did file Application for Certificate of Citizenship for his three children:
- (U//FOUO)  Elia Khan Suri—Applied on 1 April 2024: Denied on 20 June 2024
- (U//FOUO)  Watan Khan Suri—Applied on 31 March 2024: Denied on 11 June 2024
- (U//FOUO)  Arafat Khan Suri—Applied on 31 March 2024: Denied on 11 June 2024

### (U)  Residence

- (U//FOUO)  ███ Arlington, Virginia 22209 (21 January 2023): [Accurint, SEVIS: ███]
- (U//FOUO)  ███ Arlington, Virginia 22209 (February 2023): [Accurint: ███]
- (U//FOUO)  ███, Virgina 22203 (18 January 2023): [UPAX, SEVIS: ███]
- (U//FOUO)  ███, Washington DC 20057 (December 2022): (University Office): [I-94, APIS, SEVIS, ███]

### (U)  Communications

- (U)  **Phone Numbers:**
  - (U//FOUO)  ███ (cell) (August 2024): [SEVIS: ███]
  - (U//FOUO)  ███ (home) (October 2022): [CCDI: ███]
- (U//FOUO)  **Email:**
  - (U//FOUO)  ███
  - (U//FOUO)  ███
- (U//FOUO)  **Social Media:**
  - (U//FOUO)  ███
  - (U//FOUO)  ███
  - (U//FOUO)  ███
  - ███

JA2166

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**(U)  Badar Khan SURI**

### (U)  Travel and Border Crossing History

(U//FOUO)  10 December 2022: air travel from Indira Gandhi International Airport. New Delhi. India to Dulles International Airport. Washington. DC.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

JA2167

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

## (U)  Badar Khan SURI

ICE-HQINT-30148-25

### (U)  Social and Open Sources

- (U)  **For Georgetown Univ. Couple, Terror-Ties are a Family Affair**—Published 24 February 2025
  https://www.meforum.org/campus-watch/for-georgetown-univ-couple-terror-ties-are-a-family-affair

  *"The Middle East Forum think tank has uncovered that Saleh, the daughter of longtime Hamas leader Ahmed Yousef, is married to Georgetown post-doctoral fellow Badar Khan Suri. Even more troubling, Suri—who holds a position at Georgetown's Alwaleed Center for Christian and Muslim Understanding, funded by Saudi tycoon Alwaleed bin Talal—has repeatedly endorsed Hamas terror and actively spreads its propaganda while claiming to specialize in "peace processes in the Middle East."*

  *"Suri isn't just connected to Hamas by family. He actively spreads the terror group's propaganda and promotes virulent antisemitism on social media. In a blatant act of revisionism, he denied well-documented reports of the Hamas-led massacre in southern Israel on Oct. 7, 2023, posting on Facebook: "Three lies by Israeli occupation, no proof whatsoever of babies beheaded, rapes or mass killings at carnival."*

  *In another post, he stated that Palestine's elected government must sustain its resistance, legitimizing Hamas's violent actions. Years ago, he expressed support for Hamas founder Sheikh Ahmed Yassin, posting a video saying, "This is what Hamas argues. Sheikh Yaseen giving the reasons why his group is fighting for their land which was stolen," legitimizing Hamas's violent actions.*

  *Perhaps most disturbingly, Suri posted a video showing Hamas terrorists holding Israeli child hostages and wrote, "This is how Hamas men dealt with kids on Oct. 7." Rather than condemn the horrifying abduction of Israeli children, Suri appeared to defend and even praise how Hamas militants "dealt" with the children."*

- (U)  **Middle East Monitor (MEMO)**—Contributed articles in 2018 and 2023 for the site
  https://www.middleeastmonitor.com/6-author/badar-khan-suri/

*Prepared for/in collaboration with HSI Office of Intelligence*

*ROA Published Date: 10 March 2025*

JA2168

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

## (U)  Badar Khan SURI



**MIDDLE EAST MONITOR**

*Creating new perspectives since 2009*

News    Opinion    Reviews    Features    Publications    Multimedia    More          English Edition ˅   |  Free Subscription  | 𝗢 X ⦾ⓖ ♪ ▣ ❤ | ॲ



### Badar Khan Suri

Badar Khan Suri Postdoctoral Fellow School of Foreign Service Georgetown
University Washington DC.

### Items by Badar Khan Suri



September 20, 2023 | BADAR KHAN SURI

Hate against Muslims in India,
whether on the streets or in
Parliament, is the same

Hate is the chief ingredient of
everyday discourse on the streets
and the country's socio-political . .

October 20, 2016 | BADAR KHAN SURI

Unveiling its vision of
apartheid: Israel's Nation-
State law

Democracy never came to Israel
Finally, it is here: the masquerade of
advocating Jewishness and ...



May 16, 2015 | BADAR KHAN SURI

Democracy has taken a leap
forward in Iraq

A conversation with Shadi Hamid of
Brookings Institution on the
performance of Iraqi democracy ...

UNCLASSIFIED  [Open Source]

- (U)  **Twitter Posting by Anna Stanley**—Posted on 25 February 2025
  https://x.com/_Anna_Stanley_/status/1894358989086842939

  Post claiming KHAN SURI has pro-Hama sympathies and direct link to Hamas via spouse. Anna Stanley lists herself as a
  Research Associate/OSINT Investigator for the Middle East Forum Think Tank.

X

⚙ Settings

← Post



**Anna Stanley** ✅
@_Anna_Stanley_

⦿ Badar Khan Suri's father-in-law, was a top adviser to Hamas chief
Ismail Haniyeh. Yet, Suri **teaches future U.S. diplomats** "Middle East
peace process" at @Georgetown, while denying Hamas atrocities &
spreading terror propaganda. • •

7:09 AM · Feb 25, 2025 · **1,224** Views

⬚  ...

- (U)  **Instagram Profile Photos**—Posting date is not visible

UNCLASSIFIED  [Open Source]

SUBJECT PROFILE

UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

JA2169

# (U)  Badar Khan SURI



KHAN SURI appears to post pro-Palestine content



- (U) **Georgetown University**—Biographic Information listed for KHAN SURI
https://acmcu.georgetown.edu/profile/badar-khan-suri/

*"**Dr. Badar Khan Suri** is a Postdoctoral Fellow at the Alwaleed Bin Talal Center for Muslim-Christian Understanding at the Edmund A. Walsh School of Foreign Service, Georgetown University, Washington, D.C. He completed his Ph.D. in Peace & Conflict Studies from Nelson Mandela Center for Peace and Conflict Resolution, Jamia Millia Islamia, New Delhi in 2020. He wrote his thesis on "Transitional Democracy, Divided Societies and Prospects for Peace: A Study of State Building in Afghanistan and Iraq" in which he underlined the complexities involved in introducing democracy in ethnically diverse societies; as well as challenges to project state building."*

*"He has travelled extensively in the conflict zones of India, Pakistan, Balochistan in Iran, Iran, Turkey, Kurdish Areas in Turkey, Syria, Lebanon and its southern region, Egypt and Palestine. He is an interdisciplinary scholar who's areas of interest are religion, violence and peace; ethnic conflicts and peace processes in  Middle East and South Asia. He is working on a project that looks into potential causes that hinder cooperation among religiously diverse societies and possibilities to overcome those hindrances."*

- (U) **GUfaculty360.Georgetown.edu**—Biographic Information and Featured Works Profile—Date of Information 10 March 2025
https://gufaculty360.georgetown.edu/s/contact/0031Q00002e7tV9QAI/badar-khan-suri?searchType=Contact-Info&searchText=khan%20suri UNCLASSIFIED  [Open Source]                    UNCLASSIFIED  [Open Source]

*Postdoctorial Associate—Email: badarsuri@gmail.com*

*"Dr. Badar Khan Suri is a Postdoctoral Fellow at the Alwaleed Bin Talal Center for Muslim-Christian Understanding at the Edmund A. Walsh School of Foreign Service, Georgetown University, Washington, D.C."*

*"He completed his Ph.D. in Peace & Conflict Studies from Nelson Mandela Center for Peace and Conflict Resolution, Jamia Millia Islamia, New Delhi in 2020. He wrote his thesis on "Transitional Democracy, Divided Societies and Prospects for Peace: A Study of State Building in Afghanistan and Iraq" in which he underlined the complexities involved in introducing democracy in ethnically diverse societies; as well as challenges to project state building."*

*"He has travelled extensively in the conflict zones of India, Pakistan, Balochistan in Iran, Iran, Turkey, Kurdish Areas in Turkey, Syria, Lebanon and its southern region, Egypt and Palestine."*

*"He is an interdisciplinary scholar who's areas of interest are religion, violence and peace; ethnic conflicts and peace processes in  Middle East and South Asia. He is working on a project that looks into potential causes that hinder cooperation among religiously diverse societies and possibilities to overcome those hindrances."*

- (U) **GUfaculty360.Georgetown.edu**—Courses Teaching—Date of Information 10 March 2025

PROFILE

JA2170

██████████████████████████

## (U) Badar Khan SURI

https://gufaculty360.georgetown.edu/s/faculty-teaching?id=0031Q00002e7tV9QAI

*Badar Khan Suri*

Postdoctoral Associate

Contact
Email ████████

### Teaching

| Title | Semester | Course Number | CRN |
|---|---|---|---|
| Minrosm&Minty Rghts in S Asia | Spring 2023 | CMCU-4190-C1 | 48330 |

(U) **Coursicle.com**—Course information for classes taught by KHAN SURI—Date of Information 10 March 2025
https://www.coursicle.com/georgetown/professors/Badar+Suri/

# Badar Suri



**Courses**
CMCU 4190   Minrosm&Minty Rghts in S Asia

**Course Chat**
Chat with other students in Badar Suri's classes

**Department**
CMCU

**Schedule Planner**
View Badar Suri's Fall 2025 classes

**Email**
████████

**Recent Semesters Teaching**
Spring 2025

**Typical Class Size**
12

UNCLASSIFIED  [Open Source]

UNCLASSIFIED  [Open Source]

JA2171

UNCLASSIFIED / LAW ENFORCEMENT SENSITIVE

## (U)  Badar Khan SURI

*(U)  Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U)  Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

*(U)  This document has been designated by DHS as UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

*(U)  This product contains U.S. person information that has been deemed necessary for the intended recipient to understand, assess, or act on the information provided. It has been highlighted in this document with the label USPER and should be handled in accordance with the recipient's intelligence oversight/information handling procedures. U.S. person information should be protected in accordance with constitutional requirements and all federal and state privacy and civil liberties laws.*

*(U)  This document contains information that is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

(U//FOUO)  Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to

EXHIBIT
235

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

## (U//LES) Mohsen Khader MAHDAWI

ICE-HQINT-30150-25

**SUBJECT PROFILE**

### (U) Analysis Findings

- (U//LES) Palestinian national Mohsen Khader MAHDAWI holds Legal Permanent Resident (LPR) status through marriage to U.S. citizen in Palestine in June 2013.
- (U//LES) MAHDAWI changed residence status following divorce by spouse in December 2015.
- (U//LES) MAHDAWI submitted N-400 Application for Citizenship on 14 February 2024.
- (U//LES) On January 12, 2019 MAHDAWI was encountered at Derby Line, Vermont POE in possession of LSD, mushrooms (opiate), and methamphetamine.

### (U) Biographical Information

 

- (U) **Name:** MAHDAWI, Mohsen Khader Mohsen
- (U//LES) **Alias:** Mohsen Mehdawi
- (U//LES) **DOB:** ▮▮▮▮▮
- (U//LES) **COB:** Israel (Nablus)
- (U//LES) **COC:** Palestinian Territory
- (U//LES) **Current Passport:** ▮▮▮▮, Palestinian Territory (expiration: 25 June 2029) [ADIS]
- (U//LES) **Former Passport:** ▮▮▮▮, Palestinian Territory
- (U//LES) **SSN:** ▮▮▮▮
- (U//LES) **Alien Number:** ▮▮▮▮
- (U//LES) **FIN:** ▮▮▮▮
- (U//LES) **FBI Number:** ▮▮▮▮

- (U//LES) ▮▮▮▮▮▮
- (U//LES) **Legal Permanent Resident Card:** ▮▮▮▮
- (U//LES) **Driver's License:** ▮▮▮▮

### (U) Criminal History

- (▮▮▮▮▮▮▮▮▮▮y ▮▮▮▮)

### (U) USCIS Applications

- (U//LES) 14 February 2024: N-400 Application for Naturalization – Process pending. [ELIS: 20250311]
- (U//LES) 29 June 2018: I-551 Legal Permanent Resident – Active; expiration 06/27/2028. [CPMS: 20250312]
- (U//LES) 15 November 2016: I-751 Petition to Remove Conditions on Residence - Approved. [ELIS: 20250312]

### (U) Residences

- (U//LES) ▮▮▮▮
- (U//LES) ▮▮▮▮ (July 2023▮ August 2021▮
- (U//LES) ▮▮▮▮ (June 2020)▮
- (U//LES) ▮▮▮▮ (June 2019▮
- (U//LES) ▮▮▮▮

### (U) Communications

- (U) **Phone Numbers:**
  - (U//LES) ▮▮▮▮ (cell) ▮▮▮▮
- (U) **Social Media:**
  - (U//LES) ▮▮▮▮
  - (U//LES) ▮▮▮▮

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

JA2173

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

## (U//LES)  Mohsen Khader MAHDAWI

- o  (U//LES)
- o  (U//LES)
- o  (U//LES)
- o  (U//LES)
- o  (U//LES)

- o  (U//LES)
- o  (U//LES)
- o  (U//LES)
- o  (U//LES)
- o  (U//LES)

- o  (U//LES)
- o  (U//LES)
  [Deleted]
- o  (U//LES)
- o  (U//LES)
- **(U)  Email:**
  - o  (U//LES) ████████████ [ELIS: 20240214]

### (U)  Travel and Border Crossing History

- (U//LES) 08 August 2024: air travel from John F Kennedy International Airport (JFK) to Athens (ATH), Greece.
- (U//LES)  22 August 2024: air travel from Gardermoen Airport (OSL), Oslo, Norway to Los Angeles International Airport (LAX), California.
- (U//LES)  12 January 2019: inbound border crossing: Derby Line (L026), Vermont in 2013, White Audi/A5; license plate: GTA561, Vermont. [UPAX, NLETS]

### (U)  Vehicles

- (U//LES)  1996 Silver BMW Z3: Tag: ████████
- (U//LES)  2010 Ducati Monster: VIN: ████████

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

JA2174

## (U//LES)  Mohsen Khader MAHDAWI

ICE-HQINT-30150-25

### (U)  Social and Open Sources

- (U)  **Twitter (X) post stating the subject is pro-Hamas, appeared on 60 Minutes justifying October 7th Hamas attack on Israel, calling for the destruction of Israel.**—Viewed 11 March 2025

← Post



COLUMBIA UNIVERSITY

Hello PAM Mam . @TheJusticeDept  Hi, Marco. @SecRubio

This is Mohsen Mahdawi. He's co-President of the Palestinian Student Union and organizer of pro-Hamas rallies. He appeared on 60 Minutes justifying the Oct 7th massacre.

He's currently at Columbia on a student visa.

Mohsen Mahdawi is an anti-Israel activist leader who called for Israel's destruction and justified Hamas terrorism in late 2023. Ten years earlier, he celebrated a terrorist who had murdered dozens of Israeli Jews in 1978. Mahdawi also showed support for the pro-Hamas encampment at Columbia in April 2024.

Mahdawi made his late 2023 statements after a series of Hamas terror atrocities and war crimes against Israeli civilians, including mass murder, torture, rape, beheadings and kidnappings, which were executed on October 7, 2023. The attacks left over 1,200 Israelis dead, hundreds kidnapped and thousands wounded. Israel retaliated with a war called "Swords of Iron."

Hamas is a designated terrorist organization founded in 1987 that is dedicated to destroying Israel and killing Jews. Since 2001, Hamas has launched thousands of rockets at Israel and on October 7, 2023, Hamas murdered approximately 1,200 Israelis and kidnapped over 200

**(U//LES) Open Source**

- (U)  **Mohsen MAHDAWI video posted by TRT World on Twitter (X) accusing Israel of genocide—** Posted 10 October 2024

← Post

 TRT World
@trtworld

Mohsen Mahdawi, a Palestinian studying philosophy at Columbia University in NYC, tells TRT World that his school is complicit in Israel's genocidal war on Gaza given its financial ties with Tel Aviv



12:07 PM · Oct 10, 2024 · 3,359 Views

**(U//LES) Open Source**

JA2175

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U//LES)  Mohsen Khader MAHDAWI

- (U)  Twitter (X) posted from Congresswoman Rep. Beth Van Duyne stating the subject praised the death of his "martyr" cousin; implying the cousin may have been a militant. —Posted 5 September 2024






(U//LES) Open Source

- (U)  X (Twitter) post to TheJusticeDept (Department of Justice) and SecRubio (Secretary of State Marco Rubio) posting of Mohsen MAHDAWI—Unknown Date



Hi, Pam. @TheJusticeDept  Hi, Marco. @SecRubio

This is Mohsen Mahdawi. He's co-President of the Palestinian Student Union and organizer of pro-Hamas rallies. He appeared on 60 Minutes justifying the Oct 7th massacre.

He's currently at Columbia on a student visa.




(U//LES) Open Source

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

**(U//LES)  Mohsen Khader MAHDAWI**

**(U)  Twitter (X) post showing 60-Minutes interview with a Columbia University student who claims to have heard MAHDAWI speak about Jews in a derogatory way with antisemitic rhetoric—Published 31 January 2025**

←    **Post**



Mohsen Mahdawi, a Columbia University student on a visa, has been added to the deportation database due to his support for Hamas, including celebrating their October 7 massacre and praising terrorist Dalal Mughrabi.

12:57 AM · Jan 31, 2025 · **3.323** views

Read 7 replies

(U//LES) Open Source

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

## (U//LES) Mohsen Khader MAHDAWI

*(U) Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U) Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

(U) This document has been designated by DHS as *UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES)* and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.

(U) This document contains information that is *UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO)*. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.

(U) This product contains U.S. person information that has been deemed necessary for the intended recipient to understand, assess, or act on the information provided. It has been highlighted in this document with the label ᴜᴜᴘ and should be handled in accordance with the recipient's intelligence oversight/information handling procedures. U.S. person information should be protected in accordance with constitutional requirements and all federal and state privacy and civil liberties laws.

**(U//FOUO) Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to** ███████████.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

JA2178

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

EXHIBIT

tabbies 236

## (U//FOUO) Yunseo CHUNG

ICE-HQINT-00294-25

**SUBJECT PROFILE**

### (U) Analysis Findings

(U//LES) Yunseo CHUNG is a U.S. Legal Permanent Resident (LPR). CHUNG entered the United States on an F2 visa on 23 June 2009. She requested legal permanent resident status on 18 June 2020. CHUNG was issued an LPR card on 27 August 2021.

### (U) Biographical Information



(U//FOUO)

- (U) **Name:** Yunseo CHUNG
- (U) **Alias:** unknown
- (U//FOUO) **DOB:** ███████
- (U//FOUO) **COB:** South Korea
- (U//FOUO) **COC:** South Korea
- (U//FOUO) **Current Passport:** ███████; South Korea (expiration: 12 November 2031)
- (U//FOUO) **Alien #:** ███████
- (U//FOUO) **FIN:** ███████
- (U//FOUO) **FBI Number:** ███████
- (U//FOUO) **Criminal Record:** ███████
- (U//FOUO) **SSN:** ███████

### (U) Criminal History

- (U//LES) Obstruct Governmental Administration 2nd Degree—Prevent Official Function; New York County Criminal Court (March 2025)
- (U//LES) Disorderly Conduct—Refusing to Move On; New York County Criminal Court (March 2025)
- (U//LES) Trespass; New York County Criminal Court (March 2025)

### (U) USCIS Application

- (U//FOUO) 21 February 2025—Permanent resident applying to replace permanent resident card on 20 February 2025—In process.
- (U//FOUO) 1 September 2021—Applied for I-485 Employment Authorization Card ███████ Completed.

### (U) Residence

(U//FOUO) ███████

### (U) Communications

- (U) **Phone Numbers:**
  - (U//FOUO) ███████ (cell)
  - (U//FOUO) ███████ (cell)
- (U) **Possible Social Media:**
  - (U) ███████
- (U) **Email:**
  - (U//FOUO) ███████
  - (U//FOUO) ███████

### (U) Travel and Border Crossing History

| Date | Flight |
| --- | --- |
| 11 August 2024 | AA 280 (ICN > DFW) |
| 17 July 2024 | AA 281 (DFW > ICN) |
| 14 March 2024 | NK 528 (CUN > FLL) |
| 11 March 2024 | NK 1280 (MSY > CUN) |
| 12 August 2022 | KE 93 (ICN > IAD) |
| 2 July 2022 | KE 94 (IAD > ICN) |
| 12 March 2022 | AA 2248 (CUN > CLT) |
| 5 March 2022 | AA 1778 (CLT > CUN) |
| 26 July 2010 | UA 892 (ICN > SFO) |

(U//FOUO)

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

JA2179

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

**(U//FOUO) Yunseo CHUNG·**                                    ICE-HQINT-30144-25

## (U)  News Articles

- (U)  **Anti-Israel protesters arrested at Barnard were mostly privileged youths, including woman whose family started Hamptons Jitney**—Published 6 March 2025

  https://nypost.com/2025/03/06/us-news/arrested-anti-israel-protesters-at-barnard-include-repeat-offender-woman-whose-family-started-hampton-jitney-bus-service/

  Describes her as being part of the protests.

  *"Others hauled off campus by police included Hanna Puelle — whose Instagram identifies her as publisher of Columbia Law Review — and Yunseo Chung, a Columbia women's studies junior, former high school valedictorian and social media editor for Quarto, the university's official undergraduate literary magazine."*

- (U)  **Meet the Columbia Radicals Arrested for Storming a Barnard Building**— Published 6 March 2025

  https://freebeacon.com/campus/meet-the-columbia-radicals-arrested-for-storming-a-barnard-building/

  Describes her as being part of the protests and includes a screenshot of her Linkedin page.

  *"Of the nine individuals arrested after storming Millstein Library, four are Columbia students: Gabrielle Wimer, Hannah Puelle, Yunseo Chung, and Symmes Cannon. One, Tramy Dong, is a Barnard student. Another, Christopher Holmes, attends Union Theological Seminary, a Columbia affiliate, while the remaining three appear unassociated with either school. They were charged with disorderly conduct, trespassing, and obstructing governmental administration, according to an NYPD spokesman..."*

  *"The third, Chung, is a Columbia junior pursuing her bachelor's degree in English and Women's and Gender Studies. According to a screenshot of her LinkedIn taken before it was <u>deleted</u>, she is involved in Columbia's Criminal Justice Coalition and Columbia's Queer Alliance and was the valedictorian of the high school she attended."*

## (U)  Social Media

(U)  Linkedin (currently locked)



UNCLASSIFIED

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# (U) Yunseo CHUNG

*(U) Warning: This product is preliminary criminal analysis supporting an ongoing criminal investigation; the analysis may change, subject to new information developed over the course of the ongoing investigation.*

*(U) Warning: This is a U.S. Immigration and Customs Enforcement internal document and may not be shared externally.*

*(U) This document has been designated by DHS as UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE (U//LES) and is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS and ICE policy relating to LES information. This information can be distributed further within DHS on a need-to-know basis; however, it may not be distributed outside DHS without authorization from the originating office.*

*(U) This document contains information that is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. § 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need-to-know without prior approval of an authorized DHS official.*

**(U//FOUO)  Please be advised that you may request assistance or follow-up information from the Criminal Analysis Division (CAD). In this capacity, CAD leverages its resources, partnerships, and capabilities to provide additional criminal analysis collaboration and coordination, and intelligence support. For any feedback or comments, please send to** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

JA2181

**Trial Exhibit 237 is a multimedia file that will be separately served on a digital media storage device alongside paper copies of the Joint Appendix**

JA2182



| From: | SMART Core |
|---|---|
| Sent: | Wednesday, June 18, 2025 1:47 PM |
| Cc: | |

**Subject:** Action Request: Expanding Screening and Vetting for FMJ Applicants

<div align="center">

**UNCLASSIFIED**

SBU

</div>



**Action Office:**

**Info Office:** ALDACS

| MRN: | 25 STATE 59756    Reply |
|---|---|
| Date/DTG: | Jun 18, 2025 / 181737Z JUN 25 |
| From: | SECSTATE WASHDC |
| Action: | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| E.O: | 13526 |
| TAGS: | CMGT, CVIS, KFRD |
| Captions: | SENSITIVE |
| Reference: | A) 25 STATE 5914 |
| | B) 25 STATE 26168 |
| | C) 25 STATE 50220 |
| Subject: | Action Request: Expanding Screening and Vetting for FMJ Applicants |

1. (U) This is an action request.  See paras. 26-29.

**INTRODUCTION AND SUMMARY**

JA2183

AAUP-00348

2. (SBU) In ref A, the Department directed consular officers to maintain extra vigilance and to comprehensively review and screen every visa applicant for potential security and non-security related ineligibilities including to assess whether the applicant poses a threat to U.S. national security. In ref B, consular officers were instructed to conduct expanded social media screening and vetting for certain F, M, and J nonimmigrant visa (FMJ) applicants. In ref C, the Department directed consular sections to temporarily suspend scheduling FMJ cases pending further guidance on FMJ vetting. This guidance supersedes ref B, which was limited to social media vetting for certain FMJ applicants.

3. (SBU) This updated guidance requires consular officers to conduct a comprehensive and thorough vetting of all FMJ applicants, including online presence, to identify applicants who bear hostile attitudes toward our citizens, culture, government, institutions, or founding principles; who advocate for, aid, or support designated foreign terrorists and other threats to U.S. national security; or who perpetrate unlawful antisemitic harassment or violence. <u>Consular sections should resume scheduling FMJ appointments but should consider the effect of this guidance on workload and schedule accordingly.</u> **Posts should prioritize expedited FMJ appointment requests as described in para 29.** Posts should implement these vetting procedures within five business days.

**WHY ARE WE DOING THIS?**

4. (U) E.O. 14161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats, directs us to ensure that foreign nationals admitted to the United States do not bear hostile attitudes toward the citizens, culture, government, institutions, or founding principles of the United States, and that they do not advocate for, aid, or support designated foreign terrorists and other threats to U.S. national security. E.O. 14188, Additional Measures to Combat Anti-Semitism, establishes U.S. policy to combat antisemitism vigorously, using all available legal tools to hold to account perpetrators of unlawful antisemitic harassment and violence, including on university campuses.

5. (U) Removing foreign nationals from the United States, even when they have clearly violated our laws, is a lengthy, expensive, and difficult process. Therefore, we must be vigilant during the visa issuance process. We must ensure that aliens seeking admission

2

JA2184

AAUP-00349

to the United States are screened and vetted to the maximum extent possible and that they will respect the terms of their admission to the United States. As Secretary Rubio said, "a visa is a privilege, not a right."

6. (SBU) Such pre-admission vetting is particularly important for long-stay NIV holders, and acutely for FMJ cases. The FBI has long warned that foreign powers seek access to American higher education institutions to, among other things, steal technical information, exploit U.S. research and development, and spread false information for political or other reasons. In addition, a recent CA/FPP study suggested that almost half of international students seek to remain in the United States, whether legally or illegally.

## WHICH CASES ARE COVERED?

7. (SBU) This guidance for consular officers covers **all FMJ applicants,** new or returning. This updated guidance supersedes that in ref B, which was limited to social media vetting for certain FMJ applicants.

## HOW DO I HANDLE THESE CASES?

8. (SBU) Post should conduct intake and interviews in accordance with standard procedures. Once you determine an FMJ applicant is otherwise eligible for the requested nonimmigrant status, you must refuse the case under INA 221(g). Inform the applicant that his case is refused and requires additional administrative processing to establish his eligibility for the visa. Request that the applicant set all of his social media accounts to "public" and remind the applicant that limited access to, or visibility of, online presence could be construed as an effort to evade or hide certain activity.

## WHO DOES THE VETTING?

3

<span style="color:red">JA2185</span>

AAUP-00350

9. (SBU) The <u>same</u> consular officer who interviews the applicant should perform the vetting described below. This "caseworker" approach is a best practice that allows a single decisionmaker to consider the whole applicant and the totality of facts surrounding the application. It also permits better detection of potentially derogatory information and inconsistencies. Other consular staff may perform discrete portions of the vetting that cannot be performed by the interviewing officer. For example, if only FPU staff have access to LexisNexis, FPU staff may conduct that check and return the results to the interviewing consular officer.

10. (SBU) **Vetting is not a fraud assessment.** Do not refer a case to post FPU for vetting or for any portion of the vetting. However, you might discover information during vetting that leads to an FPU referral. Posts should handle such cases according to their FPU referral SOPs and 7 FAH-1 H-940, Overseas FPU Responsibilities.

11. (SBU) To promote thorough vetting of visa applicants, and to promote quality decision-making generally, consular managers shall not maintain or establish any formal or informal production or processing quotas or targets for consular officers or those involved in administrative processing of visa cases. Rather consular officers shall take the time necessary to satisfy themselves that visa applicants qualify for the visas they seek, and personnel involved in back-office processing shall take the time necessary to perform their tasks thoroughly.

**WHERE DO I LOOK?**

12. (SBU) You must conduct a comprehensive and thorough vetting of each FMJ applicant who is otherwise issuable (i.e. overcomes 214(b)). Vetting means examining all aspects of the case, including the application, supporting evidence, and information you gather during the interview. You should review these in light of your personal knowledge, your expertise, and all sources of information available to you. It should include a review of the applicant's entire online presence -- not just social media activity -- using any appropriate search engines or other online resources. It also should include a check of any databases to which the consular section has access (e.g., LexisNexis or local equivalents).

13. (SBU) Consular sections may consult LE staff and Public Diplomacy sections to understand the social media environment at post and which search engines and techniques are best for comprehensively exploring an applicant's online presence. LE

JA2186

AAUP-00351

staff can help provide context, including when assessing the credibility of applicants who apparently lack any online presence or who did not provide social media identifiers.

14. (SBU) If it is necessary to sign in to an account to view all of an applicant's activity on a particular social media platform (e.g., Instagram), you must do so using an official account that is publicly attributable to the Department. Consular sections may create such accounts in accordance with the platform's Terms of Service. Do not use accounts that are used for public communication. Follow the guidance on social media use in 7 FAH-1 H-945.4, Social Media Rules of Conduct in Fraud Assessments, but recall that **vetting is not a fraud assessment,** so you should not track such vetting activities in ECAS.

15. (SBU) If you are unable to review any aspect of an applicant's online presence because social media accounts are set to "private" or otherwise limited, you should treat the case as any other where an applicant fails to provide certain information on request. **You must consider whether such failure reflects evasiveness or otherwise calls into question the applicant's credibility.**

**WHAT AM I LOOKING FOR?**

16. (U) During the vetting, you simply are looking for any potentially derogatory information about the applicant. You must review any such information to ensure it does not indicate an ineligibility under INA 212(a) or 214(b). For example, during an online presence search, you might discover in local media that an applicant had been arrested and charged with a serious crime, a possible 2A1 ineligibility, that he did not disclose on his application. In such a case, you could request additional information from the applicant to help you determine whether he is ineligible.

17. (U) You should consider as potentially derogatory any indications of hostility toward the citizens, culture, government, institutions, or founding principles of the United States; of advocacy for, aid, or support for designated foreign terrorists and other threats to U.S. national security; or of support for unlawful antisemitic harassment or

JA2187

AAUP-00352

violence. You must review any such indicators to ensure they do not indicate an ineligibility under INA 212(a). For example, during an online presence search, you might discover on social media that an applicant endorsed Hamas or its activities, a possible 3B ineligibility, that he did not disclose on this application.

18. (SBU) You also should be alert to any inconsistencies between what you discover during vetting and how the applicant presented himself in his application, in his supporting evidence, or during the interview. You must explore all such inconsistencies to ensure they do not indicate visa ineligibilities. **Even when such inconsistencies do not point to an INA 212(a) ineligibility, they can call into question the applicant's credibility.**

19. (U) You must document the results of your vetting in detailed case notes, including all potentially derogatory information and inconsistencies. If you find any relevant information online, take screenshots to preserve the record against possible later alteration or loss of the information and upload those screenshots to the applicant's case record in the CCD.

## DOES THE APPLICANT STILL OVERCOME INA 214(B)?

20. (U) INA 214(b) requires an applicant to show credibly that all activities in which he is expected to engage in while in the United States are consistent with the specific requirements of his visa classification. That is, **if you are not completely satisfied (1) that the applicant is credible and (2) that, during his time in the United States, the applicant will engage only in activities consistent with his nonimmigrant visa status, you should refuse the visa under INA 214(b).** That is true even in cases where the applicant has convinced you that he is not an intending immigrant, and even in cases where the applicant is also ineligible under another section of the law.

21. (SBU) Even if inconsistencies or potentially derogatory information you uncover during vetting do not rise to the level of an INA 212(a) ineligibility, you must consider whether they undermine the applicant's credibility or suggest that the applicant will not

6

JA2188

AAUP-00353

respect the terms of his admission to the United States. For example, while vetting applicants, many posts have discovered evidence online that those applicants had worked illegally while in the United States previously, thus seriously undermining their credibility in subsequent visa applications.

22. (SBU) In the same way, indications of hostility toward the citizens, culture, government, institutions, or founding principles of the United States; of advocacy for, aid, or support for designated foreign terrorists and other threats to U.S. national security; or of support for unlawful anti-Semitic harassment or violence might not lead to an INA 212(a) ineligibility. However, you must consider whether applicants who express such strong animus are likely to respect the terms of their admission to the United States, including respecting all of its laws.

23. (SBU) Likewise, for applicants who demonstrate a history of political activism, especially when it is associated with violence or with the views and activities described above, you must consider the likelihood they would continue such activity in the United States and, if so, whether such activity is consistent with the nonimmigrant visa classification they seek. As Secretary Rubio has said, we do not seek to import activists who will disrupt and undermine scholarly activity at U.S. universities.

## IS THE APPLICANT INELIGIBLE UNDER INA 212(a)(3)?

24. (SBU) If you uncover information that might lead to an INA 212(a)(3) ineligibility, you should follow the instructions in 9 FAM 304.2 to request an SAO. This includes but is not limited to ineligibilities under:

- INA 212(a)(3)(A)(ii), where an applicant is traveling solely, principally, or incidentally to engage in any unlawful activity (9 FAM 302.5-4).
- INA 212(a)(3)(A)(iii), where an applicant seeks to engage solely, principally, or incidentally in any activity, a purpose of which is the opposition to, or the control or overthrow of, the U.S. government by force, violence, or other unlawful means (9 FAM 302.5-5).
- INA 212(a)(3)(B), where an applicant engages in certain terrorist activities, including espousing such activities, or has provided any form of material support to a terrorist organization (9 FAM 302.6).

7

JA2189

AAUP-00354

25. (SBU) In any case where an applicant:

- expresses hostile attitudes toward the citizens, culture, government, institutions, or founding principles of the United States;
- **OR** advocates for, aids, or supports designated foreign terrorists and other threats to U.S. national security;
- **OR** expresses support for or perpetrates unlawful anti-Semitic harassment or violence;
- **AND** overcomes INA 214(b);
- **AND** is not ineligible under any other provision of INA 212(a)(3);
- **THEN** you should pursue a finding that the applicant is ineligible under INA 212(a)(3)(C), where an applicant's entry or proposed activities would have potentially serious foreign policy consequences or compromise a compelling U.S. foreign policy interest. Only the Secretary can make such a finding, which requires an SAO. See 9 FAM 302.14-2 for details.

## ACTION REQUESTS

26. (U) Posts should implement these vetting procedures within five business days.

27. (U) In addition, posts should work with their Public Diplomacy Sections on any public announcements for appropriate social media platforms and/or in local press. Cleared social media content for posts to translate for this purpose will be available on the Consular Affairs Outreach Hub, and cleared press guidance will be available on CAWeb. The GSS Program Team will instruct vendors to update GSS websites.

## RESUMING FMJ SCHEDULING

28. (U) Posts should resume regular scheduling of FMJ visa applications once these actions requests are implemented. However, posts should consider overall scheduling volume and the resource demands of appropriate vetting; posts might need to schedule fewer FMJ cases than they did previously.

29. (SBU) Posts may resume processing of FMJ Referrals and Priority Appointment Requests (PARs), as well as FMJ expedited appointment requests. However, among expedited appointment requests for FMJs, posts should prioritize the following groups:

8

AAUP-00355

JA2190

- J-1 physicians
- F-1 students seeking to study at a U.S. university where international students constitute 15 percent or less of the total student population, according to the U.S. Department of Education. CA will post a list of such schools on CAWeb.

## APPLICATION PROCESS CONSIDERATIONS

30. (U) For FMJ cases currently in "open" status that have not yet been interviewed or, in the case of interview waiver cases, otherwise adjudicated, posts should request that applicants make their social media accounts "public," then conduct the vetting described in this cable. If no potentially derogatory information is found, post can adjudicate the case to completion. If potentially derogatory information is found, post should refuse the case under the appropriate refusal code; or, if needed, post should call the applicant back for a follow-up interview.

31. (U) For FMJ cases that were interviewed before the release of ref C and are otherwise approvable but currently in INA 221(g) status, posts should request that applicants make their social media accounts "public," then conduct the vetting described in this cable. If no potentially derogatory information is found, post can adjudicate the case to completion. If potentially derogatory information is found, post should refuse the case under the appropriate refusal code; or, if needed, post should call the applicant back for a follow-up interview.

JA2191

AAUP-00356

JA2192

AAUP-00357

# AAUP & MESA Political Activity April 17, 2024



JA2193

# AAUP Political Activity April 17, 2025



JA2194

# Comparison of AAUP Political Activity April 2024 and April 2025



JA2195



Comparison of AAUP Public Events 2022 - 2025

- Events
- Palestine/Israel Associated Events

| Year | Events | Palestine/Israel Associated Events |
|------|--------|-----------------------------------|
| 2022 | 1 | |
| 2023 | 20 | |
| 2024 | 32 | 1 |
| 2025 | 41 | 3 |

JA2196

AAUP v. RUBIO - ATTORNEYS EYES ONLY

*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

LAW ENFORCEMENT SENSITIVE

Andrea Toll Whiting
Director
Field Operations
Department of State

Re: Mahmoud KHALIL

Director Whiting:

I am writing to provide a summary of the actions by Mahmoud Khalil that violate President Trump's executive orders on anti-Semitism and may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences for the United States from the alien's presence or activities consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

Khalil was issued an F1 visa on December 12, 2022, and entered the United States under that visa on December 20, 2022. His status was changed to that of a Conditional Resident (CR6), Spouse of a United States Citizen, on November 16, 2024, and he received Legal Permanent Resident (LPR) status.

Mahmoud Khalil's involvement in the March 6, 2025, protest at Barnard College, where Hamas flyers were distributed, aligns with the executive order's focus on deporting "Hamas sympathizers." His leadership in these disruptive protests creates a hostile environment for Jewish students, meeting Title VI criteria. Khalil is identified as a former graduate student of Columbia University and a prominent pro-Palestinian activist involved in antisemitic activities. Social media posts and open-source articles document his leadership roles, including the occupation of Columbia University's Hamilton Hall in April 2024. Recent social media posts from March 6, 2025, indicate he was a key figure in the Barnard College library occupation, where protesters distributed Hamas-authored flyers.

HSI is concerned that the distribution of Hamas-authored flyers, leadership roles in antisemitic activities, and leadership in disruptive protests may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI requests that the Secretary of State determine whether there are compelling adverse foreign policy consequences for the United States from the alien's presence or activities



LAW ENFORCEMENT SENSITIVE

JA2197

AAUP v. RUBIO - ATTORNEYS EYES ONLY

consistent with INA § 237(a)(4)(C). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.

Enclosed with this letter is supporting factual documentation.

If you require further assistance or additional information, I can be reached at ██████████.

Respectfully,

ANDRE R WATSON
Digitally signed by ANDRE R WATSON
Date: 2025.03.07 18:25:26 -05'00'

Andre R. Watson
Assistant Director
National Security Division



*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

LAW ENFORCEMENT SENSITIVE

Andrea Toll Whiting
Director
Field Operations
Department of State

Re: Yunseo CHUNG

Director Whiting:

I am writing to provide a summary of the actions by Yunseo Chung that violate President Trump's executive orders on anti-Semitism and may be sufficient for the Secretary of State to determine there are compelling adverse foreign policy consequences for the United States from the alien's presence or activities consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

Chung is a U.S. Legal Permanent Resident (LPR). Chung entered the United States on an F2 visa on 23 June 2009. She requested legal permanent resident status on 18 June 2020. Chung was issued an LPR card on 27 August 2021.

Yunseo Chung's involvement in the March 5, 2025, protest at Barnard College, where Hamas flyers were distributed, aligns with the executive order's focus on deporting "Hamas sympathizers." Her involvement in these disruptive protests created a hostile environment for Jewish students, meeting Title VI criteria. Chung is identified as a student of Columbia University and involved in antisemitic activities. Recent social media posts from March 6, 2025, indicate she was a figure in the Barnard College library occupation, where protesters distributed Hamas-authored flyers.

HSI is concerned that the distribution of Hamas-authored flyers, leadership in disruptive protests, involvement in antisemitic activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI requests that the Secretary of State determine whether there are compelling adverse foreign policy consequences for the United States from the alien's presence or activities consistent with INA § 237(a)(4)(C). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.

Enclosed with this letter is supporting factual documentation.



LAW ENFORCEMENT SENSITIVE

JA2199

If you require further assistance or additional information, I can be reached at ███████████ .

Respectfully,

ANDRE R
WATSON

Digitally signed by ANDRE R
WATSON
Date: 2025.03.07 18:18:15 -05'00'

Andre R. Watson
Assistant Director
National Security Division



*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C.  20536

LAW ENFORCEMENT SENSITIVE

John L. Armstrong
Senior Bureau Official
Bureau of Consular Affairs
Department of State

Re: Mohsen MAHDAWI

Dear Mr. Armstrong:

I am writing to provide a summary of the actions by Mohsen MAHDAWI in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether the alien's presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

MAHDAWI first entered the U.S. as B2 nonimmigrant visitor for pleasure. MAHDAWI received his CR6 Conditional Legal Resident status in January 2015 after marrying a U.S. Citizen in Palestine in June 2013. His marriage was dissolved in December 2015. He filed a petition to remove the conditions on residence in 2016, after which he received Legal Permanent Resident (LPR) status (IR6). MAHDAWI filed an N-400 Application for Naturalization, which is on hold.

Mohsen MAHDAWI's involvement in disruptive protests at Columbia University align with the executive orders' focus on deporting "Hamas sympathizers." His leadership and involvement in these disruptive protests creates a hostile environment for Jewish students. MAHDAWI is identified as a student of Columbia University and a prominent pro-Palestinian activist involved in pro-Hamas rhetoric and events. News media articles refer to MAHDAWI calling for Isreal's destruction and justifying Hamas terrorism in late 2023. They also state that MAHDAWI has openly expressed support for eliminating Israel, leading protests with chants such as "From the river to the sea, Palestine will be free."

A post from stopantisemitism.org states that MAHDAWI's glorification of terrorism was exemplified by a poem posted online and attributed to him that said, "I will breathe home…and fill my shame, and clean my gun, and collect my packages, my bombs and embrace my gun." The poem also praises Dalal Mughrabi, who perpetrated the 1978 Coastal Road massacre, which resulted in the murder of Jews.



LAW ENFORCEMENT SENSITIVE

JA2201

MAHDAWI served as co-president of DAR Palestine at Columbia University. MAHDAWI was also affiliated with the pro-terror activist group Within Our Lifetime, (WOL) in 2023 and was reportedly a member of Students for Justice in Palestine (SJP) that same year.

HSI is concerned that MAHDAWI's participation in the above activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI provides this summary of actions for the Secretary of State to determine whether the alien's presence and activities compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences for the United States consistent with INA § 237(a)(4)(C). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.

Enclosed with this letter is supporting factual documentation. If you require further assistance or additional information, please let me know. I can be reached at ███████████.

Respectfully,

ANDRE R WATSON
Digitally signed by ANDRE R WATSON
Date: 2025.03.14 12:51:37 -04'00'

Andre R. Watson
Assistant Director
National Security Division

LAW ENFORCEMENT SENSITIVE



*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

LAW ENFORCEMENT SENSITIVE

John L. Armstrong
Senior Bureau Official
Bureau of Consular Affairs
Department of State

Re: Rumeysa OZTURK

Mr. Armstrong:

I am writing to provide a summary of the actions by Rumeysa OZTURK for consideration of actions that may constitute violations of President Trump's executive orders on anti-Semitism, and for the Secretary of State to assess whether the alien's presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

OZTURK is a national of Turkey enrolled at Tufts University (Tufts) pursuing a post doctorate degree in Child Studies and Human Development. OZTURK last entered the United States on June 28, 2024, on a nonimmigrant student visa (F1). The initial student program start date was February 1, 2021, and the program end date is December 23, 2027.

On March 26, 2024, OZTURK engaged in anti-Israel activism in the wake of the Hamas terrorist attacks on Israelis on October 7, 2023. Specifically, on March 26, 2024, OZTURK co-authored an Op-ed article titled Try again, President Kumar: Renewing Calls for Tufts to adopt March 4 TCU Senate resolutions, which was published in The Tufts Daily. The Op-ed was in response to Tufts President Kumar's statement regarding the Tufts Community Union Senate vote on proposed resolutions by the Coalition for Palestinian Liberation at Tufts (CPLT). The CPLT resolutions proposed an end to study abroad programs in Israel, for Tufts dining to stop selling items connected to Israel, for Tufts to acknowledge a "Palestinian genocide, and for Tufts Investment office and administration to disclose all investments and divest from companies tied to Israel.

The authors of the Op-ed, including OZTURK, again called for Tufts to "disclose its investments and divest from companies with direct or indirect ties to Isreal." The authors also state that Graduate Students for Palestine joins Tufts Students for Justice in Palestine (SJP) and other student groups to reject the University's response to the resolutions. Tufts SJP was officially suspended on Nov. 6, 2024, until January 2027 after it used images of weapons to promote a



LAW ENFORCEMENT SENSITIVE

JA2203

protest rally and urged members of the Tufts community to "join the student intifada." According to a news article on Boston.com, SJP violated the Threats Policy in October when it posted the images of weapons and used the term "intifada" to urge student action. Intifada is a call for the uprising or rebellion specifically: an armed uprising of Palestinians against Israeli occupation of the West Bank and Gaza Strip. On October 2, 2024, an X.com (Twitter) posting by Eyal Yakoby, "an incoming MIT student dedicated to combating anti-Americanism," showed stickers claiming to have been plastered on Tufts University campus by students. The post depicts signage placed around Tufts campus with the statement "Bring the war home" with a Palestinian flag and Hamas inverted red triangle above what appears to be a Tufts Police Department vehicle. The post states that this is a call to "bring the war to campus."

HSI is concerned that OZTURK's involvement in these activities and associations with these groups may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI provides this summary of the alien's actions for the Secretary of State to assess whether the alien's presence and activities compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences for the United States consistent with INA § 237(a)(4)(C) (8 U.S.C. § 1227(a)(4)(C)). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.

Additionally, HSI provides the above information relating to OZTURK's nonimmigrant status and activities in the United States for the Secretary of State to assess whether revocation of the visa, effective immediately, is appropriate pursuant to INA § 221(i) (8 U.S.C. § 1201(i)). If the Secretary of State determines that this alien's visa should be revoked effective immediately, the revocation will support a ground of removability under INA § 237(a)(1)(B), codified as 8 U.S.C. § 1227(a)(1)(B).

Enclosed with this letter is supporting factual documentation. If you require further assistance or additional information, please let me know. I can be reached at ███████.

Respectfully,

ANDRE R WATSON
Digitally signed by
ANDRE R WATSON
Date: 2025.03.21
07:29:10 -04'00'

Andre R. Watson
Assistant Director
National Security Division

AAUP v. RUBIO - ATTORNEYS EYES ONLY



*Homeland Security Investigations*
*National Security Division*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

LAW ENFORCEMENT SENSITIVE

John L. Armstrong
Senior Bureau Official
Bureau of Consular Affairs
Department of State

Re: Badar Khan SURI

Dear Mr. Armstrong:

I am writing to provide a summary of the actions by Badar Khan SURI in violation of President Trump's executive orders on anti-Semitism and for the Secretary of State to assess whether the alien's presence or activities in the U.S. compromise a compelling U.S. foreign policy interest and would have potentially serious adverse foreign policy consequences consistent with Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), codified as 8 U.S.C. § 1227(a)(4)(C).

SURI last entered the United States on 12/10/2022 on a nonimmigrant exchange visa (J1) to attend Georgetown University as a research scholar. Suri's student status is currently ACTIVE, scheduled for a program end date of 12/31/2026.

SURI is identified as a research exchange student at Georgetown University actively supporting Hamas terrorism, who actively spreads it's propaganda and promotes antisemitism on social media. SURI is married to the U.S. Citizen daughter of a known or suspected terrorist, who is a senior advisor to Hamas.

HSI is concerned that SURI's direct connection to Hamas leadership and involvement in antisemitic activities may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization. As the Secretary of State is the top U.S. diplomat and steward of U.S. foreign policy, HSI provides this summary of the alien's actions for the Secretary of State to determine whether the alien's presence and activities compromise a compelling U.S. foreign policy interest and would have potentially adverse foreign policy consequences for the United States consistent with INA § 237(a)(4)(C). If the Secretary of State makes that determination, HSI would initiate removal charges against the alien.



LAW ENFORCEMENT SENSITIVE

Enclosed with this letter is supporting factual documentation. If you require further assistance or additional information, please let me know. I can be reached at ███████████ .

Respectfully,

ANDRE R WATSON
Digitally signed by
ANDRE R WATSON
Date: 2025.03.14
12:59:02 -04'00'

Andre R. Watson
Assistant Director
National Security Division

REC1|Approve|3-8-2025|MR
REC2|Approve|3-8-2025|MR
REC3|Approve|3-8-2025|MR

AAUP v. RUBIO - ATTORNEYS EYES ONLY



2025001959

United States Department of State

Washington, DC   20520



SENSITIVE BUT UNCLASSIFIED//
LAW ENFORCEMENT SENSITIVE

March 8, 2025

**Action Memo for the Secretary**

FROM:          CA – John Armstrong, SBO

SUBJECT:     (SBU) Removal of Yunseo Chung and Mahmoud Khalil, both
                     U.S. LPRs, under Section 237(a)(4)(C) of the Immigration and
                     Nationality Act (INA)

**(SBU) Recommendation 1:** That you determine the presence and activities of Yunseo Chung (███████████████████████) have potentially serious adverse foreign policy consequences for the United States and would compromise a compelling U.S. foreign policy interest, rendering her deportable under Section 237(a)(4)(C) of the INA.
**Decision:  ☐ Approve  ☐ Disapprove  ☐ Discuss**

**(SBU) Recommendation 2:** That you determine the presence and activities of ████████████████████████████████), have potentially serious adverse foreign policy consequences for the United States and would compromise a compelling U.S. foreign policy interest, rendering him deportable under Section 237(a)(4)(C) of the INA.
**Decision:  ☐ Approve  ☐ Disapprove  ☐ Discuss**

**(SBU) Recommendation 3:** That you authorize the transmission of the attached notification to the secretary of Homeland Security of the determination(s) as a basis for the removal(s).
**Decision:  ☐ Approve  ☐ Disapprove  ☐ Discuss**

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
AAUP v. RUBIO - ATTORNEYS EYES ONLY
-2-

**Background**

(SBU) On March 7, DHS/ICE requested that CA seek your determination that Chung and Khalil are deportable under INA section 237(a)(4)(C) in order to initiate removal charges against them.  Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.  Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Yunseo Chung is an LPR of the United States and a current undergraduate student at Columbia University.  Press reporting and social media identify Chung as a participant in protests on March 5 at Barnard College, and specifically as a participant in the occupation of the Barnard's Millstein Library.  According to a DHS/ICE summary of Chung, she received three charges of unlawful conduct stemming from the March protests, including charges related to obstructing governmental administration, disorderly conduct, and trespass.  On March 7, DHS/ICE provided a summary of Chung's actions to CA, reporting that "Hamas-authored flyers" were distributed at the protests, and that Chung's involvement in the protests "created a hostile environment for Jewish students, meeting Title VI criteria."

(SBU) Mahmoud Khalil is a U.S. LPR and a former graduate student at Columbia University.  According to social media and open-source articles, Khalil has been involved in numerous pro-Palestinian protests, including serving as the lead negotiator of an encampment at Columbia in April 2024, and also a key figure in the March 6 Barnard College library occupation, where protestors distributed Hamas-authored flyers.  On March 7, DHS/ICE provided a summary of Khalil's actions to CA, reporting that "Hamas-authored flyers" were distributed at the March 6 protests, and that Khalil's leadership in the protests "created a hostile environment for Jewish

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
AAUP V. RUBIO - ATTORNEYS EYES ONLY
-3-

students, meeting Title VI criteria." Unlike Chung, we are not aware of any prior arrests or citations for Khalil regarding unlawful activity.

(SBU) The activities and presence of Chung and Khalil in the United States have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest, because their participation and roles in antisemitic protests and disruptive activities fosters a hostile environment for Jewish students in the United States, and the public actions undermine U.S. policy to combat anti-Semitism around the world. Under E.O. 14188, *Additional Measures to Combat Anti-Semitism*, it is the policy of the United States to combat anti-Semitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence. Allowing Chung and Khalil to remain in the United States undermines the U.S. policy to combat anti-Semitism and efforts to protect Jewish students from harassment and violence in the United States. Consistent with E.O. 14150, *America First Policy Directive to the Secretary of State*, the foreign policy of the United States champions core American interests and U.S. citizens, and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective.

(SBU) DHS has not identified any alternative grounds of removability that would be applicable to Chung and Khalil, including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity. We are not aware of any prior exercises of the Secretary's removal authority in INA section 237(a)(4)(C), and given their LPR status, Chung and Khalil are likely to challenge their removal under this authority, and courts may scrutinize the basis for these determinations.

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
AAUP V. RUBIO - ATTORNEYS EYES ONLY

-4-

**Attachments**

Tab 1 – DHS Letter on Chung
Tab 2 – HSI Subject Profile of Chung
Tab 3 – DHS Letter on Khalil
Tab 4 – HSI Subject Profile of Khalil
Tab 5 – State Notification Letter to DHS
Tab 6 – 8 USC 1227(a)(4)(C)

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
AAUP v. RUBIO - ATTORNEYS EYES ONLY

Approved:  CA – John L. Armstrong, Senior Bureau Official [JLA]
**I confirm** the drafter received guidance on this paper's intent, objectives, topics, scope, and structure.  ☒ **Yes** ☐ **No**

Drafted:    CA - Various Drafters

Cleared:

| Bureau | Name | Clearance Status |
|--------|------|------------------|
| CA/VO | ██████ | (ok) |
| CA/VO | ██████ | (ok) |
| CA/VO/F | ██████ | (ok) |
| L/CA | ██████ | (ok) |
| S/P | ██████ | (ok) |
| C | ██████ | (ok) |
| M | ██████ | (info) |
| D | ██████ | **(info)** |
| P | ██████ | **(info by request)** |
| NEA/FO | ██████ | (info) |
| EAP/FO | | (info) |

REC1|Approve|3-15-2025|MR
REC2|Approve|3-15-2025|MR

AAUP v. RUBIO - ATTORNEYS EYES ONLY



2025002362

United States Department of State

Washington, DC   20520

SENSITIVE BUT UNCLASSIFIED//
LAW ENFORCEMENT SENSITIVE

March 15, 2025



EXHIBIT
248

**Action Memo for the Secretary**

FROM:        CA – John Armstrong, SBO

SUBJECT:     (SBU) Determination of Deportability of Mohsen Mahdawi, a
             U.S. Lawful Permanent Resident (LPR), under Section
             237(a)(4)(C) of the Immigration and Nationality Act (INA)

**(SBU) Recommendation 1:**  That you determine the presence and activities
of Mohsen MAHDAW███████████████████████ have potentially
serious adverse foreign policy consequences for the United States and
would compromise a compelling U.S. foreign policy interest, rendering him
deportable under Section 237(a)(4)(C) ("4C") of the INA.
**Decision:  ☐ Approve  ☐ Disapprove  ☐ Discuss**

**(SBU) Recommendation 2:**  That you authorize the transmission of a
notification to the Secretary of Homeland Security of the determination as a
basis for the removal and authorize use of that notification by DHS in
immigration court.
**Decision:  ☐ Approve  ☐ Disapprove  ☐ Discuss**

**Background**
(SBU) On March 14, the Assistant Director of the National Security Division
of DHS/ICE's Homeland Security Investigations referred to CA information
on three aliens in the United States, Momodou Taal, Badar Khan Suri, and
Mohsen Mahdawi, for your determination that they are deportable under
INA section 237(a)(4)(C), in order to initiate removal charges against them.
CA will transmit an action memo to you regarding a 4C determination for

2025002362

AALP v. RUBIO - ATTORNEYS EYES ONLY
SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

-2-

Suri under separate cover, and CA has revoked the nonimmigrant visa of Taal, allowing DHS/ICE to pursue removal on that basis.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States. Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Mohsen Mahdawi is a LPR of the United States and according to information provided by DHS/ICE/HSI, is "identified as a student of Columbia University and a prominent pro-Palestinian activist involved in pro-Hamas rhetoric and events."

(SBU) DHS/ICE/HSI reports that Mahdawi, through his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction. While DHS/ICE/HSI reporting provided only several screenshots of social media activity as evidence of Mahdawi's involvement in anti-Semitic activity, additional open-source reporting indicates that Mahdawi played an active role in fall 2024 student protests at Columbia University, instructing protestors to physically push a small group of pro-Israel students, events that university officials later acknowledged as threatening rhetoric and intimidation. Open-source reporting also identifies Mahdawi as behind anti-Semitic rhetoric in the fall 2024 protests, referring to Israeli Defense Force solders as terrorists and shouting through a megaphone at Jewish bystanders and Israel supporters.

(SBU) The activities and presence of Mahdawi in the United States have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest, because his

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

JA2213

2025002362

participation and roles in anti-semitic protests and reported intimidating and harassment of Jewish students during fall 2024 protests at Columbia University undermine U.S. policy to combat anti-Semitism around the world and in the United States. Under E.O. 14188, *Additional Measures to Combat Anti-Semitism*, it is the policy of the United States to combat anti-Semitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence. Allowing Mahdawi to remain in the United States undermines the U.S. policy to combat anti-Semitism and efforts to protect Jewish students from harassment and violence in the United States. Consistent with E.O. 14150, *America First Policy Directive to the Secretary of State*, the foreign policy of the United States champions core American interests and American citizens, and condoning antisemitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective. Moreover, protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

(SBU) DHS/ICE/HSI has not identified any alternative grounds of removability applicable to Mahdawi, including any indication that Mahdawi has provided material support to a foreign terrorist organization or terrorist activity; however, in September 2015, CA revoked Mahdawi's B1/B2 nonimmigrant visa at the request of CBP's National Targeting Center (NTC) based on derogatory information in reporting in USG interagency holdings that was identified after visa issuance. At that time, NTC concluded Mahdawi would be inadmissible pursuant to INA section 212(a)(3)(B)(i)(I) for having engaged in terrorist activity, as defined in the INA. At the time of the visa revocation, Mahdawi was already in the United States and had adjusted status to a conditional Lawful Permanent Resident. A CA search of interagency databases on March 14, did not reveal any record indicating that the interagency currently assesses that Mahdawi has links to terrorism. In February 2024, Mahdawi filed an application to naturalize, although DHS has not indicated whether that it will deny his application upon pursuing removal.

JA2214

2025002362

AAUP v. RUBIO – ATTORNEYS EYES ONLY
SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

-4-

(SBU) Like the legal challenge brought by Mahmoud Khalil with respect to your March 8, 2025, 4C determination regarding him, as an LPR, Mahdawi is likely to challenge his removal under the 4C authority, including whether the Department in fact has a compelling basis for determination.  Given the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination.  We understand that Khalil intends to seek an injunction of the determination in his case, and we could anticipate Mahdawi to do the same.

(SBU) While State is required to report visa denials under the similar authority in INA section 212(a)(3)(C) to certain congressional committees, we have identified no such requirement to report 4C determinations.

## Attachments

> Tab 1 – State Notification Letter to DHS
> Tab 1a – DHS Letter on Mohsen Mahdawi
> Tab 1b – HSI Subject Profile of Mohsen Mahdawi
> Tab 1c – 8 USC 1227(a)(4)(C)

JA2215

2025002362

AAUP v. RUBIO - ATTORNEYS EYES ONLY
SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

-5-

Approved:  CA – John L. Armstrong, Senior Bureau Official [JLA]
**I confirm** the drafter received guidance on this paper's intent, objectives, topics, scope, and structure.  ☒ **Yes** ☐ **No**

Drafted:    CA - Various Drafters

Cleared:

| Bureau | Name | | Clearance Status |
|---|---|---|---|
| CA | ███████████ | , Acting | ok |
| CA/VO | ███████████ | , Acting | ok |
| CA/VO/SAC | ███████████ | | info |
| CA/VO/F | ███████████████████ | , | info |
| | Acting | | |
| L/FO | ███████████████████ | | ok |
| L/CA | | | ok |
| L/CA | ███████████████ | | ok |
| S/P | | | ok |
| C | █████████████ | | ok |
| M | ███████████ | | ok |
| D | █████████ | | info |
| P | ███████████ | | ok |
| NEA/FO | ██████████████ | | info |

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

**JA2216**

AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025002363



United States Department of State

Washington, DC  20520



EXHIBIT
249

SENSITIVE BUT UNCLASSIFIED//
LAW ENFORCEMENT SENSITIVE

March 15, 2025

**Action Memo for the Secretary**

FROM:        CA – John Armstrong, SBO

SUBJECT:     (SBU) Determination of Deportability of Badar Khan Suri
             under Section 237(a)(4)(C) of the Immigration and Nationality
             Act (INA)

**(SBU) Recommendation 1:**  That you determine the presence and activities
of Badar Khan Suri ██████████████████████████) have potentially serious
adverse foreign policy consequences for the United States and would
compromise a compelling U.S. foreign policy interest, rendering him
deportable under Section 237(a)(4)(C) ("4C") of the INA.
**Decision:  ☐ Approve  ☐ Disapprove  ☐ Discuss**

**(SBU) Recommendation 2:**  That you authorize the transmission of a
notification to the Secretary of Homeland Security of the determination as a
basis for the removal and authorize use of that notification by DHS in
immigration court.
**Decision:  ☐ Approve  ☐ Disapprove  ☐ Discuss**

**Background**
(SBU) On March 14, the Assistant Director of the National Security Division
of DHS/ICE's Homeland Security Investigations referred to CA information
on three aliens in the United States, Momodou Taal, Badar Khan Suri, and
Mohsen Mahdawi, for your determination that they are deportable under
INA section 237(a)(4)(C), in order to initiate removal charges against them.
CA will transmit an action memo to you regarding a 4C determination for

JA2217

AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025002363

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE
-2-

Mahdawi under separate cover, and CA has revoked the nonimmigrant visa of Taal, allowing DHS/ICE to pursue removal on that basis.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the United States if the Secretary of State has reasonable ground to believe that the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.  Under INA section 237(a)(4)(C)(ii), for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statements, or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest.

(SBU) Badar Khan Suri is an Indian national, currently in J1 nonimmigrant status in the United States as a Postdoctoral Associate at Georgetown University's School of Foreign Service, where he is currently teaching a course on "Majoritarianism and Minority Rights in South Asia."  His J1 visa was issued November 15, 2022, and expired October 31, 2023, but he remains in valid nonimmigrant status.  Suri is married to a U.S. citizen who is the daughter of Ahmed Yousef, a senior Hamas figure in Gaza and a senior advisor to Hamas leadership.

(SBU) According to the assessment provided by DHS/ICE, Suri is "actively supporting Hamas terrorism" and "actively spreads its propaganda and promotes antisemitism on social media."  Evidence cited by DHS/ICE includes a post by the "Middle East Forum" think tank referencing two Facebook posts by Suri in fall 2023 that denied certain reports regarding Hamas actions in the October 7 attack, and one expressing support for Hamas founder Ahmed Yassin.  DHS/ICE also notes a 2018 article authorized by Suri in the Middle East Monitor labeling Israel as apartheid, in additional to Instagram photos by Suri that DHS/ICE assesses as "pro-Palestine content."  We have not independently uncovered additional open-source information regarding Suri's involvement in antisemitic conduct or intimidation of Jewish students.

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

JA2218

AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025002363

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE
-3-

(SBU) CA did not identify any particularized information on Suri in relevant interagency databases, and Suri's most recent visa application in November 2022 was reviewed by the Department's interagency vetting partners through the National Vetting Center, none of whom returned any derogatory information.  DHS/ICE/HSI has not provided CA with an assessment of any alternative grounds of removability that would be applicable to Suri, including whether Suri may be removable under the terrorism-related grounds based on his relationship with Ahmed Yousef.

(SBU) The activities and presence of Suri in the United States has potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest.  This conclusion is based on the assessment by DHS/ICE/HSI, to which we defer as ICE is the principal investigative unit of DHS, that "Suri's direct connection to Hamas leadership and involvement in antisemitic activities … [creates] a hostile environment for Jewish students and [indicates] support for a designated terrorist organization."  Under E.O. 14188, *Additional Measures to Combat Anti-Semitism*, it is the policy of the United States to combat antisemitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and intimidation.  Allowing Suri to remain in the United States undermines the U.S. policy to combat anti-Semitism and efforts to protect Jewish students from intimidation in the United States.  Consistent with E.O. 14150, *America First Policy Directive to the Secretary of State*, the foreign policy of the United States champions core American interests and American citizens, and condoning anti-Semitic conduct and intimidation of Jewish students in the United States would severely undermine that significant foreign policy objective.  Moreover, the type of intimidation and incitement attributable Suri potentially undermines the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

(SBU) Like the legal challenge brought by Mahmoud Khalil with respect to your March 8 determination regarding him, Suri is likely to challenge his removal under the 4C authority.  Such a challenge would likely question

AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025002363

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE
-4-

whether the Department in fact has a compelling basis for determination. Given the reliance on Suri's public statements as an academic, and the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination. We understand that Khalil intends to seek an injunction of the determination in his case, and we could anticipate Suri to do the same.

(SBU) State also requests the opportunity to consult with the DHS on any public statements regarding this determination.

(SBU) While State is required to report visa denials under the similar authority in INA section 212(a)(3)(C) to certain congressional committees, we have identified no such requirement to report 4C determinations.

**Attachments**
> Tab 1 – State Notification Letter to DHS
> Tab 1a – DHS Letter on Badar Khan Suri
> Tab 1b – HSI Subject Profile of Badar Khan Suri
> Tab 1c – 8 USC 1227(a)(4)(C)

JA2220

AAUP v. RUBIO - ATTORNEYS EYES ONLY

2025002363

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE
-5-

Approved:  CA – John L. Armstrong, Senior Bureau Official [JLA]
**I confirm** the drafter received guidance on this paper's intent, objectives, topics, scope, and structure.  ☒ **Yes** ☐ **No**

Drafted:    CA – Various Drafters

Cleared:

| Bureau | Name | Clearance Status |
|---|---|---|
| CA | ███████, Acting | ok |
| CA/VO | ███████, Acting | ok |
| CA/VO/SAC | █████ | info |
| CA/VO/F | █████████, Acting | info |
| L/FO | ████████ | ok |
| L/CA | █████ | ok |
| L/CA | ██████ | ok |
| S/P | ██████ | ok |
| C | █████ | ok |
| M | ████ | ok |
| D | █████ | info |
| P | ████ | ok |
| SCA/FO | █████ | info |

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

JA2221



AAUP v. RUBIO - ATTORNEYS EYES ONLY

United States Department of State

Washington, DC  20520



SENSITIVE BUT UNCLASSIFIED – LAW ENFORCEMENT SENSITIVE

March 21, 2025

**Action Memo for Senior Bureau Official John Armstrong**

FROM:        CA/VO – Stuart Wilson, Deputy Assistant Secretary

SUBJECT:     (SBU) Revocation of F1 Visa for Rumeysa OZTURK

**(SBU) Recommendation 1:** That you approve the revocation of the F1 visa, effective immediately, for ██████████████████████████████ ████████████) under section 221(i) of the Immigration and Nationality Act (INA).  Due to ongoing ICE operational security, this revocation will be silent; the Department will not notify the subject.  (Approve/Disapprove by 03/21/25)

**Decision:** ☒ **Approve** ☐ **Disapprove** ☐ **Discuss**

*JA2 3/21/25*

**(SBU) Recommendation 2:** That you authorize the transmission of the attached notification to the Department of Homeland Security noting the immediate revocation of OZTURK's visa.  (Approve/Disapprove by 03/21/25)

**Decision:** ☒ **Approve** ☐ **Disapprove** ☐ **Discuss**

*JA2 3/21/25*

**Background**

(SBU) On March 21, 2025, the Assistant Director of the National Security Division of DHS/ICE's Homeland Security Investigations referred to CA information regarding Rumeysa OZTURK, a Turkish national, for a possible determination by the Secretary that the alien is deportable under INA section 237(a)(4)(C).  As a nonimmigrant visa holder, such a determination is not necessary for DHS/ICE to pursue removal of OZTURK from the United States, as INA section 237(a)(1)(B) provides that an alien is deportable if their nonimmigrant visa has been revoked under INA section 221(i).

(SBU) Under INA section 221(i), the Secretary of State may at any time, in his discretion, revoke a visa. This authority is delegated to you pursuant to Delegation of Authority 367-4. Department policy reflected in 9 FAM 403.11-5(B) provides that a visa may be revoked in cases of a suspected ineligibility, when an individual would not meet requirements for admission, or "in other situations where warranted."

*Has valid visa,*

(SBU) OZTURK was issued an F-1 visa on December 14, 2020, valid until December 9, 2025. According to information provided by DHS/ICE/HSI, OZTURK is a post doctorate degree candidate in Child Studies and Human Development at Tufts University. On March 21, 2025, DHS/ICE/HSI referred information to CA indicating that OZTURK co-authored an op-ed in Tufts' student newspaper. In this article, the authors wrote, "Graduate Students for Palestine joins Tufts Students for Justice in Palestine (TSJP), the Tufts Faculty and Staff Coalition for Ceasefire, and Fletcher Students for Palestine to reject the University's response" (to a student government resolution). According to DHS/ICE/HSI, Tufts Students for Justice in Palestine was placed on interim suspension "after it used images of weapons to promote a protest rally and urged members of the Tufts community to 'join the student intifada.'" DHS/ICE/HSI referral concluded that "OZTURK's involvement in these activities and associations with these groups may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization."

*actions, not words*

(SBU) While OZTURK has been involved with/actions protesting Tufts' relationship with Israel, DHS/ICE/HSI has not, however, provided any evidence showing that OZTURK has engaged in any antisemitic activity or made any public statements indicating support for a terrorist organization or antisemitism generally. While the report implies a connection between OZTURK and the now-banned Tufts Student for Justice in Palestine (TJSP), the report presents no evidence other than OZTURK's membership in Graduate Students for Palestine which supported proposals to Tufts which were also supported by TSJP. Nor has DHS/ICE/HSI shown any evidence that

OZTURK was involved in any of the activities which resulted in TJSP being suspended from Tufts.

(SBU) Through a search on March 21, 2025, on available USG interagency databases, CA/VO identified no reporting specific to OZTURK, and interagency vetting partners did not provide any response to OZTURK's 2024 visa application indicating the existence of derogatory terrorism-related information.

(SBU) DHS did not identify any alternative grounds of removability that would be applicable to OZTURK, including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity, and have not indicated whether it plans to consider termination of OZTURK's SEVIS registration.  Although information provided by DHS/HSI/ICE does not establish any potential ineligibility for OZTURK, you may, in your discretion and in accordance with Department policy in 9 FAM 403.11-5(B), approve revocation of her F-1 visa effective immediately based on the totality of the circumstances presented indicating that revocation may be warranted.

**Attachments**

        Tab 1 – DHS Letter on OZTURK
        Tab 2 – HSI Subject Profile of OZTURK
        Tab 3 – State Notification Memo to DHS

AAUP v. RUBIO - ATTORNEYS EYES ONLY
SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

-4-

Approved:  CA/VO – Stuart Wilson, Deputy Assistant Secretary [SRW]
**I confirm** the drafter received guidance on this paper's intent, objectives, topics, scope, and structure.  ☒ **Yes** ☐ **No**

Drafted:    CA - Various Drafters

Cleared:

| Bureau | Name | Clearance Status |
|--------|------|------------------|
| CA | ███████ | ok |
| CA/VO | ████████ | Info |
| CA/VO/F | ████████ | info |
| CA/VO/SAC | ███████ | ok |
| CA/P | ████████ | info |
| L/CA | █████████ | ok |

SENSITIVE BUT UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

JA2225

# State Department Process and Protocol for Information Sharing, Visa Revocations, and Foreign Policy Determinations



JA2226

# HSI Process and Protocol for Information Sharing, Referrals, and Enforcement Actions*



HSI Office of Intelligence

Report of Analysis

NO ACTION

HSI Assistant Director for National Security Division

Referral

NO ACTION

State Department Action

Action Letter

Action Letter

HSI Domestic Operations Division

ICE Executive Secretariat

NO ACTION

NO ACTION

Lead for Enforcement Action

HSI SAC Office

NO ACTION

Enforcement Action

*Authorities
Homeland Security Act of 2002
Delegation Order 7030.2

JA2227

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I electronically filed the foregoing Joint Appendix with the Clerk for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 /s/ Paul F. Stone
PAUL F. STONE
*United States Department of Justice*