**Nos. 26-1141 & 26-1195**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS - HARVARD FACULTY CHAPTER; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY; RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS; MIDDLE EAST STUDIES ASSOCIATION,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

MARCO RUBIO, in the official capacity as Secretary of State; U.S. DEPARTMENT OF STATE; MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, in the official capacity as Acting Director of U.S. Immigration and Customs Enforcement; DONALD J. TRUMP, in the official capacity as President of the United States; UNITED STATES,

*Defendants-Appellants/Cross-Appellees*.

On appeal from the United States District Court for the District of Massachusetts — No. 1:25-CV-10685 (Young, J.)

**PLAINTIFFS-APPELLEES'/CROSS-APPELLANTS'
PRINCIPAL AND RESPONSE BRIEF**

Edwina Clarke
David Zimmer
Zimmer, Citron & Clarke, LLP
130 Bishop Allen Drive
Cambridge, MA 02139

Ramya Krishnan
Xiangnong (George) Wang
Stephany Kim
Raya Koreh
Carrie DeCell

(617) 676-9423
edwina@zimmercitronclarke.com

Noam Biale
Michael Tremonte
Alexandra Conlon
Courtney Gans
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com
nbiale@shertremonte.com

Scott Wilkens
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham (SBN 237841)
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

*Counsel for Plaintiffs-Appellees/Cross-
  Appellants*

**Corporate Disclosure Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel certifies that Plaintiffs have no parent corporations and that no publicly held corporation owns 10 percent or more of their stock.

*/s/ Ramya Krishnan*
Ramya Krishnan

i

**Table of Contents**

Table of Authorities ................................................................................................. iv

Introduction.............................................................................................................1

Statement of Jurisdiction..........................................................................................3

Statement of Issues on Appeal ................................................................................3

Statement of the Case...............................................................................................4

    I.       Factual Background ....................................................................................4

          A.      President Trump lays the groundwork for the Policy by issuing two executive orders. .................................................................................. 4

          B.      Defendants adopt the Policy to enforce the executive orders. .......................... 6

          C.      The Policy has a profound chilling effect on noncitizen students and faculty, and harms Plaintiffs and their members. ........................................... 13

    II.      Procedural Background..............................................................................16

Summary of Argument ...........................................................................................17

Standard of Review................................................................................................19

Argument ..............................................................................................................19

    I.       The district court properly held that it has subject matter jurisdiction to hear the case...............................................................................................................19

          A.      Plaintiffs have standing................................................................. 19

              1.      Plaintiffs have associational standing. ................................. 19

              2.      Plaintiffs have organizational standing.............................. 23

          B.      No provision of the INA bars jurisdiction over Plaintiffs' claims.................. 25

              1.      8 U.S.C. § 1252 (g) does not bar jurisdiction over Plaintiffs' claims. ............................................................................................ 25

              2.      8 U.S.C. § 1252(b)(9) does not bar jurisdiction over Plaintiffs' claims. ............................................................................................ 28

II.     The district court properly held that the Policy violates the First Amendment. ..........30

      A.     Noncitizens have a First Amendment right to engage in core political speech and association, and that right holds even in the context of deportation. ...................................................................................... 31

      B.     The Policy is unconstitutional because it suppresses speech based on its viewpoint. ................................................................................... 34

            1.     The Policy is subject to strict scrutiny because it discriminates on the basis of viewpoint. .................................................. 34

            2.     The Policy fails any standard of review............................................. 36

III.    Defendants' coercive threats independently violate the First Amendment. ................38

IV.     The district court properly held that the Policy violates the APA. ..............................39

V.      Injunctive relief against the Policy is warranted. ...........................................................41

      A.     Injunctive relief is necessary to fully remedy Plaintiffs' injuries. .................. 41

      B.     The requested relief is not barred by 8 U.S.C. § 1252(f)(1). .......................... 43

      C.     The requested relief is consistent with *Trump v. CASA*................................. 46

Conclusion .....................................................................................................................................48

Certificate of Compliance ............................................................................................................50

Certificate of Service ....................................................................................................................51

**Table of Authorities**

**Cases**

*Abourezk v. Reagan*, 592 F. Supp. 880 (D.D.C. 1984), *vacated and remanded on other grounds*, 785 F.2d 1043 (D.C. Cir. 1986) ........................................................ 33

*Abrams v. United States*, 250 U.S. 616 (1919) .......................................................... 2

*Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007) ........................................................ 28, 29, 30

*Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102 (9th Cir. 2025), *rev'd and remanded on other grounds sub nom.*, *Mullin v. Al Otro Lado*, 146 S. Ct. 2079 (2026) .......................................................................................................... 44

*Allende v. Shultz*, 605 F. Supp. 1220 (D. Mass. 1985) .................................................. 33

*Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045 (9th Cir. 1995) ................ 32, 33, 34

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ............................................ 46

*Asociación de Educación Privada de Puerto Rico, Inc. v. García-Padilla*, 490 F.3d 1 (1st Cir. 2007) ...................................................................................... 42

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) ........................................................ 30

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) .................................................. 38

*Barnette v. W. Va. State Bd. of Educ.*, 47 F. Supp. 251, *aff'd*, 319 U.S. 624 (1943) .................. 48

*Biden v. Texas*, 597 U.S. 785 (2022) ................................................................ 44, 45

*Blum v. Holder*, 744 F.3d 790 (1st Cir. 2014) .......................................................... 21

*Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012) ................ 32

*Bridges v. California*, 314 U.S. 252 (1941) ............................................................ 31

*Bridges v. Wixon*, 326 U.S. 135 (1945) ........................................................ 2, 18, 31, 34

*Calandro v. Sedgwick Claims Mgmt. Servs., Inc.*, 919 F.3d 26 (1st Cir. 2019) .................... 19

*Castañon-Nava v. DHS*, 175 F.4th 828 (7th Cir. 2026) .................................................. 44

*Chiles v. Salazar*, 146 S. Ct. 1010 (2026) ............................................................ 21

iv

*Citizens United v. FEC*, 558 U.S. 310 (2010) .................................................................. 31

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...................................................... 21

*Coal. for Indep. Tech. Rsch. v. Rubio*, 2026 WL 2030770 (D.D.C. July 14, 2026) .......... 2, 26, 29

*Dep't of State v. Muñoz*, 602 U.S. 899 (2024) ............................................................... 35

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ........................................... 26, 29

*Doe v. Trump*, 157 F.4th 36 (1st Cir. 2025), *cert. denied*, No. 25-899, 2026 WL
    1871309 (June 30, 2026) .......................................................................... 46, 47

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) ............................................................. 42

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ............................. 47

*E.F.L. v. Prim*, 986 F.3d 959 (7th Cir. 2021) ............................................................... 27

*Easyriders Freedom FIGHT v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996) ...................... 47

*FCC v. Fox Television Studios*, 556 U.S. 502 (2009) .................................................... 40

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) .............................................. 41

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ......................................... 23, 24

*First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114 (2026) ........... 20, 22

*Galvez v. Jaddou*, 52 F.4th 821 (9th Cir. 2022) ........................................................... 45

*Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022) ...................................................... 44

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952) .................................................... 32, 33

*Harvard L. Sch. F. v. Shultz*, 633 F. Supp. 525 (D. Mass. 1986), *vacated without
    opinion*, 852 F.2d 563 (1st Cir. 1986) ......................................................... 33

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ............................................... 23

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ..................................................... 47

*Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936 (5th Cir. 1999) ..................... 27

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) .............................. 19

*Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972 (9th Cir. 2025) .................................................. 25

*In re Fin. Oversight and Mgmt. Bd. for P.R.*, 110 F.4th 295 (1st Cir. 2024) ............................... 19

*In re Jackson*, 988 F.3d 583 (1st Cir. 2021) ................................................................. 39

*Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19 (D.D.C. 2018) ................................................. 27

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) .................................................................. 28

*Jimenez-Angeles v. Ashcroft*, 291 F.3d 594 (9th Cir. 2002) ............................................. 27

*Joyce v. Town of Dennis*, 720 F.3d 12 (1st Cir. 2013)..................................................... 41

*Khalil v. President*, 164 F.4th 259 (3d Cir. 2026) ........................................................... 30

*Kleindienst v. Mandel*, 408 U.S. 753 (1972)...................................................... 31, 34, 35

*Kong v. United States*, 62 F.4th 608 (1st Cir. 2023)........................................................ 26

*Larson v. Valente*, 456 U.S. 228 (1982) ......................................................................... 22

*Mahdawi v. Trump*, 2026 WL 2090981 (2d Cir. July 21, 2026) ...................................... 30

*Make the Rd. N.Y. v. Noem*, 2025 WL 2576701 (D.D.C. Sep. 5, 2025)........................... 46

*Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003) ................................................... 22

*Mass. Coal. for Immigr. Reform v. DHS*, 621 F. Supp. 3d 84 (D.D.C. 2022).................... 28

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ................................................................. 22

*Massachusetts v. NIH*, 164 F.4th 1 (1st Cir. 2026)......................................................... 43

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)............................................................ 36

*N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38 (1st Cir. 2021) ........................................... 21

*N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8 (1st Cir. 1996) .................... 21

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ........................................... 46

*New Jersey v. Trump*, 800 F. Supp. 3d 180 (D. Mass.), *aff'd in part sub nom.*, *Doe v. Trump*, 157 F.4th 36 (1st Cir. 2025) .............................................................. 48

*New York v. DOC*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019), *aff'd in part, rev'd in part and remanded sub nom.*, *DOC v. New York*, 588 U.S. 752 (2019) ................................ 43

*NRA v. Vullo*, 602 U.S. 175 (2024) .................................................................. 38, 39

*NWDC Resistance v. ICE*, 493 F. Supp. 3d 1003 (W.D. Wash. 2020) .................................. 26, 29

*Parcham v. INS*, 769 F.2d 1001 (4th Cir. 1985) .......................................................... 32

*President & Fellows of Harvard Coll. v. HHS*, 798 F. Supp. 3d 77 (D. Mass. 2025) ................................................................ 43

*Presidents' All. on Higher Educ. & Immigr. v. Noem*, 824 F. Supp. 3d 168 (D. Mass. 2026) ................................................................ 25

*Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) ............................................. 21

*Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019), *vacated on other grounds sub nom.*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020) .......................................... 27, 32, 33, 36

*Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008) .................................................... 35, 36

*Rauda v. Jennings*, 55 F.4th 773 (9th Cir. 2022) .......................................................... 27

*Reddy v. Foster*, 845 F.3d 493 (1st Cir. 2017) ............................................................. 21

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ................................................. 35, 38

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19 (D.D.C. 2025), *aff'd sub nom.*, *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026) .................................................. 42, 44

*Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ....................... 26, 27, 31, 36

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ..................................... 35

*Suri v. Trump*, 2026 WL 2123557 (4th Cir. July 23, 2026) ..................................... 28, 30

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ....................................... 20, 21

*Texas v. DHS*, 123 F.4th 186 (5th Cir. 2024) ............................................................. 45

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ..................... 47

*Town of Milton v. FAA*, 87 F.4th 91 (1st Cir. 2023) .................................................... 23

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025)..............................................................46, 48

*United States ex rel. Turner v. Williams*, 194 U.S. 279 (1904) ......................................32

*United States v. Millenium Lab'ys, Inc.*, 923 F.3d 240 (1st Cir. 2019) ..........................28

*Vasquez Perdomo v. Noem*, 148 F.4th 656 (9th Cir. 2025), *stayed mem.*, 146 S.
 Ct. 1 (2025) ................................................................................................................46

*Virginia v. Black*, 538 U.S. 343 (2003)............................................................................36

*Washington v. Trump*, 145 F.4th 1013 (9th Cir. 2025)....................................................47

*Webster v. Doe*, 486 U.S. 592 (1988) ..............................................................................27

*Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98 (D.
 Mass. 2003)................................................................................................................42

*Whitney v. California*, 274 U.S. 357 (1927) .......................................................................2

*Young v. Town of Conway*, 783 F. Supp. 3d 588 (D.N.H. 2025).....................................42

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .........................................................................32

**Statutes**

5 U.S.C. § 706..............................................................................................................18, 41

8 U.S.C. § 1182..................................................................................................................5

8 U.S.C. § 1201................................................................................................................37

8 U.S.C. § 1227.............................................................................................................5, 37

Emergency Supplemental Appropriations Act for Defense, The Global War on
 Terror, and Tsunami Relief, 2005, Pub. L. No. 109–13, § 103, 119 Stat 231
 (2005)..........................................................................................................................45

Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108–458,
 § 5304(b), 118 Stat 3638 (2004) ...............................................................................45

**Other Authorities**

Adam B. Cox, *The Invention of Immigration Exceptionalism*, 134 Yale L.J. 329
 (2024)..........................................................................................................................32

Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 30, 2025)........................................................ 4, 5

Exec. Order No. 14188, 90 Fed. Reg. 8847 (Jan. 29, 2025)......................................................... 5

Hamed Aleaziz & Annie Correal, *Memo by Rubio Approved Detention of Immigrant Who Criticized Trump Ally*, N.Y. Times (June 19, 2026), https://perma.cc/82JD-GW58 ...................................................................................... 3

**Introduction**

After a nine-day bench trial during which the court reviewed hundreds of exhibits and heard testimony from senior government officials as well as leaders and members of the plaintiff organizations, the district court found that Defendants had adopted a policy of arresting, detaining, revoking the visas of, and deporting noncitizens who engage in pro-Palestinian advocacy "with the goal of tamping down pro-Palestinian student protests and terrorizing [a wide range of] non-citizen (and other) pro-Palestinians into silence because their views were unwelcome" (the "Policy"). Add.163. The court held that the Policy violates the First Amendment and the Administrative Procedure Act ("APA"), and after a hearing on remedies it issued a formal declaration to that effect and vacated the Policy under the APA. The court did not, however, enter Plaintiffs' requested injunction. Instead, it imposed a "remedial sanction" that Plaintiffs did not ask for and do not defend here.

This Court should affirm the district court's grant of declaratory relief and vacatur under the APA, and reverse the district court to the extent it denied Plaintiffs' request for injunctive relief. To begin, Defendants do not seriously challenge the district court's conclusion that they adopted the Policy; nor could they. The trial record shows plainly—indeed, by "clear and convincing evidence," Add.72 & n.3—that Defendants enforced two executive orders in a viewpoint discriminatory way and "deliberately and with purposeful aforethought" targeted speakers whose speech they deemed to be antisemitic, anti-Israel, or pro-Hamas. Add.73, 197–203. Defendants used these terms "to encompass, and indeed to be centered on, core First Amendment speech and expressive conduct, such as attending public protests, leading such protests, or even publishing op-eds." Add.199. Defendants forthrightly announced the invidious

intent of the Policy, and testimony from senior officials of the Department of Homeland Security ("DHS") and Department of State ("DOS") confirmed the Policy's nature and purpose.

The district court was correct to hold that the Policy violates the First Amendment and the APA. The Supreme Court wrote more than half a century ago that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). Whatever the outer limits of noncitizens' First Amendment rights, there is no authority for the proposition that the First Amendment permits the imprisonment and expulsion of noncitizens simply because they have endorsed political ideas the government disfavors. The district court was correct to hold that the Policy would fail even the most deferential constitutional review. The Policy is, for the same reasons, "contrary to constitutional right" under the APA. And, as the court also held, it separately violates the APA because Defendants "have engaged in quintessential arbitrary action: an abrupt reversal of course, using statutes in new and constitutionally suspect ways, with no explanation." Add.212.

Defendants' arguments in support of their censorial policy are not simply wrong but foreign to our constitutional tradition. A foundational premise of the modern First Amendment is that the integrity of the democratic process requires that the government be foreclosed from suppressing political speech it disfavors. *See Whitney v. California*, 274 U.S. 357, 375–76 (1927) (Brandeis, J., concurring); *Abrams v. United States*, 250 U.S. 616, 630–31 (1919) (Holmes, J., dissenting). But endorsing the arguments Defendants advance here would give the government sweeping power to do exactly that. Notably, in recent months the Trump administration has relied on the very same arguments to target not just noncitizens who criticize Israel but also noncitizens who criticize the administration's favored social media companies, *Coal. for Indep. Tech. Rsch. v. Rubio* ("*CITR*"), 2026 WL 2030770, at *3–4 (D.D.C. July 14, 2026), or who criticize the

administration's favored candidates for political office abroad.[1] To allow this kind of censorship would have far-reaching implications for noncitizens in this country, for citizens who would speak and associate with them, and for our democratic process more broadly. This Court should not endorse Defendants' effort to transform the United States into "a nation that imprisons and deports people because we are afraid of what they have to tell us." Add.213.

## Statement of Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. The district court had jurisdiction under 28 U.S.C. § 1331, 5 U.S.C. § 702, and the U.S. Constitution. The district court entered judgment on January 22, 2026. JA77. Defendants filed a timely notice of appeal on February 9, 2026. JA81. Plaintiffs filed a timely notice of cross-appeal on February 24, 2026. JA185.

## Statement of Issues on Appeal

1. Whether the district court properly held that Defendants' policy of arresting, detaining, revoking the visas of, and deporting noncitizens who engage in pro-Palestinian advocacy violates the First Amendment and the APA.

2. Whether the district court erred in declining to hold that Defendants' campaign of coercive threats independently violates the First Amendment.

3. Whether the district court was correct to conclude that it had jurisdiction over Plaintiffs' claims.

4. Whether the district court erred in declining to grant Plaintiffs' requested injunctive relief.

---

[1] *See* Hamed Aleaziz & Annie Correal, *Memo by Rubio Approved Detention of Immigrant Who Criticized Trump Ally*, N.Y. Times (June 19, 2026), https://perma.cc/82JD-GW58.

3

**Statement of the Case**

I.    **Factual Background**

After a nine-day bench trial, the district court issued extensive findings of fact, none of which Defendants explicitly contest on appeal. The district court found, and the trial record established, the following:

Plaintiffs—the American Association of University Professors ("AAUP") and the Middle East Studies Association of North America ("MESA")—are nationwide associations of faculty and students dedicated to advancing academic freedom and facilitating scholarly discourse. Among Plaintiffs' members are noncitizen scholars who care deeply about issues relating to Israel and Palestine and wish to engage in speech and advocacy on the topic. In early 2025, President Trump issued two executive orders—one of them ostensibly addressed to protecting citizens from noncitizens who "espouse hateful ideology," and the other to combatting antisemitism. To enforce the executive orders, Defendants adopted the Policy and eventually targeted (among many others) five individuals with respect to whom the district court permitted Plaintiffs to conduct discovery—Mahmoud Khalil, Rümeysa Öztürk, Mohsen Mahdawi, Badar Khan Suri, and Yunseo Chung. In adopting the Policy, Defendants' aim was "to target a few for speaking out and . . . to have them publicly deported with the goal of tamping down pro-Palestinian student protests and terrorizing similarly situated non-citizen (and other) pro-Palestinians into silence because their views were unwelcome." Add.163. Defendants largely succeeded.

A.    **President Trump lays the groundwork for the Policy by issuing two executive orders.**

Shortly after taking office, President Trump issued two executive orders: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," 90 Fed. Reg. 8451 (Jan. 30, 2025); and Executive Order 14188, titled

4

"Additional Measures to Combat Anti-Semitism," 90 Fed. Reg. 8847 (Jan. 29, 2025) (together, the "Executive Orders"). Executive Order 14161 states that "[i]t is the policy of the United States" to protect its citizens from noncitizens who "espouse hateful ideology" and to ensure that noncitizens present in the United States "do not advocate for, aid, or support designated foreign terrorists." 90 Fed. Reg. at 8451. Executive Order 14188 states that it is the policy of the United States "to combat anti-Semitism vigorously," and directs the head of each department to submit a report "identifying all civil and criminal authorities or actions" that might be used "to curb or combat anti-Semitism" at institutions of higher education. 90 Fed. Reg. at 8847. This executive order instructs Defendants to include recommendations related to the "grounds for inadmissibility under 8 U.S.C. 1182(a)(3)" and the monitoring of "activities by alien students and staff relevant to those grounds." *Id.* at 8848.

The "grounds for inadmissibility" cited are the security and related grounds for inadmissibility, which also serve as grounds for deportation. Under provisions related to terrorism in the Immigration and Nationality Act ("INA"), a noncitizen is inadmissible and deportable if they "endorse[] or espouse[] terrorist activity or persuade[] others to endorse or espouse terrorist activity or support a terrorist organization." 8 U.S.C. §§ 1182(a)(3)(B)(i)(VII), 1227(a)(4)(B); *see also id.* § 1182(a)(3)(B)(i)(IV)(bb). Under INA provisions related to foreign policy, a noncitizen is inadmissible and deportable if "the Secretary of State has reasonable ground to believe that [the noncitizen's presence or activities in the United States] would have serious adverse foreign policy consequences." *Id*. §§ 1182(a)(3)(C)(i), 1227(a)(4)(C)(i). The foreign policy provisions state that individuals shall not be excluded based on their lawful "beliefs, statements, or associations" unless the Secretary of State "personally determines that the [noncitizen]'s admission would compromise a compelling United States foreign policy interest." *Id.* §§ 1182(a)(3)(C)(iii), 1227(a)(4)(C)(ii).

In a fact sheet issued alongside Executive Order 14188, the President vowed to "Deport Hamas Sympathizers and Revoke Student Visas," warning: "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you." JA1732.

**B.      Defendants adopt the Policy to enforce the executive orders.**

The defendant agencies immediately began enforcing the Executive Orders by adopting the Policy. Add.89–90. The Policy operates as follows.

DHS Identifies Pro-Palestinian Protesters for Potential Deportation

In early March 2025, DHS's Homeland Security Investigations ("HSI") launched an operation to identify pro-Palestinian protesters on college campuses for potential referral to DOS. Add.79–80, 91. As part of this effort, HSI instructed its Office of Intelligence to scour lists of suspected protesters, and to prepare dossiers called "reports of analysis" on noncitizen protesters from among those lists. Add.91–92. The focus of this operation was on noncitizens who had engaged in protest. Add.94; JA889:15–22 (Hatch). This included looking for protesters who had "support[ed] terrorist organizations" such as Hamas. Add.91–92.

The largest source of potential targets—more than 5,000 names—came from the website of Canary Mission. Add.92–94. The website identifies individuals whom Canary Mission deems to be anti-American, anti-Israel, or antisemitic, including those who have criticized the actions of the Israeli government or expressed support for the boycott, divestment, and sanctions movement. JA796:15–17, JA797:10–798:4 (Hatch); *see also* Add.109. Some of the names of potential targets also came from Betar U.S. Add.94; JA798:7–16 (Hatch); *see also* JA686:2–22 (Abu El-Haj).

To investigate these many potential targets quickly, the Office of Intelligence formed a specialized "Tiger Team." Add.92–93. The Tiger Team produced reports of analysis on

approximately 200 protesters, JA862:22–863:1 (Hatch), including the five targeted noncitizens with respect to whom the district court permitted discovery, JA2148–81. These reports focused on the subject's expressive and associational activities, and included unvetted third-party allegations that those activities were antisemitic or pro-Hamas. *See, e.g.*, JA2150–59 (Öztürk), JA2162–64 (Khalil); JA818:11–20, JA863:2–864:16 (Hatch); Add.202 & n.43.

<u>Defendants Use an Ends-Driven Process to Fast-Track Deportations</u>

DHS and DOS established a new ends-driven referral process to fast-track targeted individuals for deportation. At a high-level, the new process called for the reports of analysis developed by the Office of Intelligence to be sent to HSI's National Security Division ("NSD") for review and possible referral to DOS for possible action. Add.80–81. NSD personnel prepared referral letters for Andre Watson, the seniormost official in the division, to approve and submit to DOS. *See, e.g.*, Add.96, 98, 117. The referral letters purported to provide summaries of actions by the subject individuals "that violate President Trump's executive orders on anti-Semitism." *See, e.g.*, JA2197–2206. Some of the letters noted that the subject's actions "align with the executive orders' focus on deporting 'Hamas sympathizers.'" Add.118 (quoting JA2201); *see also* Add.97, 99. The referral letters adopted as fact the unverified third-party allegations reproduced in the reports of analysis that the subject's activities were antisemitic, anti-Israel, or pro-Hamas. *See, e.g.*, Add.97 (noting assertions about Chung that were not based on any evidence), Add.99 (same for Khalil); *see also* Add.202 & n.43. Relying only on the reports of analysis, the letters identified potential bases for revoking an individual's visa or finding them removable. *See, e.g.*, JA2197–2206. Watson approved every referral he received through this process and sent each one to DOS. JA1309:16–19 (Watson).

Upon receiving a referral, DOS reviewed the referral letter and determined whether to revoke the individual's visa or find them removable. Add.80–81. John Armstrong, the seniormost official in the Bureau of Consular Affairs, and other personnel from that office evaluated whether individuals' expressive and associational activities were antisemitic or supported terrorism. JA1372:20–1373:23, 1380:3–20 (Armstrong). For referrals involving visa holders, a deputy provided Armstrong with "action memos" recommending revocation, which included the relevant referral letters and reports of analysis. *See, e.g.*, JA2222–25; *see also* Add.134–35. Armstrong had the authority to revoke these visas himself. Add.136. For referrals involving lawful permanent residents, Armstrong prepared action memos for Secretary Rubio, which included the relevant referral letters and reports of analysis, proposing that the Secretary make determinations of removability. *See, e.g.*, JA2207–11.

If a recommendation from an action memo was approved, DOS prepared a memorandum for DHS memorializing the determination. Add.81. In cases involving lawful permanent residents, Secretary Rubio issued memoranda incorporating the reasoning from the relevant action memos, finding individuals deportable based on "beliefs, statements, or associations that are otherwise lawful," JA1564–65, 1572–73, 1589–90, 1592–93, and explaining that the bases for these determinations were information provided by DHS on the individuals' pro-Palestinian advocacy. *See* Add.104–05, 125–27. If detention was sought, DHS quickly moved to arrest the targeted noncitizen. *See, e.g.*, Add.105–06, 139.

In carrying out this process, government officials systematically conflated pro-Palestinian advocacy with antisemitism and support for terrorism, and constitutionally protected speech with unprotected conduct. *See* Add.200–02 & n.43. As the district court found, "decisionmakers at every step of the challenged implementation interpreted the 'support' for terrorists (a key term

8

from Executive Order 14161) that they construed as potentially subject to the penalty of detention, deportation, and visa revocation to encompass, and indeed to be centered on, core First Amendment speech and expressive conduct." Add.199. Officials "consistently referred to campus protests related to Palestine as per se 'pro-Hamas,'" and treated "Hamas sympathizers" as if it were "a self-interpreting term." Add.199–200. They treated "antisemitism," as something that "one simply knows when one sees it." Add.200.

Armstrong did not receive formal training or guidance on how he should interpret those terms. Add.100. As a result, he decided for himself how they should be understood. Add.101. He treated opposition to Israel as antisemitic per se, and he understood a wide range of criticism of Israel and support for Palestinians to be grounds for deportation. In his view, a statement denouncing Zionism was a potential ground for deportation because Zionism is "Jewish patriotism or Israeli patriotism." JA1382:9–12. So too statements calling Israel an "apartheid state," JA1383:13–16; criticizing the state of Israel as a "racist endeavor," JA1547:9–12; and calling for divestment from Israel, JA1545:3–6. Armstrong viewed criticism of the Trump administration's policies toward Israel as relevant to removability. JA1390:12–1391:11. He also conflated constitutionally protected expression and association with unprotected conduct. Add.136–38.

DOS issued guidance that laid the groundwork for expanding the Policy. This guidance formalized multiple pathways for revoking the visas of students who engage in pro-Palestinian advocacy and characterized a broad range of such advocacy as pro-Hamas and antisemitic. *See, e.g.,* JA1759 (directing officers to "catch" noncitizens "misusing" their visas and to "revoke" those visas), JA1772–73 (explaining that under "Catch-And-Revoke," when DOS finds student visa holders "who have supported terrorists . . . , their visas are instantly revoked"), JA1778 (addressing social media screening), JA2187–88 (requiring officers to "consider as potentially

9

derogatory . . . advocacy for, aid, or support for designated foreign terrorists . . . ; or of support for unlawful antisemitic harassment or violence"); *see also* Add.87–88, 143.

<u>Defendants Target Noncitizens Based on Their Speech and Associations</u>

Pursuant to the Policy, Defendants have targeted potentially hundreds of noncitizen students and faculty for their pro-Palestinian advocacy. JA1682. Among them are the five people with respect to whom the district court permitted discovery. Add.96–106, 110–142. Based on a close review of the reports of analysis, referral letters, action memos, and removability determinations, the district court found that all five were targeted based solely on their protected speech and associations. Add.163–64, 198–202.

For example, Defendants targeted recent Columbia University graduate Mahmoud Khalil, a lawful permanent resident, on the basis of unsubstantiated allegations from Canary Mission that Khalil is antisemitic, anti-Israel, and pro-Hamas. JA2162–64. The referral letter identifies Khalil as "a prominent pro-Palestinian activist involved in antisemitic activities," pointing to his "leadership roles" in "disruptive protests." JA2197. Armstrong's action memo to Secretary Rubio recommending that Khalil be found removable cites "social media and open-source articles" in the report of analysis, including Canary Mission's profile of Khalil, and Khalil's involvement in "numerous pro-Palestinian protests." JA2208. When Secretary Rubio approved this recommendation, he explained that his determination was based on information provided by HSI regarding Khalil's participation in "antisemitic protests and disruptive activities." JA1565.

Defendants also targeted former Tufts University doctoral student Rümeysa Öztürk, then a student visa holder, for her pro-Palestinian speech and association. The report of analysis about Öztürk attaches an op-ed she had co-authored criticizing the Tufts president's rejection of three Community Union Senate resolutions relating to divestment and the treatment of student

10

protesters. JA2156–57. The report also includes a profile of Öztürk on Canary Mission's website, which the report summarizes as "stating her participation in anti-Israel activism in March 2024." JA2150. DHS's referral letter focuses on the alleged "anti-Israel activism" purportedly reflected in the op-ed she co-authored, JA2203–04; and it attempts to connect Öztürk to a suspended Tufts student group, even though there was "no direct connection alleged between Öztürk and the [group]," Add.133. The action memo recommending the immediate revocation of Öztürk's visa repeats DHS's characterization of Öztürk's activities but acknowledges that DHS had not "provided any evidence showing that OZTURK has engaged in any antisemitic activity or made any public statements indicating support for a terrorist organization or antisemitism generally." JA2223; *see also* Add.138. Nonetheless, when Armstrong reviewed the action memo, he wrote "actions, not words" in the margin, and approved the revocation. JA2223; *see also* JA1409:13–1410:1, 1412:22–1413:4 (Armstrong).

<u>Defendants Tout the Policy in Public Statements</u>

Defendants repeatedly proclaimed their intent to deport noncitizens based on speech they deem to be pro-Hamas or antisemitic. For instance, on March 6, 2025, two days before Khalil was arrested, Secretary Rubio wrote on X that the U.S. has "zero tolerance for foreign visitors who support terrorists" and that "international students" would "face visa denial or revocation, and deportation." JA1602. Secretary Rubio returned to X on March 9, promising: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." JA1604. The next day, President Trump announced on Truth Social that Khalil's was "the first arrest of many to come." JA1605. Defendants' public statements also evince the Policy's conflation of pro-Palestinian advocacy with antisemitism and support for terrorism. Add.198–99; *see, e.g.*, Add.114 (Deputy Secretary of Homeland Security Troy Edgar suggesting that Khalil had supported Hamas

11

by "put[ting] himself in the middle of the process of basically pro-Palestinian activity"); JA1682 (Secretary Rubio intimating that most of the administration's first 300 or so visa revocations were "related to pro-Palestinian protests"). As the district court found, government officials made "many public statements" indicating that they "wished to staunch public protest related to Israel's treatment of Palestinians." Add.198; *see, e.g.*, Add.96, 107–09, 110–17, 128–30, 147–54, 155–62 (cataloging statements by officials touting the Policy).

Defendant agencies treated these statements as official policy, *see* Add.101, 143, JA1369:2–8, JA1369:21–JA1370:5, JA1370:20–JA1371:3 (Armstrong); and incorporated them into internal agency guidance, *see, e.g.*, JA1738 (DOS webinar), JA1776 (consular cable), JA2189 (same).

### The Intent of the Policy is to Silence Pro-Palestinian Speech

As the district court found, the "invidious" intent of the Policy was "to target a few for speaking out" in order to terrorize other noncitizens who wished to engage in pro-Palestinian advocacy into silence. Add.163. This intent was plain from the above-mentioned statements touting the Policy. Add.198–99. It was also evident from the "tasking of HSI with investigating protestors for violations of laws based on anonymous website lists targeted at protesters," like Canary Mission; from the "frictionless quality" of the Policy's implementation, such that "one was potentially subject to adverse action so long as, it seems, there was any online mention of one's pro-Palestine activities"; and from the Policy's focus on "core First Amendment speech and expressive conduct." Add.199–202. The Policy's intent was likewise manifest in the "obvious, highly publicized atmosphere of secrecy and fright" surrounding the arrests of Khalil, Öztürk, and others. Add.205–06; *see, e.g.*, JA2123 (Öztürk arrest video); JA2182 (Khalil arrest video); *see also* Add.139–41, 142 n.30.

12

C.    **The Policy has a profound chilling effect on noncitizen students and faculty, and harms Plaintiffs and their members.**

As the district court found, the point of the Policy was to terrify noncitizen students and faculty on college campuses into silence, and it has had exactly this effect.

Plaintiffs are nationwide associations of faculty and students dedicated to advancing academic freedom and fostering academic discourse and scholarship. The AAUP is a nonprofit membership association and labor union of faculty, graduate students, and other academic professionals. Add.73–74. Founded in 1915, it has long been dedicated to the goal of protecting academic freedom and shared governance in higher education. JA1931. A central component of the AAUP's mission is to protect its members' right to engage in "extramural" speech—that is, their right to speak as citizens. Add.74. The AAUP has approximately 50,000 members, JA1418:24–25 (Dubal), spread across hundreds of local chapters around the country, including at Harvard, Rutgers, and New York University, Add.74.

MESA is a nonprofit membership association whose mission is to foster the study of the Middle East, promote high standards of scholarship and teaching, and encourage public understanding of the region and its peoples. Add.74; JA1983. MESA has over 2,000 individual members, JA2007, which include faculty, post-doctoral scholars, and graduate or undergraduate students, JA1973. The organization's "core activity" is to "facilitat[e] academic discourse and scholarship about issues impacting the Middle East." Add.181.

<u>The Policy Has Forced Plaintiffs' Noncitizen Members into Silence</u>

Plaintiffs have noncitizen members who have been compelled to curtail their expression because of the Policy. Members once regularly spoke and wrote publicly about Israel and Palestine, attended protests and signed open letters on the topic, and openly associated with groups that took positions on the issue. Now many noncitizen members have been terrified into silence.

13

The experiences of the noncitizen witnesses who testified at trial, which the district court fully credited, Add.176–79, demonstrate the Policy's broad chilling effect.

For instance, AAUP and MESA member Nadje Al-Ali, a professor of Middle East studies at Brown University and a lawful permanent resident, had "a long history of scholarly work and advocacy on issues related to Palestine." Add.176. Before the Policy, Al-Ali signed and drafted open letters concerning Brown's divestment from companies involved in Israel's military occupation of Palestine and the university's treatment of pro-Palestinian student protesters, and facilitated negotiations between Brown and a group of its students in relation to pro-Palestinian protests. Add.176–77. As recently as early 2025, Al-Ali had started researching a new academic article covering Hamas and Israel. JA468:17–JA470:7, JA478:5–7 (Al-Ali); Add.107.

All of this changed because of the Policy. As the district court found, Al-Ali "credibly testified" that the Policy has led her to "alter international travel plans," "decline a public-facing leadership opportunity that might have more firmly associated her with pro-Palestine human rights advocacy," "cease her previous practice of signing open letters related to these issues," "forego specific research projects related to Palestine and funded research opportunities requiring travel," and "stop attending protests and assisting in negotiations between Brown University and its students as she had previously done." Add.177. She has abandoned these activities "all out of fear of being targeted for her pro-Palestinian speech and association with such views." *Id.*

The Policy has similarly chilled AAUP members Megan Hyska and Bernhard Nickel (also a member of Harvard's local chapter) from engaging in "public-facing writing, public letter signing, and protest attendance." Add.178–79; *see also, e.g.*, Add.108, 145–46 (Nickel); Add.109, 144–45 (Hyska); JA379:2–JA380:2 (Hyska).

14

## The Policy Has Harmed Plaintiffs

The Policy has undermined Plaintiffs' ability to pursue their missions.

Since the initiation of the Policy, many of the AAUP's noncitizen members have withdrawn from the organization. Add.147. Noncitizen members who were previously active in the AAUP's virtual meetings stopped attending meetings or attended them with their videos off. *Id.* The result is that the AAUP has been deprived of the voices and insights of its noncitizen members, making it more difficult for the AAUP to effectively represent its full membership and to achieve its mission. *Id.*

The same has been true for MESA, whose entire reason for being is to foster scholarship and discourse about the Middle East. Add.74, 181. The Policy has reduced noncitizen members' engagement with the organization and caused members to self-censor. Add.147, 181; *see also* JA478:2–25 (Al-Ali); Add.107–08. It has also caused them to withdraw from MESA events, including from MESA's flagship annual meeting. JA2011. MESA estimated its year-end membership would be approximately ten percent below expectations. JA2007.

Plaintiffs have also been forced to divert resources from other activities to support members impacted by the Policy. Add.146–47. Soon after the arrests of Khalil, Öztürk, and others, the AAUP began receiving a deluge of questions from its noncitizen members about how the Policy would affect them. Add.109–10. The AAUP has redirected substantial time and effort to provide resources to these members, including by organizing multiple immigration-related townhalls and meetings. Add.146; JA1421:15–JA1423:12, JA1423:19–JA1424:19, JA1425:6–21 (Dubal). The AAUP's general counsel has also spent considerable time and resources addressing noncitizen members' fears concerning the Policy, Add.146–47, which has detracted from the work she was hired to do, JA1426:3–JA1427:7 (Dubal). MESA has similarly been required to put on new events

15

focused on informing members about the Policy, their rights, and ways they can protect themselves from immigration enforcement. *See, e.g.*, JA1935–36, JA1938, JA1950–51; *see also* Add.146.

## II.    Procedural Background

Plaintiffs filed this lawsuit on March 25, 2025. JA34. In their complaint, Plaintiffs pled four causes of actions: (1) that the Policy violates the First Amendment; (2) that Defendants' campaign of coercive threats violates the First Amendment; (3) that the Policy violates the Fifth Amendment; and (4) that the Policy violates the APA. JA333–34.

On April 1, 2025, Plaintiffs moved for a preliminary injunction and for a stay of the Policy under the APA. Dist. Ct. Dkt. 13. On April 23, 2025, the district court held a hearing on Plaintiffs' motion, during which the court collapsed the motion into a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a). Dist. Ct. Dkt. 75 at 10:19–21. In doing so, the court construed Defendants' opposition to the motion as a motion to dismiss and Plaintiffs' reply as an opposition to the motion to dismiss. *Id.* at 11:19–21, 17:2. On April 29, 2025, the district court denied in part and granted in part Defendants' motion to dismiss, finding that the court had subject matter jurisdiction and that Plaintiffs had sufficiently pleaded their First Amendment and APA claims. Add.5.

From July 7, 2025 to July 21, 2025, the district court held a nine-day bench trial, during which it heard from 15 witnesses and admitted 250 exhibits consisting of documents, photographs, and videoclips.

On September 30, 2025, the district court issued its 161-page findings of fact and rulings of law, concluding that the court had jurisdiction to hear Plaintiffs' claims and that the Policy violated the First Amendment and the APA. Add.69–229. Following briefing and a hearing on remedy, the court declared that the Policy violates the First Amendment and the APA and vacated

the Policy under the APA. Add.230–32. The court also issued a "remedial sanction" against Defendants designed to protect Plaintiffs' noncitizen members from "any retribution for the free exercise of their constitutional speech." Add.232–36.

On February 9, 2026, Defendants moved the district court for a stay pending appeal of only the "sanction" portion of the district court's remedial order. Dist. Ct. Dkt. 317. The district court largely denied Defendant's motion. Dist. Ct. Dkt. 330. On April 7, 2026, this Court granted Defendant's unopposed motion to stay the sanction pending appeal.

## Summary of Argument

This Court should affirm the district court's grant of declaratory relief and vacatur under the APA, and reverse the district court to the extent it denied Plaintiffs' request for injunctive relief.

First, the district court properly found that it had subject matter jurisdiction. As to standing, Plaintiffs have associational standing to sue on behalf of their noncitizen members who have been chilled by the Policy, as the district court correctly held. Plaintiffs also have organizational standing because the Policy directly impedes their ability to carry out their core missions. While the district court was correct to conclude that MESA has organizational standing, Add.181, it erred in holding that the AAUP lacks such standing, Add.182. With respect to the jurisdiction-limiting provisions on which Defendants rely, neither 8 U.S.C. § 1252(g) nor § 1252(b)(9) displace the district court's jurisdiction over this case. Section 1252(g) bars review of challenges to only certain discrete actions, but the Policy is not one of them. Section 1252(b)(9) does not apply either. It channels judicial review of only certain kinds of claims brought by individual noncitizens to challenge their removal orders, not constitutional challenges to broad government policies brought

17

by noncitizens who are not in removal proceedings and by organizations that cannot ever be put into such proceedings.

Second, the district court was correct to hold that the Policy violates the First Amendment. It is well-settled that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges*, 326 U.S. at 148. And whatever the outer limits of those rights may be, the First Amendment protects noncitizens from having their visas revoked or being arrested, detained, and deported simply for expressing viewpoints the government disfavors. The district court was thus correct to hold that the Policy is unconstitutional under any standard of review.

Third, the district court erred in failing to find that Defendants' campaign of coercive threats to arrest, detain, deport, and revoke the visas of noncitizens for their pro-Palestinian speech independently violates the First Amendment. The record in this case overwhelmingly demonstrates that Defendants used the threat of imprisonment and expulsion to coerce pro-Palestinian noncitizens into silence.

Fourth, the district court properly held that the Policy violates the APA, both because it is "contrary to constitutional right," 5 U.S.C. § 706(2)(B), and because it is arbitrary and capricious and exceeds statutory authority. *Id.* § 706(A), (C).

Finally, the district court erred in declining to grant injunctive relief. That relief is necessary because Defendants deny there is a Policy at all (despite the district court's finding to the contrary) and accordingly take the position that the vacatur of the Policy does not have any bearing on their authority to continue targeting noncitizens on the basis of their pro-Palestinian speech. The relief ordered by the district court is thus unlikely to end Defendants' unconstitutional conduct—and accordingly, it does not fully address the chill that results from that conduct. The

18

district court was justified in issuing declaratory relief and vacating the Policy, but it should have issued injunctive relief as well.

## Standard of Review

Following a bench trial, this Court reviews the district court's findings of fact, including reasonable inferences drawn from those facts, for clear error and its legal conclusions *de novo*. *Calandro v. Sedgwick Claims Mgmt. Servs., Inc.*, 919 F.3d 26, 33 (1st Cir. 2019). Here, Defendants do not contest any of the district court's factual findings, and so this Court's review is limited to *de novo* review of the district court's legal conclusions.

## Argument

I.    **The district court properly held that it has subject matter jurisdiction to hear the case.**

    A.    **Plaintiffs have standing.**

        1.    **Plaintiffs have associational standing.**

The district court correctly held that the AAUP and MESA have associational standing to sue on behalf of their noncitizen members, Add.179, because those members "would otherwise have standing to sue in their own right"; the interests Plaintiffs seek to protect are germane to their missions; and neither the claims asserted, nor the relief requested, require the participation of Plaintiffs' individual members in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see In re Fin. Oversight and Mgmt. Bd. for P.R.*, 110 F.4th 295, 309 (1st Cir. 2024) (applying *Hunt*). Defendants focus on the first prong of the test, arguing primarily that Plaintiffs' noncitizen members have not suffered any actual injuries, and that any injuries they have suffered are not traceable to the Policy or redressable by Plaintiffs' requested relief. Defs.' Br. 25–33. These arguments fail.

As explained above and in the district court's findings, Plaintiffs have noncitizen members who have been forced into silence by the Policy. *See supra* pp. 13–14; Add.107–10, 144–47. Nadje Al-Ali, for instance, previously engaged in a wide-range of pro-Palestinian speech and advocacy, Add.176–77, but because of the Policy and the government's threats to enforce it, she "canceled overseas trips, shied away from writing on certain topics critical of Israeli policies, . . . stopped engaging in protests as she previously did, and generally kept a low profile," Add.107–08, "all out of fear of being targeted for her pro-Palestinian speech and association with such views," Add.176–77. Other noncitizen members testified to similar chill based on the threat of being targeted under the Policy, the district court accepted that testimony, and Defendants do not now challenge those factual findings. Add.144–45, 178 (describing how Hyska curtailed her expressive activities); Add.145–46, 178–79 (same for Nickel).

The district court correctly held that these facts establish Article III injury, Add.172–75, 184, and that conclusion is correct whether analyzed under the line of cases recognizing standing where a plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder," *see Susan B. Anthony List v. Driehaus* ("*SBA List*"), 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)), or under the line of cases recognizing standing to challenge government conduct that results in "objectively reasonable chill" of constitutionally protected speech, *First Choice Women's Research Centers, Inc. v. Davenport* ("*First Choice*"), 146 S. Ct. 1114, 1126–27 (2026). In both of these

20

circumstances, the "vice" of the government action "is its pull toward self-censorship." *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996).[2]

Defendants claim that Plaintiffs' fears of enforcement are "subjective" and "unreasonable," Defs.' Br. 28–29, but they are nothing of the sort. As the district court concluded, Defendants "target[ed] non-citizen pro-Palestinians for deportation primarily on account of their First Amendment protected political speech," Add.215, and have "forcefully asserted their right to detain, deport, and revoke visas in response to the very speech-based activities" in which Plaintiffs' noncitizen members wish to engage, Add.174–75. Indeed, the district court noted that Al-Ali, in particular, "bears many of the traits that appear to make one ripe for targeting" under the Policy. Add.177. This Court and the Supreme Court have recognized credible-threat standing in precisely these kinds of circumstances. *See N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 50–51 (1st Cir. 2021) (a "history of past enforcement against the same conduct supports a finding of injury in fact for pre-enforcement standing"); *SBA List*, 573 U.S. at 164 (similar).

Moreover, Defendants "have not disavowed enforcement" against Plaintiffs' members if they make "similar statements in the future." *SBA List*, 573 U.S. at 165. "[N]o more is required" under Supreme Court precedent. *Chiles v. Salazar*, 146 S. Ct. 1010, 1019 n.* (2026); *see PILF*, 92 F.4th at 50 (holding that plaintiffs had standing despite defendant's representations that it "would not view [plaintiff's] intended activities as violations of" the challenged provision because those

---

[2] Defendants rely on two decisions that predate *SBA List*—*Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013), and *Blum v. Holder*, 744 F.3d 790, 799 (1st Cir. 2014)—for the proposition that Plaintiffs must show that their members' injuries are "certainly impending." Defs.' Br. 24–29. "Because *SBA List* both postdated and cited *Clapper*," however, this Court "follow[s] its disjunctive framing of the test: injury is imminent if it is certainly impending *or* if there is a substantial risk that harm will occur." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017). Thus, plaintiffs' injuries are sufficiently imminent if "there is a 'substantial risk'"—or credible threat—that they "will be subject to an enforcement action." *Pub. Int. Legal Found., Inc. v. Bellows* ("*PILF*"), 92 F.4th 36, 50 (1st Cir. 2024) (quoting *Reddy*, 845 F.3d at 500).

"representations [did] not promise nonenforcement"). Defendants' repeated insistence that Plaintiffs' members have not *yet* been targeted under the Policy, *see* Defs.' Br. 26–27, and that it is uncertain whether any enforcement of the Policy "would be approved," *id.* at 27, is therefore irrelevant. As the Supreme Court reiterated just this past term, "[t]he value of a sword of Damocles is that it hangs—not that it drops." *First Choice*, 146 S. Ct. at 1127 (quoting *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting)).[3]

Plaintiffs' injuries are also traceable to the Policy. As the district court found, Plaintiffs' noncitizen members "previously engaged" in pro-Palestinian protests and related expression and association, Add.175, but stopped because of the "threat that the [Policy] will be enforced" against them if they continued. *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003) (quoting *N.H. Right to Life*, 99 F.3d at 14). Defendants do not meaningfully contest traceability but simply rehash their argument that the injuries to Plaintiffs' noncitizen members are not "certainly impending." Defs.' Br. 30. That argument is wrong for the reasons already explained.

Finally, Plaintiffs' injuries are redressable. All Plaintiffs need show is that the "risk would be reduced to some extent if [Plaintiffs] received the relief they seek." *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007); *see also Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (a plaintiff "need not show that a favorable decision will relieve his *every* injury"). Here, the record makes clear that Plaintiffs' noncitizen members "would engage" again in the expressive activities they ceased if the

---

[3] Defendants point to the experience of Brian Shuve, who sat for a deposition but did not testify at trial, in support of their argument that Plaintiffs' members' fears are unreasonable. Defs.' Br. 28. But the relevant question is not whether every noncitizen who engaged in pro-Palestinian speech was targeted for it; it is, instead, whether the Policy leads noncitizens to reasonably fear that they may be targeted. Notably, Defendants themselves acknowledge that Shuve was "fearful of arrest and detention." Defs.' Br. 28; *see also* JA1532–36, JA1538. In any event, Shuve was a naturalized citizen by the time of his deposition, as Defendants recognize, Defs.' Br. 14, so his experiences are not comparable to those of Plaintiffs' members who remain noncitizens.

Policy were no longer in effect. Add.175; *see also* Add.108 (explaining that, absent the Policy, Al-Ali would resume her expressive activities); *see also, e.g.*, JA411:11–21 (Hyska).

Defendants argue that relief against the Policy would not address any chill to Plaintiffs' members because Defendants would still retain their authority to enforce the foreign policy provisions and other "valid immigration statutes that have been in effect for decades," Defs.' Br. 31, but the record plainly demonstrates that it is the Policy and not the mere existence of Defendants' statutory authority that is causing the chill. *See supra* pp. 13–14; Add.211 (finding that the Policy "reverse[d] course . . . on the way the relevant statutes had [previously] been enforced"). At most, Defendants' contention that they can revive the invalidated Policy through these immigration statutes, *see* Defs.' Br. 31–32, only underscores the need for injunctive relief. *See infra* Part 0.

### 2. Plaintiffs have organizational standing.

Plaintiffs have organizational standing to challenge the Policy because it "perceptibly impair[s]" their ability to conduct their "core . . . activities." *FDA v. All. for Hippocratic Med.* ("*Alliance*"), 602 U.S. 367, 395 (2024) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Though a mere "setback to the organization's abstract social interests" will not suffice, *id.* at 394 (quoting *Havens Realty*, 455 U.S. at 379), this Court has long held that organizations have standing where "the challenged conduct frustrated their organizational missions" and they "diverted resources to combat that conduct." *Town of Milton v. FAA*, 87 F.4th 91, 99 (1st Cir. 2023) (quoting *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021)); *see Havens Realty*, 455 U.S. at 379. Both MESA and AAUP meet that standard.

The district court correctly concluded that MESA had organizational standing because the Policy "significantly harmed [MESA's] core activity of facilitating academic discourse and

scholarship about issues impacting the Middle East." Add.181. Contrary to Defendants' characterization, MESA's interest in the scholarly study of the Middle East is far from an "abstract social interest." Defs.' Br. 34 (quoting *Alliance*, 602 U.S. at 394). It is, as the district court found, the "lifeblood of the organization." Add.181. Because of the Policy, however, MESA's noncitizen members declined to contribute scholarship and ideas they otherwise would have contributed. *See* JA478:2–25 (Al-Ali); *see also* Add.107–08, Add.176–77. They also withdrew from MESA events, including MESA's "flagship" annual meeting. Add.147; *see also* JA2011 (noting "a significant drop" in submissions). The Policy has thus "directly affected and interfered" with MESA's annual meeting and other "core . . . activities." *Alliance*, 602 U.S. at 395.

Despite its ruling to the contrary, the district court's conclusion with respect to MESA applies with equal force to the AAUP. *See* Add.182–83. Like MESA, one of the AAUP's core missions is to "protect academic freedom." Add.74. The Policy has directly affected and interfered with this mission by chilling members from engaging in scholarly discourse on matters within their disciplinary expertise. Add.107–08 (discussing Al-Ali's decision to refrain from writing on certain topics critical of Israeli policies). The Policy has also impaired the AAUP's goal of protecting its members' right to engage in "extramural" speech. Add.74, 147. Due to the Policy, members have refrained from signing public letters, participating in protests, and publishing op-eds. Add.144–46 (Hyska and Nickel). And, just as with MESA, the Policy has caused noncitizen members to withdraw from the organization, Add.147, making it difficult for the AAUP to fulfil its goal of representing "the voice of the profession," *see* JA1931.

MESA and the AAUP have also both diverted significant resources to combat the Policy's impact on their core activities. In response to member concerns stemming from the arrests of Khalil, Öztürk, and others, MESA and the AAUP organized new events to inform members about

24

the Policy, their rights, and how they might protect themselves from immigration enforcement under the Policy. *See supra* p. 15; Add.146. Additionally, the AAUP's general counsel has spent considerable time and resources addressing members' concerns related to the Policy, which has diverted her attention from the duties that the AAUP anticipated she would focus on when she took on the role. *See supra* p. 16. MESA and the AAUP were not trying to "spend [their] way into standing." Add.182 (quoting *Alliance*, 602 U.S. at 394). Rather, they were dedicating significant resources to mitigating the effects of the Policy on their members and mission. *Cf. Presidents' All. on Higher Educ. & Immigr. v. Noem*, 824 F. Supp. 3d 168, 188–89 (D. Mass. 2026) (citation omitted) (standing based on "flood of requests for assistance from member[s]," which "caused the organization to divert resources from its other initiatives in order to offer guidance to its members on responding to the federal government's actions"); *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 988 (9th Cir. 2025) (similar).[4]

Defendants' contention that Plaintiffs' organizational injuries are "speculative" or based on "subjective" fears cannot overcome the district court's careful findings to the contrary. Defs.' Br. 35–38. As explained above, it is hardly surprising that noncitizens curtailed their expressive and associational activities after the government threatened repeatedly to arrest and deport them for that activity, and after it began to make good on the threat. *See supra* pp. 13–14.

**B.      No provision of the INA bars jurisdiction over Plaintiffs' claims.**

**1.      8 U.S.C. § 1252 (g) does not bar jurisdiction over Plaintiffs' claims.**

The district court correctly held that § 1252(g) does not bar jurisdiction over Plaintiffs' claims. Add.27–38. As the Supreme Court and this Court have explained, § 1252(g)'s compass is

---

[4] Defendants argue that the increase in the number of events that Plaintiffs sponsored from 2024 to 2025 means that Plaintiffs were not injured by the Policy, Defs.' Br. 36, but the increase only underscores that Plaintiffs have been forced to divert resources because of the Policy. *See* JA1251.

"narrow[]." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC II*"), 525 U.S. 471, 482 (1999); *see also Kong v. United States*, 62 F.4th 608, 612–13 (1st Cir. 2023). It eliminates jurisdiction only over challenges to "three discrete actions" concerning the exercise of discretion: the Attorney General's "'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *AADC II*, 525 U.S. at 482 (quoting 8 U.S.C. § 1252(g) (emphasis in original)); *see also Kong*, 62 F.4th at 617–18.

Plaintiffs do not challenge any of these "three discrete actions." Instead, they challenge Defendants' *policy* of targeting noncitizens for arrest, detention, visa revocation, and deportation on the basis of protected speech, and Defendants' attendant threats. Plaintiffs' challenge is not aimed at any ongoing proceedings, cases, or removal orders; it applies only to Defendants' continued pursuit of the Policy. Section 1252(g) does not bar this kind of policy-level challenge. *Cf. DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 13–16 (2020) (§ 1252(g) did not bar policy-level challenge to rescission of DACA, although rescission rendered DACA recipients removable); *NWDC Resistance v. ICE*, 493 F. Supp. 3d 1003, 1011 (W.D. Wash. 2020) (same for ICE policy of retaliating against immigrants for their speech); *CITR*, 2026 WL 2030770, at *12 (same for policy targeting noncitizens purportedly complicit in censorship).

Defendants insist that § 1252(g) was intended to broadly limit "judicial constraints upon prosecutorial discretion" and "similar discretionary decisions." Defs.' Br. 46 (quoting *AADC II*, 525 U.S. at 485 & n.9); *see also id.* 50. But their sweeping construction of § 1252(g) is inconsistent with the provision's plain language and contravenes the Supreme Court's recognition that the provision "applies to only a limited subset of deportation claims." *AADC II*, 525 U.S. at 487; *see also CITR*, 2026 WL 2030770, at *12. Indeed, *AADC II* itself described a broad set of "similar" acts that could be reviewed despite § 1252(g). 525 U.S. at 482 (listing "the decisions to open an

26

investigation, to surveil the suspected violator, [and] to reschedule the deportation hearing" as reviewable). Defendants' reading is also unsupported by the cases they cite, all of which involved noncitizens who challenged covered actions brought against them. The plaintiffs in *AADC II*, for instance, sued to reverse decisions to "'commence proceedings' against them." 525 U.S. at 487 (quoting 8 U.S.C. § 1252(g)); *see also Rauda v. Jennings*, 55 F.4th 773, 777 (9th Cir. 2022) (challenging "execution of [plaintiff's] removal order"); *E.F.L. v. Prim*, 986 F.3d 959, 964 (7th Cir. 2021) (same); *see also Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002) (barring plaintiff's challenge to timing of decision "to initiate deportation proceedings against her" but permitting challenge "to deportation procedures"); *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 945 (5th Cir. 1999) (barring challenge to "Attorney General's decision to place [plaintiff] in exclusion proceedings" but permitting "adjudication of [plaintiff's] claims for involuntary servitude and mistreatment while in detention").

Defendants' proposed construction of § 1252(g) would also foreclose meaningful judicial review of Plaintiffs' constitutional claims, thus raising a "serious constitutional question" that courts have a duty to avoid. *Webster v. Doe*, 486 U.S. 592, 603 (1988); *see also Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 31 (D.D.C. 2018) (holding that § 1252(g) did not preclude policy-level challenge for this reason).

Finally, even if § 1252(g) applied, the Policy is so egregious a violation of the First Amendment that it would come within the exception recognized in *AADC II* for outrageous government conduct. *See* 525 U.S. at 491; Dist. Ct. Dkt. 330 at 23–24; *Ragbir v. Homan*, 923 F.3d 53, 69–73 (2d Cir. 2019), *vacated on other grounds sub nom.*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020).

27

### 2.    8 U.S.C. § 1252(b)(9) does not bar jurisdiction over Plaintiffs' claims.

Defendants' newfound reliance on § 1252(b)(9) is also misplaced. *See* Dist. Ct. Dkt. 309 at 7–8 (raising this argument for the first time).

As a threshold matter, Plaintiffs' claims do not fall within the scope of § 1252(b)(9) because Plaintiffs are organizations asserting organizational injuries. Section 1252(b)(9) is a subsection of § 1252(b), which applies only "[w]ith respect to review of an order of removal under (a)(1)." 8 U.S.C. § 1252(b). Accordingly, § 1252(b)(9) does not apply where a plaintiff "will never be subject to a removal proceeding under the INA," as "there will never be a final order of removal through which they could" bring a challenge. *Mass. Coal. for Immigr. Reform v. DHS*, 621 F. Supp. 3d 84, 99 (D.D.C. 2022). Here, Plaintiffs can never be subject to a removal proceeding because organizations cannot be put through such proceedings.[5]

In any event, section 1252(b)(9) does not apply because Plaintiffs' claims do not "aris[e] from any action taken or proceeding brought to remove an alien from the United States." 8 U.S.C. § 1252(b)(9). As this Court has made clear, the phrase "arising from" in § 1252(b)(9) does not reach "claims that are independent of, or wholly collateral to, the removal process."

---

[5] Section 1252(b)(9) also does not apply to individuals who are not seeking review of removal orders. *See Suri v. Trump*, 2026 WL 2123557, at *18–19 (4th Cir. July 23, 2026). To the extent the Court's decision in *Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007), suggests otherwise, this aspect of the decision should be re-examined in light of *Jennings v. Rodriguez*, 583 U.S. 281 (2018). *See United States v. Millenium Lab'ys, Inc.*, 923 F.3d 240, 249 (1st Cir. 2019) (explaining that the Court is not bound by a prior panel decision when "non-controlling authority that postdates the decision . . . offer[s] 'a compelling reason for believing that the former panel, in light of new developments, would change its collective mind.'" (quoting *Sánchez ex rel. D.R.-S. v. United States*, 671 F.3d 86, 96 (1st Cir. 2012))). In *Jennings*, six out of eight justices warned against reading § 1252(b)(9) expansively, *see* 583 U.S. at 293 (opinion of Alito, J., joined by Roberts, C.J., and Kennedy, J.); *id.* at 355 (Breyer, J., dissenting, joined by Ginsburg, J., and Sotomayor, J.); and three of those justices expressly rejected the provision's application outside of challenges to orders of removal, *id.* (Breyer, J., dissenting). Those opinions cannot be reconciled with *Aguilar*'s premise that § 1252(b)(9) is "breathtaking" in scope. 510 F.3d at 9.

28

*Aguilar*, 510 F.3d at 11. And as the Supreme Court has said, § 1252(b)(9) does not apply "where those bringing suit 'are not asking for review of an order of removal,' 'the decision . . . to seek removal,' or 'the process by which . . . removability will be determined.'" *Regents*, 591 U.S. at 19 (quoting *Jennings*, 583 U.S. at 294–95 (plurality opinion)); *see also* Dist. Ct. Dkt. 330 at 20. Plaintiffs' challenges to the Policy and campaign of threats are entirely separate from any challenge to specific removal proceedings. *Cf. Regents*, 591 U.S. at 19 (§ 1252(b)(9) did not apply because the plaintiffs challenged DACA recission, not "any removal proceedings"); *NWDC Resistance*, 493 F. Supp. 3d at 1013 (same where plaintiffs sought to enjoin ICE policy); *CITR*, 2026 WL 2030770, at *14 (same for challenge to "agency policy, not any action taken to remove a particular member"). To be sure, the district court treated Defendants' targeting of Khalil, Öztürk, and others as *evidence* of the Policy, but Plaintiffs' claims do not arise from those individuals' proceedings. Likewise, Plaintiffs do not challenge any yet-to-be-initiated proceedings involving Plaintiffs' members. Rather, they seek relief from the Policy and the harms caused by its chilling effect, injuries that will continue whether Defendants ever put Plaintiffs' noncitizen members into removal proceedings.

Plaintiffs' claims also do not "arise from" any action taken to remove a noncitizen because they are "claims that cannot effectively be handled through the available administrative process." *Aguilar*, 510 F.3d at 11. Section 1252(b)(9) "is a judicial channeling provision, not a claim-barring one." *Id.* Plaintiffs' claims, however, cannot be raised in removal proceedings, which "are confined to determining whether a particular alien should be deported." *Id.* (citing 8 U.S.C. § 1229a(c)(1)(A))). Thus, Defendants' reading of § 1252(b)(9) would deprive Plaintiffs of "any meaningful judicial review" of their substantial constitutional claims. *Id.* And even if individual noncitizens could obtain *some* relief through this process, it would come entirely "too late" to

address the "here-and-now" injuries caused by the Policy—namely, the ongoing chill of constitutionally protected speech, which is caused by the existence of the Policy and extends even to noncitizens who may never be placed in removal proceedings but nonetheless must account for the possibility that they might be. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023); *see also Suri*, 2026 WL 2123557, at *25.

Defendants point to the Third Circuit's decision in *Khalil v. President*, 164 F.4th 259 (3d Cir. 2026), *see* Defs.' Br. 41, but that case was brought by a noncitizen who was placed in removal proceedings, and who therefore had some plausible (if inadequate) pathway to judicial review through the INA. In any event, the Third Circuit's suggestion that § 1252(b)(9) channels "now-or-never claims" for which a petition for review cannot provide effective relief is wrong and inconsistent with Supreme Court and First Circuit precedent. *See Aguilar*, 510 F.3d at 19; *see also Khalil*, 164 F.4th at 286 (Freeman, J., dissenting); *Suri*, 2026 WL 2123557, at *24–25. As the Supreme Court reaffirmed in *Axon*, an administrative scheme does not provide meaningful judicial review where, as here, a plaintiff asserts a "here-and-now injury" that is "impossible to remedy once the [administrative] proceeding is over." 598 U.S. at 191.[6]

## II.     The district court properly held that the Policy violates the First Amendment.

Defendants do not contest that the Policy discriminates on the basis of viewpoint. This concession is fatal, because it is axiomatic that the government has no legitimate interest in suppressing speech or punishing speakers on this basis. In an effort to sidestep the rule against viewpoint discrimination, Defendants focus on the fact that the Policy targets noncitizens. They argue, first, that the First Amendment doesn't protect noncitizens from being deported for their

---

[6] For the same reasons, the Second Circuit's decision in *Mahdawi v. Trump*, 2026 WL 2090981 (2d Cir. July 21, 2026), is inapt. *Compare Suri*, 2026 WL 2123557, at *18–25 & n.25 (holding similar claims are not barred by §1252(b)(9)).

political views, Defs.' Br. 51–54; and, second, that any First Amendment scrutiny necessary because of the Policy's implications for citizens should be limited to "facially legitimate and bona fide" review under *Kleindienst v. Mandel*, 408 U.S. 753 (1972), which (Defendants say) the Policy satisfies. Defs.' Br. 54–58. All of these arguments are wrong.

### A. Noncitizens have a First Amendment right to engage in core political speech and association, and that right holds even in the context of deportation.

The Supreme Court has long held that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges*, 326 U.S. at 148. *Bridges* involved the government's effort to deport labor organizer Harry Bridges, an Australian citizen, under statutory provisions that rendered noncitizens deportable if they were affiliated with a political party that advocated the overthrow of the U.S. government. 326 U.S. at 140–41. The government targeted Bridges for his alleged association with the Communist Party. *Id*. at 145–46. The Court held that the government's allegations were insufficient to satisfy the statute, but only after construing the statute narrowly against the backdrop of the First Amendment. *Id*. at 147–48; *see also Bridges v. California*, 314 U.S. 252, 275–78 (1941) (invalidating California's attempt to jail Bridges for contempt, applying then-prevailing First Amendment doctrine).

Since *Bridges*, the proposition that "[f]reedom of speech and of press is accorded aliens residing in this country" has been regarded as "well settled," including in the context of immigration enforcement. *AADC II*, 525 U.S. at 497 (Ginsburg, J., concurring in part) (quoting *Bridges*, 326 U.S. at 148); *cf. Citizens United v. FEC*, 558 U.S. 310, 392–93 (2010) (Scalia, J., concurring) (noting that "the [First] Amendment is written in terms of 'speech,' not speakers").[7]

---

[7] To the extent the government implies that visa holders do not have any First Amendment rights even if lawful permanent residents have "some," Defs.' Br. 53, no court has drawn this constitutional distinction where the right to engage in pure political speech is concerned, and there is no basis for it.

31

Multiple courts of appeals have affirmed that noncitizens inside the United States are generally entitled to "the full panoply of First Amendment rights." *Am.-Arab Anti-Discrimination Comm. v. Reno* ("*AADC I*"), 70 F.3d 1045, 1063–66 (9th Cir. 1995); *Parcham v. INS*, 769 F.2d 1001, 1004 (4th Cir. 1985) ("It has long been held that aliens residing in this country enjoy the protection of the First Amendment."); *Ragbir*, 923 F.3d at 53, 58–59, 69–70 (holding that the First Amendment protects noncitizens who are threatened with deportation for their protected speech).[8]

The First Amendment cases that Defendants cite in defense of the Policy—*United States ex rel. Turner v. Williams*, 194 U.S. 279 (1904), and *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952)—predate the emergence of the modern First Amendment. *See* Defs.' Br. 52; Add.187–88. *Turner* was based on the "distinction between rights and privileges," Adam B. Cox, *The Invention of Immigration Exceptionalism*, 134 Yale L.J. 329, 363–64 n.122 (2024), a distinction that simply has no purchase in contemporary First Amendment jurisprudence, *id*. (citing *Wieman v. Updegraff*, 344 U.S. 183, 192 (1952)). *Turner* also involved the exclusion of a noncitizen not granted admission, rather than the deportation of someone previously allowed to enter. *See* 194 U.S. at 282–83; *cf. Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (noting "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law"). Similarly, when the Court upheld the deportation of Communist

---

[8] *Bluman v. FEC* is not to the contrary. *See* 800 F. Supp. 2d 281 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012). There, a district court panel upheld a law that prohibited noncitizens on work visas from donating to political candidates and parties, reasoning that the First Amendment did not preclude Congress from barring noncitizens from participating in activities "intimately related to the process of democratic self-government." *Id.* at 287–88. The court applied strict scrutiny, however, and emphasized that the constitutional analysis would be different if the law applied to lawful permanent residents, or if it restricted noncitizens from "issue advocacy and speaking out on issues of public policy," *id.* at 292, and it expressly cited *Bridges* for the proposition that "resident aliens [are] protected by the First Amendment in the context of deportation," *id.* at 286.

Party members in *Harisiades*, it applied then-prevailing First Amendment doctrine under which association with the Party was not protected, irrespective of citizenship. 342 U.S. at 592 (citing *Dennis v. United States*, 341 U.S. 494 (1951)); *see also AADC I*, 70 F.3d at 1064 (endorsing this interpretation of *Harisiades*); Add.187–88.

To affirm the district court's conclusion that the Policy violates the First Amendment, this Court need not delineate the outer limits of noncitizens' First Amendment rights. That is because it is beyond cavil that noncitizens have at least the First Amendment right to engage in core political speech and association and that this right holds even in the context of deportation. *See* Add.190–91; *Ragbir*, 923 F.3d at 69–73 (holding that the First Amendment protects noncitizens' right to engage in core political speech and finding that right threatened when noncitizens face deportation as a result of their protected speech).

Indeed, courts have made clear that the First Amendment's protection of pure political speech and association applies even when the government seeks to *exclude* a foreign citizen *not yet admitted* to the country—a context in which Congress's power is plenary, the only First Amendment rights at issue are those of U.S. listeners, and courts apply the "facially legitimate and bona fide" standard from *Mandel*. *See, e.g.*, *Abourezk v. Reagan*, 592 F. Supp. 880, 887 & n.23 (D.D.C. 1984) (stating that the government "may not, consistent with the First Amendment, deny entry solely on account of the content of speech"), *vacated and remanded on other grounds*, 785 F.2d 1043 (D.C. Cir. 1986); *Allende v. Shultz*, 605 F. Supp. 1220, 1225 (D. Mass. 1985); *Harvard L. Sch. F. v. Shultz*, 633 F. Supp. 525, 531 (D. Mass. 1986) ("[T]he Secretary's reason . . . is not facially legitimate [because it] is directly related to the suppression of a political debate with American citizens."), *vacated without opinion*, 852 F.2d 563 (1st Cir. 1986).

33

Defendants concede that their proposed construction of the First Amendment would "limit[]" the First Amendment rights of noncitizens, Defs.' Br. 53, but this concession dramatically understates the implications of their position. In fact, Defendants' construction of the First Amendment would nullify noncitizens' First Amendment rights altogether, because noncitizens could exercise those rights only by risking detention and deportation. *See Bridges*, 326 U.S. at 162 (Murphy, J., concurring) (explaining that such a construction "would make our constitutional safeguards transitory," because while "the Government would be precluded from enjoining or imprisoning an alien for exercising his freedom of speech," it "would be free, from a constitutional standpoint, to deport him for exercising that very same freedom"); *see also AADC I,* 70 F.3d at 1065–66 ("If aliens do not have First Amendment rights at deportation, then their First Amendment rights in other contexts are a nullity, because the omnipresent threat of deportation would permanently chill their expressive and associational activities."). In other words, creating a "deportation exception" to the First Amendment would swallow noncitizens' constitutional rights altogether, with dramatic implications not only for noncitizens but also for the citizens who have a right to hear what their noncitizen neighbors have to say. *See* Add.193; *see also Mandel,* 408 U.S. at 762–63 (stating, in addressing U.S. citizens' challenge to denial of visa to a foreign scholar, that "[i]t is now well established that the Constitution protects the right to receive information and ideas").

> **B.    The Policy is unconstitutional because it suppresses speech based on its viewpoint.**
>
> **1.    The Policy is subject to strict scrutiny because it discriminates on the basis of viewpoint.**

Because the Policy discriminates on the basis of viewpoint, it is "presumptively unconstitutional" and can survive only if it satisfies strict scrutiny. *Reed v. Town of Gilbert*, 576

34

U.S. 155, 163 (2015); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Defendants argue that the Policy should be reviewed under the more permissive standard the Supreme Court described in *Mandel* and *Dep't of State v. Muñoz*, 602 U.S. 899 (2024). Defs.' Br. 54. This is incorrect. That standard of review applies only in cases that concern the exclusion of noncitizens not yet admitted to the country.

In *Mandel*, U.S. citizens challenged the denial of a visa to Ernest Mandel, a Belgian Marxist who had been invited to speak at a U.S. conference. 408 U.S. at 756–57. The case "c[ame] down to [a] narrow issue": whether, because plaintiffs "wish[ed] to hear, speak, and debate with Mandel in person," the First Amendment "confer[red] upon [them] . . . the ability to determine that Mandel should be permitted to enter the country." *Id.* at 762. Reasoning that the authority Congress had delegated to the executive to make visa decisions would "become[] a nullity" if U.S. citizens could obtain court orders compelling noncitizens' admission, the Court determined that it would not "look behind" the executive's decision to exclude a particular noncitizen so long as there was a "facially legitimate and bona fide" reason. *Id.* at 768–70; *see also Muñoz*, 602 U.S. at 902 (addressing a challenge to the denial of a visa to enter the country).

The "facially legitimate and bona fide" standard does not apply to First Amendment claims asserted by noncitizens lawfully present inside the United States, because those individuals have already been admitted and have their own First Amendment rights to assert. Tellingly, Defendants do not cite any cases applying *Mandel* in a case like this one. They cite the Second Circuit's decision in *Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008), *see* Defs.' Br. 55–56, but that case did little more than apply the Supreme Court's decision in *AADC II*, which addressed a claim of selective enforcement, *see Rajah*, 544 F.3d at 438–39. In both *Rajah* and *AADC II*, the government had a lawful basis to deport the plaintiffs—a basis unrelated to constitutionally protected speech—

35

but the plaintiffs claimed that the government had chosen to use its enforcement authority because of their political views. *Rajah*, 544 F.3d at 438–39; *AADC II*, 525 U.S. at 490–91. Here, by contrast, Plaintiffs do not challenge the selective deportation of noncitizens who are deportable for reasons unrelated to speech. Rather, they challenge Defendants' claimed authority to arrest, detain, and deport noncitizens *on the basis of* their speech. Add.191. Plaintiffs' challenge to that claim of legal authority is subject to ordinary First Amendment analysis.

### 2. The Policy fails any standard of review.

Defendants do not contend that the Policy can survive ordinary First Amendment review, and plainly it cannot. Defendants simply have no interest, compelling or otherwise, in suppressing pro-Palestinian expression and association. *Cf. Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024). Indeed, the speech that the Policy targets—criticism of Israel's policies, criticism of our own government's policies relating to the Middle East, and advocacy for Palestinian rights—is public discourse "at the core of what the First Amendment is designed to protect." *Virginia v. Black*, 538 U.S. 343, 365 (2003); *see* Add.199–200 (referring to these activities as "pure political speech"); Add.34 n.17. Accordingly, the Policy "trenches upon an area in which the importance of First Amendment protections *is at its zenith*," *Ragbir*, 923 F.3d at 70 (quoting *Meyer v. Grant*, 486 U.S. 414, 421–22, 425 (1988)).[9]

The Policy would be unconstitutional even if *Mandel*'s standard of review applied. As noted above, courts have made clear that the First Amendment limits the government's authority

---

[9] The Policy is not narrowly tailored to any interest in combating discriminatory harassment, because, as the district court found (and Defendants do not contest), it conflates a broad swath of core political speech with conduct and speech that the First Amendment does not protect. *See* Add.199–200; Add.193 n.40 (noting that "a policy of intentionally targeting pro-Palestine and anti-Israel speech in order to chill it" would "fail strict scrutiny for want of being narrowly tailored to the invoked end of combating antisemitism").

to discriminate on the basis of viewpoint even in the context of excluding foreign citizens, where Congress's power is at its zenith. *See supra* p. 33 (citing *Abourezk*, 592 F. Supp. at 887 & n.23; *Allende*, 605 F. Supp. at 1225; *Harvard L. Sch. F.*, 633 F. Supp. at 531). As those courts recognized, it is not facially legitimate and bona fide within the meaning of *Mandel* for the government to exclude a noncitizen based solely on political viewpoint. That rationale is weaker still as a basis for deporting a noncitizen lawfully present.

Defendants' argument that the Policy is facially legitimate and bona fide because deportations under the Policy are "supported by statute," Defs.' Br. 56–57, suffers two flaws. First, it addresses the wrong question. Plaintiffs' challenge is to the Policy, not to any individual deportation under the Policy. If *Mandel* applies, then, the question is whether *the Policy* is facially legitimate and bona fide, not whether any individual deportation was. Given that the Policy is to target noncitizens based on their political viewpoints, it is facially illegitimate, irrespective of the way the Policy happens to be carried out in any particular case. Second, even if the proper question is whether individual deportations were facially legitimate and bona fide, they were not. Defendant's assertion that the deportations were "supported by statute" elides the basis on which they have invoked the relevant statutes. In each of the five exemplar cases, Defendants pointed to the noncitizens' pro-Palestinian expression as the legal justification for invoking either the foreign-policy provision, 8 U.S.C. § 1227(a)(4)(C), or the visa-revocation authority, 8 U.S.C. § 1201(i). *See supra* pp. 10–11 (describing Khalil and Öztürk). There is no need to "look behind" Defendants' individual removal decisions, Defs.' Br. 56–58, to establish that fact. In each of the five representative cases, the decisional documents themselves make clear on their face that Defendants acted based on viewpoint. *See, e.g.*, JA2161–65 (Khalil report of analysis), JA2197 (Khalil referral letter), JA2208 (Khalil action memo), JA1565 (Khalil Rubio determination).

Finally, the district court properly found that the Policy was motivated by a desire to chill speech. *See* Add.72–73, 169, 198–202. But Plaintiffs note that the Policy would be unconstitutional even absent censorial motive. *See Reed*, 576 U.S. at 165 (explaining that if a restriction is viewpoint-based, it "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech" (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993))).

### III.    Defendants' coercive threats independently violate the First Amendment.

The district court properly concluded that Defendants' public threats to arrest, detain, deport, and revoke the visas of noncitizens for their pro-Palestinian speech evidenced the existence of the Policy. Add.204. But the statements also independently violate the First Amendment, because they are part of a campaign of threats aimed at suppressing pro-Palestinian speech. Of course, the government is entitled to speak on matters of public concern, including in ways that might deter disfavored views. What it may not do, however, is use the "threat of invoking legal sanctions and other means of coercion" to "achieve the suppression" of protected speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963); *see also NRA v. Vullo*, 602 U.S. 175, 196–97 (2024). The record in this case overwhelmingly demonstrates that Defendants did just that. *See supra* pp. 11–12.

The district court rejected this conclusion based only on its view that Plaintiffs had not demonstrated that the threats were "targeted specifically at their members." Add.203–04. But there is no such requirement in the coercion caselaw, and imposing one would turn a blind eye to the most far-reaching threats. Just two years ago, the Supreme Court reaffirmed *Bantam*, holding that plaintiffs alleging coercion must demonstrate "conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or

suppress the plaintiff's speech." *Vullo*, 602 U.S. at 191. Defendants' statements here meet that test—whether or not they named Plaintiffs' members—because they threatened arrest, detention, and deportation of noncitizens who engaged in precisely the sort of pro-Palestinian advocacy in which Plaintiffs' noncitizen members engage. *See supra* pp. 11–14; *see also* Add.177. Respectfully, the district court's conclusion to the contrary was mistaken.

## IV.   The district court properly held that the Policy violates the APA.

The district court properly concluded that the Policy violates the APA because it is contrary to constitutional right, arbitrary and capricious, and exceeds statutory authority. Add.206–15. The only argument Defendants advance to the contrary—beyond the argument, addressed above, that the Policy does not violate the First Amendment—is that the district court failed to afford them an opportunity to rebut Plaintiffs' interpretation of the Mayorkas Memorandum. Defendants are wrong, as they could have offered their response in a supplemental brief, a motion to alter or amend the judgment, during the briefing on remedies, or during the hearing on remedies. *Cf. In re Jackson*, 988 F.3d 583, 594 (1st Cir. 2021) (rejecting similar argument concerning purportedly insufficient opportunity to respond to judicially noticeable material). But, in any event, the two-sentence rebuttal they offer now is unpersuasive.

The Mayorkas Memorandum, JA1551–57, memorialized a decision by DHS to "prioritize for apprehension and removal noncitizens who are a threat to our national security, public safety, and border security." JA1553. In giving effect to that decision, DHS stated that "a noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action." JA1555. The Policy is flatly inconsistent with this determination.

In claiming otherwise, Defendants now latch on to the memorandum's next sentence— "This guidance does not prohibit consideration of one or more of the above-mentioned factors if

they are directly relevant to status under immigration law or eligibility for an immigration benefit," *id.*—which they suggest limits the preceding one. But this interpretation is untenable. If speech is "directly relevant" whenever DHS chooses to rely on it, then the caveat would swallow the rule. Moreover, the sentence following the one that Defendants quote—"For example, religion or political beliefs are often directly relevant in asylum cases and need to be assessed in determining a case's merit," *id.*—makes clear that the caveat is a narrow one. It is meant to ensure that the prohibition on considering political and religious beliefs does not prevent the consideration of, for example, valid asylum claims. In any event, the district court properly found that, even ignoring the Mayorkas Memorandum, Defendants had "reverse[d] course . . . on the way the relevant statutes had been enforced in the past, without explanation." Add.211–12; *see, e.g.*, JA2209 ("We are not aware of any prior exercises of the Secretary's removal authority in INA section 237(a)(4)(C) . . . .").

This course of decision-making was arbitrary and capricious. "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *FCC v. Fox Television Studios*, 556 U.S. 502, 515 (2009) (emphasis in original). Here, Defendants have offered *no* explanation in support of the Policy; nor have they expressed awareness of a change in policy, even though their statements and actions make such a change clear. *See* Add.207 ("[The Policy] represents an unexplained reversal of the agencies' position . . . ."). Worse still, Defendants have expressed conflicting positions about the status of the 2021 policy before the district court and now on appeal,[10] and they have failed to

---

[10] Before the district court, Defendants equivocated about whether the 2021 policy had been rescinded. *See* Dist. Ct. Dkt. 293 at 16 (arguing that "it is for the agency to decide on remand . . . whether ICE rescinded its 2021 policy"). On appeal, Defendants imply that the 2021 policy is still operative and, indeed, consistent with the Policy. *See* Defs.' Br. 58–59.

articulate any legitimate interest in suppressing the broad category of pro-Palestinian expression targeted by the Policy. The Policy is therefore neither "reasonable" nor "reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

## V.     Injunctive relief against the Policy is warranted.

As relief for the First Amendment and APA violations found by the district court, Plaintiffs sought declaratory relief; a "set aside" of the Policy under the APA, *see* 5 U.S.C. § 706(2); and an injunction forbidding Defendants from implementing the Policy or threatening to implement it. *See* Dist. Ct. Dkt. 277, 277-1. The district court properly granted the first two forms of relief, Add.231–32, and Defendants do not contest those grants of relief (except in the ways addressed above). But the district court denied Plaintiffs' request for an injunction and instead imposed a "remedial sanction" designed to allow Plaintiffs' noncitizen members to challenge retaliatory changes to their immigration status. Add.232–36. As Plaintiffs explain below, the sanction remedy is not an adequate substitute for the injunctive relief that Plaintiffs requested.

### A.  Injunctive relief is necessary to fully remedy Plaintiffs' injuries.

The Court may order permanent injunctive relief where: "(1) the plaintiff has prevailed on the merits, (2) the plaintiff would suffer irreparable injury in the absence of injunctive relief, (3) the harm to the plaintiff would outweigh the harm to the defendants from an injunction, and (4) the injunction would not adversely affect the public interest." *Joyce v. Town of Dennis*, 720 F.3d 12, 25 (1st Cir. 2013). These requirements are easily met here.

As explained above, Plaintiffs have prevailed on the merits of their First Amendment and APA challenges to the Policy (and should have prevailed on their First Amendment challenge to Defendants' campaign of coercive threats). Plaintiffs have also demonstrated that they will suffer irreparable harm absent injunctive relief. As this Court has recognized, in deciding whether to

41

grant a permanent injunction, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Asociación de Educación Privada de Puerto Rico, Inc. v. García-Padilla*, 490 F.3d 1, 21 (1st Cir. 2007) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). Plaintiffs established, and the district court fully credited, the far-reaching and ongoing chill caused by the Policy and the threats to enforce it. *See supra* Part I.A.1; Add.180–81, 215. The balance of equities and public interest also strongly favor injunctive relief. These factors "merge when the government is the opposing party." *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)) (cleaned up). The requested injunctive relief would promote the public interest because the Policy intentionally chills lawful expression, because it lacks even a facially legitimate or bona fide purpose, *see supra* Part II.B.2; Add.189–90, 193, and because "[p]rotecting rights to free speech is *ipso facto* in the interest of the general public." *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 128 (D. Mass. 2003); *accord Young v. Town of Conway*, 783 F. Supp. 3d 588, 612 (D.N.H. 2025).

The declaratory and APA relief ordered by the district court are insufficient to fully remedy the chill caused by the Policy and Defendants' threats to enforce it, particularly given Defendants' exceedingly narrow interpretation of the scope of that relief. From the beginning, Defendants have insisted that there is no Policy at all, and that they are merely relying on *existing* statutory authority to advance the President's agenda. *See* Defs.' Br. 31–32; Dist. Ct. Dkt. 255 at 1–2, 59–60, 90–92, 130–31; Dist. Ct. Dkt. 65 at 3, 10. On Defendants' theory, then, the relief ordered by the district court has *no effect at all* on their ability to continue the conduct that Plaintiffs challenged. Injunctive relief will help ensure that Defendants cannot simply sidestep the declaratory and APA relief. *Cf. Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 109 (D.D.C. 2025) (granting injunction where "Defendants have themselves expressed doubt that an

42

order merely setting aside the guidance would be effective"), *aff'd sub nom.*, *Refugee & Immigrant Ctr. for Educ. & Legal Servs.* ("*RAICES*") *v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026); *New York v. DOC*, 351 F. Supp. 3d 502, 676 (S.D.N.Y. 2019) (same where vacatur did not alleviate risk that Secretary would "arriv[e] at the same decision *without* curing the problems identified in [the court's] opinion"), *aff'd in part, rev'd in part and remanded sub nom.*, *DOC v. New York*, 588 U.S. 752 (2019); *President & Fellows of Harvard Coll. v. HHS*, 798 F. Supp. 3d 77, 136 (D. Mass. 2025) (granting injunction in addition to vacatur to prevent defendants from "reimposing any unconstitutional conditions imposed to date"); *see also Massachusetts v. NIH*, 164 F.4th 1, 6 (1st Cir. 2026) (affirming district court's grant of injunction in addition to APA vacatur).

The district court's sanctions remedy is not an adequate substitute for injunctive relief because it offers, at most, only after-the-fact relief. Even assuming members targeted by the government can seek relief in district court through a "sanction action," they will almost certainly languish in detention for weeks, if not months, while courts consider jurisdictional arguments and questions about the import and propriety of the sanctions remedy. *See* Defs.' Br. 60–62 (arguing that the INA strips jurisdiction over such cases); *see also* Dist. Ct. Dkt. 330 at 27 ("This Court's Sanction is, of course, non-binding on other federal district courts and they are free to disregard it."). So long as members continue to face a real prospect of prolonged detention for their protected speech, they will be chilled from engaging in that speech. *See* Add.107–10, 143–47, 176–80*; see also* Dist. Ct. Dkt. 330 at 17.

**B.     The requested relief is not barred by 8 U.S.C. § 1252(f)(1).**

In the district court, Defendants asserted that an injunction against the Policy would violate the limits on relief imposed by 8 U.S.C. § 1252(f)(1). *See* Dist. Ct. Dkt. 309 at 7; Dist. Ct. Dkt. 293 at 2–3. That provision forbids courts other than the Supreme Court from "enjoin[ing] or

restrain[ing] the operation of the provisions of part IV of [the INA], as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 [(the "IIRIRA")]." 8 U.S.C. § 1252(f)(1). But it does not foreclose the injunctive relief Plaintiffs seek for two reasons.

First, § 1252(f)(1) does not bar an injunction against *the Policy*. The Supreme Court has emphasized that the scope of § 1252(f)(1) is "narrow[]," *Biden v. Texas*, 597 U.S. 785, 798 (2022), holding that it prohibits only "injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" covered provisions of the INA, *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022). An injunction against the Policy would not prohibit Defendants from carrying out any covered provision, only from carrying out the Policy—that is, "implement[ing] *Executive Orders 14161 and 14188* in a viewpoint-discriminatory way." Add.169 (fixing typo). The Executive Orders were not expressly issued pursuant to any covered provision, nor do they cite any such provision. While an injunction against the Policy could have *downstream* effects on Defendants' operation of covered provisions, the Supreme Court strongly suggested when first construing § 1252(f)(1) that "a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision." *Aleman Gonzalez*, 596 U.S. at 553 n.4 (emphasis in original). Since then, several courts of appeals have confirmed that injunctions that have "indirect, collateral effects [on covered provisions] do not run afoul of § 1252(f)(1)." *Castañon-Nava v. DHS*, 175 F.4th 828, 838–39 (7th Cir. 2026); *accord RAICES*, 174 F.4th at 118 (rejecting argument that injunction against implementing presidential proclamation is barred merely "because it could have the indirect effect of compelling the Executive to adhere to" covered provisions); *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1125–26 (9th Cir. 2025),

44

*rev'd and remanded on other grounds sub nom.*, *Mullin v. Al Otro Lado*, 146 S. Ct. 2079 (2026); *Texas v. DHS*, 123 F.4th 186, 209–10 (5th Cir. 2024).

Second, even if § 1252(f)(1) barred an injunction against the Policy, it would not prevent the Court from enjoining Defendants from: (1) revoking the visas of noncitizens under § 1201(i) or charging them with removability under either § 1227(a)(1)(B) (to the extent the basis for doing so is a visa revocation under § 1201(i)) or § 1227(a)(4)(B) (to the extent the basis for doing so is the endorse or espouse provisions); and (2) *threatening* to revoke the visas or green cards of noncitizens, or to arrest, detain, and deport them, on the basis of constitutionally protected speech or association. *See* Dist. Ct. Dkt. 277-1 at 7. This is because the plain text of § 1252(f)(1) applies only to provisions contained in "part IV of [the INA], as amended by the [IIRIRA]," 8 U.S.C. § 1252(f)(1), and none of the provisions just mentioned are contained in part IV. Defendants' authority to revoke visas lies in § 1201(i), which is in Part III of the INA, and the cross-reference to it in § 1227(a)(1)(B)—the provision authorizing deportation based on the revocation of an individual's visa—was added *after* § 1252(f)(1)'s enactment, so cannot be covered by it. *See* Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108–458, § 5304(b), 118 Stat 3638, 3736 (2004); *Galvez v. Jaddou*, 52 F.4th 821, 830–31 (9th Cir. 2022) (holding that § 1252(f)(1) does not cover provisions enacted after its passage). The same is true for the endorse or espouse provisions, which were enacted in 2005. *See* Emergency Supplemental Appropriations Act for Defense, The Global War on Terror, and Tsunami Relief, 2005, Pub. L. No. 109–13, § 103, 119 Stat 231, 307 (2005). And, of course, an injunction against Defendants' threats would have no effect on the operation of any covered provisions.[11]

---

[11] Should this Court hold that any of Plaintiffs' requested injunctive relief is barred by § 1252(f)(1), Plaintiffs will ask the Supreme Court to award it and hereby preserve their right to do so. *See Biden v. Texas*, 597 U.S. at 799.

45

### C.    The requested relief is consistent with *Trump v. CASA*.

The injunction that Plaintiffs seek would forbid Defendants from enforcing the Policy against *anyone*. In the district court, Defendants objected to the scope of that relief based on the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Dist. Ct. Dkt. 293 at 4–6. But under *CASA*, district courts retain their traditional equitable authority to craft injunctions that are necessary to provide plaintiffs "complete relief." 606 U.S. at 851; *see also Doe v. Trump*, 157 F.4th 36, 80–81 (1st Cir. 2025), *cert. denied*, No. 25-899, 2026 WL 1871309 (June 30, 2026). And here, broad injunctive relief is necessary, for several reasons, to provide Plaintiffs and their members complete relief.

First, limiting relief to Plaintiffs' noncitizen members would not remedy—and indeed it would only *exacerbate*—the chill on those members. To give effect to limited injunctive relief, Plaintiffs would have to identify their noncitizen members to the government. But few would be willing to be identified, especially given Defendants' continued threats to deport noncitizens based on their speech, *see supra* pp. 11–12, and Plaintiffs should not have to forfeit the confidentiality of their membership lists to receive meaningful relief. *Cf. Make the Rd. N.Y. v. Noem*, 2025 WL 2576701, at *2 (D.D.C. Sep. 5, 2025) (declining to limit relief to the plaintiffs' members where doing so would "put[] those members at risk of 'retaliation'"); *Vasquez Perdomo v. Noem*, 148 F.4th 656, 687 (9th Cir. 2025) (rejecting a "list-of-protected-people injunction" because disclosure of membership lists implicated "constitutional problems regarding the freedom of association and privacy"), *stayed mem.*, 146 S. Ct. 1 (2025); *see also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021). Even members who would be willing to be identified would be unlikely to take comfort in an injunction

46

tied to their membership status, because Plaintiffs' membership is constantly shifting. *See* JA1417:20–23 (describing the AAUP's membership); JA1972–73 (same for MESA).

Second, narrow relief focused only on Plaintiffs' members would be unworkable because Plaintiffs have a constantly changing list of over 50,000 members around the country. JA1439:24–JA1440:4, 1418:24–25 (AAUP); JA2007 (MESA). To have any chance of providing relief, a limited injunction would require Plaintiffs to track the immigration status of their members (which they do not have, JA1440:5–17) and provide Defendants with a continuously updating roster of their noncitizen members. *Cf. Doe v. Trump*, 157 F.4th at 82 (affirming injunction where government did not demonstrate that narrower relief would not "impos[e] material administrative or financial burdens on the plaintiffs"); *Washington v. Trump*, 145 F.4th 1013, 1039 (9th Cir. 2025) (similar). At best, this would be a logistical nightmare all but guaranteeing that Defendants would inadvertently fail to comply with the Court's injunction. *See Easyriders Freedom FIGHT v. Hannigan*, 92 F.3d 1486, 1501–02 (9th Cir. 1996) (enjoining agency's actions against "all motorcyclists" where agency was unlikely to determine whether a motorcyclist was a named plaintiff *before* citing them).

Third, narrower relief would undermine the "very national consistency" that immigration laws are "designed to protect." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326–27 (4th Cir. 2021); *see also Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015), *as revised* (Nov. 25, 2015). It would create a patchwork system where two faculty teaching in the *same* department of the *same* university would fare differently based only on their membership, or lack thereof, in the plaintiff organizations. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021).

Finally, even if this Court rejects a broad injunction, it should at the very least order an injunction that encompasses all noncitizen students and faculty, because Plaintiffs' injuries are

47

impossible to "peel off" from the rest of the academic community. *CASA*, 606 U.S. at 851–52; *see also id.* at 865 (Thomas, J., concurring). The Policy forces noncitizens, including Plaintiffs' noncitizen members, into silence, thus depriving all of Plaintiffs' members of the insights and engagement of their noncitizen colleagues and students. In doing so, it also harms Plaintiffs' ability to pursue their missions of fostering intellectual exchange and of engaging all interested scholars and students in their work and in their events. *See supra* Part I.A.2. To fully remedy these harms, the Court must at the very least issue relief that preserves the integrity of discourse in the academic communities in which Plaintiffs' members research, teach, and debate. *Cf. Barnette v. W. Va. State Bd. of Educ.*, 47 F. Supp. 251, 255 (S.D.W. Va. 1942) (enjoining flag salute law "in so far as it applies to children having conscientious scruples against giving such salute," not just children of plaintiffs), *aff'd*, 319 U.S. 624 (1943); *New Jersey v. Trump*, 800 F. Supp. 3d 180, 189 (D. Mass.) (concluding that "patchwork" injunction would "chill enrollment in critical programs"), *aff'd in part sub nom.*, *Doe v. Trump*, 157 F.4th 36 (1st Cir. 2025).

## Conclusion

The Court should affirm the district court's grant of declaratory relief and vacatur under the APA and reverse the district court to the extent it denied Plaintiffs' request for injunctive relief.

August 5, 2026                                             Respectfully submitted,

Edwina Clarke                                             /s/ *Ramya Krishnan*
David Zimmer                                              Ramya Krishnan
Zimmer, Citron & Clarke, LLP                             Xiangnong (George) Wang
130 Bishop Allen Drive                                   Stephany Kim
Cambridge, MA 02139                                      Raya Koreh
(617) 676-9423                                           Carrie DeCell
edwina@zimmercitronclarke.com                            Scott Wilkens
                                                         Alex Abdo
Noam Biale                                               Jameel Jaffer
Michael Tremonte                                         Knight First Amendment Institute at
Alexandra Conlon                                              Columbia University
Courtney Gans                                            475 Riverside Drive, Suite 302

Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2603
mtremonte@shertremonte.com
nbiale@shertremonte.com

New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Ahilan T. Arulanantham (SBN 237841)
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu

*Counsel for Plaintiffs-Appellees/Cross-
    Appellants*

**Certificate of Compliance**

This brief complies with the type-volume limit of the Court of Appeals for the First Circuit Local Rule 28.1(e)(2)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 15,286 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: August 5, 2026                                    */s/ Ramya Krishnan*
                                                        Ramya Krishnan

**Certificate of Service**

I, the undersigned counsel, certify that on August 5, 2026, I electronically filed the foregoing response in the United States Court of Appeals for the First Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: August 5, 2026

/s/ *Ramya Krishnan*

Ramya Krishnan

51