**Nos. 26-1141 & 26-1195**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS – HARVARD FACULTY CHAPTER; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY; RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS; MIDDLE EAST STUDIES ASSOCIATION,

*Plaintiffs-Appellees / Cross-Appellants,*

v.

MARCO RUBIO, in the official capacity as Secretary of State; U.S. DEPARTMENT OF STATE; MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, in the official capacity as Acting Director of U.S. Immigration and Customs Enforcement; DONALD J. TRUMP, in the official capacity as President of the United States; UNITED STATES,

*Defendants-Appellants / Cross-Appellees.*

On appeal from the United States District Court
for the District of Massachusetts — No. 1:25-CV-10685 (Young, J.)

**BRIEF OF AMICI CURIAE HISTORIANS JULIA ROSE KRAUT, SAM LEBOVIC, AND ELLEN SCHRECKER IN SUPPORT OF PLAINTIFFS-APPELLEES / CROSS-APPELLANTS AND AFFIRMANCE**

Rachel Levinson-Waldman
Leah J. Tulin
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001
(202) 249-7193
levinsonr@brennan.law.nyu.edu
tulinl@brennan.law.nyu.edu

Laura R. Handman (No. 1102627)
*Counsel of Record*
Azeezat Adeleke (No. 1225416)
DAVIS WRIGHT TREMAINE LLP
1301 K St. NW, Suite 500E
Washington, D.C. 20005
(202) 973-4224
laurahandman@dwt.com
azeezatadeleke@dwt.com

Neema Jyothiprakash
MCDERMOTT WILL & SCHULTE LLP
919 Third Avenue
New York, NY 10022
njyothiprakash@mcdermottlaw.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS


Page

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE .................1

INTRODUCTION ..........................................................................................2

ARGUMENT ..................................................................................................4

I. During the First Red Scare, the Government Punished Radicals, Anti-War Activists, Labor Agitators, and Immigrants ..........................................5

A. The "War on Anarchy" Set the Stage for the First Red Scare ...................6

B. Before and During the First Red Scare, the Government Targeted Workers, Socialists, Dissenters, Immigrants, and Teachers .................7

C. Scholars Pushed Back and Dissenting Voices on the Federal Courts Laid the Groundwork for Future Protection of Speech ...............................12

II. The Second Red Scare Ushered in Another Period of Repression ...............14

A. A Wartime Alliance Between the United States and the Soviet Union Delayed—but Did Not Ultimately Prevent—the Second Red Scare..15

B. The Government Targeted Federal Workers, Left-Wing Groups and Academics, and Noncitizens in Its Anti-Communist Crusade............17

C. Years Later, the Nation Came to Understand the Second Red Scare as a Stain on Our History .......................................................................22

III. The District Court Correctly Recognized That the Government's Conduct Echoes Prior Episodes of Political Repression ...............................24

CONCLUSION ..............................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abrams v. United States*
250 U.S. 616 (1919)....12, 23, 27

*Baggett v. Bullitt*
377 U.S. 360 (1964)....22

*Barenblatt v. United States*
360 U.S. 109 (1959)....22, 27

*Brandenburg v. Ohio*
395 U.S. 444 (1969)....23

*Bridges v. Wixon*
326 U.S. 135 (1945)....15, 16, 25

*Connick v. Myers*
461 U.S. 138 (1983)....28

*Counterman v. Colorado*
600 U.S. 66 (2023)....23

*De Jonge v. Oregon*
299 U.S. 353 (1937)....14

*Debs v. United States*
249 U.S. 211 (1919)....13

*Dennis v. United States*
341 U.S. 494 (1951)....16, 21, 28

*Fiske v. Kansas*
274 U.S. 380 (1927)....14

*Gastelum-Quinones v. Kennedy*
374 U.S. 469 (1963)....24

**TABLE OF AUTHORITIES**
**(Continued)**


**Page(s)**

*Gitlow v. New York*
268 U.S. 652 (1925)....12, 13, 23, 27

*Harisiades v. Shaughnessy*
342 U.S. 580 (1952)....21

*Mahdawi v. Trump*
136 F.4th 443 (2d Cir. 2025)....28

*Mahdawi v. Trump*
781 F. Supp. 3d 214 (D. Vt. 2025)....27

*Öztürk v. Trump*
779 F. Supp. 3d 462 (D. Vt. 2025)....28

*Rowoldt v. Perfetto*
355 U.S. 115 (1957)....24

*Scales v. United States*
367 U.S. 203 (1961)....22, 27

*Schneiderman v. United States*
320 U.S. 118 (1943)....15

*Service v. Dulles*
354 U.S. 363 (1957)....22

*Sweezy v. New Hampshire*
354 U.S. 234 (1957)....22

*United States ex rel. Knauff v. Shaughnessy*
338 U.S. 537 (1950)....20

*United States ex rel. Turner v. Williams*
194 U.S. 279 (1904)....7

*United States v. Verdugo-Urquidez*
494 U.S. 259 (1990)....25

*United States v. Witkovich*
353 U.S. 194 (1957)....24

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Watkins v. United States*
354 U.S. 178 (1957)....................22

*Yates v. United States*
354 U.S. 298 (1957)....................21, 22

**Federal Statutes**

Pub. L. No. 82-414, 66 Stat. 163 ....................20

**Regulations**

Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 30, 2025)....................2

Exec. Order No. 14188, 90 Fed. Reg. 8847 (Feb. 3, 2025)....................2

**Constitutional Provisions**

U.S. Const. amend. I ....................*passim*

**Other Authorities**

David M. Rabban, *Academic Freedom: From Professional Norm to First Amendment Right* (2024) ....................24

David M. Rabban, *The Emergence of Modern First Amendment Doctrine*, 50 U. Chi. L. Rev. 1205 (1983) ....................22

Edward A. Shils, *America's Paper Curtain*, 8 Bull. Atomic Scis. 210 (1952) ....................21

Ellen Schrecker, *Immigration and Internal Security: Political Deportations During the McCarthy Era*, 60 Sci. & Soc'y 393 (1996)....................4, 19

Ellen Schrecker, *Many Are the Crimes: McCarthyism in America* (1998) ....................15, 16, 18, 20

Ellen Schrecker, *McCarthyism: Political Repression and the Fear of Communism*, 71 Soc. Rsch. 1041 (2004)....................17, 18

Ellen Schrecker, *Worse Than McCarthyism: Universities in the Age of Trump*, The Nation (Apr. 3, 2025), https://www.thenation.com/article/society/mccarthyism-universities-trump-attacks/....................19

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**


Julia Rose Kraut, *Global Anti-Anarchism: The Origins of Ideological Deportation and the Suppression of Expression*, 19 Ind. J. Glob. Legal Stud. 169 (2012)..6, 7

Julia Rose Kraut, *Threat of Dissent: A History of Ideological Exclusion and Deportation in the United States* (2020) ................................................*passim*

Julia Rose Kraut & Tyler McBrien, *The Trump Admin's Embrace of Ideological Exclusion and Deportation*, Lawfare (July 29, 2025), https://perma.cc/P8GB-6QSC ..........................................................................................26

Kenyon Zimmer, *The Voyage of the* Buford*: Political Deportations and the Making and Unmaking of America's First Red Scare* in *Deportation in the Americas: Histories of Exclusion and Resistance* (Zimmer & Salinas eds., 2018) ..........................................................................................9

Landon R.Y. Storrs, *The Second Red Scare and the Unmaking of the New Deal Left* (2012)..........................................................................................17

Lauren Said-Moorhouse & Ryan Browne, *Donald Trump wants 'extreme vetting' of immigrants*, CNN (Aug. 16, 2016), https://www.cnn.com/2016/08/16/politics/how-us-vets-immigrants-donald-trump-extreme-vetting ......................................................................24

Marc Lendler, Gitlow v. New York: *Every Idea an Incitement* (2012) ..................13

Mitchell C. Tilner, *Ideological Exclusion of Aliens: The Evolution of a Policy*, 2 Geo. Immigr. L.J. 1 (1987) ..........................................................................4

Peter Conolly-Smith, *"Reading Between the Lines": The Bureau of Investigation, the United States Post Office, and Domestic Surveillance During World War I*, 36 Soc. Just. 7 (2009)..........................................................................8

Robert K. Murray, *Red Scare: A Study in National Hysteria, 1919–1920* (1955)....8

Robert Tait, *Trump revives old tropes as he pushes warnings of 'communist menace,'* The Guardian (July 26, 2026), https://perma.cc/2FW6-NRQR ..........24

Sam Lebovic, *Do Americans Have a Right to Know About the World?*, Knight First Amend. Inst. (Feb. 10, 2025), https://perma.cc/KYJ9-UGZQ ..........................21

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

Sam Lebovic, *How the Visa Became America's Favorite Censorship Tool*, Bloomberg (Sept. 26, 2025), https://www.bloomberg.com/news/features/2025-09-26/how-the-visa-became-the-trump-administration-s-favorite-censorship-tool ....7

Timothy Reese Cain, *"Silence and Cowardice" at the University of Michigan: World War I and the Pursuit of Un-American Faculty*, 51 Hist. of Ed. Q. 296 (2011) ....10, 11

William O. Douglas, *"The Black Silence of Fear,"* N.Y. Times (Jan. 13, 1952) ....19

Zechariah Chafee, Jr., *Freedom of Speech in Wartime*, 32 Harv. L. Rev. 932 (1919) ....12

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE[1,2]

**Ellen Schrecker** is a historian who has spent decades researching and writing about social movements, political repression, and free expression in higher education, with a focus on McCarthyism. She is a retired professor of American History at Yeshiva University. Her books include *Many Are the Crimes: McCarthyism in America*, *No Ivory Tower: McCarthyism and the Universities*, and *The Lost Promise: American Universities in the 1960s*.

**Julia Rose Kraut** is a legal historian who specializes in immigration and First Amendment law and history. She is the Director of Programs, Education, and Research at the Historical Society of the New York Courts. She is the author of *Threat of Dissent: A History of Ideological Exclusion and Deportation in the United States*, in addition to various articles and book chapters.

**Sam Lebovic** is a historian of free speech and the democratic public sphere. He is a Professor at George Mason University where his research and teaching focus on U.S. politics, media, civil liberties, and foreign relations. His books include *Free*

[1] Amici certify that no party's counsel authored this brief in whole or in part, and no person or entity other than amici and their counsel contributed money intended to fund the preparation or submission of this brief. The parties have consented to the filing of this brief.

[2] Institutional and organizational affiliations are provided for identification only. The views expressed in this brief are those of the individual amici and do not reflect the views of the institutions or organizations with which they are affiliated.

*Speech and Unfree News* and *A Righteous Smokescreen: Postwar America and the Politics of Cultural Globalization*.

## INTRODUCTION

Amici write to elaborate on the parallels between historical examples of political repression in the United States and the present moment, including the government's challenged policy of arresting, detaining, and threatening to deport noncitizens for their political speech. *See* Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 30, 2025); Exec. Order No. 14188, 90 Fed. Reg. 8847 (Feb. 3, 2025). Today, it is a bedrock principle that the First Amendment prohibits the government from targeting speech based on viewpoint, and both courts and the public recognize the right to free speech as fundamental to democracy. Our history, however, contains episodes in which government actors took advantage of a narrower understanding of the First Amendment to suppress free expression and association in response to perceived national security threats. In those times, the government targeted people because of their unpopular ideas or political viewpoints and associations and excluded and even deported individuals on ideological grounds—just as it tries to do now. The effect was to chill the speech and activities of those in the government's crosshairs, along with individuals merely associated with causes the government labeled subversive. With the benefit of hindsight, those periods are now understood as stains on American history. Despite substantial developments in First Amendment

jurisprudence, Defendants rely on outdated understandings of free speech rights. As amici's brief shows, courts have repudiated the framework that permitted ideological suppression during earlier periods.

As historians, amici are uniquely attuned to cycles of repression and progress. Amici's brief first provides an overview of historical periods of political repression in the United States, seeking to help the Court understand how governmental efforts to suppress political activity undermine the freedoms the First Amendment was designed to protect. Crackdowns on expression—including arrests and deportations—chilled free expression and association for generations of political organizers, activists, federal employees, academics, and citizens.

In those repressive periods, dissenting voices on the Supreme Court articulated speech-protective principles, while the majority deferred to executive and legislative priorities driven by national security concerns or perceived threats to domestic safety and order. Eventually, First Amendment doctrine evolved to establish that the government could not punish advocacy, even of illegal conduct, without a direct nexus to imminent unlawful action. But while courts ultimately fashioned jurisprudence that promoted modern free speech values, the path was uneven. Many protective interventions took place long after periods of repression and could not undo the harm they caused.

The government repeats the mistakes of the past. Amici urge this Court to take heed of the damage that was done through governmental excesses, the judicial opinions that ultimately enforced the promises of the First Amendment, and the voices in American society that attempted to sound the alarm. The time to do so is now, before the government's latest attempt at widescale repression is legitimized.

## ARGUMENT

Government targeting of disfavored ideologies and expressions of dissent has a long and ignominious history. From the repressive Alien and Sedition Acts[3] of the late 18th century to the crackdown on anarchists in the late 19th and early 20th centuries and through the periods in the 20th century known as the First and Second Red Scares, citizens and noncitizens have been targeted for their connections to unpopular ideas or political viewpoints. Indeed, noncitizens "serve as canaries in a coal mine; increased pressures on foreign-born Americans are a good sign that further repression may follow." Ellen Schrecker, *Immigration and Internal Security: Political Deportations During the McCarthy Era*, 60 Sci. & Soc'y 393, 394 (1996).

[3] The Alien Friends Act of 1798 authorized the President to expel "all such *aliens* as he shall judge dangerous to the peace and safety of the United States," and the Sedition Act of 1798 criminalized "scandalous and malicious" writings against the federal government. Mitchell C. Tilner, *Ideological Exclusion of Aliens: The Evolution of a Policy*, 2 Geo. Immigr. L.J. 1, 11 & n.56 (1987). The Alien Friends Act, which comprised one of the four Acts passed in 1798, "formally cast the stigma of subversiveness upon the alien and opened channels through which a large part of the xenophobia of the late nineteenth and twentieth centuries would flow." *Id.* at 12 (internal quotation marks omitted).

The government's efforts led to repression and self-censorship, and the judicial branch contributed to making those historical periods a low point for free expression. Among other things, the Supreme Court approved arrests for merely distributing socialist and communist leaflets. As amici highlight, the Supreme Court later course-corrected—and embraced the values that had been confined to dissenting opinions—by requiring the government to show a link to unlawful conduct.

The government's actions during periods of political repression also narrowed the scope of political conversation, silencing voices that should have been included in the freewheeling political debate that is essential to American democracy. To be sure, some individuals targeted by the government in past periods engaged in acts of violence, and amici do not dispute that speech intended and likely to incite violence falls outside First Amendment protection. But that does not give the government license to target people for expressing unpopular ideas, engaging in dissent, or associating with disfavored causes. As the district court recognized, the government policy challenged in this case mirrors—and in some ways even surpasses—historical efforts to suppress political dissent in violation of the First Amendment.

## I. During the First Red Scare, the Government Punished Radicals, Anti-War Activists, Labor Agitators, and Immigrants

In the early 20th century, in response to perceived foreign ideological threats, the government targeted left-wing individuals—especially immigrants—through speech suppression, arrests, and deportations. Many states passed laws targeting

political dissidents and those on the far left, who were often designated as political "radicals." Courts generally upheld those laws. But early civil liberties advocates and dissenting judges began challenging these ideological crackdowns. Their efforts laid the groundwork for an eventual shift toward greater constitutional protections for free speech and association.

### A. The "War on Anarchy" Set the Stage for the First Red Scare

In 1901, a self-identified anarchist, the American-born son of immigrants, assassinated President McKinley. In response, the federal government and several states entered the "War on Anarchy" that had been launched in Europe. The government went far beyond punishing violence, targeting those who simply believed in or espoused the ideology of anarchism—without promoting violence—through restrictive laws and speech suppression. *See* Julia Rose Kraut, *Global Anti-Anarchism: The Origins of Ideological Deportation and the Suppression of Expression*, 19 Ind. J. Glob. Legal Stud. 169, 170–78 (2012) [hereinafter *Global Anti-Anarchism*]; *see also* Julia Rose Kraut, *Threat of Dissent: A History of Ideological Exclusion and Deportation in the United States* 45–46 (2020) [hereinafter *Threat of Dissent*].

Although President McKinley's assassin was a citizen, the government and the public largely blamed immigrants for anarchist violence. The state sought to control perceived ideological threats by restricting who could enter and stay in the

country. *See Global Anti-Anarchism*, *supra*, at 179–82 (describing ideological barriers to entry within 1903 Alien Immigration Act); Sam Lebovic, *How the Visa Became America's Favorite Censorship Tool*, Bloomberg (Sept. 26, 2025), https://www.bloomberg.com/news/features/2025-09-26/how-the-visa-became-the-trump-administration-s-favorite-censorship-tool. It was in this context that the Supreme Court decided *United States ex rel. Turner v. Williams*, 194 U.S. 279 (1904), upholding the 1903 Alien Immigration Act as constitutional and paving the way for more ideological exclusions and deportations.

Notably, the Free Speech League, an ACLU predecessor, fought the prosecution of anarchists, while newspapers decried the new "national hysteria." *Global Anti-Anarchism*, *supra*, at 177–78, 188; *see id.* at 182–89. Nevertheless, courts upheld these repressive measures until well after the First Red Scare. *See Threat of Dissent*, *supra*, at 45, 54–56, 61–62; *see also infra* Part I.C.

### B. Before and During the First Red Scare, the Government Targeted Workers, Socialists, Dissenters, Immigrants, and Teachers

Although the era known as the First Red Scare began in 1919, the groundwork was laid in 1917, when the government initiated a coordinated campaign of repression against groups with left-wing political beliefs and associations. As with the War on Anarchy, the government justified this repression by citing perceived foreign threats—opposition to U.S. mobilization in World War I, the 1917 Russian

Revolution, the subsequent Russian Civil War, and a wave of labor unrest. *See* Robert K. Murray, *Red Scare: A Study in National Hysteria, 1919–1920* at 15–17 (1955).

President Wilson blamed labor agitation on foreigners, whom he characterized as primarily responsible for radicalism. *Threat of Dissent*, *supra*, at 63–64. And soon after the United States entered the war in April 1917, the crackdown on labor organizers and socialists intensified. Local and federal law enforcement raided Industrial Workers of the World (IWW) offices across the country, confiscated written materials, and arrested most of the organization's leaders. Murray, *supra*, at 30–31. Soldiers and mobs raided Socialist Party headquarters, the postal service denied mailing privileges to many Socialist publications, and roughly 2,000 people—including Eugene Debs, the Socialist Party candidate for President—were indicted under the Espionage Act. Scores who faced charges were critical of the war but not accused of spying or sabotage. *See id.* at 20, 25–26; Peter Conolly-Smith, *"Reading Between the Lines": The Bureau of Investigation, the United States Post Office, and Domestic Surveillance During World War I*, 36 Soc. Just. 7, 16, 22 n.17 (2009) (citations omitted).

Federal and state governments also cracked down on opponents of the war by restricting speech. The authorities censored left-wing and foreign-language periodicals, raided meetings, and conducted mass arrests

"on the basis of suspected left-wing political beliefs and affiliations." Kenyon Zimmer, *The Voyage of the* Buford*: Political Deportations and the Making and Unmaking of America's First Red Scare* in *Deportation in the Americas: Histories of Exclusion and Resistance* 132, 132 (Zimmer & Salinas eds., 2018). States passed syndicalism and sedition laws in response to a "growing fear of domestic radicalism" and the "incessant prodding" of ultra-nationalist individuals and politicians. Murray, *supra*, at 232. Though these laws were aimed at barring advocacy for government overthrow or violent acts, they were extremely broad. *See Threat of Dissent*, *supra*, at 63. "Opinions were labeled as objectionable and punished for their own sake without any consideration of the probability of criminal acts; severe penalties were imposed for the advocacy of small offenses; and a practical censorship of speech and press was established . . . ." Murray, *supra*, at 232.

The First Red Scare intensified after World War I. In early 1919, Congress launched an investigation into the potential threat of Bolshevism and its links to subversive activities within the United States. The congressional committee recommended that the government suppress foreign papers, promote patriotic anti-radical campaigns, strictly enforce deportation laws, and pass a peacetime sedition law. *Threat of Dissent*, *supra*, at 70. The same year, an anarchist and his followers mailed bombs to industrialists, legislators, and public officials. After a bomb exploded at Attorney General A. Mitchell Palmer's home, Palmer set in motion a

widespread investigation targeting radicals that culminated in a series of raids assisted by future FBI Director J. Edgar Hoover. Officials raided offices of the Union of Russian Workers in twelve cities, arrested over 600 in warrantless searches, and seized and destroyed materials. *Id.* at 71–73.

As in the earlier War on Anarchy, during the First Red Scare "the United States continued to view foreigners as a source of subversion" and treated them "as scapegoats and targets for suppression." *Id.* at 64. The federal government had targeted leftist immigrants by passing the Immigration Act of 1917 and the Anarchist Exclusion Act of 1918, which allowed it to deport individuals based solely on their beliefs. *See id.* at 67–70. In 1919, the Justice Department announced that the country should be "swept clean of its alien anarchists and trouble makers." Zimmer, *supra*, at 138–39 (internal quotation marks omitted). Between 1918 and 1925, the government deported at least 979 individuals as "alien anarchists." *Id.* at 132.

Suspicion also reached into the education system. Professors and public-school teachers who opposed the war, or were merely suspected of insufficient patriotic zeal, were dismissed. At the University of Michigan, for example, Professor Edward Allen was fired for refusing to purchase war bonds; Allen rejected an offer to keep his position if he pledged "unconditional support for all future American wars." Timothy Reese Cain, *"Silence and Cowardice" at the University of Michigan: World War I and the Pursuit of Un-American Faculty*, 51 Hist. of Ed. Q.

296, 315–17 (2011). Classrooms were increasingly treated "as a holy shrine where only the goddess of 100 per cent patriotism, and not truth, was to be worshiped." Murray, *supra*, at 170. Such rigid demands for conformity led to a series of purges, including the firing of a Baltimore public-school teacher who explained Bolshevism to her students and compared it with democracy. *Id.* "Disloyalty" functioned as a flexible charge that educational administrators could deploy to silence dissent. In short, though "teachers on all levels of instruction retained their theoretical right to free speech, they were abject fools if they exercised it." *Id.* at 173.

The effects of ideological targeting during this era reached beyond the individuals directly targeted. It is estimated that IWW membership fell by half after the organization was targeted by raids, espionage and sedition laws, and the arrest of its leaders. *Id.* at 30–31, 277. The expulsions of noncitizens also had a chilling effect on leftist movements by casting foreign-born leftists as potentially deportable. Though not the sole cause, federal targeting of radicalism "diminish[ed] the anarchist movement" and "cripple[d]" anarchist, socialist, and radical labor unions. Zimmer, *supra*, at 156. Regardless of the normative values espoused by such groups, targeting individuals based on ideology was inconsistent with the nation's constitutional principles and undermined the marketplace of ideas.

### C. Scholars Pushed Back and Dissenting Voices on the Federal Courts Laid the Groundwork for Future Protection of Speech

American authorities framed their repressive tactics as necessary to protect American democracy, including from the destabilizing threat of the Russian Revolution. *See Threat of Dissent*, *supra*, at 70. Although many Americans supported the expulsions of radical foreigners, a few early civil liberties advocates and public officials raised concerns about the legality of mass arrests and deportations. *See id.* at 76–77.

Some federal judges also began to respond to political repression, reflecting a burgeoning, albeit muted, recognition that the government's broad targeting of ideological speech was inconsistent with democracy. *See generally* Zechariah Chafee, Jr., *Freedom of Speech in Wartime*, 32 Harv. L. Rev. 932 (1919). While early attempts to protect free speech were largely confined to dissenting opinions, the principles they outlined later formed the basis for a more expansive doctrine.

For example, in *Abrams v. United States*, 250 U.S. 616 (1919), the Supreme Court upheld Espionage Act convictions of Russian immigrants for distributing leaflets calling for a general strike against the war effort. In dissent, Justices Holmes and Brandeis opined that the leaflets were "puny anonymities" that posed no clear, present, or imminent danger, adding that "the ultimate good desired is better reached by free trade in ideas." *Id.* at 628–31. Similarly, in *Gitlow v. New York*, 268 U.S. 652

(1925), the Supreme Court upheld an arrest for distribution of a socialist manifesto under New York's Criminal Anarchy Law. Dissenting, Holmes and Brandeis argued that the clear and present danger test should be applied stringently, with punishment only for speech that could start a "present conflagration." *Id.* at 672–73. From then, Brandeis and Holmes—the latter of whom was a target of one of the anarchist bombs—"voted together to uphold First Amendment claims fourteen times, including twelve dissents," building the framework for the Court's eventual shift toward a more speech-protective jurisprudence. *See* Marc Lendler, Gitlow v. New York: *Every Idea an Incitement* 104 (2012).

Legal scholars also criticized the government's ideological targeting and the Supreme Court's support. *See Threat of Dissent*, *supra*, at 45, 55–56, 61. Zechariah Chafee, Jr., a Harvard law professor and civil libertarian, called for an end to the "bad tendency test" pervasive in the Court's jurisprudence.[4] *Id.* at 82–83. He argued that the First Amendment protected society's "social interest" in the "attainment of truth," which had to be balanced against public safety concerns. *Id.* at 82 (quoting Chafee, *supra*, at 958). Chafee also denounced ideological deportation, explaining

[4] The "bad tendency" test originated in English common law and was frequently used by American courts before and after World War I. *See Threat of Dissent*, *supra*, at 45. Under that test, speech that had a tendency to harm the public welfare was not constitutionally protected. *Id.*; *see, e.g.*, *Debs v. United States*, 249 U.S. 211, 216 (1919) (upholding Eugene Debs's conviction under the Espionage Act because his public speech had the "natural tendency and reasonably probable effect to obstruct" military recruitment).

that people inside the U.S. are "seriously affected if they are denied the privilege of listening to, and associating with a foreign thinker." *Id.* at 85–86 (citation omitted).

In a few cases the Court's majority did side with the radical speaker. *See, e.g.*, *Fiske v. Kansas*, 274 U.S. 380, 387 (1927) (overturning conviction for unlawful advocacy under state syndicalism law); *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937) (stating, in striking down conviction of communist who led rally supporting a strike, that "peaceable assembly for lawful discussion cannot be made a crime").

Although limited, these early efforts to oppose ideological repression prefaced a greater expansion of free speech protections in the modern era.

## II. The Second Red Scare Ushered in Another Period of Repression

Unfortunately, however, the Supreme Court's evolving jurisprudence and public resistance did not prevent another era of repression. The Second Red Scare was a period of intense anti-communist targeting from all branches of government that began in earnest in the late 1940s, during the early Cold War, and tapered off by the 1960s. This era was marked by a multifaceted effort to pursue alleged communists and communist sympathizers. By labeling Communism an outside import, foreignness was once again used as a vector through which the government diminished free public debate.

### A. A Wartime Alliance Between the United States and the Soviet Union Delayed—but Did Not Ultimately Prevent—the Second Red Scare

In the 1930s, before the Red Scare began, the Communist Party, though neither large nor popular, was targeted by the U.S. government because of its adherence to a revolutionary ideology. *See* Ellen Schrecker, *Many Are the Crimes: McCarthyism in America* 86–91, 103–05 (1998) [hereinafter *Many Are the Crimes*]. The late 1930s saw anti-communist investigations by the House Un-American Activities Committee (HUAC) and in 1940, Congress passed the Alien Registration Act (known as the Smith Act), which broadly restricted advocacy of, and association with, radical ideas.

Once the United States entered World War II, however, the wartime alliance with the Soviet Union temporarily diverted the government's attention to fascists. The Supreme Court followed suit, issuing decisions rejecting the notion that people who associated with the Communist Party necessarily posed a serious threat to democracy. In 1943, the Supreme Court reversed a denaturalization order against a Communist Party member, concluding that his beliefs did not necessarily conflict with the principles of the Constitution. *Schneiderman v. United States*, 320 U.S. 118, 136, 142 (1943). The Court emphasized, "Whatever attitude we may individually hold toward persons and organizations that believe in or advocate extensive changes in our existing order, it should be our desire and concern at all times to uphold the

right of free discussion and free thinking to which we as a people claim primary attachment." *Id.* at 139. Similarly, in *Bridges v. Wixon*, 326 U.S. 135 (1945), the Court reversed a deportation order against a labor union leader based on his alleged ties to the Communist Party, concluding there was no evidence that Bridges "embraced the political faith of force and violence." *Id.* at 145–48.

The end of World War II prefaced the collapse of the Soviet-American alliance, the beginning of the Cold War, and the emergence of the Second Red Scare (otherwise known as McCarthyism). The period that followed represented a disproportionate government response to a small, mostly ideologically driven political minority. By the time the government's efforts came to dominate domestic politics in the late 1940s and 1950s, it extended far beyond the limited threat the Communist Party posed, damaging the American polity by narrowing the spectrum of acceptable political debate. *See Many Are the Crimes*, *supra*, at 370 ("From race relations to the mass media, almost every area of American life felt the chill."). It was a coordinated effort, in which "such mainstream institutions as the Supreme Court collaborated with the anticommunist crusade," and deferred to broad national security interests proclaimed by the legislative and judicial branches. *Id.* at 413; *see also Dennis v. United States*, 341 U.S. 494, 501 (1951) (upholding conviction of Communist Party leader under the Smith Act based, in part, on Congress's power to "protect the Government . . . from armed rebellion").

### B. The Government Targeted Federal Workers, Left-Wing Groups and Academics, and Noncitizens in Its Anti-Communist Crusade

Once the Cold War began, the government portrayed Communists as puppets of Moscow seeking to destroy the American way of life. *See* Ellen Schrecker, *McCarthyism: Political Repression and the Fear of Communism*, 71 Soc. Rsch. 1041, 1051 (2004) [hereinafter *Political Repression*]. The revived campaign against supposed communist subversion included persecutions and blacklisting, suppression of free speech and association, and expulsion of foreigners and bars to their entry. *Threat of Dissent*, *supra*, at 120. Federal workers, left-wing groups and academics, and noncitizens—seen as importers of a dangerous ideology—felt the chill of McCarthyism. *See id.* at 120–21.

The government went to great lengths to investigate and sanction federal workers who were perceived to have ties to the Communist Party. In 1947, President Truman issued an executive order directing all federal agencies to investigate employees for loyalty; between 1947 and 1956, more than five million federal workers were subjected to loyalty screening. Landon R.Y. Storrs, *The Second Red Scare and the Unmaking of the New Deal Left* 2, 110–11 (2012). Other coercive tactics included criminal prosecutions; hearings before congressional investigating committees; passport denials; deportation and denaturalization proceedings; IRS

audits; and FBI surveillance and/or harassment. *See Many Are the Crimes*, *supra*, at xv; *see also Political Repression*, *supra*, at 1043–46.

Because the Communist Party was a secret organization, the FBI leveraged the Party's "front groups" to identify individual Communists. Created to support progressive causes, those organizations' leaders and main staff members were usually Communists. Pursuant to Truman's executive order, the Justice Department compiled an "Attorney General's List" of those groups, membership in which automatically triggered an investigation, if not outright dismissal from public or private employment. *Many Are the Crimes*, *supra*, at 8, 37–38, 276; *see also Political Repression*, *supra*, at 1045. Fear of sanctions kept people from joining leftist groups or publicly advocating unpopular ideas. *Id.* That fear also limited the policy positions advocates could champion without the threat of sanction. *Many Are the Crimes*, *supra*, at 379–94.

Educators were similarly vulnerable, with university professors again becoming targets. Over 100 professors were fired and blacklisted for their supposed past or present connections to the Communist Party—most of them because they refused to cooperate with a congressional investigating committee or the FBI. These oppressive tactics chilled speech on campuses. *See Many Are the Crimes*, *supra*, at 404–05 (describing how "whole lines of inquiry" in academia "simply disappeared"). Professors censored themselves, pruned their syllabi, and avoided

controversial subjects. Students avoided political activity. *See* Ellen Schrecker, *Worse Than McCarthyism: Universities in the Age of Trump*, The Nation (Apr. 3, 2025), https://www.thenation.com/article/society/mccarthyism-universities-trump-attacks/. As Justice Douglas observed:

> FEAR has driven more and more men and women in all walks of life either to silence or to the folds of the orthodox. Fear has mounted—fear of losing one's job, fear of being investigated, fear of being pilloried. This fear has stereotyped our thinking, narrowed the range of free public discussion, and driven many thoughtful people to despair. This fear has even entered universities, great citadels of our spiritual strength, and corrupted them.

William O. Douglas, *"The Black Silence of Fear,"* N.Y. Times (Jan. 13, 1952).

Finally, the government aggressively moved to exclude and deport noncitizens. As in the First Red Scare, subversive ideology was seen as a foreign import, even though many accused Communists were American citizens. *See Threat of Dissent*, *supra*, at 126 (describing Senate report that declared public safety "requires the exclusion from the United States of those aliens who bring with them their alien ideologies which are subversive to the national security and contrary to our constitutional form of government"); *see also* Schrecker, *Internal Security*, *supra*. Because the immigration system afforded fewer constitutional protections than the criminal legal system, noncitizens became easy targets for the federal government, which undertook exclusions, arrests, and deportations. *Threat of Dissent*, *supra*, at 122–23 (describing "deportation drives" for foreign-born

Communists). These tactics had widespread impacts on society, undermining the free flow of ideas across artistic, political, and scientific endeavors. *See Threat of Dissent*, *supra*, at 128–32, 148–50.

Beginning in the 1940s, the U.S. government authorized denial of visas to people whose entrance would be considered "prejudicial to the public interest." *See U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 540–42 (1950) (describing 1941 presidential proclamation imposing entry restrictions on certain noncitizens). And the Immigration and Nationality Act of 1952 (McCarran-Walter Act) authorized the exclusion and deportation of those who wrote about or advocated for "the economic, international, and governmental doctrines of world communism" or associated with organizations that did. Pub. L. No. 82-414, 66 Stat. 163. Talents such as Pablo Picasso, Gabriel García Márquez, and Charlie Chaplin faced exclusion from the United States. Some were barred from entry and denied visas, while others were permitted to enter only with restrictions. *Threat of Dissent*, *supra*, at 130, 149–51, 193–94. American citizens, including artists, began to censor their work. *Many Are the Crimes*, *supra*, at 402–03.

The entry policy also targeted scientists, subjecting them to visa denials or delays and interrogations by consular officials about their political views and associations. *See Threat of Dissent*, *supra*, at 131–32. These policies hampered scientific progress by hindering collaboration between American scientists and their

foreign counterparts. *Id.*; Sam Lebovic, *Do Americans Have a Right to Know About the World?*, Knight First Amend. Inst. (Feb. 10, 2025), https://perma.cc/KYJ9-UGZQ. Despite foreign scientists being an "indispensable ingredient of American scientific progress," they were becoming scarce under harsh immigration policies. Edward A. Shils, *America's Paper Curtain*, 8 Bull. Atomic Scis. 210, 212 (1952).

It was in this climate that *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952), was decided—historical context that Defendants disregard when they rely on the case for the proposition that the First Amendment did not bar the deportation of noncitizens associated with the Communist Party. *See* Defs.' Br. 52. Relying on *Dennis*, *Harisiades* applied the then-prevailing standard—under which citizens and noncitizens were punished for past or present political affiliation—to permit deportation under the Smith Act. *See* 342 U.S. at 592 & n.19. Subsequent cases, however, significantly narrowed the scope of both *Dennis* and the Smith Act. *See, e.g.*, *Yates v. United States*, 354 U.S. 298, 318–20 (1957) (construing the Smith Act to prohibit "advocacy and teaching of concrete action for the forcible overthrow of the Government, and not of principles divorced from action"); *infra* at p. 24 (discussing *Brandenburg* standard). As a result, *Harisiades* cannot bear the precedential weight Defendants attach to it. *See* Pls.' Br. 32–33.

### C. Years Later, the Nation Came to Understand the Second Red Scare as a Stain on Our History

After the frenzy abated, government institutions and civil society came to view the Second Red Scare as a shameful period in American history. From the late 1950s through the 1960s, the Supreme Court started to address the period's anti-democratic excesses in decisions protecting free speech and academic freedom.

In June of 1957, the Supreme Court issued four decisions repudiating anti-communist measures, overturning convictions, and reinstating a government employee who had been fired for disloyalty. *See Watkins v. United States*, 354 U.S. 178 (1957); *Sweezy v. New Hampshire*, 354 U.S. 234 (1957); *Service v. Dulles*, 354 U.S. 363 (1957); *Yates*, 354 U.S. 298. A few years later, the Court struck down loyalty oaths. *See Baggett v. Bullitt*, 377 U.S. 360 (1964).

However, First Amendment doctrine evolved unevenly, and in several post-Red Scare cases, the Supreme Court failed to protect speakers from precisely the kind of ideological targeting it would later reject. *See Barenblatt v. United States*, 360 U.S. 109 (1959) (upholding conviction for refusing to answer certain questions before HUAC); *Scales v. United States*, 367 U.S. 203 (1961) (upholding conviction based on membership in the Communist Party). As in the First Red Scare, the principles outlined by the dissenting Justices in these cases were reflected in future advances in First Amendment jurisprudence. *See* David M. Rabban, *The Emergence*

*of Modern First Amendment Doctrine*, 50 U. Chi. L. Rev. 1205, 1350 (1983); *see also supra* Part I.C.

Courts ultimately recognized that the First and Second Red Scares threatened the country's constitutional values. In *Brandenburg v. Ohio*, the Court held that individuals could not be prosecuted even for advocating the violent overthrow of the U.S. government unless their speech was both intended to incite imminent lawless action *and* likely to do so. 395 U.S. 444, 447 (1969). In his famous *Brandenburg* concurrence, Justice Douglas declared that the "invasions of privacy made by investigating committees were notoriously unconstitutional," and that Truman-era loyalty screenings were "primarily concerned with one's thoughts, ideas, beliefs, and convictions," making them "the most blatant violations of the First Amendment we have ever known." *Id.* at 456. The legal standard announced in *Brandenburg* is still reflected in today's jurisprudence. *See, e.g.*, *Counterman v. Colorado*, 600 U.S. 66, 81 (2023) (observing that "mere advocacy," even of illegal acts, is speech that falls "within the First Amendment's core" and citing *Gitlow* and *Abrams* as examples of "the Court's failure, in an earlier era, to protect mere advocacy of force or lawbreaking from legal sanction").

The Supreme Court also developed jurisprudence on academic freedom. Although often reaching inconsistent results, the Court frequently "stressed the danger that government investigations of professors, loyalty oaths, and disclaimer

oaths could inhibit the societally valuable academic discussion of controversial ideas in the classroom." David M. Rabban, *Academic Freedom: From Professional Norm to First Amendment Right* 53 (2024).

Likewise, the Court held that immigration officials could not pursue boundless inquiries about potential deportees' activities, associations, and habits. *See United States v. Witkovich*, 353 U.S. 194, 199–202 (1957). It also required the government to sufficiently prove that an individual had a "meaningful" association with the Communist Party before deporting them on ideological grounds. *See Rowoldt v. Perfetto*, 355 U.S. 115, 120–21 (1957); *Gastelum-Quinones v. Kennedy*, 374 U.S. 469, 476–477, 480 (1963).

## III. The District Court Correctly Recognized That the Government's Conduct Echoes Prior Episodes of Political Repression

Students and academics today are being targeted for their speech and associations—op-eds, social media posts, participation in campus protests, or connections with members of student groups that have been banned on campus. *See* Add.133–39 (findings related to Öztürk); *id.* 199.[5]

[5] As a candidate for office, and as recently as July 2026, President Trump endorsed repressive tools used during the Second Red Scare. Lauren Said-Moorhouse & Ryan Browne, *Donald Trump wants 'extreme vetting' of immigrants*, CNN (Aug. 16, 2016), https://www.cnn.com/2016/08/16/politics/how-us-vets-immigrants-donald-trump-extreme-vetting ("In the Cold War, we had an ideological screening test. The time is long overdue to develop a new screening test for the threats we face today."); Robert Tait, *Trump revives old tropes as he pushes warnings of 'communist menace,'* The Guardian (July 26, 2026),

During the First Red Scare, members of left-wing organizations feared government raids of their meetings and criminal prosecutions. During the Second Red Scare, the threat of investigations, prosecutions, harassment, and unemployment kept potential dissenters quiet. For the foreign-born, deportations loomed large. History has shown that past repression paves the way for future abuses. *See, e.g.*, Zimmer, *supra*, at 156 (observing that deportations during First Red Scare subsequently justified Japanese-Americans' internment during World War II, Communist deportations during Cold War, and policies targeting Muslim and Arab-Americans after 9/11).

Today, the government has made clear that it is dangerous for noncitizens to espouse disfavored speech or ideas, thus narrowing the range of ideas accessible to the American public. This is precisely the harm the First Amendment is supposed to prevent, and it contradicts the Supreme Court's acknowledgement that noncitizens have free speech rights. *See Bridges*, 326 U.S. at 148 ("Freedom of speech and of press is accorded aliens residing in this country."); *accord United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990); *see also id.* at 265 (defining "the people" in the Bill of Rights to "refer[] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be

---

https://perma.cc/2FW6-NRQR (reporting Trump's statement that "there is now a resurgence of the communist menace in our land, including from newcomers to our country who embrace ideas totally opposed to our way of life").

considered part of that community," a definition not dependent upon citizenship). Yet, through its actions here, the government has shown that noncitizens must choose their words carefully. *See* Add.205 (noting that government has conveyed the danger of expression not just through "arrests, detentions, and visa revocations . . . but also by the manner" in which they have been conducted).

The chilling impact on academics mirrors the effects of the World War I purges, the First Red Scare, and the more acute attacks on scholars and scientists during McCarthyism. Academics have forgone research and publication opportunities, collaborations with colleagues on matters of public importance, and the freedom to teach about sensitive topics. The impact is also felt by those who can no longer learn from and engage with noncitizen colleagues, students, and faculty. *See* Add.176–81.

Once again, the government has characterized the current threat, at least partially, as "foreign." *See* Add.86–87, 112. And the threat of ideological deportation is again a powerful tool in chilling free expression and association. *See* Julia Rose Kraut & Tyler McBrien, *The Trump Admin's Embrace of Ideological Exclusion and Deportation*, Lawfare (July 29, 2025), https://perma.cc/P8GB-6QSC.

Indeed, as the district court noted, the government's enforcement policy "is a new invention" that outstrips its closest historical analogues. Add.210. Past punishments of those espousing disfavored ideologies were tied to alleged violations

of law. Here, by contrast, "[t]he Plaintiffs' noncitizen members . . . have all been made to understand that there are certain things that it may be gravely dangerous for them to say or do, but have not been told precisely what those things are. . . ." Add.204–05. The government does not invoke a specific threat; instead, it draws on abstract threats to "national security" and "public safety" to imperil free speech rights. *See* Exec. Orders 14161 & 14188; *see also* Add.199–203, 210.

The Supreme Court's patchwork response to political repression in prior eras is a cautionary tale. Despite the all-too-frequent support for the government's repressive policies, there were nonetheless voices on the Supreme Court that prefaced a future of stronger First Amendment protections. *See, e.g.*, *Abrams*, 250 U.S. at 624–31 (Holmes & Brandeis, JJ., dissenting); *Gitlow*, 268 U.S. at 672–73 (Holmes & Brandeis, JJ., dissenting); *Barenblatt*, 360 U.S. at 134–62 (Warren, C.J., Black & Douglas, JJ., dissenting); *Scales*, 367 U.S. at 262–75 (Douglas, J., dissenting). As they do today, members of civil society sounded the alarm. Their warnings should not go unheard.

Amici urge this Court to embrace speech-protective jurisprudence, including the cautionary voices from the past, as the district court and other courts have done. *See, e.g.*, *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 230 (D. Vt. 2025) (holding that noncitizen's speech, which "advocated for a peaceful resolution of the conflict in Gaza," "concerned an issue of great public interest" and was therefore protected by

the First Amendment); *Mahdawi v. Trump*, 136 F.4th 443, 455 (2d Cir. 2025) (denying government's motion for stay pending appeal and recognizing that balance of the equities favored Mahdawi in light of his "substantial First Amendment claims"); *see also Öztürk v. Trump*, 779 F. Supp. 3d 462, 470, 490 (D. Vt. 2025) (noting that noncitizen's op-ed urging that university acknowledge "ongoing genocide in Palestine" was "self-evidently speech regarding public issues," a category that "occupies the highest rung of the hierarchy of First Amendment values" (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983))).

The First Amendment protects disfavored speech. That principle is a cornerstone of American democracy. The current moment, in which the federal government has used its full power to target a few raised voices, has dangerously undermined that principle. Justice Black's dissent in *Dennis*, decided at a time when the Second Red Scare had no end in sight, offers clarity:

> Public opinion being what it now is, few will protest the conviction of these Communist petitioners. There is hope, however, that in calmer times, when present pressures, passions and fears subside, this or some later Court will restore the First Amendment liberties to the high preferred place where they belong in a free society.

341 U.S. at 581 (Black, J., dissenting). This Court should do so now, before more damage is done.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's ruling.

Dated: August 12, 2026

Respectfully submitted,

*/s/ Laura R. Handman*
Laura R. Handman (No. 1102627)
*Counsel of Record*
Azeezat Adeleke (No. 1225416)
DAVIS WRIGHT TREMAINE LLP
1301 K St. NW, Suite 500E
Washington, D.C. 20005
(202) 973-4224
laurahandman@dwt.com
azeezatadeleke@dwt.com

Neema Jyothiprakash
MCDERMOTT WILL & SCHULTE LLP
919 Third Avenue
New York, NY 10022
njyothiprakash@mcdermottlaw.com

Rachel Levinson-Waldman
Leah J. Tulin
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001
(202) 249-7193
levinsonr@brennan.law.nyu.edu
tulinl@brennan.law.nyu.edu

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,493 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Laura R. Handman*
Laura R. Handman

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on August 12, 2026. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Laura R. Handman*
Laura R. Handman