**Nos. 26-1141 & 26-1195**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS - HARVARD FACULTY CHAPTER; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY; RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN FEDERATION OF TEACHERS; MIDDLE EAST STUDIES ASSOCIATION,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

MARCO RUBIO, in the official capacity as Secretary of State; U.S. DEPARTMENT OF STATE; MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, in the official capacity as Acting Director of U.S. Immigration and Customs Enforcement; DONALD J. TRUMP, in the official capacity as President of the United States; UNITED STATES,

*Defendants-Appellants/Cross-Appellees*.

On Appeal from the United States District Court
for the District of Massachusetts Docket Number 1:25-cv-10685-WGY

**CORRECTED BRIEF OF SERVICE EMPLOYEES INTERNATIONAL UNION, COMMUNICATIONS WORKERS OF AMERICA, INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, NATIONAL EDUCATION ASSOCIATION, UNITE HERE LOCAL 33, AND UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Steven K. Ury*
Elena Medina Neuman
Deborah L. Smith
Service Employees International Union, AFL-CIO
1800 Massachusetts Avenue, NW
Washington, DC 20036
(213) 440-4547
* Attorney of Record
*Attorneys for Amicus Curiae SEIU*

Kate Andrias
Patricia D. and R. Paul Yetter Professor of Law
Columbia Law School**
435 West 116th Street
New York, NY 10027
*Of Counsel to Amici*

Charlotte Garden
Gray, Plant, Mooty, Mooty, & Bennett Professor of Law
University of Minnesota Law School**
Walter F. Mondale Hall
229 S 19th Avenue
Minneapolis, MN 55455
*Of Counsel to Amici*

Matthew Holder
Communications Workers of America
501 3rd Street, NW
Washington, DC 20001
*Attorney for Amicus Curiae CWA*

William Karges
International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America
8000 E. Jefferson Avenue
Detroit, MI 48214
*Attorney for Amicus Curiae UAW*

Alice O'Brien
National Education Association
1201 16th Street, NW
Washington, DC 20036
*Attorney for Amicus Curiae NEA*

Kristin Martin
UNITE HERE Local 33
c/o McCracken, Stemerman & Holsberry, LLP
475 14 Street
Suite 1200
Oakland, CA 94612
*Attorney for Amicus Curiae UNITE HERE Local 33*

Margot A. Nikitas
United Electrical, Radio and Machine Workers of America
429 Fourth Avenue
Suite 805
Pittsburgh, PA 15219
*Attorney for Amicus Curiae UE*

** Institutional affiliation is listed for identification purposes only

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* Service Employees International Union; Communications Workers of America; International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America; National Education Association; UNITE HERE Local 33; and United Electrical, Radio and Machine Workers of America have no parent corporations. They have no stock, and, therefore, no publicly held company owns 10% or more of their stock.

Dated: August 20, 2026

Respectfully submitted,

/s/ Steven K. Ury
Steven K. Ury

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..... i

TABLE OF AUTHORITIES ..... iv

INTERESTS OF *AMICI CURIAE* ..... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..... 4

ARGUMENT ..... 7

I. THE ADMINISTRATION'S POLICY OF IDEOLOGICAL DEPORTATION IMPINGES ON THE FIRST AMENDMENT RIGHTS OF UNIONS AND HARMS THEIR ABILITY TO ORGANIZE AND REPRESENT THEIR MEMBERS ..... 7

A. Workers' Collective Action Depends on – and Is at the Heart of – the First Amendment ..... 7

B. The Administration's Policy of Ideological Deportation Chills Union Organizing and Associated Speech ..... 9

II. THE ADMINISTRATION'S POLICY OF IDEOLOGICAL DEPORTATION IMPINGES ON THE ACADEMIC FREEDOM AND SPEECH RIGHTS OF UNIVERSITY WORKERS ..... 14

III. THE ADMINISTRATION'S POLICY OF IDEOLOGICAL DEPORTATION UNDERCUTS FEDERAL AND STATE LAW THAT GUARANTEES WORKERS PROTECTION FOR SPEAKING OUT AGAINST WRONGDOING ..... 19

A. Anti-Retaliation Protections Are Critical to Federal Policy Encouraging Workers to Report Wrongdoing, Fraud, Discrimination, and Workplace Safety Violations ..... 19

B. State Law Similarly Protects Workers from Retaliation When They Report Wrongdoing, Including Fraud, Violations of Workplace Safety Rules, and Antidiscrimination Law ..... 22

C. The Threat of Deportation of Noncitizen Workers on the Basis of Their Political Speech and Association Will Reduce Workers' Willingness to Report Employer Wrongdoing ....................................24

CONCLUSION ........................................................................................26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Trs. of the Univ. of N.C.-Wilmington*,
640 F.3d 550 (4th Cir. 2011) ....................15

*Americans for Prosperity Foundation v. Bonta*
594 U.S. 595 (2021)....................9, 10, 11, 14

*Aptheker v. Sec'y of State*,
378 U.S. 500 (1964)....................18

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)....................11

*Bridges v. Wixon*,
326 U.S. 135 (1945)....................16

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006)....................20

*Clue v. Johnson*,
179 F.3d 57 (2d Cir. 1999) ....................12

*Davignon v. Hodgson*,
524 F.3d 91 (1st Cir. 2008)....................12

*Demers v. Austin*,
746 F.3d 402 (9th Cir. 2014) ....................15

*Eastex, Inc. v. NLRB*,
437 U.S. 556 (1978)....................12, 14

*Ellis v. Railway Clerks*,
466 U.S. 435 (1984)....................14

*Galvin v. Roxbury Cmty. Coll.*,
273 N.E.3d 186 (Mass. 2026)....................23

*Hague v. CIO*,
307 U.S. 496 (1939)....7, 8

*Heim v. Daniel*,
81 F.4th 212 (2d Cir. 2023) ....15

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
563 U.S. 1 (2011)....20

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967)....6, 15

*Kilborn v. Amiridis*,
131 F.4th 550 (7th Cir. 2025) ....15

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)....16

*Lamont v. Postmaster Gen.*,
381 U.S. 301 (1965)....16, 18

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) ....15

*Mitchell v. Robert DeMario Jewelry, Inc.*,
361 U.S. 288 (1960)....20

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958)....8, 9, 18

*NAACP v. Button*,
371 U.S. 415 (1963)....17

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)....11

*NLRB v. Maine Coast Reg'l Health Facilities*,
999 F.3d 1 (1st Cir. 2021)....12

*In re Primus*,
436 U.S. 412 (1978)....17

*Shelton v. Tucker*,
364 U.S. 479 (1960) .......... 16

*Stericycle, Inc.*,
372 NLRB No. 113, 2023 WL 4947792 (2023) .......... 20, 21

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957) .......... 15

*Thomas v. Collins*,
323 U.S. 516 (1945) .......... 8

*Thornhill v. Alabama*,
310 U.S. 88 (1940) .......... 7, 8

*Ulysse v. AAR Aircraft Component Servs.*,
841 F. Supp. 2d 659 (E.D.N.Y. 2012) .......... 23

*United States v. Robel*,
389 U.S. 258 (1967) .......... 18

**Statutes and Regulations**

8 U.S.C. § 1101(a)(15)(U) .......... 21

15 U.S.C. § 78u-6(h) .......... 21

29 U.S.C. § 158(a)(1), (3) .......... 20

29 U.S.C. § 215(a)(3) .......... 20

31 U.S.C. § 3730(h) .......... 21

42 U.S.C. § 2000e-3(a) .......... 20

454 Mass. Code Regs. § 25.03(5) (2021) .......... 22

804 Mass. Code Regs. § 3.01(4)(d)(3) (2026) .......... 22

Cal. Lab. Code §§ 1101–1102 (West 2026) .......... 23

D.C. Code § 2-1402.11(a)(1)(A) (2023) .......... 24

Mass. Gen. Laws ch. 149 § 105A(c)(3) (2018) .......... 23

Mass. Gen. Laws ch. 149, § 185(b)(1) (2021) ....................22

N.J. Admin. Code § 4A:7-3.1 (2020) ....................22

N.J. Admin. Code § 12:110-7.2(a)(1) (2023) ....................22

N.J. Stat. Ann. § 34:11-4.10(a) (West 2019) ....................23

N.J. Stat. Ann. § 34:19-3(a)(1) (West 2006) ....................22

N.Y. Exec. Law § 296(7) (McKinney 2025) ....................22

N.Y. Lab. Law § 27-a(5) (McKinney 2021) ....................22

N.Y. Lab. Law § 194-a(1)(f) (McKinney 2020) ....................23

N.Y. Lab. Law § 201-d (McKinney 2023) ....................23

N.Y. Lab. Law § 740 (McKinney 2022) ....................22

S.C. Code Ann. § 16-17-560 (2026) ....................24

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 ....................21

**Other Authorities**

AFL-CIO, *Workers' Rights ICE'd Out* (2026) ....................13

Amanda M. Grittner & Matthew S. Johnson, *When Labor Enforcement and Immigration Enforcement Collide: Deterring Worker Complaints Worsens Workplace Safety* (W.E. Upjohn Inst., Working Paper No. 21-353, 2021) ....................24, 25, 26

Barry T. Hirsch, David A. Macpherson & William E. Even, *Union Membership, Coverage, Density, and Employment by Industry: 2025*, Union Membership and Coverage Database (2026) ....................4

Brief for 19 Labor Organizations as *Amici Curiae* in Support of Respondent, *Trump v. Barbara*, No. 25-365 (U.S. Feb. 24, 2026) ....................13, 14

Jocelyn Gecker, *After Columbia Arrests, International College Students Fall Silent*, AP News (Mar. 15, 2025) ....................9

Kevin Boyle, *The UAW and the Heyday of American Liberalism, 1945-1968* (1995) ....................13

Michael Edwards & Mark Walsh, *More than a Lawyer: Robert Chanin, the National Education Association, and the Fight for Public Education, Employee Rights, and Social Justice* (2010) ....................13

*National Defense Migration: Hearings Before the Select Committee Investigating National Defense Migration, Part 29*, 77th Cong. 11187–89 (1942)....................12

William A. Herbert et al., *Academic Freedom and Collective Bargaining*, Nat'l Ctr. for the Study of Collective Bargaining in Higher Educ. & the Profs. & AAUP Ctr. for the Def. of Acad. Freedom (Mar. 2026)....................16

William A. Herbert, Jacob Apkarian & Joseph van der Naald, *2024 Directory of Bargaining Agents and Contracts in Institutions of Higher Education*, Nat'l Ctr. for the Study of Collective Bargaining in Higher Educ. & the Profs. (Sept. 2024)....................5

## **INTERESTS OF *AMICI CURIAE*[1]**

*Amici curiae* are six labor unions that represent workers at universities and colleges across the country.

The **Service Employees International Union, AFL-CIO (SEIU)** represents approximately two million workers across the United States, Puerto Rico, and Canada. SEIU's members include foreign-born U.S. citizens, lawful permanent residents, and immigrants authorized to work in the United States. In Massachusetts, SEIU Local 509 represents educators and graduate student workers, including Rümeysa Öztürk when she was a graduate student worker.

**Communications Workers of America (CWA)** represents workers in the communications and information industries, the news media, broadcast and cable television, public service, higher education, health care, manufacturing, video games, air travel, and high tech. CWA advocates for its members on workplace issues, including by participating in litigation as a party.

The **International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW)** and its affiliated locals represent approximately 120,000 workers in higher education, including graduate

---

[1] No party opposes the filing of this brief. No counsel of any party to this proceeding authored any part of this brief. No party or party's counsel, or person other than *Amici* and their members, contributed money to the preparation or submission of this brief.

students, postdoctoral scholars, researchers, staff, and faculty, including noncitizen workers. The UAW has bargaining units at dozens of universities throughout the United States.

The **National Education Association (NEA)** is the nation's oldest and largest union, representing approximately three million members of diverse backgrounds who work in public schools and higher-education institutions. NEA is committed to protecting the free speech and academic freedom of educators and the dignity of all, regardless of immigration status.

**UNITE HERE Local 33** represents academic workers at Yale University including many who have come to the United States to engage in graduate and postdoctoral study and research. In response to Rümeysa Öztürk's arrest, academic workers at Yale expressed fear of signing union cards and reporting workplace problems.

The **United Electrical, Radio and Machine Workers of America (UE)** is a democratic, independent national union representing tens of thousands of workers in a wide variety of manufacturing, public sector, and private service-sector jobs. While many UE members still work in factories related to the union's traditional jurisdictions in electrical manufacturing and metalworking, UE members are also rail crew drivers, hospital workers, co-op workers, federal

contract workers, teachers, paraeducators, clerical workers, graduate workers, scientists, and librarians.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Workplace rights depend on workers being able to speak and act together – to report a safety hazard, testify about a wage violation, file a discrimination charge, or organize with their coworkers. *Amici* are labor unions whose members engage in those forms of speech and collective action. They submit this brief to explain a consequence of the Administration's ideological-deportation policy that is easy to miss from any other vantage: by teaching noncitizen workers that disfavored speech and association can cost them the right to remain in the country, the policy does not merely burden the plaintiffs before this Court. It inflicts a distinct First Amendment injury on the organized workforce *Amici* represent, chilling the collective activity through which unions exist and the academic freedom on which university work depends, and disabling the complaint-driven system on which federal and state work law relies.

*Amici* represent workers across the country, including those employed in higher education. More than 670,000 workers in U.S. colleges and universities are represented by unions.[2] As of January 2024, about 27% of faculty and nearly 40%

---

[2] Barry T. Hirsch, David A. Macpherson & William E. Even, *Union Membership, Coverage, Density, and Employment by Industry: 2025*, Union Membership and Coverage Database (2026) (Excel file, row for "Colleges and universities, including junior colleges").

of graduate student employees were union represented.[3] In many cases, they work alongside unionized clerical, administrative, maintenance, skilled-trade, custodial, library, food-service, and healthcare workers. When a policy silences noncitizens among them, it affects an organized workforce that speaks, bargains, and enforces its rights collectively.

As Plaintiffs-Appellees explain, and as the District Court found, the Trump Administration has violated the First Amendment by targeting noncitizen students and faculty lawfully present in the United States for visa revocation, arrest, detention, and removal because of their political expression and association – suppressing speech on the basis of viewpoint and chilling noncitizens from exercising constitutionally protected rights. D. Ct. Op. at 134–35, 147. The Government argues that Plaintiffs' members showed only a "subjective chill." Appellants' Br. 21. As Plaintiffs-Appellees demonstrate, and the District Court found, that is wrong. D. Ct. Op. at 114–15. *Amici* do not re-brief the standing question. Rather, they explain from the vantage point of labor organizations why this policy objectively chills the speech and association of individuals and

---

[3] William A. Herbert, Jacob Apkarian & Joseph van der Naald, *2024 Directory of Bargaining Agents and Contracts in Institutions of Higher Education*, Nat'l Ctr. for the Study of Collective Bargaining in Higher Educ. & the Profs., 17, 32 (Sept. 2024) (reporting 402,217 unionized faculty and approximately 150,104 union-represented graduate student employees).

organizations – confirming that the District Court was right to find the chill cognizable.

*Amici* elaborate three harms. First, by threatening noncitizen workers for their political expression and association, the policy chills participation in union activity and so impairs the union speech and association that lie at the core of the First Amendment. A union's efficacy depends on its members' willingness to speak publicly, attend meetings, sign petitions, take on leadership, and act collectively; a policy that marks certain views or associations as grounds for deportation predictably deters noncitizen workers from participating in such union activity, weakening the union's capacity to advocate for all its members.

Second, the policy burdens academic freedom, a "special concern of the First Amendment," *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). By making noncitizen faculty, graduate-student employees, and other university workers afraid to research, teach, publish, and travel in their fields, it inflicts a distinct First Amendment injury on the workers *Amici* represent.

Third, the policy disables the enforcement of federal and state labor law. That enforcement is largely complaint-driven: it depends on workers reporting violations, cooperating with investigations, testifying, filing charges, and challenging retaliation. By teaching noncitizen workers that coming forward can cost them the right to remain in the country, the policy makes them less likely to do

so, leaving workplace violations undetected and the governing laws more likely to go unenforced.

These harms are mutually reinforcing: the same fear that deters noncitizen workers from speaking publicly, participating in union activity, and engaging in academic work also deters them from invoking the legal protections that depend on worker complaints.

## ARGUMENT

### I. THE ADMINISTRATION'S POLICY OF IDEOLOGICAL DEPORTATION IMPINGES ON THE FIRST AMENDMENT RIGHTS OF UNIONS AND HARMS THEIR ABILITY TO ORGANIZE AND REPRESENT THEIR MEMBERS

#### A. Workers' Collective Action Depends on – and Is at the Heart of – the First Amendment

Several of the First Amendment's core protections for speech and association were forged in labor cases, and they directly protect the collective activity at issue here. The Court announced the "traditional public forum" doctrine in a case about union organizing, *Hague v. CIO*, upholding an injunction against the mayor of Jersey City for expelling organizers affiliated with the Committee for Industrial Organization. 307 U.S. 496, 515, 518 (1939) (opinion of Roberts, J.). One year later, in *Thornhill v. Alabama*, the Court underscored again that union speech fell within the First Amendment's protection; it overturned a state criminal conviction for peaceful labor picketing, holding that "the dissemination of information concerning the facts of a labor dispute must be regarded as within that

area of free discussion that is guaranteed by the Constitution." 310 U.S. 88, 102 (1940) (collecting cases). And in *Thomas v. Collins*, the Court held that union organizing is protected speech on which no prior restraint may be imposed. 323 U.S. 516, 542–43 (1945). Together these decisions establish two propositions of critical importance to this case: the government violates the First Amendment when it burdens speech in support of union activity, *see Hague*, 307 U.S. at 514; *Thomas*, 323 U.S. at 542–43, and when it retaliates against or punishes workers for taking part in that activity, *Thornhill*, 310 U.S. at 102–03.

The government also violates a union's own associational rights when it deters workers from taking part in union activity, for the First Amendment protects the right of individuals and groups to associate for expressive ends. The seminal case, *NAACP v. Alabama ex rel. Patterson*, holds as much: the Court permitted the organization to assert its members' associational rights "because [the NAACP] and its members are in every practical sense identical," and recognized that the association is itself harmed through "diminished financial support and membership" when the government succeeds in deterring association. 357 U.S. 449, 459–60 (1958). That principle applies with special force to labor unions, which speak, organize, and bargain only through the aggregated participation of their members. When some workers fall silent, the collective's voice is weakened. The resulting injury to the union is direct and present, not derivative or speculative.

The modern associational-rights cases are more protective still. In *Americans for Prosperity Foundation v. Bonta* (*AFP*), the Court held a nonprofit-disclosure requirement facially unconstitutional even as to "noncontroversial" groups and even though the requirement served purposes other than retaliation against disfavored viewpoints. 594 U.S. 595, 615 (2021). Constitutional scrutiny attaches, the Court explained, even to conjectural burdens on association: "Exacting scrutiny is triggered by 'state action which *may* have the effect of curtailing the freedom to associate,' and by the '*possible* deterrent effect' of disclosure." *Id.* at 616 (quoting *NAACP v. Alabama*, 357 U.S. at 460–61 (emphasis added by the *AFP* Court)). A plaintiff need not show "actual restrictions on an individual's ability to join with others"; "[t]he risk of a chilling effect on association is enough." *AFP*, 594 U.S. at 618.

### B. The Administration's Policy of Ideological Deportation Chills Union Organizing and Associated Speech

This case presents exactly the risk those precedents forbid. The enforcement policy has made noncitizen university workers afraid to engage in activity that might draw the government's attention. *See* D. Ct. Op. at 108–11 (summarizing trial testimony of self-censorship); *see also* Jocelyn Gecker, *After Columbia Arrests, International College Students Fall Silent*, AP News (Mar. 15, 2025), https://apnews.com/article/columbia-university-trump-arrests-international-students-0551bb740eac7d5cec155a2d779a45d1. Because unions and their

members routinely speak on contested public questions, that fear attaches directly to union participation. The record makes the mechanism concrete. Professor Nadje Al-Ali, a lawful permanent resident and member of plaintiff organizations AAUP and MESA, testified that after learning of the government's enforcement actions she declined a public-facing leadership role, stopped signing the open letters she had signed before, and ceased assisting in negotiations between Brown University and its students. D. Ct. Op. at 108–09. Each is a withdrawal from precisely the kind of collective, associational activity through which unions act.

The policy inflicts an objective associational harm directly traceable to government action – not a mere "subjective chill" resting on an unreasonable fear of enforcement. *See* D. Ct. Op. at 107–11; *see also AFP*, 594 U.S. at 618 ("[t]he risk of a chilling effect on association is enough"). Its standardless quality makes that harm especially acute. As the District Court found, Rümeysa Öztürk's visa was revoked even though:

> there is no evidence that Öztürk did anything but co-author an op-ed that criticized the University's position on investments with Israel, that she criticized Israel, and that the organization of which she was a member joined in that criticism with an organization that was banned on Tufts campus, with which she was not affiliated.

D. Ct. Op. at 70.

If association can be held against a noncitizen based on the government's surmise about a group's ties to a *different*, banned group, no worker can predict

which affiliations are safe. Rather than guess, many will reasonably choose non-association. That is a heavier burden on association than that imposed by the compelled disclosure invalidated in *AFP*. *See* 594 U.S. at 618. And unlike the disclosure rule in *AFP*, this policy operates by direct threat: it teaches noncitizen workers that disfavored expression or association may cost them their right to remain in the country. But the First Amendment forbids officials from wielding "the threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression" of disfavored speech. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

When workers decline a leadership role, stop signing collective letters, or step back from negotiations, the union loses their participation immediately and practically; and because the union speaks only through the collective force of its members, the silencing of some weakens the organization on which all workers – citizen and noncitizen alike – depend. That is to say, the government's policy limits the "core activity" of unions that represent academic workers, harming them much as it harms plaintiff MESA. D. Ct. Op. at 113 (MESA had organizational standing because the government's policy "significantly harmed" MESA's "core activity").

The stakes for unions are substantial because union advocacy is, by design, public and often controversial. Unions have always pressed workers' interests "on

fronts other than collective bargaining and grievance settlement . . . ." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978). They wage labor disputes "on multiple fronts, including in the court of public opinion," *NLRB v. Maine Coast Reg'l Health Facilities*, 999 F.3d 1, 10 (1st Cir. 2021), and advocate on matters that "necessarily entail a substantial criticism of management" and so "raise matters of public concern," *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999); *accord Davignon v. Hodgson*, 524 F.3d 91, 101–02 (1st Cir. 2008).

That tradition of public, government-critical advocacy by unions cuts across industries and runs throughout U.S. history. Today, steel tariffs may be paramount for autoworkers, while immigration policy may be front-and-center for the university workers this policy targets. Historical examples are equally varied. The International Longshore and Warehouse Union and the California State Industrial Union Council were among the few organizations to oppose the internment of Japanese Americans during World War II. *See National Defense Migration: Hearings Before the Select Committee Investigating National Defense Migration, Part 29*, 77th Cong. 11187–89 (1942) (statement of Louis Goldblatt, Secretary-Treasurer, California State Industrial Union Council, Congress of Industrial Organizations). During the civil-rights era, the United Auto Workers (UAW) championed federal civil-rights legislation, helped fund the NAACP's school-desegregation litigation, supported the Woolworth boycott, and bailed out Freedom

Riders arrested in 1961, including four UAW members. Kevin Boyle, *The UAW and the Heyday of American Liberalism, 1945-1968* 107, 121, 168 (1995). The National Education Association (NEA) supported the voting rights marches in Selma, Alabama, and helped fund the NAACP Legal Defense Fund and litigation to protect Black teachers who were fired in the aftermath of the *Brown v. Board of Education* decision. Michael Edwards & Mark Walsh, *More than a Lawyer: Robert Chanin, the National Education Association, and the Fight for Public Education, Employee Rights, and Social Justice* 110–11 (2010). Starting in the 1970s, the NEA defended gay educators who were fired as a result of their sexual orientation and adopted policies supporting the rights of gay teachers, during a time when open acceptance of gay people was rare. *Id.*

Unions today frequently organize around immigration policy: in February 2026, the AFL-CIO criticized the Trump Administration, arguing that its "obsession with immigration enforcement and disregard for labor enforcement has put workers in physical and financial danger." AFL-CIO, *Workers' Rights ICE'd Out* 11 (2026). And nineteen labor organizations – including several *Amici* – recently filed a brief recounting the stories of members who faced harm from the Administration's birthright-citizenship order. Brief for 19 Labor Organizations as *Amici Curiae* in Support of Respondent, *Trump v. Barbara*, No. 25-365 (U.S. Feb.

24, 2026). Tellingly, those members told their stories anonymously, out of a reasonable fear of retaliation.

Because unions speak and act through the collective force of their members, the inability of some workers to participate freely in union activity weakens the organization on which all workers depend. As the Supreme Court itself has recognized, collectivity is not incidental to unions' existence and core functions; it is central. *See Ellis v. Railway Clerks*, 466 U.S. 435, 449–50 (1984) (treating community-building expenses including union convention and social-activity expenses as chargeable union fees because they were sufficiently related to the union's representational functions, including collective bargaining). And the Court has recognized that public, political advocacy lies at the center of what unions do. *See Eastex*, 437 U.S. at 565. By teaching noncitizen workers that even a tenuous link to a disfavored group may cost them their ability to remain in the country, the policy strikes at that collective enterprise directly, producing exactly the "risk of a chilling effect" on association that the First Amendment does not tolerate. *AFP*, 594 U.S. at 618.

## II. THE ADMINISTRATION'S POLICY OF IDEOLOGICAL DEPORTATION IMPINGES ON THE ACADEMIC FREEDOM AND SPEECH RIGHTS OF UNIVERSITY WORKERS

The enforcement policy also violates the First Amendment by chilling the academic freedom and workplace speech of the faculty, graduate-student

employees, and staff whom *Amici* represent. The record is explicit: faculty testified that they discontinued research on disfavored topics, canceled academic travel, and withheld publications and public commentary in their fields, D. Ct. Op. at 109–11, responses the District Court found "objectively reasonable," *id.* at 116 n.38. The First Amendment does not tolerate that chill.

The Court has emphasized that academic freedom is "a special concern of the First Amendment." *Keyishian*, 385 U.S. at 603; *see Sweezy v. New Hampshire*, 354 U.S. 234, 249 (1957). As the Court observed, it "could not be seriously debated" that a professor's "right to lecture and his right to associate with others were constitutionally protected freedoms." *Sweezy*, 354 U.S. at 249–50. Academic freedom protects not only universities as institutions, but also individual faculty in their research and teaching. Courts of appeals have long recognized, in the context of public-employee speech cases, that faculty retain some measure of First Amendment protection for their scholarship and instruction. *See, e.g.*, *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011); *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014); *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021); *Heim v. Daniel*, 81 F.4th 212 (2d Cir. 2023); *Kilborn v. Amiridis*, 131 F.4th 550 (7th Cir. 2025). That individual dimension matters here, because the noncitizen faculty and graduate-student employees *Amici* represent hold academic-freedom interests of their own that the policy directly burdens.

Here, by making noncitizen faculty and graduate-student employees afraid to research, teach, publish, and travel in their fields, the policy strikes at the core of what academic freedom protects – and at protections that *Amici* have secured for their members contractually and that they are legally obligated to enforce.[4]

The injury also reaches beyond the noncitizen scholars themselves to their students and colleagues, because the First Amendment's protections include the right to receive information. *See Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965). That right is "nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960); *see also Kleindienst v. Mandel*, 408 U.S. 753, 762–64 (1972).[5] By driving noncitizen scholars out of research, teaching, and public engagement, the policy impoverishes the exchange

[4] Collective bargaining agreements covering higher education workers frequently contain academic-freedom protections that *Amici* negotiate and are bound to enforce. William A. Herbert et al., *Academic Freedom and Collective Bargaining*, Nat'l Ctr. for the Study of Collective Bargaining in Higher Educ. & the Profs. & AAUP Ctr. for the Def. of Acad. Freedom, 1, 18–19 (Mar. 2026), https://www.aaup.org/sites/default/files/2026-03/NationalConference_CDAF_Academic_Freedom_and_Collective_Bargaining_Report.pdf.

[5] The *Kleindienst* Court held that the First Amendment interests of American professors who wished to "hear, speak, and debate" with a noncitizen who was located outside the United States did not overcome Congress's power over immigration. 408 U.S. at 762, 769–70. However, that holding does not apply in this case, where faculty and students are losing opportunities to speak and associate with noncitizens who are already working or studying in the United States and who also have First Amendment rights. *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country.").

of ideas for entire university communities – including the many workers *Amici* represent.

Even beyond the academic setting, the Court has held that the government violates the Constitution when it makes people fear that doing their work, or doing it in a disfavored way, will bring serious professional consequences. In *NAACP v. Button*, the Court held that Virginia could not apply its rules on soliciting legal business to the NAACP, because of their chilling effect on "[l]awyers on the legal staff or even mere NAACP members" who risked bar discipline or prosecution for their advocacy. 371 U.S. 415, 434 (1963); *see also In re Primus*, 436 U.S. 412, 422 (1978) (holding that South Carolina could not apply its attorney-solicitation rule to a lawyer acting "to express personal political beliefs and to advance the civil-liberties objectives of the ACLU"). One danger the Court identified in *Button* was standardless, selective enforcement: "a vague and broad statute lends itself to selective enforcement against unpopular causes." 371 U.S. at 435. The policy here operates the same way – if anything, it is vaguer and more easily redirected against new forms of disfavored expression, leaving noncitizens to guess whether their speech will raise their risk of deportation. *See* D. Ct. Op. at 137 ("[T]he diffuseness and ambition of this coercion campaign do not render it less constitutionally suspect.").

The Court has likewise been wary of burdening speech through consequences for employment. In *United States v. Robel*, it struck down a statute barring members of certain groups from working at any "defense facility," because "the operative fact upon which the job disability depends is the exercise of an individual's right of association, which is protected by the provisions of the First Amendment." 389 U.S. 258, 260, 263 (1967). The principle reaches indirect burdens as well. *See NAACP v. Alabama*, 357 U.S. at 462–63 (holding that compelled disclosure that could lead to "economic reprisal" and "loss of employment" chilled protected association); *Lamont*, 381 U.S. at 307 ("Public officials like schoolteachers who have no tenure[] might think they would invite disaster if they read what the Federal Government says contains the seeds of treason."). This policy does precisely what the caselaw forbids: it threatens noncitizens with the loss of authorization to work, teach, and conduct research in the United States on account of their disfavored speech and association. *See also Aptheker v. Sec'y of State*, 378 U.S. 500 (1964) (invalidating a related bar on passports for members of Communist organizations). As such, the policy burdens not only individual academic workers, but also the unions that depend on their members' freedom to teach, research, speak, travel, advise one another, and enforce the academic-freedom protections secured through collective bargaining.

## III. THE ADMINISTRATION'S POLICY OF IDEOLOGICAL DEPORTATION UNDERCUTS FEDERAL AND STATE LAW THAT GUARANTEES WORKERS PROTECTION FOR SPEAKING OUT AGAINST WRONGDOING

Not only does the Administration's enforcement policy silence expressive and academic activity, it also undermines a body of federal and state law built on the premise that workers will report fraud, discrimination, and unsafe conditions only if the law shields them from reprisal. Congress and the states have encoded that premise into dozens of anti-retaliation and whistleblower statutes, and labor-enforcement agencies depend on the very complaints those protections are meant to elicit. The deportation policy directly works against that design. By raising the price of speaking out even beyond the loss of a job to the loss of the right to remain in the country, it revives the fear these laws were enacted to dispel – and it does so with a threat that no anti-retaliation statute was built to neutralize.

### A. Anti-Retaliation Protections Are Critical to Federal Policy Encouraging Workers to Report Wrongdoing, Fraud, Discrimination, and Workplace Safety Violations

Numerous federal statutes contain anti-retaliation provisions for employees who speak out about discriminatory conduct, wage and hour issues, unfair labor practices, or other illegal conduct. Their goal is to encourage robust enforcement of federal labor law. As the Supreme Court has observed in the context of the Fair Labor Standards Act (FLSA), meaningful enforcement of workplace law depends on employees' willingness to report violations; anti-retaliation provisions "make[]

this enforcement scheme effective by preventing 'fear of economic retaliation' from inducing workers 'quietly to accept substandard conditions.'" *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 12 (2011) (quoting *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)); *cf. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 73 (2006) ("A reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former.").

That premise appears throughout federal labor and employment law. For example, Title VII, which protects employees from discrimination, contains an anti-retaliation provision that prohibits employers from punishing employees for asserting their rights under the law. 42 U.S.C. § 2000e-3(a). The FLSA has a similar provision, making it unlawful for employers to fire or otherwise discriminate against employees for asserting their rights under the Act, such as requesting minimum wage or overtime pay. 29 U.S.C. § 215(a)(3). And the National Labor Relations Act prohibits employers from retaliating against employees who favor or oppose a union, as well as those who engage in concerted activities protected by the Act. 29 U.S.C. § 158(a)(1), (3). The National Labor Relations Board (NLRB) has interpreted these protections broadly, including by invalidating facially neutral workplace rules that employees could reasonably understand to chill protected activity. *See Stericycle, Inc.*, 372 NLRB No. 113,

2023 WL 4947792, at *3 (2023) ("[O]ur standard requires the General Counsel to prove that a challenged rule has a reasonable tendency to chill employees from exercising their Section 7 rights."). The NLRB's understanding underscores the importance of employees' right to speak out against employer misconduct and to organize collectively.

Congress has made the same judgment in laws protecting workers who report wrongdoing to public authorities. The False Claims Act prohibits retaliation against employees who report fraud against the federal government. 31 U.S.C. § 3730(h). The Dodd-Frank Act protects individuals who report securities violations to the Securities and Exchange Commission. 15 U.S.C. § 78u-6(h). These provisions reflect the same enforcement design: workers must be able to report, testify, cooperate, and organize without fear that doing so will trigger reprisal.

That design is particularly important for immigrant workers. In creating the U-visa scheme, Congress recognized that immigrant victims may be unable to report abuse or assist investigations when they fear immigration consequences. *See* 8 U.S.C. § 1101(a)(15)(U). Congress found that trafficking victims "often fear retribution and forcible removal to countries in which they will face . . . hardship" and therefore may be unable "to report the crimes committed against them or to assist in the investigation . . . of such crimes." Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464, 1468. Together, these

provisions reflect Congress's judgment that protection from immigration consequences can be necessary to enable reporting. Here, the Administration's enforcement policy runs directly contrary: it teaches noncitizen workers that speech, association, and cooperation with public processes can place their ability to remain in the country at risk.

### B. State Law Similarly Protects Workers from Retaliation When They Report Wrongdoing, Including Fraud, Violations of Workplace Safety Rules, and Antidiscrimination Law

State labor and employment law rests on similar suppositions. Massachusetts, New Jersey, and New York, the states in which several Plaintiffs in this case are based, have all adopted policies that encourage workers to speak out against wrongdoing. *See* Mass. Gen. Laws ch. 149, § 185(b)(1) (2021) ("An employer . . . shall not take any retaliatory action against an employee because the employee . . . [d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of the employer . . . that the employee reasonably believes is in violation of a law . . . ."); *accord* N.J. Stat. Ann. § 34:19-3(a)(1) (West 2006); N.Y. Lab. Law § 740 (McKinney 2022).[6] The robust

[6] These states also have specific provisions for workers who complain about discrimination, as well as provisions addressing worker complaints and retaliation in other contexts. *See, e.g.*, 804 Mass. Code Regs. § 3.01(4)(d)(3) (2026); N.J. Admin. Code § 4A:7-3.1 (2020); N.Y. Exec. Law § 296(7) (McKinney 2025), workplace health and safety, 454 Mass. Code Regs. § 25.03(5) (2021); N.J. Admin. Code § 12:110-7.2(a)(1) (2023); N.Y. Lab. Law § 27-a(5) (McKinney 2021), and

whistleblowing protections adopted by these states have the purpose of "encourag[ing] reporting of violations of law and [] protect[ing] employees who report violations of law from retaliation by their employers." *Galvin v. Roxbury Cmty. Coll.*, 273 N.E.3d 186, 197 n.15 (Mass. 2026); *see also Ulysse v. AAR Aircraft Component Servs.*, 841 F. Supp. 2d 659, 678 (E.D.N.Y. 2012) (recognizing that such provisions "protect the whistleblower that makes a complaint . . . and thereby indirectly encourage[] these complaints to be made").

Some states also recognize that workplace retaliation can be used to suppress workers' political expression and association – and prohibit such action. For instance, California's labor code prohibits employers from "controlling or directing, or tending to control or direct the political activities or affiliations of employees" or attempting to influence employees' political activity through threat of discharge. Cal. Lab. Code §§ 1101–1102 (West 2026). New York state law similarly makes it unlawful for an employer to refuse to hire, employ, discharge, or otherwise discriminate against an individual based on political activities conducted outside of working hours, subject to some statutory exceptions. N.Y. Lab. Law § 201-d (McKinney 2023). The District of Columbia, South Carolina, and other

---

wage discrimination, Mass. Gen. Laws ch. 149 § 105A(c)(3) (2018); N.J. Stat. Ann. § 34:11-4.10(a) (West 2019); N.Y. Lab. Law § 194-a(1)(f) (McKinney 2020), among others.

cities and states have adopted similar protections. *See, e.g.*, D.C. Code § 2-1402.11(a)(1)(A) (2023); S.C. Code Ann. § 16-17-560 (2026).

Taken together, these statutes reflect a coherent federal and state commitment to preventing retaliation against workers who report wrongdoing, assert workplace rights, or engage in protected speech and collective activity. They recognize that labor and employment rights can be meaningfully enforced only if workers, including immigrant workers, are free to report violations, cooperate with enforcement agencies, and engage in protected collective activity without fear of reprisal.

### C. The Threat of Deportation of Noncitizen Workers on the Basis of Their Political Speech and Association Will Reduce Workers' Willingness to Report Employer Wrongdoing

The Administration's ideological deportation policy chills noncitizen workers' willingness to report workplace violations, frustrating federal and state efforts to detect misconduct and protect those who expose it. Federal and state labor enforcement agencies rely heavily on workplace complaints to fulfill their statutory missions. For example, workplace complaints triggered 20% of all OSHA inspections between 2006 and 2016, over 75% of the inspections conducted by the Wage and Hour Division of the Department of Labor, and 100% of the EEOC's antidiscrimination enforcement actions. Amanda M. Grittner & Matthew S. Johnson, *When Labor Enforcement and Immigration Enforcement Collide:*

*Deterring Worker Complaints Worsens Workplace Safety* 2 (W.E. Upjohn Inst., Working Paper No. 21-353, 2021), https://research.upjohn.org/cgi/viewcontent.cgi?article=1372&context=up_workingpapers/353/. Even when government agencies do conduct investigations independent of worker complaints, the number of workplaces that the agency can inspect each year is tiny; OSHA, for example, inspects less than one percent of the workplaces that it oversees each year. *Id.* at 2 n.2.

Empirical evidence demonstrates that immigration enforcement efforts, like deportation threats, reduce the willingness of workers to report workplace violations. When workers are deterred from complaining due to barriers like immigration enforcement, reductions in workplace safety follow. Researchers Amanda Grittner and Matthew Johnson studied the workplace effects of a localized immigration enforcement program where local law enforcement shared arrest information with ICE. *Id.* at 9. They found that the immigration enforcement program reduced OSHA complaints by 40-50% in county-level industries with an entirely Hispanic workforce compared to workforces in the same county with no Hispanic workers. *Id.* at 3. In those all-Hispanic workplaces, the authors found a corresponding 24% increase in workplace injuries relative to the non-Hispanic workplaces. *Id.* In addition to reducing workplace safety, the authors found that the immigration enforcement program led to a 12% increase in the probability that an

hourly Hispanic worker would be paid an hourly wage below minimum wage. *Id.* at 27.

As this study shows, the threat of immigration consequences can deter workers from reporting workplace violations. The Administration's ideological use of deportation is therefore especially destructive because it weaponizes that deterrent effect against workers who engage in protected speech, complaints, or collective activity. It disables the complaint-driven enforcement system on which federal and state labor law depends, allowing workplace violations to go undetected and undermining the very regulatory regimes designed to prevent them.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be affirmed.

Dated: August 20, 2026

Respectfully submitted,

/s/ Steven K. Ury

Steven K. Ury
Elena Medina Neuman
Deborah L. Smith
Service Employees International Union, AFL-CIO
1800 Massachusetts Avenue, NW
Washington, DC 20036
(213) 440-4547

*Attorneys for Amicus Curiae SEIU*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,529 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

Dated: August 20, 2026

Respectfully submitted,

/s/ Deborah Smith
Deborah Smith

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2026, I electronically filed this brief with the Clerk of the Court for the U.S. Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that all participants are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

/s/ Steven K. Ury
Steven K. Ury