**Nos. 26-1141 & 26-1195**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS - HARVARD FACULTY CHAPTER; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY; RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN FEDERATION OF TEACHERS; MIDDLE EAST STUDIES ASSOCIATION,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

MARCO RUBIO, in the official capacity as Secretary of State; U.S. DEPARTMENT OF STATE; MARKWAYNE MULLIN, in the official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, in the official capacity as Acting Director of U.S. Immigration and Customs Enforcement; DONALD J. TRUMP, in the official capacity as President of the United States; UNITED STATES,

*Defendants-Appellants / Cross-Appellees.*

On Appeal from the United States District Court
for the District of Massachusetts, No. 1:25-cv-10685-WGY

# BRIEF OF *AMICI CURIAE* FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, CATO INSTITUTE, PEN AMERICA, NATIONAL COALITION AGAINST CENSORSHIP, FIRST AMENDMENT LAWYERS ASSOCIATION, AND THE RUTHERFORD INSTITUTE, IN SUPPORT OF PLAINTIFFS-APPELLEES

Conor T. Fitzpatrick
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
conor.fitzpatrick@fire.org
(215) 717-3473
*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 29(a)(4)(A), counsel for *amici curiae* certifies that (1) *amici* do not have any parent corporations; and (2) no publicly held corporations hold 10 percent or more of the stock or of any ownership interest in *amici*.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................... i

TABLE OF AUTHORITIES ...................................................................iii

INTEREST OF *AMICI CURIAE* ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 5

ARGUMENT ........................................................................................... 7

I. The First Amendment Protects Noncitizens.................................... 8

A. The Alien Friends Act of 1798 Faced Immediate Backlash and Led to the Extinction of the Federalist Party. ........................................................................... 9

B. Noncitizens Played a Key Role at the Founding. ................. 18

II. The First Amendment Bars Deportation Based on Protected Speech. ............................................................................................. 23

A. Unbroken Caselaw Holds the First Amendment Prohibits Deporting Noncitizens Based on Speech. ............. 23

B. Deporting a Noncitizen for Speech is Forbidden Viewpoint Discrimination. .................................................... 29

C. Deporting Noncitizens Based on Speech Amounts to Unconstitutional Retaliation. ............................................... 31

III. Allowing the Government to Deport Speakers Deemed Contrary to the National Interest is an Un-American Approach to Speech. ......................................................................... 32

CONCLUSION ...................................................................................... 34

## TABLE OF AUTHORITIES

### Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .......... 5

*AAUP v. Rubio*,
802 F. Supp. 3d 120 (D. Mass. 2025) .......... 30

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
70 F.3d 1045 (9th Cir. 1995) .......... 23–25, 27–28

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 17

*Ashcroft v. ACLU*,
535 U.S. 564 (2002) .......... 8

*Bridges v. California*,
314 U.S. 252 (1941) .......... 23

*Bridges v. Wixon*,
326 U.S. 135 (1945) .......... 6, 23, 25, 34

*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 29

*Dennis v. United States*,
341 U.S. 494 (1951) .......... 27

*Dep't of State v. Muñoz*,
602 U.S. 899 (2024) .......... 26

*Edwards v. South Carolina*,
372 U.S. 229 (1963) .......... 31

*Ex parte Milligan*,
71 U.S. 2 (1866) .......... 6

*FCC v. Pacifica Found.*,
438 U.S. 726 (1978) .......... 29

*Fong Yue Ting v. United States*,
149 U.S. 698 (1893) .......... 16

*Galvan v. Press*,
347 U.S. 522 (1954) .......... 25

*Hannon v. Beard*,
645 F.3d 45 (1st Cir. 2011) .......... 31

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) .......... 27

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) .......... 26

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) .......... 26

*Kwong Hai Chew v. Colding*,
344 U.S. 590 (1953) .......... 5, 23, 27

*Lozman v. Riviera Beach*,
585 U.S. 87 (2018) .......... 31

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) .......... 21

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 30

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) .......... 6

*Pahls v. Thomas*,
718 F.3d 1210 (10th Cir. 2013) .......... 24

*Rafeedie v. INS*,
795 F. Supp. 13 (D.D.C. 1992) .......... 23

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 30

*Reno v. AADC*,
525 U.S. 471 (1999) .................................................................... 28

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .................................................................... 29

*Sessions v. Dimaya*,
584 U.S. 148 (2018) ........................................................... 7, 17, 26

*Snyder v. Phelps*,
562 U.S. 443 (2011) .................................................................... 29

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .................................................................... 30

*Speiser v. Randall*,
357 U.S. 513 (1958) .................................................................... 25

*Starr v. Dube*,
334 F. App'x 341 (1st Cir. 2009) ................................................. 31

*Trump v. J.G.G.*,
604 U.S. 670 (2025) .................................................................... 17

*Turner Broadcasting Sys., Inc. v. FCC*,
512 U.S. 622 (1994) .................................................................... 30

*Turner v. Williams*,
194 U.S. 279 (1904) .................................................................... 28

*United States v. Robel*,
389 U.S. 258 (1967) .................................................................... 26

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .................................................................... 29

*Zadvydas v. Davis*,
533 U.S. 678 (2001) .................................................................... 27

**Statutes**

An Act Concerning Aliens, Pub. L. No. 5-58, § 1, 1 Stat. 570 (1798) (expired June 25, 1800) ........................................ 7–12, 14–17, 20, 23

Sedition Act, Pub. L. No. 5–74, 1 Stat. 596 (1798) (expired Mar. 3, 1801) ...................................................... 9–12, 14–17

**Treatises**

1 Smolla & Nimmer on Freedom of Speech § 10:19 ............................................................................... 27

**Constitutional Provisions**

U.S. Const. amend. I ................................ 5–6, 8–9, 12, 20, 23–29, 31, 34

U.S. Const. art. 1, § 8, cl. 1 ............................................................... 25

**Congressional Records**

4 Annals of Cong. 934 (1794) ................................................................ 9

8 Annals of Cong. 1954–2029 (1798) .................................................... 11

8 Annals of Cong. 2985–3017 (1799) .................................................... 13

25 Annals of Cong. 664 (1813) .............................................................. 16

32 Annals of Cong. 1326 (1818) ............................................................ 17

9 Reg. Deb. 1017 (1833)......................................................................... 17

**Foreign Constitutional Provisions**

Federal Law of the Russian Federation on Information, Informational Technologies and the Protection of Information [Russian Federation Collection of Legislation] 2006, No. 31, Item 3448 ......................................................................................... 32

Law of Printing and Publication (Royal Decree No. M/23, 3/9/1424 H), art. 9 (2003) ............................................................................ 33

Xianfa art. 51 (1982) .......... 32

**Other Authorities**

1 Hermann von Holst, *The Constitutional and Political History of the United States* (John J. Lalor & Alfred B. Mason trans., 1876) .......... 16

3 Joseph Story, *Commentaries on the Constitution of the United States* (1833) .......... 16

4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 1836) .......... 6, 8, 13–14, 24

14 *The Papers of Thomas Jefferson* (Julian P. Boyd et al. eds., 2018) .......... 9

17 *The Papers of James Madison* (William T. Hutchinson et al. eds., 1991) .......... 7, 11

30 *The Papers of Thomas Jefferson* (Barbara B. Oberg ed., 2018) .......... 10

33 *The Papers of Thomas Jefferson* (Barbara B. Oberg ed., 2018) .......... 16

Charles Slack, *Liberty's First Crisis: Adams, Jefferson, and the Misfits Who Saved Free Speech* (2015) .......... 19

Daniel Green, *Great Cobbett: The Noblest Agitator* (1985) .......... 22

David A. Wilson, *United Irishmen, United States: Immigrant Radicals in the Early Republic* (1998) .......... 20

David M. Rabban, *The First Amendment in Its Forgotten Years*, 90 Yale L.J. 514 (1981) .......... 28

Douglas Bradburn, *A Clamor in the Public Mind: Opposition to the Alien and Sedition Acts*, 65 Wm. & Mary Q. 565 (2008) .......... 12

George Parker Winship,
*Two or Three Boston Papers*, 14 Papers Bibliographical Soc'y Am. (1920) .......... 22

History, Art, & Archives: United States House of Representatives,
*Party Divisions of the House of Representatives, 1789 to Present* ....... 15

James Morton Smith,
*Freedom's Fetters: The Alien and Sedition Laws and American Civil Liberties* (1956) .......... 10, 11, 20

Jenny Graham,
*The Emigration of Joseph Priestley to America 1794–1804* (1995) ..... 21

Letter from James Madison to Thomas Jefferson (May 20, 1798) ........ 11

Letter from Thomas Jefferson to David Humphreys (Mar. 18, 1789) ..... 9

Letter from Thomas Jefferson to Joseph Priestley (Mar. 21, 1801) ...... 16

Letter from Thomas Jefferson to Thomas Mann Randolph (May 9, 1798) .......... 10

Matthew J. Lindsay,
*Immigration, Sovereignty, and the Constitution of Foreigners*, 45 Conn. L. Rev. 743 (2013) .......... 14

Stephen D. Solomon,
*Revolutionary Dissent: How the Founding Generation Created the Freedom of Speech* (2016) .......... 18

Terri Diane Halperin,
*The Alien and Sedition Acts of 1798: Testing the Constitution* (2016) .......... 12

*The New York Criminal Anarchy Act*, 36 Harv. L. Rev. 199 (1922) ...... 28

Thomas Jefferson,
First Inaugural Address (Mar. 4, 1801) .......... 33

United States Senate,
*Party Division* .......... 15

Wendell Bird,
*Criminal Dissent: Prosecutions Under the Alien and Sedition Acts of 1798* (2020) ........ 11–15, 18–20

William Duane,
*A Letter to George Washington, President of the United States* (Nov. 12, 1796) ........ 19

## INTEREST OF *AMICI CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights nationwide without regard to speakers' views through public advocacy, strategic litigation, and *amicus curiae* filings in cases implicating expressive rights. *See, e.g.*, *Volokh v. James*, 148 F.4th 71 (2d Cir. 2025); *Pernell v. Fl. Bd. of Gov. of St. Univ.*, 181 F.4th 1135 (11th Cir. 2026); *Reges v. Cauce*, 175 F.4th 1014 (9th Cir. 2026). FIRE is deeply concerned by the government's claim of authority to subject resident aliens to adverse action for their expressed viewpoints. FIRE has engaged in direct litigation on this issue on behalf of noncitizens and a student newspaper with noncitizen writers and editors. *See Stanford Daily Publ'g Corp. v. Rubio*, 820 F. Supp. 3d 974 (N.D. Cal. 2026). FIRE has also provided *amicus* support to noncitizens facing deportation based on protected

[1] No counsel for a party authored this brief in whole or part. Further, no person, other than *amici*, their members, or their counsel contributed money intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

speech. *See* Br. *Amici Curiae* FIRE et al. Supp. Pet'r-Appellee, *Khalil v. Trump*, 164 F.4th 259 (3d Cir. 2025) (No. 25-2162); Br. *Amici Curiae* FIRE et al. Supp. Pet'r-Appellee, *Mahdawi v. Trump*, No. 25-1113, 2026 WL 2090981 (2d Cir. July 21, 2026); Br. *Amici Curiae* FIRE et al. Supp. Pet'r-Appellee, *Ozturk v. Hyde*, No. 25-1019 (2d Cir. dismissed July 21, 2026). FIRE seeks to ensure the First Amendment continues to constrain the government from subjecting individuals to disfavored treatment based on their viewpoint.

The Cato Institute is a nonpartisan public-policy research foundation established in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, produces the annual *Cato Supreme Court Review*, and files amicus briefs.

PEN American Center, Inc. ("PEN America") is a nonpartisan nonprofit organization working at the intersection of literature and human rights. Founded in 1922, PEN America advocates for free

expression and the interests of writers and journalists in the United States and abroad. Its membership includes more than 5,000 writers, journalists, literary professionals, and readers nationwide. PEN America protects press freedom and journalists by combatting disinformation, defending journalists against online abuse, and supporting local news.

The National Coalition Against Censorship (NCAC) is an alliance of more than 60 national non-profit literary, artistic, religious, educational, and civil liberties groups. NCAC was founded in 1974 in response to the United States Supreme Court's landmark decision in *Miller v. California*, 413 U.S. 15 (1973), which narrowed First Amendment protections for sexual expression and opened the door to obscenity prosecutions. The organization's purpose is to promote free speech in service of democracy. NCAC engages in direct advocacy and education to support free expression rights of students, teachers, librarians, artists, and others. It therefore has a longstanding interest in ensuring robust First Amendment protections for all, including noncitizens. The positions advocated in this brief do not necessarily reflect the views of NCAC's member organizations.

The First Amendment Lawyers Association (FALA) is a nonprofit organization comprised of attorneys across the United States with a shared commitment to preserving and advancing the rights guaranteed by the First Amendment. Since its founding in the 1960s, FALA has actively participated in cases concerning free expression, freedom of the press, and restrictions on speech in public spaces. FALA members are often on the front lines of First Amendment litigation, and the organization frequently appears as *amicus* to protect against government encroachment on constitutional expression.

The Rutherford Institute is a nonprofit civil liberties organization which was founded in 1982 by its President, John W. Whitehead. The Institute provides legal assistance at no charge to individuals whose constitutional rights have been violated and educates the public about issues affecting their freedoms.

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness."

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court correctly held the First Amendment bars deporting noncitizens for protected speech. It is unthinkable that a person in a free society could be jailed and deported for expressing an opinion. Certainly not in the country envisioned by our nation's Framers, who viewed "the freedom to think and speak" as "inalienable human rights." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023).

To protect those inalienable rights, the Framers crafted the First Amendment, ensuring that "Congress shall make no law" abridging the right of individuals to think and speak for themselves. The Bill of Rights' opening command, forged when noncitizen Europeans were some of the most prolific and controversial commentators of the day, makes no "distinction between citizens and resident aliens." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (internal quotation marks omitted).

James Madison explained that because noncitizens "owe, on one hand, a temporary obedience" to American laws, "they are entitled in return, to their protection and advantage." James Madison, Report on the

Virginia Resolutions (1800), *reprinted in* 4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 546, 556 (Jonathan Elliot ed., 1836) ("Elliot's Debates"). Thus, the Supreme Court has made clear that the First Amendment's protection for "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945).

Yet the government argues the First Amendment provides no shield against deportation based on protected speech. To reach that result, the government's brief ignores *Wixon* entirely. Disregarded or not, the law remains the same. The First Amendment prohibits government officials from "us[ing] the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). Deporting noncitizens based on speech is inescapably just that.

The Constitution "is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances." *Ex parte Milligan*, 71 U.S. 2, 120–21 (1866). The government's argument that the political branches may expel law-abiding noncitizens for expressing a disfavored opinion is

contrary to centuries of American history and settled law. This Court should affirm the district court.

**ARGUMENT**

Our Nation has been here before. In 1798, fearful that Irish and French immigrants were importing the spirit of the French Revolution, the Federalist majority in Congress passed, and President John Adams signed, the Alien Friends Act. It authorized Adams to deport any noncitizen he deemed "dangerous to the peace and safety of the United States." An Act Concerning Aliens, Pub. L. No. 5-58, § 1, 1 Stat. 570, 571 (1798) (expired June 25, 1800). But as Justice Gorsuch explained, the Alien Friends Act was "one of the most notorious laws in our country's history," "widely condemned as unconstitutional," and "may have cost the Federalist Party its existence." *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring).

During the drafting process, James Madison called the law a "monster that must for ever disgrace its parents." Letter from James Madison to Thomas Jefferson (May 20, 1798), *in* 17 *The Papers of James Madison* 133–34 (William T. Hutchinson et al. eds., 1991). He compared presidential power to banish noncitizens for speech to that of a king:

"Could a power be well given in terms less definite, less particular, and less precise? … They leave everything to the President. His will is the law." Madison, Report on the Virginia Resolutions, *reprinted in* Elliot's Debates, *supra*, at 560. The Alien Friends Act expired on its own terms in 1800 (not long before its sister statute, the Sedition Act), and the backlash to the Acts helped usher Thomas Jefferson into the presidency.

But 225 years later, the spirit of the Alien Friends Act rises from the grave. Yet again we have a President and Secretary of State fueled by a belief that the Constitution permits banishing peaceful noncitizens from our shores for voicing "dangerous" ideas. Yet again they are wrong.

## I. The First Amendment Protects Noncitizens.

The First Amendment's guarantee that "'Congress shall make no law … abridging the freedom of speech' … embodies our profound national commitment to the free exchange of ideas." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (cleaned up). This commitment traces to the founding belief in free speech as an inalienable right rather than a government-bestowed privilege. Two years before the First Amendment's ratification, Thomas Jefferson explained: "There are rights which it is useless to surrender to the government, and which yet, governments

have always been fond to invade. These are the rights of thinking, and publishing our thoughts by speaking or writing." Letter from Thomas Jefferson to David Humphreys (Mar. 18, 1789), *in* 14 *The Papers of Thomas Jefferson* 676, 678 (Julian P. Boyd et al. eds., 2018). Three years after ratification, James Madison put the First Amendment's command in plain terms: "Opinions are not the objects of legislation." 4 Annals of Cong. 934 (1794).

The government's insistence here that the First Amendment poses no barrier to deporting noncitizens based on their protected speech ignores freedom of speech's status as an inalienable right not subject to government regulation. Moreover, it ignores the extensive contemporaneous backlash to the Alien Friends Act and the prominent role noncitizen dissidents and commentators have played since the Founding.

### A. The Alien Friends Act of 1798 Faced Immediate Backlash and Led to the Extinction of the Federalist Party.

The Alien Friends Act stands in infamy alongside its sister statute, the Sedition Act.[2] After publication of the XYZ dispatches in early 1798

[2] The Sedition Act made it a crime for any person to "print, utter, or

inflamed anti-French sentiment across the United States, the Adams administration and its Federalist allies in Congress seized the moment as an opportunity to curtail political opposition to their policies. The Federalists' "first move was to identify [Jefferson's] Republican party with the French, and then to treat opposition to administration measures as nearly traitorous." James Morton Smith, *Freedom's Fetters: The Alien and Sedition Laws and American Civil Liberties* 14 (1956).

The Federalist-controlled Senate quickly began work on the Alien Friends Act, which authorized the president to deport any noncitizen he deemed "dangerous to the peace and safety of the United States." An Act Concerning Aliens, Pub. L. No. 5–58, § 1, 1 Stat. 570, 571 (1798) (expired June 25, 1800). Thomas Jefferson decried the legislation as "an alien bill worthy of the 8th or 9th century." Letter from Thomas Jefferson to Thomas Mann Randolph (May 9, 1798), in 30 *The Papers of Thomas Jefferson* 341 (Barbara B. Oberg ed., 2018). Madison was equally harsh: "The Alien Bill proposed in the Senate is a monster that must for ever disgrace its parents. I should not have supposed it possible that such [a]

---

publish … any false, scandalous, and malicious writing" about the government. Pub. L. No. 5–74, 1 Stat. 596 (1798) (expired Mar. 3, 1801).

one could have been engendered in either House, & still persuade myself, that it cannot possibly be fathered by both." Letter from James Madison to Thomas Jefferson (May 20, 1798), *in* 17 *The Papers of James Madison*, *supra*, at 133–34.

Republicans in the House mounted a vigorous attack on the bill's constitutionality, led by future Secretary of State Edward Livingston and future Secretary of the Treasury Albert Gallatin. *See* 8 Annals of Cong. 1954–2029 (1798); Smith, *supra*, at 63–90. Livingston railed against the bill, arguing that a broad view of aliens' rights would be "consonant to the principles of common justice, for who alone would ever resort to another country, if he alone was marked out as the object of arbitrary power?" 8 Annals of Cong. 2012 (1798) (statement of Rep. Livingston). But the Alien Friends Act narrowly passed, carried exclusively by the Federalist majority. Wendell Bird, *Criminal Dissent: Prosecutions Under the Alien and Sedition Acts of 1798* 40 (2020).

The Alien Friends Act and accompanying Sedition Act sparked an immediate backlash. Petitions urging the laws' repeal flooded Congress, including at least two from Irish aliens in Philadelphia and New York City, which the Federalist majority agreed to consider (thus implicitly

acknowledging noncitizens' First Amendment right to petition). *See* Terri Diane Halperin, *The Alien and Sedition Acts of 1798: Testing the Constitution* 108 (2016); Douglas Bradburn, *A Clamor in the Public Mind: Opposition to the Alien and Sedition Acts*, 65 Wm. & Mary Q. 565, 579 (2008) (explaining that the Irish petitions were "bold … assertion[s] by noncitizens of an authority to interpret the Constitution, decrying what they believed was the unconstitutional nature of the Alien Act and asking for its repeal"). As time passed, a growing number of Federalists—including Charles Cotesworth Pinckney, President Washington's minister to France—voiced opposition to the Alien and Sedition Acts. *See* Bird, *supra*, at 48–49; *see also* Bradburn, *supra*, at 572, 593.

Public opposition to the Acts prompted the passage of the famous Kentucky and Virginia Resolutions in those states' respective legislatures calling for the Acts' repeal. *See* Bradburn, *supra*, at 566–67. Jefferson drafted the Kentucky Resolutions while Madison drafted the Virginia Resolutions, the latter declaring the Alien Friends Act a "palpable and alarming infraction[] of the Constitution" that "subverts the general principles of free government, as well as the particular organization and positive provisions of the Federal Constitution."

Virginia Resolutions of 1798, *reprinted in* Elliot's Debates, *supra*, at 528. Tennessee and Georgia passed resolutions supporting Kentucky's and Virginia's call to repeal the Acts, with Tennessee decrying the Acts as "in several parts opposed to the constitution, and … impolitic, oppressive, and unnecessary." Bird, *supra*, at 169–73.

Responding to the state resolutions, the federal House of Representatives narrowly adopted a committee report defending the Acts' constitutionality. *See* 8 Annals of Cong. 2985–3017 (1799). The Federalist majority relied on the same argument advanced the year before, that aliens were not members of the polity and therefore not entitled to constitutional rights. *See* 8 Annals of Cong. 2987 (1799) ("[T]he Constitution was made for citizens, not for aliens, who of consequence have no rights under it, but remain in the country and enjoy the benefit of the laws, not as matter of right, but merely as matter of favor and permission.").

Madison penned a lengthy rebuttal which the Virginia legislature adopted in what came to be known as the "Report of 1800." The Report rejected the Federalists' position that aliens possessed no constitutional

rights and argued noncitizens have a reciprocal relationship with America's Constitution and laws:

> Again, it is said that, aliens not being parties to the constitution, the rights and privileges which it secures, cannot be at all claimed by them. … [But] it does not follow, because aliens are not parties to the Constitution, as citizens are parties to it, that, whilst they actually conform to it, they have no right to its protection. Aliens are not more parties to the laws than they are parties to the Constitution; yet, it will not be disputed that, as they owe, on one hand, a temporary obedience, they are entitled in return to their protection and advantage.

Madison, Report on the Virginia Resolutions, *reprinted in* Elliot's Debates, *supra*, at 556.

"The constitutional arguments advanced by Republicans in opposition" to the Alien and Sedition Acts "better reflected mainstream political and legal opinion" about the federal government's authority over noncitizens. Matthew J. Lindsay, *Immigration, Sovereignty, and the Constitution of Foreigners*, 45 Conn. L. Rev. 743, 759 (2013). To that end, Jefferson, Madison, and the Republicans made opposition to the Acts "a central part" of their strategy for the 1800 elections. Bird, *supra*, at 165. "The Republican belief that the Constitution and its liberties were being violated by the Federalists, and particularly by the Alien and Sedition

Acts, provided an effective platform and a powerful motivation." *Id.* at 369.

The Republicans swept to victory, flipping both houses of Congress and winning a near-supermajority in the House.[3] The results showed "extensive public support for a broad understanding of freedoms of press and speech, and for the Virginia and Kentucky Resolutions." Bird, *supra*, at 368. Jefferson remarked to Joseph Priestley, who was both an English citizen living in the United States and a prominent Republican-aligned political philosopher, that "a mighty wave of public opinion" had vindicated the Republican vision of the Constitution, bringing noncitizens squarely "under the protection of those laws which were made for the wise & the good like you, and disclaim the legitimacy of that libel on legislation which under the form of a law was for sometime placed among them." Letter from Thomas Jefferson to Joseph Priestley (Mar.

[3] History, Art, & Archives: United States House of Representatives, *Party Divisions of the House of Representatives, 1789 to Present*, https://history.house.gov/Institution/Party-Divisions/Party-Divisions/ [https://perma.cc/E275-S644]; United States Senate, *Party Division*, https://www.senate.gov/history/partydiv.htm [https://perma.cc/U5HR-MPEB].

21, 1801), *in* 33 *The Papers of Thomas Jefferson* 393, 394 (Barbara B. Oberg ed., 2018).

The Alien Friends Act sits in the ash heap of constitutional history. It "was severely denounced by many of [America's] ablest statesmen and jurists as unconstitutional and barbarous" and "has ever since been the subject of universal condemnation." *Fong Yue Ting v. United States*, 149 U.S. 698, 747, 750 (1893) (Field, J., dissenting). Speaker Henry Clay called it an "insidious attack upon the freedom of the person." 25 Annals of Cong. 664 (1813). And Justice Joseph Story observed that the Alien and Sedition Acts had "left no permanent traces in the constitutional jurisprudence of the country." 3 Joseph Story, *Commentaries on the Constitution of the United States* 164 (1833); *see also* 1 Hermann von Holst, *The Constitutional and Political History of the United States* 142 (John J. Lalor & Alfred B. Mason trans., 1876) ("[F]or a long time, [the Alien and Sedition Acts] have been considered in the United States as unquestionably unconstitutional.").

Thirty years later, Representative Erastus Root of New York remarked, "[T]he alien law[] had been, by the political revolution of 1801, pronounced, as facts could speak, in terms as strong as human language

could furnish, as strong as any language that could be used in judicial decisions, to be unconstitutional and void." 9 Reg. Deb. 1017 (1833). Virginia Representative Henry St. George Tucker Sr. concurred: "It would be absurd to speak of the alien and sedition laws as precedents. It would be absurd to attribute the sanctity of national acquiescence, to measures which were received with the deep-toned murmurs of national disapprobation." 32 Annals of Cong. 1326 (1818).

The rejection of the Alien and Sedition Acts continues. Justice Gorsuch recently highlighted the Alien Friends Act's status as "one of the most notorious laws in our country's history." *Sessions*, 584 U.S. at 185–86 (Gorsuch, J., concurring). Justice Scalia called it a "fleeting exception" in the early history of American immigration law and quoted Jefferson's assertion that "no power over [alien friends] has been delegated to the United States … distinct from their power over citizens." *Arizona v. United States*, 567 U.S. 387, 420–21 (2012) (Scalia, J., concurring in part and dissenting in part) (cleaned up). Just last year, Justice Sotomayor noted the Alien Friends Act was "widely denounced" and "lapsed in disrepute." *Trump v. J.G.G.*, 604 U.S. 670, 676 (2025) (Sotomayor, J., dissenting).

So, here, when the government attempts to rely on immigration statutes to expel law-abiding noncitizens for speech the government disfavors, it is resuscitating a long-rejected view of noncitizen rights under our Constitution. The district court correctly rejected the government's argument. This Court should do the same.

### B. Noncitizens Played a Key Role at the Founding.

Noncitizen activists and commentators have played a starring role in American politics. During the early Republic, many of the most prominent (and controversial) voices were noncitizens, yet none faced deportation based on their speech. Take Scotland's James Callender, who one historian described as "the most scurrilous of the Republican writers of the 1790s." Bird, *supra*, at 303. With Thomas Jefferson's financial support, Callender "discharged his pen against the Federalists," exposed Alexander Hamilton's extramarital affair, and, after a falling out with Jefferson, was the first to publish the scandalous "allegations that Jefferson had fathered children with one of [Jefferson's] slaves." Stephen D. Solomon, *Revolutionary Dissent: How the Founding Generation Created the Freedom of Speech* 271, 284, 293 (2016); Charles Slack,

*Liberty's First Crisis: Adams, Jefferson, and the Misfits Who Saved Free Speech* 62 (2015).[4]

Consider also William Duane from Newfoundland Colony,[5] who served as editor of the Philadelphia *Aurora*, the foremost opposition newspaper to the Adams administration. *See* Bird, *supra*, at 227–31. There, Duane "waged relentless attacks against the Federalists." *Id.* at 229. Shortly after arriving in the United States, Duane wrote a scathing critique of George Washington in a pamphlet published by the *Aurora*, disparaging him as a hypocrite for owning slaves and suggesting his "attachment to the revolution was not the result of a love of republican freedom, but of disappointed ambition." William Duane, *A Letter to George Washington, President of the United States* 34, 47–48 (Nov. 12, 1796) [https://perma.cc/Y7LK-G7CT].[6]

---

[4] Philadelphia records reflect that Callender petitioned for naturalization in 1798 but do not indicate that he took the oath of allegiance and became a citizen prior to his death in 1803. Philadelphia Naturalization Records ix, 77 (P. William Filby ed., 1982).

[5] Bird, *supra*, at 241 (noting an 1801 court finding that Duane was not an American citizen).

[6] Duane published this piece under the name "Jasper Dwight," which a Federalist newspaper later exposed as Duane's pseudonym. Bird, *supra*, at 229.

Irishman James Reynolds' experience is likewise instructive. Reynolds was a close ally of Duane and regularly contributed to the *Aurora*. David A. Wilson, *United Irishmen, United States: Immigrant Radicals in the Early Republic* 41–42 (1998); Bird, *supra*, at 63. In 1799, Reynolds, Duane, and others circulated a petition in Philadelphia urging repeal of the Alien Friends Act, arguing it unconstitutionally denied aliens due process, subverted the presumption of innocence, and vested arbitrary power in the president. *See* Wilson, *supra*, at 52. A group of Federalists objected to their signature-gathering efforts at a church and a physical altercation ensued. *Id.* at 53. A Federalist prosecutor indicted Reynolds for assault with intent to kill and, at trial, argued aliens have "no right whatever to petition, or to interfere in any respect with the government of this country—as the right of voting is confined to our citizens, the right of petitioning is also." *Id.* at 53; Smith, *supra*, at 281.

Reynolds' counsel, Alexander Dallas (a future Secretary of the Treasury under President James Madison), invoked the First Amendment as a defense to the charges. *See* Smith, *supra*, at 281–82; Wilson, *supra*, at 53–54. The jury acquitted on all counts. *See* Smith, *supra*, at 282 ("The jury had repudiated the arguments that aliens were

not entitled to a lawful exercise of the right of petition as guaranteed in the Constitution."). This is persuasive evidence of the contemporaneous understanding of the First Amendment. *See also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 361 (1995) (Thomas, J., concurring) (explaining how publisher John Peter Zenger's 1735 acquittal by a New York jury for the "crime" of insulting the British royal governor sheds light on the early American understanding of press freedom); *see also id.* at 374 (Scalia, J., dissenting) (arguing that the Zenger trial is "unquestionably" relevant to the constitutional question of "whether criticism of the government could be punished by the state" (emphasis deleted)).

The records at the Founding are filled with examples of other prominent noncitizen firebrand commentators. Englishman (and, later, French citizen) Joseph Priestley was a vocal proponent of republicanism whose writings were widely circulated in Jeffersonian circles. *See* Jenny Graham, *Revolutionary in Exile: The Emigration of Joseph Priestley to America 1794–1804*, 85 Transactions of the Am. Phil. Soc'y, 1–3, 96, 141–42 (1995) [https://perma.cc/Y66M-E9T3]. William Cobbett from England published the popular daily newspaper *Porcupine's Gazette* in which he

"cheerfully abused almost every hero in the American pantheon and derisively trampled on what was to become known as the American dream." Daniel Green, *Great Cobbett: The Noblest Agitator* 130 (1985). And Frenchman Joseph de Nancrède published the influential *Courier de Boston* newspaper for French immigrants, urging Americans to sever ties with England and adopt the French language. George Parker Winship, *Two or Three Boston Papers*, 14 Papers of the Bibliographical Soc'y of Am. 57–59, 69–76 (1920) [https://perma.cc/N2X2-HD7N]. All were influential. Some were incendiary. None were deported.

Over the last two centuries, noncitizens have continued to play a prominent role in American political discourse. Christiane Amanpour, Piers Morgan, John Oliver,[7] and countless others have provided their unique perspectives on life in America to millions of viewers and listeners. Under the Constitution, it is for the American public, not the government, to decide whether their views are worthy of being heard. The only permissible remedy is the remote control, not a deportation flight.

---

[7] John Oliver became a U.S. citizen in late 2019.

## II. The First Amendment Bars Deportation Based on Protected Speech.

### A. Unbroken Caselaw Holds the First Amendment Prohibits Deporting Noncitizens Based on Speech.

True to the Framers' rejection of the Alien Friends Act, the Supreme Court has made clear the Constitution's "freedom of speech and of press is accorded aliens residing in this country." *Wixon*, 326 U.S. at 148 (citing *Bridges v. California*, 314 U.S. 252 (1941)). Our First Amendment does not "acknowledge[] any distinction between citizens and resident aliens." *Kwong Hai Chew*, 344 U.S. at 596 n.5 (internal quotation marks omitted); *see also Wixon,* 326 U.S. at 161 (Murphy, J., concurring) ("Once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders … includ[ing] those protected by the First and the Fifth Amendments").

This has stood as established law for more than 70 years. *See, e.g.*, *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1065 (9th Cir. 1995) ("*AADC*"); *Rafeedie v. INS*, 795 F. Supp. 13, 22 (D.D.C. 1992) ("It has long been settled that aliens within the United States enjoy the protection of the First Amendment…."). That is because the First

Amendment operates as a restraint on government infringing the inalienable right of free speech. At bottom, "freedom of speech is a negative liberty. The First Amendment is a restriction on the government's power to 'abridge' speech." *Pahls v. Thomas*, 718 F.3d 1210, 1239 (10th Cir. 2013) (cleaned up).

The Ninth Circuit, with a nod to Madison's Report of 1800, held the First Amendment prohibits deporting aliens for protected speech. *AADC*, 70 F.3d at 1065. The court explained, "The Framers explicitly recognized that aliens within this country participate in a reciprocal relationship of societal obligations and correlative protection." *Id.* (citing Madison, *Report on the Virginia Resolutions*, *reprinted in* 4 Elliot's Debates, *supra*, at 556). Therefore, "the values underlying the First Amendment require the full applicability of First Amendment rights to the deportation setting." *Id.* at 1064. After all, "[i]f aliens do not have First Amendment rights at deportation, then their First Amendment rights in other contexts are a nullity, because the omnipresent threat of deportation would permanently chill their expressive and associational activities." *Id.* at 1065–66.

The First Amendment constrains Congress' exercise of its immigration authority just as it does Congress' other enumerated powers. For example, while Congress may "lay and collect Taxes," U.S. Const. art. 1, § 8, cl. 1, it would violate the First Amendment to condition a tax rebate on having a Republican yard sign. *See, e.g.*, *Speiser v. Randall*, 357 U.S. 513, 518 (1958) ("Congress may not, by withdrawal of mailing privileges, place limitations upon the freedom of speech which, if directly attempted, would be unconstitutional."). Likewise here: While Congress has authority to craft legislation regulating noncitizens in the country, *see Galvan v. Press*, 347 U.S. 522, 530 (1954), it cannot legislate in a manner that targets their protected speech. As the Ninth Circuit held, quoting Justice Murphy's concurrence in *Wixon*, "Since resident aliens have constitutional rights, it follows that Congress may not ignore them in the exercise of its 'plenary' power of deportation." *AADC*, 70 F.3d at 1065 (quoting *Wixon*, 326 U.S. at 161 (Murphy, J., concurring)).

These principles remain true even when the political branches invoke their foreign-affairs powers. As the Supreme Court explained, "Faced with a clear conflict between a federal statute enacted in the interests of national security and an individual's exercise of his First

Amendment rights, we have confined our analysis to whether Congress has adopted a constitutional means in achieving its concededly legitimate legislative goal." *United States v. Robel*, 389 U.S. 258, 268 n.20 (1967). More recently, it stressed that "precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role" to safeguard constitutional rights. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010); *see also Sessions*, 584 U.S. at 174–75 (holding unconstitutional an INA provision). Striking down a national defense statute on First Amendment grounds, the Court explained in *Robel* that "[i]t would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties … which makes the defense of the Nation worthwhile." 389 U.S. at 264.

Much of the government's proffered authority here involves the exclusion of noncitizens (*i.e.*, refusal to permit entry) rather than removal of lawfully present noncitizens. *See, e.g.*, Govt. Br. at 54–55 (citing *Dep't of State v. Muñoz*, 602 U.S. 899 (2024); *Kleindienst v. Mandel*, 408 U.S. 753 (1972)). It is thus inapposite. As the Supreme Court explained, "[t]he distinction between an alien who has effected an entry into the United

States and one who has never entered runs throughout immigration law." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). "The Supreme Court has consistently distinguished between aliens in the United States and those seeking to enter from outside the country, and has accorded to aliens living in the United States those protections of the Bill of Rights that are not, by the text of the Constitution, restricted to citizens." *AADC*, 70 F.3d at 1063–64 (citing *Kwong Hai Chew*, 344 U.S. at 596 n.5).

The government also incorrectly asserts *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952), supports its contention that it may deport noncitizens for otherwise lawful speech. *Harisiades*, applying First Amendment jurisprudence of the time, concluded the Constitution did not prohibit deportation for being a Communist Party member because citizens could be punished for the same affiliation. *See* 342 U.S. at 592 (citing *Dennis v. United States*, 341 U.S. 494 (1951)); *see also* 1 *Smolla & Nimmer on Freedom of Speech* § 10:19 (detailing how subsequent Supreme Court precedent limited *Dennis*). But that gets the government nothing. As the Ninth Circuit explained, "read properly, *Harisiades* establishes that deportation grounds are to be judged by the

same standard applied to other burdens on First Amendment rights." *AADC*, 70 F.3d at 1064 (internal quotation marks omitted).

The government's other proffered authority, *Turner v. Williams*, 194 U.S. 279 (1904), is further afield because it involved deportation of an illegally present alien. *See id.* at 282 (explaining the arrest warrant noted the alien "came into this country contrary to the prohibition of the act of Congress of March 3, 1903"). The Supreme Court has recognized a "general rule" that illegally present noncitizens cannot assert a First Amendment defense against removal. *Reno v. AADC*, 525 U.S. 471, 491–92 (1999). Moreover, the deportation in *Turner* stemmed from the alien's status as an anarchist, and American citizens at that time faced punishment for the same speech. *See The New York Criminal Anarchy Act*, 36 Harv. L. Rev. 199 (1922); David M. Rabban, *The First Amendment in Its Forgotten Years*, 90 Yale L.J. 514, 543–49 (1981) (surveying early 20th-century prosecutions for pro-anarchist advocacy).

Ultimately, the government has not supplied any decision allowing deportation of a lawfully present noncitizen for speech that would be protected if uttered by an American citizen. That is because no such decision exists in the 250-year history of the Republic.

### B. Deporting a Noncitizen for Speech is Forbidden Viewpoint Discrimination.

It is core First Amendment law that the government may not punish people because of their opinions. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion …." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Thus, "it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *FCC v. Pacifica Found.*, 438 U.S. 726, 745–46 (1978).

That tenet means the government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). This is particularly true regarding "speech on public issues," which "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (internal quotation marks and citation omitted); *see also Citizens United v. FEC*, 558 U.S. 310, 340 (2010) ("[P]olitical speech must prevail against laws that would suppress it."). Viewpoint- and content-discriminatory laws are

thus presumptively unconstitutional. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Deporting a noncitizen based on speech necessarily discriminates based on viewpoint. Here, for example, the district court expressly found the government targeted pro-Palestinian speakers for deportation. *AAUP v. Rubio*, 802 F. Supp. 3d 120, 131 (D. Mass. 2025). The Supreme Court has made clear "[t]he State may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578–79 (2011). In *Moody v. NetChoice, LLC*, the Court re-emphasized that such "suppression of free expression" is never a "valid, let alone substantial" governmental interest. 603 U.S. 707, 740 (2024); *see also Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994) ("Government action that stifles speech on account of its message … pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion."). By targeting pro-Palestinian speakers for deportation, that is precisely what the government has done and is doing here.

### C. Deporting Noncitizens Based on Speech Amounts to Unconstitutional Retaliation.

Targeting noncitizens for deportation based on their viewpoints is also textbook unlawful retaliation. The "First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. Riviera Beach*, 585 U.S. 87, 90 (2018). Unlawful retaliation occurs when, after an individual engages in protected conduct, the government takes an adverse action against them, and there is a "causal link between the former and the latter." *Hannon v. Beard*, 645 F.3d 45, 48 (1st Cir. 2011). Action is retaliatory when it is sufficient to "deter persons of 'ordinary firmness' from exercising their constitutional rights in the future." *Starr v. Dube*, 334 F. App'x 341, 342 (1st Cir. 2009).

Deporting noncitizens based on speech ticks each unconstitutional box. Protest and advocacy on a matter of public concern is quintessential protected speech. *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963). There can be no doubt deportation would deter a person of ordinary firmness from speaking. And causation is satisfied due to the reliance on protected speech. The government supplies no justification for excluding immigration enforcement from bedrock First Amendment principles.

## III. Allowing the Government to Deport Speakers Deemed Contrary to the National Interest is an Un-American Approach to Speech.

Allowing the Secretary of State to retaliate against speakers if he deems it in the national interest would place the United States among strange bedfellows when it comes to freedom of speech. For example, Article 51 of China's Constitution provides that individual liberty gives way if the government decides the expression "undermine[s] the interests of the state." Xianfa art. 51 (1982).[8] Russia's laws, too, permit "[r]estriction of access to information" in the name of protecting "morality," its system of government, and the "security of the state." Federal Law of the Russian Federation on Information, Informational Technologies and the Protection of Information [Russian Federation Collection of Legislation] 2006, No. 31, Item 3448.[9] And Saudi Arabia prohibits expression that serves any "foreign interest" conflicting with the "national interest" or that "stir[s] up discord among citizens."

---

[8] Available at: https://english.www.gov.cn/archive/lawsregulations/201911/20/content_WS5ed8856ec6d0b3f0e9499913.html [https://perma.cc/D8DG-5RSH].

[9] Available at: https://www.wto.org/english/thewto_e/acc_e/rus_e/wtaccrus58_leg_369.pdf [https://perma.cc/GW9F-C78F].

Law of Printing and Publication (Royal Decree No. M/32, 3/9/1424 H), art. 9 (2003).[10]

As China's, Russia's, and Saudi Arabia's experiences show, giving the government the power to censor when it believes speech threatens the government's "interests" is a loophole with infinite diameter. It has no place in America's tradition of individual liberty.

America has charted a different course than the world's censorial kings and authoritarian regimes. In 1801, President Thomas Jefferson used his first inaugural address to defend the free speech rights of those who called for dissolution of the Union. He proclaimed, "If there be any among us who would wish to dissolve this Union, or to change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated, where reason is left free to combat it."[11] Little could be more dangerous to the interests of a fledgling nation than calling for its extinction, yet our commitment to free speech remained. So it should today, 225 years later.

---

[10] Available at: https://www.saudiembassy.net/law-printing-and-publication [https://perma.cc/PG92-U2F4].

[11] Thomas Jefferson, First Inaugural Address (Mar. 4, 1801), *reprinted by* Nat'l Archives: Founders Online [https://perma.cc/647Z-7LP9].

## CONCLUSION

The freedom of foreign nationals lawfully residing in the United States is not "dependent upon their conformity to the popular notions of the moment," because the First Amendment "belongs to them as well as to all citizens." *Wixon,* 326 U.S. at 166 (Murphy, J., concurring). The government's position is contrary to more than two centuries of American commitment to free and open expression. The Court should affirm the district court's holding that the First Amendment prohibits deporting noncitizens based on protected speech.

Dated: August 12, 2026

/s/ *Conor T. Fitzpatrick*

Conor T. Fitzpatrick
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
conor.fitzpatrick@fire.org
(215) 717-3473

*Counsel for* Amici Curiae

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMIT**

This document complies with the word limit stated in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,453 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in Microsoft Word using a 14-point proportionally spaced typeface, Century Schoolbook.

Dated: August 12, 2026

/s/ *Conor T. Fitzpatrick*

Conor T. Fitzpatrick
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

*Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

I certify that on August 12, 2026, the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the First Circuit using the Court's CM/ECF system, which will send a notification to attorneys of record in this matter.

Dated: August 12, 2026

/s/ *Conor T. Fitzpatrick*

Conor T. Fitzpatrick
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION

*Counsel for* Amici Curiae