**Nos. 26-1141 & 26-1195**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIRST CIRCUIT**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS - HARVARD FACULTY CHAPTER; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY; RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS; MIDDLE EAST STUDIES ASSOCIATION,

*Plaintiffs-Appellees, Cross-Appellants*

v.

MARCO RUBIO, IN THE OFFICIAL CAPACITY AS SECRETARY OF STATE; U.S. DEPARTMENT OF STATE; MARKWAYNE MULLIN, IN THE OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, IN THE OFFICIAL CAPACITY AS ACTING DIRECTOR OF U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DONALD J. TRUMP, IN THE OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; UNITED STATES,

*Defendants-Appellants Cross-Appellees.*

On Appeal from the United States District Court for the District of Massachusetts — 1:25-cv-10685-WGY

***AMICUS CURIAE* BRIEF OF FACULTY ASSOCIATIONS AT 27 UNIVERSITIES IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Counsel listed on following page

COUNSEL FOR *AMICUS CURIAE*

Philip Monrad
First Cir. Bar No. 1218708
Eleanor Morton
First Cir. Bar No. 1218703
Peter Saltzman
LEONARD CARDER LLP
1999 Harrison Street, Suite 2700
Oakland, California 94612
Tel: (510) 272-0169

Yaman Salahi
SALAHI PC
yaman@salahilaw.com
505 Montgomery St., 11th Floor
San Francisco, California 94111
Tel: (415) 236-2352

## ATTESTATION OF CONSENT AS TO FILING

Undersigned counsel for *amici* attests that all parties have consented to the filing of this brief. Accordingly, pursuant to Local Rule 29(a)(2), this brief is filed without a motion seeking leave to file.

/s/ Philip C. Monrad

Counsel for *amicus curiae*

## DISCLOSURE STATEMENT & LIST OF AMICI

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), each amicus organization listed below has no parent corporation, and no publicly held company holds 10% or more of its stock.

No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief. No person, other than amici curiae, their members, or their counsel, contributed money intended to fund preparing or submitting this brief. The *amicus* organizations submitting this brief include:

**Council of University of California Faculty Associations**

**Berkeley Faculty Association**

**Davis Faculty Association**

**Irvine Faculty Association University of California**

**Merced Faculty Association**

**Riverside Faculty Association**

**San Diego Faculty Association**

**University of California San Francisco Faculty Association**

**University of California Santa Barbara Faculty Association**

**University of California Los Angeles Faculty Association**

**Santa Cruz Faculty Association**

**University Council – American Federation of Teachers Local 1474**

**Boston University AAUP Chapter**

**Brown University Chapter of the AAUP**

**Stanford AAUP Chapter**

**Dartmouth College Chapter of the AAUP**

**Massachusetts Institute of Technology Chapter of the AAUP**

**Rice University Advocacy Chapter of the AAUP**

**Tufts University Chapter of the AAUP**

**University of Houston Chapter of the AAUP**

**Johns Hopkins University Chapter of the AAUP**

**University of Minnesota Twin Cities Chapter of the AAUP**

**Northwestern University Chapter of the AAUP**

**AAUP Advocacy Chapter at the University of Texas at Austin**

**AAUP Advocacy Chapter at the University of Texas at Dallas**

**Yale University Chapter of the AAUP**

**Wesleyan University Chapter of the AAUP**

# TABLE OF CONTENTS


ATTESTATION OF CONSENT AS TO FILING .................................................... i

DISCLOSURE STATEMENT & LIST OF AMICI .............................................. i

TABLE OF AUTHORITIES ........................................................................... vi

I. STATEMENT OF INTEREST OF AMICI CURIAE ....................................1

II. INTRODUCTION ..........................................................................................2

III. BACKGROUND ...........................................................................................3

A. ACADEMIC FREEDOM OCCUPIES A SPECIAL PLACE IN FIRST AMENDMENT JURISPRUDENCE. .......................................3

B. FEDERAL POLICY HAS LONG RECOGNIZED THE IMPORTANCE OF ATTRACTING FOREIGN STUDENTS AND SCHOLARS, RECOGNIZING THEIR CRITICAL ROLE IN RESEARCH AND THE BENEFITS THEY BRING TO HIGHER EDUCATION AND THE U.S. ECONOMY .......................................9

IV. ARGUMENT ...............................................................................................12

A. THE DISTRICT COURT CORRECTY FOUND THAT THE POLICY VIOLATES THE FIRST AMENDMENT. ..........................12

B. THE EXECUTIVE ORDERS ARE PART AND PARCEL OF THE ADMINISTRATION'S UNCONSTITUTIONAL ATTACKS ON AMERICA'S UNIVERSITIES. .........................................................14

C. THE GOVERNMENT'S ACTIONS HAVE CHILLED ACADEMIC FREEDOM, HARMING THE RESEARCH AND EDUCATIONAL MISSIONS OF AMERICA'S UNIVERSITIES. ................................18

V. CONCLUSION ............................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Accord Grutter v. Bollinger*,
539 U.S. 306 (2003) ........ 3

*American Association of University Professors et al. v. Donald J. Trump et al.*,
815 F.Supp.3d 907 (N.D. Cal. 2025) ........ 15, 17, 20

*Buchanan v. Alexander*,
919 F.3d 847 (5th Cir. 2019) ........ 6

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967) ........ 5, 6, 7

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) ........ 19

*Laird v. Tatum*,
408 U.S. 1 (1972) ........ 19

*Meriweather v. Hartop*,
992 F.3d 492 (6th Cir. 2021) ........ 6

*President and Fellows of Harvard College et al. v. United States Dept. of Health and Human Services et al.*,
798 F.Supp.3d 77 (D. Mass. 2025) ........ 17

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ........ 20

*Rust v. Sullivan*,
500 U.S. 173 (1991) ........ 7

*Speech First, Inc., v Fenves*,
979 F.3d 319 (5th Cir. 2020) ........ 19

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957) ........ 4, 6, 8, 18

*Villanueva v. Wellesley College*,
930 F.2d 124 (1st Cir. 1991) .......... 3

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .......... 4

**Statutes**

20 U.S.C. § 1132-2 .......... 6

20 U.S.C. § 7907 .......... 6

20 U.S.C. § 9572 .......... 7

28 U.S.C. § 101 .......... 10

42 U.S.C. § 12645f .......... 7

8 U.S.C. § 1101 .......... 10

**Other Authorities**

Executive Order 14161 .......... 1, 17, 20, 21, 24

Executive Order 1488 .......... 1, 20, 21

Cecelia Smith-Schoenwalder, *Tracking Trump's Crackdown on Higher Education,* U.S. News & World Report, May 20, 2026 .......... 13

*Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students*, 81 Fed. Reg. 13,040, 13,047 (March 11, 2016) .......... 11

Isha Chitirala, *Jewish Penn faculty join thousands in signing 'Not in Our Name' letter to college administrators,* The Daily Pennsylvanian, March 23, 2025 .......... 16

Jaweed Kaleem, *Caught off-guard, California colleges scramble to determine scope of student visa cancellations*, L.A. TIMES, April 7, 2025 .......... 13

Matthew W. Finkin & Robert C. Post, F*or the Common Good: Principles of American Academic Freedom*, 127 (2009) .......... 7

Trisha Tewari, *US universities face steep enrollment decline as Trump's visa policies drive international Students Away*, The Times Of India, October 3, 2025 .......... 20, 23

U.S. Dept. of State, *Table XV(B) Nonimmigrant Visas Issued by Classification (Including Border Crossing Cards), Fiscal Years 2019-2023*, ............................11

## I. STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici*, identified above, are independent faculty associations representing professors, researchers and lecturers at 27 universities across the country. *Amici* represent the interests of their members, including on issues related to academic freedom and campus expression. They have a strong interest in the outcome of this appeal in light of the damaging impact the government's enforcement of Executive Orders 14161 and 1488 has had on the mission of higher education in the United States.

*Amici* submitted an *amicus curiae* brief to the District Court in this case (Dist. Ct. Dkt. 36-1) and submit this brief to highlight the central role academic freedom plays in First Amendment jurisprudence and the pervasive chill on academic freedom that the government's enforcement policy has inflicted on universities across the country

Because the government's enforcement of these Executive Orders undermines fundamental First Amendment standards and impairs the mission of higher education that is essential to this country, *amici* urge this Court to affirm the District Court's holding that the government's actions violate the First Amendment and to enjoin all future enforcement of the Executive Orders.

## II. INTRODUCTION

Academic freedom forms the backbone of a healthy democracy and pluralistic society, and is thus an important aspect of the First Amendment's protections. It encourages innovation and protects the search for truth by ensuring that research and scholarly work are free from political, social, and economic interference.

*Amici* represent diverse academic disciplines and viewpoints, but they are united in their view that the federal government's campaign to single out noncitizen scholars and students for their views, associations, or expression poses an existential threat to academic freedom and the aims and functions of the American university. Defendants' policy of arresting and deporting noncitizens who engage in pro-Palestinian advocacy with the goal of tamping down student protests (the "Policy", as described in Plaintiffs-Appellees'/Cross-Appellants' Principal and Response Brief, p.1) has had an *in terrorem* effect at every institution of higher learning in the country, limiting research projects and plans, changing the way departments schedule their programming, interfering with the types of lectures and panels faculty will participate in, and harming universities' ability to invite, host, and fruitfully engage with noncitizen scholars and students.

The Policy thus not only betrays basic democratic values, but also upends decades of federal efforts to attract scholars from around the world to study and work in the United States, undermining the standing of American universities in the world

and subjecting the entire system of higher education in the United States to a shock that threatens serious and lasting damage.

Our universities are world leaders in research. Maintaining that position requires them to be able to attract world-class talent. Defendants' actions threaten the ability of American universities to do so. The government's enforcement of the Executive Orders challenged here must be enjoined to avoid further irreparable harm to the nation's universities, educators, and students.

## III. BACKGROUND

### A. ACADEMIC FREEDOM OCCUPIES A SPECIAL PLACE IN FIRST AMENDMENT JURISPRUDENCE.

Courts have been "hesitant to intrude upon academic freedom, which, 'although not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment.'" *Villanueva v. Wellesley College*, 930 F.2d 124, 129 (1st Cir. 1991); *accord Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) ("We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition.").

The basis of this concern is a firmly established recognition that academic freedom is a precondition for a healthy democracy. Even in primary and secondary schools, the Supreme Court has observed that "[i]f there is any fixed star in our

constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (striking down local school board regulation requiring students to salute the flag).

Those concerns have greater significance, and more protections, in the higher-education context. When a state attorney general summoned a university professor and attempted to compel him to answer questions about the contents of lectures concerning Marxism and his knowledge of the organizational affiliations of other persons, the Supreme Court sided with the professor:

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. . . Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

Justice Frankfurter expressed similar themes in his concurring opinion:

> These pages need not be burdened with proof . . . of the dependence of a free society on free universities. This means the exclusion of governmental intervention in the intellectual life of a university. It matters little whether such intervention occurs avowedly or through action that inevitably tends to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor.

*Id*. at 262 (Frankfurter, J., concurring).

The "four essential freedoms" of a university were then understood to include the university's right "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Id.* at 263 (citation and quotation omitted).

A decade later, when New York implemented laws to prevent "subversive" persons from being employed at the state university, the Supreme Court scrutinized the vagueness and overbreadth of the prohibitions insofar as they reached "mere statement[s] about abstract doctrine," observing that "[i]t would be a bold teacher who would not stay as far as possible from utterances or acts which might jeopardize his living by enmeshing him in th[e] intricate machinery [of the law's enforcement scheme]." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 599, 601 (1967). "The result must be to stifle 'that free play of the spirit which all teachers ought especially to cultivate and practice," *id.* at 601, even though "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned," *id.* at 603. Indeed, "[t]hat freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id.*

Although these ideals appear in cases dating back nearly a century, courts have continued to re-affirm them to the present day. *See, e.g., Meriweather v.*

*Hartop*, 992 F.3d 492, 505 (6th Cir. 2021) (holding that "*Sweezy* and *Keyishian* establish that the First Amendment protects the free-speech rights of professors when they are teaching"); *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (recognizing that "academic freedom is 'a special concern of the First Amendment'" and that 'classroom discussion is protected activity'" when it serves an academic purpose).

The foundational nature of these norms is also reflected in several statutes that prohibit federal authorities from meddling in curricular content, an homage to the "four freedoms" discussed above—including the freedom of educational institutions to determine, on academic grounds, what is taught and how. *See, e.g.,* 20 U.S.C. § 1132-2 (in re: Higher Education Act, "Nothing in this subchapter shall be construed to authorize the Secretary [of Education] to mandate, direct, or control an institution of higher education's specific instructional content, curriculum, or program of construction."); 20 U.S.C. § 7907(a) ("Nothing in this chapter shall be construed to authorize an officer or employee of the Federal Government, including through a grant, contract, or cooperative agreement, to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction . . . ."); *id.* § 7907(b) ("Notwithstanding any other provision of Federal law, no funds provided to the Department [of Education] under this chapter may be used by the Department, whether through a grant, contract, or cooperative agreement, to endorse, approve,

develop, require, or sanction any curriculum . . . ."); 20 U.S.C. § 9572(b)-(c) (similar); 42 U.S.C. § 12645f(a)-(b) (similar).

The purpose of these prohibitions is to prevent federal authorities from misusing their funding powers to interfere with the mission of education. *Cf. Rust v. Sullivan*, 500 U.S. 173, 200 (1991) (Rehnquist, J.) ("[W]e have recognized that the university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines of the First Amendment." (citing *Keyishian, supra*)).

Moreover, the benefits of academic freedom – to U.S. students, faculty and the wider community – are not confined to the library, the laboratory, or the classroom. Academic freedom also protects students' and scholars' non-scholarly speech and expressive activity from interference by the university or the government. The latter is often described as "freedom of extramural expression" and refers to "speech that is typically about matters of public concern and that is unrelated to either scholarly expertise or institutional affiliation", such as writing op-eds, signing open letters or petitions, and engaging in protests. Matthew W. Finkin & Robert C. Post, *For the Common Good: Principles of American Academic Freedom*, 127 (2009).

While this is primarily a right that academics hold against their universities rather than against the government, it also serves to protect them from the pressure that universities sometimes face from government actors and others to take punitive action against academics or students based on disagreement with their views or expressive activities.

In an environment where scholars are targeted for saying or supporting disfavored ideas, "[f]aculty members in general might . . . sagaciously conclude that they cannot afford the luxury of ranging thought and bold speech. Our campuses would then lose the stimulus of clashing opinions and would become havens of cautious mediocrity." *Id.* at 142-43 (quotation and citation omitted). "The suppression of extramural speech can thus establish an atmosphere of caution and fear that is inconsistent with the fulfillment of the academic mission to promote new knowledge and to model independent thought." *Id.* at 143.

As Justice Frankfurter cautioned, "[t]his kind of evil grows by what it is allowed to feed on . . . . 'It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.'" *Sweezy*, 354 U.S. at 263-64 (Frankfurter, J., concurring) (citation omitted).

### B. FEDERAL POLICY HAS LONG RECOGNIZED THE IMPORTANCE OF ATTRACTING FOREIGN STUDENTS AND SCHOLARS, RECOGNIZING THEIR CRITICAL ROLE IN RESEARCH AND THE BENEFITS THEY BRING TO HIGHER EDUCATION AND THE U.S. ECONOMY.

The benefits of academic freedom are not secured only by protecting the speech, research and associations of U.S. citizen scholars and students. Knowledge is a global pursuit, and the United States has been able to establish itself as a world leader in research only through the influx of world-class intellectuals from all corners of the world. Famously, many of the last century's most notable scientists and thinkers fled Hitler's ascendance to power and came to the United States, making fundamental contributions that catapulted research universities in the United States into the top rank. Notably, many of these thinkers were also outspoken critics of certain United States domestic and foreign policies—and their perspectives now are regarded as assets to American intellectual life, not liabilities.

This tradition of welcoming students, thinkers, and teachers from around the world has continued to the present, and the active presence of international scholars and students remains a critical asset to American universities and to *amici* faculty associations' ability to further the mission of higher education in the United States.

Pursuant to the Fulbright-Hays Act of 1961, 28 U.S.C. § 2451, Congress established a statutory scheme to facilitate the ability of scholars from around the

world to participate in, learn from, and contribute to American universities on student visas. The purpose of this legislation was:

> to enable the Government of the United States to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange; to strengthen the ties which unite us with other nations by demonstrating the educational and cultural interests, developments, and achievements of the people of the United States and other nations, and the contributions being made toward a peaceful and more fruitful life for people throughout the world; to promote international cooperation for educational and cultural advancement; and thus to assist in the development of friendly, sympathetic, and peaceful relations between the United States and the other countries of the world.

Fulbright-Hays Act of 1961, 28 U.S.C. § 2451. Pub. L. 87–256, 75 Stat. 527, § 101.

To effectuate this policy, Congress created visa categories for foreign students, including the J-1 and F-1 visas. *See* 8 U.S.C. §1101(a)(15)(J) (classification for a nonimmigrant "who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill . . . who is coming temporarily to the United States . . . for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training . . . ."); 8 U.S.C. §1101(a)(15)(F) ("student qualified to pursue a full course of study").

Recognizing the benefit of this Congressional policy, the Department of Homeland Security in 2016 issued a Final Rule increasing the number of such visas, stating:

> International students have historically made significant contributions to the United States, both through the payment of tuition and other expenditures in the U.S. economy, as well as by significantly enhancing academic discourse and cultural exchange on campuses throughout the United States. In addition to these general benefits, STEM students further contribute through research, innovation, and the provision of knowledge and skills that help maintain and grow increasingly important sectors of the U.S. economy.
>
> * * * *
>
> Accordingly, international students provide substantial benefits to their U.S. colleges and universities, including beneficial economic and cultural impacts.

*Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students*, 81 Fed. Reg. 13,040, 13,047 (Mar. 11, 2016) (final rule).

In short, "these students enrich the academic and cultural life of college and university campuses throughout the United States and make important contributions to the U.S. economy and academic sector." *Id.* at 13,049.

To realize these benefits, between 2019 and 2023, the United States issued nearly 2 million F-1 student visas and over 1 million J-1 visas.[1] Defendants' ideologically motivated Policy at issue here eviscerates the purpose of such visa programs, as well as the United States' global reputation. Long a destination for

[1] *See* U.S. Dept. of State, *Table XV(B) Nonimmigrant Visas Issued by Classification (Including Border Crossing Cards), Fiscal Years 2019-2023*, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2023AnnualReport/FY2023_AR_TableXVB.pdf.

many of the world's most talented people, the United States' viability as a center of intellectual advancement, scientific innovation, and free inquiry is sharply undermined by the government's actions.

## IV. ARGUMENT

### A. THE DISTRICT COURT CORRECTY FOUND THAT THE POLICY VIOLATES THE FIRST AMENDMENT.

In nearly 80 pages of findings, based on evidence presented during nine weeks of trial, the District Court detailed how Defendants implemented the Policy. *AAUP et al. v. Rubio et al.*, Findings of Fact and Rulings of Law (Dist. Ct. Dkt. 261) ("Findings"), pages 15-94. Among other actions, the government created an inter-Departmental Task Force "to root out anti-Semitic harassment in schools and on college campuses" (Findings at 19); Secretary of State Marco Rubio issued a "Catch and Revoke Cable" sent to over 200 diplomatic posts abroad (Findings at 19-20) as well as an "Enhanced Screening and Social Media Vetting" Cable applicable to both visa applicants and visa holders (Findings at 75); the Homeland Security Council met weekly to discuss visa revocations (Findings at 21); a "Tiger Team" was assembled, taking agents from other units within Homeland Security to investigate thousands of students on a list of some 5,000 individuals who purportedly promoted "hatred of the USA, Israel and Jews on North American college campuses" (Findings at 24 *et seq.*); investigative reports were prepared based on vague standards whose legal foundation was questioned by key officials themselves

(Findings at 23, 31, 35, 54-57); those reports were then referred to the Secretary of State who quickly issued deportation orders (Findings at 57-59), followed by highly publicized detentions and arrests using masked agents, of noncitizen students and faculty. (Findings at 28 *et seq.*)[2]

The District Court found that these actions were intended to carry out the President's agenda to tamp down pro-Palestinian protest. Findings at 95. Indeed, the President and his top officials boldly broadcast their intentions by making a series of bellicose threats on social media, on television, and in the press. Among many others, the Fact Sheet accompanying EO 14188 states in part: "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you…"; and Secretary Rubio made repeated public statements to the effect that the State Department would revoke the visas and/or green cards of "Hamas supporters in America so they can be deported." Findings at 27-28, 39, 40-41, 48-49, 79-94.

---

[2] In March 2025 alone, the State Department revoked the visas of over 300 students "said to have taken part in pro-Palestinian demonstrations." Findings at 81; *see also* Cecelia Smith-Schoenwalder, *Tracking Trump's Crackdown on Higher Education,* U.S. News & World Report, May 20, 2026, https://www.usnews.com/news/national-news/articles/trumps-higher-education-crackdown-visa-revocations-dei-bans-lawsuits-and-funding-cuts#visas; Jaweed Kaleem, *Caught off-guard, California colleges scramble to determine scope of student visa cancellations*, L.A. TIMES, Apr. 7, 2025, https://www.latimes.com/california/story/2025-04-07/ucla-california-universities-concerns-cancellations-student-visas.

As the District Court found, these threatening statements clearly demonstrated that the officials intended the enforcement of the Executive Orders "to be centered on core First Amendment speech and expressive conduct, such as attending public protests, leading such protests, or even publishing op-eds." Findings at 131. Thus, the District Court was unquestionably correct in concluding that "Secretaries Noem and Rubio are engaged in a mode of enforcement leading to detaining, deporting, and revoking noncitizen' visas solely on the basis of political speech, and with the intent of chilling such speech and that of others similarly situated. Such conduct is not only unconstitutional, but a thing virtually unknown to our constitutional tradition"; it is "a new invention that in important ways goes beyond its closest analogues in the Red Scare." Findings at 123, 142; Annotated Judgment (Dist. Ct. Dkt. 313), pages 2-3.

## B. THE EXECUTIVE ORDERS ARE PART AND PARCEL OF THE ADMINISTRATION'S UNCONSTITUTIONAL ATTACKS ON AMERICA'S UNIVERSITIES.

In their opening brief, Defendants-Appellants argue that the government's actions were justified solely on the basis of unsupported allegations that individuals who were arrested participated in "antisemitic" or "terrorist" activities. As the District Court found, however, the trial evidence was contrary, showing that Defendants relied on vague interpretations of those terms, and that their avowed intention was to target a handful of individuals in order to broadly chill protected

speech and conduct on university campuses. In other words, the deportations and arrests carried out pursuant to the Policy were intended as "show trials" meant to instill fear in all those whose views did not align with the President's political agenda.

In short, the Policy, carried out under color of law, was to chill protected speech, as other courts have found. *See,* e.g., *American Association of University Professors et al. v. Donald J. Trump et al.* ("*AAUP v. Trump*"), 815 F.Supp.3d 907, 930 (N.D. Cal. 2025) (granting preliminary injunction against the administration and executive agencies' "concerted campaign to purge 'woke,' 'left,' and 'socialist' viewpoints from our country's leading universities. Agency officials, as well as the President and Vice President, have repeatedly and publicly announced a playbook of initiating civil rights investigations of preeminent universities to justify cutting off federal funding, with the goal of bringing universities to their knees and forcing them to change their ideological tune.").

Although Defendants claimed to justify their actions as stamping out alleged anti-semitism in the wake of protests against Israel's actions in the Gaza Strip, criticisms of the State of Israel are not, as the district court noted, "anti-Semitism, they're political speech, protected speech." Findings at 34, FN 17. Indeed, many Jewish faculty, students and alumni have sharply criticized any definition of anti-semitism that includes mere criticism of the State of Israel or its policies. For

example, on March 11, 2025, a large group of Jewish faculty and university staff and students circulated an open letter entitled "Not In Our Name." It begins:

> We hold various views about Israel and Palestine, politics in the Middle East, and student activism on our campuses. But we are united in denouncing, without equivocation, anyone who invokes our name – and cynical claims of antisemitism – to harass, expel, arrest, or deport members of our campus communities.

"*Not in Our Name,*" March 23, 2025.[3]

Courts have called out this pretextual claim of combating anti-semitism to mask the government's actual policy of universities it disapproves of. *See, e.g., AAUP v. Trump, supra*, 815 F. Supp. 3d at 935 (the government "engaged in a concerted policy to use allegations of antisemitism to justify funding cancellations, when their intent is to coerce universities into purging disfavored 'left' and 'woke' viewpoints from their campuses and replace them with views that the Administration favors."); *President and Fellows of Harvard College et al. v. United States Dept. of Health and Human Services et al.* ("*Harvard v. DHS*"), 798 F.Supp.3d 77, 121 (D. Mass. 2025) ("[R]eview of the administrative record makes it difficult to conclude anything other than that Defendants used antisemitism as a smokescreen for a

---

[3] The letter was reported in numerous journals, with links to the full letter excerpted above. *See*, e.g., Isha Chitirala, *Jewish Penn faculty join thousands in signing 'Not in Our Name' letter to college administrators,* The Daily Pennsylvanian, March 23, 2025, https://www.thedp.com/article/2025/03/penn-open-letter-columbia-university-jewish-faculty

As of filing of this brief more than 3,400 individuals have signed the letter.

targeted, ideologically-motivated assault on this country's premier universities, and did so in a way that runs afoul of the APA, the First Amendment and Title VI.”).

The *Harvard v. DHS* court concludes with the comment -- of critical relevance and concern to *amici* and their members -- that the administration’s “actions have jeopardized decades of research and the welfare of all those who could stand to benefit from that research, as well as reflect a disregard for the rights protected by the Constitution and federal statutes.” *Id.*

Thus, although the earliest targets of Defendants’ enforcement of the challenged Executive Orders were people whom the government believes harbor disfavored views regarding Israel, Palestine, Gaza, and the United States’ relationship thereto, they are not its only victims. Executive Orders 14161’s extraordinarily broad and subjective terms prohibit any speech by noncitizens which could be deemed to “espouse hateful ideology” or “bear hostile attitudes toward [U.S.] citizens, culture, government institutions or founding principles.”

If Defendants’ campaign to target and deport supporters of the Palestinian cause or critics of the United States’ policies regarding Israel/Palestine receives judicial approval, Defendants would be free to target whomever they choose for ideological reasons. Any foreign student or scholar whose research or speech the administration considers “woke” or “left”, or who, for example, questions the administration’s approach to tariffs, reproductive rights, vaccines or climate change

may be threatened with visa cancellation and even arrest and deportation. The result would be an insidious "atmosphere of suspicion and distrust" incompatible with the free exchange of ideas and robust academic discourse. *Sweezy*, 354 U.S. at 250. That cannot be allowed to pass.

### C. THE GOVERNMENT'S ACTIONS HAVE CHILLED ACADEMIC FREEDOM, HARMING THE RESEARCH AND EDUCATIONAL MISSIONS OF AMERICA'S UNIVERSITIES.

At trial, non-citizen faculty witnesses testified that, having witnessed the President's social media posts and public statements of the Secretaries and others, and having seen videos of the ensuing arrests, they canceled overseas trips, refrained from writing on topics critical of Israeli policies, and stopped engaging in protests for fear of being harassed upon reentry to the United States or deported. Findings, 39-41, 76-77. On the basis of that testimony and the record as a whole, the District Court found that the Policy objectively chilled protected speech. Findings, 115-116.

In its Opening Brief, the government disputes that finding, arguing that Plaintiffs' members failed to identify any chilling effect other than an "unreasonable fear of enforcement" and "self-censorship based purely on their subjective assessments of the Government's reasons for taking immigration enforcement actions." Defendants-Appellants' Principal Brief, pages 4, 25.

This is contradicted by the trial evidence and the experiences of *amici's* members noted below. Fear and self-censorship among non-citizen students and

faculty is a rational reaction to explicit threats from top public officials, their highly publicized acts of intimidation and arrests, and an unprecedented number of visa revocations and deportations. And the district correctly noted that "constitutional violations may arise from the deterrent or 'chilling' effect of government regulations." Findings at 104 (quoting *Speech First, Inc., v Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)).

Moreover, the government's argument ignores the fact that the chill inflicted on university campuses is inflicted not only on non-citizens, but also harms the academic freedom of citizen students and faculty. *See Kleindienst v. Mandel*, 408 U.S. 753, 755 (1972) (Marshall, J., dissenting) ("The freedom to speak and the freedom to hear are inseparable; they are two sides of the same coin."); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

Courts have correctly accepted similar evidence as evidence of objective chill. In *AAUP v. Trump, supra*, dealing with funding cuts to the University of California, the court had little difficulty concluding that the government's actions chilled speech: "numerous UC faculty and staff have submitted declarations describing how Defendants' actions have already chilled speech throughout the UC system. They describe how they have stopped teaching or researching topics they are afraid are too 'left' or 'woke,' in order to avoid triggering further funding cancellations by

Defendants. These are classic, predictable First Amendment harms, and exactly what Defendants publicly said that they intended." 815 F.Supp.3d at 931.

In its *amicus* brief in the district court, incorporated by reference here, *amici* described numerous examples of the chilling effect that the Executive Orders and enforcement Policy have had on faculty and students, non-citizens and citizens, at their universities. Dist. Ct. Dkt. 36-1, at 9-17. That chill continues to harm *amici* and their members, and academic functions at *amici*'s campuses, causing a marked decline in university enrollments and a fiscal shock to university budgets.[4]

As noted above, academic research is performed in a collaborative international arena in which U.S. faculty and students work closely with their counterparts around the globe to exchange diverse perspectives, address global challenges, achieve groundbreaking discoveries and drive innovation across disciplines. Such collaboration has severely diminished in the wake of the Executive

---

[4] *See, e.g.,* Trisha Tewari, "US universities face steep enrollment decline as Trump's visa policies drive international Students Away," The Times Of India, Oct. 3, 2025 ("According to NAFSA [Association of International Educators], international students contributed $37 billion to the US economy in the 2024-2025 academic year. This year, that figure could drop by as much as $7 billion. For universities already strained by declining domestic enrollment and rising costs, the loss is a fiscal shock. Moody's has warned that schools heavily reliant on foreign graduate students face significant credit risks.")

https://timesofindia.indiatimes.com/education/news/us-universities-on-the-brink-as-trump-era-visa-policies-trigger-historic-international-student-collapse/articleshow/124280721.cms

Orders. As one citizen *amicus* member reports: "I work frequently with international scholars and help to plan international conferences. Many European scholars are now unwilling to attend these conferences, either at all or in person, because of fears of entry denial or visa consequences. This is a serious harm to my research, including my ability to disseminate that research."

*Amici* members report that many noncitizen faculty members are leaving or considering leaving the United States to avoid being targeted pursuant to the Executive Orders. They have cancelled international research trips because they fear difficulties re-entering the United States, where many have been subject to detentions for detailed questioning about their research and those with whom they collaborate, forced searches of cell phones, and threats of visa revocation. Likewise, they have had to change the scope and topics of their research projects, abandoning research that may be viewed as being too political or sufficiently contrary to the current federal administration's agenda. For example, one noncitizen member of *amici* faculty associations who was asked to participate in a program related to her expertise declined, responding that she would have been happy to do so but for her fear that her green card would be revoked if she were reported to have presented on any topic connected to Palestine.

Again, it bears repeating that this chill on faculty research and curricula is not limited to noncitizen faculty. Citizen members of *amici* faculty associations also

avoid "suspect" research subjects and class discussion/assignments to protect their research assistants and/or students from reprisal pursuant to the government's enforcement policy.

Likewise, *amici's* members have seen international conferences scheduled to take place in the United States dwindle or be canceled as international scholars pull out due to concerns about entry denial or visa consequences. Prominent foreign scholars have declined offers of positions in the United States for fear of being unable to safely enter and exit the United States; foreign post-graduates offered prestigious postdoctoral fellowships in the United States have been unwilling – for good reason – to accept, due to fear of the current administration's policies.

Many noncitizen students, unable to complete their degrees, plan on leaving the United States because of the chill in their ability to engage in study or research that could be construed as critical of either the US or Israel, or that touch on topics related to diversity or other issues disfavored by the Trump administration. Many have been paralyzed with fear, afraid to return to their campuses after their visa renewals have been delayed, or concerned that past social media statements against the current President may lead to cancellation of their visa and abduction by ICE. As one commentator put it: "US universities, once the world's classroom, face the prospect of losing both global prestige and financial stability. The question lingers:

Are America's doors to knowledge still open, or are they closing under political weight?"[5]

The chilling effects both in and outside the classroom have been profound. Discussion and debate about hotly disputed issues have long been present on many U.S. campuses. Open dialogue, the hallmark of academic freedom, has dampened on campuses today following highly publicized reports of the Policy's brutal enforcement against noncitizen faculty and students. The Policy has cast a pall over these campuses, chilling the robust campus dialogue essential to their mission. Noncitizen students have been silenced, fearful that their comments in class, or participation in events on campus, could get them deported.

With reports that ICE officers may be on campus, students have stayed home rather than attend class. Previously vigorous classroom discussions around the subject of the Israel/Palestine conflict and other contested subjects have become stilted and awkward—or are avoided altogether. For example, one noncitizen *amicus* faculty member reported removing Palestine from a course description altogether. This chill on classroom discussion not only deprives foreign students of their First Amendment rights, it also deprives their citizen classmates of the enriching experience of engaging with diverse viewpoints and information.

[5] Trisha Tewari, *US universities face steep enrollment decline as Trump's visa policies drive international students away, supra* fn. 4.

Outside the classroom moreover, America's universities serve a vital function in U.S. society as cultural, artistic, and political "extramural" gathering places for the community, where urgent issues facing our society are vigorously debated. This essential public function has also been harmed by the government's actions. Political gatherings and speech on campus have been discouraged if they could potentially fall within Executive Order 14161's vague prohibition of any speech by noncitizens which could be deemed to "espouse hateful ideology" or "bear hostile attitudes toward [U.S.] citizens, culture, government institutions or founding principles."

*Amici* members, and the academic community generally understand that the Executive Orders are vague, subjective and susceptible to being applied in an arbitrary manner to virtually any speech or conduct this administration considers "hostile." Noncitizens cannot know what language or conduct they might engage in that could subject them to detention and deportation. Would statements or class work on disease, climate change, abortion, immigration, or cultural and political developments across the globe fall into that category? Likewise, citizens cannot know if they are endangering their fellow noncitizen students or faculty by encouraging discussion or debate on any of these issues.

The only prudent response is to say or do nothing that could remotely be considered a "hostile attitude" in the mind of the present administration. The

response has been a decrease in research, study and campus activities that might run afoul of the President's political agenda. An *amicus* member who teaches at the University of California, Berkeley, reported on a comment that brings the harm inflicted by the Policy into sharp focus: "Some Chinese students in my class remarked that they loved the experience of being at Berkeley in the fall semester [before the Executive Orders issued], when they saw what a free political culture is like, and they are saddened by the atmosphere now."

In sum, despite the government's protestations, there can be no doubt its enforcements of these Executive Orders have deprived citizens, as well as noncitizens, of their First Amendment rights to associate with colleagues and engage in protected expressive activity on campuses throughout the United States. The atmosphere of fear that now pervades institutions of learning in the United States is anathema to our tradition of academic freedom. It must be stopped.

## V. CONCLUSION

For these reasons and those in Plaintiffs-Appellees' Brief, this Court should affirm the District Court's holding that the Policy violates the First Amendment and enjoin all future enforcement of the Executive Orders.

//

//

//

Dated: August 12, 2026

Respectfully submitted,

/s/ Philip C. Monrad
/s/ Eleanor Morton
Peter Saltzman
Leonard Carder LLP
1999 Harrison Street, Suite 2700
Oakland, California 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Yaman Salahi
SALAHI PC
yaman@salahilaw.com
505 Montgomery St., 11th Floor
San Francisco, California 94111
Tel: (415) 236-2352

Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of the Federal Rules of Appellate Procedure Rules 32(a)(7) & 29(a)(5), it contains 5,577 words, excluding the parts of the document exempted by Rule 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: August 12, 2026

*/s/Philip C. Monrad*

Philip Monrad

## CERTIFICATE OF SERVICE

I, the undersigned counsel, certify that on August 12, 2026, I caused the foregoing *amicus curiae* brief to be electronically filed in the United States Court of Appeals for the First Circuit using the CM/ECF system. To my understanding and belief, all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: August 12, 2026

*/s/ Philip C. Monrad*
Philip C.Monrad