Nos. 26-1141 & 26-1195

# In the United States Court of Appeals for the First Circuit

**AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS - HARVARD FACULTY CHAPTER; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY; RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN FEDERATION OF TEACHERS; MIDDLE EAST STUDIES ASSOCIATION,**

Plaintiffs–Appellees/Cross–Appellants,

v.

**MARCO RUBIO, IN THE OFFICIAL CAPACITY AS SECRETARY OF STATE; U.S. DEPARTMENT OF STATE; MARKWAYNE MULLIN, IN THE OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, IN THE OFFICIAL CAPACITY AS ACTING DIRECTOR OF U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DONALD J. TRUMP, IN THE OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; UNITED STATES,**

Defendants–Appellants/Cross–Appellees.

*On Appeal from the U.S. District Court*
*for the District of Massachusetts*
*Docket Number 1:25-cv-10685-WGY*

## DEFENDANTS–APPELLANTS/CROSS–APPELLEES RESPONSE AND REPLY

BRETT A. SHUMATE
*Assistant Attorney General*
*Civil Division*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
PAUL F. STONE
*Assistant Director*
*National Security Unit*
*Office of Immigration Litigation*
VICTORIA SANTORA
*Senior Counsel for National Security*

JESSE BUSEN
RACHEL BERMAN-VAPORIS
*Counsel for National Security*
*Office of Immigration Litigation*
*U.S. Department of Justice*
*P.O. Box 878, Ben Franklin Station*
*Washington, DC 20044-0878*
*(202) 305-9647*

ATTORNEYS FOR DEFENDANTS-APPELLANTS/CROSS-APPELLEES

October 29, 2026

# TABLE OF CONTENTS

STATEMENT OF ADDITIONAL ISSUES .....1

SUMMARY OF THE ARGUMENT .....2

ADDITIONAL STANDARD OF REVIEW .....3

ARGUMENT .....4

I. AAUP AND MESA LACK STANDING .....4

A. Associational Standing .....4

B. AAUP and MESA Lack Organizational Standing .....11

C. AAUP and MESA Lack Standing Because Their Injuries are not Redressable .....13

II. THE DISTRICT COURT LACKED JURISDICITON OVER AAUP AND MESA'S CLAIMS .....15

A. 8 U.S.C. §1252(b)(9) .....16

B. 8 U.S.C. §1252(g) .....25

III. The District Court Erred in Determining that the Government had a Mode of Enforcement Policy that Violated AAUP and MESA's First Amendment Rights .....27

IV. THE DISTRICT COURT CORRECTLY DENIED COUNT II BECAUSE AAUP AND MESA IDENTIFIED NO THREATS AGAINST THEMSELVES .....35

V. THE DISTRICT COURT ERRED IN FINDING A VIOLATION OF THE APA .....41

VI. 8 U.S.C. §§1252(f)(1), (b)(9), & (g) BAR INJUNCTIVE RELIEF .....44

A. 8 U.S.C. §§1252(b)(9) and (g) .....45

B. 8 U.S.C. §1252(f)(1) .....46

C. Relief Must be Limited to the Parties ....... 52

D. An Injunction Against Government Speech, Including Speech by Cabinet Level Officers, Would Violate Their First Amendment Rights ....... 56

CONCLUSION ....... 58

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Abourezk v. Reagan*,
592 F. Supp. 880 (D.D.C. 1984) ....................31

*Aguilar v. USICE*,
510 F.3d 1 (1st Cir. 2007) .................... 15, *passim*

*Allende v. Shultz*,
605 F. Supp. 1220 (D. Mass. 1985) ....................31

*Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*,
716 F.3d 633 (D.C. Cir. 2013) ....................21

*Am. Hosp. Ass'n v. Price*,
867 F.3d 160 (D.C. Cir. 2017) ....................57

*Axia NetMedia Corp. v. Mass. Tech. Park Corp.*,
889 F.3d 1 (1st Cir. 2018) ....................58

*Babb v. Wilkie*,
589 U.S. 399 (2020) ....................13

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ....................35

*Biden v. Texas*,
597 U.S. 785 (2022) ....................44

*Carney v. Adams*,
592 U.S. 53 (2020) ....................11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................... 4, *passim*

*Commonwealth of Puerto Rico v. United States*,
490 F.3d 50 (1st Cir. 2007) ....................43

*Dep't of State v. AIDS Vaccine Advoc. Coal.*,
145 S. Ct. 753 (2025) ....................57

*Dep't of State v. Muñoz*,
602 U.S. 899 (2024) .................... 31, 32

*Doe v. Trump*,
157 F.4th 36 (1st Cir. 2025) ....................53

*Elend v. Basham*,
471 F.3d 1199 (11th Cir. 2006) ....................14

*Energy Mgmt. Corp. v. City of Shreveport*,
397 F.3d 297 (5th Cir. 2005) ....................54

*Hines Immigration L., PLCC v. Exec. Off. Of Immigr. Rev.*,
2026 WL 969020 (D.D.C. Apr. 10, 2026) ....................20

*FDA v. Alliance for Hippocratic* Medicine,
("Alliance"), 602 U.S. 367 (2024) .................... 12, 13

*First Choice Women's Resource Ctrs., Inc. v. Davenport*,
608 U.S. 174 (2026) ....................10

*Foundation v. City of Colorado Springs*,
11 F.4th 1151, 1171 (10th Cir. 2025) ....................36

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) ....................30

*Galvez v. Jaddou*,
52 F.4th 821 (9th Cir. 2022) ....................49

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ....................57

*Garland v. Aleman Gonzalez*,
596 U.S. 543 (2022) .................... 47, 48

*Goldstein v. Galvin*,
719 F.3d 16 (1st Cir. 2013) .......................................... 37, 56, 57

*Gonzales v. DHS*,
508 F.3d 1227 (9th Cir. 2007) .......................................... 48

*Guild v. EOIR*,
456 F. Supp. 3d 16 (D.D.C. 2020) .......................................... 20

*Gutierrez v. Saenz*,
606 U.S. 305 (2025) .......................................... 13

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) .......................................... 28 , 29

*President & Fellows of Harvard College v. DHS*,
788 F. Supp. 3d 182 (D. Mass. June 23, 2025) .......................................... 36

*Harvard L. Sch. F. v. Shultz*,
633 F. Supp. 525 (D. Mass. 1986) .......................................... 31

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .......................................... 11

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .......................................... 29

*In re Jackson*,
988 F.3d 583 (1st Cir. 2021) .......................................... 43

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) .......................................... 16, 17, 18, 22

*Johnson v. Eisentrager*,
339 U.S. 763 (1950) .......................................... 29

*Khalil v. Blanche*,
No. 26-60344 (5th Cir.) .......................................... 24

*Khalil v. President*,
164 F.4th 259 (3d Cir. 2026) .......................................................... 17, 18, 20, 21

*Khan v. Holder*,
766 F.3d 689 (7th Cir. 2014) ..........................................................................40

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)..................................................................................... 31, 34

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990)..................................................................................... 44, 54

*Mahdawi v. Trump*,
183 F.4th 103 (2d Cir. 2026) .................................................................. 18, 20, 21

*Mallory v. Norfolk S. Ry. Co.*,
600 U.S. 122 (2023)..........................................................................................29

*Marks v. United States*,
430 U.S. 188 (1977)..........................................................................................17

*Massachusetts Coalition for Immigration Reform v. DHS*,
621 F. Supp. 3d 84 (D.D.C. 2022)......................................................................19

*Mathews v. Diaz*,
426 U.S. 67 (1976)............................................................................................32

*Murthy v. Missouri*,
603 U.S. 43 (2024)............................................................................................11

*N.H. Lottery Comm'n v. Rosen*,
986 F.3d 38 (1st Cir. 2021).................................................................................7

*NBA Props. v. Gold*,
895 F.2d 30 (1st Cir. 1990)................................................................................58

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)............................................................................................44

*NRA v. Vullo*,
602 U.S. 175 (2024) ....................35

*NWDC Resistance v. ICE*,
493 F. Supp. 3d 1003 (W.D. Wa. 2020) ....................26

*Parker v. Dist. of Columbia*,
478 F.3d 370 (3d Cir. 2007) ....................37

*Perkins Coie LLP v. U.S. Dep't of Justice*,
783 F. Supp. 3d 105 (D.D.C. May 2, 2025) ....................36

*Pham v. Ragbir*,
592 U.S. 901 (2020). ....................27

*Playboy Enterprises, Inc. v. Pub. Serv. Comm'n of Puerto Rico*,
906 F.2d 25 (1st Cir. 1990) ....................44

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) .................... 37, 56

*Poe v. Ullman*,
367 U.S. 497 (1961) ....................37

*Ragbir v. Homan*,
923 F.3d 53 (2d Cir. 2019) ....................27

*Rajah v. Mukasey*,
544 F.3d 427, 432, 438 (2d Cir. 2008) .................... 32, 33

*Regents of the University of California*,
591 U.S. 1 (2020) .................... 22, 23

*Reno v. Am.-Arab Anti-Discrimination* Comm.,
("AADC"), 525 U.S. 471 (1999) .................... 26, 27, 30, 51

*Rights v. Mullin*,
("CHIR"), 185 F.4th 1275 (D.C. Cir. 2026) .................... 13, 14, 19

*Rincon Band of Mission Indians v. San Diego County*,
495 F.2d 1 (2d Cir. 1974)....................................................................................36

*Rizzo v. Goode*,
423 U.S. 362 (1976)...........................................................................................52

*Santiago-Sepulveda v. Esso Standard Oil Co. (Puerto Rico)*,
643 F.3d 1 (1st Cir. 2011)...............................................................................3, 45

*Stanford Daily Publishing Corp. v. Rubio*,
--- F. Supp. 3d ---, 2026 WL 2549090 (N.D. Cal. 2026)....................................15

*Stephan v. United States*,
319 U.S. 423........................................................................................................49

*Suri v. Trump*,
184 F.4th 260 (4th Cir. 2026) ............................................................ 18, 20, 22

*Susan B. Anthony List v. Driehaus*,
("SBA List"), 573 U.S. 149 (2014) ...................................................... 4, 5, 10

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)...........................................................................................52

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)................................................................................ 52, *passim*

*Trump v. Hawaii*,
585 U.S. 667 (2018).................................................................................. 32, 33, 38

*Turner v. Williams*,
194 U.S. 279 (1904)......................................................................................... 28, 29

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,
508 U.S. 439 (1993)...........................................................................................49

*United States v. Escobar-Temal*,
161 F.4th 969 (6th Cir. 2025) ...........................................................................30

*United States v. Texas*,
599 U.S. 670 (2023) .......................................................................................51

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990) .......................................................................................29

*Venetian Casino Resort, LLC v. Cortez*,
9 F. Supp. 2d 1102 (D. Nv. May 1, 2000) .........................................................37

*Vidal v. Elster*,
602 U.S. 286 (2024) .......................................................................................30

*Walker v. TX Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ................................................................................. 37, 56

*White v. United States*,
601 F.3d 545 (6th Cir. 2010) ...........................................................................15

## STATUTES

### Immigration and Nationality Act of 1952, as amended:

8 U.S.C. §1182(a)(3)(B) .................................................................................39

8 U.S.C. §1182(a)(3)(B)(i)(IV) .........................................................................50

8 U.S.C. §1182(a)(3)(C) ........................................................................... 15, 42

8 U.S.C. §1182(a)(3)(C)(iii) ..................................................................... 15, 42

8 U.S.C. §1182(f) ............................................................................................36

8 U.S.C. §1189 ................................................................................................39

8 U.S.C. §1201(i) ............................................................................. 3, *passim*

8 U.S.C. §1201(iii) ..........................................................................................45

8 U.S.C. §1221 ................................................................................................47

8 U.S.C. §1226 ....................48

8 U.S.C. §1227 ....................48

8 U.S.C. §1227(a)(1)(B) .................... 45, 49, 50, 51

8 U.S.C. §1227(a)(2)(A)(iii) ....................42

8 U.S.C. §1227(a)(4)(B) .................... 39, 45, 50

8 U.S.C. §1227(a)(4)(C) .................... 34, 40, 42

8 U.S.C. §1227(a)(4)(C)(i) ....................15

8 U.S.C. §1229a ....................51

8 U.S.C. § 1232 ....................47

8 U.S.C. §1252 ....................23

8 U.S.C. §1252(b)(9) .................... 16, *passim*

8 U.S.C. §1252(f) ....................46

8 U.S.C. §1252(f)(1) .................... 3, *passim*

8 U.S.C. §1252(g) .................... 25, *passim*

8 U.S.C. §1401 ....................55

Nos. 26-1141 & 26-1195

# In the United States Court of Appeals for the First Circuit

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ET AL.,

*Plaintiffs – Appellees/Cross – Appellants,*

v.

MARCO RUBIO, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE, ET AL.,

*Defendants – Appellants/Cross – Appellees.*

*On Appeal from the U.S. District Court*
*for the District of Massachusetts*
*Docket No. 1:25-cv-10685-WGY*

**RESPONSE AND REPLY BRIEF FOR DEFENDANTS – APPELLANTS/CROSS – APPELLEES**

## STATEMENT OF ADDITIONAL ISSUES

1. Whether public comments made by administration officials were alone sufficient to violate AAUP and MESA's First Amendment rights.

2. Whether the District Court abused its discretion in declining to grant injunctive relief.

## SUMMARY OF THE ARGUMENT

The Government reiterates its summary of the argument in its Principal Brief but adds argument here relevant to the new issues AAUP and MESA raise in their cross-appeal.

The district court's determination that AAUP and MESA failed to prove the Government engaged in a campaign of verbal statements that, by themselves, violated AAUP and MESA's rights under the First Amendment's free-speech clause was not clearly erroneous. AAUP and MESA did not prove that their members were directly targeted by any statements from the Government or that those statements were sufficiently specific to, by themselves, constitute a restraint on protected speech—indeed the district court made no such finding. Instead, Government officials exercised their own free-speech rights and spoke out on matters of public concern. They identified valid immigration laws and insisted they would be enforced. That cannot be a violation of the First Amendment rights of persons who were not targeted.

That this case was beyond the district court's jurisdiction from the beginning is reemphasized by AAUP and MESA's demand for injunctive relief, which likewise violates jurisdictional limitations. Consequently, the district

court did not abuse its discretion in declining to grant it. Plaintiffs seek to enjoin the putative mode of enforcement policy found by the district court, but 8 U.S.C. §1252(b)(9) and (g) bar such injunctive relief. Enjoining such a conjectural policy, which the district court described as consisting of detaining and deporting noncitizens, as well as revoking noncitizens' visas, would exceed the district court's jurisdiction, as it would restrain "actions taken or proceedings brought" to remove aliens and "decisions and actions" to commence proceedings, adjudicate cases, and execute removal orders. Section 1252(f)(1) likewise bars jurisdiction to enter an injunction because such an injunction would enjoin or restrain the operation of provisions of the INA involving the inspection, apprehension, examination, and removal of aliens. And 8 U.S.C. §1201(i) limits review of those decisions to visa revocations to removal proceedings. In short, the district court lacked jurisdiction over this case top to bottom.

## ADDITIONAL STANDARD OF REVIEW

This Court reviews the district court's decisions on remedies for abuse of discretion. *See Santiago-Sepulveda v. Esso Standard Oil Co. (Puerto Rico)*, 643 F.3d 1, 4 (1st Cir. 2011) (holding denials of injunctions are reviewed for abuse of discretion).

# ARGUMENT

## I. AAUP AND MESA LACK STANDING

### A. Associational Standing

AAUP and MESA lack associational standing. They did not show that their fear of immigration enforcement is imminent given the few enforcement actions taken under the alleged policy and the lack of evidence of ongoing enforcement of any such policy. They also have failed to show that their injuries are redressable given that enjoining the putative policy leaves the relevant legal authorities in place.

1. AAUP and MESA attack the Government's reliance on *Clapper* and *Blum* because they predate *SBA List*, which says that to meet the imminence requirement of associational standing, plaintiffs' injuries must be "'certainly impending,' or there is a 'substantial risk' that the harm will occur. *Susan B. Anthony List v. Driehaus ("SBA List")*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414, n.5 (2013)). To be sure, the Government does not dispute the validity of the disjunctive test given that it cited it several times in its Principal Brief. *See* Gov't Principal Br. at 24-26. But *Clapper* did apply the disjunctive test, which *SBA List* recognized when it cited footnote 5 of *Clapper* as holding that the plaintiffs' standing claim also

fell short of the *substantial-risk* standard. *See SBA List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5).

*Clapper* is remarkably similar to this case, which is likely why AAUP and MESA seek to cabin it. The *Clapper* plaintiffs, who were U.S. persons, sought to challenge a provision of the Foreign Intelligence Surveillance Act ("FISA") by arguing that the Government would intercept their communications with foreign individuals because those individuals would likely be targeted for FISA surveillance. *See id.* at 406. The plaintiffs believed that the foreign individuals would be targeted because the Government believed them to be associated with terrorist organizations, located in geographic areas that are a focus of counterterrorism or diplomatic efforts, and "*activists who oppose governments that are supported by the United States Government*." *Id.* at 406 (emphasis added). As with AAUP and MESA, which, as organizations, cannot be placed in removal proceedings, the *Clapper* plaintiffs could not be targeted under FISA, so their claims necessarily turned on their assertion that the Government would target other individuals. *See id.* at 411. Also, like AAUP and MESA's member-witnesses, plaintiffs restricted their own First Amendment activities in response to the perceived threat that their conversations with targeted individuals would be intercepted. *See id.* at 406-07.

In *Clapper*, the Supreme Court first set out some critical principles in analyzing standing. It made clear that its "standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* at 408. And this is especially so when the courts "review actions of the political branches in the fields of intelligence gathering and *foreign affairs*." *Id.* at 409 (emphasis added). The Supreme Court concluded that the *Clapper* plaintiffs' theory of standing relied on too attenuated a chain of possibilities, which, among other things, required the court to speculate as to how the Government would exercise its discretion to target foreign entities under FISA. *See id.* at 410. As in *Clapper*, AAUP and MESA speculate on how the Government would exercise its discretion to target its actual and prospective members who, too, have never been targets of immigration enforcement actions. *See id.* at 412; Gov't Principal Br. at 26-29. Moreover, the scarcity of enforcement actions against non-members is insufficient to prove enforcement against members is imminent.

2. As AAUP and MESA point out, their witnesses feared they would be targeted for immigration enforcement. But subjective fear is not enough to satisfy the injury-in-fact requirement. Indeed, even an objectively reasonable

fear is insufficient. *See Clapper*, 568 U.S. at 410 (rejecting *objectively reasonable likelihood* standard). Plaintiffs highlight the testimony of Nadia Al-Ali ("Al-Ali") to show their members suffered injury because they felt forced to curtail their First Amendment activity. *See* AAUP/MESA Principal Br. ("AAUP Br.") at 14. They rely on the district court's statement that she "bears many of the traits that appear to make one ripe for targeting" under the policy. Add.177. But that doesn't mean harm to her is imminent; that there was *some* enforcement is not dispositive. Instead, how clear the threat of enforcement "needs to be turns very much on the facts of the case and on a sliding-scale judgment …." *See N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 50 (1st Cir. 2021).

Notwithstanding its finding that AAUP and MESA members were "ripe" for immigration enforcement actions, the district court did not seriously wrestle with the implications of AAUP and MESA's failure to identify any members who were enforcement targets under what the district court described as a mode of enforcement policy as well as the fact that enforcement of the putative policy against anyone was vanishingly rare. Of the 5,000 leads DHS reviewed, it referred fewer than 1% to the Department of State. *See*

Gov't Principal Br. at 16, 27. And AAUP and MESA did not identify any actions taken after those initial referrals, against members or non-members, that would fit into the putative policy or the mode of enforcement the district court found. This is so even though there has never been an injunction against enforcement along the lines AAUP and MESA demand.

Ultimately, Al-Ali testified only to subjective fears; her testimony did not and could not establish that there was any likelihood those fears would be realized, let alone that immigration enforcement against her or any other AAUP or MESA noncitizen member was imminent. Indeed, even though AAUP and MESA insist an injunction is necessary to protect them and the sanctions portion of the district-court order has been stayed, they still point to no immigration enforcement action against any of their members under the putative policy.

In support of their standing argument, AAUP and MESA also rely (at 14) on fears expressed by their witnesses Megan Hyska ("Hyska") and Bernhard Nickel ("Nickel"). These witnesses too testified only about subjective fears. AAUP and MESA also omitted the fact that their witness-members continued to engage in what they would consider "risky" behavior without consequence. For example, Hyska attended a protest after the arrests of Khalil and

Öztürk. *See* JA.399, 402, 432-33. And Nickel continued to send large group emails concerning immigration issues, including one email critical of the Trump administration. JA.614-16, JA1991-93. He also attended at least one public protest against Khalil's detention. JA.596-604.

AAUP and MESA try to minimize the fact that one of their members and potential witnesses, Brian Shuve ("Shuve"), naturalized as a U.S. citizen on April 23, 2025. JA.1530. They argue that because Shuve is now a citizen, he is in a materially different position than other non-citizen members. This is true as far as it goes, but it elides the obvious point that the Government's grant of citizenship to him amid the alleged enforcement of the putative policy shows that his fear was never reasonable, let alone that the threat of enforcement is imminent given that he was naturalized. This further undermines AAUP and MESA's claim that enforcement against their members is imminent as it was neither certainly impending nor was there a substantial risk of harm. The volume of Shuve's public speech in support of Palestine—including drafting website statements about Palestine and Gaza, his membership in the Claremont Colleges' Faculty for Justice in Palestine ("FJP"), his participation in an FJP public demonstration in the spring of 2025, and his leadership role

at Harvey-Mudd-AAUP—far exceeded the public profile of the other testifying witnesses. JA.1520-21, 1523-34. So if anyone's fears of retaliatory immigration enforcement under the putative policy were to come true, it would have been Shuve's. Instead, he naturalized following a 20-minute interview. JA.1530.

3. To avoid the implication of none of AAUP and MESA's members being placed in removal proceedings and the overall unlikelihood of enforcement, the district court described the "mode of enforcement" policy as not being to remove all persons who support the terrorist organization Hamas or Palestine but rather targeting a few to cause the rest to self-censor. Add.163. AAUP and MESA describe this as a "sword of Damocles" whose value "is that it hangs—not that it drops." AAUP Br. at 22 (quoting *First Choice Women's Resource Ctrs., Inc. v. Davenport*, 608 U.S. 174, 191 (2026)). But the injury must be *certainly impending* or there must be a *substantial risk* that the sword will drop. *See SBA List*, 573 U.S. at 158. Given the paucity of enforcement actions, that AAUP and MESA have not shown their members are similarly situated to those who were placed in removal proceedings, and that no members of AAUP or MESA have, in fact, been targeted under the policy, the standard of injury-in-fact is not met.

AAUP and MESA criticize (at 21) the Government for not "disavow[ing] enforcement" against their members. The Government does not have the burden to disavow enforcement; rather AAUP and MESA have the burden to prove standing at the time of their "lawsuit and maintaining it thereafter." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). In other words, they must prove that enforcement is certainly impending or there is a substantial risk of enforcement against their members; the Government does not have to disprove it. And they have failed to do so.

### B. AAUP and MESA Lack Organizational Standing

1. AAUP and MESA do not defend the district court's determination that MESA has organizational standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); Add.183 n.37; Gov't Principal Br. at 34-35. Nor do they repeat their claim regarding their right to hear from and associate with aliens. Add.47-48.[1] Instead, they defend the decision on the grounds that they have suffered injuries to their core activities. *See* AAUP Br. at 24. They

[1] In any event, such a theory would be untenable under *Murthy v. Missouri*, 603 U.S. 43, 46 (2024) (rejecting a broad "right to listen" theory of standing because plaintiffs failed to identify any specific actions that caused identifiable harm).

also claim that the district court erred in determining that AAUP lacked organizational standing and argue that its core activities, too, have been harmed. *Id.* at 24-25. But injuries to their core activities are only one aspect of organizational standing. They still must "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. Alliance for Hippocratic Medicine* ("*Alliance*"), 602 U.S. 367, 393 (2024); Gov't Principal Br. at 33. Put differently, to prove organizational standing, an injury is not enough; rather, the injury must be fairly traceable to the challenged action, and it must be redressable.

This is why the district court had to resort to relying on the "unique" holding in *Havens*. MESA's, and now AAUP's, theory of standing is novel. They argue that they have suffered organizational injuries because of the choice of non-parties to self-censor based on possible immigration enforcement. This requires the same speculative chain of reasoning required to find that they have associational standing. Except it also requires the additional step of harm to the organization resulting from the harm to its members or putative members. This is why the district court grasped (unsuccessfully) at *Havens*. *See* Gov't Principal Br. at 34-35.

2. AAUP and MESA fare no better with their diversion-of-resources theory, in which they claim their organization was injured because it had to divert resources to address their members' concerns about immigration issues. But this is what the Supreme Court warned against in explaining that organizations "cannot spend [their] way into standing simply by expending money to gather information and advocate against defendant's actions." *Alliance*, 602 U.S. 394. If diversion of resources were enough to confer standing, then any organization would have standing to challenge almost any decision, policy, or action should an alien ask them about it. *See Alliance*, 602 U.S. at 394 ("[T]hat theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike ….").

### C. AAUP and MESA Lack Standing Because Their Injuries are Not Redressable

For AAUP and MESA "to establish standing, they must show that their injuries would likely be redressed by the order *requested*." *Coalition for Humane Immig. Rights v. Mullin ("CHIR")*, 185 F.4th 1275, 1281 (D.C. Cir. 2026) (citing *Gutierrez v. Saenz*, 606 U.S. 305, 316-17 (2025); *see Babb v. Wilkie*, 589 U.S. 399, 413 (2020)). AAUP and MESA confirm (at 44) that they are requesting that the Court overturn the putative mode of enforcement, but doing so would not redress their claimed injuries. To begin, an injunction, not

to mention declaratory and Administrative Procedure Act ("APA") relief, would not address AAUP and MESA's claimed injuries because it would not amount to more than "abstractly commanding the [Government] to obey the First Amendment." *Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006) (finding no redressability for standing).

*CHIR*, additionally, shows that AAUP's and MESA's requested relief flunks standing's redressability requirement. There, the plaintiffs moved to stay agency actions directing immigration officers to place amenable aliens in expedited removal proceedings. *See CHIR*, 185 F.4th at 1279. But plaintiffs did not move to stay the pre-existing regulations authorizing that action. *See id.* So the court held that plaintiffs' injuries could not be redressed because staying the directives would still leave the regulation in force. Meaning, immigration officers could still place the same aliens in expedited removal proceedings. *See id.* at 1282.

So too here. AAUP and MESA seek to have the putative policy enjoined, but do not seek to have the statutes authorizing aliens' removal enjoined. *See* Gov't Principal Br. at 31-32; Add.59 n.9 (noting that plaintiffs do not raise a facial challenge and instead challenge a policy); Transcript, Jul. 7, 2026, Dkt#231 at 12:11-17 (stating plaintiffs do not challenge the constitutionality of

the provisions); AAUP and MESA's Motion for Remedies, Proposed Or. at 4-11; *cf.*, *e.g.*, *White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010) (concluding that the plaintiffs lacked standing because their injuries would not "be redressed by the relief plaintiffs seek, since the states' prohibitions on cockfighting would remain in place notwithstanding any action we might take in regard to the" challenged federal law).[2] Given that the statutes will remain in effect even if the district court were to grant an injunction, AAUP and MESA's injuries are not redressable.

## II. THE DISTRICT COURT LACKED JURISDICITON OVER AAUP AND MESA'S CLAIMS

When dealing with jurisdictional directives, the Court looks through "evasions as creative labeling and considers the fundamental nature of the claims asserted." *Aguilar v. USICE*, 510 F.3d 1, 17 (1st Cir. 2007). The Court has made clear it will not "allow collective end runs around congressional directives." *Id.* Despite AAUP and MESA's attempts to recharacterize their

[2] The Northern District of California recently concluded that 8 U.S.C. §§1182(a)(3)(C)((iii), 1227(a)(4)(C)(i), and 1201(i) violated the First Amendment as unlawful viewpoint- or content-based speech restriction, and the Fifth Amendment, as unconstitutionally vague. *See Stanford Daily Publishing Corp. v. Rubio*, --- F. Supp. 3d ---, 2026 WL 2549090 (N.D. Cal. Aug. 8, 2026). AAUP and MESA did not seek similar relief here, and that decision is under appeal.

broad challenges, their claims, at bottom, rest on those issues over which courts lack jurisdiction—actions taken and proceedings brought to remove aliens, and decisions and actions to commence those proceedings and adjudicate removal cases.

### A. 8 U.S.C. §1252(b)(9)

AAUP and MESA argue that 1252(b)(9) applies only to reviewing removal orders, but they are wrong. Critically, they do not address the rush-to-the-courthouse problem this Court identified in *Aguilar* that would allow plaintiffs to circumvent §1252(b)(9) so long as they file their lawsuit before the Government initiates removal. *See Aguilar v. ICE*, 510 F.3d 1, 10 (1st Cir. 2007). Neither §1252(b)(9) nor *Aguilar* permit such an end run around Congress's carful delineation of jurisdiction. *See* Gov't Princip. Br. at 43; *Aguilar*, 510 F.3d at 10 (nothing in §1252(b)(9) "limits its reach to claims arising from extant removal proceedings").

1. AAUP and MESA instead argue that this Court should reconsider *Aguilar* given the Supreme Court's later decision in *Jennings v. Rodriguez*, 583 U.S. 281, 292, 294-95 (2018). But *Jennings* is wholly consistent with *Aguilar*. The issue in *Jennings* was whether courts have habeas jurisdiction to de-

termine whether aliens are eligible for bond hearings. *See Jennings v. Rodriguez*, 583 U.S. 281, 292, 294-95 (2018). The plurality of three justices held that the court had jurisdiction because the aliens were "not challenging the decision to detain them in the first place or to seek removal; and they [were] not even challenging any part of the process by which their removability will be determined." *Id.* The two concurring justices would have held that §1252(b)(9) barred jurisdiction. *See id.* at 326 (Thomas, J., concurring in part, joined by Justice Gorsuch). The three dissenters, by contrast, would have held that §1252(b)(9) has no effect outside challenges to orders of removal. *See id.* at 355 (Breyer, J. dissenting).

The plurality decision is the controlling one. The holding of a divided Supreme Court "may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). The plurality did not "attempt to provide a comprehensive interpretation of §1252(b)(9)." *Jennings*, 583 U.S. at 295. The dissent, by contrast, would have comprehensively interpreted §1252(b)(9) as having no effect outside challenges to orders of removal. *See id.* at 355. Given the plurality adopted "a case-specific application of §1252(b)(9), rather than

adopting an exact interpretation," the plurality decision is the narrower holding. *See Khalil v. President*, 164 F.4th 259, 278 (3d Cir. 2026) (holding the *Jennings* plurality's reading of §1252(b)(9) is binding under *Marks*); *accord Suri v. Trump*, 184 F.4th 260, 291 (4th Cir. 2026) (following the plurality); *Mahdawi v. Trump*, 183 F.4th 103, 118 (2d Cir. 2026) (rehearing granted No. 25-1113, Dkt. #244) (following the plurality).[3]

The plurality in no way suggests that this Court was wrong when it concluded in *Aguilar* that "nothing in the statute limits its reach to claims arising from extant removal proceedings." 510 F.3d at 10. To hold otherwise, would "render the word 'action' superfluous and effectively excise it from the statute" by requiring removal proceedings to be in progress, or—as AAUP and MESA would have it—completed. *Id.* at 10 (interpreting "arising from *any action* taken or proceeding brought to remove an alien") (emphasis added). Plus, limiting the bar to final removal orders, as AAUP and MESA would have this Court do, would contradict *Jennings* because the plurality would have had no reason to state that §1252(b)(9) bars challenges to "the decision to detain … in the first place or to seek removal…." *Jennings*, 583 U.S. at 294; *see also Khalil*,

[3] The Second Circuit has since ordered rehearing en banc, but the court did not vacate the panel decision.

164 F.4th at 278 (noting the plurality's strong implication that §1252(b)(9) covers some pre-final-order-of-removal actions).

2. In §1252(b)(9), Congress made no exception for third-party lawsuits. Nevertheless, AAUP and MESA argue that because they are organizations that can never be subject to removal proceedings, §1252(b)(9) does not apply. In support they cite *Massachusetts Coalition for Immigration Reform v. DHS*, 621 F. Supp. 3d 84 (D.D.C. 2022). But that case is materially different. It involved a challenge to a Department of Justice policy that permitted immigration judges to use administrative closure. There, plaintiffs claimed that the Department did not provide an analysis of the policy under the National Environmental Policy Act ("NEPA"). *See id.* at 90. In finding that §1252(b)(9) did not bar its jurisdiction, the court explained that the Attorney General's NEPA compliance was wholly separate from an order of removal. *See id.* at 98. This contrasts with the present case where the challenged policy is inextricably intertwined with removal proceedings.

That same court distinguished *Massachusetts Coalition* in a later case where an immigration law firm and immigrant rights group challenged the pace at which certain removal hearings were being set. The court found §1252(b)(9) barred its jurisdiction. *See Hines Immigration L., PLCC v. Exec.*

*Off. Of Immigr. Rev. ("EOIR")*, 2026 WL 969020, *9 (D.D.C. Apr. 10, 2026). Notably, the court concluded that because the plaintiffs would not be subject to removal proceedings did not bring them outside §1252(b)(9)'s ambit. *See id.* (following *Nat'l Immigr. Project of Nat'l Laws. Guild v. EOIR*, 456 F. Supp. 3d 16, 20 (D.D.C. 2020) (holding organizations could not challenge detention policies because they too were subject to §1252(b)(9)).

Additionally, the district court's finding that MESA had organizational standing was premised on harm to the organization resulting from fears among its alien members, prospective members, and participants in its activities that they would be subject to detention and removal. Add.181-82. But that finding does not confer standing. Those aliens, when and if they are placed in removal proceedings, may, *in those proceedings*, challenge the decision to place them in removal proceedings, so the claimed constitutional violations will not go unreviewed.

3. The decisions in *Khalil*, *Mahdawi*, and *Suri* are instructive. *See* Gov't Principal Br. at 41-42. AAUP and MESA argue (at 30) that they are irrelevant because they involve aliens collaterally challenging their removal proceedings and who could eventually obtain review in those proceedings. But Congress may delineate federal court jurisdiction and direct that constitutional rights

be raised in a particular way. *Cf. Clapper*, 568 U.S. at 420 ("that if respondents have no standing to sue, no one would have standing, is not a reason to find standing") (cleaned up); *Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*, 716 F.3d 633, 638 (D.C. Cir. 2013) (under Civil Service Reform Act ("CSRA") channeling, "the fact that National AFGE may not pursue a claim through the CSRA does not mean that it has access to the courts. Rather, it means that National AFGE may not raise the claim at all"). In §1252(b)(9), Congress directed those rights to be addressed by aliens challenging their removal orders. It would be paradoxical to require Khalil, Mahdawi, or Suri, who have immediate personal stakes, to bring their constitutional claims in removal proceedings, while permitting someone against whom no proceedings will be brought to challenge hypothetical future enforcement actions against third parties. *See* Gov't Principal Br. at 42.

Since the Government filed its Principal Brief, the Second Circuit decided *Mahdawi*. *See supra* at 18 n.3. That court agreed with the Third Circuit's decision in *Khalil* that 8 U.S.C. §1252(b)(9) strips federal district courts of jurisdiction to review challenges to aliens' removal proceedings and channels all such challenges to a court of appeals through a petition for review. *See id.* at 114-18. Just as §1252(b)(9) barred Khalil and Mahdawi's direct challenges to

their detention (and indirect challenges to removal), so too does it bar AAUP's even-more-indirect challenge here *a fortiorari*.

The recent decision in *Suri v. Trump*, 184 F.4th 260 (4th Cir. 2026), does not hold otherwise. In a habeas petition, Suri, unlike AAUP and MESA, did not challenge the commencement of removal proceedings, but rather his detention and the conditions of his detention. *See id.* at 284-85 ("Suri's habeas petition does not challenge the Government's decision to commence removal proceedings against him"). In finding it had jurisdiction over his petition, the Fourth Circuit did not address the validity of placing Suri in removal proceedings and noted that the district court required him to participate in them. *Id.* at 285-86. *Suri*, however, conflicts with *Jennings* to the extent it permits collateral challenges the initial decision to detain. *See Jennings*, 583 U.S. at 294-95 (holding court had jurisdiction where aliens were "not challenging the decision to detain them in the first place"). *Suri* is not binding on this Court, so the Court should decide this case consistently with *Jennings*, which is.

4. AAUP and MESA argue that they can circumvent §1252(b)(9)'s strictures by describing their challenge as being to a policy rather than individual removal proceedings. In support they cite *DHS v. Regents of the University of California*, 591 U.S. 1 (2020). *Regents*, however, stands on entirely different

footing. There, the plaintiffs challenged the rescission of the Deferred Action for Childhood Arrivals program ("DACA"). The Supreme Court held that the challenge was not barred by §1252(b)(9) because DACA was not a *non-enforcement* policy. *See id.* at 18. Instead, the program set up an application process for "eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance." *Id.* DACA "created a program for conferring affirmative immigration relief." *Id.* This relief included access to work authorization, Social Security, and Medicare. *Id.* at 18-19. Here, by contrast, the district court found that there is a "mode of *enforcement* policy" that consists of "detaining, deporting, and revoking noncitizens' visas …." Add.191, 232 (emphasis added) (setting aside the "enforcement policy"); *see also* JA.333 ¶134 (alleging the policy "entails the arrest, detention, and deportation of noncitizen students and faculty …."). So unlike *Regents*, AAUP and MESA challenge the way enforcement decisions were made, putting it in §1252's ambit. *See* 8 U.S.C. §1252(b)(9) (barring jurisdiction to review *actions taken* to remove an alien).

5. AAUP and MESA's arguments that their "claims are independent of, or wholly collateral to, the removal process" are unavailing. Again, the district

court's findings and their own complaint make clear they are challenging actions to commence removal proceedings. *See* Add.191, 232; JA.333 ¶134. The brief recently filed by Khalil shows that AAUP and MESA's claims may have an impermissible collateral effect on actual removal proceedings the Government instituted. Specifically, Khalil argues that the Board of Immigration Appeals lacks authority to order his removal because of the district court's decision in this case. *See Khalil v. Blanche*, No. 26-60344 (5th Cir.), Dkt. #77 at 22-26, 40 ("The AAUP court's findings that Petitioner was specifically targeted by a Policy to punish him for his speech, *conclusively demonstrates* the government's retaliatory intent ....") (emphasis added). AAUP and MESA's remedy request below dispels any lingering doubts that they are challenging actions taken to remove aliens from the United States. Dkt. #277-1. They sought declaratory and injunctive relief concerning decisions to revoke visas, and to arrest, detain, and deport aliens. *Id.* at 4, 7; *see Aguilar*, 510 F.3d at 17 (holding "evasions as creative labeling" cannot make "end runs around congressional directives"). As explained below, this is precisely the type of relief federal courts lack jurisdiction to impose.

**B. 8 U.S.C. §1252(g)**

The gravamen of AAUP and MESA's complaint is a challenge to decisions to *commence proceedings* and *adjudicate cases*, thus it also falls within §1252(g)'s bar on any review of a '"decision or action to 'commence proceedings, adjudicate cases, or execute removal orders." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 482 (1999) (quoting 8 U.S.C. §1252(g)). As with §1252(b)(9), AAUP and MESA cannot circumvent the statute by reframing their claims as a challenge to a policy divorced from such decisions.

1. AAUP and MESA argue (at 26) that their claims are not aimed at any ongoing proceedings, cases, or removal orders. The record says otherwise. Indeed, the record of a 9-day trial was replete with evidence of ongoing removal proceedings. And tellingly, aliens whose evidence was used in the AAUP trial are treating the district court's findings in this case as dispositive in their own cases. *See supra* at 24. Moreover, AAUP and MESA's jurisdictional arguments are contradicted by the district court's findings and their own complaint, both of which relied on scrutinizing ongoing removal proceedings. Such arguments are also contradicted by their request for remedies that would

plainly interfere with decisions or actions to commence proceedings and adjudicate cases. *See infra* at 44-52. Along those lines, *NWDC Resistance* is unhelpful to AAUP and MESA's arguments. There, the court, in denying a motion to dismiss, determined that the plaintiffs did "not seek to stop, delay, reverse or otherwise interfere with any of the three discrete actions described in Section 1252(g), as to any specific alien or particular proceedings." *NWDC Resistance v. ICE*, 493 F. Supp. 3d 1003, 1011 (W.D. Wa. 2020). In contrast, here, AAUP and MESA absolutely intend such interference. *Regents* is likewise unhelpful to AAUP and MESA's §1252(g) argument. That case involved a challenge to a much broader policy that included benefits granted outside removal proceedings, such as work authorization, Social Security, and Medicare. *See supra* at 22-23.

2. AAUP and MESA argue that the conduct they challenge is sufficiently "outrageous" to raise the principle of constitutional doubt and that their claims should be subject to review despite the prohibitions of §1252(g). This argument is based on dicta in *AADC* where the Supreme Court commented that a rare case might present a constitutional violation that is so outrageous as to overcome the jurisdictional prohibitions of §1252(g). *See AADC*, 525 U.S. at 485 n.9.

Assuming such an exception exists, this does not present such a case. *AADC* involved the same First Amendment claims raised here, yet the Supreme Court did not apply the outrageousness exception it contemplated. *See id.* at 488 n.10 (noting that the Government admitted "that the First Amendment activity was the basis for selecting the individuals for adverse action"). *Ragbir* also does not support the application (or even existence) of an outrageousness exception because that case was vacated by the Supreme Court, and it is thus neither precedential nor binding in any court. *See Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019), *vacated sub nom*, *Pham v. Ragbir*, 592 U.S. 901 (2020). Moreover, it lacks persuasive value because the claim there—First Amendment violations—that *Ragbir* found to be outrageous were like those in *AADC*, where the Supreme Court declined to find an outrageousness exception applied. *See id.* at 66-67. Further, because AAUP and MESA are not themselves placed in removal proceedings, their claim of "outrageousness" is even more tenuous than those charged as removable.

### III. The District Court Erred in Determining that the Government had a Mode of Enforcement Policy that Violated AAUP and MESA's First Amendment Rights

The district court's First Amendment ruling hinged on the notion that aliens have coextensive First Amendment free-speech rights as U.S. citizens.

Add.184-193. But the district court's premise clearly conflicts with Supreme Court precedent. The Supreme Court has held that the Government may deport aliens based on their membership or association with certain political parties or because of advocacy of certain political positions. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 592 (1952); *Turner v. Williams*, 194 U.S. 279, 293 (1904). That alone is enough to vacate the district court's judgment and remand for the proper inquiry. Perhaps out of concern that its legal conclusion was spurious, the district court added that, in any event, "political speech is not, on its own, a facially legitimate reason for expelling persons from this country." Add.189-190. This, too, misunderstands the law. *See infra* at 34-35.

In any event, AAUP and MESA's attempt (at 32-33) to distinguish these cases fails. That First Amendment jurisprudence may have evolved in the years after *Harisiades* was decided does not invalidate its core holding that the Alien Registration Act of 1940, as applied to aliens, did not violate the First Amendment. *See Harisiades*, 342 U.S. at 592 ("We think the First Amendment does not prevent the deportation of these aliens."). And AAUP and MESA's assertion (at 32-33) that *Turner* was based on a "distinction between rights and privileges" does not undermine its precedential value. *Turner* holds that the First Amendment was not violated by the exclusion of an alien because he

was an anarchist. *See Turner*, 194 U.S. at 292-94. That *Turner* involved an alien who was in exclusion, as opposed to removal proceedings (despite the fact that he was present in the United States) is immaterial for the point the Government relies on; the decision itself does not turn on the rights (or lack thereof) of aliens in exclusion proceedings, but instead establishes that certain classes of aliens do not share the same First Amendment rights as citizens—a position AAUP and MESA, and the district court, reject.

Both *Harisiades* and *Turner* remain binding precedent. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) ("If a precedent of this Court has direct application in a case, … a lower court should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions. This is true even if the lower court thinks the precedent is in tension with some other line of decisions.") (cleaned up). And subsequent cases have reinforced the principle that aliens do not have constitutional rights coterminous with U.S. citizens. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (holding that only as a noncitizen "increases his identity with our society" do the "generous and ascending scale of rights" spring into action) (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)); *cf. Holder v. Hu-*

*manitarian Law Project*, 561 U.S. 1, 25-26, 31-32 (2010) (affirming constitutionality of speech restrictions that could include citizens where the only exemption was for "independent advocacy that might be viewed as promoting the [terrorist] group's legitimacy"); *AADC*, 525 U.S. at 488 ("an alien unlawfully in this country has no constitutional right to assert selective enforcement [based on the First Amendment]"). So does history and tradition. *See, e.g.*, *United States v. Escobar-Temal*, 161 F.4th 969, 997-99 (6th Cir. 2025) (Thapar, J., concurring) (explaining why "[n]either history nor precedent indicates that the First Amendment definitively applies to aliens" and that "courts recognize that the First Amendment does not attach with equal force to citizens and noncitizens"); *Vidal v. Elster*, 602 U.S. 286, 301 (2024) ("history and tradition" relevant to "the scope of the First Amendment"); *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 472 (2025) (same).

Because the caselaw establishes that the First Amendment rights of non-citizens is not coterminous with that of citizens, AAUP and MESA's claims should have been reviewed under the facially legitimate and bona fide standard. The Government's actions satisfy that standard. *See* Gov't Principal Br. at 56-58. AAUP and MESA assert (at 33) that even under a facially legitimate and bona fide standard, the Government cannot exclude an alien based

on that alien's speech, but each of the cases they rely on concern the rights of *United States citizens* who claimed that their First Amendment rights were harmed because the Government excluded an alien based on that alien's speech. *See Abourezk v. Reagan*, 592 F. Supp. 880, 887 & n.23 (D.D.C. 1984), *vacated and remanded on other grounds*, 785 F.2d 1043 (D.C. Cir. 1986); *Allende v. Shultz*, 605 F. Supp. 1220, 1225 (D. Mass. 1985); *Harvard L. Sch. F. v. Shultz*, 633 F. Supp. 525, 531 (D. Mass. 1986), *vacated without opinion*, 852 F.2d 563 (1st Cir. 1986). None of the cases AAUP and MESA rely on involved the First Amendment rights of the alien who was excluded, so they have no bearing on whether aliens have First Amendment rights coterminous with citizens.

The district court declined to find that AAUP and MESA's U.S. citizen members have standing. Add.47-48, 192-193. But even if they did, given that the First Amendment does not apply to aliens in full, any claim of First Amendment burden on citizens are also reviewed under the highly deferential "facially legitimate and bona fide standard"—*i.e.*, solely whether the legal justification proffered by the agency is facially valid, without further inquiry into the justifications behind the government's actions. *See Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024); *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972). That

standard is plainly met here. Under the facially legitimate and bona fide standard, the court looks to the legal justification proffered by the agency and, if facially valid, "the inquiry is at an end." *Muñoz*, 602 U.S. at 908 (reviewing a citizen's constitutional challenge to a noncitizen's visa denial for whether the agency provided a "facially legitimate and bona fide reason"); *see Mathews v. Diaz*, 426 U.S. 67, 81 n.17 (1976) (Congress has plenary authority over immigration matters, which are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.") (cleaned up).

AAUP and MESA assert that the facially legitimate and bona fide standard applies only in cases involving the exclusion of aliens not yet admitted to the United States, *see* AAUP Br. at 34-35, but Courts have applied this standard to aliens present in the United States. In *Rajah v. Mukasey*, the Second Circuit held that a claim by aliens that an executive-created registration and removal program violates equal protection based on religion, ethnicity, gender, or race, is reviewed no more stringently than under a facially legitimate and bona fide standard, or for rational basis. 544 F.3d 427, 432, 438 (2d Cir. 2008). Notably, the Supreme Court relied on this decision in discussing review

of executive action involving aliens. *See Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (citing *Rajah*).

AAUP and MESA argue (at 35-36) that *Rajah* and *AADC II* are distinguishable from the instant case because in those cases "the government had a lawful basis to deport the plaintiffs … [but] had chosen to use its enforcement authority because of [the plaintiffs'] political views." But this case does not present a materially different situation. Plaintiffs do not challenge—nor have they ever challenged—the legality of the statute used to remove any individual, including those held out as examples in this case. Rather, they alleged the existence of an "ideological deportation policy" through which the government targeted individuals for their speech. *See* Gov't Principal Br. at 2-3, 7-8. AAUP and MESA assert (at 37) that they are not challenging the individual deportations themselves but instead are arguing that the policy is not facially legitimate and bona fide. But this contradicts the reasoning of *Rajah* and *AADC*, where the courts looked to whether the Government had a rational basis to use its enforcement authority, and not to whether any unconstitutional reasoning may have informed the use of that authority. *See Hawaii*, 585 U.S. at 704-05.

The Government's actions satisfy the facially legitimate and bona fide standard. *See* Gov't Principal Br. at 56-57. In each case the district court reviewed, the Government provided evidence that it acted based on behavior that would have serious adverse foreign-policy consequences, as is authorized by statute. *See* JA.1564, 1572, 1582, 1589, 1592. Contrary to AAUP and MESA's assertions, (at 37), and as the district court correctly concluded, the facts of these removal cases do not establish the existence of an "ideological deportation policy" in the way AAUP and MESA allege in their complaint. Add.163 ("There was no ideological deportation policy."). Rather, it was only by impermissibly looking behind the face of the decisional documents and looking to statements made by executive branch officials that the district court inferred evidence of an ulterior motive. Add. 163-68. This is precisely the action that the Supreme Court admonished when applying the facially legitimate and bona fide standard. *See Kleindienst*, 408 U.S. at 758, 766 (declining to balance the First Amendment interests of those bringing the suit against Congress's plenary power because Congress had placed that responsibility "in the hands of the executive"). The same should apply here where Congress placed plenary power in the hands of the executive in 8 U.S.C. §§1201(i) and

1227(a)(4)(C). The district court should have followed *Kleindienst* and deferred to the agency's facially legitimate and bona fide reasons for placing aliens in removal proceedings. This is especially so here, in a collateral challenge where the validity of individual removal proceedings was not actually before the district court.

## IV. THE DISTRICT COURT CORRECTLY DENIED COUNT II BECAUSE AAUP AND MESA IDENTIFIED NO THREATS AGAINST THEMSELVES

AAUP and MESA argue that Government officials' statements, by themselves, violate their First Amendment rights because their members felt threatened. But the district court's conclusion was not clearly erroneous that Plaintiffs did not establish a coercion campaign against them because they did not produce evidence of threats targeted at them. Add.203-204. This failure is fatal to their claim because without threats directed toward them, such a claim can only succeed where there is some adverse action taken against them. General threats alone are not enough. This is why the district court considered the statements of public officials only, as part of its analysis of Count I, in finding that the existence of a particular "mode of enforcement." Add. 204-05.

In disputing the district court's ruling on Count II of their complaint, AAUP and MESA rely (at 38-39) on *NRA v. Vullo*, 602 U.S. 175 (2024), and

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). But the facts adduced at trial do not fit into their framework. A claim under those cases turns on the point that the Government cannot accomplish indirectly what it cannot do directly: it cannot suppress one party's speech by coercing a third party to censor it. *See Vullo*, 602 U.S. at 191. That is not the case here where AAUP and MESA alleged general threats by the Government but failed to establish that any such "threat" was targeted at them or a threat was made to a third party who then censored AAUP and MESA.

Courts have held that to succeed on a First Amendment claim based on "threats," there must be a relation between the purported threat and some adverse action. General threats to enforce laws or regulations are insufficient. *See, e.g.*, *Rincon Band of Mission Indians v. San Diego County*, 495 F.2d 1, 4-6 (2d Cir. 1974) (no case or controversy where alleged threat was general in nature). In *VDARE Foundation v. City of Colorado Springs*, the Tenth Circuit determined that the plaintiff failed to show that a statement from a municipality was a "veiled threat" because it was not directed at the plaintiff. 11 F.4th 1151, 1171 (10th Cir. 2025).

The non-binding cases AAUP and MESA relied on below involved threats directed at the plaintiffs or retaliatory actions taken. In *President &*

*Fellows of Harvard College v. DHS*, for example, the court concluded that the defendant carried out the alleged threat—issuing a proclamation exercising authority under 8 U.S.C. §1182(f) to prohibit the entry of aliens to pursue a course of study specifically at Harvard. 788 F. Supp. 3d 182 (D. Mass. 2025). In *Perkins Coie LLP v. U.S. Dep't of Justice*, the court determined that the defendant specifically targeted Perkins Coie LLP for retaliation. 783 F. Supp. 3d 105 (D.D.C. 2025). No such statements directly targeting AAUP and MESA or their members exist here, and there was no adverse action directed at AAUP or MESA their members. *See Parker v. Dist. of Columbia*, 478 F.3d 370 (3d Cir. 2007) (no case or controversy where a state government vowed to prosecute violators of gun control laws and plaintiffs had suffered no injury in fact).

The Government has the right to have views on the enforcement of the law and to take strong positions on how the law is enforced; "otherwise, the government would not work." *See VDARE*, 11 F.th at 1170 (quoting *Walker v. TX Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015)); *see also Goldstein v. Galvin*, 719 F.3d 16 30 (1st Cir. 2013) ("Not only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern"); *Pleasant Grove City v. Summum*, 555 U.S. 460,

467-68 (2009) (the government has the right to speak for itself). As part of their own right to free speech, general statements by government officials to prosecute unlawful actions are insufficient to support a claim of First Amendment retaliation or chilling of speech. *See Venetian Casino Resort, LLC v. Cortez*, 9 F. Supp. 2d 1102, 1107 (D. Nv. 2000); *Poe v. Ullman*, 367 U.S. 497, 501 (1961) (holding that allegations that official intends to prosecute offenses, and that giving advice concerning contraceptives constitutes offenses, did not provide immediate "threat … rais[ing] serious questions of non-justiciability of appellants' claims").

Likewise, public statements implying an unconstitutional basis for an action do not mean the action was unconstitutional if it was otherwise permissible. In *Trump v. Hawaii*, the plaintiffs challenged an Executive Order (turned Proclamation) that they claimed "was motivated not by concerns pertaining to national security but by animus toward Islam," in violation of the First Amendment. 585 U.S. at 681. The Supreme Court examined a series of media "statements by the President and his advisors casting doubt on the official objective of the Proclamation," which plaintiffs submitted to claim "the primary purpose of the Proclamation was religious animus." *Id.* at 699-700. It then explained that, because the Proclamation was "neutral on its face" and

concerned "a matter within the core of executive responsibility," *i.e.*, national security and regulating the entry of aliens, it would not "probe the sincerity of the [Executive Branch's] stated justification for the policy by reference to extrinsic statements." *Id.* at 702-04.

Finally, the public officials' statements at issue here, taken by themselves without reference to enforcement, as they must be under Count II, do not clearly target protected speech. For example, the X post from Secretary Rubio that Plaintiffs offered into evidence as proof of a coercive threat says "[t]hose who support designated terrorist organizations, including Hamas, threaten our national security…. Violators of U.S. law—including international students—face visa denial or revocation, and deportation." JA.1602. Secretary Rubio's post addressed those who support terrorist organizations and violate the law, which are both unquestionably valid grounds of inadmissibility and deportability. *See* 8 U.S.C. §1182(a)(3)(B) (containing material support for terrorism ground among others); §1227(a)(4)(B). A DHS X post stated that Khalil was detained for his activities aligned to Hamas. *See* JA.1603. Even though that post cited the Executive Order targeting antisemitism, it showed DHS was targeting support for Hamas, a terrorist organization designated under 8 U.S.C. §1189. *See also* JA.1604 (similar post from Secretary Rubio),

JA.1667 (post from Assistant Secretary for Public Affairs DHS stating Suri was targeted for spreading Hamas propaganda, among other things), JA.1730 (post from same, in response to report of masked anti-Israel students breaking into the library, saying those pushing Hamas propaganda, glorifying terrorists that relish the killing of Americans, harassing Jews, taking over buildings, or other anti-American activities will have their visas revoked), JA.1729 (post from Secretary Rubio stating they are reviewing visa status of trespassers and vandals who took over the library). The President truthed, about Khalil's detention, that it was because of his pro-Hamas activities. *See* JA.1605. Other public statements of Government officials similarly targeted support for terrorism or other unprotected speech. *See* JA.1626-27 (stating Khalil was detained for supporting the Hamas terrorist organization).

AAUP and MESA provided a statement by the White House Communications Director that laid out a clear non-protected justification for Khalil's arrest. The statement begins by correctly describing the foreign policy removal provision at 8 U.S.C. §1227(a)(4)(C). *See* JA.1610. Then it explains that Khalil had his green card revoked because of his support for Hamas, for organizing group protests that disrupted college classes, and because he harassed Jewish students and made them feel unsafe on their own college campus.

*See id.* It also describes Khalil as distributing pro-Hamas propaganda with a Hamas logo. *See id.*; *Khan v. Holder*, 766 F.3d 689, 698 (7th Cir. 2014) (holding that distributing flyers on behalf of a terrorist organization was, among other things, material support).

At bottom, none of these "threats" targeted AAUP or MESA or their members. At best, they targeted Hamas supporters and those who commit unprotected acts, such as disrupting college classes, invading college buildings, and supporting designated terrorist organizations. So taking the so-called threats by themselves, as required by the language of Plaintiffs' Count II, the public officials' statements did not clearly establish that the Government targeted protected speech. And the statements did not target AAUP or MESA or their members, so they could not violate the First Amendment rights of the organizations or their members. This is why the district court rejected Count II and combined its analysis of the purported threats with its analysis of Count I's alleged "mode of enforcement." This Court should also reject AAUP and MESA's attempt to revive Count II.

## V. THE DISTRICT COURT ERRED IN FINDING A VIOLATION OF THE APA

The district court lacked jurisdiction over this action, which includes claims under the APA, pursuant to §1252(b)(9) and (g), and it erred in finding

a First Amendment violation, all of which undermine the APA finding. *See* Gov't Principal Br. at 24-59. It also erred in considering, without notice, and misinterpreted, the September 30, 2021 memorandum from Secretary of Homeland Security Mayorkas, www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf, [https://perma.cc/5LPN-BPU5]. *See* Gov't Principal Br. at 58-59. AAUP and MESA argue (at 40) that the sentence explaining that this guidance "does not prohibit consideration of one or more of the above-mentioned factors [including First Amendment rights] if they are directly relevant to status under immigration law or eligibility for an immigration benefit" is limited to consideration of benefits like asylum. But the caveat explicitly mentions *status* in addition to benefits. And Congress explicitly permitted the consideration of speech in status determinations under the foreign-policy provisions. *See* 8 U.S.C. §§1182(a)(3)(C), 1227(a)(4)(C). In addition, the visa-revocation provision is purely discretionary, so it can likewise include considerations related to speech. The Mayorkas memorandum simply prohibited such considerations as speech and religious exercise for determinations that do not normally include such elements, like a person removable for committing an aggravated felony where speech is not an element. *See* 8 U.S.C. §1227(a)(2)(A)(iii).

Also, the Mayorkas memorandum is not part of the record—hence the parties citing to the webpage—because the district court did not take judicial notice of the document under Federal Rule of Evidence 201 and AAUP and MESA did not ask it to do so. The district court made a general statement that it would take judicial notice of certain facts but stated that those facts were "not dispositive of any issue here …." Add.73 n.4. Yet the district court absolutely treated the Mayorkas memorandum as dispositive. Unlike in the case AAUP and MESA cite, the party there had been aware the court might take judicial notice of a particular document and argued against it. *See in re Jackson*, 988 F.3d 583, 594 (1st Cir. 2021) ("But Jackson, in her own motion to strike, presaged that possibility and explicitly argued against it."). The Government was unaware of the possibility until briefing was closed and the district court issued its decision.

That the district court did not identify any discrete final agency action being challenged exacerbates the district court's error. *See, e.g.*, *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007) ("The issue of whether there was final agency action implicates the jurisdiction of the federal courts, and such final action is normally a prerequisite to judicial review."). The district court attempted to divine a policy (and in turn a policy

change) by cobbling together various statements by government officials and a handful of removal actions. *See* Add.110-17, 128-30, 147-62, 163-64. But the APA requires far more: the APA requires a *discrete* or *specific* final agency action. *See, e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990) (explaining that the APA requires a "case-by-case approach" targeting "specific final agency action rather than "more sweeping actions" seeking systemic improvement" at a "higher level of generality") (cleaned up); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (APA covers only "*discrete* action"). There is no such thing as "an abstract decision apart from specific agency action" or "the existence of an agency decision wholly apart from any agency statement of general or particular applicability designed to implement that decision." *Biden v. Texas*, 597 U.S. 785, 809 (2022) (cleaned up). Yet that is the entire premise of the district court's APA ruling.

## VI. 8 U.S.C. §§1252(f)(1), (b)(9), & (g) BAR INJUNCTIVE RELIEF

AAUP and MESA do not dispute the Government's position that the district court erred in entering its sanctions remedy. *See* Gov't Principal Br. at 59-65; AAUP Br. 41-48; *Playboy Enterprises, Inc. v. Pub. Serv. Comm'n of Puerto Rico*, 906 F.2d 25, 40 (1st Cir. 1990) ("An appellant waives any issue which it does not adequately raise in its initial brief ....") (cleaned up). They

also do not argue that the district court erred in not granting them the relief they sought—other than an injunction against the policy. *See id.*; Dkt. #277-1 at 4-11. AAUP and MESA are correct that the Government contests the declaratory and APA relief. First, as discussed, the district court lacked jurisdiction to enter any relief because it lacked subject-matter jurisdiction over this action ab initio and AAUP and MESA lacked standing. *See* Gov't Principal Br. at 24-50; 8 U.S.C. §1252(b)(9) & (g). Second, the Court erred in finding First Amendment violations that underpin the remedies. *See* Gov't Principal Br. at 51-65; Add.231-36. Finally, AAUP and MESA are correct that the Government maintains that declaratory and APA relief will not redress their injuries because they leave the statutes in effect. *See supra* at 13-15.

**A. 8 U.S.C. §§1252(b)(9) and (g)**

AAUP and MESA have not shown that the district court abused its discretion in denying their request for an injunction. *See Santiago-Sepulveda v. Esso Standard Oil Co. (Puerto Rico)*, 643 F.3d 1, 4 (1st Cir. 2011) (holding denials of injunctions are reviewed for abuse of discretion). To begin, AAUP and MESA have abandoned their demand below that the Government be restrained from "(i) revoking the visas of noncitizens under 8 U.S.C. §1201(i); (ii) charging them with removability under 8 U.S.C. §1227(a)(1)(B) (to the extent

the basis for doing so is a visa revocation under §1201(i)); and (iii) charging them with removability under 8 U.S.C. §1227(a)(4)(B) (to the extent the basis for doing so is the endorse or espouse provisions).” Dkt. #277-1 at 7. They, instead, describe the injunction they desire as one enjoining the “policy.” *See* AAUP Br. at 44. But making the request more abstract does not change its fundamental nature. As the district court found, the “mode of enforcement policy” consists of “detaining, deporting, and revoking noncitizens’ visas ....” Add.191, 232. An injunction of that “policy” directly constrains “actions taken or proceedings brought” to remove aliens and “decisions and actions” to commence proceedings, adjudicate cases, and execute removal orders, which is plainly prohibited by §1252(b)(9) and (g).

**B. 8 U.S.C. §1252(f)(1)**

In addition to §1252(b)(9) and (g), which bar jurisdiction over this action completely, §1252(f)(1) deprives the district court of jurisdiction to enter the relief AAUP and MESA seek. As §1252(f) mandates:

> [N]o court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of [Part IV] as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. §1252(f)(1). Given that the statute limits injunctions to the application of provisions to individual aliens in removal proceedings, this is plainly another attempt by Congress to limit challenges to immigration enforcement to individual proceedings and bar broad third-party injunctions like the one sought here.

1. Section 1252(f)(1)'s jurisdictional bar includes provisions governing "the inspection, apprehension, examination and removal of aliens" under 8 U.S.C. §§1221-1232. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022); *id.* at 544 ("[1252(f)(1)] generally prohibits … injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the … provisions."). An injunction that enjoins enforcement of the "mode of enforcement" district court found would plainly fall within §1252(f)(1)'s ambit as described in *Aleman Gonzalez*.

2. AAUP and MESA argue (at 44) that an injunction against the putative policy would not prohibit the Government from "carrying out any covered provision, only from carrying out the policy," and that §1252(f)(1) thus does not bar the injunction. First, this concession reinforces the Government's point that AAUP and MESA lack standing because their injuries are unredressable,

as the provisions of the INA that would permit the third parties' removal remain in force. *See* Gov't Principal Br. at 31-33; *supra* 13-15. Second, their description of the injunction as merely having permissible downstream effects on covered provisions is spurious. They cite *Aleman Gonzalez*, where the Supreme Court explained in a footnote that the case *Gonzales v. DHS*, 508 F.3d 1227 (9th Cir. 2007), "stands at most for the unresponsive proposition that a court may enjoin the unlawful operation of a provision that is not specified in §1252(f)(1) even if that injunction has *some collateral effect* on the operation of a covered provision." *Aleman Gonzalez*, 596 U.S. at 554 n.4 (citation omitted) (emphases added). The *Aleman Gonzales* footnote does not broadly limit 8 U.S.C. §1252(f)(1)'s reach to the extent AAUP and MESA hope. The policy the district court found, by its very nature, is one involving removal proceedings under §1227 and detention under §1226—provisions unequivocally covered by §1252(f)(1). Enjoining such a mode of enforcement does not just have "downstream effects" on covered provisions; the whole aim of such an injunction is to directly affect their application. That is, such an injunction would prevent the initiation and conduct of removal proceedings, which is precisely the kind of injunction that §1252(f)(1) bars.

2. Plaintiffs alternatively argue that §1252(f)(1) does not bar injunctions outside removal proceedings to the extent the injunction limits the Government's enforcement of provisions that were enacted after the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. *See* AAUP Br. at 45; IIRIRA, Pub. L. 104-208, Div. C, §306(a)(2), 110 Stat. 3009-546, 611. The INA enactment at §242(f)(1), which materially differs from the codification in the U.S. Code at §1252(f)(1), provides that the jurisdictional bar applies to "the provisions of chapter 4 of title II [of the INA] as amended by [IIRIRA] …." *Id.* The court in *Galvez* explained that because the INA's language controls, for a provision to be covered it had to amend the INA, not just be included in the U.S. Code. *See Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022) (citing *Stephan v. United States*, 319 U.S. 423. 426 (1943) ("the text of the United States Code 'cannot prevail over the Statutes at Large when the two are inconsistent'"; *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993)). In *Galvez*, some parts of the statute at issue directly amended the INA, while others did not. *See id.* 830-31. The court held that those provisions that did not amend the INA fell outside the bar in §1252(f)(1).

AAUP and MESA's claim that §1227(a)(1)(B) is not covered by §1252(f)(1)'s jurisdictional bar because it was enacted later is patently wrong.

Section 1227(a)(1)(B) did amend the INA at §237(a)(1)(B), in Chapter 4 or Title II, so it falls under §1252(f)(1)'s strictures. *See* Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108–458, §5304(b), 118 Stat 3638, 3736 (2004) ("Section 237(a)(1)(B) of the Immigration and Nationality Act (8 U.S.C. 1227(a)(1)(B)) is amended ….").

AAUP and MESA also summarily refer to the endorse-or-espouse provisions of the terrorism-related inadmissibility grounds ("TRIG") arguing they are not subject to §1252(f)(1). Those provisions, however, were not at issue in the trial. AAUP and MESA introduced no evidence of anyone—much less any AAUP or MESA member—charged as removable under them, and the district court did not find any facts about them. So they are not properly the subject of any relief in this case. AAUP and MESA argue, nevertheless, that the so-called "endorse or espouse" provisions contained in §1227(a)(4)(B) do not fall under §1252(f)(1)'s jurisdictional limitation. On the contrary, Congress enacted those provisions—which are found at 8 U.S.C. §1182(a)(3)(B)(i)(IV) but incorporated by §1227(a)(4)(B)—directly into INA §212(a)(3)(B)(i). *See* REAL ID Act of 2005, Pub. L. 109-13, div. B, §103a, 119 Stat. 302, 303 (2005). So they too are subject to §1252(f)(1)'s limitation on jurisdiction to grant injunctive relief.

3. Plaintiffs' effort to enjoin Defendants' use of 8 U.S.C. §1201(i) (providing for the revocation of visas by the Secretary of State or a consular officer), is similarly impermissible. They claim that because §1201(i) is not a covered provision under §1252(f)(1), its application can be subject to an injunction. But even though §1201(i) is not a covered provision, it is inextricably intertwined with §1227(a)(1)(B) and §1229a, which are covered provisions, such that enjoining §1201(i) would violate §1252(f)(1). Section 1227(a)(1)(B) specifically incorporates revocations under §1201(i) as a deportation ground. And §1201(i) limits judicial review to removal proceedings, i.e. proceedings under 8 U.S.C. §1229a, another covered provision. So enjoining the Government's use of §1201(i) necessarily also enjoins it from relying on the covered provisions of §1227(a)(1)(B) and §1229a. Such an injunction likewise violates §1201(i)'s jurisdictional bar limiting review to removal proceedings.

4. Moreover, separation-of-powers principles counsel against granting the broad injunctive relief AAUP and MESA seek. AAUP and MESA's request that the Court restrict the operation of the relevant INA provisions put the Court in the untenable position of micromanaging day-to-day immigration enforcement operations. *See United States v. Texas*, 599 U.S. 670, 679 (2023)

("The principle of enforcement discretion over arrests and prosecutions extends to the immigration context, where the Court has stressed that the Executive's enforcement discretion implicates not only normal domestic law enforcement priorities, but also foreign-policy objectives.") (citing *AADC*, 525 U.S. at 490-91) (quotation marks omitted). It is the role of the Executive, not the courts, to oversee the execution of the laws as courts "do not possess a roving commission" to "exercise general legal oversight of the … Executive Branch[]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-25 (2021); *see also Rizzo v. Goode*, 423 U.S. 362 (1976). But that is precisely what AAUP and MESA's requested injunctions invite the Court to do. The Court should decline the request.

### C. Relief Must be Limited to the Parties

Finally, even if the Court determines the district court abused its discretion and directs the court to grant AAUP and MESA an injunction, any relief must apply solely to the parties. As the Supreme Court explained, "A universal injunction can be justified only as an exercise of equitable authority, yet Congress has granted federal courts no such power." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025). Relying on the types of remedies available historically under the Judiciary Act of 1789, the Supreme Court determined that

"[n]either declaratory nor injunctive relief … can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs" involved in a lawsuit. *Id.* at 844 (quotation marks omitted).

Here, AAUP and MESA plainly seek impermissible universal relief. *See* AAUP Br. at 46 ("The injunction that Plaintiffs seek would forbid Defendants from enforcing the Policy against *anyone*."), 47 (demanding relief for "all noncitizen students and faculty" in the alternative). They claim such relief is necessary to afford them complete relief, but "[t]he equitable tradition has long embraced the rule that courts generally may administer complete relief *between the parties*." *CASA*, 606 U.S. at 851 (quotation marks omitted) (emphasis in original). So the appropriate question is "whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* at 852 (quotation marks omitted) (emphasis in original). And even then, "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *Id.* at 854. Complete relief is a ceiling, not a floor.

*Doe v. Trump*, 157 F.4th 36 (1st Cir. 2025), does not hold otherwise. There, this Court granted relief beyond the parties because the Government

did not develop in the district court the narrower proposals for relief the Supreme Court discussed in *CASA*. *Id.* at 81-82. In *Doe*, there was *no* proposal for alternative relief before the district court. Here, the Government argued below that a universal injunction was unnecessary and that relief could be limited to AAUP and MESA's members at the time the suit was filed. *See* Dkt. #293 at 5-6, 10 (citing *Lujan*, 497 U.S. at 570 n.5; *Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 301 n.3 (5th Cir. 2005)). This is because the Court found the organizational harms to MESA were based primarily on effects of the putative mode of enforcement policy on its *members*. *See* Dkt. #261 at 113 (noting "a reduced anticipated participation in [MESA's] flagship annual meeting," and the self-censorship of "members"). Accordingly, MESA's organizational harms do not justify universal injunctions. The same applies should this court decide AAUP has organizational standing. Relief should be limited to AAUP and MESA's members.

Even so, Plaintiffs argue that narrower relief "would be unworkable" because AAUP and MESA have a "changing list of over 50,000 members around the country." AAUP Br. at 47. They complain about the burden of having to identify and disclose their membership to the Government. *Id.* at 46. But the associational plaintiffs in *CASA* made the same arguments—that it would

be burdensome to "identify and disclose to the government" their membership—and the Supreme Court rejected them. *See CASA*, 606 U.S. at 865 (Thomas, J., concurring) ("the Court today readily dispatches with the individual and associational respondents' position that they require a universal injunction, notwithstanding their argument that a 'plaintiff-specific injunction' would be difficult to administer").

AAUP and MESA also argue that relief narrower than a universal injunction will "undermine the 'very national consistency' that immigration laws are 'designed to protect.'" *See* AAUP Br. at 47 (citations omitted). This argument is unpersuasive because *CASA* itself, like this case, involved a challenge to the Executive Branch's enforcement of an Executive Order concerning the operation of an INA provision. *See CASA*, 606 U.S. at 838-39; *see also* Executive Order 14160, *Protecting the Meaning and Value of American Citizenship*, §1 (discussing 8 U.S.C. §1401). As the Court indicated in *CASA*, if an alien who is not party to this lawsuit wants to challenge the "policy" at issue here, "she must file her own suit." *See CASA*, 606 U.S. at 852.

AAUP and MESA argue, in the alternative, that the universal injunction could be limited to all alien students and faculty. Again, the harms to MESA were based primarily on effects of the putative mode of enforcement policy on

its *members*. *See* Dkt. #261 at 113. So a universal injunction is unnecessary. Moreover, granting universal relief when party-specific relief is available, even if imperfect or incomplete, would render *CASA* a dead letter. The Court must therefore decline to order a universal injunction. *See CASA*, 606 U.S. at 841 ("Congress has granted federal courts no such power"), 854 ("Complete relief is not a guarantee—it is the maximum a court can provide.").

### D. An Injunction Against Government Speech, Including Speech by Cabinet Level Officers, Would Violate Their First Amendment Rights

For all the above reasons, a general injunction against Government speech is also inappropriate. *See* AAUP Br. at 45. In addition, such an injunction would only be at issue if the Court determines that it was error for the district court to dismiss Count II, which claimed that the generalized threats alone violated the First Amendment. The district court did not err. *See supra* 35-41. Even so, restricting Government speech would be an outrageous remedy and inappropriate and unworkable here. The Government and its employees also have First Amendment rights. *See Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013) ("Not only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern."). The Government "has the right to speak for itself, is entitled to say what it

wishes, and to select the views that it wants to express." *Pleasant Grove City*, 555 U.S. at 467-68 (cleaned up); *see Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) (holding that the electoral process provides a check on government speech). AAUP and MESA below cited *Garcetti v. Ceballos*, 547 U.S. 410 (2006), as authority to support their argument that restricting Government speech was an appropriate remedy. That case, however, involves restrictions on speech placed by the Government on its employees in their official duties. *See id.* at 421. Here, AAUP and MESA seek to restrain speech of public officials, including cabinet level officials, putting the district court in the position of holding hearings to determine whether speech constitutes a threat violative of an injunction or the official carrying out their "obligation to speak out about matters of public concern." *Goldstein*, 719 F.3d at 30. This sort of policing of the Executive Branch's speech by the Judiciary would also violate separation-of-powers principles. *See supra* 51-52.

An injunction on Government speech would be difficult or impossible to administer given that "[e]very order granting an injunction" must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d); *see also Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 167 (D.C. Cir.

2017) ("a court may not require an agency to render performance that is impossible"); *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753, 753 (2025) (directing "due regard for the feasibility of any compliance timelines" the district court orders). So an injunction must "be framed so that those enjoined will know what conduct the court has prohibited." *Axia NetMedia Corp. v. Mass. Tech. Park Corp.*, 889 F.3d 1, 12 (1st Cir. 2018) (citation omitted). The specificity requirements are necessary to "prevent uncertainty and confusion" and "avoid basing a contempt citation on a decree too vague to be understood." *NBA Props. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990) (cleaned up). In the context of an injunction against Government speech, the district court's need to impermissibly micromanage Government speech, and the Government in general, would risk contempt proceedings owing to what will necessarily be vague speech requirements that, themselves, violate the First Amendment's free-speech clause.

## CONCLUSION

The Court should reverse the judgment of the district court that it had jurisdiction over AAUP and MESA's claims and direct that the case be dismissed. Alternatively, the Court should reverse the district court's judgment that AAUP and MESA established a First Amendment and APA violation. At

a minimum, the Court should vacate the Sanction portion of the district court's remedy order and deny AAUP and MESA's request for injunctive relief.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
*Civil Division, U.S. Department of Justice*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

/s/ Paul F. Stone
PAUL F. STONE
*Assistant Director*
*National Security Unit*
VICTORIA SANTORA
*Senior Counsel for National Security*
JESSE BUSEN
RACHEL BERMAN-VAPORIS
*Counsel for National Security*

*Office of Immigration Litigation*
*Civil Division, U.S. Department of Justice*
*Post Office Box 878, Ben Franklin Station*
*Washington, D.C. 20044*
*Telephone: (202) 305-9647*
*Facsimile: (202) 307-8698*

OCTOBER 29, 2026 ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I certify that this Brief for Defendants – Appellants/Cross-Appellees complies with the word limit of Rule 31(a)(7)(B)(i), of the Federal Rules of Appellate Procedure, because, excluding the parts of the documents exempted by Rule 32(f), the brief contains 12,193 words. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it is prepared in a proportionally spaced typeface using MS Word in 14-point Century Expanded BT.

/s/ Paul F. Stone
PAUL F. STONE
*United States Department of Justice*

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2026, I electronically filed the foregoing Brief for Respondent with the Clerk for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Paul F. Stone

PAUL F. STONE
*United States Department of Justice*